## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ALEX A., by and through his guardian, MOLLY SMITH individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>GOVERNOR JON BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS, in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections,<br><br>      Defendants. | Civil Action No. 3:22-CV-00573-SDD-RLB<br><br>**Memorandum in Support of Plaintiff's Emergency Motion for Temporary Restraining Order**<br><br>**IMMEDIATE RELIEF SOUGHT** |

## <u>INTRODUCTION</u>

On July 19, 2022, at a press conference called to address the failings of one of the state's juvenile facilities, Louisiana's Gov. Jon Bel Edwards announced a shocking plan: he declared that the state will "temporarily move" approximately 25 youth in the custody of the Office of Juvenile Justice ("OJJ") from Bridge City Center for Youth ("BCCY"), a juvenile secure care facility, to the Louisiana State Penitentiary ("LSP").[1]  LSP, commonly known as Angola Prison, is the notoriously dangerous maximum security adult prison for men—the largest in the United States.[2] Through these transfers, Defendants have knowingly and wrongfully placed the lives, health, and

---

[1] https://wgno.com/news/louisiana/today-3-p-m-governor-edwards-to-address-recent-issues-at-a-louisiana-juvenile-detention-center/ (video portion, beginning at 5:35).

[2] Anat Rubin, Tim Golden & Richard A. Webster, *Inside the U.S.'s Largest Maximum-Security Prison, COVID-19 Raged. Outside, Officials Called Their Fight a Success*, https://www.propublica.org/article/inside-the-uss-largest-maximum-security-prison-covid-19-raged.

1

emotional well-being of the children under OJJ's charge at substantial risk of serious, irreparable harm. Because this would be a flagrant violation of Plaintiff's constitutional and statutory rights, Plaintiff Alex A. seeks a temporary restraining order preventing the Defendants from moving him and other youth to LSP.

## FACTUAL BACKGROUND

Juvenile delinquency adjudications in Louisiana are civil, not criminal proceedings, and young people who are adjudicated delinquent are not confined for the purpose of punishment. The Louisiana Constitution explicitly provides that children in OJJ custody are confined solely for the purpose of receiving "rehabilitation and individual treatment" and requires the State in its role as "parens patriae" to manage "the welfare of the juvenile in State custody."[3] Defendants' plan to incarcerate children at LSP would subject the youth to conditions of confinement so seriously deficient in providing for their basic needs as to constitute punishment—rather than rehabilitation or treatment—in violation of their constitutional right to substantive due process under the Fourteenth Amendment to the United States Constitution.

Since 1974, with the passage of the federal Juvenile Justice and Delinquency Prevention Act (JJDPA), Congress recognized that young people should not be incarcerated in adult jails or prisons.[4] And, if ever youth are held in adult facilities under limited and extremely circumscribed circumstances, the JJDPA requires that juveniles not be confined in any institution where they may

---

[3] Pursuant to Louisiana Constitution Article V, § 19, the nature of the juvenile justice system is a non-criminal "focus on rehabilitation and individual treatment rather than retribution, and the state's role as *parens patriae* in managing the welfare of the juvenile in state custody." *In re C.B.*, 708 So. 2d 391, 397 (La. 1998).

[4] Juvenile Justice and Delinquency Prevention (JJDPA) (Pub. L. No. 93-415), 42 U.S.C. § 5601 et seq. The Act has been reauthorized most recently in 2018 with the Juvenile Justice Reform Act amendments. Pub. L. No. 115-385.

have sight and sound contact with adult incarcerated people.  34 U.S.C.A. § 11133(11)(B), (12), (13) (West) (stating that juveniles "shall not have sight or sound contact with adult [prisoners]"). Known as one JJDPA's core protections, sight and sound separation "mandates that incarcerated youths may not be placed in situations in which they have any clear visual or verbal contact that is `not brief and inadvertent' with adult incarcerated persons."[5]  The law was passed in part because "youths who are incarcerated with adults face a heightened risk of a multitude of dangers, including sexual assault and suicide" and was significantly strengthened in 2018.[6]

Although Gov. Edwards has claimed that the youth would be held in a separate location from adults at LSP, and that youth transferred to LSP will have counseling, educational programming, and other services, those claims are unsupported by any plan. Indeed, despite repeated calls by community advocates for Defendants to articulate their plan to provide necessary services to youth at LSP, Defendants have failed to provide any information about how they will assure the constitutional rights of youth at LSP to rehabilitation and treatment are protected at LSP. As one former top OJJ official noted, the move to transfer youth from juvenile facilities to LSP is "abhorrent" and "the worst juvenile justice policy decision probably ever made in modern times."[7]

Almost five thousand men are incarcerated at LSP, with over eighty-four percent of the population locked up for crimes of violence.[8]  LSP is commonly referred to as Angola due to its

---

[5] Lauren Knoke, *See No Evil, Hear No Evil: Applying the Sight and Sound Separation Protection to All Youths Who Are Tried as Adults in the Criminal Justice System*, 88 Fordham L. Rev. 791, 794 (2019).

[6] 88 Fordham L. Rev. at 794-795.

[7]  https://www.nbcnews.com/news/us-news/louisiana-sending-youth-angola-prison-rcna39150; *see also* Exhibit 1 (declaration of Glenn Holt).

[8] La. DPS&C website, LSP "Facility Breakout" link at  https://wgno.com/news/louisiana/today-3-p-m-governor-edwards-to-address-recent-issues-at-a-louisiana-juvenile-detention-center/ (last visited Aug. 19, 2022).

origins as a forced labor camp before the Civil War, when it was called the "Angola Plantations" and owned by Isaac Franklin.[9]  Given the fact that 83% of youth in OJJ's secure care system are Black, it is statistically likely that Black youth will disproportionately suffer the brunt of the Governor's transfer plan.[10]

LSP cannot provide basic, humane care for the adults within its gates, let alone children. In 2021, Chief Judge Shelly Dick found "that [the Louisiana State Penitentiary] lacks the infrastructure necessary to provide a constitutionally adequate health care system for patients with serious medical needs," and "overwhelming deficiencies in the medical leadership and administration of health care at [the prison] contributes to these constitutional violations."[11]  In addition to regular COVID-19 outbreaks, LSP is currently under a boil water alert due to broken infrastructure.[12]  If LSP cannot protect the constitutional rights of the almost five thousand adults in its custody and care, how it will be able to provide care to Plaintiffs and the other children placed there?  Defendants' unconstitutional actions place Plaintiff and members of the class at risk of serious harm and lifelong trauma.[13]

The transfer of many of the young people from OJJ's Bridge City center for youth to LSP

---

[9] See, e.g., https://www.blackpast.org/african-american-history/institutions-african-american-history/louisiana-state-prison-angola-1880/#:~:text=Angola's%20origins%20as%20a%20prison,addition%20to%20the%20Angola%20Plantation. Franklin also owned Franklin and Armfield, the largest enslaved people trading firm in the United States.

[10] https://ojj.la.gov/wp-content/uploads/2022/03/OJJ-Indicators-2021Q4.pdf

[11] *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *4 (M.D. La. Mar. 31, 2021), *reconsideration denied*, No. CV 15-318-SDD-RLB, 2021 WL 5287856 (M.D. La. Oct. 8, 2021).

[12] https://www.theadvocate.com/baton_rouge/news/crime_police/article_430d2b12-19c9-11ed-a2da-5b4ee0eea08d.html

[13] Exhibit 1.

also violates Plaintiff's federal statutory rights.  Plaintiff Alex A., along with other putative class members, is a student with a disability under Section 504 of the Rehabilitation Act. Alex A. previously had an Individual Accommodations Plan under Section 504 and now receives special education, related services, and accommodations under an Individualized Education Program. Plaintiff's status as a child with a disability entitles him to educational accommodations and other services under federal law to ensure equal and nondiscriminatory access to the classroom. *See Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 990 (5th Cir. 2014).  As a maximum-security adult prison, LSP does not have a school capable of providing those services and Defendants have provided no plan for ensuring these students receive lawful education and services while at LSP for an indefinite period of time.

Time is of the essence, as media reports that Defendants would relocate youth to LSP "as soon as possible[14] and Defendants' staff tell BCCY youth that the transfers will occur "any day now."[15] Accordingly, on behalf of himself and all children currently confined in OJJ's secure care facilities at risk of being transferred to LSP, Plaintiff seeks a temporary restraining order immediately enjoining Defendants (1) from incarcerating Plaintiff or any proposed Class Member at LSP and (2) to return any youth adjudicated delinquent who have been transferred to LSP, back to OJJ youth facilities.

Pursuant to the Governor's plan, youth at the Bridge City Center for Youth who are not participants in the Juveniles Understanding and Managing Problematic Behavior Program

---

[14] https://wgno.com/news/louisiana/today-3-p-m-governor-edwards-to-address-recent-issues-at-a-louisiana-juvenile-detention-center/.

[15] Exhibit 2, redacted Declaration of Alex. A.

("JUMP") will be imminently moved to LSP.  As of July 19, 2022, at least 25 children are confined in BCCY; all 25 children are at risk of relocation to LSP, with BCCY continuing to accept and release new youth on a weekly basis.

### A.  The Inappropriateness of LSP For Rehabilitation of Youth

LSP is one of the most notorious prisons in the country.  Located on former plantation grounds, it holds nearly five thousand adult men in a maximum security facility, with over 84% of the population held for crimes of violence and sentenced to hard labor.[16]   One building identified to hold Alex A. and his peers is the former housing for death row prisoners at LSP.  It contains individual cells, not dorm style housing—which is the research-based best practice for juvenile justice facilities.[17]   And although the building itself is separate from the other areas of the prison, other services required by the youth will not be separate.  Importantly, LSP's daily functions are carried out by incarcerated adults—including, but not limited to, maintenance services, food preparation and grounds keeping.  Given this reliance on prisoner labor, the adult prisoners are present throughout the grounds of LSP.  If the youth ever leave the building they are held in for any reason, including outdoor recreation, they could encounter adults who are incarcerated at LSP. Neither OJJ nor the Governor have provided satisfactory explanations as to how they will be able to ensure that children in OJJ custody are not in contact with adults who are incarcerated at Angola. The state's mere conclusory assertions that it will not put children in contact with adults is belied by the structure of Angola and the reliance on adult labor. Furthermore, if a young person gets sick

---

[16] La. DPS&C website, LSP "Facility Breakout" link at https://wgno.com/news/louisiana/today-3-p-m-governor-edwards-to-address-recent-issues-at-a-louisiana-juvenile-detention-center/.

[17] *See* Annie E. Casey Foundation, *The Missouri Model*,  https://assets.aecf.org/m/resourcedoc/aecf-MissouriModelFullreport-2010.pdf.

or injured, they will need to go to the infirmary, where they will certainly encounter adults who are incarcerated at the facility.

Further, OJJ's conclusory, non-specific assurances that it will hire staff to ensure sight and sound separation are insufficient to meet the agency's obligations. On their face, these assurances are not believable, given the significant staffing issues that both OJJ and the Department of Corrections are currently facing. In June of 2022, the Governor announced that staff members from the Department of Corrections would be brought into OJJ facilities to address understaffing issues plaguing the OJJ facilities. At the time, Defendant Sommers acknowledged that "we're facing some major challenges with staff."[18] The Department of Corrections is also facing chronic understaffing issues at prisons across the state.[19] In March 2022, Defendant Le Blanc explained that "staffing remains the biggest challenge for the department."[20] At that time, the department was short 1,275 employees "through a combination of unfilled positions and staff that was out on leave across the state's sprawling corrections system."[21] Given the staffing shortages that are endemic to both OJJ and DOC, it will simply be impossible for OJJ to fill all necessary positions to set up the complete rehabilitative programming that children like Alex A. would need at Angola prison.

---

[18] Kenny Kuhn, *Governor Edwards to Send State Police to Help Staffing Shortage at Two Troubled Youth Centers*, WWL Radio New Orleans, https://www.msn.com/en-us/news/us/governor-edwards-to-send-state-police-to-help-staffing-shortage-at-two-troubled-youth-centers/ar-AAYBgsG.

[19] Paul Braun, *Low Wages, Poor Working Conditions Have Left State Prisons Understaffed, Officials Say*, WWNO, https://www.wwno.org/2022-03-08/low-wages-poor-working-conditions-have-left-state-prisons-understaffed-officials-say.

[20] *Id.*

[21] *Id.*

Public records requests reveal that Defendants have no plan to provide education, counseling, and other rehabilitative programming to Alex A.  In early August, the month Defendants set as the target for the transfer of youth to LSP, advocates sought "documents, plans, memoranda, or agreements related to the relocation of youth in OJJ custody to" LSP.[22]  The response from OJJ was simple: "The requested records do not exist at this time."[23]  The response was identical from the state entity responsible for providing education services to any youth at LSP.[24]  As recently as August 18, 2022, the DOC admitted it would not have responsive documents to a public records request for anything related to the plan to move youth to LSP for "at least 3-4 weeks."[25]  Defendants lack of any plans to provide the services Plaintiff and any youth transferred to LSP increases the importance of relief from his Court.

### B.  Constitutionally Deficient Health Care at LSP

LSP is in ongoing litigation regarding the quality of health care it provides, and courts have recognized the serious and persistent deficiencies in the provision of healthcare that the *adults* incarcerated at LSP receive.[26]  As such, with the imminent move of Alex A. and his peers to LSP, OJJ and the Department of Public Safety & Corrections ("DOC") must now ensure access to a constitutionally adequate mental or physical health care system for *youth*, when they are already

---

[22] *See*, Exhibit 3 (Aug. 4, 2022 email containing records request and response).

[23] *Id.*

[24] *See*, Exhibit 4 (Aug. 1-3, 2022 emails containing records request and response).

[25] *See*, Exhibit 5 (Aug. 17-18 emails containing records request and response).

[26] In 2021, Chief Judge Shelly Dick of this Court found in *Lewis v. Cain* "that [the Louisiana State Penitentiary] lacks the infrastructure necessary to provide a constitutionally adequate health care system for patients with serious medical needs," and "overwhelming deficiencies in the medical leadership and administration of health care at [the prison] contributes to these constitutional violations." No. 3:15-CV-318, 2021 U.S. Dist. LEXIS 63293 (M.D. La. Mar. 31, 2021).

woefully deficient in addressing the needs of adults.  Notably, however, LSP continues to experience frequent COVID-19 outbreaks and quarantines, and it is currently under a boil water alert.  The Department of Public Safety and Corrections is unable to provide the adults incarcerated at LSP with the safety, hygiene, and medical treatment and care they need, let alone address the complex needs of an influx of youth.

### C.  Youth Transferred to This Notorious Adult Prison Face a Grave Risk of Harm

Decades of research demonstrates the serious harms youth experience when they are incarcerated in adult jails and prisons. Youth in adult facilities are more likely to commit suicide, more likely to suffer from sexual assault and trauma, and more likely to experience exacerbated mental health challenges. These experiences can lead to long-term consequences for the mental and physical health of vulnerable youth in the juvenile and criminal legal system, the majority of whom have experienced significant trauma that can impact their responses to their surroundings.[27] As one former top OJJ official has explained, even just informing youth that they will be placed at an adult facility is likely to cause "mental anguish" for youth who have already experienced significant trauma in their lives.[28]

Youth in adult facilities are also more likely than their peers in juvenile facilities to be subjected to solitary confinement. Although adult prisons often rely on solitary confinement as a way to keep youth safe from incarcerated adults, it leads to serious and harmful consequences for

---

[27] National Child Traumatic Stress Network, *Complex Trauma: In Juvenile Justice System-Involved Youth*, https://www.nctsn.org/sites/default/files/resources/complex_trauma_in_juvenile_justice_system_involved_youth.pdf

[28] Erin Einhorn, *Teens in a Louisiana Juvenile Justice Facility Are Being Sent to Angola Prison. Experts Say It's Not Only Cruel, It Could Violate the Law*, NBC News, https://www.nbcnews.com/news/us-news/louisiana-sending-youth-angola-prison-rcna39150.

vulnerable youth. Solitary confinement has been linked to increased rates of suicide, depression, and anxiety.[29] Youth in particular are especially vulnerable to severe mental and physical harm as a result of solitary confinement, including developmental delay and psychosis.[30] When youth are placed in solitary confinement, they are frequently not given access to education and mental health programming, and they are not permitted to communicate with their families.[31] As a result, they are not able to participate in the rehabilitative programming necessary for their growth and development.[32]

As a maximum-security prison notorious for unsafe and violent conditions, youth transferred to LSP will experience these serious and well-documented harms, leading to grave consequences. Adult prisons were not developed to meet the needs of children. Adult prisons lack the academic, vocational, and social skill building education that adolescents needs. Rather than providing these services, adult prisons serve as a "school for crime" where children learn and see reinforced norms of domination, exploitation, and retaliation – all while their adolescent brains are forming and developing.[33] Even short periods of time in adult facilities have been linked to high

---

[29] *See* Timothy Williams, *Locked in Solitary at 14: Adult Jails Isolate Youths Despite Risks*, New York Times, https://www.nytimes.com/2015/08/16/us/citing-safety-adult-jails-put-youths-in-solitary-despite-risks.html?_r=1.

[30] *Growing up Locked Down*, ACLU and Human Rights Watch, https://www.aclu.org/files/assets/us1012webwcover.pdf.

[31] *Id.*

[32] *Id.*

[33] *See* James C. Howell, et al., Bulletin 5: Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know (Study Group on the Transitions between Juvenile Delinquency and Adult Crime) 11 (2013), ojp.gov/pdffiles1/nij/grants/242935.pdf (accessed Sept. 22, 2021).

rates of suicide as well as serious paranoia, anxiety, and depression for youth.[34] Because LSP is not equipped to provide education, mental health programming, or other forms of rehabilitation, youth moved to LSP will also be less likely to progress on their rehabilitative journey so that they can return home to their families healthy and whole.

### D. Plaintiff Alex A. and Members of the Class

Plaintiff Alex A. is a 17-year-old male currently in the secure care custody of OJJ at BCCY. As a youth residing at BCCY who is not enrolled in JUMP, Alex A. meets the criteria for relocation to LSP under the Governor's plan. Indeed, Alex A. has been informed that he, along with approximately 24 other youth in BCCY, will be imminently transferred to LSP.[35]

As a minor, Alex A. has a right to an education under Louisiana state law, and this right is not forfeited upon entering state custody. Along with other putative class members, Alex A. is a child with a disability who is entitled to receive education accommodations and other services under federal law, including Section 504 of the Rehabilitation Act. Alex A. previously had an Individual Accommodation Plan under the Rehabilitation Act and now receives special education services and accommodations through his Individualized Education Program. He is among the up to 70% of youth in detention that have educational or other disabilities. As part of his legal right to rehabilitation and treatment in OJJ custody, Alex A. —like his similarly-situated peers— requires comprehensive and frequent access to anger management treatment, substance abuse counseling, and other types of therapy and counseling. He has been diagnosed with a learning

---

[34] Campaign for Youth Justice, *Jailing Juveniles: The Dangers of Incarcerating Youth in Adult Jails in America* (Nov. 2007).

[35] Exhibit 2.

disability, and also has been prescribed medication to address post-traumatic stress disorder, to help him sleep, and to address nightmares.

While at BCCY, Alex A. attends school every weekday for five hours.[36]  His classes include social studies, math, English, and science.  He has different teachers and changes classrooms for each subject.  As a student with a disability, he receives classroom accommodations to help him access material in the classroom, including the use of a calculator and read aloud services.  He also has the assistance of a special education teacher in his classes who helps to deliver his services.  In addition to regular school, he is provided with opportunities to explore his hobbies by reading at the library and exploring books about sports and life in the city.  He receives intensive counseling and treatment services at BCCY, including participating in group counseling three times a week for an hour, individual counseling for at least thirty minutes twice a week, and meeting every two weeks with a social worker to discuss skills like coping and anger management.

Alex A. first learned that he and his peers would be moved to LSP while watching television news at BCCY.  Since then, he has experienced significant mental and physical harm, including increased difficulty sleeping and extreme stress.  During sleepless nights, he has started to pull out his hair. Plaintiff fears that he will be subjected to unsafe conditions and violence at LSP.  Already, the Louisiana Department of Public Safety & Corrections (DOC) staff that have been brought into BCCY have begun using mace on Plaintiff and the other youth at the facility and he is afraid these actions will only intensify at LSP.  Additionally, Plaintiff is concerned that he will not receive the same level of treatment, counseling, and education he receives at BCCY.

---

[36] *Id.*

Like Plaintiff, his peers at BCCY are also terrified of being moved to LSP. Plaintiff has seen his peers break down and cry because of their fear of being moved to LSP.

Staff members at OJJ have continually told Plaintiff that he will be imminently moved to LSP. When the decision to move BCCY youth to Angola was first announced, Plaintiff was informed by BCCY employees that he would be moved within a week or two of the announcement. Later, he was informed that he and his peers would be moved to LSP on August 15 or August 16. When that did not happen, staff members told him that he would be moved "any day now."[37] Based on these representations, Plaintiff reasonably believes that the move is imminent and could happen at any time.

Like her son, Alex A.'s mother and next friend, Molly Smith, is deeply concerned about Defendants' imminent plan to move youth to LSP. Ms. Smith is terrified that her son will be locked in a windowless cell for 24 hours a day, or that he will be exposed to adults who are incarcerated at LSP. She is also concerned that her son will be deprived of the education, medical and mental health treatment, and rehabilitative services he requires when he is moved to LSP.[38]

Alex A. filed an Emergency Grievance pursuant to OJJ's Administrative Remedy Procedure ("ARP") on Tuesday, August 16, 2022. Despite the imminent nature of Plaintiff's anticipated move to LSP and the serious physical and psychological harm Plaintiff is already experiencing as a result, OJJ responded on August 18, 2022 by stating that Plaintiff is "not subject to any immediate risk of harm" and therefore his ARP would be reviewed "within the regular ARP

---

[37] *Id.*

[38] *See*, Exhibit 6 (declaration by Molly Smith).

time limits."[39]  OJJ's failure to properly treat Plaintiff's grievance as an emergency grievance that requires an expedited timeline has made the grievance process unavailable to Plaintiff.[40] As a result, Plaintiff has exhausted all available administrative remedies and represents the Class in this action.

### E.  Deficient Education under OJJ and at LSP

In order to deliver much-needed educational programs to youths such as Alex A. in an effective, trauma-informed, and youth-focused manner, there must be adequate and well-trained staff available to provide regular therapies.  But LSP does not have these programs or available staff to fill this extreme need.  This remains true even if OJJ staff is slated to provide staffing and oversight at LSP as has been reported.  In fact, over the last several years, OJJ itself has struggled to provide coordinated general and special education at its existing facilities.[41]  These facilities are already severely understaffed and are failing to provide students with the credits they need to enroll in their community schools upon release.[42]

OJJ's schools consistently receive "F" scores on Louisiana's School Performance Score metric, ranking them at the bottom of all schools in the state in academic performance and other

---

[39] *See*, Exhibit 7 (administrative remedy filed on behalf of Plaintiff and OJJ response, filed under seal).

[40] *See Ross v. Blake*, 578 U.S. 632, 644 (2016) (observing that a prison's administrative grievance process is unavailable if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation").

[41] *See* Beth Schwartzapfel, *"No Light, No Nothing." Inside Louisiana's Harshest Juvenile Lockup*, The Marshall Project, https://www.themarshallproject.org/2022/03/10/no-light-no-nothing-inside-louisiana-s-harshest-juvenile-lockup

[42] *See* Southern Educ. Found., Just Learning: The Imperative to Transform Juvenile Justice Systems into Effective Educational Systems (2014), https://tinyurl.com/fvmpw286 (finding that just 8% of students in juvenile prisons in Louisiana earn high school course credits during their time in custody).

student success outcomes.[43]  Schools in OJJ's secure care facilities are frequently closed for days, weeks, and even months at a time, and loss of education has been exacerbated by the COVID-19 pandemic.  Compounding the inherent struggles of OJJ with juvenile education, the education system for adult prisoners at LSP is fundamentally problematic.  At LSP there are long waitlists for adult students to be accepted into school to prepare for high school equivalency exams.  Due to frequent COVID-19 outbreaks, classes are often cancelled.  And there is not a clear process for evaluating adult students' needs or disabilities.

**F. Demand Letters From the Community and Representatives of Youth Go Unanswered**

Concerned about the educational circumstances surrounding the relocation of youth to LSP, the Louisiana Center for Children's Rights, Loyola Law Clinic, and Southern Poverty Law Center sent a demand letter to OJJ, the DOC, the Special School District, and the Louisiana Department of Education.[44]  This letter demanded a plan to ensure consistent and legally compliant general and special education for children that are to be moved to LSP.  Although the relocation of these children is imminent, OJJ could only respond that it is still "in the process" of "develop[ing] a comprehensive plan,"[45] and none of the other agencies provided any response.  If Alex A. and his peers are moved now, no plan will be in place for these students to receive lawful education or other services while at LSP.

A letter to Governor Edwards, sent by Disability Rights of Louisiana, Families and Friends of Louisiana's Incarcerated Children, Louisiana Center for Children's Rights, and Jack Harrison

---

[43] *See* Louisiana Believes, *Riverside Alt. High Sch.*, https://tinyurl.com/4yncbnch; Louisiana Believes, *Southside Alt. High Sch.*, https://tinyurl.com/yhrfjvap.

[44] *See*, Exhibit 8 (Demand Letter, August 3, 2022).

[45] *Id.*

(Director, LSU Law Center Juvenile Defense Clinic), expressed similar outrage at the plan to move the youth to LSP.  That letter made clear that LSP is an unacceptable place for children, and demanded the Governor halt this transfer of youth to prevent the unconstitutional treatment of children in OJJ custody.[46]  This letter further demands an alternative approach that involves a depopulation strategy, an investment in and access to educational and holistic rehabilitative services for children, and a special meeting of the Juvenile Justice Reform Act Implementation Commission to review alternative options. To date, there has been no response to this letter.

## LEGAL ARGUMENT

A preliminary injunction is warranted if the movant demonstrates: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.  *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).  The same factors apply to a motion for temporary restraining order (TRO).  *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).  Plaintiffs satisfy each of these requirements.  Moreover, where circumstances are such that even the time needed to hear a request for a preliminary injunction is too long to prevent irreparable harm, a TRO may issue while a court considers a request for a preliminary injunction. *See* Charles Alan Wright, et al., *Temporary Restraining Orders*, 11A Federal Practice and Procedure § 2951 (3d ed. 2019); *see also Callet v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974)

---

[46] *See*, Exhibit 9 (Aug. 2, 2022 demand letter).

16

(Courts are authorized to enter habeas relief pending a full disposition on the merits of a petition).  This is the situation here, as the Defendants plan to transfer young people imminently[47], and Plaintiff has been informed by staff members at BCCY that the move could happen any day.[48]

Because the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," and "given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  "A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Id.* (citation omitted).  Instead, to "show a likelihood of success, the plaintiff must present a prima facie case"—"not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,* 710 F.3d 579, 582 (5th Cir. 2013).  Indeed, the U.S. Supreme Court has cautioned against "improperly equat[ing] "likelihood of success" with "success" when considering requests for preliminary injunctions. *See Camenisch*, 451 U.S. at 394.

## I.    Plaintiffs Have Established a Substantial Likelihood of Success on the Merits.

Plaintiffs have a substantial likelihood of success on the merits because they "present a

---

[47] *See*, Exhibit 10 (Governor Jon Bel Edwards July 19, 2022 press release).

[48]  Exhibit 2.

p*rima facie* case."[49]  The evidence proves that Defendants' move of children to LSP without a plan

to guarantee their health, safety and rights to education and rehabilitative services is objectively

unreasonable and rises to the level of deliberate indifference, in violation of the Fourteenth

Amendment to the U.S. Constitution.  Defendants cannot satisfy their obligations to Plaintiffs with

disabilities under Section 504 of the Rehabilitation Act while they are incarcerated at LSP either,

and thus the use of LSP to house those Plaintiffs is also objectively unreasonable.

> **A.    Plaintiffs Have Shown Their Constitutional Rights are Violated by the Unreasonable Risk of Harm to Them at the Adult Louisiana State Penitentiary.**

For more than half a century, the United States Supreme Court has repeatedly reaffirmed

that "[c]hildren have a very special place in life which law should reflect." *May v. Anderson*, 345

U.S. 528, 536 (1953) (Frankfurter, J., concurring); *see also J.D.B. v. North Carolina*, 564 U.S.

261, 272 (2011) ("'[O]ur history is replete with laws and judicial recognition' that children cannot

be viewed simply as miniature adults.") (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115–16

(1982)). The basic principle that children are different from adults, and that the "distinctive

attributes of youth" have legal significance, is reflected in a diverse array of constitutional contexts,

ranging from First Amendment protections, to the reasonableness of searches, to the protection

against cruel and unusual punishment. *See, e.g.*, *Miller v. Alabama*, 132 S. Ct. 2455, 2464 (2012)

("[C]hildren are constitutionally different from adults for purposes of sentencing."); *J.D.B.*, 564

U.S. at 272 (explaining that children "'are more vulnerable or susceptible to . . . outside pressures'

---

[49] Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11A Federal Practice & Procedure § 2948.3 (2d ed. 1995); *see also Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011) (noting that plaintiffs are "not required to prove [their] entitlement to summary judgment" to show likelihood of success on the merits).

than adults," and adopting a "reasonable child" standard for determining the scope of *Miranda*

protections) (quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2005)); *Safford Unified Sch. Dist. No.*

*1 v. Redding*, 557 U.S. 364, 379 (2009) (relying upon the unique vulnerability of adolescents, and

their heightened expectation of privacy, to hold a suspicionless strip search unconstitutional in the

school context). For young people in state custody, this principle takes on heightened importance.

These youth, who have been removed from the custody of their parents and often have complex

histories and needs, are entirely dependent upon the state for their care, safety, and well–being.

Moreover, the state has assumed custody of these children not for the purpose of punishing

them, but to provide treatment to help them rehabilitate and grow into successful adults. As

Louisiana law recognizes, the state owes youth adjudicated delinquent not only the duty to

provide safe conditions and protect them from harm, but also the duty to provide rehabilitative

treatment. In the words of the Louisiana Supreme Court,

> [T]he unique nature of the juvenile system is manifested in its noncriminal, or civil, nature,
> its focus on rehabilitation and individual treatment rather than retribution, and the state's
> role as parens patriae in managing the welfare of the juvenile in state custody.

In re C.B., 708 So.2d 391, 396-7 (La. 3/11/98). The Louisiana Children's Code not only highlights

the juvenile justice system's focus on rehabilitation and individual treatment, but specifically

points to the state's duty to act as a parent with respect to children in custody.  The Children's

Code provides:

> The provisions of this Code shall be liberally construed to the end that each
> child and parent coming within the jurisdiction of the court shall be accorded
> due process and that *each child shall receive, preferably in his own home, the*
> *care, guidance, and control that will be conducive to his welfare*.

La. Ch. C. art. 102 (emphasis added). As the Louisiana legislature declared, it is the public

policy of the state that:

> [C]ommitment of a juvenile to the care of the department [OJJ] is not punitive nor in anywise to be construed as a penal sentence, but as a step in the total treatment process toward rehabilitation of the juvenile and that, therefore, the recommendations of the department should be given careful consideration by the court in determining what is to the best interest of the juvenile.

La. R.S. § 15:906A(2); State v. J.R.S.C., 00-2108 (La. 06/01/01), 788 So.2d 424.

### B. The Fourteenth Amendment Accords Youth in Custody Heightened Protections, Including the Right to Rehabilitative Treatment

The United States Supreme Court has held that the state has heightened duties toward confined individuals under the Fourteenth Amendment where the purpose of the confinement is not punitive. In *Youngberg v. Romeo*, 457 U.S. 307 (1982), the Court explained that involuntarily committed individuals "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321–22. In light of that difference in purpose, the Court concluded that the committed individual in that case had the right to "minimally adequate or reasonable training," in addition to the basic rights to safe conditions and freedom from undue restraints provided to all confined individuals. *Id.* at 319. The Court has similarly extended additional protections to pretrial detainees, holding, in *Bell v. Wolfish*, that because they have not been "convicted of any crimes," pretrial detainees cannot be subjected to conditions that "amount to punishment." 441 U.S. 520, 535, 545 (1979); *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015) (clarifying that the Fourteenth Amendment excessive force standard applicable to pretrial detainees is indeed more protective than the Eighth Amendment standard).

Based upon the Supreme Court's reasoning in *Youngberg* and *Bell*, courts around the country have concluded that the Fourteenth Amendment provides heightened protections to youth adjudicated delinquent. Like pretrial detainees and involuntarily committed patients,

youth in state custody due to a delinquency adjudication are not confined for punitive purposes. Recognizing the rehabilitative purpose of the juvenile justice system and the state's responsibility toward the young people in its care, many courts have held that children in state custody are entitled to additional protection under the Fourteenth Amendment. *See, e.g.*, *Nelson v. Heyne*, 491 F.2d 352 at 360 n.12 (7th Cir. 1974); *A.M. v. Luzerne Cnty. Juvenile Detention Ctr.*, 372 F.3d 572, 579 (3rd Cir. 2004) (analyzing conditions claims that arose both before and after plaintiff's delinquent adjudication under the *Youngberg* standard); *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987) (applying the Fourteenth Amendment standard because "the Oregon juvenile justice system is noncriminal and nonpenal"); *Santana v. Collazo*, 714 F.2d 1172, 1180- 83 (1st Cir. 1983) (concluding that the Fourteenth Amendment applies because juveniles have not been convicted of crimes and so are entitled to a higher level of scrutiny of their conditions of confinement).

Plaintiffs are entitled to injunctive relief under the Fourteenth Amendment because the evidence demonstrates that Defendants' transfer of children to the adult Angola prison deprives children of their right to rehabilitative treatment and their right to be free from punishment[50] through unsafe conditions, and that this deprivation is objectively unreasonable because Defendants purposely or knowingly engaged in the actions.[51]  *Lawrence v. Geautreaux*, No.

---

[50] Defendants' actions constitute unconstitutional punishment. *See, e.g., Bell,* 441 U.S. at 535 ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); *Parker v. Carpenter*, 978 F.2d 190, 193 (5th Cir. 1992) (ordering evidentiary hearing on whether transfer to more violent wing was punitive).

[51] The Supreme Court has clarified that the Eighth Amendment has no place in the analysis of the rights of students in school but has never explicitly addressed the standard to apply in juvenile detention facilities. *See Ingraham v. Wright*, 430 U.S. 651 (1977).  The Court has recognized that those involuntarily committed for other non-punitive reasons, such as involuntary commitment for mental health treatment, must be treated differently from prisoners and

CV 19-206-BAJ-RLB, 2021 WL 6751211, at *2 (M.D. La. July 22, 2021), *report and recommendation adopted*, No. CV 19-00206-BAJ-RLB, 2022 WL 264535 (M.D. La. Jan. 27, 2022) (adopting the *Kingsley* standard in an excessive force case involving a pretrial detainee, finding that no proof of subjective intent is necessary, only that the actions "purposely or knowingly used against" the individual were unreasonable.) (*quoting Kingsley*, 135 S. Ct. at 2473).[52]

Punishment—and therefore deliberate indifference—is established if the jailer's conduct is either not rationally related to a legitimate, nonpunitive government purpose or excessive in relation to that purpose. *Bell*, 441 U.S. at 561; *Kingsley*, 135 S. Ct. at 2473–74; *see also Alderson*, 848 F.3d at 424. Both elements are satisfied here. Even if OJJ had run out of appropriate space for youth deemed to need a secure rehabilitative youth center placement, which it has not, this transfer would be inappropriate because it is in no way rationally related to the rehabilitative purpose of youth delinquency placements.[53] Indeed, Defendants' plan is excessive in relation to the course of conduct that would actually achieve their rehabilitative purpose: providing adequate and well-trained staffing in its youth facilities rather than shipping

---

must not be punished with unsafe conditions. *Youngberg v. Romeo*, 457 U.S. 307 (1982). Some Circuits have explicitly established a Fourteenth Amendment right to rehabilitation for youth in the juvenile justice system. *See, e.g.*, *Nelson v. Heyne*, 491 F.2d 352, 360 (7th Cir. 1974). The Fifth Circuit has not decisively answered the question— and the only case to address the issue arose out of a Texas case without a clear right to rehabilitation and preceded the U.S. Supreme Court's decision in *Youngberg* as well as its subsequent holdings in *Roper*, *Graham*, and *Miller* that the law must take into account the unique developmental status of youth. *See Morales v. Turman*, 562 F.2d 993, 999 (5th Cir. 1977) ("even if such a right to treatment does exist," the court did not need to reach a holding on that matter because the Eighth Amendment analysis sufficed to address the facts at issue.).

[52] In the context of pretrial detention of adults, the Fifth Circuit has held that the same subjective deliberate indifference standard applies to both the Eighth and Fourteenth Amendments. See *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 648-49 (5th Cir. 1996). But that case *precedes* the Supreme Court's holding to the contrary in *Kingsley* and does not apply in the juvenile justice system, where the sole purpose of confinement is rehabilitation.

[53] Bridge City has space – the space where the Plaintiffs are currently housed.

the youth out to an adult prison.  If they cannot adequately care for the number of youth at BCCY, Defendants should evaluate all youth held there for appropriateness for alternatives to secure detention and reduce the population through releases to such alternatives.

Plaintiffs have established that Defendants' actions and inactions likely constitute deliberate indifference to a substantial risk of serious harm.  *See Farmer*, 511 U.S. at 828, 114 S. Ct. at 1974. Under the objective test of deliberate indifference, the Court's consideration must be whether the children have been "expos[ed] to a substantial risk of serious harm."  *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018).

As the Governor has acknowledged publicly by his assurance that this transfer will be "temporary," there can be no serious dispute that holding teenagers in the adult LSP creates a substantial risk of serious harm.  Defendants' ill-planned transfer, with neither the staffing nor the planning for ensuring the safety, health, rehabilitative services and education of the young people who will be moved there, creates a grave and unnecessary risks.  Defendants' actions deprive Plaintiffs of the programming and education that are the core of the rehabilitative programming to which they are entitled.  Thus, Defendants' conduct is objectively unreasonable.  As the Court of Appeals stated in *Gates,* "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004).

Even if analyzed under the Eighth Amendment, which should not apply because Louisiana law does not confine juveniles for "punishment," youth confined for delinquency have greater rights and protections than adult prisoners.  *See Miller v. Alabama*, 132 S. Ct. at 2475 (striking down mandatory imposition of life without parole sentences for juveniles);

23

*Graham v. Florida*, 560 U.S. 48, 82 (striking down life without parole sentences for juveniles convicted of nonhomicide offenses); *Roper v. Simmons*, 543 U.S. at 578–79 (striking down the juvenile death penalty as unconstitutional); *see also Montgomery v. Louisiana*, 136 S. Ct. 718, 733 (2016) (holding *Miller* retroactive on collateral review). Each of these cases highlights the importance of adolescent status on the constitutional standard, with the Court emphasizing that children differ from adults in their maturity, susceptibility to outside influences, and capacity for change. *See, e.g.*, *Miller*, 132 S. Ct. at 2463–64 (explaining that these traits make children "constitutionally different from adults for purposes of sentencing"). Rules of criminal procedure that fail to take these characteristics into account, the Court has said, "would be flawed." *Graham*, 560 U.S. at 76.

Of particular relevance here, the Supreme Court has emphasized that adolescents' developmental characteristics render them more vulnerable to lasting psychological harm than adults. *See Roper*, 543 U.S. at 569 (explaining that adolescence is a period when youth are "most susceptible . . . to psychological damage") (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)). Because of this developmental vulnerability, conditions that are constitutionally acceptable for adults may be unduly harsh for children. *See Montgomery*, 136 S. Ct. at 732 ("[C]ertain punishments [are] disproportionate when applied to juveniles."); *Graham*, 560 U.S. at 70 (concluding that "[l]ife without parole is an especially harsh punishment for a juvenile").

## C.    Even if Analyzed Under the Eighth Amendment, Plaintiffs' Claim Would Succeed

The Fourteenth Amendment is the correct source of the Plaintiffs' constitutional rights to rehabilitative treatment. Even if the Court were to analyze Plaintiffs' claims under the Eighth

Amendment standard applicable to adults, however, given the Supreme Court's rulings, it must take into account the particular needs of juveniles. And the appalling inappropriateness of Angola prison as a rehabilitative placement for youth cannot pass constitutional muster under any standard.

The government has an affirmative duty to provide conditions of reasonable health and safety to the people it holds in its custody. As the Supreme Court has made clear,

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being . . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment . . . .

*DeShaney v. Winnebago County Dept. of Soc. Servs.,* 489 U.S. 189, 199-200 (1989). Conditions that pose an unreasonable risk of future harm violate the Eighth Amendment's prohibition against cruel and unusual punishment, even if that harm has not yet come to pass.

> That the Eighth Amendment protects against future harm to [prisoners] is not a novel proposition. The Amendment, as we have said, requires that prisoners be furnished with the basic human needs, one of which is "reasonable safety." It would be odd to deny an injunction to [prisoners] who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.

*Helling*, 509 U.S. at 33 (quoting *DeShaney*, 489 U.S. at 200). These foundational cases involve the protections of the Eighth Amendment, which applies to convicted adult prisoners. Plaintiffs here are civilly adjudicated delinquent and are not convicted of crimes. Thus, they are entitled to even greater protection. *J.D. v. Nagin*, No. CIV. A. 07-9755, 2008 WL 2522127, at *6 (E.D. La. June 20, 2008) (noting the many programs and services that are required to

provide to children in detention).  Like pretrial detainees, children adjudicated delinquent may not be punished at all, and are protected by the Fourteenth Amendment.  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); *id.* at n.16 (pretrial detainees retain greater protections than convicted counterparts); *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473-74 (2015) (requiring pretrial detainees need only show the objective prong of the "deliberate indifference" test in excessive force context); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415 (5th Cir. 2017) (concurring opinion suggesting that *Kingsley* should be extended to all pretrial detainee medical claims).

Because the legal protections for children are stronger than those for convicted adults, as a practical matter if they satisfy the Eighth Amendment test outlined here, Plaintiffs necessarily have also met their burden under the Fourteenth Amendment.  *See Alexander S. v. Boyd*, 876 F. Supp. 773, 796 (D.S.C. 1995) (observing that the Fourteenth Amendment standard "implicitly encompasses the protections of the Eighth Amendment").  Corrections officials have a constitutional obligation to protect incarcerated people from a substantial risk of serious harm.  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  Indeed, under both the Eighth and Fourteenth Amendments, jail officials "must provide humane conditions of confinement; must ensure that [prisoners] receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the [prisoners] [.]" *Id.* at 832 (internal quotation marks omitted).

Government officials violate this affirmative obligation by showing "deliberate indifference" to the substantial risk of serious harm.  *Farmer*, 511 U.S. at 828.  An obvious risk

26

such as the risk of incarcerating children in an adult facility where sight and sound separation is virtually impossible meets the standard. *Ball v. LeBlanc*, 792 F.3d 584, 594 (5th Cir. 2015) (court "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious") (citing *Farmer*, 511 U.S. at 842); *Hinojosa*, 807 F.3d at 667 ("open and obvious nature" of dangerous prison conditions supported an inference of deliberate indifference); <u>*J.D. v. Nagin*</u>, No. CIV. A. 07-9755, 2008 WL 2522127, at *6 (E.D. La. June 20, 2008) (Plaintiffs' allegations stated a claim for a violation under the Fourteenth Amendment, as they claimed that Defendants were "deliberately indifferent to … the risk of irreparable harm" to youthful offenders).

## II.    Plaintiffs With Disabilities Are Likely to Succeed in a Claim Under of the Rehabilitation Act.

Under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability in the United States, … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance". 29 U.S.C.A. § 794 (West).  To succeed on a claim under the Rehabilitation Act, a plaintiff must show that they have a qualifying disability; that they were denied the benefits of certain programs, services, or activities for which a public entity is responsible; that any discrimination is by reason of their disability; and that the public entity in question receives federal financial assistance.  *Tellis v. LeBlanc*, No. CV 18-541, 2021 WL 4267513, at *8 (W.D. La. Sept. 20, 2021).  A person with a disability, under the Rehabilitation Act, is any individual who has a "physical or mental impairment that substantially limits one or

more major life activities"[54] that is recorded or which an individual is regarded as having. 42 U.S.C.A. § 12102(1) (West) (incorporated by reference into the Rehabilitation Act under 29 U.S.C.A. § 705(20)(B) (West)).

Plaintiff and the other putative class members are likely to succeed in their claims under the Rehabilitation Act. As discussed above, Plaintiff Alex A., along with other putative members of the subclass, qualifies as a student with a disability under Section 504 of the Rehabilitation Act and thus, has already established that he has a disability that has been previously recorded under the Rehabilitation Act. Plaintiff has been diagnosed with a learning disability, for which he previously received accommodations under an Individual Accommodations Plan and now receives special education and related services under his Individualized Education Program. Plaintiff also takes medication for post-traumatic stress disorder.

In addition, LSP and OJJ is controlled by the DOC, which receives federal funding. LSP is also responsible for a variety of programs and services available to adults imprisoned at the prison, and OJJ is responsible for providing care and treatment to incarcerated youth. Indeed, public agencies, such as LSP, are required to provide specific programs to minors, including education programs to for incarcerated youth in their custody. *See,* Arne Duncan & Eric H. Holder, Letter to Chief State School Officers and State Attorneys General (June 9, 2014), https://www2.ed.gov/policy/elsec/guid/secletter/140609.html ("[W]ith regard to students with disabilities, the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990 . . . obligate specific public

---

[54] Major life activities include "learning, reading, concentrating, thinking, communicating, and working". 42 U.S.C.A. § 12102(2) (West).

agencies . . . to provide educational services to eligible youth in confinement.").  Plaintiff Alex A. and other similarly situated class members are entitled to receive educational accommodations and other services, which OJJ cannot provide to them while at LSP.

### A.   Defendants Will Be Unable to Provide Necessary Programming to Ensure Non-Discrimination of Youth with Disabilities at LSP

As a maximum-security adult prison, Defendants must provide reasonable accommodations in programs, services, and activities to youth with disabilities in their custody, yet it is unlikely that LSP will be able to provide these services to Alex A. and subclass Class members with disabilities who are in danger of transfer to LSP.  LSP has shown time and time again that their staff is unable to provide basic services and programs to their current *adult* prisoners, much less provide additional services to *youth*, as is required by law.  LSP does not have educational programing capable of providing proper educational services for adult prisoners with disabilities.  Nor have Defendants provided any plan for ensuring that youth with disabilities receive lawful education or other services while at LSP for an indefinite period of time.

Indeed, case law evidences that, as recently as last year, LSP had violated the Rehabilitation Act rights of a subclass of adult incarcerated individuals by "[f]ailing to identify and track disabilities and accommodation requests in a meaningful way", "[f]ailing to accommodate disabled [prisoners] in applying discipline", and "[f]ailing to comply with [the Rehabilitation Act] in providing disabled [prisoners] access to programs and services", among other egregious failures related to the physical, mental and general wellbeing of the incarcerated adults at LSP.  *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at \*59 (M.D. La. Mar. 31, 2021), *reconsideration denied*, No. CV 15-318-SDD-RLB, 2021 WL 5287856 (M.D. La. Oct. 8, 2021).  In the absence of

a plan for youth with disabilities facing imminent transfer to LSP here, Plaintiffs are likely to succeed on claims of a similar violation here.

### III.    A Temporary Restraining Order Enjoining Defendants from Placing Youth at Angola Prison is the Only Option, Given the Impossibility of Safely Detaining Plaintiffs There.

There are no mitigation efforts the Defendants could undertake that would ensure the youth being transferred to LSP remain safe and receive the rehabilitative and education services to which they are entitled. Given the judicially-found failures of LSP to keep adults in its custody safe, as well as the physical setup of LSP and the fact that this adult prison relies heavily on the labor of incarcerated people for cleaning, yard work, maintenance, cooking, and other functions that necessarily require adult men to be on all parts of the property,[55] it is impossible for Defendants to ensure the constitutional and statutory rights of children transferred to LSP. See *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644 (5th Cir. 1996) ("[E]ven where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices.") The necessary and least intrusive means of maintaining the status quo and vindicating the rights of Plaintiff and the proposed Class is simply to prevent the transfer of any youth who are or will be in OJJ's custody to LSP, and direct Defendants to return any youth already sent there to OJJ facilities.

---

[55] Julie O'Donoghue, *Louisiana Will Move Incarcerated Youth to an Adult Prison. Child Advocates are Worried*, LA Illuminator, https://lailluminator.com/2022/07/20/louisiana-will-move-incarcerated-youth-to-an-adult-prison-child-advocates-are-worried/.

**IV.    There is a Substantial Threat That Plaintiffs Will Suffer Irreparable Injury Without Emergency Relief.**

Failing to grant Plaintiffs their requested injunction would result in a substantial threat of irreparable injury to them, including physical and psychological harm, violence, and educational neglect. As former OJJ official and current Arkansas justice official Glenn Holt states in his Declaration filed with this motion,

> I have managed adult prisons and have been to Angola.  I am certain Angola is not a safe place for OJJ youth.  Whether isolated from adults incarcerated in Angola or not—and it is highly unlikely prison officials will be able to maintain sight and sound separation between OJJ youth and Angola's incarcerated adults—the transfer to and incarceration in Angola will be psychologically traumatizing to youth. Angola is a massive prison, on a physical space larger than the island of Manhattan.  Louisiana officials proudly portray Angola to be a "working farm," with thousands of incarcerated people doing daily labor . . . .  Angola houses Louisiana's Death Row and regularly executes people.  When they occur, the state sanctioned killings are felt across Angola, a pall that will not escape OJJ's youth should they be locked away there.  Finally, every person sent to be incarcerated in Angola is sent there to be punished . . . .

*Exhibit 1*, at ¶¶ 6-7.  Indeed, Plaintiff provides evidence that youth subject to Defendants' threats of transfer to LSP are already harmed and terrified of being at LSP.  *Exhibit 2*.  The need for immediate relief to prevent irreparable harm could not be clearer.  Plaintiffs allege injuries that are irreparable and, therefore, not suitable for resolution in the ordinary course of litigation.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States*, 549 F.3d 1079 (7th Cir. 2008).

**V.    The Equities and Public Interest Clearly Favor Plaintiffs**

The threat of injury to Plaintiffs outweighs any potential harm to Defendants of issuing the injunction Plaintiffs request. Plaintiffs seek relief to protect themselves from unconstitutional, irreparable harm. It is hard to imagine what harm would be done to Defendants by maintaining the status quo or implementing a solution within OJJ, as the law already requires them to do. The

requested injunction would protect Plaintiffs' constitutional rights, and "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)).  Because "confidence in the humane application of the governing laws of the State must be in the public's interest," *Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004), public interest considerations weigh strongly in favor of preventing Defendants from willfully exposing children to punishment and the risk of substantial harm by transferring them to LSP. By contrast, there is no substantial harm to Defendants.  Even if there were some articulable harm to Defendants here, it would be greatly outweighed by the catastrophic risk posed to the children in their custody.

Plaintiffs are prepared to proceed to a preliminary injunction hearing as soon as Defendants and the Court are able.  In the interim, a temporary restraining order is the only way to ensure that Defendants' actions do not further threaten the safety of these young people prior to a hearing.

## VI.    The Court Should Waive the Security Bond

Courts have discretion to waive the Rule 65(c) requirement that the movant for a temporary restraining order provide security.  "The Fifth Circuit has acknowledged that the amount of the security is within the discretion of the district court, who can elect to impose no security at all." *New Orleans Home for Incurables Inc. v. Greenstein*, 911 F. Supp 386, 412-13 (E.D. LA 2012) *citing City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority*, 636 F.2d 1084, 1094 (5th Cir. Unit B Feb. 13, 1981).  District courts in this circuit routinely exercise this discretion to require no security in cases brought by indigent or incarcerated people.  *See, e.g.*, *Schultz v. Alabama*, 330

F. Supp. 3d 1344, 1376 (N.D. Ala. 2018) (county prisoners); *Campos v. I.N.S.*, 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998) (indigent immigrants).  This Court should do the same here.

## **CONCLUSION**

For these reasons, Plaintiffs respectfully request that this Court grant their motion for temporary restraining order.

Respectfully submitted, this 19th day of August, 2022.

/s/: *David J. Utter*
DAVID J. UTTER **
Louisiana Bar Number: 23236
WILLIAM R. CLAIBORNE ***
Georgia Bar Number: 126363
*(Pro Hac Vice Application Forthcoming)*
THE CLAIBORNE FIRM, P.C.
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
david@claibornefirm.com
will@claibornefirm.com

/s/: *Christopher J. Murell*
CHRISTOPHER J. MURELL
Louisiana Bar Number: 32075
MURELL LAW FIRM
2831 St. Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 Telephone
(504) 233-6691 Facsimile
chris@murell.law

/s/: *Hector Linares*
HECTOR LINARES
Louisiana Bar Number: 28857
SARA GODCHAUX
Louisiana Bar Number: 34561
STUART H. SMITH LAW CLINIC
LOYOLA UNIVERSITY NEW ORLEANS
COLLEGE OF LAW
7214 St. Charles Avenue, Box 902
New Orleans, Louisiana 70118
(504) 861-5560 Telephone
(504) 861-5440 Facsimile
halinare@loyno.edu
shgodcha@loyno.edu

/s/: *Ronald Haley*
RONALD HALEY
Louisiana Bar Number: 30900
HALEY & ASSOCIATES
8211 Goodwood Blvd., Suite E
Baton Rouge, Louisiana 70806
(225) 755-9935 Telephone
(888) 900-9771 Facsimile
rhaley@ronaldhaleylawfirm.com

/s/: *David Shanies*
DAVID SHANIES ***
New York Bar Number: 4471140

SHANIES LAW OFFICE
110 West 40th Street
Tenth Floor
New York, New York 10018
Tel (212) 951-1710
Fax (212) 951-1350
Cell (646) 515-2151
david@shanieslaw.com
*(Pro Hac Vice Application Forthcoming)*

*\*\* Lead Counsel*
*\*\*\* Pro Hac Vice Application Forthcoming*

**ATTORNEYS FOR PLAINTIFF**