**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| ALEX A., by and through his guardian, MOLLY SMITH individually and on behalf of all other similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. A. No. 3:22-CV-00573-SDD-RLB |
| GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS, in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections, | ) ) ) ) ) ) ) ) ) ) | **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |
| Defendants. | ) | |

## I.  INTRODUCTION

The Louisiana Office of Juvenile Justice ("OJJ") is about to open a new Transitional Treatment Unit ("TTU") to provide greater individual rehabilitation services and security to a small number of Youth who are not responding appropriately to the current level of services and care. The TTU will be at the OJJ's newly formed Bridge City Center for Youth at West Feliciana ("BCCY-WF"), which is located on the campus of the Louisiana State Penitentiary ("LSP"). *See* Ex. G, Decl. of Angela Bridgewater ("Bridgewater Decl.") ¶ 16 & Ex. G-1.

Plaintiff's Memorandum in Support of Plaintiff's Emergency Motion for Temporary Restraining Order ("Plaintiff's Motion") (Doc. 9) speculates without citation to any evidence that the security, operation, and services at BCCY-WF will be insufficient. Defendants will address in detail Plaintiff's allegations below, but at the outset, the Court should know the following facts:

1

- BCCY-WF is a Youth-only secure care facility. No adult inmates are or will be housed at BCCY-WF. *See* Ex. F, Decl. of Curtis Nelson ("Nelson Decl.") ¶ 31; *see also* Ex. B, Aff. of Deron Patin ("Patin Aff.") ¶ 18.

- BCCY-WF is physically and geographically isolated from the adult detention facilities located on the LSP campus. *See* Ex. B, Patin Aff. ¶ 15.

  o BCCY-WF is located <u>1.5 miles</u> from the nearest adult detention facility. *See id.* & Ex. B-1 (Google Map Overhead Satellite Photo depicting BCCY-WF facility);

  o BCCY-WF is within a fenced perimeter. *See id.* ¶ 17.

  o BCCY-WF's fenced perimeter will be wrapped with "black-out" fabric so that no one can see in or out of BCCY-WF. *See id.*

- Ancillary services (e.g., food service, custodial, maintenance, groundskeeping) for BCCY-WF will <u>not</u> be provided by adult inmates. Adult inmates will <u>not</u> be allowed within the BCCY-WF fence-line for the purposes of providing services or for any purpose. *See id.* ¶ 18.

- Educational services, rehabilitation services, and medical services for Youth housed at BCCY-WF will be provided by OJJ staff and/or vendors. Staffing at BCCY-WF for these services will be provided in an identical fashion to the staffing for these services at other OJJ secure care facilities. *See* Ex. D, Aff. of Denise Dandridge ("Dandridge Aff.") ¶¶ 8-19; Ex. C, Aff. of Shenell Deville ("Deville Aff.") ¶¶ 15-21; Ex. G, Bridgewater Decl. ¶¶ 29, 34.

- Educational services, rehabilitation services, and medical services for Youth housed at BCCY-WF will be provided on the grounds of BCCY-WF, and Youth will <u>not</u> receive

these services at the adult inmate facilities on the LSP campus. *See* Ex. D, Dandridge

Aff. ¶ 20; Ex. C, Deville Aff. ¶ 23; Ex. G, Bridgewater Decl. ¶¶ 29-34.

- To the extent that any Youth housed at BCCY-WF are subject to an Individual Accommodation Plan and/or Individual Education Program, OJJ will provide educational services that comply with the IAP/IEP. The level of educational services provided at BCCY-WF will be identical to the level of services provided at the other OJJ secure care facilities. *See* Ex. C, Deville Aff. ¶¶ 24-31.

OJJ's decision to locate the TTU at BCCY-WF is rationally related to a legitimate government objective—maintaining the safety of the Youth within OJJ's care and the delivery of rehabilitation services to the Youth. Youth must meet specific criteria for transfer to the TTU, including exhibiting a pattern of battery on other Youth, committing a single battery/predatory act of such serious consequence that the potential of reoccurrence must be actively prevented, engaging in substantial and documented physical battery on staff, engaging in a documented history of behavior that causes major disruption to programming (i.e., gang activity), and being in possession of a weapon. The TTU will provide a more restrictive level of care to prevent recurrence of this violent, dangerous, and destructive behavior, while at the same time providing individualized rehabilitative services. Ex. G-1, TTU Policy.

OJJ's current physical facilities do not meet the needs for the TTU. A previously unused building on the LSP campus was discovered to have the appropriate layout and infrastructure that, with minor modifications, satisfied the needs of the TTU. *See* Ex. F, Nelson Decl. ¶ 29; Ex. B, Patin Aff. ¶ 14. The TTU will be temporarily located at BCCY-WF and will be relocated to one of the existing OJJ secure care facilities once construction of a permanent facility is completed. *See* Ex. F, Nelson Decl. ¶ 30; Ex. B, Patin Aff. ¶ 11.

When viewed against the backdrop of the true facts—not Plaintiff's unfounded speculation—Plaintiff is left only to argue that OJJ's decision to locate a secure care facility on the LSP campus is an automatic constitutional violation. No law supports this argument. Defendants' creation of the TTU and placement of the TTU at BCCY-WF not only complies with, but exceeds, the requisite constitutional protections for the Youth.

Plaintiff's Motion is due to be dismissed for any one, and certainly all, of the following reasons:

- Plaintiff fails to establish a substantial threat of irreparable injury if the injunction is denied;

- Plaintiff is not likely to succeed on the merits of his claims on multiple grounds:

  o Plaintiff has come forward with no evidence in support of his allegation that he will be denied a federally protected constitutional right or the benefits of a federal statute;

  o Plaintiff failed to exhaust administrative remedies before filing suit as required by the Prison Litigation Reform Act ("PLRA"); and

  o Plaintiff does not (and cannot) demonstrate Defendants acted with deliberate indifference;

- The certain and immediate harm to Defendants if the injunction is granted outweighs Plaintiff's speculation of potential injury if the injunction is denied; and

- The public interest is served if the Motion is denied.

## II.  <u>FACTS AND BACKGROUND</u>

### A.    <u>OJJ and Its Mission</u>

The Louisiana Legislature has delegated to the Office of Juvenile Justice the responsibility to provide rehabilitation services to juveniles who have been adjudicated as delinquent. Certain Youth who have been adjudicated as delinquent require placement in a secure care facility. *See* Ex. F, Nelson Decl. ¶ 10. There are a number of factors that would lead a Youth to be assigned to a secure care facility, but most often the assignment to a secure care facility is due to the violent

nature of the underlying crime committed by the Youth, the Youth committing a crime of sexual assault, the Youth's repeated commission of serious crimes, and/or the Youth's failure to comply with less restrictive rehabilitation programs (e.g., probation, group homes). *See id.* ¶ 10.

The OJJ operates five secure care facilities for Youth. *See id.* ¶ 11. While the secure care facilities share some characteristics that are similar to an adult prison, there are important differences. *See id.* ¶ 12. Relevant to the issues at bar, the Youth in secure care facilities are not assigned to individual sleeping quarters, but rather are assigned to a dormitory. *See id.* Each dorm may be comprised of twelve to fifteen Youth, and Youth are free to move about their dormitories. *See id.* The secure care facilities contain on-site schools, gymnasiums, outdoor recreation areas, medical facilities, counseling facilities, and cafeterias. *See id.* While movement of the Youth between these areas is controlled by staff, the Youth have significantly greater freedom to move from one area of the campus to another than that of an inmate in an adult prison setting would have. *See id.*

Additionally, these secure care facilities were constructed with standards designed to house Youth offenders. *See id.* ¶ 15. In OJJ's experience, Youth offenders assigned to the secure care facilities are generally able to adapt to the secure care environment and comply with the behavioral rules. *See id.* While Youth will from time to time stray from the rules, historically OJJ has not experienced large scale or serious events (e.g., riots, escape attempts, acts of armed violence against other Youth or staff). *See id.* ¶ 15. Accordingly, the construction techniques to build these facilities have been consistent with the expected behavior (e.g., non-reinforced walls, standard ceiling heights). *See id.* ¶ 15.

**B.**     **Recent Events Dictate that Certain Youth Require a Heightened Level of Restriction and Care.**

Recent events involving a small number of the Youth in OJJ's secure care facilities have revealed that the existing secure care facilities and rehabilitation programs are not sufficient to effectively house these particular Youth. *See* Ex. F, Nelson Decl. ¶ 17–23, 28. Certain Youth (numbering probably less than 25 total across OJJ's entire secure care system) have engaged in violent and destructive behavior, injuring other Youth and staff members, utterly destroying multiple facilities, and disrupting OJJ's ability to deliver educational and rehabilitation services to the other Youth. *See id.* ¶ 17–23. Additionally, these same Youth have been involved in multiple (and some successful) attempts to escape from the secure care facility. *See id.* ¶ 19–21. For example:

- On July 17, 2022, six Youth housed at BCCY escaped the facility.  Five of the Youth engaged in the theft of a truck, repeatedly rammed into a Jefferson Parish Sheriff's Deputy's vehicle, were involved in a short pursuit, and ultimately crashed the truck. The sixth Youth engaged in the carjacking of a vehicle at gunpoint then shot the occupant, a 59-year-old New Orleans man, who was critically injured. *See id.* ¶ 20.

- On June 16, 2022, around 20 Youth escaped their dormitory at BCCY, took over part of the facility, and caused a riot. The riot resulted in injuries requiring medical attention to at least two Youth.  At least one staff member was hospitalized due to injuries.  In addition, five Youth escaped the secure care facility. *See id.* ¶ 21.

- On June 13, 2022, at least five Youth were involved in a physical altercation outside of the school building at SCY.  At least four staff members were battered by the Youth, and one staff member was transported to the hospital.  Named Plaintiff, Alex A., was

involved in this incident and is accused of striking at least three staff members with a closed fist. *See id.* ¶ 22.

- On May 25, 2022, several Youth were involved in a fight in their dormitory at SCY. Three of the Youth were over the age of 18 and were subsequently booked into adult correctional facilities for criminal charges.   The incident caused over $35,000 in damage to the facility. *See id.* ¶ 23.

**C.**    **OJJ Is Creating a Transitional Treatment Unit to Address These Issues.**

These recent experiences dictate that certain Youth will need a greater level of individualized care in a more restrictive housing environment for OJJ to effectively deliver its rehabilitative services. In furtherance of this goal, OJJ is establishing a Transitional Treatment Unit. A copy of the TTU Policy is available online at the OJJ's website,[1] and a true and correct copy is attached as Exhibit 1 to the Bridgewater Declaration, Ex. G.

The Policy "establish[es] the program objectives and the criteria for the placement of youth and youth with disabilities in the Transitional Treatment Unit (TTU)." Ex. G-1 at 1. While the Policy "address[es] the needs of the youth assigned to a YS Secure Care facility who require individual attention," the Policy also notes that "[a]ll reasonable efforts shall be made to utilize less restrictive alternatives in the placement of youth." *Id.* at 6.

As stated in the Policy:

> The Transitional Treatment Unit (TTU) is able to house up to twenty-four (24) youth, and is a maximum custody unit for youth described as violent and very aggressive with a documented history of engaging in behavior which creates or incites aggressive responses from others and creates an unsafe therapeutic environment for staff and youth.  The purpose of the TTU is to assist staff in implementing promising strategies for identified youth. The TTU is designed to assist youth in developing the self-regulatory, coping, and social skills needed to safely and successfully engage

---

[1] https://ojj.la.gov/policies-systems/ojj-policies/.

peers and staff members. The TTU is a specialty program that ensures coordinated programming for youthful offenders.

The goals of the program are to provide youth with accountability for their actions, to enable them to learn adaptive methods of resolving problems and reaching personal goals, and to provide on-going support to enable youth to generalize and maintain positive changes.

*Id.*

The Policy provides specific criteria to determine whether a Youth should be assigned to the TTU. This criteria includes:

- Youth who have exhibited a pattern of battery on other youth which has not been substantially reduced by prior intervention efforts;

- Youth who have committed a single battery/predatory act of such serious consequence that the potential of reoccurrence must be actively prevented;

- Youth who have engaged in substantial physical battery on staff that has been documented;

- Youth who have a documented history of engaging in behavior that causes major disruption to programming (i.e., gang activity) or incites predatory responses from other youth;

- Youth who have been in possession of a significant weapon; and

- Youth who have been involved in AWOL, AWOL attempt, and escape.

*Id.* at 7-8.

The Policy contains a detailed process regarding how a Youth is referred to the TTU and the transfer process. *Id.* at 9-13. It also details the types of services that are to be provided for the Youth while housed at the TTU, including individual counseling, group counseling, family intervention, educational services, medical services, and mental health services. *Id.* at 13-15. The Policy also specifically addresses the delivery of educational services to Youth in the TTU who have disabilities, including the delivery of special education services. *Id.* at 20-23.

While at the TTU, Youth will engage in a phased rehabilitation approach. As outlined in the Policy, the Youth will first go through an orientation phase, which may last up to seven days. During that time, the Youth will be apprised of the rules and expectations of the TTU, will be introduced to the group counseling process, will be educated on the cognitive-behavioral philosophy, will complete a behavioral analysis worksheet regarding the behavior that led to the Youth's assignment to the TTU, and will prepare a "Life Story" autobiography which will be received daily by social services and OJJ staff. *Id.* at 16. Also during this orientation phase, the Youth will meet with his social worker, counselor, and group leader who will create an individualized intervention plan for the Youth, setting target goals for the Youth to achieve. *Id.* at 17.

After the orientation phase, the Youth will move into a treatment phase. The treatment phase will last a minimum of two weeks, but may extend longer depending on the specific circumstances. *Id.* at 17. The treatment phase will involve various modalities including individual counseling and group counseling, therapeutic homework assignments, and Milieu (or "on the floor") counseling to help the Youth develop skillful, effective behaviors to replace and extinguish the Youth's unskilled/maladaptive behaviors. *Id.* at 17-18.

Lastly, the Youth will move into the transition phase. The goal of this phase is to prepare the Youth to return to the general population of Youth in the OJJ secure care facilities or, in some cases, to return to the outside community. The phase will last a minimum of one week. During this phase, a reintegration plan will be developed for the Youth. *Id.* at 19.

**D.    The TTU Will Be Located at BCCY-WF on the LSP Campus.**

The existing secure care facilities lack the physical infrastructure necessary for the TTU. OJJ is in the process of developing a permanent site for the TTU, and the permanent site will be

located on the campus of an existing secure care facility. *See* Ex. F, Nelson Decl. ¶ 30; Ex. B, Patin

Aff. ¶ 11. In the meantime, OJJ needed to identify a suitable location for temporary placement of

the TTU. Defendants identified a building that was going unused on the campus of the LSP with

the necessary layout and infrastructure to serve as the temporary TTU.[2] *See* Ex. F, Nelson Decl. ¶

27, 29; Ex. B, Patin Aff. ¶ 14. This new secure care facility is known as the Bridge City Center for

Youth at West Feliciana. *See* Ex. B, Patin Aff. ¶ 9.

      As even Plaintiff admits, the LSP is a sprawling campus comprised of more than 18,000

acres. *See* Louisiana State Penitentiary, https://doc.louisiana.gov/location/louisiana-state-

penitentiary/; Pl.'s Mot. (Doc. 9) at 31 (stating that the LPS campus is "larger than the Island of

Manhattan"). BCCY-WF is the first building located behind the main gate of the LSP campus, and

is located 1.5 miles from the nearest adult detention facility on the LSP campus. *See* Ex. B, Patin

Aff. ¶ 15.

      While BCCY-WF lies just within the main fence-line of the LSP, BCCY-WF also has its

own fence-line, which surrounds the BCCY-WF building and grounds and separates BCCY-WF

from all other facilities on the LSP campus. *See id.* ¶ 17. The BCCY-WF fence-line will be

wrapped in "black-out" fabric so that no one can see in or out of the BCCY-WF building and

grounds. *See id.*

### E.    BCCY-WF Will Be a Youth-Only Facility Run by OJJ.

      Much of Plaintiff's Motion is premised on the unsupported assertion that BCCY-WF will

house Youth and adult inmates and that BCCY-WF will not be run by OJJ, but rather will be run

---

[2] The building where BCCY-WF is located previously housed adult women incarcerated at the Louisiana
Correctional Institute for Women ("LCIW"). LCIW vacated the building on June 24, 2021, and no adult inmates
have been housed in that building since then. *See* Ex. B, Patin Aff. ¶ 16.

and staffed by the Louisiana Department of Corrections ("DOC"). Notably, Plaintiff cites to <u>no evidence whatsoever</u> in support of these assertions.

To the contrary and as detailed in the affidavits and declarations attached to this response, BCCY-WF will be a Youth-only facility. Ex. F., Nelson Decl. ¶ 31. No adult inmates will be housed at BCCY-WF. *See id.* No adult inmates will be providing services (e.g., food services, custodial, groundskeeping, etc.) at BCCY-WF. *See id* ¶ 34*.* No adult inmates will be permitted within the BCCY-WF fence-line for any reason. *See id* ¶ 33*.* To be clear, BCCY-WF is designed and staffed to create complete physical separation of the Youth from adult inmates at all times. *See id.* ¶ 33*;* Ex. B, Patin Aff. ¶¶ 12-13, 15, 17-19.

Additionally, BCCY-WF will be run by OJJ, just as all other secure care facilities are run by OJJ. *See* Ex. F, Nelson Decl. ¶ 34. Educational services will be provided by OJJ staff. *See* Ex. C, Deville Aff. ¶ 23. Food services will be provided by OJJ staff/vendors. *See* Ex. F, Nelson Decl. ¶ 34; Ex. B, Patin Aff. ¶¶ 18-19. Medical services will be provided by OJJ staff/vendors. *See* Ex. D, Dandridge Aff. ¶¶ 8-20. Counseling services will be provided by OJJ staff/vendors. *See* Ex. D, Dandridge Aff. ¶¶ 8-19; Ex. G, Bridgewater Decl. ¶ 34. Custodial, maintenance, and groundskeeping will be provided by OJJ staff/vendors. *See* Ex. F, Nelson Decl. ¶ 34; Ex. B, Patin Aff. ¶¶ 18-19.

While it is the goal and intent of OJJ to have security services provided exclusively by OJJ staff, it is likely that some DOC security officers will provide security services at BCCY-WF. *See* Ex. F, Nelson Decl. ¶ 36. However, this is not a practice that will be unique to BCCY-WF. OJJ routinely relies on DOC security officers to provide additional staffing at its secure care facilities if OJJ faces a staffing shortage. *See id.* ¶ 36. Before any DOC security officer is allowed to work with the Youth, the officer must undergo training specific to youth detention services. *See id.* ¶ 36.

BCCY-WF will require approximately 112 staff members (including security, education, medical, programming, and ancillary services) when it is fully operational; as of the date of this filing, OJJ has already retained 40 staff members from existing secure care facilities who will staff BCCY-WF, and approximately 20 new employees have been interviewed and hired. *See id.* ¶ 37. OJJ is actively interviewing and hiring more employees to staff BCCY-WF on a daily basis. *See id.* ¶ 37.

**F.**    **<u>Plaintiff Will Likely Be Transferred to the TTU at BCCY-WF.</u>**

Plaintiff meets the criteria for transfer to the TTU at BCCY-WF. Specifically, Plaintiff engaged in the following conduct that precipitated his referral for transfer to the TTU:

- Plaintiff has been adjudicated guilty of two incidents involving assault or threat of assault on another youth;

- Twelve incidents of assault or threat of assault on staff or visitors;

- Seven incidents of property destruction;

- Six incidents of accessing an unauthorized area;

- Three incidents of tampering with security devices; and

- One incident of gang organizational activity.

*See* Ex. E, Aff. of Beth Broussard ("Broussard Aff.") ¶ 8. By way of specific example:

- On July 7, 2021, Plaintiff punched multiple maintenance workers in the face, stole keys from one maintenance worker, and bit a staff member who attempted to stop Plaintiff from opening the door to another dorm;

- On June 13, 2022, Plaintiff was involved in a riot in which he struck another Youth, multiple staff members, and the Facility Director with a closed fist, threatened a staff member prior to striking her, and kicked the Facility Director while he was on the ground after being struck;

- On July 1, 2022, Plaintiff assaulted a staff member causing the staff member to fall onto the floor;

- On July 17, 2022, Plaintiff left his dormitory, climbed over the fence, and left the facility grounds.

*See id.* Because of Plaintiff's pattern of battery against other Youth, substantial physical battery of OJJ staff, and his documented history of engaging in behavior that causes major disruption to programming, Plaintiff is eligible for transfer for the TTU. *See id.* ¶ 10.

**G.    Plaintiff Will Continue to Receive All Educational and Rehabilitation Services**

In his Motion, Plaintiff articulates his "concern" that OJJ will not be able to provide him with educational services at BCCY-WF that comply with his Individualized Education Program ("IEP"). *See* Pls.' Mot. (Doc. 9) at 11-12. Plaintiff also states that he is "concerned" that OJJ will not provide him with the same level of treatment and counseling at BCCY-WF as he is currently provided. *See id.* at 12. As with nearly all factual allegations in his Motion, Plaintiff cites no evidence whatsoever to substantiate these concerns. *See generally id.* at 11-13.

Contrary to Plaintiff's unsupported speculation, Plaintiff will continue receiving the same educational services at BCCY-WF that he is currently receiving. *See* Ex. C, Deville Aff. ¶¶ 10-31. Also, he will be receiving <u>more</u> individualized counseling and treatment services at BCCY-WF than he is currently receiving. *See* Ex. G-1, TTU Policy; Ex. D, Dandridge Aff. ¶¶ 9-20.

### III.  LAW AND ARGUMENT

Injunctive relief is "an extraordinary remedy" and requires the movant to "unequivocally show the need for its issuance." *Sacal-Micha v. Longoria*, 449 F. Supp. 3d 656, 662 (E.D. La. 2020) (citing *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997)). To demonstrate entitlement to injunctive relief in the form of a preliminary injunction, Plaintiff must establish: "(1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) that the injunction will not

disserve the public interest." *Gumns v. Edwards*, No. 20-231-SDD-RLB, 2020 WL 2510248, at *3 (M.D. La. May 15, 2020) (citations omitted). The first two factors are most critical. *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016). Failure to establish any element warrants denial of the motion. *Sacal-Micha*, 2020 WL 1518861, at *2 (citing *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003)).

In the context of injunctions against correctional facilities, based on the PLRA, "preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and be the least intrusive means necessary to correct the harm." *Id.* (citations omitted). Public policy, and the Supreme Court, counsels federal courts to "eschew toward minimum intrusion into the affairs of state prison administration." *Id.* (citing, *inter alia*, *Mecham v. Fano*, 427 U.S. 215, 228-229 (1976) (warning against judicial decisions regarding "the day-to-day functioning of state prisons and involve[ing] the judiciary in issues and discretionary decisions that are not the business of federal judges")). Stated differently, "[w]hen weighing any form of injunctive relief, federal courts must be mindful not to jump at the chance to take prison administration into their own hands and out of the hands of the people entrusted with such tasks by the state." *Id.* (citations omitted).

Plaintiff fails to carry his burden to establish any of the four required elements. While Plaintiff cannot satisfy even a single element of the preliminary injunction standard, the most glaring deficiency is with regard to the second element—the requirement that Plaintiff demonstrate a substantial risk of irreparable harm. Accordingly, Defendants will address this element first before proceeding to the other three.

**A.    No Substantial Threat of Irreparable Injury to Plaintiff if the Injunction Is Denied.**

"One seeking injunctive relief must demonstrate a real and immediate threat that he will be subject to the behavior which he seeks to enjoin. It is not sufficient for the plaintiff to speculate that he will be subject to injurious conduct if the practice is continued …." *Gladden v. Roach*, 864 F.2d 1196, 1198 (5th Cir. 1989) (citing *City of L.A. v. Lyons*, 461 U.S. 95 (1983)) (emphasis added). An injunction is not appropriate where the movant presents only the "mere fact that irreparable harm may possibly ensue if restraint is not imposed." *Standard Brands, Inc. v. Zumpe*, 264 F. Supp. 254, 267 (E.D. La. 1967) (emphasis added) (citations omitted). Indeed, "[i]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties." *Id.* at 267-68 (emphasis added).[3] Instead, and particularly concerning injunctions against the government, "courts should not intervene [by granting injunctions] unless the need for equitable relief is clear, not remote or speculative." *Machete Prod., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015).

As Louisiana courts have held, "speculative injury" is not sufficient to establish irreparable harm for purposes of injunctive relief; the movant must present "more than an unfounded fear" of injury. *Dixie Brewing Co., Inc. v. U.S. Dep't of Vet. Affairs*, 952 F. Supp.2d 809, 813 (E.D. La. 2013) (citations and brackets omitted). An injunction requires that an irreparable injury "be both certain and great," "actual and not theoretical." *Id.* (citations, quotations, and brackets omitted).

Here, Plaintiff's Motion offers only vague assertions regarding what he contends the irreparable harm will be if he is transferred to BCCY-WF. Plaintiff offers no evidence whatsoever

---

[3] *See also Simon v. Southwest La. Elec. Membership Corp.*, 267 So.2d 757, 760 (La. App. 1972) ("[T]he applicant for injunction must show a reasonable probability that the acts sought to be enjoined will occur. It is not sufficient for plaintiff to simply state that he fears they will occur.").

in support of the idea that there is a "substantial threat" that these alleged harms will come to pass. As best as can be discerned, Plaintiff is arguing that if he is transferred to BCCY-WF:

- He will be subjected to "punishment" because there is no rational basis for the decision to transfer him to BCCY-WF;

- He will be subjected to "punishment" because he will be deprived of education and rehabilitation services thus rendering his confinement purely punitive;

- He may come within the sight and sound of an adult inmate;

- He fears that he will be placed in an unsafe condition or be subjected to violence;

- He fears that the educational, medical, and rehabilitation services may decrease (and presumably he means below the constitutionally protected level of services); and

- The knowledge that he may get transferred to BCCY-WF causes him "stress" and "difficulty sleeping,"

None of Plaintiff's stated injuries constitute a substantial risk of irreparable harm. They are all based purely on conjecture and do not rise above the level of fear or apprehension. Furthermore, they have no evidentiary support whatsoever.

1. **There is a rational basis and legitimate government interest in transferring Plaintiff.**

Plaintiff contends that there is no rational relationship between the decision to transfer Plaintiff (or any other Youth) to BCCY-WF and any legitimate government interest. Pl.'s Mot. (Doc. 9) at 22. Plaintiff cites no evidence in support of this proposition, and this argument is contrary to the record evidence.

While in OJJ's secure care facilities, Plaintiff has repeatedly engaged in violent and destructive conduct. *See* Ex. E, Broussard Aff. ¶ 8. This conduct is enabled by the physical structure of the OJJ secure care facilities. *See* Ex. F, Nelson Decl. ¶ 15. To further the rehabilitative

services, the OJJ must create barriers that prevent Plaintiff from continuing to engage in criminal behavior. BCCY-WF provides such barriers. Specifically, BCCY-WF provides individual housing accommodations that will prevent Plaintiff from being able to access other Youth while they sleep. BCCY-WF employs reinforced walls and high ceilings so that Plaintiff will be incapable of damaging the facilities and using the structural components of the facility to fashion weapons. BCCY-WF is located within multiple secure fences that will prevent Plaintiff from escaping or attempting to escape. *See* Ex. F, Nelson Decl. ¶ 38; Ex. B, Patin Aff. ¶ 17.

In addition to the physical barriers, placement in the TTU will increase (not decrease) the rehabilitative services that Plaintiff will receive. All Youth within the TTU will participate in a three-phrase approach to behavior modification. The first phase will provide orientation to the TTU where the Youth will be educated on the process, where the Youth will undergo a behavioral analysis, and where the Youth will be introduced to the cognitive behavioral approach. Phase II of the program is the treatment phase, where Youth will be exposed to multiple treatment modalities including group therapy, Milieu therapy, therapeutic homework, and behavioral techniques. After successfully completing Phase II, Youth will move to Phase III, which prepares the Youth to transfer from the TTU to a secure care facility. *See* Ex. G, Bridgewater Decl. ¶¶ 19-22 & Ex. G-1, TTU Policy.

2.      **Plaintiff will not be deprived of any educational services.**

Plaintiff speculates that if he is transferred to BCCY-WF his educational and rehabilitation services will be decreased to the point that they are non-existent, thus converting the purpose of his detention from rehabilitation to pure punishment. As part of this argument, Plaintiff further speculates that educational services will be provided by DOC, not OJJ, and that any educational services provided by DOC are sure to be constitutionally deficient.

This argument is precisely the type of non-actionable speculation that the Fifth Circuit warns against. Plaintiff offers no evidence indicating that there will be any changes to his educational or rehabilitative services at BCCY-WF. To the contrary, the record evidence shows that he will receive the exact same level of education and rehabilitation services that he is currently receiving. *See* Ex. C, Deville Aff. ¶¶ 10-31; Ex. G, Bridgewater Decl. ¶¶ 25-34.

Likewise, Plaintiff speculates and assumes the education and rehabilitation services will be provided by DOC instead of OJJ. Plaintiff again offers no evidence in support of this proposition. And again, this speculative argument is contrary to the only record evidence before the Court—OJJ <u>will</u> be providing all normal education and rehabilitation services at BCCY-WF. *See* Ex. C, Deville Aff. ¶¶ 10-31; Ex. G, Bridgewater Decl. ¶¶ 25-34.

Because Plaintiff will continue to receive the same level of education and rehabilitation services at BCCY-WF, all administered by OJJ, his transfer to this facility will not reduce the level or quality of services he receives and certainly will not convert his detention into "punishment."

3. **OJJ's transfer plan complies with the "sight and sound" requirement of the Juvenile Justice and Delinquency Prevention Act.**

Ignoring OJJ's assurances and relying solely on speculation, Plaintiff argues that the temporary transfers will violate the "sight and sound" requirements of the Juvenile Justice and Delinquency Prevention Act.  Not so.  OJJ plans to ensure the transferred Youth are safely separated from adult inmates through well-reasoned architectural controls, specifically trained juvenile corrections officers, and detailed separation procedures.  For these reasons, and for the reasons discussed below, Plaintiff's arguments are without merit.

Under the pertinent portions of the Act, a state plan for the administration of its juvenile justice program must provide that "juveniles alleged to be or found to be delinquent . . . will not be detained or confined in any institution in which they have sight or sound contact with adult

18

inmates." 34 U.S.C. § 11133(12)(A).  If corrections officers will work with both juveniles and adult inmates, those officers must be trained and certified to work with juveniles.  34 U.S.C. § 11133(12)(B).  The Act also provides that no juvenile shall be detained or confined in any jail or lockup for adults.  34 U.S.C. § 11133(13).[4]

The other provision Plaintiff cites in his motion is inapplicable on its face. Section 11133(11)(B) only applies to "juveniles awaiting trial or other legal process who are treated as adults for purposes of prosecution in criminal court." 34 U.S.C. § 11133(11)(B).  All of the Youth to be transferred as part of OJJ's plan have been adjudicated delinquent and are not awaiting trial.  On top of that, OJJ's plan will plainly satisfy § 11133(13), as the Youth will be housed in what will effectively be a juvenile facility (not a jail or lockup for adults).  Thus, the only provisions at issue are the "sight and sound" and training requirements of § 11133(12)(A) and (B).  These are easily satisfied in this case.

The Act defines "sight or sound contact" as "any physical, clear visual, or verbal contact that is not brief and inadvertent." 34 U.S.C. § 11103(25).  Reading the phrase "clear visual" in the context of "physical" and "verbal" makes clear that the contact Congress sought to prohibit is that which is close enough for conversations or physical interaction.  Indeed, "brief and inadvertent contact" does not constitute a violation.  34 U.S.C. § 11103(25).

The regulations implementing the Act's "sight and sound" provisions shed further light on their meaning.  These regulations provide that a state's plan must ensure that separation is accomplished "architecturally or through policies and procedures in all secure areas of the facility

---

[4] The wording of 11133(13) seems broad at first glance.  But if it simply meant that no juvenile could ever be housed in a building that was at one point used for adults, or that no juvenile could ever be housed on the same property as adult inmates, both § 11133(11) and (12) would be rendered meaningless.  There would be no need for a "sight and sound" requirement if juveniles could not be housed on the same property as adult inmates.  This point is demonstrated in greater detail below.

which include, but are not limited to, such areas as admissions, sleeping, and shower and toilet areas." 28 C.F.R. § 31.303(d)(i).  Consistent with the statute, the regulations further confirm that "[b]rief and inadvertent sight or sound contact between juveniles . . . or found to be delinquent . . . and adult inmates in secure areas of a facility that are not dedicated to use by juveniles and which are nonresidential, which may include dining, recreational, educational, vocational, health care, sally ports or other entry areas, and passageways (hallways), would not require a facility or the State to document or report such contact as a violation.  *Id.*

At least one federal court has held that a plan similar to OJJ's complied with "sight and sound" requirements.  *Hughes v. Judd*, 108 F. Supp. 3d 1167, 1235 (M.D. Fla. 2015).  The *Hughes* decision, which was issued following a bench trial, makes extensive findings of fact, including that the "juveniles [were] separated—out of "sight and sound"—from the adult inmates, who [were] housed in a separate building across a large field at the adjoining adult campus of [the property]."  *Id*.  The court held that the defendants were not deliberately indifferent to the juvenile plaintiffs' safety, and that there were no other constitutional violations.  *Id.* at 1258.

Here, as in *Hughes*, OJJ's transfer plan will ensure "sight and sound" separation and will comply with the Act.  The plan first features several architectural controls.  *See* 28 C.F.R. § 31.303(d)(i).  The Youth who are transferred will be housed in a secure care facility; an entirely separate building that is located approximately 1.5 miles from any adult campuses, recreation areas, or housing.  *See* Ex. B, Patin Aff. ¶ 15 & Ex. B-1; *Hughes*, 108 F. Supp. 3d at 1235.  The building will be cordoned off by a fence that will prevent adult inmates from entering the area. *See id.* ¶ 17. The only potential contact will be "brief and inadvertent".  *See id.* ¶¶ 18-19. Such contact will not give rise to a violation.  28 34 U.S.C. § 11103(25); 28 C.F.R. § 31.303(d)(i).

OJJ will also implement policies and procedures designed to ensure separation. 28 C.F.R. § 31.303(d)(i). It will staff the secure care facility with officers who are trained to protect Youth from contact with adult inmates. *See* Ex. F, Nelson Decl. ¶ 33, 36. If OJJ requires help from DOC security staff, it will ensure compliance with 34 U.S.C. § 11133(12)(B) by requiring that any such DOC officers be trained and certified to work with juveniles. *See id*. ¶ 36. And OJJ will not allow any adult inmates to enter the BCCY-WF fence line for any reason. *See id*. ¶ 33.

Plaintiff has failed to make any showing that these controls are insufficient to meet "sight and sound" separation requirements. In fact, he hardly makes any meaningful attempt to do so. His brief largely relies on speculation, including references to general staffing issues (with no attempt to tie them specifically to the transfer or these Youth) and a former official who has "been to Angola." Plaintiff has cited no evidence indicating that OJJ's architectural controls will be insufficient or any specific evidence that the secure care facility will not be staffed with qualified officers. Although it is true that a court may issue a preliminary injunction on evidence that is "less complete" than what would be presented at a full trial on the merits, *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), there is no dispute that a plaintiff must come forth with *some evidence* to establish a likelihood of success. Plaintiff has failed to provide any such evidence and have cited no caselaw indicating that the type of speculation they rely on is sufficient for a court to issue extraordinary relief like a preliminary injunction.

Further, from a substantive standpoint, Plaintiff cites no caselaw interpreting or applying "sight and sound" requirements. Instead, they rely entirely on a law review article whose general thesis revolves around a provision in 34 U.S.C. § 11133(11)(B) that allows a judge to except a youth from the sight and sound requirements if it is "in the interest of justice" to do so. *See* Lauren Knoke, *See No Evil, Hear No Evil: Applying the Sight and Sound Separation Protection to All*

*Youths Who Are Tried as Adults in the Criminal Justice System*, 88 Fordham L. Rev. 791, 794 (2019). As previously discussed, § 11133(11)(B) only applies to the "juveniles awaiting trial" and is therefore inapposite. And nothing in the Knoke article indicates that OJJ's separation procedures are insufficient.

In sum, OJJ's transfer plan includes architectural, procedural, and staffing controls that will ensure Youth are protected from sight and sound contact with adult inmates. Plaintiff has failed to make any evidentiary showing or provide any authority to the contrary. They have therefore failed to establish a likelihood of success on the merits.

### 4. Plaintiff's subjective "stress," "anxiety," and "fear" of being subject to unsafe conditions/violence is not an irreparable harm.

Plaintiff's subjective, unfounded "fear" that he will be subjected to an unsafe living condition or violence does not constitute an irreparable harm. As discussed above, unfounded fears do not give rise to an actionable irreparable harm. Plaintiff has not established any substantial threat of irreparable injury to warrant the extreme remedy of an injunction. His request for injunctive relief accordingly fails.

First, Plaintiff cannot establish that "fear," "mental stress," or even a "great amount of stress" are an irreparable injury for purposes of an emergency injunction. *Anthony v. Thomas*, No. 2:21-CV-1251, 2022 WL 194324, at *3 (W.D. La. Jan. 19, 2022) (denying request for injunction when plaintiff claimed he "endure[d] a great amount of stress on a daily basis" and "fear" stemming from his transfer to correctional facility); *Tweedy v. Boggs*, 983 F.2d 232 (5th Cir. 1993) (affirming dismissal of pretrial detainee's claim that being housed with convicted prisoners "caused him to suffer mental stress, resulting in irreparable harm" in part because he was "not entitled to a stress-free atmosphere."); *see generally Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *17 (W.D. Tex. Apr. 9, 2007) (finding that the plaintiffs'

claim that the "stressful conditions of detention [was] causing them irreparable injury" was insufficient for preliminary injunction).

Second, a mere "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985); *J.H. by & through N.H. v. Edwards*, No. CV 20-293-JWD-EWD, 2020 WL 3448087, at *45 (M.D. La. June 24, 2020) (denying motion for temporary restraining order because "Plaintiffs have only demonstrated what *could* happen in OJJ's secured care facilities in the absence of universal testing, furloughs, and their other measures. They have not demonstrated beyond speculation a *substantial* threat of imminent, irreparable harm to the Youth in these facilities."). In fact, "a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. A presently existing actual threat must be shown." 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. Apr. 2022 update). For this reason, a plaintiff who claims that he "endures a great amount of stress on a daily basis" but fails to identify the "specific basis for his fear" will not meet the requisite threat of irreparable injury. *Anthony*, 2022 WL 194324, at *3.

Plaintiff merely claims that, since the transfer decision was announced, "he has experienced significant mental and physical harm, including increased difficulty sleeping and extreme stress." Doc. 9 at 12. But this alleged harm is driven only by the unfounded speculation that he "will be subjected to unsafe conditions and violence at LSP." Doc. 9 at 12.  Plaintiff cites to no evidence that would substantiate this stated fear. Instead, Plaintiff states his belief that certain adult detention facilities located on the LSP campus present an unsafe condition, and from there concludes that because BCCY-WF is located on the grounds of the LSP campus, it too will present unsafe conditions.

23

Plaintiff comes forward with no evidence that the adult detention facilities on the LSP campus present unsafe living conditions. Even if they did, Plaintiff presents no evidence that the OJJ-run BCCY-WF will present unsafe conditions. Once again, the only evidence before the Court is to the contrary.  In truth, BCCY-WF will provide Plaintiff with more protection to prevent Plaintiff from injuring himself, from injuring others, and from being injured by others. Specifically, BCCY-WF will house fewer Youth residents than Plaintiff's current secure care facility. *See* Ex. F, Nelson Decl. ¶ 30. BCCY-WF will provide greater individualized attention to Plaintiff. *See* Ex. G-1, TTU Policy. And the physical structure will provide additional protection through reinforced walls, high ceilings, and individualized sleeping accommodations. *See* Ex. F, Nelson Decl. ¶ 38.

### 5. Plaintiff's "fear" of decreased services is not an irreparable harm.

As with his other alleged harms, Plaintiff presents no evidence that he will actually receive a decreased level of education, medical, or rehabilitative services (let alone a constitutionally deficient level of services). Instead, he merely argues, without evidence, that this will occur.

Once more, an unfounded fear can never constitute a substantial risk of an irreparable harm. Not only has Plaintiff failed to cite any evidence corroborating or justifying his fear, the only evidence before the Court is, yet again, to the contrary. Plaintiff will continue to receive the same level of constitutionally compliant education, medical, and rehabilitation services if he is transferred to BCCY-WF. *See* Ex. G, Bridgewater Decl. ¶ 25-34; Ex. D, Dandridge Aff. ¶¶ 9-20; Ex. C, Deville Aff. ¶¶ 10-31.

### B. Plaintiff does not have a substantial likelihood of prevailing on the merits.

Generally, Plaintiff's Complaint (Doc. 1) asserts claims pursuant to 42 U.S.C. § 1983 for "unlawful conditions of confinement and deprivation of due process." *See* Compl. (Doc. 1) at ¶ 13. More specifically, Plaintiff contends that "[b]y transferring youth adjudicated delinquent to the

24

Louisiana State Penitentiary at Angola, a maximum-security adult prison, Defendants violate their duty to provide conditions of reasonable health and safety to the Youth it holds in its custody, and demonstrate deliberate indifference to a substantial risk of serious harm to Plaintiff, in violation of Plaintiff's rights under the Fourteenth Amendment to the U.S. Constitution" and that "Defendants' actions are also punishment of Plaintiff in violation of the Fourteenth Amendment." *Id.*

Plaintiff has not established a substantial likelihood of prevailing on the merits for at least four reasons:

- Plaintiff failed to exhaust administrative remedies before filing suit as required by the PLRA;

- Plaintiff incorrectly relies on the relaxed "objectively unreasonable" standard of liability, but that standard does not apply to Plaintiff's claims;

- Plaintiff does not—and cannot—demonstrate Defendants were deliberately indifferent, as required by Section 1983; and

- Plaintiff's claim regarding a deprivation of educational and rehabilitation services is neither legally cognizable, nor factually supported.

Because Plaintiff failed to establish the first element required to obtain a temporary restraining order, his Motion should be denied.

1.     **Plaintiff failed to exhaust his available administrative remedies before filing this action.**

The federal PLRA provides that "no action shall be brought under [§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).[5],[6] Exhaustion is

---

[5] Because Plaintiff is alleging violations of federal law in a federal district court, his complaint is subject to the procedural requirements of the PLRA. *Ferrington v. Louisiana Dep't of Corr.*, 315 F.3d 529, 532 (5th Cir. 2002).

[6] For purposes of the PLRA exhaustion requirement, "prisoner" is broadly defined and includes "any person … detained in any facility who is accused of . . . **or adjudicated delinquent for**, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h) (emphasis added); *see also Molina v. New York*, 697 F. Supp. 2d 276, 282 (N.D.N.Y. 2010) ("[t]his exhaustion requirement applies equally to juveniles confined in correctional facilities.") (citing 42 U.S.C. § 1997e(h)).

only complete when a plaintiff pursues all "available" administrative remedies, and when (1) the plaintiff has received a final administrative decision at the last step of the applicable procedure; or (2) the time limits for the prison's response at the last step of every available administrative remedy has expired, such that "there is no next step (save filing a lawsuit) to which the prisoner can advance." *See Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004); *Wilson v. Epps*, 776 F.3d 296, 301 (5th Cir. 2015). The PLRA also requires "proper" exhaustion; that is, the plaintiff must comply with "an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).

The PLRA establishes a mandatory exhaustion regime, forecloses judicial discretion, and prevents a court from excusing a failure to exhaust, even to take "special circumstances" into account. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016) ("the PLRA's text suggests no limits on an inmate's obligation to exhaust."); *see also Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."). Moreover, "a prisoner must now exhaust administrative remedies even where the relief sought . . . cannot be granted by the administrative process." *Woodford*, 548 U.S. at 85. The only limit to § 1997e(a)'s mandate is that administrative remedies must be "available." *See Ross*, 136 S. Ct. at 1859-62.

### a.    OJJ maintains a detailed administrative remedy procedure.

OJJ maintains an Administrative Remedy Procedure ("ARP") to efficiently process internal grievances, such as those addressed in Plaintiff's Complaint, based on its expertise in managing Youth detention facilities. *See* Ex. A, Aff. of Revettea Woods ("Wood Aff.") ¶ 2-3; *see also* Exhibit A-1. Under the ARP, a Youth must fully exhaust a two-step grievance process before

seeking judicial review. *See* Ex. A-1 at 1-14. A Youth first initiates the process by filing an ARP form, deemed filed upon "receipt" by an ARP Coordinator. *Id.* at 4. The ARP Coordinator screens the form and sends it to a facility director, who must respond within 30 days. *Id.* at 7-8. If the Youth is dissatisfied with the director's response, he has 15 days to seek review from the Deputy Secretary of Youth Services. *Id.* at 8-9. The Deputy Secretary must render a final decision within 21 days of receiving the request for review, and the entire process must be completed within 51 days of the original filing of the Youth's grievance form. *Id.* If the Youth is dissatisfied with the response, he may then seek judicial review. *Id.* at 9.

If the Youth's ARP form expresses a belief that he is at immediate risk of harm and that any delay in responding to the grievance would subject him to immediate personal injury or other serious irreparable harm, the ARP coordinator must "immediately forward the ARP" to the regional director, who must "provide an initial response within 48 hours and issue a final decision within five[] calendar days." *Id.* at 9-10. The emergency grievance procedure does not render the standard two-step process unavailable to the Youth, nor does it prevent the Youth from seeking requested relief from the facility in Step 1, or review from the Deputy Secretary in Step 2. *See generally id.*

### b.    Plaintiff did not exhaust the available ARP.

Plaintiff filed an Emergency ARP form in connection with his potential transfer to BCCY-WF on August 16, 2022. *See* Ex. A, Woods Aff. ¶ 8 & Ex. A-3. OJJ denied the request for emergency consideration of the ARP and informed Plaintiff of same on August 18, 2022. *See id.* ¶ 9 & Ex. A-3. As of the date of this filing, the time period for responding to Plaintiff's ARP has not run. *See id.* ¶ 10. This lawsuit was filed on August 19, 2022—before the deadline for responding to Plaintiff's ARP. *See* Doc. No. 1.

Plaintiff failed to exhaust because OJJ's two-step grievance process remained available to him notwithstanding his emergency grievance. The PLRA is clear that a Youth must exhaust all "available" remedies prior to filing a claim under federal law. 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 741 (2001). As the Supreme Court has emphasized, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 211 (2007); *see also Woodford*, 548 U.S. at 90 (explaining that administrative exhaustion "means using all steps that the agency holds out, and doing so properly so that the agency addresses the issues on the merits.").

OJJ's ARP does not except Youths from addressing grievances through the standard two-step process if they do not receive emergency relief where requested. *See generally* Ex. A-1. In other words, the ARP includes no provision for complete curtailment of the two-step grievance process, even where a Youth is denied emergency relief. In fact, the ARP specifically states that a Youth may seek judicial review after the conclusion of Step 2 of its standard process but contains no such language in the emergency grievance provision. *See id.* at 9-10. Thus, the ordinary grievance process remains "available" within the meaning of the PLRA even after an inmate has sought administrative relief under an emergency grievance. *See, i.e.*, *Brown v. Eardley*, 184 F. App'x 689, 691-92 (10th Cir. 2006) (holding administrative remedies were still available to inmate through standard grievance process even though warden did not respond to emergency grievances within the three days required under applicable regulations); *Brazell v. Ruh*, 2015 WL 2452410, at *3-4 (E.D. Ark. May 21, 2015) (same).

Here, a finding that Plaintiff fully exhausted available remedies would create a perverse incentive for Youth to file frivolous "emergency" ARPs and then immediately file suit at the end of the five-day window, thereby circumventing OJJ's grievance procedure. *See Smith v.*

*Asselmeier*, 2018 WL 3533346, at *3 (S.D. Ill. July 23, 2018), *aff'd*, 762 F. App'x 342 (7th Cir. 2019) ("If a prisoner could exhaust his administrative remedies by filing an emergency grievance instead of going through the standard protocols, then the entire regulatory structure would collapse."). It is clear from the express language of PLRA and applicable case law that Congress did not intend this result.

Accordingly, Plaintiff has not fully exhausted available administrative remedies. Nothing in the PLRA allows for a plaintiff to bypass the exhaustion requirement. The Supreme Court has consistently been clear that the PLRA's statutory exhaustion requirement does not make exceptions for "special circumstances." *Ross*, 136 S. Ct. at 1856–57. For this reason alone, this Court should deny Plaintiff's Motion.

### 2.    The *Kingsley* "objectively unreasonable standard" does not apply.

Plaintiff argues Defendants are liable under the Fourteenth Amendment because Defendants' plan to transfer him to BCCY-WF is "objectively unreasonable," a more relaxed standard adopted by the Supreme Court in *Kingsley* for excessive force cases involving pre-trial detainees. *See* Pls.' TRO Br. (Doc. 9) at 21 & n.51 (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)). Plaintiff admits that the more stringent deliberate indifference standard has been applied by the Fifth Circuit in Eighth and Fourteenth Amendment cases, like *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996). *Id*. at 22, n.52. But, because *Hare* precedes *Kingsley*, Plaintiff asserts the more relaxed "objectively unreasonable" standard should apply. *Id*.

Plaintiff is incorrect—the Fifth Circuit has expressly rejected the *Kingsley* objectively unreasonable standard for cases not involving excessive force against pre-trial detainees. *See Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419–20 (5th Cir. 2017) (rejecting one dissenting judge's invitation to extend *Kingsley*). This Court has repeatedly recognized this

holding. *See Guillory v. Louisiana Dep't of Health & Hosps.*, No. CV 16-787-JWD-RLB, 2018 WL 1404277, at *8 (M.D. La. Mar. 20, 2018) ("deliberate indifference standard remains a subjective one as set out in *Hare* despite the intervening case of *Kingsley*").[7, 8] *Alderson* and its progeny make clear that the deliberate indifference standard applies here.

### 3.   <u>Plaintiff does not—and cannot—demonstrate deliberate indifference.</u>

Liability under Section 1983, whether based on the Eighth or Fourteenth Amendment, requires that prison officials act with deliberate indifference to a substantial risk of serious harm. *See generally Gumns*, 2020 WL 2510248 (analyzing Section 1983 claims under Eighth and Fourteenth Amendments).[9] Deliberate indifference is "an extremely high standard to meet." *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020) (citation omitted). Proof of negligence, or even gross negligence, is not enough. *Hare*, 74 F.3d at 645 (deliberate indifference must be a "step up" from "mere or even gross negligence," or otherwise the standard is rendered "meaningless"). Relevant to Plaintiff's claim, apprehension regarding confinement does not imply unconstitutional confinement conditions. Instead, deliberate indifference requires deprivation of "basic human needs." *Valentine*, 956 F.3d at 801.

---

[7] *See Robertson v. Gautreaux*, No. CV 16-341-JJB-RLB, 2017 WL 690542, at *4 (M.D. La. Feb. 21, 2017), *aff'd in part*, 731 F. App'x 337 (5th Cir. 2018) ("Recently the Fifth Circuit reaffirmed the *Hare* holding in light of *Kingsley*. Accordingly, this Court applies a deliberate indifference standard to Plaintiff's claims."); *see also Joyner v. Grenada Cty., Miss.*, 458 F. Supp.3d 486, 491 (N.D. Miss. 2020) (failure to protect case discussing *Alderson* to explain Fifth Circuit has considered and expressly rejected *Kingsley* beyond excessive force cases).

[8] Admittedly, Defendants are somewhat uncertain of Plaintiff's precise argument as to the standard of liability. The *Hare* decision differentiated between constitutional challenges regarding "conditions of confinement" versus "episodic acts or omissions." *Hare*, 74 F.3d at 644-45. To the extent Plaintiff is attempting to make a "conditions of confinement" allegation, the liability test for such claims is whether "a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective." *Id.* at 651 (J. Dennis, concurring). If it is rationally related, then it is not unconstitutional "punishment." *Id.* (but applying the deliberate indifference standard to episodic acts at *id.* at 636). *See also Guillory v. La. Dep't of Health & Hosp.*, No. 16-787, 2018 WL 1404277, at *7-8 (M.D. La. March 20, 2018) (discussing *Hare* and distinguishing the liability standards). Here, all of Defendants' objectives are clearly rationally related to the legitimate government goal of protecting the health and safety of the Youth. Thus, even if Plaintiff is making a "conditions of confinement case" and the rational relationship test applies, which Plaintiff has not (clearly) argued, Plaintiff still fails to demonstrate any likelihood that Defendants are liable.

[9] *See also generally, i.e., Jones v. Tex. Dep't of Crim. Justice*, 880 F.3d 756 (5th Cir. 2018) (discussing deliberate indifference in Eighth Amendment claim); *Estate of Pollard v. Hood County, Tex.*, 579 Fed. App'x 260 (5th Cir. 2014) (discussing deliberate indifference in Fourteenth Amendment claim).

Courts apply a two-part analysis to determine whether a defendant has acted with deliberate indifference under Section 1983. *Id.* (citation omitted). First, the plaintiff must establish an "objectively intolerable risk of harm." *Id.* Second, the plaintiff must establish the defendant acted with subjective indifference; that is, the defendant: "(1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively dr[e]w the inference that the risk existed; and (3) disregarded the risk." *Id.* (citations and quotations omitted).

Plaintiff's Motion fails to establish either the objective or the subjective prong of the deliberate indifference standard.

### a.    OJJ's use of the BCCY-WF facility does not create an "objectively intolerable risk of harm."

First, Plaintiff fails to establish an "objectively intolerable risk of harm."  As Defendants have demonstrated through the record evidence, the Youth will not be housed within "sight or sound" of adult inmates, and all current services will continue at BCCY-WF.  Plaintiff has presented no evidence to the contrary.  Accordingly, there is no risk of any harm to the Youth.

### b.    OJJ's creation of BCCY-WF is well-reasoned and demonstrates Defendants did not act with subjective deliberate indifference.

Second, even if Plaintiff could establish an objectively intolerable risk of harm (and he cannot), Plaintiff fails to establish Defendants acted with subjective deliberate indifference to that risk, as required for Section 1983 liability.

In *Valentine*, the Fifth Circuit clarified that – to establish liability – defendants must have "general awareness of the dangers" posed by their conduct and must "subjectively believe the measures they are taking are inadequate." *Valentine*, 956 F.3d at 802. The Fifth Circuit has held that, though a court may disagree with a defendants' actions, "mere disagreement" "does not establish deliberate indifference." *Id.* at 803.

The only evidence before the Court is that Defendants subjectively believe that the steps they are taking are <u>adequate</u> to protect the Youth from the dangers, if any, posed by temporarily locating the TTU at BCCY-WF. *See* Ex. B, Patin Aff. ¶¶ 13-19.

Because Plaintiff cannot meet his burden under the objective or subjective prong of the deliberate indifference test, he cannot establish a substantial likelihood of success on the merits of his Section 1983 claim.

### 4.    <u>Plaintiff's claim regarding a deprivation of educational and rehabilitative services is neither legally cognizable nor factually supported.</u>

Plaintiff has also failed to show a substantial likelihood of success on the merits of his substantive due process claim involving OJJ's alleged denial of access to educational and rehabilitative programming.

As an initial matter, Plaintiff references the Louisiana Constitution and the Supreme Court of Louisiana's opinion in *In re C.B.,* 708 So.2d 391 (La. 1998), which have no bearing on this case. Plaintiff has not pled a claim for violations of state law or the Louisiana Constitution. *See generally* Compl. (Doc. 1). Instead, his claims sound under federal law, which only provides a cause of action for rights that arise under the U.S. Constitution or other federal laws. *Woodard v. Andrus*, 419 F.3d 348, 353 (5th Cir. 2005) ("§ 1983 is only a remedy for violations of federal statutory and constitutional rights."). *In re C.B.* based its holding on the Due Process Clause of the Louisiana Constitution and expressly declined to address whether the alleged "constitutional infirmities would also be present at the federal level." *In re C.B.,* 708 So.2d at 395-400. Accordingly, Plaintiff cannot base his action, which sounds entirely under Section 1983, on any rights established under state law in *In re C.B.*[10]

---

[10] In any event, the Fifth Circuit has noted that "[t]he Louisiana Constitution provides the same due process protections as that of the United States Constitution." *Cripps v. Louisiana Dep't of Agric. & Forestry*, 819 F.3d 221, 232 (5th Cir. 2016). Moreover, *In re C.B.* dealt with a Louisiana statute that allowed juveniles to be housed in adult facilities and

Even if the claim was legally cognizable – and it is not – Plaintiff has failed to show that OJJ's transfer of Plaintiff to BCCY-WF will alter the educational and rehabilitative programming provided to Plaintiff or will constitute a deprivation of constitutional rights.

First, there is no firmly established constitutional right to educational and rehabilitative programming. The Supreme Court has declined to address the appropriate federal standards by which to judge the conditions of a state juvenile detention facility, both generally and as applied to rehabilitative treatment. *See Ingraham v. Wright*, 430 U.S. 651, 669 n.37 (1977). In the Fifth Circuit's only case addressing the issue, the court vacated a district court's grant of an injunction in favor of a class of juvenile detainees, explaining that a "right to treatment for juvenile offenders has not been firmly established." *Morales v. Turman*, 562 F.2d 993, 997 (5th Cir. 1977). Indeed, the *Morales* Court was skeptical of such a right, characterizing it as "doubtful." *Id.* at 998. The court ultimately reasoned that "even if some form" of the right existed, the district court's injunction was excessively detailed, as a court "is not in a position to monitor day-by-day changes that affect rehabilitation programs." *Id.* at 999.[11]

Second, even in cases recognizing a constitutional right to rehabilitative programming, the challenged practices in those cases fall far below what common sense suggests as appropriate. For instance, in *Donnell C. v. Illinois State Board of Education*, 829 F. Supp. 1016 (N.D. Ill. 1993), the juvenile-detainee plaintiffs alleged that, for the entire length of their pretrial detention, (a) only

---

subjected to the same hard-labor requirements as adults. *In re C.B.*, 708 So.2d at 395-400. Plaintiff has not been threatened with nor subjected to any such conditions, and as discussed below, the undisputed evidence demonstrates that he will not be.

[11] Other courts that have addressed the existence and extent of juvenile detainees' constitutional rights to rehabilitative programming have held that no such right exists. *See, i.e.*, *Santana v. Collazo*, 714 F.2d 1172 (1st Cir. 1983). In *Santana*, the First Circuit expressly held that such a right did not exist. *Id.* at 1176–77. "[A]lthough rehabilitative training is no doubt desirable and sound as a matter of policy and, perhaps, of state law, [juvenile detainees] have no constitutional right to that rehabilitative training." *Id.* Even in courts that have embraced the right of juveniles to receive rehabilitative education and treatment, those courts specifically declined to draw a bright-line rule and instead offered "minimum acceptable standards of care and treatment" as guideposts. *See Nelson v. Heyne*, 491 F.2d 352, 360 (7th Cir. 1974).

39% of those in need of special educational services were receiving them; (b) the plaintiffs were not being taught courses other than reading and math; (c) they did not have textbooks, workbooks, or other instructional materials; and (d) they were not given learning disability assessments and instruction. *Id.* at 1017-18. Based on these allegations, the court held that the plaintiffs' complaint stated a claim for violations of substantive due process. *Id.* at 1018. Similarly, a court has held that due process violations were present where detainees were placed in "cottages without regard to their age, prior social history, reason for confinement[,] or individual treatment needs, but solely on the basis of vacancies and the maintenance of a fixed black-white ratio in each cottage." *Morgan v. Sproat*, 432 F. Supp. 1130, 1141–43 (S.D. Miss. 1977). The court explained that this did "not allow the matching of students with compatible counseling and supervisory staff" and that it failed to provide a "reasonable opportunity to be rehabilitated." *Id.*

Here, Plaintiff has failed to show a substantial likelihood of success on his claim that OJJ's transfer of Plaintiff to BCCY-WF will result in a modification to his educational and rehabilitative programming such that it would create a constitutional deficiency. Aside from his speculation that educational and rehabilitation services might be provided by DOC staff or that the level or amount of service will decrease upon transfer, which is not accurate, Plaintiff has failed to make any meaningful, specific allegations about how the educational and rehabilitation services provided to him at BCCY-WF will be constitutionally insufficient, let alone provide evidence of same.

Plaintiff certainly has not shown the complete breakdown in educational programing as present in *Donnell* or the absolute failure to consider individualized needs as present in *Morgan*

that gave rise to a finding of a constitutional deprivation. *See Donnell* 829 F. Supp. at 1017-18; *Morgan*, 432 F. Supp. at 1141–43.[12]

To the contrary, OJJ has plans and staff in place to continue all of Plaintiff's education and rehabilitative services once transferred to BCCY-WF and to provide such services through OJJ staff and vendors in the exact same manner as they are currently being provided to Plaintiff at BCCY. *See* Ex. D, Dandridge Aff. ¶¶ 8-19; Ex. C, Deville Aff. ¶¶ 15-21; Ex. G, Bridgewater Decl. ¶¶ 29, 34.

As long recognized in the Fifth Circuit, courts are not in "a position to monitor day-by-day changes that affect rehabilitation programs." *Morales v. Turman*, 562 F.2d at 996. Intervention on this issue is "a significant federal intrusion into a state's affairs," where "[s]tate governments have wide discretion." *Id.* at 996.

For these reasons, Plaintiff's claims regarding a constitutional deprivation of educational and rehabilitative services are not substantially likely to succeed on the merits. Because Plaintiff cannot establish the first element of injunctive relief, the Court should deny Plaintiff's Motion.

**C.    The Certain and Immediate Harm to Defendants if the Injunction Is Granted Outweighs Plaintiff's Speculation of Potential Injury if the Injunction Is Denied.**

While Plaintiff offers only speculation of potential injury if the injunction is denied, Defendants will suffer irreparable injury as a matter of law if the injunction is granted. *See Valentine*, 956 F.3d at 803. ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (quoting *Maryland v. King*, 567 U.S. 1301, (2012) (Roberts, C.J., in chambers)).

---

[12] Plaintiff has also failed to show, or even suggest, how the OJJ's current objectives will result in Youth being subject to adult hard-labor requirements or have otherwise made the Youths' confinement indistinguishable from that of adult prisoners, as was the case in *In re C.B.* 708 So.2d at 395-400.

Here, as in *Valentine*, the State of Louisiana has "assigned the prerogatives" of juvenile detention policy to Defendants, and the Court's injunction would "prevent the State from effectuating the Legislature's choice and hence imposes irreparable injury." *Id.* As the *Valentine* court explained, the Supreme Court "has repeatedly warned that it is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Id.* (quotations omitted). Operation of juvenile detention centers is no different. As such, like the *Valentine* defendants, Defendants will be irreparably harmed if the injunction is granted. *Id.*

As recognized in *Valentine*, in the midst of the COVID-19 pandemic, the harm to Defendants is "particularly acute" because an injunction would interfere with OJJ's "system-wide approach" to respond to the changing needs of the Youth in its care. *Id.* Issuing an injunction here will threaten Defendants' "ability to continue to adjust its policies" by "lock[ing] in place a set of policies". *Id.* If Defendants are not free to act "without a permission slip from the district court, … [t]hat constitutes irreparable harm." *Id.*

For this additional reason, Plaintiff's Motion should be denied.

**D.**     **The Public Interest Is Served if the Motion Is Denied.**

While Plaintiff's Motion asserts it is "always" in the public interest to prevent the violation of constitutional rights, there are limits to this sweeping statement. *See* Pls.' TRO Br. (Doc. No. 9) at 31-32.[13] Indeed, "when a state statute vests state officials with broad discretionary authority concerning [prison operations], the Constitution affords the prisoners no constitutionally protected interests that might outweigh defendants' or the public interests in prison administration." *Patterson v. Daniels*, No. 12-1674, 2010 WL 2100546, at \*21 (E.D. La. March 22, 2013)

---

[13] If there were no limits on this position, then the fourth factor would be a moot point, as it would always weigh in favor of a movant claiming deprivation of constitutional rights.

(referencing *Olim v. Wakinekona*, 461 U.S. 238, 249–50 (1983) and *Merit v. Lynn*, 848 F.Supp. 1266, 1267–68 (W.D. La. 1994)).

Louisiana courts have held it is "against the public interest to issue an injunction based solely on plaintiff's disagreement with the health care being provided" by "corrections officials who are presently charged with that obligation." *Hawkins v. Hawkins*, No. 3:11–cv–1325, 2012 WL 601426, at *9 (W.D. La. Jan. 2, 2012) (where plaintiff inmate complained of denial of prompt and appropriate medical care and requested injunctive relief for same). Again, the Supreme Court "has continuously cautioned federal courts from assuming a greater role in decisions affecting prison administration." *Id.* (collecting cases); *see also Zantiz v. Seal*, No. 12-1580, 2013 WL 357069, at *4 (E.D. La. Jan. 29, 2013) ("To issue an injunction against this facility would limit those best equipped to make decisions about the proper procedures to maintain safety, and would therefore disserve the public interest in maintaining the safety of the prisoners and officers at the facility.") (where plaintiff inmate complained of, *inter alia*, inadequate medical care).

Therefore, Plaintiff has failed to establish that the public interest will be served if the injunction is granted. The Court should deny the Plaintiff's Motion.

## CONCLUSION

As demonstrated here, Plaintiff's Motion for Emergency Temporary Restraining Order is unwarranted and should be denied.

- Plaintiff fails to establish a substantial likelihood of success on the merits for multiple reasons: (1) Plaintiff failed to exhaust administrative remedies, (2) Plaintiff cannot rely on a relaxed "objectively unreasonable" liability standard, (3) Plaintiff does not—and cannot—establish Defendants were objectively or subjectively deliberately indifferent, and (4) Plaintiff improperly asserts a claim based on the Louisiana Constitution that is neither legally or factually actionable.

- Plaintiff fails to establish he will suffer an irreparable injury if the injunction is not granted; his speculative fear does not amount to a violation of his constitutional rights.

37

- Plaintiff ignores the certain and immediate harm to Defendants if an injunction is granted, as this would interrupt OJJ's ability to continue appropriately responding to the needs of the Youth in its care.

- Plaintiff's request for injunctive relief is inconsistent with the public interest, based on OJJ's duty under Louisiana law to oversee and administer juvenile justice.

For all of these reasons, the Court should deny Plaintiff's Motion.

Dated: August 26, 2022

Respectfully submitted,

By:   *S/Allena McCain*
      Randal J. Robert (La. Bar No. 21840)
      Connell L. Archey (La. Bar No. 20086)
      Madaline G. King (La. Bar No. 38301)
      Allena W. McCain (La. Bar. No. 38830)
      Butler Snow LLP
      City Plaza
      445 North Boulevard, Suite 300 (70802)
      P.O. Box 2997
      Baton Rouge, LA 70821
      randy.robert@butlersnow.com
      connell.archey@butlersnow.com
      madaline.king@butlersnow.com
      allena.mccain@butlersnow.com
      Phone: 225-325-8735
      Fax: 225-343-0630

      Kyle V. Miller (*pro hac vice* pending)
      Lemuel E. Montgomery III (*pro hac vice* pending)
      Butler Snow LLP
      kyle.miller@butlersnow.com
      lem.montgomery@butlersnow.com
      1020 Highland Colony Parkway, Suite 1400
      Ridgeland, MS 39157
      Phone: 601-948-5711
      Fax: 601-985-4500

      *Defendants' Attorneys*

## <u>CERTIFICATE OF SERVICE</u>

I, Allena W. McCain, hereby certify that I have today served the foregoing Defendants' Response in Opposition to Plaintiffs' Motion for Temporary Restraining Order via the Court's electronic filing system, which provided notice to all counsel of record.


Dated: August 26, 2022

*S/Allena McCain*
ALLENA W. McCAIN

65504980.v2