## 28 U.S.C. 1746 DECLARATION OF CURTIS NELSON

Pursuant to 28 U.S.C. 1746, I hereby declare as follows:

1.      My name is Otha "Curtis" Nelson, Jr..   I am over twenty-one (21) years of age and of sound and disposing mind.   I have never been convicted of a felony or a crime involving dishonesty or false statement.   I have knowledge of, and am competent to testify about, the matters stated in this Affidavit.   I am under no legal or other disability. The facts stated herein are true and correct to the best of my knowledge and belief.

2.      I am currently employed as the Assistant Secretary for the Louisiana Office of Juvenile Justice ("OJJ").   I have held this position since May 30, 2022.   I have over 30 years of experience working with children and families in various roles, including as an adolescent mental health technician, a court appointed special advocate, a parent's attorney in child in need of care proceedings, a child's defense attorney in delinquency and families in need of services proceedings, a juvenile prosecutor for the Nineteenth Judicial District Attorney's Office, and as Deputy Judicial Administrator for the Louisiana Supreme Court's Division of Children and Families.

3.      I received a Bachelor's Degree in Psychology with a minor in Sociology from Louisiana State University in 1992.   I obtained my Juris Doctor from Loyola University New Orleans College of Law in 1997.

4.      I am a member of the Louisiana State Bar Association and National Association of Counsel for Children.   I serve as a Child Welfare and Juvenile Justice State and National Trainer.   I received the 2012 President's Award from the Baton Rouge Bar Association for Juvenile Justice Work and the 2020 Children's Law Award from the Louisiana State Bar Association

5.      I am a veteran of the United States Army.   I served six years with the Louisiana Army National Guard in the Combat Medical Unit and six years with the United States Army Reserve in the Theater Support Command and as a Judge Advocate General.

6.      I have served as a Co-Chair of the Louisiana State Bar Association Children's Law Committee, Co-Chair of the Juvenile Detention Alternatives Initiative Leadership



EXHIBIT
F

Collaborative, Committee Member of the Louisiana Children Justice Task Force, Committee Member of the Governor's Advisory Board of Juvenile Justice and Delinquency Prevention, and Advisory Board Fellow for the Pelican Center for Children and Families.

## OJJ Operations and Structure

7.      OJJ is an arm of the Louisiana Department of Public Safety & Corrections ("DOC").  OJJ is responsible for the care, custody, security, and treatment of children adjudicated delinquent and children of families adjudicated in need of services committed to the custody of or placed under the supervision of the OJJ or youth services pursuant to the Children's Code.

8.      OJJ's mission to protect the public by providing safe and effective individualized services to youth, who will become productive, law-abiding citizens.

9.      There are three primary levels of care for Youth in the OJJ system: probation and parole, non-secure facilities, such as group homes, and secure care facilities.

10.      OJJ houses certain Youth who have been adjudicated delinquent in secure care facilities.  A number of factors may cause a Youth to be assigned to a secure care facility, but most often the assignment is due to the violent nature of the underlying criminal act committed by the Youth, the Youth committing a crime of sexual assault, the Youth's repeated commission of serious crimes, and/or the Youth's failure to comply with less restrictive rehabilitation programs (e.g., probation, group homes).

11.      OJJ maintains five secure care facilities across the state: Acadiana Center for Youth at Bunkie ("ACY"), Acadiana Center for Youth at St. Martinville ("ACY-SM"), Bridge City Center for Youth ("BCCY"), Swanson Center for Youth at Monroe ("SCY"), and Swanson Center for Youth at Columbia ("SCY-C").

12.      The secure care facilities include housing dormitories, common areas, gymnasiums, outdoor recreational areas, schools, medical and counseling facilities, and dining areas.  Movement of the Youth between these areas is controlled by staff, but the Youth have significantly greater freedom to move from one area of the campus to another than an inmate in an adult correctional setting would have.   Each dormitory may be

65528285.v1

comprised of twelve to fifteen Youth on average, and the Youth are free to move about their dormitories.

13.     Youth who are classified in OJJ secure care facilities are under the direct and constant supervision of OJJ staff and adhere to a daily programming rehabilitation schedule that includes education, counseling, medical, and recreational services to help the Youth learn how to make healthier life decisions.

**Current Issues Faced by Existing OJJ Secure Care Facilities**

14.     Recent events involving only a small number of Youth in OJJ's secure care facilities have revealed that the existing secure care facilities and rehabilitation programs are not sufficient to effectively house these particular Youth.

15.     The secure care facilities were constructed with standards designed to house Youth offenders.   In OJJ's experience, Youth offenders assigned to the secure care facilities are generally able to adapt to the secure care environment and comply with the behavioral rules.  Historically, OJJ has not experienced large scale or serious events (e.g., riots, escape attempts, acts of armed violence against other Youth or staff).  Accordingly, the construction techniques to build these facilities have been consistent with the expected behavior (e.g., non-reinforced walls, standard ceiling heights).

16.     While ordinarily beneficial for the therapeutic mission of OJJ, the open dormitory housing at existing secure care facilities presents a safety and security issue with respect to these particular Youth.

17.     Certain Youth have engaged in repeated disruptive behaviors and physical assaults upon their peers, demonstrating an inability to cohabitate peacefully and safely with other Youth in the facilities.  These disruptions present a physical and mental health hazard for Youth housed with the disruptive Youth.   Those Youth have also assaulted and injured staff members to the point that many staff members have voluntarily ended their employment with OJJ.

18.     The disruptive Youth have caused substantial property damage to the secure care facilities.

65528285.v1

19.     The disruptive Youth have repeatedly escaped and have engaged in violent and serious criminal behavior prior to their apprehension and return to the facilities.   For example, Youth who have escaped from OJJ secure care facilities have been accused of theft of motor vehicles, carjacking, burglary, armed robbery, attempted murder, reckless operation of stolen vehicles, and illegal possession of handguns.

20.     On July 17, 2022, six Youth housed at BCCY escaped the facility.   Five of the Youth engaged in the theft of a truck, repeatedly rammed into a Jefferson Parish Sheriff's Deputy's vehicle, were involved in a short pursuit, and ultimately crashed the truck.   The sixth Youth engaged in the carjacking of a vehicle at gunpoint then shot the occupant, a 59-year-old New Orleans man, who was critically injured.

21.     On June 16, 2022, around 20 Youth escaped their dormitory at BCCY, took over part of the facility, and caused a riot. The riot resulted in injuries requiring medical attention to at least two Youth.   At least one staff member was hospitalized due to injuries.  In addition, five Youth escaped the secure care facility.

22.     On June 13, 2022, at least five Youth were involved in a physical altercation outside of the school building at SCY.  At least four staff members were battered by the Youth, and one staff member was transported to the hospital.  Named Plaintiff, Alex A., was involved in this incident and is accused of striking at least three staff members with a closed fist.

23.     On May 25, 2022, several Youth were involved in a fight in their dormitory at SCY.  Three of the Youth were over the age of 18 and were subsequently booked into adult correctional facilities for criminal charges.   The incident caused over $35,000 in damage to the facility.

24.     OJJ is already undergoing many renovation projects at various secure care facilities across the state, including a renovation of the Cypress Unit at SCY, ACY, and ACY-SM.  Additionally, OJJ is planning to begin large-scale renovations at BCCY once the new facility at Bridge City Center for Youth at West Feliciana ("BCCY-WF") is operational.

25.     Additionally, OJJ anticipates the opening of a new 72 bed Tier 1 and 2 high security facility at SCY in 2023.   This newly built facility, along with the recently renovated and repaired 48 beds at the SCY Cypress Unit and Mental Health Transitional Unit will provide a total of 120 secure care beds to house Youth with more severe and aggressive behavior.

**BCCY-WF as a Temporary Solution**

26.     OJJ is currently preparing to open a new Transitional Treatment Unit ("TTU") to provide greater individual rehabilitation services and security to a small number of disruptive Youth who are not responding appropriately to the current level of services and care.   Attached as Exhibit F-1 is Policy B.2.8 Transitional Treatment Unit (TTU) 08-23-22.

27.     The TTU will be at the OJJ's newly formed BCCY-WF, which is located on the campus of the Louisiana State Penitentiary ("LSP"), in a building physically and geographically isolated from housing units for adult offenders at LSP.

28.     Certain Youth with severe and dangerous behavioral issues, primarily confined in the current BCCY facility, have destroyed the physical facilities to the point that they must be renovated and repaired.  Due to the damage by these 25 to 30 Youth, the current BCCY facility no longer has enough available beds that are in habitable condition, and OJJ's current physical structures do not meet the needs for the TTU.  OJJ is currently at full bed capacity within the secure care facilities largely due to the extensive damage caused to sections of the five facilities by these Youth.

29.     A previously unused building on the LSP campus has the appropriate layout and infrastructure that, with minor modifications, can satisfy the needs of the TTU.

30.     Twenty-four Youth in OJJ custody will be housed at BCCY-WF.  This secure care facility is to be a temporary housing solution for the Youth.  The TTU will be relocated to one of the existing OJJ secure care facilities as soon as construction of the permanent facility is completed.

31.     BCCY-WF will be a Youth-only secure care facility.   No adult inmates are currently housed or will be housed at BCCY-WF.

32.     OJJ is committed to maintaining sight and sound separation from adults incarcerated at LSP such that Youth housed at BCCY-WF will not be placed in situations in which they have any clear visual or verbal contact with adult inmates.

33.     Consistent with federal and state requirements, the Youth housed at BCCY-WF will not be in contact with adults incarcerated at LSP.  Separation of Youth in OJJ custody from adult inmates will be maintained at all times.  No adult inmates will be permitted to enter the BCCY-WF fence line for any reason.

34.     OJJ will provide all services at BCCY-WF, including food, medical, counseling, custodial, maintenance, and groundskeeping.   OJJ will run BCCY-WF independent of LSP.  Although the DOC will assist OJJ with certain services while OJJ continues to onboard new staff, no adult inmates will be utilized to provide services within the BCCY-WF fence line.

35.     OJJ will not utilize DOC staff at BCCY-WF unless there are insufficient OJJ staff available to meet the facility's needs.  DOC staff will only be utilized when necessary, and such use will be limited, as the OJJ staff will primarily interact with the Youth.

36.     While it is the goal and intent of OJJ to exclusively provide security services, it is likely that some DOC security officers will provide security services at BCCY-WF.  This is not a practice that is unique to BCCY-WF, as OJJ routinely relies on DOC security officers to provide additional staffing at its secure care facilities if OJJ faces a staffing shortage.   Before any DOC security officer is permitted to work with the Youth, the officer must undergo training specific to policies and procedures for handling delinquent Youth.

37.     BCCY-WF will require approximately 112 staff members (including security, education, medical, programming, and ancillary services) when it is fully operational.  As of today, OJJ has identified approximately 40 staff members from existing secure care facilities who will staff BCCY-WF, and approximately 20 new employees have been interviewed and hired.  OJJ is actively interviewing and hiring more employees to staff BCCY-WF on a daily basis.

65528285.v1

38.     BCCY-WF will provide greater individual rehabilitation services and security to those Youth who are not responding appropriately to the services and care at BCCY. Specifically, BCCY-WF provides individual housing accommodations that will prevent certain Youth from accessing other Youth while they sleep.    BCCY-WF employs reinforced walls and high ceilings to avoid property damage.    BCCY-WF is located within multiple fences that will stop Youth from escaping or attempting to escape.

39.     BCCY-WF will provide Youth with more protection to prevent them from injuring themselves or from being injured by others.   Specifically, BCCY-WF will have fewer Youth residents than BCCY.

40.     I declare under penalty of perjury that the above and foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 26, 2022



_____
Otha "Curtis" Nelson

65528285.v1

# YOUTH SERVICES
# POLICY

| **Title:** Transitional Treatment Unit (TTU) | **Type:** B. Classification, Sentencing and Service Functions |
|---|---|
| | **Sub Type:** 2. Classification |
| | **Number:** B.2.8 |
| | **Page** 1    **of** 25 |

**References:**
La. Children's Code Arts. 897 and 899; La. R.S. 15:901 G, 17.416.2 – Discipline of Pupils, 17.7.5 – Alternative Education Instruction; ACA Standards 2-CO-3C-01 and 2-CO-4F-01 (Administration of Correctional Agencies); YS Policy Nos. A.1.14 "Unusual Occurrence Reports", B.2.1 "Assignment, Reassignment and Release of Youth", B.2.2 "Youth Classification System and Treatment Procedures", B.2.21 "Behavioral Intervention (BI) and Extended BI", B.5.1 "Youth Code of Conduct – Secure Care", B.6.4 "Accident and Injury (A&I) Evaluations"; BESE Bulletin 111 – State/School Accountability, 131 – Alternative Education, 741 – School Administrators, 1508 – Pupil Appraisal Handbook, 1706 – Regulations for the Implementation of Children with Exceptionalities Act; Section 504 of the Rehabilitation Act of 1973

| STATUS: Approved | |
|---|---|
| **Approved By:** *William A. Sommers, Deputy Secretary* | **Date of Approval:** 08/23/2022 |

## I.    AUTHORITY:

Deputy Secretary of Youth Services (YS) as contained in La. R.S. 36:405. Deviation from this policy must be approved by the Deputy Secretary.

## II.    PURPOSE:

To establish the program objectives and the criteria for the placement of youth and youth with disabilities in the Transitional Treatment Unit (TTU) located at the Bridge City Center for Youth at West Feliciana.  All students with disabilities assigned to OJJ's TTU program shall be provided a free and appropriate education (FAPE).

## III.    APPLICABILITY:

Deputy Secretary, Assistant Secretary, Chief of Operations, Executive Management Advisor, Youth Facilities Director - Statewide, Director of Treatment and Rehabilitation, Director of Education, Facility Directors, WFTTU staff, and contracted health care provider (CHP) staff.



**EXHIBIT**

**F-1**

YS Policy No. B.2.8
Page 2

Facility Directors are responsible for ensuring that procedures are in place to comply with the provisions of this policy.

## IV.  DEFINITIONS:

***Behavior and Accommodations Binder (BAB)*** – A binder containing the history of youth requiring physical intervention, as well as the most current Unified Behavior Plan (UBP) for Youth With Special Needs.  The BAB will contain these two (2) documents for youth residing in a particular housing area and shall be maintained in a secured area readily accessible to staff at all times.  Staff shall be advised of the location, content and purpose of the binder as it relates to this policy, and shall review the BAB at the beginning of every tour of duty, documenting their review in the unit's logbook.

***Behavior Intervention Plan (BIP)*** **–** A BIP is a written plan to help a student who struggles to behave in class. It's designed to stop problem behaviors by rewarding good behaviors.

***Bulletin 1508*** **–** Louisiana's Pupil Appraisal Handbook and serves as a regulatory guide for pupil appraisal personnel when conducting individual evaluations of students suspected of being exceptional and in need of special education and related services.

***Case Manager*** **–** A generic term used within a YS secure care facility to identify members of the counseling profession (e.g., social services counselor, clinical social worker, program manager, case manager or a treatment team member) assigned to manage a youth's case.

***Child Find*** – Child Find requires Local Education Educations (LEAs) to ensure that all students with disabilities who may be in need of special education and related services are identified, located, and evaluated.

***Compensatory Education*** **–** Compensatory services are educational services needed to make up for skills or learning that have been lost when services described in an IEP were not provided.

***Contracted Health Care Provider (CHP)*** **–** Contracted licensed practitioners responsible for the physical and mental well-being of the secure care youth population.  Services include medical, dental and mental health services, nursing, pharmacy, personal hygiene, dietary services, health education and environmental conditions.

YS Policy No. B.2.8
Page 3

***Developmentally Disabled/Intellectually Disabled (DD/ID) –*** Refers to significantly impaired intellectual and adaptive functioning with an Intelligence Quotient (IQ) of 68 or below with concurrent deficits or impairments in present adaptive functioning in at least two of the following areas:  communication; self-care; home living; social/interpersonal skills; use of community resources; self-direction; functional academic skills; work; leisure; health and safety; with onset before age 18.

***Exceptionality*** – Any disability term as well as gifted and talented per Individuals with disabilities Education Act (IDEA) and Bulletin 1508 guidelines.

***Exigent Circumstances –*** Exist when there is a substantial threat to the safety of others, or the custody concerns of the facility, and there is no time as a practical matter to convene a multidisciplinary team meeting.

***Free and Appropriate Public Education (FAPE)*** – FAPE is a law that makes available a free appropriate public education to eligible children/youth ages 3-21 and provided in conformity with an individualized education program (IEP).

***Individual Accommodation Plan/504 Plan –*** 504 Plan is intended for disabled children who do not need or qualify for special education but could benefit from accommodations and/or specialized help in school. These plans identify accommodations a disabled child needs to fully participate in the classroom and set up ways to help the child succeed.

***Individual Education Program (IEP) –***  An IEP is a written statement for a student with a disability that is developed, reviewed, and revised in a meeting in keeping with certain requirements of law and regulations. The IEP establishes measurable annual goals for the student and states the special education and related services and supplementary aids and services that the public or local education agency will provide to, or on behalf of, the student.

***Individualized Intervention Plan (IIP) – Initial and Formal –*** A statement of goals, objectives, and the methods used to obtain them that is created for each youth in secure care.  The IIP is dynamic and is updated depending on the identified needs and specialized treatment required for a youth while in secure care.  The IIP also identifies follow-up services needed by the youth on release and is coordinated with Community Based Services to provide the proper level of aftercare.

***Individualized Intervention Plan Summary of Staffing Form –*** A form completed for all case staffings for a youth in secure care.  The form lists any modification of goals and objectives that occur as well as new goals and objectives that are developed.

YS Policy No. B.2.8
Page 4

***Individuals with Disabilities Education Act (IDEA)*** – The nation's federal special education law that ensures public schools serve the educational needs of students with disabilities. IDEA requires that schools provide special education services to eligible students as outlined in a student's Individualized Education Program (IEP).

***Juvenile Justice Specialist (JJS)*** **–** Provides security of youth and assists in the application of clinical treatment in accomplishing the overall goal of evaluation and/or treatment of individuals judicially remanded to a YS secure care facility.

***Local Education Agency (LEA)*** – A public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other.

***Manifestation Determination (MDR)*** – A meeting to review all relevant information and the relationship between the child's disability and the behavior.

***Mental Health Treatment Professional (MHTP)/Qualified Mental Health Professional (QMHP)*** **–** Includes psychiatrists, psychologists, social workers, nurses and others who by virtue of their education, credentials, experience or with appropriate supervision, are permitted by law to evaluate and care for the mental health needs of patients.

***Multidisciplinary Evaluation (MDE)*** – The process of gathering both formal and informal data from a variety of sources to determine whether a student is eligible for special education services and to provide information about his or her current levels of functioning.

***Multidisciplinary Team (MDT) Staffing*** **–** A team consisting of representatives from at least three disciplines, (e.g., treatment, custody, education, mental health or medical) to determine a youth's suitability for placement to/removal from the Behavioral Health Treatment Unit.

***Operations Shift Supervisor (OSS)*** **–** Staff responsible for a range of duties that support management in maintaining a safe, secure facility.  Shift Supervisors oversee administrative and operational security activities during specific shifts; manage staff during each assigned shift; ensure adequate security coverage; lead count procedures; oversee the custody, supervision and control of secure care youth; manage frontline security staff; assist in controlling youth movement; assist in directing the use and issuance of keys, locks, and security equipment.

***Positive Behavior Intervention Supports (PBIS***) – An evidence-based three-tiered framework to improve and integrate all of the data, systems, and practices affecting student academic and behavior outcomes every day.

YS Policy No. B.2.8
Page 5

*Progress Monitoring* – A scientifically based practice used to assess a student's on-going academic and behavioral progress and evaluate the effectiveness of instruction.

*Related Services* - Related services means transportation and any other developmental, corrective, or other supportive services (e.g., speech, counseling health…) that a student needs to benefit from his or her educational program provided through the IEP for students identified with an exceptionality under IDEA.

*Section 504* – Section 504 of the Rehabilitation Act of 1973 requires that school districts provide a free appropriate public education (FAPE) to qualified students in their jurisdictions who have a physical or mental impairment that substantially limits one or more major life activities, regardless of the nature or severity of the disability.

*Seriously Mentally Ill (SMI)* **–** Disorders of mood and cognition (with the exception of developmentally disabled/ID) that significantly interfere with functioning in at least one essential sphere of the youth's life (e.g. psychotic disorders, mood disorders, the aggressively mentally ill, and youth who exhibit self-mutilating or suicidal behavior).  Youth with these disorders may be referred to as "SMI" youth.

*Structured Programming* **–** Includes any regularly scheduled activity provided to a youth out of his room from the time lights are turned on in the morning until lights are turned off at night in accordance with the facility's posted daily schedule.

*Transitional Treatment Unit (TTU)* **–** A maximum custody unit for youth described as violent and very aggressive with a documented history of engaging in behavior which creates or incites aggressive responses from others and creates an unsafe therapeutic environment for staff and youth.

*Trust Based Relational Intervention (TBRI)* **--** An attachment based, trauma informed intervention designed to meet the needs of vulnerable youth by using empowering, connecting and correcting principles to address behaviors.

*Unified Behavior Plan (UBP)* – A document developed by youth's Case Manager and maintained on youth designated by the contracted health care provider as having an individual deficit disorder.  This plan shall include any physical limitations and/or precautions that staff must be aware of in the event a physical intervention is necessary.

*Weekly Team Meeting* **–** A meeting conducted weekly by staff assigned to a unit to assess the development of the individual youth, to review a youth's progress, to plan out treatment strategies for the week, and to promote staff development and discuss staff issues.

YS Policy No. B.2.8
Page 6

## V.   POLICY:

It is the Deputy Secretary's policy to address the needs of the youth assigned to a YS Secure Care facility who require individual attention.  All reasonable efforts shall be made to utilize less restrictive alternatives in the placement of youth.

However, certain youth may require assignment to a more restrictive setting because their continued presence in the general population poses an ongoing threat to property, staff and other youth, or to custody concerns or orderly running of the facility.  In order to prevent arbitrary assignment, this policy establishes specific criteria for assignments to the TTU.  Assignment to the Transitional Treatment Unit is not to be used as punishment of youth.

## VI.  PHILOSOPHY, GOALS AND OBJECTIVES:

The Transitional Treatment Unit (TTU) is able to house up to twenty-four (24) youth, and is a maximum custody unit for youth described as violent and very aggressive with a documented history of engaging in behavior which creates or incites aggressive responses from others and creates an unsafe therapeutic environment for staff and youth.  The purpose of the TTU is to assist staff in implementing promising strategies for identified youth. The TTU is designed to assist youth in developing the self-regulatory, coping, and social skills needed to safely and successfully engage peers and staff members. The TTU is a specialty program that ensures coordinated programming for youthful offenders.

The goals of the program are to provide youth with accountability for their actions, to enable them to learn adaptive methods of resolving problems and reaching personal goals, and to provide on-going support to enable youth to generalize and maintain positive changes.

Objectives to achieve these goals are to:
1. Engage and motivate each youth to commit to change in their thinking, feelings and actions, by utilizing many therapeutic tools including but not limited to TBRI;
2. Identify the youth's dysregulatory emotions, thinking errors, and skills deficits that foster and lead to continuing violent behavior;
3. Assist the youth in learning more adaptive ways to solve problems through changing belief systems and teaching self-control, self-management, and problem-solving skills;
4. Provide a safe and reinforcing environment for the youth to practice the application of new cognitive constructs and emotional/behavioral skills to solve problems;
5. Provide phased reintegration of the youth into the general population with follow-up support services.

YS Policy No. B.2.8
Page 7

## VII.  PROCEDURES:

A Difficult Case Staffing may be conducted outside of the regularly scheduled Quarterly Reclassification Staffing if there are immediate concerns about a youth. Issues that may prompt the scheduling of a difficult case staffing would consist of medical, mental health or behavioral issues that have caused the youth to have difficulty functioning in the general population or have caused safety concerns.

The multi-disciplinary treatment team shall meet to develop a future plan for the youth to best meet his needs and assign specific staff to monitor and enforce the treatment plan.  A specific Behavior Improvement Plan [see Attachment B.2.8(a)] shall be developed by the youth's assigned Case Manager and approved by the Case Manager Supervisor within five (5) days of the staffing for youth with mental health or behavioral issues that are preventing the youth from progressing in treatment or are causing disruptions to programming. The behavioral plan shall be behaviorally specific, measurable, time limited and reviewed weekly with the youth and documented on how well he is doing or not doing in working towards successful completion of the plan.

If the youth has an exceptionality identified per IDEA and Bulletin 1508 guidelines, the BIP or Behavior Plan must be in alignment with the youth's IEP and the development should involve members from the IEP team

Unless there are exigent circumstances, a difficult case staffing must be held and a Behavior Improvement Plan implemented for a period of 30 days and show a lack of documented success in disrupting or stopping the behavior prior to referring a youth to the Transitional Treatment Unit (TTU).

### A.  Admission Criteria

To be considered for transfer to the TTU, a youth must meet at least one of the following criteria and must undergo all of the due processes involved in the unit transfer:

1.   Has exhibited a pattern of battery on other youth which has not been substantially reduced by prior intervention efforts (i.e., difficult case staffing, behavioral plan, code of conduct).

2.   Has committed a single battery/predatory act of such serious consequence that the potential of reoccurrence must be actively prevented.

3.   Has exhibited a substantially physical battery on staff that has been documented.

YS Policy No. B.2.8
Page 8

4.    Has a documented history (i.e. UORs, Youth Statements, Code of Conduct) of engaging in behavior that causes major disruption to programming (ie. gang activity) or incites predatory responses from other youth.

5.    Has been in possession of a significant weapon (i.e., gun, knife, bomb).

6.    Has created a dangerous situation for other peers by bringing in contraband (i.e., drugs, medication, substantial pornography with motivation to distribute).

7.    Has marijuana or other illegal substances in possession or has a substantial amount with motivation to distribute.

8.    Youth displays a chronic pattern of public masturbation.  Based upon the severity and frequency of the issue, the sex offender protocol shall be initiated.

9.    Has been involved in AWOL, AWOL attempt, and escape

**All incidents referenced must be documented with an Unusual Occurrence Report (UORs) (Refer to YS Policy A.1.14), Code of Conduct Violation Report (Refer to YS Policy B.5.1), and Accident & Injury (A&I) report (when applicable) (Refer to YS Policy B.6.4).**

Upon release from the TTU, the youth's placement will be best determined by the needs of the youth and not necessarily the unit from which the youth was transferred from.

B.    **Exclusionary Criteria**

The program is mostly designed for youth with significant delinquency issues. However, up to four youth classified as Seriously Mentally Ill may be transferred to the program after a consensus recommendation from an MDT staffing.

Youth classified with a Serious Mental Illness (SMI) whose MH stability is not currently well managed shall not be considered for this program. Youth with significant thought disorders (i.e., Schizophrenia, Schizoaffective Disorder, Delusional, Psychotic Disorder Unspecified, Dissociative Identity Disorder, Conversion Disorder, Major Depression with Psychotic Features, Post Traumatic Stress Disorder, Severe, etc), imminent suicidal ideation, imminent psychotic behavior will not be considered for the program.  Upon stabilization,

YS Policy No. B.2.8
Page 9

these youths shall be released to the most appropriate unit. Additionally, youth with significant developmental disabilities should be referred to the unit on a case by case basis.  These youths may be referred, with concurrence of Mental Health Contractor (Wellpath).

Youth identified with an exceptionality per IDEA regulations and Bulletin 1508, shall be afforded a Manifestation Determination Review (MDR) within 10 days, prior to the transfer to the TTU.

**C.    Referral Process**

1.    A referral for admission to the TTU can be made by the Facility Director, Deputy Director, Assistant Facility Director, Facility Treatment Director, the youth's assigned Case Manager or the youth's assigned dorm Group Leader.

Prior to making a referral to the TTU, a multidisciplinary team (MDT) shall conduct a staffing to discuss the specific circumstances of the youth's pattern of aggressive behavior, current Behavior Improvement Plan and its appropriateness to modify the youth's behavior. The MDT shall also review all documentation to support the referral to the TTU including, UOR(s), Code of Conducts, and A&I reports and speak with the youth about the consideration of a referral to TTU.

The multidisciplinary treatment team shall consist of the Facility Deputy Director and Treatment Director, youth's assigned Social Services Counselor and Group Leader and educational representative. The assigned Wellpath qualified MH professional and Wellpath psychiatrist if the youth is currently under Wellpath mental health care shall also be included.

2.    If the multidisciplinary team deems a referral to the TTU is appropriate, within two (2) working days, excluding holidays and weekends, the youth's Case Manager shall complete the TTU Referral Form [see Attachment B.2.8(b)] in JETS and send to the Director of Treatment and Rehabilitation along with documentation to support the youth meets the admission criteria, i.e. UOR(s), Code of Conducts, and A&I reports. The referral will be reviewed to verify the youth meets the admission criteria for transfer to the TTU.

Within one (1) working day of receiving the referral, the Director of Treatment and Rehabilitation will notify the referring Facility Director, Deputy Director, Assistant Facility Director, Facility Treatment Director, and the youth's assigned Case Manager of the outcome.

OJJ-000035

YS Policy No. B.2.8
Page 10

3.   Within five (5) days of verifying the youth meets the admission criteria to the TTU, a transfer staffing shall be held with the multidisciplinary treatment team. The Director of Treatment and Rehabilitation will notify all members of the MDT of the staffing date at least three (3) days prior to being held.

The multidisciplinary treatment team shall consist of the following: the Facility Deputy Director, Director of Education and Treatment Director of the sending facility, youth's assigned Social Services Counselor and Group Leader, TTU Dorm Leader and Case Manager, and the Director of Treatment and Rehabilitation. The youth's Wellpath assigned qualified MH professional and Wellpath psychiatrist if the youth is currently under Wellpath mental health care shall also be included.  The Supervisor of Special Education shall be a member of the multidisciplinary team if the referred youth receives special education or related services.

The youth's Case Manager shall invite the youth's parent/guardian to the MDT staffing, which shall be documented on a "Weekly Contact Progress Note" in JETS by the youth's assigned Case Manager of the requesting facility within three (3) working days.

4.   At least two (2) days prior to the staffing, the youth's assigned Case Manager shall forward the following to all members of the multidisciplinary team: completed TTU Behavioral Staffing Form [see Attachment B.2.8(c)], supporting documentation such as UORs and Code of Conduct hearing, A&Is, Behavior Improvement Plan, along with notes regarding how the youth did meeting the goals of the behavior plan.

5.   The MDT staffing may take place telephonically. The staffing shall be recorded in its entirety, and maintained by the Facility Treatment Director for a minimum of one (1) year in a secured location.

6.   A written record of the MDT staffing shall be prepared by the sending facility utilizing the "Individualized Intervention Plan Summary of Staffing" form in JETS, within three (3) working days of the staffing. Only the signature page of the "Individualized Intervention Plan Summary of Staffing" form shall be placed in the youth's Master Record.

If both facilities cannot agree on whether the youth will benefit from placement in the Transitional Treatment Unit, the Youth Facilities Director - Statewide shall make the final decision based upon the safety of the staff and the best needs of the youth.

YS Policy No. B.2.8
Page 11

**D. Transfer Process**

1. Arrangements for transfer to the TTU shall be made by designated staff within one working (1) day of the MDT staffing. The youth's Case Manager shall ensure that all appropriate paperwork is completed and processed in accordance with this policy and YS Policy No. B.2.1.

2. The documentation reflecting what precipitated the youth being transferred to the TTU, the strategies utilized to address these behaviors, and all other applicable documentation shall be included in the youth's Master and/or JETS record prior to transfer.

3. The youth's Case Manager on the TTU shall complete the "Transfer Letter to Judge" [see Attachment B.2.8(d)] and "Parental Notification of Transfer" [see Attachment B.2.8(e)] in JETS and send to the youth's judge of jurisdiction, and his family/legal guardian within 48 hours of his admission to the program (excluding weekends/holidays), utilizing the appropriate transfer letters in JETS.

**E. Emergency Transfer**

There may be an exigent circumstance when a youth's behavior or single action is so severe it necessitates the need for an emergency staffing and transfer to the TTU. In such rare cases, the following shall occur prior to a youth's assignment to the program.

1. An Emergency Transfer may be considered when:

   a. The youth poses a substantial immediate threat to the safety of other youth **and/or**

   b. The youth has caused a serious documented physical injury to staff **and**;

   c. There is not sufficient time to convene an MDT staffing committee without placing other youth or staff at risk.

2. Prior to an emergency transfer to the TTU, the Facility Director where the youth is currently housed shall send a request to the Youth Facilities Director - Statewide for placement in Extended BI at TTU as outlined in YS Policy B.2.21.

YS Policy No. B.2.8
Page 12

3.  Within three (3) working days of the youth's placement in Extended BI, an Emergency Transfer staffing shall be held with the multidisciplinary treatment team. The Director of Treatment and Rehabilitation will notify all members of the MDT team of the staffing date at least two (2) days prior to being held.

    The multidisciplinary treatment team shall consist of the following: the Facility Deputy Director and Treatment Director from both the sending and receiving facility, Director of Education, youth's assigned Social Services Counselor and Group Leader, TTU Dorm Leader and Case Manager, and the Director of Treatment and Rehabilitation. The youth's Wellpath assigned qualified MH professional and Wellpath psychiatrist if the youth is currently under Wellpath mental health care shall also be included.

    The youth's Case Manager from the referring dorm/facility shall invite the youth's parent/guardian to the MDT staffing, which shall be documented on a "Weekly Contact Progress Note" in JETS by the youth's assigned Case Manager of the requesting facility within three (3) working days.

4.  At least two (2) days prior to the staffing, the youth's Case Manager from the referring dorm/facility shall forward the following to all members of the multidisciplinary team: completed TTU Referral form [see Attachment B.2.8(b)], Behavioral Staffing Form [see Attachment B.2.8(c)], supporting documentation such as UORs and Code of Conduct hearing, A&Is, Behavior Improvement Plan, along with notes regarding how the youth did meeting the goals of the behavior plan.

5.  The MDT staffing may take place telephonically. The MDT staffing shall be recorded in its entirety, and recorded staffing shall be maintained by the Facility Treatment Director for a minimum of one (1) year in a secured location.

6.  A written record of the MDT staffing shall be prepared by the sending facility utilizing the "Individualized Intervention Plan Summary of Staffing" form in JETS, within three (3) working days of the staffing, documenting the decision of the Director of Treatment and Rehabilitation, documentation of the youth's behavior meeting unit admission criteria, inclusive of prior attempts made to modify the behavior, and any statements made by the youth during the staffing. Only the signature page of the "Individualized Intervention Plan Summary of Staffing" form shall be placed in the youth's Master Record.

YS Policy No. B.2.8
Page 13

7. The youth's Case Manager on the TTU shall complete the Transfer Letter to the Judge [see Attachment B.2.8(d)] and the Parental Notification of Transfer [see Attachment B.2.8(e)] and send to the youth's judge of jurisdiction, and his family/legal guardian within 48 hours in writing of his admission to the program (excluding weekends/holidays), utilizing the appropriate transfer letters in JETS.

8. If the multidisciplinary team determines that transfer to the TTU is not in the youth's best interest, the team shall develop an appropriate Behavior Improvement Plan and determine the most appropriate facility and housing unit to accommodate the youth's needs.

**F.    Special Accommodations**

1. Any specific accommodations a youth in the program may require due to special needs, such as diagnosis of mental health or medical concern requiring specific medication for treatment, shall be listed in the Behavior and Accommodations Binder (BAB) in the youth's assigned housing unit.

2. The BAB shall direct staff to adhere to the youth's needs. The accommodations may include the Case Manager completing a Unified Behavior Plan for Youth with Special Needs (UBP) form in JETS [see Attachment B.2.8(f)]. The UBP shall developed by the CHP and YS staff in a multidisciplinary treatment team staffing for youth diagnosed with ID, which specifically lists needs and suggested staff interventions.

**G.    Provision of Services**

1. Individual Counseling-The youth will be assigned a social services staff member for individual counseling which will occur at least one time per week, which may include crisis services. Individual counseling will focus on individual vulnerabilities and risk factors that increase the chance of the youth responding or acting in maladaptive ways. Additionally, the youth's Mental Health Contractor (MHTP for SMI youth) will counsel with the youth once weekly.

Individual counseling sessions shall be documented by the Case Manager in JETS on the Weekly Contact Progress Note using the Data, Assessment, Goal, and Plan (DAGP) format within five (5) working days. (Refer to YS Policy B.2.2)

Youth receiving counseling as a related service per their IEP, will also receive individual counseling from the designated pupil appraisal team member based on the frequency and documented in the IEP. These counseling sessions are separate from the counseling sessions provided by the Social Services staff noted.

YS Policy No. B.2.8
Page 14

2.  Groups -- Skills training (interpersonal effectiveness, problem-solving, emotional regulation, distress tolerance) will occur in group counseling. Homework is an essential part of skills training, as repetition and practice is essential as part of the learning process.  Once skills are learned in group, unit staff will reinforce use of the skills, coach youth on applying the skills and reward youth for demonstrating commitment and competence in skills utilization.

Youth will also attend group counseling focusing on anger management, victim awareness/impact, and components of PACT training, which is a cognitive based program, will be utilized.

In the event groups cannot be integrated into TTU, anger management, victim awareness/impact, and Thinking for a Change will be implemented in individual counseling.

3.  Family Intervention - Family interventions are based on four major assumptions.  First, every youth enters the program with a "family", whether absent, distant, functional or dysfunctional and the involvement of their family is a critical component in ensuring compliance and developing skills necessary to build and support productive lifestyle changes.  Secondly, the family is seen as the primary socializing unit, and in most cases the most influential system to which the youth belongs.  Thirdly, that consistent with systemic thinking, the youth cannot be considered as separate from the social context from which he lives. Lastly, the family remains a family whether reunited or not and family members will often continue to have relationships throughout their lives.

Since the eventual goal of the program is to re-integrate youth back to their home and/or community, family involvement is a strong component to treatment. To ensure successful reintegration of youth back into the community, the home must be a positive, safe and loving place that will foster the youth's display of positive behaviors and rational beliefs. Family interventions may include telephonic counseling sessions and Zoom sessions. These sessions will be facilitated by the youth's case manager on the unit.

Family counseling sessions should be documented on the Weekly Contact Progress Note in JETS within five (5) working days of the contact, and reflect the date, time, and "Parental Management" or "Family Reintegration" as the topic. (Refer to YS Policy B.2.2)

4.  Recreation - Each youth will be given the opportunity to exercise and participate in outdoor exercise for at least one hour per day, including weekends and holidays.

    Additionally, leisure activities will be conducted on the unit. In addition to opportunities for relaxation and exercise, recreational activities will be structured as much as possible to provide opportunities to practice and build skills competency.

5.  Religious Services - Each youth will be provided the opportunity to voluntarily participate in religious activities.

6.  Educational Services - Educational services will be provided to all youth. Educational instruction will be determined based on each students needs for courses according to their graduation plan, learning plan and IEP requirements. Students/ youths who are enrolled in school, will complete assigned coursework via online learning with the assistance of a teacher/facilitator.

7.  Medical Services - Unit residents will have equitable access to all medical, nursing, and other physical health services available at TTU. As much as possible, such services shall be provided within the confines of the unit. However, youth will be transported off the unit to received specialized medical and dental services.

8.  Mental Health Services - Unit residents will have equitable access to mental health services as applicable. Unit personnel will follow applicable Mental Health Contractor (Wellpath) policies as it relates to authorization for suicide watch. Mental Health Contractor's staff will make determination whether or not youth's emotional state has deteriorated which dictates need for re-evaluation by Mental Health Contractor and reassessment of placement

**H.  Phases of Treatment**
The SMTTU is divided into three phases:
Phase I - Orientation to Treatment
Phase II- Treatment
Phase III - Transition

Youth will be promoted to phases as to their individual level of participation in programming. While transfers back to the general population is optimal, there may be some youth who remain on the program until release to the community. However, systematically applied incentives are in place to encourage youth to continue program progress.

YS Policy No. B.2.8
Page 16

1.  **PHASE I – ORIENTATION**
    Upon entry to the unit, a youth will go through a formal orientation to treatment. The orientation period is up to seven days during which the youth is familiarized with the rules of the unit and the objectives for treatment.  During this phase, youth shall be housed on a tier within the TTU.

    Goals/objectives of the orientation to treatment include:

    •   Learn unit rules, regulations, posted policies and expectations;
    •   Complete introduction to the group process (when and if feasible group will be integrated), curriculum, stages;
    •   Introduce to other youth on the unit;
    •   Introduce to cognitive-behavioral philosophy, particularly the concept of Behavioral Analysis;
    •   Completion of a Behavioral Analysis Worksheet for the precipitating behavior that led to transfer to the Unit;
            *A Behavioral Analysis is looking at and evaluating the cause and effect of one's behavior, recognizing any problem areas, and correcting these behavioral environments. Three aspects of behavior include stimulus, response, and reinforcement, also known as the ABCs of behavior. ABC stands for antecedent, behavior, and consequence. The antecedent is the trigger or cause of the behavior. The behavior is the "action" or what the subject does. The consequence is what happens following the behavior. The ABCs can help determine why the behavior continues to happen and how different consequences affect that behavior.
    •   Review of the Unit Youth Handbook which will contain information on unit rules, regulations, and expectations; the levels system; the unit schedule; and a summary of the treatment and interventions that will be provided;
    •   Contact by staff with the youth's parents/custodians about the unit program, with encouragement of family involvement/participation in the process;
    •   Prepare the "Life Story" autobiography to be reviewed daily by social services and juvenile justice staff towards the goal of completion and review.

    During this first week, the youth's assigned social worker/counselor will meet with the youth to introduce him to the cognitive-behavioral approach and to explain the concept of behavioral analysis, which is an essential element of the program that will be used to analyze the youth's behavior and to develop treatment plans that will be effective in reducing

maladaptive thought, feelings and behaviors. The social worker/counselor/group leader will coach the youth in preparing a Behavioral Analysis Worksheet (BAW) for the precipitating behavior that led to transfer to the unit.  Also, during this phase, an inter-disciplinary treatment team staffing will be conducted within seven working days following the youth's admission to the Program for the purpose of modifying his individualized intervention plan (IIP) to reflect his identified target objectives and the interventions included in the unit program. Observations and information collected by the social worker/counselor during orientation will be used in the development of the IIP. Composition of the team will be consistent with current OJJ policy.  The youth's social services staff person from his original area/facility will also attend.

2.   **PHASE II – TREATMENT**
  Upon leaving the orientation phase of treatment, youth will enter the treatment phase. The treatment phase of treatment is designed for a minimum of two weeks in duration (or more, depending on specific circumstances).   During this phase, youth shall be housed on a tier within the TTU.  Also, during this phase, youth will complete therapeutic homework assignments.  These assignments will be facilitated during both group and individual counseling sessions and or group when groups are feasible.  Details on the various types of counseling provided as well as adjunctive therapies is described under Provision of Services above.

Group counseling will be integrated into programming when TTU is at an optimal staffing pattern and when groups are feasible.

The following treatment modalities occur during this phase:

Milieu Counseling
Milieu Therapy is structuring the environment so that events and interactions are therapeutically designed for the purpose of enhancing skills and building confidence.  It is in the milieu or "on the floor" that staff will consistently guide and reinforce the youth's ability to learn new skills, while at the same time offering a safe place for these skills to be practiced and integrated into the youth's repertoire of strategies.  While attempting to accept youth as they are, staff will also be looking for adaptive responses to reinforce while extinguishing maladaptive responses.  The constant focus is essentially supporting replacement of unskilled (maladaptive) behaviors with more skillful, effective behaviors.

YS Policy No. B.2.8
Page 18

Behavioral Techniques
Techniques for breaking the maladaptive behavior chain are part of the treatment plan and are employed in the milieu when the problem behavior occurs.  Techniques that may be employed include:

- Reinforcement – any event that maintains or increases the future occurrence of a behavior that it follows.  To be reinforcing, the event must be something the individual likes and responds to.  Reinforcers might include positive statements about the behavior, additional attention given to the person when the behavior is demonstrated, or a simple thank you.
- Shaping – consists of selecting the target behavior; select the initial behavior that the youth currently performs and that resembles the target behavior in some way; select powerful reinforcements with which to reinforce the target behavior; determine successive approximations or small steps of the target behavior; and reinforce the initial behavior until it occurs frequently.
- Redirection – A method of intervention that involves asking or telling the youth to stop the inappropriate behavior, orienting them to appropriate behavior, and warning them of the consequences for not redirecting their inappropriate behavior to appropriate behavior.
- Extinction – is a procedure in which the reinforcement that has been maintaining increasing an inappropriate behavior is withheld entirely.  A common practice of the extinction process is ignoring behavior that is reinforced by attention.
- Contingency Management – is based upon a simple behavioral principle – if a behavior is reinforced or rewarded, it is more likely to occur in the future.  Positive performance rewards would be an example, when used, of "catching a youth doing something good".
- Coaching and Role-Playing – Feedback with instructions or acting out the instructions given or practicing new skills.
- Cognitive Restructuring – the basic idea is that people's emotions and behavior can be greatly affected by what they think.  If people can consciously change their habits of what they say to themselves and what mental images they present to themselves, they can make themselves more productive or can accomplish any of several other positive changes.  It is a way of giving you more control over your own thoughts, feelings, and behaviors.
- Cool down – An area will be provided within range of the social services staff and used as a tool to allow the youth to separate themselves in times when they are unable to manage emotions.  Youth will have options to engage in self-soothing activities so that conversation can follow about the stressors and ways to prevent them in the future. This is in line with TBRI practices.

OJJ-000044

YS Policy No. B.2.8
Page 19

3. **PHASE III – TRANSITION**

Phase III is designed for youth who will either transfer to the general population and under some circumstances will transfer back into the community.  Youth on this phase shall be housed in a tier on the TTU for at least one week (or more, depending on specific circumstances).  During or before phase III, the youth may have been involved in a mediated meeting with the staff or youth with whom the youth offended.  When a youth has demonstrated a working knowledge of new skills; is able to apply these skills in everyday situations within the unit with few prompts from staff; and therefore has a significant reduction in the behaviors which resulted in unit admission, the youth will begin the process of gradual transition.  Prior to beginning the reintegration process, a specific general population reintegration plan will be developed by the inter-disciplinary treatment team, with specific objectives and performance indicators specified.  The youth's permanent social worker/counselor/group leader will be integrally involved in development and implementation of the general population reintegration plan.

In addition to the aforementioned, the following indicators would be achieved:

- The youth is not a current danger to others;
- The youth is free of major violations for a three-week period;
- The youth has met the goals of his IIP;
- The consensus of the multi-disciplinary treatment team is that the youth no longer requires residence and treatment in the Bridge City Center for Youth at West Feliciana Transitional Treatment Unit, and continued treatment can be effectively rendered elsewhere.

At this point, the youth will be reviewed for transfer to a general population housing unit, maintenance within the TTU or release to the community.

A youth can be placed in the TTU program for a minimum of 4 weeks.  Their progression though the program is determined by their behavior, compliance with programing, their achievement in programing, and overall improvement.  Youth might be in the program longer if there is continued behavioral problems, lack of behavioral change or willingness to implement strategies taught, or more intervention is needed due the significance of the occurrences that warranted the referral to the program.

YS Policy No. B.2.8
Page 20

The decision of the interdisciplinary treatment team will be forwarded to the Director of Treatment and Rehabilitative Services and to the Program Manager 1 of secure movement to review and determine appropriate placement. Once appropriate placement is determined, the youth will be returned to a general population housing unit. This process shall be finalized within 48 hours of the recommendation.

If a youth is released from the TTU for 14 days or less, he does not have to be formally re-staffed if his behavior meets the criteria of the TTU program. However, certain protocols will need to be adhered for policy compliance. In these situations, some youth may participate in a shorter stay with the emphasis being placed on re-focusing. Also, if a youth is involved in continual behavioral and disruptive problems while on the TTU, the MDT may refer him back to phase I of the program.

## VIII. EDUCATIONAL PROGRAMMING FOR STUDENTS WITH DISABILITIES

### A. Child Find

OJJ's TTU Program will follow OJJ's Child Find Policy and collaborate with the SSD the contracted special education provider to identify, locate, and evaluate all students between the ages of birth through 21 years who might be in need of special education and related services. This policy includes all students assigned to OJJ's TTU program.

1. Parental and public awareness of possible areas of concern and special education.

2. Weekly reports of SBLC referrals made to the Supervisor of Special Education.

3. The School Building Level Committee will meet every two (2) weeks.

4. The TTU program uses a research-based academic and behavioral response-to-intervention (RTI) program inclusive of universal screenings, three-tier support levels, and progress monitoring.

5. Referral to pupil appraisal (SSD contracted special education provider) for a Bulletin 1508 evaluation as requested by the parent/guardian or SBLC committee with appropriate parent consent.

YS Policy No. B.2.8
Page 21

**B.    Special Education Programming**

OJJ's TTU Program will designate at the minimum 2 special education teachers to provide students with disabilities identified by IDEA with any special education instruction as prescribed by the student's IEP. Related service providers are required and will be provided by SSD the contracted special education provider for the school site. Related services are determined by each individual student need and identified in the Bulletin 1508 evaluation and IEP.

1.    Evaluations:
Any Bulletin 1508 evaluations in-progress at OJJ schools prior to being assigned OJJ's TTU program shall continue and be completed within 60 business day of original parental consent obtained unless documented parental consent has been obtained for an extension.

2.    IEP Services:

a.    The parent/guardian will be notified within two (2) business days of a student's assignment to OJJ TTU's program.

b.    The Supervisor of Special Education will notify SSD the contracted special education provider of any OJJ student assigned to OJJ's TTU program that is identified as a student with an exceptionality within 2 business days of transfer.

c.    Any student with an IEP will continue to receive special education services as outlined in their IEP. Confirmation that services have been initiated at the TTU program site will be confirmed by SSD the special education provider to the Supervisor of Special Education and School Principal with the student name, date of birth, name of the provider(s) and date of initiation.

d.    If an amendment or change to their educational program is required due to their assignment in the TTU program, SSD the contracted special education provider will send prior written notice of any proposed changes within 10 business days. All IDEA procedural safeguards must followed and along with a copy provided to the parent/guardian(s).

3.    Special Instruction is provided by the special education teacher and/or personnel responsible as indicated in the student's individual education program (IEP) in the services and placement section.

    a.    A service log is maintained by SSD the contracted special education provider.

4.    Related services are provided by the related service provider and/or personnel responsible as outlined in the IEP.

5.    Required Related Staff:
Speech-Language Pathologist, Social Worker/School Psychologist, Occupational Therapist, Physical Therapist, Adapted Physical Education Teacher, etc.

6.    Manifestation Determination Review:
Any student who has been removed from their educational placement a total of 10 days and are recommended for short-term removal or long-term alternative school sites due to a behavior incident that occurred in-school, shall have a MDR to determine if the behavior has a direct and substantial relationship or caused by the student's disability.

    a.    Prior written notice of proposed action shall be provided to the student's parent/guardian.

7.    Training:

    a.    Annual training on the LEA's Child Find Policy.

        i.    Annual training on the Special Education Handbook;

        ii.    Documentation of request and receipt of special educational records between facilities/school.

    b.    Prior notification provided to parents/guardian.

    c.    Annual training on 504 Policy and Procedures.

8.    Special Education Records:
The special education folder maintained at OJJ's TTU facility site includes the following documents:

    a.    Current copy of evaluation, reevaluation, or waiver with a copy of the most current evaluation;
    b.    Current IEP;
    c.    Current Progress Reports and Progress Monitoring;
    d.    Parent Contact Log;

YS Policy No. B.2.8
Page 23

   e. Parental Notification Letters;
   f. Report Cards;
   g. Transition Assessment(s)/ Transition Agency communication and contact information;
   h. Discipline Reports;
   i. Functional Behavior Assessment (if applicable);
   j. Behavior Intervention Plan (if applicable);
   k. Manifestation Determination Review (MDR- if applicable);
   l. Extended School Year Program Eligibility Letter;
   m. Documentation of criteria used to determine eligibility for the April Dunn Act;
   n. Goals and objectives for specific course for courses or content areas where individual performance criteria for alternate pathway to promotion or graduation is applied.

- If the student is transferring from or among OJJ facilities these records should be requested by receiving facility and received by the new facility **within 2 business days**.

## IX. TRAINING AND STAFF DEVELOPMENT:

All staff members should have some experience working with juveniles.  Once employed, staff members receive new employee orientation training.  Additionally, staff will receive program-specific training activities over a course of a year.  These training activities may be held during scheduled in-services and during team meetings. Each unit of training describes definitional, identifying characteristics and management principles.  Each training session uses role plays and situational-based scenarios.  The training activities may be conducted by the Social Worker/Counselor, Mental Health Contractor staff members, and Consultant. Course outlines are available for the indicated training activities. The following provides a sample overview of the content domains of the training units:

1. Cognitive Behavioral Treatment
2. Accommodating the Needs of SMI youth
3. Adolescent Aggressive Behavior
4. Establishing and Maintaining Therapeutic Environments
5. Unit Management Procedures
6. Integrated Treatment Model
7. Conflict Resolution
8. Overview of TTU program
9. PACT
10. Trust-Based Relational Intervention

**YS Policy No. B.2.8**
**Page 24**

Additionally, all staff members will receive on-going training in program management, policy and procedural updates, quality assurance and other relevant areas as needed.

**X.    QUALITY ASSURANCE:**

The planning and evaluation process is ongoing with methodologies including monitoring of data collected through monthly and quarterly assessment and improvement measures.  Actions are taken as a result of information obtained through these activities.

Please note some of the activities to ensure such.

a) File Reviews-administered quarterly
b) Program Audits-administered quarterly
c) Staff Training and Development

A.    Director of Treatment and Rehabilitation Responsibilities

1.  All youth records will be reviewed monthly from the date of intake utilizing JETS.  The purpose of the review is to ensure that need areas identified on the IIP are being addressed, to assess the quality of services being provided to the youth by the assigned Case Manager, to ensure required signatures are documented, and to ensure that the Master Record follows the established guidelines of YS Policy B.3.1.

2.  The Director of Treatment and Rehabilitation shall ensure that the required individual counseling, groups (if applicable) and family sessions are being provided as outlined in the program by reviewing group notes, as well as individual notes, of the Case Manager and/or the CHP if applicable.  This information shall be verified in JETS.

4.  When groups are implemented into the treatment milieu, The Director of Treatment and Rehabilitation shall also monitor a minimum of one (1) TTU Group per month by co-facilitating a group with staff under their supervision.

5.  The Director of Treatment and Rehabilitation shall conduct quarterly quality assurance reviews to ensure that treatment plans are being completed, and that services are being provided and documented per policy.

6.  On-site QA Reviews of YS secure care facilities shall be conducted to provide Facility Directors with an objective, informative assessment of operational activities.

**YS Policy No. B.2.8**
**Page 25**

7. The QA Reviews shall be conducted on a frequency as determined by the Deputy Secretary, but at a minimum, annually for secure care facilities.

8. The Correctional Program Checklist (CPC) is an evidence-based tool developed to assess correctional intervention programs. The CPC is used to ascertain how closely correctional programs meet the known "Principles of Effective Intervention". (Refer to YS B.2.19).

    In an effort to assure program integrity and facilitate opportunities for ongoing quality improvement, YS shall conduct CPC evaluations under the following timelines:

    a. New programs shall be evaluated after one (1) year.

    b. Programs scoring "Ineffective" or "Needs Improvement" shall be evaluated annually.

    c. Programs scoring "Effective" or "Highly Effective" shall be evaluated every other year or more frequently at the discretion of the Chief of Operations.

**Previous Regulation/Policy Number:**  B.2.8
**Previous Effective Date:**    09/23/2021
**Attachments/References:**

B.2.8 (a) Behavior Improvement Plan April 2021
B.2.8 (b) TTU Referral Form August 2022
B.2.8 (c) TTU Behavioral Staffing Form August 2022
B.2.8 (d) Transfer Letter to Judge August 2022
B.2.8 (e) Parental Notification of Transfer August 2022
B.2.8 (f) Unified Behavior Plan for Youth with Special Needs (UBP) May 2018
B.2.8 (g) Behavioral Analysis Worksheet September 2021
B.2.8 (h) Transitional Treatment Unit (TTU) Handbook August 2022
B.2.8 (i) Transitional Treatment Unit (TTU) Youth Handbook August 2022
B.2.8 (j) TTU Youth Assignment Workbook August 2022
B.2.8 (k) TTU Placement Release Report August 2022
B.2.8 (l) Interim Behavior Activity Documentation September 2021
B.2.8 (m) Daily Participation Chart August 2022