**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| ALEX A., by and through his guardian, MOLLY SMITH individually and on behalf of all other similarly situated, | ) ) ) | |
| | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. A. No. 3:22-CV-00573-SDD-RLB |
| | ) ) | |
| GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS, in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections, | ) ) ) ) ) ) ) ) ) ) | **DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | ) ) ) | |

COME NOW, through undersigned counsel, Defendants John Bel Edwards, in his official capacity as Governor of Louisiana; William Sommers, in his official capacity as Deputy Secretary of the Office of Juvenile Justice; and James M. LeBlanc, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections (collectively "Defendants") and respectfully submit these Proposed Findings of Fact and Conclusions of Law with respect to Plaintiff's Motion for Preliminary Injunction (Doc. 9), which is set for hearing before this Honorable Court on September 6 and 7, 2022.

## I.    FINDINGS OF FACT

**A.    OJJ History and Structure**

1.    The Louisiana Office of Juvenile Justice ("OJJ") is a state agency charged with the providing rehabilitation services to juveniles who have been adjudicated as delinquent. Nelson Decl. (Doc. 28-6) ¶ 7.

2.    OJJ's mission is to protect the public by providing safe and effective individualized services to youth, who will become productive, law-abiding citizens. Nelson Decl. (Doc. 28-6) ¶ 8.

3.    There are three primary levels of care for Youth in the OJJ system: probation and parole, non-secure facilities such as group homes, and secure care facilities. Nelson Decl. (Doc. 28-6) ¶ 9.

4.    OJJ houses certain Youth who have been adjudicated delinquent in secure care facilities.  A number of factors may cause a Youth to be assigned to a secure care facility.  The most common reasons a Youth is assigned to a secure care facility include the violent nature of the underlying criminal act committed by the Youth, the Youth committing a crime of sexual assault, the Youth's repeated commission of serious crimes, and/or the Youth's failure to comply with less restrictive rehabilitation programs such as probation or non-secure facilities. Nelson Decl. (Doc. 28-6) ¶ 10.

5.    OJJ currently maintains five secure care facilities across the state: Acadiana Center for Youth at Bunkie ("ACY"), Acadiana Center for Youth at St. Martinville ("ACY-SM"), Bridge City Center for Youth ("BCCY"), Swanson Center for Youth at Monroe ("SCY") and Swanson Center for Youth at Columbia ("SCY-C"). Nelson Decl. (Doc. 28-6) ¶ 11.

65626135.v1

6.    OJJ secure care facilities include housing dormitories, common areas, gymnasiums, outdoor recreational areas, schools, medical and counseling facilities, and dining areas. Nelson Decl. (Doc. 28-6) ¶ 12.

7.    Although OJJ secure care facilities share some characteristics that are similar to an adult prison, the Youth in secure care facilities have significantly greater freedom to move about the campus than an inmate in an adult prison setting would have. Nelson Decl. (Doc. 28-6) ¶ 12.

8.    Additionally, Youth in OJJ secure care facilities are assigned to dormitories and are not assigned to individual sleeping quarters. Each dormitory may be comprised of twelve to fifteen Youth, and the Youth are free to move about their dormitories. Nelson Decl. (Doc. 28-6) ¶ 12.

9.    OJJ secure care facilities were designed and constructed based upon standards for housing Youth offenders.  As a general matter, OJJ secure care facilities have non-reinforced walls, standard ceiling heights, and other construction elements meant to provide a secure environment that is still conducive to the therapeutic and rehabilitative goals of juvenile facilities. Nelson Decl. (Doc. 28-6) ¶ 15.

10.    Historically, the majority of Youth offenders in OJJ secure care facilities generally have been able to adapt to the secure environment and comply with behavioral rules and facility policies. Nelson Decl. (Doc. 28-6) ¶ 15.

11.    Recently, there has been a significant increase in the frequency and severity of large-scale and/or serious events at OJJ secure care facilities, such as riots, attempted and successful escapes, and acts of violence against staff and other Youth. Nelson Decl. (Doc. 28-6) ¶ 17-23.

12.    Certain Youth (numbering probably less than 25 total across OJJ's entire secure care system) have engaged in violent and destructive behavior, injuring other Youth and staff

65626135.v1

members, utterly destroying multiple facilities, and disrupting OJJ's ability to deliver educational and rehabilitation services to the other Youth in its custody. Nelson Decl. (Doc. 28-6) ¶ 17-23.

13.     The disruptive Youth have repeatedly escaped and have engaged in violent and serious criminal behavior prior to their apprehension and return to the facilities. Nelson Decl. (Doc. 28-6) ¶ 19.

14.     Youth who have escaped from OJJ secure care facilities have been accused of motor vehicle theft, carjacking, burglary, armed robbery, attempted murder, reckless operation of stolen vehicles, and illegal possession of handguns. Nelson Decl. (Doc. 28-6) ¶ 19.

15.     On May 25, 2022, several Youth were involved in a fight in their dormitory at SCY. Three of the Youth were over the age of 18 and were subsequently booked into adult correctional facilities for criminal charges.  The incident caused over $35,000 in damage to the facility. Nelson Decl. (Doc. 28-6) ¶ 23.

16.     On June 13, 2022, at least five Youth were involved in a physical altercation outside of the school building at SCY.  At least four staff members were battered by the Youth, and one staff member was transported to the hospital.  Named Plaintiff, Alex A., was involved in this incident and is accused of striking at least three staff members with a closed fist. Nelson Decl. (Doc. 28-6) ¶ 22.

17.     On June 16, 2022, around 20 Youth escaped their dormitory at BCCY, took over part of the facility, and caused a riot. The riot resulted in injuries requiring medical attention to at least two Youth.  At least one staff member was hospitalized due to injuries.  In addition, five Youth escaped the secure care facility. Nelson Decl. (Doc. 28-6) ¶ 21.

18.     On July 17, 2022, six Youth housed at BCCY escaped the facility.  Five of the Youth engaged in the theft of a truck, repeatedly rammed into a Jefferson Parish Sheriff's Deputy's

65626135.v1

vehicle, were involved in a short pursuit, and ultimately crashed the truck. The sixth Youth engaged in the carjacking of a vehicle at gunpoint then shot the occupant, a 59-year-old New Orleans man, who was critically injured. Nelson Decl. (Doc. 28-6) ¶ 20.

19.    As a result of these and other similar incidents, OJJ secure care facilities have incurred substantial physical damage, necessitating the complete renovation of several dormitories and reinforcement of security infrastructure at the existing OJJ secure care facilities. Nelson Decl. (Doc. 28-6) ¶ 18.

20.    Due to the nature and extent of the damage to existing OJJ secure care facilities, OJJ is no longer capable of safely and effectively housing all of the Youth in its custody. Nelson Decl. (Doc. 28-6) ¶ 28.

21.    The problematic Youth, who are primarily housed at BCCY currently, have destroyed the physical facilities to the point that OJJ no longer has enough available beds in habitable condition to house the Youth in its custody. Nelson Decl. (Doc. 28-6) ¶ 28.

22.    These events involving a small number of the Youth in OJJ's secure care facilities have revealed that the existing secure care facilities and rehabilitation programs are not sufficient to effectively house these particular Youth. These Youth have demonstrated a need for a greater level of individualized care in a more restrictive housing environment to allow for OJJ to effectively deliver its rehabilitative services. Nelson Decl. (Doc. 28-6) ¶ 17–23, 26, 28.

**B.    New Facility at BCCY-WF**

23.    In response to the need for a greater level of individualized care in a more restrictive housing environment, OJJ is establishing a Transitional Treatment Unit ("TTU") in an effort to effectively deliver its rehabilitative services. Nelson Decl. (Doc. 28-6) ¶ 26; TTU Policy (Doc. 28-7).

65626135.v1

24.     OJJ has begun renovation projects at multiple secure care facilities across the state, including a newly-renovated TTU at SCY. Nelson Decl. (Doc. 28-6) ¶ 24.

25.     Additionally, large-scale renovations at BCCY will begin once Youth are moved out of the damaged units at BCCY. Nelson Decl. (Doc. 28-6) ¶ 24.

26.     While repairs are being made at existing secure care facilities, OJJ has identified an unused building on the campus of Louisiana State Penitentiary ("LSP") which, with minor modifications, can satisfy the needs of the TTU. Nelson Decl. (Doc. 28-6) ¶ 27, 29; Patin Aff. (Doc. 28-2) ¶ 14.

27.     OJJ plans to open a sixth secure care facility, to be called Bridge City Center for Youth at West Feliciana ("BCCY-WF") on the campus of LSP as a temporary location for the TTU pending completion of the renovations and repairs at other secure care facilities. Patin Aff. (Doc. 28-2) ¶ 9.

28.     The planned BCCY-WF facility is physically and geographically isolated from housing units for adult offenders at LSP.  BCCY-WF will be a temporary solution to OJJ's lack of suitable housing and will close after renovations at other secure care facilities are completed. Patin Aff. (Doc. 28-2) ¶ 11, 15, 17; Nelson Decl. (Doc. 28-6) ¶ 30.

29.     This temporary solution will allow OJJ time to develop a permanent site for the TTU, which will be located on the campus of an existing secure care facility. Nelson Decl. (Doc. 28-6) ¶ 30; Patin Aff. (Doc. 28-2) ¶ 11.

**C.    Procedural Posture**

30.     On July 19, 2022, Governor John Bel Edwards announced the state's plan to open BCCY-WF as a temporary location for the problematic Youth at OJJ secure care facilities. *See* Doc. 4-12.

65626135.v1

31.     Plaintiff "Alex A.," through his mother Molly Smith, filed the instant litigation seeking, *inter alia*, injunctive relief prohibiting OJJ from transferring Youth to BCCY-WF.

32.     Alex A. is a delinquent Youth currently housed at BCCY. Broussard Aff. (Doc. 28-5) ¶ 5.

33.     Alex A. claims that he and other Youth will be deprived of a therapeutic and rehabilitative environment at BCCY-WF, including deprivation of the education, medical and mental health, and programming resources currently provided to him at BCCY. *See* Doc. 1.

34.     Alex A. further claims that the transfer to BCCY-WF is already causing mental anguish and emotional distress to the Youth at existing OJJ secure care facilities. *See* Doc. 1.

35.     Plaintiff filed an Emergency Motion for Temporary Restraining Order (Doc. 9), which the Court denied (Doc. 15). The Motion also sought a preliminary injunction. *See* Doc. 9 at 16.

36.     A Preliminary Injunction Hearing is scheduled for September 6 and 7, 2022.

**D.     The Named Plaintiff**

37.     Alex A. is a 17 year old male currently housed at BCCY.  He has been in the custody of OJJ and placed in secure care facilities since May 2021. Broussard Aff. (Doc. 28-5) ¶ 5.

38.     While in secure care facilities, Alex A. has been adjudicated guilty on many code of conduct violations, including two incidents of assault or threat of assault on other Youth, twelve incidents of assault or threat of assault on staff or visitors, seven incidents of property destruction, six incidents of accessing an unauthorized area, three incidents of tampering with security devices, and one incident of gang organizational activity. Broussard Aff. (Doc. 28-5) ¶ 8.

65626135.v1

39.     Because of his pattern of battery against other Youth, substantial physical battery of OJJ staff, and engaging in behavior causing major disruption to programming, Alex A. is eligible for, and has been recommended for, transfer to the TTU. Broussard Aff. (Doc. 28-5) ¶ 10.

**E.     OJJ's Operation Plans for BCCY-WF**

40.     At full capacity, BCCY-WF will house twenty-four Youth who are eligible for placement in the TTU pursuant to OJJ policy. Nelson Decl. (Doc. 28-6) ¶ 30.

41.     Although exact transfer dates are undetermined and dependent upon completion of preparation projects at the new facility, BCCY-WF is scheduled to begin receiving Youth from other secure care facilities in the second half of September 2022. Bridgewater Decl. (Doc. 28-7) ¶ 24.

42.     Youth will be transferred to BCCY-WF in phases to ensure proper acclimation of Youth and staff to the new facility and to facilitate the Youth through the TTU program phases in cohorts. Transfers will be conducted in phases with a maximum of 8 Youth in each phase. Bridgewater Decl. (Doc. 28-7) ¶ 24.

**F.     Transitional Treatment Unit Policy**

43.     The TTU is defined as a maximum custody unit for violent and very aggressive Youth with a documented history of behavior which creates or incites aggressive responses from others and creates an unsafe therapeutic environment for staff and other Youth. TTU Policy (Doc. 28-7) at 6.

44.     The purpose of the TTU is to assist staff in implementing promising strategies for identified Youth.  The TTU is designed to assist Youth in developing the self-regulatory, coping, and social skills needed to safely and successfully engage peers and staff members.  The TTU is a

specialty program that ensures coordinated program for youthful offenders. TTU Policy (Doc. 28-7) at 6.

45.    The goals of the TTU are to provide youth with accountability for their actions, to enable them to learn adaptive methods of resolving problems and reaching personal goals, and to provide ongoing support to enable Youth to generalize and maintain positive changes. TTU Policy (Doc. 28-7) at 6.

46.    The TTU Policy establishes the program objectives and the criteria for the placement of Youth in the TTU. TTU Policy (Doc. 28-7) at 1.

47.    The TTU Policy provides specific criteria to determine whether a Youth should be assigned to the TTU.  Youth who are eligible for placement in the TTU may have:

    a.    Exhibited a pattern of battery on other Youth which has not been substantially reduced by prior intervention efforts;

    b.    Committed a single battery or predatory act of such serious consequence that the potential of reoccurrence must be actively prevented;

    c.    Engaged in substantial physical battery on staff that has been documented;

    d.    Documented history of engaging in behavior that causes major disruption to programming (i.e., gang activity) or inciting predatory responses from other Youth;

    e.    Been in possession of a significant weapon; and/or

    f.    Been involved in AWOL, AWOL attempt, and escape. TTU Policy (Doc. 28-7) at 7-8.

48.    While in the TTU, Youth are provided specific programming and services, including individual counseling, group counseling, family intervention, educational services, medical services, and mental health services.  OJJ policy requires Youth in the TTU with

9

disabilities or special education services to receive the individualized education services necessitated by their educational programs. TTU Policy (Doc. 28-7) at 13-15, 20-23.

49. The TTU program includes a phased approach to the Youths' problematic behavior – Phase 1 is an orientation phase, Phase 2 is a treatment phase, and Phase 3 is a transition phase. TTU Policy (Doc. 28-7) at 15.

50. During the orientation phase, the Youth will be apprised of the rules and expectations of the TTU, will be introduced to the group counseling process, will be educated on the cognitive-behavioral philosophy, will complete a behavioral analysis worksheet regarding the behavior that led to the Youth's assignment to the TTU, and will prepare a "Life Story" autobiography which will be received daily by social services and OJJ staff. The Youth will meet with his social worker, counselor, and group leader, who will create an individualized intervention plan for the Youth, setting target goals for the Youth to achieve. TTU Policy (Doc. 28-7) at 16-17.

51. The treatment phase will involve various modalities including individual counseling and group counseling, therapeutic homework assignments, and Milieu (or "on the floor") counseling to help the Youth develop skillful, effective behaviors to replace and extinguish the Youth's unskilled/maladaptive behaviors. TTU Policy (Doc. 28-7) at 17-18.

52. The transition phase will prepare the Youth to return to the general population of the OJJ secure care facilities or, in some cases, to return to the outside community. A reintegration plan will be developed for the Youth. TTU Policy (Doc. 28-7) at 19-20.

**G.   Sight, Sound, and Movement Security of BCCY-WF Transitional Treatment Unit**

53. The temporary TTU at BCCY-WF has the necessary layout and infrastructure to meet the needs of the TTU program. Nelson Decl. (Doc. 28-6) ¶ 29.

65626135.v1

54.    BCCY-WF is on the campus of LSP.  LSP is a sprawling campus of more than 18,000 acres. (Doc. 9 at 31)

55.    BCCY-WF is located just inside the main gates of LSP's campus, near the welcome center and civilian residences. BCCY-WF is 1.5 miles from the nearest housing unit for adult offenders at LSP. Patin Aff. (Doc. 28-2) ¶ 15.

56.    BCCY-WF has its own fence-line surrounding the building and grounds. Patin Aff. (Doc. 28-2) ¶ 17.

57.    OJJ has purchased "black-out" fabric that can be used to wrap the BCCY-WF fence-line so that no one can see in or out of the BCCY-WF facility and grounds, creating a sight barrier between delinquent Youth at BCCY-WF and adult offenders at LSP. Patin Aff. (Doc. 28-2) ¶ 17.

58.    No adult offenders at LSP will be housed at or provide any services to BCCY-WF. Nelson Decl. (Doc. 28-6) ¶ 31.

59.    Youth at BCCY-WF will experience complete physical separation from adult offenders at all times. Patin Aff. (Doc. 28-2) ¶ 12-13, 15, 17-19.

60.    OJJ will operate BCCY-WF in the same manner as all other secure care facilities, with the exception of programming-related differences unique to the TTU as outlined in OJJ policies. Nelson Decl. (Doc. 28-6) ¶ 34; Bridgewater Decl. (Doc. 28-7) ¶ 25-34.

61.    Educational, food, medical, mental health, counseling, programming, custodial, maintenance, and groundskeeping services will be provided by OJJ staff or vendors. Deville Aff. (Doc. 28-3) ¶ 23; Nelson Decl. (Doc. 28-6) ¶ 34; Patin Aff. (Doc. 28-2) ¶ 18-19; Dandridge Aff. (Doc. 28-4) ¶ 8-20; Bridgewater Decl. (Doc. 28-7) ¶ 34.

65626135.v1

62.    It is the goal and intent of OJJ to provide security services exclusively through OJJ staff. Nelson Decl. (Doc. 28-6) ¶ 36.

63.    It is likely, however, that some DOC and LSP security officers will provide security services to BCCY-WF, as OJJ routinely relies on DOC security officers to provide additional staffing to secure care facilities during staffing shortages. Nelson Decl. (Doc. 28-6) ¶ 36.

64.    Before a DOC security officer is permitted to work at BCCY-WF, the officer must undergo training specific to youth detention services and practices. Nelson Decl. (Doc. 28-6) ¶ 36.

**H.    BCCY-WF Schedule and Services**

65.    OJJ has prepared a schedule for the education and treatment of Youth in the TTU program at BCCY-WF.    The schedule provides for daily education, recreation, counseling programming, quiet time, telephone and video calls with family, and other activities. TTU Policy (Doc. 28-7) at 13-15, 20-23.

66.    Youth at BCCY-WF will continue to receive six hours of educational instruction each day, just as currently occurs in existing secure care facilities. Deville Aff. (Doc. 28-3) ¶ 22.

67.    OJJ is working to ensure that an appropriate teacher to student ratio is maintained at BCCY-WF. Deville Aff. (Doc. 28-3) ¶ 21.

68.    OJJ is working to ensure that an appropriate ratio of students with exceptionalities (i.e. special education students and students with learning disabilities) is maintained at BCCY-WF.

69.    Individual Education Programs ("IEPs") and other accommodations required by Youth will be followed at BCCY-WF in the same manner as is followed in other secure care facilities. Deville Aff. (Doc. 28-3) ¶ 29.

65626135.v1

70.    Students at BCCY-WF will continue to receive the same curriculum, instruction, and evaluations as are currently provided at other secure care facilities. Deville Aff. (Doc. 28-3) ¶ 22.

71.    The school at BCCY-WF will be staffed with qualified educators sourced from existing secure care facilities and through civil service job posting and recruiting. Deville Aff. (Doc. 28-3) ¶ 16.

72.    Wellpath, the contracting agency providing medical and mental health services to Youth in OJJ secure care facilities, will service BCCY-WF in the same manner as is currently provided at existing secure care facilities. Dandridge Aff. (Doc. 28-4) ¶ 11-12.

73.    BCCY-WF medical and mental health staff will initially be sourced from medical leadership at existing secure care facilities, who are familiar with OJJ and Wellpath policies and protocols and who will ensure that adequate care is provided from the first day of operation at BCCY-WF.  The Wellpath startup team will remain at BCCY-WF until the necessary staff have been hired and trained such that the Youth at BCCY-WF will not experience any interruption in care. Dandridge Aff. (Doc. 28-4) ¶ 15-17.

74.    In addition to education and healthcare, the TTU program will provide counseling and behavior modification programming to Youth at BCCY-WF to prepare the Youth for return to other secure care settings and reentry into the community. Bridgewater Decl. (Doc. 28-7) ¶ 31-34.

I.    **OJJ Administrative Remedy Procedure**

75.    OJJ maintains an Administrative Remedy Procedure ("ARP") by which internal grievances may be processed. Woods Aff. (Doc. 28-1) ¶ 2-3; ARP Policy (Doc. No. 28-1).

76.     Under the ARP, a Youth must fully exhaust a two-step grievance process before seeking judicial review. Woods Aff. (Doc. 28-1); ARP Policy (Doc. No. 28-1) at 1-14.

77.     A Youth initiates the ARP procedures by filing an ARP form, which is deemed filed upon receipt by an ARP Coordinator. Woods Aff. (Doc. 28-1); ARP Policy (Doc. No. 28-1) at 4.

78.     The ARP Coordinator screens the form and sends it to a facility director, who must respond within 30 days. Woods Aff. (Doc. 28-1); ARP Policy (Doc. No. 28-1) at 7-8.

79.     If the Youth is dissatisfied with the facility director's response, he has 15 days to seek review from the Deputy Secretary of Youth Services.  The Deputy Secretary must render a final decision within 21 days of receiving the request for review. Woods Aff. (Doc. 28-1); ARP Policy (Doc. No. 28-1) at 8-9.

80.     The entire ARP process must be completed within 51 days of the original filing of the Youth's ARP form. Woods Aff. (Doc. 28-1); ARP Policy (Doc. No. 28-1) at 8-9.

81.     After the Deputy Secretary makes a final decision on the ARP, the Youth may seek judicial review. Woods Aff. (Doc. 28-1); ARP Policy (Doc. No. 28-1) at 9.

82.     If the Youth's ARP form expresses a belief that the Youth is in immediate risk of harm and that any delay in responding to the grievance would subject him to immediate personal injury or other serious irreparable harm, the ARP Coordinator must immediately forward the ARP to the regional director, who must provide an initial response within 48 hours and issue a final decision within five (5) calendar days. Woods Aff. (Doc. 28-1); ARP Policy (Doc. No. 28-1) at 9-10.

83.     The emergency grievance process does not render the standard two-step process unavailable to the Youth, nor does it prevent the Youth from seeking requested relief from the

14

facility or review from the Deputy Secretary. Woods Aff. (Doc. 28-1); ARP Policy (Doc. No. 28-1).

84.     Plaintiff, through his attorney, filed an Emergency ARP form in connection with his potential transfer to BCCY-WF on August 16, 2022. Woods Aff. (Doc. 28-1) ¶ 8; Emergency ARP Form (Doc. 28-1) at 47.

85.     OJJ denied the request for emergency consideration of the ARP and informed Plaintiff of its decision on August 18, 2022. Woods Aff. (Doc. 28-1) ¶ 9.

86.     OJJ's decision not to process Plaintiff's ARP as an emergency reverted the grievance to the standard ARP timelines for response. Woods Aff. (Doc. 28-1) ¶ 9.

87.     This lawsuit was filed on August 19, 2022. *See* Doc. 1.

88.     At the time the lawsuit was filed, Plaintiff had not received a final decision regarding his ARP through the standard grievance process. Woods Aff. (Doc. 28-1) ¶ 10.

89.     OJJ's ARP does not provide for exemptions for Youth to circumvent the standard two-step process when the emergency relief requested is not received. Woods Aff. (Doc. 28-1); ARP Policy (Doc. No. 28-1).

## II.      CONCLUSIONS OF FACTS AND LAW

**A.      Applicable Legal Standard for Injunctive Relief**

90.     This dispute comes before the Court on Plaintiff's Motion for Preliminary Injunction (Doc. 9) against Defendants.

91.     Injunctive relief is "an extraordinary remedy" and requires the movant to "unequivocally show the need for its issuance." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997); *see Sacal-Micha v. Longoria*, 449 F. Supp. 3d 656, 662 (E.D. La. 2020) (same).

92.     To demonstrate entitlement to injunctive relief, the movant must establish: "(1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) that the injunction will not disserve the public interest." *Gumns v. Edwards*, No. 20-231-SDD-RLB, 2020 WL 2510248, at *3 (M.D. La. May 15, 2020) (Dick, C.J.) (citations omitted) (noting common standards for temporary restraining order and preliminary injunction); *see also Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). The first two factors are most critical. *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016). The movant is required to "clearly carry the burden as to all four elements"; failure to do so requires a denial of the motion. *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003); *see Sacal-Micha*, 449 F. Supp.3d at 662.

93.     In the context of injunctions against incarceration facilities, based on the Prison Litigation Reform Act, "preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and be the least intrusive means necessary to correct the harm." *Gumns*, 2020 WL 2510248, at *3 (citations omitted). Public policy, and the Supreme Court, counsels federal courts to "eschew toward minimum intrusion into the affairs of state prison administration." *Id.* (citing, *inter alia*, *Mecham v. Fano*, 427 U.S. 215, 228-229 (1976) (warning against judicial decisions regarding "the day-to-day functioning of state prisons and involv[ing] the judiciary in issues and discretionary decisions that are not the business of federal judges")). Stated differently, "[w]hen weighing any form of injunctive relief, federal courts must be mindful not to jump at the chance to take prison administration into their own hands and out of the hands of the people entrusted with such tasks by the state." *Id.* (citations omitted).

65626135.v1

94.    The Court finds that Plaintiff failed to carry his burden to establish any of the four required elements for a temporary restraining order.

### 1. Element One – Substantial Likelihood of Prevailing on the Merits

95.    Generally, Plaintiff's Complaint (Doc. 1) asserts claims pursuant to 42 U.S.C. § 1983 for "unlawful conditions of confinement and deprivation of due process." *See* Compl. (Doc. 1) at 13. More specifically, Plaintiff contends that "[b]y transferring youth adjudicated delinquent to the Louisiana State Penitentiary at Angola, a maximum-security adult prison, Defendants violate their duty to provide conditions of reasonable health and safety to the Youth it holds in its custody, and demonstrate deliberate indifference to a substantial risk of serious harm to Plaintiff, in violation of Plaintiff's rights under the Fourteenth Amendment to the U.S. Constitution" and that "Defendants' actions are also punishment of Plaintiff in violation of the Fourteenth Amendment." *Id.*

96.    Plaintiff has not established a substantial likelihood of prevailing on the merits for at least four reasons:

- Plaintiff failed to exhaust administrative remedies before filing suit as required by the PLRA;

- Plaintiff incorrectly relies on the relaxed "objectively unreasonable" standard of liability, but that standard does not apply to Plaintiff's claims;

- Plaintiff fails to demonstrate Defendants were deliberately indifferent, as required by Section 1983; and

- Plaintiff fails to state a cognizable claim, or to factually support such a claim, of a deprivation of educational and rehabilitation services.

Each issue is further examined below.

### a. *Failure to Exhaust Administrative Remedies under PLRA*

97.     The federal PLRA provides that "no action shall be brought under [§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).[1,2] Exhaustion is only complete when a plaintiff pursues all "available" administrative remedies, and when (1) the plaintiff has received a final administrative decision at the last step of the applicable procedure; or (2) the time limits for the prison's response at the last step of every available administrative remedy has expired, such that "there is no next step (save filing a lawsuit) to which the prisoner can advance." *See Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004); *Wilson v. Epps*, 776 F.3d 296, 301 (5th Cir. 2015). The PLRA also requires "proper" exhaustion; that is, the plaintiff must comply with "an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S.81, 90 (2006).

98.     The PLRA establishes a mandatory exhaustion regime, forecloses judicial discretion, and prevents a court from excusing a failure to exhaust, even to take "special circumstances" into account. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016) ("the PLRA's text suggests no limits on an inmate's obligation to exhaust."); *see also Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."). Moreover, "a prisoner must now exhaust administrative remedies even where the relief sought . . . cannot be granted by the administrative

---

[1] Because Plaintiff is alleging violations of federal law in a federal district court, his complaint is subject to the procedural requirements of the PLRA. *Ferrington v. Louisiana Dep't of Corr.*, 315 F.3d 529, 532 (5th Cir. 2002).
[2] For purposes of the PLRA exhaustion requirement, "prisoner" is broadly defined and includes "any person … detained in any facility who is accused of . . . **or adjudicated delinquent** for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h) (emphasis added); *see also Molina v. New York*, 697 F. Supp. 2d 276, 282 (N.D.N.Y. 2010) ("[t]his exhaustion requirement applies equally to juveniles confined in correctional facilities.") (citing 42 U.S.C. § 1997e(h)).

process." *Woodford*, 548 U.S. at 85. The only limit to § 1997e(a)'s mandate is that administrative remedies must be "available." *See Ross*, 136 S. Ct. at 1859-62.

99.    OJJ maintains an Administrative Remedy Procedure ("ARP") to efficiently process internal grievances, such as those addressed in Plaintiff's Complaint, based on its expertise in managing Youth detention facilities. *See* Woods Aff. (Doc. 28-1) at ¶¶ 2-3 and ARP Policy (Doc. No. 28-1). Under the ARP, a Youth must fully exhaust a two-step grievance process before seeking judicial review. *See* ARP Policy (Doc. No. 28-1) at 1-14. A Youth first initiates the process by filing an ARP form, deemed filed upon "receipt" by an ARP Coordinator. *Id.*. The ARP Coordinator screens the form and sends it to a facility director, who must respond within 30 days. *Id.* at 7-8. If the Youth is dissatisfied with the director's response, he has 15 days to seek review from the Deputy Secretary of Youth Services. *Id.* at 8-9. The Deputy Secretary must render a final decision within 21 days of receiving the request for review, and the entire process must be completed within 51 days of the original filing of the Youth's grievance form. *Id.* If the Youth is dissatisfied with the response, he may then seek judicial review. *Id.* at 9.

100.    If the Youth's ARP form expresses a belief that he is at immediate risk of harm and that any delay in responding to the grievance would subject him to immediate personal injury or other serious irreparable harm, the ARP coordinator must "immediately forward the ARP" to the regional director, who must "provide an initial response within 48 hours and issue a final decision within five[] calendar days." *Id*. at 9-10. The emergency grievance procedure does not render the standard two-step process unavailable to the Youth, nor does it prevent the Youth from seeking requested relief from the facility in Step 1, or review from the Deputy Secretary in Step 2. *See generally id*.

65626135.v1

101.    Here, Plaintiff filed an Emergency ARP form in connection with his potential transfer to BCCY-WF on August 16, 2022. *See* Woods Aff. (Doc. 28-1) ¶ 8 and Emergency ARP Form (Doc. 28-1) at 47. OJJ denied the request for emergency consideration of the ARP and informed Plaintiff of same on August 18, 2022. *See id.* ¶ ; *see also* Emergency ARP Form (Doc. 28-1). This lawsuit was filed on August 19, 2022—before the deadline for responding to Plaintiff's ARP. *Id.* at ¶ 10; *see also* Doc. 1.

102.    Plaintiff failed to exhaust because OJJ's two-step grievance process remained available to him notwithstanding his emergency grievance. The PLRA is clear that a Youth must exhaust all "available" remedies prior to filing a claim under federal law. 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 741 (2001). As the Supreme Court has emphasized, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 211 (2007); *see also Woodford*, 548 U.S. at 90 (explaining that administrative exhaustion "means using all steps that the agency holds out, and doing so properly so that the agency addresses the issues on the merits.").

103.    OJJ's ARP does not except Youths from addressing grievances through the standard two-step process if they do not receive emergency relief where requested. *See generally* ARP Policy (Doc. No. 28-1). In other words, the ARP includes no provision for complete curtailment of the two-step grievance process, even where a Youth is denied emergency relief. In fact, the ARP specifically states that a Youth may seek judicial review after the conclusion of Step 2 of its standard process but contains no such language in the emergency grievance provision. *See id.* at 9-10. Thus, the ordinary grievance process remains "available" within the meaning of the PLRA even after an inmate has sought administrative relief under an emergency grievance. *See, i.e.*, *Brown v. Eardley*, 184 F. App'x 689, 691-92 (10th Cir. 2006) (holding administrative

remedies were still available to inmate through standard grievance process even though warden did not respond to emergency grievances within the three days required under applicable regulations); *Brazell v. Ruh*, 2015 WL 2452410, at *3-4 (E.D. Ark. May 21, 2015) (same).

104.    A finding that Plaintiff fully exhausted available remedies in this case would create a perverse incentive for Youth to file frivolous "emergency" ARPs and then immediately file suit at the end of the five-day window, thereby circumventing OJJ's grievance procedure. *See Smith v. Asselmeier*, 2018 WL 3533346, at *3 (S.D. Ill. July 23, 2018), *aff'd*, 762 F. App'x 342 (7th Cir. 2019) ("If a prisoner could exhaust his administrative remedies by filing an emergency grievance instead of going through the standard protocols, then the entire regulatory structure would collapse."). It is clear from the express language of PLRA and applicable case law that Congress did not intend this result.

105.    The Court finds that Plaintiff failed to properly exhaust his administrative remedies before filing the underlying suit. Accordingly, there is not a substantial likelihood that Plaintiff will prevail on his claim. For this reason, Plaintiff's motion for injunctive relief is denied.

### *b. Incorrect Reliance on Relaxed "Objectively Reasonable" Standard*

106.    Plaintiff argues Defendants are liable under the Fourteenth Amendment because Defendants' plan to transfer him to BCCY-WF is "objectively unreasonable," a more relaxed standard adopted by the Supreme Court in *Kingsley* for excessive force cases involving pre-trial detainees. *See* Pls.' TRO Br. (Doc. 9) at 21 & n.51 (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)). Plaintiff admits that the more stringent deliberate indifference standard has been applied by the Fifth Circuit in Eighth and Fourteenth Amendment cases, like *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996). *Id*. at 22, n.52. But, because *Hare* precedes *Kingsley*, Plaintiff asserts the more relaxed "objectively unreasonable" standard should apply. *Id*.

107.    The Fifth Circuit has expressly rejected the *Kingsley* objectively unreasonable standard for cases not involving excessive force against pre-trial detainees. *See Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419–20 (5th Cir. 2017) (rejecting one dissenting judge's invitation to extend *Kingsley*). This Court has repeatedly recognized this holding. *See Guillory v. Louisiana Dep't of Health & Hosps.*, No. CV 16-787-JWD-RLB, 2018 WL 1404277, at *8 (M.D. La. Mar. 20, 2018) ("deliberate indifference standard remains a subjective one as set out in *Hare* despite the intervening case of *Kingsley*").[3]

108.    The Court finds that, based upon *Alderson* and its progeny, the correct standard to apply to Plaintiff's Section 1983 claim is the deliberate indifference standard. Plaintiff fails to demonstrate a substantial likelihood of success on the merits of this Section 1983 claim because he has relied upon the incorrect "objectively reasonable" liability standard.

109.    As shown below, applying the correct deliberate indifference standard to Plaintiff's Section 1983 claim, the Court finds that Plaintiff likewise fails to establish a substantial likelihood of success on the merits.

### c.  Failure to Demonstrate Deliberate Indifference

110.    As referenced above, the Court finds that the proper standard for Plaintiff's claims here is the deliberate indifference standard.

111.    Liability under Section 1983, whether based on the Eighth or Fourteenth Amendment, requires that prison officials act with deliberate indifference to a substantial risk of serious harm. *See generally Gumns*, 2020 WL 2510248 (analyzing Section 1983 claims under

---

[3] *See Robertson v. Gautreaux*, No. CV 16-341-JJB-RLB, 2017 WL 690542, at *4 (M.D. La. Feb. 21, 2017), *aff'd in part*, 731 F. App'x 337 (5th Cir. 2018) ("Recently the Fifth Circuit reaffirmed the *Hare* holding in light of *Kingsley*. Accordingly, this Court applies a deliberate indifference standard to Plaintiff's claims."); *see also Joyner v. Grenada Cty., Miss.*, 458 F. Supp.3d 486, 491 (N.D. Miss. 2020) (failure to protect case discussing *Alderson* to explain Fifth Circuit has considered and expressly rejected *Kingsley* beyond excessive force cases).

Eighth and Fourteenth Amendments).[4] Deliberate indifference is "an extremely high standard to meet." *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020) (citation omitted). Proof of negligence, or even gross negligence, is not enough. *Hare*, 74 F.3d at 645 (deliberate indifference must be a "step up" from "mere or even gross negligence," or otherwise the standard is rendered "meaningless"). Relevant to Plaintiff's claim here, apprehension regarding confinement does not imply unconstitutional confinement conditions. Instead, deliberate indifference requires deprivation of "basic human needs." *Valentine*, 956 F.3d at 801.

112.    A two-part test applies to determine whether a defendant has acted with deliberate indifference under Section 1983. *Id.* (citation omitted). First, the plaintiff must establish an "objectively intolerable risk of harm." *Id.* Second, the plaintiff must establish the defendant acted with subjective indifference; that is, the defendant: "(1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively dr[e]w the inference that the risk existed; and (3) disregarded the risk." *Id.* (citations and quotations omitted).

113.    The Court finds that Plaintiff fails to carry his burden to establish a substantial likelihood that he will succeed on either the objective prong or the subjective prong of the deliberate indifference standard.

### i.    Objective Prong of the Deliberate Indifference Standard

114.    To establish the objective prong of the deliberate indifference standard, Plaintiff must prove the existence of an "objectively intolerable risk of harm." *Id.*

115.    Defendants have demonstrated through record evidence that the Youths will not be housed within "sight or sound" of adult inmates at BCCY-WF. Defendants have further

---

[4] *See also generally, i.e., Jones v. Tex. Dep't of Crim. Justice*, 880 F.3d 756 (5th Cir. 2018) (discussing deliberate indifference in Eighth Amendment claim); *Estate of Pollard v. Hood County, Tex.*, 579 Fed. App'x 260 (5th Cir. 2014) (discussing deliberate indifference in Fourteenth Amendment claim).

demonstrated through record evidence that all current services provided to the Youths at BCCY will continue at BCCY-WF.

116.   Plaintiff's Motion presents no evidence to the contrary.

117.   Because Plaintiff has not established an objectively intolerable risk of harm, Plaintiff has failed to establish the required objective prong of the Section 1983 claim and therefore has failed to demonstrate a substantial likelihood of success on the merits on this cause of action.

### ii.   Subjective Prong of the Deliberate Indifference Standard

118.   To satisfy the subjective prong of deliberate indifference, defendants must have "general awareness of the dangers" posed by their conduct <u>and</u> must "subjectively believe the measures they are taking are inadequate." *Valentine*, 956 F.3d at 802. The Fifth Circuit has held that, though a court may disagree with a defendants' actions, "mere disagreement" "does not establish deliberate indifference." *Id.* at 803.

119.   The only evidence before the Court is that Defendants subjectively believe that the steps they are taking are <u>adequate</u> to protect the Youth from the dangers, if any, posed by temporarily locating the TTU at BCCY-WF. *See* Patin Aff. (Doc. 28-2) ¶¶ 13-19.

120.   Accordingly, Plaintiff has not carried his burden to establish that he has a substantial likelihood of success on the subjective prong of the deliberate indifference standard. For this additional reason, Plaintiff's motion for injunctive relief must be denied.

### d.   *Failure to State or Support Claim for Deprivation of Education or Rehabilitative Services*

121.   Plaintiff's references to the Louisiana Constitution and the Supreme Court of Louisiana's opinion in *In re C.B.,* 708 So.2d 391 (La. 1998) have no bearing on this case. Plaintiff has not pled a claim for violations of state law or the Louisiana Constitution. *See generally* Compl. (Doc. 1). Instead, Plaintiff's claims sound under federal law, which only provides a cause of action

for rights that arise under the U.S. Constitution or other federal laws. *Woodard v. Andrus*, 419 F.3d 348, 353 (5th Cir. 2005) ("§ 1983 is only a remedy for violations of federal statutory and constitutional rights."). *In re C.B.* based its holding on the Due Process Clause of the Louisiana Constitution and expressly declined to address whether the alleged "constitutional infirmities would also be present at the federal level." *In re C.B.,* 708 So.2d at 395-400. Accordingly, Plaintiff cannot base his action, which sounds entirely under Section 1983, on any rights established under state law in *In re C.B.*[5] This is not a legally cognizable claim.

122.    Furthermore, Plaintiff has failed to show that OJJ's transfer of Plaintiff to BCCY-WF will alter the educational and rehabilitative programming provided to Plaintiff or that such altering would constitute a deprivation of constitutional rights.

123.    First, to the extent Plaintiff attempts to assert a federal constitutional right to educational and rehabilitative programming, no such right has been firmly established. The Supreme Court has declined to address the appropriate federal standards by which to judge the conditions of a state juvenile detention facility, both generally and as applied to rehabilitative treatment. *See Ingraham v. Wright*, 430 U.S. 651, 669 n.37 (1977). In the Fifth Circuit's only case addressing the issue, the court vacated a district court's grant of an injunction in favor of a class of juvenile detainees, explaining that a "right to treatment for juvenile offenders has not been firmly established." *Morales v. Turman*, 562 F.2d 993, 997 (5th Cir. 1977). Indeed, the *Morales* Court was skeptical of such a right, characterizing it as "doubtful." *Id.* at 998. The court ultimately reasoned that "even if some form" of the right existed, the district court's injunction was

---

[5] In any event, the Fifth Circuit has noted that "[t]he Louisiana Constitution provides the same due process protections as that of the United States Constitution." *Cripps v. Louisiana Dep't of Agric. & Forestry*, 819 F.3d 221, 232 (5th Cir. 2016). Moreover, *In re C.B.* dealt with a Louisiana statute that allowed juveniles to be housed in adult facilities and subjected to the same hard-labor requirements as adults. *In re C.B.*, 708 So.2d at 395-400. Plaintiff has not been threatened with nor subject to any such conditions, and as discussed below, the undisputed evidence demonstrates that he will not be.

excessively detailed, as a court "is not in a position to monitor day-by-day changes that affect rehabilitation programs." *Id.* at 999.[6]

124.    In cases recognizing a constitutional right to rehabilitative programming, the challenged practices in those cases fall far below what common sense suggests as appropriate. For instance, in *Donnell C. v. Illinois State Board of Education*, 829 F. Supp. 1016 (N.D. Ill. 1993), the juvenile-detainee plaintiffs alleged that, for the entire length of their pretrial detention, (a) only 39% of those in need of special educational services were receiving them; (b) the plaintiffs were not being taught courses other than reading and math; (c) they did not have textbooks, workbooks, or other instructional materials; and (d) they were not given learning disability assessments and instruction. *Id.* at 1017-18. Based on these allegations, the court held that the plaintiffs' complaint stated a claim for violations of substantive due process. *Id.* at 1018. Similarly, a court has held that due process violations were present where detainees were placed in "cottages without regard to their age, prior social history, reason for confinement[,] or individual treatment needs, but solely on the basis of vacancies and the maintenance of a fixed black-white ratio in each cottage." *Morgan v. Sproat*, 432 F. Supp. 1130, 1141–43 (S.D. Miss. 1977). The court explained that this did "not allow the matching of students with compatible counseling and supervisory staff" and that it failed to provide a "reasonable opportunity to be rehabilitated." *Id.*

125.    Second, here, Plaintiff has failed to show that OJJ's transfer of Plaintiff to BCCY-WF will result in a modification to his educational and rehabilitative programming such that it

---

[6] Other courts that have addressed the existence and extent of juvenile detainees' constitutional rights to rehabilitative programming have held that no such right exists. *See, i.e.*, *Santana v. Collazo*, 714 F.2d 1172 (1st Cir. 1983). In *Santana*, the First Circuit expressly held that such a right did not exist. *Id.* at 1176–77. "[A]lthough rehabilitative training is no doubt desirable and sound as a matter of policy and, perhaps, of state law, [juvenile detainees] have no constitutional right to that rehabilitative training." *Id.* Even in courts that have embraced the right of juveniles to receive rehabilitative education and treatment, those courts specifically declined to draw a bright-line rule and instead offered "minimum acceptable standards of care and treatment" as guideposts. *See Nelson v. Heyne*, 491 F.2d 352, 360 (7th Cir. 1974).

would create a constitutional deficiency. Aside from his speculation that educational and rehabilitation services might be provided by DOC staff or that the level or amount of service will decrease upon transfer, which is not accurate, Plaintiff has failed to make any meaningful, specific allegations—much less provide evidence—that the educational and rehabilitation services provided to him at BCCY-WF will be constitutionally insufficient.

126.    Plaintiff has not shown the complete breakdown in educational programing as present in *Donnell* or the absolute failure to consider individualized needs as present in *Morgan* that gave rise to a finding of a constitutional deprivation. *See Donnell* 829 F. Supp. at 1017-18; *Morgan*, 432 F. Supp. at 1141–43.[7]

127.    On the contrary, OJJ has plans and staff in place to continue all of Plaintiff's education and rehabilitative services once transferred to BCCY-WF and to provide such services through OJJ staff and vendors in the exact same manner as they are currently being provided to Plaintiff at BCCY. *See* Dandridge Aff. (Doc. 28-4) ¶¶ 8-19; Deville Aff. (Doc. 28-3) ¶¶ 15-21; Bridgewater Decl. (Doc. 28-7) ¶¶ 29, 34.

128.    As long recognized in the Fifth Circuit, courts are not in "a position to monitor day-by-day changes that affect rehabilitation programs." *Morales v. Turman*, 562 F.2d at 996. Intervention on this issue is "a significant federal intrusion into a state's affairs," where "[s]tate governments have wide discretion." *Id.* at 996.

129.    For these reasons, the Court finds Plaintiff's claim regarding a constitutional deprivation of education and rehabilitative services are not substantially likely to succeed on the merits.

---

[7] Plaintiff has also failed to show, or even suggest, how the OJJ's current objectives will result in Youth being subject to adult hard-labor requirements or have otherwise made the Youths' confinement indistinguishable from that of adult prisoners, as was the case in *In re C.B.* 708 So.2d at 395-400.

130.    For this additional reason, Plaintiff's motion for injunctive relief must be denied.

## 2.    Element Two – Irreparable Injury if Injunction is Not Granted

131.    "One seeking injunctive relief must demonstrate a real and immediate threat that he will be subject to the behavior which he seeks to enjoin. It is not sufficient for the plaintiff to speculate that he will be subject to injurious conduct if the practice is continued …." *Gladden v. Roach*, 864 F.2d 1196, 1198 (5th Cir. 1989) (citing *City of L.A. v. Lyons*, 461 U.S. 95 (1983)) (emphasis added). An injunction is not appropriate where the movant presents only the "mere fact that irreparable harm may possibly ensue if restraint is not imposed." *Standard Brands, Inc. v. Zumpe*, 264 F. Supp. 254, 267 (E.D. La. 1967) (citations omitted). Indeed, "[i]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties." *Id.* at 267-68.[8] Instead, and particularly concerning injunctions against the government, "courts should not intervene [by granting injunctions] unless the need for equitable relief is clear, not remote or speculative." *Machete Prod., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015).

132.    Furthermore, Louisiana courts have held, "speculative injury" is not sufficient to establish irreparable harm for purposes of injunctive relief; the movant must present "more than an unfounded fear" of injury. *Dixie Brewing Co., Inc. v. U.S. Dep't of Vet. Affairs*, 952 F. Supp.2d 809, 813 (E.D. La. 2013) (citations and brackets omitted). An injunction requires that an irreparable injury "be both certain and great," "actual and not theoretical." *Id.* (citations, quotations, and brackets omitted).

---

[8] *See also Simon v. Southwest La. Elec. Membership Corp.*, 267 So.2d 757, 760 (La. App. 1972) ("[T]he applicant for injunction must show a reasonable probability that the acts sought to be enjoined will occur. It is not sufficient for plaintiff to simply state that he fears they will occur.").

133.    Here, Plaintiff asserts vague contentions of what he believes the irreparable harm will be if he is transferred to BCCY-WF. Plaintiff appears to argue that if he is transferred to BCCY-WF:

- He will be subjected to "punishment" because there is no rational basis for the decision to transfer him to BCCY-WF;

- He will be subjected to "punishment" because he will be deprived of education and rehabilitation services thus rendering his confinement purely punitive;

- He may come within the sight and sound of an adult inmate;

- He fears that he will be placed in an unsafe condition or be subjected to violence;

- He fears that the educational, medical, and rehabilitation services may decrease (and presumably he means below the constitutionally protected level of services); and

- The knowledge that he may get transferred to BCCY-WF causes him "stress" and "difficulty sleeping."

*See generally* Doc. 9.

134.    Plaintiff offers no evidence of a "substantial threat" that these alleged harms will come to pass. The alleged harms are seemingly based on conjecture and do not rise about the level of fear or apprehension. Moreover, for the reasons outlined below, these allegations fail to demonstrate a substantial threat of irreparable injury as required for injunctive relief.

### a. *Rational Basis and Legitimate Government Interest to Transfer Plaintiff*

135.    Plaintiff contends that there is no rational relationship between the decision to transfer Plaintiff (or any other Youth) to BCCY-WF and any legitimate government interest. Pl.'s Mot. (Doc. 9) at 22. Plaintiff cites no evidence in support of this proposition.

65626135.v1

136.    However, Defendants have testified that, while in OJJ's secure care facilities, Plaintiff has repeatedly engaged in violent and destructive conduct. *See* Broussard Aff. (Doc. 28-5) ¶ 8. This conduct is enabled by the physical structure of the OJJ secure care facilities. *See* Nelson Decl. (Doc. 28-6) ¶ 15. To further the rehabilitative services, the OJJ must create barriers that prevent Plaintiff from continuing to engage in criminal behavior. BCCY-WF provides such barriers. Specifically, BCCY-WF provides individual housing accommodations that will prevent Plaintiff from being able to access other Youth while they sleep. BCCY-WF employs reinforced walls and high ceilings so that Plaintiff will be incapable of damaging the facilities and using the structural components of the facility to fashion weapons. BCCY-WF is located within multiple secure fences that will prevent Plaintiff from escaping or attempting to escape. *See* Nelson Decl. (Doc. 28-6) ¶ 38; Patin Aff. (Doc. 28-2) ¶ 17. In addition to the physical barriers, placement in the TTU will increase (not decrease) the rehabilitative services that Plaintiff will receive. All Youth within the TTU will participate in a three-phrase approach to behavior modification. The first phase will provide orientation to the TTU where the Youth will be educated on the process, where the Youth will undergo a behavioral analysis, and where the Youth will be introduced to the cognitive behavioral approach. Phase II of the program is the treatment phase, where Youth will be exposed to multiple treatment modalities including group therapy, milieu therapy, therapeutic homework, and behavioral techniques. After successfully completing phase II, Youth will move to phase III which prepares the Youth to transfer from the TTU to a secure care facility. See Bridgewater Decl. (Doc. 28-7) ¶¶ 19-22 & TTU Policy (Doc. 28-7).

**b.    *No Deprivation of Educational or Rehabilitative Services***

137.    Plaintiff argues that if he is transferred to BCCY-WF, his educational and rehabilitation services will be decreased to the point that they are non-existent, thus converting the

purpose of his detention from rehabilitation to punishment. Plaintiff offers no evidence indicating that there will be any changes to his educational or rehabilitative services at BCCY-WF. To the contrary, the record evidence shows that he will receive the exact same level of education and rehabilitation services that he is currently receiving. *See* Deville Aff. (Doc. 28-3) ¶¶ 10-31; Bridgewater Decl. (Doc. 28-7) ¶¶ 25-34.

138.    Plaintiff further speculates that educational services will be provided by DOC, not OJJ, and that any educational services provided by DOC will be constitutionally deficient. Plaintiff again offers no evidence in support of this proposition. Further, the only record evidence before the Court is OJJ's testimony that it will provide all normal education and rehabilitation services at BCCY-WF. *See* Deville Aff. (Doc. 28-3) ¶¶ 10-31; Bridgewater Decl. (Doc. 28-7) ¶¶ 25-34.

139.    The record demonstrates that Plaintiff will continue to receive the same level of education and rehabilitation services at BCCY-WF, all administered by OJJ. Plaintiff's transfer to BCCY-WF will not reeducate the level or quality of services he receives and will not convert his detention into "punishment."

### c. *Transfer Plan's Compliance with "Sight and Sound" Requirement of the JJDPA*

140.    Under the pertinent portions of the Juvenile Justice and Delinquency Prevention Act ("JJDPA"), a state plan for the administration of its juvenile justice program must provide that "juveniles alleged to be or found to be delinquent . . . will not be detained or confined in any institution in which they have sight or sound contact with adult inmates." 34 U.S.C. § 11133(12)(A). If corrections officers will work with both juveniles and adult inmates, those officers must be trained and certified to work with juveniles. 34 U.S.C. § 11133(12)(B). The Act

also provides that no juvenile shall be detained or confined in any jail or lockup for adults.  34 U.S.C. § 11133(13).[9, 10]

141.    The Act defines "sight or sound contact" as "any physical, clear visual, or verbal contact that is not brief and inadvertent."  34 U.S.C. § 11103(25).  Reading the phrase "clear visual" in the context of "physical" and "verbal" makes clear that the contact Congress sought to prohibit is that which is close enough for conversations or physical interaction.  Indeed, "brief and inadvertent contact" does not constitute a violation.  34 U.S.C. § 11103(25).

142.    The regulations implementing the Act's "sight and sound" provisions highlight additional context.  Those regulations provide that a state's plan must ensure that separation is accomplished "architecturally or through policies and procedures in all secure areas of the facility which include, but are not limited to, such areas as admissions, sleeping, and shower and toilet areas."  28 C.F.R. § 31.303(d)(i).  Consistent with the statute, the regulations further confirm that "[b]rief and inadvertent sight or sound contact between juveniles . . . or found to be delinquent . . . and adult inmates in secure areas of a facility that are not dedicated to use by juveniles and which are nonresidential, which may include dining, recreational, educational, vocational, health care, sally ports or other entry areas, and passageways (hallways), would not require a facility or the State to document or report such contact as a violation.  *Id.*

---

[9] The wording of 11133(13) seems broad at first glance.  But if it simply meant that no juvenile could ever be housed in a building that was at one point used for adults, or that no juvenile could ever be housed on the same property as adult inmates, both § 11133(11) and (12) would be rendered meaningless.  There would be no need for a "sight and sound" requirement if juveniles could not be housed on the same property as adult inmates.  This point is demonstrated in greater detail below.

[10] Plaintiff also cites another provision of JJDPA in his motion for injunctive relief; however, that provision is inapplicable on its face.  *See* Doc. No. 9 at 33 (citing 34 U.S.C.A. § 11133(11)(B)).  Section 11133(11)(B) applies to "juveniles awaiting trial or other legal process who are treated as adults for purposes of prosecution in criminal court."  34 U.S.C. § 11133(11)(B).  All of the Youth to be transferred as part of OJJ's plan have been adjudicated delinquent and are not awaiting trial.  Further, OJJ's plan satisfies § 11133(13), as the Youth will be housed in what will effectively be a juvenile facility (not a jail or lockup for adults).  Thus, the only provisions at issue are the "sight and sound" and training requirements of § 11133(12)(A) and (B).

143.    At least one federal court has held that a plan similar to OJJ's complied with "sight and sound" requirements. *Hughes v. Judd*, 108 F. Supp. 3d 1167, 1235 (M.D. Fla. 2015).  The *Hughes* decision, which was issued following a bench trial, makes extensive findings of fact, including that the "juveniles [were] separated—out of "sight and sound"—from the adult inmates, who [were] housed in a separate building across a large field at the adjoining adult campus of [the property]." *Id.*  The court held that the defendants were not deliberately indifferent to the juvenile plaintiffs' safety, and that there were no other constitutional violations. *Id.* at 1258.

144.    Here, as in *Hughes*, OJJ's transfer plan will ensure "sight and sound" separation and will comply with the Act. The plan first features several architectural controls. *See* 28 C.F.R. § 31.303(d)(i). The Youth who are transferred will be housed in a secure care facility; an entirely separate building that is located approximately 1.5 miles from any adult campuses, recreation areas, or housing. *See* Patin Aff. (Doc. 28-2) ¶ 15 and Aerial View (Doc. 28-2) at 5-6; *Hughes*, 108 F. Supp. 3d at 1235. The building will be cordoned off by a fence that will prevent adult inmates from entering the area. *See id.* ¶ 17. The only potential contact will be "brief and inadvertent". *See id.* ¶¶ 18-19. Such contact will not give rise to a violation. 34 U.S.C. § 11103(25); 28 C.F.R. § 31.303(d)(i).

145.    OJJ has testified that it will also implement policies and procedures designated to ensure separation. It will staff the secure care facility with officers who are trained to protect Youth from contact with adult inmates. *See* Nelson Decl. (Doc. 28-6) ¶ 33, 36. If OJJ requires help from DOC security staff, it will ensure compliance with 34 U.S.C. § 11133(12)(B) by requiring that any such DOC officers be trained and certified to work with juveniles. *See id.* ¶ 36. And OJJ will not allow any adult inmates to enter the BCCY-WF fence line for any reason. *See id.* ¶ 33.

146.    Plaintiff has failed to show that these controls are insufficient to meet "sight and sound" separation requirements.  Plaintiff largely relies on speculation and has cited no evidence indicating that OJJ's architectural controls will be insufficient or any specific evidence that the secure care facility will not be staffed with qualified officers.  Although it is true that a court may issue a preliminary injunction on evidence that is "less complete" than what would be presented at a full trial on the merits, *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), there is no dispute that a plaintiff must come forth with *some evidence* to establish a likelihood of success. Plaintiff has failed to provide any such evidence and has cited no caselaw finding that the type of speculation Plaintiff relies on is sufficient to warrant extraordinary relief like a preliminary injunction.

147.    Further, Plaintiff cites no caselaw interpreting or applying "sight and sound" requirements.  Instead, Plaintiff cites only a law review article whose general thesis revolves around a provision in 34 U.S.C. § 11133(11)(B) that allows a judge to except a youth from the sight and sound requirements if it is "in the interest of justice" to do so.  *See* Lauren Knoke, See No Evil, Hear No Evil: Applying the Sight and Sound Separation Protection to All Youths Who Are Tried as Adults in the Criminal Justice System, 88 Fordham L. Rev. 791, 794 (2019).  As previously discussed, § 11133(11)(B) only applies to the "juveniles awaiting trial" and is therefore inapposite.  Nothing in the Knoke article indicates that OJJ's separation procedures are insufficient.

148.    The record demonstrates that OJJ's transfer plan includes architectural, procedural, and staffing controls that will ensure Youth are protected from sight and sound contact with adult inmates.  Plaintiff has failed to make any evidentiary showing or provide any authority to the contrary.

### d.  Subjective Stress, Anxiety, or Fear Is Not Irreparable Harm

149.    Neither "fear," "mental stress," nor even a "great amount of stress" are irreparable injuries for purposes of an emergency injunction. *See Anthony v. Thomas*, No. 2:21-CV-1251, 2022 WL 194324, at *3 (W.D. La. Jan. 19, 2022) (denying request for injunction when plaintiff claimed he "endure[d] a great amount of stress on a daily basis" and "fear" stemming from his transfer to correctional facility); *Tweedy v. Boggs*, 983 F.2d 232 (5th Cir. 1993) (affirming dismissal of pretrial detainee's claim that being housed with convicted prisoners "caused him to suffer mental stress, resulting in irreparable harm" in part because he was "not entitled to a stress-free atmosphere."); *see generally Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *17 (W.D. Tex. Apr. 9, 2007) (finding that the plaintiffs' claim that the "stressful conditions of detention [was] causing them irreparable injury" was insufficient for preliminary injunction).

150.    Likewise, a mere "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985); *J.H. by & through N.H. v. Edwards*, No. CV 20-293-JWD-EWD, 2020 WL 3448087, at *45 (M.D. La. June 24, 2020) (denying motion for TRO because "Plaintiffs have only demonstrated what *could* happen in OJJ's secured care facilities in the absence of universal testing, furloughs, and their other measures. They have not demonstrated beyond speculation a *substantial* threat of imminent, irreparable harm to the Youth in these facilities."). In fact, "a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. A presently existing actual threat must be shown." 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. Apr. 2022 update). For this reason, a plaintiff who claims that he "endures a

great amount of stress on a daily basis" but fails to identify the "specific basis for his fear" will not meet the requisite threat of irreparable injury. *Anthony*, 2022 WL 194324, at *3.

151.    Plaintiff claims that, since OJJ announced the transfer decision, Plaintiff "has experienced significant mental and physical harm, including increased difficulty sleeping and extreme stress." Doc. 9 at 12. Plaintiff's alleged harm appears to be driven by his speculation that he "will be subjected to unsafe conditions and violence at LSP." Doc. 9 at 12. Plaintiff cites to no evidence that substantiates this stated fear. Instead, Plaintiff states his belief that certain adult detention facilities located on the LSP campus present an unsafe condition, and from there concludes that, because BCCY-WF is located on the grounds of the LSP campus, it too will present unsafe conditions.

152.    Plaintiff presents no evidence that adult detention facilities on the LSP campus present unsafe living conditions. Plaintiff presents no evidence that the OJJ-run BCCY-WF will present unsafe conditions.

153.    The only evidence before the Court is that BCCY-WF will provide Plaintiff with *more* protection to prevent Plaintiff from injuring himself, from injuring others, and from being injured by others. Specifically, BCCY-WF will house fewer Youth residents than Plaintiff's current secure care facility. *See* Nelson Decl. (Doc. 28-6) ¶ 30. BCCY-WF will provide greater individualized attention to Plaintiff. *See* TTU Policy (Doc. 28-7). And the physical structure will provide additional protection through reinforced walls, high ceilings, and individualized sleeping accommodations. *See* Nelson Decl. (Doc. 28-6) ¶ 38.

154.    In sum, Plaintiff fails to demonstrate that his subjective stress, anxiety, and fear are irreparable injuries required to warrant an emergency injunction.

### e.   *Fear of Decreased Services is Not Irreparable Harm*

155.    Plaintiff presents no evidence that he will actually receive a decreased level of education, medical, or rehabilitative services, and certainly no evidence that he will receive a constitutionally-deficient level of services. Instead, Plaintiff apparently has a mere suspicion that this will occur.

156.    Again, a mere "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland*, 777 F.2d at 997; *J.H.*, 2020 WL 3448087, at *45. Plaintiff has failed to cite any evidence to corroborate or justify his fear, and the only evidence before the Court dispels Plaintiff's fear. Defendants have demonstrated that Plaintiff will continue to receive the same level of constitutionally compliant education, medical, and rehabilitation services if he is transferred to BCCY-WF. *See* Bridgewater Decl. (Doc. 28-7) ¶ 25-34; Dandridge Aff. (Doc. 28-4) ¶¶ 9-20; Deville Aff. (Doc. 28-3) ¶¶ 10-31.

157.    In sum, Plaintiff fails to demonstrate a substantial threat of irreparable injury if the injunction is not granted. The motion for injunctive relief must be denied.

### 3.    Element Three – Whether Threatened Harm to Plaintiff if Injunction is Not Granted Outweighs Harm to Defendants if Injunction is Granted

158.    While Plaintiff fails to establish more than mere speculation of potential injury if the injunction is denied, Defendants will suffer irreparable injury as a matter of law if the injunction is granted. *See Valentine*, 956 F.3d at 803. ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (quoting *Maryland v. King*, 567 U.S. 1301, (2012) (Roberts, C.J., in chambers)).

159.    Here, as in *Valentine*, the State of Louisiana has "assigned the prerogatives" of juvenile detention policy to Defendants, and the Court's injunction would "prevent the State from effectuating the Legislature's choice and hence imposes irreparable injury." *Id.* As the *Valentine* court explained, the Supreme Court "has repeatedly warned that it is difficult to imagine an activity

65626135.v1

in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Id.* (quotations omitted). Operation of juvenile detention centers is no different. As such, like the *Valentine* defendants, Defendants will be irreparably harmed if the injunction is granted. *Id.*

160.    As recognized in *Valentine*, in the midst of the COVID-19 pandemic, the harm to Defendants is "particularly acute" because an injunction would interfere with OJJ's "system-wide approach" to respond to the changing needs of the Youth in its care. *Id.* Issuing an injunction here will threaten Defendants' "ability to continue to adjust its policies" by "lock[ing] in place a set of policies". *Id.* If Defendants are not free to act "without a permission slip from the district court, … [t]hat constitutes irreparable harm." *Id.*

161.    For this additional reason, Plaintiff's Motion for injunctive relief should be denied.

**4.  Element Four – Public Interest**

162.    While Plaintiff's Motion asserts it is "always" in the public interest to prevent the violation of constitutional rights, there are limits to this sweeping statement. *See* Pls.' TRO Br. (Doc. 9) at 31-32.[11] Indeed, "when a state statute vests state officials with broad discretionary authority concerning [prison operations], the Constitution affords the prisoners no constitutionally protected interests that might outweigh defendants' or the public interests in prison administration." *Patterson v. Daniels*, No. 12-1674, 2010 WL 2100546, at *21 (E.D. La. March 22, 2013) (referencing *Olim v. Wakinekona*, 461 U.S. 238, 249–50 (1983) and *Merit v. Lynn*, 848 F. Supp. 1266, 1267–68 (W.D. La. 1994)).

163.    Louisiana courts have held it is "against the public interest to issue an injunction based solely on plaintiff's disagreement with the health care being provided" by "corrections

---

[11] If there were no limits on this position, then the fourth factor would be a moot point, as it would always weigh in favor of a movant claiming deprivation of constitutional rights.

65626135.v1

officials who are presently charged with that obligation." *Hawkins v. Hawkins*, No. 3:11–cv–1325, 2012 WL 601426, at *9 (W.D. La. Jan. 2, 2012) (where plaintiff inmate complained of denial of prompt and appropriate medical care and requested injunctive relief for same). Again, the Supreme Court "has continuously cautioned federal courts from assuming a greater role in decisions affecting prison administration." *Id.* (collecting cases); *see also Zantiz v. Seal*, No. 12-1580, 2013 WL 357069, at *4 (E.D. La. Jan. 29, 2013) ("To issue an injunction against this facility would limit those best equipped to make decisions about the proper procedures to maintain safety, and would therefore disserve the public interest in maintaining the safety of the prisoners and officers at the facility.") (where plaintiff inmate complained of, inter alia, inadequate medical care).

164.    Plaintiff has failed to establish that the public interest will be served if the injunction is granted.

**B.    Request for Preliminary Injunction As Distinguished from Request for Temporary Restraining Order**

165.    This dispute came to the Court on Plaintiff's Motion for Temporary Restraining Order (Doc. 9), which the Court denied. However, that Motion also included a request for preliminary injunction. *Id.* at 16. Based on the evidence considered by this Court on Plaintiff's Motion for Temporary Restraining Order and Motion for Preliminary Injunction, the Court denies both requests for injunctive relief.

166.    The Federal Rules of Civil Procedure, the Fifth Circuit, and the Supreme Court all draw express lines of demarcation between the proceedings leading up to, and the relief granted by, a temporary restraining order and a preliminary injunction. *See* Fed. R. Civ. P. 65(a),(b); *Sampson v. Murray*, 415 U.S. 61, 87 (1974); *Belo Broad. Corp. v. Clark*, 654 F.2d 423, 426 (5th Cir. 1981).

167.    "[T]he label appended by the requesting party" is not conclusive as to whether the district court has ordered a temporary restraining order or a preliminary injunction. *Belo Broad. Corp. v. Clark*, 654 F.2d 423, 426 (5th Cir. 1981); *see also Doe v. Vill. of Crestwood, Ill.*, 917 F.2d 1476, 1477 (7th Cir. 1990) ("[n]omenclature does not determine whether an order is a preliminary injunction" or a temporary restraining order).

168.    Instead, the "central inquiry" focuses on the nature and scope of the hearing that precedes the grant or denial of the requested relief. *Belo Broad. Corp.* 654 F.2d at 426.[12] Both the Fifth Circuit and the Supreme Court have consistently held that if the district court holds a contested hearing and receives evidence from both parties, the resulting relief can no longer be characterized as a temporary restraining order. *See Sampson*, 415 U.S. at 87 ("where an adversary hearing has been held, and the court's basis for issuing the order strongly challenged, classification of the potentially unlimited order as a temporary restraining order seems particularly unjustified."); *Belo Broad. Corp.*, 654 F.2d at 426; *Turner*, 460 F. App'x at 325–26; *Jones*, 98 F. App'x at 284. In fact, in a case analyzing COVID-19-related deliberate indifference claims, the Fifth Circuit explained that "precedent makes clear that when a court holds a hearing on a preliminary motion and the motion is strongly contested, its resulting order constitutes" an appealable preliminary injunction. *See, e.g., Marlowe v. LeBlanc*, 2020 WL 2043425, at *1 n. 1 (5th Cir. Apr. 27, 2020) (rejecting the plaintiff's argument that the district court's order was a temporary restraining order).

169.    It is clear, then, that a court addressing whether an order is a preliminary injunction or a temporary restraining order should focus on the following factors: whether a party strongly challenges the court's basis for issuing the order; whether the court receives written submissions

---

[12] As the Seventh Circuit has persuasively explained, the "essence of a temporary restraining order is its brevity, its ex parte character, and (related to the second element) its informality." *Geneva Assur. Syndicate, Inc. v. Med. Emergency Servs. Assocs. (MESA) S.C.*, 964 F.2d 599, 600 (7th Cir. 1992).

from counsel; whether the court decides the issue after an adversary hearing; whether the court develops the factual record before making a decision; and whether the resulting order extends beyond the time limit for temporary restraining orders under Fed. R. Civ. P. 65(b)(2). *See, e.g., Sampson*, 415 U.S. at 87; *Marlowe*, 2020 WL 2043425, at *1; *Turner*, 460 F. App'x at 326 ("Given that the district court took evidence in the form of affidavits, received written submissions from counsel, and heard oral arguments on this matter, as well as the fact that the district court's TRO would delay Turner's execution beyond its scheduled date, we conclude that the district court's order is a preliminary injunction, rather than a TRO.").

170.    Here, the inescapable conclusion after applying these factors is that this Court's order will effectively deny Plaintiff's request for all injunctive relief sought, including the preliminary injunction. Indeed, the Court held an adversary hearing and heard live testimony from witnesses. The parties have substantially developed the record through the submission of affidavits, declarations, and exhibits. The parties also briefed the matter extensively.

171.    Accordingly, the Court denies all injunctive relief sought by Plaintiff in this case.

## C.    The Transfer of Youth to BCCY-WF Does Not Raise a Due Process Concern

172.    Plaintiff did not argue in his motion that the OJJ cannot transfer Youth offenders from one facility to another. The Court *sua sponte* raised the question of whether the transfer of Youth to BCCY-WF would create a potential due process problem. Because the Youth transferred to BCCY-WF are not being transferred out of OJJ's custody and, instead, are being moved from one OJJ secure care facility to another OJJ secure care facility, Due Process concerns do not arise.

173.    OJJ has sole authority over the placement, care, treatment, or any other considerations deemed necessary for children who are judicially committed.

174.    Specifically, after adjudication, a court may commit a Youth to the custody of the Department of Public Safety and Corrections ("Department"). La. Ch. Code art. 897(D), 899(D). Upon commitment, the Department shall have sole custody of the Youth and determine the Youth's placement, care, and treatment. La. R.S. § 15:901(D)(1). The Secretary of the Department shall develop rules and regulations to govern the assignment of Youth to specific facilities and institutions. *Id.* at 901(G)(1)(d).

175.    The OJJ is the state body responsible for Youth who have been adjudicated delinquent and has full control of all juvenile institutions, facilities, and programs under its administration. La. R.S. § 15:905(A). The deputy secretary for youth services shall establish all rules and regulations for the placement, care, and treatment of Youth in the custody of the OJJ. *Id.* at 905(B). The OJJ has sole authority over the placement, care, treatment, or any other considerations deemed necessary from the resources that are available for children judicially committed to the Department. La. Ch. Code art. 908(A); *State in Interest of S.T.,* 97-0216, p. 3 (La. App. 1 Cir. 9/19/97), 699 So. 2d 1128, 1129, *writ denied*, 97-2627 (La. 2/13/98), 706 So. 2d 992.

176.    The juvenile court judge initially determines if a Youth will be placed in the custody of the Department. *State in Interest of S.T.,* 699 So. 2d at 1129. If the court makes this determination, the Department has the authority to determine where the Youth should be placed, and the court may not order the Department to provide a particular type of placement. *Id.* "Specific placement of children and payment for services is the prerogative of the state after custody has been assigned to a state department or agency." *State in Interest of J.H.,* 97-1291, p. 3 (La. App. 4 Cir. 1/14/98), 706 so. 2d 561, 563.

177.    Here, the OJJ has the authority and discretion to determine the placement of Plaintiff within its secure care facilities.

### III.    CONCLUSION

178.    For all of these reasons, Plaintiff's Motion for Preliminary Injunction (Doc. 9) is DENIED, and Plaintiff's request for preliminary injunction is DENIED.

Dated: September 2, 2022

Respectfully submitted,

Respectfully Submitted:

BY:    */s/ Allena McCain*
    Connell Archey (#20086)
    Randal J. Robert (#21840)
    Allena McCain (#38830)
    Madaline King (#38301)
    BUTLER SNOW LLP
    445 North Boulevard, Suite 300 (70802)
    P.O. Box 2997
    Baton Rouge LA  70821-2997
    Telephone:    (225) 325-8700
    Facsimile:    (225) 325-8800
    Connell.Archey@butlersnow.com
    Randy.Robert@butlersnow.com
    Madaline.King@butlersnow.com
    Allena.McCain@butlersnow.com

    Counsel for Defendants
    GOVERNOR JON BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS, in his official capacity as Deputy Secretary of the Office of Juvenile Justice; and JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections

65626135.v1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing has this day been filed electronically with the Clerk of Court using the CM/ECF system, which will deliver notice of this filing to all counsel of record.

Baton Rouge, Louisiana this 2nd day of September, 2022.

<i>/s/ Allena McCain</i>_____

65626135.v1