# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

ALEX A., by and through his guardian, Molly Smith, individually and on behalf of all others similarly situated,

Plaintiff,

v.

GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS, in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections,

Defendants.

Civil Action No. 3:22-cv-573-SDD-RLB

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

As ordered by this Court on August 23, 2022 (Doc. 14), Plaintiff, on his own behalf and on behalf of the proposed Class, timely submits the following Proposed Findings of Fact and Conclusions of Law relative to the Preliminary Injunction hearing to be held on September 6 and 7, 2022. Pursuant to the Magistrate Judge's Order on September 1, 2022 (Doc. 39), Plaintiff will provide a supplemental Proposed Findings of Fact and Conclusions of Law following depositions, by September 5, 2022.

## PROPOSED FINDINGS OF FACT

### I. Introduction and Procedural History

1. At a press conference called to address the failings of one of the state's juvenile secure care facilities on July 19, 2022, Louisiana's Governor John Bel Edwards announced a shocking plan: he declared that the state will "temporarily move" approximately 25 youth in the

custody of the Office of Juvenile Justice ("OJJ") from Bridge City Center for Youth ("BCCY" or "Bridge City"), a juvenile secure care facility, to the Louisiana State Penitentiary at Angola ("LSP"). (Doc. 4-2 at 1).

2. LSP, commonly known as Angola, is the notoriously dangerous, largest adult maximum-security prison in the United States.[1] (Doc. 4-2 at 1). Defendants plan to transfer youth in OJJ custody to the former death row unit at LSP. (Expert Report and Direct Written Testimony of Vincent N. Schiraldi, filed herewith (hereinafter "Schiraldi Report") at ¶ 1).

3. On August 19, 2022, Plaintiff Alex A. (by and through his guardian, Molly Smith) filed a class action complaint against Governor John Bel Edwards, OJJ Deputy Secretary William Sommers, and Louisiana Department of Public Safety & Corrections ("DOC") Secretary James M. LeBlanc (collectively, "Defendants") on behalf of a putative class of all current and future persons held at BCCY who might be transferred to LSP or another adult prison. (Doc. 1). Plaintiff brought claims under the Fourteenth Amendment of the U.S. Constitution and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. (Doc. 1).

4. Also on August 19, 2022, Plaintiff filed an Emergency Motion for Temporary Restraining Order seeking an order immediately an order immediately (1) enjoining Defendants from transferring to or incarcerating Plaintiff or any proposed Class member at LSP, and (2) enjoining Defendants to move any youth who have already been transferred to LSP to BCCY or another appropriate OJJ facility for youth. (Doc. 3). Plaintiff also filed a Memorandum in Support of Emergency Relief. (Doc. 9).

---

[1] Anat Rubin, Tim Golden & Richard A. Webster, *Inside the U.S.'s Largest Maximum-Security Prison, COVID-19 Raged. Outside, Officials Called Their Fight a Success*, https://www.propublica.org/article/inside-the-uss-largest-maximum-security-prison-covid-19-raged.

5. On August 23, 2022, this Court held a telephonic status conference regarding this matter. (Doc. 14). During that conference, Defendants stipulated that no youth would be moved to Angola until September 15, 2022. The Court denied Plaintiff's emergency motion for temporary restraining order and set this matter for a Preliminary Injunction hearing to be held on September 6, and September 7, 2022. During the same conference, the Court also set deadlines for discovery, including depositions and disclosure of experts.

6. On August 24, 2022, Defendants filed a motion asking the Court to enter an Emergency Protective Order. (Doc. 17). The Court denied Defendants' motion without prejudice on the same day. (Doc. 19).

7. On August 25, 2022, in accordance with the Court's minute entry following the telephonic conference, Plaintiff disclosed to Defendants that Mr. Schiraldi would serve as Plaintiff's juvenile justice expert and provide expert testimony in this matter. (Doc. 21).

8. On August 26, 2022, the Court denied, without prejudice, Plaintiff's motion for disclosure of information pertaining to class members at Bridge City. (Doc. 24). The Court held that there are two primary issues to be determined at the preliminary injunction hearing: "whether the Defendants have the legal authority to transfer juveniles to a facility housed on the campus of an adult prison and whether the Plan for transfer and detention satisfies the statutory and constitutional rights of all juveniles subject to transfer, which necessarily includes the provision of all services and programs to which juveniles are entitled, access to constitutional medical care, and ADA compliance." (*Id.*)

9. After conferring with Defendants' counsel, Plaintiff filed a notice with the Court on August 26, 2022, informing the Court that the parties agreed to allow Plaintiff's expert to tour the juvenile portion of the Louisiana State Penitentiary at Angola. (Doc. 25).

10. On August 26, 2022, in accordance with the Court's order, Defendants filed their Memorandum in Opposition to Plaintiff's Motion for TRO. (Doc. 26-2).

11. On August 31, 2022, the Court granted Defendant's Unopposed Motion for Entry of a Protective Order (Doc. 36).

12. Also on August 31, 2022, at the request of Counsel, Magistrate Judge Richard L. Bourgeois Jr. scheduled a telephonic conference for September 1, 2022 with the parties. (Doc. 37).

13. During the telephonic conference on August 31, 2022, Judge Bourgeois "informed the parties that it was reasonable to conduct certain limited depositions." (Doc. 39). Judge Bourgeois also ordered that the parties could provide a supplemental Proposed Findings of Fact and Conclusions of Law following depositions by September 5, 2022. On September 2, 2022, Plaintiff provided notice of expert Monica L. Stevens, Ph.D., and provided Dr. Stevens' curriculum vitae and resume. (Doc. 41).

14. On September 2, 2022, Plaintiff filed a notice of subpoena for the following witnesses to appear and testify at trial: Warden Tim Hooper, William Sommers, and Orlando Martinez (Docs. 42-44). Plaintiff also filed a motion for writ of habeas corpus ad testificandum for Alex A. to be present to testify on September 6, 2022. (Doc. 45).

15. Plaintiff additionally filed an expert report for Vincent N. Schiraldi, Plaintiff's juvenile justice expert, an expert declaration for Dr. Monica L. Stevens, these Proposed Findings of Fact and Conclusions of Law, and witness and exhibits lists on September 2, 2022.

16. The Court heard this matter on September 6 and 7, 2022 in Courtroom One beginning at 9:00 A.M. (Doc. 14).

## II. Parties

### A. Plaintiff

17. Plaintiff Alex A. is a 17-year-old male currently under juvenile court jurisdiction. He is in the secure custody of OJJ at the Bridge City Correctional Center for Youth ("BCCY"). Alex (Plaintiff) has been informed that he, along with approximately 24 other youth in BCCY, will be transferred to Angola imminently. (Doc. 1 at 4; Doc. 4-4). Plaintiff all current and future persons held at BCCY who might be transferred to LSP or another adult prison. (Doc. 1 at 10).

18. Alex is a child with a disability under Section 504 of the Rehabilitation Act. He has been diagnosed with a learning disability, and also has been prescribed medication to address post-traumatic stress disorder, to help him sleep, and to address nightmares. (Doc. 1 at 5).

**B. Defendants**

19. Defendant Governor John Bel Edwards ("Defendant Edwards") is an adult resident of Louisiana. Defendant Edwards is the Governor of Louisiana and responsible for the faithful execution of the laws of Louisiana. In addition, he is responsible for appointments of the Secretary of the Louisiana Department of Public Safety & Corrections ("DOC") and Deputy Secretary of the Office of Juvenile Justice ("OJJ"). Defendant Edwards is a final juvenile justice policymaker who at times delegates policymaking authority to other Defendants named in this lawsuit. At all pertinent times, Defendant Edwards was acting under color of law. Defendant Edwards is being sued in his official capacity as Governor of Louisiana. (Doc. 1 at 7).

20. Defendant William Sommers ("Defendant Sommers") is an adult resident of Louisiana. Defendant Sommers is the Deputy Secretary of OJJ and responsible for the development and execution of Louisiana's juvenile justice policy who at times delegates policymaking authority to others in the OJJ. At all pertinent times, he was acting under color of law.

Defendant Sommers is being sued in his official capacity as the Deputy Secretary of OJJ. (Doc. 1 at 7).

21. Defendant James M. LeBlanc ("Defendant LeBlanc") is an adult resident of Louisiana. Defendant LeBlanc is the Secretary of the Louisiana Department of Public Safety & Corrections ("DOC") and responsible for the development and execution of Louisiana's adult criminal justice policy who at times delegates policymaking authority to others in the DOC. At all pertinent times, Defendant LeBlanc was acting under color of law. Defendant LeBlanc is being sued in his official capacity as the Secretary of the Louisiana DOC. (Doc. 1 at 8).

**III. Plaintiff's Efforts to Exhaust Available Administrative Remedies**

22. OJJ maintains an Administrative Remedy Procedure (ARP) that sets forth the timelines and process for responding to grievances.[2] In addition to the standard two-step, 51-day process for traditional grievances, OJJ's policy provides for a separate emergency grievance process.[3] The emergency process is available in situations where a youth believes they are at "immediate risk of harm and any delay in responding to the grievance would subject the youth to substantial risk of immediate personal injury or cause other serious or irreparable harm."[4]

23. Under the emergency grievance process, the secure facilities director must provide the youth with an initial response to an ARP within 48 hours of submission and issue a final

---

[2] Administrative Remedy Procedure, Youth Services Policy, https://ojj.la.gov/wp-content/uploads/2021/11/B.5.3.pdf.
[3] *Id.*
[4] *Id.*

decision within five calendar days.[5] ARPs must be sent to the ARP coordinator at each OJJ facility.[6]

24. The Louisiana Administrative Code explicitly allows attorneys to file ARPs on behalf of youth clients.[7] In order to do so, an attorney must include proof of representation, which can include a letter signed by the parent confirming the attorney's representation.[8]

25. On August 16, 2022, attorney Hector Linares placed a phone call to the Bridge City Center for Youth at 4:31 P.M. to request information about the ARP Coordinator for Bridge City.[9] The person who answered the phone put him on hold and then the phone line went silent.[10] After waiting on the line for several minutes, Mr. Linares called the number for Bridge City Center for Youth again at 4:36 P.M.[11] The same person answered and said she did not know the name of the ARP Coordinator, which is why she previously tried to transfer Mr. Linares to the treatment director for the facility.[12] The same individual stated that she believed the ARP Coordinator may be Shaeki Shanklin, who also served as the Family Liaison Coordinator for Bridge City.[13] The woman on the phone provided Ms. Shanklin's email address as shaeki.shanklin@la.gov.[14]

26. Based on this information, Mr. Linares filed a third-party ARP on behalf of youth Alex A. on August 16, 2022 at 5:14 P.M.[15] The email was sent from Mr. Linares's email address

---

[5] *Id.*
[6] *Id.*
[7] La. Admin. Code tit. 22 § 713(F)(4).
[8] *Id.*
[9] Godchaux Decl. ¶ 5.
[10] *Id.*
[11] *Id.* ¶ 6.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.* ¶ 8; Defs.' Opp'n to Pl. PI, Ex. A, Woods Aff. ¶ 8 (acknowledging that attorney Hector Linares files on Emergency ARP form on August 16, 2022).

and the recipients were Ms. Shanklin and Ms. Donna Bowie, who is listed as the Interim Deputy Director for Bridge City on OJJ's website.[16] Additionally, the following people were copied on the email: Revettea Woods, OJJ attorney; Angelic Keller, OJJ General Counsel; Jonathan Vining, DOC General Counsel; Bill Sommers, OJJ Deputy Secretary; James LeBlanc, DOC Secretary; and attorneys for Alex A: Sara Godchaux, David Utter, David Shanies, and Christopher Murrell.[17]

27. The grievance sent by Mr. Linares contained a signed letter from Ms. Molly Smith, Alex A.'s mother, affirming that she had retained the Loyola Law Clinic, Murrell Law Firm, Claiborne Firm, and the Shanies Law Office to represent herself and her minor son.[18] Ms. Smith's letter specifically authorized the attorneys, including Mr. Linares, to file an emergency grievance form on behalf of her son and to sign a Third-Party Acknowledgment form on his behalf.[19] The Third-Party Acknowledgment form attached to the emergency ARP was signed by Mr. Linares and witnessed by Ms. Godchaux on August 16, 2022.[20]

28. The emergency grievance raises a number of concerns about Alex A.'s mental and physical health, education, and safety due to the imminent plans to move Alex A. and his peers to a new facility located on the grounds of LSP (Angola).[21] The grievance states that Alex A. and his peers are at "imminent risk of physical and emotional harm" due to the planned move to a unit at LSP.[22] It further states that the move to LSP could happen at "any time"

---

[16] *Id.* ¶¶ 7-8; OJJ Secure Care Facilities, https://ojj.la.gov/about-ojj/administrative-functions/ojj-secure-care-facilities/.
[17] *Id.* ¶ 8.
[18] Defs.' Opp'n to Pl. PI, Ex. A-3.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*

and that Alex A. believed that it was scheduled to occur on August 22, 2022, just six days after the filing of his grievance.[23]

29. OJJ received Alex A.'s Emergency Grievance, sent by Mr. Linares, on August 16, 2022.[24] On August 18, 2022, OJJ sent a response to the Emergency Grievance.[25] The response acknowledged receipt of the ARP but determined that the ARP did not qualify as an "Emergency ARP" because Alex A. was "not subject to any immediate risk of harm" and was not "subject to any substantial risk of imminent personal injury or serious and irreparable harm within the regular ARP time limits."[26] As a result, OJJ asserted that Alex A.'s grievance would be handled as a standard ARP.[27]

30. OJJ's standard ARP timeline requires that the ARP Coordinator provide a recommendation and that the Facility Director responds within 30 calendar days.[28] A youth who is dissatisfied with the Facility Director's response has an additional 15 days to complete Step Two of the grievance procedure and seek review by the Deputy Secretary.[29] If a grievance is sent to the Deputy Secretary, the Deputy Secretary must render a final decision within 21 calendar days of receipt of the request for Step Two review.[30]

31. At the time that Alex A. and his attorneys received OJJ's response to his Emergency Grievance on August 18, 2022, Alex A. believed that he and his peers would be moved to

---

[23] *Id.*; *see also* Alex A. Decl., ¶¶ 19-20.
[24] *See* Defs.' Opp'n to Pl. PI, Ex. A, Woods Aff., ¶ 8.
[25] Defs.' Opp'n to Pl. PI, Ex. A, Woods Aff., ¶ 9; Defs.' Opp'n to Pl. PI, Ex. A-4.
[26] *Id.*
[27] *Id.*
[28] Administrative Remedy Procedure, Youth Services Policy, https://ojj.la.gov/wp-content/uploads/2021/11/B.5.3.pdf.
[29] *Id.*
[30] *Id.*

the new site at LSP within four days.[31] Beginning on August 16, 2022, employees at BCCY began telling him that the move would happen "any day now."[32] Alex A.'s belief that he would be moved imminently to the site at LSP caused him to have difficulty sleeping and to pull out his hair as a response to stress.[33]

**IV. The Angola Plan**

32. At a press conference on July 19, 2022, Defendant Edwards announced that youth in the custody of OJJ would be moved to a vacant building on the grounds of LSP.[34] The announcement came after a group of youth escaped from Bridge City. According to the Governor, the planned move to LSP was necessary because the housing at Bridge City was no longer habitable and certain youth at Bridge City required a more secure setting.[35] The Governor further explained that "[m]ore permanent, long term solutions are also being developed."[36]

33. During his announcement, the Governor stated: "I understand this is not the perfect or the ideal plan . . . . But I do believe the situation demands an immediate response and these are the best options we currently have to ensure the safety of the youth, the staff and the community."[37]

34. At the time of the announcement, Deputy Secretary Bill Sommers acknowledged that OJJ was facing "some major challenges," but stated that he and his team were "working every

---

[31] Defs.' Opp'n to Pl., Ex. A-3; Alex A. Decl., ¶¶ 19-20.

[32] Alex A. Decl., ¶¶ 19-20.

[33] *Id.*

[34] https://wgno.com/news/louisiana/today-3-p-m-governor-edwards-to-address-recent-issues-at-a-louisiana-juveniledetention-center/ (video portion, beginning at 5:35).

[35] *Id.*

[36] *Id.*

[37] Ashley White, *Juvenile Detainees to be Moved to Angola After Small Group Causes "Tremendous Chaos,"* https://news.yahoo.com/juvenile-detainees-moved-angola-small-231726562.html.

day to address them for the safety of our youth, staff and the outside communities."[38]

## IV. Youth Transferred to LSP Will Face an Unreasonable Risk of Harm

### A. The Physical Space and Layout at the Youth Facility at Angola

35. The physical space and structure at Angola are inadequate. The space designated to serve as the youth facility at Angola does not meet professional standards for juvenile facilities and is not reasonably likely to ensure the safety and well-being of youth held there. It is an adult correctional model facility that is not designed to increase normalization and rehabilitation, the bulwarks of the juvenile justice system. (Schiraldi Report ¶¶ 31, 35).

36. An employee at the U.S. Department of Justice's Office of Juvenile Justice and Delinquency Prevention ("OJJDP") expressed concern about OJJ's plan in a letter to Defendant Sommers, identifying the provisions of the law that it could violate, and explicitly offering assistance to OJJ to "undertak[e] alternative options." Defs' Doc. 421, Bates No. OJJ-000415.

37. The youth facility at Angola is located in the former death row unit that afterwards housed adult women until June 2021. The physical structure, layout, and appearance of the unit appears to be very similar, if unchanged, to when it was a death row unit. Indeed, the fire emergency floorplans posted on two of the tiers where youth would live say "Death Row" on them. (Schiraldi Report ¶ 36).

38. The planned youth facility at Angola has single cells that have sliding barred doors that lock from the outside and are centrally controlled. The cells are windowless, and have correctional toilet and sink units, that are semi-operable. Each cell has a light fixture on the

---

[38] https://ojj.la.gov/gov-edwards-announces-ongoing-investigation-and-immediate-actions-related-to-weekend-incident-at-bridge-city-center-for-youth/.

ceiling and is the size of a typical single cell in an adult maximum-security prison. (*Id.* ¶ 37).

39. There was no "black-out" fabric wrapped around the fenced perimeter of the outdoor space youth would have access to. (*Id.* ¶ 40).

40. There is no indoor recreation area. There is only a partial basketball court outside the facility to which youth would have access. That court, which consisted of a single basket, was on a soggy grass lawn, with concrete pathways trisecting the court, making it impossible to play even a standard half-court game due to the inability to dribble the ball. Youth do not have access to larger soccer/football/softball-type fields. There is no track or area for running or other large-muscle exercise. (*Id.* ¶ 41).

41. There are two showers in one space/area in the bottom two tiers with 15 single cells. They are public and offer youth no privacy when they shower: there is no covering preventing youth who are showering from seeing each other, or preventing staff in the area watching showering youth. (*Id.* ¶ 42).

42. It is unclear where medical care would be provided to youth, as Plaintiffs' expert was not shown a designated infirmary space and there is no room or area in the designated youth facility that could suffice as an infirmary. Plaintiffs' expert did not see any medical supplies, x-ray machines, dental chairs, examining rooms, or any other indicia of medical care or any office space identified as medical space, other than a "Biomedical Hazard" sign. It is also unclear how youth would receive emergency medical care if needed, whether they would ever need to be taken to the adult infirmary, and/or if youth would be transported to receive emergency medical care in the same vehicles as adults incarcerated at Angola. The R.E. Barrow, Jr. Treatment Center at Angola has an Acute Treatment Unit,

which is where adult prisoners are sent initially for medical emergencies but is not an emergency room or hospital,[39] and the nearest hospital is the West Feliciana Parish Hospital, about 24 miles from LSP, but it is not a referral hospital and does not provide mechanical ventilation for patients. The contract hospital for DOC is the University Medical Center in New Orleans, approximately 134 miles—an over 2-hour drive—from LSP. (*Id.* ¶ 43).

43. The only visitation spaces are non-contact with mesh screens for family members or attorneys on one side and youth on the other. These visitation spaces still had slots that can open and close on the youth side, usually used for shackling, applying handcuffs, and feeding. (*Id.* ¶ 44).

44. There are two rooms where the posted signage indicated they were used for multiple purposes. One of the rooms had a paper sign taped to the doorframe that said "Classroom/Zoom." Another room had a paper sign taped up that said "principal, assistant principal, and other administrators." A white board and a few other fabric boards were lying on the ground and had not yet been installed. There are no computers or smart boards in the facility, nor any textbooks, or books of any sort, nor any school supplies, notebooks, calculators, pens, pencils, or other typical school indicia, other than a handful of desks. (*Id.* ¶ 45).

45. The walls in the youth facility were painted, but there were rust spots indicating leakage in several locations, as well as peeling paint. Several bathrooms had badly discolored sinks, extremely rusty towel dispensers, and leakage spots from the ceiling. The kitchen was unsanitary and had noticeable grease and rust on numerous appliances. (*Id.* ¶ 46).

---

[39]     *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *15 (M.D. La. Mar. 31, 2021).

46. There are no couches, day room furniture, games, televisions, pool or ping-pong tables, basketballs, footballs, soccer balls or other recreational equipment. There is also no storage area designated as being for recreational equipment. (*Id.* ¶ 47).

47. The entire design of the unit was for an adult correctional population. Certain shared items that one might find in an adult or juvenile correctional facility, like an infirmary, gymnasium, large library, or athletic fields, are not in evidence within this unit. (*Id.* ¶ 48).

**B. Increased Risk of Solitary Confinement to Youth held at LSP**

48. There is a broad consensus among professional organizations and practitioners that the purpose of the juvenile justice system is to rehabilitate, not to punish, youth. Across numerous developmental spheres, youth under the age of 18 are different from adults, making their rehabilitative, mental health, educational, and social needs different from those for adults. (Schiraldi Report ¶ 21).

49. The prevailing professional view and practice is to employ positive behavioral management to reduce institutional violence and improve youth behavior without requiring the use of solitary confinement and force through chemical or pepper sprays, tasers, and mechanical restraints. Such approaches entail a combination of practices, programs and policies reliant more on positive incentives than force and punishment. (*Id.* ¶ 22).

50. Disciplinary isolation, sometimes called "solitary confinement," "isolation" or "punitive segregation," is the placement of youth into segregation as a punishment for misconduct other than as a temporary response to behavior that immediately threatens the safety of the youth or staff.[40] It is distinguished from temporary room confinement, "time outs" or "cool

---

[40] Carceral facilities often use different terms for solitary confinement, such as "isolation," "segregation," "detention," or "seclusion." References to solitary confinement and isolation apply to those terms as well when referring to juveniles. (Schiraldi Report ¶ 56 n.24)

downs," in which youth are isolated from other youth, generally in their own room, for a period of minutes to a few hours while staff counsel them and engage in de-escalation techniques that facilitate youths stabilizing their behavior so they are able to return to normal facility activities. (*Id.* ¶ 56).

51. In 2017, the American Psychological Association acknowledged that solitary confinement was associated with heightened risk of self-mutilation and suicidality, a range of adverse psychological symptoms such as anxiety, depression, sleep disturbance, paranoia and aggression as well as the exacerbation of pre-existing mental illness and trauma-related symptoms, and called for the end of its use on children. The National Commission on Correctional Health Care (NCCHC) is the trade organization of corrections professionals who work in medical and mental health care. Its 2016 Position Statement on the use of isolation includes a provision that juveniles should be "excluded from solitary confinement of *any* duration." (*Id.* ¶ 57).

52. Widespread and accepted scientific research shows that the psychological anguish of being in isolation or solitary confinement is categorically greater in children, and can cause potentially irreversible physical and mental harm. Furthermore, the vast majority of incarcerated youth – whether in adult or juvenile facilities – have already experienced a great deal of adverse childhood experiences. Thus, incarceration of these youth in and of itself represents additional trauma for these minors, and the compounded trauma produced by incarceration in solitary confinement makes it even worse. The widely accepted fact that isolation is even more dangerous for children than for adults is why a number of professional mental and physical health-related, legal, human rights, and other

organizations call for the drastic reduction or outright elimination in the use of solitary confinement with juveniles. (*Id.* ¶ 58).

53. Many jurisdictions across the United States have laws that prohibit or greatly restrict the use of isolation on youth. (*Id.* ¶ 59). The American Academy of Child and Adolescent Psychiatry has concluded that, due to their developmental vulnerability, youth are in particular danger of adverse reactions to prolonged stays in isolation. Youth held in solitary confinement for 23 hours a day lose their sense of reality, and can become paranoid, anxious and despondent, all of which can exacerbate existing mental health conditions. As many of the youth in custody have experienced some serious trauma in their lives or have undiagnosed or untreated mental illness, they are particularly vulnerable. (*Id.* ¶¶ 59-60).

54. Youth incarcerated in Angola will have an experience of isolation and for longer periods because they will be confined to single cells with sliding barred doors, for living, sleeping, and most of their time. Depending on the out-of-cell time they are given, their single cells may serve as de facto solitary confinement. (*Id.* ¶ 62)

55. Youth incarcerated at Angola are also more likely to be placed in solitary confinement because DOC staff will be filling in for staffing shortages and are trained to respond by placing adults at Angola in solitary confinement, rather than incentives and de-escalation that are best practices for juveniles. OJJ is permitting DOC staff to use the methods that they are trained in, and their training as corrections officers for adults in a maximum-security prison includes using solitary confinement. (*Id.* ¶ 65).

56. Pepper spray, or oleoresin capsicum (OC) spray, is a type of chemical agent that contains capsaicinoids extracted from the resin of hot peppers. It "incapacitates subjects by inducing an almost immediate burning sensation of the skin and burning, tearing, and swelling of

the eyes. When it is inhaled, the respiratory tract is inflamed, resulting in a swelling of the mucous membranes…and temporarily restricting breathing to short, shallow breaths."[41] People with heart conditions or respiratory conditions such as asthma or chronic bronchitis are at heightened risk for respiratory arrest from exposure to pepper spray. People with mental illness who take psychotropic medications likewise are at increased risk of serious harm or death from exposure to pepper spray. Chemical agents such as pepper spray or mace cause severe gastrointestinal side effects if ingested or swallowed. Children "are uniquely susceptible to deployment of and exposure to riot-control agents such as tear gas and pepper spray," according to Dr. Irwin Redlener, a professor of public health at Columbia University.[42] This is because children and adolescents have higher respiratory rates than adults, and so as a result, they will inhale significantly more air in a given time frame. (*Id.* ¶ 66).

57. In May 2011, the Council of Juvenile Correctional Administrators published an Issue Brief on the use of pepper spray. It noted that, while the use of pepper spray, "is widely accepted and used by law enforcement and adult corrections agencies across the country, its use has been shunned by juvenile correctional agencies because of the harm it causes to youths and the negative impact it has on staff-youth relationships." The CJCA brief goes on to state, "very few states authorize its use and in the states that allow its use in policy, most prohibit the use except as a last resort and with many conditions and few facilities put it into practice." (*Id.* ¶ 67).

---

[41]     "Pepper Spray in Juvenile Facilities," Council of Juvenile Correctional Administrators, May 2011, available at http://cjca.net/wpcontent/uploads/2018/02/CJCA.Issue_.Brief_.OCSpray.pdf.

[42]     Irwin Rendlener, *Tear Gas Should Never Be Used on Children. Period*. Wash. Post (Nov. 28, 2018), available at https://www.washingtonpost.com/pb/opinions/tear-gasshould-never-be-used-on-children-period/2018/11/28/91c1ca78-f32c-11e8-9240- e8028a62c722_story.html.

58. Given the small number of states that even permit juvenile facility staff to carry or use chemical agents against children, the case law regarding the constitutionality of its use in juvenile facilities is sparse. The few federal courts that have reviewed the matter have found that its indiscriminate use, or the failure to use it as a last resort, violates the constitutional rights of children.[43] Five decades ago, a federal court found that the use of chemical agents in Texas juvenile prison facilities in situations not posing imminent threat to human life violated the Eighth Amendment. In *Alexander S. v. Boyd*, 876 F. Supp. 773, 786 (D.S.C. 1995), the court wrote that,

> the use of CS gas upon juveniles is counterproductive. It causes more anger in the juveniles toward the adults who are supposed to be caring for them. The use of gas as a form of punishment teaches the victims to inflict pain as a method of controlling others and makes the juveniles more volatile, more aggressive, and less likely to respond properly to authority figures. Moreover, the inappropriate use of CS gas may cause long-term medical complications for the juveniles. For these reasons, the court concludes that the indiscriminate use of CS gas violates the juveniles' constitutional rights under the Due Process Clause. Based upon the testimony presented on this issue, the court finds that gas should be used only when a genuine risk of serious bodily harm to another exists and other less intrusive methods of restraint are not reasonably available.[44]

59. When sanction-based approaches like solitary confinement and pepper spray are heavily relied upon, they cause palpable damage to young people in custody like Plaintiff Alex A., including exacerbating mental illness, increasing the likelihood of suicide, feelings of worthlessness, depression, and hypervigilance. Further, these restrictive

---

[43] The use of chemical agents such as pepper spray, pepper ball guns, or mace against children in juvenile detention facilities also violates international human rights law and standards. *See* United Nations Rules for the Protection of Juveniles Deprived of Their Liberty, Rules 63-65 (1990), available at https://www.ohchr.org/EN/ProfessionalInterest/Pages/JuvenilesDeprivedOfLiberty.aspx.

[44] In 2000, the U.S. DOJ initiated an investigation into Los Angeles County's juvenile facilities, and in 2003, issued a findings letter that determined that the County's use of pepper spray against children likely violated their constitutional rights. U.S. Department of Justice, Letter from Ralph F. Boyd to Yvonne B. Burke, (April 9, 2003), at 20-23, available at https://www.justice.gov/sites/default/files/crt/legacy/2010/ 12/15/la_county_juvenile_findlet.pdf.

practices have not been shown to improve institutional safety for youth and staff and as such are not reasonably calculated to restore facility discipline and security. This is especially so as compared to positive behavioral approaches, which include de-escalation techniques and graduated sanctions and rewards as a means of managing behavior of even violent youth in locked custody. (*Id.* ¶ 69).

### C. Inadequate Staffing at the Youth Facility at LSP and Reliance on DOC Staff

60. Both OJJ and DOC—like correctional systems around the country—are having difficulty finding adequate staff to operate their systems. OJJ's plan for operating the youth facility at Angola indicates that, if there are not enough OJJ staff, DOC staff will be employed to guard the youth. (Schiraldi Decl. ¶ 60). It is clear that OJJ does not have adequate staffing. As of August 29, 2022, OJJ "identified approximately 40 staff members from existing secure care facilities who will staff [the youth facility at LSP], and approximately 20 new employees have been interviewed and hire." That is only approximately 50 percent (53.6%) of the number of staff the youth facility at Angola will require (according to OJJ, the youth facility will require 112 staff members). *Id.* ¶ 71.

61. The MOU between OJJ and DOC/LSP further states that DOC/LSP custody staff may provide assistance with medical transportation and that Angola staff will provide food services on a temporary basis. There is no guarantee of sight and sound separation, especially if youth will be transported to offsite medical appointments in the same vehicle as adults. (*Id.* ¶ 73). Even if youth were to be provided medical care at the infirmary in LSP, there is a detailed record of the deficiencies in medical care at Angola, and this Court previously ruled that the medical care offered at the prison is below constitutional

standards. *See Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *15 (M.D. La. Mar. 31, 2021).

**D. The Defendants Cannot Provide Lawful Education, Special Education, or Related Services to Youth at Angola.**

62. Children in OJJ custody retain the same right to education, including general education, special education, and related services, that they would have if they were enrolled at schools in their community.[45]

63. Louisiana law requires OJJ to directly provide or contract with other agencies to provide education to children in secure facilities as a key part of its treatment obligations.[46] While OJJ is responsible for providing general education to youth at secure care facilities across the state, the Louisiana Special School District (SSD) is responsible for providing special education and related services to students with disabilities who are placed in OJJ secure facilities.[47] SSD is an education service agency that serves students with exceptionalities in a range of settings, including "any state-operated facility that provides only a general education program" and facilities "where public agencies place students who are in the care and custody of the public agency or students whose education is the responsibility of the public agency."[48]

---

[45] La. Const. of 1974, art. VIII, pmbl. *See also* La. Const. of 1974, art. VIII, § 1; La. R.S. § 17:1 *et seq. See generally* 20 U.S.C. § 6301 *et seq.*; 20 U.S.C. § 1400(d)(1)(A); 34 C.F.R. § 300.2(b)(1)(iv). *See also* Statement of Interest of the United State at 1, G.F. v. Contra Costa Cnty., 2915 U.S. Dist. LEXIS 159597 (N.D. Cal. 2015); Arne Duncan & Eric H. Holder, Letter to Chief State School Officers and State Attorneys General (June 9, 2014), https://www2.ed.gov/policy/elsec/guid/secletter/140609.html ("[W]ith regard to students with disabilities, the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990 . . . obligate specific public agencies . . . to provide educational services to eligible youth in confinement.").

[46] *See e.g.*, La. R.S. § 17:100.1(C); La. R.S. § 17:3912(A); La. R.S. § 17:10.9(A); La. Admin. Code. tit. 28 pt. XI § 3601.

[47] La. R.S. § 17:1945(C); *see also* La. Admin. Code. Tit. 28 pt. I § 311(A)(b).

[48] La. R.S. § 17:1945(C).

64. OJJ maintains schools at all of its secure facilities, including Riverside Alternative School at Bridge City; Southside Alternative School at Swanson Center for Youth in Monroe; and Pinehill Alternative School at Swanson Center for Youth in Columbia.[49]

65. All students in Louisiana are required to participate in at least 360 minutes of instructional time per day and 177 days of instruction per year.[50]

### a) Special Education Obligations for Youth in OJJ Custody

66. Under federal and state law, all state agencies that provide education to youth with disabilities must ensure that youth receive a "free appropriate public education" (FAPE).[51] FAPE refers to the special education and related services that are provided in accordance with each child's individualized education program, or IEP.[52] The term "special education" means "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability."[53] "Related services" refers to the additional services that are "required to assist a child with a disability to benefit from special education," including social work services, therapeutic recreation, counseling services, speech and language therapy, and physical therapy.[54]

---

[49] *Educational Services*, https://ojj.la.gov/serving-youth-families/youth-in-secure-care-facilities/educational-services/.

[50] La. R.S. § 17:154.1(A)(1).

[51] *See* 20 U.S.C. § 1401(8)(D); Louisiana Bulletin 1706 § 101 ("A free appropriate public education shall be available to all students residing in the state between the ages of 3 and 21, inclusive, including students with disabilities who have been suspended or expelled from school."

[52] 20 U.S.C. § 1401(9).

[53] 20 U.S.C. § 1401(29).

[54] 20 U.S.C. § 1401(26).

67. Under the IDEA, a youth is considered a child with a disability who is eligible to receive special education and related services if they meet one of thirteen disability classifications, including a specific learning disability and emotional disturbance.[55]

68. Although the Special School District directly provides special education services to youth in OJJ facilities, OJJ has a shared obligation to ensure that all youth with disabilities in its custody receive a FAPE.[56]

69. In addition to the IDEA, students with disabilities are protected by Section 504 of the Rehabilitation Act, which forbids discrimination on the basis of disability by a program or activity receiving federal financial assistance.[57] Students who qualify for services under Section 504 can receive Individual Accommodations Plans.

70. Students with disabilities are significantly overrepresented in the juvenile justice system. According to the Office of Juvenile Justice and Delinquency Prevention, as many as 77 percent of youth in juvenile prisons across the country have disabilities that qualify them for services under the IDEA and/or Section 504.[58]

71. Alex A. is a student who has been diagnosed with disabilities, including a learning disability in math.[59] Additionally, Alex A. has been diagnosed with post-traumatic stress disorder and is prescribed medication to help with nightmares and sleeping.[60]

---

[55] 20 U.S.C. § 1401(3)(A)(i).
[56] *See* 34 C.F.R. § 300.2(b)(iv) ((providing that the provisions of the IDEA apply to all political subdivisions of the State, including "[s]tate and local juvenile and adult correctional facilities").
[57] 29 U.S.C.A. § 794 (West).
[58] OFF. JUV. JUST. & DELINQ. PREVENTION, *Education for Youth Under Formal Supervision of the Juvenile Justice System*, January 2019 OJJDP MODEL PROGRAMS GUIDE LITERATURE REVIEWS 1, 3-4, https://ojjdp.ojp.gov/sites/g/files/xyckuh176/files/media/document/education-for-youth-in-the-juvenile-justice-system.pdf.
[59] Alex A. Decl. ¶ 7.
[60] *Id.* ¶ 11-12.

**b)    The Educational Programming at OJJ's Existing Facilities**

72. At Riverside Alternative School, the school located at Bridge City, Alex A. currently attends school every week day from 8:00 AM to 10:00 AM, and again from 12:00 PM to 3:20 PM.[61] During that time, he takes courses in social studies, math, English and science.[62] Throughout the day, he is taught by different teachers for each subject and moves throughout the school building to enter different classrooms.[63] He receives live instruction from educators rather than participating in school in a virtual or remote manner.[64]

73. Because of his disability, Alex A. also receives additional classroom-based accommodations and services, including the use of a calculator and read-aloud services.[65] His classroom contains a second teacher who services as a special education teacher who provides read-aloud services.[66] Alex A. believes that this second teacher is a special education teacher.[67]

74. In addition to classroom-based learning, Alex A. has a library at his school.[68] He and his peers are permitted to check books out of the library regularly and take them back to the dorm to read.[69]

---

[61] Alex A. Decl. ¶ 6.
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.* ¶ 7.
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] *Id.*

75. Alex A. also receives group counseling three times a week, for one hour per session, and individual counseling once a week for 30 minutes to an hour.[70] The group counseling sessions discuss coping mechanisms and anger management.[71]

### c) OJJ's Plans to Provide Education at the Angola Facility Are Insufficient To Meet Its Obligations Under State and Federal Law.

76. On August 3, 2022, advocates from the Louisiana Center for Children's Rights, Southern Poverty Law Center, and the Loyola Law Clinic sent a demand letter to OJJ, the Department of Corrections, the Special School District and the Louisiana Department of Education seeking information about each agency's plans to ensure consistent and legally compliant general and special education to youth who would be moved to the Angola site.[72] Although at that time the relocation of children was imminent, OJJ could only respond that it was still "in the process" of "develop[ing] a comprehensive plan," and none of the other agencies provided any response.[73]

77. On August 10, 2022, OJJ administrators developed a list of staffing needs for the school at Angola.[74] That list identified the following staffing needs for the Angola site: one principal, 3-5 certified instructors or instructors with temporary authority to teach, 3 paraeducators, 1 school counselor, and 1 administrative assistant.[75] It also noted that the Special School District would be responsible for providing two special education instructors and pupil appraisal staff, including a social worker, psychologist, and other services as needed.[76]

---

[70] *Id.* ¶¶ 14-15.
[71] *Id.* ¶ 14.
[72] Pl.'s Mot. For TRO, Ex. 9.
[73] *Id.*
[74] Defs' Doc. 122., Bates No. OJJ-000231.
[75] *Id.*
[76] *Id.*

With the exception of a social worker, the list did not identify a plan to hire any related service providers, including speech therapists, physical therapists, or occupational therapists.[77]

78. More recently, the organizational chart shared by Defendants indicates that the school at Angola will employ fewer staff members than identified above, specifically just two instructors, one special education instructor, and one tutor/paraprofessional.[78] Additionally, many staff members will divide their time between the Angola facility and the Bridge City Center for Youth facility at Angola, including the school Principal and Therapeutic Recreational Specialist.[79]

79. OJJ also developed a list of equipment needs for the school at the Angola site.[80] The list included furniture and technology needed to outfit up to three classrooms.[81] The list did not mention include any books or other physical materials needed to provide live instruction to youth, including paper, writing utensils, and other supplies.[82]

80. As of August 24, 2022, OJJ reported that it was having a "difficult time finding educators to apply," and requested advice from Mr. Simon Gonsoulin.[83] As of February 10, 2022, there were six vacant education positions at that facility, including one instructor position that had been vacant since October 19, 2020.[84]

[77] *Id.*; *see also* Deville Aff., Doc. 28-3.
[78] Defs' Doc. 1, Bates No. OJJ-000088.
[79] *Id.*; *see also* Deville Aff., Doc. 28-3.
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] Defs' Doc. 419., Bates No. OJJ-000385.
[84] *Id.*

81. At the Angola facility, OJJ will utilize a hybrid model of face-to-face and virtual instruction.[85] At least one classroom at the Angola site has a label on the door indicating that it is a classroom/Zoom room. (Schiraldi Report ¶ 45).

### d) OJJ Has Failed in the Past to Provide Legally Compliant General and Special Education.

82. Not only do children in OJJ have a legal right to effective and appropriate education, but they also require these services in order to succeed upon release.[86] Research demonstrates that youth who do not receive the education they need in custody are at a greater risk of dropping out upon release.[87]

83. Based on current Louisiana Department of Education monitoring, OJJ schools rank at the bottom of all schools in the state on school performance metrics.[88] According to the Southern Education Foundation, just 8% of students in custody in Louisiana earn high school course credits while in custody.[89]

---

[85] Deville Aff.; *but see* Defs.' Opp'n to Pl. PI, Ex. G-1 (stating that students enrolled at the school "will complete assigned coursework via online learning with the assistance of a teacher/facilitator").

[86] *See* Southern Educ. Found., *Just Learning: The Imperative to Transform Juvenile Justice Systems into Effective Educational Systems*, 18, 27 (2014), https://www.prisonlegalnews.org/media/publications/Southern%20Education%20Foundation%20-%20Just%20Learning%20-%20Report%20on%20Juvenile%20Justice%20Schools%2C%202014.pdf.

[87] *Id.* (explaining that as many as two thirds of children who leave the juvenile justice system drop out of school).

[88] *See Riverside Alternative High School Report Card: Student Breakdown*, LA. DEP'T OF EDUC., https://louisianaschools.com/schools/A02002/academic-performance/breakdown_student_groups (last visited June 30, 2022); *Central Southwest Alternative High School Report Card: Student Breakdown*, LA. DEP'T OF EDUC., https://louisianaschools.com/schools/A02004/academic-performance/breakdown_student_groups (last visited June 30, 2022); *Southside Alternative High School Report Card: Student Breakdown*, LA. DEP'T OF EDUC., https://louisianaschools.com/schools/A02003/academic-performance/breakdown_student_groups (last visited June 30, 2022).

[89] *See* Southern Educ. Found., *Just Learning: The Imperative to Transform Juvenile Justice Systems into Effective Educational Systems* (2014), https://www.prisonlegalnews.org/media/publications/Southern%20Education%20Foundation%20-%20Just%20Learning%20-%20Report%20on%20Juvenile%20Justice%20Schools%2C%202014.pdf.

84. When OJJ has opened new facilities in the past, it has not always prioritized education or effectively delivered educational services.[90] When OJJ opened the Acadiana Center for Youth – St. Martinville secure care facility in the summer of 2021, there was no school at that facility for several months after opening.[91] Although the facility opened in the summer of 2021, the Special School District did not begin providing special education and related services to youth at that facility until December 17, 2021.[92]

### V. The Angola Facility Discriminates Against Youth with Disabilities

85. The Transitional Treatment Unit at Angola will serve youth with significant behavioral and emotional needs, including a history of disruptive behaviors that interfere with the youth and others.[93]

86. In addition, up to four youth who are classified as "Seriously Mentally Ill" may be transferred to the OJJ site on the grounds of Angola.[94] The Transitional Treatment Unit policy defines "Seriously Mentally Ill" as a set of disorders including mood and cognition disorders "that significantly interfere with functioning in at least one essential sphere of the youth's life (e.g., psychotic disorders, mood disorders, the aggressively mentally ill, and youth who exhibit self-mutilating or suicidal behavior."[95]

---

[90] *See* Erin Einhorn, Annie Waldman & Beth Schwartzapfel, *'No Light. No Nothing.' Inside Louisiana's Harshest Juvenile Lockup*, NBC News, https://www.nbcnews.com/news/us-news/louisiana-juvenile-detention-st-martinvillle-rcna19227.

[91] *Id.* ("Perry Stagg, the Office of Juvenile Justice's assistant secretary, confirmed that St. Martinville did not initially provide education.").

[92] *Id.*

[93] Defs.' Opp'n to Pl. PI, Ex. G-1. (Doc. 28 at 3).

[94] *Id.*

[95] *Id.*

87. Youth who are transferred to the Angola site will experience a more restrictive and secure program than they would in another OJJ facility.[96] Although youth in OJJ's other secure care facilities have freedom of movement around the campus and between dormitories, common areas, gymnasiums, and other areas of the facility, youth at Angola will live in individual housing accommodations that restrict their movement.[97] Additionally, the Angola facility will have reinforced walls and high ceilings, as well as multiple fences around the property.[98]

88. Additionally some activities that are available to youth at other OJJ sites will not be available at the Angola facility.[99] While youth at Swanson Center for Youth, another facility, are sometimes allowed to ride around campus with staff in a vehicle to "calm down," OJJ staff acknowledge that that activity won't be allowed at the Angola site.[100]

**VI. Defendants' Plan To Open a Facility on the Grounds of LSP is an Even Worse Version of the Acadiana Center for Youth – St. Martinville Facility**

### a) Origins and Programming at St. Martinville Facility

89. In the summer of 2021, OJJ opened a new secure care facility for youth known as the Acadiana Center for Youth – St. Martinville.[101] OJJ opened the facility without first notifying legislators, judges, defense attorneys, or advocates about its plans.

---

[96] *See* Defs.' Opp'n to Pl. PI, Doc. 28-6 (Nelson Affidavit).
[97] *Id.*
[98] *Id.*
[99] Def.'s Doc. 122.
[100] *Id.*
[101] *See* Erin Einhorn, Annie Waldman & Beth Schwartzapfel, *'No Light. No Nothing.' Inside Louisiana's Harshest Juvenile Lockup*, NBC News, https://www.nbcnews.com/news/us-news/louisiana-juvenile-detention-st-martinvillle-rcna19227.

90. According to an OJJ policy document published in September 2021, the St. Martinville facility was opened with the stated purpose of providing specialized supports for children who demonstrate severe behavioral health needs that jeopardize their ability to benefit from programming at OJJ's other secure facilities.[102] The OJJ policy document identified the St. Martinville facility as a "Transitional Treatment Unit" that would serve youth in OJJ custody who have "significant delinquency issues," including up to four youth who are classified as "Seriously Mentally Ill."[103] According to that policy, youth would be moved to St. Martinville after a staffing meeting determining it was an appropriate placement for them.[104] While there, they would participate in three phases of a treatment program that could last for at least four weeks, though the timeline could be extended "depending on specific circumstances."[105]

91. Soon after the facility was opened, defense attorneys for youth in OJJ custody began to learn that their clients were not receiving educational services while at St. Martinville.[106] During two separate hearings in juvenile court in Orleans Parish, OJJ staff members confirmed that no educational programming was provided.[107]

92. Attorneys for children at St. Martinville requested information about the facility, including information about educational services.[108] On October 1, 2021, the Louisiana Center for Children's Rights requested information about educational programming at St. Martinville

---

[102] https://ojj.la.gov/wp-content/uploads/2021/10/B.2.8.pdf.
[103] *Id.*
[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] *Id.*
[108] *Id.*

through a public records request.[109] OJJ responded on October 7, 2021 that "no responsive documents exist."[110]

93. In an article published by NBC News, The Marshall Project, and ProPublica on March 10, 2022, Perry Stagg, the assistant secretary for OJJ, "confirmed that St. Martinville did not initially provide education."[111] Neither the Louisiana DOE nor the SSD were aware of the facility's existence until several months after it opened.[112] The SSD did not begin providing special education or related services to youth with disabilities at St. Martinville until December 17.[113]

94. Unlike other OJJ secure care facilities,[114] the St. Martinville facility is structured in individual cells instead of an open dorm plan.[115]

95. Youth placed at St. Martinville have report that they were put in solitary confinement—in isolation in their cells—for up to 23 hours a day.[116] When youth were let out of their cells to shower, they were shackled with handcuffs and leg irons.[117]

---

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *See* Defs.' Opp'n to Pl. PI, Doc. 28-6 (Nelson Affidavit).

[115] *See* https://ojj.la.gov/wp-content/uploads/2021/10/B.2.8.pdf (explaining that youth will eat meals in their "assigned cell" and identifying "return to cell" as a behavioral response guards can document).

[116] *See* Erin Einhorn, Annie Waldman & Beth Schwartzapfel, *'No Light. No Nothing.' Inside Louisiana's Harshest Juvenile Lockup*, NBC News, https://www.nbcnews.com/news/us-news/louisiana-juvenile-detention-st-martinvillle-rcna19227.

[117] *Id.*

96. According to the May 2021 Legislative Audit, the majority of transfers between OJJ facilities that occurred during 2020 were transfers to place youth in behavioral intervention, which is a form of solitary confinement.[118]

97. In June 2022, the Legislature passed a new law that strictly limits the use of solitary confinement, room isolation, and behavioral isolation in juvenile secure care facilities in Louisiana.[119] Under the new law, youth cannot be held in isolation unless they are a physical threat to themselves or others, and they cannot be held in isolation for more than eight hours unless a mental health professional determines that they continue to pose a physical threat.[120]

98. Testifying in front of the Louisiana Senate, OJJ Deputy Secretary Bill Sommers supported that bill and said that it was the "right thing to do."[121]

99. Incident reports from St. Martinville reveal that youth at the facility have engaged in self-harm that required medical attention.[122] Some have also destroyed the furniture and structures in the facility, including shattering light fixtures and using metal shards to break holes in the wall large enough to escape.[123] Additionally, incident reports reveal that guards

---

[118] Louisiana Legislative Auditor, State of Louisiana, Response to the COVID-19 Pandemic in Secure Care Facilities: Office of Juvenile Justice (May 2021), available at https://app.lla.state.la.us/publicreports.nsf/0/440be9ae5125841c862586da006ba222/$file/000239c6-2.pdf?openelement&.7773098.

[119] Erin Einhorn, Annie Waldman & Beth Schwartzapfel, *Louisiana Limits Solitary Confinement for Youth*, NBC News, https://www.nbcnews.com/news/us-news/louisiana-limits-solitary-confinement-youth-rcna32720.

[120] *Id.*

[121] Archived Videos, R.S. 15:905, https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2022/apr/0427_22_CJ.

[122] *Id.*

[123] *Id.*

at the St. Martinville facility have responded to youth behavior with violence, including slamming the door on youth's hands and using pepper spray.[124]

100.     Despite the cell-based structure of St. Martinville, youth held at the St. Martinville facility have escaped from confinement, including two youth who escaped on May 30, 2022.[125]

### b)     Use of Force as a Response to Challenges at OJJ Facilities

101.     Since June 2022, OJJ has utilized guards from DOC to assist with staffing.[126] In addition to enlisting officers from DOC and the Louisiana State Police, OJJ has also changed its policy to allow for the use of tasers and other force in OJJ facilities.[127]

102.     In testimony given to the Louisiana Legislature on April 19, 2022, OJJ Assistant Secretary Perry Stagg admitted that OJJ is not currently providing the treatment and care that children need and are legally obligated to receive. In his remarks, Stagg stated that OJJ's difficulty managing a small number of youth has produced a "chaotic" situation that is like a "circus inside of the facilities at all times."[128] Stagg also commented that the large majority of children who want to participate in rehabilitative programs "can't" do so

---

[124] *Id.*

[125] KATC News, *Two Juveniles Still at Large After Escape from OJJ Facility in St. Martin Parish*, https://www.katc.com/news/covering-louisiana/two-juveniles-still-at-large-after-escape-from-ojj-facility-in-st-martin-parish.

[126] Jillian Kramer & Faimon Roberts III, "Fifth Escapee in Custody, but Officials will Push for Bridge City Youth Jail to be Closed," NOLA.com, https://www.nola.com/news/crime_police/article_e3aba3aa-ee77-11ec-87a0-af635ab99627.html

[127] WDSU, "Louisiana Office of Juvenile Justice Addresses Use of Force at Bridge City Center," https://www.wdsu.com/article/bridge-city-center-excessive-force/40378725.

[128] Louisiana State Senate, https://senate.la.gov/s_video/videoarchive.asp?v=senate/2022/04/041922JUDC.

because of the situation in the facilities.[129] Public statements about St. Martinville, kids not being able to rehabilitated.

### c) The Angola Facility's Similarities with St. Martinville

103.    OJJ is preparing to open a new unit on the grounds of Angola in order to "provide greater individual rehabilitation services and security to a small number of disruptive Youth who are not responding appropriately to the current level of services and care."[130]

104.    The Transitional Treatment Unit document that describes the programming that will be provided to youth at Angola was adapted from the document used for St. Martinville.[131] Some of the features of the St. Martinville program, including that youth would be given group counseling five times per week, have been removed from the Angola Policy document.[132]

105.    The Angola Policy document retains many of the same elements as the St. Martinville document, including the same criteria for admission.[133]

106.    The Angola Policy document removes staffing positions outlined in the St. Martinville document, including a residential therapist, and no longer includes a minimum staffing pattern for the facility.[134]

---

[129] *Id.*

[130] Nelson Decl.

[131] Nick Chrastil, *Internal Document Outlining Program for Youth at Angola Raises Concerns Among Advocates*, The Lens, https://thelensnola.org/2022/08/23/internal-document-outlining-program-for-youth-at-angola-raises-concerns-among-advocates/.

[132] *Id. See also* Defs.' Opp'n to Pl. PI, Ex. G-1.

[133] Nick Chrastil, *Internal Document Outlining Program for Youth at Angola Raises Concerns Among Advocates*, The Lens, https://thelensnola.org/2022/08/23/internal-document-outlining-program-for-youth-at-angola-raises-concerns-among-advocates/.

[134] *Id.*

**VII. Defendant Edwards Has Failed to Ensure that OJJ Provides Safety to Youth in Custody or the Rehabilitation and Treatment They Require**

107.     OJJ is an agency of the executive branch of the Louisiana government that is organized under the Louisiana DOC.[135] OJJ has "responsibility for the care, custody, security, and treatment of children adjudicated delinquent . . . committed to the custody of or placed under the supervision of the office of juvenile justice."[136] In his official capacity as Governor of Louisiana, Defendant Edwards oversees agencies of the executive branch, including the DOC and OJJ.[137]

108.     On August 7, 2020, Defendant Edwards appointed Bill Sommers as Deputy Secretary of the Office of Juvenile Justice.[138]

109.     Defendant Edwards has been aware of the repeated security concerns, including escapes from secure care facilities, and rehabilitation challenges at OJJ's existing facilities.[139]

110.     On June 17, 2022, Defendant Edwards announced that staff members from DOC would be detailed to BCCY and Swanson Center for Youth to provide "extra security in order to ensure the safety of the youth, staff and the surrounding communities."[140] Two

---

[135] La. R.S. § 36:408(H); La. R.S. § 36:2.
[136] La. R.S. § 36:408(H)(1).
[137] *Id.*
[138] Office of the Governor, *Gov. Edwards Appoints a New Deputy Secretary to the Office of Juvenile Justice*, https://gov.louisiana.gov/index.cfm/newsroom/detail/2629.
[139] Office of Juvenile Justice, *Gov. Edwards Announces Ongoing Investigation and Immediate Actions Related to Weekend Incident at Bridge City Center for Youth*, https://ojj.la.gov/gov-edwards-announces-ongoing-investigation-and-immediate-actions-related-to-weekend-incident-at-bridge-city-center-for-youth/.
[140] *Id.*

days later, on June 19, 2022, Defendant Edwards announced that youth from BCCY would be moved to a vacant building on the grounds of Angola.[141]

111.     The United States Department of Justice's Office of Juvenile Justice and Delinquency Prevention ("OJJDP") has reached out repeatedly to OJJ with an offer to provide assistance in solving the challenges at OJJ facilities so that the planned move to Angola can be cancelled.[142] Specifically, OJJDP committed to working with OJJ to "identify and implement more feasible and long-term solutions that will promote public safety and serve the best interests of children and the community."[143] OJJDP provided a list of specific technical assistance that would be offered to OJJ.[144] Defendants have not provided any documents that demonstrate whether OJJ took advantage of this offer of assistance.

## PROPOSED CONCLUSIONS OF LAW

To the extent that any Findings of Fact above are deemed to be Conclusions of Law, they are incorporated into these Conclusions of Law.

### I. LEGAL STANDARD FOR PRELIMINARY INJUNCTION

1.     A preliminary injunction is warranted if the movant demonstrates: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

---

[141] https://gov.louisiana.gov/index.cfm/newsroom/detail/3723.
[142] Defs.' Doc. 421.
[143] *Id.*
[144] *Id.*

2.     Because the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," and "given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Id.* (citation omitted). Instead, to "show a likelihood of success, the plaintiff must present a prima facie case"—"not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). Indeed, the U.S. Supreme Court has cautioned against "improperly equat[ing] 'likelihood of success'" with "success" when considering requests for preliminary injunctions. *See Camenisch*, 451 U.S. at 394.

3.     Based on the governing law and the evidence presented by the parties in their submissions and at the two-day evidentiary hearing held by this Court, and as detailed above in the Findings of Fact (FOF), the Court concludes that a preliminary injunction is appropriate to issue on this motion.

## II. PLAINTIFF HAS ESTABLISHED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

4.     Plaintiff has a substantial likelihood of success on the merits because he "present[s] a *prima facie* case." Charles Alan Wright, et al., *Grounds for Granting or Denying a Preliminary Injunction – Probability of Success on the Merits*, 11A Federal Practice & Procedure § 2948.3 (2d ed. 1995); *see also Janvey*, 647 F.3d at 595-96 (noting that plaintiffs are "not required to prove [their] entitlement to summary judgment" to show likelihood of success on the merits).

### A.     Plaintiff Satisfied the Exhaustion Requirement of the Prison Litigation Reform Act (PLRA).

5.      Under the PLRA, prisoners may not file suit unless they first exhaust all available administrative remedies. 42 U.S.C. § 1997e(a) (2000) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). To comply with the Prison Litigation Reform Act, ("PLRA"), a grievance must "reasonably indicate a problem" and give officials "fair notice" of that problem. *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004).

6.      Failure to exhaust is an affirmative defense that must be raised by Defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Therefore, Defendants have the burden of proving that Plaintiffs failed to exhaust available administrative remedies.

7.      When an emergency grievance procedure exists and the grievance protocol does not direct prisoners that they must also file a regular, non-emergency grievance, the grievance is exhausted once the timeline for the emergency procedure is complete. *See Edwards v. DeShields*, 211 Fed. App'x 256, 257 (5th Cir. 2006); *see also Gates v. Cook*, 376 F.3d 323, 331-32 (5th Cir. 2004). OJJ's grievance policies state that if an emergency grievance is filed, the youth will receive a "final decision within five (5) calendar days."[145] The Court finds that OJJ's emergency grievance process results in a "final decision" and that youth who satisfy the emergency grievance process need not proceed to the second step of the traditional administrative remedy process for non-emergency situations. *See J.H. v. Edwards*, No. 20-293-JWD-EWD, 2020 U.S. Dist. LEXIS 110686, at *121-122 (M.D. La. June 24, 2020) (holding the same).

---

[145] Administrative Remedy Procedure, Youth Services Policy, https://ojj.la.gov/wp-content/uploads/2021/11/B.5.3.pdf.

8.     Moreover, in cases involving juveniles confined to secure care facilities, courts have interpreted grievance procedures generously to avoid findings of non-exhaustion. *See Lewis v. Gagne*, 281 F. Supp. 2d 429, 433-35 (N.D.N.Y. 2003) (holding that a mother had made sufficient "reasonable efforts" to exhaust, without explicitly commenting on the juvenile's own status); *see also Troy D. v. Mickens*, 806 F. Supp. 2d 758, 768-69 (D.N.J. 2011) (holding ombudsman procedure was exhausted by an attorney's letter to juvenile institution superintendent); *Moore v. Louisiana Dept. of Public Safety and Corrections*, 2002 WL 1791996, at *4 (E.D. La., Aug. 5, 2002) (declining to enforce 30-day time limit; declaring 30-day delay in filing complaint "not unreasonable" given that the plaintiff was a juvenile in state custody).

9.     Only those administrative remedies that are "available" are required to be exhausted under the PLRA. *Ross v. Blake*, 578 U.S. 632, 635 (2016). Specifically, the PLRA does not demand exhaustion where no remedy can be achieved. *Id.* at 643 (holding that a plaintiff need not exhaust if the administrative remedy is "not capable of use to obtain relief"). The Supreme Court in *Ross* provided several examples of situations where an administrative remedy is unavailable. For example, exhaustion is not required if the administrative procedure "operates as a simple dead end—with officers unable or inconsistently unwilling to provide any relief to aggrieved inmates." *Id.* Additionally, administrative remedies are not available if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

10.    When OJJ responded to Alex A.'s emergency grievance by indicating that it would not treat the grievance as an emergency (with a 5-day timeline) and would instead evaluate the grievance under the traditional two-step 51-day timeline, OJJ misinterpreted its own policies and made the administrative remedy process unavailable to Plaintiff. OJJ's policy states that the

emergency timeline is available when the ARP "contains statements which indicate that the *youth* believes they are in immediate risk of harm and any delay in responding to the grievance would subject the youth to substantial risk of immediate personal injury or cause other serious or irreparable harm."[146] Alex A.'s grievance included statements that showed he believed himself to be in immediate danger and that delay would create a risk of harm. The relevant question is not whether OJJ believed that Alex A. was in immediate danger, but whether *he* believed that he was in immediate danger.[147] Alex A. provided specific information about his belief that he would be moved to the facility at Angola imminently.

11. OJJ made the administrative remedy process unavailable to Alex A. when officials informed him that his grievance would not be reviewed as an emergency grievance. *See Thomas v. Prator*, 172 F. App'x 602, 603 (5th Cir. 2006) ("[W]e have recognized that the exhaustion requirement may be excused where administrative remedies are inadequate because prison officials ignore or interfere with a prisoner's pursuit of relief."); *see also Wiley v. Ky. Dep't of Corr.*, No. 19-5368, 2020 U.S. App. LEXIS 27030, at *9-10 (6th Cir. Aug. 25, 2020) (holding that an administrative remedy scheme may have been unavailable to plaintiff where the prison officers' interpretation of a policy resulted in the rejection of a grievance based on "mere technicalities"); *Fox v. Hazelwood*, No. 21-cv-159-PB, 2022 U.S. Dist. LEXIS 130081, at *2 (D.N.H. July 22, 2022) (holding that exhaustion was not required where the plaintiff claimed a prison official thwarted efforts to comply with the appeal process). Alex A. attempted to exhaust the emergency grievance process by filing a grievance that complied with the requirements of the OJJ Administrative Remedy Process and its emergency grievance procedures. Defendants' failure to

---

[146] *Id.* (emphasis added).
[147] *Id.*

comply with their own policies cannot be a basis for dismissing Plaintiff's suit. To hold otherwise would give a prison free reign to mischaracterize administrative grievances and thereby foreclose or delay judicial review.

12.     Because the Court concludes that Alex A. exhausted available administrative remedies, the putative class members are also considered to have exhausted vicariously through the named plaintiffs. *See Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004) (holding that one class member's completion of exhaustion requirement in PLRA class action was "enough to satisfy the requirement for the class.").

13.     The Court may also pretermit this issue until after the issue is fully played out in discovery. The PLRA's exhaustion requirement is not jurisdictional. *Woodford v. Ngo*, 548 U.S. 81, 101 (2006). Therefore, the Court may reach the merits before addressing the exhaustion argument and deal with the issue at summary judgment. *Douglas v. Anderson*, CIVIL ACTION 15-445-JJB-RLB, 2017 WL 4052158, at *2 (M.D. La. Sept. 13, 2017); *Nelson v. Abbett*, No. 3:10-CV-1076-WKW, 2013 WL 5493410, at *7 (M.D. Ala. Sept. 30, 2013).

> **1.     Plaintiff Has Shown Defendants' Plan to Hold Him in Custody at the Adult Louisiana State Penitentiary at Angola Violates His Constitutional Rights.**

14.     The basic principle that children are different from adults, and that the "distinctive attributes of youth" have legal significance, is reflected in a diverse array of constitutional contexts, ranging from First Amendment protections, to the reasonableness of searches, to the protection against cruel and unusual punishment. *See, e.g., Miller v. Alabama*, 567 U.S. 460, 471(2012) ("[C]hildren are constitutionally different from adults for purposes of sentencing."); *J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011) (explaining that children "'are more vulnerable or susceptible to . . . outside pressures' than adults," and adopting a "reasonable child" standard for

determining the scope of Miranda protections) (quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2005)); *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 379 (2009) (relying upon the unique vulnerability of adolescents, and their heightened expectation of privacy, to hold a suspicionless strip search unconstitutional in the school context).

15.     Juvenile delinquency proceedings are civil in nature, and juvenile delinquency adjudications are civil findings, not criminal convictions. *See* La. R.S. § 15:906 ("It is hereby declared to be the public policy of this state that commitment of a juvenile to the care of the department is not punitive nor is it in any way to be construed as a penal sentence."). Because Plaintiff here is civilly adjudicated delinquent and has not been convicted of any crime, he is entitled to even greater protection than adults. *J.D. v. Nagin*, No. CIV. A. 07-9755, 2008 WL 2522127 at *6 (E.D. La. June 20, 2008) (noting the many programs and services that are required to be provided to children in detention)

16.     Louisiana law recognizes that the State owes youth adjudicated delinquent not only the duty to provide safe conditions and protect them from harm, but also the duty to provide them rehabilitative treatment.  *See In re C.B.*, 708 So.2d 391, 396-97 (La. 1998). This obligation stems from the fact that youth who are adjudicated delinquent do not have the same due process protections provided to adults who are convicted of a crime, including the right to trial by jury. *Id.* at 396. Because they have fewer procedural rights, youth in turn must receive rehabilitation and treatment, not punishment. *Id.* at 400.

17.     The Louisiana Children's Code points to the state's duty to act as a parent with respect to the child in custody, providing that "each child and parent coming within the jurisdiction of the court shall be accorded due process and … each child shall receive, preferably in his own home, the care, guidance, and control that will be conducive to his welfare." La. Ch. C. art. 102.

**2. Defendants' Transfer of Youth in OJJ Custody to the Adult Angola Prison Deprives Youth of their Right to Rehabilitative Treatment and their Right to be Free from Punishment.**

18.     The Supreme Court has held that under the Fourteenth Amendment, the state has heightened duties towards people detained in its custody where the purpose of the confinement is not punitive. *See Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982) (holding that involuntarily committed individuals "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."). Given that difference in purpose, the Supreme Court determined that an individual who was involuntarily committed had the right to "minimally adequate or reasonable training," in addition to the basic rights to safe conditions and freedom from undue restraints provided to all confined individuals. *Id.* at 319. *See also Bell v. Wolfish*, 441 U.S. 520, 535, 545 (1979) (holding that pretrial detainees cannot be subjected to conditions that "amount to punishment" because they have not yet been "convicted of any crimes").

19.     Courts of Appeal across the country have found that the Fourteenth Amendment provides heightened protections to youth adjudicated delinquent because youth detained under state custody due to a delinquency adjudication are not confined for punitive purposes. *See, e.g., Nelson v. Heyne*, 491 F.2d 352, 360 n.12 (7th Cir. 1974); *A.M. v. Luzerne Cnty. Juvenile Detention Ctr.*, 372 F.3d 572, 579 (3rd Cir. 2004) (analyzing conditions claims that arose both before and after plaintiff's delinquent adjudication under the *Youngberg* standard); *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987) (applying the Fourteenth Amendment standard because "the Oregon juvenile justice system is noncriminal and nonpenal"); *Santana v. Collazo*, 714 F.2d 1172, 1180-83 (1st Cir. 1983) (concluding that the Fourteenth Amendment applies because juveniles

have not been convicted of crimes and so are entitled to a higher level of scrutiny of their conditions of confinement).

20.　　The Eighth Amendment standard applicable to adults does not apply here because youth in OJJ custody are held in civil, not criminal, detention, and Louisiana law does not confine juveniles for "punishment." *See* La. R.S. § 15:906. But even if analyzed under the Eighth Amendment, youth confined for delinquency have greater rights and protections than adult prisoners. *See Miller v. Alabama*, 567 U.S. 460 (2012) (striking down mandatory imposition of life without parole sentences for juveniles); *Graham v. Florida*, 560 U.S. 48, 82 (2010) (striking down life without parole sentences for juveniles convicted of non-homicide offenses); *Roper v. Simmons*, 543 U.S. at 578–79 (striking down the juvenile death penalty as unconstitutional); *see also Montgomery v. Louisiana*, 577 U.S. 190 (2016) (holding *Miller* retroactive on collateral review). Indeed, children have been recognized by courts as different from adults in their maturity, susceptibility to outside influences, and capacity for change. *Miller*, 577 U.S. at 471 (explaining that these traits make children "constitutionally different from adults for purposes of sentencing").

21.　　The Supreme Court has emphasized that adolescents' developmental characteristics render them more vulnerable to lasting psychological harm than adults, so conditions that are constitutionally acceptable for adults may be unduly harsh for children. *See Roper*, 543 U.S. at 569 (explaining that adolescence is a period when youth are "most susceptible . . . to psychological damage") (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)); *Montgomery*, 577 U.S. at 206 ("[C]ertain punishments [are] disproportionate when applied to juveniles."); *Graham*, 560 U.S. at 70 (concluding that "[l]ife without parole is an especially harsh punishment for a juvenile").

22.　　As noted above, like pretrial detainees, children adjudicated delinquent may not be punished at all, and are protected by the Fourteenth Amendment. *Bell*, 441 U.S. at 535 (1979)

("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); *id.* at n.16 (pretrial detainees retain greater protections than convicted counterparts); *Kingsley*, 576 U.S. at 398-99 (2015) (requiring pretrial detainees need only show the objective prong of the "deliberate indifference" test in the context of excessive force); *Alderson*, 848 F.3d 415 (concurring opinion suggesting *Kingsley* should be extended to all pretrial detainee medical claims.).

23.     Punishment—and therefore also deliberate indifference to a substantial risk of harm—is established if the jailer's conduct is either not rationally related to a legitimate, nonpunitive government purpose or excessive in relation to that purpose. *Bell*, 441 U.S. at 561; *Kingsley*, 135 S. Ct. at 2473–74; *see also Alderson v. Concordia Par. Corr. Facility,* 848 F.3d 415, 424 (5th Cir. 2017).  The Court concludes that the Defendants' plan to transfer youth in OJJ custody to the Angola site is inappropriate because it is in no way rationally related to the rehabilitative purpose of youth delinquency placements.  In fact, it is the opposite. Defendants' plan is excessive in relation to the course of conduct that would actually achieve their rehabilitative purpose: providing adequate numbers and types of well-trained staffing in its youth facilities for youth in custodial settings, instead of placing the youth in an adult prison. *See, e.g.*, *Baker v. Hamilton*, 345 F. Supp. 345, 352 (W.D. Ky. 1972) (holding that the transfer of youth in the juvenile justice system to an adult prison that is "designed primarily for punishment rather than rehabilitation" is a violation of the Fourteenth Amendment because it is "treating for punitive purposes the juveniles as adults and yet not according them for due process purposes the right accorded to adults"); *Osorio v. Rios*, 429 F. Supp. 570, 575 (D.P.R. 1976) (holding that placing youth in an adult prison "without some form of notice and a hearing prior to the crucial confinement decision" is a violation of the Constitution).

### B. Defendants' Transfer of Youth in OJJ Custody to the Adult Angola Prison Poses an Unreasonable Risk of Harm to Youth.

24. Corrections officials have a constitutional obligation to protect incarcerated people from a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). As the Supreme Court has explained, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). Indeed, under both the Eighth and Fourteenth Amendments, jail officials "must provide humane conditions of confinement; must ensure that [prisoners] receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the [prisoners] [.]" *Farmer*, 511 U.S. at 832 (internal quotation marks omitted). The Fourteenth Amendment's standard is more protective. *See*, *Kingsley v. Hendrickson*, 576 U.S. 389, 398-99 (2015) (clarifying that the Fourteenth Amendment excessive force standard applicable to pretrial detainees is more protective than the Eighth Amendment Standard).

25. Government officials violate this affirmative duty by showing "deliberate indifference" to the substantial risk of serious harm, such as the risks inherent to incarcerating children in an adult facility where sight and sound separation from adult prisoners is virtually impossible. *Ball v. LeBlanc*, 792 F.3d 584, 594 (5th Cir. 2015) (stating that a court "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious") citing *Farmer*, 511 U.S. at 842; *Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015) (finding that the "open and obvious nature" of dangerous prison conditions supported an inference of deliberate indifference); *J.D.*, 2008 WL 2522127, at *6 (E.D. La. June 20, 2008) (finding that Plaintiffs' allegations stated a claim for a violation under the Fourteenth Amendment, as they claimed that

Defendants were "deliberately indifferent to … the risk of irreparable harm" to youthful offenders).

26.    In the context of young people in civil delinquency proceedings, the objective test of deliberate indifference applies, as it does for pre-trial detainees. *See Kingsley*, 135 S.Ct. at 2473-74 (requiring pretrial detainees need only show the objective prong of the "deliberate indifference" test in excessive force context). Under the objective test, the Court must consider whether Plaintiff has been "expos[ed] to a substantial risk of serious harm." *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018); *see also Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (holding that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").[148]

27.    The Court concludes that Defendants' ill-planned transfer, with neither the staffing nor the planning to ensure the safety, health, rehabilitative services and education of the young people who will be moved there, creates grave and unnecessary risks and thus is objectively deliberately indifferent to a substantial risk of harm. Defendants' plan will deprive Plaintiff of the health, safety, programming and education that are at the core of the rehabilitative programming to which he is entitled under the Fourteenth Amendment and Louisiana law.

---

[148] Even if analyzed under the Eighth Amendment's "subjective" standard for deliberate indifference, Plaintiff would be likely to succeed given the facts here. The Supreme Court has clarified that the Eighth Amendment has no place in the analysis of the rights of students in school, but has never explicitly addressed the standard to apply in juvenile detention facilities. *See Ingraham v. Wright*, 430 U.S. 651 (1977). Some Circuits have explicitly established a Fourteenth Amendment right to rehabilitation for youth in the juvenile justice system. *See, e.g.*, *Nelson v. Heyne*, 491 F.2d 352, 360 (7th Cir. 1974). The Fifth Circuit has not decisively answered the question—and the only case to address the issue arose out of a Texas case without a clear right to rehabilitation, and preceded the U.S. Supreme Court's holdings in *Roper*, *Graham*, and *Miller* that the law must take into account the unique developmental status of youth.

28.     This Court concludes that Defendants have shown deliberate indifference to the substantial risk of serious harm to Plaintiff because Defendants purposely or knowingly engaged in these actions and the decision to transfer youth in OJJ custody to the Angola site. *Lawrence v. Geautreaux*, No. CV 19-206-BAJ-RLB, 2021 WL 6751211, at *2 (M.D. La. July 22, 2021), *report and recommendation adopted*, No. CV 19-00206-BAJ-RLB, 2022 WL 264535 (M.D. La. Jan. 27, 2022) (adopting the *Kingsley* standard in an excessive force case involving a pretrial detainee, finding that no proof of subjective intent is necessary, only that the actions "purposely or knowingly used against" the individual were unreasonable.) (quoting *Kingsley*, 135 S. Ct. at 2473). *See also, Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644 (5th Cir. 1996) ("[E]ven where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices.")

29.     The Court concludes that Plaintiff is entitled to preliminary injunctive relief under the Fourteenth Amendment. The evidence demonstrates that Defendants' transfer of children to the adult Angola prison site deprives children of their right to rehabilitative treatment and their right to be free from punishment through unsafe conditions, and that these deprivations and the conditions at the Angola site pose an unreasonable risk of harm to children who would be held there.

## III. PLAINTIFF IS ALSO LIKELY TO SUCCEED ON HIS CLAIM UNDER THE REHABILITATION ACT

30.     Under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability in the United States, … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C.A. § 794 (West). To succeed on a claim

under the Rehabilitation Act, a plaintiff must show: (1) that they have a qualifying disability; (2) that they were denied the benefits of certain programs, services, or activities for which a public entity is responsible; (3) that any discrimination is by reason of their disability; and (4) that the public entity in question receives federal financial assistance. *Tellis v. LeBlanc*, No. CV 18-541, 2021 WL 4267513, at *8 (W.D. La. Sept. 20, 2021).

31.     A person with a disability, under the Rehabilitation Act, is any individual who has a "physical or mental impairment that substantially limits one or more major life activities" that is recorded or which an individual is regarded as having. 42 U.S.C.A. § 12102(1) (West) (incorporated by reference into the Rehabilitation Act under 29 U.S.C.A. § 705(20)(B) (West)). Major life activities include "learning, reading, concentrating, thinking, communicating, and working". 42 U.S.C.A. § 12102(2) (West).

32.     Public agencies, including OJJ and DPSC, are required to provide specific programs to minors, including education programs for incarcerated youth in their custody. *See* Arne Duncan & Eric H. Holder, Letter to Chief State School Officers and State Attorneys General (June 9, 2014), https://www2.ed.gov/policy/elsec/guid/secletter/140609.html ("[W]ith regard to students with disabilities, the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990 . . . obligate specific public agencies . . . to provide educational services to eligible youth in confinement.").

33.     As recently as last year, LSP had violated the Rehabilitation Act rights of a subclass of adult incarcerated individuals by "[f]ailing to identify and track disabilities and accommodation requests in a meaningful way", "[f]ailing to accommodate disabled [prisoners] in applying discipline", and "[f]ailing to comply with [the Rehabilitation Act] in providing disabled [prisoners] access to programs and services", among other egregious failures related to the physical, mental

and general wellbeing of the incarcerated adults at LSP. *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *59 (M.D. La. Mar. 31, 2021), *reconsideration denied*, No. CV 15-318-SDD-RLB, 2021 WL 5287856 (M.D. La. Oct. 8, 2021).

34.     Plaintiff Alex A., who has been found to be disabled and has had a "504 plan" to accommodate his learning disabilities, is entitled to the protections of the Rehabilitation Act.

35.     The findings of fact above are sufficient to show that Defendants do not have a realistic plan to accommodate and avoid disparate treatment of Plaintiff and other young people with disabilities who will be housed in OJJ custody on the LSP site.

36.     The findings of fact above also show that Defendants' plan to place youth with disabilities at the LSP site, where they will receive fewer rehabilitative services, less consistent education, and inferior treatment, discriminates against youth on the basis of their disability in violation of Section 504 of the Rehabilitation Act. *See, e.g.*, *Lewis v. Cain*, 2021 WL 1219988, at *125-126 (holding that segregating disabled inmates at LSP, which denied them "access to programs and services provided to non-disabled inmates at LSP, was a violation of both the Rehabilitation Act and the Americans with Disabilities Act).

37.     The Court concludes that Defendants cannot satisfy their obligations to Plaintiff with disabilities under Section 504 of the Rehabilitation Act while they are incarcerated at the LSP site. The Court further concludes that this failure to provide appropriate treatment and accommodations to youth with disabilities at LSP discriminates against youth on the basis of disability. As a result, Plaintiff's Rehabilitation Act claim that the use of LSP is inappropriate to house Plaintiff is likely to succeed on the merits.

### III. THERE IS A SUBSTANTIAL THREAT THAT PLAINTIFF WILL SUFFER IRREPARABLE INJURY WITHOUT EMERGENCY RELIEF

38.     The Supreme Court has long recognized that "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them . . . [A] remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see also Brown v. Plata*, 563 U.S. 493, 531-32 (2011) ("Even prisoners with no present physical or mental illness may become afflicted, and all prisoners in California are at risk so long as the State continues to provide inadequate care. . . . Prisoners who are not sick or mentally ill . . . [are] in no sense [] remote bystanders in California's medical care system. They are that system's next potential victims."). In this regard, the Court takes notice of the Declaration submitted by former OJJ official and current Arkansas justice official Glenn Holt:

> "I have managed adult prisons and have been to Angola. I am certain Angola is not a safe place for OJJ youth. Whether isolated from adults incarcerated in Angola or not—and it is highly unlikely prison officials will be able to maintain sight and sound separation between OJJ youth and Angola's incarcerated adults—the transfer to and incarceration in Angola will be psychologically traumatizing to youth. Angola is a massive prison, on a physical space larger than the island of Manhattan. Louisiana officials proudly portray Angola to be a "working farm," with thousands of incarcerated people doing daily labor . . . . Angola houses Louisiana's Death Row and regularly executes people. When they occur, the state sanctioned killings are felt across Angola, a pall that will not escape OJJ's youth should they be locked away there. Finally, every person sent to be incarcerated in Angola is sent there to be punished . . . ." *Exhibit 1*, at ¶¶ 6-7.

39.     Plaintiff alleges injuries that are irreparable and, therefore, not suitable for waiting for resolution in the ordinary course of litigation. *See Jia v. Xu*, 28 F.4th 591, 598 (5th Cir. 2022) (stating that harm is irreparable where there is no adequate remedy at law, such as monetary damages); *see also Jones v. Texas Department of Criminal Justice*, 880 F.3d 756, 759 (5th Cir. 2018) (finding that an inmate sufficiently alleged a substantial threat of irreparable injury where pleadings indicated that his prison exhibited a "deliberate indifference to [his] serious medical needs."). Further, because Plaintiff here is substantially likely to succeed on his claim of a

violation of his constitutional rights, no further showing is necessary to demonstrate irreparable injury. *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012).

40.　　The findings of fact related to the testimony of Plaintiff, his mother, and Plaintiff's mental health expert, along with other evidence presented, is sufficient to show the substantial likelihood of irreparable injury.

41.　　This Court concludes that failing to grant Plaintiff's requested injunction would result in a substantial threat of irreparable injury to them, including physical and psychological harm, violence, and educational neglect. [149]

## IV. THE EQUITIES AND PUBLIC INTEREST CLEARLY FAVOR PLAINTIFF

42.　　The requested injunction would protect Plaintiff's constitutional rights, and "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)). Because "confidence in the humane application of the governing laws of the State must be in the public's interest," *Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004), public interest considerations weigh strongly in favor of preventing Defendants from willfully exposing children to punishment and the risk of substantial harm by transferring them to LSP.

---

[149] Courts have discretion to waive the Rule 65(c) requirement that the movant for a temporary restraining order provide security. "The Fifth Circuit has acknowledged that the amount of the security is within the discretion of the district court, who can elect to impose no security at all." *New Orleans Home for Incurables Inc. v. Greenstein*, 911 F. Supp 386, 412-13 (E.D.La. 2012) citing *City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority*, 636 F.2d 1084, 1094 (5th Cir. Unit B Feb. 13, 1981). District courts in this circuit routinely exercise this discretion to require no security in cases brought by indigent or incarcerated people. *See, e.g.*, *Schultz v. Alabama*, 330 F. Supp. 3d 1344, 1376 (N.D. Ala. 2018) (county prisoners); *Campos v. I.N.S.*, 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998) (indigent immigrants). The Court will exercise its discretion and waive the Rule 65(c) requirement that the movant for a temporary restraining order provide security.

43. Furthermore, granting the injunction will not harm Defendants or the public safety. The injunction will require Defendants to invest the resources and staffing that it planned to devote to the facility at LSP back into its existing juvenile facilities. This will provide youth across OJJ with more rehabilitative programming and support the development of programs and responses that are consistent with child development and psychology. Additionally, the injunction will not jeopardize public safety because it is in the public's interests for youth in the juvenile justice system to be provided with supportive, rehabilitative programming that can help them emerge from custody with the skills and resources they need to thrive.

## CONCLUSION

44. This Court concludes that preliminary relief is appropriate. It is not possible for Defendants to ensure the constitutional and statutory rights of children transferred to LSP.

Respectfully submitted, this 2nd day of September, 2022.

/s/: *David J. Utter*
DAVID J. UTTER **
Louisiana Bar Number: 23236
WILLIAM R. CLAIBORNE
Georgia Bar Number: 126363
THE CLAIBORNE FIRM, P.C.
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
david@claibornefirm.com
will@claibornefirm.com

/s/: *Christopher J. Murell*
CHRISTOPHER J. MURELL
Louisiana Bar Number: 32075
MURELL LAW FIRM
2831 St. Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 Telephone
(504) 233-6691 Facsimile
chris@murell.law

/s/: *Hector Linares*
HECTOR LINARES
Louisiana Bar Number: 28857
SARA GODCHAUX
Louisiana Bar Number: 34561
STUART H. SMITH LAW CLINIC
LOYOLA UNIVERSITY NEW ORLEANS
COLLEGE OF LAW
7214 St. Charles Avenue, Box 902
New Orleans, Louisiana 70118
(504) 861-5560 Telephone
(504) 861-5440 Facsimile
halinare@loyno.edu
shgodcha@loyno.edu

/s/: *Ronald Haley*
RONALD HALEY
Louisiana Bar Number: 30900
HALEY & ASSOCIATES
8211 Goodwood Blvd., Suite E
Baton Rouge, Louisiana 70806
(225) 755-9935 Telephone
(888) 900-9771 Facsimile
rhaley@ronaldhaleylawfirm.com

/s/: *David Shanies*
DAVID SHANIES
New York Bar Number: 4471140
SHANIES LAW OFFICE
110 West 40th Street
Tenth Floor
New York, New York 10018
Tel (212) 951-1710
Fax (212) 951-1350
Cell (646) 515-2151
david@shanieslaw.com

/s/ *Nancy Rosenbloom*
NANCY ROSENBLOOM
New York Bar Number: 2168425
ADITI SHAH
New York Bar Number: 5886254
TAMMIE GREGG
MN Bar Number: 026240
ACLU NATIONAL PRISON PROJECT
125 Broad Street
New York, NY 10004
Telephone: (202) 393-4930
Facsimile: (202) 393-4931
nrosenbloom@aclu.org
ashah@aclu.org

** *Lead Counsel*

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of September, 2022, a copy of the foregoing pleading was served upon all counsel of record by electronic transmission.

_/s/ David J. Utter_
DAVID J. UTTER