## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ALEX A., by and through his guardian, Molly Smith, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS, in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections,<br><br>        Defendants. | Civil Action No. 3:22-cv-573-SDD-RLB |

## PLAINTIFF'S POST-HEARING BRIEF

Just as a leopard cannot change its spots, a facility designed to isolate men incarcerated on death row cannot change from an adult penal institution into a youth facility offering rehabilitation. The State's plan to move youth to Angola re-directs enormous amounts of money and resources away from existing Office of Juvenile Justice (OJJ) facilities and toward a futile effort to convert a portion of the notorious adult maximum-security prison into a youth facility. Youth moved to Angola will face heightened risks of suicide by being forced to live in single barred-door cells without privacy, and risks of being pepper sprayed, tased, and subject to other uses of force that Louisiana Department of Public Safety and Corrections (DOC) staff are expressly authorized to use pursuant to the Memorandum of Understanding (MOU) between OJJ and DOC. They will also suffer the consequences of inadequate staffing, recreation, educational services, access to medical

care, and rehabilitative programming. These factors collectively demonstrate the serious risk of harm youth would face at Angola, and compel granting Plaintiff's requested preliminary injunction.[1]

## II. Plaintiff Exhausted All Available Administrative Remedies Before Filing this Action.

Plaintiff Alex A. filed an emergency grievance pursuant to OJJ's Administrative Remedy Procedure (ARP) on August 16, 2022. PX 2. Despite the imminent nature of Plaintiff's anticipated move to Angola and the serious physical and psychological harm Plaintiff was already experiencing as a result, OJJ responded on August 18, 2022, that Plaintiff could not proceed with the emergency ARP, stating that he is "not subject to any immediate risk of harm" and therefore his ARP would be reviewed "within the regular ARP time limits" rather than within the 48-hour (initial response) and 5-day (final response) deadlines of the emergency ARP.[2] *Id.* OJJ's failure to treat Plaintiff's grievance as an emergency made the grievance process unavailable to Plaintiff. As a result, Plaintiff exhausted all available administrative remedies as required by the Prison Litigation Reform Act (PLRA). *See* 42 U.S.C. § 1997e(a).

It is Defendants' burden to prove non-exhaustion as an affirmative defense. *Scott v. Williams*, No. CV 19-150-SDD-EWD, 2019 WL 7547382, at *2 (M.D. La. Dec. 5, 2019), *report and recommendation adopted*, No. CV 19-150-SDD-EWD, 2020 WL 113351 (M.D. La. Jan. 9, 2020) ("Because failure to exhaust administrative remedies, as required by the [PLRA], is an

---

[1] Plaintiff incorporates by reference herein all factual allegations, factual and expert evidence, and legal arguments made in his previous filings, including in Doc. No. 1 (Class Action Complaint), Doc. No. 9 (Memorandum in Support of TRO/PI Motion), Doc. No. 51 (Plaintiff's Proposed Findings of Fact and Conclusions of Law), Doc. No. 57 (Plaintiff's Supplemental Proposed Findings of Fact), and all exhibits attached to these documents. Plaintiffs' and Defendants' exhibits from the preliminary injunction hearing are cited as "PX" and "DX," respectively.

[2] Alex A. testified that he learned about his anticipated move to Angola when he heard staff discussing the decision and watched news on TV that Bridge City youth would be moved to the facility. Alex A. testimony 9.6.22; DX 59 (OJJ's eligibility screening for Alex A. dated September 2021, recommending he be moved to the Transitional Treatment Unit (TTU) on an expedited basis without convening a multidisciplinary team); PX 2 (Alex A.'s ARP, dated August 16, 2022, and OJJ's response to the ARP, dated August 18, 2022).

affirmative defense, defendants bear the burden of proof concerning exhaustion both at trial and in pretrial motions."). Defendants presented no evidence, let alone sufficient evidence, to satisfy their burden to prove that their grievance process was available to Plaintiff. If the agency fails to render a decision within the time limit it has set for itself, the incarcerated person has exhausted, as he is not required to go beyond the requirements of the grievance policy. *Jones v. Bock*, 549 U.S. 199, 218 (2007). Defendants' only response to Plaintiff's emergency grievance was that it would not be reviewed as an emergency grievance.[3] PX 2 at 9. The lack of a substantive response within OJJ's own five-day deadline is essentially a non-response, and most courts agree that "[a] prisoner's administrative remedies are deemed exhausted when a valid grievance has been filed and the state's time for responding thereto has expired."[4] The Court may also find that Plaintiff exhausted without pursuing the non-emergency grievance process because he "filed a 'sensitive' grievance" appropriate for emergency treatment that was rejected as non-emergent, given that the nature of his grievance "implicated a reasonable belief that his safety would be at risk if he filed at the prison." *Taylor v. Gilbert*, 2016 WL 5944481, *3 (S.D.Ind., Oct. 13, 2016).[5]

## III.  Plaintiff is Likely to Succeed on the Merits of His Fourteenth and Eighth Amendment Claims.

### A) Moving Youth to the OJJ Facility at Angola Constitutes Punishment in Violation of Plaintiff's Fourteenth Amendment Rights.

---

[3] OJJ's policy states that the emergency grievance timeline is available when the grievance "contains statements which indicate that the *youth believes* they are in immediate risk of harm and any delay in responding to the grievance would subject the youth to substantial risk of immediate personal injury or cause other serious or irreparable harm." PX 42 at 9 (emphasis added). The relevant question, therefore, is whether Plaintiff believed he was in immediate danger—which his grievance, declaration, and testimony at the hearing all demonstrate.

[4] *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) (footnote omitted); *accord*, *Hayes v. T. Dahlke*, 976 F.3d 259, 270-71 (2d Cir. 2020); *Whitington v. Ortiz*, 472 F.3d 804, 807-08 (10th Cir. 2007).

[5] In *Ross v. Blake*, 578 U.S. 632 (2016), the Supreme Court observed that a prison's administrative grievance process is unavailable if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. OJJ's unsupported contention that the immediate threat of being moved to the Angola site was not an emergency constitutes a machination.

Because youth in OJJ custody are held in *civil*, not criminal, detention, they may not be subject to punitive conditions of confinement. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The purpose of the juvenile justice system in Louisiana is rehabilitation, not punishment. La. R.S. § 15:906(B) ("[T]he public policy of this state [is] that commitment of a juvenile to the care of [OJJ] is not punitive nor is it in any way to be construed as a penal sentence, but as a step in the total treatment process toward rehabilitation of the juvenile."); *In re C.B.*, 708 So. 2d 391, 397 (La. 1998); *see also* Schiraldi testimony 9.7.22; Stevens testimony 9.6.22; Sommers testimony 9.8.22.[6] Rehabilitation provides youth with services and supports that will allow them to leave delinquency behind, whereas punishment deprives youth of their freedoms and liberty. Schiraldi testimony 9.7.22. Almost all states have moved to more rehabilitative models. *Id.* Rehabilitation requires a safe, "normalized" environment—mimicking home—and adequate staffing and programming; by contrast, the OJJ facility at Angola is a correctional environment, marked by fully barred sliding-door cells originally designed to house adult men on death row. *Id.*; PX 20 at 80.

Almost every aspect of the OJJ facility at Angola creates an unmistakably punitive environment, excessive in relation to any potential legitimate government interest. *Bell*, 441 U.S. at 561; *Baker v. Hamilton*, 345 F. Supp. 345, 352 (W.D. Ky. 1972) (holding that confinement of youth in a "penal institution designed primarily for punishment rather than rehabilitation" violates the Fourteenth Amendment "in that it is treating for punitive purposes the juveniles as adults and yet not according them for due process purposes the right accorded to adults"); Schiraldi testimony 9.8.22 (explaining that fixing any single issue at the facility will not make it suitable for youth). As a result, no matter what services are brought in, this environment will be unconstitutionally

---

[6] Defendants rely upon *Morales v. Turman*, 562 F.2d 993, 999 (5th Cir. 1977), Doc. No. 28 at 33, but that case was decided before the U.S. Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307 (1982), and also preceded the Louisiana Supreme Court's decision in *In re C.B.*, 708 So. 2d at 397, which explicitly held that youth in Louisiana who are in the juvenile justice system have a right to rehabilitation.

punitive. Children and their families, along with staff, enter by passing through the gates of the Louisiana State Penitentiary (LSP), where there is a sign that says "Weapons Check In/Out." PX 20 at 206. Both the entrance to LSP and the OJJ facility at Angola are surrounded by high fencing and multiple coils of razor wire. *Id.* at 1-2. Signage on the road leading to Angola says "Louisiana State Penitentiary – Now Hiring." *Id.* at 207. Plaintiff's juvenile justice expert, Vincent Schiraldi, presented unrefuted testimony that the OJJ facility at Angola is inappropriate because it is an adult correctional environment that would endanger the safety and well-being of youth rather than provide rehabilitation, explaining that this is "a very inappropriate environment for children" that "is going to scream 'prison' to young people."[7] Schiraldi testimony 9.7.22.

Because the physical features of the OJJ facility at Angola can only be understood as an adult maximum-security prison, nothing about it will support the rehabilitation of youth. Despite his incongruous characterization of the Angola facility as being "like summer camp," OJJ Assistant Secretary Curtis Nelson admitted that youth at Angola will live in single cells with floor-to-ceiling metal bars with no privacy, no windows, and open metal toilets, which look nothing like the open dorms at some of OJJ's other facilities or the individual rooms for youth in secure care facilities. *Id.*; Nelson testimony 9.7.22; PX 20 at 80. The cold concrete walls and floors of the cells signal to youth that they are being punished. Schiraldi testimony 9.7.22. To make matters worse, Defendants' only response to the increased suicide risk is that they hope to have guards constantly patrolling outside the cells when youth are there, which not only is unrealistic given acknowledged staffing shortages and impractical for reducing suicide risk, but also prevents privacy for youth and further emphasizes that they are in a correctional and punitive, rather than normalized and

---

[7] Defendants did not present any expert testimony, and their expert's report is not in evidence.

rehabilitative, environment. *Id.*; Patin testimony 9.8.22 (admitting there are chances for incidental sightings of youth by DOC and OJJ staff if they are changing clothes in their cells).

In addition to the punitively-designed cells, the only visitation space Defendants showed to Mr. Schiraldi consists of non-contact visitation rooms with mesh screens separating the visitor's side from the youth's side. PX 20 at 163. Mr. Schiraldi did not observe any other visitation spaces in his tour, and Defendants' own schematic layout designates only "Non-Contact Visitation." Schiraldi testimony 9.7.22; PX 38. The only recreation space—a grassy outdoor area with one basketball hoop and no court—also reminds youth of the punitive nature of the institution while depriving youth of adequate recreation and interaction opportunities crucial for their development. Schiraldi testimony 9.7.22. Mr. Schiraldi testified that the "holding/intake" area that Defendants suggest will be used for indoor recreation would be insufficient given its small size. *Id.* Mr. Nelson also admitted that youth at Angola will not receive any additional "modality of treatment" to ensure rehabilitation, and they will not receive the full array of LAMOD programming offered to youth at OJJ's other secure care facilities.[8] Nelson testimony 9.7.22. As OJJ's Program Manager testified, the *only* aspect of the LAMOD program that will be offered to youth at Angola is the "check in/check out" program. Bridgewater testimony 9.8.22.[9] All other LAMOD programming provided to youth at OJJ's rehabilitative programs will be denied to youth at Angola, including group therapy, which Ms. Bridgewater testified is not appropriate for all youth. *Id.*

The punitive conditions to which youth at Angola would be subject are exacerbated by the heightened risk of solitary confinement, chemical sprays, tasers, and other uses of force. Mr.

---

[8] LAMOD is Louisiana's version of the "Missouri Model," adopted by many jurisdictions as the most effective, less-restrictive and rehabilitative model of providing secure care to youth adjudicated delinquent. Schiraldi testimony 9.7.22; Annie E. Casey Foundation, *The Missouri Model*, https://assets.aecf.org/m/resourcedoc/aecf-MissouriModelFullreport-2010.pdf.

[9] In the "check in/check out" program, youth meet with a counselor at the beginning of the day to share their needs and preview the day's schedule, and they meet again at the end of the day to recap how the day went and to identify needs for the following day. Bridgewater testimony 9.8.22.

Nelson testified that youth at Angola will have limited movement and may be locked in their barred-door cells to deal with disciplinary issues and in other circumstances. Nelson testimony 9.7.22. It is also highly likely that youth would be forced to stay locked in their single cells for long periods of time if there is a situation that prevents youth from being outside their cells, constituting *de facto* solitary confinement in violation of Louisiana Act No. 496.[10] Schiraldi testimony 9.7.22. The MOU explicitly authorizes DOC staff to use "chemical spray, electronic control weapons ('Tasers') and the use of force continuum for which they are trained," and none of Defendants' witnesses refuted this plain language of the contract. PX 32 at 2; *see also* Nelson testimony 9.7.22 (testifying that DOC guards will carry tasers and pepper spray). Indeed, Mr. Nelson testified that DOC officers have not been instructed on modifying uses of force for youth compared to adults incarcerated at LSP. Nelson testimony 9.7.22.

Although proof of intent to punish is not required to demonstrate punitive conditions, OJJ employees' testimonies make clear that the only possible function of the LSP facility is to punish youth for engaging in what they consider problematic behavior. *Bell*, 441 U.S. at 538. Mr. Nelson, who oversees this plan, testified that rehabilitation, in his view, is "unrealistic" for a small percentage of youth who have engaged in extreme behaviors and these are the youth who will be transferred to OJJ's Angola site. Nelson testimony 9.7.22. If providing a more secure environment in an effort to enhance public safety—the only stated government interest relevant here—were Defendants' true concern, Defendants would invest in resources to increase security without moving youth to an adult correctional environment where they are forced to live in barred-door

---

[10] Louisiana Act No. 496 forbids OJJ from placing youth in solitary confinement "for the purpose of discipline, punishment, administrative convenience . . . or general behavior management that is not a response to a serious and immediate threat of physical harm to the juvenile or others." Act No. 496, Enrolled, https://legis.la.gov/legis/ViewDocument.aspx?d=1289566.

single cells with non-contact visitation and lesser access to rehabilitative services.[11] Indeed, Mr. Nelson testified that OJJ's previous attempts to segregate the small portion of difficult youth and place them in single-occupancy rooms did nothing to improve their behaviors, and when they were all moved to the same facility (without adequate staffing and services), violent incidents were only worsened. *Id.* Moving youth to Angola replicates these past failings, achieves only a more unsafe, punitive environment for youth, and is not "reasonably related" to the purposes of "treatment and rehabilitation." *Morgan v. Sproat*, 432 F. Supp. 1130, 1135 (S.D. Miss. 1977).

**B) Moving Youth to Angola Poses an Unreasonable Risk of Harm of which Defendants are Subjectively Aware, in Violation of Plaintiff's Constitutional Rights.**

Defendants' slapdash plan to transfer at least 24, and potentially upwards of 100, youth to Angola without adequate protections for the health and safety of youth and access to rehabilitative services, recreation, programming, and education creates a grave and objectively unreasonable risk of harm to youth, of which Defendants are subjectively aware. Schiraldi testimony 9.7.22. The state has a constitutional obligation to protect incarcerated people from a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). Under the Fourteenth Amendment, the state has heightened duties towards people detained in its custody where the purpose of the confinement is not punitive. *See Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

Courts of appeal across the country have found that the Fourteenth Amendment provides heightened protections to youth adjudicated delinquent because such youth are not confined for

---

[11] An official from the Office of Juvenile Justice and Delinquency Prevention (OJJDP) of the U.S. Department of Justice even wrote to Defendants expressing concern about the decision to move youth to the Angola site and offered to work with Defendants to develop a different, more appropriate plan. PX 31 at 2-3.

punitive purposes. *See, e.g., Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987) (applying the Fourteenth Amendment standard of objectively unreasonable risk of harm because "the Oregon juvenile justice system is noncriminal and nonpenal"); *Nelson v. Heyne*, 491 F.2d 352, 360 n.12 (7th Cir. 1974); *A.M. v. Luzerne Cnty. Juvenile Detention Ctr.*, 372 F.3d 572, 579 (3rd Cir. 2004); *Santana v. Collazo*, 714 F.2d 1172, 1180-83 (1st Cir. 1983).[12] Under the "objective deliberate indifference" standard, the Court must consider whether Plaintiff has been "expos[ed] to a substantial risk of serious harm." *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018); *see also Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (holding that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). The Eighth Amendment "objective and subjective deliberate indifference" standard applicable to people who have been convicted of crimes should not apply here because youth in OJJ custody are held in civil, not criminal, detention.[13] However, even under the Eighth Amendment standard, the evidence suffices to show a likelihood of success on the merits.

The punitive conditions at the OJJ facility at Angola, discussed above, themselves present an objectively unreasonable risk of harm. Schiraldi testimony 9.7.22. OJJ Executive Management Advisor Deron Patin agreed that the barred cells present an increased suicide risk, which Mr.

---

[12] Like pretrial detainees and civilly committed people, children removed from their homes and taken in state custody through the foster care system have greater due process rights than adults convicted of crimes. The Fifth Circuit has held that when the State takes "custody of a child, the State 'assume[s] the responsibility to provide for constitutionally adequate care.'" *M.D. v. Abbott*, 907 F.3d 237, 249-50 (5th Cir. 2018) (alterations in original) (citation omitted); *see also id.* at 250 n.17 (collecting cases and noting that "[v]irtually every other circuit agrees"). For children in foster care, this substantive right under the Fourteenth Amendment is "not inconsistent" with "the right to be free from an unreasonable risk of harm." *M.D.*, 907 F.3d at 250 n.18.

[13] *See, Kingsley v. Hendrickson*, 576 U.S. 389, 398-99 (2015) (clarifying that the Fourteenth Amendment excessive force standard applicable to pretrial detainees is more protective than the Eighth Amendment standard and thus, pretrial detainees need only meet the objective prong of the "deliberate indifference" test for those claims); *see also Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 424 (5th Cir. 2017) (concurring opinion suggesting *Kingsley* should be extended to all pretrial detainee medical claims). Some Circuits have explicitly established a Fourteenth Amendment right to rehabilitation for youth in the juvenile justice system. *See, e.g., Nelson v. Heyne,* 491 F.2d 352, 360 (7th Cir. 1974). The Fifth Circuit has not ruled one way or the other on whether *Kingsley* applies in the context of youth adjudicated delinquent being held in custody.

Schiraldi explained is because of the numerous tie-off points around the bars. Patin testimony 9.8.22; Schiraldi testimony 9.7.22. In addition, the physical and psychological damage caused by solitary confinement, pepper spray, and tasers on youth is well-documented, with consequences including skin burning, temporary blindness, difficulty breathing, long-term paranoia, anxiety, and an increased suicide risk.  Schiraldi testimony 9.7.22. *See Alexander S v. Boyd*, 876 F. Supp. 773, 786 (D.S.C. 1995) (holding tear gas policies in juvenile corrections facilities unconstitutional because the use of tear gas was counterproductive, made youth angrier and more aggressive, and caused long-term medical complications). It is clear from the hearing evidence that Defendants know of the "substantial risks of serious harm," and are knowingly exposing young people to those risks by forging ahead with this plan.

The lack of coordination between OJJ and DOC poses an objectively and subjectively unreasonable risk of physical and psychological harm for youth. Mr. Nelson testified that DOC staff will be used as "rovers," walking around both inside and outside the OJJ facility at Angola, and that inside the building, DOC staff will help "de-escalate kids engaging in high risk behavior" and will prevent youth from "destroying property;" their duties will include being "hands on" with youth. Nelson testimony 9.7.22. However, Maghen Gagnard, Executive State Officer at LSP, disputed this plan and testified that OJJ has provided no information to DOC about the nature or type of security services that OJJ will require at the Angola facility. Gagnard testimony 9.6.22. Specifically, there have been no conversations between OJJ and DOC about (1) DOC staff members serving as "rovers" at the OJJ Angola site; (2) the criteria for identifying which DOC officers will interact with youth; or (3) the training DOC staff will receive before working with youth. *Id.* Likewise, there have been no new policies, procedures, or regulations developed by DOC or LSP pertaining to the OJJ facility for youth at Angola, including any revisions to the use

of force policies when working with youth. *Id.* In addition, the MOU does not contain different direction for DOC officers' use of force on youth at Angola, nor does it specify that force should only be used in "rare" circumstances. PX 32. There is also no evidence that members of DOC's emergency response CHASE team at Angola, which may be activated at OJJ's request per the MOU, received any training about use of less-than-lethal force in the event of an attempted youth escape from the Angola site. Gagnard testimony 9.6.22. These failings regarding DOC's role will prevent adequate security staffing in cases of emergency, risking the lives of youth at Angola.

Several witnesses also testified extensively about the harms faced by youth in co-located or adult facilities.[14] When youth are incarcerated in adult facilities, they experience a higher rate of assault, suicide, sexual assault, and recidivism. Schiraldi testimony 9.7.22. Because youth who interact with incarcerated adults face significant harms, the federal Juvenile Justice and Delinquency Prevention Act strictly requires sight and sound separation in co-located facilities. Schiraldi testimony 9.7.22. Although OJJ claims that youth will be separated from adults, Ms. Gagnard testified that if an incarcerated adult is outside making noise, youth at the Angola site could hear him. Gagnard testimony 9.6.22. Given that incarcerated adults maintain the Angola grounds, this circumstance is not unlikely. *Id.* Defendants presented no evidence that the fabric they have allegedly purchased would in fact achieve sight-and-sound separation, and Ms. Gagnard testified she was not aware of the durability or material of the fabric OJJ plans to drape around the fence separating the Angola OJJ site from the rest of the prison—which has not yet arrived. *Id.*

These harms are compounded by the fact that OJJ is not nearly at the necessary staffing levels for the Angola site. Nelson testimony 9.7.22; Patin testimony 9.8.22. Just *three* juvenile justice specialists (JJS) have been hired for the OJJ facility at Angola, and there are staffing

---

[14] These examples involve youth convicted as adults because, to Plaintiff's expert's knowledge, no state has ever before incarcerated youth adjudicated delinquent on the grounds of an adult prison. Schiraldi testimony 9.7.22; 9.8.22.

shortages right now for every position. Nelson testimony 9.7.22. OJJ is having difficulties hiring and retaining JJS staff across all of its facilities. *Id.* Moreover, OJJ plans to hold 4-7 weeks of training for JJS staff working at the Angola site and has not yet held any training classes, despite their plan to open by the end of this month. *Id.* OJJ has eliminated ideal staffing numbers from previous versions of the TTU program for the Angola site, making it extremely likely that the facility will be understaffed and youth and adults alike will be endangered. PX 41; PX 18; Nelson Testimony 9.7.22. If OJJ is understaffed at the Angola site, it will create a security risk for youth, adults, and staff members. Gagnard testimony 9.6.22.

Despite these clear and known risks, Defendants have failed to take necessary steps to mitigate the risks, including failing to conduct training, engaging in clear discussions regarding DOC's role at the OJJ facility at Angola, and ensuring adequate hiring and training. Mr. Nelson testified that he was not even aware that the facility at Angola previously served as death row and was designed with a physical structure appropriate to those convicted of the most serious adult criminal offenses—demonstrating indifference to the complex harms posed by the facility's physical structure. Nelson testimony 9.7.22. Defendants are also inconsistent about their understanding of the staffing needs at the Angola site. According to Ms. Bridgewater, the facility currently has sufficient staff to open on a start-up basis, whereas Mr. Patin testified that the facility is "absolutely not" ready yet. Bridgewater testimony 9.8.22; Patin testimony 9.8.22. These inconsistent testimonies create a heightened risk that the site will be opened before the agency is coordinated and prepared to meet the needs of youth moved to Angola.

Other witnesses testified extensively about the risk of psychological harm faced by youth moved to Angola. According to Dr. Stevens, it is reasonable and developmentally appropriate for youth including Alex A. to be highly anxious and concerned that they will not receive appropriate

education, family interactions, and social and emotional accommodations at the Angola site. Stevens testimony 9.6.22. Alex A. and other youth who have learned they are eligible for transfer to the Angola site are already experiencing significant "anticipatory" stress. *Id.* Having not been told any details of who might be transferred and when, and having not been told by anyone at OJJ that they will not be housed with adults, Alex A. testified he has had nightmares and trouble sleeping, and has such a high level of stress that he has been pulling his hair out. Alex A. testimony 9.6.22; Stevens testimony 9.6.22. Alex A. also fears being in contact with adult prisoners at LSP and being harmed by them. PX 1 at 3-4. Dr. Stevens' and OJJ staff's testimonies also underscore the harms that will result from OJJ's failure to plan for opening the Angola site. Mr. Schiraldi testified that, given his experience, it will not be possible for OJJ to deliver on its plan to hire and train sufficient staff and get the Angola facility ready to house youth by the end of September. Schiraldi testimony 9.7.22. Deputy Secretary Sommers likewise testified that the plan for Angola, like any plan, can go wrong if poorly implemented, and agreed that staffing shortages make a plan more likely to fail. Sommers testimony 9.8.22. Indeed, Dr. Stevens believes that the harms that youth will face at the Angola site are so significant that, as a mandatory reporter of possible child abuse and neglect, she is obligated to report to the State her well-founded suspicion of the physical and emotional abuse youth at Angola would face. Stevens testimony 9.6.22.

Youth at Angola will also face a significant risk of physical harm due to the inadequate medical care at the facility. According to OJJ health services director Denise Dandridge, youth who require emergency medical care—including treatment for chest pains, trauma or injury—will not receive care on site at the Angola hospital, and will instead have to make a 40-minute journey to the West Feliciana Hospital for care. Dandridge testimony 9.6.22, 9.7.22. That distance is double the distance between other OJJ secure care facilities and local hospitals. *Id.* It is further

compounded by the fact that West Feliciana Hospital does not have ventilators, so youth in need of ventilation will need to travel even further to get treatment. *Id.* Even youth who need x-rays will be transported to the West Feliciana hospital, as OJJ will not have x-ray capability on site. *Id.* Defendants are deliberately indifferent to the dangers youth will face whenever the facility opens due to the significant medical care limitations the distance to more extensive treatment services.

## IV.  Plaintiff is Likely to Succeed on the Merits of his Claim Under Section 504 of the Rehabilitation Act.

To succeed on a claim under the Rehabilitation Act, a plaintiff must show that they have a qualifying disability; that they were denied the benefits of certain programs, services, or activities for which a public entity is responsible; that any discrimination is by reason of their disability; and that the public entity in question receives federal financial assistance. *Tellis v. LeBlanc*, No. CV 18-541, 2021 WL 4267513, at *8 (W.D. La. Sept. 20, 2021). Youth with disabilities are significantly overrepresented in the juvenile justice system and among youth in OJJ's custody, as compared to the overall population of the state and the country. Deville testimony 9.8.22.[15] The criteria for transferring youth to LSP are significantly likely to result in a large number of youth with disabilities being placed there (especially because youth with mental health disabilities are often involved in acting out behavior), although the plan documents indicate that Defendants have not planned sufficient staffing to accommodate students with a range of disabilities and needs. PX 18. The TTU criteria in fact permit youth who meet the definition of "Seriously Mentally Ill" (SMI) to be placed at the facility. *Id.* at 15, Section VII.B. Young people who are classified as SMI have qualifying disabilities under the Rehabilitation Act, and require intensive services and

---

[15] Nationally, up to 77% of students in the juvenile legal system have disabilities. *See* OFF. JUV. JUST. & DELINQ. PREVENTION, *Education for Youth Under Formal Supervision of the Juvenile Justice System*, January 2019 OJJDP MODEL PROGRAMS GUIDE LITERATURE REVIEWS 1, 3-4, https://ojjdp.ojp.gov/sites/g/files/xyckuh176/files/media/document/education-for-youth-in-the-juvenile-justice-system.pdf.

supports to succeed in school. *Id.* (defining "seriously mentally ill" as disorders that "significantly interfere with functioning in at least one essential sphere of the youth's life"); *see also Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (holding that the definition of a qualifying disability is the same under the ADA and the Rehabilitation Act); 42 U.S.C. § 12102(1).

Plaintiff has a learning disability in math and has had a Rehabilitation Act Section 504 plan since he was in fourth grade.[16] Alex A. testimony 9.6.22. He also has a diagnosis of Post-Traumatic Stress Disorder ("PTSD") and is prescribed medications for his nightmares and other mental health symptoms. *Id.*; Stevens testimony 9.6.22. Plaintiff's 504 plan requires accommodations in school, including use of a calculator and read-aloud services. Alex A. testimony 9.6.22; Doc. No. 1 at 5. OJJ is aware of Plaintiff's learning disability and mental health issues, and has provided learning accommodations to him at the Riverside Alternative School at Bridge City Center for Youth ("BCCY"), including through an "extra teacher" in the classroom who provides the read-aloud service for Plaintiff. Alex A. testimony 9.6.22.  Under the Rehabilitation Act, Defendants' failure to address and accommodate Plaintiff's non-classroom needs, namely his anxiety and fear related to the threatened transfer to Angola, is disability-based discrimination. In fact, Defendants' failure to provide any information about their plans to Plaintiff and other youth at risk of being transferred to LSP, despite knowing that the young people are aware of the impending transfer, constitutes discrimination as well because it exacerbates his mental health disabilities. *Id.*[17]

---

[16] Defendants do not dispute that Plaintiff has a qualifying disability under the Rehabilitation Act, or that they are public entities receiving federal financial assistance within the meaning of Section 504 and are therefore responsible for providing education programs and services to all youth in OJJ's custody. Deville testimony 9.8.22.

[17] Defendants' failure to take into account the numbers of students with disabilities and their failure to plan to accommodate the special needs of youth with high levels of trauma-related disabilities violate the Act as well. Stevens testimony 9.6.22, Deville testimony 9.8.22. When providing services to people with disabilities, the Rehabilitation Act requires affirmative steps, i.e. reasonable modifications to "business as usual." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020) (citations omitted). Defendants' lack of planning for this high-needs group to ensure equity between disabled and non-disabled youth at the OJJ facility at Angola is further evidence of discrimination. *See Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010) ("An organization . . . violates § 504 if it denies a qualified individual with a disability a reasonable accommodation that the individual needs in order to enjoy meaningful access to the benefits of public services.").

Moreover, because of Defendants' anemic staffing and educational deficiencies, it is likely that Plaintiff will not receive his disability accommodations at the Angola site. *See* Deville testimony 9.8.22 (explaining that only one teacher has been hired for the OJJ site at Angola). If he is denied those services, it will be discrimination on the basis of his disability. Plaintiff testified that he is worried that he will not receive these required services or the counseling he now receives, that he will not be able to focus on school, and that his education will suffer as a result. *Id.* His goal is to finish high school and become a welder and to help support his family, and he is anxious that placement at the Angola site will prevent him from progressing in high school. *Id.* OJJ's Director of Education, Shenell Deville, testified that OJJ will staff the facility with three teachers and three tutors for 24 students on site each school day, and that the special school district will provide two special education teachers, neither of whom have been hired. Deville testimony 9.8.22; PX 18 at 28. Because hiring is incomplete, and in fact only one teacher of any classification had been hired as of September 8, 2022, there is no evidence that OJJ will ensure an adequate number of special education certified teachers, tutors, and/or providers of special education "related services" to accommodate the educational needs of the large proportion of students who have disabilities. Deville testimony 9.8.22. Defendants' plan acknowledges that "required related [services] staff" include "Speech-Language Pathologist, Social Worker/School Psychologist, Occupational Therapist, Physical Therapist, Adapted Physical Education Teacher, etc." PX 18 at 29, VIII.B, but Ms. Deville did not provide any detail about the hiring of such staff members. Because Defendants' plan is to have students spend about four weeks in the Angola facility, the population will be shifting constantly, including different students with different disabilities and individualized entitlements to legally-required disability accommodations. Nelson testimony 9.7.22. It is unlikely that one teacher per eight students, or one staff line person qualified to provide

16

some set of related services, will be able to provide the disability accommodations needed within each group of students sent to the Angola site.

## V.  There is a Substantial Threat that Youth Moved to LSP Will Suffer Irreparable Injury Without this Preliminary Injunction.

The violation of Plaintiff's constitutional rights, in addition to the unrefuted evidence of increased risks of suicide, solitary confinement, being pepper sprayed, tased, and subject to other uses of force for youth at Angola, demonstrate that Plaintiff and youth moved to LSP will suffer irreparable injury without this preliminary injunction. When considering a preliminary injunction motion, a federal court may find the threatened injury "irreparable" where "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013). "It has been repeatedly recognized by the federal courts that violation of constitutional rights constitutes irreparable injury as a matter of law." *Springtree Apartments, ALPIC v. Livingston Par. Council*, 207 F. Supp. 2d 507, 515 (M.D. La. 2001); *but see Bouchard Transportation Co. v. Dep't of Homeland Sec.*, No. CV 20-1116, 2020 WL 1689869, at *2 (E.D. La. Apr. 7, 2020) (explaining that "an alleged due process violation does not, without more, establish a threat of irreparable injury") (citation omitted). District courts within this Circuit have repeatedly found threats of irreparable injury warranting preliminary injunctive relief in cases challenging conditions of detention. *See, e.g.*, *Advocacy Ctr. for the Elderly & Disabled v. La. Dep't of Health & Hosps.*, 731 F. Supp. 2d 603 (E.D. La. 2010); *Morales v. Turman*, 364 F. Supp. 166, 175 (E.D. Tex. 1973).

The psychological harm youth will face at LSP will be significantly compounded by the fact that their brains are still developing and they are forming their sense of self and individuality. Stevens testimony 9.6.22. According to Dr. Stevens, youth are likely to conform when placed in stressful situations—a function of the fight/flight/freeze survival modes. *Id.* If youth are placed in

an environment that treats them as criminals and strips them of their identity, they will conform to that vision of themselves. *Id.* The fact that the planned OJJ facility at Angola is in the former death row is especially problematic from a psychological perspective, and conveys messages of punishment and hopelessness rather than rehabilitation and opportunities for the future. *Id.*; Schiraldi testimony 9.7.22. "Emotional distress, anxiety, depression, and other psychological problems can constitute irreparable injury." *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal.), *appeal dismissed and remanded*, 802 F.3d 1090 (9th Cir. 2015) (citations omitted).

In addition, as explained above, youth at Angola are unlikely to receive adequate access to education, including special education, which further constitutes irreparable harm. *See, e.g.*, *N.J. v. New York*, 872 F. Supp. 2d 204, 214 (E.D.N.Y. 2011) ("[I]nterruption of a child's schooling causing a hiatus not only in the student's education but also in other social and psychological developmental processes that take place during the child's schooling, raises a strong possibility of irreparable injury."); *Zavala v. Contreras*, 581 F. Supp. 701, 702-03 (S.D. Tex. 1984) (failure to provide proper educational services to special needs minors constituted an irreparable harm warranting a preliminary injunction).[18]  Although OJJ has a "plan" to implement educational and counseling programming for youth at Angola, it is undisputed that they do not currently have the staff, facilities, or materials necessary to do so. Deville testimony 7.8.22; Bridgewater testimony 7.8.22; Nelson Testimony 7.7.22. Indeed, OJJ is currently struggling to hire sufficient teachers for youth at Angola, Deville testimony 7.8.22, and there is no evidence, outside of conclusory statements about good intentions, that either OJJ or the Special School District will in fact hire and onboard service professionals (including school counselors, speech therapists, and physical

---

[18] *See also Cosgrove v. Bd. of Educ. of Niskayuna Cent. Sch. Dist.*, 175 F. Supp. 2d 375, 392 (N.D.N.Y. 2001) ("It is almost beyond dispute that wrongful discontinuation of a special education program to which a student is entitled subjects that student to actual irreparable harm.").

therapists) necessary to provide services to students with disabilities. PX 27. OJJ's plans to share staff across two facilities—the Angola site and BCCY—including the school principal, also creates a risk of service disruption and delays. *Id.*; Deville testimony 9.8.22. And, OJJ acknowledges that youth who have a gap or disruption in their education suffer negative consequences in their academic development, including a higher risk of dropping out of school. Deville testimony 9.8.22. OJJ's recent experience with a "TTU" at St. Martinville—where youth were housed at the facility for several months without any education—demonstrates that OJJ has a poor track record of following through on its obligations to provide programs to youth in custody.[19] Deville testimony 9.8.22; Sommers testimony 9.8.22.

## VI. The Equities and Public Interest Considerations Strongly Weigh in Favor of Granting the Preliminary Injunction.

The threat of injury to Plaintiff and other youth who may be moved to the Angola site outweighs any potential harm to Defendants from issuing the preliminary injunction. The requested injunction would protect Plaintiff's constitutional rights, and "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)). Defendants' vague counterargument that issuing an injunction "would limit those best equipped to make decisions about the proper procedures to maintain safety, and would therefore disserve the public interest . . . ." fails to account for the serious and irreversible risks to safety and health that youth moved to the Angola site would face. ECF No. 28 at 37 (citing *Zantiz v. Seal*, No. CIV.A. 12-1580, 2013 WL 357069, at *4 (E.D. La. Jan. 29, 2013)).

---

[19] *See also* Erin Einhorn, et al., *'No light. No nothing.' Inside Louisiana's harshest juvenile lockup*, NBC News, Mar. 10, 2022, https://www.nbcnews.com/news/us-news/louisiana-juveniledetention-st-martinvillle-rcna19227.

Moreover, Defendants have "fail[ed] to produce credible evidence of harm that competes with the severity of the harm" to Plaintiff and youth who may be moved to LSP. *Daves v. Dallas Cnty.*, Texas, 341 F. Supp. 3d 688, 696 (N.D. Tex. 2018), *vacated and remanded on other grounds*, 22 F.4th 522 (5th Cir. 2022). The only evidence Defendants have offered is of prior incidents of violence involving youth at understaffed OJJ facilities such as BCCY. Defendants have presented no evidence of a program – other than more security, higher walls, razor wire, cell bars and fewer services – that will provide a rehabilitative environment designed to reduce behavioral incidents to youth at the OJJ facility at Angola. Schiraldi Testimony. Further, Defendants repeatedly admitted over the course of the hearing that the OJJ facility at Angola is not ready to accept youth, and OJJ employees have now testified that no youth will be moved to the facility at LSP until it is ready. Dandridge testimony 9.7.22; Deville testimony 9.8.22; Patin testimony 9.8.22. Defendants' agreement that the OJJ facility at Angola is inadequate to accept youth and purported commitment to delaying until it is ready implies that any security concerns or problems with still-existing OJJ facilities "may not be as urgent as [Defendants previously] suggested," demonstrating that "the issuance of a preliminary injunction would [not] be adverse to the public interest." *S.W. Shattuck Chem. Co. v. City & Cnty. of Denver, Colo.*, 1 F. Supp. 2d 1235, 1240 (D. Colo. 1998). The risks of harm to Plaintiff and youth who may be moved to LSP and public interest considerations therefore strongly outweigh any potential harm to the public interest.

## VII. Conclusion

For the foregoing reasons, Plaintiff respectfully requests that this Court grant his motion for a preliminary injunction.

Respectfully submitted, this 14th day of September, 2022.

/s/: *David J. Utter*
DAVID J. UTTER **
Louisiana Bar Number: 23236
WILLIAM R. CLAIBORNE
Georgia Bar Number: 126363
THE CLAIBORNE FIRM, P.C.
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
david@claibornefirm.com
will@claibornefirm.com

/s/: *Christopher J. Murell*
CHRISTOPHER J. MURELL
Louisiana Bar Number: 32075
MURELL LAW FIRM
2831 St. Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 Telephone
(504) 233-6691 Facsimile
chris@murrell.law

/s/: *Hector Linares*
HECTOR LINARES
Louisiana Bar Number: 28857
SARA GODCHAUX
Louisiana Bar Number: 34561
STUART H. SMITH LAW CLINIC
LOYOLA UNIVERSITY NEW ORLEANS
COLLEGE OF LAW
7214 St. Charles Avenue, Box 902
New Orleans, Louisiana 70118
(504) 861-5560 Telephone
(504) 861-5440 Facsimile
halinare@loyno.edu
shgodcha@loyno.edu

/s/: *Ronald Haley*
RONALD HALEY
Louisiana Bar Number: 30900
HALEY & ASSOCIATES
8211 Goodwood Blvd., Suite E
Baton Rouge, Louisiana 70806
(225) 755-9935 Telephone
(888) 900-9771 Facsimile
rhaley@ronaldhaleylawfirm.com

/s/: *David Shanies*
DAVID SHANIES
New York Bar Number: 4471140
SHANIES LAW OFFICE
110 West 40th Street
Tenth Floor
New York, New York 10018
Tel (212) 951-1710
Fax (212) 951-1350
Cell (646) 515-2151
david@shanieslaw.com

/s/ *Nancy Rosenbloom*
NANCY ROSENBLOOM
New York Bar Number: 2168425
ADITI SHAH
New York Bar Number: 5886254
TAMMIE GREGG
MN Bar Number: 026240
ACLU NATIONAL PRISON PROJECT
125 Broad Street
New York, NY 10004
Telephone: (202) 393-4930
Facsimile: (202) 393-4931
nrosenbloom@aclu.org
ashah@aclu.org

*** Lead Counsel*

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of September, 2022, a copy of the foregoing pleading was served upon all counsel of record by electronic transmission.

/s/ *David J. Utter*
DAVID J. UTTER