IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ALEX A., by and through his guardian, MOLLY SMITH individually and on behalf of all other similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS, in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections, <br><br> Defendants. | Civ. A. No. 3:22-CV-00573-SDD-RLB <br><br> **DEFENDANTS' POST-HEARING BRIEF** |

COME NOW, through undersigned counsel, Defendants John Bel Edwards, in his official capacity as Governor of Louisiana; William Sommers, in his official capacity as Deputy Secretary of the Office of Juvenile Justice; and James M. LeBlanc, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections (collectively "Defendants") and respectfully submit this post-hearing brief following the evidentiary hearing on Plaintiff's Motion for Preliminary Injunction (Doc. 9, the "Motion"), held before this Honorable Court on September 6-8, 2022.

## I.     INTRODUCTION

Plaintiff's Complaint and Motion asserted a request for relief on an emergency basis to prevent OJJ from transferring youth to the Louisiana State Penitentiary at Angola (LSP-Angola), alleging that youth would be housed with dangerous adult inmates and would be denied necessary

rehabilitation, education, and medical services.

After a full evidentiary hearing, it is clear that OJJ has developed and is carrying out a comprehensive plan to safely and securely house youth at a dedicated youth facility, Bridge City Center for Youth at West Feliciana (BCCY-WF), to be located on the sprawling 18,000-acre property of LSP-Angola. BCCY-WF youth will have zero contact with adult inmates of LSP-Angola, and BCCY-WF youth will continue to receive all services that they currently receive at other OJJ secure care facilities, without interruption.

It is further clear that Plaintiff had no credible basis upon which to rely to support his allegations in the Complaint and Motion. And, important here, it is clear that Plaintiff has failed to carry his burden to establish entitlement to injunctive relief.

Based upon the evidence presented at the evidentiary hearing, the Court should deny Plaintiff's Motion for injunctive relief.

## II.   PLAINTIFF'S REQUEST FOR AN INJUNCTION

### A.   Plaintiff's Stated Basis for Emergency Injunctive Relief

Plaintiff's Complaint (Doc. 1) and Memorandum in Support of Emergency Motion for Temporary Restraining Order (Doc. 9) alleged that Defendants were actively moving, or would immediately move, Plaintiff and dozens of his peers currently housed in OJJ secure care youth facilities to the Louisiana State Penitentiary ("LSP") adult prison facility at Angola.[1] Plaintiff claimed that youth transferred to LSP would be incarcerated with "five thousand [adult] men," more than 84 percent of whom are "locked up for crimes of violence."[2] Plaintiff cited to "decades

---

[1] *See generally* Doc. 1 at 4 (demanding that "any youth who have already been transferred to LSP be transferred back to BCCY or another appropriate OJJ facility for youth"), *id.* at 6 (alleging Plaintiff would be "imminently moved to LSP"). *See also* Doc. 9 at 5 (explaining "[t]ime is of the essence" as the transfer of youth will occur "any day now"), *id.* at 11 (asserting Plaintiff, along with approximately 24 other youth "will be imminently transferred to LSP").
[2] Doc. 1 at 2; Doc. 9 at 3.

2

of research" that demonstrate the "serious harms youth experience when they are incarcerated in adult jails and prisons," including increased risks of sexual assault and trauma, exacerbated mental health challenges, and suicide.[3]

Plaintiff stated he has experienced "significant mental and physical harm, including increased difficulty sleeping and extreme stress" since hearing on the television news that he would be moved to LSP.[4] He expressed "fears that he will be subjected to unsafe conditions and violence" at LSP and "that he will not receive the same level of treatment, counseling, and education" he currently receives at the OJJ secure care facility at Bridge City.[5] His initial Declaration claimed that his peers are also "terrified" and "break down and cry because of their fear of being moved to LSP."[6] Plaintiff's mother stated she is "terrified that [upon transfer] her son will be locked in a windowless cell for 24 hours a day" and fears his "expos[ure] to adults who are incarcerated at LSP."[7] She also said she is concerned that, at LSP, Plaintiff will be "deprived of the education, medical and mental health treatment, and rehabilitative services he requires."[8]

## B. Evidence Attached to Plaintiff's Motion for Injunctive Relief

Plaintiff provided the following as the sum total of evidence supporting his need for emergency injunctive relief:

- Affidavit of Plaintiff, expressing fear based on speculation he would be moved to Angola;[9]

- Affidavit of Plaintiff's mother, expressing fear based on speculation that Plaintiff would be moved to Angola;[10]

---

[3] Doc. 1 at 8; Doc. 9 at 9.
[4] Doc. 9 at 12.
[5] *Id.* at 12-13.
[6] *Id.* at 13.
[7] *Id.*
[8] *Id.*
[9] *See* Doc. 8-1.
[10] *See* Doc. 9-6.

65720526.v1

- Affidavit of Glenn Holt, disgruntled former employee of OJJ, expressing concerns about moving youth to Angola without any supporting knowledge of OJJ's plan for the development of a fully-separate youth facility, Bridge City Center for Youth at West Feliciana (BCCY-WF), to be located on Angola's 18,000-acre property;[11]

- Plaintiff's emergency administrative remedy procedure form and OJJ's written denial of Plaintiff's request for emergency relief, given that Plaintiff "is not subject to any immediate risk of harm" or any "substantial risk of imminent personal injury or serious and irreparable harm" and therefore did not qualify for emergency administrative procedures;[12]

- Hearsay records constituting responses to public records requests issued in early August to OJJ, the Louisiana Special School District, and the Louisiana Department of Public Safety and Corrections pertaining to the relocation of youth in OJJ custody to LSP;[13]

- Hearsay correspondence from the Louisiana Center for Children's Rights to OJJ regarding the Center's "profound concern about the recent decision to move vulnerable students in OJJ's custody to the [LSP] at Angola," and OJJ's response providing assurance that OJJ was currently developing a comprehensive plan for providing services to youth who will be placed at BCCY-WF, that "[y]outh will not be moved until all services are in place," and that more information will be provided once finalized;[14]

- Hearsay correspondence signed by 48 non-parties to Louisiana Governor John Bel Edwards and Louisiana Supreme Court Chief Justice John Weimer, noting the senders' "outrage" at the decision to move youth to LSP at Angola;[15] and

- A July 19, 2022 press release from the Office of the Governor regarding the transfer of youth to BCCY-WF, which expressly stated that youth would be kept "in separate facilities from adult inmates at all times," that the youth would be "completely isolated and apart from the rest of the campus," and that the youth "will continue to receive all of the services they currently receive through OJJ, including education."[16]

Based on the above, Plaintiff asked this Court for emergency injunctive relief to "preven[t] Defendants from moving Plaintiff and other youth to LSP."[17] Specifically, Plaintiff sought, among other relief, a declaratory judgment that Defendants are violating Plaintiff's and Class Members'

---

[11] *See* Doc. 9-1.
[12] *See* Doc. 8-2.
[13] *See* Doc. Nos. 9-3, 9-4, 9-5.
[14] *See* Doc. 9-8.
[15] *See* Doc. 9-9.
[16] *See* Doc. 9-10.
[17] *See* Doc. 9 at 2.

65720526.v1

constitutional rights "by transferring them to a notoriously dangerous maximum security adult prison, LSP, without a plan to provide counseling, education, other rehabilitative services, and sufficient safety from adult people incarcerated at LSP" and sought a temporary restraining order, preliminary injunction, and permanent injunction "requiring Defendants to cease plans to transfer Plaintiff and Class Members to LSP, and to immediately release or transfer the Plaintiff and any Class Members who have already been moved to LSP back to one of OJJ's secure care facilities."[18] The Court denied the requested emergency temporary restraining order[19] but held a full evidentiary hearing on Plaintiff's motion for preliminary injunction.[20]

Based on the evidence introduced at the hearing, and applying that evidence against the legal standard for an injunction, the Court should deny Plaintiff's request for injunctive relief.

### III.   THE EVIDENTIARY HEARING

#### A.   Overview of Evidence Revealed at the Hearing

The evidence introduced at the hearing established several critical undisputed facts:

- BCCY-WF is an OJJ facility that is wholly separate from adult facilities at LSP-Angola.

- Youth housed at BCCY-WF will not be within the sight and sound of adults housed at LSP-Angola.

- The move of youth to BCCY-WF is not imminent. There is no date set for the transfers to occur.

- Before any youth are transferred to BCCY-WF, OJJ will ensure that the facility is structurally ready, that appropriate numbers of staff are hired and trained, and that all services (including medical, education, rehabilitation, recreation, etc.) provided to youth at their current OJJ secure care facilities will continue to be provided at BCCY-WF, without interruption.

- Youth who will ultimately be transferred to BCCY-WF are in need of focused services and therapies provided in an OJJ Transitional Treatment Unit (TTU). These youth are

---

[18] *See* Doc. 1 at 13-14.
[19] *See* Doc. 15.
[20] *See* Doc. Nos. 67-69.

65720526.v1

- currently engaged in a pattern of youth-on-youth assault, youth-on-staff assault, property destruction, escape (leading to the youth committing criminal acts in the community including robbery and assault with a firearm), and other behaviors that meet the criteria for transfer to a TTU.

- The current OJJ secure care facilities are structurally insufficient and inappropriate in design to safely and securely house Youth who are in need of treatment within a TTU.

- OJJ has a rational basis to establish a TTU at BCCY-WF and to transfer Youth in need of TTU services to that facility.

- BCCY-WF is a temporary solution to house Youth who require TTU services while OJJ completes construction of a new TTU facility at OJJ's Swanson-Monroe campus.

- The physical facility at BCCY-WF is an unfinished work in progress. There is a clear and detailed plan to complete the facility so that it is sufficient to immediately provide all security, medical services, educational services, programming, and behavioral intervention needs upon transfer of youth to BCCY-WF.

**B.     What Plaintiff Must Prove**

To demonstrate entitlement to injunctive relief, Plaintiff must establish: "(1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) that the injunction will not disserve the public interest." *Gumns v. Edwards*, No. 20-231-SDD-RLB, 2020 WL 2510248, at *3 (M.D. La. May 15, 2020) (Dick, C.J.) (citations omitted) (noting common standards for temporary restraining order and preliminary injunction); *see also Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). The first two factors are most critical. *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016). Plaintiff is required to "clearly carry the burden as to all four elements"; failure to do so requires a denial of the motion. *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003); *see Sacal-Micha*, 449 F. Supp.3d at 662.

In the specific context of injunctions against incarceration facilities, based on the Prison Litigation Reform Act, "preliminary injunctive relief must be narrowly drawn, extend no further

than necessary to correct the violation of the federal right, and be the least intrusive means necessary to correct the harm." *Gumns*, 2020 WL 2510248, at *3 (citations omitted). Public policy, and the Supreme Court, counsels federal courts to "eschew toward minimum intrusion into the affairs of state prison administration." *Id.* (citing, *inter alia*, *Mecham v. Fano*, 427 U.S. 215, 228-229 (1976) (warning against judicial decisions regarding "the day-to-day functioning of state prisons and involv[ing] the judiciary in issues and discretionary decisions that are not the business of federal judges")). Stated differently, "[w]hen weighing any form of injunctive relief, federal courts must be mindful not to jump at the chance to take prison administration into their own hands and out of the hands of the people entrusted with such tasks by the state." *Id.* (citations omitted).

C.  **Evidence Applied to the Required Elements of Plaintiff's Claim**

   1.  **Plaintiff is highly unlikely to succeed on the merits of a Section 1983 claim.**

Plaintiff's Complaint (Doc. 1) asserts claims pursuant to 42 U.S.C. § 1983 for "unlawful conditions of confinement and deprivation of due process." *See* Compl. (Doc. 1) at 13.[21] Liability under Section 1983 requires that prison officials act with deliberate indifference to a substantial risk of serious harm. *See generally Gumns*, 2020 WL 2510248 (analyzing Section 1983 claims under Eighth and Fourteenth Amendments).[22] Deliberate indifference is "an extremely high standard to meet." *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020) (citation omitted). Proof of negligence, or even gross negligence, is not enough. *Hare*, 74 F.3d at 645 (deliberate

---

[21] Importantly, the OJJ is the state body responsible for Youth who have been adjudicated delinquent and has full control of all juvenile institutions, facilities, and programs under its administration. La. R.S. § 15:905(A). The deputy secretary for youth services shall establish all rules and regulations for the placement, care, and treatment of Youth in the custody of the OJJ. *Id.* at 905(B). The OJJ has sole authority over the placement, care, treatment, or any other considerations deemed necessary from the resources that are available for children judicially committed to the Department. La. Ch. Code art. 908(A); *State in Interest of S.T.*, 97-0216, p. 3 (La. App. 1 Cir. 9/19/97), 699 So. 2d 1128, 1129, *writ denied*, 97-2627 (La. 2/13/98), 706 So. 2d 992.

[22] *See also generally Jones v. Tex. Dep't of Crim. Justice*, 880 F.3d 756 (5th Cir. 2018) (discussing deliberate indifference in Eighth Amendment claim); *Estate of Pollard v. Hood County, Tex.*, 579 Fed. App'x 260 (5th Cir. 2014) (discussing deliberate indifference in Fourteenth Amendment claim).

indifference must be a "step up" from "mere or even gross negligence," or otherwise the standard is rendered "meaningless"). Relevant to Plaintiff's claim here, apprehension regarding confinement does not imply unconstitutional confinement conditions. Instead, deliberate indifference requires deprivation of "basic human needs." *Valentine*, 956 F.3d at 801.

A two-part test applies to determine whether a defendant has acted with deliberate indifference under Section 1983. *Id.* (citation omitted). First, the plaintiff must establish an "objectively intolerable risk of harm." *Id.* Second, the plaintiff must establish the defendant acted with subjective indifference to that risk; that is, the defendant: "(1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively dr[e]w the inference that the risk existed; and (3) disregarded the risk." *Id.* (citations and quotations omitted).

      *i.*    *<u>There is zero evidence of an objectively intolerable risk of harm.</u>*

Plaintiff generally claimed the following risks of harm in placing youth at BCCY-WF: (1) risk of contact between adult inmates at LSP-Angola and youth offenders at BCCY-WF, including potential violations of the sight/sound prohibition contained in the Juvenile Justice Delinquency and Prevention Act (JJDPA) and the potential assault and sexual assault of youth by adult inmates; (2) risk of removal or decline in youth services at BCCY-WF, such as education, medical, rehabilitative, and recreational services due to understaffing; (3) risk that youth will be housed in unfinished and unfit facilities at BCCY-WF; (4) risk that DOC staff at LSP-Angola will run BCCY-WF; and (5) risk of excessive solitary confinement.[23]

Undisputed witness testimony established there is zero risk of these alleged harms:

---

[23] *See generally* Complaint (Doc. 1) and Memorandum in Support of Motion for Emergency TRO (Doc. 9).

- There will be virtually zero sight or sound (or any other) contact between adult inmates housed at LSP-Angola and youth offenders housed at BCCY-WF.[24] There is no risk of adult inmate contact or assault and no evidence to support that allegation.

- There is no risk of a removal or decline in services and no evidence to support that allegation. Before any youth are transferred to BCCY-WF, OJJ will ensure that the facility is structurally ready, that appropriate numbers of staff are hired and trained, and that all services (including medical, education, rehabilitation, recreation, etc.) provided to youth at their current OJJ secure care facilities will continue to be provided at BCCY-WF, without interruption.[25]

- There is no risk that youth will be transferred to BCCY-WF before it is finished and before sufficient modifications are made to house youth offenders.[26] While the physical facility at BCCY-WF is an unfinished work in progress, there is a clear and detailed plan to complete the facility so that it is sufficient to immediately provide all security, programming, and behavioral intervention needs upon transfer of youth to BCCY-WF.[27] The undisputed testimony and evidence was that no Youth will be transferred to BCCY-WF until the facility is ready to receive them.

- OJJ staff, <u>not</u> Louisiana Department of Corrections (DOC) staff, will operate BCCY-WF. BCCY-WF is not part of LSP-Angola. The role of DOC officers at BCCY-WF will be extremely limited and DOC officers will provide staffing support at BCCY-WF only upon express requested and authorization by OJJ. In the event DOC staff are utilized at BCCY-WF in any capacity, OJJ will provide training to DOC staff on policies and procedures applicable to serving youth populations.[28] There is no risk that untrained DOC staff will oversee youth at BCCY-WF and no risk that DOC will run BCCY-WF.[29]

- Youth will only be confined to their cells while sleeping at night and, in any event, no longer than is prescribed by law.

---

[24] *See generally* testimony of OJJ Assistant Secretary Curtis Nelson and Executive Management Advisor Deron Patin. Furthermore, as Plaintiff's own expert Mr. Vincent Schiraldi admitted, the JJDPA does not prohibit any "rare" or "inadvertent" sight and sound contact that could possibly occur between LSP-Angola adult inmates and BCCY-WF youth offenders.

[25] *See generally* testimony of OJJ Assistant Secretary Curtis Nelson, Deputy Secretary Bill Sommers, Director of Health Services Denise Dandridge, Director of Education Shenell Deville, Program Manager Angela Bridgewater, and Executive Management Advisor Deron Patin.

[26] Plaintiff's expert Vincent Schiraldi admitted that he toured the facility in its unfinished state and admitted that work was ongoing – but repeatedly judged the facility in its current form as of the date of his only tour. When asked if he knew the ultimate plan for the finished facility and the programs to be administered within it, Schiraldi admitted he had no such knowledge. *See generally* testimony of Pl.'s expert Vincent Schiraldi.

[27] *See generally* testimony of OJJ Assistant Secretary Curtis Nelson, Deputy Secretary Bill Sommers, Director of Health Services Denise Dandridge, Director of Education Shenell Deville, Program Manager Angela Bridgewater, and Executive Management Advisor Deron Patin.

[28] *See generally* testimony of DOC [title] Meghan Gagnard and OJJ Executive Management Advisor Deron Patin.

[29] Moreover, Plaintiff's expert Mr. Schiraldi admitted that there is no industry standard that advises against hiring of officers who have worked in an adult facility to subsequently work in a youth facility, as long as those officers are properly trained. *See generally* testimony of Pl.'s expert Vincent Schiraldi.

65720526.v1

Based on the above, Plaintiff failed to introduce any evidence demonstrating an objectively intolerable risk of any of the harms asserted in his Complaint or Motion for injunctive relief. Not only did Plaintiff fail to present any such evidence, but Defendants affirmatively and conclusively refuted each of Plaintiff's allegations with undisputed witness testimony.

After all of the original allegations were dispelled by the evidentiary record, Plaintiff pivoted to a different argument: whether it constitutes "irreparable harm" to the youth's mental health to be housed at BCCY-WF due to the facility's location on the (albeit sprawling) property of "Angola" and the more prison-like aesthetics of BCCY-WF as compared to OJJ's existing secure care youth facilities.

To prop up this last minute argument, Plaintiff resorted to pure inflammatory rhetoric, continually referring to BCCY-WF as "old death row" or "the hole," a tactic intended to distract from the total lack of evidence that any youth will be mentally or emotionally affected simply by being on the LSP campus or being housed in a prison-like setting. Instead, Plaintiff came forward with nothing but conjecture.

The only two witnesses who spoke on this issue were Plaintiff's child psychology expert Dr. Monica Stevens and Plaintiff's juvenile detention expert Mr. Vincent Schiraldi. Neither offered competent evidence to support the new theory.

Dr. Stevens testified that she does not personally like the decision to move youth to BCCY-WF, but she offers no diagnosis of Plaintiff, no prognosis of Plaintiff, and no testimony that Plaintiff will suffer any particular symptom causally related to being housed on campus at "Angola." She has spent a total of 30 minutes with Plaintiff, all via Zoom. She has no knowledge of Plaintiff's medical or psychiatric history, no knowledge of his family history, and no knowledge of his experiences while in OJJ's custody or before he entered OJJ's custody. Dr. Stevens admitted

10

that she claims no expertise in corrections and has never been to Angola or even seen photographs of it. Her position is mostly grounded in folklore – for example, she is from Mississippi and has heard about "Angola." Perhaps most importantly, she ultimately characterized her own testimony as "speculation."

Mr. Schiraldi does claim expertise in youth corrections but admits that moving youth to BCCY-WF violates no laws and violates no accepted industry standard for juvenile detention. He merely characterizes or criticizes the transfer of youth to BCCY-WF as "unique" or "unusual" and inconsistent with the "Missouri model" (a model he prefers but admits is not the prevailing standard in the United States). Mr. Schiraldi has no literature—medical or otherwise—to support his position that youth should not be housed in a facility that formerly housed adults and he admits no such literature exists. While he is not a doctor or health care professional and claims no such expertise, he took the liberty of offering a short list of articles on the risks of placing youth offenders within "adult prisons." However, he readily conceded under cross-examination that articles he cited are irrelevant here because they pertain to situations where youth and adults are actually housed together (unlike BCCY-WF where the youth facility will be completely separated from the adult inmate facilities). Overall, his testimony can be summarized as a lecture in what he considers to be best practices based on Mr. Schiraldi's own preferences,[30] not according to accepted industry standards or minimum constitutional standards.

Furthermore, to the extent Plaintiff was able to put on any evidence that merely being housed at "Angola," presents some risk of mental stress, Plaintiff's own testimony confirmed he is experiencing no harm on such a basis. Rather, Plaintiff testified unequivocally that his only concern about BCCY-WF is the risk of being assaulted by adult inmates. Plaintiff testified that if

---

[30] The majority of Mr. Schiraldi's testimony involved recalling his own work at youth facilities in Missouri and Rikers Island, which are not relevant to this case.

65720526.v1

convinced he will <u>not</u> be assaulted by adult inmates, then he will no longer be afraid of a transfer to BCCY-WF. He testified that he is now sleeping well. He also admitted that, while he was concerned about the move to BCCY-WF, he was not concerned enough to ask OJJ staff members[31] whether he will be transferred to BCCY-WF and, if so, what the environment will be like. Finally, when asked how other youth within his current facility have reacted to the rumors of a potential transfer to BCCY-WF, Plaintiff said, in direct contradiction to his Complaint, they "don't care."

This falls far short of "clearly carrying" the burden to establish an objectively intolerable risk of harm. Plaintiff cannot meet part one of the two-part test to state an actionable a Section 1983 claim. The injunction must be denied.

### ii. *Even if there was credible proof of some risk of harm (and there is none), there is no evidence that Defendants were deliberately indifferent to any risk.*

Momentarily setting aside Plaintiff's failure to establish an intolerable risk of harm, Plaintiff also failed to establish that Defendants were deliberately indifferent to any such risk.

As to medical services, OJJ Director of Health Services Denise Dandridge testified about (among other things) OJJ's contract with third party vendors to deliver medical care and ambulatory services to youth housed at BCCY-WF. She described the dedicated spaces at BCCY-WF for appropriate on-site medical facilities and clearly confirmed that BCCY-WF will not utilize LSP-Angola medical facilities.

As to education, OJJ Director of Education Shenell Deville testified about (among other things) OJJ's education and special education services to be provided at BCCY-WF. She described OJJ's legal and contractual obligations to work with the Louisiana Special School District to provide such services to BCCY-WF youth, described the facilities at which educational services

---

[31] Plaintiff comments that he trusts OJJ staff members and has positive relationships with many of them. He went so far as to refer to one staff member as "like a mother" to him. *See generally* testimony of Plaintiff Alex A.

65720526.v1

will be offered, confirmed the facility will have internet access but will provide in-person instruction similar to other OJJ secure care facilities, outlined the academic annual and daily calendars, and confirmed the staffing patterns and teacher-student ratios to be employed, all in compliance with federal and state education laws and regulations.

As to programming, OJJ Program Manager Angela Bridgewater testified about (among other things) the provision of food services to BCCY-WF, confirming that LSP-Angola inmates would not be used to deliver meals to BCCY-WF. She confirmed that counseling and related programming will continue at BCCY-WF, just as it is offered at the youth's current secure care facilities. She explained that BCCY-WF will follow OJJ policies concerning recreational activities for the youth, outlined the recreation schedule, and described the recreation options that will be available. She confirmed that BCCY-WF youth will have daily communication opportunities with family via phone or video calls and weekly in-person visitation. She described the goals and phases of TTU programming and the specific TTU services to be provided at BCCY-WF, as well as the training staff will receive to provide such services in compliance with OJJ policies.

OJJ leadership Deputy Secretary William Sommers, Assistant Secretary Curtis Nelson, and Executive Management Advisor Daron Patin confirmed the comprehensive plans outlined by staff above and discussed their management roles in carrying out these plans. Most importantly, each of these witnesses testified repeatedly and consistently about their passion for and dedication to OJJ's purpose and goal of rehabilitating youth within their care and custody.

In sum, the record evidence demonstrates that the OJJ team has worked diligently to develop and carry out a comprehensive plan to safely and securely house youth at BCCY-WF and to provide all necessary services in the interim while OJJ constructs a new facility at Swanson-

Monroe to permanently house and service the specific needs of this youth population. There is zero evidence of deliberate indifference here.

Having failed to establish any risk of harm (much less an intolerable risk) and having failed to establish deliberate indifference to any such harm, Plaintiff is highly **un**likely to succeed on the merits of this Section 1983 claim. The Court should deny the injunction.

### 2. There will be no irreparable injury if the Court denies the injunction.

As discussed above, Plaintiff has failed to put on any evidence of an intolerable risk of harm or injury for purposes of the merits of his Section 1983 claim. But furthermore (and relatedly), for purposes of establishing entitlement to injunctive relief, Plaintiff has also failed to put on any evidence of any <u>irreparable</u> injury if the Court denies the injunction.

The Fifth Circuit has explained the heavy burden to establish <u>irreparable</u> harm or injury where adequate relief is available under the plaintiff's asserted cause of action:

> Federal courts have long recognized that, when 'the threatened harm is more than de minimis, **it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction**.'" *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir.1985) … (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 575 (5th Cir.1974)). It is thus well-established that **an injury is irreparable only "if it cannot be undone through monetary remedies."** *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984); *see also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir.1981); Spiegel v. City of Houston, 636 F.2d 997, 1001 (5th Cir.1981); *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction], are not enough. **The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm**." *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir.1975) (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir.1958)).

*Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (emphasis added). *See also Howard v. Town of Jonesville*, 935 F. Supp. 855, 859 (W.D. La. 1996) (where a

"broa[d] range of remedies will be available to plaintiff under 42 U.S.C. § 1983," her "largely conclusory allegations [of] irreparable harm … are simply not of a magnitude to justify a preliminary injunction. … [P]laintiff's request for preliminary injunctive relief at this stage of the proceedings must be dismissed").

Here, Plaintiff's experts speculated (at best) that Plaintiff and other youth may experience mental health harm simply by being housed at "Angola," but offered zero testimony – and no support in the form of scholarly articles, accepted industry standards, or other professional research – that a <u>temporary</u> housing assignment at BCCY-WF will cause <u>irreparable</u> harm. As a matter of law, Plaintiff is required not only to show potential harm – but <u>irreparable</u> harm. Plaintiff has not done so. The injunction must be denied.

  **3.** <u>**Serious harm will occur if the Court grants the injunction.**</u>

The youth who may be transferred to BCCY-WF are continually assaulting one another, continually assaulting staff, continually destroying property to the point that housing units are uninhabitable, and continually escaping or attempting to escape – and when successful, are committing dangerous crimes in the community. These youth are currently exhibiting behaviors that, if continued, will place them on a path to permanent incarceration.

OJJ's TTU program at BCCY-WF is designed to <u>help</u> (not harm) these youth. The program provides intensified, targeted rehabilitative services and therapies to assist the youth who are not responding to OJJ's standard programming. If an injunction issues in this case, these youth will be prevented from receiving the focused services and therapies that they desperately need and that a TTU can provide – and the youth's assaults, property destruction, escapes, and other criminal activity will continue. Indeed, an injunction in this case will defeat the very purpose of the OJJ's TTU program—to teach the youth to overcome their maladaptive behaviors, to re-enter traditional

15

OJJ secure care facilities, and ultimately to return to their homes and communities as productive members of society.

If the goals and purposes of the OJJ TTU program are thwarted by an injunction, then there will be an increased likelihood of the youth engaging in criminal conduct that may ultimately lead to incarceration. Similarly, if an injunction is issued prohibiting the placement of the TTU at BCCY-WF, then there will be an increased likelihood of future physical injury to Youth, OJJ staff, and the community when the youth (including but not limited to Plaintiff[32]) repeat the above patterns of behavior that they have already exhibited.

These youth cannot be effectively rehabilitated unless they can first be securely housed in a facility such as BCCY-WF (and ultimately, Swanson-Monroe) that allows OJJ staff to control and monitor the youth's activity and prevent the youth from engaging in violence, property destruction, or escape attempts while their therapy is ongoing.

### 4.     The public interest counsels the Court to deny the injunction.

It is well-established that courts routinely advise against judicial intervention in the day-to-day operation of correctional facilities. As long recognized in the Fifth Circuit, courts are not in "a position to monitor day-by-day changes that affect rehabilitation programs." *Morales v. Turman*, 562 F.2d at 996. Intervention on this issue is "a significant federal intrusion into a state's affairs," where "[s]tate governments have wide discretion." *Id.* at 996. The point is, judicial intervention generally – much less combined with the specific facts of this case – is against the public interest.

---

[32] Plaintiff admitted in his testimony that he has been written up multiple times for assault, escapes, rioting, and public masturbation. He also admitted that he has anger issues that cause homicidal thoughts and tendencies and that he considers (and believes he is capable of) killing staff members or other youth within the OJJ facility. *See generally* testimony of Plaintiff Alex A.

16

Affecting the case specifically, the public has a vested interest in the future of these youth and in their effective rehabilitation. It is OJJ's obligation to prepare these youth for re-entry into the community so that they may be productive members of society. If youth cannot achieve this goal, it costs the public in the form of increased crime, increased risk of property loss and personal injuries, and increased public dollar spending. Preventing OJJ from doing its job is against the public interest.

And most obviously, the public has an interest in maintaining public safety. OJJ's work is, in large part, a function of public safety. OJJ certainly seeks to provide necessary programs and services so that the youth are ultimately able to go back home, but while those therapies are ongoing, OJJ must ensure the youth are securely detained in order to protect other youth and staff within the facility and to protect the public at large. An injunction will handicap OJJ's ability to prevent youth assaults and riots inside the facility, as well as youth escape and criminal activity in the neighboring communities.

## IV.     CONCLUSION

For all these reasons, Plaintiff's Motion (Doc. 9) and request for preliminary injunction should be denied.

Dated: September 14, 2022

                                              Respectfully submitted,

                                              Respectfully Submitted:

BY:   */s/ Allena McCain*
        Connell Archey (#20086)
        Randal J. Robert (#21840)
        Allena McCain (#38830)
        Madaline King (#38301)
        BUTLER SNOW LLP
        445 North Boulevard, Suite 300 (70802)

P.O. Box 2997
Baton Rouge LA  70821-2997
Telephone:	(225) 325-8700
Facsimile:	(225) 325-8800
Connell.Archey@butlersnow.com
Randy.Robert@butlersnow.com
Madaline.King@butlersnow.com
Allena.McCain@butlersnow.com

Counsel for Defendants
GOVERNOR JON BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS, in his official capacity as Deputy Secretary of the Office of Juvenile Justice; and JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections

65720526.v1

## **CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the above and foregoing has this day been filed electronically with the Clerk of Court using the CM/ECF system, which will deliver notice of this filing to all counsel of record.

    Baton Rouge, Louisiana this 14th day of September, 2022.

                                            */s/ Allena McCain*

65720526.v1