## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

ALEX A., by and through his guardian,
MOLLY SMITH, individually and on behalf
of all others similarly situated                                    CIVIL ACTION

VERSUS                                                              22-573-SDD-RLB

GOVERNOR JON BEL EDWARDS,
in his official capacity as Governor of Louisiana;
 WILLIAM SOMMERS, in his official
capacity as Deputy Secretary of the
Office of Juvenile Justice,
JAMES M. LEBLANC, in his official capacity
 as Secretary of the Louisiana Department
of Public Safety & Corrections

### RULING

      This matter is before the Court on the *Motion for Temporary Restraining Order*,[1]

filed by Alex A., by and through his guardian, Molly Smith ("Plaintiff"), which also included

a request for injunctive relief.  Defendants, Governor Jon Bel Edwards, in his official

capacity as Governor of Louisiana, William Sommers ("Sommers"), in his official capacity

as Deputy Secretary of the Office of Juvenile Justice ("OJJ"), and James M. Leblanc, in

his official capacity as Secretary of the Louisiana Department of Public Safety &

Corrections ("DOC")(collectively "Defendants"), filed an *Opposition*[2] to Plaintiff's motion.

The Court denied Plaintiff's *Motion for Temporary Restraining Order*[3] and set the matter

_____

[1] Rec. Doc. No. 3.
[2] Rec. Doc. No. 28.
[3] Rec. Doc. No. 15.

for a Preliminary Injunction hearing,[4] which was held on September 6 through September 8, 2022.[5] The Parties were granted leave to file post-hearing memoranda.[6]

This case presents an untenable proposition to house adolescents, some as young as 12 years old, who have been determined to be juvenile delinquents, at the notorious Angola Penitentiary in a cell block which once housed death row inmates. A few of the adolescents adjudicated as "delinquent" and placed in the secure care of the OJJ present formidable security and safety risks. OJJ is charged with a rehabilitative, not punitive, mission. But a small handful of youth have wreaked havoc, endangering themselves, other youth, OJJ staff, and members of the general public. Ongoing and repeated acts of violent and disruptive behavior by a few has reduced OJJ to becoming security enforcers instead of rehabilitators.

For the reasons which follow, the Court finds that the Plaintiff's Motion for Preliminary Injunction shall be denied. The prospect of putting a teenager to bed at night in a locked cell behind razor wire surrounded by swamps at Angola is disturbing. Some of the children in OJJ's care are so traumatized and emotionally and psychologically disturbed that OJJ is virtually unable to provide a secure care environment. While locking children in cells at night at Angola is untenable, the threat of harm these youngsters present to themselves, and others, is intolerable. The untenable must yield to the intolerable.

The Court finds that OJJ has shown that it will provide a constitutional level of care to youth transferred to the Temporary Transitional Treatment Unit ("TTU") proposed to be

---

[4] Rec. Doc. No. 14.
[5] Rec. Doc. Nos. 67, 68, & 69.
[6] Rec. Doc. Nos. 73 & 74.

located at Angola. The Court is mindful that the specter of the prison surroundings alone will likely cause psychological trauma and harm. However, the public interest and the balance of harms require that OJJ be afforded the latitude to carry out its rehabilitative mission for the benefit of all youth in its care.

## I.    BACKGROUND

On July 19, 2022, in response to several recent incidents of serious events at OJJ secure care facilities, including riots, attempted and successful escapes, and acts of violence against staff, other youth, and members of the public, Louisiana's Governor John Bel Edwards held a press conference announcing that the state will "temporarily move" approximately 25 youth in the custody of OJJ from Bridge City Center for Youth ("BCCY"), a juvenile secure care facility, to the grounds of the Louisiana State Penitentiary at Angola ("LSP" or "Angola").[7]

On August 19, 2022, Plaintiff filed a class action complaint against the Defendants on behalf of a putative class of all current and future persons held at BCCY who might be transferred to LSP or another adult prison. Plaintiff asserts claims under the Fourteenth Amendment of the U.S. Constitution and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[8]    The Plaintiff moved for an *Emergency Temporary Restraining Order* seeking to: (1) enjoin Defendants from transferring or incarcerating Plaintiff or any proposed Class member at LSP, and (2) enjoin Defendants to immediately return any youth who may have already been transferred to LSP to BCCY or another appropriate OJJ facility for youth.[9]

---

[7] PX 7; Rec. Doc. No. 4-2, p. 1.
[8] Rec. Doc. No. 1.
[9] Rec. Doc. No. 3.  Memorandum in support filed at Rec. Doc. No. 9.

On August 23, 2022, the Court held a telephonic status conference, during which Defendants stipulated that no youth had been or would be moved to Angola until on or after September 15, 2022.[10] The Court denied Plaintiff's emergency motion for a TRO and set this matter for a Preliminary Injunction hearing.[11] The Court set expedited deadlines for discovery, including depositions and disclosure of experts.[12]  The Parties conducted limited, expedited discovery. The Preliminary Injunction hearing was held from September 6 through September 8, 2022.

## I.    PRISON LITIGATION REFORM ACT ("PLRA") EXHAUSTION

The Parties dispute whether Alex A. exhausted administrative remedies under the PLRA before filing this action.  At the Preliminary Injunction hearing, neither Plaintiff nor Defendants presented evidence on this issue, and they offered no arguments other than those previously briefed.  Thus, the Court will rule on this issue based on the pleadings before the Court.

Alex A. lodged an emergency Administrative Remedy Procedure ("ARP") grievance, which was denied.[13]  Defendants contend that, following denial of the emergency ARP, Alex A. was required to engage the general ARP procedure, which he did not do, and thus he failed to exhaust his administrative remedies.  The general ARP process takes 51 days, which Plaintiff claims would render the emergency process meaningless.

Defendants maintain that there is nothing in the ARP policy of OJJ that exempts a youth from utilizing the "still available" general ARP process before filing suit; thus,

---

[10] Rec. Doc. No. 14.
[11] *Id.*
[12] *Id.*
[13] PX 2.

Plaintiff's claims are not exhausted and not properly before the Court. The same argument advanced by the Defendants was recently rejected by another section of this Court. In *J.H. v. Edwards*,[14] Judge deGravelles noted that:

> The Fifth Circuit has explained the following about exhaustion of remedies under the PLRA:
>
> > The PLRA requires inmates to exhaust "such administrative remedies as are available" before filing suit in federal court to challenge prison conditions. 42 U.S.C. § 1997e(a). This exhaustion obligation is mandatory—there are no "futility or other [judicially created] exceptions [to the] statutory exhaustion requirements...." *Booth v. Churner*, 532 U.S. 731, 741 n.6, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001). So long as the State's administrative procedure grants "authority to take some action in response to a complaint," that procedure is considered "available," even if it cannot provide "the remedial action an inmate demands." *Id.* at 736, 121 S. Ct. 1819 (emphasis added); *see also id.* at 739, 121 S. Ct. 1819 ("Congress meant to require procedural exhaustion regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible.").
> >
> > By contrast, a remedy is not "available"—and exhaustion is not required—when:
> >
> > 1. The procedure "operates as a simple dead end" because "the relevant administrative procedure lacks authority to provide any relief," or "administrative officials have apparent authority, but decline ever to exercise it."
> >
> > 2. The "administrative scheme [is] so opaque that ... no reasonable prisoner can use them."
> >
> > 3. Or when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, —— U.S. ——, 136 S. Ct. 1850, 1859–60, 195 L.Ed.2d 117 (2016) (quotation omitted).[15]

---

[14] No. 20-293-JWD-EWD, 2020 WL 3448087 (M.D. La. June 24, 2020).
[15] *Id.* at *41 (quoting *Valentine v. Collier*, 956 F.3d 797, 804 (5th Cir. 2020)).

Turning to OJJ's ARP policy, the Court observed that: "the ARP Policy does not appear to require youth to exhaust the standard two-step procedure after they have filed an emergency procedure."[17]  OJJ's emergency ARP policy provides:

> If a youth's ARP contains statements which indicate he believes he is at immediate risk of harm and any delay in responding to the grievance would subject the youth to substantial risk of immediate personal injury or cause other serious or irreparable harm, the ARP Coordinator shall immediately forward the ARP, or that portion of the ARP which alleges substantial risk of imminent personal injury or cause serious or irreparable harm, to the Facility Director, Regional Director, and IS. The Regional Director shall provide an initial response with 48 hours and *issue a final decision with five (5) calendar days.*[18]

Based on the plain language in the ARP policy, the Court in *J.H.* reasoned: "both the ARP Policy and the youth ARP Instructions indicate that the Emergency ARP results in a 'final decision,' which would logically mean that the Youth could proceed to the 'next step' of filing suit."[19]

In this matter, without mentioning *J.H.*, Defendants endeavor to get around the Court's ruling on exhaustion by stating:

> 103. OJJ's ARP does not except Youths from addressing grievances through the standard two-step process if they do not receive emergency relief where requested. See generally ARP Policy (Doc. No. 28-1). In other words, the ARP includes no provision for complete curtailment of the two-step grievance process, even where a Youth is denied emergency relief. In fact, the ARP specifically states that a Youth may seek judicial review after the conclusion of Step 2 of its standard process but contains no such language in the emergency grievance provision. *See id*. at 9-10. Thus, the ordinary grievance process remains "available" within the meaning of the PLRA even after an inmate has sought administrative relief under an emergency grievance. *See, i.e., Brown v. Eardley*, 184 F. App'x 689, 691-92 (10th Cir. 2006) (holding administrative remedies were still available to inmate through standard grievance process even though warden did not

---

[17] *Id.*
[18] Rec. Doc. No. 28-1, pp. 3-16 (emphasis added). The same language was analyzed by Judge DeGravelles in the *J.H* case, *id.* at *43.
[19] *Id.*

respond to emergency grievances within the three days required under applicable regulations); *Brazell v. Ruh*, 2015 WL 2452410, at *3-4 (E.D. Ark. May 21, 2015) (same).[20]

Despite this argument, the ARP policy is unchanged from the policy language evaluated by Judge deGravelles in *J.H.*[21] The Court finds that the denial of Alex A.'s emergency ARP constituted a final decision upon which Plaintiff could rely in filing suit. Alternatively, the Court finds that, following a denial of the emergency ARP, the remaining procedure "operates as a simple dead end" because the second step procedure, urged by the Defendants, "lacks authority to provide any relief."[22] Furthermore, if applied as advocated by the Defendants the "administrative scheme [is] so opaque that ... no reasonable prisoner can use them."[23]

## II.    FINDINGS OF FACT

The Court has considered the Parties' pre-hearing and post-hearing briefs, the evidence admitted during the hearing, and the applicable law.[24]  The Court's credibility findings, findings of fact, and conclusion of law are set forth below pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  If any finding is in truth a conclusion of law, or if any conclusion stated is in truth a finding of fact, it shall be deemed so. Where a particular fact was controverted, the Court weighed the evidence and determined that the evidence presented by the party supporting that fact was more persuasive.

---

[20] Rec. Doc. No. 49, pp. 20-21.
[21] Rec. Doc. No. 28-1, pp. 13, 25.
[22] *Valentine*, 956 F.3d at 804.
[23] *Id*.
[24] The Court considered all exhibits filed into the record in this matter even if not specifically referred to herein.

**A. Witnesses**

1. Maghen Gagnard ("Gagnard") is the Executive Staff officer at LSP, and she reports to Warden Tim Hooper.  Gagnard testified credibly about the Memorandum of Understanding ("MOU") entered into by LSP/DOC and OJJ.[25]

2. Alex A., represented by and through his mother Molly Smith, is an adjudicated juvenile delinquent currently in the care and custody of OJJ at the Bridge City Center for Youth.[26] The Court considered Alex A.'s age (17), his learning disabilities and his history of PTSD and weighed his testimony accordingly. The Court finds that Alex A. was a good historian of his fears surrounding possible transfer to an OJJ facility on the grounds of Angola.

3. Dr. Monica Stevens ("Dr. Stevens") was accepted as an expert in the field of clinical psychology with a specialty in child psychology and trauma.[27] Since 2013, Dr. Stevens has been an Assistant Professor in the Psychology Department at Tulane, and she serves as a staff psychologist at the Children's Hospital in New Orleans, Louisiana.[28]  The Court found Dr. Stevens credible and knowledgeable in her field of expertise.

4. Dr. Denise Dandridge ("Dr. Dandridge") is a Registered Nurse with a Doctorate degree.  She has been the Director of Health Services for OJJ for 8 years.  Dr. Dandridge is responsible for the management, procurement, and oversight of all medical and mental health services for youth in OJJ custody.[29] The Court found

---

[25] 9/6/22 Testimony of Gagnard at 8:18.
[26] 9/6/22 Testimony of Alex A. at 10:11-10:13.
[27] 9/6/22 Testimony of Stevens at 11:21.
[28] *Id.*
[29] 9/6/22 Testimony of Dandridge at 2:23.

Dr. Dandridge both credible and knowledgeable about the medical and mental health services provided by OJJ and OJJ's policies and procedures regarding same.

5. Otha Curtis Nelson ("Nelson"), is the Assistant Secretary of OJJ, and reports directly to Deputy Secretary William Sommers.  Nelson has a Bachelor's Degree in Psychology from LSU, and a J.D. from Loyola Law School.  He has a long professional history working in juvenile justice and has received professional recognition and awards for his work in the juvenile justice field. As Assistant Secretary,  he is responsible for the oversight of secure facilities, probation, parole, and non-secure facilities within the OJJ. He serves on OJJ's Executive Management Team.[30]  The Court found Nelson credible and knowledgeable in the field of juvenile justice and the mission and operation of OJJ, and committed to the rehabilitation of adjudicated delinquent youth in the custody of the OJJ.

6. Vincent Schiraldi ("Schiraldi") is a Senior Fellow at the Columbia University Justice Lab and a Senior Research Scientist at the Columbia School of Social Work.  He was accepted by the Court as an expert in juvenile justice.  Schiraldi has a Bachelor's Degree in Social Psychology and a Master's Degree in Social Work from New York University.  His professional history includes experience as the Director of the Washington, D.C. equivalent of the OJJ, the Commissioner of Probation for New York City, and he ran two non-profit juvenile justice organizations, the Center for Juvenile Justice Education and the Justice Policy Institute.  He has taught courses at various universities on juvenile justice and

---

[30] 9/7/22 Testimony of Nelson.

related fields and has provided opinion testimony in the field of juvenile justice in State and Federal Courts.[31]  The Court found Schiraldi credible, knowledgeable and qualified by education, experience and knowledge to provide opinion testimony in the field of juvenile justice.

7. William Sommers, Sr. ("Sommers") is the Deputy Secretary of the OJJ.  He has a B.S. from McNeese and has worked in juvenile justice since 1987.  He started with the agency as a probation officer and subsequently promoted to many different positions within the agency, culminating in his position as Director.  He received an award for excellence in Juvenile Justice in 2015 and has contributed to several boards involved in juvenile justice. He was appointed to his current position in 2020.[32] The Court found him credible and knowledgeable in his field, passionate about juvenile justice, and committed to provide a safe and secure environment for the rehabilitation of juveniles.

8. Shenell Deville ("Deville") is the Director of Education for the OJJ.  Her responsibilities include developing policies and procedures for education services, selecting curriculum materials, developing the budget, and supporting teachers and students.  She also oversees and ensures alignment in programming for all secure care facilities, including BCCY-WF. Deville has worked in education for twenty-eight years and in special education for seven years; she has served as a principal and assistant principal; and she has served in many coordinator positions in education and special education.  She has a Bachelor's Degree in Biological Sciences, a Master's Degree in Special Education, a Master's Degree in

---

[31] 9/7/22 Testimony of Schiraldi.
[32] 9/8/22 Testimony of Sommers at 10:00, 10:20-10:23.

Curriculum & Instruction, and a number of certifications from the Louisiana Department of Education.[33] The Court found Deville credible and knowledgeable in the field of education and special education and well informed regarding OJJ's educational policies, procedures and services.

9.  Angela Bridgewater ("Bridgewater") has worked for OJJ for twenty-eight years, currently as the Detail Program Manager with oversight of treatment services, education, food services. She is the statewide LAMOD[34] coordinator.  She has a Bachelor's Degree in Social Work from Southern University and a Master's Degree in Social Work from LSU.  She is a licensed clinical social worker and a board approved clinical supervisor.[35]   The Court found Bridgewater credible and knowledgeable in her field and in her oversight of programming for OJJ.

10. Deron Patin ("Patin")  is the Executive Management Advisor with the OJJ.  He is responsible for supervising the training director, supervising the public information director, and emergency operations.  He acts as the legislative liaison for OJJ, and he handles any other special projects assigned to him, the current project being to bring BCCY-WF online. He began his career as a Juvenile Probation Officer, was promoted to Supervisor over the Probation Section, later became the Manager of a Juvenile Detention Center in East Baton Rouge Parish, and he retired in the role of Interim Director of Juvenile Services for East Baton Rouge Parish before accepting his current position with OJJ.[36]   The Court found Patin credible and

---

[33] 9/8/22 Testimony of Deville at 1:03-1:08.
[34] LAMOD is the Louisiana Model for juvenile justice which follows the Missouri Model.
[35] 9/8/22 Testimony of Bridgewater at 2:19-2:22.
[36] 9/8/22 Testimony of Patin at 3:51-3:53.

knowledgeable in the field of juvenile justice and in his current role of Executive Management Advisor.

**B. OJJ Background, Structure, and Impetus for Transfer Plan**

11. The OJJ is the state agency responsible for providing rehabilitation services to youth who have been adjudicated delinquent.[37] OJJ's Deputy Secretary for Youth services is charged with establishing all rules and regulations for the placement, care, and treatment of youth in the custody of the OJJ.[38] The OJJ has sole authority over the placement, care, treatment, or any other considerations deemed necessary from the resources that are available for children judicially committed to the Department.[39]

12. OJJ currently maintains five secure care facilities across the state: Acadiana Center for Youth at Bunkie ("ACY"), Acadiana Center for Youth at St. Martinville ("ACY-SM"), Bridge City Center for Youth ("BCCY"), Swanson Center for Youth at Monroe ("SCY" or "Swanson-Monroe"), and Swanson Center for Youth at Columbia ("SCY-C").[40]

13. Several factors inform a youth's placement in a secure care facility rather than a less restrictive facility, including (1) the violent nature of the underlying criminal act; (2) commission of a crime of sexual assault; (3) a history of repeated commission of serious crimes; and/or (4) the youth's failure to respond in a  less restrictive rehabilitation program/facility.[41]

---

[37] La. R.S. § 15:905(A).
[38] *Id*. at 905(B).
[39] La. Ch. Code art. 908(A); *State in Interest of S.T*., 97-0216, p. 3 (La. App. 1 Cir. 9/19/97), 699 So. 2d1128, 1129, *writ denied*, 97-2627 (La. 2/13/98), 706 So. 2d 992.
[40] 9/8/22 Testimony of Sommers at 10:26.
[41] 9/7/22 Testimony of Nelson at 11:21; 9/8/22 Testimony of Sommers at 10:25.

14. OJJ secure care facilities include housing dormitories, common areas, gymnasiums, outdoor recreational areas, schools, medical and counseling facilities, and dining areas.[42]

15. Most youth in OJJ secure care facilities reside in dormitories which accommodate twelve to fifteen Youth. The youth can move freely in their dormitories.[43]

16. Most youth offenders in OJJ secure care facilities have demonstrated an ability to adapt to the secure environment and comply with behavioral rules and facility policies.[44]

17. Recently there has been a significant increase in the frequency and severity of serious incidents at OJJ secure care facilities, including destruction of property, attempted and successful escapes, acts of violence against staff and other youth, and injury to a member of the public. A small population of the youth, approximately 25, have engaged in violent and destructive behavior which has caused significant disruption in OJJ's ability to deliver educational and rehabilitation services to the other youth in its custody.[45] OJJ Deputy Secretary Sommers estimates that "about five percent of the youth give us the most problems."[46]

18. Some youth have repeatedly escaped and have engaged in violent criminal behavior before being returned to OJJ.  Youth who have escaped from OJJ secure care facilities have been accused of motor vehicle theft, carjacking, burglary,

---

[42] *See generally* 9/6/22 Testimony of Gagnard; 9/7/22 Testimony of Dr. Dandrige, Nelson at 11:11-11:12; 9/8/22 Testimony of Sommers, Deville, and Patin.
[43] 9/7/22 Testimony of Nelson, generally; 9/8/22 Testimony of Sommers, generally. The Cypress Unit at Swanson Monroe is a facility providing single rooms with locking doors.
[44] 9/7/22 Testimony of Nelson at 11:04; 9/8/22 Testimony of Sommers, generally.
[45] 9/7/22 Testimony of Nelson at 11:03 -11:30; 9/8/22 Testimony of Sommers at 10:06, 10:42.
[46] 9/8/22 Testimony of Sommers at 10:36-10:37.

armed robbery, attempted murder, reckless operation of stolen vehicles, and illegal possession of handguns.[47]

19. A small percentage of the OJJ population have caused substantial property destruction across OJJ campuses, with some dorms having been destroyed to the point of being uninhabitable.[48] These youth have also become increasingly aggressive and have engaged in serious acts of violence against other youth and OJJ staff, resulting in "severely broken bones, crushed skulls, broken fingers, eye sockets" resulting, in some instances, in "lifelong injuries to some [OJJ] staff members."[49]

20. Other youth have been victimized by the high-risk youth when they try to go to sleep at night, and they have reported to Nelson that they are afraid to go to sleep at night for fear of being attacked by these high-risk youth.[50]

21. The high-risk youth have created weapons like shanks, and they have used pipes from the walls and ceilings (of facilities they have destroyed) as weapons. They have destroyed security cameras so their behavior cannot be observed by OJJ security.[51] Rival groups have emerged who fight each other, particularly during recreational time.[52]

---

[47] 9/7/22 Testimony of Nelson 11:44-11:51.
[48] *Id.* at 11:03-11:04; DX 15-40 (Unusual Recurrence Reports ("UOR") and photographs of damage to property from March 2021 through July 6, 2022).
[49] *Id.* at 11:08-11:09.
[50] *Id.* at 11:11.
[51] *Id.* at 11:12-15.
[52] *Id.*

22. In 2021, the Cypress Unit at Swanson, Monroe housed high-risk youth in need of a high level of security; the Cypress Unit provided single rooms and locking doors.[53]

23. In May 2021, the Cypress Unit was "completely destroyed" by the high-risk youth housed there.[54] Nelson testified that he had "never seen that type of destruction to any building,"[55] and the photographic evidence admitted supported this testimony.[56]

24. Having no secure location to house these youth, OJJ transferred them to the Ware facility in Alabama, but the youth destroyed that facility as well.[57]  Sommers testified that, very soon after the youth were transferred to the Ware facility, Alabama officials demanded their removal.[58]

25. More recently, on June 13, 2022, at least five youth were involved in a physical altercation outside of the school building at SCY, referred to by Nelson as a riot. At least four staff members were battered by the youth, and one staff member was transported to the hospital for treatment of injuries.[59]

26. On June 16, 2022, around 20 youth escaped their dormitory at BCCY, took over part of the facility, and caused a riot. The riot resulted in injuries requiring medical attention to at least two youth. At least one staff member was hospitalized due to injuries. Ultimately, five youth escaped the BCCY secure care facility.[60]

---

[53] *Id.* at 11:14.
[54] *Id.* at 11:03.
[55] *Id.*
[56] DX 36.
[57] 9/7/22 Testimony of Nelson at 2:44-2:45.
[58] 9/8/22 Testimony of Sommers at 10:43.
[59] 9/7/22 Testimony of Nelson at 11:44; 9/8/22 Testimony of Sommers at 10:06.
[60] *Id.*

27. On July 17, 2022, six youth escaped the BCCY facility. Five of the youth stole a truck from a nearby residence, repeatedly rammed it into a Jefferson Parish Sheriff's Deputy's vehicle,  and led officers on a short pursuit before finally crashing the stolen truck. Most of the escaped youth were apprehended, but one youth managed to get away.  The escaped youth then carjacked and shot the driver, who was critically injured and remained hospitalized at the time of the hearing.[61]

28. The high-risk youth, primarily housed at BCCY, have destroyed the facility to the point that it can no longer provide enough beds for the youth.[62]

29. Due to repairs and improvements that have become necessary, OJJ lacks high security accommodations for the high-risk youth in OJJ custody.[63]

30. OJJ is in the process making substantial repairs to the structures and reinforcement of the security infrastructure at some of its facilities.[64]

31. High-risk youth are stepped up to a higher level of secure care and therapeutic intervention in what is known as a Transitional Treatment Unit ("TTU").[65]

32. A new TTU at Swanson-Monroe is expected to come online in April 2023.[67]

33. Before the July 17, 2022 escape from BCCY, OJJ had been looking for an acceptable facility to utilize as a TTU.[68]  Specifically, OJJ had looked into options at Jetson and a jail in St. Charles Parish.[69]  No facility on the grounds of Angola was under consideration.[70]   After July 17, 2022, however, OJJ determined that

---

[61] *Id.* at 11:45-11:50.
[62] DX 1.
[63] *See generally* Testimony of Nelson & Sommers.
[64] *See generally* Testimony of Nelson, Sommers, & Patin.
[65] DX 2 & DX3.
[67] DX 1; 9/7/22 Testimony of Nelson at 9:40-9:42.
[68] 9/8/22 Testimony of Sommers at 10:03-10:04; 9/7/22 Testimony of Nelson at 11:50-11:51.
[69] 9/8/22 Testimony of Sommers at 10:04.
[70] *Id.* at 10:03.

none of the options being considered could provide the level of safety and security required to house the high-risk youth.[71]  Thus, the facility on the grounds of Angola known as the Reception Center and three other jails were considered as potential options.[72]

34. Local politics and the "not in my backyard" community reaction to the July 17, 2022 escape from BCCY, and the aftermath, contributed to the urgency to locate a facility that provided a high level of security.[73]

35. The Court finds that the evidence overwhelmingly established an immediate need for a more secure facility.[74]

**C.  The Bridge City Center for Youth at West Feliciana ("BCCY-WF") Plan**

36. In response to the need for a greater level of individualized treatment in a more restrictive housing environment, OJJ is establishing a TTU to effectively deliver its rehabilitative services.[78]

37. OJJ has begun renovations at several secure care facilities across the state, including a newly-renovated TTU at Swanson-Monroe, and these efforts continue. The new TTU at Swanson will have 72 beds and is scheduled to be completed at the end of April 2023. The TTU at BCCY-WF is a temporary placement until the Swanson-Monroe TTU is online.[80]

38. While repairs are being made at existing secure care facilities and pending the completion of the TTU at Swanson-Monroe, OJJ identified the Reception Center,

---

[71] 9/7/22 Testimony of Nelson at 2:44-2:45.
[72] 9/8/22 Testimony of Sommers at 10:05.
[73] 9/7/22 Testimony of Nelson at 9:42-9:43; 9/8/22 Testimony of Sommers at 10:05.
[74] *See* Findings of Fact Nos. 17-27.
[78] 9/8/22 Testimony of Sommers at 10:03-10:04; -11:51; DX 3.
[80]  9/7/22 Testimony of Nelson at 9:40-9:42, 9:50.

an unused building on the campus of LSP that, with minor modifications, can temporarily serve as a TTU.[81] This building was most recently used to house female inmates evacuated from the St. Gabriel Women's Prison following the 2016 flood.[82]  Before this building was repurposed to serve as the Reception Center, it was the death row cell block at LSP.[83]

39. The proposed temporary TTU at Angola is to be called Bridge City Center for Youth at West Feliciana ("BCCY-WF").[84]

40. While far from ideal, the Court finds that the BCCY-WF location has adequate physical facilities needed to temporarily house high-risk youth.[85]

41. The Court finds that this temporary solution is necessary pending completion of the permanent TTU at Swanson-Monroe.[86]

42. At full capacity, BCCY-WF will house between twenty-four to thirty youth who are eligible for placement in the TTU pursuant to OJJ policy.[87]  The plan is to populate BCCY-WF in three phases, with eight youth being placed at the facility in each phase.  BCCY-WF will not open on day one with twenty-four youth.[88]

43. BCCY-WF should be capable of receiving youth by the end of September 2022.[89]

---

[81] 9/7/22 Testimony of Nelson, generally; 9/8/22 Testimony of Patin, generally.
[82] 9/6/22 Testimony of Gagnard at 9:44.
[83] 9/7/22 Testimony of Nelson at 9:41.
[84] DX 1; 9/7/22 Testimony of Nelson at 9:40-9:42, 11:51.
[85] DX 1; Testimony of Sommers, generally.
[86] DX 1; 9/7/22 Testimony of Nelson at 9:40-9:42.
[87] 9/7/22 Testimony of Nelson at 11:03; 2:37.
[88] 9/8/22 Testimony of Patin at 4:15.
[89] 9/7/22 Testimony of Nelson at 9:50; 9/8/22 at 4:38 - Counsel for Defendants stipulated that no youth would be transferred to BCCY-WF before September 23, 2022.

44. The Court finds that the evidence established that no youth will be transferred to BCCY-WF until the facility is ready, properly staffed, and can fully provide educational, medical, mental health, recreational, and food services.[90]

**D. Relationship Between BCCY-WF, LSP, and DOC Security**

45. On August 29, 2022, OJJ and DOC signed a Memorandum of Understanding ("MOU") outlining the relationship, rights, and responsibilities regarding BCCY-WF.[91]

46. Federal law requires that juvenile delinquents may not be housed in any institution where they could have sight or sound contact with adult inmates.[92]  Federal law also contemplates the existence of "collocated facilities" and requires that individuals who work with both juveniles and adult inmates be trained and certified to work with juveniles.[93]

47. BCCY-WF is approximately 100 yards inside the main gates of LSP and approximately 1.5 miles from the nearest adult housing unit.[94]

48. The Court finds that the evidence established that youth housed at  BCCY-WF will not come in contact with adult inmates.[95]

49. The Court finds that the evidence established that OJJ is eliminating the opportunity for youth to be within sight and sound of adult inmates.

---

[90] DX 1; 9/8/22 Testimony of Sommers at 10:46; 9/8/22 Testimony of Patin at 4:01, 1:14.
[91] PX 32; 9/7/22 Testimony of Gagnard at 9:30.
[92] 34 U.S.C. § 11133(12)(A).  Brief and inadvertent contact does not constitute a violation. 34 U.S.C. § 11103(25).
[93] 34 U.S.C. § 11133(12)(B).
[94] DX 1; DX 6.
[95] DX 1; 9/7/22 Testimony of Nelson at 1:47-1:48; 9/8/22 Testimony of Sommers at 10:46-10:49.

50. The existing perimeter fence around BCCY-WF will be wrapped in solid fabric to block views.[96]

51. OJJ will provide all maintenance services except for repairs to damage to the facility's infrastructure.[97]    OJJ has contracted for private lawn and grounds maintenance for the perimeter, both inside and outside the fenced area of BCCY-WF. DOC will install signage around BCCY-WF to notify trustees that the facility is off-limits. DOC staff will be used as necessary for maintenance to the facility, but no LSP inmate labor will be used inside or outside the building for any reason.[98]

52. OJJ will run BCCY-WF independent of LSP. However, the MOU provides that DOC may assist OJJ with staffing by providing interior and perimeter roving security. DOC is presently providing roving security at other OJJ secured facilities where staffing shortages exist.[99]

53. DOC may provide cafeteria operations, maintenance, and exterior security support.[100]

54. DOC security will not be on tiers or delivery service; they are only there to assist if called for a disturbance.[101]

55. LSP will have no operational authority over the TTU,[102] and LSP will provide supplemental security for BCCY-WF only upon request.[103]

---

[96] DX 1.
[97] DX 1; PX 32.
[98] 9/8/22 Testimony of Patin at 3:56-3:57.
[99] DX 1.
[100] DX 1.
[101] 9/8/22 Testimony of Patin at 4:18.
[102] 9/6/22 Testimony of Gagnard at 9:45; PX 32.
[103] *Id.* at 9:30; PX 32.

56. Utilizing DOC security officers as a measure of last resort is not a new policy nor is it unique to BCCY-WF; DOC security officers have historically been used in this manner at all existing OJJ secure care facilities.[104]

57. The parties to the MOU acknowledge that, "[d]uring this temporary timeframe, DOC/LSP staff shall utilize chemical spray, electron control weapons ("Tasers") and the use of force continuum for which they are trained."[105]  This procedure, available to DOC supplemental security officers, is not unique to the BCCY-WF facility but is true of all OJJ secure care facilities.[106]  Any use of force on the continuum requires permission by an OJJ supervisor.[107]

58. OJJ will be responsible for the training of any LSP/DOC personnel.[108]

59. Based on the above, the Court finds that the TTU at BCCY-WF will be run by OJJ alone; DOC will only be utilized in a manner consistent with the terms of the MOU and historical practices. The Court further finds that OJJ has taken the appropriate measures to insulate the youth at BCCY-WF from contact with adult inmates at LSP and to eliminate sight and sound of LSP inmates.

**E. TTU Policy, Programs, and Services**

60. The Youth Services Policy for the TTU states that the purpose of the TTU is "[t]o establish the program objectives and the criteria for the placement of youth and youth with disabilities in the Transitional Treatment Unit (TTU) located at the Bridge City Center for Youth at West Feliciana. All students with disabilities assigned to

---

[104] 9/8/22 Testimony of Patin at 4:18; PX 32.
[105] PX 32, p. 2.
[106] 9/8/22 Testimony of Patin at 3:59, 4:18.
[107] Id.
[108] PX 32; DX 1 ("All incoming staff will undergo additional training to ensure security within BCCY-WF.").

OJJ's TTU program shall be provided a free and appropriate education (FAPE)."[109] This Policy identifies a variety of general and special education services that must be provided to youth placed in a TTU.[110]

61. Youth ages ten through eighteen, identified as high-risk, are eligible for placement in the TTU.[112]

62. OJJ utilizes a classification system to determine what youth are appropriate for transfer for the TTU.[113]  Youth are constantly being re-classified to see if they can "step down" back into the general population of another facility or be released to their homes and communities.   OJJ employs a multi-disciplinary team to determine, on a case-by-case basis, if a youth fits the criteria for placement at the TTU.  There is no current list of transferees to BCCY-WF because "every day is a new day" for a child to start working their plan.[114]

63. The TTU is only for youth who are an *imminent* risk for violence, destruction, or escape after all de-escalation efforts have been made, unsuccessfully, at a regular campus.[115]

64. The TTU is intended to be a 4-6 week intensive therapeutic program. Youth can "work their way out" of TTU by demonstrating ability to thrive in a social living environment.[116]

65. Sommers testified that the goal of OJJ is to design facilities that facilitate a tiered therapeutic model, but OJJ has historically lacked the funding to accomplish

---

[109] DX 3.
[110] *Id.*
[112] 9/8/22 Testimony of Sommers at 10:01.
[113] DX 2.
[114] 9/7/22 Testimony of Nelson at 11:53-11:56.
[115] *Id.* at 2:20.
[116] *Id.* at 11:51.

this.[117]  The biggest challenge to creating a tiered system is the lack of the proper physical plant.[118]

66. The existing secure care facilities in Louisiana were "just not built to keep youth inside," and need to be designed  using "correctional construction" materials, such as correctional grade sheetrock, etc.[119]

67. The TTU Youth Services Policy provides that all services and programs available to youth in all other OJJ secure care facilities will be fully available to the youth at BCCY-WF.[120]  The evidence establishing that all services required by law, by LAMOD (where applicable), and TTU policies will be in place at BCCY-WF was unrefuted.

68. The Court finds that the TTU at BCCY-WF is a temporary solution and will provide all necessary programs and services to youth, and the TTU is not designed to be punitive but to be therapeutic and rehabilitative while maintaining discipline, safety, and security.

1.  Medical & Mental Health Services

69. Dr. Denise Dandridge, the Director of Health Services for OJJ is responsible for all medical and mental health services provided by OJJ.[121]

70. OJJ contracts with Wellpath, LLC ("Wellpath") to deliver medical and mental health services to youth at BCCY-WF.[122]

---

[117] 9/8/22 Testimony of Sommers at 10:31.
[118] *Id.* at 10:32.
[119] *Id.* at 10:29, 10:34.
[120] DX 3.
[121] 9/6/22 Testimony of Dandridge at 2:23.
[122] *Id.* at 2:25; DX 50.

71. The scope of Wellpath's delivery of medical and mental health services was extended to BCCY-WF on September 1, 2022.[123]

72. Wellpath has provided medical and mental health services to OJJ for the last 10-11 years; Wellpath is also contracted to provide similar services to juvenile facilities across the country.[124]

73. All OJJ medical providers are hired and employed or contracted by Wellpath; Dr. Dandridge participates in this process.[125]

74. Wellpath personnel have visited the proposed facility in West Feliciana and are confident they can provide the necessary medical and mental health services at the BCCY-WF site.[126]

75. Mental health counselors will be onsite at BCCY-WF 8 hours a day, Monday through Friday. Counselors will be on-call on weekends and nights. A psychiatrist will be available by telemedicine.[127]

76. A start-up team of experienced mental health providers and nursing staff have been identified and will be on-site when BCCY-WF opens.[128] This start-up team will be onsite until new staff have been hired and fully trained.[129]

77. The goal is for BCCY-WF to have two mental health providers on site.[130]

78. Youth who are transferred to BCCY-WF will receive the same mental health and counseling services as youth in any other OJJ facility.[131]

---

[123] *Id.*
[124] *Id.*
[125] *Id.* at 2:26-2:27, 2:29.
[126] *Id.* at 2:31.
[127] *Id.* at 2:36-2:37.
[128] *Id.* at 2:37.
[129] *Id.* at 2:38-2:39; 9/7/22 Testimony of Dandridge at 9:15-9:16.
[130] *Id.* at 2:40, 9/7/22 Testimony of Dandridge at 8:43.
[131] 9/8/22 Testimony of Bridgewater at 2:27.

79. OJJ will be adding Trust Based Relational Intervention to BCCY-WF.[132]

80. The medical directors at BCCY-WF will be Dr. Christopher Lee and Dr. Michael Day who have a practice in Baton Rouge.[133]

81. OJJ will transport youth in need of medical treatment outside of BCCY-WF.[134]

82. Plaintiffs failed to present evidence or offer legal authority demonstrating that the distance from the nearest hospital renders the level of medical care provided by OJJ unconstitutional.

83. Dr. Dandridge testified that OJJ will likely contract a provider for emergency transport services;[135] however, according to the MOU, "LSP may provide assistance to OJJ/BCCY-WF with medical transportation (ambulance) to a designated emergency room facility in life threatening situations and as safety, resources, and regulations permit."[136]

84. Youth offenders will not be treated with adult offenders.[137]

85. No juvenile will ever be referred to LSP for medical care.[138]

86. Youth at BCCY-WF will have the same access to medical and mental health care as in all other OJJ facilities.[139]

87. Youth at BCCY-WF will have the same access to prescribed medications.[140]

---

[132] *Id.*
[133] 9/6/22 Testimony of Dandridge at 2:35.
[134] *Id.* at 2:44.
[135] 9/7/22 Testimony of Dandridge at 9:24.
[136] PX 32 at OJJ-000418.
[137] 9/6/22 Testimony of Dandridge at 2:42.
[138] 9/7/22 Testimony of Dandridge at 9:07-9:08, 9:13.
[139] *Id.* at 9:08-9:09.
[140] *Id.* at 9:13.

88. Youth at BCCY-WF will have the same individualized and group counseling available.[141]

89. No Youth will be transferred to BCCY-WF until all medical and mental health care services are fully available, including the physical spaces to provide such care.[142]

90. The Court finds that the level of medical care, including mental health care, that will be provided by OJJ at BCCY-WF meets the constitutional standard. The Court further finds that no child at BCCY-WF will receive medical care at LSP.

2. Education and Special Education Services

91. The same education and special education services provided to youth in other OJJ facilities will be provided to youth transferred to BCCY-WF.[143]

92. All youth assigned to OJJ's TTU program at BCCY-WF will be provided a free and appropriate education (FAPE), including special education services.[144]

93. "OJJ's TTU Program will designate at the minimum 2 special education teachers to provide students with disabilities identified by the Individuals with Disabilities Education Act ("IDEA") with any special education instruction as prescribed by the student's Individualized Education Program ("IEP"). Related service providers are required and will be provided by the Special School District ("SSD")[;] the contracted special education provider for the school site is determined by each individual student need and identified in the Bulletin 1508 evaluation and IEP."[145]

---

[141] *Id.* at 9:13-9:14.
[142] *Id.* at 9:16.
[143] 9/8/22 Testimony of Shenell Deville, generally.
[144] DX 43.
[145] *Id.* at OJJ-000265.

94. The Louisiana Department of Public Safety & Corrections Youth Services contracts with the Louisiana Special School District to provide education and related services to the exceptional populations in OJJ secure care facilities.  This contract sets forth the responsibilities of the State to provide special education services for students in unique settings.[146]   This contract governs all OJJ secure care facilities in the state, including BCCY-WF.[147]

95. There will be no interruption of special education services for any student transferred to the TTU at BCCY-WF.[150]

96. If a student in the TTU has an IEP that requires a psychologist, speech therapist, occupational therapist, or any other special service deemed necessary by the IEP, such service/provider will be provided to the student in the BCCY-WF TTU.[151]

97. All special educators who provide education services in the TTU must go through specialized training.[152]

98. The same general education format offered at all other OJJ secure care facilities will be offered at BCCY-WF.[153]

99. The student to teacher ratio at BCCY-WF will be 8 to 1, compared to  the 12 to 1 student to teacher ratio typical at most other OJJ facilities.[154]

100. The BCCY principal will serve as the principal at BCCY-WF.[155]

101. Teachers at BCCY-WF will be credentialed as required by Louisiana state law.[156]

---

[146] DX 44.
[147] 9/8/22 Testimony of Deville at 1:12.
[150] *Id.* at 1:20-1:21.
[151] *Id.* at 1:23.
[152] *Id.* at 1:25.
[153] *Id.* at 1:29.
[154] *Id.*; DX 45, 46.
[155] *Id.* at 1:36.
[156] *Id.* at 1:40; DX 48.

102. No educational staff will be shared between staff at LSP and staff at BCCY-WF.[157]

103. All educational services will be ready and available to each student at BCCY-WF on day one; no student will be transferred to BCCY-WF until the education department is fully staffed and trained.[158]

104. The Court finds that the youth at BCCY-WF will be provided education, including special education, in accordance with the requirements of federal and state law, without interruption.

### 3.    Food & Recreation Services and Visitation

105. Daily meals for BCCY-WF will be prepared by the DOC.  The food will be placed in a hot box and transported by OJJ staff from LSP to BCCY-WF.  DOC staff will not transport the food to BCCY-WF, and no inmate trustees will transport food to BCCY-WF.[159]

106. The Recreation and Activity Monitoring Standard Operating Procedure applicable to BCCY will apply to BCCY-WF.[160]

107. The Activity Schedule for BCCY-WF sets forth opportunities for recreation at BCCY-WF.[161]

108. While the designated recreation areas at the facility as of the date of the hearing were sorely lacking, unrefuted evidence submitted at the hearing established that OJJ is having concrete poured for basketball courts and is undertaking other improvements to serve recreational needs.[162]

---

[157] *Id*. at 1:50.
[158] *Id*. at 1:52.
[159] 9/8/22 Testimony of Bridgewater at 2:22.
[160] *Id*. at 2:29-2:30; DX 54.
[161] *Id*. at 2:31; DX 56.
[162] 9/8/22 Testimony of Patin at 4:04.

109.   Sommers vehemently stated that there would be contact visitation at BCCY-WF. He also testified that OJJ will hopefully be able to offer transportation for parents to and from BCCY-WF.[163]

110.   The Court finds that, based on the unrefuted evidence of upgrades that OJJ is in the process of making to the BCCY-WF facility, youth at BCCY-WF will be provided constitutionally adequate meals and opportunities for recreation.  The Court further finds that youth will have the opportunity for contact visitation with family.

**F.  The BCCY-WF Plan - Rehabilitative/Therapeutic Model v. Correctional Model**

111.   The Parties in this matter agree that the goal of juvenile justice is rehabilitation, not punishment.[164]

112.   Vincent Schiraldi was accepted by the Court as an expert in juvenile justice and gave opinion testimony to the Court on the appropriateness of Defendants' Plan for BCCY-WF.[165]

113.   Schiraldi explained that the goal of rehabilitation is to provide services, support, and opportunities to enable a young person to "matriculate out of delinquent behavior"; punishment is the act of being confined or incarcerated that deprives a juvenile of their liberty as a matter of public safety and deterrence to committing crimes.[167]

114.   In Schiraldi's opinion, juvenile justice systems should not mirror adult justice systems. Youth should not be sent to adult prisons.[168]

---

[163] 9/8/22 Testimony of Sommers at 10:39.
[164] 9/7/22 Testimony of Schiraldi at 3:38; 9/7/22 Testimony of Nelson at 10:34; 9/8/22 Testimony of Sommers at 10:23.
[165] *Id.* at 3:30; PX 11, 12.
[167] *Id.* at 3:38-3:40.
[168] *Id.*

115. A juvenile facility should provide a normalized environment, to the degree possible.[169]

116. Schiraldi conceded that, "eventually you may have to restrain a kid, put your hands on a kid," but this should be a last resort.[171]

117. Schiraldi toured the proposed BCCY-WF facility in the first week of September 2022.[172]

118. Schiraldi opined that BCCY-WF is an inappropriate environment for youth because it "screams prison."[173]  Its atmosphere suggests a correctional model rather than a rehabilitative model.[174]

119. The indoor space designated for recreation is inadequate.[175]

120. The existing outdoor recreational space are likewise inadequate, consisting of a basketball goal erected in a grassy area in view of a guard tower.[176]

121. The existing visitation space is a non-contact, mesh screen separating the juvenile from a visitor.[177]

122. The youth's living quarters will be prison cells with barred sliding doors that lock them in.[178]

---

[169] *Id.* at 3:49. Schiraldi testified that he had visited BCCY in 2016 and observed that the facility was old, but it had an internal gym, outdoor field and basketball, a vocational building, school building, and dorms.
[171] *Id.* at 4:05-4:06.
[172] *Id.* at 4:24.
[173] *Id.* at 4:25.
[174] *Id.*  Schiraldi took photographs from this visit admitted *en globo* at PX 20.
[175] *Id.* at 4:43.
[176] *Id.* at 4:40; PX 20, p. 100.
[177] PX 20.
[178] PX 20, p. 80.  Schiraldi also raised the issue of lack of privacy in the open showers (PX 20 at Alex A. – 000282), but Patin testified that shower curtains have been ordered to correct this issue.  9/8/22 Testimony of Patin at 4:05.

123. The nearest hospital in West Feliciana Parish is 24 miles away from LSP, and the contracted hospital is 134 miles away.[179]

124. While Schiraldi opines that the use of adult prison cells as rooms for youth is "de facto" solitary confinement, the Court disagrees for the reasons stated below. Schiraldi concedes that confining youth to their cells at night is not solitary confinement, but it is isolation, and therein lies the psychological harm.[180]

125. Solitary confinement has a very negative affect on young people; it exacerbates already existing mental health problems, it can exacerbate or cause the onset of mental illness and depression, and causes an increased risk of suicide.[181]

126. Unlike the situation in OJJ secure care facilities across the Louisiana, Schiraldi's experiences in renovating juvenile facilities in Washington, D.C. allowed him to renovate a vacant facility while youth were housed elsewhere. As renovations were complete, the youth would be moved into renovated areas, and renovations would start on the vacated areas.[183]

127. Years ago, both Louisiana and New York consulted with the Missouri Youth Services Institute regarding its model for juvenile justice.[184]

128. The Missouri Model for juvenile justice is a therapeutic model; it is not the model used by the majority of states in the country. Further, the Missouri Model is not the only therapeutic model in the United States. Some states utilize a trauma informed therapy model, and some states utilize a more correctional approach.[185]

---

[179] *Id.* at 4:50.
[180] *Id.* at 5:00.
[181] *Id.* at 4:53-4:54.
[183] 9/8/22 Testimony of Schiraldi at 8:40-8:42.
[184] 9/7/22 Testimony of Schiraldi at 4:19.
[185] 9/8/22 Testimony of Schiraldi at 8:42-8:44.

129. Bridgewater, the Statewide LAMOD Coordinator for all OJJ facilities,[186] explained that LAMOD is the Louisiana model for juvenile justice, modeled after the Missouri model.  With LAMOD, youth are taught various social skills. The LAMOD philosophy allows the youth to work in groups, and peer-to-peer interaction is very important.  Youth are allowed to confront each other and discuss issues.  There are four stages of LAMOD, and youth progress from one stage to another while completing assignments and learning new skills.  The last stage is citizenship, and there are rewards and incentives for completing the stages and learning the various skills associated with each stage.[187]  The LAMOD approach is defined as: "[a] holistic therapeutic approach to how we engage, work with, and treat youth staff, families and communities."[188]

130. Schiraldi agreed that rehabilitation of a juvenile is not the only interest served by the juvenile justice system; the safety of youth, staff, and the public are also interests served by the juvenile justice system.[189]  There must be a balancing of these interests.[190] Rehabilitation can many times serve all these interests, but not always.[191]

131. When a youth is acting out violently, one of the last resort options is physical restraint.[192]

132. Nelson believes in the LAMOD therapeutic model and finds it works well for compliant youth that are willing to use the program and adapt; however, LAMOD

---

[186] 9/8/22 Testimony of Bridgewater at 2:21.
[187] *Id*. at 2:27-2:28.
[188] DX 2 at OJJ-0000004.
[189] 9/8/22 Testimony of Schiraldi at 8:44.
[190] *Id*.
[191] *Id*. at 8:45.
[192] *Id*. at 8:47.

does not work well with aggressive, violent youth that attack staff and peers because they can freely move around and act out.[196]

133. Nelson testified, "We don't punish kids placed in our custody."[197]

134. Sommers stated that the goal of OJJ is "to rehabilitate every kid we get."[198]

135. Sommers would prefer to use the Missouri model for juvenile justice in every situation but lamented, "you cannot do therapy if a faction of youth are disrupting everything."[199]

136. To the issue of solitary confinement, Nelson testified that, legally, no child can be confined in their room for more than 8 hours and then only after an assessment; the child must be checked on an hourly basis; once the child has calmed down, they are released back into the general population. Sleeping in your room at night is not solitary confinement.[200]

137. As for the photographs of the proposed BCCY-WF site that show that the visitation area is that of an adult prison, with a screen separating the offender from a visitor and no opportunity for physical contact,[201] Sommers testified that these photographs do not depict the plan for visitation at BCCY-WF: Visiting through plexiglass "is not gonna happen … a momma needs to hug her son … we will have that type of visitation at West Feliciana, no doubt."[202]

138. The photographs of the facility taken by Schiraldi on September 1, 2022 are, in some instances, shocking and depressing. However, the Court finds that these

---

[196] 9/7/22 Testimony of Nelson at 11:12-11:13.
[197] 9/7/22 Testimony of Nelson at 10:34.
[198] 9/8/22 Testimony of Sommers at 10:23.
[199] Sommers at 10:31. Sommers also notes that Missouri has nineteen facilities to Louisiana's four. *Id.*
[200] Nelson at 2:20-2:23.
[201] PX 20, Bates Nos. Alex A – 000378-000384.
[202] 9/8/22 Testimony of Sommers at 10:39

photographs are not representative of the renovations and improvement underway and planned for BCCY-WF.[203]

139. The Court finds that OJJ is committed to rehabilitation of youth that will be placed in the temporary TTU at BCCY-WF.  The Court further finds that the goal of using the facility on the grounds of Angola is not punishment but rehabilitation in a setting that allows OJJ to deliver therapeutic services while maintaining order, security, and safety for all youth in the custody of OJJ.  However, the Court also finds that some aspects of the facility could have harmful psychological effects on youth placed at BCCY-WF.

### G.   Alex A. - Evidence of Harm[204]

140. Alex A. is a seventeen-year-old who has been in the custody of OJJ since May 9, 2021, and is currently housed at BCCY.[205]

141. Alex A. became aware of the "Angola plan" by overhearing OJJ staff discussions and seeing news reports that some youth in OJJ custody would be moved to the grounds of Angola.[206]

142. Alex A. testified that DOC guards at BCCY behave differently than OJJ security guards, stating that DOC guards "mace us for nothing."[207]

143. Since learning about this transfer plan, Alex A. has had trouble sleeping and has had nightmares. He testified that the other kids "don't care."[208]

---

[203] *See, generally,* Testimony of Dandrigde, Deville, and Patin.
[204] The juvenile Plaintiff is proceeding under a pseudonym to protect his identity. The Court has also considered Alex A.'s redacted Declaration admitted into evidence under seal as PX 1.
[205] 9/6/22 Testimony of Alex A. at 10:11-10:13.
[206] *Id.* at 10:21.
[207] *Id.* at 10:23.
[208] *Id.* at 10:23-10:24. This live testimony contradicted Alex A.'s Declaration, wherein he attested that other youth at BCCY "are also terrified of being moved to Angola."  PX 1, ¶ 22.

144. Alex A. admitted that he has a history of aggressive behavior and problems with anger management,[209] and he receives counseling for anger management.[210]

145. Alex A. gets angry when he is told to do things by staff that he does not want to do and when other youth annoy him.[211]

146. Alex A. testified that getting angry sometimes makes him "want to kill." He admitted that anger has caused him to "choke somebody [another youth] out," break someone's nose, and he stated he might kill someone if he got angry enough, including OJJ staff.[212]

147. Alex A. has been treated for a history of anxiety manifested by hair pulling.[213]

148. Many of Alex A.'s fears are based on incorrect assumptions; however, it is not Alex A.'s obligation to ask OJJ about the transfer plan, it is OJJ's obligation to properly communicate with its youth and their parents.

149. Dr. Monica Stevens was accepted as an expert in the field of clinical psychology with a specialty in child psychology and trauma.[214]

150. Generally, the human brain is not fully formed until the age of 25 years old.[215] Before the age of 25, the prefrontal cortex activity and development will be

---

[209] *Id.* at 11:00-11:05. (Alex A. was accused in May 2022 of destruction of property- throwing a fire hydrant through a window, which he denies; he admits he threw a liquid in a social worker's face in August 2022; he denies climbing the fence and leaving campus in July 2022; he denies that he pushed a staff member onto his back to leave a classroom; he denies that he was written up a few times for exposing himself; he admits that he masturbated toward female staff; denies that he threatened to hit female staff; he admits he hit another Youth multiple times in August 2022; he admits he was involved in a dorm versus dorm campus riot where he knocked out staff to unconsciousness with his fist because they were in his way. *See* DX 58-67).

[210] *Id.* at 11:05-11:06.

[211] *Id.* at 11:06-11:07.

[212] *Id.* at 11:08-11:09.

[213] *Id.* at 11:14.

[214] 9/6/22 Testimony of Stevens at 11:21.

[215] *Id.* at 11:47.

impaired/impacted if survival stressors are placed on adolescents.[216]

151. An ideal setting to rehabilitate delinquent youth is therapeutic rather than punitive. The environment should not be traumatizing.[217]

152. Five days before the Preliminary Injunction hearing, Dr. Stevens conducted a 30-minute non-clinical interview with Alex A. via Zoom.[218]  This was the first time the two met.[219]

153. Alex A. fears physical harm, including sexual violence, based on a belief that the youth will encounter LSP inmates upon arrival to Angola.[220]

154. Dr. Stevens concluded that very little information about this transfer was communicated to Alex A., and part of a rehabilitative aspect in assisting youth is to provide them "plenty of notice" to absorb major changes.[221]

155. Dr. Stevens concluded that the psychological impact of Angola's reputation as a scary prison plagued with aggression and violence has resulted in serious anticipatory stress for Alex A.[222] The specter of the move to Angola is traumatic and thus harmful to the developing adolescent brain.

156. Alex A. is experiencing discomfort, and his hair pulling is rare in general and particularly for his demographic.  He is having nightmares and is hyper vigilant, all hallmarks of traumatization.[223]

---

[216] *Id.* at 1:27.
[217] *Id.* at 11:31.
[218] *Id.* at 1:40.
[219] *Id.*
[220] *Id.* at 1:09-1:10.
[221] *Id.* at 11:37.
[222] *Id.* at 11:38-11:39.
[223] *Id.* at 11:14-11:15.

157. Placement of Alex A. in a facility designed to house adult inmates will exacerbate his PTSD.[224]

158. The goal of rehabilitation is disserved by re-triggering traumatized youth by placing them in an environment that looks and feels punitive, like LSP.[225]

159. Placing any child in a maximum-security facility designed for adults is unreasonably psychologically harmful to children.[226]

160. The Court finds that there is a high-risk that the placement of adolescents in a facility designed to house adult inmates will be psychologically harmful and traumatizing. However, the Court finds that OJJ needs to place high-risk youth in a facility that provides a high level of security, both for the protection and safety of high-risk youth and all youth in OJJ custody. This finding is validated by Alex A.'s testimony and conduct record.

## III.  CONCLUSIONS OF LAW

### A.  Preliminary Injunction Standard

Injunctive relief is an extraordinary remedy, to be granted only if Plaintiff clearly demonstrates (1) a substantial likelihood of success on the merits, (2) a substantial threat that Plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to the Defendants, and (4) that granting the preliminary injunction will not disserve the public interest.[227]  While the first two factors

---

[224] *Id.* at 11:16.
[225] *Id.* at 1:24.
[226] *Id.* at 1:28-1:29.
[227] *Gumns v. Edwards*, No. 20-231-SDD-RLB, 2020 WL 2510248, at *3 (M.D. La. May 15, 2020)(Dick, C.J.)(citing *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012) (quotation and citation omitted); *Justin Industries v. Choctaw Securities, L.P.*, 920 F.2d 262 (5th Cir.1990).

are most critical,[230] the movant is required to "clearly carry the burden as to all four elements;" failure to do so requires a denial of the motion.[231]

In the context of detention, and in accordance with the PLRA, "preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and be the least intrusive means necessary to correct the harm."[232]  Even though adjudicated delinquents are not incarcerated per se, the Fifth Circuit has held that "the deference given to correctional officials in the adult context applies to correctional officials in the juvenile context as well."[233]

Federal Courts eschew toward "minimum intrusion into the affairs of state prison administration; state prison officials enjoy wide discretion in the operation of state penal institutions."[234]  In a case challenging a state prison transfer policy, the Supreme Court warned against federal courts making decisions regarding "the day-to-day functioning of state prisons and involv[ing] the judiciary in issues and discretionary decisions that are not the business of federal judges,"[235] noting that "[t]he federal courts do not sit to supervise state prisons, the administration of which is an acute interest to the States."[236] The same deference is owed to state juvenile justice agencies.[237]

As this Court held in *Lavergne v. Cain*, "[w]hen weighing any form of injunctive relief, federal courts must be mindful not to jump at the chance to take prison

---

[230] *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016).

[231] *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).

[232] *Hood v. Vessel*, 2013 WL 12121562, at *1 (M.D. La. May 14, 2013) (citing 18 U.S.C. § 3626(a)).

[233] *Mabry v. Lee County*, 849 F.3d 232, 238 (5th Cir. 2017).

[234] *Williams v. Edwards*, 547 F.2d 1206, 1211-1212 (5th Cir. 1977)(citing *Procunier v. Martinez*, 416 U.S. 396, 404-05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)).

[235] *Mecham v. Fano*, 427 U.S. 215, 228-229 (1976).

[236] *Id.* at 229 (citing *Preiser v. Rodriguez*, 411 U.S. 475, 491-492, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973); *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Johnson v. Avery*, 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969)).

[237] *Mabry*, 849 F.3d at 238.

administration into their own hands and out of the hands of the people entrusted with such tasks by the state."[239]   "[U]nwarranted intrusions by the courts can be disruptive to the prison administrators, who are often in the best position to operate the prison in a fashion that is best for the security of prisoners and outsiders alike."[240]

### B.  Substantial Likelihood of Success on the Merits

Plaintiff's Complaint asserts claims pursuant to 42 U.S.C. § 1983 for unlawful conditions of confinement and deprivation of due process.[241]  Plaintiff contends that, "[b]y transferring Youth adjudicated delinquent to the Louisiana State Penitentiary at Angola, a maximum-security adult prison, Defendants violate their duty to provide conditions of reasonable health and safety to the youth it holds in its custody, and demonstrate deliberate indifference to a substantial risk of serious harm to Plaintiff, in violation of Plaintiff's rights under the Fourteenth Amendment to the U.S. Constitution" and that "Defendants' actions are also punishment of Plaintiff in violation of the Fourteenth Amendment."[242]  Plaintiff also seeks declaratory and injunctive relief under Section 504 of the Rehabilitation Act of 1973, claiming that, "[b]y transferring youth adjudicated delinquent to the Louisiana State Penitentiary at Angola, a maximum-security adult prison … the required educational and rehabilitative services for Plaintiffs with disabilities cannot be provided."[243]

---

[239] 2016 WL 5899972 at *2 (M.D. La. Oct. 7, 2016)(citing *Williams v. Edwards*, 547 F.2d 1206, 1211-12 (5th Cir. 1977) ("The Supreme Court has articulated for the federal courts a policy of minimum intrusion into the affairs of state prison administration; state prison officials enjoy wide discretion in the operation of state penal institutions.")).
[240] *Id.* (citing *Woodford v. Ngo*, 548 U.S. 81, 89 (2006)(discussing the importance of preserving penal institution's administrative authority)).
[241] Rec. Doc. No. 1, p. 13.
[242] *Id.*
[243] *Id.*

1. <u>Section 504 of the Rehabilitation Act of 1973 ("RA")</u>

Plaintiff claims that disabled youth will not receive special education accommodations or mental health services at BCCY-WF. The evidence does not bear this out. First, Plaintiff's RA claim is predicated on a faulty assumption and unproven assertion that youth will be placed in the LSP adult prison with adult inmates. The evidence established that no youth will be placed in LSP with adult inmates.

Second, to the extent Plaintiff attempted to show that disabled youths' special education and mental health needs will not be accommodated at BCCY-WF, Plaintiff failed to carry his burden of showing a substantial likelihood of success on the merits. Plaintiff's argument that special education services and mental health services will be unavailable or deficient at BCCY-WF went unproven.[244] Plaintiff failed to refute the evidence establishing that special education services, as well as mental health services, will be provided to youth transferred to BCCY-WF to the same or greater extent and in the same manner these services are provided to all youth in OJJ custody. The evidence established that there will be increased opportunities for counseling at BCCY-WF, and Trust Based Intervention will be an additional therapeutic tool provided at BCCY-WF to address the youth's particularized needs.[245] The evidence established that mental health services will be more robust at BCCY-WF, and there was utterly no showing that special education requirements will be adversely impacted.

---

[244] For example, Plaintiff contends: "*If* he is denied those services, it *will be* discrimination on the basis of his disability."  Rec. Doc. No. 73, p. 16 (emphasis added).
[245] 9/8/22 Testimony of Bridgewater at 2:27, 2:33-2:34.

Third, Plaintiff attempts to amend his Complaint via his post-hearing memorandum to add a claim for disability discrimination, claiming that "Defendants' failure to address and accommodate Plaintiff's non-classroom needs, namely his anxiety and fear related to the threatened transfer to Angola, is disability-based discrimination."[246]  Plaintiff also argues, in conclusory fashion, "Defendants' failure to provide any information about their plans to Plaintiff and other youth at risk of being transferred to LSP, despite knowing that the young people are aware of the impending transfer, constitutes discrimination as well because it exacerbates his mental health disabilities."[247]  These allegations do not appear in Plaintiff's Complaint or in his motion for injunctive relief.  The Complaint alleges a failure to accommodate claim under the RA, not disability discrimination.

Even if such a claim could be somehow gleaned from Plaintiff's Complaint, there was not a shred of evidence that Defendants intentionally failed to provide youth with mental disabilities at BCCY with the details of the plan *because* **of their disabilities**.[249]  A disability discrimination claim is not properly before the Court,[250] and there has been utterly no showing of likelihood of success on the merits of such a claim.

2.  Section 1983 Constitutional Claims

Plaintiff claims that Defendants' plan to transfer youth to BCCY-WF violates his Fourteenth Amendment rights because it subjects him to unlawful conditions of confinement, violates his due process rights, and unlawfully constitutes punishment.

---

[246] Rec. Doc. No. 73, p. 15.
[247] *Id.*
[249] *See Tellis v. LeBlanc*, No. CV 18-541, 2021 WL 4267513, at *8 (W.D. La. Sept. 20, 2021)(emphasis added).
[250] *See Humana Insurance Company v Tenet Health System*, No. 3:16-cv-2919-B, 2016 WL 6893629 (N.D. Tex, Nov. 21, 2016).

Preliminarily, the Court notes the Supreme Court's holding in *Reno v. Flores*, that "'the best interests of the child' is not the legal standard that governs parents' or guardians' exercise of their custody: So long as certain minimum requirements of child care are met, the interests of the child may be subordinated to the interests of other children, or indeed even to the interests of the parents or guardians themselves."[251]

In support of his claims, Plaintiff elicited testimony of "best practices" or prevailing industry standards; however, the Constitution does not require "best practices." Courts addressing the constitutional claims of juveniles in secure care stress this point.

In *Alexander S. by and through Bowers v. Boyd*,[253] the court noted that its role in the case was to ensure that minimally acceptable standards for treatment and rehabilitation were met by the juvenile justice agency.[254]

> [I]t is not necessary that the state provide the best possible services and training available to the Plaintiffs. The test in this case is whether the state is providing minimally adequate or reasonable services and training necessary to ensure the protected interests of the Plaintiffs. It is not appropriate that the state be held to a standard which imposes an affirmative duty to succeed in the purpose of correcting the juveniles' behavior. Although such a standard may be desirable, it is not constitutionally mandated. All that is required is that the juveniles be housed under conditions that provide them with a reasonable opportunity to correct their behavior. Obviously, this standard incorporates the security, program, and service functions that are basic to juvenile corrections.[255]

Similarly, in *Hughes v. Judd*,[256] the court stressed that the juvenile-plaintiffs' attempt to import "best practices" into the constitutional standard was improper:

> The Sheriff argues, again convincingly, that the plaintiffs strive to avert the Constitution by substituting for the governing constitutional standard an impromptu, improvised standard equivalent to "best practices" as

---

[251] 507 U.S. 292, 304 (1993)(citation omitted).
[253] 876 F.Supp. 773 (D. S.C. 1995).
[254] *Id.* at 798.
[255] *Id.*
[256] 108 F.Supp.3d 1167 (M.D. Fla 2015).

understood at and for the moment by persons who are, in effect, professional advocates and critics, that is, persons other than the corrections and detention professionals whose professional judgment receives under the governing constitutional law a strong presumption of correctness and whose supervision is subject to judicial intervention under the Fourteenth Amendment only in the extraordinary circumstance. Suffice to say that, if the Fourteenth Amendment requires intervention into the management of the juvenile detention facility that the Sheriff operates at CCJ, the Fourteenth Amendment requires a wholesale intervention into detention and incarceration at most of the facilities in the United States, an intervention possible only by an unprecedented and precipitous lowering of the constitutional threshold.[257]

> *a.    Conditions of Confinement Liability Standard*

Plaintiff maintains that the constitutional standard to be applied in this matter is an objective deliberate indifference standard as discussed in *Kingsley v. Hendrickson*.[268]  In *Kingsley*, the Supreme Court held that pretrial detainees need only show the objective prong of the "deliberate indifference" test in the context of an excessive force claim.

Defendants respond that Plaintiff incorrectly relies on *Kingsley*, which doesn't apply to this case.  Defendants contend:

> The Fifth Circuit has expressly rejected the *Kingsley* objectively unreasonable standard for cases not involving excessive force against pre-trial detainees. *See Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419–20 (5th Cir. 2017) (rejecting one dissenting judge's invitation to extend Kingsley). This Court has repeatedly recognized this holding. *See Guillory v. Louisiana Dep't of Health & Hosps.*, No. CV 16-787-JWD-RLB, 2018 WL 1404277, at *8 (M.D. La. Mar. 20, 2018) ("deliberate indifference standard remains a subjective one as set out in *Hare* despite the intervening case of *Kingsley*").[269]

The Plaintiff's argument was considered and rejected by another Section of this Court in *J.H.v. Edwards*:

> 263. Defendants argue that the Eighth Amendment deliberate indifference standard applies, even for actions against juveniles. There is support in the

---

[257] *Id.* at 1174-1175.
[268] 576 U.S. 389 (2015).
[269] Rec. Doc. No. 49, p. 22.

Fifth Circuit for this position; indeed, the Fifth Circuit expressly said in *Morales v. Turman*, 562 F.2d 993 (5th Cir. 1977),"The [E]ighth [A]mendment applies to juvenile detention centers as well as to adult prisons." *Id.* at 998 n.1. One reported district court decision within this circuit also followed *Morales. Vega v. Parsley*, 700 F. Supp. 879, 883 (W.D. Tex. 1988) ("The Fifth Circuit has held that the Eighth Amendment applies to juvenile detention centers." (citing *Morales*, *supra*)).

264. Further, while Plaintiffs urge that the "objectively unreasonable" or "rational relationship" test discussed by *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015), applies, **Defendants are correct that the Fifth Circuit has limited *Kingsley*'[s] "objectively unreasonable" standard to cases involving excessive force against pretrial detainees."** (citations omitted) [270]

Thus, the Court concludes that, in this Circuit, the deliberate indifference standard applies to Plaintiff's conditions of confinement claim which requires proof of both the objective component and the subjective component.

In *Valentine v. Collier*, the Fifth Circuit articulated the proper Eighth Amendment standard to apply in a conditions of confinement case:

In a constitutional claim alleging deliberate indifference to the conditions of a prisoner's confinement, the plaintiff must satisfy both the "subjective and objective requirements" of the Eighth Amendment inquiry. *Farmer v. Brennan*, 511 U.S. 825, 846, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). To satisfy the objective requirement, the plaintiff must show an "objectively intolerable risk of harm." *Ibid*. To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (quoting *Farmer*, 511 U.S. at 837, 114 S. Ct. 1970) … The plaintiff must show a denial of "basic human needs." *Ibid.* "Deliberate indifference is an extremely high standard to meet." *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020).[271]

---

[270] *J.H.*, 2020 WL 3448087 at *31 (emphasis added).
[271] 956 F.3d 797, 801 (5th Cir. 2020).

Both *Valentine* and *Farmer* hold that deliberate indifference requires "a subjective 'state of mind more blameworthy than negligence,' akin to criminal recklessness."[272] Also, although a court may disagree with a defendant's actions, "mere disagreement" "does not establish deliberate indifference."[273]

### i.   Objective Component

Plaintiff alleged the following serious risks of harm in placing youth at BCCY- WF: (1) risk of contact between adult inmates at LSP and youth at BCCY-WF, including potential violations of the sight/sound prohibition found in the Juvenile Justice Delinquency Prevention Act ("JJDPA") and the potential assault and sexual assault of youth by adult inmates; (2) risk of loss of or reduction to programs and services at BCCY-WF, including education, medical, rehabilitative, mental health, and recreational services due to understaffing; (3) risk that youth will be housed in unfinished and unfit facilities at BCCY-WF; (4) risk that DOC staff at LSP will run BCCY-WF; and (5) risk of excessive solitary confinement.[274]   Plaintiff has failed to demonstrate an objective risk of serious harm for the asserted claims.

The public policy underpinning the JJDPA is the principle that juvenile rehabilitation is undermined by placing juveniles in adult jails or prisons. Best practices counsel against housing juveniles in an adult penal institution. The JJDPA "mandates that incarcerated youths may not be placed in situations in which they have any clear visual or verbal contact that is 'not brief and inadvertent' with adult incarcerated persons."[275]   The JJDPA

---

[272] *Id.* at 802 (quoting *Farmer*, 511 U.S. at 835, 839–40.
[273] *Id.* at 803.
[274] Rec. Doc. Nos. 1 & 9.
[275] 34 U.S.C.A. § 11133(11)(B), (12), (13) (West) (stating that juveniles "shall not have sight or sound contact with adult [prisoners]").

contemplates the existence of "collocated facilities" and requires that individuals who work with both juveniles and adult inmates be trained and certified to work with juveniles.[277] There is no record evidence that the Defendants' transfer plan violates the JJDPA. The evidence established that there will be no sight or sound (or any other) contact between adult inmates at LSP and youth housed at BCCY-WF.[278]

There is no evidence that a serious risk of the loss of standard services and programs provided to youth will result from the transfer plan. The testimony of OJJ employees was consistent and unrefuted that no youth in OJJ custody will be transferred to BCCY-WF before the facility is structurally ready, adequately staffed with multi-discipline professionals, and all special education, mental health, and other services are in place.[279] Deville testified that OJJ is required by law to comply with Louisiana Bulletin for Special Education 1508, which is a guideline for interpreting what disability or disorder a student might have that needs accommodation.[280] Federal law requires this determination be made within sixty days.[281] Thus, by law, OJJ cannot withhold or delay special education services in any facility.

---

[277] 34 U.S.C. § 11133(12)(B).

[278] *See generally* testimony of Nelson and Patin. Schiraldi, Plaintiff's expert, admitted that the JJDPA does not prohibit any "rare" or "inadvertent" sight and sound contact that could possibly occur between LSP inmates and BCCY-WF youth offenders.

[279] *See generally* testimony of Nelson, Sommers, Dandridge, Deville, Bridgewater, and Patin. Plaintiff quibbles with this argument, noting that Bridgewater admitted that the only LAMOD phases that will be offered to youth at BCCY-WF will be morning check-in and morning check-out. However, Bridgewater explained the reason for this distinction, stating that group counseling can only happen when it is "feasible and safe to do so." 9/8/22 Testimony of Bridgewater at 2:25. Bridgewater further explained that the youth subject to transfer are not amenable to working in a group process. The youth at BCCY-WF will receive individual counseling and will also be introduced to Trust Based Intervention, a tool not currently used at other OJJ facilities. *Id.* at 2:27. Bridgewater testified at length that there will actually be more opportunities for counseling at BCCY-WF and that any change in modality is based on the specific nature and characteristics of each child and a determination of how the child can best succeed. This does not reflect a decline or removal of a mental health or therapeutic program; rather, it is evidence of a plan to offer particularized treatment to youth in the TTU in a manner that is best for each individual child.

[280] 9/8/22 Testimony of Deville at 1:09-1:10, 1:18.

[281] *Id.* at 1:21.

While the photos of the proposed BCCY-WF are disturbing, the testimony was unrefuted that much was left to be done to ready the site.[282] There is no evidence of a serious risk that youth will be transferred to BCCY-WF before it is ready. Despite the condition of the facility on the date the photographs were taken, Defendants presented evidence of a clear and detailed plan to complete the facility in a manner sufficient to provide all security, programming, and behavioral intervention needs before the transfer of any youth.

Plaintiff's claim that the DOC would operate BCCY-WF is not supported by any record evidence.  To the contrary, the record evidence established that the OJJ, not the DOC, will be entirely responsible for the operation of BCCY-WF.  According to the MOU, the role of DOC officers at BCCY-WF will be extremely limited, and DOC security officers will provide staffing support at BCCY-WF only upon express request and authorization by OJJ. Should DOC staff be utilized at BCCY-WF in any capacity, OJJ will provide training to DOC staff on policies and procedures applicable to serving youth populations. There is no serious risk that untrained DOC staff will run BCCY-WF.[283]

There is also insufficient evidence to support Plaintiff's claim that there is a serious risk of excessive or abusive solitary confinement.  Although youth will be confined to their cells while sleeping at night, there was no evidence that OJJ has any intent to unlawfully subject youth to solitary confinement at BCCY-WF.  Nelson testified that, legally, no child can be confined in their room for more than eight hours. Only after an assessment could youth be confined to their room for a longer period; during such time, the youth must be checked on an hourly basis, and once the youth has calmed, they must be released back

---

[282] *See* PX 20.
[283] *See* PX 32; DX 1.

into the general population.   Sleeping in a room, albeit a cell, at night is not solitary confinement.[284]

The Court does find, however, that Plaintiff has presented sufficient evidence of a serious risk of psychological harm to juveniles by placing them in facilities that were designed to house adult prisoners. To be clear, the Court is not finding that the facility in general poses this risk, and the Court has already found that Defendants proved they were undertaking aggressive measures to clean, paint, repair, and modify the facility.  But the photographs of prison cells, barred sliding doors, open toilets in the cells, guard towers and razor wire surrounding the entire facility do, indeed, "scream prison" as Schiraldi testified.[285]   Dr. Stevens testified at length about the harmful psychological impact juveniles could suffer by being housed in a prison facility meant for adults, particularly because, at under 25 years old, they are cognitively underdeveloped, and they are likely already suffering from a history of trauma.[286]   Schiraldi testified that using adult prison cells as rooms for youth has the effect of solitary confinement because the isolation causes the psychological harm.[287]   Dr. Stevens opined that placing any child in a maximum security facility designed for adults is unreasonably psychologically harmful to children.[288]

The fact that there are developmental differences between adult and juvenile offenders has been recognized by the United States Supreme Court. In *Roper v. Simmons*, the Supreme Court held that the execution of individuals under 18 years old at

---

[284] 9/7/22 Testimony of Nelson at 2:20-2:23.
[285] 9/7/22 Testimony of Schiraldi at 4:25.
[286] *See generally*, 9/6/22 Testimony of Stevens.
[287] 9/7/22 Testimony of Schiraldi at 5:00.
[288] 96/22 Testimony of Stevens at 1:28-1:29.

the time of their capital crimes is prohibited by the Eighth and Fourteenth Amendments.[289]

In making this determination, the Court noted that "'[y]outh is more than a chronological

fact.  It is a time and condition of life when a person may be most susceptible to influence

and to psychological damage.'"[290] More recently, in *Montgomery v. Louisiana*, the

Supreme Court noted the line of Supreme Court precedent holding certain punishments

disproportionate when applied to juveniles.[291]

The Plaintiff presented objective evidence of a serious risk of psychological harm;

thus, the Court next considers the subjective component of the deliberate indifference

standard.

ii. <u>Subjective Component</u>

The Court finds that Plaintiff failed to present evidence to demonstrate a likelihood

of success that he could satisfy the subjective component of the deliberate indifference

standard.  While it is obvious that OJJ officials are aware of the ages of the youth eligible

for transfer and arguably aware of the mental health status of these youth, there is no

evidence that OJJ officials subjectively drew the inference that housing youth on the

grounds of Angola in the designated facility poses a serious risk of psychological harm.

First, as set forth above, the Court found the OJJ witnesses who testified in this

matter to be credible and deeply committed to the rehabilitation of youth in their custody.

Many of these OJJ employees have invested decades of their professional lives to

juvenile justice.  Not a single OJJ witness struck the Court as cavalier or dismissive about

---

[289] 543 U.S. 551 (2005).
[290] *Id.* at 569 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)).
[291] 577 U.S. 190, 206 (2016).

the needs of the youth to be rehabilitated, and none testified in a manner which was suggestive of a vengeful or retaliatory intent in creating this transfer plan.

Plaintiff characterizes Nelson as being subjectively indifferent to the needs of high-risk youth because he testified that there are some youth, a small percentage, that will not be rehabilitated, either because they refuse to participate in the therapeutic programs offered by OJJ or because of other characteristics of the youth.  But Nelson unequivocally testified that OJJ's goal is always rehabilitation and never punishment, and OJJ never stops trying to find ways to rehabilitate even the most resistant youth.

A wealth of unrefuted evidence established that the high-risk youth have completely destroyed all secure care facilities in the state.  Sommers testified that OJJ has been renovating these facilities and that the permanent home for the TTU will be in Swanson-Monroe in April of 2023. Sommers also explained that OJJ was considering approximately five facilities to place youth while these renovations continued.  But, after the July 17, 2022 escape from BCCY-WF, Sommers knew these other potential facilities did not provide the level of security necessary to address the increasingly violent and destructive youth.  It was only then that Defendants began to consider the Reception Center on the grounds of Angola as a facility that, with minimal modifications, could provide a level of security necessary to address this problem.  The evidence shows that, since that time, OJJ has invested considerable time and money to make the Reception Center as appropriate as possible to house the youth and to maintain all services and programs available to all youth in OJJ custody.  There is no evidence to support the proposition that OJJ made a "knee-jerk" reaction decision to "send youth to Angola."

Accordingly, Plaintiff failed to meet his burden of demonstrating a likelihood of success on the merits of his conditions of confinement claim.

### b.    Standard Applied to Punishment of Juveniles

Plaintiff also claims that the facility itself is inherently punitive rather than rehabilitative in violation of state and federal law.  It is the public policy of the state of Louisiana that commitment of a juvenile to the care of OJJ "is not punitive nor is it in any way to be construed as a penal sentence, but as a step in the total treatment process toward rehabilitation of the juvenile[.]"[292]  According to the Louisiana Supreme Court, "[T]he unique nature of the juvenile system is manifested in its noncriminal, or civil, nature, its focus on rehabilitation and individual treatment rather than retribution, and the state's role as *parens patriae* in managing the welfare of the juvenile in state custody."[293]

In *Bell v. Wolfish*, the United States Supreme Court established that, under the due process clause, "a detainee may not be punished prior to an adjudication of guilt."[294]  The Court also held that a pretrial detainee can demonstrate that he was subjected to unconstitutional punishment in either of two ways: (1) by showing "an expressed intent to punish on the part of the detention facility officials," or (2) by showing that a restriction or condition is not rationally related to a legitimate government objective or is excessive in relation to that purpose.[295]  The Supreme Court in *Schall v. Martin* applied the *Bell* principles for pretrial detainees to juveniles because, like pretrial detainees, juveniles have not been found guilty of a crime.[296]

---

[292] La. Rev. Stat. Ann. § 15:906(B).
[293] *In re C.B.*, 708 So.2d 391, 396-7 (La. 3/11/98).
[294] 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).
[295] *Id.* at 538–39, 99 S.Ct. 1861; *see also Kingsley*, 576 U.S. at 398.
[296] 467 U.S. 253, 263 (1984).  Courts across the country apply the *Bell* test to constitutional claims brought by juveniles in detention facilities.

The "expressed intent to punish" prong prohibits an intent to punish a pretrial detainee for the alleged crime for which he is detained.[297] It also prohibits officials from subjectively seeking to punish detainees simply because they are detainees,[298] or to serve vengeful or other illegitimate interests.[299] However, this prong does not "categorically prohibit discipline imposed by jail officials for infractions committed while in pretrial detention."[300]

The Court finds there is no evidence that OJJ officials "expressed intent to punish" the youth subject to transfer. The Court next considers whether placing high-risk youth at BCCY-WF is "rationally related to a legitimate nonpunitive governmental purpose and whether [it] appear[s] excessive in relation to that purpose."[301]  As the *Bell* Court made clear, "maintaining institutional security and preserving internal order and discipline are essential goals" of a detention facility.[302]

There is overwhelming evidence in this matter that the transfer plan is rationally related to a legitimate, nonpunitive governmental purpose. OJJ has an obligation to attempt to rehabilitate all youth placed in its custody.  But, as Sommers testified, "you cannot do therapy if a faction of youth are disrupting everything."[303]  The violent and destructive conduct and the escapes require OJJ to create barriers to the youths' ability

---

[297] *See Bell*, 441 U.S. at 535.
[298] *See id.* at 539.
[299] *See Bistrian v. Levi*, 696 F.3d 352, 375 (3d Cir. 2012), *abrogated on other grounds*, 912 F.3d 79 (3d Cir. 2018)(holding the plaintiff had sufficiently alleged a substantive due process violation under the "expressed intent to punish" prong where placement of the plaintiff in solitary confinement was allegedly a vindictive response to a challenge brought by the plaintiff's lawyer).
[300] *J.H. v. Williamson County, Tennessee*, 951 F.3d 709, 717 (6th Cir. 2020)(citing *e.g.*, *Rapier v. Harris*, 172 F.3d 999, 1002–03 (7th Cir. 1999); *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018); *Stamper v. Campbell Cnty.*, 415 F. App'x 678, 678–81 (6th Cir. 2011)).
[301] *Bell*, 441 U.S. at 561; *see also Collazo-Leon v. U.S. Bureau of Prisons*, 51 F.3d 315, 318 (1st Cir. 1995).
[302] *Bell*, 441 U.S. at 546.
[303] Sommers at 10:31. Sommers also notes that Missouri has nineteen facilities to Louisiana's four. *Id.*

to continue this behavior, and BCCY-WF provides those structural barriers and a higher level of security in general. For example, BCCY-WF has reinforced concrete walls and high ceilings, making it impossible for the youth to damage the facility, and multiple secure fences that will help prevent escapes.  OJJ has an obligation to protect all other youth in its custody (and its staff) from the violent attacks that have taken place; transferring youth to BCCY-WF allows OJJ to segregate violent youth away from the youth who complain that they cannot sleep at night for fear of being attacked.[304] The transfer plan also serves the interests of the high-risk youth because it increases rather than decreases the rehabilitative and counseling services available to them. All of these actions qualify as "maintaining institutional security and preserving internal order and discipline" which "are essential goals" of a detention facility.

The next question is whether the discipline utilized is excessive. In making this determination, courts are to keep in mind that jail administrators are afforded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."[305]  Nevertheless, this deference is not unlimited; a detention facility is not permitted to impose conditions that are excessively "harsh ... to achieve objectives that could be accomplished [with] ... alternative and less harsh methods."[306]

Plaintiff argues that housing youth in a facility designed for adult inmates on the grounds of Angola is "appallingly inappropriate."[307]  Initially, the Court agreed. However,

---

[304] Nelson Testimony
[305] *Id.* at 547.
[306] *Id.* at 539, n.20.
[307] Rec. Doc. No. 9, p. 25. The Court notes that many of the same alleged risks of harm that formed the basis of Plaintiff's conditions of confinement claim are also raised here as purported punishment and/or excessively harsh conditions.  Because these claims have already been dispelled, the Court will not repeat them here.

the hearing testimony demonstrated that several other options were being considered before July 17, 2022, and only after that date did the Reception Center enter these considerations.  The Reception Center was ultimately chosen because it was the only building under consideration with the structural construction to address the security and safety issues facing OJJ.  Thus, choosing the Reception Center after the events of July 17, 2022 was not excessively harsh in response to the legitimate purpose of preserving internal order and discipline and maintaining institutional security; indeed, the evidence established that it was the only option that could quickly accomplish these goals.  Thus, Plaintiff has failed to demonstrate a likelihood of success on the merits as to his unconstitutional punishment/due process claim.

<em>c.    Supporting Jurisprudence</em>

The Court finds the following cases analogous and instructive to the issues raised by Plaintiff.

In *Alexander S.*, the United States District Court for the District of South Carolina addressed Fourteenth Amendment claims brought by juveniles incarcerated at a correctional institution who challenged their conditions of confinement.[308] Plaintiff sued the Department of Juvenile Justice ("DJJ") challenging a host of conditions similar to those alleged in the instant case:  food, shelter, sanitation, living space, health care, recreation, programs, classification, discipline, and personal safety.[309]   Regarding the need for discipline in the juvenile detention facilities, the court found:

> An effective discipline system is necessary in a juvenile correctional institution to aid staff in controlling violence and other inappropriate behavior, to maintain safety and security, and to serve as a training tool for the overall purpose of correcting the juveniles' behavior. The Plaintiffs

---

[308] 876 F.Supp. 773 (D. S.C. 1995).
[309] *Id.* at 783.

mount a variety of attacks against the system of discipline in place at DJJ facilities, which depends primarily upon the use of lock-up units and CS gas to punish juveniles for disciplinary infractions. The Plaintiffs challenge the procedures by which juveniles are placed in lock-up units and the Spartan conditions of the lock-up cells themselves. They also seek to have the court impose a one-hour limitation on the duration of their stay in lock-up facilities. They seek an order of this court imposing "less intrusive and more effective methods of maintaining security and control." The Plaintiffs also seek to have the court prohibit the use of CS gas altogether.[310]

Except for the DJJ's use of CS gas, the court determined that the disciplinary procedures at DJJ facilities were not unconstitutional.[311]  Regarding the use of CS gas, the court took issue not with the fact that it was an option to use, but the fact that it was being "used on a fairly regular basis … for purposes other than the protection of staff or others."[312]  The court concluded that "the indiscriminate use of CS gas violates the juveniles' constitutional rights under the Due Process Clause."[313]  The court further found that "gas should be used only when a genuine risk of serious bodily harm to another exists and other less intrusive methods of restraint are not reasonably available."[314]

The plaintiffs also raised the issue of fire safety in the individual cells of the two lock-up units with padlocks on all the cell doors.[315]  The court described these two "disciplinary units" at DJJ as having thirty individual cells all secured with padlocks.[316] Because each padlock had to be unlocked by hand, the court concluded that this process created an unreasonable risk of harm to the plaintiffs in the event of a fire.[317]  Notably, the court mentioned no constitutional violations merely because more aggressive

---

[310] *Id.* at 785.
[311] *Id.*
[312] *Id.* at 786.
[313] *Id.*
[314] *Id.* The OJJ Continuum of Force policy does not allow "indiscriminate use" of chemical spray.
[315] *Id.*
[316] *Id.*
[317] *Id.*

juveniles were in disciplinary units containing individual lock-up cells.

The plaintiffs also raised the need for a classification system to protect passive juveniles from more aggressive juveniles.[318]

> Classification, for the purposes of this case, is the process of separating aggressive juveniles from passive ones and determining appropriate levels of restraint for each juvenile based upon the threat the juvenile presents to other juveniles and to the public. The juveniles possess a clearly recognized liberty interest in being free from unreasonable threats to their physical safety. *See Youngberg v. Romeo*, 457 U.S. 307, 315–16, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1982). On the other hand, the general public is entitled to reasonable protection from juveniles incarcerated at DJJ.
>
> For these reasons, juveniles in DJJ facilities should be screened and classified, so that the aggressive juveniles are identified and separated from more passive juveniles. The level of restraint to be used for each juvenile should be based upon some rational professional judgment as to legitimate safety and security needs. Inherent in this right is a system of periodic review of the initial placement to evaluate whether subsequent events demonstrate the need for a reclassification of the juvenile's security requirements.[319]

The issue of programming was also challenged. The plaintiffs argued that, with proper rehabilitative programming, juveniles would be released faster. "Because such programming improves the juveniles' behavior while confined, it reduces the need for disciplinary lock-up and enhances the safety of the institution for the juveniles and the staff."[320] The court found that

> [U]nder the Constitution, a minimally adequate level of programming is required in order to provide juveniles with a reasonable opportunity to accomplish the purpose of their confinement, to protect the safety of the juveniles and the staff, and to ensure the safety of the community once the juveniles are ultimately released. Minimally adequate program services should be designed to teach juveniles the basic principles that are essential to correcting their conduct. These generally recognized principles include: (1) taking responsibility for the consequences of their actions; (2) learning appropriate ways of responding to others (coping skills); (3) learning to

---

[318] *Id.* at 787.
[319] *Id.* The OJJ has a classification system in place for this purpose.
[320] *Id.* at 790.

manage their anger; and (4) developing a positive sense of accomplishment.[321]

In *Hughes v. Judd*, a case decided by the Middle District of Florida, several juveniles, as representatives of other juveniles similarly situated, brought a Section 1983 action asserting that Grady Judd, in his capacity as Sheriff of Polk County, Florida, and Corizon Health, Inc., a health care provider retained by the Sheriff, violated the juveniles' rights under the Fourteenth Amendment during the juveniles' detention at the Central County Jail (CCJ) in Bartow, Polk County, Florida.[322]  The plaintiffs alleged constitutional claims similar to those asserted in the instant case.

In *Hughes*, the Sheriff assumed new statutory responsibility for juvenile detainees and transferred them from the facility operated by the Department of Juvenile Justice (DJJ) to the Juvenile Detention Facility, a self-contained, newly refurbished section of CCJ.[323]  The court found that "the pre-adjudicated juveniles and the direct-file juveniles have lived at CCJ but in separate dorms. The juveniles are separated—out of 'sight and sound'—from the adult inmates, who are housed in a separate building across a large field at the adjoining adult campus of CCJ."[324]  The plaintiffs alleged constitutional violations based on being housed on the grounds of an adult prison and being incarcerated in "an adult model."  The court rejected this claim:

> The plaintiffs' claim that CCJ, owing to location and origin, is managed as an adult facility. However, the evidence establishes that CCJ is "not run as an adult model" but rather "with a juvenile focus or juvenile-specific focus." (XXII 31:12–14) The plaintiffs also attempt to prove, contrary to the predominant and clearly convincing evidence, that juveniles are left "unsupervised" and observed only remotely through cameras, that deputies interact with the juveniles only to physically abuse them, that the deputies

---

[321] *Id.*
[322] 108 F.Supp.3d 1167 (M.D. Fla. 2015).
[323] *Id.* at 1235.
[324] *Id.*

do "nothing" to prevent the "inevitable conflict" between juveniles, that "jail-house justice" rules apply, and that punishment is the "default." The evidence soundly refutes each of the plaintiffs' claims, notwithstanding several episodes to the contrary. Consistent with the Sheriff's constitutional mandate to maintain security, safety, and control (XVII 134:20–135:16), discipline of juveniles occurs only after violation of a facility rule or after disobedience of a detention deputy's lawful order. Discipline in this circumstance is not punishment in the constitutional sense, *Bell*, 441 U.S. at 537, 99 S.Ct. 1861, but is discipline on the "regulation" side of the "punitive/regulatory" dichotomy in *Salerno* and later cases.[325]

The court also reinforced the principle that juvenile detention administrators do not violate the Constitution by utilizing a discipline program to maintain order, safety, and security in a detention facility:

> Nonetheless, *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), finds that the regime of pre-trial detention codified in the Bail Reform Act of 1984 "is regulatory in nature and does not constitute punishment before trial in violation of the Due Process Clause." 481 U.S. at 748, 107 S.Ct. 2095. *Salerno* holds that "the punitive/regulatory distinction turns on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it and whether it appears excessive in relation to the alternative purpose assigned.'" 481 U.S. at 747, 107 S.Ct. 2095. Quite obviously, this reasoning directly applies to Florida's system of detention. **The management of a detention facility and the preservation of safety and security at the facility present a compelling "alternative purpose" for regulatory measures, including temporary suspension of a privilege or the imposition of administrative confinement, however denominated, without implicating the Due Process Clause and without requiring an adversary hearing before every enforcement of the rules.**[326]

### C. Irreparable Harm

Having found that the Plaintiff failed to demonstrate a likelihood of success on his RA and Section 1983 claims, the Motion for injunctive relief fails. Nonetheless, the Court will analyze the proof on the irreparable harm element. "'Irreparable harm requires a

---

[325] *Id.* at 1236.
[326] *Id.* at 1235 (emphasis added).

showing that: (1) the harm to Plaintiff[] is imminent (2) the injury would be irreparable and (3) that Plaintiff[] ha[s] no other adequate legal remedy.'"[327] A plaintiff seeking injunctive relief:

> must show that "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Id.* (alteration in original) (quoting Wright & Miller, supra, § 2948.1); *Morrell v. City of Shreveport,* 536 Fed.Appx. 433, 435 (5th Cir.2013). There must be more than "an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir.1985). Accordingly, the party seeking a preliminary injunction must show that the threatened harm is "more than mere speculation." *Janvey*, 647 F.3d at 601; *see also Connecticut v. Massachusetts*, 282 U.S. 660, 674, 51 S.Ct. 286, 75 L.Ed. 602 (1931) ("[An injunction] will not be granted against something merely feared as liable to occur at some indefinite time in the future."); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985) ("[T]he injury must be both certain and great; it must be actual and not theoretical."). Therefore, "[a] presently existing actual threat must be shown." *Morrell*, 536 Fed.Appx. at 435 (alteration in original)(quoting *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir.2001)).[328]

For the same reasons the Court found that there was a serious risk of psychological harm to Plaintiff (and similarly situated youth) due to his age and that he suffers from PTSD and other mental health issues, the Court finds that Plaintiff has presented evidence to support the likelihood that psychological harm is imminent upon his transfer to BCCY-WF.

To be clear, the Court does not find that Alex A.'s nightmares, fears, or anxiety caused by his mistaken belief that he would be transferred to LSP to be confined with adult inmates constitute irreparable psychological harm.  Alex A. testified that his only

---

[327] *J.H. by and through N.H. v. Edwards*, 2020 WL 3448087 at *44 (quoting *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 608 (N.D. Tex. 2006) (citing *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975))).

[328] *Monumental Task Committee, Inc. v. Foxx*, 157 F.Supp.3d 573, 583 (E.D. La. 2016).

concern about BCCY-WF was the risk of being assaulted by adult inmates. Plaintiff further testified that, if convinced he will not be assaulted by adult inmates, then he will no longer be afraid of a transfer to BCCY-WF.[329]

However, Dr. Stevens' expert opinions did not apply only specifically to Alex A. but to any juveniles in state custody based on the lack of brain development in adolescents and the likelihood that most incarcerated juveniles are suffering from trauma and/or other mental health issues.  Relying on her expertise in juvenile trauma, Dr. Stevens testified that housing juveniles in a facility designed for adult inmates would place these juveniles in a defense posture and force them to regulate survival stressors rather than normal, appropriate stressors for adolescents, like stress related to their studies. The Court is persuaded that transferring emotionally vulnerable adolescents, many of whom have mental health issues and cognitive disfunction, to a prison camp on the grounds of Angola will likely have deleterious psychological ramifications. This solution is distressing and not without consequence. That our society has such a choice to make is emblematic of grave underlying systemic social issues.

The Court's finding of likely irreparable psychological harm, however, does not alone carry Plaintiff's preliminary injunction burden.

### D.  Balance of Harms

While Plaintiff focuses entirely on the alleged risk of harm to himself and the purported class, Plaintiff fails to advance any meaningful argument addressed to the serious potential risk of harm that an injunction would cause to Defendants.

In this case, as in *Valentine*, the State of Louisiana has "assigned the prerogatives"

---

[329] *See generally* 9/6/22 Testimony of Alex A.

of juvenile detention policy to Defendants, and granting Plaintiff's injunction would "prevent the State from effectuating the Legislature's choice and hence imposes irreparable injury."[330] As the *Valentine* court explained, the Supreme Court "has repeatedly warned that it is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons."[331] The Supreme Court has counseled that the operation of juvenile detention centers is no different.

The harm to Defendants if the Court grants the injunction is "particularly acute" because an injunction would interfere with OJJ's "system-wide approach" to respond to the changing needs of the youth in its care.[332] Issuing an injunction would undermine Defendants' "ability to continue to adjust its policies" by "lock[ing] in place a set of policies."[333] If Defendants are not free to act "without a permission slip from the district court, … [t]hat constitutes irreparable harm."[334]

The youth eligible for transfer to BCCY-WF present a demonstrated risk to other youth in OJJ care, OJJ staff, and when they escape, a risk to the public.

The evidence demonstrated that the TTU program will provide intensified, targeted rehabilitative services and therapies to assist the youth who are not responding to OJJ's standard programming. An injunction would defeat the purpose of the OJJ's TTU program—"to teach the youth to overcome their maladaptive behaviors, to re-enter traditional OJJ secure care facilities, and ultimately to return to their homes and

---

[330] *Valentine*, 956 F.3d at 803.
[331] *Id*. (quotations omitted).
[332] *Id*.
[333] *Id*.
[334] *Id*.

communities as productive members of society."[336]    As Defendants succinctly state: "These youth cannot be effectively rehabilitated unless they can first be securely housed in a facility such as BCCY-WF (and ultimately, Swanson-Monroe) that allows OJJ staff to control and monitor the youth's activity and prevent the youth from engaging in violence, property destruction, or escape attempts while their therapy is ongoing."[337]

An injunction would subordinate rehabilitative therapies to security enforcement. OJJ's therapeutic and educational programing would become subordinate to providing safety and security from high-risk youth. Housing high-risk youth in a cell block that once was Angola's death row is far from ideal. However, the Court finds that OJJ has made the necessary provisions to provide the youth subject to transfer to BCCY-WF with constitutionally adequate care and rehabilitative services. The Court finds that the interests of the youth subject to transfer are subordinate to the needs of, and opportunities for, the overwhelming majority of the youth in OJJ's care who do not pose a security threat. As the Supreme Court held: "So long as certain minimum requirements of child care are met, the interests of the child may be subordinated to the interests of other children, or indeed even to the interests of the parents or guardians themselves."[338]    The needs of this small group of high-risk youth are subordinate to the health, safety, and welfare of the other youth in the program, OJJ staff, and the public.

The Court finds that the balance of harms weighs against granting the injunction.

**E.  Public Interest**

Plaintiff argues it is always in the public interest to prevent the violation of

---

[336] Rec. Doc. No. 74, pp. 15-16.
[337] *Id.* at 16.
[338] 507 U.S. 292, 304 (1993)(citation omitted).

constitutional rights; however, the Court finds no evidence that Plaintiff's (or the proposed class's) constitutional rights would be violated by the transfer Plan.

Louisiana has vested OJJ with discretionary authority concerning secure care for the juveniles in its custody. The Constitution affords juveniles in secure care no constitutionally protected interests that outweigh the Defendants' or the public's interests in the administration of juvenile justice.[339]

The public has an interest in seeing adolescents adjudicated delinquent rehabilitated.  So too, the public has an interest in maintaining public safety.  There can be no meaningful rehabilitation of youth if OJJ's principal objective is reduced to maintaining order.  As aptly observed by the court in *Hughes*, "[n]o one wants any of these juveniles to be where they are [but] [t]hat some are defiant, aggressive, and enduringly turbulent  . . . renders their safe and peaceful management complex."[340] The Court must consider and balance the "many other acute and competing needs of society."[341] These youth deserve more than the circumstances they have endured that have brought them to this point. In terms of their secure care, they "deserve and should have more—perhaps, quite a bit more—than the constitutionally permissible minimum."[342] Nonetheless, the Court finds that the constitutional minimum is satisfied under the circumstances of this case.

---

[339] *Patterson v. Daniels*, No. 12-1674, 2010 WL 2100546, at *21 (E.D. La. March 22, 2013) (referencing *Olim v. Wakinekona*, 461 U.S. 238, 249–50 (1983) and *Merit v. Lynn*, 848 F. Supp. 1266, 1267–68 (W.D. La. 1994)).
[340] *Hughes,* 108 F.Supp.3d at 1176-1177.
[341] *Id.*
[342] *Id.*

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's *Motion for Preliminary Injunction*[343] is DENIED. This matter is referred to the Magistrate Judge for a Scheduling Order.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 23rd day of September, 2022.

_____

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[343] Rec. Doc. No. 3. This motion was previously terminated when the Court denied the emergency request for a TRO; this Ruling denies the request for preliminary injunctive relief.