# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ALEX A., by and through his guardian, Molly Smith; BRIAN B.; and CHARLES C., by and through his guardian Kenione Rogers, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS, in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections,<br><br>　　　　　Defendants. | Civil Action No. 3:22-cv-573-SDD-RLB<br><br>**First Amended Complaint for Injunctive and Declaratory Relief—Class Action** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Alex A., by and through his guardian, Molly Smith; Brian B.; and Charles C.,[1] by and through his guardian Kenione Rogers (collectively, "Plaintiffs") bring this action on behalf of themselves and others similarly situated against Governor John Bel Edwards, Deputy Secretary of the Office of Juvenile Justice (OJJ) William Sommers, and Secretary of the Louisiana Department of Public Safety & Corrections (DOC) James M. LeBlanc (collectively, "Defendants"), and allege as follows:

---

[1] Alex A., Brian B. and Charles C. are pseudonyms, as the plaintiffs are minors or were minors upon entering the juvenile justice system. Brian B. is no longer a minor, but was when he was adjudicated delinquent.

1

## INTRODUCTION

1.

Plaintiffs and putative class members are children who have been adjudicated delinquent and are placed in OJJ custody for the purpose of receiving treatment and rehabilitation.

2.

In July 2022, Governor John Bel Edwards announced that the State of Louisiana would "temporarily move" youth in OJJ custody to the Louisiana State Penitentiary (LSP), a notorious adult maximum-security prison commonly referred to as "Angola Prison" or "Angola." Rather than providing treatment and rehabilitation, this decision risks punishing and traumatizing Plaintiffs and putative class members in violation of their due process rights under the U.S. Constitution and federal disability rights laws.

3.

Juvenile delinquency proceedings are civil in nature, not criminal.

4.

The purpose of the juvenile justice system is to rehabilitate, not punish, youth. According to OJJ, "[y]outh in residential [(non-secure group homes)] and secure care facilities have the same rights," and "[i]t is the state's duty to act as a parent to the youth placed in custody."[2] OJJ recognizes that "the purpose of incarcerating juveniles . . . is treatment and rehabilitation, [and] due process requires that the conditions and programs . . . must be reasonably related to that purpose."[3]

5.

A normalized physical environment is critical to achieving the rehabilitative purpose of

---

[2] Louisiana Office of Juvenile Justice, *Louisiana Laws*, https://ojj.la.gov/policies-systems/louisiana-laws/ (last accessed Oct. 23, 2022).
[3] *Id.* (quoting *State ex rel. S.D.*, 2002-0672 (La. App. 4 Cir. 11/6/02), 832 So. 2d 415, 433).

juvenile justice out-of-home placements. According to the Annie E. Casey Foundation (Casey Foundation), an organization that focuses on improving the lives and wellbeing of children, including children in the juvenile justice system, and works closely with states, one of the principles "that every juvenile justice system should embrace right now" is to have a physical space and environment with "natural light, inviting and warm color schemes and pictures" and "[i]n place of gray walls, windowless rooms and caged-in recreational spaces typical of many correctional designs, secure settings [for children] would include places to relax and learn and separate space for therapeutic conversation."[4] The Casey Foundation's 2014 update to its Juvenile Detention Facility Assessment, a guide to juvenile detention reform, states that "[j]uvenile detention facilities should not look like or be operated as jails."[5] These concepts are not new: in 1980, the Institute of Judicial Administration-American Bar Association (IJA-ABA) Joint Commission on Juvenile Justice Standards (the "IJA-ABA Commission") issued a set of standards and recommendations, instructing that "[t]he princip[al] value that pervades these standards is the concept of normalization: that youths, at whatever stage of the pre- or post- adjudicative process, should lead lives as close to normal as possible."[6] As the IJA-ABA Commission explained, "[n]ormalization . . . points out that building design should not be a source of punishment."[7]

6.

The need for a normalized, rehabilitative, and non-punitive environment is a core reason Defendants' decision to transfer youth in OJJ custody to the grounds of Angola Prison is dangerous and unlawful. Since 1974, with the passage of the federal Juvenile Justice and Delinquency

---

[4] Annie E. Casey Foundation, *Eight Principles to Transform Care*, https://assets.aecf.org/m/resourcedoc/aecf-eightprinciplestotransformcare-2019.pdf (last accessed 10.25.22).
[5] Annie E. Casey Foundation, *Juvenile Detention Facility Assessment*, https://cclp.org/wp-content/uploads/2016/06/JDAI-Detention-Facility-Assessment-Standards.pdf at 77 (last accessed 10.25.22).
[6] Institute of Judicial Administration American Bar Association, Juvenile Justice Standards, *Standards Relating to Architecture of Facilities*, https://www.ojp.gov/pdffiles1/ojjdp/83567.pdf (last accessed Oct. 25, 2022).
[7] *Id.*

Prevention Act (JJDPA), Congress recognized that young people should not be incarcerated in adult jails or prisons. Juvenile Justice and Delinquency Prevention (JJDP) Act (Pub. L. No. 93-415), 42 U.S.C. § 5601 *et seq*. The U.S. Department of Justice's Office of Juvenile Justice and Delinquency Prevention (OJJDP) has similarly taken the position that "[c]hildren do not belong in adult courts, jails, and prisons."[8] The JJDPA requires that youth not be confined in any institution where they may have contact with adult inmates; if ever youth are held in adult facilities under temporary and exceptional circumstances, there must be "sight and sound separation" from incarcerated adults. The requirement of "sight and sound separation" prohibits contact between children and adults "in order to protect [children] from threats or abuse from adult offenders," and is defined as "any physical, clear visual, or verbal contact that is not brief and inadvertent."[9]

7.

At LSP, adult prisoners perform much of the maintenance of the grounds, food service, and other jobs on the property. In the recent past, adult prisoners have maintained the grounds around the building where OJJ is housing children.

8.

Even with a strip of black fabric around the fencing surrounding the OJJ Angola site, there is a risk of sight and/or sound contact between youth in OJJ custody and adult prisoners incarcerated at LSP.

9.

Potential contact between incarcerated adults and children housed at the OJJ Angola site

---

[8] U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, *OJJDP Priorities: Treat Children as Children* https://ojjdp.ojp.gov/about/ojjdp-priorities#treat-children-as-children ("Children do not belong in adult courts, jails, and prisons.") (last accessed Sept. 2, 2022).
[9] Coalition for Juvenile Justice, *JJDPA Reauthorization: Updated Protections to Ensure Equity for Youth*, Sep. 23, 2019, https://www.juvjustice.org/blog/1138.

poses a substantial risk of harm to the children and has already caused anticipatory harm to children who might be moved to the site.

10.

The physical features of the Angola prison complex are typical of a maximum-security adult prison. These features, which children moved there and their families when they visit will see, include high fencing topped by multiple layers of razor wire, tall guard towers looming over the building and yard designated for recreation for youth in OJJ custody, signage about weapons check-ins, and signage indicating one is entering the Louisiana State Penitentiary on the way into the grounds.

11.

The OJJ site at Angola is in a building designed for and formerly used as the death row unit for adult men. That building is located on the grounds of LSP, and as such, is surrounded by high fences, razor wire, guard towers, and other features that characterize maximum-security adult prisons.

12.

It is well known in Louisiana that Angola is a maximum-security adult prison that houses men convicted of the most serious crimes, including those on death row. It is also well known in Louisiana that Angola is notorious for human rights abuses of adults incarcerated there.

13.

The correctional, punitive environment in the building OJJ is using to house youth, designed as a death row building in an adult prison, is inappropriate and dangerous for children. Unlike dormitories or individual rooms where youth adjudicated delinquent normally live, including those in secure facilities, in the adult prison building at Angola, youth are forced to live in barred-door

cells designed to house adults. The cells have no windows and only a single cot, a metal shelf, and a metal sink and toilet without a toilet seat. These cells deprive youth of any modicum of privacy and normalcy, and create an increased risk of solitary confinement, suicide, and self-harm for youth living there.

14.

The Defendants' decision to transfer youth in OJJ custody to Angola creates an unreasonable risk of harm for youth who have been or will be moved there because of the adult correctional design and environment; the heightened risks of solitary confinement, suicide, and self-harm; lack of adequate access to medical, educational, and rehabilitative services, including inadequate accommodations for youth with disabilities; and the risk that sight and sound separation will not be maintained.

15.

On July 19, 2022, at a press conference called to address the failings of the Bridge City Center for Youth (BCCY), an OJJ secure care facility, Defendant Edwards declared that the State would "temporarily move" youth from BCCY to a facility on the grounds of LSP ("the OJJ site at Angola"). Although Governor Edwards claimed that the youth would be held in a separate location at LSP, would not have any contact with adults incarcerated at LSP, and that youth transferred to the OJJ site at Angola will have counseling, educational programming, and other services, those claims were unsupported by any public plan. Since the Governor's July announcement, Defendants have acknowledged that youth in any OJJ facility—and not just BCCY—are at risk of being moved to the OJJ site at Angola if they satisfy certain criteria set by OJJ. On October 19, 2022, OJJ moved eight youth—four from Acadiana Center for Youth at St. Martinville and four from Swanson Center for Youth at Monroe— to the OJJ site at Angola.

16.

Almost five thousand men are incarcerated at LSP, making it the largest adult maximum-security prison in the country. LSP is commonly referred to as "Angola" because of its origins as a plantation where people were enslaved before the Civil War, when it was called the "Angola Plantations." Given that 83 percent of youth in OJJ's secure juvenile care system are Black, it is highly likely that Black youth will disproportionately suffer the brunt of the Governor's plan to transfer youth in OJJ custody to the site at Angola.

17.

LSP has a long history of abuse and human rights violations, continuing to this day. In July 2020, four supervisory correctional officers at LSP pleaded guilty and/or were convicted for beating an adult incarcerated at LSP who was handcuffed, shackled, and not resisting.[10] As described further below, LSP officers who normally work with adults at LSP are authorized under Defendants' policy to provide security assistance at the OJJ site at Angola. The prison also cannot provide basic medical care for the adults within its gates. In March 2021, Chief Judge Shelly Dick of this Court concluded that "LSP lacks the infrastructure necessary to provide a constitutionally adequate health care system for patients with serious medical needs," and "overwhelming deficiencies in the medical leadership and administration of health care at LSP contributes to these constitutional violations."[11] Given the likely interactions between youth in OJJ custody at Angola and adult corrections workers and the risk that youth at the OJJ Angola site might receive medical care at LSP in cases of emergency, youth moved to Angola will face significant threats to their safety, health, and wellbeing in this

---

[10] Department of Justice Office of Public Affairs, *Four Supervisory Correctional Officers at Angola Prison Sentenced for Beating a Handcuffed and Shackled Inmate*, Jul. 6, 2020, https://www.justice.gov/opa/pr/four-supervisory-correctional-officers-angola-prison-sentenced-beating-handcuffed-and.

[11] *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *4 (M.D. La. Mar. 31, 2021), *reconsideration denied*, No. CV 15-318-SDD-RLB, 2021 WL 5287856 (M.D. La. Oct. 8, 2021).

environment..

18.

Regardless of what services are provided to youth in OJJ custody at the Angola site, it is a punitive, adult prison environment that is not appropriate for any youth adjudicated delinquent. As one former top OJJ official noted, the move to transfer youth from juvenile facilities to the OJJ site at Angola is "abhorrent" and "the worst juvenile justice policy decision probably ever made in modern times."[12]

19.

Adult staff working in the OJJ site at Angola will be able to see youth while they are changing their clothes and/or using the toilet in the cells in which they are confined. The bars, instead of doors, create an increased risk of suicide and self-harm because of the numerous "cut-off" points presented by the bars where youth could tie a sheet or shoe string or comparable item.

20.

Although the site where youth will be held at Angola will be staffed in part by OJJ staff, youth held at the OJJ site at Angola will be exposed regularly to adult corrections staff. Department of Public Safety and Corrections (DOC) staff are also authorized to provide security inside and outside the OJJ site at Angola. OJJ's Curtis Nelson testified that DOC staff will be assigned to be "roving" throughout the building used by OJJ and will intervene to provide security whenever OJJ requests it. According to the Memorandum of Understanding (MOU) between OJJ and DOC, DOC guards are authorized to use the same force they are trained to use against adults at LSP—including deploying pepper spray and using tasers—against youth at the OJJ site at Angola.

---

[12] Erin Einhorn, *Teens in a Louisiana juvenile facility are being sent to Angola prison. Experts say it's not only cruel, it could violate the law*, NBC News (Jul. 21, 2022), https://www.nbcnews.com/news/us-news/louisiana-sending-youth-angola-prison-rcna39150.

21.

Under Louisiana law, youth in OJJ custody are adjudicated delinquent, which is a civil-law adjudication.  Plaintiffs and putative class members have not been convicted of any crime. They are in juvenile custody for the sole purpose of rehabilitation, and the State is prohibited under the Fourteenth Amendment of the U.S. Constitution from subjecting them to punishment.  Transferring young people in OJJ custody to the OJJ site at Angola, an infamous prison with thousands of people convicted of crimes under Louisiana law and sentenced to hard labor, is clearly punishment. Defendants' unconstitutional actions place Plaintiffs and putative class members at risk of grave harm and lifelong trauma.

22.

The harms of Defendants' actions are exacerbated for Plaintiffs and putative class members who have disabilities. Plaintiffs Alex A., Brian B., and Charles C. each have a disability as defined under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act (ADA). They seek to represent a subclass of all class members who have a disability, as defined under federal law ("Disability Subclass"). As people with disabilities, Plaintiffs and the Disability Subclass members are entitled to reasonable modifications, nondiscrimination, and equal access. This includes a right to modifications and accommodations in their education, housing, behavior and treatment plans, and other aspects of life in OJJ custody. OJJ must consider whether any general policies, systems, and procedures that it creates or applies uniformly have the effect of discriminating against or excluding students with disabilities. If so, it must make changes to these policies to ensure equal access and avoid such discrimination.

23.

Given that a disproportionate number of youth in OJJ's custody are youth with disabilities,

it is highly likely that youth with disabilities are at risk of being sent to the OJJ site at Angola. The criteria for referring youth in OJJ custody to the Angola site consist chiefly or solely of bad behaviors. Youth with mental health disabilities who are not provided appropriate services and supports face an increased risk of being sent to the Angola site.

24.

Young people with disabilities are overrepresented in juvenile justice system, with an estimated 70 percent of children in juvenile justice systems nationwide having disabilities. The OJJ site at Angola is not equipped to provide minimally adequate care and education for *any* children, and even less so for children entitled to educational, behavioral, and housing accommodations, and in need of intensive therapeutic and mental health services, as a result of their disabilities. Youth with disabilities are thus likely to suffer disproportionately if sent to Angola. Despite holding in custody a majority-disabled population, OJJ is failing to take disability into account in using the Angola site, including in assessing or modifying its selection criteria or transfer process for placement at Angola. By ignoring disability, OJJ is violating disability rights laws.

25.

Young people who are the target of Defendants' commitment to transfer youth to the OJJ site at Angola, including Plaintiffs and putative class members, are experiencing anxiety, fear for their safety, and exacerbated disability symptoms as a result of Defendants' transfer plan.

26.

Because Defendants' actions constitute ongoing, systemic violations of Plaintiffs' constitutional and statutory rights, Plaintiffs seek classwide relief enjoining Defendants from transferring youth to the OJJ site at Angola or on the grounds of any other adult prison. In addition, Plaintiffs request that any youth who have already been transferred to the OJJ site at Angola be

immediately released to the community or transferred to one of OJJ's other existing facilities.

## JURISDICTION AND VENUE

### 27.

This action arises under 42 U.S.C. § 1983, pursuant to the Fourteenth Amendment to the United States Constitution, and, for Plaintiffs and putative class members with disabilities, under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 2201.

### 28.

Venue is proper pursuant to 28 U.S.C. § 1391 because the events and omissions giving rise to these claims occurred and continue to occur in this judicial district.

## PARTIES

### 29.

PLAINTIFF ALEX A. is a 17-year-old currently under juvenile court jurisdiction. He is currently in the secure custody of Defendant SOMMERS and OJJ, at BCCY, where he participates in LAMOD, the Louisiana Model for Secure Care, and is not involved with the Juvenile Understanding and Managing Problematic Behavior Program (JUMP) Sexual Treatment Units program. Alex A was deemed eligible by OJJ for transfer to the OJJ site at Angola. He has been informed repeatedly by OJJ staff that he, along with other youth in OJJ custody, will be transferred to the OJJ site at Angola imminently.

### 30.

While at BCCY, Alex A. attends school every weekday for five hours, during which he takes social studies, math, English, and science.  He has different teachers and changes classrooms for each subject.  As a student with a disability, he receives classroom accommodations to help him access

11

material in the classroom, including the use of a calculator and read aloud services.  He also has the assistance of a special education teacher in his classes who helps to deliver his services. In addition to school, he is provided with opportunities to explore his hobbies by reading at the library and exploring books about sports and life in the city. He receives intensive counseling and treatment services at BCCY, including participating in group counseling three times a week for an hour, individual counseling for at least thirty minutes twice a week, and meeting every two weeks with a social worker to discuss skills like coping and anger management.

31.

Alex A. is a child with a disability under Section 504 of the Rehabilitation Act and under the ADA.  He has been diagnosed with a learning disability, and post-traumatic stress disorder and has been prescribed medication to address his PTSD, to help him sleep, and to address nightmares.

32.

Alex A. first learned that he and his peers would be moved to the OJJ site at Angola while watching television news at BCCY.  Since then, he has experienced significant mental and physical harm, including increased difficulty sleeping, extreme stress, and an exacerbation of his disabilities. During sleepless nights, he has started to pull out his hair.  Alex A. fears that he will be subjected to unsafe conditions and violence at the OJJ site at Angola. At BCCY, DOC staff have been brought in to assist with security due to OJJ staffing shortages. DOC staff at BCCY have used mace and pepper spray on Alex A. and other youth at the facility. As a result, Alex A. is afraid this violence and use of force by DOC staff will only intensify at the OJJ site at Angola, where DOC staff per the MOU with OJJ are explicitly authorized to use the force they are trained in using against adults at LSP against youth at the OJJ site at Angola. Additionally, Alex A. fears that he will not receive the treatment, counseling, and education that he needs and receives at BCCY. Like Alex A., his peers

are also terrified of being moved to the OJJ site at Angola.  Alex A. has seen his peers break down and cry because of their fear of being moved there.

33.

In July 2022, when Alex A. first learned of the decision to move BCCY youth to Angola, BCCY employees informed him that he would be moved within a week or two.  Later, BCCY staff informed him that he and his peers would be moved to the OJJ site at Angola on August 15 or August 16, 2022.  When that did not happen, staff members told him that he would be moved "any day now."  Based on these representations, Alex A.  reasonably believes that the move is imminent and could happen at any time.

34.

Alex A.  filed an Emergency Grievance pursuant to OJJ's Administrative Remedy Procedure (ARP) on Tuesday, August 16, 2022.  Despite the imminent nature of Alex A.'s anticipated move to the OJJ site at Angola and the serious physical and psychological harm Alex A. is already experiencing as a result, OJJ responded on August 18, 2022 by stating that Alex A.  is "not subject to any immediate risk of harm" and therefore his ARP would be reviewed "within the regular ARP time limits."  OJJ's failure to properly treat Alex A.'s grievance as an emergency grievance that requires an expedited timeline has made the grievance process unavailable to Alex A.  As a result, Alex A. has exhausted all available administrative remedies and represents the class in this action.

35.

Alex A. brings his lawsuit through his mother and next friend, Molly Smith, who is an adult resident of the state of Louisiana.  Molly Smith brings this action on Alex A.'s behalf pursuant to Fed. R. Civ. P. 17(c)(2).  Ms. Smith is dedicated to the best interests of Alex A. and will advocate for those best interests in this action.  Like her son, Ms. Smith is deeply concerned about Defendants'

imminent plan to move youth to the OJJ site at Angola. Ms. Smith is terrified that her son will be locked in a windowless cell for 24 hours a day, or that he will be exposed to adults who are incarcerated at the OJJ site at Angola. She is also concerned that Plaintiff will be deprived of the education, medical and mental health treatment, and rehabilitative services he requires when he is moved to the OJJ site at Angola.

36.

PLAINTIFF BRIAN B. is 18 years old. He is currently in the secure custody of Defendant SOMMERS and OJJ, at the Bridge City Correctional Center for Youth (BCCY). Brian B. was a minor when he was charged with juvenile delinquency and turned 18 while his case was pending.

37.

Brian B. participates in the LAMOD program at BCCY. He is currently assigned to Liberty Dormitory at BCCY.

38.

Brian B. learned about the plan to move youth from BCCY to Angola from the news and was shocked and confused to learn he was one of the youth being moved.

39.

Prior to his arrival at BCCY on or around April 20, 2022, Brian B. was hospitalized twice at mental health facilities. Each hospitalization was due to a mental health crisis and each stay lasted about a week.

40.

Brian B. is a youth with a disability under Section 504 of the Rehabilitation Act and the ADA. He has been prescribed medication, including Adderall, to address behavioral and attention disabilities since he was a young child.

41.

While at BCCY, Brian B. attends school five days per week at Riverside Alternative School. Brian B. is currently in tenth grade and repeated sixth grade. While at school, he has access to work on a computer while a teacher is present in the room. Brian B. believes he is earning high school credits through his attendance at Riverside Alternative School.

42.

Brian B. participates in group counseling on a daily basis at his dormitory. He also works with a counselor in individual sessions once a week.

43.

Brian B. first learned about the plan to move youth to LSP while watching the television news at BCCY. OJJ staff subsequently told Brian B. that he was one of the youths who would be transferred. Brian B was shocked and confused by this news. Unlike many youth who OJJ plans to transfer, Brian B. does not have a history of attempted escapes from any OJJ facility, which has added to his confusion about why he would be sent to the OJJ site at Angola.

44.

Like Brian B., his peers at BCCY fear being sent to the Angola site and have shared with him their fear of being moved there.

45.

Brian B. filed an Emergency Grievance pursuant to OJJ's Administrative Remedy Procedure (ARP) on September 2, 2022. Despite the imminent nature of Plaintiff's anticipated move to the OJJ site at Angola and the serious physical and psychological harm Plaintiff is already experiencing as a result, OJJ responded that same day by stating that Plaintiff is "not subject to any immediate risk of harm" and therefore his ARP would be reviewed "within the regular ARP time limits." OJJ's

failure to properly treat Plaintiff's grievance as an emergency grievance that requires an expedited timeline has made the grievance process unavailable to Plaintiff.  As a result, Plaintiff has exhausted all available administrative remedies and represents the Class in this action.

46.

PLAINTIFF CHARLES C. is 16 years old. He is currently in the secure custody of Defendant SOMMERS and OJJ, at the Acadiana Center for Youth at St. Martinville ("St. Martinville").

47.

Charles C. is in the LAMOD program at St. Martinville. He is currently assigned to the Charlie pod.

48.

Charles C. has been informed by staff at St. Martinville that if he misbehaves, he will be transferred to Angola.

49.

In the past, Charles C. has been hospitalized for mental health crises. Each time, he stayed about a week at the mental health hospital.

50.

Charles C. is a youth with a disability under Section 504 of the Rehabilitation Act and the ADA. He has been diagnosed with ADHD, bipolar disorder, schizophrenia, and PTSD. The main medication he has been taking is Seroquel, which he was taking until last Friday when he was instructed to stop because it was making him pre-diabetic. He has also taken Adderall, Risperdal, Clonidine, Wafazine, and Remeron in the past to treat his mental health conditions.

51.

At St. Martinville, Charles C. attends school five days per week. He is currently in tenth grade. Charles C. believes he is earning high school credits through his classes at St. Martinville.

52.

Charles C. receives individual counseling once a week for about thirty minutes at St. Martinville.

53.

Charles C. first learned about the plan to move youth to Angola a couple of months ago from staff at St. Martinville, who told him that he has been behaving well, but if he started behaving badly again, he would be sent to Angola. Staff at St. Martinville have been saying the same to him since then, including as recently as three weeks ago. Charles C. has heard staff at St. Martinville say the same to other kids.

54.

Charles C. is worried, scared, and anxious about being sent to Angola, and has had trouble sleeping because of this. He has heard of Angola and knows it is an adult prison, that he would be living in the old death row, and is concerned about being locked in a cell most of the time if he is moved there.

55.

Charles C. filed an Emergency Grievance pursuant to OJJ's Administrative Remedy Procedure (ARP) on October 25, 2022.

56.

Charles C. brings his lawsuit through his mother and next friend, Kenione Rogers, who is an adult resident of the state of Louisiana. Kenione Rogers brings this action on Charles C.'s behalf pursuant to Fed. R. Civ. P. 17(c)(2). Ms. Rogers is dedicated to the best interests of Charles

C. and will advocate for those best interests in this action. Like her son, Ms. Rogers is worried Charles C. might be sent to the Angola site.

57.

DEFENDANT JOHN BEL EDWARDS (Defendant Edwards) is an adult resident of Louisiana. Defendant Edwards is the Governor of Louisiana and responsible for the faithful execution of the laws of Louisiana. In addition, he is responsible for appointments of the Secretary of the Louisiana Department of Public Safety & Corrections and Deputy Secretary of the Office of Juvenile Justice. Defendant Edwards is a final juvenile justice policymaker who at times delegates policymaking authority to other Defendants named in this lawsuit. At all pertinent times, Defendant Edwards was acting under color of law. Defendant Edwards is being sued in his official capacity as Governor of Louisiana.

58.

DEFENDANT WILLIAM SOMMERS (Defendant Sommers) is an adult resident of Louisiana. Defendant Sommers is the Deputy Secretary of the Office of Juvenile Justice and responsible for the development and execution of Louisiana's juvenile justice policy who at times delegates policymaking authority to others in the OJJ. At all pertinent times, Defendant Sommers was acting under color of law. Defendant Sommers is being sued in his official capacity as the Deputy Secretary of the Office of Juvenile Justice.

59.

Defendant JAMES M. LEBLANC (Defendant LeBlanc) is an adult resident of Louisiana. Defendant LeBlanc is the Secretary of the Louisiana Department of Public Safety and Corrections and responsible for the development and execution of Louisiana's adult criminal justice policy who at times delegates policymaking authority to others in the DOC. At all pertinent times, Defendant

LeBlanc was acting under color of law.  Defendant LeBlanc is being sued in his official capacity as

the Secretary of the Louisiana Department of Public Safety and Corrections.

## STATEMENT OF FACTS

**I.    The Adult Prison Physical Environment, Design, and Architecture of the OJJ Site at Angola is Inappropriate and Constitutes Punishment for Youth Transferred there.**

60.

Defendants' decision to transfer youth to an adult maximum-security prison flies in the face

of prevailing professional standards of juvenile justice, as it plainly promotes punishment instead

of rehabilitation. As noted above, the Casey Foundation has instructed that "[j]uvenile detention

facilities should not look like or be operated as jails."[13] As a result, the Casey foundation

"encourages facilities to provide a non-penal environment appropriate for youth who need to be

held in a secure setting," which includes ensuring that "the facility is clean, meets fire and safety

codes, has properly functioning temperature controls, light and ventilation and offers youth

appropriate living conditions," and "that youth will have clean, properly-fitting clothing; pleasant,

healthy eating experiences; permission to retain appropriate personal items; and some measure of

privacy."[14] Indeed, one of the Casey Foundation's recommended standards is for juvenile facilities

to have "[f]urnishings and other decorations reflect a home-like, non-penal environment supportive

of boys and girls to the maximum extent possible."[15]

61.

The IJA-ABA Commission explained in its recommendations on the architecture of juvenile

justice facilities that:

---

[13] Annie E. Casey Foundation, *Juvenile Detention Facility Assessment*, https://cclp.org/wp-content/uploads/2016/06/JDAI-Detention-Facility-Assessment-Standards.pdf at 77 (last accessed 10.25.22).
[14] *Id.*
[15] *Id.* at 79.

The importance of this standard [(that "[s]ecure settings should provide security measures which . . . instill a sense of security and well-being in facility residents; and . . . rely on increased staff coverage rather than building plant")] is that it does not interpret security as simply controlling the activities of many residents with as few staff as possible, thereby minimizing staff and resident contact. *It avoids the routinizing of activities, the boredom, and the brutality that often occurs in facilities designed on maximum security principles, whether for youths or adults*. . . . The youth in detention or corrections should not be viewed as deviant, subhuman, or mindless. He or she should be treated with respect, encouraged to form a positive self-image, and provided with an interesting and varied program of activities.[16]

62.

The United Nations Rules for the Protection of Juveniles Deprived of their Liberty prescribe similar recommendations. Specifically, they state "[s]leeping accommodation [for youth in juvenile facilities] *should normally consist of small group dormitories or individual bedrooms*," and "[t]he design of detention facilities for juveniles and the physical environment *should be in keeping with the rehabilitative aim of residential treatment*, with due regard to the need of the juvenile for *privacy, sensory stimuli, opportunities for association with peers* and participation in sports, physical exercise and leisure-time activities."[17]

63.

Youth transferred to the OJJ site at Angola will be forced to live in single cells that have previously only been used by adults incarcerated at LSP—originally by adult men on death row, and more recently by adult women. These cells have floor-to-ceiling sliding barred doorways that lock from the outside, a correctional-style metal cot, and a metal sink and metal toilet without a seat

---

[16] Institute of Judicial Administration American Bar Association, Juvenile Justice Standards, *Standards Relating to Architecture of Facilities*, https://www.ojp.gov/pdffiles1/ojjdp/83567.pdf (last accessed Oct. 25, 2022)  (emphasis added).

[17] United Nations General Assembly resolution 45/113, *United Nations Rules for the Protection of Juveniles Deprived of their Liberty*, adopted Dec. 14, 1990, https://www.ohchr.org/en/instruments-mechanisms/instruments/united-nations-rules-protection-juveniles-deprived-their-liberty (emphasis added).

or cover. Because of the bars instead of doors, youth living in these cells lack privacy: indeed, when they are changing clothes or using the toilet, any person in the hallway outside the cell—including staff and/or other youth—is able to see the youth while exposed inside their cell. This contravenes the recommended practice for juvenile facilities, as youth should be able to "change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances."[18]

64.

Nothing about these cells resembles the dormitories or individual rooms that are standard in juvenile facilities; instead, they are different from the living and sleeping environments to which Plaintiffs and putative class members are accustomed in OJJ youth facilities. A photo of a cell in the OJJ site at Angola where youth will live is below:



65.

Outside, the OJJ site at Angola is surrounded by high fences with razor wire and guard towers, as depicted in the photographs of the site below. These features are characteristic of adult

---

[18] Annie E. Casey Foundation, *supra* note 14, at 88.

maximum-security prisons, not juvenile facilities for youth adjudicated delinquent.



**II. Youth Transferred to the OJJ Site at Angola Face an Increased Risk of Suicide, Solitary Confinement, and Use of Force by Staff.**

66.

Youth in adult facilities are more likely to die by suicide, more likely to suffer from sexual assault and trauma, and more likely to experience exacerbated mental health disabilities than youth who are not housed in adult facilities. These experiences can lead to long-term consequences for the mental and physical health of vulnerable youth in the juvenile and criminal legal system, many of whom have already experienced significant trauma and mental health disabilities. As one former top OJJ official has explained, even just informing youth that they will be placed at an adult facility is likely to cause "mental anguish" for youth who have already experienced significant trauma in their lives. Plaintiffs' experiences confirm this prediction—each has experienced significant fear, anxiety, and worsening mental health symptoms due to the fear and anticipation of being transferred to Angola.

67.

The design of the prison cells in which youth at the OJJ site at Angola are being and will be held creates a heightened risk of suicide. The bars provide multiple "cut-off" points around which youth could tie sheets or comparable items. Unlike their peers in juvenile facilities with individual rooms or dormitories, rather than barred cells, youth transferred to the OJJ site at Angola face a greater risk of suicide by the very architecture of the facility.

68.

There are no windows in the cells that house youth in OJJ custody.

69.

Plaintiffs and putative class members are highly likely to be subject to solitary confinement because of the limited physical space available at the OJJ site at Angola for behavioral interventions and due to staffing limitations. Solitary confinement—even for only two days—has been linked to increased rates of suicide, depression, paranoia, and anxiety in *adults*. These harmful outcomes are further amplified in youth. Indeed, youth are especially vulnerable to severe mental and physical harm as a result of solitary confinement, including developmental delay and psychosis. When youth are placed in solitary confinement, supportive or social systems they may have are often withdrawn, including educational and mental health programming and communication with their families. As a result, youth placed in solitary confinement are precluded from participating in rehabilitative programming necessary for their growth and development, contrary to prevailing professional standards of juvenile justice.

70.

Youth transferred to the OJJ site at Angola are also likely to be subject to uses of force that are inappropriate for and especially dangerous to young people. As noted above, the MOU between

OJJ and LSP/DOC explicitly permits DOC staff to use force they are trained to use against adults at LSP against youth. The MOU states that "DOC/LSP may provide general supplemental security staffing inside BCCY-WF [(the OJJ site at Angola)], upon request and availability, on an interim basis until BCCY-WF is fully staffed. During this temporary timeframe, DOC/LSP staff shall utilize chemical spray, electronic control weapons ('Tasers') and the use of force continuum for which they are trained."

71.

Oleoresin capsicum (OC) spray (pepper spray) is a chemical spray that incapacitates individuals by causing burning, swelling, and tearing of the eyes. It may also restrict breathing by affecting one's lungs and respiratory tract. While dangerous to anyone, young people "are uniquely susceptible to deployment of and exposure to riot-control agents such as tear gas and pepper spray" because of their higher respiratory rates than adults, which makes it more likely they will inhale more of the pepper-sprayed air than adults.[19] The Council of Juvenile Correctional Administrators (now called the Council of Juvenile Justice Administrators) has stated that the use of pepper spray "has been shunned by juvenile correctional agencies because of the harm it causes to youths and the negative impact it has on staff-youth relationships" and "very few states authorize its use and in the states that allow its use in policy, most prohibit the use except as a last resort and with many conditions and few facilities put it into practice."[20] One court has concluded that "the indiscriminate use of CS gas violates the juveniles' constitutional rights under the Due Process Clause."[21] Even if OJJ's policy does not permit indiscriminate use of chemical sprays, the MOU permits DOC/LSP

---

[19] Irwin Rendlener, *Tear Gas Should Never Be Used on Children. Period*. Wash. Post (Nov. 28, 2018), available at https://www.washingtonpost.com/pb/opinions/tear-gasshould-never-be-used-on-children-period/2018/11/28/91c1ca78-f32c-11e8-9240- e8028a62c722_story.html.
[20] Council of Juvenile Correctional Administrators, *Pepper Spray in Juvenile Facilities*, May 2011, http://cjca.net/wpcontent/uploads/2018/02/CJCA.Issue_.Brief_.OCSpray.pdf.
[21] *Alexander S. v. Boyd*, 876 F. Supp. 773, 786 (D.S.C. 1995).

staff to "utilize chemical spray . . . and the use of force continuum for which *they* are trained," which likely does not limit DOC/LSP staff's ability to deploy pepper spray.

### III. Youth Transferred to the OJJ Site at Angola Are Unlikely to Receive Adequate Medical, Educational, Rehabilitative, and Other Services.

72.

The OJJ site at Angola is not equipped to provide adequate recreation, medical care and mental health programming, education, and other forms of rehabilitation. As a result, youth moved to the OJJ site at Angola will be less likely to progress on their rehabilitative journey so that they can return home to their families and communities. For example, upon information and belief, it is unlikely based on the infrastructure of the OJJ site at Angola that youth will have adequate indoor recreation opportunities if the weather does not permit outdoor recreation; youth transferred to the OJJ site at Angola may receive medical care onsite at the infirmary at LSP in cases of emergency, which this Court has already ruled is constitutionally inadequate medical care; it is unclear and unlikely that sufficient numbers of teachers will be hired to provide adequate education to youth held at the OJJ site at Angola; and it is unclear where youth will receive in-person contact visitation with family at the OJJ site at Angola.

73.

Members of the disability subclass will be denied the programming, treatment, education, and accommodations they are entitled to under federal disability rights laws.

74.

Defendants have a long history of operational failings in Louisiana's secure care system for youth, which have been well-documented. At the OJJ facility at St. Martinville, which was, like the Angola site, developed as a temporary facility called a "Transitional Treatment Unit" for certain high-risk youth, youth were not provided education, as "Perry Stagg, OJJ's assistant secretary,

confirmed that St. Martinville did not initially provide education" and the Louisiana Department of Education and Louisiana Special School District did not even learn about the new facility until months after it opened.[22] Defendants acknowledge that these operational deficiencies have caused a situation at BCCY in which they are not properly caring for youth in OJJ's custody there.

75.

Juvenile justice experts and organizations agree that indoor and outdoor recreation is crucial to youth in juvenile facilities. According to the United Nations Rules for the Protection of Juveniles Deprived of their Liberty, "[e]very juvenile should have the right to a suitable amount of time for daily free exercise, in the open air whenever weather permits, during which time appropriate recreational and physical training should normally be provided. Adequate space, installations and equipment should be provided for these activities."[23] The Casey Foundation similarly encourages facilities to "offer[] youth a range of choices for recreational activities in dayrooms or common areas."[24]

76.

The OJJ site at Angola has inadequate indoor and outdoor recreation facilities. When Defendants represented that youth would be moved to the site earlier, before the conclusion of the preliminary injunction hearing in this case, the OJJ site at Angola had only a muddy grass are with one basketball goal, making it impossible for youth to play even a half-court game since they could not dribble the ball. Although recent media reporting indicates Defendants have covered the area with concrete, the outdoor recreation area likely remains inadequate given the limited physical activities youth can engage in within that singular outdoor space. There is also no indication youth

---

[22] Erin Einhorn, et al., *'No light. No nothing.' Inside Louisiana's harshest juvenile lockup*, NBC News, Mar. 10, 2022, https://www.nbcnews.com/news/us-news/louisiana-juvenile-detention-st-martinvillle-rcna19227.
[23]  United Nations General Assembly resolution 45/113, *supra* note 17.
[24] Annie E. Casey Foundation, *supra* note 14, at 59.

would receive adequate recreational opportunities indoors if the weather does not permit outdoor recreation. The small room designated for recreation at the OJJ site at Angola is inadequate for indoor recreation and lacked any appropriate equipment for recreation.

77.

Youth transferred to the OJJ site at Angola also face unreasonable risks of harm to their health and safety. Defendants plan to provide medical and mental health care in certain offices in the OJJ site at Angola. The nearest hospital to LSP is West Feliciana Parish, 24 miles away, which does not provide a full range of emergency and other health care services. OJJ would transport children offsite for health care in staff cars or in ambulances overseen by LSP. The hospital with which OJJ contracts is 134 miles away. Defendants have admitted that in cases of medical emergency, youth at the OJJ site at Angola may receive medical care at the infirmary onsite at LSP––used and staffed by adults incarcerated there—which this Court recently determined in another litigation to be constitutionally inadequate medical care for the adult patients. Youth transferred to the OJJ site at Angola who may receive medical care at the infirmary for adults at LSP are in danger of receiving equally inadequate medical treatment, placing their health and lives at risk.

78.

Youth transferred to the OJJ site at Angola also are unlikely to receive adequate education. OJJ is understaffed, including its teachers. As of September 8, 2022, only one teacher had been hired for the OJJ site at Angola; Defendants have represented that they will have three teachers and three tutors for twenty-four students on site for each school day and two special education teachers, neither of whom had been hired as of that date. The rooms designated as classrooms at the OJJ site at Angola did not have whiteboards set up or books or any standard classroom equipment other than desks in early September 2022.

79.

The existing visitation space at the OJJ site at Angola does not permit contact in-person visits; there is a mesh screen fully separating youth from their visitor(s). Although Defendants claim contact visits will be provided with family members, OJJ has not established areas in the OJJ site at Angola for such in-person contact visitation.

**IV.    Youth with Disabilities Transferred to the OJJ Site at Angola Will Require Reasonable Accommodations and Modifications that Defendants are Unlikely to Provide at that Site.**

80.

Because the Defendants' criteria for transferring young people to the OJJ site at Angola chiefly or solely consist of referrals based on bad behavior, youth with mental health and other disabilities are more likely to be sent to the OJJ site at Angola. OJJ's policy sets forth certain "[a]dmission criteria" for youth to be considered for transfer to the OJJ site at Angola, and states that "a youth *must meet at least one* of the following criteria" to be eligible for transfer to Angola. These criteria include whether the youth has, *inter alia*, "exhibited a pattern of battery on other youth which has not been substantially reduced by prior intervention efforts," "[h]as committed a single battery/predatory act of such serious consequence that the potential of reoccurrence must be actively prevented," "[h]as been in possession of a significant weapon," "[h]as marijuana or other illegal substances in possession or has a substantial amount with motivation to distribute." OJJ's policy also states that "up to four youth classified as Seriously Mentally Ill may be transferred to the program after a consensus recommendation from an [multidisciplinary team] staffing."

81.

Although OJJ represents that this referral form will lead to a team meeting to evaluate each child to be sent to Angola, the form itself includes a bypass provision whereby youth who are alleged

to have committed serious behavior infractions will be sent directly, without a team meeting. In those cases, there will be no individualized assessment of children's needs or disabilities.

82.

All youth who may be transferred to the OJJ site at Angola are likely to face serious psychological and physical harm. Youth with disabilities who are transferred to the OJJ site at Angola are likely to face even worse treatment, and suffer even more, than their peers who do not have disabilities.

83.

The ADA and the Rehabilitation Act require all covered entities to provide reasonable modifications in their policies, practices, and procedures in order to give people with disabilities an equal opportunity to benefit from the entity's programs, services, and activities. OJJ is a covered entity under these laws. OJJ has failed to make modifications to ensure that children with disabilities are not sent to Angola *because of* their disabilities, or harmed in Angola. OJJ has also failed to accommodate individual children's disabilities who have been or will be transferred to the Angola site.

84.

The ADA and the Rehabilitation Act also prohibit covered entities from using methods of administration that defeat or impair the accomplishment and objectives of the public entity's program. As the agency responsible for youth adjudicated delinquent, OJJ's main purpose is rehabilitation, treatment, education, and preparing youth to return to society with the skills and tools to lead a safe, law-abiding life. By setting up a system where youth with disabilities in OJJ's custody will disproportionately face the harsh and harmful impact of transfer and incarceration at Angola, OJJ's methods of administration discriminate against youth with disabilities, in violation of federal

law.

85.

Defendants are also failing to consider individuals' disabilities and failing to modify their evaluation and notice criteria for transfer to the OJJ site at Angola. As a result, Defendants' system discriminates against youth with disabilities, who will face additional harm and negative outcomes as a result of Defendants' unlawful actions and practices—including potentially being transferred to the OJJ site at Angola *because* of their disabilities, and lacking the accommodations, supports, and modifications necessary within the transfer process and once housed in Angola.

### V. Defendants Have Alternative, Less Punitive Options Available to Them Short of Transferring Youth to a Notorious Maximum-Security Adult Prison.

86.

If Defendants cannot, in their view, lawfully provide rehabilitative care to youth in their existing secure care facilities while also maintaining public safety, they have other responses available to them that are short of transferring youth to Angola or another adult prison.

87.

Defendants are able to review youth in OJJ custody who may be eligible for release and facilitate their release to alternatives to detention in order to reduce overall facility population. Defendants are also able to review youth in OJJ secure care and identify those who can be stepped down to less secure environments. These measures would reduce the population in the secure facilities Defendants are having trouble controlling, thus allowing Defendants to provide appropriate care and services to Plaintiffs and putative class members in danger of being transferred to the OJJ site at Angola.

88.

Juvenile justice experts and organizations have long stated that using community-based

30

alternatives to release youth who may not need to be held in facilities can lessen the burden on juvenile justice systems and advance rehabilitation while maintaining security. A literature review conducted by the OJJDP on alternatives to detention and confinement for children explains that "research has shown that juveniles who are kept in the community recidivate less often than previously detained youths . . . [a]s a result, several researchers . . . suggest that placing juveniles in community settings that offer appropriate rehabilitation services will serve public safety better than detention or confinement," and that "research has demonstrated that detention and confinement facilities negatively affect a child's mental state, academic aptitude, and employment prospects."[25] The IJA-ABA Commission expressed that "[t]he standards recommend the development of a range of small, community-based facilities because such facilities are able to adapt to a range of programs and policy requirements to use community resources, to architecturally relate to the buildings in the surrounding area, and to provide a richer range of options to ensure security."[26]

89.

The OJJDP has also offered to work with Defendants to avoid transferring youth to the Angola site, recognizing the grave harms such a transfer would cause to youth. Other juvenile justice experts, advocates, and officials have also offered to work with Defendants to hire experts in the field to conduct a systemwide assessment to safely reduce the overall population of youth adjudicated delinquent in OJJ facilities and create specialized treatment units within existing OJJ facilities that offer rehabilitation based on best practices.

---

[25] U.S. Department of Justice's Office of Juvenile Justice and Delinquency Prevention, *Literature Review Alternatives to Detention and Confinement*, Aug. 2014, https://ojjdp.ojp.gov/model-programs-guide/literature-reviews/alternatives_to_detection_and_confinement.pdf.

[26] Institute of Judicial Administration American Bar Association, Juvenile Justice Standards, *Standards Relating to Architecture of Facilities*, https://www.ojp.gov/pdffiles1/ojjdp/83567.pdf.

## CLASS ACTION ALLEGATIONS

90.

Alex A., Brian B., and Charles C. ("Named Plaintiffs") bring this action on behalf of themselves and all others similarly situated as a class action under Federal Rule of Civil Procedure 23(b)(2).

91.

The class that Plaintiffs seek to represent is defined as all current and future persons held in OJJ's secure or other custody who have been or might be transferred to the OJJ site at Angola or another adult prison.

92.

Named Plaintiffs Alex A., Brian B., and Charles C. also seek to represent a subclass of all current and future persons with disabilities as defined under the ADA and Section 504 of the Rehabilitation Act held in OJJ's secure or other custody who have been or might be transferred to the OJJ site at Angola or another adult prison (the "Disability Subclass").

93.

This action is brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation.  Fed. R. Civ. P. 23(a). It also satisfies the criteria for certifying a class action for declaratory and/or injunctive relief under Rule 23(b)(2).

94.

Any youth in OJJ custody ages ten through eighteen who satisfy OJJ's selection criteria are eligible for transfer to the OJJ site at Angola. Each youth who is now or will be in OJJ custody at risk of transfer to the OJJ site at Angola, or has already been transferred to the OJJ site at Angola, is a member of the proposed class.

95.

On any given day there are approximately 356 youth in OJJ's secure care custody, the subgroup of youth in OJJ custody who are most susceptible to transfer to the OJJ site at Angola. A significant proportion of these youth have disabilities, given that approximately 70 percent of youth in juvenile detention nationwide have educational or other disabilities. Given that Defendants have stated the OJJ site at Angola will be a temporary facility where they plan to have youth in custody for about 4-to-6 weeks per youth, the population at the OJJ site at Angola will be fluid and constantly changing. In addition, class members are detained and most or all are low-income, which limit their ability to institute individual lawsuits.  The proposed class and subclass are therefore sufficiently numerous as to make joinder impracticable. Fed. R. Civ. P. 23(a)(1).

96

Common questions of law and fact exist as to all members of the class.  The Named Plaintiffs seek common declaratory and injunctive relief concerning whether Defendants' policies, practices, and procedures violate the constitutional and statutory rights of the class members. These common questions of fact and law include whether the transfer of youth adjudicated delinquent and not convicted of any crime may be transferred to the OJJ site at Angola. With respect to the Disability Subclass, common questions of fact and law include whether OJJ is failing to provide accommodations and modifications required by disability rights laws, and whether children with disabilities are experiencing discrimination due to OJJ's failure to consider and account for known disabilities.

97.

Named Plaintiffs' claims are typical of the class members' claims.  The injuries that Named Plaintiffs have suffered and will suffer because of Defendants' unconstitutional and illegal course of

conduct are typical of the injuries suffered by the class. All class members seek the same declaratory and injunctive relief.

98.

The Named Plaintiffs are adequate representatives of the class and the subclass, respectively, because their interests in the vindication of the legal claims they raise are entirely aligned with the interests of the other class members, each of whom has the same constitutional (and, for the subclass, statutory) claims. There are no known conflicts of interest among members of the proposed class, and the interests of the Named Plaintiffs do not conflict with those of the other class members.

99.

Plaintiffs are represented by counsel with experience and success in litigating complex civil rights matters in federal court. The interests of the members of the class and subclass will be fairly and adequately protected by the Named Plaintiffs and their attorneys.

100.

Because the putative class challenges Defendants' system as unconstitutional and illegal through declaratory and injunctive relief that would apply the same relief to every member of the class and subclass, certification under Rule 23(b)(2) is appropriate and necessary.

101.

A class action is the only practicable means by which the Named Plaintiffs and class members can challenge the Defendants' unconstitutional actions and obtain the necessary immediate declaratory and injunctive relief sought for themselves and all other members of the class.

## CLAIMS FOR RELIEF

**COUNT I (on behalf of Alex A., Brian B., Charles C. and the proposed class):
Declaratory and Injunctive Relief for Violation of the Fourteenth Amendment
(42 U.S.C. § 1983)**

102.

By transferring youth adjudicated delinquent to the grounds of the Louisiana State
Penitentiary at Angola, a maximum-security adult prison, in a building designed for death row
prisoners, Defendants violate their duty to provide conditions of reasonable health and safety to the
youth they holds in their custody, and demonstrate deliberate indifference to a substantial risk of
serious harm to Plaintiffs and putative class members, in violation of their rights under the
Fourteenth Amendment to the U.S. Constitution.  Defendants' actions also constitute punishment of
Plaintiffs and putative class members, who are in civil detention, in violation of their substantive
due process rights under the Fourteenth Amendment.

103.

Plaintiffs and the proposed Class have suffered and will imminently suffer irreparable injury
as a result of Defendants' policies, practices, and failures to act and are entitled to injunctive relief
to avoid any further injury.

**COUNT II (on behalf of Alex A., Brian B., Charles C., and the proposed Disability
Subclass): Declaratory and Injunctive Relief for Violation of Section 504 of the Rehabilitation
Act of 1973, 29 U.S.C. § 794**

104.

Section 504 of the Rehabilitation Act states that "no otherwise qualified individual with a
disability … shall, solely by reason of [] disability, be excluded from the participation in, be denied
the benefits of, or be subject to discrimination under any program or activity receiving Federal
financial assistance." 29 U.S.C. § 794(a). The regulations implementing Section 504 of the

Rehabilitation Act require that entities receiving federal financial assistance avoid unnecessary policies, practices, criteria, or methods of administration that have the effect of discriminating against people with disabilities. 28 C.F.R. § 41.51(b)(3)(i).

105.

Plaintiffs Alex A., Brian B., and Charles C. individuals with disabilities for the purposes of the ADA. 42 U.S.C. § 12102. As people held in OJJ custody, they are "qualified" for the programs, services, and activities being challenged here – including custody in OJJ facilities. 42 U.S.C. § 12131(2).

106.

Defendants receive federal financial assistance to operate their juvenile detention facilities.

107.

Defendants are violating Section 504 of the Rehabilitation Act by failing to make reasonable modifications necessary to ensure equal access to housing in appropriate, supportive, non-punitive facilities for youth in their custody with disabilities. Defendants are further violating the Section 504 of the Rehabilitation Act by employing methods of administration (including selection criteria that penalize conduct that is likely disability-related) that tend to discriminate against people with disabilities by placing them at heightened risk of transfer to an inappropriate, harmful, and dangerous adult facility.  By transferring youth adjudicated delinquent who have disabilities to the OJJ site at Angola, where they will likely face exacerbation of their disabilities and inadequate support, Defendants are in violation of Section 504 of the Rehabilitation Act.

108.

By transferring youth adjudicated delinquent who have disabilities to the OJJ site at Angola instead of making reasonable modifications to appropriately address each youth's disability-related

behaviors in OJJ's existing facilities, Defendants violate Section 504 of the Rehabilitation Act.

109.

By transferring youth adjudicated delinquent who have disabilities to the OJJ site at Angola, Defendants are punishing and discriminating against youth with disabilities by disproportionately segregating them from their peers in violation of Section 504 of the Rehabilitation Act.

110.

Plaintiffs with disabilities have also suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and failures to act and are entitled to declaratory and injunctive relief to avoid any further injury.

**COUNT III (on behalf of Alex A., Brian B., Charles C. and the proposed subclass): Declaratory and Injunctive Relief for Violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*.**

111.

Title II of the ADA requires that public entities refrain from discriminating against qualified individuals on the basis of disability. 42 U.S.C. § 12132. The regulations implementing Title II of the ADA require that public entities avoid unnecessary policies, practices, criteria, or methods of administration that have the effect of excluding or discriminating against people with disabilities in the entity's programs, services, or activities. 28 C.F.R. § 35.130(a), (b)(3), (b)(8). Further, a public entity must "make reasonable modifications in policies, practice, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

112.

Plaintiffs Alex A., Brian B., and Charles C. are individuals with disabilities for the purposes

of the ADA. 42 U.S.C. § 12102. As people held in OJJ custody, they are "qualified" for the programs, services, and activities being challenged here – including custody in OJJ facilities. 42 U.S.C. § 12131(2).

### 113.

Defendant OJJ is a public entity covered under Title II of the ADA.

### 114.

Defendants are violating Title II of the ADA by failing to make reasonable modifications necessary to ensure equal access to housing in appropriate, supportive, non-punitive facilities for youth in their custody with disabilities. Defendants are further violating the ADA by employing methods of administration (including selection criteria that penalize conduct that is likely disability-related) that tend to discriminate against people with disabilities by placing them at heightened risk of transfer to an inappropriate, harmful, and dangerous adult facility.  By transferring youth adjudicated delinquent who have disabilities to the OJJ site at Angola, where they will likely face exacerbation of their disabilities and inadequate support, Defendants are in violation of the ADA.

### 115.

By transferring youth adjudicated delinquent who have disabilities to the OJJ site at Angola, Defendants are punishing and discriminating against youth with disabilities by disproportionately segregating them from their peers in violation of the ADA.

### 116.

Plaintiffs with disabilities have also suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and failures to act and are entitled to declaratory and injunctive relief to avoid any further injury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Putative Class Members respectfully request that the Court:

A.  Certify the proposed class and subclass;

B.  Enter a declaratory judgment that Defendants are violating Named Plaintiffs' and class members' constitutional rights (and, for proposed disability subclass members, federal statutory rights) by transferring them to the OJJ site at Angola where they will not receive lawful conditions of confinement, counseling, education, other rehabilitative services, and sufficient safety from adults incarcerated at LSP;

C.  Issue a preliminary injunction and permanent injunction, requiring Defendants to cease plans to transfer Plaintiffs and class members to the OJJ site at Angola, and to immediately release to the community or transfer Plaintiffs and any class members who have already been moved to the OJJ site at Angola back to one of OJJ's pre-existing secure care or other facilities;

D.  Expedite review of this case;

E.  Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

F.  Order such other and further relief as this Court deems just, proper, and equitable.

Respectfully submitted, this 25th day of October, 2022.


/s/: *David J. Utter*                              /s/: *Christopher J. Murell*
DAVID J. UTTER **                          CHRISTOPHER J. MURELL
Louisiana Bar Number: 23236           Louisiana Bar Number: 32075
WILLIAM R. CLAIBORNE                MURELL LAW FIRM
Georgia Bar Number: 126363            2831 St. Claude Avenue
THE CLAIBORNE FIRM, P.C.           New Orleans, Louisiana 70117
410 East Bay Street                          (504) 717-1297 Telephone
Savannah, Georgia 31401                  (504) 233-6691 Facsimile
(912) 236-9559 Telephone                 chris@murrell.law

(912) 236-1884 Facsimile
david@claibornefirm.com
will@claibornefirm.com


/s/: *Hector Linares*_____
HECTOR LINARES
Louisiana Bar Number: 28857
SARA GODCHAUX
Louisiana Bar Number: 34561
STUART H. SMITH LAW CLINIC
LOYOLA UNIVERSITY NEW ORLEANS
COLLEGE OF LAW
7214 St. Charles Avenue, Box 902
New Orleans, Louisiana 70118
(504) 861-5560 Telephone
(504) 861-5440 Facsimile
halinare@loyno.edu
shgodcha@loyno.edu


/s/: *David Shanies*_____
DAVID SHANIES
New York Bar Number: 4471140
SHANIES LAW OFFICE
110 West 40th Street
Tenth Floor
New York, New York 10018
Tel (212) 951-1710
Fax (212) 951-1350
Cell (646) 515-2151
david@shanieslaw.com

/s/: *Ronald Haley*_____
RONALD HALEY
Louisiana Bar Number: 30900
HALEY & ASSOCIATES
8211 Goodwood Blvd., Suite E
Baton Rouge, Louisiana 70806
(225) 755-9935 Telephone
(888) 900-9771 Facsimile
rhaley@ronaldhaleylawfirm.com


/s/ *Nancy Rosenbloom*_____
NANCY ROSENBLOOM
New York Bar Number: 2168425
ADITI SHAH
New York Bar Number: 5886254
ACLU NATIONAL PRISON PROJECT
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2652
nrosenbloom@aclu.org
ashah@aclu.org
/s/ *Tammie Gregg*_____
TAMMIE GREGG*
MN Bar Number: 026240
ACLU NATIONAL PRISON PROJECT
915 15th St. N.W., 7th Floor
Washington D.C. 20005
Telephone: (202) 393-4930
Facsimile: (202) 393-4931
tgregg@aclu.org


** *Lead Counsel*
*Not admitted in DC; practice limited to federal
courts

40

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of October, 2022, a copy of the foregoing initial disclosures was served upon all counsel of record by electronic transmission.

/s/ *David J. Utter*
DAVID J. UTTER