# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| ALEX A., by and through his guardian, Molly Smith; BRIAN B.; and CHARLES C., by and through his guardian Kenione Rogers, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS, in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections,<br><br>        Defendants. | Civil Action No. 3:22-cv-573-SDD-RLB |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ...................................................3

I.    Procedural History ......................................................................................................3

II.   Statement of Facts.......................................................................................................4

    A.    Eligibility of Youth in OJJ Custody to be Transferred to the TTU at
       Angola......................................................................................................5

    B.    Risks of Harm to Proposed Class and Subclass Members Transferred to
       the TTU at Angola ...................................................................................7

    C.    The Named Plaintiffs ............................................................................10

LEGAL STANDARD..............................................................................................................12

ARGUMENT ........................................................................................................................13

I.    The Principal Class and Disability Subclass Satisfy All Rule 23(a) Requirements. .........13

    A.    The Proposed Class and Subclass Satisfy the Numerosity Requirement. ..............13

    B.    The Proposed Classes Meet the Rule 23(a)(2) Commonality Requirement. .........16

    C.    The Proposed Classes Satisfy the Rule 23(a)(3) Typicality Requirement.............20

    D.    The Proposed Class and Subclass Satisfy the Rule 23(a)(4) Adequacy of
       Representation Requirement. ....................................................................21

II.   Class Certification is Appropriate Under Rule 23(b)(2)....................................................22

III.  Plaintiffs' Counsel Satisfy the Requirements of Rule 23(g) and Should Be
    Appointed Class Counsel............................................................................................23

CONCLUSION......................................................................................................................24

US-DOCS\135835780.1

# TABLE OF AUTHORITIES

## CASES

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 414 (5th Cir. 1998)........................................ 26

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) ............................................ 12, 24, 25

*Andre H. by Lula H. v. Ambach*, 104 F.R.D. 606, 613 (S.D.N.Y. 1985).................................... 14

*Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001)................................... 12

*Braggs v. Dunn*, 317 F.R.D. 634, 656 (M.D. Ala. 2016)............................................................. 19

*Choice Inc. of Texas v. Graham*, No. CIV.A.04-1581,
    2005 WL 1400408 (E.D. La. June 3, 2005).......................................................................... 26

*Christina A. ex rel. Jennifer A. v. Bloomberg*, 197 F.R.D. 664, 671 (D.S.D. 2000) .................. 14

*Cole v. Livingston*, No. 4:14-CV-1698, 2016 WL 3258345, at *6 (S.D. Tex. June 14, 2016), *aff'd*
    *sub nom. Yates v. Collier*, 868 F.3d 354 (5th Cir. 2017) ......................................................... 15

*Dockery v. Hall*, No. 3:13-CV-326-WHB-JCG, 2018 WL 11424799, at *5 (S.D. Miss. Feb. 14,
    2018) .............................................................................................................................. 19, 20

*Doiron v. Conseco Health Ins. Co.*, 240 F.R.D. 247, 254 (M.D. La. 2007)............................... 26

*Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004) ...................................................................... 25

*General Tel. Co. of the Northwest, Inc. v. Equal Employment Opportunity Commission*, 446 U.S.
    318, 330 n. 14 (1980).............................................................................................................. 17

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157-58, n.13 (1982)................. 22

*In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014) ..................................................... 18

*In re S. Cent. States Bakery Prod. Antitrust Litig.*, 86 F.R.D. 407, 415 (M.D. La. 1980)........... 23

*J.D. v. Nagin*, 255 F.R.D. 406, 416 (E.D. La. 2009) .................................................................... 13

*J.S.X. Through Next Friend D.S.X. v. Foxhoven*, 330 F.R.D. 197, 206, 215 (S.D. Iowa 2019)... 13

*James v. Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001), *abrogated on other grounds by In re*
    *Rodriguez*, 695 F.3d 360 (5th Cir. 2012) ............................................................................... 23

*Jones v. Gusman*, 296 F.R.D. 416, 465 (E.D. La. 2013) ............................................................. 15

Lewis v. Cain, 324 F.R.D. 159, 168 (M.D. La. 2018) .............................................................. 17, 25

*Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *1 (M.D. La. Mar. 31, 2021),
    *reconsideration denied*, No. CV 15-318-SDD-RLB, 2021 WL 5287856 (M.D. La. Oct. 8,
    2021) .......................................................................................................................................... 9

*M.D. ex rel.Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) .......................................... 18

*Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007) ........................... 13, 26

*Morgan v. Sproat*, 432 F. Supp. 1130, 1133 (S.D. Miss. 1977) .................................................. 13

*Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 625 (5th Cir. 1999) ................................ 23

*Nola v. Exxon Mobil Corp.*, No. CIV.A. 13-439-JJB, 2015 WL 2338336, at *4 (M.D. La. May
    13, 2015) .................................................................................................................................. 19

*Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 498–99 (5th Cir. 1968)................................... 25

*Parsons v. Ryan*, 754 F.3d 657, 681 (9th Cir. 2014) ............................................................. 19, 20

*Pederson v. Louisiana State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000)......................... 14, 15

*Phillips v. Joint Legislative Comm.*, 637 F.2d 1014, 1022 (5th Cir.1981) .................................. 15

*Pitts v. Greenstein*, No. CIV.A. 10-635-JJB-SR, 2011 WL 2193398, at *6 (M.D. La. June 6,
    2011) ....................................................................................................................................... 24

*Plaza 22, LLC v. Waste Mgmt. of Louisiana, LLC*, No. CIV.A. 13-618-SDD, 2015 WL 1120320,
    at *3 (M.D. La. Mar. 12, 2015)............................................................................................... 17

*Reid v. Donelan*, 297 F.R.D. 185, 189 (D. Mass. 2014), *enforcement granted*, 64 F. Supp. 3d 271 (D. Mass. 2014) ........................................................................................................... 16
*Santiago v. City of Philadelphia*, 72 F.R.D. 619, 629 (E.D. Pa. 1976) ...................................... 14
*Simms v. Jones*, 296 F.R.D. 485, 497 (N.D. Tex. 2013) ........................................................ 17, 18
*Valentine v. Collier*, No. 4:20-cv-01115 (S.D. Tex. June 27, 2020) .......................................... 25
*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) .................................................. 18, 22
*Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992), *on reh'g*, 53 F.3d 663 (5th Cir. 1994) ........................................................................................................................... 15
*Yates v. Collier*, 868 F.3d 354, 363 (5th Cir. 2017) ............................................................. 15, 19
*Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. July 1981) ...................... 15

## STATUTES

29 U.S.C. § 794 ............................................................................................................................ 3

## RULES

Fed. R. Civ. P.
23(a) ............................................................................ 2, 12, 14, 18, 24, 25
23(a)(1) ...................................................................................................... 14
23(a)(2) ...................................................................................................... 18
23(a)(3) .................................................................................................. 22, 23
23(a)(4) ...................................................................................................... 24
23(b)(2) ........................................................... 2, 13, 14, 25, 26, 27
23(g) ...................................................................................................... 27, 28
23(g)(1) ...................................................................................................... 27
23(g)(1)(A) ................................................................................................. 27
23(g)(4) ...................................................................................................... 27

## TREATISES

*Moore's Federal Practice* § 23.24[4] (3d ed. 2000) ................................................................. 23
*Newberg and Rubenstein on Class Actions* § 3:12 (6th ed. 2022 ) ........................................... 16

## OTHER AUTHORITIES

Anat Rubin, Tim Golden & Richard A. Webster, *Inside the U.S.'s Largest Maximum-Security Prison, COVID-19 Raged. Outside, Officials Called Their Fight a Success*, PROPUBLICA (Jun. 24, 2020) https://www.propublica.org/article/inside-the-uss-largest-maximum-security-prison-covid-19-raged. ............................................................................................... 4
Coalition for Juvenile Justice, *Youth with Undiagnosed or Mistreated Disabilities*, https://www.juvjustice.org/our-work/safety-opportunity-and-success-project/national-standards/section-i-principles-responding-2 (last accessed Oct. 28, 2022). ..................... 16
Erin Einhorn, *Teens in a Louisiana juvenile facility are being sent to Angola Prison. Experts say it's not only cruel, it could violate the law*, NBC NEWS (Jul. 21, 2022), https://www.nbcnews.com/news/us-news/louisiana-sending-youth-angola-prison-rcna39150... ................................................................................................................................. 5

Erin Einhorn, et al., *'No light. No nothing.' Inside Louisiana's harshest juvenile lockup*, NBC News, Mar. 10, 2022, https://www.nbcnews.com/news/us-news/louisiana-juvenile-detention-st-martinvillle-rcna19227 .................................................................................... 10

LA Department of Public Safety and Corrections, *Louisiana State Penitentiary*, https://doc.louisiana.gov/location/louisiana-state-penitentiary/ (last accessed Oct. 31, 2022)… ........................................................................................................................................4

Lyndon B. Johnson, Remarks Upon Signing the Juvenile Delinquency Prevention and Control Act of 1968. Online by Gerhard Peters and John T. Woolley, The American Presidency Project https://www.presidency.ucsb.edu/node/237791. .......................................................... 5

Neelum Arya, *Jailing Juveniles: The Dangers of Incarcerating Youth in Adult Jails in America*, CAMPAIGN FOR YOUTH JUSTICE (Nov. 2007). ............................................................... 20

Office of Juvenile Justice, *Louisiana Quarterly Juvenile Justice Indicators: An up-to-date view of juvenile custody and supervision populations*, 2021 4th Quarter Update, https://ojj.la.gov/wp-content/uploads/2022/03/OJJ-Indicators-2021Q4.pdf (last accessed October 27, 2022)..............................................................................................................2

Office of Juvenile Justice, *OJJ Completes First Phase of Adjudicated Youth Transfers*, Oct. 19, 2022, https://ojj.la.gov/ojj-completes-first-phase-of-adjudicated-youth-transfers/...................3

Office of Juvenile Justice, *Youth Services Policy Education*, https://ojj.la.gov/wp-content/uploads/2022/03/B.7.1.pdf (last accessed Oct. 28, 2022). ......................................... 16

Stacie Richard, *Gov. Edwards address recent issues at a Louisiana juvenile detention center*, NEW ORLEANS WGNO (Jul. 19, 2022), https://wgno.com/news/louisiana/today-3-p-m-governor-edwards-to-address-recent-issues-at-a-louisiana-juvenile-detention-center/ (video portion, beginning at 5:35)................................................................................................. 4

Pursuant to Federal Rule of Civil Procedure 23 and Local Civil Rule 23, individual plaintiffs Alex A., Brian B., and Charles C. ("Plaintiffs") move the Court to certify this case as a class action and to appoint Plaintiffs' counsel as class counsel.

## INTRODUCTION

Despite the clear psychological and physical harm youth will face if they are forced to live in an adult maximum-security prison environment, Defendants are forging ahead with their plan to move youth in the custody of the Louisiana Office of Juvenile Justice (OJJ) to the former death row building on the grounds of the Louisiana State Penitentiary (LSP) (also known as "Angola Prison" or "Angola"). Youth who are moved to the OJJ site at Angola pursuant to Defendants' plan will live in windowless, floor-to-ceiling barred single cells with correctional-style cots, metal sinks, and open metal toilets; are likely to face increased risks of suicide, solitary confinement, and uses of force such as pepper spray, tasers, and shackling; and are likely to receive inadequate educational, recreational, medical, and other services, and to be deprived of their right to rehabilitation. In addition, moving youth with disabilities to the OJJ site at Angola will likely violate their rights under the Rehabilitation Act and the Americans with Disabilities Act (ADA). This case is appropriate for class certification because of the large and fluid population of youth at risk of serious harm by being moved to the Angola site, Defendants' policies, actions, and failures to act that apply to all members of the proposed class and subclass, and the need for relief that would apply to all proposed class and subclass members transferred to the Angola site.

Plaintiffs' proposed class consists of all youth who are now or will be in the custody of OJJ who have been, might be, or will be transferred to the OJJ site (the "Transitional Treatment Unit" or "TTU") at Angola or another adult prison (the "Principal Class"), including a subclass of all current and future youth with disabilities within the meaning of the ADA and Section 504 of the Rehabilitation Act in the custody of OJJ who have been, might be, or will be transferred to the OJJ

site at Angola or another adult prison (the "Disabilities Subclass").[1] OJJ's criteria for determining which youth might be transferred to the TTU at Angola are described below.

The proposed class and subclass satisfy all of the requirements of Federal Rule of Civil Procedure 23(a). First, the class members are numerous, consisting of at least 356 youth in OJJ secure care facilities who might be transferred to the OJJ facility at Angola, thus making joinder impracticable.[2] Second, class and subclass members share common questions of law, including, for example, whether moving youth to the TTU at Angola violates the Due Process Clause of the Fourteenth Amendment and the requirements of the ADA and the Rehabilitation Act. Third, the putative class representatives' (Plaintiffs') claims are typical of the class because Plaintiffs are subject to the same plan by Defendants to move youth to the Angola site and to the same practices, actions, and failures to act by Defendants concerning the TTU at Angola as the rest of the class. Plaintiffs will also fairly and adequately protect the interests of the class.

The proposed class and subclass also satisfy the requirements of Rule 23(b)(2) because Defendants' plan to move youth in OJJ custody to the TTU at Angola applies to all class members, making declaratory and injunctive relief appropriate for the class as a whole. Class members' claims are not dependent on individualized determinations. Instead, they are bound by a common injury caused by Defendants' plan to move youth to the TTU at Angola, which is curable by a single class-wide injunction enjoining Defendants from moving youth to the Angola site and requiring Defendants to release or return any youth who have already been transferred to the Angola site either to their community or to another OJJ facility. Finally, Plaintiffs' counsel's experience and resources demonstrate that they will fairly and adequately represent the interests of the class.

---

[1] The TTU is the proposed OJJ facility at Angola. This Court found that this facility will be "called Bridge City Center for Youth at West Feliciana ('BCCY-WF')." Doc. No. 79 at 18, ¶ 39. For purposes of the class definition, the "TTU at Angola" is the same as the "OJJ facility at Angola," the "OJJ Angola site," and "BCCY-WF."

[2] Office of Juvenile Justice, *Louisiana Quarterly Juvenile Justice Indicators: An up-to-date view of juvenile custody and supervision populations*, 2021 4th Quarter Update, https://ojj.la.gov/wp-content/uploads/2022/03/OJJ-Indicators-2021Q4.pdf (last accessed October 27, 2022).

The Court should therefore certify the proposed class and subclass and appoint Plaintiffs' counsel as class counsel.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.    Procedural History

On August 19, 2022, Plaintiff Alex A. filed a class action complaint against Defendants, bringing claims for declaratory and injunctive relief under the Fourteenth Amendment of the U.S. Constitution and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Doc. No. 1. Simultaneously with filing the complaint, Alex A. moved for a Temporary Restraining Order and a Preliminary Injunction seeking to: (1) enjoin Defendants from transferring or incarcerating Plaintiff Alex A. or any proposed class member at LSP, and (2) require Defendants to immediately return any youth who may have already been transferred to LSP to the Bridge City Center for Youth (BCCY) or another appropriate OJJ facility for youth. Doc. Nos. 3, 9.

On August 23, 2022, the Court held a telephone status conference, during which Defendants stipulated that no youth had been or would be moved to LSP before September 15, 2022. Doc. No. 14. As a result, the Court denied Alex A.'s emergency motion for a TRO and set the matter for a Preliminary Injunction hearing. *Id.* The Court set expedited deadlines for preliminary discovery, including a limited number of depositions and disclosure of experts. *Id.* The Preliminary Injunction hearing was held from September 6, 2022 through September 8, 2022. On September 8, 2022, during the hearing, the Court denied Defendants' motion to dismiss Alex A.'s complaint, finding that Alex A. presented sufficient *prima facie* evidence to avoid dismissal. On September 23, 2022, the Court denied Alex A.'s Motion for a Preliminary Injunction, based in part on certain promises by Defendants during the hearing to make numerous improvements to the Angola site where youth will be housed—including ensuring adequate services and staffing—prior to any youth being moved there. Doc. No. 79 at  19, ¶ 44, 26, ¶ 89. On October 19, 2022, OJJ

moved eight youth—four from Acadiana Center for Youth at St. Martinville and four from Swanson Center for Youth at Monroe—to the TTU at Angola.[3]

On October 25, 2022, Plaintiffs filed a First Amended Class Action Complaint, which includes additional individual plaintiffs, Brian B. and Charles C., who are also proposed class representatives, and an additional claim under the Americans with Disabilities Act, among other updates. Doc. No. 96. Plaintiffs allege that Defendants' plan to move youth in OJJ custody to the TTU at Angola violates proposed class members' due process rights under the Fourteenth Amendment to reasonably safe conditions and to be free from punishment given that their detention is civil, not criminal, as well as the Disability Subclass members' rights under the Rehabilitation Act and the ADA.

## II.    Statement of Facts

The relevant facts are set out in Plaintiffs' original and amended class action complaints, *see* Doc. No. 1; Doc. No. 96, and the declarations attached to this motion. On July 19, 2022, Governor John Bel Edwards announced that the state would "temporarily" move approximately 25 youth in OJJ custody from Bridge City Center for Youth (BCCY), a secure care facility for children, who may range from ages 10 to 21, to LSP.[4] LSP, a notoriously dangerous adult maximum-security prison—the largest in the United States—is commonly referred to as Angola prison based on its physical address[5] and its origins as a slave plantation and a forced labor camp.[6] Defendants' plan to incarcerate youth at Angola would subject youth to conditions of confinement so seriously deficient as to violate their due process rights under the Fourteenth Amendment. As one former top OJJ official noted, the decision to transfer youth from juvenile facilities to Angola

---

[3] Office of Juvenile Justice, *OJJ Completes First Phase of Adjudicated Youth Transfers*, Oct. 19, 2022, https://ojj.la.gov/ojj-completes-first-phase-of-adjudicated-youth-transfers/.

[4] Stacie Richard, *Gov. Edwards address recent issues at a Louisiana juvenile detention center*, NEW ORLEANS WGNO (Jul. 19, 2022), https://wgno.com/news/louisiana/today-3-p-m-governor-edwards-to-address-recent-issues-at-a-louisiana-juvenile-detention-center/ (video portion, beginning at 5:35).

[5] LA Department of Public Safety and Corrections, *Louisiana State Penitentiary*, https://doc.louisiana.gov/location/louisiana-state-penitentiary/ (last accessed Oct. 31, 2022).

[6] Anat Rubin, Tim Golden & Richard A. Webster, *Inside the U.S.'s Largest Maximum-Security Prison, COVID-19 Raged. Outside, Officials Called Their Fight a Success*, PROPUBLICA (Jun. 24, 2020) https://www.propublica.org/article/inside-the-uss-largest-maximum-security-prison-covid-19-raged.

is "abhorrent" and "the worst juvenile justice policy decision probably ever made in modern times."[7] Instead of serving the purposes of the juvenile justice system to "rehabilitate life and renew hope" and "[assist] police and other public agencies to come up with modern and compassionate answers to the stubborn problems of juvenile crime,"[8] Defendants' decision to move youth to the TTU at Angola will subject class and subclass members to serious psychological and physical harm and to punishment in violation of their constitutional and federal statutory rights. *See, e.g.,* Doc. No. 79 at 37, ¶ 159 ("Placing any child in a maximum-security facility designed for adults is unreasonably psychologically harmful to children.").

## A.  Eligibility of Youth in OJJ Custody to be Transferred to the TTU at Angola

Proposed class and subclass members—youth in OJJ custody who have been, might be, or will be transferred to the TTU at Angola—are all subject to the same criteria and eligibility procedures identified in OJJ's TTU policy. The Defendants have designated the TTU at Angola where youth in OJJ custody will be transferred as a "secure care" facility, which by design is a more restrictive environment compared to other juvenile facilities run by OJJ. Doc. No. 79 at 12, ¶ 13. As this Court found, pursuant to OJJ policy, certain "[h]igh-risk youth are stepped up to a higher level of secure care and therapeutic intervention in what is known as a Transitional Treatment Unit ('TTU')." *Id.* at 16, ¶ 31.[9] OJJ policy defines TTU as "[a] *maximum custody unit* for youth described as violent and very aggressive with a documented history of engaging in behavior which creates or incites aggressive responses from others and creates an unsafe therapeutic environment for staff and youth." Defs.' Ex. 3 at 5 (emphasis added). The OJJ facility at Angola where youth will be housed will be a TTU. Doc. No. 79 at 18.

---

[7]  Erin Einhorn, *Teens in a Louisiana juvenile facility are being sent to Angola Prison. Experts say it's not only cruel, it could violate the law*, NBC NEWS (Jul. 21, 2022), https://www.nbcnews.com/news/us-news/louisiana-sending-youth-angola-prison-rcna39150; *see also* Doc. No. 4-2, Exhibit 1 (declaration of Glenn Holt).

[8]  Lyndon B. Johnson, *Remarks Upon Signing the Juvenile Delinquency Prevention and Control Act of 1968. Online by Gerhard Peters and John T. Woolley*, The American Presidency Project, Jul. 31, 1968, https://www.presidency.ucsb.edu/node/237791.

[9]  *See also* Defs.' Ex. 2 (Youth Services Policy for Youth Classification System and Treatment Procedures); Defs.' Ex. 3 (Youth Services Policy Transitional Treatment Unit (TTU)).

OJJ's written TTU policy explicitly serves to "establish[] specific criteria for assignments to the TTU" to "prevent arbitrary assignment." Defs.' Ex. 3 at 6; *see also id.* at 1 (stating that the purpose of the policy document is "[t]o establish the program objectives and the criteria for the placement of youth and youth with disabilities in the [TTU] located at the Bridge City Center for Youth at West Feliciana"). As this Court found based on Defendants' testimony, "[y]outh ages ten through eighteen, identified as high-risk, are eligible for placement in the TTU." Doc. No. 79 at 22, ¶ 61. OJJ's policy sets forth certain "[a]dmission criteria" for youth to be considered for transfer to the TTU, and states that "a youth *must meet at least one* of the following criteria" to be eligible for transfer to the TTU. Defs.' Ex. 3 at 6-7 (emphasis added). These criteria include whether the youth has, *inter alia*, "exhibited a pattern of battery on other youth which has not been substantially reduced by prior intervention efforts," "[h]as committed a single battery/predatory act of such serious consequence that the potential of reoccurrence must be actively prevented," "[h]as been in possession of a significant weapon," "[h]as marijuana or other illegal substances in possession or has a substantial amount with motivation to distribute." *Id.* All of the "incidents" referenced in the criteria "must be documented" by various policy reports. *Id.* at 8. The policy also establishes the procedure for referring youth for admission to the TTU, which includes an evaluation by a "multidisciplinary team" consisting of facility staff, the youth's social services counselor, group leader, and educational representative. *Id.* at 9. OJJ's TTU policy also states that "up to four youth classified as Seriously Mentally Ill may be transferred to the program after a consensus recommendation from an [multidisciplinary team] staffing." *Id.* at 8. According to the TTU referral form and the eligibility and referral criteria described in Defendants' TTU policy document, some youth will be found eligible for the TTU at Angola based only on behavioral incidents, without OJJ convening a team to evaluate their particular needs. Defs.' Ex. 59; Pls.' Ex. 18 at 37 (describing the process for an emergency transfer).

Although Defendants have not expressly limited eligibility for transfer to the TTU at Angola to youth classified as in need of "secure care," the eligibility criteria in OJJ's TTU policy demonstrate that most of the youth at risk of being transferred to the Angola site are or will be in

existing OJJ secure care facilities. Indeed, Defendants have stated that the TTU at Angola "is scheduled to begin receiving Youth *from other secure care facilities* in the second half of September 2022," and that "[y]outh being transferred to BCCY-WF . . . are being moved from one OJJ secure care facility to another OJJ secure care facility." Doc. No. 49 at 8 (emphasis added), *see also id.* at 41 ("Because the Youth transferred to BCCY-WF are not being transferred out of OJJ's custody and, instead, are being moved from one OJJ secure care facility to another OJJ secure care facility . . . ."); Doc. No. 83 (Defendants' Answer) (stating that Governor Edwards announced in July that BCCY-WF would be "a temporary location for certain problematic [y]outh currently housed in Louisiana [OJJ] *secure care* facilities") (emphasis added). The eight youth who were moved to the TTU at Angola on October 19, 2022, were all from secure care facilities. As a result, the proposed Principal Class and Disability Subclass primarily consist of youth who are or will be in OJJ secure care custody.

**B.    Risks of Harm to Proposed Class and Subclass Members Transferred to the TTU at Angola**

Proposed class and subclass members who are moved to the TTU at Angola are likely to face serious psychological and physical harm. At the Angola site, youth will live in, as this Court articulated, "prison cells with barred sliding doors that lock them in." Doc. No. 79 at 30, ¶ 122. The cells are windowless, and contain correctional-style cots, metal sinks, and metal toilets without seats or covers. As the Court found, "[p]lacing *any child* in a maximum-security facility designed for adults *is unreasonably psychologically harmful to children*." *Id.* at 37, ¶ 159 (emphasis added). The Court further determined that "there is a high-risk that the placement of adolescents in a facility designed to house adult inmates will be psychologically harmful and traumatizing." *Id.* at ¶ 160. Unlike their peers in juvenile facilities with individual rooms or dormitories, rather than barred cells, youth transferred to the TTU at Angola face a greater risk of suicide by the very architecture of the facility. The design of the prison cells in which youth at the OJJ site at Angola are being and will be held creates a heightened risk of suicide because the bars provide multiple "cut-off" points around which youth could tie sheets or comparable items. Schiraldi testimony

9.7.22. Youth transferred to the TTU at Angola will also be subject to uses of force that are inappropriate and dangerous for young people, as the Memorandum of Understanding (MOU) between OJJ and LSP/Department of Public Safety and Corrections (DOC) explicitly authorizes LSP/DOC officers to use "chemical spray, electronic control weapons ('Tasers') and the use of force continuum for which they are trained" against youth in OJJ custody moved to the TTU at Angola. Pls.' Ex. 32 at 2.

The Court also made several findings of fact regarding the conditions at the Angola site as of Vincent Schiraldi's (Plaintiffs' juvenile justice expert) tour of the facility with Plaintiffs' and Defendants' counsel on September 1, 2022, including: (1) "[t]he indoor space designated for recreation is inadequate," (2) "[t]he existing outdoor recreational space are likewise inadequate, consisting of a basketball goal erected in a grassy area in view of a guard tower," and (3) "[t]he existing visitation space is a non-contact, mesh screen separating the juvenile from a visitor." *Id.* at 30, ¶¶ 119-121. These conditions stray far from the "normalized environment" that "[a] juvenile facility should provide . . . to the degree possible." *Id.* at 30, ¶ 115.

Defendants' policies and plans to provide critical medical, educational, and rehabilitative services in the TTU at Angola are insufficient to provide reasonable health and safety to proposed class and subclass members who are moved there. The Court found that Wellpath, a private contractor, will "deliver medical and mental health services to youth at BCCY-WF" and that "[n]o youth will ever be referred to LSP for medical care." *Id.* at 23, ¶ 70, 25 ¶ 85. However, just a few days after the Preliminary Injunction hearing, a media article reported that "in the case of a life-threatening medical emergency, *children would be treated at the hospital on the [LSP] prison grounds*, according to the [OJJ] spokesperson."[10] This Court previously concluded that the medical care provided to adult prisoners in the hospital on the Angola campus—where some youth in OJJ custody would be treated according to Defendants—violates the Eighth Amendment, the ADA, and Section 504 of the Rehabilitation Act. *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988,

---

[10] Elizabeth Weill-Greenberg, *Louisiana Wants to Jail Kids at Angola Prison's Old Death Row*, The Appeal, Sept. 22, 2022, https://theappeal.org/louisiana-juvenile-detention-angola-death-row/ (last visited Oct. 3, 2022) (emphasis added).

at *1 (M.D. La. Mar. 31, 2021), *reconsideration denied*, No. CV 15-318-SDD-RLB, 2021 WL 5287856 (M.D. La. Oct. 8, 2021). For children who need other services at a hospital, Defendants plan to transport them to the nearest hospital which is 24 miles away, in West Feliciana Parish, and does not provide a full range of emergency and other health care services. The hospital with which OJJ has contracted is 134 miles away. *See* Doc. No. 79 at 31, ¶ 123. During Mr. Schiraldi's tour of the OJJ Angola site on September 1, 2022, he did not see any medical infirmary. Schiraldi testimony 9.7.22.

Other services, such as educational and rehabilitative services, were not yet in place as of the preliminary injunction hearing and are entirely dependent on Defendants following through on their promised improvements to the Angola site before any youth are moved there. OJJ's policy prescribes that the "TTU Program will designate at the minimum 2 special education teachers to provide students with disabilities identified by IDEA [(Individuals with Disabilities Education Act)] with any special education instruction as prescribed by the student's IEP [(Individualized Education Plan)]." Defs.' Ex. 43 at 1. During the Preliminary Injunction hearing, OJJ's Director of Education, Shenell Deville, testified that neither of the two special education teachers have been hired yet. Deville testimony 9.8.22. OJJ's policy also calls for "required related [services] staff," including a "Speech-Language Pathologist, Social Worker/School Psychologist, Occupational Therapist, Physical Therapist, Adapted Physical Education Teacher, etc.," Defs.' Ex. 43 at 2, yet there is no evidence on any updates regarding the hiring status for those positions. At the OJJ facility at St. Martinville, which was, like the Angola site, developed as a temporary TTU for certain high-risk youth, youth were not provided education, as "Perry Stagg, OJJ's assistant secretary, confirmed that St. Martinville did not initially provide education" and the Louisiana Department of Education and Louisiana Special School District did not even learn about the new facility until months after it opened.[11]

---

[11] Erin Einhorn, et al., *'No light. No nothing.' Inside Louisiana's harshest juvenile lockup*, NBC News, Mar. 10, 2022, https://www.nbcnews.com/news/us-news/louisiana-juvenile-detention-st-martinvillle-rcna19227.

If the eight proposed class members who have already been transferred to the Angola site were moved before it was "ready, properly staffed, and can fully provide educational, medical, mental health, recreational, and food services," those children are already being subject to constitutionally and legally deficient services and conditions. Defendants refused to stipulate that no youth will be moved before then, and refused to permit Plaintiffs' counsel to inspect the Angola site before youth were moved. As a result, there is no independent verification that adequate staff were hired and services were in place prior to the October 19, 2022, move of eight children to the Angola site.

### C.    The Named Plaintiffs

**Alex A.**

Plaintiff Alex A. is 17 years old and is in the secure care custody of OJJ at BCCY. Declaration of Alex A., Doc. No. 9-2 at ¶¶ 3-4. He is a youth with disabilities who has had a Rehabilitation Act Section 504 plan and an IEP under the IDEA. *Id.* at ¶ 7. As a youth residing at BCCY who is not enrolled in the sex offender treatment program, Alex A. was informed that he, along with other youth in BCCY, would be transferred to LSP imminently. *Id.* at ¶¶ 13, 19. Alex A. first learned that he and his peers would be moved to LSP while watching television news at BCCY and overhearing OJJ staff discuss the planned move. *Id.* at 19; *see also* Doc. No. 79 at 34, ¶ 141. Defendants failed to provide any form of notice to Alex A. or his mother, let alone notice appropriate for a youth with his disabilities. Since then, Alex A. has experienced significant mental and physical harm, including increased difficulty sleeping, extreme stress, and pulling his hair. Doc. No. 9-2 at ¶¶ 20-21; *see also* Doc. No. 79 at ¶¶ 143, 147. Alex A. fears that he will be subject to unsafe conditions and violence at the Angola site. Doc. No. 9-2 at ¶ 20-23. DOC staff, who have been brought into BCCY, have used mace on Alex A. and other youth at the facility. *Id.* at ¶ 23. Despite having been accused of being involved in instances of acting out, Defendants made no individualized plan to address his behaviors, manifestations of his disability. In fact, OJJ's referral form for Alex A. to send him to the Angola site checks boxes related only to his alleged

behavior and determines that he should be moved without even convening a multi-disciplinary team under the TTU emergency admissions criteria. Defs.' Ex. 59 at 2.

Alex A. brings this lawsuit through his mother Molly Smith, an adult resident of the state of Louisiana. Declaration of Molly Smith, Doc. 9-6 at ¶¶ 1, 2. Ms. Smith is deeply concerned her son will be locked in a barred single cell and be deprived of adequate educational, medical, and rehabilitative services at the Angola site. *Id.* at ¶ 8. Ms. Smith is dedicated to the best interests of her son and will advocate for those best interests in this action.

**Brian B.**

Plaintiff Brian B. is 18 years old and is in the secure care custody of OJJ at BCCY. Declaration of Brian B. ("Brian B. Decl.") at ¶¶ 1, 4. Brian B. was a minor when he was charged with juvenile delinquency and turned 18 while his case was pending. He is a youth with a disability under Section 504 of the Rehabilitation Act and the ADA, as he has been prescribed Adderall to address behavioral and attention disabilities, and on at least two prior occasions was placed in a mental health facility for about a week each time due to a mental health crisis. *Id.* at ¶¶ 6, 7. Brian B. attends school at BCCY five days a week, and believes he is earning high school credits through his classes. *Id.* at ¶ 8. Brian B. learned about the plan to move youth from BCCY to Angola from the news. *Id.* at ¶ 9. He was shocked and confused to learn of this plan, and does not feel he deserves to be moved there. *Id.* Brian B. expressed that "[t]he youth in my dorm are scared, and no one wants to be moved to Angola." *Id.* Brian B. has never tried to escape from BCCY or any other facility. *Id.* at ¶ 10.

**Charles C.**

Plaintiff Charles C. is 16 years old and is in the secure care custody of OJJ at the Acadiana Center for Youth at St. Martinville ("St. Martinville"). Declaration of Charles C. ("Charles C. Decl.") at ¶¶ 1, 3-4. Charles C. is a youth with a disability under Section 504 of the Rehabilitation Act and the ADA, as he has been diagnosed with ADHD, bipolar disorder, schizophrenia, and PTSD, has been taking medication for his mental health conditions, and previously spent time in mental health hospitals as a result of mental health crises. *Id.* at ¶¶ 6-7. Charles C. attends school

at St. Martinville and believes he is earning high school credits through his classes. *Id.* at ¶ 8. Charles C. learned about the plan to move youth to Angola from staff at St. Martinville, who started telling him in July 2022 that if he misbehaved, he would be sent to Angola. *Id.* at ¶ 9. The staff at St. Martinville have continued saying that to Charles C., and a week ago, another youth at St. Martinville told Charles C. he heard they both were on the list to be sent to Angola—just two days before Charles C. thinks that youth was transferred to Angola. *Id.* Charles C. is scared and anxious about being sent to Angola, and has had trouble sleeping as a result. *Id.* at ¶ 10. Charles C. knows Angola is an adult prison and that he would be living on the former death row, and is concerned about being locked in a cell most of the time if he is moved there. *Id.* He has also heard other youth say they do not want to be moved there, and has heard staff threaten other youth that they will be sent to Angola if they do something wrong. *Id.* at ¶ 10.

Charles C. brings this lawsuit through his mother Kenione Rogers, an adult resident of the state of Louisiana. Ms. Rogers is worried about her son being sent to the Angola site. *Id.* at ¶ 10. Ms. Rogers is dedicated to the best interests of her son and will advocate for those best interests in this action.

## LEGAL STANDARD

Federal Rule of Civil Procedure 23 sets out the requirements for certification of a class action. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14 (1997). "An action may proceed as a class action only if the party seeking certification demonstrates that all four of the familiar requirements of rule 23(a) are satisfied." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001). The four elements of Rule 23(a) are: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "Class certification under Rule 23(b)(2) is appropriate if the requirements of 23(a) are satisfied and: 'the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or

corresponding declaratory relief with respect to the class as a whole.'" *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007) (quoting Fed. R. Civ. P. 23(b)(2)).

All elements of Rule 23(a) and Rule 23(b)(2) are satisfied here.

## ARGUMENT

Many courts in this Circuit, as well as others, have certified Rule 23(b)(2) class actions consisting of people who are incarcerated or detained and are challenging their conditions of confinement, including class actions on behalf of youth housed in juvenile facilities. *See, e.g.*, *J.D. v. Nagin*, 255 F.R.D. 406, 416 (E.D. La. 2009) ("[C]lass certification under Rule 23(b)(2) is an appropriate case management tool for cases involving juvenile detention centers."); *Morgan v. Sproat*, 432 F. Supp. 1130, 1133 (S.D. Miss. 1977) (explaining that the court previously certified a class consisting of present and future young people adjudicated delinquent who were challenging their conditions of confinement at a state institution under Rule 23(b)(2)); *see also J.S.X. Through Next Friend D.S.X. v. Foxhoven*, 330 F.R.D. 197, 206, 215 (S.D. Iowa 2019) (certifying class under Rule 23(b)(2) of male juveniles adjudicated delinquent with mental illnesses challenging conditions of confinement); *Christina A. ex rel. Jennifer A. v. Bloomberg*, 197 F.R.D. 664, 671 (D.S.D. 2000) ("[A] general class of all juveniles who are now or in the future will be confined at Plankinton is certified with regard to the Plaintiffs' claims of violations of their due process rights under the Fourteenth Amendment . . . ."); *Andre H. by Lula H. v. Ambach*, 104 F.R.D. 606, 613 (S.D.N.Y. 1985) (certifying class under Rule 23(b)(2) of "all current and future residents of the Spofford Juvenile Center who are handicapped and in need of special education and related services"); *Santiago v. City of Philadelphia*, 72 F.R.D. 619, 629 (E.D. Pa. 1976) (certifying Rule (23)(b)(2) class of juveniles "who are or will become subject to incarceration at the Youth Study Center, Philadelphia, Pennsylvania" and meet other requirements).

## I.    The Principal Class and Disability Subclass Satisfy All Rule 23(a) Requirements.

### A.    The Proposed Class and Subclass Satisfy the Numerosity Requirement.

Under Rule 23(a)(1), the proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Fifth Circuit has held that "when conducting a

numerosity analysis, district courts must not focus on sheer numbers alone but must instead focus 'on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors.'" *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000) (quoting *Phillips v. Joint Legislative Comm*., 637 F.2d 1014, 1022 (5th Cir.1981)); *Zeidman v. J. Ray McDermott & Co*., 651 F.2d 1030, 1038 (5th Cir. July 1981); *see also Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992), *on reh'g*, 53 F.3d 663 (5th Cir. 1994) ("We previously have noted that while the number of claimants is relevant to this determination, a court also may consider other factors, including the nature of the action."). The Fifth Circuit has also "found the inclusion of future members in the class definition a factor to consider in determining if joinder is impracticable." *Pederson*, 213 F.3d at 868 n.11. This general principle is further strengthened when applied in the jail and detention contexts, including juvenile detention, which courts in the Fifth Circuit and other circuits have recognized involve a "population [that] is constantly in flux." *Jones v. Gusman*, 296 F.R.D. 416, 465 (E.D. La. 2013); *see also Cole v. Livingston*, No. 4:14-CV-1698, 2016 WL 3258345, at *6 (S.D. Tex. June 14, 2016), *aff'd sub nom. Yates v. Collier*, 868 F.3d 354 (5th Cir. 2017) (noting that there is "a constant flux of inmates into and out of the Pack Unit, so joinder of all the proposed class members would be impracticable if not impossible") (internal quotation marks omitted); *see also, e.g.*, *Reid v. Donelan*, 297 F.R.D. 185, 189 (D. Mass. 2014), *enforcement granted*, 64 F. Supp. 3d 271 (D. Mass. 2014) ("Unforeseen members will join the class at indeterminate points in the future, making joinder *impossible*.").

Here, the Court found that "[a]t full capacity, BCCY-WF will house between twenty-four to thirty youth who are eligible for placement in the TTU pursuant to OJJ policy." Doc. No. 79 at 18, ¶ 42. As noted above, the Court also found that "[y]outh ages ten through eighteen, identified as high-risk, are eligible for placement in the TTU," pursuant to OJJ's classification system and TTU policy for "determin[ing] what youth are appropriate for transfer for the TTU." *Id.* at 22, ¶¶ 61-62. In any given day there are approximately 356 youth in OJJ's secure care custody, the subgroup of youth in OJJ custody who are most susceptible to satisfying the eligibility criteria for transfer to the TTU at Angola for the reasons identified above. *See* Defs.' Ex. 3; Doc. No. 40 at 8,

41; Doc. No. 83 at 2. Many youth in OJJ's custody are youth with disabilities who require additional special education services under the law.[12] Nationally, "70 percent of youth who enter the justice system have a mental health, sensory or learning disability, and anywhere between 28 percent and 43 percent of detained or incarcerated youth have special education needs."[13] Moreover, according to Defendants, the TTU at Angola is "intended to be a 4-6 week intensive therapeutic program. Youth can 'work their way out' of TTU by demonstrating ability to thrive in a social living environment." Doc. No. 79 at 22, ¶ 64. As a result, the population of youth at the TTU at Angola will be fluid and constantly shifting.

Although it is well established that there is no exact numerical threshold Plaintiffs must meet to satisfy the numerosity requirement, all available potential numbers based on the evidence demonstrate that the proposed class and subclass easily surpass "[t]he 20-member presumptive floor" that is sometimes used as a "general guideline." 1 Newberg and Rubenstein on Class Actions § 3:12 (6th ed.); *see also General Tel. Co. of the Northwest, Inc. v. Equal Employment Opportunity Commission*, 446 U.S. 318, 330 n. 14 (1980) ("The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations."); *Simms v. Jones*, 296 F.R.D. 485, 497 (N.D. Tex. 2013) (noting "there is no magic number at which the numerosity requirement is satisfied"). More importantly, "the fluid nature" of the proposed class and subclass "counsels in favor of certification of all present and future members." *Lewis v. Cain*, 324 F.R.D. 159, 168, 176 (M.D. La. 2018) (granting certification for class and subclass of "all inmates who [are] now, or will be in the future, incarcerated at LSP") (alteration in original). Indeed, Plaintiffs' proposed Principal Class and Disability Subclass consist of fluid, transient populations not only because they encompass youth who might be or are transferred to the Angola site, but also because the youth population at the TTU at Angola is intended to be transitional by its very nature. As a result, the proposed class and subclass are sufficiently numerous to make joinder impracticable.

---

[12] *See also* Office of Juvenile Justice, *Youth Services Policy Education*, https://ojj.la.gov/wp-content/uploads/2022/03/B.7.1.pdf (last accessed Oct. 28, 2022) (discussing special education supports).
[13] Coalition for Juvenile Justice, *Youth with Undiagnosed or Mistreated Disabilities*, https://www.juvjustice.org/our-work/safety-opportunity-and-success-project/national-standards/section-i-principles-responding-2 (last accessed Oct. 28, 2022).

The proposed class and subclass also satisfy the implicit requirement of ascertainability, because "its members can be ascertained by reference to objective criteria." *Plaza 22, LLC v. Waste Mgmt. of Louisiana, LLC*, No. CIV.A. 13-618-SDD, 2015 WL 1120320, at *3 (M.D. La. Mar. 12, 2015) (quoting Manual for Complex Litigation § 21.222 at *1 (4th ed.)). As described above, there are numerous objective criteria in OJJ's TTU policy that govern the eligibility of youth who may be transferred to the TTU at Angola—the youth in OJJ custody "who have been, might be, or will be transferred" to the TTU at Angola.

The proposed class and subclass therefore satisfy Rule 23(a)'s numerosity requirement, as well as the implicit ascertainability requirement.

### B.    The Proposed Classes Meet the Rule 23(a)(2) Commonality Requirement.

To satisfy the commonality requirement, Plaintiffs must demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The crux of the commonality requirement is that the putative class members' "claims must depend upon a common contention" that is "of such a nature that it is capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The commonality test requires "merely *a single* common contention that enables the class action 'to generate common answers apt to drive the resolution of the litigation.'"  *In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014) (emphasis added) (quoting *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012)); *see also Simms v. Jones*, 296 F.R.D. at 497 (noting that "a single common question of law or fact can suffice" to show commonality) (citing *Dukes*, 564 U.S. at 359). The "common answers" may relate to injurious effects experienced by class members as well as Defendants' injurious conduct. *Deepwater Horizon*, 739 F.3d at 811.

Commonality is satisfied where all class members are exposed to systemic policies or practices that create a substantial risk of serious harm, even if the challenged policies or practices affect individual class members in different ways. *See, e.g.*, *Yates v. Collier*, 868 F.3d 354, 363 (5th Cir. 2017); *Parsons v. Ryan*, 754 F.3d 657, 681 (9th Cir. 2014); *Jones*, 296 F.R.D. at 465. The common, shared risk is the relevant constitutional injury—not how that risk may manifest on an

16

individual level. As one court in this Circuit adopted from the Ninth Circuit's explanation of the commonality requirement in a prison conditions class action lawsuit:

> What all members of the putative class and subclass have in common is their alleged exposure, as a result of specified [prison] policies and practices that govern the overall conditions of health care services and confinement, to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent. . . . [A]lthough a presently existing risk may ultimately result in different future harm for different inmates — ranging from no harm at all to death — every inmate suffers exactly the same constitutional injury when he is exposed to a single [prison] policy or practice that creates a substantial risk of serious harm.

*Dockery v. Hall*, No. 3:13-CV-326-WHB-JCG, 2018 WL 11424799, at *5 (S.D. Miss. Feb. 14, 2018) (alterations in original) (quoting *Parsons*, 754 F.3d at 678-79); *see also Nola v. Exxon Mobil Corp.*, No. CIV.A. 13-439-JJB, 2015 WL 2338336, at *4 (M.D. La. May 13, 2015) ("For commonality, that the parties suffered a common injury is important, though this 'can be satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse.'") (quoting *Deepwater Horizon*, 739 F.3d at 810); *Braggs v. Dunn*, 317 F.R.D. 634, 656 (M.D. Ala. 2016) (finding commonality satisfied "because being subjected to a substantial risk of serious harm is an actionable constitutional injury, even when a prisoner's physical or mental condition has not yet been detrimentally impacted.").

Here, the commonality question is satisfied as all class and subclass members are subject to the same referral procedures to be transferred to the Angola site and the same policies, actions, and failures to act by Defendants that will produce constitutionally deficient conditions at the Angola site and produce an unreasonable risk of serious harm to youth moved there. Doc. No. 79 at 37, ¶¶ 159, 160. As described above, all proposed Principal Class and Disability subclass members who might be moved to the Angola site will be forced to live in barred single cells and in an adult maximum-security environment, subjecting youth to punitive conditions and unreasonable risks of harm in violation of the class's Fourteenth Amendment due process rights. Research and unrefuted testimony by Mr. Schiraldi during the Preliminary Injunction hearing demonstrated that even short periods of time in adult facilities have been linked to high rates of

suicide as well as serious paranoia, anxiety, and depression for youth,[14] in addition to the increased risk of suicide for youth presented by barred cells. As a result, whether the conditions at the Angola site expose adolescents to an unconstitutional risk of harm is amenable to a common answer.

Moreover, in Plaintiffs' amended complaint, "[t]he putative class and subclass members thus all set forth numerous common contentions whose truth or falsity can be determined in one stroke: whether the specified . . .  policies and practices to which they [will] all [be] subjected [in the Angola site] expose them to a substantial risk of harm." *See Dockery*, 2018 WL 11424799, at *5 (quoting *Parsons*, 754 F.3d at 678-79). These "common contentions" of law and fact shared by the Principal Class and Disability Subclass members include:

- Whether Defendants have sufficient policies and practices in place to ensure the physical and psychological safety of youth transferred to the Angola site.

- Whether Defendants have sufficient policies and practices in place to ensure adequate educational and rehabilitative services to youth transferred to the Angola site.

- Whether Defendants' policies, including their TTU policy requirements and education policy requirements, are implemented in practice at the Angola site.

- Whether Defendants will provide adequate medical and mental health treatment and services to youth transferred to the Angola site.

- Whether Defendants will provide adequate staffing for all relevant services at the Angola site.

---

[14]  Neelum Arya, *Jailing Juveniles: The Dangers of Incarcerating Youth in Adult Jails in America*, CAMPAIGN FOR YOUTH JUSTICE (Nov. 2007).

- Whether Defendants will hire sufficient education staff, including special education teachers and specialists, to meet the needs of youth with disabilities who are transferred to the Angola site.

- Whether Defendants will provide adequate access to family members of youth transferred to the OJJ Angola site to the geographically remote Angola campus, and adequate contact visitation spaces for family members of youth transferred there.

- Whether the conditions at the Angola site constitute punishment in violation of the Fourteenth Amendment due process rights of youth transferred there.

- Whether the conditions at the Angola site are likely to cause serious physical and/or psychological harm to youth transferred there, in violation of their right to safety under the Fourteenth Amendment.

- Whether youth with disabilities who are transferred to the Angola site will face discrimination, in violation of their rights under the Rehabilitation Act and the ADA.

- Whether Defendants are objectively aware of the risk of harm to youth who may be moved to the Angola site.

- Whether Defendants are subjectively aware of the risk of harm to youth who may be moved to the Angola site.

The key questions listed above primarily concern the policies and practices of Defendants, not actions or characteristics specific to the proposed class members. For example, the answer to the factual question of whether Defendants will provide adequate staffing for all relevant services at the Angola site will be common to all class members. And if the answer is "yes," and the Court determines that inadequate staffing produces an unreasonable risk of harm to class members'

health and safety and/or constitutes punishment, Plaintiffs will have prevailed on the merits of their Fourteenth Amendment due process claims. As a result, the common questions capable of class-wide resolution that are central to this case suffice to establish commonality.

**C.    The Proposed Classes Satisfy the Rule 23(a)(3) Typicality Requirement.**

Rule 23(a)(3) requires that the claims of the named Plaintiffs be typical of those of the class. Fed. R. Civ. P. 23(a)(3). As noted by the Supreme Court, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-mart*, 564 U.S. at 349 n.5 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157-58, n.13 (1982)). The typicality requirement ensures that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[T]he test for typicality is not demanding." *Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 625 (5th Cir. 1999). Nor does typicality "require a complete identity of claims." *James v. Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001), *abrogated on other grounds by In re Rodriguez*, 695 F.3d 360 (5th Cir. 2012). In analyzing typicality, "the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *Id.* (citing Moore's Federal Practice § 23.24[4] (3d ed. 2000)).

Here, Plaintiffs' claims, like those of the putative absent class members, arise from the same event, Defendants' plan to move youth to the TTU at Angola, and the same policies and conditions that they will be subject to if moved to the Angola site. Plaintiff's claims are also based on the same legal theories as the proposed Principal Class and Disability Subclass: violations of their due process rights under the Fourteenth Amendment and, for the Disability Subclass, violations of their rights under Section 504 of the Rehabilitation Act and the ADA. All Plaintiffs are youth who might be transferred to the TTU at Angola because they are youth in the custody of OJJ subject to OJJ's eligibility criteria for referral to the TTU at Angola. Indeed, some of the Plaintiffs have already been informed they are at risk of being transferred to the TTU at Angola. Alex A. Decl., Doc. 9-2 at 19; Charles C. Decl. at 10. As with commonality, factual variations

between Plaintiffs and absent class members do not defeat typicality. *See In re S. Cent. States Bakery Prod. Antitrust Litig.*, 86 F.R.D. 407, 415 (M.D. La. 1980) ("Factual variations between the claims of the class representative and those of some members of the class do not mandate a finding of a lack of typicality where the claims of the class and the representative arise out of the same legal and remedial theory.").

The Principal Class and Disability Subclass therefore satisfy the typicality requirement.

### D.     The Proposed Class and Subclass Satisfy the Rule 23(a)(4) Adequacy of Representation Requirement.

Plaintiffs will also "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prod., Inc.*, 521 U.S. at 625. As courts in this Circuit have recognized, "the adequacy-of-representation requirement 'tends to merge' with the commonality and typicality criteria of Rule 23(a)." *Pitts v. Greenstein*, No. CIV.A. 10-635-JJB-SR, 2011 WL 2193398, at *6 (M.D. La. June 6, 2011) (citation omitted).

Plaintiffs do not have any conflicting interests with the putative absent class and subclass members, given that they assert the same claims, the same violations of their constitutional and statutory rights, and seek the same declaratory and injunctive relief. There is no evidence to demonstrate divergent or conflicting interests between Plaintiffs and absent class members or to otherwise doubt Plaintiffs' abilities to fairly and adequately protect the interests of the class.

In addition, all Plaintiffs have sufficiently exhausted all available administrative remedies as required under the Prison Litigation Reform Act by utilizing OJJ's emergency grievance (ARP) process. Doc. No. 79 at 7.[15] While exhaustion is not a requirement for class action certification, and does not affect Plaintiffs' standing in this case, this exhaustion further evidences Plaintiffs'

---

[15] Plaintiff Alex A. filed an Emergency Grievance pursuant to OJJ's Administrative Remedy Procedure ("ARP") on Tuesday, August 16, 2022. Despite the imminent nature of Plaintiff's anticipated move to the OJJ Angola site and the serious physical and psychological harm Plaintiff is already experiencing as a result, OJJ responded on August 18, 2022 by stating that Plaintiff is "not subject to any immediate risk of harm" and therefore his ARP would be reviewed "within the regular ARP time limits." The Court found he had exhausted administrative remedies. Doc. No. 79 at 7. Brian B. and Charles C. received identical responses from OJJ to their emergency grievances.

ability to represent the class members at hand. *Lewis v. Cain*, 324 F.R.D. at 163 n. 19 (M.D. La. 2018); *see also Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004) (citing *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 498–99 (5th Cir. 1968) (exhaustion of remedies requirement satisfied for class action if named plaintiff representing class exhausted remedies); *Valentine v. Collier*, No. 4:20-cv-01115 at *14 (S.D. Tex. June 27, 2020), ECF No. 160 (Order granting Motion for Class Certification) (noting that "[t]he Court is not aware of Fifth Circuit precedent that requires district courts to determine exhaustion prior to class certification").

The proposed Principal Class and Disability Subclass therefore satisfy Rule 23(a)'s adequacy requirement.

## II.    Class Certification is Appropriate Under Rule 23(b)(2).

Rule 23(b)(2) authorizes a class action where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Wal-Mart*, 564 U.S. at 360.  Civil rights cases present precisely the types of systemic legal and factual issues for which class certification under Rule 23(b)(2) was designed. *See Amchem Prod., Inc.*, 521 U.S. at 614 ("Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of cases fitting the Rule 23(b)(2) standards).

The Fifth Circuit has held that the Rule 23(b)(2) certification requires that "(1) class members must be harmed in essentially the same way; (2) injunctive relief must predominate over monetary damage claims; and (3) the injunctive relief sought must be specific." *Yates*, 868 F.3d at 366 (internal quotations omitted) (quoting *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007)). "Actions for class-wide injunctive or declaratory relief are intended for (b)(2) certification precisely because they involve uniform group remedies. Such relief may often be awarded without requiring a specific or time-consuming inquiry into the varying circumstances

and merits of each class member's individual case." *Choice Inc. of Texas v. Graham*, No. CIV.A.04-1581, 2005 WL 1400408, at *5 (E.D. La. June 3, 2005) (quoting *Allison v. Citgo Petroleum Corp*., 151 F.3d 402, 414 (5th Cir. 1998); *see also Doiron v. Conseco Health Ins. Co*., 240 F.R.D. 247, 254 (M.D. La. 2007).

Plaintiffs seek relief for the entire class based on policies and practices by Defendants that affect the class equally. First, Defendants have "acted . . . on grounds that apply generally to the class," Fed. R. Civ. P. 23(b)(2), given that Defendants' policies, actions, and failures to act concerning the TTU at Angola apply equally to all proposed class and subclass members. Second, Plaintiffs seek the same declaratory and injunctive relief on behalf of all members of the proposed class and subclass, specifically: (i) a declaratory judgment that Defendants are violating their constitutional rights and the federal statutory rights of the Disability Subclass members, and (ii) injunctive relief requiring Defendants to cease plans to transfer Plaintiffs and class members to the Angola site, and to immediately release or transfer the Plaintiffs and any class members who have already been moved to the Angola site either to the community or to one of OJJ's other existing facilities. Plaintiffs seek no money damages in this action. Any injunction involving the transfer of the adolescents from OJJ secure sites to the OJJ Angola site would occur on a class-wide basis and provide protection for all Principal Class members and Disability Subclass members. In fact, the only remedy capable of redressing the injury of which Plaintiffs complain is one that enjoins Defendants' conduct as to every class and subclass member. These circumstances make a prototypical case for class treatment under Rule 23(b)(2).

### III.    Plaintiffs' Counsel Satisfy the Requirements of Rule 23(g) and Should Be Appointed Class Counsel.

Rule 23(g) requires courts to appoint class counsel for any certified class. Fed. R Civ. P. 23(g)(1). In appointing class counsel, courts must consider: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to

representing the class." Fed. R. Civ. P. 23(g)(1)(A). Class counsel has a duty to "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

The undersigned counsel fulfill the criteria set forth in Rule 23(g). Plaintiffs are represented by attorneys who have extensive experience litigating complex civil rights and class action lawsuits in federal courts, as well as prison litigation matters and cases involving minors. *See* Declarations of David Utter, Christopher Murell, Tammie Gregg, David Shanies, Ronald Haley and Hector Linares. Plaintiffs' counsel from the Claiborne Firm, P.C.; Murell Law Firm; Stuart H. Smith Law Clinic, Loyola University New Orleans College of Law; Shanies Law Office; Haley & Associates; and American Civil Liberties Union (ACLU) National Prison Project have extensive experience litigating class actions, prison-litigation matters, and cases involving minors. *See* Utter Decl. at ¶¶ 2-6; Murrell Decl. at ¶¶ 2-9; Gregg Decl. ¶¶ 2-10; Haley Decl. at ¶¶ 2-7; Shanies Decl. ¶¶ 9-12; Linares Decl. ¶¶ 2-8. Plaintiffs' counsel also possess a thorough understanding of the conditions within OJJ secure facilities and the proposed TTU at Angola and of the relevant constitutional and statutory law, as they have worked on this case from its inception. *See, e.g.*, Utter Decl. at ¶ 7. Plaintiffs' attorneys have demonstrated their steadfast commitment to the case and have thoroughly investigated the matter, engaged in discovery, filed motions and briefs, and participated in hearings before the Court. *See id.* They have built strong relationships with Plaintiffs and their families, and are committed to utilizing the many resources available to them to adequately represent the interests of the Principal Class and Disability Subclass. Plaintiffs' counsel will advocate with the zeal, skill, and means to prosecute this action and qualify for appointment as class counsel under Rule 23(g).

## CONCLUSION

The issues concerning Defendants' plan to transfer vulnerable youth who are in OJJ's custody to an inadequate facility on the grounds of the notorious and dangerous adult maximum security prison at Angola lend themselves perfectly to class action treatment. In order to adequately protect Plaintiffs' and proposed class members' rights and interests, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Class Certification and Appointment of Class Counsel.

Respectfully submitted, this 31st day of October, 2022,

/s/: *David J. Utter*
DAVID J. UTTER **
Louisiana Bar Number: 23236
WILLIAM R. CLAIBORNE
Georgia Bar Number: 126363
THE CLAIBORNE FIRM, P.C.
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
david@claibornefirm.com
will@claibornefirm.com

/s/: *Christopher J. Murell*
CHRISTOPHER J. MURELL
Louisiana Bar Number: 32075
MURELL LAW FIRM
2831 St. Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 Telephone
(504) 233-6691 Facsimile
chris@murell.law

/s/: *Hector Linares*
HECTOR LINARES
Louisiana Bar Number: 28857
SARA GODCHAUX
Louisiana Bar Number: 34561
STUART H. SMITH LAW CLINIC
LOYOLA UNIVERSITY NEW ORLEANS
COLLEGE OF LAW
7214 St. Charles Avenue, Box 902
New Orleans, Louisiana 70118
(504) 861-5560 Telephone
(504) 861-5440 Facsimile
halinare@loyno.edu
shgodcha@loyno.edu

/s/: *Ronald Haley*
RONALD HALEY
Louisiana Bar Number: 30900
HALEY & ASSOCIATES
8211 Goodwood Blvd., Suite E
Baton Rouge, Louisiana 70806
(225) 755-9935 Telephone
(888) 900-9771 Facsimile
rhaley@ronaldhaleylawfirm.com

/s/: *David Shanies*
DAVID SHANIES
New York Bar Number: 4471140
SHANIES LAW OFFICE
110 West 40th Street
Tenth Floor
New York, New York 10018
Tel (212) 951-1710
Fax (212) 951-1350
Cell (646) 515-2151
david@shanieslaw.com

/s/ *Nancy Rosenbloom*
NANCY ROSENBLOOM
New York Bar Number: 2168425
ADITI SHAH
New York Bar Number: 5886254
ACLU NATIONAL PRISON PROJECT
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2652
nrosenbloom@aclu.org
ashah@aclu.org

/s/ *Tammie Gregg*
TAMMIE GREGG*
MN Bar Number: 026240
ACLU NATIONAL PRISON PROJECT
915 15th St. N.W., 7th Floor
Washington D.C. 20005
Telephone: (202) 393-4930

25

Facsimile: (202) 393-4931
tgregg@aclu.org


** *Lead Counsel*
*Not admitted in DC; practice limited to
federal courts

**ATTORNEYS FOR PLAINTIFFS**


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 31st  day of October, 2022, a copy of the was served upon all

counsel of record by electronic transmission.

*/s/ David J. Utter*
DAVID J. UTTER