## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ALEX A., by and through his guardian, Molly Smith; BRIAN B.; and CHARLES C., by and through his guardian Kenione Rogers, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>v.<br><br>GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS,[1] in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections,<br><br>           Defendants. | Civil Action No. 3:22-cv-573-SDD-RLB |

## MEMORANDUM IN SUPPORT
## OF MOTION FOR ACCESS TO COUNSEL

MAY IT PLEASE THE COURT:

Plaintiffs move this Honorable Court to order that Defendants' Office of Juvenile Justice ("OJJ") comply with their own policy to permit undersigned counsel timely legal visits with clients in secure care, including clients in the juvenile facility at issue in this case.

## PROCEDURAL HISTORY

On August 19, 2022, Plaintiff Alex A. filed a class action complaint against Defendants, bringing claims for declaratory and injunctive relief under the Fourteenth Amendment of the U.S.

---

[1] On November 18, 2022, Gov. Edwards announced the resignation of Dep. Sec. Sommers and the appointment of Otha "Curtis" Nelson as his replacement.  https://gov.louisiana.gov/index.cfm/newsroom/detail/3892   Because Sommers was sued in his official capacity, Nelson is automatically substituted as a Defendant. Fed. R. Civ. P. 25(d). Plaintiff leaves Sommers as a Defendant until the clerk is ordered to change the caption.

Constitution and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[2]  The lawsuit's genesis was an announcement on July 19, 2022, by Defendant Governor John Bel Edwards that the state would "temporarily" move approximately 25 youth in OJJ custody from Bridge City Center for Youth (BCCY), a secure care facility for children, who may range from ages 10 to 21, to a new juvenile facility on the grounds of the Louisiana State Penitentiary ("LSP").[3]  LSP, a notoriously dangerous adult maximum-security prison—the largest in the United States—is commonly referred to as Angola prison based on its physical address and its origins as a slave plantation and a forced labor camp.  Simultaneously with filing the complaint, Alex A. moved for a Temporary Restraining Order and a Preliminary Injunction seeking to: (1) enjoin Defendants from transferring or incarcerating Plaintiff Alex A. or any proposed class member at LSP, and (2) require Defendants to immediately return any youth who may have already been transferred to LSP to the Bridge City Center for Youth (BCCY) or another appropriate OJJ facility for youth.[4]

On August 23, 2022, the Court held a telephone status conference, during which Defendants stipulated that no youth had been or would be moved to LSP before September 15, 2022.[5]  As a result, the Court denied Alex A.'s emergency motion for a TRO and set the matter for a Preliminary Injunction hearing.[6]  The Court set expedited deadlines for preliminary discovery, including a limited number of depositions and disclosure of experts.[7]

---

[2] Doc. 1.

[3] Doc. 4-12.

[4] Doc. 3, 9.

[5] Doc. 14.

[6] Id.

[7] Id.

2

The Preliminary Injunction hearing was held from September 6, 2022 through September 8, 2022.  On September 8, 2022, during the hearing, the Court denied Defendants' motion to dismiss Alex A.'s complaint, finding that Alex A. presented sufficient prima facie evidence to avoid dismissal.[8]  On September 23, 2022, the Court denied Alex A.'s Motion for a Preliminary Injunction, based in part on certain promises by Defendants during the hearing to make numerous improvements to the Angola site where youth will be housed—including ensuring adequate services and staffing—prior to any youth being moved there.[9]  On October 19, 2022, OJJ moved eight youth—four from Acadiana Center for Youth at St. Martinville and four from Swanson Center for Youth at Monroe—to the juvenile facility at Angola ("Angola").[10]

On October 25, 2022, Plaintiffs filed a First Amended Class Action Complaint, which includes additional individual plaintiffs, Brian B. and Charles C., who are also proposed class representatives, and an additional claim under the Americans with Disabilities Act (ADA), among other updates.[11]  Plaintiffs allege that Defendants' plan to move youth in OJJ custody to Angola, and their current practice of doing so, violate proposed class members' due process rights under the Fourteenth Amendment to reasonably safe conditions and to be free from punishment given that their detention is civil, not criminal, as well as the Disability Subclass members' rights under the Rehabilitation Act and the ADA.[12]  On October 31, Plaintiffs filed a motion for class

---

[8]  Plaintiff has a pending request for the transcript of the testimony and exhibits.  Doc. 91.

[9]  Doc. No. 79 at 19, ¶ 44, ¶ 26, ¶ 89.

[10]  Office of Juvenile Justice, OJJ Completes First Phase of Adjudicated Youth Transfers, Oct. 19, 2022, https://ojj.la.gov/ojj-completes-first-phase-of-adjudicated-youth-transfers/.

[11]  Doc. No. 96.

[12]  Id.

certification.[13]

On November 21, 2022, Defendants filed a motion to dismiss.[14]  The next day, November 22, 2022, Defendants filed a motion to stay discovery.[15]  Both essentially rely on an argument that the named Plaintiffs lack standing because they are not currently incarcerated at the Angola facility.[16]

Beginning on November 30, 2022, undersigned counsel complied with OJJ policy and requested legal visits with youth currently incarcerated at Angola who have retained the undersigned as counsel.  Those visits were arbitrarily denied.[17]  This motion and memorandum in support seek an order directing Defendants to allow lawyers to visit their clients at the Angola facility.

## I.    Statement of Facts

The purpose of OJJ's attorney visits policy is "to provide uniform procedures for approving and conducting attorney visits."  *Exhibit 1*, p. 1.  Such visits include "face-to-face meetings."  *Id.*, p. 2.  "It is the Deputy Secretary's policy that youth shall be provided reasonable and confidential access to their attorneys."  *Id.*

Before visiting with their clients in OJJ custody, counsel must fax or email OJJ's "General Counsel/designee and the appropriate Facility Director simultaneously."  *Id.*  In addition, counsel's "credentials must be verified through the Louisiana State Bar Association prior to being approved

---

[13] Doc. 99.

[14] Doc. 102.

[15] Doc. 103.

[16] Doc. 102-1.

[17] While this is the first time Plaintiffs' counsel has been denied outright the ability to visit their clients, it is not the first time access has been unreasonably delayed.  *See, e.g.* Exhibit 5 (October 14, 2022 request to visit client, with approval not provided until October 24, 2022—*ten days later*).

to visit or engage in privileged communication with youth." *Id.* OJJ's general counsel or designee "shall approve/disapprove requests, and email confirmations to the appropriate Facility Director." *Id.*, p. 3. Once approved or not, the Facility Director or their designee "shall advise attorneys of approval or non-approval of requested visits." *Id.*

Once approved, visits by attorneys "must be scheduled through the Facility Director's office a minimum of 24 hours in advance" and the visits "shall take place Monday through Friday, excluding holidays, between the hours of 8 a.m. and 4 p.m." *Id.*, p. 4. Finally, counsel may not visit with more than 10 youth at any one time, and "no more than 20 on any one (1) day subject to available space and security constraints." *Id.*, p. 5.

On Wednesday, November 30, 2022, one of undersigned counsel ("Utter") emailed OJJ counsel requesting the email address and name "for the facility director at the new secure care facility on the Angola grounds." *See, Exhibit 2*, p. 4 (email exchanges between Utter and OJJ counsel).[18] Utter added that he planned on requesting legal visits "with a number of youth for next week and want to make sure I follow OJJ policy." *Id.* A little more than an hour later, OJJ counsel Revettea Woods responded with the answer—Linda London—and provided London's email address. *Id.*, pp. 3-4.

The next day, December 1, 2022, Utter emailed OJJ counsel and London, requesting legal visits with three youth "at the new secure care facility on the grounds of the Louisiana State Penitentiary, known as BCCY-West Feliciana." Utter requested that the visits take place at 9 a.m. on December 5, 2022 and provided his Louisiana bar card number. *Id.*, p. 3. The next morning, December 2, 2022, Utter added one more youth to visit, requested that OJJ counsel and London

---

[18] The names of the youth are redacted due to their status as juveniles and under disposition pursuant to Louisiana's juvenile delinquency laws.

confirm receipt of the emails, and asked that the recipients "let me know what else you need to effectuate my clients' right to visit with their attorney." *Id.*, p. 2.

Later that day, at 2:10 p.m., Utter sent another email to OJJ counsel and London noting:

> I have not heard from anyone to confirm my scheduled visits for Monday, Dec. 5 at 9 a.m. I am scheduled to fly to Louisiana Sunday night in order to be at the prison on Monday. Please confirm my visits or let me know what else you need from me.

*Id.* Because the "verification" requirement in OJJ policy is unclear as to who is responsible for providing proof of an attorney's status, *Exhibit 1*, p.2, Utter provided a certificate of good standing from the Louisiana State Bar. *Exhibit 2*, p. 1.

At 4:30 p.m. on December 2, 2022, after no response from OJJ counsel or London, Utter emailed private counsel for the Defendants in this action, Lem Montgomery and Kyle Miller. Utter forwarded the email exchange he had with OJJ counsel and London, and stated:

> I write to provide a heads up that since yesterday I've been requesting in person confidential legal visits with our clients. See below the email chain and attached. I am happy to provide any other documentation your clients may request and will plan to be at the gates of Angola at 9 a.m. on Monday, December 5, 2022.

*Exhibit 3*, p. 1. Less than an hour later, OJJ counsel Revettea Woods responded to Utter's requests for the legal visits at Angola with a one sentence denial, claiming – despite his compliance with the policy – that Utter failed "to comply with the Attorney Visit Policy." *Exhibit 2*, p. 1.

On Monday, December 5, 2022, Utter emailed private counsel for the Defendants requesting that the parties confer to resolve the issue of access to courts for youth in secure care. *Exhibit 4*, pp. 2-3. Defendants' counsel's response conflated youth at Angola's right to meet with counsel with discovery in this action, and flatly denied Plaintiffs' counsel ability to meet with their clients. *Id.*, p. 2. Although Plaintiffs' counsel is under no obligation to explain why the legal visits are necessary, and indeed the purpose is protected by attorney-client privilege, the legal visits for

some of the youth are part of counsels' defense of youth in their delinquency proceedings. All of the four youth are also part of the putative class in this action. Plaintiffs' counsel fully complied with OJJ's Attorney Visits policy and the denial of the visits violates Plaintiffs' right of access to the courts and burden counsels' rights as well.

### II.    Legal Argument

### A. Defendants' Actions Infringe Upon Detained Youths' First Amendment Right of Access to the Courts

Separate and distinct from any Sixth Amendment rights of people facing criminal charges, "[i]t is . . . established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977). In fact, the U.S. Supreme Court noted, "[b]ecause a prisoner ordinarily is divested of the privilege to vote, the right to file a court action might be said to be his remaining most fundamental political right, [ ] preservative of all rights." *McCarthy v. Madigan*, 503 U.S. 140, 153 (1992) (quotation marks and citation omitted). Defendants' actions infringe upon putative class members' and named plaintiffs' First Amendment right of access to the courts. The right extends to all categories of incarcerated people, including juveniles. *See, John L. v. Adams*, 969 F.2d 228, 232-33 (6th Cir. 1992).

This right of access to courts means that incarcerated people such as the youth at issue here "must have a reasonable opportunity to seek and receive the assistance of attorneys. *See Adams v. Carlson*, 488 F.2d 619, 630-31 (7th Cir. 1973) ("All other rights of an inmate are illusory without [the right of unfettered access to the courts] . . . the effective protection of access to counsel requires that the traditional privacy of the lawyer-client relationship be implemented in the prison context.") (citations omitted). Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts . . . are invalid."

*Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled in part on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989).[19]

If a client fears interference with or disclosure of confidential communications, "the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice." *Fisher v. United States*, 425 U.S. 391, 403 (1976); *Weatherford*, 429 U.S. at 554 n.4 (acknowledging that effective assistance of counsel is threatened by a reasonable "fear that the government is monitoring [attorney-client] communications through electronic eavesdropping."); *see also Nordstrom v. Ryan*, 762 F.3d 903, 910 (9th Cir. 2014) (holding that if an incarcerated person is denied the right of "private consultation," then the client "does not enjoy the effective aid of counsel.").

### B. Defendants' Actions Burden Plaintiffs' Counsel's First Amendment Rights

Defendants' actions in preventing Plaintiffs' counsel from meeting with their retained clients, and other putative class members and putative named plaintiffs, not only violates the rights of the relevant youth, but also implicate the First Amendment rights of Plaintiffs' counsel and of all lawyers or legal organizations who may attempt to meet with the youth incarcerated at Angola. Counsel's separate and distinct First Amendment rights are clear in litigation that involves systemic violations of people's civil and constitutional rights, which is precisely the type of litigation at hand here.

In *NAACP v. Button*, the Supreme Court held that the First Amendment protected counsel's advising persons of their legal rights and soliciting prospective litigants. 371 U.S. 415, 429 (1963). The Court reaffirmed *Button* 15 years later, in a case in which an ACLU attorney attempted to

---

[19] While a person's right of access to the courts is not violated unless there is a showing of "actual injury," *Lewis v. Casey*, 518 U.S. 343, 349 (1996), the Supreme Court has found such a showing is not required when prison officials affirmatively interfere with a person's access to counsel; nor does it apply to the Sixth Amendment rights of pretrial detainees, *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001).

communicate with a potential litigant. The Court recognized the ACLU's work "in the defense of unpopular causes and unpopular defendants," and that "[f]or the ACLU, as for the NAACP, 'litigation is not a technique of resolving private differences'; it is 'a form of political expression' and 'political association.'" *In re Primus*, 436 U.S. 412, 427-28 (1978) (quoting *Button*); *see also Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) ("Attorneys have rights to speak freely, subject only to the government regulating with narrow specificity.") (citing *Button*).

Numerous federal courts have relied on *Button*, *In re Primus*, and their progeny to find that prison or jail policies or practices that unreasonably impede communication between attorneys and incarcerated people violate counsel's First Amendment protections. *See, e.g., Cruz v. Beto*, 603 F.2d 1178, 1180-81, 1186 (5th Cir. 1979) (holding that arbitrarily barring an attorney from communicating with incarcerated clients by mail or in person violated her First and Fourteenth Amendment rights); *see also Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642-48 (6th Cir. 2015) (affirming preliminary injunction, and holding that the ACLU showed likelihood of success on its claim that a jail's restrictions on legal mail violated its First Amendment rights and Fourteenth Amendment due process rights); *Sturm v. Clark*, 835 F.3d 1009, 1015 (3d Cir. 1987) (concluding that an attorney stated a First Amendment claim when her access to incarcerated people was restricted after she publicized staff misconduct); *Abel v. Miller*, 824 F.2d 1522, 1534 (7th Cir. 1987) (holding that a federal prison could not ban attorneys from a prisoners' rights organization from communicating with incarcerated people in retaliation for the group's exercise of its First Amendment rights to criticize and litigate against the institution); *Jean v. Nelson*, 711 F.2d 1455, 1508-09 (11th Cir. 1983) (holding that Haitian Refugee Center attorneys had a right to provide "know your rights" education for detained Haitian immigrants), *on rehearing*, 727 F.2d 957 (11th Cir. 1984), *rev'd on other grounds*, 472 U.S. 846 (1985).

Defendants' actions prohibiting Utter from visiting with youth thus has ramifications beyond the Sixth Amendment right to counsel, endangering both the First Amendment rights of incarcerated people and their attorneys.

### C. Defendants' Actions Implicate Plaintiffs' Counsel's Ethical Duties

Defendants' actions create challenges for Plaintiffs' counsel to fulfill ethical obligations.

#### 1. Attorneys' Duty of Competent and Diligent Representation.

The Louisiana Rules of Professional Conduct,[20] the American Bar Association's ("ABA") Model Rules of Professional Conduct, and the National Juvenile Defender Center ("NJDC") standards for the representation of youth in the delinquency system require lawyers to act with the "skill, thoroughness, and preparation reasonably necessary for the representation," (La. R. Prof'l Conduct, R. 1.1(a)), and to "act with reasonable diligence and promptness in representing a client." *Id.*, R. 1.3.[21] And relevant to the instant case, where Plaintiffs' counsel represent people in class action litigation, class counsel "must be willing and able to vigorously prosecute the action." 7A Mary Kay Kane, Federal Practice and Procedure § 1769.1 (4th ed. 2022).

Defendants' pretextual excuses preventing Plaintiffs' counsel from meeting in person with their clients at Angola interferes with counsel's ability to act diligently, promptly, and with skill and thoroughness.

#### 2. Attorneys' Duty to Communicate and Keep Clients Reasonably Informed

Under the Louisiana Rules of Professional Conduct, attorneys must keep their clients "reasonably informed" throughout the representation. *See* La. R. Prof' Conduct R. 1.4(a)(3). "A

---

[20] Louisiana has incorporated the ABA Model Rules into its state rules, including in rules related to the attorney-client relationship.

[21] *See also* ABA Model Rules of Prof'l. Conduct R. 1.1, 1.3 (2016); National Juvenile Defender Center ("NJDC"), National Juvenile Defender Standards, Standard 1.1 ("Counsel must provide competent, diligent, and zealous advocacy to protect the client's procedural and substantive rights.").

lawyer shall give the client sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued." *Id.*, R. 1.4(b). Plaintiffs' counsel cannot fulfill these duties when they are arbitrarily barred from in-person visits with their clients.

Moreover, written correspondence with an incarcerated client is much slower than communicating in person.[22] Lawyers cannot effectively communicate with their clients if they are relying solely on a form of communication that requires days or weeks to have a dialogue. And even assuming that legal mail is unopened and unread, many incarcerated people are unable to communicate effectively through written correspondence. Nearly one-third of adult U.S. prisoners have little or no ability to read, and a similar percentage do not have a high school degree.[23] Similarly, studies have found that 19 percent of people in prison and 31 percent of people in jail have a cognitive disability, which affects their ability to comprehend and respond to legal documents.[24] These statistics are even more stark among the youth in the juvenile justice system, as research shows that the prevalence of youth with learning and intellectual disabilities in juvenile detention facilities is four to five times greater than the prevalence of youth with disabilities in

---

[22] Similarly, relying solely upon telephone calls introduces barriers to full communication, especially for clients who may have auditory processing disabilities. In-person, face-to-face meetings, are the gold standard for ensuring the most thorough communication.

[23] Nat'l Ctr. for Educ. Statistics, U.S. Dep't of Educ., *Highlights from the U.S. PIAAC Survey of Incarcerated Adults* 6, B-3 (2016) (scoring the reading levels of incarcerated individuals from Level 1 to Level 5, and finding that 29 percent of incarcerated people scored *below* a Level 2 reading level. Level 2 readers "can integrate two or more pieces of information based on criteria, compare and contrast or reason about information, and make low-level inferences." Level 1 readers can only "read relatively short…texts to locate a single piece of information that is identical to or synonymous with the information given in the question or directive.") *at* https://nces.ed.gov/pubs2016/2016040.pdf. Because communication with clients often involves, at a minimum, a Level 2 reading ability, many incarcerated people are effectively unable to relay their legal issues to their attorneys via written mail.

[24] Jennifer Bronson, *et al.*, *Disabilities Among Prison and Jail Inmates*, 2011-12 (Dec. 2015) (national survey of almost 40,000 prisoners incarcerated in more than 200 state and federal prisons, including at least one facility located in each state), *available at* www.bjs.gov/content/pub/pdf/dpji1112.pdf.

public schools.[25]  With such low literacy and education rates pervasive throughout the criminal and juvenile systems, neither incarcerated youth nor their attorneys can depend upon written communication. In-person visits thus are an essential part of Plaintiffs' counsel's representation of putative class members and named plaintiffs.

### 3.  Attorneys' Duty of Confidentiality

The Louisiana Rules of Professional Conduct and ABA's Model Rules require that attorneys ensure the confidentiality of information related to the representation of a client.  *See* La. R. Prof'l. Conduct R. 1.6(a), (c) (2015); ABA Model Rules of Prof'l Conduct 1.6 (2016); *see also* NJDC Standards, Rule 2.3(c) (2013) ("Counsel must zealously protect confidential information from public disclosure."); ABA Criminal Justice Standards for the Defense Function ("ABA Defense Standards"), Standard 4-1.4(a) (4th ed. 2017) (requiring that defense counsel "act zealously within the bounds of the law and applicable rules to protect the client's confidences.").[26]

Defendants' refusal to permit a confidential legal visit for counsel prevent Plaintiffs' counsel (and potentially other youths' attorneys) from complying with their ethical duty to maintain the confidentiality of all attorney-client communications.  *See Lanza v. State of New York*, 370 U.S. 139, 143-44 (1962) ("[E]ven in a jail, or perhaps especially there, the relationship with the law has endowed with particularized confidentiality must continue to receive unceasing protection."); *see also Nordstrom*, 762 F.3d at 910 ("In American criminal law, the right to privately confer with counsel is nearly sacrosanct.").

---

[25] Nat'l Ctr. for Spec. Educ. Research, Inst. for Educ. Research, *A summary of Research on Youth with Disabilities & the Juvenile Justice System*, (2016) at https://ies.ed.gov/ncser/pdf/JuvenileJustice.pdf.

[26] *See* https://www.americanbar.org/groups/criminal_justice/standards/DefenseFunctionFourthEdition/ (last reviewed Dec. 7, 2022).

Multiple ABA standards memorialize these principles, noting that jurisdictions should guarantee by statute or rule "the right of a criminally detained or confined person to prompt. . . confidential . . . communication with a defense lawyer" and that carceral facilities provide "confidential *and unmonitored* telephonic and other communication facilities to allow effective confidential communication between defense counsel and their detained clients." ABA Crim. Just. Standards for the Def. Function, Standard 4-2.2 (a)-(b) (4th ed. 2015) (emphasis added).[27]

In fact, Standard 4-2.2(d) states that "[a]bsent a credible threat of immediate danger or violence, or advance judicial authorization, *persons working in detention or imprisonment institutions should be prohibited from examining, monitoring, recording, or interfering with confidential communications between defense counsel and their detained clients*." Standard 4-2.2(d) (emphasis added). The ABA Standards for Criminal Justice: Treatment of Prisoners, Standard 23-9.4(c)(iii)(A)) at 310 (3d ed. 2011), states that "correctional officials should implement procedures to enable confidential telephonic contact between counsel and a prisoner who is a client, prospective client, or witness, subject to reasonable regulations, and should not monitor or record properly placed telephone conversations between counsel and such a prisoner."[28]

---

[27] *See id.*

[28] *See* https://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/treatment_of_prisoners.pdf (last reviewed Dec. 7, 2022).

Respectfully submitted, this 8th day of December, 2022.

/s/: *David J. Utter*
DAVID J. UTTER **
Louisiana Bar Number: 23236
WILLIAM R. CLAIBORNE
Georgia Bar Number: 126363
THE CLAIBORNE FIRM, P.C.
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
david@claibornefirm.com
will@claibornefirm.com

/s/: *Christopher J. Murell*
CHRISTOPHER J. MURELL
Louisiana Bar Number: 32075
MURELL LAW FIRM
2831 St. Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 Telephone
(504) 233-6691 Facsimile
chris@murell.law

/s/: *Hector Linares*
HECTOR LINARES
Louisiana Bar Number: 28857
SARA GODCHAUX
Louisiana Bar Number: 34561
STUART H. SMITH LAW CLINIC
LOYOLA UNIVERSITY NEW ORLEANS
COLLEGE OF LAW
7214 St. Charles Avenue, Box 902
New Orleans, Louisiana 70118
(504) 861-5560 Telephone
(504) 861-5440 Facsimile
halinare@loyno.edu
shgodcha@loyno.edu

/s/: *Ronald Haley*
RONALD HALEY
Louisiana Bar Number: 30900
HALEY & ASSOCIATES
8211 Goodwood Blvd., Suite E
Baton Rouge, Louisiana 70806
(225) 755-9935 Telephone
(888) 900-9771 Facsimile
rhaley@ronaldhaleylawfirm.com

/s/: *David Shanies*
DAVID SHANIES
New York Bar Number: 4471140
SHANIES LAW OFFICE
110 West 40th Street
Tenth Floor
New York, New York 10018
Tel (212) 951-1710
Fax (212) 951-1350
Cell (646) 515-2151
david@shanieslaw.com

/s/ *Nancy Rosenbloom*
NANCY ROSENBLOOM
New York Bar Number: 2168425
ACLU NATIONAL PRISON PROJECT
125 Broad Street
New York, NY 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2652
nrosenbloom@aclu.org

/s/ *Tammie Gregg*
TAMMIE GREGG*
MN Bar Number: 026240
ACLU NATIONAL PRISON PROJECT
915 15th St. N.W., 7th Floor

14

Washington D.C. 20005
Telephone: (202) 393-4930
Facsimile: (202) 393-4931
tgregg@aclu.org

\*\* *Lead Counsel*
\*Not admitted in DC; practice limited to federal courts
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of December, 2022, a copy of the foregoing was served upon all counsel of record by electronic transmission.

/s/ *David J. Utter*
DAVID J. UTTER