1                 UNITED STATES DISTRICT COURT

2               MIDDLE DISTRICT OF LOUISIANA

3

4  MOLLY SMITH, ET AL          *        CIVIL ACTION
                               *
5  VERSUS                      *        NO. 3:22-573-SDD
                               *
6  JON BEL EDWARDS, ET AL      *        SEPTEMBER 6, 2022
   * * * * * * * * * * * * * * *

7

8

9                   PRELIMINARY INJUNCTION
            BEFORE THE HONORABLE SHELLY D. DICK
10            UNITED STATES CHIEF DISTRICT JUDGE

11

12 APPEARANCES:

13 FOR THE PLAINTIFFS:         THE CLAIBORNE FIRM, P.C.
                               BY:  DAVID J. UTTER, ESQ.
14                             410 EAST BAY STREET
                               SAVANNAH, GEORGIA 31401

15
                               AMERICAN CIVIL LIBERTIES UNION
16                             FOUNDATION
                               BY:  NANCY ROSENBLOOM, ESQ.
17                                  ADITI SHAH, ESQ.
                               116 CHESTER DRIVE
18                             YONKERS, NEW YORK 10710

19                             MURELL LAW FIRM
                               BY:  CHRISTOPHER J. MURELL, ESQ.
20                             2831 ST. CLAUDE AVENUE
                               NEW ORLEANS, LOUISIANA 70170

21
                               ACLU NATIONAL PRISON PROJECT
22                             BY:  TAMMIE M. GREGG, ESQ.
                               125 BROAD STREET
23                             NEW YORK, NEW YORK 10004

24

25

```
 1                               HALEY & ASSOCIATES
                                 BY:  RONALD S. HALEY, JR., ESQ.
 2                               8211 GOODWOOD BOULEVARD, SUITE E
                                 BATON ROUGE, LOUISIANA 70806
 3
     FOR THE DEFENDANTS:         BUTLER SNOW, LLP
 4                               BY:  CONNELL L. ARCHEY, ESQ.
                                      ALLENA B. MCCAIN, ESQ.
 5                                    MADALINE KING, ESQ.
                                 445 NORTH BOULEVARD, SUITE 300
 6                               BATON ROUGE, LOUISIANA 70802

 7                               BUTLER SNOW, LLP
                                 BY:  KYLE V. MILLER, ESQ.
 8                                    LEMUEL E. MONTGOMERY, ESQ.
                                      ANNA L. MORRIS, ESQ.
 9                               1020 HIGHLAND COLONY PARKWAY,
                                 SUITE 1400
10                               RIDGELAND, MISSISSIPPI 39157

11   OFFICIAL COURT REPORTER:    SHANNON L. THOMPSON, CCR
                                 UNITED STATES COURTHOUSE
12                               777 FLORIDA STREET
                                 BATON ROUGE, LOUISIANA 70801
13                               SHANNON_THOMPSON@LAMD.USCOURTS.GOV
                                 (225)389-3567
14

15

16        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
               COMPUTER-AIDED TRANSCRIPTION SOFTWARE
17

18

19

20

21

22

23

24

25
```

```
1                              INDEX

2                                                          PAGE

3    PLAINTIFFS' WITNESSES:

4    MAGHEN SHIPLEY GAGNARD
```

```
5         DIRECT EXAMINATION BY MR. MURELL              8

6         CROSS-EXAMINATION BY MS. MCCAIN              25

7         REDIRECT EXAMINATION BY MR. MURELL           36
```

```
8    ALEX A.
```

```
9         DIRECT EXAMINATION BY MS. ROSENBLOOM         47

10        CROSS-EXAMINATION BY MR. MONTGOMERY          63

11        REDIRECT EXAMINATION BY MS. ROSENBLOOM       93
```

```
12   MONICA STEVENS, PH.D.
```

```
13        DIRECT EXAMINATION BY MS. GREGG              99

14        DIRECT EXAMINATION CONTINUED BY MS. ROSENBLOOM  122

15        CROSS-EXAMINATION BY MR. MONTGOMERY         143

16        REDIRECT EXAMINATION BY MS. ROSENBLOOM      175
```

```
17   DENISE DANDRIDGE, PH.D.
```

```
18        DIRECT EXAMINATION BY MR. HALEY             179
```

```
19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **(SEPTEMBER 6, 2022)** |
| 2 | **(CALL TO THE ORDER OF COURT)** |
| 3 | **THE COURT:**  GOOD MORNING. |
| 4 | BE SEATED. |
| 5 | OKAY.  CALL THE CASE, PLEASE. |
| 6 | **THE DEPUTY CLERK:**  THIS IS CIVIL ACTION NO. 22-573, |
| 7 | *MOLLY SMITH VERSUS JOHN BEL EDWARDS AND OTHERS*. |
| 8 | **THE COURT:**  OKAY, COUNSEL.  MAKE APPEARANCES, PLEASE. |
| 9 | **MR. MURELL:**  FOR THE PLAINTIFFS, CHRISTOPHER MURELL, |
| 10 | DAVID UTTER, ADITI SHAH, TAMMIE GREGG, RONALD HALEY, AND |
| 11 | NANCY ROSENBLOOM. |
| 12 | **THE COURT:**  OKAY, COUNSEL.  WHEN YOU APPROACH -- IF |
| 13 | AND WHEN YOU APPROACH TO EXAMINE A WITNESS, MAKE AN APPEARANCE |
| 14 | FOR THE COURT REPORTER. |
| 15 | COUNSEL FOR THE DEFENDANT. |
| 16 | **MR. MONTGOMERY:**  THANK YOU, YOUR HONOR. |
| 17 | FOR THE DEFENDANTS, I'M LEM MONTGOMERY.  THESE |
| 18 | ARE MY PARTNERS:  KYLE MILLER, ALLENA MCCAIN, MADALINE KING, |
| 19 | AND ANNA MORRIS. |
| 20 | **THE COURT:**  OKAY. |
| 21 | **MR. MONTGOMERY:**  AND CONNELL ARCHEY. |
| 22 | **THE COURT:**  ALL RIGHT.  OKAY, COUNSEL.  I DON'T NEED |
| 23 | TO HEAR OPENINGS.  I'VE READ YOUR PROPOSED FINDINGS OF FACT AND |
| 24 | CONCLUSIONS OF LAW.  UNLESS YOU JUST FEEL LIKE YOU MUST -- |
| 25 | UNLESS THERE IS SOMETHING THAT HAS COME UP SINCE YOU HAVE FILED |

09:14 1   THOSE THAT YOU FEEL LIKE THAT YOU NEED TO INFORM THE COURT

2   ABOUT, I DON'T NEED OPENINGS.

3             ARE YOU ALL OKAY WITH THAT?

4          **MR. MURELL:** (NODDED HEAD UP AND DOWN.)

5          **THE COURT:** THAT'S A "YES"?

6          **MR. MURELL:** YES, YOUR HONOR.

7          **MR. MONTGOMERY:** YES, YOUR HONOR.

8          **THE COURT:** OKAY. TWO QUESTIONS THAT THE COURT HAS.

9   ONE, SEQUESTRATION OF WITNESSES. YES OR NO?

10         **MR. MURELL:** THE PLAINTIFFS WOULD MOVE FOR THAT.

11         **THE COURT:** COUNSEL, WHEN YOU ADDRESS THE COURT, IT

12   WOULD BE CUSTOMARY AND APPROPRIATE TO STAND.

13         **MR. MURELL:** YES, MA'AM.

14         **THE COURT:** PLUS I CAN HEAR YOU BETTER.

15           YOU WANT SEQUESTRATION?

16         **MR. MONTGOMERY:** WE'RE FINE WITH THAT, YOUR HONOR.

17         **THE COURT:** ALL RIGHT. SO THE ORDER OF SEQUESTRATION

18   IS HEREBY ENTERED.

19            IF YOU ARE A WITNESS IN THIS MATTER, YOU WILL

20   HAVE TO REMAIN IN THE HALL UNTIL YOU ARE CALLED TO TESTIFY.

21   YOU ARE NOT TO DISCUSS YOUR TESTIMONY -- UNLESS YOU ARE AN

22   EXPERT WITNESS OR GOING TO BE OFFERED AS AN EXPERT. IF YOU ARE

23   A FACT WITNESS IN THIS CASE, DO NOT DISCUSS YOUR TESTIMONY WITH

24   ANY PERSON PRIOR TO YOUR TESTIMONY.

25            THE OTHER QUESTION THAT I HAVE IS -- I'M GOING

09:15 1   TO COUNT ON YOU ALL TO MOVE FOR SEALING OF TESTIMONY IF AND

2   WHEN IT'S APPROPRIATE.

3                   ARE THERE GOING TO BE CIRCUMSTANCES IN WHICH

4   TESTIMONY WILL BE -- WHERE THERE WILL BE A MOTION TO SEAL?

5           **MR. UTTER:**  YES, YOUR HONOR.

6           **THE COURT:**  MR. UTTER?

7           **MR. UTTER:**  DAVID UTTER ON BEHALF OF THE DEFENDANTS.

8                   THANK YOU, YOUR HONOR.

9                   WE WILL MOVE, OF COURSE -- WE WILL MOVE, OF

10   COURSE, TO HAVE OUR CLIENT'S -- ALEX X. -- ALEX A.'S TESTIMONY

11   SEALED.  WE ALSO HAVE A QUESTION OF WHERE TO TAKE HIS

12   TESTIMONY.  WE PREFER PERHAPS THE COURT'S CONFERENCE ROOM OR A

13   SMALLER SETTING.  WE UNDERSTAND THERE'S LOTS OF PEOPLE HERE.

14   BUT WE -- BECAUSE HE'S GOT A RIGHT TO ANONYMITY, WE WOULD HAVE

15   TO HAVE THE ENTIRE COURTROOM CLEARED IF THAT'S WHAT

16   YOUR HONOR -- IF THAT'S WHAT THE COURT PREFERS.

17           **THE COURT:**  WELL, WE WILL SEAL THE COURTROOM.  WE

18   WILL CLEAR THE COURTROOM AND SEAL THE COURTROOM, SEAL THE

19   RECORD.

20           **MR. UTTER:**  THANK YOU.  AND HE --

21           **THE COURT:**  AND WHEN WE SAY TOTAL ANONYMITY, I MEAN

22   OBVIOUSLY NOT ANONYMITY FROM COUNSEL AND FROM THE COURT?

23           **MR. UTTER:**  THAT'S TRUE.

24           **THE COURT:**  OKAY.

25           **MR. UTTER:**  YEP.

09:16 1                  THE COURT:  SO ARE THERE ANY OTHER MEASURES THAT NEED
    2    TO BE TAKEN?
    3                  MR. UTTER:  NO, MA'AM.  AND HE WILL GO FIRST FOR THE
    4    PLAINTIFFS' SIDE.
    5                  THE COURT:  OKAY.  ALL RIGHT.  SO ARE THE PLAINTIFFS'
    6    READY TO CALL THEIR FIRST WITNESS?
    7                  MR. MURELL:  YOUR HONOR, CHRISTOPHER MURELL ON BEHALF
    8    OF THE PLAINTIFFS.
    9                  HE'LL ACTUALLY BE THE SECOND WITNESS.  WE ARE
   10    READY TO CALL OUR FIRST WITNESS.
   11                  THE COURT:  ALL RIGHT.  CALL YOUR FIRST WITNESS.
   12                  MR. MURELL:  MAGHEN GAGNARD.
   13                  THE COURT:  THE COURT REPORTER CAN'T HEAR YOU.
   14                  MR. MURELL:  MAGHEN GAGNARD.
   15                  THE REPORTER:  SPELL IT.
   16                  MR. MURELL:  G-A-G-N- -- G-A-G-N-A-R-D.
   17                  THE DEPUTY CLERK:  I DON'T SEE HER ON Y'ALL'S LIST.
   18                  MR. MURELL:  SHE'S ON THE DEFENSE LIST.  WE
   19    SUBPOENAED HER.
   20                  THE DEPUTY CLERK:  OH, OKAY.
   21                  THE COURT:  COUNSEL.
   22                  MR. MONTGOMERY:  YES, MA'AM.  I HAVE ONE -- JUDGE, I
   23    HAVE ONE HOUSEKEEPING MATTER.  THE SEQUESTRATION RULE DOES NOT
   24    APPLY TO EXPERTS, AS THE COURT POINTED OUT.  BUT ALSO, THE
   25    PARTIES ARE ALLOWED TO REMAIN IN THE COURTROOM.

MAGHEN SHIPLEY GAGNARD

09:17  1          **THE COURT:**  CORRECT.  THE PARTIES AND CORPORATE
       2  REPRESENTATIVES.
       3          **MR. MONTGOMERY:**  JUST WANTED TO CONFIRM.  THANK YOU.
       4          **THE COURT:**  YES, SIR.
       5                    **MAGHEN SHIPLEY GAGNARD,**
       6  **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**
       7          **THE DEPUTY CLERK:**  WOULD YOU PLEASE STATE YOUR NAME
       8  AND SPELL IT FOR THE RECORD.
       9          **THE WITNESS:**  MAGHEN SHIPLEY GAGNARD.  M-A-G-H-E-N,
      10  S-H-I-P-L-E-Y, G-A-G-N-A-R-D.
      11          **THE COURT:**  AND YOU PRONOUNCE IT HOW, MA'AM?
      12          **THE WITNESS:**  GAGNARD.
      13          **THE COURT:**  GAGNARD?
      14          **THE WITNESS:**  YES, MA'AM.
      15          **THE COURT:**  MR. MURELL, GO AHEAD.
      16                    **DIRECT EXAMINATION**
      17  **BY MR. MURELL:**
      18  **Q.**   GOOD MORNING, MS. GAGNARD.
      19  **A.**   GOOD MORNING.
      20  **Q.**   WE MET YESTERDAY.  MY NAME IS CHRIS MURELL.
      21          IF I ASK YOU ANY QUESTIONS YOU DON'T UNDERSTAND, JUST
      22  LET ME KNOW.  OKAY?
      23  **A.**   (NO ORAL RESPONSE.)
      24  **Q.**   CAN YOU PLEASE TELL THE COURT YOUR PRESENT POSITION?
      25  **A.**   I'M THE EXECUTIVE STAFF OFFICER AT LOUISIANA STATE

MAGHEN SHIPLEY GAGNARD

09:18 1  PENITENTIARY.

2  **Q.**   FOR WHOM DO YOU WORK?

3  **A.**   WARDEN TIM HOOPER.

4  **Q.**   OKAY.  WHAT ARE YOUR DUTIES AS -- WHAT ARE YOUR DUTIES IN

5  YOUR JOB?

6  **A.**   CURRENTLY, MY POSITION IS AN ADMINISTRATIVE ASSISTANT TO

7  WARDEN HOOPER.  I'M A POINT OF CONTACT BETWEEN HIM, OUTSIDE

8  AGENCIES, AND OTHER FACILITIES AS HE IS THE REGIONAL WARDEN.

9  AND I ALSO AM RESPONSIBLE FOR DRAFTING PENITENTIARY DIRECTIVES

10 FOR LOUISIANA STATE PENITENTIARY.

11 **Q.**   MS. GAGNARD, WE SPOKE YESTERDAY.  BEFORE YOU TOOK THIS

12 JOB -- BEFORE YOU WERE PROMOTED TO YOUR CURRENT POSITION, YOU

13 HAD A LONG HISTORY IN DOC.  BUT YOU'VE NEVER WORKED WITH

14 JUVENILES.  CORRECT?

15 **A.**   CORRECT.

16 **Q.**   SO ONE OF THE DOCUMENTS THAT WE WENT OVER YESTERDAY IS

17 WHAT'S BEEN MARKED -- WHAT WAS MARKED IN THE PLAINTIFFS'

18 EXHIBIT LIST AS 32.

19        **MR. MURELL:**  WE'LL MARK IT AS -- WOULD THE COURT

20 PREFER WE MARK IT NO. 1 FOR THIS HEARING?

21        **THE COURT:**  HOWEVER IT'S MARKED.

22        **THE DEPUTY CLERK:**  HOWEVER IT IS IN JERS, THAT'S HOW

23 IT NEEDS TO BE.

24        **MR. MURELL:**  OKAY.  SO THIS IS PLAINTIFFS'

25 EXHIBIT NO. 32.

MAGHEN SHIPLEY GAGNARD

09:19  1          THE COURT:  OKAY.  DO Y'ALL WANT TO PRE-ADMIT ANY

       2   EXHIBITS?  OR ARE WE GOING TO GO THROUGH THIS THE OLD FASHION

       3   WAY?

       4          MR. MURELL:  YES, YOUR HONOR.  WE'VE STIPULATED WITH

       5   THE DEFENSE ON MOST EXHIBITS.  THIS IS ONE OF THE ONES THAT HAS

       6   BEEN STIPULATED TO.

       7          THE COURT:  LET'S TAKE A MINUTE AND LET'S GO THROUGH

       8   THE EXHIBITS AND GET THEM IN, BECAUSE IF THEY ARE -- IF THEY

       9   HAVE NOT BEEN OFFERED INTO EVIDENCE, YOU CANNOT DISPLAY THEM

      10   UNTIL IT'S OFFERED INTO EVIDENCE.  YOU CAN DISPLAY IT TO THE

      11   WITNESS AND THE COURT.  BUT IF IT'S NOT IN EVIDENCE, YOU NEED

      12   TO TELL ME IT'S NOT IN EVIDENCE, NOT TO BE PUBLISHED TO THE

      13   GALLERY.

      14          GIVE US JUST A MINUTE, MA'AM.  WE'RE GOING TO DO

      15   SOME HOUSEKEEPING THAT I PROBABLY SHOULD HAVE ASKED FOR EARLIER

      16   BUT NEGLECTED TO.

      17          OKAY.  PLAINTIFF IS GOING TO OFFER WHAT

      18   EXHIBITS?

      19          MR. MURELL:  THE PLAINTIFFS WILL OFFER PLAINTIFFS'

      20   NO. --

      21          MR. UTTER:  YOUR HONOR, MAY I DO IT BY EXCLUSION,

      22   WHAT WE HAVEN'T STIPULATED TO?  IT'S A VERY SMALL NUMBER.

      23          THE COURT:  WELL, HOW MANY EXHIBITS HAVE YOU GOT?

      24   ONE THROUGH WHAT?

      25          MR. UTTER:  PLAINTIFF HAS 78.

MAGHEN SHIPLEY GAGNARD

09:21 1                    **THE COURT:**  1 THROUGH 78.  ALL RIGHT.  WHICH ONES ARE
      2   NOT GOING TO BE OFFERED?
      3                    **MR. UTTER:**  36, 40, 44, 46, 47, 51, 52, 53, 54, 56,
      4   58, 59, 61, AND 63.
      5                    **THE COURT:**  58, 59.  WHAT WERE THE -- I GOT
      6   EVERYTHING UP UNTIL THEN.  59?
      7                    **MR. UTTER:**  61 AND 63.  AND THOSE ARE EXHIBITS THAT
      8   WE WOULD LIKE TO ENTER.  MOST OF THEM ARE MEDIA ARTICLES,
      9   JOURNALS, STUFF LIKE THAT.
     10                    **THE COURT:**  OKAY.  SO THERE HAS NOT BEEN ANY
     11   STIPULATION ON THOSE?
     12                    **MR. UTTER:**  THAT'S RIGHT.
     13                    **THE COURT:**  COUNSEL, ARE WE IN AGREEMENT WITH RESPECT
     14   TO THE ADMISSION OF THE REMAINING EXHIBITS 1 THROUGH 78, OTHER
     15   THAN THOSE THAT WERE JUST ARTICULATED BY MR. UTTER?
     16                    **MR. UTTER:**  THERE WERE TWO OTHERS.  YOUR HONOR, I'M
     17   SORRY.  EXHIBITS 62 AND 72, AND THEN 73.  WE'VE ALSO AGREED NOT
     18   TO STIPULATE TO ALL THE DECLARATIONS OR AFFIDAVITS AND THE
     19   EXPERT REPORTS.  BUT WE HAVE AGREED TO STIPULATE TO THE
     20   QUALIFICATIONS OF ALL THE EXPERTS.
     21                    **THE COURT:**  OKAY.  WELL, WE'LL GET TO THAT.
     22                    COUNSEL.
     23                    **MR. MILLER:**  YOUR HONOR, KYLE MILLER FOR THE
     24   DEFENDANTS.
     25                    YES, WE AGREE THAT THE EXHIBITS THAT HAVE BEEN

MAGHEN SHIPLEY GAGNARD

09:23 1   CALLED OUT ARE THE ONES THAT WE HAVE NOT STIPULATED TO.

2   HOWEVER, AS MR. UTTER POINTED OUT, THERE WERE A NUMBER OF

3   AFFIDAVITS AND DECLARATIONS THAT HAVEN'T BEEN COVERED, SO I'D

4   BE CONCERNED IF WE PUT IN, IN ORDER, SAYING EVERYTHING OTHER

5   THAN WHAT JUST GOT READ OUT IS STIPULATED TO BECAUSE THAT

6   WOULDN'T BE ACCURATE.

7        THE COURT:  OKAY.  LET'S DO IT THE OLD FASHION WAY.

8   GIVE ME THE EXHIBITS THAT YOU ARE GOING TO STIPULATE TO.  LET'S

9   DO IT.

10        SO EXHIBITS 1 THROUGH 35.  CORRECT?

11        MR. MILLER:  NO, YOUR HONOR, THAT'S NOT CORRECT.

12   THERE ARE SOME OF THE DECLARATIONS THAT ARE IN THERE.

13        SO STIPULATIONS WOULD BE TO PLAINTIFFS' 2, 3, 4,

14   5, 7, 8, 10, 11, 12, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29,

15   30, 31, 32, 33, 34, 35, 37, 38, 39, 41, 42, 45, 48, 49, 50, 60,

16   64, 65, 70, AND 71.

17        THE COURT:  ALL RIGHT.  THE EXHIBITS THAT HAVE JUST

18   BEEN ARTICULATED BY MR. MILLER ARE ADMITTED WITHOUT OBJECTION.

19        DO THE DEFENDANTS HAVE -- OR DO THE PLAINTIFFS

20   HAVE ANY OF THE DEFENDANTS' EXHIBITS THAT THEY CAN STIPULATE TO

21   ADMISSIBILITY?

22        MR. MURELL:  YES, YOUR HONOR.

23        DO YOU WANT TO GO THROUGH YOUR EXHIBITS?

24        MR. MILLER:  I BELIEVE THAT WE HAVE STIPULATIONS,

25   YOUR HONOR, ON D-1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, D-15

MAGHEN SHIPLEY GAGNARD

09:25  1    THROUGH D-41, D-43, 44, 45, 46, 47, 48, D-50, 51, 52, 53, D-54,
       2    55, 56, D-59 THROUGH 67, AND D-68.
       3            THE COURT:  ALL RIGHT.  WITHOUT OBJECTION, THE
       4    DEFENDANTS' EXHIBITS ARTICULATED BY COUNSELOR MILLER ARE
       5    ADMITTED WITHOUT OBJECTION.
       6                ALL RIGHT.  SO IF THERE IS AN EXHIBIT THAT YOU
       7    WANT THE WITNESS TO LOOK AT OR THAT YOU WANT TO REFER TO THAT
       8    HAS NOT BEEN ADMITTED, YOU WILL NEED TO SAY "NOT FOR
       9    PUBLICATION" UNTIL IT'S ADMITTED.
      10                ALL RIGHT.  PROCEED.
      11            MR. MURELL:  YES, YOUR HONOR.  WE'D SHOW THE WITNESS
      12    PLAINTIFFS' 32, WHICH HAS BEEN ADMITTED.
      13            THE COURT:  ALL RIGHT.  IT MAY BE PUBLISHED.
      14                YOU HAVE TO PUT IT UP.  WE DON'T DO IT.
      15            MR. MURELL:  OKAY.
      16            THE COURT:  SO I DON'T KNOW HOW YOU ARE DOING IT.
      17    ARE YOU GOING TO DO IT BY A COMPUTER?  ARE YOU GOING TO DO IT
      18    BY ELMO?  WHAT ARE YOU GOING TO DO?
      19            MR. MURELL:  I CAN DO ELMO ALSO.  OR I DON'T -- OUR
      20    SCREEN IS GREEN.  WE'RE PLUGGED IN.
      21            THE DEPUTY CLERK:  I'M NOT SURE WHY IT'S NOT WORKING.
      22            MR. MURELL:  WE HAVE THE HDMI ONE PLUGGED IN.
      23            THE DEPUTY CLERK:  OKAY.  YOU WANT TO TRY THE
      24    DOCUMENT CAMERA?
      25            MR. MURELL:  SURE.

MAGHEN SHIPLEY GAGNARD

09:26  1          **THE DEPUTY CLERK:**  WELL, THAT'S NOT WORKING, EITHER.
       2   I DON'T KNOW.
       3          **MR. MILLER:**  YOUR HONOR, IF I MAY, IF DEFENSE
       4   COUNSEL'S FEED IS WORKING, I'M FINE DISPLAYING THE EXHIBIT.
       5   OH, HERE IT GOES.
       6          **THE COURT:**  OKAY.  WE MIGHT HAVE LIFT OFF.
       7          **MR. MURELL:**  IF YOU COULD SCROLL DOWN JUST A LITTLE
       8   BIT.
       9   **BY MR. MURELL:**
      10   **Q.**   MA'AM, DO YOU RECOGNIZE THIS DOCUMENT?
      11   **A.**   CAN YOU SCROLL ALL THE WAY TO THE BOTTOM?
      12          YES, I DO RECOGNIZE THIS DOCUMENT.
      13   **Q.**   AND IF YOU COULD SCROLL UP JUST ONE.
      14          **THE COURT:**  WILL YOU ADJUST YOUR MIC, MA'AM?
      15          **THE WITNESS:**  YES.
      16          **THE COURT:**  YES.  THANK YOU.
      17          **THE WITNESS:**  YOU'RE WELCOME.
      18   **BY MR. MURELL:**
      19   **Q.**   IF YOU COULD SCROLL UP JUST ONE LITTLE BIT RIGHT -- DOWN.
      20   I'M SORRY.
      21          **MR. MURELL:**  OH, WE ALSO HAVE PAPER COPIES THAT WE
      22   CAN DO THIS THE REAL OLD WAY.
      23          **THE DEPUTY CLERK:**  NO.  GO AHEAD.
      24   **BY MR. MURELL:**
      25   **Q.**   IF YOU COULD GO DOWN TO THE SECOND-TO-THE-LAST PAGE.

**MAGHEN SHIPLEY GAGNARD**

09:28  1            RIGHT THERE IT SAYS "CONTACT INFORMATION."  THAT'S

     2   YOUR NAME?

     3   **A.**   YES, THAT'S MY NAME.

     4   **Q.**   AND YOU ARE FOR -- THIS IS A MEMORANDUM OF UNDERSTANDING

     5   BETWEEN THE OFFICE OF JUVENILE JUSTICE AND THE DEPARTMENT OF

     6   CORRECTIONS?

     7   **A.**   CORRECT.

     8   **Q.**   THIS IS ABOUT THE TRANSFER TO -- ABOUT THE HOUSING OF --

     9   ABOUT THE MOVING OF BRIDGE CITY CENTER FOR YOUTH TO A BUILDING

    10   WITHIN LOUISIANA STATE PENITENTIARY?

    11   **A.**   THAT IS CORRECT.

    12   **Q.**   THAT BUILDING IS THE OLD DEATH ROW?

    13   **A.**   YES.

    14   **Q.**   THIS AGREEMENT IS ABOUT DOC SUPPLEMENTING SECURITY

    15   SERVICES FOR OJJ?

    16   **A.**   IN PART, YES.

    17   **Q.**   IF WE COULD GO TO THE SECOND PAGE, LETTER B.

    18            FIRST, GENERALLY DOC IS IN CHARGE OF PROVIDING

    19   SECURITY AT ANGOLA?

    20   **A.**   YES.

    21   **Q.**   HERE Y'ALL HAVE AGREED IF YOU -- THE DOCUMENT BELOW, YOU

    22   RECOGNIZE AS PARAGRAPH B, "MUTUAL ASSISTANCE"?

    23   **A.**   YES.

    24   **Q.**   AND THE SECOND FULL PARAGRAPH, THE FIRST SENTENCE IS

    25   DOC/LSP, LOUISIANA STATE POLICE, MAY PROVIDE GENERAL

**MAGHEN SHIPLEY GAGNARD**

09:30 1   SUPPLEMENTAL SECURITY STAFFING INSIDE BCCY-WF -- THAT'S BRIDGE

2   CITY CENTER FOR YOUTH, WEST FELICIANA.

3        THAT'S THE NAME OF THE FACILITY JUVENILES WILL BE

4   HOUSED INSIDE OF ANGOLA?

5   **A.**   THAT'S CORRECT.  BUT IT'S NOT LOUISIANA STATE POLICE.

6   IT'S LOUISIANA STATE PENITENTIARY.

7   **Q.**   STATE PRISON.  I'M SORRY.  LOUISIANA STATE PENITENTIARY.

8        -- "UPON REQUEST AND AVAILABILITY, ON AN INTERIM

9   BASIS UNTIL BCCY-WF IS FULLY STAFFED."

10        HERE Y'ALL AGREED TO -- SO YOUR ORGANIZATION, DOC AND

11   LSP, AGREED TO PROVIDE SUPPLEMENTAL SECURITY STAFFING?

12   **A.**   SUPPLEMENTAL, CORRECT.

13   **Q.**   WHAT "SUPPLEMENTAL" MEANS WHEN WE TALKED ABOUT THIS

14   YESTERDAY, IN ORDER FOR YOU TO PROVIDE ANY ASSISTANCE, OJJ HAS

15   TO ASK?

16   **A.**   THAT IS CORRECT.

17   **Q.**   Y'ALL HAVEN'T HAD ANY CONVERSATIONS WITH DOC ABOUT WHAT

18   SECURITY THEY'RE GOING TO BE ASKED -- OR WITH OJJ ABOUT WHAT

19   SECURITY THEY'RE GOING TO BE ASKING FOR?

20   **A.**   THAT IS CORRECT.

21   **Q.**   Y'ALL HAVE HAD -- THE TERM "ROVER" AS IN SOMEBODY WHO GOES

22   AROUND BCCY-WF TO SECURE THE CAMPUS FROM DOC OR LSP, THAT'S

23   NEVER COME UP IN ANY CONVERSATIONS WITH YOUR --

24   **A.**   NO CONVERSATION THAT I HAVE BEEN INVOLVED IN.

25   **Q.**   THERE'S BEEN CONVERSATIONS ABOUT DOC MEMBERS GOING THROUGH

**MAGHEN SHIPLEY GAGNARD**

09:31 1    THE HALL OF BCCY-WF?

2    **A.**   NO, THERE HAS NOT.

3    **Q.**   THERE'S BEEN -- ALL THESE REQUESTS -- IF -- WE TALKED

4    ABOUT THIS.  IF OJJ MADE A REQUEST, IT WOULD GO TO -- IF IT WAS

5    A NON-EMERGENT REQUEST, IT WOULD GO TO JAMES LEBLANC?

6    **A.**   FOR SECURITY STAFFING, I WOULD ASSUME THAT IT WOULD GO TO

7    SECRETARY LEBLANC.

8    **Q.**   AND HE WOULD PASS IT ON TO YOUR BOSS, WARDEN HOOPER?

9    **A.**   YES, SIR.

10    **Q.**   AND IF THAT WAS PASSED ON TO WARDEN HOOPER, YOU WOULD KNOW

11    ABOUT IT?

12    **A.**   I CANNOT SAY DEFINITELY YES OR DEFINITELY NO.

13    **Q.**   YOU'RE NOT AWARE OF -- WARDEN HOOPER HADN'T HAD ANY

14    MEETINGS, YOU'RE AWARE OF, ABOUT SECURITY STAFFING AND REQUESTS

15    FROM OJJ?

16    **A.**   NO, WE HAVE NOT.

17    **Q.**   YOU HAVE NOT --

18    **A.**   HE HAS NOT.

19    **Q.**   YOU HAVEN'T BEEN PART OF ANY MEETINGS?

20    **A.**   NO.

21    **Q.**   YOU'RE NOT AWARE OF ANY DOCUMENTS THAT HAVE BEEN PROVIDED

22    FROM OJJ SAYING HERE'S WHERE WE NEED SUPPLEMENTAL SECURITY?

23    **A.**   NO, WE HAVE NOT.

24    **Q.**   NONE OF YOUR STAFF HAS BEEN TRAINED TO INTERACT WITH

25    JUVENILES.  RIGHT?

MAGHEN SHIPLEY GAGNARD

09:32 1  **A.**   CORRECT, TO MY KNOWLEDGE.

2  **Q.**   Y'ALL HAVE NOT -- IN TERMS OF DOC OR LSP PEOPLE WHO WOULD,

3  IF OJJ ASKED, INTERACT WITH JUVENILES, Y'ALL HAVE NOT

4  IDENTIFIED WHICH CORRECTIONAL OFFICERS THOSE WOULD BE?

5  **A.**   NO, WE HAVE NOT.

6  **Q.**   Y'ALL HAVE NOT SET UP ANY CRITERIA FOR WHAT CORRECTIONAL

7  OFFICERS IT WOULD BE?

8  **A.**   NO, WE HAVE NOT.

9  **Q.**   Y'ALL HAVE NOT SET UP ANY BACKGROUND CHECKS THAT YOU WOULD

10  DO ON THE SELECTED CORRECTIONAL OFFICERS?

11  **A.**   NO, WE HAVE NOT.

12  **Q.**   YOU HAVE NO ESTABLISHED TRAINING FOR WHAT -- FOR WHAT

13  CORRECTIONAL OFFICERS WOULD DO WHEN DEALING WITH YOUTH AS

14  OPPOSED TO ADULTS?

15  **A.**   THAT WOULD BE THE RESPONSIBILITY OF OJJ.

16  **Q.**   SO DOC HAS NONE?

17  **A.**   NO.

18  **Q.**   SINCE GOVERNOR EDWARDS ANNOUNCED THIS PLAN ON JULY 19TH,

19  YOU'VE ISSUED NO NEW POLICIES OR PROCEDURES FROM YOUR POSITION

20  ABOUT HOW TO DEAL WITH JUVENILES IN LOUISIANA STATE

21  PENITENTIARY?

22  **A.**   NO.

23  **Q.**   THERE HAVE BEEN NO NEW REGULATIONS THAT HAVE COME FROM

24  DOC?

25  **A.**   NO.

MAGHEN SHIPLEY GAGNARD

09:33 1   Q.   GOING TO THE SECOND SENTENCE OF THIS SECOND PARAGRAPH,
2   "DURING THIS TEMPORARY TIME FRAME, DOC/LSP SHALL UTILIZE
3   CHEMICAL SPRAY, ELECTRONIC CONTROL WEAPONS, TASERS, AND THE USE
4   OF FORCE CONTINUUM FOR WHICH THEY ARE TRAINED."
5          NONE OF YOUR OFFICERS HAVE BEEN TRAINED IN ANY WAY
6   ABOUT THE DIFFERENCE OF USE OF FORCE WITH ADULTS AND USE OF
7   FORCE WITH JUVENILES?
8   A.   I CAN'T ANSWER THAT.
9   Q.   Y'ALL HAVE NOT -- WITH REGARDS TO JUVENILES BEING
10   TRANSFERRED TO ANGOLA, Y'ALL HAVE NOT TRAINED ANY OF YOUR
11   OFFICERS ABOUT THE DIFFERENCE OF USE OF FORCE WITH JUVENILES
12   AND USE OF FORCE WITH ADULTS?
13   A.   NO.
14   Q.   Y'ALL HAVE NOT SAID THERE'S A DIFFERENCE IN THE USE OF
15   CONTINUUM FORCE OR WHAT'S APPROPRIATE WITH JUVENILES VERSUS
16   WHAT'S APPROPRIATE WITH ADULTS?
17   A.   CORRECT.
18   Q.   NO ONE FROM OJJ HAS TRAINED ANYBODY FROM -- ANY OF YOUR
19   STAFF ON WHAT'S APPROPRIATE USE OF FORCE WITH JUVENILES VERSUS
20   WHAT'S APPROPRIATE USE OF FORCE WITH ADULTS?
21   A.   NO.
22   Q.   Y'ALL DON'T HAVE -- Y'ALL DON'T EVEN HAVE ANY MEETINGS SET
23   UP WITH OJJ WHEN TO EVEN TALK ABOUT THIS SUPPLEMENTAL STAFFING
24   AT THIS POINT.  CORRECT?
25   A.   AS I STATED TO YOU YESTERDAY, THIS MOU WAS GIVEN TO ME

MAGHEN SHIPLEY GAGNARD

09:34 1    FRIDAY.  YESTERDAY WAS A HOLIDAY.  WE HAVEN'T EXACTLY HAD A

2    CHANCE TO PLAN ANYTHING.

3    **Q.**    WELL, YOU'VE BEEN AWARE OF THIS PLAN SINCE JULY.  CORRECT?

4    **A.**    IT'S A PLAN.

5    **Q.**    YOU'VE BEEN AWARE OF THE PLAN SINCE JULY TO HOUSE

6    INMATES -- HOUSE JUVENILES AT THE OLD DEATH ROW?

7    **A.**    YES.

8    **Q.**    OJJ CAME AND THEY TOOK A TOUR OF THE OLD DEATH ROW.

9    RIGHT?

10    **A.**    YES.

11    **Q.**    BUT THEY ONLY TOOK ONE TOUR?

12    **A.**    THEY TOOK -- HOW MANY TOURS DO YOU NEED?  YES, ONE.

13    **Q.**    OKAY.  AND AFTER TAKING THIS TOUR OF THE OLD DEATH ROW,

14    OJJ HAS SINCE NOT GOTTEN IN TOUCH WITH WARDEN HOOPER OR YOU OR

15    ANYBODY IN YOUR OFFICE ABOUT WHAT THIS SUPPLEMENTAL SECURITY

16    STAFFING WOULD MEAN?

17    **A.**    AND AGAIN, WE WERE NOTIFIED ABOUT THE MOU.  WARDEN HOOPER

18    RECEIVED THE SIGNED MOU ON SEPTEMBER 1ST -- OR ON FRIDAY.  I'M

19    SORRY IF THAT WAS NOT FRIDAY.  FRIDAY WE RECEIVED THE SIGNED

20    MOU.  SO NO, WE HAVE NOT HAD A MOMENT TO SCHEDULE MEETINGS.

21    **Q.**    DO YOU KNOW WHEN WARDEN HOOPER STARTED NEGOTIATING THIS

22    MOU WITH OJJ?

23    **A.**    WHENEVER I WAS DETERMINED TO BE THE POINT OF CONTACT.

24    **Q.**    AND SO YOU'RE NOT SURE OF THE DATE?

25    **A.**    NO.

MAGHEN SHIPLEY GAGNARD

09:36 1    Q.   YOU'RE NOT SURE OF WHEN OJJ REACHED OUT TO SCHEDULE

2    THIS -- TO AGREE TO THIS MOU?

3    A.   I'M NOT SURE HOW THIS MOU WAS DRAFTED.  WE WERE NOT A PART

4    OF THAT.  AND BY "WE," I MEAN WARDEN HOOPER AND I.

5    Q.   YES, MA'AM.

6         PARAGRAPH B, THE THIRD FULL PARAGRAPH -- FIRST, IN

7    THIS PARAGRAPH IT SAYS "CHASE TEAM."

8         CAN YOU TELL US WHAT "CHASE TEAM" MEANS?

9    A.   IT'S AN EMERGENCY RESPONSE TEAM THAT'S AT LOUISIANA STATE

10   PENITENTIARY.  THEY RESPOND TO CHASES FOR OUTSIDE AGENCIES,

11   WITHIN THE DEPARTMENT.  WE ASSIST LOCAL SHERIFF'S OFFICES, EVEN

12   SOMETIMES OUT OF STATE.

13   Q.   "CHASE," MEANING IF AN INMATE ESCAPES?

14   A.   CORRECT.

15   Q.   IF AN INMATE ESCAPES OR ATTEMPTS TO ESCAPE ANGOLA, THE

16   CHASE TEAM IS WHO IS ASSIGNED TO TRACK DOWN THAT INMATE?

17   A.   YES.

18   Q.   THESE MEMBERS OF THE CHASE TEAM ARE TRAINED TO DEAL WITH

19   ADULT INMATE ESCAPES?

20   A.   IF THERE IS A DIFFERENCE, I'M UNAWARE.

21   Q.   THERE'S BEEN NO SPECIFIC TRAINING ABOUT HOW TO DEAL WITH

22   JUVENILES WHO MAY ESCAPE OR ATTEMPT TO ESCAPE LOUISIANA STATE

23   PENITENTIARY.  TRUE?

24   A.   CORRECT.

25   Q.   THERE'S BEEN NO TRAINING OF ANY MEMBER OF THE CHASE TEAM

MAGHEN SHIPLEY GAGNARD

09:37 1   ABOUT WHAT FORCE IS APPROPRIATE AND WHAT FORCE IS APPROPRIATE
2   WITH A JUVENILE VERSUS AN ADULT?
3   **A.**   TO MY KNOWLEDGE, NO.
4   **Q.**   THERE'S BEEN NO TRAINING WITH ANY MEMBER OF THE CHASE TEAM
5   ABOUT DIFFERENT METHODS, ENGAGEMENT PROTOCOLS, ABOUT WHAT'S
6   APPROPRIATE WITH JUVENILES VERSUS WHAT'S APPROPRIATE WITH
7   ADULTS?
8   **A.**   NO.
9   **Q.**   THERE'S BEEN NO TRAINING ABOUT LESS THAN LETHAL METHODS
10   BEING USED WITH JUVENILES VERSUS ADULTS?
11   **A.**   ALL OF OUR STAFF -- ALL OF OUR CHASE TEAM STAFF IS TRAINED
12   ON THE USE OF LESS THAN LETHAL FORCE.
13   **Q.**   THEY ARE AUTHORIZED TO USE LETHAL FORCE WITH ADULT INMATES
14   IN EMERGENT CIRCUMSTANCES.  RIGHT?
15   **A.**   YES.
16   **Q.**   THEY HAVE NOT BEEN TRAINED THAT THEY CANNOT USE LETHAL
17   FORCE WITH JUVENILES?
18   **A.**   TO MY KNOWLEDGE, NO, THEY HAVE NOT.  I DON'T NECESSARILY
19   THINK THAT'S A TRAINING, THAT'S A POLICY.
20   **Q.**   IN TERMS OF THE LAST SENTENCE OF PARAGRAPH 2 ABOUT THE USE
21   OF CHEMICAL SPRAY, ELECTRONIC WEAPONS, AND THE USE OF FORCE
22   CONTINUUM FOR WHICH YOUR OFFICERS ARE TRAINED, THERE'S NO
23   SUPPLEMENT TO THIS MOU DEFINING THEIR TRAINING AND WHAT THEY DO
24   WITH ADULTS VERSUS WHAT THEY DO WITH JUVENILES.  TRUE?
25   **A.**   TRUE.

MAGHEN SHIPLEY GAGNARD

09:39 1  **Q.**   THE ONLY POLICY THAT DOC AND OJJ HAVE -- ONLY AGREEMENT
2  THEY HAVE IS WHAT'S HERE ABOUT THE USE OF FORCE ON JUVENILES BY
3  DOC STAFF AND LSP STAFF AND IS WHAT'S HERE AT THE BOTTOM OF THE
4  SECOND PARAGRAPH?
5  **A.**   TO MY KNOWLEDGE, THIS IS THE ONLY DOCUMENT.
6  **Q.**   AND THERE'S NO OTHER -- OJJ HASN'T REACHED OUT AND SAID,
7  "WE ACTUALLY NEED TO DO SOMETHING ELSE WITH JUVENILES."
8  CORRECT?
9  **A.**   PER THE MOU, THEY HAVE TO ESTABLISH TRAINING.  BUT TO MY
10 KNOWLEDGE, THAT'S ALL I CAN SPEAK ON IN REGARDS TO OJJ IS
11 WHAT'S IN THE MOU.
12 **Q.**   BUT THEY HAVEN'T -- THEY HAVEN'T DONE -- TO THE BEST OF
13 YOUR KNOWLEDGE, OJJ, IN TERMS OF ACTUALLY IMPLEMENTING WHAT IS
14 IN THE MOU, HAS TAKEN NO STEPS AS OF NOW TO IMPLEMENT OR SET
15 INTO EFFECT THE POLICIES THAT ARE HERE REGARDING SECURITY?
16 **A.**   I CAN'T SPEAK ON BEHALF OF OJJ.
17 **Q.**   THEY HAVEN'T REACHED OUT TO WARDEN HOOPER, TO THE BEST OF
18 YOUR KNOWLEDGE, TO IMPLEMENT OR BEGIN PLANNING ANY OF THE
19 IMPLEMENTATION OF WHAT -- ANY SECURITY POLICIES?
20 **A.**   TO MY KNOWLEDGE, NO.
21 **Q.**   THERE IS -- YOU SAID THAT -- IN HERE YOU SAY THAT DOC AND
22 LSP EMPLOYEES MAY RESPOND TO -- THERE COULD BE EMERGENCIES,
23 EMERGENT SITUATIONS, THAT DOC STAFF WOULD RESPOND TO?
24 **A.**   PER THE MOU, YES.
25 **Q.**   DOC AND OJJ HAVE HAD NO DISCUSSIONS OF WHAT CONSTITUTES AN

MAGHEN SHIPLEY GAGNARD

09:40 1    EMERGENCY?

2    **A.**   NO.

3    **Q.**   DOC AND OJJ HAVE HAD NO DISCUSSIONS ABOUT WHO GETS TO

4    DETERMINE IF IT'S EMERGENT SITUATIONS OR NOT?

5    **A.**   PER THE MOU, OJJ WOULD REQUEST ASSISTANCE AND -- WHEN THEY

6    DETERMINE IT'S AN EMERGENCY.

7    **Q.**   IF OJJ DOESN'T REQUEST ASSISTANCE, DOC STAFF WON'T

8    RESPOND?

9    **A.**   THAT IS CORRECT.

10   **Q.**   AND THERE'S BEEN NO DISCUSSION WITH ANYBODY AT OJJ OF WHAT

11   WOULD BE EMERGENT ASSISTANCE OR WHEN THAT WOULD BE APPROPRIATE

12   TO REQUEST?

13   **A.**   NO.

14   **Q.**   LAST QUESTION.  DO YOU HAVE -- TO THE BEST OF YOUR

15   KNOWLEDGE, DO YOU KNOW -- HAVE Y'ALL BEEN INFORMED WHEN THESE

16   INMATES OR WHEN THESE JUVENILES WOULD BE MOVED TO THIS

17   FACILITY?

18   **A.**   NO.

19            **MR. MURELL:**  THANK YOU, YOUR HONOR.

20            **THE COURT:**  COUNSEL FOR THE DEFENDANT.

21            **MS. MCCAIN:**  GOOD MORNING.  ALLENA MCCAIN ON BEHALF

22   OF THE DEFENDANTS.

23                 CAN WE TAKE THIS DOWN?

24            **MR. MURELL:**  YES.

25            **MS. MCCAIN:**  GREAT.

MAGHEN SHIPLEY GAGNARD

09:41 1                          CROSS-EXAMINATION

2     BY MS. MCCAIN:

3     Q.   GOOD MORNING, MS. GAGNARD.

4              I WANT TO BACK UP A LITTLE BIT AND KIND OF LAY A

5     LITTLE BIT MORE FOUNDATION ABOUT WHO YOU ARE AND WHAT YOUR ROLE

6     IS IN ALL OF THIS.

7              WILL YOU EXPLAIN TO THE COURT WHAT YOUR BACKGROUND IS

8     WITHIN THE DOC.

9     A.   I'VE BEEN WORKING FOR THE DEPARTMENT OF CORRECTIONS SINCE

10    2009.  I'VE WORKED IN ACCOUNTING, PROCUREMENT, REHABILITATIVE

11    SERVICES.  I'VE WORKED AT LCIW, TIME COMPUTATION.  I'VE ALSO

12    WORKED AT DEPARTMENT OF CORRECTIONS HEADQUARTERS.  I WAS THE

13    STATEWIDE RE-ENTRY PROGRAM MANAGER WHERE I DID OVERSIGHT OF

14    REHABILITATIVE PROGRAMS.

15    Q.   CAN YOU SLOW DOWN A LITTLE BIT FOR THE COURT REPORTER?

16    A.   SORRY.

17    Q.   IN YOUR CURRENT ROLE, WHAT IS -- WHO DO YOU REPORT TO?

18    A.   WARDEN HOOPER.

19    Q.   DOES ANYONE REPORT TO YOU?

20    A.   I HAVE ONE ADMINISTRATIVE SPECIALIST THAT DOES REPORT TO

21    ME.

22    Q.   AND OUTSIDE OF THIS INVOLVEMENT WITH THE OJJ PLAN, DO YOU

23    HAVE -- WHAT ARE YOUR GENERAL DAY-TO-DAY DUTIES?

24    A.   I PROVIDE OVERSIGHT TO OUR ELECTRONIC SYSTEM WHERE WE HAVE

25    OUR POLICIES.  I ENSURE THAT OUR PENITENTIARY DIRECTIVES ARE IN

MAGHEN SHIPLEY GAGNARD

09:42  1   LINE WITH THE DEPARTMENTAL REGULATIONS.  I'M ALSO RESPONSIBLE

2   FOR BEING A LIAISON FOR WARDEN HOOPER IN REGARDS TO HIS

3   REGIONAL WARDEN POSITION.  AND I -- ANY ADMINISTRATIVE DUTIES

4   THAT HE NEEDS, I TAKE CARE OF THOSE AS WELL.

5   **Q.**   OKAY.  ARE THERE CURRENTLY YOUTH HOUSED ON THE GROUNDS OF

6   LSP?  AND WHEN I SAY "LSP," I'M TALKING ABOUT LOUISIANA STATE

7   PENITENTIARY.

8   **A.**   NO.

9   **Q.**   OKAY.  WHEN DID YOU FIRST HEAR ABOUT THE PLAN TO BRING

10   YOUTH TO THE RECEPTION CENTER AT LSP?

11   **A.**   SOME TIME IN JULY.

12   **Q.**   OKAY.  AND WHAT WAS YOUR INVOLVEMENT WITH THAT PLAN AT

13   THAT TIME?

14   **A.**   AT THAT TIME I WAS JUST TOLD TO SIT IN ON THE MEETINGS SO

15   I CAN TAKE NOTES, ASSIST.

16   **Q.**   AND WHAT TYPES OF -- WHAT TYPES OF DISCUSSIONS WERE HAD IN

17   THOSE MEETINGS?

18   **A.**   JUST THAT --

19          **MR. MURELL:**  OBJECTION, YOUR HONOR.  HEARSAY.

20   OBJECTION, YOUR HONOR.  HEARSAY.

21          **THE COURT:**  I HEARD YOU.  ADDRESS THE OBJECTION.

22          **MS. MCCAIN:**  YOUR HONOR, I'M NOT ASKING FOR ANY SORT

23   OF STATEMENT.  I'M JUST ASKING ABOUT WHAT SHE LEARNED IN THOSE

24   MEETINGS.

25          **THE COURT:**  THE QUESTION WAS:  WHAT KIND OF SUBJECT

**MAGHEN SHIPLEY GAGNARD**

09:43 1  MATTER WAS COVERED IN THE MEETINGS.  IS THAT THE QUESTION?

2           **MS. MCCAIN:**  I'M SORRY.  I DIDN'T HEAR YOU.

3           **THE COURT:**  I THOUGHT THE QUESTION WAS:  WHAT KIND OF

4  SUBJECT MATTER WAS COVERED IN THE MEETINGS.

5           **MS. MCCAIN:**  RIGHT.

6           **THE COURT:**  OKAY.  OVERRULED.

7  **BY THE WITNESS:**

8  **A.**   THE SUBJECT MATTER WAS THE POSSIBILITY THAT YOUTH COULD BE

9  TRANSFERRED TO LOUISIANA STATE PENITENTIARY AT THE RECEPTION

10  CENTER.

11  **Q.**   OKAY.  AND WHAT WAS THE RECEPTION CENTER USED FOR MOST

12  RECENTLY?

13  **A.**   MOST RECENTLY IT WAS UTILIZED TO HOUSE FEMALES THAT HAD

14  BEEN EVACUATED DURING LCIW'S FLOOD IN 2016.

15  **Q.**   AND WHEN DID THOSE FEMALES LEAVE THE CAMPUS?

16  **A.**   JUNE 24, 2022.

17  **Q.**   OKAY.  SINCE YOU WERE ASKED TO SIT IN ON THOSE INITIAL

18  MEETINGS, WHAT HAS YOUR -- HOW HAS YOUR ROLE DEVELOPED WITH

19  RESPECT TO THIS PLAN?

20  **A.**   MY ROLE IN RESPECT TO THIS PLAN IS BASICALLY ASSISTING OJJ

21  WITH NAVIGATING THE OPERATIONS OF LOUISIANA STATE PENITENTIARY

22  IN REGARDS TO ASSISTANCE, IF THEY NEED ASSISTANCE, WITH

23  BACKGROUND CHECKS FOR VENDORS, THAT -- CONTRACT STAFF THAT

24  COMES IN.  I ASSIST THEM WITH LOCATING SERVICES, SUPPLIES, AND

25  THINGS LIKE THAT.  I ASSIST THEM WITH HOW THEY WOULD RECEIVE

MAGHEN SHIPLEY GAGNARD

09:45 1  DELIVERIES AND THE OVERALL FUNCTION OF THEIR FACILITY ONCE THEY

2  START UTILIZING IT WITH YOUTH INVOLVED.

3  **Q.**  ONCE YOUTH ARE MOVED TO THAT FACILITY, WHAT POWER WILL LSP

4  HAVE OVER THE FUNCTION OF THAT FACILITY?

5  **A.**  NONE.

6  **Q.**  AND IN WHAT CIRCUMSTANCES WOULD LSP EMPLOYEES EITHER VISIT

7  THAT FACILITY OR BECOME INVOLVED AT THAT FACILITY?

8  **A.**  THE ONLY REASON THAT LSP EMPLOYEES WOULD BE INVOLVED OR

9  VISIT THE FACILITY IS AT THE REQUEST OF OJJ.

10  **Q.**  OKAY.  YOU WERE ASKED A LITTLE BIT A MINUTE AGO ABOUT THE

11  TRAINING THAT'S MENTIONED IN THE MOU.  WHAT IS YOUR

12  UNDERSTANDING ABOUT THE TRAINING THAT IS SUPPOSED TO OCCUR WITH

13  LSP EMPLOYEES PRIOR TO SERVING YOUTH?

14  **A.**  IT IS MY UNDERSTANDING THAT OJJ WILL PROVIDE SUPPLEMENTAL

15  TRAINING TO LOUISIANA STATE PENITENTIARY STAFF, CORRECTIONAL

16  OFFICERS SPECIFICALLY, IN REGARDS WITH DIRECT CARE AND

17  INTERACTION WITH YOUTH.

18  **Q.**  TO YOUR KNOWLEDGE, HAS LSP RECEIVED THAT TRAINING FROM

19  OJJ?

20  **A.**  TO MY KNOWLEDGE, NO, THEY HAVE NOT.

21  **Q.**  OKAY.  YOU WERE ASKED ABOUT THE CHASE TEAM AND THE WAY

22  THAT MIGHT BE USED WITH RESPECT TO YOUTH.  WHO'S RESPONSIBLE

23  FOR THE CHASE TEAM AT LSP?

24  **A.**  WARDEN TRACY FALGOUT.

25  **Q.**  AND WOULD WARDEN FALGOUT HAVE MORE INFORMATION ABOUT WHAT

**MAGHEN SHIPLEY GAGNARD**

09:46  1   HAS BEEN CONVEYED TO THE CHASE TEAM WITH RESPECT TO POTENTIAL

2   YOUTH LOCATED ON THE LSP CAMPUS?

3   **A.**   YES.

4   **Q.**   OKAY.  WOULD YOU DEFER TO HIS ANSWERS REGARDING ANYTHING

5   THAT HAS -- ON ANY TRAINING OR INFORMATION THAT HAS BEEN

6   PROVIDED TO THE CHASE TEAM?

7   **A.**   YES.

8   **Q.**   MS. GAGNARD, YOU'RE FAMILIAR WITH THE RECEPTION CENTER

9   THAT WILL BE SERVED -- THAT WILL BE USED TO HOUSE YOUTH.

10   CORRECT?

11   **A.**   I AM.

12   **Q.**   OKAY.  AFTER THE LCIW WOMEN MOVED OUT OF THAT FACILITY,

13   WHAT DID LSP DO?

14   **A.**   THE FACILITY, ONCE THE FEMALES HAD MOVED OUT, WAS STILL

15   IN -- FULLY OPERATIONAL.  IT WAS FULLY FUNCTIONALLY OPERATIONAL

16   AT THAT TIME.  THERE WERE NO COSMETIC DAMAGES THAT I WAS AWARE

17   OF.  SIMPLY, WE JUST MAINTAINED PREVENTIVE MAINTENANCE AS WE

18   WOULD CONTINUE TO KEEP THE BUILDING OPERATIONAL.

19   **Q.**   OKAY.  WAS THAT STILL ONGOING ONCE THESE DISCUSSIONS ABOUT

20   USING THE FACILITY FOR OJJ STARTED?

21   **A.**   PREVENTIVE MAINTENANCE WAS CONTINUED.  BUT THERE'S ALSO

22   BEEN ADDITIONAL MAINTENANCE AND ADJUSTMENTS TO THE

23   INFRASTRUCTURE OF THE BUILDING IN REGARDS TO OJJ'S REQUEST.

24   **Q.**   HAS LSP MADE ANY REVISIONS TO THE STRUCTURE OF THE

25   BUILDING THAT WEREN'T BY OJJ REQUEST?

MAGHEN SHIPLEY GAGNARD

09:47 1  **A.**  NO.

2  **Q.**  CAN YOU DESCRIBE WHAT TYPES OF ADAPTATIONS ARE OCCURRING

3  AT THAT BUILDING IN ORDER TO HOUSE THE YOUTH?

4  **A.**  YES.  WE HAVE INSTALLED AC UNITS FOR THE LIVING QUARTERS.

5  WE ARE -- OTS IS ACTUALLY IN CONVERSATION OF UPGRADING THE

6  ENTIRE NETWORK FOR THE USE OF OJJ STAFF.  WE'VE HAD ATLOW

7  CONTRACTORS COME OUT IN ORDER TO DISCUSS THE DEPLOYMENT OF

8  TECHNOLOGY FOR EDUCATIONAL BASED SERVICES FOR THE YOUTH.

9        WE'VE HAD -- AND I SAY "WE" -- OJJ HAS HAD CAMERA

10  CONTRACTORS COME OUT IN ORDER TO DO AN INSTALLATION OF SECURITY

11  CAMERAS IN THE BUILDING.  AND ALSO, WE HAVE STARTED

12  CONSTRUCTION OF A WALL IN ORDER TO MAXIMIZE THE SPACE FOR

13  EDUCATION TO INCLUDE SPECIAL EDUCATION SERVICES AND A SPACE FOR

14  THAT.

15  **Q.**  OKAY.  HAVE THERE BEEN ANY FIXTURES THAT HAVE BEEN CHANGED

16  WITHIN THE FACILITY TO MAKE IT MORE CONDUCIVE TO HOUSING YOUTH?

17  **A.**  YES.  WE HAVE EXPANDED THE EXTERIOR OUTDOOR REC YARD AREAS

18  IN ORDER TO HAVE SPACE FOR GROUP REC.  WE HAVE ALSO REMOVED

19  FIXTURES WITHIN THE CELLS OR THE HOUSING UNIT THAT IS -- THAT

20  WAS DOUBLE BUNKED.  THEY ARE NOW SINGLE BUNKED.  WE'VE REMOVED

21  SHELVES.  WE'VE REMOVED HOOKS AT THE REQUEST OF OJJ.

22  **Q.**  OKAY.  ARE YOU, AS AN LSP EMPLOYEE, RESPONSIBLE FOR

23  DETERMINING HOW OJJ USES THE SPACE IN THAT BUILDING?

24  **A.**  NO, I AM NOT.

25  **Q.**  ARE YOU AWARE OF HOW EACH ROOM IS GOING TO BE USED AT THAT

MAGHEN SHIPLEY GAGNARD

09:49 1  BUILDING?

2  **A.**   NO, I AM NOT.

3  **Q.**   HAVE YOU BEEN CONSULTED IN ORDER TO DETERMINE THE MOST

4  EFFICIENT USE OF THE BUILDING?

5  **A.**   NO, I HAVE NOT.

6  **Q.**   OKAY.  WITH RESPECT TO OJJ'S DETERMINATION OF THE BEST USE

7  OF THAT BUILDING FOR HOUSING YOUTH, WHAT HAS YOUR ROLE BEEN?

8  **A.**   I BASICALLY HAVE JUST BEEN WITH THE OJJ STAFF TO

9  FAMILIARIZE THEM WITH THE BUILDING.  THEIR UTILIZATION OF SPACE

10  AND THE BUILDING IS COMPLETELY UP TO THEM.  I TAKE THEIR

11  REQUESTS AND DISCUSS IT WITH WARDEN HOOPER, AND WE IMPLEMENT

12  CHANGES AS THEY SEE NECESSARY.

13  **Q.**   WHAT TYPES OF REQUESTS ARE THEY SENDING TO YOU?

14  **A.**   THEY'VE REQUESTED FOR ASSISTANCE WITH DELIVERY OF

15  SUPPLIES, HEAVY FURNITURE, DESKS, THINGS LIKE THAT.  THEY'VE

16  REQUESTED ASSISTANCE WITH THAT.

17        THEY ALSO HAVE BROUGHT IN STAFF HOUSING.  WE'VE

18  ASSISTED THEM WITH THAT.  THEY HAVE BEEN DELIVERED.  AND WE ARE

19  CURRENTLY HOOKING UP ELECTRIC AND PLUMBING FOR THE STAFF TO BE

20  HOUSED THERE.  THEY ASKED FOR ASSISTANCE WITH -- "IS THIS --

21  CAN WE PUT WIRES HERE -- ADDITIONAL ELECTRICAL OUTLETS?" FOR

22  UTILIZATION OF THE SPACE.  JUST GENERAL MAINTENANCE REQUESTS IN

23  REGARDS TO THAT.

24  **Q.**   OKAY.  WHAT CONTROL DOES LSP CURRENTLY HAVE OVER THIS

25  BUILDING?

**MAGHEN SHIPLEY GAGNARD**

09:51 1  **A.**   WE DO NOT HAVE ANY CONTROL OVER THE BUILDING.

2  **Q.**   WHEN DID LSP RELINQUISH CONTROL TO OJJ?

3  **A.**   I WOULD SAY THE WEEK OF AUGUST 22ND.

4  **Q.**   OKAY.

5  **A.**   SPECIFICALLY THAT DATE, I DON'T KNOW.  BUT I KNOW IT WAS

6  THAT WEEK.

7  **Q.**   ONCE YOUTH MOVE INTO THIS FACILITY, WHAT WILL YOUR ROLE BE

8  WITH RESPECT TO THE OJJ OPERATIONS ON THE CAMPUS OF LSP?

9  **A.**   STRICTLY FOR MAINTENANCE REQUESTS AND A POINT OF CONTACT

10  FOR NONEMERGENCY SITUATIONS.

11  **Q.**   OKAY.  ARE YOU RESPONSIBLE IN ANY WAY FOR THE OPERATION OF

12  THAT FACILITY?

13  **A.**   ABSOLUTELY NOT.

14  **Q.**   IS LSP RESPONSIBLE IN ANY WAY FOR THE OPERATION OF THAT

15  FACILITY?

16  **A.**   NO.

17  **Q.**   WHAT SERVICES WILL LSP PROVIDE TO THE OJJ FACILITY?

18  **A.**   STRICTLY EMERGENCY RESPONSE AT OJJ'S REQUEST, AND

19  PREVENTIVE AND GENERAL MAINTENANCE TO THE BUILDING.

20  **Q.**   ARE THERE --

21  **A.**   -- UNTIL THEY ARE ABLE TO ESTABLISH STAFF THAT CAN DO

22  THAT.

23  **Q.**   ARE THERE ANY SERVICES THAT LSP HAD AGREED TO TEMPORARILY

24  PROVIDE AT THAT FACILITY?

25  **A.**   FOOD SERVICE.

MAGHEN SHIPLEY GAGNARD

09:52  1  Q.   OKAY.
       2  A.   AND AGAIN, PREVENTIVE AND GENERAL MAINTENANCE.
       3  Q.   DO YOU KNOW WHAT THE PLANS ARE FOR PROVIDING FOOD SERVICE
       4  AT THAT FACILITY?
       5  A.   AT THIS TIME -- THE LAST DISCUSSION THAT I WAS INVOLVED IN
       6  IS THAT LOUISIANA STATE PENITENTIARY WOULD COOK THE MEALS.  OJJ
       7  STAFF WOULD PICK THEM UP FROM A HOUSING UNIT THAT IS TO BE
       8  DETERMINED, AND THEY WOULD SERVE THE YOUTH IN THE KITCHEN AT
       9  RC.
      10  Q.   WILL ADULT OFFENDERS DELIVER MEALS TO THAT FACILITY?
      11  A.   ABSOLUTELY NOT.
      12  Q.   WILL LSP EMPLOYEES DELIVER MEALS TO THAT FACILITY?
      13  A.   NO, THEY WILL NOT.
      14  Q.   ALL RIGHT.  WHY HAVE THERE BEEN NO MEETINGS ABOUT THE
      15  SUPPLEMENTAL SECURITY THAT MAY BE PROVIDED AT THIS FACILITY?
      16  A.   I CAN ONLY SPEAK -- TO THE BEST OF MY KNOWLEDGE ON THIS
      17  IS, AGAIN, WE RECEIVED THE MOU ON FRIDAY AND THAT WAS
      18  ESTABLISHED THAT WE WOULD BE PROVIDING SUPPLEMENTAL SECURITY.
      19        ALSO, ANOTHER REASON IS WE ARE NOT AWARE OF WHAT
      20  THEIR STAFFING AT THIS TIME LOOKS LIKE BECAUSE WE DO KNOW THAT
      21  THEY ARE ACTIVELY HIRING STAFF.
      22  Q.   AND WHEN OJJ SENDS A REQUEST FOR SUPPLEMENTAL STAFFING, A
      23  REQUEST FOR TRAINING, IS LSP IN A POSITION TO PROVIDE THAT
      24  STAFFING AND TRAINING?
      25  A.   LSP'S PRIMARY GOAL IS GOING TO BE FILLING THE POSITIONS AT

MAGHEN SHIPLEY GAGNARD

09:53 1   LOUISIANA STATE PENITENTIARY AS IT RELATES TO ADULT OFFENDERS.

2   SO WHAT THAT LOOKS LIKE, I'M NOT GOING TO -- I CANNOT ANSWER

3   THAT.

4   **Q.**   ARE YOU FAMILIAR WITH THE TRAINING FOR ADULT CORRECTIONAL

5   OFFICERS WITH REGARDS TO USE OF FORCE?

6   **A.**   I HAVE NEVER BEEN THROUGH THE USE-OF-FORCE TRAINING.  I'VE

7   ONLY BEEN TRAINED IN DEFENSIVE TACTICS.

8   **Q.**   ALL RIGHT.  YOU WERE ASKED A LITTLE BIT ABOUT POLICIES,

9   AND YOU MENTIONED EARLIER THAT YOU MAINTAIN THE POLICIES AT

10   LSP.  IS THERE CURRENTLY A PLAN TO REVISE POLICIES PRIOR TO

11   YOUTH MOVING ON TO LSP?

12   **A.**   IF THERE IS, I'M NOT AWARE OF IT.

13   **Q.**   OKAY.  AND IF THAT PLAN WAS PUT INTO PLACE, WOULD YOU BE

14   ONE OF THE FIRST PEOPLE THAT FOUND OUT?

15   **A.**   YES.

16   **Q.**   AND DO YOU BELIEVE THAT IT'S NECESSARY TO IMPLEMENT NEW

17   POLICIES BEFORE THE YOUTH MOVE ONTO THE CAMPUS?

18   **A.**   IN REGARDS TO THE OPERATIONS OF THE FACILITY?  NO.  IN

19   REGARDS TO RESPONSES?  I DO BELIEVE THAT IT WILL BE NECESSARY

20   TO IMPLEMENT POLICIES.

21   **Q.**   ARE THERE CURRENTLY THINGS THAT ARE OCCURRING ON OR AROUND

22   THIS FACILITY THAT WILL NO LONGER OCCUR ONCE THE YOUTH MOVE

23   ONTO THE FACILITY?

24   **A.**   YES.  THE PRESENCE OF ADULT OFFENDERS WILL BE ELIMINATED.

25   CURRENTLY, THEY PROVIDE GROUNDSKEEPING SERVICES BECAUSE THERE

MAGHEN SHIPLEY GAGNARD

09:55  1 ARE NO YOUTH THERE.  THEY ALSO ASSIST THE OJJ STAFF WITH

       2 UNLOADING EQUIPMENT AND THINGS LIKE THAT.  AND ULTIMATELY

       3 ALL -- ALL OFFENDERS HAVE BEEN REMOVED FROM THE RC FACILITY

       4 EXCEPT FOR THE GROUNDSKEEPING, AND -- AT THE REQUEST OF OJJ.

       5 **Q.**   AND HOW WILL LSP ENSURE THAT NO ADULT OFFENDERS ACCESS

       6 THAT BUILDING ONCE YOUTH ARE THERE?

       7 **A.**   WELL, WE HAVE DESIGNATED THE AREA AS AN UNAUTHORIZED AREA.

       8 OUR POLICIES ALREADY REFLECT THAT AS A CONDITION AND IN THEIR

       9 DISCIPLINARY RULES AND PROCEDURES.

      10 **Q.**   WILL YOU NEED TO REVISE THAT POLICY IN ORDER TO DESIGNATE

      11 THIS AREA AS AN UNAUTHORIZED AREA?

      12 **A.**   NO.

      13 **Q.**   WHAT IS THE PERIMETER FENCING CURRENT -- WHAT IS THE

      14 STATUS OF THE PERIMETER FENCING CURRENTLY AT THIS RECEPTION

      15 CENTER?

      16 **A.**   IT EXISTS.  I'M NOT REALLY SURE WHAT YOU'RE --

      17 **Q.**   WILL YOU DESCRIBE WHAT IT LOOKS LIKE.

      18 **A.**   IT'S DOUBLE PERIMETER FENCING.  IT HAS INTERIOR AND

      19 EXTERIOR.  AND IT'S TRADITIONAL, YOU KNOW, FACILITY --

      20 **Q.**   IS THERE CURRENTLY BLACKOUT FABRIC WRAPPED AROUND THE

      21 FACILITY FENCING?

      22 **A.**   NO.

      23 **Q.**   DO YOU KNOW IF THERE ARE PLANS TO INSTALL THAT?

      24 **A.**   IT'S SUPPOSED TO BE RECEIVED SEPTEMBER 7TH OR 8TH.  THAT'S

      25 THE ONLY THING I CAN ATTEST TO.

MAGHEN SHIPLEY GAGNARD

09:56 1    **Q.**   THOSE ARE MY QUESTIONS.  THANK YOU, MS. GAGNARD.

2              **THE COURT:**  ANY REDIRECT, MR. MURELL?

3              **MR. MURELL:**  YES, MA'AM.

4                      **REDIRECT EXAMINATION**

5    **BY MR. MURELL:**

6    **Q.**   MA'AM, YOU SPOKE A LOT ABOUT THE FACILITY, SO I WANT TO GO

7    THROUGH SOME OF THE THINGS WITH YOU.

8              LAST THURSDAY YOU WENT ON A TOUR OF THE FACILITY WITH

9    MR. UTTER, DEFENSE COUNSEL, AND EXPERTS FOR THE PLAINTIFF AND

10   DEFENDANT?

11   **A.**   CORRECT.

12   **Q.**   NOTHING IN YOUR -- TO YOUR KNOWLEDGE HAS CHANGED FROM WHEN

13   YOU TOURED IT LAST THURSDAY TO TODAY?

14   **A.**   CORRECT.

15   **Q.**   OKAY.  SO WHEN Y'ALL TOURED LAST THURSDAY, THESE ARE

16   SINGLE CELLS.  RIGHT?

17   **A.**   THEY ARE NOW, YES.

18   **Q.**   THEY ARE CONTROLLED BY A SLIDING DOOR?

19   **A.**   CORRECT.

20   **Q.**   YOUTH WILL BE --

21             **MS. MCCAIN:**  OBJECTION.  THIS IS OUTSIDE THE SCOPE OF

22   MY CROSS -- DIRECT, WHATEVER YOU CALL IT.

23             **THE COURT:**  THE OBJECTION IS IT EXCEEDS THE SCOPE OF

24   CROSS.

25                  MR. MURELL.

MAGHEN SHIPLEY GAGNARD

09:57  1              MR. MURELL:  SHE WENT INTO ALL THE PLANNING, ALL THE

   2   CHANGES, ALL THE STRUCTURES, ALL THE THINGS THEY'VE ADDED, ALL

   3   THE THINGS THEY'VE DONE SINCE THE WOMEN MOVED OUT, THE

   4   COMPANIES THAT HAVE COME IN, HOW -- WHAT OJJ'S REQUESTED TO BE

   5   CHANGED.  WE DIDN'T GO --

   6              THE COURT:  I'LL GIVE YOU SOME LIMITED LATITUDE.  GO

   7   AHEAD.  OVERRULED.

   8   BY MR. MURELL:

   9   Q.   THESE ARE SOLITARY SINGLE CELLS?

  10   A.   CURRENTLY.

  11   Q.   SLIDING DOORS?

  12   A.   CORRECT.

  13   Q.   NO WINDOWS?

  14   A.   I MEAN, IF YOU LOOK OUT OF THEM, THEY HAVE WINDOWS.  THE

  15   WHOLE WALL IS WINDOWS.

  16   Q.   THE CELLS THEMSELVES DO NOT HAVE WINDOWS?

  17   A.   NO.

  18   Q.   THE CELLS THEMSELVES AND THE STRUCTURE WHERE THE JUVENILES

  19   WILL BE HOUSED HAVEN'T BEEN CHANGED SINCE IT WAS DESIGNED TO

  20   HOLD DEATH-ROW INMATES?

  21   A.   CORRECT.

  22   Q.   WHEN YOU WENT THERE LAST THURSDAY -- YOU WERE TALKING

  23   ABOUT THE BLACKOUT FABRIC.

  24              RIGHT NOW THERE'S BARBED WIRE AND RAZOR FENCE

  25   SURROUNDING THE OLD DEATH ROW.  RIGHT?

MAGHEN SHIPLEY GAGNARD

09:58  1    **A.**    YES.

2    **Q.**    THIS BLACKOUT FABRIC, DO YOU KNOW WHAT IT'S MADE OF?

3    **A.**    NO.

4    **Q.**    DO YOU KNOW IF IT'S GOING TO TEAR SO THE JUVENILES --

5    PEOPLE -- DO YOU HAVE ANY IDEA OF THE DURABILITY OF IT?

6    **A.**    NOPE.

7    **Q.**    I KNOW THIS IS KIND OF A SILLY QUESTION.  BUT THIS

8    BLACKOUT FABRIC, MY GUESS IS, ISN'T GOING TO PREVENT SOUND FROM

9    CARRYING OVER INTO THE OLD DEATH-ROW FACILITY?

10    **A.**    WHAT SOUND?

11    **Q.**    SAY AN INMATE -- SO THIS -- THE OLD DEATH-ROW FACILITY IS

12    IMMEDIATELY INSIDE LSP'S GATE WHEN YOU ARRIVE AT THE FRONT

13    GATE.  TRUE?

14    **A.**    CORRECT.

15    **Q.**    IF SOMEBODY HAD YELLED AT THE FRONT GATE -- THIS IS ONLY

16    MAYBE ABOUT A HUNDRED YARDS TO WHERE THE OLD DEATH ROW IS.

17    RIGHT?

18    **A.**    I GUESS.

19    **Q.**    THERE ARE INMATES ALL OVER ANGOLA'S PROPERTY TENDING TO

20    CATTLE, FARMING, LAWN CARE.  RIGHT?

21    **A.**    YES.

22    **Q.**    THE PLACE WHERE THE INMATE -- WHERE THE STAFF IS GOING TO

23    LIVE TO WHERE THE CORRECTIONAL OFFICERS CURRENTLY LIVE,

24    EVERYTHING THERE IS TAKEN CARE OF BY INMATES.  RIGHT?  THE

25    GARBAGE, THE TRASH, ALL THE MAINTENANCE.  RIGHT?

MAGHEN SHIPLEY GAGNARD

09:59 1   A.   THE GARBAGE IS TAKEN CARE OF BY A CONTRACT.  THE GROUNDS
2   IS THE ONLY THING THAT'S MAINTAINED.  AND THEY ARE OVERSEEN BY
3   A SECURITY OFFICER AT ALL TIMES.
4          SO I GUESS IF A WEED-EATER COULD BE HEARD, IT WILL BE
5   HEARD.
6   Q.   IF SOMEBODY WAS HOLLERING AND IT COULD BE HEARD, IT WOULD
7   BE HEARD?
8   A.   I MEAN, THEY'D HAVE TO BE HOLLERING.
9   Q.   WHEN YOU GAVE THE TOUR LAST THURSDAY, THERE'S NO INDOOR
10   RECREATION CENTER AT THE OLD DEATH ROW.  RIGHT?
11   A.   HOW THE -- HOW OJJ PLANS TO USE THAT FACILITY IN REGARDS
12   TO INDOOR RECREATION, I CANNOT SPEAK ON THAT.
13   Q.   FROM WHAT YOU SAW, THERE IS NO PLACE WHERE INDOOR
14   RECREATION PRESENTLY COULD OCCUR?
15   A.   WHAT IS YOUR DEFINITION OF "INDOOR RECREATION"?
16   Q.   THERE'S NO PLACE WHERE BASKETBALL GAMES COULD BE PLAYED.
17   A.   NO.  IT'S ON THE OUTDOOR REC YARD.
18   Q.   THE OUTDOOR REC YARD -- WELL, LET'S TALK ABOUT THAT.
19          THE BASKETBALL GOAL IS SETUP RIGHT IN FRONT OF A
20   PATCH OF GRASS.  RIGHT?
21   A.   I MEAN, THERE'S GRASS AROUND IT.
22   Q.   THE GOAL IS DIRECTLY IN FRONT OF GRASS?
23   A.   OKAY.
24   Q.   HAVE YOU TRIED TO DRIBBLE A BASKETBALL ON WET GRASS
25   BEFORE?

MAGHEN SHIPLEY GAGNARD

10:01 1    A.   NO.

2    Q.   THIS IS NOT -- THE BASKETBALL GOAL YOU'RE TALKING ABOUT

3    IS -- THIS IS NOT A HALF COURT OR SOMETHING SIMILAR WHERE

4    CONCRETE -- WHERE KIDS CAN RUN UP AND DOWN AND PLAY.  RIGHT?

5    A.   DO YOU NEED CONCRETE?

6    Q.   WELL, THERE'S NOT CONCRETE LEADING UP TO THIS BASKETBALL

7    COURT IN THE WAY A TRADITIONAL HALF COURT WOULD BE.  RIGHT?

8    A.   NO.

9    Q.   THERE'S NO SOCCER NETS.  RIGHT?

10   A.   DO YOU WANT SOCCER NETS?

11   Q.   THIS IS A QUESTION.

12   A.   NO.

13   Q.   OR THERE ARE NONE.

14        THERE'S NO WEIGHTLIFTING EQUIPMENT?

15   A.   NO.

16   Q.   ALL IT IS IS A PATCH OF GRASS WITH TWO TRANSECTING

17   CONCRETE WALKWAYS AND A BASKETBALL GOAL IN FRONT OF SOME GRASS?

18   A.   YES.

19   Q.   THAT IS THE RECREATION AREA?

20   A.   AT THIS TIME.

21   Q.   YOU TALKED ABOUT THERE BEING SPACE AND BRINGING IN CABLE

22   FOR EDUCATION.

23        THERE ARE NO DESKTOPS THERE RIGHT NOW?

24   A.   DESKTOP COMPUTERS?

25   Q.   UH-HUH.

**MAGHEN SHIPLEY GAGNARD**

10:02 1   **A.**   NO.   THEY HAVE NOT BEEN DEPLOYED.

2   **Q.**   THERE ARE NO -- THERE ARE NO CHROMEBOOKS OR ANY KIND OF

3   MOBILE DEVICES?

4   **A.**   NO.   THEY HAVE NOT BEEN DEPLOYED.   THEY HAVE BEEN ORDERED

5   BUT NOT DEPLOYED.

6   **Q.**   THERE'S NO -- IN THE AREA THAT YOU WENT ON TOUR WITH,

7   THERE IS ONE DOOR THAT HAS A "BIOHAZARD" SIGN ON IT.   RIGHT?

8   **A.**   I CAN'T ANSWER THAT.

9   **Q.**   THERE'S NO MEDICAL EQUIPMENT?   THERE'S NO X-RAY MACHINES?

10   **A.**   NO.

11   **Q.**   THERE'S NO MEDICAL EQUIPMENT?

12   **A.**   NO.

13   **Q.**   NO EXAMINING BEDS?

14   **A.**   TO MY KNOWLEDGE, NO.

15   **Q.**   NO FIRST-AID KITS?

16   **A.**   YES.

17   **Q.**   ARE THERE PLACES WHERE YOUTH COULD BE TREATED IF THE YOUTH

18   IS HURT?

19   **A.**   OJJ, TO MY UNDERSTANDING, CONTRACTS THEIR OWN MEDICAL

20   STAFF.   THAT IS NOT ANY SERVICES THAT LSP WILL PROVIDE UNLESS

21   IT IS A LIFE OR DEATH SITUATION IN THE CASE OF AN EMERGENCY

22   DECLARED BY OJJ.

23   **Q.**   BUT AS THE OLD DEATH ROW STANDS NOW, THERE'S NO MEDICAL

24   EQUIPMENT INSIDE THE OLD DEATH ROW?

25   **A.**   NO.

MAGHEN SHIPLEY GAGNARD

10:03 1  **Q.**   THE CLOSEST HOSPITAL IS 30 MILES AWAY?
2  **A.**   FALSE.  WE HAVE A HOSPITAL ON-SITE.
3  **Q.**   THAT'S RUN BY ADULT INMATES -- RIGHT? -- AS ORDERLIES?
4  **A.**   NO, IT'S NOT RUN BY ADULT INMATES.  IT'S RUN BY HEALTHCARE
5  PROFESSIONALS.
6  **Q.**   ADULT INMATES ARE THE ORDERLIES?
7  **A.**   YES.  BUT NO YOUTH WILL BE TREATED THERE.
8  **Q.**   OKAY.  SO FOR THE YOUTH, THE CLOSEST HOSPITAL THAT DOESN'T
9  HAVE ADULT INMATES IN IT IS APPROXIMATELY 30 MILES AWAY?
10  **A.**   CORRECT.
11  **Q.**   AND LAST, THIS WILL -- AND A LOT OF THIS WILL GO INTO I
12  KNOW BOTH EXPERTS, BUT WE TALKED ABOUT THIS YESTERDAY.  YOU
13  DON'T KNOW THE STAFFING PLANS FOR OJJ FOR THE OLD DEATH-ROW
14  BUILDING.  RIGHT?
15  **A.**   FOR BCCY-WF?  NO, I DO NOT.
16  **Q.**   IN YOUR PROFESSIONAL OPINION, IF BCCY-WF WAS UNDERSTAFFED,
17  WOULD THAT CREATE A SECURITY RISK AT ANGOLA IN GENERAL?
18  **A.**   IN MY PROFESSIONAL OPINION, IT WOULD CREATE A SECURITY
19  RISK FOR OJJ AND LOUISIANA STATE PENITENTIARY, YES.
20          **MR. MURELL:**  THAT'S ALL THE QUESTIONS I HAVE, YOUR
21  HONOR.
22          **THE COURT:**  ALL RIGHT.  YOU MAY STEP DOWN.
23              IS SHE RELEASED FROM HER SUBPOENA?
24          **MR. MURELL:**  FROM THE PLAINTIFFS, YES.
25          **THE COURT:**  OKAY.  DO YOU WANT TO -- WELL, Y'ALL CAN

10:04  1  FIGURE IT OUT.

2              YOU MAY STEP DOWN.

3         **MS. MCCAIN:**  YOUR HONOR, IS SHE RELEASED FROM

4  SEQUESTRATION?

5         **THE COURT:**  IF YOU HAVE A NEED TO CALL HER AGAIN,

6  THEN NO.

7         **MS. MCCAIN:**  WE DON'T PLAN ON CALLING HER.

8         **THE COURT:**  ALL RIGHT.  YES, SHE IS RELEASED FROM

9  SEQUESTRATION, BUT SHE CANNOT TALK TO ANY OF THE OTHER

10  WITNESSES.

11             BUT YOU MAY REMAIN IN THE COURTROOM, MA'AM.

12         **THE COURT:**  NEXT WITNESS.

13         **MS. ROSENBLOOM:**  GOOD MORNING, YOUR HONOR.

14             NANCY ROSENBLOOM FOR PLAINTIFFS.

15             OUR NEXT WITNESS WILL BE PLAINTIFF ALEX A.  SO I

16  WOULD ASK AT THIS TIME THAT THE COURT CLEAR THE COURTROOM.

17         **THE COURT:**  OKAY.

18         **MS. ROSENBLOOM:**  OR WHATEVER OTHER MEASURES THE COURT

19  WOULD LIKE TO TAKE.

20         **THE COURT:**  OKAY, LADIES AND GENTLEMEN.  ALEX A., WHO

21  IS THE PLAINTIFF PROCEEDING UNDER A PSEUDONYM, WILL BE CALLED

22  TO TESTIFY.  HE IS ENTITLED -- HE/SHE IS ENTITLED TO ANONYMITY

23  TO PROTECT SENSITIVE AND CONFIDENTIAL INFORMATION AS A

24  JUVENILE, SO I'M GOING TO ASK THAT YOU EXIT THE COURTROOM.  THE

25  COURTROOM DEPUTY -- OR THE COURT SECURITY OFFICER WILL SEAL THE

10:05 1   COURTROOM.  IF YOU ARE NOT AN EXPERT WITNESS IN THIS CASE, YOU

2   MUST EXIT THE COURTROOM.

3                **MR. MILLER:**  YOUR HONOR, KYLE MILLER.

4                WE DO HAVE PERSONNEL FROM OJJ THAT ARE SECURITY

5   STAFF THAT I ASSUME ARE PERMITTED TO STAY.  AND THEN ALSO THE

6   GENERAL COUNSEL'S OFFICE FROM OJJ HAS TWO ATTORNEYS THAT ARE

7   HERE THAT WILL BE PERMITTED TO STAY AS WELL.

8                **MS. ROSENBLOOM:**  YOUR HONOR, WE HAVE NO OBJECTION TO

9   THE ATTORNEYS.  OBVIOUSLY SECURITY STAFF, AS NEEDED.  BUT EXTRA

10  STAFF, WE WOULD ASK NOT TO BE IN THE ROOM.

11               **THE COURT:**  I WILL ABIDE BY THE PLAINTIFFS' REQUEST.

12  IF THERE IS SOME NEED FOR EXTRA SECURITY STAFF, THE COURT HAS A

13  COURT SECURITY OFFICER AND WE HAVE THE UNITED STATES MARSHALS.

14               SO DO YOU THINK YOU NEED EXTRA SECURITY?

15               **MR. MILLER:**  YOUR HONOR, I DON'T KNOW THAT THERE'S

16  ANY NEED FOR ADDITIONAL SECURITY.  JUST THE YOUTH HAVE BEEN

17  ESCORTED HERE BY THE JUVENILE PAROLE AND PROBATION.

18               **THE COURT:**  OKAY.  NOBODY BUT LAWYERS.  IF YOU ARE

19  NOT A LAWYER IN THIS CASE OR AN EXPERT WITNESS IN THIS CASE,

20  YOU NEED TO EXIT THE COURTROOM.

21               **MS. ROSENBLOOM:**  THANK YOU, YOUR HONOR.

22               WE'D ALSO REQUEST THAT THE PLAINTIFF'S HANDCUFFS

23  AND WAIST CHAINS BE REMOVED WHILE HE'S TESTIFYING.  IT'S VERY

24  PREJUDICIAL.

25               **THE COURT:**  WELL, IT'S A BENCH TRIAL.

10:06  1        OKAY.  WHO'S IN THE COURTROOM?  LOOK AROUND.

2  HAVE WE GOT ANY ISSUES?  ALL WE HAVE IS LAWYERS AND EXPERT

3  WITNESSES.

4        **MR. MILLER:**  WE DO HAVE BILL SOMMERS, WHO IS THE

5  DIRECTOR OF THE OJJ, WHO IS A PARTY.

6        **THE COURT:**  HE CAN STAY AS A PARTY.

7        ALL RIGHT.  THE COURTROOM HAS BEEN SEALED.  THIS

8  PORTION OF THE -- THIS PORTION OF THE RECORD WILL ALSO BE TAKEN

9  AND REMAIN UNDER SEAL UNTIL FURTHER ORDER OF THE COURT.

10        ALEX A., IS THERE ANY NEED FOR RESTRAINTS,

11  COUNSEL FOR THE DEFENDANT?

12        **MR. MILLER:**  I DON'T BELIEVE.

13        **THE COURT:**  I MEAN, IT IS THE POLICY OF THE UNITED

14  STATES MARSHAL THAT PERSONS UNDER DETENTION -- BUT I DON'T

15  THINK HE QUALIFIES SINCE IT'S A CIVIL DETENTION -- CAN HAVE ONE

16  HAND REMAINING UNBOUND.  BUT I DON'T THINK THAT APPLIES IN THIS

17  CASE.  SO UNLESS YOU HAVE SOME PARTICULAR NEED FOR THIS -- FOR

18  MR. ALEX A. TO BE RESTRAINED, THE COURT'S GOING TO ORDER THE

19  RELEASE OF THE RESTRAINTS.

20        **MR. MILLER:**  NO OBJECTION, YOUR HONOR.

21        **THE COURT:**  ALL RIGHT.  NO RESTRAINTS.

22        **MS. ROSENBLOOM:**  AND, YOUR HONOR, AS LONG AS THIS IS

23  ALL UNDER SEAL, WE'D LIKE TO BE PERMITTED TO USE HIS REAL NAME

24  FOR -- WHILE I'M TALKING TO HIM.  I DON'T NEED TO, BUT --

25        **THE COURT:**  I DON'T THINK IT'S A GOOD IDEA, QUITE

10:08 1  FRANKLY.

2            **MS. ROSENBLOOM:**  OKAY.  THAT'S FINE.

3            **THE COURT:**  I CAN ONLY GUARANTEE SO MUCH.  I AM GOING

4  TO GUARANTEE THAT THIS BE UNDER SEAL.  BUT, YOU KNOW, YOU HAVE

5  PEOPLE THAT ARE PRETTY ASTUTE AT HACKING AND WHAT HAVE YOU.  SO

6  I THINK IT'S BETTER THAT -- IF YOU WOULD JUST EXPLAIN TO HIM --

7  IF YOU WANT TO TAKE A MINUTE TO EXPLAIN TO HIM THAT YOU'RE

8  GOING TO BE REFERRING TO HIM AS "ALEX A.," DO THAT.

9            **MS. ROSENBLOOM:**  THAT'S FINE.  FINE, YOUR HONOR.

10  UNDERSTOOD.

11            **THE COURT:**  OKAY.  YOU CAN BRING HIM IN.  HE WILL BE

12  ASKED TO TAKE AN OATH.  THE COURT WILL CLARIFY THAT HE WILL

13  TAKE AN OATH AS ALEX A.

14            **MS. ROSENBLOOM:**  YOUR HONOR, MAY I STAND AT THIS MIC?

15            **THE COURT:**  YOU MAY.

16            **MS. ROSENBLOOM:**  SO I HAVE BETTER SIGHT TO THE

17  WITNESS.  THANK YOU.

18        **(WHEREUPON, THERE WAS AN OFF-RECORD DISCUSSION.)**

19            **THE COURT:**  SIR, YOU ARE GOING TO COME RIGHT OVER

20  HERE.

21                          **ALEX A.,**

22  **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

23            **THE COURT:**  ARE YOU VACCINATED, SIR?  ARE YOU

24  VACCINATED FOR COVID?

25            **THE WITNESS:**  YES.

ALEX A.

10:10  1            THE COURT:  OKAY.  YOU DON'T HAVE TO WEAR A MASK IF
       2   YOU DON'T WANT TO.  YOU CAN IF YOU WANT TO.
       3            SIT IN THIS CHAIR, ALL RIGHT, AND SPEAK INTO THE
       4   MIC.
       5            GO AHEAD.
       6       MS. ROSENBLOOM:  SHOULD THE WITNESS BE SWORN?
       7       THE COURT:  YES.  SHE SWORE HIM IN.
       8       THE DEPUTY CLERK:  I DID.
       9       MS. ROSENBLOOM:  OH, THANK YOU.  SORRY.
      10       THE COURT:  YES.  SHE SWORE HIM.
      11            YOU ARE GOING TO BE REFERRED TO AS "ALEX A."
      12   DO YOU UNDERSTAND?
      13            THE WITNESS:  MA'AM?
      14       THE COURT:  SHE'S GOING TO REFER TO YOU AS "ALEX A."
      15   DO YOU UNDERSTAND?
      16            THE WITNESS:  YES, MA'AM.
      17       THE COURT:  ALL RIGHT.  GO AHEAD.
      18                      DIRECT EXAMINATION
      19   BY MS. ROSENBLOOM:
      20   Q.   I'M JUST REMINDING YOU THAT -- BECAUSE WE'RE NOT USING
      21   YOUR REAL NAME IN THIS PROCEEDING, SO I WON'T BE USING YOUR
      22   NAME.  OKAY?
      23            THE DEPUTY CLERK:  OKAY, SIR.  WE CAN HEAR YOU BETTER
      24   WHEN -- AND THE COURT REPORTER CAN SEE YOUR MOUTH, IF YOU DON'T
      25   MIND.

ALEX A.

10:11  1            THE WITNESS:  YES, MA'AM.

       2            THE COURT:  ALL RIGHT.  GO AHEAD.

       3            MS. ROSENBLOOM:  OKAY.  GREAT.

       4   BY MS. ROSENBLOOM:

       5   Q.   HOW OLD ARE YOU?

       6   A.   SEVENTEEN.

       7   Q.   OKAY.  AND WHERE DO YOU LIVE?

       8   A.   VILLE PLATTE, LOUISIANA.

       9   Q.   WHO LIVES IN YOUR HOUSE WITH YOU?

      10   A.   MY MAMA AND MY DADDY AND HER KIDS.

      11   Q.   HOW MANY BROTHERS AND SISTERS DO YOU HAVE?

      12   A.   ONE LITTLE BROTHER AND TWO SISTERS.

      13   Q.   AND WHEN DID YOU TURN 17?

      14   A.   JULY 20TH.

      15   Q.   OKAY.  AND WHAT SCHOOL WERE YOU GOING TO BEFORE YOU WENT

      16   TO OJJ?

      17   A.   VILLE PLATTE HIGH.

      18   Q.   VILLE PLATTE HIGH SCHOOL.

      19            WHAT GRADE WERE YOU IN THERE?

      20   A.   THE NINTH.

      21   Q.   AND WHEN DID YOU GO TO OJJ FIRST?

      22   A.   MAY 9TH OF LAST YEAR.

      23   Q.   OF LAST YEAR.

      24            OF 2021?

      25   A.   YES, MA'AM.

ALEX A.

10:12 1   **Q.**   WAS THAT BECAUSE OF A JUVENILE DELINQUENCY ADJUDICATION?

2   **A.**   YES, MA'AM.

3   **Q.**   OKAY.  WHAT SCHOOL DO YOU ATTEND NOW?

4   **A.**   RIVERSIDE ALTERNATIVE.

5   **Q.**   AND HOW OFTEN DO YOU HAVE SCHOOL?

6   **A.**   EVERY DAY.

7   **Q.**   HOW MANY HOURS A DAY, ABOUT?

8   **A.**   FROM 8:00 TO 3:00.

9   **Q.**   OKAY.  DO YOU GO TO -- DO YOU HAVE DIFFERENT SUBJECTS?

10   **A.**   YES, MA'AM.

11   **Q.**   AND WHAT SUBJECTS ARE YOU TAKING?

12   **A.**   ALL SUBJECTS.

13   **Q.**   OKAY.  DO YOU HAVE DIFFERENT TEACHERS FOR DIFFERENT

14   SUBJECTS?

15   **A.**   YES, MA'AM.

16   **Q.**   OKAY.  AND DO YOU HAVE HOMEWORK?

17   **A.**   YES, MA'AM.

18   **Q.**   OKAY.  AND THAT -- WHAT BUILDING DOES THAT SCHOOL TAKE

19   PLACE IN?  WHERE ARE YOU HOUSED RIGHT NOW?

20   **A.**   BRIDGE CITY CENTER FOR YOUTH.

21   **Q.**   AND SO THE TEACHERS COME RIGHT INTO THE BUILDING?

22   **A.**   YES, MA'AM.

23   **Q.**   OKAY.  DO YOU -- IS THERE A LIBRARY THERE?

24   **A.**   YES, MA'AM.

25   **Q.**   ARE YOU ABLE TO CHECKOUT BOOKS TO READ?

ALEX A.

10:13  1    **A.**   YES, MA'AM.

2    **Q.**   DO YOU EVER DO THAT?

3    **A.**   NO.

4    **Q.**   OKAY.  WHEN'S THE LAST -- WHAT'S THE LAST NOVEL YOU READ?

5    **A.**   I DON'T REMEMBER.

6    **Q.**   THAT'S OKAY.

7            DO YOU LIKE READING?

8    **A.**   YES, MA'AM.

9    **Q.**   WHAT KIND OF THINGS DO YOU LIKE READING ABOUT?

10    **A.**   URBAN BOOKS.

11    **Q.**   SAY AGAIN.

12    **A.**   URBAN BOOKS.

13    **Q.**   URBAN BOOKS.

14            ABOUT CITIES?

15    **A.**   (NODDED HEAD SIDE TO SIDE.)

16    **Q.**   DO YOU HAVE ANY ACCOMMODATIONS IN YOUR LEARNING?  DO YOU

17    HAVE A LEARNING DISABILITY?

18    **A.**   YES, MA'AM.

19    **Q.**   OKAY.  WHAT -- WHAT -- DO YOU KNOW -- CAN YOU DESCRIBE

20    WHAT KIND OF LEARNING DISABILITY IT IS?

21    **A.**   IT'S LIKE IN -- LIKE MY SUBJECTS?

22    **Q.**   YEAH.

23    **A.**   MATH.

24    **Q.**   IN MATH.

25            HAVE YOU HAD THAT -- DO YOU HAVE A PLAN FOR EXTRA

ALEX A.

10:14 1  SERVICES BECAUSE OF THAT?

2  **A.**   YES, MA'AM.

3  **Q.**   AND HOW LONG -- HAS THAT BEEN FOR A WHILE, OR IS THAT

4  RECENT?

5  **A.**   THAT'S BEEN FOR A WHILE.

6  **Q.**   DO YOU REMEMBER WHAT GRADE YOU WERE IN WHEN YOU FIRST HAD

7  THAT?

8  **A.**   FOURTH GRADE.

9  **Q.**   FOURTH GRADE.

10       SO WHAT KIND OF ACCOMMODATIONS, WHAT KIND OF EXTRA

11  SERVICES DO YOU GET BECAUSE OF THAT?

12  **A.**   TUTORING, READ ALOUD.

13  **Q.**   SO DO YOU GET THE TUTORING AND READ ALOUD SERVICES AT

14  BRIDGE CITY?

15  **A.**   YES, MA'AM.

16  **Q.**   OKAY.  AND IS THERE ANY EXTRA PROFESSIONAL OR A TEACHER IN

17  THE CLASSROOMS THAT HELP YOU?

18  **A.**   YES, MA'AM.

19  **Q.**   OKAY.  WHAT DOES THAT PERSON DO?

20  **A.**   SHE SITS DOWN AND HELPS ME DO THE WORK.

21  **Q.**   OKAY.

22  **A.**   ON THE SIDE OF ME.

23  **Q.**   OKAY.  DID YOU -- ARE YOU TAKING ANY MEDICATIONS RIGHT

24  NOW?

25  **A.**   YES, MA'AM.

ALEX A.

10:15  1  **Q.**   WHAT MEDICATIONS DO YOU TAKE?

2  **A.**   PRAZOSIN.

3  **Q.**   WHAT'S THAT FOR?  DO YOU KNOW?

4  **A.**   MY SLEEPING MEDICINE.

5  **Q.**   OKAY.  WHY DO YOU NEED SLEEPING MEDICINE?

6  **A.**   I BE STRESSING AND STUFF.

7  **Q.**   OKAY.  CAN YOU TELL US ABOUT LAMOD?  IS THAT THE PROGRAM

8  YOU'RE IN?

9  **A.**   YES, MA'AM.

10  **Q.**   OKAY.  AND WHAT'S YOUR UNDERSTANDING OF WHAT THAT IS?

11  **A.**   GOING TO SCHOOL, DINING HALL, GROUP.

12  **Q.**   GROUP COUNSELING?

13  **A.**   YES, MA'AM.

14  **Q.**   OKAY.  DO YOU GET INDIVIDUAL COUNSELING, TOO?

15  **A.**   YES, MA'AM.

16  **Q.**   OKAY.

17  **A.**   FROM MY COUNSELOR.

18  **Q.**   HOW OFTEN IS THE GROUP COUNSELING AT BRIDGE CITY?

19  **A.**   EVERY WEEK.

20  **Q.**   AND HOW OFTEN DO YOU HAVE INDIVIDUAL COUNSELING?

21  **A.**   EVERY TWO WEEKS.

22  **Q.**   OKAY.  WHAT ARE THE TYPES OF THINGS YOU TALK ABOUT IN THE

23  GROUP COUNSELING?  NOT YOUR PERSONAL STUFF, BUT JUST GENERAL

24  TYPES OF THINGS.

25  **A.**   LIKE SPORTS.  IT COULD BE ANY TYPE OF LIKE -- IT COULD BE

ALEX A.

10:16  1    SPORTS OR LIKE WHAT YOU DID WHEN YOU WAS IN THE COMMUNITY AND

2    STUFF LIKE THAT.

3    **Q.**    DO THEY HELP YOU OUT WITH THINGS LIKE ANGER MANAGEMENT?

4    **A.**    YES, MA'AM.

5    **Q.**    DO YOU GET TO VISIT WITH YOUR FAMILY BY PHONE OR VIDEO OR

6    IN PERSON?

7    **A.**    YES, MA'AM.

8    **Q.**    OKAY.  HOW OFTEN DO YOU TALK TO YOUR MOM ON THE PHONE?

9    **A.**    EVERY DAY.

10    **Q.**    OKAY.  YOU LIKE DOING THAT?

11    **A.**    YES, MA'AM.

12    **Q.**    OKAY.  AND HOW ABOUT VIDEO, DO YOU HAVE ZOOM VISITS ALSO?

13    **A.**    YEAH, I GET ZOOMS.

14    **Q.**    OKAY.  HOW OFTEN IS THAT?

15    **A.**    THAT'S EVERY TWO WEEKS.

16    **Q.**    DO YOU GET TO SEE YOUR SIBLINGS ALSO ON THOSE VISITS?

17    **A.**    YES, MA'AM.

18    **Q.**    AND HOW DO THOSE VISITS HELP YOU?

19    **A.**    IT MOTIVATES ME TO COME HOME, DO THE RIGHT THING.

20    **Q.**    THAT'S GREAT.

21          I WANT TO ASK YOU ABOUT KIND OF THE ENVIRONMENT AT

22    BRIDGE CITY.

23          ARE THERE SOMETIMES FIGHTS AND ARGUMENTS THERE AMONG

24    THE KIDS?

25    **A.**    YES, MA'AM.

ALEX A.

| | | |
|---|---|---|
| 10:17 | 1 | **Q.**   WHAT DO YOU DO WHEN THAT HAPPENS? |
| | 2 | **A.**   LIKE I HAD TOLD YOU, GIVE THE SAME RESPECT YOU WANT.  BUT |
| | 3 | SOMETIMES YOU CAN WALK AWAY. |
| | 4 | **Q.**   SOMETIMES YOU CAN WALK AWAY AND SOMETIMES YOU NEED TO GET |
| | 5 | RESPECT, IS THAT WHAT YOU'RE SAYING? |
| | 6 | **A.**   YES, MA'AM. |
| | 7 | **Q.**   DO YOU EVER GET INVOLVED IN ANY KIND OF FIGHTING? |
| | 8 | **A.**   NO, MA'AM. |
| | 9 | **Q.**   OKAY.  HAVE YOU HAD ANY CODE OF CONDUCT VIOLATIONS WHILE |
| | 10 | YOU'VE BEEN AT OJJ? |
| | 11 | **A.**   YES, MA'AM. |
| | 12 | **Q.**   DO YOU REMEMBER EXACTLY HOW MANY AND WHAT DATES? |
| | 13 | **A.**   NO, MA'AM. |
| | 14 | **Q.**   WHAT TYPES OF THINGS HAVE YOU HAD VIOLATIONS FOR? |
| | 15 | **A.**   UNAUTHORIZED AREA AND FIGHTING. |
| | 16 | **Q.**   WHAT DOES "UNAUTHORIZED AREA" MEAN? |
| | 17 | **A.**   LEAVING, WALKING AWAY WITHOUT THE STAFF'S PERMISSION. |
| | 18 | **Q.**   OKAY.  AND WHY HAVE YOU DONE THAT? |
| | 19 | **A.**   HOMICIDAL THOUGHTS. |
| | 20 | **THE COURT:**  WAIT.  WHAT? |
| | 21 | **THE WITNESS:**  HOMICIDAL THOUGHTS. |
| | 22 | BY MS. ROSENBLOOM: |
| | 23 | **Q.**   HOMICIDAL THOUGHTS. |
| | 24 | ARE YOU SAYING YOU'RE ANGRY SOMETIMES OR -- |
| | 25 | **A.**   YES, MA'AM. |

ALEX A.

10:18 1   Q.   YEAH.  HAVE YOU HAD -- YOU SAID "FIGHTING" ALSO.  LIKE HOW

2   DOES THAT HAPPEN?  IS THERE -- HAVE YOU EVER STARTED A FIGHT

3   YOURSELF?

4   A.   NO, MA'AM.

5   Q.   YEAH.  SO DO YOU FIGHT BACK SOMETIMES?

6   A.   YES, MA'AM.

7   Q.   WHY DO YOU FIGHT BACK?  WHY DO YOU FIGHT BACK?

8   A.   LIKE IF SOMEBODY START SOMETHING WITH ME.  I AIN'T GONNA

9   BRING IT TO THEM UNLESS THEY START SOMETHING WITH ME.

10   Q.   OKAY.  SO YOU'VE BEEN WRITTEN UP FOR THAT, TOO?

11   A.   YES, MA'AM.

12   Q.   HAVE YOU HAD ANY CHARGES?  ANY LIKE COURT CHARGES FOR ANY

13   KIND OF FIGHTING OR UNAUTHORIZED AREA?

14   A.   OH, I GOT SIMPLE ESCAPE.

15   Q.   SIMPLE ESCAPE.

16        WAS THAT FROM -- WHAT FACILITY WERE YOU IN WHEN THAT

17   HAPPENED?

18   A.   BRIDGE CITY.

19   Q.   AT BRIDGE CITY.

20        WHAT WAS THAT SIMPLE ESCAPE CHARGE ABOUT?

21   A.   WELL, I AIN'T LEAVE THE CAMPUS.

22   Q.   DIDN'T LEAVE THE CAMPUS.

23        DID YOU GO IN SOME AREA YOU WEREN'T SUPPOSE TO BE IN?

24   A.   YES, MA'AM.

25   Q.   AND IS THAT CASE STILL GOING ON IN DELINQUENCY COURT?

**ALEX A.**

10:19 1   **A.**   YES, MA'AM.  I STILL DIDN'T GET A COURT DATE FOR IT,

2   THOUGH.

3   **Q.**   YOU DON'T HAVE A COURT DATE YET.

4            OKAY.  YOU KNOW WHY -- WELL, ARE MOST OF THE KIDS AT

5   BRIDGE CITY, IF YOU KNOW, ARE THEY FROM VILLE PLATTE, PLACES

6   LIKE THAT OR --

7   **A.**   NO, MA'AM.

8   **Q.**   WHERE ARE THEY FROM MOSTLY?

9   **A.**   NEW ORLEANS.

10   **Q.**   NEW ORLEANS.

11           DO YOU FEEL LIKE THOSE KIDS ARE DIFFERENT FROM YOU?

12   **A.**   I MEAN, SOME OF THEM.

13   **Q.**   YEAH.  DO YOU KNOW HOW OLD MOST OF THE YOUNG PEOPLE ARE AT

14   BRIDGE CITY?

15   **A.**   ONE WAS 12.  BUT HE IN COLUMBIA NOW.

16   **Q.**   OKAY.  DO YOU KNOW THE AGES OF OTHER YOUNG PEOPLE WHO ARE

17   THERE NOW?

18   **A.**   SEVENTEEN.

19   **Q.**   MOSTLY 17?

20   **A.**   YES, MA'AM.

21   **Q.**   ANYBODY YOUNGER WHO YOU'VE MET?

22   **A.**   NO, MA'AM.

23   **Q.**   OKAY.  WHEN DID YOU FIRST HEAR ABOUT THIS PLAN TO MOVE

24   KIDS TO THE ANGOLA SITE?

25   **A.**   MY LAWYERS, ON THE 15TH.

ALEX A.

10:20 1  **Q.**   15TH OF AUGUST?

2  **A.**   NO.   SEPTEMBER.

3  **Q.**   IT'S SEPTEMBER NOW.   SO IT'S ONLY SEPTEMBER 6TH NOW.

4         SO -- OH, YOU HEARD THAT'S WHEN THEY'RE GOING TO MOVE

5  YOU ON THE 15TH?

6  **A.**   YES, MA'AM.

7  **Q.**   HOW DID YOU LEARN ABOUT THIS?   THE FIRST TIME YOU EVER

8  HEARD OF THIS PLAN, HOW DID YOU LEARN ABOUT IT?

9  **A.**   I HEARD IT FROM THE STAFF AND THE NEWS.

10  **Q.**   STAFF AND NEWS?

11  **A.**   YES, MA'AM.

12  **Q.**   SO WHAT -- YOU JUST HEARD STAFF TALKING, OR DID SOMEBODY

13  SAY SOMETHING TO YOU?

14  **A.**   NO.   I JUST HEARD THEM TALKING.

15  **Q.**   HEARD THEM TALKING ABOUT IT.

16         AND WHAT DO YOU MEAN "NEWS," WERE YOU WATCHING TV?

17  **A.**   YES, MA'AM.

18  **Q.**   WHAT DID YOU HEAR ON THE NEWS, OR WHAT DID YOU LEARN FROM

19  THE NEWS?

20  **A.**   THEY WAS SUPPOSED TO BE MOVING US TO ANGOLA.   I SEEN THE

21  BEDS AND STUFF AND THE CELLS.

22  **Q.**   YOU SAW PICTURES OF THE CELLS AT ANGOLA?

23  **A.**   YES, MA'AM.

24  **Q.**   HOW DID YOU FEEL WHEN YOU SAW THAT?

25  **A.**   WE SHOULDN'T BE GOING OVER THERE.   IT'S NOT A PLACE FOR

**ALEX A.**

10:21 1   US.

2   **Q.    NOT A PLACE FOR US.

3         WHAT DO YOU THINK WILL HAPPEN WHEN YOU GO THERE?

4   WHAT DO YOU THINK IT WILL BE LIKE OVER THERE, IF YOU HAVE TO GO

5   THERE?

6   A.**    WELL, YOU DON'T KNOW WHAT COULD HAPPEN.  LIKE, WE COULD BE

7   SHANKED UP, 'CAUSE, LIKE, I DON'T THINK WE GONNA BE SEPARATED

8   FROM THE INMATES, 'CAUSE I THINK THEY RUN THE CAMPUS.  LIKE, I

9   THINK THEY RUN THE FACILITY THEY SELF.

10  **Q.    WHAT DO YOU THINK ABOUT SCHOOL, IF YOU HAVE -- IF YOU'RE

11  MOVED TO ANGOLA?  DO YOU HAVE -- ANYBODY TOLD YOU ANYTHING

12  ABOUT WHAT THAT WILL BE LIKE?

13  A.**    NO, MA'AM.

14  **Q.    OKAY.  DO YOU HAVE ANY WORRIES ABOUT THAT?

15  A.**    NO, MA'AM.

16  **Q.    OKAY.  DO YOU THINK THEY'LL HAVE COUNSELING AND A LIBRARY

17  AND ALL THAT STUFF?

18  A.**    NO, MA'AM.

19  **Q.    HAVE THE STAFF AT OJJ BEEN TALKING ABOUT THIS PLAN AT ALL?

20  ANYBODY TELL YOU PERSONALLY ANYTHING ABOUT IT?

21  A.**    NO, MA'AM.

22  **Q.    OKAY.  ARE THERE DOC GUARDS AT BRIDGE CITY ALSO --

23  DEPARTMENT OF CORRECTIONS?

24  A.**    YES, MA'AM.

25  **Q.    THERE ARE?  DO YOU REMEMBER WHEN THOSE GUARDS STARTED**

ALEX A.

10:22  1   BEING THERE?  NOT THE DATE, BUT WAS IT --

       2   **A.**   LIKE THREE MONTHS AGO, I THINK.

       3   **Q.**   YEAH.  WAS THAT -- WAS THAT AROUND THE TIME SOME OTHER

       4   KIDS ESCAPED?

       5   **A.**   I DON'T REMEMBER.

       6   **Q.**   THAT'S OKAY.  IT'S OKAY NOT TO REMEMBER.

       7        SO THE DOC GUARDS, DID THEY ACT DIFFERENT FROM THE

       8   OJJ GUARDS?

       9   **A.**   YES, MA'AM.

      10   **Q.**   IN WHAT WAY?  WHAT DO THEY -- WHAT HAPPENS?

      11   **A.**   THEY MACE US FOR NOTHING.  LIKE --

      12   **Q.**   HAVE YOU BEEN MACED BY THEM?

      13   **A.**   YES, MA'AM.

      14   **Q.**   ANYTHING ELSE?

      15   **A.**   NO, MA'AM.

      16   **Q.**   OKAY.  SINCE YOU'VE HEARD ABOUT THIS PLAN TO MOVE KIDS

      17   FROM BRIDGE CITY TO ANGOLA, HAVE YOU HAD ANY LIKE PHYSICAL

      18   SYMPTOMS?

      19   **A.**   I WAS JUST WONDERING, LIKE, WHY THEY WANT TO MOVE US TO

      20   ANGOLA.

      21   **Q.**   HAVE YOU HAD MORE TROUBLE SLEEPING OR ABOUT THE SAME?

      22   **A.**   YEAH.  I HAD, LIKE, NIGHTMARES.

      23   **Q.**   HAVE YOU SEEN OTHER KIDS REACTING TO THE PLAN?

      24   **A.**   THEY DON'T CARE.

      25   **Q.**   THEY DON'T CARE.

ALEX A.

10:23 1          HAVE YOU SEEN ANYBODY BE SAD ABOUT IT OR SCARED OR

2    ANYTHING?

3    **A.**   (NODDED HEAD UP AND DOWN.)

4    **Q.**   OKAY.  HAVE YOU HAD ANY CHANGES IN YOUR MEDICATION SINCE

5    YOU LEARNED ABOUT THIS PLAN WITH THE SLEEPING OR ANYTHING?

6    **A.**   YES, MA'AM.  I SLEEP, I SLEEP GOOD NOW.

7    **Q.**   YOU'RE SLEEPING BETTER WITH -- THE MEDICATIONS ARE

8    HELPING?

9    **A.**   YES, MA'AM.

10   **Q.**   OKAY.  TELL ME ABOUT YOUR PLANS FOR THE FUTURE.  WHAT ARE

11   YOUR GOALS WHEN YOU GET OUT OF THERE, OJJ?

12   **A.**   TAKE MY MAMA OUT OF MY CITY AND PUT HER IN NEW ORLEANS,

13   TAKE CARE OF HER AND HER KIDS AND MY GRANDMOTHER.

14   **Q.**   YOU GONNA GRADUATE AND GET A JOB, GO TO COLLEGE?  WHAT ARE

15   YOUR PLANS?

16   **A.**   GET A JOB.

17   **Q.**   UH-HUH.

18   **A.**   WORK.

19   **Q.**   DO YOU KNOW WHAT YOU WANT TO DO FOR WORK?

20   **A.**   WELDING.

21   **Q.**   WELDING?

22   **A.**   YES, MA'AM.

23   **Q.**   GREAT.

24           **MS. ROSENBLOOM:**  I'M GOING TO SHOW THE WITNESS

25   PLAINTIFFS' EXHIBIT 1, WHICH IS NOT FOR PUBLICATION TILL IT'S

ALEX A.

10:24 1   ADMITTED.

2                   CAN WE PUT THAT UP ON THE SCREEN?

3           **THE COURT:**  YOU MAY.  IT IS NOT FOR PUBLICATION, SO

4   JUST TO THE WITNESS AND THE COURT AND COUNSEL.

5           **MS. ROSENBLOOM:**  OKAY.  AND, COUNSEL, YOU HAVE THAT.

6   I'M SORRY.  I DON'T HAVE PAPER COPIES.

7   **BY MS. ROSENBLOOM:**

8   **Q.**  CAN YOU SEE THAT OKAY ON YOUR SCREEN?

9   **A.**  YES, MA'AM.

10  **Q.**  OKAY.  DO YOU RECOGNIZE THAT DOCUMENT?  IS THAT A

11  STATEMENT THAT YOU MADE?

12  **A.**  YES, MA'AM.

13  **Q.**  OKAY.  AND IF YOU SCROLL DOWN TO THE BOTTOM, YOU'LL SEE A

14  PLACE WHERE THERE'S A SIGNATURE.

15                  IS THAT YOUR SIGNATURE?

16  **A.**  YES, MA'AM.

17  **Q.**  OKAY.  DID YOU SAY EVERYTHING THAT'S IN THAT DECLARATION?

18  **A.**  YES, MA'AM.

19  **Q.**  OKAY.  AND MR. LINARES, ONE OF THE OTHER LAWYERS,

20  PHYSICALLY WROTE IT DOWN.  RIGHT?

21  **A.**  YES, MA'AM.

22  **Q.**  OKAY.  AND ARE THOSE ALL OF YOUR WORDS, THE THINGS YOU

23  SAID IN THERE?

24  **A.**  YES, MA'AM.

25  **Q.**  OKAY.

ALEX A.

10:25 1          **MS. ROSENBLOOM:**  I'D MOVE TO ADMIT THIS DECLARATION
     2   INTO EVIDENCE AS PLAINTIFFS' 1.
     3          **MR. MONTGOMERY:**  YOUR HONOR, WE OBJECT.  THAT'S HIS
     4   OWN STATEMENT.  HE'S NOT A -- YOU CAN'T PUT YOUR OWN STATEMENT
     5   INTO EVIDENCE.  I THINK IT'S HEARSAY.  PLUS, WE HAVE HIS
     6   TESTIMONY.  I THINK THAT'S THE BEST EVIDENCE IN ADDITION.
     7          **THE COURT:**  WELL, I AGREE THAT THE BEST EVIDENCE OF
     8   HIS STATEMENTS IS HIS TESTIMONY UNDER OATH.
     9              IS THERE ANYTHING IN THERE THAT YOU HAVE NOT
    10   COVERED?  WHY DO YOU NEED IT?
    11          **MS. ROSENBLOOM:**  IT, YOU KNOW, REFLECTS WHAT HIS
    12   THOUGHTS WERE AT THE TIME HE WROTE IT, WHICH MAY HAVE CHANGED
    13   NOW.
    14          **THE COURT:**  WELL, GIVEN THE FACT THAT WE ARE DEALING
    15   WITH A JUVENILE, THE COURT'S GOING TO ALLOW -- ADMIT
    16   PLAINTIFFS' EXHIBIT 1, THE DECLARATION.  IT NEEDS TO BE
    17   REDACTED.  HIS NAME NEEDS TO BE REDACTED.  IT WILL BE
    18   MAINTAINED UNDER SEAL.
    19              P-1 IS ADMITTED.
    20          **MS. ROSENBLOOM:**  THANK YOU, YOUR HONOR.
    21              I HAVE NO MORE QUESTIONS RIGHT NOW.
    22   **BY MS. ROSENBLOOM:**
    23   **Q.**  ONE OF THE LAWYERS FOR THE STATE IS GOING TO ASK YOU A FEW
    24   QUESTIONS, AND THEN I MAY COME BACK UP HERE AFTER THAT.  OKAY?
    25   **A.**  YES, MA'AM.

ALEX A.

10:27 1          THE COURT:  CROSS.

2          MR. MONTGOMERY:  THANK YOU, YOUR HONOR.

3          THE COURT:  GO AHEAD.

4                    CROSS-EXAMINATION

5    BY MR. MONTGOMERY:

6    Q.   ALEX, GOOD MORNING.

7          I'M LEM MONTGOMERY.  I REPRESENT THE DEFENDANTS.

8          I KNOW ALEX IS NOT YOUR NAME, BUT THAT'S WHAT WE ARE

9    GOING TO CALL YOU TODAY.  I KNOW YOUR NAME, BUT I'M NOT GOING

10   TO SAY IT.  SO I'M GOING TO CALL YOU "ALEX," IF THAT'S OKAY

11   WITH YOU?

12   A.   YES, SIR.

13   Q.   OKAY.  THANK YOU.

14          I WANT TO GO BACK OVER SOME OF THE TESTIMONY YOU

15   COVERED WITH MS. ROSENBLOOM, JUST TO MAKE SURE I UNDERSTAND A

16   FEW THINGS.  OKAY?

17   A.   YES, SIR.

18          THE DEPUTY CLERK:  SIR, WOULD YOU GET IN FRONT OF THE

19   MICROPHONE.

20          MR. MONTGOMERY:  THANK YOU.  I APOLOGIZE.

21          THE DEPUTY CLERK:  YOU CAN MOVE IT.

22          MR. MONTGOMERY:  CAN EVERYBODY HEAR ME NOW?

23          THE DEPUTY CLERK:  YES.

24   BY MR. MONTGOMERY:

25   Q.   CAN YOU HEAR ME OKAY?

**ALEX A.**

10:28 1   **A.**   YES, SIR.

2   **Q.**   OKAY.  YOU SAID YOU'RE 17 YEARS OLD?

3   **A.**   YES, SIR.

4   **Q.**   YOUR BIRTHDAY IS JULY 20TH?

5   **A.**   YES, SIR.

6   **Q.**   OKAY.  LET'S DO THIS, SINCE WE JUST ADMITTED YOUR

7   AFFIDAVIT INTO EVIDENCE, CAN I -- CAN WE PULL IT UP AND TAKE A

8   LOOK AT THAT.  I'M GOING TO PULL YOUR STATEMENT UP.

9          CAN YOU SEE THAT, THAT DOCUMENT?

10  **A.**   YES, SIR.

11  **Q.**   DID YOU WRITE THAT DOCUMENT?

12  **A.**   NO, SIR.

13  **Q.**   WHO WROTE THAT?

14  **A.**   MY LAWYER.

15  **Q.**   HE WROTE IT IN HIS OWN HAND WITH AN INK PEN?

16  **A.**   YES, SIR.

17  **Q.**   AND THEN YOU SIGNED IT?

18  **A.**   YES, SIR.

19  **Q.**   WHEN WAS THIS DOCUMENT PREPARED?

20  **A.**   I HAD JUST TALKED TO MY MAMA.  SHE TOLD ME MY LAWYER WAS

21  SUPPOSED TO BE COMING TO TALK TO ME.  I DON'T REMEMBER THE DAY,

22  THOUGH.

23  **Q.**   DID HE COME MEET WITH YOU AT BRIDGE CITY?

24  **A.**   AT BRIDGE CITY.

25  **Q.**   OKAY.  IS THAT YOUR SIGNATURE AT THE BOTTOM?

ALEX A.

10:29  1    **A.**   YES, SIR.

2    **Q.**   BUT THAT'S NOT YOUR HANDWRITING ON THE DOCUMENT?  THAT'S

3    JUST -- YOUR ONLY HANDWRITING ON THAT IS THE SIGNATURE?

4    **A.**   YES, SIR.

5    **Q.**   OKAY.  YOU SAID YOU LEARNED ABOUT THE PLAN FOR THE MOVE TO

6    ANGOLA WHEN YOU SAW IT ON THE NEWS.  CORRECT?

7    **A.**   YES, SIR.

8    **Q.**   WHEN WAS THAT?

9    **A.**   LIKE TWO MONTHS AGO, A MONTH AGO.

10   **Q.**   AND THEN YOU SAID YOU ALSO HEARD STAFF TALKING ABOUT IT?

11   **A.**   YES, SIR.

12   **Q.**   AND WHEN DID THAT HAPPEN?

13   **A.**   THE SAME TIME AS THAT.

14   **Q.**   OKAY.  SO YOU'VE KNOWN ABOUT IT FOR ABOUT TWO MONTHS?

15   **A.**   YES, SIR.

16   **Q.**   DO YOU HAVE A CASE MANAGER AT BRIDGE CITY?

17   **A.**   YES, SIR.

18   **Q.**   WHO IS YOUR CASE MANAGER?

19   **A.**   MS. BRYANT.

20   **Q.**   TELL ME ABOUT MS. BRYANT.  DO YOU HAVE A GOOD RELATIONSHIP

21   WITH HER?

22   **A.**   YES, SIR.

23   **Q.**   TELL ME ABOUT THAT.  WHEN DO YOU INTERACT WITH MS. BRYANT?

24   **A.**   EVERY TUESDAY.  SHE DO HER JOB LIKE, YOU KNOW, WITH PHONE

25   CALLS AND STUFF, ZOOMS.

ALEX A.

10:30  1    **Q.**    DOES SHE WORK FOR OJJ?

     2    **A.**    YES, SIR.

     3    **Q.**    DO YOU TRUST HER?

     4    **A.**    YES, SIR.

     5    **Q.**    TELL ME ABOUT OTHER PEOPLE, OTHER STAFF AT OJJ THAT YOU

     6    INTERACT WITH.  WHO ARE THE ONES YOU HAVE GOOD RELATIONSHIPS

     7    WITH?

     8    **A.**    MR. PALMER.

     9    **Q.**    WHO IS MR. PALMER?

    10    **A.**    HE AT OSS.

    11    **Q.**    IS HE THE SECURITY OFFICER?

    12    **A.**    YES, SIR.

    13    **Q.**    HOW DO YOU KNOW HIM?

    14    **A.**    LIKE, WE PLAY BASKETBALL TOGETHER AND STUFF.

    15    **Q.**    DO YOU HAVE A GOOD RELATIONSHIP WITH MR. PALMER?

    16    **A.**    YES, SIR.

    17    **Q.**    YOU GUYS TALK ABOUT STUFF TOGETHER?

    18    **A.**    YES, SIR.

    19    **Q.**    DO YOU TRUST MR. PALMER?

    20    **A.**    YES, SIR.

    21    **Q.**    WHO ELSE DO YOU HAVE A GOOD RELATIONSHIP WITH?  YOU WERE

    22    GOING TO LIST SOMEBODY ELSE.  I STOPPED YOU TO TALK A LITTLE

    23    BIT ABOUT MR. PALMER, BUT KEEP GOING.  TELL ME WHO THE OTHERS

    24    ARE.

    25    **A.**    MS. KELLER.

ALEX A.

10:31 1   **Q.**   WHO IS MS. KELLER?

2   **A.**   SHE LIKE -- SHE UNDER THE DORM LEADER.  SHE A STAFF, TOO.

3   **Q.**   I'M SORRY.  I DIDN'T UNDERSTAND YOU.

4   **A.**   SHE'S UNDER THE DORM LEADER.  SHE A STAFF.

5   **Q.**   SHE'S THE DORM LEADER?

6   **A.**   SHE'S UNDER THE DORM LEADER.

7   **Q.**   UNDER THE DORM LEADER?

8   **A.**   YES, SIR.

9   **Q.**   I'M SORRY.  WHAT'S YOUR RELATIONSHIP WITH HER?

10   **A.**   SHE LIKE A MOM.  LIKE, SHE HELP ME WHEN I'M DOWN AND

11   STUFF.

12   **Q.**   DO YOU TRUST HER?

13   **A.**   YES, SIR.

14   **Q.**   HAVE YOU TALKED TO ANY OF THOSE THREE PEOPLE ABOUT THE

15   MOVE TO ANGOLA?

16   **A.**   NO, SIR.

17   **Q.**   YOU NEVER ASKED THEM ANYTHING?

18   **A.**   NO, SIR -- WELL, I ASKED THEM, LIKE, "WHEN WE MOVING?"

19        THEY SAY THEY AIN'T HAVE NO EVIDENCE ON THAT.  THEY

20   JUST SIT AND WATCH THE NEWS SAYING WE WAS GOING.

21   **Q.**   BUT YOU NEVER ASKED THEM ANYTHING ABOUT WHAT IT WAS GOING

22   TO BE LIKE?

23   **A.**   NO, SIR.

24   **Q.**   WHY NOT?

25   **A.**   I'M JUST WATCHING THE NEWS TO SEE FURTHER EVIDENCE, SEE IF

ALEX A.

10:32 1  WE REALLY GOING OR NOT.

2  **Q.**   YEAH.  BUT, YOU KNOW, I READ YOUR AFFIDAVIT AND IT SAYS

3  THAT YOU'RE AFRAID BAD THINGS WILL HAPPEN TO YOU AT ANGOLA IF

4  YOU GO.  RIGHT?

5  **A.**   RIGHT.

6  **Q.**   LIKE YOU'LL BE EXPOSED TO ADULTS AT ANGOLA, ADULT

7  PRISONERS?

8  **A.**   YES, SIR.

9  **Q.**   AND YOU'RE WORRIED ABOUT THAT?

10  **A.**   YES, SIR.

11  **Q.**   AND I'M JUST WONDERING WHY YOU DIDN'T ASK ANYBODY AT OJJ

12  WHETHER THAT WAS TRUE?

13  **A.**   (NO ORAL RESPONSE.)

14          **THE COURT:**  ANSWER OUT LOUD.  WE HAVE TO MAKE A

15  RECORD.  SO YOU HAVE TO USE WORDS.

16  **BY THE WITNESS:**

17  **A.**   I AIN'T REALLY ASK THEM.  I DON'T REALLY KNOW IF IT'S TRUE

18  OR NOT.

19  **Q.**   OKAY.

20  **A.**   SO -- UNTIL WE GO.

21  **Q.**   WHEN YOU WANT TO FIND OUT YOU COULD ASK MS. KELLER,

22  MR. PALMER, PEOPLE LIKE THAT, "HEY, ARE WE GOING TO BE EXPOSED

23  TO ADULTS AND WHAT'S IT GOING TO BE LIKE?"  YOU DIDN'T WANT TO

24  ASK ANYBODY THAT?

25  **A.**   YES, SIR.

ALEX A.

10:33  1    **Q.**   WHY DID YOU NOT ASK?

2    **A.**   LIKE, MY THOUGHTS BE EVERYWHERE.  LIKE, I JUST BE -- I

3    DON'T KNOW.

4    **Q.**   SO YOU ARE WORRIED ABOUT THAT?

5    **A.**   YES, SIR.

6    **Q.**   JUST NOT WORRIED ENOUGH TO ASK ANYBODY?

7    **A.**   YES, SIR.

8    **Q.**   OKAY.  FAIR ENOUGH.

9            DO YOU KNOW FOR A FACT WHETHER OR NOT YOU -- IF

10   YOU -- WELL, DO YOU KNOW FOR A FACT WHETHER YOU ARE EVEN GOING

11   TO BE MOVED TO ANGOLA?

12   **A.**   NO, SIR.  I DON'T KNOW IF I'M MOVING.

13   **Q.**   HAVE YOU ASKED ANYBODY?

14   **A.**   WHAT THE NEWS TELLING ME, THEY SAYING ALL GP DORMS ARE

15   GOING.

16   **Q.**   BUT YOUR CASE MANAGER AND MR. PALMER AND MS. KELLER, YOU

17   DIDN'T ASK ANY OF THEM?

18   **A.**   THEY SAID "THE GP DORM IS GOING OFF CAMPUS, TOO."

19   **Q.**   OKAY.  THEY TOLD YOU, YOU WERE PROBABLY GONNA GO?

20   **A.**   YES, SIR.

21   **Q.**   DO YOU KNOW WHETHER OR NOT YOU'LL BE EXPOSED TO ADULTS AT

22   ANGOLA?

23   **A.**   NO, SIR, I DON'T KNOW.

24   **Q.**   BUT THAT'S YOUR CONCERN?

25   **A.**   RIGHT.

ALEX A.

10:34 1   **Q.**  SO IF YOU WERE SATISFIED THAT YOU WERE NEVER GOING TO BE

2   EXPOSED TO ADULTS AT ANGOLA, THAT IT WAS JUST GOING TO BE A

3   YOUTH FACILITY INSIDE THE ANGOLA CAMPUS, BUT YOU WOULD NEVER

4   SEE THE ADULTS AND THEY WOULD NEVER COME NEAR YOU, THAT WOULD

5   ALLEVIATE YOUR CONCERNS?

6   **A.**  YES, SIR.

7        **MS. ROSENBLOOM:**  OBJECTION, YOUR HONOR.  SPECULATION.

8   THIS IS A LOT OF STUFF THAT THE WITNESS IS BEING ASKED TO

9   IMAGINE.

10        **THE COURT:**  DO YOU WANT TO RESPOND TO THE OBJECTION,

11   PLEASE, MR. MONTGOMERY?

12        **MR. MONTGOMERY:**  I DON'T THINK IT CALLS FOR

13   SPECULATION.  I MEAN, THIS WHOLE LAWSUIT IS ABOUT THE

14   PLAINTIFF'S CONCERN THAT HE'S GOING TO BE EXPOSED TO ADULTS AT

15   ANGOLA.  AND I'M ASKING IF THAT WERE NOT TRUE, IF THAT WERE NOT

16   THE CASE, WOULD THAT ALLEVIATE THE CONCERN WE'RE ALL HERE ABOUT

17   AND I THINK HE JUST SAID "YES."

18        **THE COURT:**  OBJECTION OVERRULED.

19          ASK YOUR QUESTION AGAIN SO THAT THE WITNESS CAN

20   ANSWER IT.

21   **BY MR. MONTGOMERY:**

22   **Q.**  IF THEY SATISFIED YOU, YOU WERE NEVER GOING TO BE EXPOSED

23   TO ADULTS AT ANGOLA, YOU WOULDN'T HAVE TO BE CONCERNED ABOUT

24   THAT ANYMORE?

25   **A.**  RIGHT.

ALEX A.

10:35 1  **Q.**  IS THERE ANY SOURCE OF INFORMATION, OTHER THAN THE NEWS

2  AND WHATEVER YOU HEARD FROM STAFF, THAT MAKES YOU THINK YOU

3  WILL BE EXPOSED TO ADULTS AT ANGOLA?

4  **A.**  I AIN'T HEAR -- I AIN'T HEAR NOTHING ELSE ABOUT IT.

5  **Q.**  WOULD YOU BE HAPPY TO KNOW THAT IF YOU WENT TO ANGOLA, YOU

6  WOULD NOT BE EXPOSED TO ADULTS, THAT YOU WOULD BE IN A SECURE

7  FACILITY WITH ONLY YOUTH?

8      **MS. ROSENBLOOM:**  OBJECTION, YOUR HONOR.  CALLS FOR

9  FACTS NOT IN EVIDENCE AND SPECULATIVE.

10      **MR. MONTGOMERY:**  IT'S THAT WE ARE TAKING EVIDENCE

11  TODAY IS MY UNDERSTANDING.  I'M JUST ASKING HOW HE FEELS ABOUT

12  IT.

13      **THE COURT:**  THE QUESTION IS -- YOU DIDN'T REALLY

14  FINISH YOUR QUESTION.  WHAT'S YOUR QUESTION?

15      **MR. MONTGOMERY:**  THANK YOU, YOUR HONOR.  WHETHER --

16      **THE COURT:**  TELL ME WHAT THE QUESTION IS SO I CAN

17  RESPOND TO THE OBJECTION.

18      **MR. MONTGOMERY:**  WOULD YOU BE HAPPY TO HEAR THE FACT

19  THAT YOU WILL NOT BE EXPOSED TO ADULTS IF MOVED OR TRANSFERRED

20  TO THE YOUTH FACILITY AT ANGOLA.

21      **THE COURT:**  SUSTAINED.  IT'S NOT A FACT.  IT HASN'T

22  BEEN ESTABLISHED.

23          DO YOU WANT TO REPHRASE?

24  BY MR. MONTGOMERY:

25  **Q.**  HOW WOULD IT MAKE YOU FEEL IF YOU LEARNED THAT YOU WOULD

ALEX A.

10:36 1   NOT BE EXPOSED TO ADULTS IF YOU WERE TRANSFERRED TO ANGOLA,
      2   THAT YOU WOULD ONLY BE WITH YOUTH?
      3   **A.**   IT WOULD MAKE ME FEEL A LITTLE BETTER.
      4   **Q.**   OKAY.  YOU TESTIFIED THAT YOU ARE IN SCHOOL CURRENTLY AT
      5   BCCY.  CORRECT?
      6   **A.**   YES, SIR.
      7   **Q.**   YOU SAID YOU TAKE ALL SUBJECTS.  I NOTICED IN YOUR
      8   AFFIDAVIT YOU SPECIFICALLY SAY YOU TAKE SOCIAL STUDIES, MATH,
      9   ENGLISH, AND SCIENCE.  IS THAT TRUE?
     10   **A.**   YES, SIR.
     11   **Q.**   DO YOU HAVE ANY INFORMATION THAT SUGGESTS YOU WOULDN'T BE
     12   TAKING THOSE SUBJECTS IF YOU WERE TRANSFERRED TO ANGOLA?
     13   **A.**   NO, SIR.
     14   **Q.**   YOU SAID YOU HAVE A SPECIAL LEARNING PLAN FOR A DISABILITY
     15   IN MATH?
     16   **A.**   YES, SIR.
     17   **Q.**   TELL ME ABOUT YOUR DISABILITY IN MATH.  WHAT'S YOUR
     18   UNDERSTANDING ABOUT THAT AND WHAT IT IS?
     19   **A.**   LIKE READ ALOUD, I GOT TO GET HELP WITH IT.
     20   **Q.**   OKAY.  ARE YOU SAYING READ ALOUD?
     21   **A.**   YES, SIR.
     22   **Q.**   I HEARD YOU MENTION THAT.  WHAT IS THAT?
     23   **A.**   WHEN YOU'RE DOING YOUR WORK AND IT'S LIKE THE TEACHER IS
     24   ON THE SIDE OF YOU HELPING YOU.
     25   **Q.**   SO THEY READ TO YOU WHAT'S ON THE PAGE?

**ALEX A.**

10:37   1   **A.**   AND HELP YOU GO OVER THE QUESTIONS.

2   **Q.**   AND DO YOU GET READ ALOUD HELP FOR ONLY MATH OR FOR ALL

3   SUBJECTS?

4   **A.**   ONLY MATH.

5   **Q.**   OKAY.  WHAT YOU CALL YOUR DISABILITY IN MATH, DO YOU KNOW

6   IF IT HAS A NAME, LIKE A DIAGNOSED CONDITION, OR DO YOU JUST

7   CALL IT A DISABILITY?

8   **A.**   A DISABILITY.

9   **Q.**   IS IT THAT YOU JUST HAVE TROUBLE WITH MATH?

10   **A.**   YES, SIR.

11   **Q.**   ALL RIGHT.  YOU SAID YOU HAVE A TUTOR?

12   **A.**   SIR?

13   **Q.**   YOU SAID YOU HAVE A TUTOR WHO HELPS YOU?

14   **A.**   YES, SIR.

15   **Q.**   DO YOU HAVE ANY INFORMATION THAT SUGGESTS YOU WOULD NOT

16   HAVE A TUTOR IF YOU MOVED TO THE ANGOLA FACILITY?

17   **A.**   NO, SIR.

18   **Q.**   SO YOU MAY WELL HAVE ONE THERE IF THEY MOVE YOU, FOR ALL

19   YOU KNOW?

20   **A.**   I DON'T REALLY KNOW.

21   **Q.**   DO YOU KNOW WHETHER THERE'S A PLAN AT THE FACILITY THAT

22   WILL BE IN ANGOLA -- WE CALL IT THE WEST FELICIANA FACILITY.

23   DO YOU KNOW IF THERE'S A PLAN TO HAVE CALLS TO HOME?

24   **A.**   NO, SIR.

25   **Q.**   DO YOU HAVE ANY INFORMATION, FOR PURPOSES OF THIS TRIAL,

ALEX A.

10:38 1    THAT WOULD SUGGEST THAT YOU WOULD NOT BE ABLE TO MAKE CALLS
       2    FROM THAT NEW FACILITY?
       3    **A.**    NO, SIR.
       4    **Q.**    SO FOR ALL YOU KNOW, YOU MIGHT WELL BE ABLE TO?
       5    **A.**    NO, SIR.
       6    **Q.**    YOU DON'T HAVE ANY INFORMATION EITHER WAY?
       7    **A.**    NO, SIR.
       8    **Q.**    DO YOU HAVE ANY INFORMATION THAT SUGGESTS YOU WOULDN'T BE
       9    ABLE TO CONDUCT ZOOM CONFERENCES FROM THE NEW FACILITY?
      10    **A.**    NO, SIR.
      11    **Q.**    IS THERE ANY REASON YOU WOULDN'T BE ABLE TO HAVE VISITS AT
      12    THE NEW FACILITY, THAT YOU KNOW OF?
      13    **A.**    NO, SIR.
      14    **Q.**    HOW LONG HAVE YOU HAD TROUBLE SLEEPING?  HAS THAT BEEN AN
      15    ONGOING PROBLEM?
      16    **A.**    NO, SIR.
      17    **Q.**    BUT YOU SAID YOU'RE SLEEPING GOOD NOW?
      18    **A.**    YES, SIR.
      19    **Q.**    YOU GET A GOOD NIGHT'S SLEEP MOST NIGHTS THESE DAYS?
      20    **A.**    YES, SIR.
      21    **Q.**    DO YOU HAVE ANY OTHER INFORMATION ABOUT THIS NEW FACILITY,
      22    OTHER THAN WHAT YOU SAW ON THE NEWS AND WHAT YOU HEARD STAFF
      23    SAY?
      24    **A.**    NO, SIR.
      25    **Q.**    TELL ME EXACTLY WHAT YOU HEARD STAFF SAY.

ALEX A.

10:39  1    **A.**   WE GONNA BE GETTING MOVED, BOTH GP DORMS.  AND ON OTHER
       2    FACILITIES, BOTH GP DORMS GETTING MOVED, TOO.
       3    **Q.**   AND YOU'RE IN THAT?  YOU'RE IN THOSE DORMS?
       4    **A.**   I'M IN A GP DORM, YES, SIR.
       5    **Q.**   AND IS THAT THE SUM TOTAL OF EVERYTHING YOU HEARD FROM THE
       6    STAFF ABOUT THIS MOVE?
       7    **A.**   YES, SIR.
       8    **Q.**   NO OTHER --
       9    **A.**   OTHERWISE THE NEWS, THAT'S IT.
      10    **Q.**   NO OTHER DETAILS?
      11    **A.**   NO, SIR.
      12    **Q.**   DO YOU KNOW IF THEY'LL HAVE TREATMENT PROGRAMS AND
      13    COUNSELING AT THE NEW FACILITY?
      14    **A.**   NO, SIR.
      15    **Q.**   AND DO YOU HAVE ANY REASON TO BELIEVE THEY WOULD NOT?
      16    **A.**   I DON'T THINK THEY -- I DON'T THINK THEY GONNA HAVE
      17    TREATMENT.
      18    **Q.**   WHY WOULD YOU SAY THAT?
      19    **A.**   I DON'T EVEN KNOW.
      20    **Q.**   YOU DON'T HAVE ANYTHING TO BASE THAT ON, YOU'RE JUST
      21    GUESSING THEY MIGHT NOT?
      22    **A.**   YES, SIR.
      23    **Q.**   DO YOU HAVE ANY OTHER CONCERNS ABOUT THE POTENTIAL MOVE TO
      24    THE NEW FACILITY BESIDES POTENTIALLY BEING EXPOSED TO ADULT
      25    INMATES?

ALEX A.

10:41 1    **A.**   NO, SIR.

2    **Q.**   THAT'S IT?

3    **A.**   RIGHT.

4    **Q.**   IT'S YOU DON'T WANT TO GO AND BE EXPOSED TO ADULT

5    PRISONERS IN THE PRISON SYSTEM?

6    **A.**   YES, SIR.

7    **Q.**   AND THAT'S YOUR CONCERN?  WE ARE ALL -- THAT'S WHY YOU'RE

8    HERE?

9    **A.**   YES, SIR.

10   **Q.**   ALEX, WE WENT OVER -- OR MS. ROSENBLOOM WENT OVER SOME OF

11   YOUR DISCIPLINARY HISTORY, JUST GENERALLY.  I HAVE A LOT OF

12   INFORMATION HERE ABOUT YOUR DISCIPLINARY HISTORY.  AND I'D

13   RATHER NOT GET TOO DEEP INTO IT IF WE DON'T HAVE TO, BUT I DO

14   NEED TO MAKE SOME KIND OF A RECORD HERE.  SO LET'S SEE WHAT WE

15   CAN AGREE ON ABOUT THIS.

16        **MS. ROSENBLOOM:**  YOUR HONOR, WE OBJECT TO THE DEFENSE

17   BRINGING IN ANY EXTRINSIC EVIDENCE THAT HAS NOT BEEN PROVIDED

18   TO US.  WE HAVE NOT RECEIVED ANY DISCIPLINARY RECORDS IN

19   RESPONSE TO OUR REQUESTS, ALTHOUGH WE DID REQUEST A FULL FILE

20   FOR THE PLAINTIFF.  WE RECEIVED MEDICAL RECORDS ONLY.  SO WE

21   OBJECT TO -- UNDER RULE 608, TO BRINGING IN ANY OTHER EVIDENCE

22   ABOUT HIS DISCIPLINARY HISTORY.

23        **THE COURT:**  MR. MONTGOMERY?

24        **MR. MONTGOMERY:**  EVERYTHING I HAVE IN FRONT OF ME IS

25   BATES LABELED AND HAS BEEN PRODUCED ON TIME.

ALEX A.

10:42  1            **MS. ROSENBLOOM:**  MAY I SEE A COPY OF IT?

2            **MR. MONTGOMERY:**  I'M LOOKING AT OJJ-1100 AND 1101.

3            **MS. ROSENBLOOM:**  YOUR HONOR, MAY WE HAVE A MOMENT TO

4 LOOK AT THESE DOCUMENTS?  WE COMBED THROUGH AND DID NOT SEE ANY

5 DISCIPLINARY RECORDS.

6            **THE COURT:**  ALL RIGHT.  WE ARE GOING TO TAKE A 10

7 MINUTE -- OR A 15-MINUTE RECESS.  Y'ALL TAKE --

8            **MR. MONTGOMERY:**  AND THESE ARE ALL STIPULATED

9 EXHIBITS.  THEY ARE D-42 -- I'M SORRY -- D-58 THROUGH D-67.

10            **THE COURT:**  D-58 THROUGH D-67 HAVE BEEN ADMITTED

11 WITHOUT OBJECTION.

12            WE WILL STILL TAKE A RECESS TO LET COUNSEL GET

13 FAMILIAR WITH THE DOCUMENTS THAT HAVE BEEN PREVIOUSLY ADMITTED.

14 AND WE WILL BE BACK AT 11:00 A.M.

15            **MR. MONTGOMERY:**  THANK YOU, YOUR HONOR.

16            **MS. ROSENBLOOM:**  THANK YOU.

17            **THE LAW CLERK:**  ALL RISE.

18            **(WHEREUPON, THE COURT WAS IN RECESS.)**

19            **THE COURT:**  WE NEED A WITNESS ON THE WITNESS STAND.

20            ALL RIGHT.  BE SEATED.

21            THE OBJECTION IS OVERRULED.  YOU MIGHT PROBABLY

22 WANT TO RESTATE YOUR QUESTION.  WELL, ACTUALLY I DON'T THINK

23 THERE WAS A QUESTION ON THE FLOOR.  IT WAS JUST AN OBJECTION TO

24 TESTIMONY REGARDING DISCIPLINE BASED ON LACK OF RECORDS.

25            OKAY.  YOU ARE STILL UNDER OATH, SIR.

ALEX A.

11:00  1                    MR. MONTGOMERY.
       2          **MR. MONTGOMERY:**  YES, YOUR HONOR.  I APOLOGIZE.
       3  BY MR. MONTGOMERY:
       4  **Q.**   ALEX, CAN YOU HEAR ME OKAY?
       5  **A.**   YES, SIR.
       6  **Q.**   OKAY.  I WAS ABOUT TO ASK YOU SOME QUESTIONS ABOUT YOUR
       7  DISCIPLINARY HISTORY.  I THINK WE ESTABLISHED THAT YOU TALKED
       8  TO MS. ROSENBLOOM A LITTLE BIT GENERALLY ABOUT YOUR
       9  DISCIPLINARY HISTORY, BUT I WANT TO ASK YOU SOME MORE DETAILED
      10  QUESTIONS.
      11          WHAT HAPPENS WHEN YOU VIOLATE THE RULES AT
      12  BRIDGE CITY?
      13  **A.**   YOU GET A CODE OF CONDUCT.
      14  **Q.**   A CODE OF CONDUCT VIOLATION REPORT?
      15  **A.**   YES, SIR.
      16  **Q.**   DO THEY GIVE YOU A COPY OF THOSE WHEN THEY GIVE THEM TO
      17  YOU?
      18  **A.**   YES, SIR.
      19  **Q.**   WHAT DO YOU DO WITH THEM WHEN YOU GET THEM?
      20  **A.**   YOU KEEP THEM.  IF YOU KNEW YOU AIN'T DO IT, YOU COULD
      21  WRITE AN APPEAL ON IT.
      22  **Q.**   OKAY.  I JUST WANT TO ASK YOU ABOUT SOME OF THE THINGS
      23  YOU'VE BEEN WRITTEN UP FOR.  OKAY?
      24          HAVE YOU BEEN WRITTEN UP FOR DESTROYING PROPERTY,
      25  LIKE BREAKING WINDOWS WITH A FIRE EXTINGUISHER AND JAMMING THE

ALEX A.

11:01 1  UNIT DOORS?

2  **A.**   YEAH, I BEEN WRITTEN UP, BUT I AIN'T DO IT.  SO I WROTE AN

3  APPEAL ON IT.

4  **Q.**   OKAY.

5           **THE COURT:**  I DIDN'T UNDERSTAND WHAT YOU SAID.

6               YOU HAD BEEN WRITTEN UP.  YOU DIDN'T DO IT.

7  WHAT WAS THE LAST SENTENCE?

8           **THE WITNESS:**  I WROTE AN APPEAL ON IT.

9           **THE COURT:**  YOU WROTE AN APPEAL ON IT?

10           **THE WITNESS:**  YES, MA'AM.

11           **THE COURT:**  OKAY.  GO AHEAD.

12  **BY MR. MONTGOMERY:**

13  **Q.**   WAS THAT AROUND MAY OF 2022?

14  **A.**   YES, SIR.

15  **Q.**   SO YOU GOT WRITTEN UP IN MAY OF 2022 FOR PROPERTY

16  DESTRUCTION, BREAKING WINDOWS WITH A FIRE EXTINGUISHER, AND

17  JAMMING THE UNIT DOORS.  BUT IT'S YOUR TESTIMONY THAT EVEN

18  THOUGH YOU GOT WRITTEN UP, YOU DID NOT DO IT?

19  **A.**   YES, SIR.

20  **Q.**   DID YOU GET WRITTEN UP IN AUGUST OF 2022 WHEN -- FOR --

21  WHEN A SOCIAL WORKER ASKED HOW YOU WERE DOING, THE REPORT SAID

22  YOU "THREW LIQUID IN HER FACE, AND SAID 'GET THE F ON'"?

23  **A.**   YES, SIR.

24  **Q.**   YOU WERE WRITTEN UP FOR THAT?

25  **A.**   YES, SIR.

ALEX A.

11:02  1   Q.   DID YOU DO THAT?

2   A.   YES, SIR.

3   Q.   IN JULY OF 2022, WERE YOU WRITTEN UP FOR CLIMBING OVER THE

4   FACILITY FENCE INTO A NEIGHBORHOOD AND TAMPERING WITH A

5   SECURITY DEVICE?

6   A.   NO, SIR.

7   Q.   YOU WERE NOT WRITTEN UP FOR THAT?

8   A.   I WAS WRITTEN UP, BUT I AIN'T GO IN NO NEIGHBORHOOD.

9   Q.   DID YOU JUMP THE FENCE?

10   A.   NO, SIR.  I AIN'T LEAVE CAMPUS.

11   Q.   WHAT DID YOU DO?

12   A.   I WENT BY THE FENCE, BUT I AIN'T LEAVE CAMPUS.

13   Q.   OKAY.  BUT YOU WERE WRITTEN UP FOR IT?

14   A.   YES, SIR.

15   Q.   FOR CLIMBING OVER THE FENCE INTO A NEIGHBORHOOD?  THAT'S

16   WHAT THE WRITE-UP -- THAT'S WHAT THE RULE VIOLATION REPORT

17   SAID?

18   A.   YES, SIR.

19   Q.   OR THE CODE OF CONDUCT REPORT, VIOLATION REPORT?

20   A.   YES, SIR.

21   Q.   THAT'S WHAT THEY ARE CALLED.  RIGHT?

22   A.   YES, SIR.

23   Q.   IN JULY OF 2022, WERE YOU WRITTEN UP FOR PUSHING A STAFF

24   MEMBER ONTO HIS BACK TO FORCE YOUR WAY OUT OF A CLASSROOM?

25   A.   YES, SIR.

ALEX A.

11:03 1  **Q.**  DID YOU DO THAT?

2  **A.**  NO, SIR.

3  **Q.**  BUT YOU WERE WRITTEN UP FOR IT?

4  **A.**  YES, SIR.

5  **Q.**  IN JULY OF 2022, WERE YOU WRITTEN UP A COUPLE OF TIMES FOR

6  EXPOSING YOURSELF?

7  **A.**  NO, SIR.

8  **Q.**  HAVE YOU EVER BEEN WRITTEN UP FOR ANY KIND OF SEXUAL

9  STUFF?

10  **A.**  YES, SIR.

11  **Q.**  HAVE YOU BEEN WRITTEN UP FOR MASTURBATING TOWARD FEMALE

12  STAFF?

13  **A.**  YES, SIR.

14  **Q.**  AND FOR THREATENING TO HIT THE FEMALE STAFF?

15  **A.**  NO, SIR.  I DON'T KNOW NOTHING ABOUT THAT.

16  **Q.**  YOU DON'T KNOW IF YOU WERE WRITTEN UP FOR THREATENING TO

17  HIT THE FEMALE STAFF?

18  **A.**  NO, SIR.

19  **Q.**  BUT YOU WERE WRITTEN UP TWICE FOR MASTURBATING TO THE

20  FEMALES, TOWARD FEMALE STAFF?

21  **A.**  YES, SIR.  BUT I AIN'T DO NONE OF THAT.

22  **Q.**  OKAY.  AND, LOOK, I'M NOT HERE TO RE-LITIGATE YOUR RULE

23  VIOLATION REPORTS.  I'M JUST GOING OVER WHAT YOU WERE WRITTEN

24  UP FOR.  OKAY?

25  **A.**  YES, SIR.

ALEX A.

11:03 1   **Q.**   OKAY.  ON AUGUST OF 2022, WERE YOU INVOLVED IN A -- OR

2   WRITTEN UP FOR BEING INVOLVED IN A YOUTH-ON-YOUTH ASSAULT FOR

3   STRIKING ANOTHER YOUTH MULTIPLE TIMES?

4   **A.**   YES, SIR.

5   **Q.**   DID YOU DO THAT?

6   **A.**   YES, SIR.

7   **Q.**   AND IN JUNE OF 2022, WERE YOU WRITTEN UP -- OR WERE YOU

8   INVOLVED IN, NOT WRITTEN UP FOR, BUT WERE YOU INVOLVED IN A

9   KIND OF A DORM VERSUS DORM CAMPUS RIOT THAT WENT ON?

10   **A.**   YES, SIR.

11   **Q.**   AND WHAT WAS YOUR INVOLVEMENT IN THAT?

12   **A.**   THAT WAS IN SWANSON-MONROE.

13   **Q.**   AND YOU WERE INVOLVED IN IT?

14   **A.**   YES, SIR.

15   **Q.**   DID YOU ASSAULT A STAFF MEMBER?

16   **A.**   YES, SIR.

17   **Q.**   DID YOU KNOCK HIM UNCONSCIOUS?

18   **A.**   YES, SIR.

19   **Q.**   WITH YOUR FIST?

20   **A.**   YES, SIR.

21   **Q.**   CLOSED FISTED?

22   **A.**   YES, SIR.

23   **Q.**   HOW MANY TIMES DID YOU HIT HIM?

24   **A.**   ONE.

25   **Q.**   WHY DID YOU HIT THE STAFF MEMBER?

ALEX A.

11:04  1   **A.**  BECAUSE HE WAS IN MY WAY.

2   **Q.**  DID YOU DESTROY PROPERTY, SOME PROPERTY IN THAT RIOT?

3   **A.**  NO, SIR.

4   **Q.**  DID YOU ATTEMPT TO BARRICADE THE DOOR?

5   **A.**  NO, SIR.

6   **Q.**  DO YOU HAVE ANY OTHER INVOLVEMENT, OTHER THAN KNOCKING THE

7   STAFF MEMBER UNCONSCIOUS?

8   **A.**  FIGHTING ANOTHER DORM.

9   **Q.**  FIGHTING WITH THE OTHER YOUTH IN A DIFFERENT DORM?

10   **A.**  YES, SIR.

11   **Q.**  HAVE YOU BEEN WRITTEN UP FOR OTHER THINGS IN ADDITION TO

12   THESE?

13   **A.**  NO, SIR.

14   **Q.**  NO OR NOT THAT YOU ARE AWARE?

15   **A.**  NO, SIR, I AIN'T BEEN WRITTEN UP FOR IT.

16   **Q.**  YOU MENTIONED IN YOUR EARLIER TESTIMONY WHEN YOU WERE

17   SPEAKING WITH MS. ROSENBLOOM THAT YOU RECEIVE SERVICES FOR

18   ANGER MANAGEMENT?

19   **A.**  YES, SIR.

20   **Q.**  TELL ME ABOUT THAT.

21   **A.**  I GO SEE MY SOCIAL WORKER, MR. LABORDE.  WE DO SESSIONS

22   AND STUFF.  HE HELP ME WITH MY COPING SKILLS, FOR ME TO CALM

23   DOWN AND STUFF.

24   **Q.**  WHY DO YOU NEED ANGER MANAGEMENT?

25   **A.**  'CAUSE I GET ANGRY AND JUST WANT TO DO BAD STUFF.

ALEX A.

11:06 1  Q.   WHAT KIND OF --

2  A.   SO I GO TALK TO HIM FOR SESSIONS AND, LIKE, WE TALK ABOUT

3  SOME STUFF; IT MAKE ME CALM DOWN.

4  Q.   OKAY.  WHAT ARE SOME THINGS THAT CAN TRIGGER YOU AND MAKE

5  YOU ANGRY?

6  A.   LIKE HOLLERING AT ME, TELLING ME TO DO SOMETHING, THAT

7  TYPE OF STUFF.

8  Q.   TELLING YOU TO DO SOMETHING YOU DON'T WANT TO DO?

9  A.   YES, SIR.

10  Q.   LIKE WHAT KIND OF THINGS?

11  A.   LIKE GET OUT THE BATHROOM TWO AT A TIME, BUT I BE RAPPING

12  IN THE BATHROOM, WRITING LYRICS, THAT MAKE ME MAD.

13  Q.   THAT'S A GOOD EXAMPLE.

14        WHAT ELSE CAN YOU THINK OF?  ANYTHING?

15  A.   GET OUT OF MY BED.

16  Q.   SOMEBODY TELLS YOU TO GET OFF YOUR BED, THAT WILL MAKE YOU

17  ANGRY?

18  A.   YES, SIR.

19  Q.   WOULD STAFF TELL YOU THINGS LIKE THAT?

20  A.   YES, SIR.

21  Q.   AND THAT MAKES YOU GET ANGRY AT THE STAFF?

22  A.   YES, SIR.

23  Q.   WHAT ABOUT DO YOU GET ANGRY AT THE OTHER YOUTH SOMETIMES?

24  A.   YES, SIR.

25  Q.   WHAT ARE SOME THINGS THAT MAKE YOU ANGRY AT THE OTHER

**ALEX A.**

11:07 1   YOUTH?

2   **A.**   LIKE WHEN I'M ON THE PHONE, THEM TAPPING THE -- TAPPING

3   THE BUTTONS AND STUFF.

4   **Q.**   TAPPING THE BUTTONS ON THE PHONE?

5   **A.**   YES, SIR.

6   **Q.**   JUST TO BE ANNOYING, THAT KIND OF THING?

7   **A.**   YES, SIR.

8   **Q.**   WHAT ELSE CAN MAKE YOU ANGRY AT THE OTHER YOUTH?

9   **A.**   THEM DROPPING LIQUID ON MY BED.

10   **Q.**   JUST STUFF THAT ANNOYS YOU, WALKING AROUND STUFF WHEN

11   YOU'RE LIVING WITH OTHER PEOPLE?

12   **A.**   YES, SIR.

13   **Q.**   AND YOU SAID WHEN YOU GET ANGRY -- ONE OF THE REASONS YOU

14   HAVE ANGER MANAGEMENT WITH MR. LABORDE IS WHEN YOU GET ANGRY,

15   IT MAKES YOU WANT TO DO BAD THINGS?

16   **A.**   YES, SIR.

17   **Q.**   WHAT KIND OF THINGS?

18   **A.**   LIKE SOME BAD THINGS THAT CAN GET ME LIFE.

19   **Q.**   LIKE WHAT?

20   **A.**   LIKE KILL.

21   **Q.**   WHEN YOU GET ANGRY, IT MAKES YOU WANT TO KILL?

22   **A.**   YES, SIR.

23   **Q.**   IS THAT WHY YOU SOMETIMES GET AGGRESSIVE WHEN YOU GET

24   ANGRY?

25   **A.**   YES, SIR.

ALEX A.

11:08  1   **Q.**   DO YOU GET AGGRESSIVE WHEN YOU GET ANGRY?

2   **A.**   YES, SIR.

3   **Q.**   WHAT ARE SOME ACTS OF AGGRESSION THAT YOU MIGHT ENTER INTO

4   IF YOU GOT ANGRY?

5          **MS. ROSENBLOOM:**  OBJECTION, YOUR HONOR.  THIS CALLS

6   FOR SPECULATION.

7          **MR. MONTGOMERY:**  I'LL WITHDRAW IT.

8   **BY MR. MONTGOMERY:**

9   **Q.**   WHAT TYPES OF AGGRESSIVE BEHAVIOR HAVE YOU ENGAGED IN WHEN

10  YOU GOT ANGRY IN THE FACILITY?

11  **A.**   CHOKE SOMEBODY OFF.

12  **Q.**   DID YOU CHOKE OUT ANOTHER YOUTH?

13  **A.**   YES, SIR.

14  **Q.**   THAT WAS A COUPLE WEEKS AGO, WASN'T IT?

15  **A.**   YES, SIR.

16  **Q.**   HE WENT UNCONSCIOUS WHEN YOU CHOKED HIM?

17  **A.**   NO, SIR.  WE JUST BOTH WENT TO THE INFIRMARY, GOT AN A&I,

18  AND I WENT TO BI.

19  **Q.**   WHAT OTHER ACTS OF AGGRESSION HAVE YOU ENTERED INTO WHEN

20  YOU GOT ANGRY AT SOMEBODY?

21  **A.**   BROKE SOMEBODY'S NOSE.

22  **Q.**   DO YOU THINK YOU MIGHT KILL SOMEBODY IF YOU GOT ANGRY

23  ENOUGH?

24  **A.**   YES, SIR.

25  **Q.**   YOU DO?

ALEX A.

11:09  1   **A.**   (NODDED HEAD UP AND DOWN.)

2   **Q.**   YOU THINK YOU MIGHT KILL A STAFF MEMBER IF YOU GOT ANGRY

3   ENOUGH?

4   **A.**   YES, SIR.

5   **Q.**   YOU THINK YOU MIGHT KILL ANOTHER YOUTH IF --

6            **MS. ROSENBLOOM:**  OBJECTION, YOUR HONOR.

7   **BY MR. MONTGOMERY:**

8   **Q.**   -- YOU GOT ANGRY ENOUGH?

9            **MS. ROSENBLOOM:**  I THINK THE POINT IS MADE.  AND THIS

10   REALLY CALLS FOR SPECULATION --

11            **THE COURT:**  SUSTAINED.

12            **MS. ROSENBLOOM:**  -- ABOUT WHAT SOMEBODY MIGHT THINK,

13   MIGHT DO.

14            **THE COURT:**  SUSTAINED.

15   **BY MR. MONTGOMERY:**

16   **Q.**   THESE ANGER MANAGEMENT SESSIONS WITH MR. LABORDE, YOU SAID

17   YOU TALK AND GET YOURSELF CALM.  IS THAT WHAT YOU TOLD ME?

18   **A.**   YES, SIR.

19   **Q.**   HOW IS THAT DONE?  WHAT KIND OF THINGS DO YOU TALK ABOUT?

20   WHAT STRATEGIES DOES HE USE TO CALM YOU DOWN?

21   **A.**   COPING SKILLS LIKE STARING AT SOMETHING, TAKING DEEP

22   BREATHS.

23   **Q.**   AND ARE THE ANGER MANAGEMENT SESSIONS HELPFUL TO YOU?

24   **A.**   YES, SIR.

25   **Q.**   DO YOU THINK THAT MORE OF THAT KIND OF THING COULD BENEFIT

ALEX A.

11:09 1    YOU?

2    **A.**   YES, SIR.

3    **Q.**   DO YOU WANT TO BE ABLE TO CONTROL YOUR ANGRY BEHAVIOR?

4    **A.**   YES, SIR.

5    **Q.**   DID YOU FEEL LIKE YOU CAN CONTROL IT NOW?

6    **A.**   YES, SIR, BY WALKING AWAY.

7    **Q.**   BY WALKING AWAY?  THAT'S ONE OF THE --

8    **A.**   BEING A BIGGER PERSON, A BETTER PERSON.

9    **Q.**   IS THAT ONE OF THE THINGS YOU TALK ABOUT IN ANGER

10    MANAGEMENT?

11    **A.**   YES, SIR.

12    **Q.**   HOW TO WALK AWAY AND BE THE BIGGER PERSON?

13    **A.**   YES, SIR.

14    **Q.**   BUT DO YOU FEEL LIKE INCREASED ANGER MANAGEMENT SERVICES,

15    THAT WOULD BE A HELPFUL THING FOR YOU IF YOU HAD ACCESS TO

16    THAT?

17    **A.**   YES, SIR.

18    **Q.**   DID YOU MEET WITH A PSYCHIATRIST RECENTLY OR A MENTAL

19    HEALTH SPECIALIST OVER ZOOM?

20    **A.**   YES, SIR.

21    **Q.**   WAS THAT -- WAS HER NAME MONICA STEVENS, MS. STEVENS?

22    **A.**   YES, SIR.

23    **Q.**   WHEN DID THAT OCCUR?

24    **A.**   LAST WEEK.

25    **Q.**   AND IT WAS OVER ZOOM?  I APOLOGIZE IF I ASKED YOU THAT.

ALEX A.

11:10 1     A.   YES, SIR.

2     Q.   IT WAS?

3     A.   YES, SIR.

4     Q.   HOW LONG DID YOU MEET WITH MS. STEVENS?

5     A.   LIKE 30 MINUTES.

6     Q.   WHAT WAS YOUR UNDERSTANDING OF WHY YOU WERE MEETING WITH

7     MS. STEVENS?

8     A.   SHE WAS TALKING ABOUT THIS AND MY MEDICINE AND STUFF.

9     Q.   I'M SORRY.  CAN YOU REPEAT THAT?

10    A.   SHE WAS TALKING ABOUT THIS AND MY MEDICINE AND STUFF.

11    Q.   TALKING ABOUT "THIS," MEANING THIS CASE?

12    A.   THIS CASE, YES, SIR.

13    Q.   OKAY.  SO TELL ME SPECIFICALLY WHAT YOU TALKED ABOUT WITH

14    MS. STEVENS ABOUT THE CASE.  WHAT DID --

15         MS. ROSENBLOOM:  OBJECTION, YOUR HONOR, IF IT CALLS

16    FOR HEARSAY ABOUT WHAT DR. STEVENS MIGHT HAVE SAID.

17         THE COURT:  WELL, I THINK HIS QUESTION WAS WHAT DID

18    HE TELL DR. STEVENS.

19         MS. ROSENBLOOM:  OKAY.  I HEARD "TALK ABOUT."

20         THE COURT:  ALL RIGHT.

21         MS. ROSENBLOOM:  THAT SOUNDED LIKE A CONVERSATION.

22         THE COURT:  REPHRASE YOUR QUESTION, PLEASE, JUST TO

23    MAKE SURE WE UNDERSTAND WHAT QUESTION IS ON THE FLOOR.

24    BY MR. MONTGOMERY:

25    Q.   WHAT DID YOU TELL DR. STEVENS?

**ALEX A.**

11:11 1   **A.**   IF SHE KNEW WHEN WE WAS GETTING MOVED TO ANGOLA.

2   **Q.**   YOU ASKED HER THAT?

3   **A.**   YES, SIR.

4   **Q.**   DID SHE KNOW?

5   **A.**   SHE LOOKED IT UP FOR ME.

6   **Q.**   LOOKED IT UP.  WHERE?

7   **A.**   ON GOOGLE.  BUT SHE SAID THEY AIN'T HAVE NO FURTHER

8   NOTICE.

9   **Q.**   DID MS. STEVENS TELL YOU A DATE WHEN YOU WERE SUPPOSED TO

10   BE GOING TO ANGOLA?

11   **A.**   NO, SIR.

12   **Q.**   SHE DIDN'T KNOW A DATE?

13   **A.**   NO, SIR.

14   **Q.**   OKAY.  WHAT ELSE DID YOU TELL MS. STEVENS?

15   **A.**   WHAT I HEARD, THAT WE WAS SUPPOSED TO BE GETTING MOVED

16   SEPTEMBER 15TH.  THAT'S IT.

17   **Q.**   OKAY.  WELL, YOU TALKED FOR 30 MINUTES.

18         DID YOU TALK ABOUT ANYTHING ELSE RELATED TO THE CASE?

19   **A.**   NO, SIR.

20   **Q.**   DID YOU TALK --

21   **A.**   SHE ASKED ME HOW IT WAS GONNA BE AT ANGOLA, HOW I THOUGHT

22   IT WOULD'VE BEEN AT ANGOLA.  DO I THINK IT WAS GONNA HAVE LIKE

23   SCHOOL AND STUFF, WHAT YOU WERE ASKING ME.

24   **Q.**   OKAY.  SO LET'S TALK ABOUT THOSE QUESTIONS.

25         TELL ME WHAT QUESTIONS MS. STEVENS WAS ASKING YOU

**ALEX A.**

11:12 1    ABOUT ANGOLA.

2                **MS. ROSENBLOOM:**  OBJECTION, YOUR HONOR.  CALLS FOR

3    HEARSAY.

4                **MR. MONTGOMERY:**  IT'S NOT OFFERED TO PROVE THE TRUTH.

5    IT'S OFFERED TO DISCUSS HIS REACTION TO THAT.

6                **THE COURT:**  AND THE QUESTION IS:  WHAT DID MS.

7    STEVENS TELL HIM?

8                **MR. MONTGOMERY:**  THE QUESTION IS MS. STEVENS ASKED

9    HIM ABOUT WHAT HE THOUGHT IT WOULD BE LIKE AT ANGOLA.  IT GOES

10   TO HIS -- WHAT I'M TRYING TO ESTABLISH HERE IS HIS REACTION TO

11   THAT, THE EFFECT THOSE QUESTIONS WOULD HAVE HAD ON ALEX.

12               **THE COURT:**  SUSTAINED.  ASK HIM WHAT HIS REACTION

13   WAS.

14   **BY MR. MONTGOMERY:**

15   **Q.**   WHAT WAS YOUR REACTION TO MS. STEVENS' QUESTIONS ABOUT

16   ANGOLA?  HOW DID IT MAKE YOU FEEL TO TALK ABOUT THAT?

17   **A.**   IT MADE ME FEEL GOOD TO TALK WITH HER ABOUT IT, BUT GOING

18   OVER THERE MAKE ME FEEL A LITTLE DOWN.

19   **Q.**   WHAT DID YOU TELL MS. STEVENS WHEN SHE -- YOU JUST

20   TESTIFIED SHE ASKED YOU WHAT YOU THOUGHT IT WAS GOING TO BE

21   LIKE.  WHAT DID YOU TELL HER?

22   **A.**   WE SHOULDN'T GO OVER THERE.  WE DON'T DESERVE IT.

23   **Q.**   ANYTHING ELSE SPECIFIC THAT YOU CAN REMEMBER ABOUT YOUR

24   CONVERSATION WITH MS. STEVENS?

25   **A.**   YES, SIR.

ALEX A.

11:13 1    Q.    WHAT ELSE DO YOU REMEMBER?

2    A.    LIKE THE INMATES, WE DON'T NEED TO BE AROUND THEM, 'CAUSE

3    WE -- WE KNOW FOR SURE THAT THE INMATES RUN THE FACILITY.  AND

4    IT'S NO WAY WE COULD BE SEPARATED FROM THEM.

5    Q.    THAT'S YOUR BELIEF?

6    A.    YES, SIR.

7    Q.    DID YOU TELL MS. STEVENS ANYTHING ABOUT YOUR PRIOR MEDICAL

8    HISTORY?

9    A.    YES, SIR.

10   Q.    WHAT DID YOU TELL HER?

11   A.    SHE ASKED ME ABOUT MY MEDICINE.  I TOLD HER IT WAS HELPING

12   ME.

13   Q.    WHAT SPECIFICALLY DID YOU TELL HER ABOUT YOUR MEDICINE?

14   A.    WELL, AT FIRST I TOLD HER I WAS STRESSING, 'CAUSE SHE

15   ASKED ME ABOUT MY HAIR GETTING PULLED OUT, PULLING MY HAIR OUT.

16   I TOLD HER MY MEDICINE'S HELPING ME NOW.

17   Q.    AND WHICH MEDICINE IS THAT?

18   A.    PRAZOSIN.

19   Q.    DID SHE ASK YOU ANYTHING ELSE ABOUT YOUR MEDICAL HISTORY?

20   A.    NO, SIR.

21   Q.    DID SHE ASK YOU WHETHER YOU HAD ANY PRE-EXISTING

22   PSYCHIATRIC CONDITIONS?

23            MS. ROSENBLOOM:  OBJECTION, YOUR HONOR.  CALLS FOR

24   HEARSAY AGAIN:  "DID SHE ASK YOU."

25            THE COURT:  IT DOES CALL FOR HEARSAY.  SUSTAINED.

ALEX A.

11:14  1          **MR. MONTGOMERY:**  OKAY.  FAIR ENOUGH.  YOUR HONOR, I

2    DON'T HAVE ANYTHING FURTHER.

3              **THE COURT:**  REDIRECT?

4              **MS. ROSENBLOOM:**  YES, YOUR HONOR.

5                   **REDIRECT EXAMINATION**

6    BY MS. ROSENBLOOM:

7    **Q.**   YOU TALKED BEFORE ABOUT BEING IN THE LAMOD PROGRAM.

8    RIGHT?

9    **A.**   YES, MA'AM.

10   **Q.**   DO ALL THE KIDS IN LAMOD GET ANGER MANAGEMENT COUNSELING?

11   **A.**   YES, MA'AM.

12   **Q.**   IS THAT KIND OF PART OF THE PROGRAM?

13   **A.**   YES, MA'AM.

14   **Q.**   DO YOU KNOW ABOUT HOW MANY OF THE YOUNG PEOPLE IN YOUR

15   DORM ARE IN LAMOD?

16   **A.**   THE WHOLE DORM.  LIKE THE WHOLE CAMPUS IS LAMOD NOW.

17   **Q.**   OKAY.  SO EVERYBODY GETS THAT ANGER MANAGEMENT COUNSELING?

18   **A.**   YES, MA'AM.

19   **Q.**   OKAY.  WHEN YOU WERE AT -- YOU TALKED EARLIER IN RESPONSE

20   TO MR. MONTGOMERY, HE ASKED YOU ABOUT THE JUNE INCIDENT AT

21   SWANSON WITH THE DORMS FIGHTING EACH OTHER?

22   **A.**   YES, MA'AM.

23   **Q.**   WAS THERE -- IF YOU KNOW, WAS THE STAFF COMPLETELY STAFFED

24   UP AT THAT TIME, OR WERE THEY SHORT ON STAFF?

25   **A.**   OH, THEY HAD STAFF.

ALEX A.

11:15 1  Q.   UH-HUH.

2  A.   BUT WE WENT TO SCHOOL THREE AT A TIME WHILE THEY HAD TWO

3  FULL DORMS IN THE SCHOOL, AND THEY KICKED OUT ON US WHILE WE

4  WAS GOING.  SO WE JUST STARTED FIGHTING.

5  Q.   THE OTHER KIDS DID THAT, ATTACKED YOUR DORM?

6  A.   YES, MA'AM.

7  Q.   IS THAT WHAT YOU MEAN BY "KICKED OUT"?

8  A.   YES, MA'AM.

9  Q.   OKAY.  YOU TALKED -- YOU MENTIONED HOMICIDAL THOUGHTS

10 BEFORE.  THAT'S PRETTY SCARY.  HAVE YOU EVER PLANNED OR TRIED

11 TO KILL ANYBODY?

12 A.   NO, MA'AM.

13 Q.   IS JUST -- THIS IS THOUGHTS?

14 A.   YES, MA'AM.

15 Q.   AND WOULD YOU SAY THAT THE PLACE YOU'RE IN NOW IS A

16 PEACEFUL ENVIRONMENT?

17 A.   YES, MA'AM.

18 Q.   IS IT A STRESSFUL ENVIRONMENT?

19 A.   NO, MA'AM.

20 Q.   YOU'RE TAKING SOME MEDICATION TO HELP WITH STRESS.  RIGHT?

21 A.   YES, MA'AM.

22 Q.   OKAY.  AND MR. MONTGOMERY ASKED YOU BEFORE ABOUT WOULD YOU

23 BE CONCERNED IF YOU KNEW THIS OR THAT ABOUT ANGOLA OR HOW WOULD

24 YOU FEEL.  WOULD YOU BE CONCERNED IF YOU KNEW YOU -- IF YOU

25 THOUGHT YOU WOULDN'T GET ANY RECREATION OVER THERE?

ALEX A.

11:17 1   A.   YES, MA'AM.

2   Q.   WOULD YOU BE CONCERNED IF YOU KNEW IT WAS SURROUNDED BY A

3   HIGH FENCE WITH RAZOR WIRE?

4   A.   NO, MA'AM.

5   Q.   HOW WOULD YOU FEEL IF THEY TOLD YOU YOU WEREN'T GOING TO

6   GET THE SAME AMOUNT OF SCHOOLING AT ANGOLA?

7   A.   IN MY MIND I WOULD BE LIKE I'M GONNA BE FAILING.  I AIN'T

8   NEVER GONNA GET TO THE NEXT GRADE.

9   Q.   YEAH.

10   A.   'CAUSE I WANT TO FINISH SCHOOL.

11   Q.   YOU WANT TO FINISH SCHOOL?  YOU WANT TO FINISH HIGH

12   SCHOOL?

13   A.   YES, MA'AM.

14   Q.   OKAY.  HAVE ANY OF THE STAFF AT OJJ SHARED WITH YOU ANY

15   LIKE PICTURES OF THE CELLS THAT YOU'D BE IN AT ANGOLA?

16   A.   NO, MA'AM.  I JUST SEEN IT ON THE NEWS.  AND THE BEDS,

17   THEY SHOWED THE BEDS IN THE CELLS.  THEY CELLS ARE SLID OPEN

18   ALREADY.

19   Q.   WHAT DID THE BEDS LOOK LIKE ON THE NEWS?

20   A.   LIKE THEY HAD GREEN MATS ON EACH RACK.

21   Q.   WHAT DOES YOUR BED LOOK LIKE AT BRIDGE CITY?

22   A.   WE HAVE SHEETS AND COVERS AND MATS.

23   Q.   OKAY.  DO YOU HAVE -- ARE YOU IN A CELL WITH BARS AT

24   BRIDGE CITY?

25   A.   NO, MA'AM.

ALEX A.

11:18  1   **Q.**   OKAY.  WHAT DOES IT LOOK LIKE?  HOW DO YOU GET IN AND OUT

2   OF YOUR CELL?

3   **A.**   IT'S A DOOR.

4   **Q.**   OKAY.  DOES THE DOOR HAVE AN OPENING IN IT?

5   **A.**   YES, MA'AM.

6   **Q.**   CAN YOU SEE THROUGH IT?

7   **A.**   YES, MA'AM.

8   **Q.**   IS THERE A WINDOW IN THE ROOM WHERE YOU ARE?

9   **A.**   YES, MA'AM.

10   **Q.**   A WINDOW TO THE OUTSIDE?

11   **A.**   YES, MA'AM.

12   **Q.**   OKAY.  THANK YOU.

13         **MS. ROSENBLOOM:**  I HAVE NOTHING FURTHER.

14         **THE COURT:**  YOU MAY STEP DOWN, SIR.

15         **MR. MONTGOMERY:**  YOUR HONOR, SINCE ALEX WASN'T HERE

16   TO HEAR THE SEQUESTRATION ORDER, WE'D JUST ASK THAT HE BE

17   INSTRUCTED NOT TO DISCUSS HIS TESTIMONY WITH ANYONE, INCLUDING

18   HIS MOM, WHO I AM TOLD IS GOING TO TESTIFY TOMORROW.

19         **MS. ROSENBLOOM:**  YOUR HONOR, HE'S PROCEEDING AS A

20   MINOR THROUGH HIS MOM AS GUARDIAN.  I BELIEVE SHE COUNTS AS A

21   PARTY UNDER RULE 17.

22         **THE COURT:**  COUNSEL, IT SOUNDS RIGHT TO ME.

23         DO YOU HAVE ANY LAW THAT WOULD SUGGEST THAT HE

24   CAN'T SPEAK TO HIS MOM WHO IS ACTUALLY THE PARTY THAT'S

25   PROCEEDING ON HIS BEHALF?

11:19  1        **MR. MONTGOMERY:**  I DON'T.  WE MIGHT LIKE THE

  2  OPPORTUNITY TO LOOK INTO THAT.  BUT I GUESS I DIDN'T THINK

  3  ABOUT IT FROM THAT PERSPECTIVE.  IF SHE'S A PARTY, THEN

  4  SEQUESTRATION WOULD NOT APPLY.  SO...

  5        **THE COURT:**  YES, THE MOTION IS OVERRULED.

  6        ALTHOUGH, ALEX, YOU CAN -- YOU SHOULDN'T TALK TO

  7  ANY OTHER WITNESSES ABOUT THIS CASE.  OKAY?

  8        **THE WITNESS:**  YES, MA'AM.

  9        **THE COURT:**  ANY OTHER YOUTH UNTIL AFTER IT'S OVER.

 10  DO YOU UNDERSTAND?

 11        **THE WITNESS:**  YES, MA'AM.

 12        **THE COURT:**  ALL RIGHT.  NEXT WITNESS.

 13        **MS. GREGG:**  GOOD MORNING, YOUR HONOR.

 14        I'M TAMMIE GREGG FOR THE PLAINTIFF.

 15        **THE COURT:**  MICROPHONE.

 16        **THE DEPUTY CLERK:**  THANK YOU.

 17        **THE COURT:**  I'M SORRY.  I DIDN'T HEAR THE NAME.

 18        **MS. GREGG:**  CERTAINLY.  TAMMIE GREGG FOR THE

 19  PLAINTIFF, YOUR HONOR.

 20        **THE COURT:**  AND HOW DO YOU SPELL YOUR LAST NAME,

 21  MA'AM?

 22        **MS. GREGG:**  G-R-E-G-G, YOUR HONOR.

 23        **THE COURT:**  OKAY.  ALL RIGHT.  WHO ARE YOU CALLING,

 24  PLEASE, MS. GREGG?

 25        **MS. GREGG:**  YOUR HONOR, I'M CALLING DR. MONICA

11:20 1  STEVENS.

2          **THE COURT:**  OKAY.  STAND RIGHT HERE, MA'AM.  SHE IS

3  GOING TO SWEAR YOU IN.

4              THE COURTROOM DOESN'T NEED TO BE SEALED AT THIS

5  POINT, DOES IT, COUNSEL?

6          **MR. MONTGOMERY:**  NOT FROM OUR PERSPECTIVE,

7  YOUR HONOR.

8          **THE COURT:**  MS. GREGG?

9          **MS. GREGG:**  NO, YOUR HONOR.

10          **THE COURT:**  ALL RIGHT.  WE CAN UNSEAL THE COURTROOM

11  AND RETURN TO THE OPEN RECORD.

12                  **MONICA STEVENS, PH.D.,**

13  **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

14          **THE DEPUTY CLERK:**  WOULD YOU STATE YOUR NAME AND

15  SPELL IT FOR THE RECORD, PLEASE.

16          **THE WITNESS:**  MONICA STEVENS.  M-O-N-I-C-A,

17  S-T-E-V-E-N-S.

18          **MS. GREGG:**  YOUR HONOR, FOR THE PURPOSES OF THE

19  RECORD, THE PARTIES HAVE STIPULATED TO THIS WITNESS'

20  QUALIFICATIONS AS A CLINICAL PSYCHOLOGIST WITH A SPECIALTY IN

21  CHILD CLINICAL PSYCHOLOGY AND TRAUMA.

22          **THE COURT:**  SO THE TENDER IS IN THE FIELD OF CHILD

23  PSYCHOLOGY AND TRAUMA?

24          **MS. GREGG:**  YES, MA'AM.

25          **THE COURT:**  IF THERE IS NO OBJECTION TO THE TENDER,

**MONICA STEVENS, PH.D.**

11:21 1 THE COURT WILL HEAR OPINION TESTIMONY FROM DR. STEVENS IN THE

2 FIELDS OF CHILD PSYCHOLOGY AND TRAUMA.

3   **MS. GREGG:**  THANK YOU, YOUR HONOR.

4   **MR. MONTGOMERY:**  NO OBJECTION.

5     **DIRECT EXAMINATION**

6 BY MS. GREGG:

7 **Q.** SO, DR. STEVENS, WE'RE GOING TO TALK A LITTLE BIT ABOUT

8 YOUR BACKGROUND BUT -- SORRY.

9   **THE COURT:**  MAYBE YOU CAN -- I DON'T KNOW -- MOVE

10 YOUR STUFF.

11   **MS. GREGG:**  YES.

12   **THE COURT:**  BUT I'D LIKE TO BE ABLE TO HEAR YOU AND

13 THE COURT REPORTER DEFINITELY NEEDS TO HEAR YOU.

14   **MS. GREGG:**  I'LL SPEAK LOUDER, YOUR HONOR.

15    HOW'S THIS?

16   **THE COURT:**  BETTER.

17   **MS. GREGG:**  OKAY.  THANK YOU.

18 BY MS. GREGG:

19 **Q.** WE'RE GOING TO TALK A LITTLE BIT ABOUT YOUR BACKGROUND

20 TODAY BUT NOT GET INTO A GREAT DEAL OF DETAIL BECAUSE THE

21 PARTIES HAVE STIPULATED AS YOU JUST HEARD.

22   SO, DR. STEVENS, CAN YOU PLEASE TELL US ABOUT YOUR

23 CURRENT POSITION?  WHAT IS IT?

24 **A.** SURE.  SINCE 2013, I'VE BEEN APPOINTED AS ASSISTANT

25 PROFESSOR OF PSYCHIATRY AT THE UNIVERSITY -- AT TULANE

**MONICA STEVENS, PH.D.**

11:22  1   UNIVERSITY SCHOOL OF MEDICINE.  AND IN THAT CAPACITY I ALSO

2   HAVE SERVED AND DO SERVE IN MULTIPLE DIFFERENT AREAS.

3            RIGHT NOW I AM SERVING AS THE STAFF PSYCHOLOGIST FOR

4   THE TRAUMA AND GRIEF CENTER AT CHILDREN'S HOSPITAL IN NEW

5   ORLEANS.  I ALSO WORK A NUMBER OF CONTRACTS, AS WE OFTEN DO.

6   ANOTHER IS TO DO PRIVATE PRACTICE IN THE COMMUNITY.  AND I WORK

7   ON MULTIPLE RESEARCH PROJECTS AND TEACHING PROJECTS.

8   **Q.**   THANK YOU.

9            DO YOU SERVE ANY ADJUNCT POSITIONS?

10  **A.**   YES.  I HAVE AN ADJUNCT PROFESSORSHIP AT THE TULANE

11  UNIVERSITY SCHOOL OF PROFESSIONAL ADVANCEMENT.

12  **Q.**   AND DO YOU HAVE ANY SUPERVISORY RESPONSIBILITIES IN EITHER

13  OF THOSE CAPACITIES?

14  **A.**   YES.  I CURRENTLY SUPERVISE PSYCHIATRY FELLOWS WHO ARE

15  ALSO WORKING AT CHILDREN'S HOSPITAL.

16  **Q.**   AND WHAT ASPECTS OF PSYCHOLOGY DO YOU TRAIN ON

17  SPECIFICALLY?

18  **A.**   MY AREAS OF SPECIALTY, AS YOU SAID, ARE IN CHILD

19  PSYCHOLOGY.  BUT MORE SPECIFICALLY, THE IMPACT OF TRAUMA IN

20  ADVERSE EXPERIENCES ON CHILDREN AND FAMILIES AS WELL AS THE

21  ROOT CAUSES, I WOULD SAY, OF DISRUPTIVE BEHAVIORS.

22           SO THE KINDS OF THINGS THAT MAKE KIDS ACT OUT, I'M

23  INTERESTED IN WHAT'S UNDERNEATH THAT SURFACE.

24  **Q.**   THANK YOU.

25           AND COULD YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL

**MONICA STEVENS, PH.D.**

11:23 1   BACKGROUND?

2   **A.**   SURE.  I GOT MY BACHELOR'S, MY B.S., AT THE UNIVERSITY OF

3   SOUTHERN MISSISSIPPI IN PSYCHOLOGY.  I WENT ON TO THE

4   UNIVERSITY OF FLORIDA WHERE I GOT MY MASTER'S IN SCIENCE AND MY

5   PH.D. IN CLINICAL PSYCHOLOGY.  I THEN WENT ON TO DO MY

6   POST-GRADUATE TRAINING AT TULANE UNIVERSITY.

7         SO I COMPLETED TWO AND A HALF YEARS OF THAT UNDER

8   SUPERVISION AND HAVE SINCE BEEN LICENSED BY THE STATE OF

9   LOUISIANA TO PRACTICE PSYCHOLOGY.

10   **Q.**   THANK YOU.

11         AND HOW LONG IS THAT -- HAVE YOU BEEN LICENSED BY THE

12   STATE OF LOUISIANA?

13   **A.**   WHENEVER 2013 WAS, IT WAS THAT LONG AGO.

14   **Q.**   THANK YOU.

15         AND WITH RESPECT TO YOUR CLINICAL SERVICES, HAVE YOU

16   PROVIDED ANY DIRECT SERVICES TO PATIENTS?

17   **A.**   YES.

18   **Q.**   CAN YOU SHARE A LITTLE BIT MORE ABOUT THAT?

19   **A.**   YES.  SO MY COMPETENCIES ARE IN THE LIFESPAN TECHNICALLY,

20   SO I CAN WORK WITH INDIVIDUALS AT ALL AGE RANGES.  THERE ARE

21   CERTAIN AREAS THAT I CLAIM THAT I AM NOT COMPETENT IN.  BUT

22   MOSTLY WHAT I DO IS PROVIDE SERVICES THROUGH -- FOR YOUTH

23   BETWEEN THE AGES OF ZERO AND 18 AND THEIR FAMILIES.

24         I GENERALLY STICK TO TREATING ANXIETY, DEPRESSION,

25   SO MOOD DISORDERS, DISRUPTIVE BEHAVIOR DISORDERS, AS I SPOKE

**MONICA STEVENS, PH.D.**

11:25  1    ABOUT, AND TRAUMA-RELATED DISORDERS.

2    **Q.**   AND WITH RESPECT TO TRAUMA-RELATED DISORDERS, HAVE YOU

3    BEEN AN INSTRUCTOR AT ANY POINT?

4    **A.**   I'M SORRY.  AN INSTRUCTOR?

5    **Q.**   YES.

6    **A.**   YES.

7    **Q.**   AND CAN YOU TELL US MORE ABOUT THAT AND WHEN?

8    **A.**   SURE.  WELL, EACH YEAR AS A PART OF MY FACULTY DUTIES, I

9    TEACH A NUMBER OF CLASSES, BOTH AT THE POST-GRADUATE LEVEL, THE

10   GRADUATE STUDENT LEVEL, THE UNDERGRADUATE STUDENT LEVEL, AND

11   THE MEDICAL STUDENT LEVEL, ALL OF WHICH AS A PART OF OUR CORE

12   CURRICULUM IN MY DEPARTMENT HAVE TO BE INFUSED WITH

13   TRAUMA-RELATED INFORMATION, TRAUMA-INFORMED TRAINING.  SO EVEN

14   IF I AM TEACHING ABOUT SOMETHING LIKE PARENTING YOUNG CHILDREN

15   WITH DISRUPTIVE BEHAVIORS, WE ALWAYS INCLUDE A PORTION OF THAT

16   TRAINING THAT HAS TO DO WITH THE LENS OF ADVERSE CHILDHOOD

17   EXPERIENCES AND TRAUMA-RELATED ISSUES THAT MAY BE CONTRIBUTING.

18   **Q.**   CAN YOU EXPLAIN TO US WHAT YOU MEAN BY "ADVERSE CHILDHOOD

19   EXPERIENCES" BRIEFLY?

20   **A.**   BRIEFLY.  ADVERSE CHILDHOOD EXPERIENCES, IN SUM, ARE BAD

21   THINGS THAT HAPPEN TO US WHEN WE'RE BELOW THE AGE OF 18.  SOME

22   EXAMPLES WOULD BE PARENTAL INCARCERATION, WITNESSING VIOLENCE,

23   HAVING A PARENT THAT HAS A SUBSTANCE ABUSE ISSUE.  THOSE ARE

24   JUST A FEW EXAMPLES.

25            WHAT WE KNOW FOR A PRETTY GOOD WHILE NOW IN MY FIELD,

**MONICA STEVENS, PH.D.**

11:26  1    THAT THE MORE EXPERIENCES YOU HAVE, THESE ADVERSE EXPERIENCES,

2    THE MORE LIKELY YOU ARE TO HAVE A HOST OF MENTAL AND PHYSICAL

3    HEALTH PROBLEMS LATER IN LIFE.

4            WE ARE ALSO NOW UNDERSTANDING THAT THIS HAS A VERY

5    BIG BEARING ON THIS RELATIVELY NEW FIELD OF WHAT WE CALL

6    EPIGENETICS, SO THAT THE INTERPLAY BETWEEN NATURE AND NURTURE

7    IS A LITTLE MORE COMPLICATED THAN WE USED TO THINK.  ADVERSE

8    CHILDHOOD EXPERIENCES ACTUALLY CHANGES OUR DNA.  AND OUR DNA

9    CHANGES OUR EXPERIENCES.

10            I DON'T KNOW IF THAT WAS BRIEF ENOUGH.

11   **Q.**   THANK YOU.

12            AND HAVE YOU HAD ANY OCCASION TO WRITE ABOUT ADVERSE

13   CHILDHOOD EXPERIENCES ON YOUTH OR -- ON YOUTH?

14   **A.**   YES.

15   **Q.**   GIVE US A LITTLE BIT MORE ABOUT THAT, PLEASE.  HOW MANY

16   TIMES HAVE YOU DONE THAT, IF YOU CAN RECALL?

17   **A.**   GOSH, I WOULD NEED MY C.V.  BUT AGAIN, I REALLY DON'T

18   DISTINGUISH THE EXPERIENCE OF ADVERSE CHILDHOOD EXPERIENCES OR

19   TRAUMA OR STRESSORS FROM ANY OTHER DOMAIN OF CHILD PSYCHOLOGY

20   BECAUSE IT IS VERY INTEGRAL TO WHO WE ARE AS PEOPLE.  SO FOR

21   ANYTHING I'VE WRITTEN, IT WOULD HAVE A PIECE OF THAT IN IT AT

22   LEAST.

23   **Q.**   SO YOU'VE WRITTEN ON ALL OF THOSE SUBJECTS, IS WHAT YOU'RE

24   SAYING?

25   **A.**   CORRECT.

**MONICA STEVENS, PH.D.**

11:27 1   **Q.**   THANK YOU.

     2        HAVE YOU HAD AN OPPORTUNITY TO TESTIFY IN ANY CASES

     3   WITH RESPECT TO YOUR SPECIALTY?

     4   **A.**   WHEN I WAS A POST-DOCTORAL FELLOW, I WAS DEEMED AN EXPERT

     5   WITNESS IN A CASE AROUND CHILD WELFARE IN JEFFERSON PARISH.

     6        AND LAST YEAR I TESTIFIED BEFORE THE HOUSE REGARDING

     7   THE SOLITARY CONFINEMENT BILL.  THAT WAS JUST VOLUNTARY,

     8   THOUGH.

     9   **Q.**   THANK YOU.

   10   **A.**   UH-HUH.

   11   **Q.**   HAVE YOU EVER HAD THE OCCASION TO WORK WITH YOUTH WHO ARE

   12   INVOLVED IN THE JUVENILE JUSTICE SYSTEM?

   13   **A.**   YES.

   14   **Q.**   CAN YOU TELL US A BIT MORE ABOUT THAT?

   15   **A.**   CERTAINLY.  THE PLACES WHERE I'VE ENCOUNTERED YOUTH

   16   INVOLVED THE MOST WOULD BE AS A STAFF PSYCHOLOGIST AT AN ACUTE

   17   ADOLESCENT UNIT IN ST. TAMMANY PARISH AND ALSO AS THE CLINICAL

   18   DIRECTOR FOR THE CENTER FOR RESILIENCE, WHICH I HELPED FOUND IN

   19   2015, AND STAYED WITH FOR SEVEN YEARS.

   20        SO JUST LAST YEAR BEFORE JOINING THE TRAUMA AND GRIEF

   21   CENTER.  IN THAT CAPACITY I'VE SEEN KIDS ON THEIR -- AT RISK

   22   FOR INVOLVEMENT ON THEIR WAY INTO THE SYSTEM IN TERMS OF LIKE

   23   PENDING CHARGES AND CERTAINLY KIDS THAT HAVE COME BACK.

   24        SO PARTICULARLY AT THE CENTER FOR RESILIENCE, WHICH

   25   BY THE WAY IS A PSYCHIATRIC DAY TREATMENT PROGRAM, THE ONLY ONE

**MONICA STEVENS, PH.D.**

11:29  1    IN LOUISIANA, IS OFTEN USED IN NEW ORLEANS AND ORLEANS PARISH

     2    SPECIFICALLY AS A STEP-DOWN FROM THE JUVENILE JUSTICE FACILITY.

     3         SO I'VE SEEN KIDS ON BOTH SIDES, BUT NOT DIRECTLY

     4    ONCE -- WHEN THEY'RE ALREADY IN THE SYSTEM, IF THEY'RE NOT LIKE

     5    PAROLED, NO, I WOULDN'T HAVE -- I DON'T HAVE THAT EXPERIENCE.

     6    **Q.**   AND WITH RESPECT TO YOUR WORK WITH CHILDREN WHO ARE

     7    JUSTICE INVOLVED, HAVE YOU RESTRUCTURED YOUR PRACTICE IN ANY

     8    WAY?

     9    **A.**   ABSOLUTELY.  I MEAN --

    10    **Q.**   IN WHAT WAY?

    11    **A.**   YOU WANT A "YES" OR YOU WANT SOME DETAILS?

    12    **Q.**   IN WHAT WAY, PLEASE.

    13    **A.**   YEAH, DEFINITELY.  I MEAN, IN GENERAL, HAVING -- NORTH

    14    CENTRAL FLORIDA, WHICH IS WHERE THE UNIVERSITY OF FLORIDA IS,

    15    IS VERY DIFFERENT FROM ORLEANS PARISH.

    16         SO SINCE COMING HERE, THERE'S A WHOLE EDUCATION

    17    AROUND JUST LIVING IN A PLACE THAT HAS INCREDIBLE RATES OF PTSD

    18    COMPARED TO THE NATIONAL AVERAGES, PARTICULARLY IN OUR YOUNG

    19    FOLKS, PARTICULARLY IN OUR PEOPLE -- OUR YOUNG FOLKS OF COLOR.

    20         AND SO I'VE DEFINITELY NEEDED TO THINK A LOT ABOUT

    21    HOW I ADAPT THE WAY I THINK ABOUT PSYCHOLOGY AS IT'S WRITTEN IN

    22    THE BOOKS TO MAKE SURE THAT I'M BEING CULTURALLY RESPONSIVE TO

    23    THE UNIQUE NEEDS OF THIS REGION IN PARTICULAR AND THE

    24    DEMOGRAPHICS OF THE REGION, AND CERTAINLY BEING AS TRAUMA

    25    INFORMED AS POSSIBLE, WHICH MANY OF OUR KIND OF STANDARD

**MONICA STEVENS, PH.D.**

11:30 1   GO-TO-TREATMENTS HAVE NOT YET CAUGHT UP TO THAT NEED.

2              SO THAT IS A DEFINITELY EMERGING AND DEVELOPING

3   PRACTICE IF YOU THINK ABOUT THAT IN TERMS OF SCIENCE, WHICH IS

4   LIKE 30 YEARS AT A TIME.  SO -- I'M SORRY IF I DIGRESSED.

5              ONE THING THAT STANDS OUT, JUST AS AN EXAMPLE, IS

6   DEFINITELY IN THE FACILITY THAT I WAS THE CLINICAL DIRECTOR OF,

7   WE TOOK -- WE USED A FORMERLY SECURE PSYCHIATRIC FACILITY FOR

8   ADULTS AS KIND OF OUR HOME.  AND I WOULD DESCRIBE THAT AS LESS

9   THAN IDEAL FOR YOUNG PEOPLE IN TERMS OF THE OPTICS, BECAUSE IT

10  LOOKS VERY MUCH LIKE A JAIL UNIT.

11             AND WHEN KIDS COME BACK FROM BEING IN CUSTODY, THEY

12  OFTEN HAVE VERY SEVERE -- WHAT I WOULD CATEGORIZE AS

13  DYSREGULATED BEHAVIOR AND TRAUMA RESPONSES TO THINGS LIKE

14  LOCKED DOORS, WALKIE-TALKIES, EVEN -- THINGS THAT YOU MIGHT

15  COMMONLY ASSOCIATE WITH WHAT YOU THINK ABOUT WHEN YOU THINK

16  ABOUT BEING INCARCERATED.

17             SO WE'VE HAD TO THINK VERY HARD ABOUT HOW WE DESIGN

18  OUR ENVIRONMENT TO BE THERAPEUTIC RATHER THAN RE-TRAUMATIZING.

19  **Q.**   THANK YOU.

20             AND IN YOUR PROFESSIONAL EXPERIENCES, DO CHILDREN WHO

21  ARE INVOLVED WITH THE JUVENILE JUSTICE SYSTEM EXHIBIT TRAUMA OR

22  PRE-EXISTING ADVERSE CHILDHOOD EXPERIENCES?

23  **A.**   THE DATA BEARS OUT THE VAST MAJORITY WOULD DEFINITELY

24  EXHIBIT AT LEAST -- I WOULD SAY, DEFINITELY AT LEAST ONE ACE IS

25  WHAT WE TALK ABOUT.  FOUR IS KIND OF THE CRITICAL NUMBER THAT

**MONICA STEVENS, PH.D.**

11:32 1   WE WORRY ABOUT.  ONCE WE GET ABOVE FOUR, THEN WE'RE LOOKING AT

2   SIGNIFICANTLY INCREASED AND EXPONENTIAL RISKS FOR NEGATIVE

3   OUTCOMES.

4         SO THE DATA WOULD SUGGEST THAT YES, KIDS THAT ARE

5   INCARCERATED HAVE AT LEAST ONE -- I WOULD ARGUE MORE THAN FOUR

6   ACES, AND THE EXPERIENCE OF INCARCERATION ITSELF, I WOULD

7   SUGGEST WOULD ALSO BE AN ADVERSE EXPERIENCE.

8   **Q.**   THANK YOU.

9         CAN YOU TELL US SPECIFICALLY WHAT YOU WERE ASKED TO

10   DO IN THIS CASE?

11   **A.**   YES.  TO PROVIDE MY OPINION ON WHETHER I THINK THAT IT'S

12   GOOD FOR KIDS TO GO TO ANGOLA.

13   **Q.**   AND IN MAKING THAT OR DOING THAT ASSESSMENT, WHAT

14   DOCUMENTS, IF ANY, DID YOU REVIEW?  WHAT MATERIALS, IF ANY, DID

15   YOU REVIEW?

16   **A.**   OH, GOSH, THERE'S A LONG LIST, I KNOW.  IF I COULD

17   REFERENCE IT, I COULD SAY IT.  BUT, I MEAN, YOU ALL -- I WAS

18   PROVIDED WITH ALEX'S DECLARATION, HIS MOTHER'S DECLARATION.  I

19   WAS ABLE TO INTERVIEW ALEX.  I WAS ABLE TO LOOK AT THE PLANS

20   THAT HAVE BEEN SET FORTH BY, I SUPPOSE, AS OJJ FOR THE FACILITY

21   THAT THEY ARE SUPPOSED TO BE TRANSFERRED TO.

22         PARTICULAR FOR ME IN MY LANE WAS LOOKING AT -- I

23   BELIEVE IT WAS ANGELA BRIDGEWATER'S DOCUMENT OUTLINING WHAT THE

24   -- KIND OF LIKE THE MILIEU SERVICES WOULD BE, THE MENTAL HEALTH

25   SERVICES, THE EDUCATIONAL SERVICE PLAN IN ADDITION TO WHAT

**MONICA STEVENS, PH.D.**

11:33 1   ALREADY IS THE PLAN AT BCCY.  THOSE WERE THE MAIN THINGS OF

2   FOCUS FOR ME, BUT THERE WERE OTHER THINGS.

3   **Q.**   THANK YOU.

4   **A.**   YOU'RE WELCOME.

5   **Q.**   AND DID YOU HAVE AN OPPORTUNITY TO PREPARE A REPORT IN

6   THIS CASE?

7   **A.**   YES.

8           **MS. GREGG:**  YOUR HONOR, AT THIS TIME I'D LIKE TO

9   REQUEST THAT PLAINTIFFS' EXHIBIT 74 BE UTILIZED.

10          **MS. ROSENBLOOM:**  WE NEED TO DISCONNECT THAT SCREEN

11  BECAUSE IT'S NOT BEEN ADMITTED.

12          **THE COURT:**  SO IT'S NOT BEEN ADMITTED.  IS THAT

13  CORRECT?  P-74, IT'S NOT ADMITTED?  IT'S A QUESTION.

14          **MS. GREGG:**  YES, YOUR HONOR.

15          **THE COURT:**  IS P-74 ADMITTED?

16          **MR. MONTGOMERY:**  IT'S NOT, YOUR HONOR.  WE OBJECTED

17  TO THE EXPERT REPORTS.

18          **THE COURT:**  OKAY.  IT'S AN EXPERT REPORT.  IT'S

19  HEARSAY.

20              SO YOU WANT TO SHOW HER HER REPORT?

21          **MS. GREGG:**  YES, YOUR HONOR, I DO.

22          **THE COURT:**  COUNSEL?

23          **MR. MONTGOMERY:**  SHE --

24          **THE COURT:**  ALL RIGHT.  NOT TO BE PUBLISHED.

25          **MR. MONTGOMERY:**  NOT TO BE PUBLISHED.  THANK YOU,

**MONICA STEVENS, PH.D.**

11:34 1  YOUR HONOR.

2  **BY MS. GREGG:**

3  **Q.**   CAN YOU SEE THIS EXHIBIT, PLAINTIFFS' EXHIBIT 74 ON YOUR

4  SCREEN?

5  **A.**   YES.

6  **Q.**   OKAY.  THANK YOU.

7       ARE YOU FAMILIAR WITH THIS DOCUMENT?

8  **A.**   YES.

9  **Q.**   CAN YOU SCROLL DOWN FOR US, PLEASE.  WAIT.  DO YOU HAVE

10  THE ABILITY TO SCROLL?  NO.

11  **A.**   I DON'T KNOW IF I HAVE SCROLL THING.  NOPE.

12       **MS. GREGG:**  CAN YOU SCROLL DOWN PLEASE, ADITI, TO THE

13  END OF THE DOCUMENT.

14  **BY MS. GREGG:**

15  **Q.**   IS THAT YOUR SIGNATURE ON PAGE 12?  I'M SORRY.  THE

16  DOCUMENT, NOT 11.

17  **A.**   YES.

18  **Q.**   IT IS.  OKAY.

19       **MS. GREGG:**  AND, ADITI, COULD YOU SCROLL BACK UP TO

20  THE TOP OF THE DOCUMENT.

21  **BY MS. GREGG:**

22  **Q.**   ARE YOU FAMILIAR WITH THIS DOCUMENT?

23  **A.**   YES.

24  **Q.**   WHY ARE YOU FAMILIAR WITH THIS DOCUMENT?

25  **A.**   I WROTE THIS DOCUMENT.

**MONICA STEVENS, PH.D.**

11:36  1              **MS. GREGG:**  AND COULD YOU SCROLL DOWN ONE MORE TIME,
       2     ADITI.  I'M SORRY.
       3     **BY MS. GREGG:**
       4     **Q.**   I JUST WANT TO MAKE SURE THAT YOU'RE COMFORTABLE THAT THIS
       5     IS A TRUE AND CORRECT COPY OF THE REPORT THAT YOU PREPARED.
       6     **A.**   I HOPE SO.  THERE WAS A LOT OF HOURS ON THIS ONE.  SO YES.
       7     **Q.**   THANK YOU.
       8              SO AFTER YOU COMPLETED YOUR REPORT, DID YOU ARRIVE AT
       9     ANY OVERARCHING CONCLUSIONS?  DID YOU ARRIVE AT ANY OVERARCHING
      10     CONCLUSIONS ABOUT THE STATE'S PLANS TO TRANSFER YOUTH TO A
      11     YOUTH UNIT ON THE LOUISIANA STATE PENITENTIARY?
      12     **A.**   YES.  ONE, I WOULDN'T USE THE WORD "PLAN."  I WOULD SAY
      13     THERE WAS AN ANNOUNCEMENT.  AND SO THAT CONCERNED ME QUITE A
      14     BIT FOR A NUMBER OF REASONS.  ONE, I JUST -- AS A PERSON THAT
      15     HAS CO-FOUNDED A DAY-TREATMENT PROGRAM THAT SERVES HIGH-NEEDS
      16     KIDS, I THINK THAT THE AMOUNT OF TIME THAT IT APPEARS FROM AT
      17     LEAST THE ANNOUNCEMENT DATE TO THE SUPPOSED ACTION DATE FEELS
      18     FAR TOO SHORT FOR A THOROUGH CONSIDERATION OF ALL THE FACTORS.
      19     I MEAN, THESE ARE VERY COMPLICATED YOUNG PEOPLE.
      20              AND MY UNDERSTANDING IS THAT THE GOAL IS
      21     REHABILITATIVE.  AND SO I JUST -- I THINK IT -- I'M VERY
      22     CONCERNED ABOUT HOW LITTLE PREPARATION THERE SEEMS TO HAVE
      23     BEEN.  I AM CONCERNED ALSO THAT THE YOUTH WHO ARE DIRECTLY
      24     IMPACTED BY IT DON'T SEEM TO HAVE A GOOD UNDERSTANDING OF THE
      25     ANNOUNCEMENT, AND THEN THE POTENTIAL PLANS WHICH IS CONCERNING

**MONICA STEVENS, PH.D.**

11:37  1   NOT ONLY BECAUSE I JUST THINK OF THAT AS A BASIC HUMAN RIGHT,

2   BUT ALSO WE ARE DEALING WITH KIDS WHO, ALTHOUGH I HAVEN'T

3   EVALUATED THEM, BUT I WOULD THINK IT'S VERY REASONABLE TO

4   SUGGEST THAT THEY HAVE LOTS OF ADVERSE EXPERIENCES.

5            AND SO ONE OF THE -- AGAIN, IF WE'RE THINKING ABOUT

6   REHABILITATION, A REHABILITATIVE ASPECT WOULD BE TO GIVE PLENTY

7   OF NOTICE TO CHILDREN AND FAMILIES WHEN DRASTIC CHANGES ARE

8   GOING TO HAPPEN IN THEIR HOUSING OR LIVING SITUATION OR

9   WHATEVER YOU WANT TO CALL IT.  THAT'S JUST ONE THING.

10            I AM DEFINITELY CONCERNED ABOUT ALSO THIS IDEA OF

11   WHETHER OR NOT THE -- IF THIS PLAN GOES OFF AS IT HAS BEEN SAID

12   IT WOULD DO, WHICH I HAVE A LOT OF CONCERNS ABOUT THE

13   FEASIBILITY OF THAT, BUT IF IT DID, EVEN STILL THERE'S A HUGE

14   ASSOCIATION AROUND ANGOLA THAT JUST HAS A PSYCHOLOGICAL IMPACT

15   BOTH ON CHILDREN AND FAMILIES.

16            FOR EXAMPLE, IN MY INTERVIEW WITH ALEX, HE TALKED

17   ABOUT HIS CONCERN FOR HIS MOTHER AND HIS INTENTIONS TO TAKE

18   CARE OF HER.  AND WHAT I COULD HEAR READING BETWEEN THE LINES,

19   AS I SOMETIMES HAVE TO DO IN MY PROFESSION, IS HIS MOTHER -- IT

20   SOUNDS LIKE SHE'S TRYING TO HOLD IT TOGETHER FOR HIM, BUT THIS

21   IS VERY CONCERNING FOR HER AND SHE DOESN'T SEEM TO HAVE A LOT

22   OF ANSWERS ABOUT WHAT'S GOING TO HAPPEN EITHER.  SO I COULD GO

23   ON ABOUT THAT.  BUT THE ANTICIPATORY STRESS HERE SEEMS TO BE

24   REALLY HIGH.

25            AND AGAIN, I GREW UP IN MISSISSIPPI.  I KNOW OF

**MONICA STEVENS, PH.D.**

11:39 1    ANGOLA.  ANGOLA IS SOMETHING, YOU KNOW, THAT COMMONLY CAN BE

2    REFERRED TO AS LIKE IT'S THE WORST PLACE YOU CAN GO TO.

3            SO I THINK IT'S PRETTY COMMON KNOWLEDGE THAT -- AT

4    LEAST IN SOUTHEAST LOUISIANA AND SURROUNDING REGIONS, THAT

5    THAT'S A SCARY PLACE FOR KIDS, IF NOT, ANYONE.

6    **Q.**    SO I WANT TO BACK UP JUST A LITTLE BIT.

7    **A.**    YEAH.

8    **Q.**    YOU MENTIONED THE TERMINOLOGY "ANTICIPATORY STRESS."

9    **A.**    UH-HUH.

10   **Q.**    CAN YOU TELL US A LITTLE BIT MORE ABOUT -- OR DESCRIBE A

11   LITTLE BIT MORE ABOUT WHAT THAT MEANS?

12   **A.**    SURE.  SO IF YOU ARE ANTICIPATING GOING INTO A STRESSFUL

13   SITUATION -- LIKE WHEN I WAS GETTING DRESSED THIS MORNING

14   THINKING I'M GOING TO HAVE TO BE SITTING RIGHT HERE, YOUR HEART

15   RATE GOES UP, RIGHT, EVEN IF YOU'VE DONE IT A HUNDRED TIMES.

16   YOU HAVE A PHYSIOLOGICAL RESPONSE THAT'S EVEN -- THAT'S NORMAL

17   STRESS.  RIGHT?  BUT WHEN WE'RE ALREADY -- IF YOUR BASELINE

18   STRESS, WHICH I WOULD ARGUE IT WOULD BE WHEN YOU'RE

19   INCARCERATED IS ALREADY HIGH, BECAUSE IN SITUATIONS WHERE --

20   ESPECIALLY AS BRIDGE CITY HAS BEEN DESCRIBED, I ASSUME THE

21   IMPETUS FOR THIS WHOLE ANNOUNCEMENT, IS THAT IT'S A PLACE WHERE

22   THERE'S AGGRESSION AND VIOLENCE.

23            SO YOUR BASELINE LEVEL OF STRESS WILL ALREADY BE SORT

24   OF IN THE RED ZONE, WHICH MEANS VERY HEIGHTENED, AND THAT'S NOT

25   GOOD FOR THE BODY OR THE BRAIN.  AND THEN WHEN -- SO YOU'RE

**MONICA STEVENS, PH.D.**

11:40  1    ALREADY LIVING THAT.  AND THEN IF YOU ANTICIPATE YOU'RE GOING

       2    TO EXPERIENCE A MORE STRESSFUL SITUATION, AS I THINK ANY

       3    REASONABLE PERSON WOULD IF THEY THOUGHT ANY DAY THEY COULD BE

       4    TRANSFERRED TO A MAXIMUM-SECURITY ADULT FACILITY, RIGHT, YOUR

       5    STRESS THEN GOES UP TO WHAT WE WOULD CONSIDER LIKE THE DANGER

       6    ZONE.  IT'S NOT REALLY SUSTAINABLE TO LIVE THERE.

       7            AND SO WHAT WE OFTEN SEE IS EXACTLY I THINK WHAT ALEX

       8    WAS DESCRIBING, JUST, YOU KNOW, WE ALL HAVE A BASIC HUMAN

       9    COMPULSION TO SURVIVE AND THAT PLAYS OUT IN FIGHT, FLIGHT,

      10    FREEZE.  AND SOME PEOPLE CAN GIVE -- WOULD SAY EVEN SOMETIMES

      11    THERE'S OTHER THINGS WE'D DO.  BUT DEFINITELY AS ALEX WAS

      12    DESCRIBING, I THINK THAT'S A PERFECT EXAMPLE OF WHEN YOU'RE IN

      13    SITUATIONS WHERE YOU NEED TO SURVIVE, THEN YOU SOMETIMES LIKE

      14    EITHER TRY TO LOOK WAY TOUGHER AND ACT TOUGHER, BECAUSE YOU

      15    NEED TO BE THE TOUGHEST PERSON IN THE SURVIVAL GAME, OR YOU

      16    ADAPT SOME OTHER KIND OF WAY.  IT IS NOT SURPRISING TO ME WHAT

      17    HE'S SAYING.

      18            I GUESS THE POINT BEING ANTICIPATORY STRESS IS

      19    REALLY RELEVANT HERE BECAUSE I ASSUME THE GOAL IS TO GET SOME

      20    OF THIS BEHAVIOR UNDER CONTROL.  AND I CAN GUARANTEE THAT IF

      21    YOU'RE TAKING ALREADY STRESSED OUT KIDS, PUTTING THEM INTO A

      22    PLACE WHERE THEY ARE ANTICIPATING IT'S GOING TO BE MORE

      23    STRESSFUL, THAT WILL COME TRUE AND THEY WILL ADAPT ACCORDINGLY,

      24    WHICH WON'T BE IN THE DIRECTION THAT I THINK THE STATE IS

      25    HOPING FOR.

**MONICA STEVENS, PH.D.**

11:42 1    Q.   THANK YOU.

2         YOU'RE DESCRIBING ANTICIPATORY REACTIONS AND STRESS.

3    AND IT SOUNDS LIKE YOU'RE DESCRIBING THAT BEING IN THE

4    CURRENT -- EVEN IN THE ABSENCE OF AN ACTUAL TRANSFER OF THE

5    CHILDREN.  IS THAT CORRECT?

6    A.   RIGHT.  AND, IN FACT, SOMETHING LIKE POST-TRAUMATIC STRESS

7    DISORDER, WE KNOW NOW, ESPECIALLY IN CHILDREN, THAT IT'S THE

8    PERCEPTION OF -- IT IS THE ACTUAL EXPERIENCE OF SOMETHING THAT

9    CAN THREATEN YOU, HARM YOU, HARM SOMEBODY ELSE THAT YOU KNOW,

10   KILL YOU, ALL OF THAT STUFF.  BUT IT CAN ALSO BE THE

11   PERCEPTION.

12        SO AGAIN, POINTING BACK TO ALEX'S CASE, HE TOLD ME IN

13   HIS OWN -- IN HIS WORDS BUT IN MY WORDS THAT HE IS CONCERNED

14   ABOUT UPON GETTING TO ANGOLA THAT HE WILL BE STABBED, SOME OF

15   THEM MIGHT BE KILLED.  THEY MIGHT BE RAPED.  AND SO -- AND HE'S

16   HAVING NIGHTMARES THAT LIKE, YOU KNOW, VIVIDLY SHOW HIM HIS

17   FEARS.  I'D ARGUE THAT'S VERY, VERY STRESSFUL.

18   Q.   IS THAT LIKE WHAT YOU JUST DESCRIBED, HIS CONCERNS, HIS

19   NIGHTMARES, THE PULLING OF THE HAIR, ARE THOSE THE KINDS OF

20   THINGS THAT YOU GENERALLY SEE IN A PERSON OF HIS DEVELOPMENTAL

21   STATUS?

22   A.   NO.  WELL, NO.  AND THE TRICHOTILLOMANIA, WHICH I CAN'T

23   DIAGNOSE THAT, BUT THAT WOULD BE THE CLINICAL TERM IF THAT

24   INDEED IS WHAT IT IS, BUT HE -- THE SYMPTOMS DESCRIBED WOULD

25   FIT THAT.  LIKE THAT'S SOMETHING I WOULD BE LOOKING AT

**MONICA STEVENS, PH.D.**

11:43 1   FURTHER -- IS VERY UNCOMMON, PERIOD.  AND THEN IF WE DELVE INTO

2   HIS DEMOGRAPHICS, AT LEAST WHAT I PERCEIVE HIS DEMOGRAPHICS TO

3   BE, IT'S EXTRA UNCOMMON.

4   **Q.**   WHAT DO YOU MEAN BY HIS DEMOGRAPHICS HERE?

5   **A.**   YOUNG BLACK MALES TYPICALLY DON'T PULL OUT THEIR HAIR,

6   UNLESS THERE'S SOMETHING THAT'S INCREDIBLE STRESSFUL FOR THEM.

7   **Q.**   OKAY.  THANK YOU.

8   **A.**   YEAH.  IT'S A VERY MALADAPTIVE COPING BEHAVIOR.

9           **MS. GREGG:**  YOUR HONOR, AT THIS TIME -- BEFORE WE GO

10  ANY FURTHER, I WOULD LIKE TO CALL -- I WOULD LIKE TO --

11  SORRY -- MOVE DR. STEVENS' EXPERT REPORT INTO EVIDENCE AS

12  PLAINTIFFS' EXHIBIT 74.

13          **MR. MONTGOMERY:**  YOUR HONOR, WE OBJECT TO THAT.  THE

14  REPORT'S HEARSAY.  AND THE BEST EVIDENCE, AGAIN, IS THE

15  TESTIMONY OF DR. STEVENS.

16          **MS. GREGG:**  YOUR HONOR, UNDER RULE 74, WE COULD

17  PROVIDE OPINION TESTIMONY WITHOUT GIVING THE BASIS AT THIS

18  PARTICULAR POINT AND GET INTO THAT BEFORE -- AND AN EXPERT IS

19  ALLOWED TO -- EXCUSE ME.  AN EXPERT IS ALLOWED TO RELY ON

20  HEARSAY IN ORDER TO TALK ABOUT THE BASIS FOR HER OPINION.

21          **THE COURT:**  SHE CERTAINLY CAN RELY ON HEARSAY TO

22  PROVIDE THE BASIS OF HER OPINION.  BUT HER REPORT IS HEARSAY.

23  SUSTAINED.

24          **MS. GREGG:**  THANK YOU, YOUR HONOR.

25          ADITI, COULD YOU -- SORRY.

**MONICA STEVENS, PH.D.**

11:44 1   **BY MS. GREGG:**

2   **Q.**   WE TALKED A LITTLE BIT EARLIER ABOUT WHETHER OR NOT YOU

3   HAD AN OPPORTUNITY TO FORM ANY OPINIONS WITH RESPECT TO AFTER

4   REVIEWING THE REPORT, SPEAKING TO ALEX, AND MAKING YOUR

5   ASSESSMENT.  I WANT TO TALK A LITTLE BIT MORE ABOUT THE ACTUAL

6   OPINIONS THAT YOU PROVIDED AS PART OF THAT.

7            **MS. GREGG:**  SO, ADITI, COULD YOU PLEASE GO TO PAGE 1,

8   PARAGRAPH 1.

9   **BY MS. GREGG:**

10   **Q.**   DO YOU SEE THAT?

11   **A.**   YEAH.

12   **Q.**   SO BASED ON, AGAIN, TALKING WITH ALEX, REVIEWING THE PLANS

13   AND YOUR ASSESSMENT, WHAT DO YOU THINK ABOUT THE GOVERNOR'S

14   OPINION -- SORRY, APOLOGIES -- THE GOVERNOR'S PLAN TO TRANSFER

15   CHILDREN TO A JUVENILE UNIT ON THE LOUISIANA STATE PENITENTIARY

16   GROUNDS?

17   **A.**   AGAIN, I HESITATE TO CALL IT A PLAN BECAUSE I JUST -- IT

18   FEELS THAT THERE ARE -- THERE'S A LOT MORE TO WORK OUT.  AND I

19   COULD CERTAINLY -- AS A PERSON THAT HAS WORKED WITH HIGH-RISK

20   YOUTH THAT DO EXHIBIT LOTS OF DYSREGULATED BEHAVIOR, I CAN

21   CERTAINLY SYMPATHIZE WITH THE NEED TO COME UP WITH AN

22   ALTERNATIVE TO WHAT'S ALREADY HAPPENING.

23            IT IS IN MY OPINION THAT THIS IS NOT THE CORRECT

24   ALTERNATIVE OR AT LEAST IT NEEDS MORE TIME TO BE THOROUGHLY

25   FIGURED OUT.  AND THEN, I GUESS, I WOULD -- ANOTHER QUESTION I

**MONICA STEVENS, PH.D.**

11:46 1    HAVE -- BECAUSE IT SEEMS LIKE FROM THE DOCUMENTS THAT I
     2    REVIEWED THAT MANY OF THE SAME -- IF, IN FACT, MANY OF THE SAME
     3    SERVICES THAT ARE ALREADY BEING PROVIDED AT BRIDGE CITY ARE
     4    GOING TO BE PROVIDED AT THIS UNIT, I'M NOT CLEAR AS TO WHY WE
     5    THINK WE'RE GOING TO GET A DIFFERENT OUTCOME.
     6            IT'S NOT CLEAR TO ME WHAT'S GOING TO BE DIFFERENT
     7    EXCEPT THE LOCATION.  AND IN MY OPINION, THE LOCATION IS
     8    INHERENTLY PROBLEMATIC.
     9    **Q.**   YOU TALK A LITTLE BIT ABOUT THAT IN PARAGRAPH 2 OF YOUR
    10    REPORT.
    11            **MS. GREGG:**  ADITI, CAN YOU PLEASE SCROLL TO PAGE 2,
    12    PARAGRAPH 2.
    13    **BY THE WITNESS:**
    14    **A.**   YES.  RIGHT.  SO AGAIN, I MEAN, I GET THE IDEA THAT MAYBE
    15    THERE'S SOME WAY THAT WE CAN COMPLETELY KEEP THE YOUNG PEOPLE
    16    AND THE ADULTS AWAY FROM ONE ANOTHER.  BUT THERE IS STILL A
    17    VERY SALIENT PSYCHOLOGICAL ASSOCIATION WITH THE ACTUAL
    18    PLACEMENT THAT'S PROPOSED.  I THINK IT'S -- AT THIS POINT IS OR
    19    SHOULD BE COMMON KNOWLEDGE THAT WE KNOW THAT THE BRAIN DOESN'T
    20    FULLY DEVELOP UNTIL AGE 25.
    21            SO WHEN I THINK ABOUT ADOLESCENCE, I THINK ABOUT 25
    22    AND UNDER, HONESTLY.  AND THERE'S VERY SPECIFIC AND RELEVANT
    23    BIOLOGICAL AND DEVELOPMENTAL PROCESSES THAT ARE GOING ON THAT
    24    ARE EXACTLY WHY WE TREAT YOUNG PEOPLE DIFFERENT THAN ADULTS.
    25    THEIR BRAINS ARE STILL VERY PLASTIC, THEY ARE FORMING.

**MONICA STEVENS, PH.D.**

11:48  1        AGAIN, GOING BACK TO THE IDEA THAT I ASSUME WE ARE
       2   TRYING TO REHABILITATE CHILDREN AND PUTTING THEM IN A PLACE
       3   THAT'S GOING TO CAUSE UNDUE STRESS THAT DOESN'T SEEM TO HAVE AN
       4   ADDED VALUE, FROM WHAT I CAN SEE, AND ISN'T FULLY, FULLY
       5   THOUGHT OUT WITH REGARD TO THE UNIQUE DEVELOPMENTAL NEEDS OF
       6   CHILDREN OF THIS AGE IS JUST -- IT JUST GOES AGAINST EVERYTHING
       7   THAT I THINK MOST PEOPLE IN MY PROFESSION WOULD RECOMMEND FROM
       8   AN ETHICAL BASIS, A CLINICAL BASIS, AND A HUMANITARIAN ONE.
       9   **Q.**   DO YOU HAVE AN OPINION AS TO WHETHER AN ADOLESCENT OR A
      10   YOUTH THAT IS IN AN ADULT FACILITY WOULD RECEIVE REHABILITATIVE
      11   SERVICES?
      12        **MR. MONTGOMERY:**  OBJECTION.  THAT'S NOT A PSYCHIATRIC
      13   OPINION, THAT'S A CORRECTIONS' OPINION.
      14        **THE COURT:**  RESPOND TO THE OBJECTION.
      15        **MS. GREGG:**  I'LL WITHDRAW THAT, YOUR HONOR.
      16   BY MS. GREGG:
      17   **Q.**   CAN YOU PLEASE GIVE US YOUR OPINION ABOUT -- DO YOU HAVE
      18   AN OPINION TO PROVIDE US, I SHOULD SAY, ABOUT WHETHER OR NOT
      19   ADOLESCENTS WHO ARE UNDER THE -- ADOLESCENTS SUCH AS ALEX A.
      20   SHOULD BE PLACED AT AN ADULT FACILITY -- A PLACE LOCATED AT AN
      21   ADULT FACILITY?
      22   **A.**   I DO NOT THINK THEY SHOULD BE.
      23        **MR. MONTGOMERY:**  YOUR HONOR, WE OBJECT.  TO THE
      24   EXTENT IT GOES OUTSIDE CHILD PSYCHIATRY, WE'RE GOING TO OBJECT
      25   TO IT AND REQUEST THAT DR. STEVENS BE INSTRUCTED TO STAY WITHIN

**MONICA STEVENS, PH.D.**

11:49  1 | THE REALM OF CHILD PSYCHIATRY.

2 |        **THE COURT:**  SUSTAINED.  ASK A QUESTION THAT CONFINES

3 | HER TO HER DISCIPLINE -- OR THAT CONFINES THE QUESTION TO THE

4 | DISCIPLINE, NOT HER BUT THE QUESTION.

5 |        **MS. GREGG:**  THANK YOU.

6 | **BY MS. GREGG:**

7 | **Q.**   DR. STEVENS, DO YOU HAVE AN OPINION, BASED ON YOUR

8 | PROFESSIONAL EXPERIENCES, ABOUT HOW CHILDREN WHO ARE IN

9 | SETTINGS THAT ARE NOT, AS YOU SAID, THERAPEUTIC AND THAT ARE

10 | NOT DESIGNED FOR ADDRESSING THEIR NEEDS AS ADOLESCENTS, HOW

11 | DOES THAT -- HOW DO THEY FARE UNDER THOSE CIRCUMSTANCES?

12 |        **MR. MONTGOMERY:**  OBJECTION.  LACK OF FOUNDATION.

13 |        **THE COURT:**  ADDRESS THE OBJECTION.

14 |        **MS. GREGG:**  CAN I ASK HER ANOTHER QUESTION, YOUR

15 | HONOR?

16 |        **THE COURT:**  SO WITHDRAW THAT QUESTION AND ASK ANOTHER

17 | QUESTION.

18 |        **MS. GREGG:**  WITHDRAWING THAT QUESTION.

19 | **BY MS. GREGG:**

20 | **Q.**   DR. STEVENS, YOU SAID PREVIOUSLY THAT YOU HAVE WORKED IN A

21 | SETTING WHERE IT WAS A SECURE FACILITY.  IS THAT CORRECT?

22 | **A.**   YES.

23 | **Q.**   BASED ON YOUR EMPLOYMENT AND YOUR SUPERVISION OF THAT

24 | FACILITY, DID YOU HAVE ANY EXPERIENCES WORKING WITH CHILDREN

25 | WHO WERE YOUTH AND WHO WERE IN A MORE SECURE SETTING?

**MONICA STEVENS, PH.D.**

11:50  1         **MR. MONTGOMERY:**  OBJECTION.  LACK OF FOUNDATION, LACK

2  OF RELEVANCE.

3         **THE COURT:**  SUSTAINED.

4  BY MS. GREGG:

5  **Q.**  I WANT TO MOVE ON A LITTLE BIT AND GO TO YOUR REPORT AND

6  TALK A LITTLE BIT ABOUT YOUR OPINION ABOUT THE NATURE OF HARM

7  THAT AN ADOLESCENT MAY EXPERIENCE BEING AT A FACILITY THAT IS

8  IN AN ADULT LOCATION AND WHO ARE YOUTH, OF COURSE.

9  **A.**  SURE.

10         **MR. MONTGOMERY:**  OBJECTION.  LACK OF FOUNDATION.

11         **THE COURT:**  COUNSEL, PERHAPS TAKE A DEEP BREATH AND

12  ASK QUESTIONS.  YOU ARE GIVING LONG NARRATIVES AND THEN ASKING

13  A QUESTION AND YOU ARE DRAWING OBJECTIONS.

14         **MS. GREGG:**  YES.

15         **THE COURT:**  PERHAPS JUST TAKE A DEEP BREATH AND

16  FIGURE OUT WHAT QUESTIONS YOU WANT TO ASK AND ASK A QUESTION.

17         **MS. GREGG:**  THANK YOU, YOUR HONOR.

18  BY MS. GREGG:

19  **Q.**  ARE YOU AWARE, DR. STEVENS, OF ANY RESEARCH ABOUT THE TYPE

20  OF HARMS THAT YOUTH WHO ARE IN AN ADULT FACILITY EXPERIENCE,

21  BASED ON YOUR BACKGROUND AND YOUR PROFESSIONAL BACKGROUND?

22  **A.**  I COULDN'T SAY THAT I NECESSARILY AM.  I DON'T KNOW THAT

23  THERE IS A PRECEDENT FOR THIS IN MODERN DAY.

24  **Q.**  I WOULD LIKE TO GO TO PAGE 2, PARAGRAPH 3 OF YOUR REPORT.

25         IT GOES ON TO 2.  IT STARTS ON PAGE 2 AND CONTINUES

**MONICA STEVENS, PH.D.**

11:52  1   ON TO PAGE 3.

2                ARE YOU ABLE TO REVIEW THAT?

3   **A.**   ARE YOU AT NO. 3?

4   **Q.**   YES, THAT'S RIGHT.

5   **A.**   YES.

6   **Q.**   IS THIS YOUR OPINION AS TO -- IS THIS YOUR WRITTEN OPINION

7   ABOUT THE TYPE OF HARMS THAT YOUTH MIGHT EXPERIENCE IN ADULT

8   SETTINGS?

9   **A.**   YES.  I MEAN --

10              **MR. MONTGOMERY:**  OBJECTION, YOUR HONOR.  THE REPORT'S

11   NOT IN EVIDENCE.

12              **THE COURT:**  YES, IT'S NOT VERY HELPFUL.  I MEAN, IT'S

13   NOT IN EVIDENCE.  ASK HER A QUESTION ABOUT IT BUT -- SUSTAINED.

14   **BY MS. GREGG:**

15   **Q.**   BASED ON YOUR EXPERIENCE, DR. STEVENS, ARE YOU FAMILIAR

16   WITH THE TYPES OF HARMS THAT ARE ATTRIBUTED TO CHILDREN WHO ARE

17   IN ADULT SETTINGS?

18              **MR. MONTGOMERY:**  OBJECTION.  LACK OF FOUNDATION.

19              **THE COURT:**  SUSTAINED.

20              **MS. GREGG:**  MAY I HAVE A MOMENT, YOUR HONOR?

21              **THE COURT:**  YOU MAY.

22              WHY DON'T WE JUST TAKE A BREAK FOR LUNCH.

23   WE ARE GOING TO BE IN RECESS FOR AN HOUR.  WE WILL RESUME COURT

24   AT 1:00.

25              **THE LAW CLERK:**  ALL RISE.

MONICA STEVENS, PH.D.

11:54  1                     COURT IS AT RECESS.

       2              **(WHEREUPON, THE COURT WAS IN RECESS.)**

       3          **THE COURT:**  BE SEATED.

       4              OKAY.  WE ARE BACK ON THE RECORD.  YOU MAY

       5     PROCEED.

       6          **MS. ROSENBLOOM:**  YOUR HONOR, MAY WE HAVE PERMISSION

       7     TO SWITCH COUNSEL AT THIS POINT?

       8          **THE COURT:**  YOU MAY.

       9          **MS. ROSENBLOOM:**  MS. GREGG IS NOT FEELING WELL.

      10          **THE COURT:**  YOU MAY.

      11          **MS. ROSENBLOOM:**  AND THE DEFENSE HAS NO OBJECTION.

      12     THANK YOU VERY MUCH.

      13                **DIRECT EXAMINATION (CONTINUED)**

      14     BY MS. ROSENBLOOM:

      15     **Q.**   DR. STEVENS, ARE YOU AWARE OF THE STATE OF LOUISIANA'S

      16     PLAN TO MOVE YOUNG PEOPLE TO A YOUTH FACILITY LOCATED AT THE

      17     LOUISIANA STATE PENITENTIARY AT ANGOLA?

      18     **A.**   I'M AWARE OF THAT DECISION.

      19     **Q.**   OKAY.  HAVE YOU HAD A CHANCE TO REVIEW THE WRITTEN PLAN

      20     ABOUT MOVING THE YOUNG PEOPLE TO THE ANGOLA CAMPUS?

      21     **A.**   YES.

      22     **Q.**   WHAT IS YOUR UNDERSTANDING OF THE STATE'S PLAN?

      23     **A.**   THAT YOUTH, AS OF SEPTEMBER, EXCUSE ME, 15TH WILL BE MOVED

      24     TO THE LOUISIANA STATE PENITENTIARY GROUNDS IN A UNIT THAT THEY

      25     HAVE DESIGNATED FOR YOUTH ONLY.  THE PLAN, I BELIEVE, IS TO

**MONICA STEVENS, PH.D.**

01:05 1 REPLICATE AT LEAST WHAT'S HAPPENING AT BRIDGE CITY RIGHT NOW IN
2 TERMS OF A DIFFERENT DOMAIN OF SERVICES AROUND EDUCATIONAL,
3 MENTAL HEALTH SERVICES.  I'M AWARE THAT THE INTENTION IS TO
4 KEEP ALL YOUTH AND ADULTS SEPARATE.
5 **Q.**   ARE YOU AWARE OF WHAT BUILDING THE STATE PLANS TO HOUSE
6 THE YOUTH IN?
7 **A.**   I WAS HERE EARLIER WHEN -- FORGIVE ME FOR FORGETTING HER
8 NAME.  BUT THE FIRST WITNESS REFERRED TO IT I BELIEVE AS THE
9 RECEPTION CENTER.  I BEFORE THAT HAD HEARD OF IT AS THE FORMER
10 DEATH-ROW UNIT.
11 **Q.**   OKAY.  HAVE YOU SPOKEN WITH PLAINTIFF ALEX A. RECENTLY?
12 **A.**   YES.
13 **Q.**   OKAY.  DID YOU SPEAK WITH HIM IN YOUR CAPACITY AS A
14 PSYCHOLOGIST?
15 **A.**   YES.
16 **Q.**   I'M NOT ASKING YOU IF YOU'RE HIS TREATING --
17 **A.**   NOT AS TREATMENT, RIGHT.
18 **Q.**   -- PSYCHOLOGIST.  RIGHT?
19 **A.**   CORRECT.
20 **Q.**   BUT IN YOUR CAPACITY AS AN EXPERT IN THIS CASE?
21 **A.**   YES.
22 **Q.**   OKAY.  WHEN DID YOU SPEAK WITH HIM?
23 **A.**   OH, GOSH, LET ME CONSULT MY CALENDAR.  BUT I BELIEVE THAT
24 WAS THURSDAY MORNING LAST WEEK.
25 **Q.**   OKAY.  AND ABOUT HOW LONG DID YOU SPEND WITH HIM?

**MONICA STEVENS, PH.D.**

01:06 1  A.   THIRTY MINUTES.

2   Q.   OKAY.  WHAT WAS THE PURPOSE OF YOUR MEETING WITH ALEX A.?

3   A.   MY INTENTION, EXCUSE ME AGAIN, IN REQUESTING TO BE ABLE TO

4   SPEAK WITH HIM WAS TO UNDERSTAND, FROM HIS PERSPECTIVE, WHAT

5   IT'S LIKE TO ANTICIPATE POTENTIALLY GOING TO ANGOLA.  I WANTED

6   TO KNOW WHAT HIS KIND OF EARS-ON-THE-GROUND EXPERIENCE WAS AS

7   WELL, AND CERTAINLY HIS PERSONAL KIND OF, YOU KNOW, REFLECTIONS

8   ON THE WHOLE ISSUE.

9        THE LARGER INTENTION IS AROUND MY LARGER KIND OF GOAL

10   OF UNDERSTANDING THE POTENTIAL HARM TO THE INDIVIDUALS THAT MAY

11   BE TRANSFERRED AND WEIGHING THAT WITH THE PUBLIC SAFETY

12   BENEFITS.

13   Q.   DO YOU KNOW IF ALEX A. OR ANY OTHER CHILDREN HAVE BEEN

14   TRANSFERRED TO THE ANGOLA SITE?

15   A.   NO, NOT YET.  I DON'T THINK SO.

16   Q.   OKAY.

17        **MS. ROSENBLOOM:**  COULD WE -- WITHOUT PUBLICATION --

18   PULL UP DR. STEVENS' REPORT AGAIN, JUST FOR HELPING ME BECAUSE

19   I DON'T HAVE A PAPER COPY.  IT'S PLAINTIFFS' EXHIBIT 74.

20        **THE DEPUTY CLERK:**  IT'S SHOWING.

21        **MS. ROSENBLOOM:**  OH, I CAN'T SEE IT.  SHOULD IT BE

22   HERE?

23        **THE COURT:**  IT SHOULD BE ON YOUR SCREEN AND THE

24   WITNESS' SCREEN.

25        **THE WITNESS:**  I SEE IT.

MONICA STEVENS, PH.D.

01:08   1              **THE DEPUTY CLERK:**  I DON'T KNOW IF SOMEHOW IT GOT
        2     TURNED OFF.
        3              **THE COURT:**  JUST CHECK TO SEE THAT THE MONITOR IS
        4     POWERED ON.  SUZIE WILL CHECK.
        5              **MS. ROSENBLOOM:**  I'VE GOT A PAPER COPY.  IT'S OKAY.
        6     THANK YOU.
        7     **BY MS. ROSENBLOOM:**
        8     **Q.**   DR. STEVENS, AS A RESULT OF YOUR INTERVIEW OF ALEX A.,
        9     DOES HE HAVE FEARS ABOUT THIS PROPOSED PLAN TO MOVE TO THE
       10     ANGOLA CAMPUS?
       11     **A.**   YES, YES.
       12     **Q.**   WHAT DID YOU LEARN ABOUT HOW HE'S FEELING?
       13     **A.**   ALEX REPORTED A PERCEPTION THAT UPON ARRIVAL -- AND I
       14     SHOULD SAY, THE -- ALSO IN HIS IDEA OF WHAT IT WOULD TAKE TO
       15     EVEN GET TO ANGOLA, IS THAT IT WOULD BE A SEVEN-HOUR DRIVE FROM
       16     BRIDGE CITY -- THE BRIDGE CITY FACILITY TO THAT FACILITY, WHICH
       17     I'M NOT SURE HOW LONG IT IS.  BUT I THINK IT'S PROBABLY NOT
       18     SEVEN HOURS, WHICH INDICATED TO ME THAT HE'S ANTICIPATING A
       19     LONG AND DIFFICULT JOURNEY.  AND THEN IN THAT SAME KIND OF
       20     SENTIMENT HE SPOKE ABOUT HOW HE FELT THAT IT WOULD BE, YOU
       21     KNOW, SOME TENSIONS ON THE RIDE OVER.
       22              AND THEN UPON GETTING THERE, HE DESCRIBED THAT A
       23     GROUP OF ADULT INMATES WOULD CONFRONT THE BUS ESSENTIALLY AND
       24     THREATEN ALL KINDS OF PHYSICAL HARM, INCLUDING SEXUAL VIOLENCE,
       25     WHEN THE CHILDREN EXITED THE BUS.

**MONICA STEVENS, PH.D.**

01:10 1   **Q.**  DID YOU LEARN ANYTHING MORE SPECIFIC ABOUT HIS FEARS OF

2  HARM?  WHAT TYPE OF HARM MIGHT HAPPEN TO HIM?

3  **A.**  IN HIS WORDS, HE SAID THAT HE IS WORRIED THAT HIM AND

4  OTHERS WILL LOSE THEIR MANHOOD.  I ASKED HIM WHAT HE MEANT BY

5  THAT.  HE REPEATED THE PHRASE A COUPLE OF TIMES.

6        MY INTERPRETATION OF THAT IS HIS CONCERN ABOUT BEING

7  SEXUALLY ASSAULTED.

8  **Q.**  AS A RESULT OF YOUR INTERVIEWING OF ALEX, WHAT DID YOU

9  LEARN ABOUT HIS FEARS, IF ANY, ABOUT ANYTHING OTHER THAN

10  CONTACT WITH ADULT PRISONERS?

11  **A.**  IT SEEMED TO BE VERY CENTRAL TO HIS CONCERNS, HIS ABILITY

12  TO FINISH HIS HIGH SCHOOL EDUCATION, WHETHER THAT BE THE HISET

13  OR A GED.  BECAUSE AGAIN, I THINK AS WE HEARD HIM SAY, IT'S A

14  PRIORITY FOR HIM TO BE ABLE TO TAKE CARE OF HIS MOTHER AND HIS

15  FAMILY.  AND THAT'S VERY MUCH HOW HE SEES HIS FUTURE PLAYING

16  OUT.  HE'S VERY CONCERNED THAT THAT EITHER WON'T HAPPEN AT ALL

17  THERE OR IF IT DOES HAPPEN, THE ACCOMMODATIONS THAT HE

18  CURRENTLY RECEIVES WON'T BE GRANTED.

19  **Q.**  IN YOUR EXPERT OPINION, ARE THOSE FEARS REASONABLE?

20  **A.**  YES.

21  **Q.**  GIVEN THE CIRCUMSTANCES?

22  **A.**  YES.

23        **MR. MONTGOMERY:**  OBJECT TO THE FORM -- OBJECTION.

24  SPECULATION.  I'M SORRY.

25        **THE COURT:**  OVERRULED.

**MONICA STEVENS, PH.D.**

01:11 1   **BY MS. ROSENBLOOM:**

2   **Q.**   AND WHAT DO YOU BASE THAT OPINION ON?

3   **A.**   WELL, ACTUALLY, I SHOULD SAY ALSO, THE CONCERNS ABOUT HIS

4   MENTAL HEALTH SERVICES, RIGHT, THAT HE DOES SEEM TO GET SOME

5   BENEFIT OUT OF IT, EVEN IF IT'S NOT, YOU KNOW, MAXIMIZING HIS

6   POTENTIAL RIGHT NOW.  SO HE DID ALSO RAISE THAT CONCERN.

7       AND SO MY CONCERN ABOUT BOTH OF THOSE IN TERMS OF HIS

8   MENTAL HEALTH, CONTINUING SERVICES AND EDUCATIONAL SERVICES IS

9   PLENTY, JUST BASED ON OTHER PLACES THAT I'VE WORKED, WHICH HAVE

10   BEEN IN CLOSE PROXIMITY TO THE SPECIAL SCHOOL DISTRICT AS WELL

11   AS THE ORLEANS PARISH SCHOOL DISTRICT, THAT SPECIAL EDUCATION

12   SERVICES ARE WROUGHT WITH COMPLICATIONS, ARE DIFFICULT TO

13   IMPLEMENT UNDER IDEAL SITUATIONS, WHICH I WOULDN'T CONSIDER

14   THIS TO BE.  AND THERE'S THAT.

15       I ALSO REALLY DO WONDER LIKE WHO IS -- YOU KNOW, I

16   THINK THAT MOST EDUCATORS IN THE K-12 ARENA HAVE CHOSEN TO BE

17   IN THE K-12 ARENA AND MIGHT NOT BE PREPARED TO TEACH ON THE

18   ANGOLA CAMPUS.  SO I AM DEFINITELY WONDERING ABOUT THE

19   WORKFORCE HERE.

20       **MR. MONTGOMERY:**   YOUR HONOR, I'M GOING TO OBJECT TO

21   THIS.  THESE ARE NOT -- THIS IS NOT OPINIONS THAT ARE BASED IN

22   CHILD PSYCHOLOGY.

23       **THE COURT:**   THAT'S CORRECT.

24       DO YOU WANT TO ASK THE QUESTION OR RESPOND TO

25   THE OBJECTION?

**MONICA STEVENS, PH.D.**

01:13 1            **MS. ROSENBLOOM:**  SURE.  WE'LL KEEP THE TESTIMONY TO
     2     PSYCHOLOGICAL OPINIONS GOING FORWARD.  THANK YOU.
     3            **MR. MONTGOMERY:**  OUR UNDERSTANDING IS THAT
     4     DR. STEVENS MET WITH ALEX A. FOR PURPOSES OF A CHILD
     5     PSYCHOLOGY-BASED EVALUATION OF HIM AND THAT IS HER -- WHAT HER
     6     EXPERT REPORT APPEARS TO US TO BE ABOUT.  SO OUR OBJECTION
     7     WOULD BE LET'S KEEP THE OPINIONS TO WHAT THEY ARE.
     8            **THE COURT:**  WELL, SHE SAID THAT'S THE QUESTIONS SHE
     9     WAS GOING TO BE ASKED.
    10            **MR. MONTGOMERY:**  OH, I'M SORRY.  I DIDN'T APPRECIATE
    11     THAT.
    12            **THE COURT:**  BE SEATED.
    13            SHE SAID SHE WAS GOING TO ASK QUESTIONS IN THE
    14     FIELD OF CHILD PSYCHOLOGY.
    15            YOU MAY ASK YOUR QUESTIONS.
    16            **MS. ROSENBLOOM:**  THANK YOU.
    17     **BY MS. ROSENBLOOM:**
    18     **Q.**   DR. STEVENS, IS ALEX EXPERIENCING ANY MENTAL HEALTH
    19     RELATED SYMPTOMS, IN YOUR OPINION, RELATED TO THIS POTENTIAL
    20     TRANSFER TO THE ANGOLA CAMPUS?
    21     **A.**   HE IS.  AND PART OF BEING A COMPETENT AND QUALIFIED CHILD
    22     PSYCHOLOGIST IS TO TAKE MULTIPLE ANGLES WHEN YOU'RE CONSIDERING
    23     AN ASSESSMENT AND AN OPINION.  AND SO SCHOOL CERTAINLY IS BEING
    24     A VERY CENTRAL PART OF CHILDRENS' LIVES IS WELL WITHIN THE
    25     REALM OF WHAT I WOULD CONSIDER WHEN I'M THINKING ABOUT KIDS.

**MONICA STEVENS, PH.D.**

01:14 1   **Q.**   WHAT MENTAL HEALTH RELATED SYMPTOMS DID HE EXHIBIT WHEN
2   YOU WERE SPEAKING WITH HIM?
3   **A.**   WELL, NOT AT THE EXACT MOMENT I WAS SPEAKING WITH HIM.
4   BUT IN GENERAL, FROM WHAT I HEARD AND WHAT I OBSERVED, BOTH,
5   WHICH AGAIN IS -- WOULD BE A PART OF A COMPREHENSIVE
6   PSYCHOLOGICAL ASSESSMENT WOULD BE THAT HE WAS MARKEDLY
7   UNCOMFORTABLE, HIS DEMEANOR EVEN -- HIS DEMEANOR -- WHAT WE SAW
8   TODAY WAS SIMILAR TO WHAT I SAW.  THIS IS A KID THAT IS
9   UNCOMFORTABLE; THAT IS TRYING TO BE BRAVE; THAT IS A BIT
10   INTIMIDATED, AS I THINK MANY OF US WOULD BE.  SO THAT IS ALL
11   PRETTY NORMAL, GIVEN HIS CIRCUMSTANCES.
12         BUT WHAT WASN'T NORMAL THAT I LEARNED ABOUT AND HEARD
13   ABOUT FROM HIM IS, AGAIN, THE HAIR PULLING.  IT IS VERY RARE IN
14   GENERAL, AND EVEN RARER, I WOULD SAY, FOR HIS DEMOGRAPHICS, AS
15   I SAID BEFORE.  AND HE'S HAVING NIGHTMARES.  HE'S
16   HYPERVIGILANT, MEANING THAT HE STARTLES.  HE IS KIND OF LIKE A
17   LOOK-OVER-YOUR SHOULDER KIND OF KID.  A LOT OF THE HALLMARKS
18   THAT WE TYPICALLY SEE IN TRAUMATIZED KIDS.
19   **Q.**   BASED ON YOUR INTERVIEW OF ALEX A., DOES HE HAVE CONCERNS
20   ABOUT CONTACT WITH HIS FAMILY IF HE WERE TO BE MOVED TO THE
21   ANGOLA CAMPUS?
22   **A.**   HE DOES.  BUT I WOULD CONSIDER HIM A PRETTY RESILIENT KID,
23   WHICH DOESN'T MEAN THAT HE'S MEETING HIS FULL POTENTIAL.  BUT
24   HE WAS ABLE TO SAY, YOU KNOW, WE CAN ZOOM.  I'M SURE WE CAN
25   ZOOM OR CALL.  BUT PHYSICAL VISITATION DEFINITELY SEEMS LIKE IT

**MONICA STEVENS, PH.D.**

01:16  1   WOULD BE A BARRIER, PER HIS REPORT.

2   **Q.**   AS A MENTAL HEALTH PROFESSIONAL, DO YOU HAVE CONCERNS

3   ABOUT ALEX IF HE WERE TO BE MOVED TO AN OJJ FACILITY ON THE

4   GROUNDS OF THE LOUISIANA STATE PENITENTIARY?

5   **A.**   YES.

6   **Q.**   WHAT ARE THOSE CONCERNS?

7   **A.**   I'M CONCERNED THAT WE ARE PROBABLY TAKING A YOUNG PERSON

8   WHO IS ALREADY AT RISK OF, IF NOT HAS FULLY-BLOWN PTSD, AND

9   POTENTIALLY OTHER THINGS.  IT WASN'T A DIAGNOSTIC INTERVIEW, SO

10   I DON'T KNOW.  BUT THE RISK FACTORS ARE ALL THERE AND SOME OF

11   THE SYMPTOMS ARE THERE AND EXACERBATING THAT.

12          AND MY OTHER CONCERN IS THAT THE TRANSITION PLAN

13   FEELS MUDDY AT BEST TO ME.  SO I DON'T KNOW WHAT -- I RECALL

14   ALEX THINKING THAT IT'S A POSSIBILITY HE COULD BE RELEASED.  I

15   THINK HE SAID MAYBE TODAY.  HE WAS WAITING ON A COURT HEARING

16   OR SOMETHING.

17          SO HE, IN HIS MIND, SORT OF HAD SOME HOPE THAT

18   THIS WOULDN'T HAPPEN FOR HIM, WHICH WAS ALSO KIND OF A

19   REMARKABLE THING THAT I WONDERED LIKE WHY WOULD YOU WANT TO DO

20   ALL OF THIS STUFF IF YOU THINK THAT THIS MIGHT NOT APPLY TO

21   YOU.  AND I THINK HE WAS CONCERNED ABOUT OTHERS.

22          BUT YES, MY RISK IS THAT WE'RE TAKING THE

23   PROTECTIVE FACTORS THAT ARE ALREADY IN PLACE FOR THIS YOUNG

24   MAN, WHO ADMITTEDLY HAS HAD A BUNCH OF CHALLENGES, AND WE ARE

25   GOING TO EFFECTIVELY DESTROY THOSE.

**MONICA STEVENS, PH.D.**

01:17 1          AND SO WHEN I THINK ABOUT A CHILD LIKE HIM BEING

2  RELEASED UPON ADULTHOOD OR WHATEVER, I DON'T THINK THAT I WOULD

3  BE VERY CONCERNED ABOUT HIS TRAJECTORY.

4  **Q.**  YOU WERE IN THE COURTROOM THIS MORNING FOR ALEX A.'S

5  TESTIMONY BECAUSE YOU'RE AN EXPERT WITNESS AND YOU'RE ALLOWED

6  TO BE HERE FOR THAT.  I'M NOT GOING TO ASK YOU TO REVEAL HIS

7  CONFIDENTIAL TESTIMONY.  BUT I DO HAVE A FEW QUESTIONS ABOUT

8  YOUR REACTION TO IT.

9          DID IT SURPRISE YOU THAT ALEX DID NOT RECALL OR

10  RECOUNT ALL THE FEARS TO THE COURT THAT HE TOLD YOU WHEN YOU

11  SPOKE WITH HIM?

12  **A.**  NO, THAT DID NOT SURPRISE ME NOR DID THE FACT THAT HE

13  DIDN'T --

14        **MR. MONTGOMERY:**  OBJECTION.  LACK OF FOUNDATION.

15  IT'S ALSO OUTSIDE THE SCOPE OF THE OPINIONS THAT WERE PRODUCED.

16        **MS. ROSENBLOOM:**  THIS WITNESS IS AN EXPERT WITNESS.

17  SHE'S A CHILD PSYCHOLOGIST.  I'M LAYING THE FOUNDATION FOR

18  ASKING HER THE QUESTION OF WHY IS A PSYCHOLOGIST --

19        **THE COURT:**  OVERRULED.

20        **MS. ROSENBLOOM:**  THANK YOU.

21  BY MS. ROSENBLOOM:

22  **Q.**  YOU CAN FINISH YOUR ANSWER IF YOU'D LIKE.

23  **A.**  I DON'T KNOW WHERE I WAS.

24  **Q.**  DID IT SURPRISE YOU THAT HE DIDN'T REMEMBER THE --

25  **A.**  YEAH.  IT DID NOT SURPRISE ME THAT HE DIDN'T REMEMBER THAT

**MONICA STEVENS, PH.D.**

01:18 1  NOR DID HE NOT ASK HIS ADULT SUPPORT MEMBERS ABOUT THE PLANS.
     2  THAT WOULD BE PRETTY CONSISTENT WITH WHAT I WOULD THINK A CHILD
     3  WOULD EXHIBIT IN HIS SITUATION.
     4  **Q.**   DID IT SURPRISE YOU THAT ALEX IS INFLUENCED BY OTHER YOUTH
     5  TO MISBEHAVE SOMETIMES?
     6  **A.**   NO.  I HAVE NOT MET A 13 YEAR OLD WHO DOES NOT DO WHAT THE
     7  OTHER 13 YEAR OLDS DO OR A 17 YEAR OLD OR ANY KID FOR THAT
     8  MATTER.
     9  **Q.**   IN YOUR OPINION AS AN EXPERT, AS A PSYCHOLOGIST, COULD
    10  THAT HAVE SOMETHING TO DO WITH HIS CIRCUMSTANCES, WHERE HE'S
    11  LIVING?
    12  **A.**   YES.
    13  **Q.**   COULD YOU EXPLAIN.
    14  **A.**   YES.  THIS KIND OF GOES BACK TO I THINK WHAT I WAS SAYING
    15  BEFORE LUNCH AROUND WHEN YOU'RE IN A FIGHT OR FLIGHT OR
    16  SURVIVAL MODE, YOU TEND TO TRY YOUR BEST TO EITHER BE THE
    17  TOUGHEST PERSON IN THE CROWD OR BLEND INTO THE CROWD.  AND
    18  ALSO, IN TYPICAL ADOLESCENT DEVELOPMENT, CONFORMITY IS LIKE THE
    19  THING TO DO.  SO IF WE PUT A BUNCH OF KIDDOS THAT ARE HAVING
    20  SOME DYSREGULATED BEHAVIOR TOGETHER, THEN YOU CAN BET THAT THE
    21  MAJORITY OF THE KIDS WILL ADAPT THAT BEHAVIOR.
    22  **Q.**   DO YOU HAVE AN OPINION ABOUT ALEX A. GETTING VARIOUS
    23  CONDUCT CODE VIOLATIONS IN THE LAST COUPLE OF MONTHS, SINCE
    24  JUNE?
    25  **A.**   YES, I HAVE SOME THOUGHTS ON THAT.

**MONICA STEVENS, PH.D.**

01:20  1    **Q.**   WHAT'S YOUR OPINION ABOUT THAT?

2          **MR. MONTGOMERY:**  OBJECTION.  IT'S NOT BEEN DISCLOSED.

3    NO FOUNDATION.

4          **THE COURT:**  IS IT IN HER REPORT?

5          **MR. MONTGOMERY:**  IT IS NOT, YOUR HONOR.

6          **MS. ROSENBLOOM:**  NO.  I CAN ASK IT A DIFFERENT WAY.

7          **THE COURT:**  YOU CAN REPHRASE.  BUT I WOULD SUSTAIN

8    THE OBJECTION.

9          **MS. ROSENBLOOM:**  THANK YOU, YOUR HONOR.

10   **BY MS. ROSENBLOOM:**

11   **Q.**   DR. STEVENS, IF YOU KNEW THAT ALEX A. HAD RECEIVED CONDUCT

12   CODE VIOLATIONS WHILE IN OJJ'S CUSTODY SINCE JUNE, DO YOU HAVE

13   AN OPINION ABOUT WHAT THAT MIGHT BE RELATED TO?

14         **MR. MONTGOMERY:**  OBJECTION, YOUR HONOR.  SAME

15   OBJECTION.

16         **THE COURT:**  IF IT'S NOT IN HER REPORT, IT'S

17   SUSTAINED.

18   **BY MS. ROSENBLOOM:**

19   **Q.**   DR. STEVENS, COULD YOU TALK ABOUT FROM -- YOUR EXPERTISE

20   AND BASED ON YOUR EXPERIENCE WORKING WITH CHILDREN IN

21   PSYCHIATRIC SETTINGS AND SO FORTH AND IN THE JUVENILE JUSTICE

22   SYSTEM, WHAT DOES A TRAUMA INFORMED AND DEVELOPMENTALLY

23   APPROPRIATE ENVIRONMENT LOOK LIKE FOR A CHILD WHO NEEDS

24   REHABILITATIVE SERVICES?

25         **MR. MONTGOMERY:**  YOUR HONOR, I THINK THAT'S ALSO

MONICA STEVENS, PH.D.

01:21 1   OUTSIDE THE REPORT.

2          THE COURT:  WELL, YOU THINK IT IS OR IT IS?

3          MS. ROSENBLOOM:  PARAGRAPH 26.

4          THE COURT:  I MEAN, IT EITHER IS OR ISN'T.  I MEAN,

5   YOU RETAINED HER AS AN EXPERT TO GIVE OPINION TESTIMONY IN

6   CERTAIN FIELDS.  I LET HER GIVE OPINION TESTIMONY ABOUT WHAT

7   SHE OBSERVED THIS MORNING BECAUSE SHE'S A CLINICAL PSYCHOLOGIST

8   AND THAT -- I GAVE YOU SOME LATITUDE.  BUT OTHERWISE -- I MEAN,

9   YOU ENGAGED HER AND YOU ASKED HER TO GIVE YOU OPINION

10  TESTIMONY, AND SHE -- OR OPINIONS -- AND SHE PUT THEM IN A

11  REPORT, AND THEY ARE ENTITLED TO RELY ON THE FOUR CORNERS OF

12  THAT REPORT.

13         MS. ROSENBLOOM:  RESPECTFULLY, YOUR HONOR --

14         THE COURT:  SO IF IT'S IN HER REPORT, YOU CAN ASK IT.

15         MS. ROSENBLOOM:  OKAY.

16         THE COURT:  IF IT'S NOT, YOU CAN'T.

17         MS. ROSENBLOOM:  OKAY.

18  BY MS. ROSENBLOOM:

19  Q.   DR. STEVENS, DIRECTING YOUR ATTENTION TO PARAGRAPH 26 OF

20  YOUR REPORT.

21         THE COURT:  SO THE QUESTION IS:  WHAT DOES

22  TRAUMA-INFORMED REHABILITATIVE SERVICES FOR YOUTH LOOK LIKE?

23  IS THAT -- AM I --

24         MS. ROSENBLOOM:  ESSENTIALLY, YES.

25         THE COURT:  OKAY.  YOU CAN ANSWER THAT QUESTION.

MONICA STEVENS, PH.D.

01:22 1  BY THE WITNESS:

2  A.    YES.  I MEAN, GOSH, THAT'S A LOT TO UNPACK.  BUT

3  "DEVELOPMENTALLY APPROPRIATE" MEANS EXACTLY THAT, APPROPRIATE

4  TO A CHILD'S DEVELOPMENTAL FUNCTIONING, WHICH IS BASED ON A

5  HOST OF INDICATORS THAT A DEVELOPMENTAL PSYCHOLOGIST OR A

6  CLINICAL PSYCHOLOGIST OR A SCHOOL PSYCHOLOGIST, OR MANY OTHER

7  PROFESSIONALS, COULD, YOU KNOW, OUTLINE.  AND I COULD GO

8  FURTHER INTO DETAIL IF YOU WOULD LIKE.

9          CULTURALLY RESPONSIVE ALSO IS REALLY IMPORTANT

10  PARTICULARLY TO THIS CASE, GIVEN THE PROBLEMATIC HISTORY OF

11  ANGOLA AND THE ASSOCIATIONS THAT OFTEN OCCUR TO YOUNG PEOPLE

12  AND ADULTS WHO GROW UP KNOWING ABOUT ANGOLA'S HISTORY.

13          TO BE MORE EXPLICIT, IT --

14          MR. MONTGOMERY:  YOUR HONOR, I OBJECT TO THIS.  THIS

15  WITNESS HAS NOT BEEN TENDERED AS AN EXPERT ON ANGOLA, ON THE

16  PRISON SYSTEM, OR EVEN IN CORRECTIONS.

17  BY MS. ROSENBLOOM:

18  Q.    THAT'S CORRECT.  IF YOU KEEP YOUR ANSWER TO WHAT A

19  DEVELOPMENTALLY APPROPRIATE REHABILITATIVE TRAUMA-INFORMED

20  ENVIRONMENT LOOKS LIKE FOR CHILDREN IN NEED OF REHABILITATION,

21  I'D APPRECIATE IT.

22          MR. MONTGOMERY:  THAT IS ALSO NOT IN THE REPORT.

23  PARAGRAPH 26 SAYS THAT THERE SHOULD BE THAT, BUT IT DOESN'T

24  GIVE ANY INFORMATION ABOUT WHAT THAT IS.

25          MS. ROSENBLOOM:  YES.

**MONICA STEVENS, PH.D.**

01:23 1                **MR. MONTGOMERY:**  THERE ARE NO OPINIONS TO THAT IN

2    THAT REGARD.

3                **MS. ROSENBLOOM:**  I'M ASKING THE WITNESS WHAT SHE

4    MEANS BY WHAT SHE SAID IN PARAGRAPH 26.

5                **MR. MONTGOMERY:**  WHICH IS, AGAIN, NOT IN THE REPORT.

6                **THE COURT:**  I'M GOING TO ALLOW IT.  OVERRULED.

7                     SO TELL US WHAT "TRAUMA-INFORMED ENVIRONMENTS

8    AND PROGRAMMING" MEANS OR WHAT YOU HAVE INDICATED IN PARAGRAPH

9    26.

10                **THE WITNESS:**  IT IS AN ENVIRONMENT THAT, AGAIN, TAKES

11   INTO ACCOUNT WHERE A CHILD IS DEVELOPMENTALLY FUNCTIONING AND

12   THAT IS SOMETHING WELL WITHIN THE SCOPE OF PSYCHOLOGY TO

13   DETERMINE.  CULTURALLY RESPONSIVE TREATMENT IS PART OF OUR

14   ETHICAL CODE IN THE AMERICAN PSYCHOLOGICAL ASSOCIATION,

15   PSYCHIATRIC ASSOCIATION.  NAME THE ASSOCIATION, THIS IS PART

16   AND PARCEL OF HOW WE APPROACH TREATING YOUNG PEOPLE.  SO WITHIN

17   THE SCOPE, I WOULD ARGUE, AND TRAUMA-INFORMED AS WELL.

18                     SO THIS MEANS THAT WE ARE NOT RE-TRIGGERING CHILDREN

19   BY RE-PERPETUATING SOME OF THE CIRCUMSTANCES THAT GOT THEM INTO

20   THESE PLACEMENTS IN THE FIRST PLACE.  WE ARE ALSO TRYING TO

21   RECOGNIZE SYMPTOMS OF TRAUMA.  WE ARE RESPONDING TO SYMPTOMS OF

22   TRAUMA.  AND IN ORDER TO HAVE AN ENVIRONMENT LIKE THAT, YOU

23   VERY MUCH NEED SPECIALLY TRAINED INDIVIDUALS WHO ARE -- WHO

24   UNDERSTAND ALL THESE HYPHENATED WORDS THAT I'VE INCLUDED IN MY

25   REPORT.

**MONICA STEVENS, PH.D.**

01:25   1       THERE IS A CERTAIN CULTURE AND MENTALITY THAT NEEDS

     2   TO GO INTO THESE ENVIRONMENTS THAT, AGAIN, TAKES A LOT OF

     3   TRAINING AND MINDSET MAKING SO AS TO NOT RE-TRAUMATIZE

     4   CHILDREN, AT A MINIMUM, TO REHABILITATE KIDS AT A GOOD -- AND

     5   TO HELP KIDS THRIVE AT THE BEST.

     6         PROGRAMMING IS -- THAT'S THE ENVIRONMENT.  THAT'S THE

     7   NEST THAT YOU WANT KIDS TO LIVE IN.  IT DOESN'T LOOK LIKE A

     8   JAIL.  I CAN TELL YOU WHAT IT DOESN'T LOOK LIKE.  IT DOES LOOK

     9   LIKE WHERE YOU WOULD WANT TO SEND YOUR OWN KIDS TO SCHOOL, FOR

   10   EXAMPLE, WHERE YOU WANT PEOPLE TO FEEL SAFE, THE CHILDREN AND

   11   THE ADULTS IN THE SITUATION.  IT LOOKS BRIGHT.  IT LOOKS CHILD

   12   FRIENDLY.

   13         IT LOOKS LIKE WE UNDERSTAND THAT WHEN WE DRIBBLE A

   14   BASKETBALL, THAT WE NEED CONCRETE UNDERNEATH IT.  IT LOOKS LIKE

   15   THINGS THAT YOU WANT TO SEE FOR CHILDREN AND ADOLESCENTS TO DO.

   16         YES, WE ARE TALKING ABOUT A MORE SECURE FACILITY.

   17   BUT THERE'S A WAY TO DO BOTH THAT I DID NOT SEE IN THE PLAN.

   18   **Q.**   THANK YOU.

   19        ARE THERE PSYCHOLOGICAL DIFFERENCES BETWEEN CHILDREN

   20   AND ADULTS?  I'M NOT ASKING FOR AN ENTIRE TREATISE.

   21   **A.**   YES.

   22   **Q.**   BUT CAN YOU SUMMARIZE WHAT SOME OF THOSE DIFFERENCES ARE?

   23   **A.**   YOUR ACTUAL NEUROANATOMICAL STRUCTURE IS DIFFERENT FROM

   24   ZERO TO 25 TO POST-25.  LIKE YOU COULD ARGUE THAT BETWEEN 24

   25   AND 26, MAYBE THE -- A LITTLE BIT -- BUT YES, WE ARE TALKING

**MONICA STEVENS, PH.D.**

01:26  1   ABOUT I BELIEVE KIDS UNDER THE AGE OF 21, IF NOT 18.  AND IT'S

2   A MARKEDLY DIFFERENT BRAIN STRUCTURE, PARTICULARLY IN THE

3   PREFRONTAL CORTEX, WHICH IS WHERE WE DO MOST OF OUR

4   DECISION-MAKING, OUR IMPULSE CONTROL, ALL THAT GOOD STUFF.

5          IT'S ALSO IMPORTANT TO KNOW THAT DURING THIS TIME OUR

6   REWARD CENTERS ARE VERY MUCH DEVELOPING OR BEING SHRUNKEN --

7   SHRUNK.  AND SO IF WE ARE TRYING TO INCENTIVIZE KIDS WITH LIKE

8   TOKEN REWARDS, BEHAVIOR SYSTEMS, STUFF LIKE THAT, IT DOESN'T

9   WORK FOR TRAUMATIZED KIDS.  IT DOESN'T WORK FOR KIDS THAT WE

10  ARE ACTIVELY TRAUMATIZING.

11  **Q.**   WHAT IS "EXECUTIVE FUNCTIONING"?

12  **A.**   IT'S LIKE A -- IT'S A NEUROPSYCHOLOGICAL TERM THAT JUST

13  BASICALLY SPEAKS TO THE PROCESSES OF YOUR PREFRONTAL CORTEX

14  WHICH IS AROUND DECISION-MAKING, LIKE I SAID, IMPULSE CONTROL,

15  THINKING THROUGH -- JUDGMENT.  IT'S REALLY YOUR JUDGMENT

16  CENTER, ESSENTIALLY.  AND ALSO BEING ABLE TO MULTITASK, LIKE

17  HOLDING TWO THINGS IN MIND AT THE SAME TIME.  PRETTY CRITICAL

18  LIFE SKILLS.

19  **Q.**   IN PARAGRAPH 2 OF YOUR REPORT -- COULD WE SCROLL TO THAT,

20  PLEASE -- YOU TALK ABOUT CHILDREN IN THE JUVENILE JUSTICE

21  SYSTEM BEING AT HIGHER RISKS THAN THEIR SAME-AGED PEERS TO HAVE

22  DEFICITS IN EXECUTIVE FUNCTIONING.  AND YOU SAY THEY WILL

23  ALMOST CERTAINLY EXPERIENCE LACK OF GROWTH AND PERHAPS

24  NEUROLOGICAL REGRESSION WHEN PLACED IN AN ENVIRONMENT

25  INCONSISTENT WITH THEIR DEVELOPMENTAL NEEDS.  COULD YOU EXPLAIN

MONICA STEVENS, PH.D.

01:27 1   A LITTLE BIT MORE IN LAYPERSON'S TERMS ABOUT WHAT THAT MEANS?

2   **A.**   WELL, YEAH.  BASICALLY IT MEANS -- I'M TRYING TO THINK OF

3   A GOOD EXAMPLE.  IF I GIVE YOU A BALL OF PLAY-DOH AND ASK YOU

4   TO MAKE SOMETHING OUT OF IT, I CAN CRUSH IT UP AND CRUMBLE IT

5   UP AND THROW BAD THINGS ON IT, OR I CAN LEAVE IT ALONE AND LET

6   YOU MAKE A THING THAT YOU WANT TO MAKE OUT OF IT.  SO THAT'S

7   ABOUT -- THAT'S HOW I WOULD EXPLAIN IT TO MAYBE A SIX YEAR OLD.

8          BUT HERE WHAT I DO MEAN IS THAT THE BRAIN IS

9   LITERALLY STILL FORMING.  IT'S PLASTIC.  IT HAS A LOT OF

10   POTENTIAL TO GET BETTER, AND A LOT OF POTENTIAL TO GET WORSE IN

11   TERMS OF LIKE THE OVERALL FUNCTIONING.  AND REALLY IT'S NOT

12   JUST LIKE PSYCHOLOGICAL.  THE BRAIN IS A PART OF YOUR BODY THAT

13   IS LIKE AN ORGAN, ESSENTIALLY.

14          SO IF WE PUT -- ANY TIME WE PUT ANY OF US UNDER

15   STRESSFUL SITUATIONS, OUR BRAIN RESERVES ENERGY AND REALLY --

16   RESERVES ENERGY AND BASICALLY TAKES AWAY BLOOD FLOW FROM THE

17   PREFRONTAL CORTEX AND PUTS IT ALL BACK IN KIND OF THE MORE LIKE

18   CAVEMAN PARTS OF OUR BRAIN, THE SURVIVAL PARTS OF OUR BRAIN.

19          SO IN A TIME PERIOD WHERE WE ARE -- ESPECIALLY FOR

20   ADOLESCENTS, WE ARE WANTING TO SEE PREFRONTAL GROWTH AND

21   NEURONAL CONNECTIONS.  WE ARE REALLY BASICALLY PUTTING KIDS IN

22   A CONDITION THAT WOULD SAY "DON'T WORRY ABOUT MATH, WORRY ABOUT

23   SURVIVING."  AND YEAH, I DON'T SEE HOW THIS PLAN WOULD MITIGATE

24   ANY OF THAT.

25   **Q.**   AND IF YOU HAVE A CHILD WHO HAS BEEN FOUND TO BE IN NEED

MONICA STEVENS, PH.D.

01:29  1    OF REHABILITATION AND YOU PLACE THAT CHILD IN AN ENVIRONMENT
        2    THAT LOOKS LIKE AN ADULT PRISON, WHAT MIGHT THE EFFECTS BE ON
        3    THEIR DEVELOPMENT, ON THEIR BRAIN DEVELOPMENT, AND SO FORTH?
        4    A.    YEAH.  I MEAN, I WOULD EXPECT REGRESSION FROM MOST KIDS.
        5    NOW, THERE'S SUCH A THING AS PROTECTIVE FACTORS, RIGHT.  SO I'M
        6    NOT GOING TO SAY IT'S ALL BAD NEWS.  YOU'VE GOT SOME KIDS THAT
        7    CAN GO THROUGH THE WORST THINGS YOU CAN IMAGINE AND COME OUT
        8    OKAY.
        9         BUT IF I'M BETTING ON -- LIKE IF I'M TALKING ABOUT
       10    POPULATIONS AND POLICY DECISIONS, I'M GOING TO GO WITH THE
       11    WHOLE AND NOT THE EXCEPTIONS.  AND SO YES, I WOULD IMAGINE THAT
       12    WE ARE GOING TO -- A PLACEMENT LIKE THIS WOULD BE CONSIDERED
       13    DEPRIVATION TO ME.  THE RISK OF HARM I THINK IS UNREASONABLE.
       14    Q.    IN YOUR OPINION, IS THERE A RISK THAT THERE WILL BE AN
       15    EFFECT ON THE LIKELIHOOD OF REHABILITATION TO BEING IN AN
       16    ENVIRONMENT LIKE THAT?
       17    A.    YEAH, DEFINITELY.
       18    Q.    WHAT IS THAT EFFECT?
       19    A.    WHAT IS THE EFFECT OR THE RISK?  THE RISK IS SUPER HIGH.
       20    I MEAN, I -- THERE'S NOT -- THIS PLAN DOESN'T -- IF THE PLAN IS
       21    TO SCARE KIDS STRAIGHT, I CAN TELL YOU RIGHT NOW THAT'S NOT AN
       22    EFFECTIVE PLAN.  THAT'S WHAT IT LOOKS LIKE TO ME, TO BE HONEST.
       23    THE REST OF IT LOOKS LIKE EXACT -- ON PAPER IT LOOKS LIKE
       24    WHAT'S HAPPENING AT BRIDGE CITY.  SO I'M STILL UNSURE ABOUT
       25    WHAT WOULD BE DIFFERENT AT THIS FACILITY BESIDES PERHAPS MORE

**MONICA STEVENS, PH.D.**

01:31 1   PHYSICAL SECURITY IN THE FACILITIES.

2   **Q.**   DR. STEVENS, FEEL FREE TO SCROLL DOWN THE REPORT OR -- IF

3   YOU CAN SCROLL IT DOWN AND -- OR JUST FROM YOUR OWN

4   RECOLLECTION OF THE REPORT, IS THERE ANY OTHER CONCERN YOU WANT

5   TO EXPRESS BASED ON YOUR TRAINING AND PROFESSIONAL EXPERIENCE

6   ABOUT ALEX OR OTHER YOUTH WHO MIGHT BE TRANSFERRED TO THIS

7   ANGOLA PRISON SITE?

8   **A.**   I MEAN, TO BE HONEST, YEAH.  WHEN I THOUGHT ABOUT GETTING

9   INVOLVED WITH THIS, I DON'T THINK I HONESTLY FULLY RECOGNIZED

10   THAT, AFTER KNOWING WHAT I KNOW NOW, HOW CONCERNED I WOULD BE

11   AS A STATE-MANDATED REPORTER, THAT IT -- KNOWING THAT THERE ARE

12   -- I STILL CONSIDER THEM CHILDREN.  WE CAN CALL THEM YOUTH,

13   WHATEVER.  BUT THESE ARE YOUNG PEOPLE THAT ARE GOING TO AN

14   ENVIRONMENT THAT'S VERY SCARY FOR THEM WHERE I DON'T -- I

15   WOULDN'T FEEL CONFIDENT ABOUT -- I'M NOT CONFIDENT THAT THEY

16   WILL BE PHYSICALLY SAFE.  I'M VERY, VERY, VERY CONCERNED ABOUT

17   THEIR PSYCHOLOGICAL SAFETY.

18          IN MY CAPACITY AS THE CLINICAL DIRECTOR AT THE

19   CENTER FOR RESILIENCE, I OFTEN HAD TO MAKE DIFFICULT DECISIONS

20   ABOUT PLACEMENT FOR KIDS THAT NEEDED HIGHER LEVELS OF CARE.

21   AND YEAH, I COULDN'T ETHICALLY EVER SIGN OFF ON THIS.  AND, IN

22   FACT, MIGHT HAVE TO REPORT IT.  IT'S KIND OF A DIFFICULT

23   POSITION TO BE IN.

24   **Q.**   WHEN YOU TALK ABOUT BEING A "MANDATED REPORTER," A

25   MANDATED REPORTER OF WHAT?

**MONICA STEVENS, PH.D.**

01:33  1    **A.**   SUSPICION OF CHILD ABUSE AND NEGLECT.

2    **Q.**   AND WHY WOULD YOU EVEN ENTERTAIN THE THOUGHT OF REPORTING

3    THIS PLAN AS A MANDATED REPORTER?  WHAT IS IT ABOUT IT THAT --

4    **A.**   YEAH.  I MEAN, IF I'M CONCERNED THAT A CHILD'S BASIC NEEDS

5    ARE BEING -- ARE NOT BEING ATTENDED TO, THAT'S ONE OF THE

6    THINGS THAT I'M MANDATED TO REPORT ON.  THIS WOULD MAKE ME --

7    AGAIN, BECAUSE I DON'T FEEL AS THOUGH THE DETAILS OF THE PLAN

8    ARE AS LAID OUT AS THEY COULD BE, IT WOULD BE DIFFICULT FOR ME

9    TO SAY YES, THEIR BASIC NEEDS WILL BE TAKEN CARE.  I CAN'T SAY

10   THAT TODAY.

11          AND THEN THE POTENTIAL FOR HARM WOULD RISE TO THE

12   LEVEL OF CONCERN FOR ME AS WELL.  IF THIS WAS AN INDIVIDUAL --

13   IF ALEX WAS A PATIENT OF MINE IN A CLINIC AND WAS DESCRIBING

14   SOME OF THE CONDITIONS THAT WE'VE LEARNED ABOUT, I WOULD

15   PROBABLY GO AHEAD AND MAKE A REPORT.

16   **Q.**   THANK YOU.

17          I HAVE NO MORE QUESTIONS EXCEPT OF YOUR HONOR.

18          **MS. ROSENBLOOM:**  THE REPORT IS NOT IN EVIDENCE.  BUT

19   SINCE DR. STEVENS' C.V. IS INCORPORATED WITHIN THE REPORT, MAY

20   WE MARK HER C.V. AS A SEPARATE EXHIBIT?  AND I WOULD OFFER THAT

21   INTO ADMISSION.  IT'S PAGES 16 TO 32 OF WHAT'S MARKED FOR

22   IDENTIFICATION AS PLAINTIFFS' 74.

23          **THE COURT:**  I WOULD JUST MARK -- YES, YOU MAY ADMIT

24   HER C.V.  ADMIT HER C.V. AS A SEPARATE EXHIBIT.  SO WHATEVER

25   YOUR NEXT EXHIBIT NUMBER IS, GIVE IT --

**MONICA STEVENS, PH.D.**

01:34  1                    **MS. ROSENBLOOM:**  OKAY.

       2                    **THE COURT:**  -- THAT EXHIBIT NUMBER AND UPLOAD IT INTO

       3     JERS.

       4                    **MS. ROSENBLOOM:**  THAT IS NO. 76.

       5                    **THE COURT:**  SO WHAT EXHIBIT NUMBER ARE YOU GOING TO

       6     GIVE IT?

       7                    **MS. ROSENBLOOM:**  THAT WILL BE 76.  PLAINTIFFS' 76,

       8     FOR THE RECORD.

       9                    **THE COURT:**  OKAY.  PLAINTIFFS' 76 IS ADMITTED.

      10                    **MS. ROSENBLOOM:**  OKAY.  IT TURNS OUT I WAS RIGHT

      11     ABOUT THAT NUMBER.  GOOD.

      12     **BY MS. ROSENBLOOM:**

      13     **Q.**   THANK YOU, DR. STEVENS.  I HAVE NO MORE QUESTIONS.  BUT

      14     THE OTHER SIDE MAY.

      15     **A.**   THANKS.

      16                    **THE COURT:**  CROSS.

      17                           **CROSS-EXAMINATION**

      18     **BY MR. MONTGOMERY:**

      19     **Q.**   DR. STEVENS --

      20     **A.**   HI.

      21     **Q.**   I'M GOING TO START FROM THE END AND WORK BACKWARDS.

      22           I WANT TO MAKE SURE I UNDERSTOOD YOUR LAST COMMENT

      23     ABOUT REPORTING THE PLAN TO THE STATE BECAUSE OF EITHER ABUSE

      24     OR LACK OF BASIC NEEDS.  I THINK YOU SAID THE PLAN IS UNCLEAR

      25     TO YOU OR UNFINISHED?

**MONICA STEVENS, PH.D.**

01:35 1    **A.**   CORRECT.

2    **Q.**   AND SO YOU CAN'T BE CERTAIN THAT WHEN YOU LOOK AT IT, YOU

3    CAN'T TESTIFY THAT THEIR BASIC NEEDS WILL BE MET.

4            WAS THAT YOUR TESTIMONY?

5    **A.**   BASED ON THE -- YEAH.  THE INFORMATION I REVIEWED, I WOULD

6    HAVE SOME CONCERNS ABOUT THAT, CORRECT.

7    **Q.**   LACK OF INFORMATION IS THE PROBLEM?

8    **A.**   LACK OF INFORMATION IS CERTAINLY THE PROBLEM IN THIS

9    SITUATION.

10   **Q.**   OKAY.  DO YOU HAVE ANY EVIDENCE OR INFORMATION SUGGESTING

11   THERE WILL BE ABUSE OR LACK OF BASIC NEEDS AT THE

12   WEST FELICIANA FACILITY AT ANGOLA?

13   **A.**   MY ETHICAL OBLIGATION IS TO ONLY REPORT SUSPICION OF.

14   **Q.**   AND WHAT IS THE BASIS FOR YOUR SUSPICION?

15   **A.**   MY CLINICAL JUDGMENT AS LIKE LAID OUT BY MY LICENSE.

16   **Q.**   OKAY.  DO YOU HAVE ANY EVIDENCE, FOR PURPOSES OF THIS

17   TRIAL, THAT OJJ INTENDS TO ABUSE YOUTH WITHIN THE NEW FACILITY?

18   **A.**   I DON'T HAVE TO REPORT ON INTENTION, JUST THE SUSPICION OF

19   HARM IS WHERE MY OBLIGATIONS LAY.

20   **Q.**   RIGHT.

21           SO THE BASIS FOR THE SUSPICION IS WHAT I AM GETTING

22   AT HERE.  YOU SAID IT'S YOUR "CLINICAL JUDGMENT."   I

23   UNDERSTAND THAT COMES FROM YOU INTERNALLY.  MY QUESTION IS:  DO

24   YOU HAVE ANY EVIDENCE, FOR PURPOSES OF THIS TRIAL, A DOCUMENT

25   OR A CONVERSATION WITH A WITNESS THAT WOULD SUGGEST THERE WILL

**MONICA STEVENS, PH.D.**

01:36  1   BE ABUSE AT THE NEW FACILITY?

2   **A.**   IN MY EXPERT OPINION AND -- IN MY EXPERT OPINION, PLACING

3   CHILDREN AT A MAXIMUM FACILITY FOR ADULTS IS OF ENOUGH CONCERN

4   THAT IT WOULD LIKE RISE TO THE LEVEL THAT I WOULD BE MANDATED.

5   NOW, WHAT THE STATE DOES WITH IT AFTER THAT IS THEIR JOB.

6   THAT'S HOW IT WORKS.

7   **Q.**   OKAY.  SO IT'S THE SIMPLE FACT THAT THEY WILL BE INSIDE

8   THE PREMISES OF ANGOLA, THAT'S THE BASIS FOR YOUR SUSPICION

9   THAT THERE WILL BE ABUSE?

10   **A.**   I'M NOT -- I'M NOT -- I'M NOT SAYING THERE WILL BE ABUSE.

11   I'M SAYING THERE ARE CONCERNING ENOUGH CONDITIONS TO RISE TO

12   THE POINT WHERE I WOULD NEED TO MAKE A REPORT.

13   **Q.**   THAT'S RIGHT.

14   **A.**   IF THIS WAS IN A SCENARIO WHERE I'M SEEING A CHILD AS A

15   PATIENT.

16   **Q.**   SO LET ME BE CLEAR.  I KEEP SAYING "THE BASIS FOR YOUR

17   SUSPICION."  I'M NOT SAYING -- I'VE NOT HEARD YOU SAY YOU HAVE

18   ANY EVIDENCE THAT THERE WILL BE ABUSE.  YOU'RE SAYING YOU

19   SUSPECT THERE MIGHT.  I'M ASKING YOU THE BASIS FOR YOUR

20   SUSPICION.  DO YOU HAVE ANY DOCUMENTS OR ANY EVIDENCE THAT

21   WOULD SUGGEST ANY CHILDREN WILL BE ABUSED AT THE NEW FACILITY?

22   **A.**   OFTENTIMES, I HAVE TO RELY ON COMMON SENSE, AND THAT'S

23   WHAT I'M RELYING ON RIGHT NOW.

24   **Q.**   YOU THINK IT'S A MATTER OF COMMON SENSE THAT THERE WILL BE

25   ABUSE AT THE NEW FACILITY?

MONICA STEVENS, PH.D.

01:37 1   **A.**   I HAVE A -- IT'S A MATTER OF COMMON SENSE THAT PLACING
2   CHILDREN AT A MAXIMUM-SECURITY ADULT FACILITY IS NOT GOOD FOR
3   CHILDREN AND, IN FACT, HARMFUL.
4   **Q.**   DO YOU HAVE ANY EXPERIENCE IN CORRECTIONS?  HAVE YOU EVER
5   WORKED IN A CORRECTIONAL FACILITY?
6   **A.**   I'M SURE NOT.
7   **Q.**   HAVE YOU EVER DESIGNED A CORRECTIONAL FACILITY?
8   **A.**   NO.  I'VE DESIGNED THERAPEUTIC FACILITIES, THOUGH.
9   **Q.**   BUT A FACILITY SUCH AS THE YOUTH FACILITIES WE'RE HERE
10   ABOUT, YOU'VE NEVER DESIGNED ONE?
11   **A.**   I'VE DESIGNED THERAPEUTIC -- A THERAPEUTIC MILIEU
12   MEANT TO REHABILITATE KIDS SO THEY CAN GO BACK TO THEIR LEAST
13   RESTRICTIVE ENVIRONMENT, WHICH IS WHAT I UNDERSTAND WE ARE
14   TRYING TO DO HERE.
15   **Q.**   HAVE YOU DESIGNED A SECURE-CARE FACILITY FOR YOUTH OF
16   THIS -- WITH OFFENSES LIKE THESE?
17   **A.**   DEFINE "SECURE CARE."
18   **Q.**   WELL, THAT'S WHAT WE'RE HERE ABOUT, THE FACILITIES WE'RE
19   HERE ABOUT.
20   **A.**   ARE WE TALKING ABOUT ADJUDICATED YOUTH?
21   **Q.**   YES, ADJUDICATED YOUTH.  WE'RE TALKING ABOUT THE
22   WEST FELICIANA FACILITY, A FACILITY FOR BEHAVIORAL TREATMENT.
23   **A.**   I'VE NEVER DESIGNED A FACILITY FOR ADJUDICATED YOUTH.
24   **Q.**   AND YOU DON'T HOLD YOURSELF OUT AS HAVING EXPERTISE IN
25   CORRECTIONS OR IN THE AREA OF CORRECTIONS, DO YOU?

**MONICA STEVENS, PH.D.**

01:38 1  **A.**   NOT UNLESS WE'RE GIVING OUT HONORARY DEGREES, WHICH I

2  THINK I PROBABLY WOULD QUALIFY FOR.  BUT NO.

3  **Q.**   RIGHT.

4        OTHER THAN HONORARY DEGREES?

5  **A.**   NO HONORARY --

6  **Q.**   ACTUAL DEGREES IS WHAT WE'RE TALKING ABOUT.

7  **A.**   NO ACTUAL DEGREE IN IT, YEP.

8  **Q.**   OKAY.  ACTUALLY EXPERTISE.

9        HAVE YOU DIAGNOSED ALEX A. WITH ANY TYPE OF MEDICAL

10  OR PSYCHIATRIC CONDITION?

11  **A.**   NO.

12  **Q.**   DO YOU HAVE -- OR HAVE YOU COME UP WITH ANY PROGNOSIS FOR

13  ALEX A.?

14  **A.**   I WOULDN'T BE ABLE TO DO THAT IN A 30-MINUTE INTERVIEW.

15  **Q.**   SO AS A MATTER OF PSYCHOLOGY AND MEDICAL DIAGNOSTICS, YOU

16  CAN'T POINT TO ANY SPECIFIC SYMPTOM OR PROBLEM THAT ALEX A.

17  WILL HAVE IF MOVED TO THE WEST FELICIANA FACILITY?

18  **A.**   I CAN TELL YOU BASED ON STATISTICS AND RESEARCH WHICH

19  SYMPTOMS I -- THAT LIKE LIT UP FOR ME THAT WOULD CAUSE ME

20  CONCERN AS A PRACTITIONER.

21  **Q.**   WELL, RIGHT NOW I WANT TO BASE IT ON YOUR OWN ANALYSIS OF

22  ALEX A., YOUR INTERVIEW.

23  **A.**   CAN YOU REPEAT YOUR QUESTION THEN?

24  **Q.**   YEAH.

25        CAN YOU -- ARE YOU ABLE TO -- YOU SAID YOU HAVE NOT

**MONICA STEVENS, PH.D.**

01:40 1 GIVEN HIM A PROGNOSIS.  ARE YOU ABLE TO POINT TO ANY SPECIFIC

2 SYMPTOM OR PROBLEM, MEDICAL OR PSYCHIATRIC, THAT ALEX A. WILL

3 EXPERIENCE IF HE MOVES TO THE FACILITY?

4 **A.**   NOT WILL.  I'M NOT -- NO, I'M NOT A FORTUNE TELLER.  I CAN

5 TELL YOU WHAT I'M SEEING NOW.

6 **Q.**   LET ME GO THROUGH YOUR UNDERSTANDING OF ALEX A.'S

7 CONCERNS.

8          YOUR INTERVIEW WAS VIA ZOOM?

9 **A.**   CORRECT.

10 **Q.**   IT WAS 30 MINUTES?

11 **A.**   CORRECT.

12 **Q.**   THAT WAS THE FIRST TIME YOU EVER MET ALEX A.?

13 **A.**   UH-HUH.

14 **Q.**   DID YOU LOOK AT ALEX A.'S CLASSIFICATION FILE FOR PURPOSES

15 OF THIS CASE?

16 **A.**   I'M NOT SURE WHAT YOU MEAN BY "CLASSIFICATION FILE."  BUT

17 I DID HAVE AN OPPORTUNITY TO REVIEW SOME FILES.  I'M NOT SURE

18 WHICH ONE YOU'RE POINTING TO.

19 **Q.**   WELL, WHAT FILES THAT PERTAIN TO ALEX A. WERE YOU ABLE TO

20 REVIEW?

21 **A.**   HIS DECLARATION.  I WOULD REALLY NEED TO LIKE LOOK AT MY

22 NOTES.

23          **MR. MONTGOMERY:**  WITH THE COURT'S PERMISSION, I CAN

24 HAND THE WITNESS THIS DOCUMENT OR WE CAN HAVE IT DISPLAYED.

25          I BELIEVE THIS IS YOUR LIST OF MATERIALS RELIED

**MONICA STEVENS, PH.D.**

01:41 1    UPON IN YOUR EXPERT REPORT.

2                    **THE COURT:**  PUT IT ON THE DOCUMENT CAMERA.

3                    **THE DEPUTY CLERK:**  YOU CAN PUT IT RIGHT HERE.

4              **MR. MONTGOMERY:**  OH, NICE.  OKAY.  THANK YOU.

5                    **THE COURT:**  YOU HAVE TO ADJUST IT.

6              **MR. MONTGOMERY:**  SO MY SCREEN IS COMPLETELY DARK.  I

7    CAN'T TELL.

8                    **THE COURT:**  IS THAT SCREEN TURNED OFF AGAIN?

9                    **THE DEPUTY CLERK:**  IS IT?  I AM GOING TO HAVE TO GET

10   SOMEBODY TO COME LOOK AT IT.

11                    IT'S RIGHT THERE.

12                    **THE COURT:**  HAND THE WITNESS THE DOCUMENT.  YOU MAY

13   APPROACH.

14             **MR. MONTGOMERY:**  THANK YOU, YOUR HONOR.

15   BY MR. MONTGOMERY:

16   **Q.**   I BELIEVE THIS WAS EXHIBIT B TO YOUR EXPERT REPORT.

17   **A.**   THANK YOU.

18   **Q.**   IS THAT A COMPLETE LIST OF EVERYTHING YOU REVIEWED, FOR

19   PURPOSES OF THE CASE?  I'M SO SORRY.  IT'S TWO PAGES.

20   **A.**   I WAS GOING TO SAY THAT DOESN'T SEEM LIKE NEARLY ENOUGH.

21   **Q.**   YEAH, I APOLOGIZE.  I DIDN'T SEE IT THERE.  MY BAD.

22   **A.**   NO WORRIES.

23   **Q.**   MY UNDERSTANDING IS THAT IS THE LIST OF MATERIALS THAT YOU

24   REVIEWED FOR PURPOSES OF THIS CASE.  IS THAT CORRECT?

25   **A.**   YES.

**MONICA STEVENS, PH.D.**

01:42 1  **Q.**  SO WHAT DOCUMENTS THAT PERTAIN TO ALEX A. WERE YOU ABLE TO
2  REVIEW?
3  **A.**  THAT PERTAINED TO ALEX?  WELL, IT FEELS TO ME THEY ALL
4  PERTAIN -- WELL, CITED IN THE REPORT, I GUESS WE COULD TAKE
5  THAT OFF OF YOUR ANSWER -- I MEAN, MY ANSWER.
6  **Q.**  LET ME ASK IT A BETTER WAY.
7  **A.**  OKAY.
8  **Q.**  BECAUSE YOU'RE RIGHT, I GUESS EVERYTHING ARGUABLY PERTAINS
9  TO ALEX A.  RIGHT?
10  **A.**  UH-HUH.
11  **Q.**  EVERYTHING WE'RE HERE ABOUT, SINCE HE'S THE PLAINTIFF.  SO
12  WHAT FILES?  WERE YOU ABLE TO REVIEW ANY FILES PERTAINING TO
13  ALEX A., LIKE HIS MEDICAL FILE OR HIS CLASSIFICATION FILE,
14  THINGS THAT WOULD KEEP -- THAT WOULD HAVE PERSONAL INFORMATION?
15  **A.**  I DON'T BELIEVE.  NO, I DON'T THINK SO.
16  **Q.**  OKAY.  SO YOU'VE REVIEWED NONE OF ALEX A.'S MEDICAL
17  RECORDS?
18  **A.**  NO.  AND IT WASN'T THE INTENTION TO DO SO.
19  **Q.**  AND YOU'VE REVIEWED NONE OF HIS -- NONE OF THE INTERNAL
20  FILES FROM THE OJJ ABOUT HIS BEHAVIORAL HISTORY WITHIN THE
21  SYSTEM?
22  **A.**  I'M GOING TO HAVE TO TAKE THAT ONE AS MY FAULT, 'CAUSE I
23  TOLD THEM I DIDN'T REALLY WANT THOSE, 'CAUSE THEY ARE SORT OF
24  IRRELEVANT TO ME.
25  **Q.**  SO THAT ANSWER IS NO?

**MONICA STEVENS, PH.D.**

01:43  1   **A.**   NO.

2   **Q.**   AND DID YOU REVIEW ANY OF ALEX A.'S CRIMINAL FILES, HIS

3   CRIMINAL HISTORY?

4   **A.**   ALSO IRRELEVANT TO ME.  BUT NO.

5          **MS. ROSENBLOOM:**  OBJECTION, YOUR HONOR.  ASSUMES A

6   FACT NOT IN EVIDENCE.  HE HAS NOT BEEN -- HE DOESN'T HAVE A

7   CRIMINAL HISTORY THAT'S IN EVIDENCE.  HE'S GOT A DELINQUENCY

8   HISTORY.  IT'S VERY, VERY DIFFERENT.

9          **THE COURT:**  WELL, I WOULD SUSTAIN THAT OBJECTION.

10          REPHRASE YOUR QUESTION.

11   **BY MR. MONTGOMERY:**

12   **Q.**   HIS DELINQUENCY HISTORY, ANY FILES PERTAINING TO HIS

13   DELINQUENCY HISTORY?

14   **A.**   DIDN'T WANT TO.

15   **Q.**   OKAY.  DID YOU SAY YOU DID OR DID NOT SPEAK WITH HIS

16   MOTHER?

17   **A.**   I DID NOT SPEAK WITH HIS MOTHER.  I READ HER DECLARATION.

18   **Q.**   IN YOUR INTERVIEW WITH ALEX A. AT -- YOUR REPORT SORT

19   OF -- DON'T LET ME -- I DON'T WANT TO MISCHARACTERIZE YOUR

20   REPORT.

21          PART OF THE REPORT, THOUGH, SUGGESTED TO ME THAT HE

22   BECAME UPSET IN THE INTERVIEW AND IT ENDED UP BEING CUT SHORTER

23   THAN YOU INTENDED?

24          DID I READ THAT RIGHT --

25   **A.**   I WOULDN'T --

**MONICA STEVENS, PH.D.**

01:44  1    Q.   -- BETWEEN THE LINES, OR IS THAT INCORRECT?

2    A.   IF I USED THE WORD "UPSET," I WOULD LIKE TO CLARIFY THAT.

3    I COULD TELL HE WAS ANXIOUS AND A BIT DISTRESSED.  MY

4    ANTICIPATION -- I HAD CARVED OUT AN HOUR TO TALK TO HIM.  AND

5    HE HAD DIFFICULTY I THINK SUSTAINING THE TIME TALKING ABOUT

6    WHAT WE WERE TALKING ABOUT.

7    Q.   AND YOU SAID HIS DEMEANOR WAS MUCH LIKE IT WAS -- WHAT YOU

8    OBSERVED TODAY --

9    A.   YES.

10   Q.   -- ON THE WITNESS STAND?

11   A.   CORRECT.

12   Q.   WAS IT EXACTLY LIKE THAT?

13   A.   I WOULDN'T SAY EXACTLY.

14   Q.   VERY CLOSE?

15   A.   IT WAS OVER ZOOM.  THIS WAS IN PERSON.  SO THERE WERE SOME

16   THINGS THAT YOU MISS.

17   Q.   OKAY.  YOUR PERCEPTION OF IT WAS THAT IT WAS MUCH LIKE

18   WHAT WE SAW TODAY?  IF WE SAW THIS TODAY, WE HAVE A GENERAL

19   APPRECIATION FOR WHAT YOU SAW ON THE ZOOM?

20   A.   MOSTLY -- ALTHOUGH I WOULD SAY I WAS A LITTLE -- I THOUGHT

21   HE WAS A BIT MORE OUTSPOKEN TODAY THAN WHEN I SAW HIM ON ZOOM

22   IN A WAY.  BUT FOR THE MOST PART, HE'S CONSISTENT.

23   Q.   HIS OVERALL DEMEANOR WAS CONSISTENT?

24   A.   PROBABLY.  BUT AGAIN, IT'S A DIFFERENT ANGLE AND ALL OF

25   THAT STUFF, WHICH IS SOMETHING I RELY ON IN MY JOB, A LOT OF

**MONICA STEVENS, PH.D.**

01:45  1   BODY LANGUAGE STUFF, ESPECIALLY FOR KIDS THAT ARE NOT SO

2   TALKATIVE.

3   **Q.**   WHAT DO YOU KNOW ABOUT HIS FAMILY HISTORY AND UPBRINGING?

4   **A.**   NOTHING EXCEPT WHAT HE TOLD ME, WHICH ISN'T MUCH.

5   **Q.**   WHAT DO YOU KNOW ABOUT PRIOR STRESSFUL SITUATIONS THAT HE

6   MAY HAVE ENDURED IN HIS LIFE?

7   **A.**   I CAN MAKE ASSUMPTIONS.  BUT FACTS, I DON'T KNOW.

8   **Q.**   NO FACTS?

9   **A.**   (NO ORAL RESPONSE.)

10  **Q.**   WHAT DO YOU KNOW ABOUT PRIOR STRESSFUL SITUATIONS HE MAY

11  HAVE ENDURED OR MAY BE ENDURING WITHIN THE CURRENT BRIDGE CITY

12  FACILITY?

13  **A.**   ONE THING THAT STANDS OUT THE MOST IS THAT -- AND, YOU

14  KNOW, FORGIVE ME.  I CAN'T KEEP STRAIGHT ALL WHO IS DOING

15  WHATEVER.  BUT HE DID SAY THAT HE'S -- SINCE -- IS IT THE DOC

16  OFFICER?  WHATEVER YOU CALL IT -- HAVE COME IN; THEY'VE BEEN

17  MACING THE KIDS.  HE FELT LIKE HE DIDN'T KNOW WHY THAT WAS

18  HAPPENING.  HE FELT LIKE IT WAS OUT OF NOWHERE.

19          HIS REMARK THAT HE MADE TO ME -- AND I THINK SOME OF

20  US HEARD -- THAT THE OTHER KIDS DON'T SEEM TO CARE IS ALSO I

21  THINK -- IT'S DISTRESSING, EVEN THOUGH IT MAY SEEM LIKE, WELL,

22  THE KIDS DON'T CARE, SO WHY ARE WE MAKING A BIG DEAL OUT OF IT.

23  THAT, TO ME, SIGNALS SOME HOPELESSNESS THAT COULD BE GOING ON.

24  I REALLY DOUBT THEY DON'T CARE.

25          SO I THINK HE'S FEELING PROBABLY -- WELL, SORRY.  LET

**MONICA STEVENS, PH.D.**

01:47  1    ME GET BACK TO YOUR QUESTION.

2    **Q.**   SO MY QUESTION HAD TO DO WITH SITUATIONS, YOUR KNOWLEDGE

3    OF SITUATIONS HE MAY BE DEALING WITH INSIDE THE CURRENT BRIDGE

4    CITY FACILITY.  LET ME MAKE IT MORE SPECIFIC.  WHAT DO YOU KNOW

5    ABOUT HIS RELATIONSHIPS AT BRIDGE CITY?

6    **A.**   PRIOR TO TODAY?

7    **Q.**   UH-HUH.

8    **A.**   I DON'T KNOW ABOUT THEM, EXCEPT THAT HE DOESN'T -- I DON'T

9    THINK HE FEELS CONNECTED TO ANY OTHER PEERS.

10   **Q.**   DID YOU ASK HIM ABOUT THAT IN YOUR INTERVIEW?

11   **A.**   UH-HUH.

12   **Q.**   YOU DID?

13   **A.**   ABOUT HIS CONNECTION WITH PEERS?

14   **Q.**   UH-HUH.

15   **A.**   YES.

16   **Q.**   BECAUSE THAT DIDN'T MAKE IT INTO YOUR REPORT THAT I SAW.

17   WHAT DID HE SAY?

18   **A.**   HE BASICALLY SAID -- I MEAN, I DIDN'T PUT -- YEAH, THAT HE

19   KIND OF JUST SHRUGGED HIS SHOULDERS.  AND I THINK HE'S REALLY

20   READY TO JUST GET OUT OF THERE.

21   **Q.**   DID YOU ASK HIM ABOUT HIS RELATIONSHIPS WITH THE FACILITY

22   EMPLOYEES?

23   **A.**   NO.

24   **Q.**   DO YOU KNOW WHO HIS CASE MANAGER IS?

25   **A.**   NO.

**MONICA STEVENS, PH.D.**

01:47  1  **Q.**  DID YOU ASK HIM ABOUT HIS RELATIONSHIP WITH MR. PALMER OR
      2  MS. KELLER?
      3  **A.**  NO.  IT'S HARD TO GET A LOT IN 30 MINUTES.  SO YEAH -- NO.
      4  OR AN HOUR FOR THAT MATTER.  MY EVALUATIONS USUALLY TAKE A
      5  COUPLE OF HOURS.
      6  **Q.**  DID YOU WANT TO KNOW ABOUT RELATIONSHIPS HE HAS AND
      7  WHETHER HE HAS PEOPLE HE CAN TRUST ON THE -- INSIDE THE
      8  FACILITY AND TALK TO?
      9  **A.**  TO BE HONEST, I WAS WORRIED ABOUT -- I ALWAYS HAVE TO
    10  WEIGH MY RISK OF HARM WHEN I DO THESE INTERVIEWS.  AND JUDGING
    11  BY THE LITTLE BIT OF BODY LANGUAGE I COULD GET, I FELT THAT
    12  EVEN TALKING ABOUT THIS WAS STRESSFUL FOR HIM.  AND SO THE
    13  OTHER CONCERN -- BECAUSE, ONE, WE TALKED A LOT ABOUT HIS
    14  ANXIETY AROUND NOT KNOWING WHAT THE DEAL IS GOING TO BE.
    15           AND SO I THINK FOR ME AT SOME POINT INTRODUCING THE
    16  IDEA THAT HE MAY ALSO HAVE TO DEPART FROM TRUSTED ADULTS TO GO
    17  SOMEWHERE WHERE HE DOESN'T KNOW WHO'S GOING TO BE THERE WOULD
    18  BE UNDUE STRESS FOR THIS KID.
    19  **Q.**  DO WE KNOW THAT THAT'S THE CASE?
    20  **A.**  WE DON'T, AND NEITHER DID HE.  SO I DIDN'T WANT TO
    21  INTRODUCE EXTRA UNCERTAINTY FOR HIM.
    22  **Q.**  AND SO ACCORDING TO YOUR TESTIMONY TODAY, HIS REPORTED
    23  PERCEPTION OF WHAT THE ANGOLA FACILITY WOULD BE LIKE IS, HE
    24  PERCEIVED THAT IT WOULD BE A LONG TRIP TO GET THERE, A
    25  SEVEN-HOUR DRIVE.

**MONICA STEVENS, PH.D.**

01:49  1          DID I HEAR THAT CORRECTLY?

2   **A.**   YES.

3   **Q.**   OKAY.  AND THERE WOULD BE TENSIONS ON THE RIDE OVER WAS

4   ANOTHER THING YOU SAID HE PERCEIVED ABOUT THE POTENTIAL MOVE.

5   IS THAT RIGHT?

6   **A.**   UH-HUH.

7   **Q.**   HE SAID THAT HE PERCEIVED THAT A GROUP OF ADULTS WOULD

8   IMMEDIATELY CONFRONT THE BUS UPON ARRIVAL?

9   **A.**   YES.

10  **Q.**   HE PERCEIVED THAT THERE WOULD BE SEXUAL VIOLENCE OR SEXUAL

11  ASSAULT?

12  **A.**   YEAH.  MAYBE WE SHOULD CHANGE "PERCEIVED" TO LIKE THAT'S

13  WHAT HE'S IMAGINING IS GONNA HAPPEN.  I DON'T KNOW IF THAT

14  MATTERS TO YOU.

15  **Q.**   SURE.

16          YOU SAID THERE ARE -- HE HAS CONCERNS ABOUT FINISHING

17  SCHOOL AND WHETHER HE'LL HAVE THE SAME EDUCATIONAL SERVICES?

18  **A.**   YES, BASED ON HIS REPORT.

19  **Q.**   ANY OTHER CONCERNS BY ALEX THAT HE IMPARTED TO YOU?

20  **A.**   AND THEN THE AFTER -- AFTER FINISHING HIS EDUCATION, HIS

21  EMPLOYMENT POTENTIAL AND ABILITY TO SUPPORT HIS FAMILY.

22  **Q.**   ANY OTHERS?

23  **A.**   NOT THAT I RECALL.

24  **Q.**   OKAY.  SO THAT'S THE SUM TOTAL OF THE CONCERNS THAT ALEX

25  IMPARTED TO YOU ON THE ZOOM CALL?

**MONICA STEVENS, PH.D.**

01:50 1   **A.**   I BELIEVE SO, YES.

2   **Q.**   HAVE YOU TALKED TO ALEX SINCE THE ZOOM CALL?

3   **A.**   NO.

4   **Q.**   SO IN YOUR LIFE, YOU SPENT 30 MINUTES WITH ALEX A.?

5   **A.**   CORRECT.

6   **Q.**   IS IT FAIR TO SAY THAT MOST OF THE ZOOM CALL WAS SPENT IN

7   A PROCESS OF YOU TRYING TO FIND OUT WHAT ALEX'S CONCERNS ARE,

8   THE ONES WE'RE TALKING ABOUT?

9   **A.**   A FAIR AMOUNT OF THE ZOOM CALL?  CAN YOU -- I MEAN, YOU

10   KNOW, WE HAVE TO DO OUR THING WHERE WE HAVE TO, LIKE, ESTABLISH

11   RAPPORT AND ALL THAT STUFF.  SO WE PROBABLY TOOK A LITTLE WHILE

12   TO TRY TO GET COMFORTABLE.  A FAIR AMOUNT WAS DEFINITELY ME

13   TRYING TO UNDERSTAND HIS EXPERIENCE RIGHT NOW AND IN

14   ANTICIPATION OF THIS POTENTIAL MOVE.  SO YES.

15   **Q.**   SO THE SUBSTANTIVE PART WAS -- I'LL SUMMARIZE TO YOU BY

16   DESCRIBING IT THIS WAY.  YOU'RE TRYING TO FIND OUT WHAT'S

17   WORRYING ALEX A., WHAT HE'S CONCERNED ABOUT, AND THEN HOW THAT

18   IS -- HOW HE SAYS THAT'S AFFECTING HIM?

19   **A.**   YEAH.  I MEAN, KIND OF LIKE ANY TIME I TALK TO A CHILD, I

20   AM GOING TO BE JUST KIND OF ASKING IN GENERAL LIKE "HOW'S YOUR

21   LIFE GOING?"  SO OBVIOUSLY THERE WAS AN INTENTION HERE THAT I

22   NEEDED TO DISCLOSE TO HIM, LIKE WHY I'M TALKING TO HIM IN THE

23   FIRST PLACE.

24            BUT IN GENERAL, THE QUESTIONS WERE LIKE "HOW ARE YOU

25   DOING?" AND HE WAS PRETTY QUICK TO BRING UP THAT THIS IS THE

MONICA STEVENS, PH.D.

01:51 1    MAIN THING THAT'S BOTHERING ME RIGHT NOW.

2    **Q.**   DID YOU ASK ALEX WHY HE THOUGHT THOSE THINGS WOULD HAPPEN,

3    OR WHY HE IMAGINED THOSE THINGS WOULD HAPPEN?

4    **A.**   I ASKED HIM IF HE KNEW ANYONE WHO HAD BEEN INCARCERATED AT

5    ANGOLA, TO TRY TO GET AT THAT, BECAUSE I THINK A LOT OF PEOPLE

6    MAKE ASSOCIATIONS BASED ON LIVED EXPERIENCES THROUGH THE

7    GENERATIONS.  AND HE KNEW OF AN UNCLE, I BELIEVE, WHO HAD BEEN

8    INCARCERATED.  I THINK, THOUGH, HIS IDEAS MOSTLY COME FROM THE

9    NEWS COVERAGE, BASED ON OUR CONVERSATIONS.

10    **Q.**   OKAY.  HE DIDN'T TELL YOU THAT ANYBODY AT OJJ TOLD HIM ANY

11    OF THESE THINGS WOULD HAPPEN TO HIM?

12    **A.**   NO.  I THINK HIS CONCERN MORE WAS LIKE NOBODY IS TELLING

13    ME ANYTHING.  SO AS MOST KIDS DO, IF YOU DON'T KNOW WHAT'S

14    GOING TO HAPPEN, YOU MAKE UP LOTS OF LIKE -- KINDS OF LIKE

15    SCENARIOS, AND THEN HE'S GETTING, YOU KNOW, INFORMATION ABOUT

16    WHAT ANGOLA IS FROM JUST THE ZEITGEIST THAT EXISTS HERE.

17    **Q.**   IN THE DOCUMENTS YOU REVIEWED, I BELIEVE I SAW INCLUDED IN

18    THERE WAS THE TRANSITIONAL TREATMENT UNIT PLAN?

19    **A.**   UH-HUH.

20    **Q.**   THE POLICY?  DID YOU REVIEW THAT?

21    **A.**   UH-HUH.

22    **Q.**   AND IT SORT OF LAYS OUT HOW THE TRANSITIONAL TREATMENT

23    UNIT WILL BE ADMINISTERED OR THE BEHAVIORAL INTERVENTION

24    STRATEGIES WILL BE ADMINISTERED.  CORRECT?

25    **A.**   YES.

**MONICA STEVENS, PH.D.**

01:52  1  **Q.**  AND THEN YOU'VE SEEN THE -- YOU'VE SEEN THE GENERAL

2  SUMMARY PLAN FOR HOW THIS IS ALL GOING TO BE ADMINISTERED AND

3  HANDLED.  RIGHT?

4  **A.**  CORRECT.

5  **Q.**  HAD YOU SEEN THAT BEFORE YOU MET WITH ALEX A.?

6  **A.**  LET'S SEE.  IT WAS AVAILABLE TO ME.  BUT NO, I READ IT

7  AFTER THE FACT I BELIEVE.

8  **Q.**  SO AT THE TIME YOU INTERVIEWED ALEX A., DID YOU KNOW

9  ANYTHING ABOUT THE NEW FACILITY OR HOW IT WOULD BE RUN OR

10  ADMINISTERED?

11  **A.**  I KNEW -- YEAH, I KNEW SOMETHING ABOUT IT, NOT NOTHING.

12  **Q.**  YOU SAID THAT YOU UNDERSTAND THAT THE PLAN IS TO HOUSE THE

13  YOUTH COMPLETELY SEPARATE FROM THE ADULTS; THAT'S YOUR

14  UNDERSTANDING AT THIS POINT?

15  **A.**  I UNDERSTAND THAT'S WHAT -- THAT'S WHAT SAID ON PAPER.

16  **Q.**  HAVE YOU SEEN ANYTHING AT ALL INCONSISTENT WITH THAT?

17  **A.**  A HESITANT NO.  I'M NOT CONVINCED.  BUT NO, THERE'S

18  NOTHING ON PAPER THAT SAYS THEY WILL COMINGLE.

19  **Q.**  HAVE YOU SEEN ANYTHING TO SUGGEST -- WELL, LET ME --

20  STRIKE THAT.

21      LET ME ASK YOU THIS WAY.  WHEN YOU TALKED TO ALEX A.,

22  I MEAN, YOU KNEW THAT IT WAS LESS THAN A SEVEN-HOUR DRIVE FROM

23  WHERE HE WAS TO ANGOLA.  RIGHT?

24  **A.**  I DIDN'T -- I DIDN'T GOOGLE THAT PART.  BUT NO, I DIDN'T

25  ADDRESS HIS CONCERN ABOUT THE TIME.

**MONICA STEVENS, PH.D.**

01:54 1 **Q.**  OKAY.  DID YOU SUGGEST TO HIM THAT ANY OF THIS MIGHT BE

2  INCORRECT OR THESE CONCERNS MIGHT BE UNFOUNDED?

3  **A.**  NO.

4  **Q.**  DID YOU HEAR ALEX A. TODAY WHEN HE SAID IF HE COULD BE

5  SATISFIED AND CONVINCED THAT HE'S GOING TO BE HOUSED SEPARATE

6  FROM ADULTS THAT THAT WOULD ALLEVIATE HIS CONCERNS?

7  **A.**  I DID HEAR THAT.

8  **Q.**  DID YOU BELIEVE HIM?

9  **A.**  I MEAN, KIDS SAY A LOT OF THINGS.  AND MY ROLE AS THE

10  ADULT IN THE SITUATION IS TO TRY TO BE THE BIGGER, WISER,

11  STRONGER, KINDER PERSON.  AND SO WHILE I GIVE LOTS OF CREDENCE

12  TO WHAT KIDS SAY, I DON'T ALWAYS BELIEVE THEY ARE THE BEST LIKE

13  PREDICTORS OF WHAT THEY'RE GOING TO THINK IN SIX MONTHS FROM

14  NOW.  SO I'M NOT SURE IF THAT'S A REALISTIC EXPECTATION FOR HIM

15  TO BE ABLE TO SAY, "OH, I WON'T BE CONCERNED IF YOU JUST TELL

16  ME THIS."  BUT THE PROBLEM IS NOBODY'S TELLING HIM ANYTHING.

17  **Q.**  BUT WE SAID SATISFY HIM THAT HE'D BE SEPARATE FROM THE

18  ADULTS.  HE SAID IT TWO OR THREE TIMES IN FAIRNESS.  I MEAN, HE

19  DIDN'T SAY ANYTHING INCONSISTENT WITH THAT THAT YOU HEARD, DID

20  HE?

21  **A.**  YEAH.

22       **MS. ROSENBLOOM:**  OBJECTION, YOUR HONOR.

23  **BY THE WITNESS:**

24  **A.**  A LOT OF TIMES WHEN --

25       **MS. ROSENBLOOM:**  MISSTATES EARLIER TESTIMONY.  HE

**MONICA STEVENS, PH.D.**

01:55  1    CERTAINLY DID SAY THINGS THAT WERE INCONSISTENT WITH THAT.

2              **THE COURT:**  WELL, WITH THE NOTION THAT IF THEY

3    SATISFIED HIM THAT -- OR HE DIDN'T SAY "SATISFIED."  BUT HE

4    WAS -- OVERRULED.  I DON'T NEED TO ARGUE WITH YOU.  OVERRULED.

5    **BY MR. MONTGOMERY:**

6    **Q.**   YOU DIDN'T HEAR HIM SAY ANYTHING INCONSISTENT WITH THE

7    NOTION THAT HE WOULD -- IT WOULD ALLEVIATE HIS CONCERNS IF WE

8    CONVINCED OR SATISFIED HIM HE'D BE SEPARATED FROM THE ADULTS?

9    **A.**   I DID NOT HEAR HIM SAY ANYTHING INCONSISTENT WITH THAT.

10   **Q.**   ARE YOU AWARE OF OJJ'S PLAN TO PROVIDE EDUCATIONAL

11   SERVICES, MENTAL HEALTH SERVICES, COUNSELING SERVICES, ALL THE

12   THINGS ALEX A. ENJOYS AT BRIDGE CITY?

13   **A.**   I'M AWARE OF THE PLAN AS OUTLINED IN THE DOCUMENTS

14   AVAILABLE TO ME.  I'M JUST VERY SCEPTICAL ABOUT THE ABILITY TO

15   PULL THAT OFF IN THE TIME FRAME THAT'S BEEN PROPOSED.

16   **Q.**   AND THAT WOULD BE -- THAT'S UP TO THE OJJ TO GET THAT

17   DONE.  CORRECT?

18   **A.**   I BELIEVE SO.  IT'S JUST -- IT'S TROUBLING FOR ME BECAUSE

19   I KNOW OF THE LACK OF HEALTHCARE, QUALIFIED HEALTHCARE

20   PROFESSIONALS, I SHOULD SAY, IN THE STATE.  SO I'M JUST -- IT

21   JUST WOULD BE A BIG FETE TO PULL OFF FROM MY -- WHERE I STAND.

22   **Q.**   AND YOU ARE SAYING WHAT YOU'RE USED TO WALKING AROUND

23   SEEING IN LIFE TELLS YOU THAT THAT'S GOING TO BE A TALL ORDER

24   TO GET THINGS READY ON A CERTAIN TIME FRAME?

25   **A.**   NO.  IT'S NOT IN MY C.V.  I THINK IT WAS LAST YEAR.  I

**MONICA STEVENS, PH.D.**

01:56  1  PUBLISHED A DOCUMENT FOR A METHODIST CHILDREN'S HOME THAT DID A

2  COMPLETE SURVEY OF THE AVAILABILITY OF MENTAL HEALTH PROVIDERS

3  IN THE STATE.  WE'RE IN A DRASTIC SHORTAGE IN THE EDUCATIONAL

4  SECTOR, ALTHOUGH I'M NOT QUALIFIED TO TALK ABOUT THAT.  BUT ITS

5  PROBABLY EXPERIENCING THE SAME THING.

6  **Q.**  OKAY.  HAVE YOU TALKED TO ANYBODY WITHIN THE OJJ ABOUT THE

7  STAFFING PLAN OR THE HIRING PROCESS, WHERE THEY ARE WITH IT,

8  HOW THAT'S COMING?

9  **A.**  SURE HAVEN'T.

10  **Q.**  OKAY.  SO HAVE YOU TALKED TO THEM ABOUT WHETHER THEY ARE

11  BORROWING CURRENT EMPLOYEES AND MOVING CURRENT PROFESSIONALS TO

12  THE NEW FACILITY VERSUS HIRING NEW PEOPLE?

13  **A.**  I HAVEN'T.  BUT THAT WOULD BE REALLY GREAT TO INCLUDE IN

14  THESE PLANS SO THAT EVERYONE KNOWS.

15  **Q.**  DO YOU HAVE ANY INFORMATION THAT SUGGESTS THINGS LIKE THAT

16  WILL NOT BE INCLUDED IN THESE PLANS?

17  **A.**  ONLY THAT WE'RE IN A NATIONAL SHORTAGE FOR HEALTHCARE

18  PROVIDERS.  SO I DON'T KNOW WHY LOUISIANA WOULD BE THE

19  EXCEPTION.  WE'RE USUALLY AT THE BOTTOM OF THE TOTEM POLE WHEN

20  IT COMES TO THAT.

21  **Q.**  YES.  BUT THESE PLANS AREN'T FINALIZED.  THAT'S YOUR

22  UNDERSTANDING.  IS THIS STILL --

23  **A.**  I THOUGHT THIS WAS HAPPENING ON SEPTEMBER 15TH, WHICH IS

24  NEXT WEEK.

25  **Q.**  WHERE DID YOU GET THAT DATE?

**MONICA STEVENS, PH.D.**

01:58  1   **A.**   THAT'S WHAT THE PUBLIC KNOWS.

2   **Q.**   WHERE DID IT COME FROM?  WHAT SOURCE?

3   **A.**   GOOGLE.

4   **Q.**   OKAY.

5   **A.**   I MEAN, ALL THE NEWS OUTLETS.

6   **Q.**   DO YOU HAVE A MORE RELIABLE SOURCE THAN GOOGLE ABOUT THE

7   TIME FRAME FOR MOVING THE YOUTH?

8   **A.**   MY CONCERN ABOUT THIS IS THE POTENTIAL FOR HARM FOR

9   CHILDREN AND FAMILIES, THEN I'M GOING TO TAKE THE INFORMATION

10   AVAILABLE TO CHILDREN AND FAMILIES, WHICH IS WHAT'S PUBLICLY

11   AVAILABLE.  AND THAT'S WHAT'S PUBLICLY AVAILABLE RIGHT NOW.

12   **Q.**   OKAY.  SO RELIABLE OR NOT, THAT'S WHAT YOU'RE GOING WITH?

13   **A.**   I DON'T KNOW WHAT ELSE -- HOW IS THE PUBLIC SUPPOSED TO

14   ACCESS THESE SUPPOSED RELIABLE RECORDS?  LIKE, THIS IS -- IF MY

15   JOB IS TO ASSESS HARM, THE HARM IS YOU'RE TELLING KIDS AND

16   FAMILIES THEY'RE GOING TO GO TO ANGOLA AND THAT IS ALL THEY

17   KNOW RIGHT NOW.  AND SEPTEMBER 15TH IS THE LOOMING DEADLINE.

18   **Q.**   DID YOU ASK ANYBODY AT THE OJJ FOR THAT INFORMATION?

19   **A.**   THIS KIND OF LINE OF QUESTIONING ABOUT "DID YOU ASK," LIKE

20   IT -- IT WASN'T IN THE SCOPE OF WHAT I WAS ASKED TO DO.  NO, I

21   DIDN'T ASK ANYBODY AT OJJ.

22   **Q.**   OKAY.  COULD YOU HAVE?  IS THERE ANYTHING THAT PREVENTED

23   THAT, THAT PREVENTED YOU FROM ASKING FOR THAT INFORMATION?

24   **A.**   I DON'T HAVE THE DIRECT LINE TO OJJ.

25          **MS. ROSENBLOOM:**  OBJECTION, YOUR HONOR.  THIS WITNESS

**MONICA STEVENS, PH.D.**

01:59  1   WAS RETAINED AS A PSYCHOLOGICAL EXPERT, NOT --

2              **THE COURT:**  SUSTAINED.  I MEAN, HER -- SHE IS TRYING

3   TO ASSESS HARM, NOT IDENTIFY WHETHER OR NOT THE PUBLIC

4   INFORMATION HAS BEEN ACCURATE.  SUSTAINED.

5   **BY MR. MONTGOMERY:**

6   **Q.**   SO AGAIN, WE COVERED THIS.  YOU ARE NOT HOLDING YOURSELF

7   OUT AS AN EXPERT IN CORRECTIONS.  YOU ARE HOLDING YOURSELF OUT

8   AS AN EXPERT IN CHILD PSYCHOLOGY?

9   **A.**   CORRECT.

10   **Q.**   IN YOUR REPORT AT PARAGRAPH 4 YOU SAY, "IT IS YOUR

11   PROFESSIONAL OPINION THAT THE PLANS OF THE LOUISIANA GOVERNOR

12   TO TRANSFER YOUTH IN OJJ CUSTODY TO AN ADULT MAXIMUM-SECURITY

13   PRISON AT ANGOLA IS A SUBSTANTIAL DEPARTURE FROM ACCEPTED

14   PROFESSIONAL STANDARDS."  IT GOES ON TO SAY "WILL FURTHER

15   EXACERBATE MENTAL AND EMOTIONAL INSTABILITY OF THE YOUTH."

16   CAN YOU CITE TO A PROFESSIONAL STANDARD IN THE AREA OF

17   CORRECTIONS THAT THE NEW -- OF WHICH THE NEW FACILITY WOULD RUN

18   AFOUL OR VIOLATE?

19   **A.**   NO.  I'M NOT AN EXPERT IN CORRECTIONS.

20   **Q.**   YOU DON'T CITE TO ANY PROFESSIONAL STANDARDS FOR THAT

21   PORTION OF YOUR REPORT, DO YOU?

22   **A.**   NO, WHICH IS KIND OF THE PROBLEM.  THOSE TWO THINGS DON'T

23   OFTEN OVERLAP AS MUCH AS A PSYCHOLOGIST WOULD LIKE THEM TO.

24   **Q.**   AND YOU SAID EVEN AS A MATTER OF CHILD PSYCHOLOGY, THIS

25   IS -- I BELIEVE YOU SAID THIS IS NEW TERRITORY OR UNTESTED

**MONICA STEVENS, PH.D.**

02:01 1   WATERS.  I'M NOT SURE HOW YOU PUT IT.  BUT MOVING YOUTH TO AN
      2   ADULT CORRECTIONAL FACILITY WHERE THEY ARE GOING TO BE
      3   SEPARATED FROM ADULTS IN A YOUTH FACILITY THAT HAPPENS TO BE ON
      4   THE GROUNDS OF --
      5   **A.**   NO.  I BELIEVE I SAID IT IS AN ANTIQUATED PRACTICE.  IT'S
      6   NOT SOMETHING WE MODERNLY DO VERY OFTEN; IF WE DO, IT'S REALLY
      7   SMALL NUMBERS.
      8   **Q.**   HAVE YOU EVER WITNESSED OR ADDRESSED PROFESSIONALLY A
      9   SITUATION LIKE THIS WHERE THEY ARE GOING TO -- A YOUTH FACILITY
     10   THAT'S TO BE OPENED ON THE GROUNDS OF AN ADULT FACILITY, BUT
     11   IT'S GOING TO BE ITS OWN SEPARATE YOUTH FACILITY?
     12   **A.**   NO.  I WOULDN'T BE A PART OF THAT.
     13   **Q.**   HAVE YOU EVER DONE ANY TYPE OF PSYCHOLOGICAL ANALYSIS THAT
     14   WOULD PERTAIN TO A SITUATION LIKE THAT?
     15   **A.**   NO.
     16   **Q.**   HAVE YOU WRITTEN OR REVIEWED ANY ARTICLES THAT WOULD
     17   ADDRESS THAT SITUATION, THAT SPECIFIC SITUATION?
     18   **A.**   YES, BUT THEY'RE A BIT OLD.
     19   **Q.**   WHERE -- AND THEY ADDRESS THE SITUATION WHERE YOUTH WILL
     20   BE HOUSED IN A YOUTH FACILITY SEPARATE FROM ADULT INMATES THAT
     21   HAPPENS TO BE ON THE GROUNDS OF A STATE CORRECTIONAL FACILITY?
     22   **A.**   MOST OF THE LITERATURE, TO MY KNOWLEDGE, IS AROUND YOUTH
     23   WHO ARE BEING TRIED AS ADULTS AND THEN INCARCERATED WITH
     24   ADULTS, NOT SO MUCH THIS SITUATION.
     25   **Q.**   OKAY.  SO I'M ASKING YOU AS TO THIS SITUATION, ARE YOU

MONICA STEVENS, PH.D.

02:02 1  AWARE OF ANY SUCH ARTICLES?

2  **A.**   I DON'T KNOW OF A PRECEDENT FOR THIS SITUATION.

3  **Q.**   YOU ARE AWARE THAT AS TO ALEX A.'S CONCERNS, YOU WOULD

4  AGREE WITH ME THAT HIS CONCERN THAT THERE WILL BE A SEVEN-HOUR

5  DRIVE TO ANGOLA IS INCORRECT?

6  **A.**   YEAH.  OFTENTIMES -- YEAH, THAT MAKES SENSE FOR WHAT HE

7  MIGHT BE EXPERIENCING, THAT IT WOULD BE DISTORTED.

8  **Q.**   AND ALL OF THESE THINGS CAN -- THAT THE BUS WILL BE

9  CONFRONTED BY ADULTS WHO WILL POTENTIALLY COMMIT ACTS OF

10  VIOLENCE OR SEXUAL VIOLENCE, THAT'S ALL UNFOUNDED BASED ON WHAT

11  YOU'VE REVIEWED AND SEEN.  CORRECT?

12  **A.**   DO I THINK THAT'S GOING TO HAPPEN IN REALITY?  NO.  DO I

13  THINK THAT HE BELIEVES IT'S REAL?  ABSOLUTELY.  AND THAT'S PART

14  OF MY ASSESSMENT OF HARM.

15  **Q.**   DO YOU KNOW WHETHER ANYONE HAS EXPLAINED TO ALEX A. THAT

16  THAT'S NOT GOING TO HAPPEN TO HIM?

17  **A.**   HE SAYS THAT HE DOESN'T KNOW.  I DON'T KNOW IF HE'S ASKING

18  QUESTIONS.  I WON'T EXPECT THAT TO BE ON HIM TO DO.  AND I

19  WOULD ALSO EXPECT -- GIVEN JUST WHAT I KNOW ABOUT HIS PROFILE

20  PSYCHOLOGICALLY, JUST A LITTLE BIT, IT WOULD BE LIKE EVEN IF

21  YOU DID TELL HIM, IT'S LIKE -- I'M SURE HE'S HAD PEOPLE TELL

22  HIM THINGS THAT HAVEN'T COME TRUE BEFORE.

23  **Q.**   WELL, FROM A PSYCHOLOGICAL PERSPECTIVE, THE HEALTH AND

24  WELL-BEING OF ALEX A., ISN'T IT IMPORTANT THAT SOMEONE SHOULD

25  TELL ALEX A. RIGHT NOW THAT THAT'S PROBABLY NOT GOING TO HAPPEN

**MONICA STEVENS, PH.D.**

02:04 1  TO HIM, SINCE HE'S HAVING DREAMS ABOUT BEING RAPED?

2  **A.**   IT'S GOING TO BE A LOT MORE THAN TELLING.  BUT YES, THAT'S

3  PART OF WHAT I'M SAYING TODAY IS THE PLAN ISN'T TRANSPARENT FOR

4  THE YOUTH OR FAMILIES THAT ARE INVOLVED, WHICH IS HARMFUL.

5  **Q.**   AND IN FAIRNESS, YOU HEARD ALEX THIS MORNING, HE'S ALSO

6  NOT BOTHERED TO ASK ANYONE AT OJJ WHETHER THESE -- WHAT THE

7  SITUATION IS GOING TO BE OR HOW THEY ARE GOING TO HANDLE IT?

8  **A.**   YEAH.  IN MY FIELD WE CALL THAT "VICTIM BLAMING."  AND

9  ESPECIALLY HAVING AN ATTORNEY GANG UP ON A CHILD LIKE THAT IS

10  A -- YES, I WOULD EXPECT HIM -- I WOULD NOT EXPECT HIM TO SEEK

11  OUT INFORMATION ON HIS OWN.  HE'S A MINOR.

12          **THE COURT:**  COUNSEL, HE'S 17 YEARS OLD AND HE'S IN

13  THE CUSTODY OF YOUR CLIENT.  SOMEBODY SHOULD EXPLAIN IT TO HIM.

14  YOU ARE SUGGESTING THAT SHE SHOULD HAVE EXPLAINED IT TO HIM?

15  WHO ARE YOU -- GO ON, CARRY ON WITH YOUR NEXT QUESTION.

16  **BY MR. MONTGOMERY:**

17  **Q.**   DO YOU KNOW IF ALEX A. MADE ANYONE AT OJJ AWARE THAT HE

18  WAS HAVING NIGHTMARES OR FEARS ABOUT ANGOLA?

19  **A.**   I DO NOT THINK -- HE DIDN'T TELL ME IF HE DID OR DID NOT,

20  I'LL SAY THAT.

21  **Q.**   BECAUSE HE HAS RESOURCES LIKE A CASE MANAGER?

22          **MS. ROSENBLOOM:**  OBJECTION, YOUR HONOR.  THE ATTORNEY

23  IS TESTIFYING NOW.

24          **THE COURT:**  OVERRULED.

25  **BY MR. MONTGOMERY:**

MONICA STEVENS, PH.D.

02:05 1    **Q.**   HE TESTIFIED THAT HE HAS RESOURCES LIKE A TRUSTED CASE

2    MANAGER AND PEOPLE IN THE OJJ HE CAN TALK TO, ONE OF THEM HE

3    SAYS IS LIKE A MOM TO HIM.  THOSE ARE PEOPLE -- AT LEAST I

4    HEARD HIM TO SAY THIS MORNING, THOSE ARE PEOPLE HE CAN TRUST

5    AND TALK TO ABOUT ISSUES WITHIN THE OJJ.  IS THAT YOUR

6    IMPRESSION OF HIS TESTIMONY?

7    **A.**   IT DOES SOUND LIKE THERE'S PEOPLE HE THINKS HE CAN TALK

8    TO.  THAT DOESN'T MEAN THAT I WOULD EXPECT THAT HE WOULD

9    DISCLOSE EVERYTHING OR ANYTHING.

10    **Q.**   DID YOU ASK ALEX IF HE HAD ASKED ANY OF THOSE PEOPLE ABOUT

11    THE TRANSFER OR THE DETAILS SURROUNDING THE POTENTIAL TRANSFER?

12    **A.**   I DON'T BELIEVE I ASKED SPECIFICALLY ABOUT THOSE

13    INDIVIDUALS.  BUT I DID ASK WHAT DOES HE KNOW AND HOW DOES HE

14    KNOW OR NOT KNOW WHAT HE DOES OR DOESN'T KNOW.

15    **Q.**   IN YOUR GOOGLE SEARCH DID YOU SEE THE GOVERNOR'S PRESS

16    RELEASE EXPLAINING OR ANNOUNCING THE TRANSFER?

17    **A.**   YOU KNOW, I DON'T RECALL WHICH LINK I ACTUALLY CLICKED ON.

18    BUT I'M SURE IT'S PASSED MY DESK AT SOME POINT.

19    **Q.**   OKAY.  DID YOU SEE ANY LINKS THAT SUGGESTED YOUTH WOULD BE

20    HOUSED WITH ADULTS AT THE NEW FACILITY?

21    **A.**   NO.

22    **Q.**   YOU HAD MENTIONED THE -- I WILL CALL IT THE LOOK OR THE

23    DESIGN OF WHAT YOU FELT LIKE WOULD BE A PROPER FACILITY VERSUS

24    A NON-PROPER FACILITY.  DO YOU KNOW THE PLANS FOR THE NEW

25    FACILITY FOR THE DECOR, THE ARTWORK, WALL HANGINGS, FURNITURE,

**MONICA STEVENS, PH.D.**

02:07  1   THE ULTIMATE LOOK?

2   **A.**   NO.  I DIDN'T -- THAT LEVEL OF DETAIL WASN'T APPARENT TO

3   ME IN THE DOCUMENTS I REVIEWED.

4   **Q.**   SO AS FAR AS YOU ARE CONCERNED, IT COULD END UP BEING

5   PERFECTLY APPROPRIATE, OR IT COULD BE NONE?  WE JUST -- YOU

6   DON'T KNOW AS YOU SIT HERE?

7          **MS. ROSENBLOOM:**  OBJECTION.  THIS IS BEYOND THE SCOPE

8   OF DIRECT.

9          **MR. MONTGOMERY:**  I THINK THAT WE SPECIFICALLY -- THEY

10  SPECIFICALLY COVERED THIS IN DIRECT.  THAT'S ACTUALLY WHY I

11  BROUGHT IT UP.

12         **MS. ROSENBLOOM:**  ARTWORK, DECOR, DETAILS ABOUT THE

13  DESIGN.

14         **MR. MONTGOMERY:**  SHE TESTIFIED IT SHOULD BE THINGS

15  LIKE WELL LIT, CONDUCIVE TO AN ATMOSPHERE THAT WOULD BE BETTER

16  FOR YOUTH, THINGS LIKE THAT.  I'M JUST EXPLORING THAT.

17         **THE COURT:**  SUSTAINED.  SHE HAS THE INFORMATION THAT

18  SHE HAD AND THAT'S WHAT SHE KNOWS.  YOU CAN PUT ON A WITNESS

19  THAT IDENTIFIES WHAT IT'S ALL GOING TO LOOK LIKE.  SUSTAINED.

20  **BY MR. MONTGOMERY:**

21  **Q.**   AND IS IT YOUR UNDERSTANDING THAT THE OJJ PLANS TO

22  CONTINUE THEIR FULL SERVICES THAT ALEX A. ENJOYS RIGHT NOW AT

23  THE NEW FACILITY, THAT THAT IS THE PLAN?

24  **A.**   I WOULDN'T SAY HE ENJOYS THEM.  BUT I DO SEE ON PAPER THAT

25  THERE'S A PLAN TO REPLICATE WHAT'S HAPPENING AT BRIDGE CITY.

**MONICA STEVENS, PH.D.**

02:08 1  **Q.**   SO I'LL SAY THE ONES HE RECEIVES.

2  **A.**   WE'LL AGREE ON THAT.

3  **Q.**   YOU MENTIONED HOW YOUTH -- YOU PUT IT, THEY CONFORM TO

4  DYSREGULATED BEHAVIOR, I BELIEVE YOU SAID.  WHEN THEY END UP IN

5  A FIGHT OR FLIGHT SURVIVAL MODE, THEY CONFORM TO DYSREGULATED

6  BEHAVIOR.  WAS THAT YOUR TESTIMONY?

7  **A.**   IT CAN.  THEY CONFORM TO MOST GROUP BEHAVIOR.  IT CAN BE

8  ALSO SITTING QUIETLY IN A COURTROOM, IF ALL THE YOUTH WERE

9  DOING IT.

10  **Q.**   AND I BELIEVE -- CORRECT ME IF I'M WRONG, BUT I BELIEVE

11  THAT DISCUSSION CAME IN THE CONTEXT OF SOME OF -- YOU SAID YOU

12  WEREN'T SURPRISED THAT HE HAD ACTED OUT OR VIOLATED CERTAIN

13  RULES?

14  **A.**   YEAH, THAT'S TRUE.

15  **Q.**   YOU SAID THE GROUP -- THAT'S WHEN YOU MENTIONED IF YOU PUT

16  YOUTH INTO WHAT YOU CALL FIGHT OR FLIGHT SURVIVAL MODE, THEY

17  CONFORM TO DYSREGULATED BEHAVIOR IN -- WITHIN A GROUP, OR THEY

18  CAN?

19  **A.**   THEY CAN, RIGHT.

20  **Q.**   YOU FEEL LIKE THAT'S WHAT HAS -- I ASSUME YOUR POINT IS

21  YOU FEEL LIKE THAT IS WHAT'S HAPPENED HERE WITH ALEX A. TO THE

22  EXTENT HE'S ACTED OUT.  WAS THAT YOUR POINT THAT HE'S JUST

23  CONFORMING TO THE BEHAVIOR OF THE GROUP?

24  **A.**   I THINK MY BIGGER POINT IS IN THINKING ABOUT IF WE SEND

25  YOUTH WHO ARE ALREADY KIND OF LIKE -- LIKE CLEARLY SOMETHING'S

**MONICA STEVENS, PH.D.**

02:10  1  NOT WORKING AT BRIDGE CITY.  RIGHT?  LIKE THERE IS -- UP --

 2  THERE IS AN ISSUE THERE THAT DOES NEED TO BE ADDRESSED.  BUT IF

 3  WE MOVE THE YOUTH WHO ARE ALREADY CAUGHT UP IN THAT SITUATION,

 4  I CAN PROBABLY PRETTY MUCH PREDICT WHY THEY'RE IN THAT

 5  SITUATION ALREADY.  AND THEN WE MOVE THEM TO AGAIN, A

 6  MAX-SECURITY FACILITY WHERE THEY FEEL -- WHETHER IT'S RIGHT,

 7  WRONG, REALITY OR PERCEPTION, BUT THE PERCEPTION IS THAT WE ARE

 8  GOING TO GET THERE AND WE ARE GOING TO HAVE TO FACE THESE

 9  HARDENED ADULT CRIMINALS.  THAT'S THE PERCEPTION.

 10           SO MY POINT WAS THEN I WOULD NOT BE AT ALL

 11  SURPRISED IF WHEN THEY SHOW UP THERE, THEY ARE GOING TO CONFORM

 12  TO THE PERCEPTION OF THE CULTURE OF ANGOLA.  AND THAT'S GOING

 13  TO CAUSE MORE DYSREGULATED BEHAVIOR THAN WHAT WE ARE SEEING.

 14  YOU CAN PUT THEM IN THE MOST SECURE FACILITY YOU CAN THINK OF,

 15  THAT'S NOT GOING TO STOP THAT.

 16  **Q.**   OKAY.  AND THAT'S ALL JUST KIND OF SPECULATION ON YOUR

 17  PART.  RIGHT?

 18  **A.**   SPECULATION BASED ON VERY GOOD EXPERIENCE.

 19  **Q.**   OKAY.  SO ARE YOU FAMILIAR WITH ALEX A.'S DORM

 20  CIRCUMSTANCES RIGHT NOW, WHO HE'S WITH DURING THE DAY AND

 21  WHETHER HE'S IN A GROUP OR --

 22  **A.**   NO.

 23  **Q.**   -- OR WHAT SIZE?

 24  **A.**   NO.

 25  **Q.**   ARE YOU AWARE THAT HE'S IN AN OPEN-DORM SETTING CURRENTLY

**MONICA STEVENS, PH.D.**

02:12  1  AT BRIDGE CITY?

2  **A.**   I'M AWARE OF THE GENERAL LAYOUT OF BRIDGE CITY, BUT NOT

3  HIS PARTICULAR CIRCUMSTANCES.

4  **Q.**   HAVE YOU HEARD THAT THEY'VE HAD ISSUES WITH YOUTH IN THAT

5  FACILITY:  CERTAIN ONES, THEY ATTACK EACH OTHER AND THEY GET

6  AGGRESSIVE IN THE OPEN DORM, AND THEY GET IN SITUATIONS WHERE

7  THEY DO GET CONCERNED ABOUT BEING ATTACKED?

8  **A.**   YEAH.  NONE OF THAT WOULD BE SURPRISING IN A JUVENILE

9  JUSTICE FACILITY THAT NEEDS ANOTHER LOOK AT PROGRAMMING.

10  **Q.**   AND YOU UNDERSTAND IT'S NOT ALL THE YOUTH?  YOU'VE BEEN

11  TOLD IT'S SOME OF THEM IN THE SYSTEM, OTHERS NOT SO MUCH?

12  **A.**   YEAH.  SOME CHILDREN -- AS WE TALKED ABOUT EARLIER, ABOUT

13  ACES AND THINGS LIKE THAT.  SOME KIDS ARE GOING TO -- YEAH, BE

14  OUTLIERS.

15  **Q.**   IT'S PRETTY COMMON.  RIGHT --

16  **A.**   WHICH ONE?

17  **Q.**   -- FOR THAT TO BE THE CASE?  YOU HAVE SOME IN THE SYSTEM

18  THAT ACT AGGRESSIVE AND ACT OUT, AND OTHERS THAT DON'T?

19  **A.**   YES, FOR SURE.

20  **Q.**   RIGHT.

21       SO -- AND YOU'VE READ THE -- YOU'VE READ THE

22  TRANSITIONAL TREATMENT UNIT PLAN?  AGAIN, WE COVERED THAT.

23  CORRECT?

24  **A.**   YEAH.  YES.  I'VE READ THE STUFF THAT WAS GIVEN TO ME,

25  YES.

**MONICA STEVENS, PH.D.**

02:13  1   Q.   OKAY.  SO IT'S YOUR UNDERSTANDING -- YOU'RE AWARE, RIGHT,
       2   THAT THAT'S KIND OF THE WHOLE POINT HERE, IS THEY ARE GOING TO
       3   CLASSIFY YOUTH WHO ARE ENGAGING IN AGGRESSIVE BEHAVIORAL
       4   TRAITS?
       5   A.   I HAVE PLENTY OF QUESTIONS ABOUT HOW THEY ARE CLASSIFYING.
       6   THAT'S ANOTHER AREA OF CONCERN FOR ME.  I READ IT.  I SEE WHAT
       7   IS ON PAPER, BUT THERE'S MORE QUESTIONS I WOULD HAVE.
       8        AGAIN, IF I WAS THE CLINICAL DIRECTOR, AS I'VE BEEN
       9   IN PREVIOUS POSITIONS, I WOULD WANT A LOT MORE DETAIL SO WE'RE
      10   NOT SENDING KIDS TO -- OR TO A SETTING THAT'S MORE RESTRICTIVE
      11   THAN THEY NEED AND, IN FACT, IS GOING TO THE CAUSE THEM MORE
      12   HARM.
      13        AND THEN AGAIN, THE PLAN THAT I SEE LOOKS VERY,
      14   VERY -- ALMOST LIKE PHOTOCOPIED FROM THE PLAN THAT'S ALREADY IN
      15   PLACE IN BRIDGE CITY.  SO I'M JUST WONDERING WHY THE LOCATION
      16   CHANGED.  LIKE WHAT ARE WE THINKING IS GOING TO CHANGE FROM
      17   THAT IS JUST A QUESTION MARK I HAVE.
      18   Q.   OKAY.  WOULD YOU MIND IF I FINISH THE QUESTION?
      19        NOW, WHAT I WAS TRYING TO ASK IS, YOU'RE AWARE THAT
      20   THE WHOLE POINT IS TO REMOVE YOUTH WHO ARE EXHIBITING JUST
      21   THOSE BEHAVIOR TRAITS AND WHO ARE CONFORMING TO DYSREGULATED
      22   BEHAVIOR AND TO PUT THEM IN A SEPARATE FACILITY WHERE THEY CAN
      23   FOCUS ON THOSE BEHAVIORAL TRAITS AND GIVE THEM ADDITIONAL
      24   TREATMENT TO TRY TO HELP THEM NOT TO ENGAGE IN BEHAVIOR LIKE
      25   THAT?

**MONICA STEVENS, PH.D.**

02:14 1   **A.**   I AM AWARE THAT THAT IS THE INTENTION.  I DISAGREE THAT
2   THAT'S GOING TO BE THE OUTCOME.
3   **Q.**   AND YOU ARE BASING THAT ON THE FACT THAT IT IS ON THE
4   PREMISES OF ANGOLA?
5   **A.**   I'M BASING THAT ON THE FACT -- WELL, I'VE REVIEWED THE
6   PLAN.  IF YOU WANT, WE CAN GO INTO THE PROBLEMS I HAVE WITH THE
7   PLAN.  BUT THAT'S OUTSIDE OF MY SCOPE.  BUT BEING ON THE CAMPUS
8   OF ANGOLA IS CERTAINLY NOT GOING TO HELP THINGS.  IT'S GOING TO
9   MAKE THINGS WORSE, IN MY PROFESSIONAL OPINION.
10   **Q.**   HAVE YOU HAD AN OPPORTUNITY TO MEET WITH ANY OF THE
11   TREATMENT PROFESSIONALS THAT WORK WITHIN THE OJJ?
12           **MR. MONTGOMERY:**  OBJECTION, YOUR HONOR.  BEYOND THE
13   SCOPE OF THIS EXPERT'S JOB HERE.
14           **THE COURT:**  WELL, I MEAN, OVERRULED.
15               HAVE YOU MET WITH ANY OF THE TREATMENT
16   PROFESSIONALS?
17           **THE WITNESS:**  NO.  THE QUALIFICATIONS ARE NOT LISTED
18   IN THE PLAN.  SO...
19   **BY MR. MONTGOMERY:**
20   **Q.**   SO YOU'VE NOT TALKED TO ANYBODY WHO IS GOING TO ACTUALLY
21   DO THIS WORK ABOUT WHETHER THEY THINK THEY CAN GET IT
22   ACCOMPLISHED AND WHETHER THEY THINK IT WILL BE SUCCESSFUL?
23   **A.**   NOR HAVE I SEEN ANY OF THE QUALIFICATIONS OF THE
24   PROFESSIONALS THAT ARE SLATED FOR THIS WORK, WHICH IS VERY
25   COMPLICATED AND REQUIRES A HIGH LEVEL OF SPECIALTY.

**MONICA STEVENS, PH.D.**

02:15 1   **Q.**   RIGHT.

2           SO HAVING NOT SEEN THEM, THEY COULD BE LITERALLY THE

3   FINEST PROFESSIONALS ON THE PLANET FOR --

4   **A.**   I SURE HOPE SO.

5   **Q.**   -- ALL YOU KNOW?

6           **MR. MONTGOMERY:**  NOTHING FURTHER.  THANK YOU.

7           **THE COURT:**  ANY REDIRECT?

8           **MS. ROSENBLOOM:**  JUST ABOUT FIVE MINUTES, YOUR HONOR.

9                       **REDIRECT EXAMINATION**

10  BY MS. ROSENBLOOM:

11  **Q.**   DR. STEVENS, YOU TESTIFIED THAT YOU DESIGNED AND WORKED IN

12  THERAPEUTIC SETTINGS FOR CHILDREN IN NEED OF REHABILITATION

13  BEFORE.  IS THAT CORRECT?

14  **A.**   YES.

15  **Q.**   DID YOU EVER WORK IN A SECURED FACILITY?

16  **A.**   YES.  AGAIN, I JUST WANT TO MAKE SURE WE'RE CLARIFYING.

17  "SECURED" FOR ME MEANS THAT DOORS ARE LOCKED, KIDS ARE NOT

18  ALLOWED TO EXIT CERTAIN EXIT WAYS, THAT SORT OF THING, YES.

19  **Q.**   THAT WAS MY NEXT QUESTION.  WAS IT LOCKED?  IN YOUR

20  OPINION, WHAT COULD BE THE EFFECT ON THE MENTAL HEALTH OF ALEX

21  A. OR OTHER CHILDREN OF BEING HOUSED IN A DEATH-ROW-SINGLE-CELL

22  WITH BARS, NO WINDOWS, NO DOOR?

23  **A.**   SO AT HIS AGE PLUS OR MINUS A COUPLE OF YEARS, RIGHT, LIKE

24  THE MAIN TASK OF ADOLESCENCE, FROM A PSYCHOSOCIAL STANDPOINT,

25  IS TO ESTABLISH YOUR IDENTITY.  NOW, IF I AM SPENDING A PERIOD

MONICA STEVENS, PH.D.

02:17 1   OF MY FORMATIVE TIME, WHETHER IT BE MONTHS, A YEAR, MORE,

2   HOPEFULLY NOT, RIGHT, ON A -- IN AN INCARCERATION SITUATION

3   PERIOD, THAT HAS ITS OWN KIND OF WAY OF IMPACTING THE WAY I

4   THINK ABOUT MYSELF AND MY IDENTITY AND MY FUTURE AND HOW I

5   RELATE TO OTHER PEOPLE.  SO NO. 1.

6        NOW, IF WE TAKE THAT UP A NOTCH AND SAY YOU SPEND A

7   PERIOD OF YOUR FORMATIVE ADOLESCENT LIFE, YEARS, EVEN IF IT'S A

8   BLIP, ON A DEATH-ROW UNIT AT ONE OF THE MOST NOTORIOUS PRISONS

9   IN THE COUNTRY, I'M VERY CONCERNED ABOUT WHAT THAT SAYS TO A

10   YOUNG PERSON ABOUT WHO THEY ARE.  AND THESE ARE NOT -- AS FAR

11   AS I UNDERSTAND, WE ARE NOT SENTENCING THEM TO LIFE.  THEIR

12   SENTENCE IS GOING TO END VERY SOON, IF WE ARE TALKING ABOUT A

13   17 YEAR OLD.  SO IF IT -- YEAH.  I'M SORRY.

14   **Q.**  IT'S ALL RIGHT.  THANK YOU.

15        WHEN YOU SPOKE WITH ALEX A. IN YOUR INTERVIEW, DO YOU

16   FEEL LIKE YOU GOT ALL THE FACTS YOU NEEDED TO GIVE YOUR EXPERT

17   OPINIONS TODAY CONCERNING HIM?

18   **A.**  WELL, I MEAN, CERTAINLY I WOULD HAVE LOVED TO HAVE HAD

19   LONGER WITH HIM, DO A LONGER ASSESSMENT.  I'D LOVE TO KNOW THAT

20   SOMEBODY'S DONE A LONGER ASSESSMENT.  I WAS CONCERNED ABOUT

21   HIM.  BY THE TIME WE ENDED THE CALL, I FEEL LIKE I GOT ENOUGH

22   TO SUPPORT WHAT I KNOW FROM MY CLINICAL EXPERIENCE AS WELL AS

23   MY, YOU KNOW, KNOWLEDGE OF THE LITERATURE.

24   **Q.**  IS IT YOUR JOB AS A MENTAL HEALTH PROFESSIONAL TO CORRECT

25   MISIMPRESSIONS THAT CHILDREN HAVE, LIKE HOW FAR AWAY SOMETHING

**MONICA STEVENS, PH.D.**

02:18 1   IS?

2   **A.**   I TYPICALLY TRY NOT TO GET INTO THOSE KIND OF DEBATES WITH

3   KIDS.  I'LL ALWAYS LOSE.  BUT YEAH -- NO.

4   **Q.**   WHY IS IT NOT PART OF YOUR CLINICAL ASSESSMENT TO DO THAT?

5   **A.**   WELL, NOT -- MY JOB IS NOT AS A TEACHER OR A PARENT.  I'M

6   A PSYCHOTHERAPIST.  SO TYPICALLY WE'RE INTERESTED IN GETTING

7   KIDS TO TALK AS MUCH AS POSSIBLE.  AND SOMETIMES WHEN YOU

8   CHALLENGE KIDS -- I DON'T KNOW IF Y'ALL HAVE NOTICED THIS --

9   BUT THEY DON'T TALK BACK SOMETIMES.  SO YOU GOT TO LET THEM SAY

10  IT.

11  **Q.**   IN YOUR EXPERIENCE WITH WORKING WITH CHILDREN WHO HAVE

12  BEEN IN THE JUVENILE JUSTICE SYSTEM, IS THAT SYSTEM SUPPOSED TO

13  BE ABOUT REHABILITATION?

14  **A.**   THAT IS MY UNDERSTANDING OF WHAT IT IS SUPPOSED TO BE

15  ABOUT.

16  **Q.**   OKAY.  AND IS IT COMMON FOR TEENAGERS TO EXPRESS FEARS?

17  **A.**   YES.  BUT I WAS BLOWN AWAY THAT ALEX WOULD TALK TO, FIRST

18  OF ALL, A STRANGER.  HE'S A TOUGH -- HE SEEMS LIKE HE'S A TOUGH

19  KIND OF KID.  SO IT WAS KIND OF REMARKABLE THAT HE WAS AS OPEN

20  AS HE WAS.

21  **Q.**   IS IT COMMON FOR TEENAGERS TO HAVE FEARS ABOUT WHAT MIGHT

22  HAPPEN IN THE FUTURE?

23  **A.**   I WOULD BE WORRIED IF THEY DIDN'T.  BUT YES, IT'S COMMON.

24  **Q.**   THANK YOU.  NOTHING FURTHER.

25          **THE COURT:**  OKAY.  YOU MAY STEP DOWN.

02:19 1          **THE WITNESS:**  THANK YOU.

2          **THE COURT:**  THANK YOU, MA'AM.

3                COUNSEL, TIMING ISSUES.  THE COURT HAS AN

4    UNAVOIDABLE CONFLICT THAT'S GOING TO REQUIRE A RECESS FOR THE

5    DAY AT 3:00 P.M.  IF THAT POSES A PROBLEM, THERE IS A -- I AM

6    GOING TO LET YOU FINISH YOUR CASE THIS WEEK.  IF I HAVE TO MOVE

7    SOME THINGS AROUND, I WILL, BUT I WANTED TO LET YOU KNOW THAT.

8                SO WE CAN COMMENCE TOMORROW MORNING AT 9:00 OR

9    WE CAN START EARLIER IF THAT WOULD HELP THINGS.  BUT I DON'T

10   FEEL LIKE WE ARE MAKING A WHOLE -- WE ARE MAKING PROGRESS, BUT

11   WE ARE NOT MAKING A LOT OF -- WE HAVEN'T TRAVELED MUCH

12   DISTANCE, LET'S SAY THAT.

13               NEXT WITNESS.

14               I WILL LET Y'ALL TALK ABOUT HOW YOU WANT TO TRY

15   TO MAKE IT UP.

16               BUT CALL YOUR NEXT WITNESS.

17          **MR. HALEY:**  YOUR HONOR, THE NEXT WITNESS, I BELIEVE,

18   IS GOING TO TAKE US BEYOND 3:00.

19          **THE COURT:**  I DON'T CARE.  PUT YOUR WITNESS ON.  WE

20   ARE GOING UNTIL 3:00, AND THEN WE WILL RESUME TOMORROW.

21          **MR. HALEY:**  OKAY.  YES, YOUR HONOR.  PLAINTIFF CALLS

22   DENISE DANDRIDGE.

23          **THE COURT:**  THE LAST NAME IS?  I'M SORRY.

24          **MR. HALEY:**  DANDRIDGE.

25          **THE REPORTER:**  CAN YOU MAKE AN APPEARANCE, PLEASE?

DENISE DANDRIDGE, PH.D.

02:21 1              **MR. HALEY:**  YES.

2                  RONALD HALEY ON BEHALF OF THE PLAINTIFFS.

3              **THE COURT:**  MA'AM, IF YOU WILL COME UP HERE, PLEASE.

4    STEP RIGHT UP HERE IN FRONT OF THIS LADY.

5                        **DENISE DANDRIDGE, PH.D.,**

6    **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

7              **THE DEPUTY CLERK:**  AND IF YOU WOULD, PLEASE STATE

8    YOUR NAME AND SPELL IT FOR THE RECORD.

9              **THE WITNESS:**  DENISE DANDRIDGE.  D-E-N-I-S-E.

10   **DANDRIDGE, D-A-N-D-R-I-D-G-E.**

11                        **DIRECT EXAMINATION**

12   BY MR. HALEY:

13   **Q.**   AND GOOD AFTERNOON.

14   **A.**   (NO ORAL RESPONSE.)

15   **Q.**   I SAID, "GOOD AFTERNOON."

16   **A.**   GOOD AFTERNOON.

17   **Q.**   AND IS IT DR. DANDRIDGE?

18   **A.**   IT IS.

19   **Q.**   OKAY.  I'M GOING TO MAKE SURE I GET IT RIGHT.

20          DOCTOR, GOOD AFTERNOON.

21          CAN YOU STATE YOUR OCCUPATION FOR THE RECORD?

22   **A.**   YES.  I AM A REGISTERED NURSE BY TRADE.  AND MY POSITION

23   AT OJJ?

24   **Q.**   YES.

25   **A.**   I AM THE DIRECTOR OF HEALTH SERVICES.

**DENISE DANDRIDGE, PH.D.**

02:23 1    **Q.**    AND HOW LONG HAVE YOU HAD THAT POSITION?

2    **A.**    EIGHT YEARS.

3    **Q.**    AND --

4    **A.**    SINCE OCTOBER OF 2013.

5    **Q.**    OKAY.  CAN YOU DESCRIBE TO THE COURT WHAT ARE MOST OF YOUR

6    DUTIES AS THE DIRECTOR OF -- AT OJJ?

7    **A.**    YES.  OVERALL, I AM RESPONSIBLE FOR ALL OF THE MEDICAL AND

8    MENTAL HEALTH SERVICES THAT THE YOUTH THAT ARE ADJUDICATED TO

9    OJJ ARE RESPONSIBLE FOR.

10    **Q.**    NOW THAT DOESN'T MEAN YOU DO ALL THE WORK.  IS THAT

11    CORRECT?

12    **A.**    I DON'T DO ALL THE WORK, NO, SIR.  I ACTUALLY MAKE SURE

13    THE ACCESS IS THERE THROUGH RFP CONTRACTED SERVICES, THOSE WITH

14    THE WELLPATH STAFF.

15    **Q.**    GOTCHA.

16         AND HAVE YOU BEEN ABREAST OF THE POTENTIAL MOVE TO

17    THE ANGOLA FACILITY?

18    **A.**    YES, SIR, I'M AWARE.

19    **Q.**    AT WHAT POINT WERE YOU ABREAST OF THAT MOVE?

20    **A.**    EARLY ON BECAUSE I WAS TASKED WITH HAVING TO MAKE SURE

21    THAT THE MEDICAL AND MENTAL HEALTH SERVICES THAT THE CONTRACT

22    WAS -- THAT IT PROVIDED -- THAT WE CURRENTLY HAVE TO AMEND THAT

23    CONTRACT.  SO VERY EARLY ON, ONCE A DECISION HAD BEEN MADE OR

24    THE IDEA WAS THROWN OUT, I BEGAN TO, YOU KNOW, LOOK FOR THOSE

25    SERVICES, MAKE SURE THAT WE ARE ABLE TO EXTEND THEM THERE.

**DENISE DANDRIDGE, PH.D.**

02:24 1   Q.   AND THAT IDEA THAT WAS THROWN OUT, THAT WAS AT OR AROUND
2   JULY 19TH OF THIS YEAR?
3   A.   I DON'T KNOW THE DATES SPECIFICALLY.  BUT I WILL SAY YES
4   THEN.
5   Q.   I'M GOING TO HOLD YOU TO IT.
6   A.   OKAY.
7   Q.   BUT JUST AROUND THAT TIME.
8   A.   OKAY.
9   Q.   OKAY.  AND ARE YOU AWARE OF THE DATE OF THE FIRST TRANSFER
10   THAT'S SUPPOSED TO TAKE PLACE TO THE ANGOLA FACILITY?
11   A.   I AM NOT AWARE OF THE SPECIFIC -- THE DATE ANYMORE.  THE
12   DATE THAT WAS ANNOUNCED WAS SEPTEMBER THE 15TH.  BUT I DON'T
13   KNOW ANY NEW DATES.
14   Q.   SO AS THE -- IS IT DIRECTOR OF HEALTH AT OJJ?
15   A.   DIRECTOR OF HEALTH SERVICES.
16   Q.   HEALTH SERVICES?
17   A.   YES.
18   Q.   SO AS THE DIRECTOR OF HEALTH SERVICES AT OJJ, AS FAR AS
19   YOU KNOW, THE DATE THAT THIS IS SUPPOSED TO ALL GO DOWN IS
20   SEPTEMBER 15TH?
21   A.   THAT'S THE DATE I WAS TOLD.  THAT'S THE DATE THAT I HAVE
22   SERVICES PUT IN PLACE FOR SEPTEMBER 1.
23   Q.   SO EVEN BEFORE THEN, POSSIBLY?
24   A.   JUST TO BE ON THE SAFE SIDE, TO MAKE SURE EVERYTHING'S IN
25   PLACE.

**DENISE DANDRIDGE, PH.D.**

02:25 1   **Q.**   GOTCHA.

2            AND YOU SAID WELLPATH IS THE COMPANY THAT IS

3   SUBCONTRACTED TO DO THIS WORK?

4   **A.**   YES.  THEY ARE A CONTRACTED HEALTH PROVIDER THAT IS PRETTY

5   KNOWN THROUGHOUT MANY OF THE STATES.  THEY HAVE CONTRACTS IN

6   VARIOUS STATES AND IN THE UNITED STATES.  THEY HAVE PROVIDED

7   THE MEDICAL AND MENTAL HEALTH SERVICES FOR OJJ FOR THE LAST TEN

8   TO ELEVEN YEARS, BASED ON WINNING THE RFP PROCESS.

9   **Q.**   GOTCHA.

10           AND WE'LL GET INTO THE RFP PROCESS LATER ON.

11           SO WOULD IT BE FAIR TO SAY, IF I'M GOING TO SURMISE

12   KIND OF WHAT'S GOING ON HERE BETWEEN OJJ AND WELLPATH, IS THAT

13   ESSENTIALLY YOU'RE THE ADMINISTRATIVE ARM; YOU'RE MAKING SURE

14   THINGS ARE IN PLACE THAT THIS RFP IS GOING THROUGH AND THAT

15   THIS IS A CONTRACTED COMPANY?

16   **A.**   CORRECT.

17   **Q.**   AND WELLPATH BASICALLY TAKES CARE OF THE OPERATIONS?

18   **A.**   CORRECT.

19   **Q.**   DO YOU OVERSEE ANY OF THOSE OPERATIONS?

20   **A.**   I HAVE FUNCTIONAL OVERSIGHT.  AND I ALSO HAVE, YOU KNOW,

21   AUDITING.  I MAKE SURE AUDITS ARE IN PLACE, MAKE SURE POLICIES

22   ARE ALIGNED WITH WHAT THE SERVICES SHOULD BE BASED ON THE

23   CONTRACT.

24   **Q.**   OKAY.

25   **A.**   EVEN THE HIRING OF THE LEADERSHIP TEAM, I'M RESPONSIBLE

**DENISE DANDRIDGE, PH.D.**

02:26 1  FOR SITTING IN ON THOSE INTERVIEWS AND MAKING A -- YOU KNOW, A

2  DECISION ALONG WITH THE WELLPATH STAFF.

3  **Q.**  OKAY.  SO I GOTCHA.

4  SO SOME OVERSIGHT IN REGARDS TO WHAT HAPPENS?

5  **A.**  YES.

6  **Q.**  AND, OF COURSE, LISTEN, THE BUCK KIND OF STOPS WITH YOU,

7  THAT IF YOU SEE A PROBLEM --

8  **A.**  YES.

9  **Q.**  -- YOU WOULD DEFINITELY ADDRESS IT?

10  **A.**  THAT'S CORRECT.

11  **Q.**  OKAY.  AND SO WHEN IT COMES DOWN TO WHO ACTUALLY MAKES

12  THESE HEALTHCARE DECISIONS FOR THE YOUTH OFFENDERS, THAT IS A

13  WELLPATH QUESTION?

14  **A.**  WE HAVE A PROVIDER -- LIKE THE MEDICAL DIRECTOR WILL --

15  I -- LIKE, FOR EXAMPLE, IF A KID IS INJURED OR SICK, THE

16  MEDICAL DIRECTOR IS CONSULTED AND THE KID -- YOU KNOW, HE MAY

17  SAY WE NEED TO SEND HIM OUT FOR AN X-RAY OR SOMETHING OR HE MAY

18  SAY GIVE HIM X, Y, AND Z MEDICATIONS.  AND THAT'S CARRIED OUT

19  BY THE NURSES ON STAFF.

20  **Q.**  OKAY.  NOW, THESE NURSES, ARE THESE NURSES EMPLOYED BY

21  OJJ, OR ARE THESE NURSES EMPLOYED BY WELLPATH?

22  **A.**  THEY ARE EMPLOYED BY WELLPATH.

23  **Q.**  OKAY.  AND THE MEDICAL DIRECTOR, IS THAT AN OJJ POSITION,

24  OR IS THAT WELLPATH?

25  **A.**  WELLPATH.

**DENISE DANDRIDGE, PH.D.**

02:27 1    Q.   OKAY.  AND SO ESSENTIALLY -- AND THAT'S FINE, THE BASIS OF

2    THE CONTRACT THAT AGAIN THE HEALTHCARE DECISIONS OF BOTH

3    PHYSICAL HEALTH AND MENTAL HEALTH, IT'S A WELLPATH DECISION AS

4    TO HOW THE KIDS ARE GOING TO GET TREATED?

5    A.   LET ME SAY THIS.  IT'S NOT FULLY A WELLPATH -- BECAUSE I

6    AM RESPONSIBLE IN TERMS OF THE -- IF SOMETHING HAPPENS THAT I

7    AM NOT OKAY WITH.  I -- LIKE IF A KID GOES TO THE E.R. AND HE'S

8    HAD A HEAD INJURY AND THE DOCTOR SAYS HE CAN GO BACK TO THE

9    DORM, I MAY MAKE A DECISION AND SAY, "HOLD ON.  I THINK WE NEED

10   TO WATCH HIM FOR 24 HOURS."

11        SO I MAY CALL THE MEDICAL DIRECTOR AND SAY, "HEY, CAN

12   WE CONSULT ON THIS A LITTLE BIT, BECAUSE I'M NOT COMFORTABLE

13   WITH HIM GOING BACK TO THE DORM?  I WANT TO KEEP HIM IN THE

14   E.R." -- I MEAN, "IN THE INFIRMARY TO WATCH HIM FOR 24 HOURS."

15        SO I GET -- I GET THAT INFORMATION AS WELL.  AND I AM

16   IN AGREEMENT OR NOT IN AGREEMENT.  IF I'M NOT IN AGREEMENT,

17   THEN WE HAVE TO CONSULT WITH THE DOCTOR CONCERNING IT AS WELL.

18   Q.   OKAY.  SO WOULD IT BE FAIR TO SAY THIS THEN, UNLESS YOU

19   HAVING A REAL --

20   A.   AN ISSUE WITH IT.

21   Q.   -- HAVE AN ISSUE WITH IT, WELLPATH ESSENTIALLY GETS TO DO

22   THEIR OWN THING?

23   A.   CORRECT.

24   Q.   OKAY.  NOW, LET ME ASK YOU THIS.  THE HEALTHCARE PROVIDERS

25   THAT WELLPATH EMPLOYS, ARE THESE -- I KNOW WE TALKED ABOUT THEY

**DENISE DANDRIDGE, PH.D.**

02:29  1  ARE NOT OJJ PEOPLE.  ARE THESE EMPLOYEES OF WELLPATH, OR ARE

2  THESE SUBCONTRACTORS OF WELLPATH?

3  **A.**    THEY ARE BOTH.  THEY ARE EMPLOYEES.  THE RNS, THE LPNS,

4  THE MENTAL HEALTH COUNSELORS, SOCIAL WORKERS ARE ALL EMPLOYEES,

5  FULL-TIME EMPLOYEES.

6           THE MEDICAL DIRECTOR MAY BE A CONTRACTED PERSON THAT

7  IS CONTRACTED, YOU KNOW, TO PROVIDE SERVICES FOR WELLPATH.  BUT

8  THEY MAY HAVE A PRIMARY CLINIC SOMEWHERE ELSE AS WELL.

9  **Q.**    SO WOULD THAT -- I'M TRYING TO THINK ABOUT THIS.  THAT

10  WOULD BE IF THERE IS A LICENSED PHYSICIAN OR SOMETHING THAT'S

11  THE MEDICAL DIRECTOR --

12  **A.**    UH-HUH.

13  **Q.**    -- THAT THEY MAY HAVE HIS OR HER OWN OFFICE SOMEWHERE

14  ELSE?

15  **A.**    UH-HUH.

16  **Q.**    AND WELLPATH WOULD CONTRACT WITH THEM TO COME IN AND

17  OVERSEE THEIR -- THOSE MEDICAL OPERATIONS?

18  **A.**    CORRECT.

19  **Q.**    OKAY.  NOW, DO YOU HAVE AN IDEA OF THE PERCENTAGE OF

20  EMPLOYEES VERSUS SUBCONTRACTORS THAT WELLPATH USES?

21  **A.**    ASK THAT QUESTION AGAIN, SIR.

22  **Q.**    SO YOU SAID THAT IT'S A MIXTURE OF BOTH EMPLOYEES AND

23  SUBCONTRACTORS THAT WELLPATH EMPLOYS?

24  **A.**    I'LL SAY 90 PERCENT OF THE EMPLOYEES ARE WELLPATH AND

25  MAYBE TEN PERCENT WOULD BE -- BECAUSE IF YOU HAD TEN PEOPLE,

**DENISE DANDRIDGE, PH.D.**

02:30 1   THE MEDICAL DIRECTOR WOULD BE THE PERSON THAT MAY NOT BE A

2   FULL-TIME STAFF EMPLOYEE.

3   **Q.**   OKAY.  NOW, I WANT TO SHIFT GEARS A LITTLE BIT AND TALK

4   SPECIFICALLY ABOUT WHAT WELLPATH IS GOING TO DO AT THE BCCY

5   ANGOLA FACILITY, IF THAT'S OKAY?

6   **A.**   YES.

7   **Q.**   ALL RIGHT.  I'M ASSUMING THAT BASED ON YOUR AMENDING THE

8   CONTRACT, THAT WELLPATH IS ALSO AWARE OF WHAT'S GOING ON?

9   **A.**   CORRECT.

10   **Q.**   OKAY.  AND THEY'VE BEEN IN DISCUSSIONS AS TO THE TYPE OF

11   FACILITY THAT THEY ARE GOING INTO?

12   **A.**   THROUGH ME.

13   **Q.**   AND MODIFICATIONS OF THE FACILITY THAT THEY MAY NEED?

14   **A.**   CORRECT.

15   **Q.**   LET ME ASK YOU THIS.  SPEAKING OF THAT, HAS ANYONE FROM

16   WELLPATH SEEN THE ACTUAL FACILITY THAT THEY'RE GOING INTO?

17   **A.**   YES.  PAMELA POOLE, WHO IS THE VICE PRESIDENT OF JUVENILE

18   HEALTH SERVICES FOR WELLPATH.

19   **Q.**   OKAY.  IS SHE THE ONLY PERSON FROM WELLPATH THAT HAS SEEN

20   THE FACILITIES?

21   **A.**   SHE HAS BEEN THERE.  MR. RASHIED CORMIER, WHO IS THE

22   MENTAL HEALTH -- REGIONAL MENTAL HEALTH COORDINATOR, HE'S BEEN

23   THERE AS WELL.

24   **Q.**   OKAY.  AND IS IT THEIR OPINION THAT THEY CAN PULL THIS JOB

25   OFF AT THE ANGOLA FACILITY?

**DENISE DANDRIDGE, PH.D.**

02:31 1    **A.**    YES.

2    **Q.**    OKAY.  NOW, I'M GOING TO GO INTO SOME -- OR BEING THE

3    HEALTHCARE SERVICE DIRECTOR AT OJJ, IT IS -- YOU ARE AWARE OF

4    KIND OF WHAT THE PROCESS IS GOING TO BE OR FOR -- HOW THE KIDS

5    WILL BE TREATED AT THE ANGOLA SITE?

6    **A.**    FOR MEDICAL AND MENTAL HEALTH SERVICES, YES.

7    **Q.**    YES.

8    **A.**    UH-HUH.

9    **Q.**    AND SO I CAN BE ABLE TO ASK YOU QUESTIONS IN REGARDS TO

10    HOW THIS IS KIND OF GOING TO GO DOWN AND YOU SHOULD BE ABLE TO

11    ANSWER THAT?

12    **A.**    I SHOULD.

13    **Q.**    OKAY.  SO LET'S GIVE A GENERAL THING RIGHT HERE.  YOUTH

14    GETS SICK.  WHAT IS THE PROCESS THAT HE GOES THROUGH TO SEE A

15    PHYSICIAN?

16    **A.**    OKAY.  A YOUTH -- WHEN A YOUTH IS SICK, THEY DO WHAT THEY

17    CALL A "SICK CALL REQUEST," AND THEY WRITE OUT WHAT THE ISSUES

18    ARE.   AND WITHIN USUALLY 12 HOURS -- 'CAUSE THEY DO A MORNING

19    SICK CALL AND AN EVENING SICK CALL, THE YOUTH IS THEN BROUGHT

20    TO THE NURSES AREA, INFIRMARY AREA, AND WILL BE TRIAGED AND

21    SERVICES WILL BE PROVIDED, MEDICAL SERVICES PROVIDED.

22    **Q.**    NOW, AT THE ANGOLA FACILITY, WILL THERE BE A PHYSICIAN

23    ON-SITE AT ALL TIMES?

24    **A.**    NO.

25    **Q.**    AT YOUR OTHER SECURE CARE FACILITIES, IS THERE A PHYSICIAN

**DENISE DANDRIDGE, PH.D.**

02:32   1   ON-SITE?

2   **A.**   NO, NOT AT ALL TIMES.

3   **Q.**   NOT AT ALL TIMES?

4   **A.**   YOU SAY, IS THERE A PHYSICIAN ON-SITE?

5   **Q.**   YES.

6   **A.**   NOT AT ALL TIMES.  THERE'S ACCESS TO A PHYSICIAN OR A

7   PHYSICIAN IS THERE, YOU KNOW, LIKE SO MANY HOURS PER WEEK, BUT

8   NOT 24/7.

9   **Q.**   OKAY.

10   **A.**   THERE'S A NURSE THERE 24/7.

11   **Q.**   OKAY.  NOW, AT YOUR OTHER SECURE CARE FACILITIES,

12   APPROXIMATELY -- YOU SAID A COUPLE OF HOURS A DAY A PHYSICIAN

13   IS GOING TO BE PRESENT?

14   **A.**   YES.

15   **Q.**   OKAY.  NOW, A BIG QUESTION HERE.  AT THE ANGOLA FACILITY,

16   IS A PHYSICIAN GOING TO BE THERE A COUPLE HOURS A DAY?

17   **A.**   THE PHYSICIAN IS GOING TO BE CONTRACTED FOR EIGHT HOURS.

18   HE CAN DO EITHER TELEMED OR IN PERSON.  SO HE'LL DO -- YOU WAS

19   STOPPING ME OR --

20   **Q.**   NO, NO.  GO --

21   **A.**   OH, CONTINUE?

22         SO HE MAY FLIP.  THIS WEEK HE MAY DO, SAY, HIS DAY IN

23   PERSON, AND THE NEXT WEEK HE MAY DO HIS DAY IN -- YOU KNOW, BY

24   TELEMED.  OR HE MAY HAVE THE OPTION OF DOING FOUR HOURS BY --

25   YOU KNOW, HALF IN HALF, FOUR TELEMED AND FOUR IN PERSON EACH

**DENISE DANDRIDGE, PH.D.**

02:33 1   WEEK.

2   **Q.**   SO --

3   **A.**   SO IT KIND OF VARIES DEPENDING ON WHAT WE CAN, YOU KNOW,

4   SCHEDULE.

5   **Q.**   SO --

6   **A.**   BUT IT'S EIGHT HOURS PER CONTRACT.

7   **Q.**   OKAY.

8   **A.**   PER THE CONTRACT.

9   **Q.**   TWO QUESTIONS.  THE FIRST IS THIS.  IS IT TO THE SOLE

10   DISCRETION OF THAT PROVIDER, THAT DOCTOR, TO DECIDE TELEMED OR

11   ON-SITE?

12   **A.**   IT'S A COMBINATION OF -- THE DECISION OF WHAT WE ARE ABLE

13   TO NARROW DOWN.  WITH THE PHYSICIAN HAVING A PRIMARY CARE SITE

14   SOMEWHERE ELSE, SOMETIMES IT BECOMES A LOT -- DIFFICULT.  IN

15   ORDER TO SAY "I NEED YOU HERE EIGHT HOURS IN PERSON AT THIS

16   LOCATION," SO IF HE CAN SAY, "OKAY, WELL, ON THIS DAY I CAN DO

17   EIGHT HOURS IN PERSON, BUT THIS DAY I'M GOING TO HAVE TO DO A

18   TELEMED," THEN AS LONG AS THE YOUTH HAS ACCESS TO THE DOCTOR --

19   I THINK COVID HAS KIND OF SHOWN US THAT WE CAN DO IT THAT WAY.

20   **Q.**   SO -- AND YOU BROUGHT UP A GOOD POINT, THAT AGAIN, A LOT

21   OF THE TIMES THESE PHYSICIANS THAT ARE OVER YOUR SKILLED CARE

22   FACILITIES, THEY ARE SUBCONTRACTORS.  THEY HAVE THEIR OWN JOBS,

23   HAVE THEIR OWN -- THEY HAVE OTHER JOBS OUTSIDE OF THIS?

24   **A.**   YES.

25   **Q.**   AND I'M ASSUMING, YOU KNOW, THE LOCATION OF THAT JOB

**DENISE DANDRIDGE, PH.D.**

02:35 1    IN THE -- TO THE PROXIMITY TO THE FACILITY WOULD HAVE A GLARING

2    EFFECT ON WHEN THEY COULD BE IN PERSON VERSUS WHEN THEY WOULD

3    HAVE TO DO TELEMED?

4    **A.**   IT COULD.

5    **Q.**   SO FOR THE ANGOLA FACILITY, HAS THE MEDICAL DIRECTOR FOR

6    THE ANGOLA FACILITY OR THE PHYSICIAN FOR THE ANGOLA FACILITY,

7    HAS HE OR SHE BEEN IDENTIFIED?

8    **A.**   YES.  AND HE'S LOCATED IN BATON ROUGE, LOUISIANA.

9    **Q.**   OKAY.  AND DO YOU KNOW THE NAME OF THAT PHYSICIAN?

10   **A.**   YES.  CHRISTOPHER LEE AS WELL AS MICHAEL DAY.  THEY HAVE A

11   CLINIC TOGETHER.

12   **Q.**   OKAY.  AND THIS IS IN BATON ROUGE?

13   **A.**   YES.

14   **Q.**   OKAY.  AND DO YOU KNOW -- THAT WOULD BE, I GUESS,

15   APPROXIMATELY MAYBE AN HOUR AND 15 MINUTES FROM ANGOLA?

16   **A.**   ABOUT, GIVE OR TAKE.

17   **Q.**   OKAY.  LET'S MOVE, JUST BRIEFLY, ONTO MENTAL HEALTH.

18         IF A YOUTH OFFENDER NEEDS TO SEE A COUNSELOR OR A

19   PSYCHIATRIST, WHAT IS THE PROCESS THEY GO ABOUT?

20   **A.**   A COUNSELOR IS GONNA BE THERE MONDAY THROUGH FRIDAY, 8:00

21   TO 4:30 OR 8:00 TO 5:00, AND THEN ON-CALL WEEKENDS AND NIGHTS.

22   AND SO THEY HAVE ACCESS TO A COUNSELOR THAT -- DURING THAT

23   TIME.

24         A PSYCHIATRIST IS GOING TO BE THROUGH TELEPSYCH.  AND

25   OH, I JUST DREW A BLANK ON HIS HOURS.  I THINK IT'S SIX HOURS,

**DENISE DANDRIDGE, PH.D.**

02:36  1   IS IN THE CONTRACT PER WEEK.

2   **Q.**   NOW, HAS THE -- HAS THIS PERSON, THIS DOCTOR, BEEN

3   IDENTIFIED?

4   **A.**   YES.  DR. MAMON.

5   **Q.**   OKAY.

6   **A.**   LAKISHA MAMON.

7   **Q.**   AND HAS THE -- YOU SAID SOCIAL WORKERS WILL BE ON-SITE?

8   **A.**   WELL, MENTAL HEALTH PROFESSIONALS, THEY CAN BE EITHER A

9   LICENSED CLINICAL SOCIAL WORKER OR A LICENSED PROFESSIONAL

10  COUNSELOR.

11  **Q.**   OKAY.  NOW, THESE COUNSELORS, HAVE THEY BEEN IDENTIFIED

12  YET?

13  **A.**   NO.  THE START-UP TEAM HAS BEEN IDENTIFIED.  HOWEVER, THE

14  FINALIZED PERSONS THAT WILL BE THERE HAVE NOT BEEN IDENTIFIED.

15  WE ARE STILL RECRUITING FOR THOSE POSITIONS -- OR WELLPATH IS

16  RECRUITING FOR THOSE POSITIONS.  HOWEVER, THE START-UP TEAM

17  WILL BE RASHIED CORMIER, WHO I MENTIONED BEFORE IS THE MENTAL

18  HEALTH COORDINATOR FOR THE REGION, AND HE IS A LICENSED

19  CLINICAL SOCIAL WORKER, AS WELL AS MS. STEPHANIE MARSHALL, WHO

20  IS THE MENTAL HEALTH COORDINATOR FOR THE SWANSON CENTER FOR

21  YOUTH.

22          WELLPATH USUALLY BRINGS IN A START-UP TEAM, WHICH IS

23  USUALLY THEIR LEADERSHIP TEAM FROM THE SURROUNDING AREA.  SO

24  THOSE INDIVIDUALS WORK -- RASHIED WAS A COUNSELOR FOR BRIDGE

25  CITY, SO IS VERY FAMILIAR WITH THE YOUTH THAT -- ACROSS THE

**DENISE DANDRIDGE, PH.D.**

02:37  1   ENTIRE STATE, BECAUSE HE -- AS THE REGIONAL, HE WORKS AT

2   VARIOUS LOCATIONS AND MAKES SURE, YOU KNOW, THE SERVICES ARE IN

3   PLACE.

4   **Q.**   AND SO -- OKAY.  SO THIS START-UP TEAM, WOULD THEY BE

5   HOUSED AT ANGOLA UNTIL THERE'S OTHER STAFF MEMBERS TO COME

6   ONBOARD?

7   **A.**   THAT IS CORRECT.  THEY WILL BE THERE THE ENTIRE TIME

8   UNTIL -- AND NURSING AS WELL WILL BE THERE THE ENTIRE TIME

9   UNTIL NEW STAFF IS HIRED AND TRAINED AND WORKING INDEPENDENTLY.

10   **Q.**   OKAY.  HOW LONG DOES THAT TRAINING TAKE PLACE?

11   **A.**   IT DOESN'T -- LIKE IT CAN VARY, BECAUSE IN TERMS OF

12   BRINGING PEOPLE IN, THEY ARE NOT GOING TO BRING IN A GROUP AT

13   ONE -- YOU KNOW, ALL AT ONE TIME.  IT'S GOING TO BE AS THEY

14   HIRE AND GET THEM IN, SO IT COULD VARY.  IT COULD BE UP TO SIX

15   MONTHS.  BUT THEY'RE GOING TO BE ON-SITE.

16   **Q.**   OKAY.  AND SO UNTIL THIS TRAINING, IT COULD GO FROM X

17   AMOUNT OF WEEKS, X AMOUNT OF MONTHS.

18       THIS START-UP TEAM, THIS IS IT FOR THE ANGOLA

19   FACILITY?

20   **A.**   YES.  IT'S A TOTAL OF -- I WANT TO SAY FIVE NURSES AND TWO

21   COUNSELORS.

22   **Q.**   OKAY.  AND THEY ESSENTIALLY WOULD BE WORKING -- I GUESS

23   BETWEEN THE NURSES THEY'LL HAVE --

24   **A.**   -- SHIFT WORK.

25   **Q.**   -- SHIFT WORK?

**DENISE DANDRIDGE, PH.D.**

02:39 1  **A.**   UH-HUH.

2  **Q.**   BUT THE COUNSELORS ESSENTIALLY WILL BE WORKING AROUND THE

3  CLOCK?

4  **A.**   UH-HUH.  THEY'LL BE WORKING MONDAY THROUGH FRIDAY, AND

5  THEY WILL BE ON-CALL FOR NIGHTS AND WEEKENDS.

6  **Q.**   OKAY.  NOW, WHAT IS -- I UNDERSTAND THAT'S THE MINIMUM OF

7  WHERE WE'RE AT RIGHT NOW.  RIGHT?

8  **A.**   UH-HUH.

9  **Q.**   WHAT IS THE GOAL AS FAR AS STAFFING-WISE?

10  **A.**   THAT IS -- I WAS ABOUT TO SAY, THE GOAL IS TO HAVE TWO

11  MENTAL HEALTH COUNSELORS THERE.

12  **Q.**   OKAY.  SO I UNDERSTAND THE GOAL IS TO HAVE TWO MENTAL

13  HEALTH COUNSELORS THERE.  IS IT ONLY TO EMPLOY TWO MENTAL

14  HEALTH COUNSELORS, OR IS IT TO BE A TEAM OF MENTAL HEALTH

15  COUNSELORS THAT WILL THEN SOMETIMES ROTATE?  LIKE, LET'S SAY

16  YOU HAVE AN EIGHT-HOUR SHIFT, MONDAY, TUESDAY, WEDNESDAY AND

17  THEN THEY'LL BE A THURSDAY, FRIDAY, SATURDAY SHIFT FOR THE SAME

18  EIGHT HOURS?

19  **A.**   NO.  THAT IS THE SCHEDULE.  THE MONDAY THROUGH FRIDAY, AND

20  THEN ON-CALL WEEKENDS AND NIGHTS.

21  **Q.**   OKAY.  AT YOUR OTHER SECURE CARE FACILITIES, IS IT PRETTY

22  MUCH THE SAME SETUP?

23  **A.**   THAT IS THE SCHEDULE AS WELL.

24  **Q.**   OKAY.  AND YOU SAID THAT AT THIS TIME, YOU ARE IN THE --

25  **A.**   WELLPATH.

**DENISE DANDRIDGE, PH.D.**

02:40  1  **Q.**  YOU OR WELLPATH IS IN THE PROCESS OF HIRING AND TRAINING

2  OTHER FOLKS?

3  **A.**  WELLPATH IS IN THE PROCESS OF RECRUITING.  THEY HAVE A

4  RECRUITING TEAM THAT RECRUITS FOR, YOU KNOW, THE STAFF THAT

5  COMES ALONG AT VARIOUS AREAS.

6  **Q.**  NOW, I UNDERSTAND BEING PRIOR -- PREPARED AS MUCH YOU CAN.

7  BUT YOU INDICATED EARLIER THAT YOU WERE TRYING TO GET READY FOR

8  SEPTEMBER 1ST.  CORRECT?

9  **A.**  YES.

10  **Q.**  CLEARLY WELLPATH IN ITS ABILITY TO STAFF THIS DIDN'T HAVE

11  IT READY BY SEPTEMBER 1ST?

12  **A.**  I WOULDN'T SAY THAT, BECAUSE AGAIN, THEY HAVE COME IN WITH

13  A START-UP TEAM.

14  **Q.**  BUT THEY ARE STILL HIRING?  BUT THIS IS A START-UP TEAM;

15  THIS IS NOT GOING TO BE THE PERMANENT FOLKS THAT ARE GOING TO

16  BE.  THESE ARE THE FOLKS THAT ARE COMING IN INITIALLY.  AND AS

17  YOU TESTIFIED TO, THAT POTENTIALLY THIS TRAINING FOR THESE

18  FOLKS COULD LAST UP TO SIX MONTHS?

19  **A.**  POTENTIALLY.  BUT KEEP IN MIND, THE START-UP TEAM IS THE

20  EXPERIENCED TEAM THAT IS VERY MUCH AWARE OF ALL THE YOUTH

21  ACROSS THE STATE.

22  **Q.**  I KNOW.  NO DOUBT ABOUT THAT.

23          AND, OF COURSE, IT'S -- TODAY IS I THINK

24  SEPTEMBER 6TH, AND WE'RE ABOUT EIGHT TO NINE DAYS FROM THE DATE

25  THAT, AS FAR AS YOU KNOW, THE FIRST TRANSFER IS GOING TO BE

**DENISE DANDRIDGE, PH.D.**

02:41 1 THERE, SEPTEMBER 15TH.  THAT'S CORRECT?

2 **A.**   CORRECT.

3 **Q.**   AND AGAIN, I UNDERSTAND THE START-UP TEAM IS COMING IN.

4 BUT AT THIS POINT, WELLPATH HAS NOT IDENTIFIED THE PERMANENT

5 POSITIONS OR FOLKS THAT ARE GOING TO BE AT THIS FACILITY?

6 **A.**   THAT'S CORRECT.

7 **Q.**   NOW, WE TALKED A LITTLE BIT ABOUT WHAT THE STAFF LOOKS

8 LIKE.  BUT LET'S TALK ABOUT THE THINGS THAT ARE GOING TO BE

9 NEEDED IN THIS -- LET ME GO HERE.  WILL YOUTH OFFENDERS BE

10 TREATED WITH ADULT OFFENDERS?

11 **A.**   NO, SIR.

12 **Q.**   OKAY.  AND IS THAT BECAUSE YOU ARE GOING TO HAVE AN

13 ON-SITE FACILITY FOR THE YOUTH OFFENDERS?

14 **A.**   THAT'S CORRECT.

15 **Q.**   OKAY.  NOW, I'M JUST GOING TO RUNOFF THE -- DO YOU KNOW

16 THE SIZE OF THAT ON-SITE?

17 **A.**   NO, SIR.

18 **Q.**   SO YOU DON'T KNOW THE SIZE OF THE CLINIC?

19 **A.**   NO, SIR.

20 **Q.**   OKAY.  DO YOU KNOW WHERE EXACTLY AT THE OLD DEATH-ROW

21 FACILITY THE CLINIC IS GOING TO BE AT?

22 **A.**   YES, SIR.

23 **Q.**   OKAY.  AND SO IF THE -- AT SOME POINT DURING THIS QUESTION

24 AND ANSWER I SHOWED YOU SOME PICTURES OF WHERE IT'S GOING TO

25 BE, YOU'D BE ABLE TO SAY, MR. HALEY, YEAH, I THINK THAT'S WHERE

**DENISE DANDRIDGE, PH.D.**

02:42 1  THIS IS GOING TO GO?

2  **A.**   YEAH.

3  **Q.**   AND I THINK THAT'S WHERE THAT'S GOING TO GO?

4  **A.**   YES, SIR.

5  **Q.**   OKAY.  NOW, I'M GOING TO THROW OUT SOME THINGS AND JUST

6  TELL ME IF THESE ARE THINGS THAT SHOULD BE IN A CLINIC, 'CAUSE

7  I'M NOT A MEDICAL PROVIDER, I'M JUST A YOUNG LAWYER FROM BATON

8  ROUGE.  AND SO YOU LET ME KNOW WHAT SHOULD BE IN THERE AND

9  WHAT'S NOT.

10  **A.**   OKAY.

11  **Q.**   SO IN THIS -- SO I GOT A -- ONE OF MY BEST FRIENDS HAS

12  URGENT CARE CLINICS INSIDE OF SCHOOLS IN NEW ORLEANS.

13        IS IT -- ESSENTIALLY, THIS IS GOING TO BE KIND OF

14  LIKE AN URGENT CARE CLINIC INSIDE OF --

15  **A.**   ESSENTIALLY.

16  **Q.**   ESSENTIALLY.  RIGHT.

17        SO JUST TO GET AN IDEA OF IT ESSENTIALLY WE'RE

18  PUTTING AN URGENT CARE CLINIC TO TAKE CARE OF THE NONEMERGENCY

19  THINGS AT THIS FACILITY?

20  **A.**   AT THE FACILITY.

21  **Q.**   OKAY.  AN INTAKE AREA, ARE WE GOING TO HAVE THAT?

22  **A.**   THERE IS AN INTAKE AREA.

23  **Q.**   A SCREENING AREA, ARE WE GOING TO HAVE THAT?

24  **A.**   SAME AS THE INTAKE AREA.

25  **Q.**   A LABORATORY, ARE WE GOING TO HAVE THAT?

**DENISE DANDRIDGE, PH.D.**

02:43 1    A.   WE DO DRAW LABS.

2    Q.   OKAY.  AND DO WE HAVE A PLACE TO STORE THOSE LABS?

3    A.   DRAW LABS AND CENTRIFUGE THE LABS AS WELL AS STORE THE

4    LABS.

5    Q.   OKAY.  AND IS THERE GOING TO BE AN X-RAY PLACE?

6    A.   X-RAY WILL NOT BE ON-SITE.  X-RAY WILL HAVE TO TAKE PLACE

7    OFFSITE.  BUT WE ARE IN THE PROCESS OF TRYING TO SEE IF THEY

8    CAN SETUP A MOBILE X-RAY.  SOMETIMES COMPANIES DON'T ALWAYS

9    COME ON-SITE FOR MOBILE X-RAY, THOUGH, BECAUSE OF THE LOCATION.

10        I'LL GIVE YOU AN EXAMPLE.  ACY, MY ACADIANA LOCATION,

11   DOES NOT HAVE MOBILE X-RAY, BUT SWANSON DOES HAVE MOBILE X-RAY.

12   Q.   OKAY.  SO LET'S STAY IN THE NEIGHBORHOOD OF X-RAYS RIGHT

13   NOW.

14        SO AS OF RIGHT NOW, THERE'S NOT AN X-RAY.  THERE'S

15   NOT A PLACE FOR X-RAYS?

16   A.   NOT ON-SITE.

17   Q.   NOT ON-SITE.

18        AND YOU'RE LOOKING FOR THE POSSIBILITY OF DOING A

19   MOBILE X-RAY THERE, BUT THAT HAS NOT BEEN FIGURED OUT?

20   A.   HOPING.  BUT IF NOT, A KID WILL BE TRANSPORTED TO THE E.R.

21   FOR X-RAYS.

22   Q.   AND THAT'S EXACTLY WHERE I'M GOING.  RIGHT?  AND SO

23   ALTHOUGH THERE IS A -- PRESUMABLY AT THE ADULT HOSPITAL AT

24   ANGOLA, AN X-RAY, THE ABILITY TO DO AN X-RAY, THE KID WON'T

25   HAVE TO GO THERE?

**DENISE DANDRIDGE, PH.D.**

02:44 1  **A.**  NO.  FIRST OF ALL, I DON'T KNOW ANYTHING ABOUT THE ADULT

2  FACILITY AND WHAT'S AVAILABLE THERE.  SO NO.

3        FOR ME, I'M GOING TO HAVE THE YOUTH TRANSPORTED TO

4  WEST FELICIANA PARISH HOSPITAL.

5  **Q.**  AND THAT'S ABOUT 35 MINUTES AWAY?

6  **A.**  YES, SIR.

7  **Q.**  NOW, YOU'RE OTHER SECURE CARE FACILITIES -- RIGHT? --

8  **A.**  UH-HUH.

9  **Q.**  -- TYPICALLY WHAT IS THE DISTANCE BETWEEN THAT SECURE CARE

10  FACILITY AND THE LOCAL HOSPITAL?

11  **A.**  IT DEPENDS ON THE LOCATION.  USUALLY MAYBE ABOUT 15 TO 20

12  MINUTES AWAY.

13  **Q.**  OKAY.  SO THE YOUTH AT THE ANGOLA SITE, IT'S ABOUT -- A

14  LITTLE BIT DOUBLE OR A LITTLE BIT MORE THAN THAT?

15  **A.**  A LITTLE FURTHER.

16  **Q.**  OKAY.  AND SO A KID THAT -- A YOUTH OFFENDER, CHILD, THAT

17  NEEDS AN X-RAY BECAUSE HE HAS POTENTIALLY FRACTURED A LIGAMENT

18  OR HAVING SOME TYPE OF INTERNAL PROBLEMS HAS TO WAIT LONGER

19  THAN THE YOUTH AT A SITE THAT EITHER HAS AN X-RAY MACHINE OR IS

20  CLOSER TO A HOSPITAL?

21  **A.**  I WOULDN'T NECESSARILY SAY HAVE TO WAIT LONGER.  THEY MAY

22  HAVE TO GO A LITTLE FURTHER DISTANCE.  BUT THEY WILL BE MOVED

23  IMMEDIATELY TO THAT AREA TO BE X-RAYED.  I MEAN, YES, DISTANCE

24  IS GOING TO IMPACT TIME.  BUT, I MEAN, THEY DON'T HAVE TO WAIT

25  TWO OR THREE -- YOU KNOW, LIKE TWO OR THREE DAYS OR DRIVE TWO

**DENISE DANDRIDGE, PH.D.**

02:45 1    OR THREE HOURS.

2    **Q.**   WE DEFINITELY HOPE NOT.

3         OKAY.  SO WE PLAYED WITH THE X-RAY.

4         INDIVIDUAL PATIENT ROOMS, ARE WE GOING TO HAVE THOSE?

5    **A.**   INDIVIDUAL PATIENT ROOMS?

6    **Q.**   YES.

7    **A.**   THERE'S ONE X-RAY ROOM -- I MEAN, ONE EXAM ROOM.  ARE YOU

8    TALKING ABOUT FOR TRIAGING AND TREATMENT, OR ARE YOU TALKING

9    ABOUT FOR HOUSING/LIVING QUARTERS?

10   **Q.**   NO, NO.  FOR TRIAGE AND TREATMENT.

11   **A.**   OH, THERE'S --

12   **Q.**   SO IF I --

13   **A.**   THERE'S AN EXAM ROOM.  THERE'S AN EXAM ROOM.  WE TEND TO

14   NOT SEE BUT ONE YOUTH, YOU KNOW, AT A TIME, BECAUSE YOU DON'T

15   KNOW WHEN YOU MAY HAVE AN ISSUE WITH ANOTHER YOUTH.  SO YOU

16   WANT TO BRING THEM IN STAGGERED.  SO ONE YOUTH IS BEING SEEN IN

17   THE EXAM ROOM SO THAT WHEN HE'S OUT, WE'LL BRING ANOTHER YOUTH

18   IN.

19   **Q.**   OKAY.  SO WE HAVE ONE EXAM ROOM.

20        NOW, AT YOUR OTHER SECURE CARE FACILITIES, IS IT ONLY

21   ONE EXAM ROOM, OR IS IT JUST AT ANGOLA?

22   **A.**   IT'S ONE EXAM ROOM AT EACH ONE.

23   **Q.**   IS THERE AN AREA FOR BIOHAZARD DISPOSAL?

24   **A.**   YES.

25   **Q.**   IS THERE A PHARMACY FOR STORAGE FOR MEDICATIONS?

**DENISE DANDRIDGE, PH.D.**

02:46  1   **A.**   WE DON'T HAVE AN ON-SITE PHARMACY.  BUT THERE IS A
       2   REFRIGERATOR AND -- YOU KNOW, FOR STORAGE OF COLD MEDS.  AND
       3   THEN WE HAVE THE MEDICAL CART THAT WILL STORE REGULAR, YOU
       4   KNOW, MONTHLY MEDS.
       5   **Q.**   DO YOU KNOW THE DISTANCE BETWEEN THE CLOSEST PHARMACY AND
       6   THE ANGOLA FACILITY?
       7   **A.**   NO, I DO NOT.  WE HAVE DIAMOND PHARMACY THAT AIRDROPS MEDS
       8   TO THE -- AND THAT'S -- ALL THE FACILITIES UTILIZE DIAMOND
       9   PHARMACY.
      10   **Q.**   OKAY.  DO YOU KNOW IF THE ADULT FACILITY USES DIAMOND
      11   PHARMACY?
      12   **A.**   NO.  I ONLY KNOW THE OJJ FACILITIES.
      13   **Q.**   OKAY.  IS THERE A STORAGE PLACE FOR THESE MEDICAL
      14   SUPPLIES?
      15   **A.**   YES.
      16   **Q.**   AND ARE THE MEDICAL AMENITIES -- ARE THESE GOING TO BE
      17   PROVIDED BY DOC OR BY OJJ?
      18   **A.**   WELLPATH.
      19   **Q.**   WELLPATH?
      20   **A.**   THAT'S A PART OF THE WELLPATH CONTRACT.
      21   **Q.**   OKAY.  SO IT'S THEIR JOB TO GET THAT DONE.
      22           **MR. HALEY:**  OKAY.  CAN WE PLEASE PULL UP, TEAM,
      23   PLAINTIFFS' EXHIBIT 38.
      24           **THE COURT:**  IS IT PREADMITTED?
      25           **MR. HALEY:**  YES.  YES, YOUR HONOR.  I'M SORRY.

**DENISE DANDRIDGE, PH.D.**

02:47  1          **THE COURT:**  EXHIBIT 38.

      2  **BY MR. HALEY:**

      3  **Q.**   OKAY.  SO, DOCTOR, CAN YOU IDENTIFY THE DOCUMENT THAT IS

      4  UP ON YOUR SCREEN?

      5  **A.**   YES, SIR.

      6  **Q.**   OKAY.

      7          **THE COURT:**  MR. HALEY, IT'S ON YOUR SCREEN, TOO.

      8          **MR. HALEY:**  OH, IT IS ON MY SCREEN.

      9          **THE COURT:**  IS IT ON?

     10          **MR. HALEY:**  OH, YES, MA'AM.

     11          **THE COURT:**  OKAY.  BECAUSE WE HAVE I.T. HERE, BECAUSE

     12  WE HAVE BEEN HAVING TROUBLE WITH THAT SCREEN.

     13              GO AHEAD.

     14          **MR. HALEY:**  YES, I CAN SEE IT, MA'AM.

     15  **BY MR. HALEY:**

     16  **Q.**   DOCTOR, CAN YOU IDENTIFY THAT DOCUMENT, PLEASE?

     17  **A.**   IT'S EXHIBIT 38, PLAINTIFFS' EXHIBIT 38.

     18  **Q.**   OKAY.  AND TO THE RIGHT OF THAT, WHAT ARE WE LOOKING AT TO

     19  THE RIGHT, WITH THOSE TRIANGLES?

     20  **A.**   THEY'RE ALLEGING THAT EXHIBITS -- I MEAN, THAT DEPICTS

     21  WHERE VARIOUS ROOMS MAY BE OR AREAS.

     22  **Q.**   OKAY.  AND SO I'M LOOKING AT -- SOMETIMES MY EYES FOOL ME.

     23  AM I LOOKING AT THAT RIGHT, THAT THE BLUE TRIANGLE, THAT

     24  REPRESENTS WELLPATH?

     25  **A.**   YES.

**DENISE DANDRIDGE, PH.D.**

02:48   1    **Q.** AND I AM COUNTING ONE, TWO -- WELL, I DON'T WANT TO COUNT,

     2    AND PUT WORDS IN YOUR MOUTH.  HOW MANY TRIANGLES ARE THERE FOR

     3    WELLPATH?

     4    **A.** IT'S THREE.

     5    **Q.** OKAY.  AND SO IS IT BASED ON AT LEAST THIS EXHIBIT, WHAT

     6    WE'RE LOOKING AT RIGHT NOW, WELLPATH HAS THREE DIFFERENT ROOMS

     7    AT THE ANGOLA FACILITY?

     8    **A.** THEY'RE ACTUALLY SOME ROOMS THAT ARE NOT IDENTIFIED ON

     9    THIS FORM.  BUT BASED ON THIS PIECE OF PAPER, IT SHOWS THREE.

   10    BUT THERE ARE SOME OTHER AREAS THAT'S NOT THERE.

   11    **Q.** AND LISTEN, YOU MAY BE RIGHT, THERE MAY BE SOME OTHER

   12    AREAS THERE.  BUT THESE ARE THE PLANS THAT WERE GIVEN TO US TO

   13    SUGGEST THIS IS HOW THIS LAYOUT IS GOING TO LOOK.  SO ALL WE

   14    HAVE TO GO ON RIGHT NOW IS WHAT'S BEEN GIVEN TO US.  SO WHAT'S

   15    BEEN GIVEN TO US RIGHT NOW, THESE THREE ROOMS HAVE BEEN

   16    IDENTIFIED FOR WELLPATH.

   17    **A.** OKAY.

   18    **Q.** NOW, CAN YOU IDENTIFY WHAT IS SUPPOSED TO GO ON IN EACH OF

   19    THOSE ROOMS, IF WE CAN START AT THE TRIANGLE AT THE BOTTOM.

   20          DO YOU KNOW WHAT'S SUPPOSED TO GO THERE?

   21    **A.** AT THE TOP 213 OR AT THE BOTTOM 217, I GUESS THAT IS.

   22    **Q.** WE'LL START WITH 217 AND WORK OUR WAY UP.

   23    **A.** OKAY.  217 IS THE EXAM ROOM.

   24    **Q.** OKAY.

   25    **A.** IF THAT'S 214, OR WHATEVER THAT IS IN THE MIDDLE, THAT'S

**DENISE DANDRIDGE, PH.D.**

02:50 1    LIKE A NURSES' STATION.  THAT AREA WILL BE THE NURSES' STATION.

2    AND THEN 213-D WILL BE THE MENTAL HEALTH OFFICES -- WELL,

3    MENTAL HEALTH OFFICES.  MENTAL OFFICE STAFF WILL BE IN THAT

4    OFFICE.

5    **Q.**   THIS WOULD BE -- SO THE BOTTOM OF THIS WOULD BE BASICALLY

6    INTAKE?

7    **A.**   YEAH.

8    **Q.**   ESSENTIALLY?

9    **A.**   ESSENTIALLY.

10   **Q.**   WHERE YOU COME IN AT -- THE TOP WOULD BE WHERE THEY WOULD

11   SEE THE MEDICAL PROFESSIONAL, THE MIDDLE, WHETHER IT'S A NURSE

12   OR A DOCTOR, THEY WOULD SEE THEM THERE?

13   **A.**   IN THE EXAM ROOM.

14   **Q.**   YEAH.  THAT'S THE EXAM ROOM, SO THAT'S IN THE MIDDLE?

15   **A.**   OKAY.  NUH-UH.

16   **Q.**   AND THEN --

17   **A.**   THE EXAM ROOM IS 217 AT THE VERY BOTTOM, NEXT TO 218.

18   **Q.**   OKAY.  SO INTAKE AND EXAM ROOM HAPPENS AT THE SAME PLACE?

19   **A.**   NO.  ACTUALLY THAT'S WHY I SAID "INTAKE."  AND AGAIN, I

20   GUESS IT'S DEFINING HOW YOU TAKE -- HOW YOU DEFINE "INTAKE."

21   IF YOU'RE SAYING INTAKE FOR MEDICAL SERVICES, THEN IT WOULD

22   HAPPEN IN THE EXAM ROOM.

23   **Q.**   YEAH.  FOR MEDICAL SERVICES?

24   **A.**   OKAY.  IN THE EXAM ROOM, YES.

25   **Q.**   AND THERE WILL BE ANOTHER COUNSELING SESSION WHERE --

**DENISE DANDRIDGE, PH.D.**

02:51 1  SECTION -- I THINK SOMEBODY WILL DO SOME INTAKE IF IT'S FOR

2  MENTAL HEALTH.

3       BUT LOOKING AT WHAT WE HAVE DESIGNATED FOR WELLPATH

4  RIGHT HERE.

5  **A.**   OKAY.  SO 217 WOULD BE THE INTAKE OR TRIAGE ROOM, EXAM

6  ROOM.

7  **Q.**   OKAY.  THEN ABOVE THAT?

8  **A.**   NURSES' STATION.

9  **Q.**   OKAY.  AND THEN MENTAL HEALTH BEHIND THAT?

10  **A.**   THEN MENTAL HEALTH, YES, SIR.

11       **MR. HALEY:**  TEAM, IF YOU DON'T MIND, CAN WE PULL UP

12  PLAINTIFFS' EXHIBIT NO. 20, AND CAN WE GO TO PAGE 139.

13  **BY MR. HALEY:**

14  **Q.**   OKAY, DOC.  CAN YOU IDENTIFY FOR ME WHAT THIS IS?

15  **A.**   IT'S SAYS "MENTAL HEALTH ADMIN. ASSISTANT/HSA OFFICE."

16  **Q.**   OKAY.  NOW, BASED ON WHAT WE JUST LOOKED AT, AM I TO

17  ASSUME THAT THAT IS THAT BLUE TRIANGLE ON TOP?

18  **A.**   YES.  BUT THEY DON'T HAVE -- THEY DON'T HAVE AN EXAM ROOM,

19  WHICH IS THE ONE RIGHT NEXT TO THAT CLOSET WHERE THE DOOR IS

20  OPEN AT.

21  **Q.**   OH, WE GOT SOME PICTURES.

22  **A.**   OKAY.

23  **Q.**   MAYBE WE CAN GET TO THE EXAM ROOM.

24       BUT AGAIN, AS FAR AS WHAT WE HAVE BEEN GIVEN, THAT

25  THESE PICTURES WERE TAKEN I THINK THURSDAY OF LAST WEEK, THAT

**DENISE DANDRIDGE, PH.D.**

02:52 1  WOULD HAVE MADE IT SEPTEMBER THE 4TH -- WAIT, SEPTEMBER 2ND.

2  SO AS OF SEPTEMBER 2ND, THAT'S WHAT IT LOOKED LIKE.

3  **A.**  OKAY.

4  **Q.**  OKAY.  CAN WE GO TO THE NEXT PICTURE.

5  WHAT ARE WE LOOKING AT RIGHT HERE?

6  **A.**  THAT WOULD BE WHERE THE ADMIN ASSISTANT WOULD BE.  AND

7  IT'S MISSING SOME FURNITURE.  SO WE'RE STILL WAITING ON

8  FURNITURE AND STUFF TO COME.

9  **Q.**  LOOK, IT'S NOT YOUR FAULT.  IT'S NOT YOUR FAULT THE

10  FURNITURE AIN'T GOING TO BE THERE.

11  **A.**  OKAY.

12  **Q.**  IT'S NOT YOUR FAULT THAT THEY SAID SEPTEMBER 15TH IS THE

13  DATE.  IT'S NOT YOUR FAULT THAT THEY HAD YOU PLAN IT FOR THE

14  1ST.  JUST RIGHT NOW THAT'S WHAT IT LOOKS LIKE.

15  CAN WE PLEASE GO TO THE NEXT PICTURE.

16  CAN YOU TELL US WHAT THAT IS?

17  **A.**  THAT'S THE STORAGE CLOSET.

18  **Q.**  OKAY.  IS THAT FOR -- IS THAT WHERE SOME OF THESE SUPPLIES

19  ARE GOING TO BE HELD?

20  **A.**  SOME SUPPLIES LIKE GAUZES AND STUFF LIKE THAT.  OVERFLOW,

21  YOUR FIRST-AID KITS, THOSE THINGS THERE.

22  **Q.**  OKAY.  ANY YOUTH MEDICATION TO BE HELD THERE?

23  **A.**  OH, NO, NO, NO.

24  **Q.**  OKAY.  THIS IS JUST MEDICAL SUPPLIES, BANDAIDS,

25  FIRST-AIDS?

**DENISE DANDRIDGE, PH.D.**

02:53  1    **A.**   BANDAIDS, YES.

2    **Q.**   OKAY.  CAN WE GO TO THE NEXT PICTURE, PLEASE.

3          WHAT ARE WE LOOKING AT THERE?

4    **A.**   THAT'S WHERE YOUR EXAM ROOM IS GONNA BE.

5    **Q.**   OKAY.  CAN YOU DESCRIBE FOR THE COURT WHAT WE ARE LOOKING

6    AT?  WHAT'S IN THERE RIGHT NOW?

7    **A.**   OH, IT'S SOME CHAIRS RIGHT NOW.

8    **Q.**   DO WE NEED MORE THAN CHAIRS TO EXAMINE YOUTH?

9    **A.**   YES.  I'M WAITING ON THE EXAM TABLE.  I'M WAITING ON THE

10    LAMP.  I'M WAITING -- EXAM LAMP.  I'M WAITING ON THE UTILITY

11    TABLE.  I'M WAITING ON THE SCALE.  I'M WAITING ON THE WALL UNIT

12    FOR BLOOD PRESSURE.  IT'S A LOT MISSING.  BUT IT'S BEEN

13    ORDERED, I PROMISE YOU.

14    **Q.**   LISTEN, I BELIEVE YOU.  I BELIEVE YOU ARE TELLING THE

15    TRUTH.

16          SO, DOC, DID THEY GIVE YOU A DATE AS TO WHEN THIS

17    STUFF IS GOING TO GET IN?

18    **A.**   IT MAY BE EVEN THERE TODAY.  THE SCALE WAS THERE

19    YESTERDAY.  AND SOME OTHER THINGS WERE THERE YESTERDAY WHEN I

20    WAS THERE.  MY EXAM BED HAS NOT COME YET, BUT IT MAY BE IN

21    TODAY.

22    **Q.**   WE JUST DON'T KNOW?

23    **A.**   BUT IT'S COMING.

24    **Q.**   BUT CLEARLY YOU'RE -- YOU'RE DOING YOUR BEST TO GET READY

25    FOR SEPTEMBER THE 1ST?

**DENISE DANDRIDGE, PH.D.**

02:54 1   **A.**   I AM.

2   **Q.**   AND ABSOLUTELY OBJECTIVELY -- THIS ISN'T ME MAKING

3   ANYTHING UP, IT WASN'T READY SEPTEMBER THE 1ST?

4   **A.**   IT WASN'T.

5   **Q.**   OKAY.  AND IT WASN'T READY SOME TIME IN AUGUST, EITHER?

6   **A.**   NO, SIR.

7   **Q.**   OKAY.  AND WE DON'T KNOW IF IT'S GOING TO BE READY

8   SEPTEMBER THE 15TH?

9   **A.**   I PRAY THAT IT WILL BE.

10   **Q.**   ME TOO.

11         CAN WE GO TO THE NEXT PICTURE, PLEASE.

12         WHAT ARE WE LOOKING AT HERE?

13   **A.**   THIS IS ACTUALLY WHERE THE NURSES' STATION IS GOING TO BE.

14   **Q.**   AGAIN, WE'RE GOING TO DO THE SAME EXERCISE.

15         DOES THAT LOOK LIKE A NURSES' STATION RIGHT NOW?

16   **A.**   NO, IT DOESN'T.

17   **Q.**   NOW, WHAT TYPE OF THINGS YOU NEED IN A NURSES' STATION?

18   **A.**   I STILL NEED -- I NEED ANOTHER REFRIGERATOR.  I HAVE ONE

19   REFRIGERATOR THERE.  ANOTHER REFRIGERATOR IS ON ORDER.  SOME

20   CABINETS THAT'S GOING TO HOLD SOME MORE MEDICAL SUPPLIES.  THE

21   NURSES' CART IS GOING TO BE IN THERE.  BUT THAT'S DELIVERED

22   ALONG WITH THE MEDICATIONS WHEN THEY COME.  THEY WOULDN'T BE

23   THERE RIGHT NOW REGARDLESS.

24   **Q.**   AND AGAIN, SAME LINE OF QUESTIONING.  RIGHT?  YOU TRIED TO

25   BE READY FOR SEPTEMBER THE 1ST.  THESE PICTURES WERE TAKEN

**DENISE DANDRIDGE, PH.D.**

02:55  1   SEPTEMBER THE 2ND.  OBVIOUSLY, WELLPATH WAS NOT READY FOR 9/1?

       2   **A.**   CORRECT.

       3   **Q.**   AND WE'RE PRAYING THAT THEY ARE READY FOR 9/15?

       4   **A.**   WELL, I WILL -- LET ME SAY THIS.  WE HAVE NOT MOVED IN

       5   THERE YET.  AND I WOULD NOT ALLOW THEM TO BRING IN THE NURSES'

       6   STATION, THE NURSES' CART AND THE COMPUTERS BECAUSE I WOULDN'T

       7   WANT THAT MAGNITUDE OF THINGS TO LEAVE THE PREMISES OR NOT MAKE

       8   IT TO THE PREMISES WHEN IT'S SO MUCH GOING ON, YOU KNOW, IN

       9   DELIVERIES.

      10            SO WHEN THEY ACTUALLY COME ON-SITE AND THEY ARE

      11   ACTUALLY GIVEN A DATE TO COME ON-SITE, THAT'S WHEN THE MEDICAL

      12   CART AND ALL THOSE THINGS WILL COME ON-SITE, THAT LOOKS MORE

      13   MEDICAL RELATED.

      14   **Q.**   AND --

      15   **A.**   BUT NOT THE EXAM TABLE, THAT'S GOING TO BE THERE BEFORE

      16   THEN AND ALL THE OTHER MEDICAL EQUIPMENT.

      17   **Q.**   LISTEN -- AND WE HOPE SO.  WE UNDERSTAND THAT YOU ARE

      18   TRYING TO DO THE BEST YOU CAN TO GET THIS PLACE READY.  BUT

      19   THEY ARE STILL PLANNING ON SENDING KIDS THERE SEPTEMBER THE

      20   15TH.

      21   **A.**   OKAY.

      22   **Q.**   CAN WE GO TO THE NEXT PICTURE, PLEASE.

      23            IS THAT STILL DEALING WITH WELLPATH, OR DID WE GO TOO

      24   FAR?

      25   **A.**   THAT'S THE -- THAT'S THE ROOM WHERE THE MENTAL HEALTH

**DENISE DANDRIDGE, PH.D.**

02:56  1 | COUNSELORS WILL BE.

2 | **Q.**   OKAY.  THERE'S A LOT GOING ON HERE.  LET'S SEE.  CHIPPED

3 | PAINT, STUFF'S COMING OFF THE WALLS.

4 |         WHAT IS THIS REALLY SUPPOSED TO LOOK LIKE?

5 | **A.**   THOSE BOXES ARE DESKS THAT HAVE BEEN PUT TOGETHER AS OF

6 | YESTERDAY AND FILE CABINETS FOR THEM TO STORE FILES IN.  WELL,

7 | PAPERWORK, 'CAUSE THEY HAVE AN ELECTRONIC MEDICAL RECORD.

8 | DESKS, CHAIRS, AND YOUTH CHAIRS.

9 | **Q.**   OKAY.  AND SO AGAIN, IT JUST GOT PAINTED FOR THAT RECORD.

10 | THAT WASN'T READY FOR SEPTEMBER THE 1ST?

11 | **A.**   NO, SIR.

12 | **Q.**   AND WE'RE PRAYING IT'S READY FOR SEPTEMBER THE 15TH?

13 | **A.**   IT WILL BE.

14 | **Q.**   NOW, YOU SAID SOME OF THESE THINGS WERE PUT TOGETHER.  DO

15 | YOU KNOW IF THEY HAVE RETOUCHED UP ON THE WALLS AND SOME OF THE

16 | OTHER AESTHETIC THINGS TO MAKE IT LOOK A LITTLE BIT NICER?  I

17 | MEAN, IT IS A MENTAL HEALTH AREA.

18 | **A.**   I JUST PUT THE DESK TOGETHER.

19 | **Q.**   UNDERSTANDABLY SO.

20 |         CAN WE GO TO THE NEXT PICTURE, PLEASE.

21 |         THAT'S STILL US?  WE STILL ARE --

22 | **A.**   THAT'S THE AREA -- THAT'S THE HALL AREA TO GO -- TO

23 | MEET -- INTO THOSE -- YOU KNOW, TO GO INTO THOSE DIFFERENT

24 | ROOMS SHE SHOWED YOU.

25 | **Q.**   OKAY.  CAN WE GO TO THE NEXT PICTURE.

**DENISE DANDRIDGE, PH.D.**

02:58 1          IS THAT STILL US?

2   **A.**   OH, YES.   THAT'S -- I GUESS I.T. WIRE, WIRING.

3   **Q.**   AND WE DON'T KNOW WHERE THAT GOES TO?

4   **A.**   I DON'T KNOW WHAT THE WIRE IS FOR, NO, SIR.   BUT IT'S IN

5   THE -- EITHER THE HSS OR THE EXAM ROOM.   I CAN'T REMEMBER WHICH

6   ONE.

7   **Q.**   OKAY.   CAN WE GO TO THE NEXT SLIDE, PLEASE.

8          THAT'S THE DOCTORS' OFFICE?

9   **A.**   SO IT'S IN THE EXAM ROOM THERE.

10  **Q.**   THAT'S AN EXAM ROOM.

11         CAN WE GO TO THE NEXT PICTURE, PLEASE.

12         IS THAT --

13  **A.**   THAT'S THE MENTAL HEALTH.   THAT'S NOT THE -- THAT'S WHERE

14  THE MENTAL HEALTH PEOPLE WILL BE.

15  **Q.**   OKAY.   AND AGAIN, IT STILL HAS THE OLD SIGNAGE AND STUFF

16  THAT'S ON THERE?

17  **A.**   YES.

18  **Q.**   AT LEAST AS OF LAST THURSDAY?

19  **A.**   YES, SIR.

20  **Q.**   CAN WE GO TO THE NEXT SLIDE, PLEASE.

21         I THINK THAT WE'RE DONE WITH THE MEDICAL STUFF AT

22  THAT POINT.   CORRECT?

23  **A.**   YES, SIR.

24  **Q.**   OKAY.   WE CAN TAKE EXHIBIT 20 DOWN.   THANK YOU.

25         **THE COURT:**   ALL RIGHT, MR. HALEY.   THE COURT IS GOING

**DENISE DANDRIDGE, PH.D.**

02:59 1  TO HAVE TO RECESS FOR THE DAY.  WE CAN RESUME TOMORROW MORNING

2  WITH MS. DANDRIDGE.

3          DO Y'ALL WANT TO START A LITTLE EARLIER?  DO YOU

4  WANT TO START AT 9:00?

5          **MR. HALEY:**  EARLIER, YOUR HONOR, IF POSSIBLE.

6          **THE COURT:**  MR. MURELL?

7          **MR. MURELL:**  YES, MA'AM, AS EARLY AS YOU WANT.

8          **THE COURT:**  ALL RIGHT.  WELL, DO I HAVE ANYBODY FROM

9  OUT OF TOWN?

10         **MR. MURELL:**  ALL PLAINTIFFS' COUNSEL IS STAYING IN

11  BATON ROUGE, SO WE CAN START AS EARLY AS YOU DESIRE,

12  YOUR HONOR.

13         **THE COURT:**  ALL RIGHT.  WHY DON'T WE START AT 8:30 IN

14  THE MORNING, AND THEN MAYBE WE CAN PUSH THROUGH AND DO AN

15  ABBREVIATED LUNCH AND SEE HOW FAR WE GET.

16         **MR. HALEY:**  YES, MA'AM.

17         **THE COURT:**  OKAY.  WE WILL BE IN RECESS.

18         **MR. MURELL:**  THANK YOU, YOUR HONOR.

19         **THE COURT:**  THANK YOU.

20         **THE LAW CLERK:**  ALL RISE.

21          THE COURT IS AT RECESS.

22  **(WHEREUPON, THIS MATTER WAS ADJOURNED UNTIL 09/07/2022 AT 8:30**

23          **A.M.)**

24          * * *

25          <u>**CERTIFICATE**</u>

03:00 1      I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

2  UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

3  CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

4  THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

5  PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

6

7                  *Shannon Thompson*

8                  SHANNON THOMPSON, CCR

9                  OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25