# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF LOUISIANA

ALEX A., by and through his guardian, Molly Smith, *et al.*, individually and on behalf of all others similarly situated,

        Plaintiffs,

v.

JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana, *et al.*,

        Defendants.

Civil Action No. 3:22-CV-00573-SDD-RLB

**Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction**

**IMMEDIATE RELIEF SOUGHT**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................. 3

  A.   Defendants are not using the Angola site sparingly, for a short time ..................................... 4

  B.   Angola is an inappropriate site for any child because it is an adult maximum-security prison ........... 4

  C.   Defendants routinely use solitary confinement at the OJJ Angola site ................................. 6

  D.   Defendants do not provide required education or special education services .......................... 10

  E.   Defendants fail to provide adequate recreation and exercise .......................................... 12

  F.   Defendants severely limit youth contact with families ............................................... 14

  G.   Defendants do not provide required mental health and other rehabilitative services ................. 15

  H.   Defendants have subjected children to prolonged exposure to excessive heat and lack of potable water ......................................................................................................... 16

LEGAL ARGUMENT .......................................................................................................... 23

  I.   Plaintiffs Have Established a Substantial Likelihood of Success on the Merits ...................... 24

    A.   Plaintiffs Have Shown that Defendants are Deliberately Indifferent to a Substantial Risk of Serious Harm to Plaintiffs, in Violation of Their Constitutional Rights .................................... 25

    B.   Plaintiffs With Disabilities Are Likely to Succeed in Their Claims Under the Americans with Disabilities Act and the Rehabilitation Act. ...................................................... 33

  II.   There is a Substantial Threat That Plaintiffs Will Suffer Irreparable Injury Without a Preliminary Injunction. ....................................................................................................... 35

  III.   The Balance of Equities and the Public Interest Clearly Favor Plaintiffs ............................ 36

CONCLUSION ................................................................................................................... 39

CERTIFICATE OF SERVICE ............................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. Sakai*,
   48 F.3d 1082 (9th Cir. 1994) ........................................................................................ 24

*Ball v. LeBlanc*,
   792 F.3d 584 (5th Cir. 2015) ................................................................................... 28, 30

*Berry v. Smith*,
   No. CV 21-20-SDD-RLB, 2021 WL 2980371 (M.D. La. June 30, 2021), *report and*
   *recommendation adopted*, No. CV 21-20-SDD-RLB, 2021 WL 2964252
   (M.D. La. July 14, 2021) ............................................................................................... 31

*Blackmon v. Garza*,
   484 Fed.Appx. 866 .......................................................................................................... 30

*Brown v. Plata*,
   563 U.S. 493, (2011) ................................................................................................. 25, 38

*Byrum v. Landreth*,
   566 F.3d 442 (5th Cir. 2009) ........................................................................................ 23

*Campos v. I.N.S.*,
   70 F. Supp. 2d 1296 (S.D. Fla. 1998) ........................................................................... 39

*City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority*,
   636 F.2d 1084 (5th Cir. Unit B Feb. 13, 1981) ............................................................. 38

*City of Revere v. Mass. Gen. Hosp.*,
   463 U.S. 239 (1983) ....................................................................................................... 24

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
   710 F.3d 579 (5th Cir. 2013) ........................................................................................ 23

*Eddings v. Oklahoma*,
   455 U.S. 104 (1982) ....................................................................................................... 25

*Elrod v. Burns*,
   427 U.S. 347 (1976) ....................................................................................................... 35

*Farmer v. Brennan*,
   511 U.S. 825 (1994) .......................................................... 24, 25, 26, 27, 28, 29, 32

*French v. Owens*,
  777 F.2d 1250 (7th Cir. 1985) ........................................................................................ 27

*Gates v. Cook*,
  376 F.3d 323 (5th Cir. 2004) .......................................................................................... 28

*Graham v. Florida*,
  560 U.S. 48 (2010) ................................................................................................... 25, 26

*H.C. ex rel. Hewett v. Jarrard*,
  786 F.3d 1080 (11th Cir. 1986) ...................................................................................... 31

*Hadix v. Johnson*,
  367 F.3d 513 (6th Cir. 2004) .......................................................................................... 27

*Hall v. Florida*,
  572 U.S. 701 (2014) ........................................................................................................ 26

*Haralson v. Campuzano*,
  356 Fed. Appx. 692 (5th Cir. 2009) ............................................................................... 31

*Hare v. City of Corinth, Miss.*,
  74 F.3d 633 (5th Cir. 1996) ............................................................................................ 39

*Harris v. Angelina Cnty., Tex.*,
  31 F.3d 331 (5th Cir. 1994) ................................................................................. 27, 28, 29

*Harris v. Johnson*,
  323 F. Supp. 2d 797 (S.D. Tex. 2004), .......................................................................... 36

*Hearns v. Terhune*,
  413 F.3d 1036 (9th Cir. 2005) ........................................................................................ 30

*Helling v. McKinney*,
  509 U.S. 25 (1993) ................................................................................................ 28, 29, 31

*Hernandez v. Velasquez*,
  522 F.3d 556 (5th Cir. 2008) .......................................................................................... 31

*Hinojosa v. Livingston*,
  807 F.3d 657 (5th Cir. 2015) .................................................................................... 29, 30

*Hope v. Pelzer*,
  536 U.S. 730 (2002) ........................................................................................................ 26

*Hutto v. Finney*,
   437 U.S. 678 (1978) ................................................................................................ 27

*J.D.B. v. North Carolina*,
   564 U.S. 261 (2011) ................................................................................................ 25

*J.H. v. Williamson Cnty., Tenn.*,
   951 F.3d 709 (6th Cir. 2020) .................................................................................. 31

*Jackson v. Duckworth*,
   955 F.2d 21 (7th Cir. 1992) .................................................................................... 30

*Jackson Women's Health Org. v. Currier*,
   760 F.3d 448 (5th Cir. 2014) .................................................................................. 36

*Janvey v. Alguire*,
   647 F.3d 585 (5th Cir. 2011) .................................................................................. 23

*Jensen v. Thornell*,
   2023 WL 2838040 (D. Ariz. Apr. 7, 2023) ........................................................... 31

*Kentucky v. Graham*,
   473 U.S. 159 (1985) ................................................................................................ 27

*Kingsley v. Hendrickson*,
   576 U.S. 389 (2015) ................................................................................................ 24

*Leer v. Murphy*,
   844 F.2d 628 (9th Cir. 1988) .................................................................................. 27

*Lewis v. Cain*,
   No. 3:15-CV-318, 2021 WL 1219988 (M.D. La. Mar. 31, 2021),
   *reconsideration denied,* No. CV 15-318-SDD-RLB, 2021 WL 5287856
   (M.D. La. Oct. 8, 2021) ................................................................................... 28, 35

*M.R. v. Dreyfus*,
   697 F.3d 706 (9th Cir. 2012) .................................................................................. 35

*Miller v. Alabama*,
   567 U.S. 460 (2012) ................................................................................................ 25

*Milonas v. Williams*,
   691 F.2d 931 (10th Cir. 1982) ................................................................................ 31

*Montgomery v. Louisiana*,

577 U.S. 190 (2016) ............................................................................................. 25

*N.J. v. New York,*
    872 F. Supp. 2d 204 (E.D.N.Y. 2011) ............................................................... 36

*Nelson v. Heyne,*
    491 F.2d 352 (7th Cir. 1974) ............................................................................. 31

*New Orleans Home for Incurables Inc. v. Greenstein,*
    911 F. Supp 386 (E.D. LA 2012) ....................................................................... 38

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................................... 36

*Ramos v. Lamm,*
    639 F.2d 559 (10th Cir. 1980), cert denied 450 U.S. 1041 (1981) ................... 27

*Rhodes v. Chapman,*
    452 U.S. 337 (1981) ........................................................................................... 26

*Robinson v. Ardoin,*
    605 F. Supp. 3d 759 (M.D. La. 2022) ............................................................... 36

*Roper v. Simmons,*
    543 U.S. 551 (2005) ........................................................................................... 25

*Schultz v. Alabama,*
    330 F. Supp. 3d 1344 (N.D. Ala. 2018) ............................................................ 38

*Spain v. Procunier,*
    600 F.2d 189 (9th Cir. 1979) ....................................................................... 25, 26

*State of Connecticut Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut,*
    706 F. Supp. 2d 266 (D. Conn. 2010) ............................................................... 34

*Tellis v. LeBlanc,*
    No. CV 18-541, 2021 WL 4267513 (W.D. La. Sept. 20, 2021) .................... 33, 34

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) ........................................................................................... 23

*V.W. ex rel. Williams v. Conway,*
    236 F. Supp. 3d 554 (N.D.N.Y. 2017) ............................................................... 31

*Wilkerson v. Stalder,*

639 F. Supp. 2d 654 (M.D. La. 2007) ........................................................ 29

*Wilson v. Seiter*,
501 U.S. 294 (1991) ........................................................................... 26, 31

*Yates v. Collier*,
868 F.3d 354 (5th Cir. 2017) ................................................................ 18, 29

*Zavala v. Contreras*,
581 F. Supp. 701 (S.D. Tex. 1984) ........................................................ 36

**Statutes**

29 U.S.C. § 794 ........................................................................................ 33

29 U.S.C.A. § 705 ..................................................................................... 33

42 U.S.C. § 12131 .................................................................................... 33

42 U.S.C. § 12132 .................................................................................... 33

42 U.S.C.A. § 12101 ................................................................................ 34

42 U.S.C.A. § 12102 ............................................................................ 33, 34

Act No. 496, available at https://legis.la.gov/legis/ViewDocument.aspx?d=1289566
(limiting involuntary isolation of a youth alone in a cell or room to regularly scheduled
sleeping hours, and only as a "temporary response to behavior that poses a serious
and immediate threat of physical harm to the juvenile or others.") ................................. 8

La. Admin. Code tit. 48, § 6945(T) (2023) ................................................ 16

U.S. Const. amend. VIII ............................................................................ 24

**Other Authorities**

Annie E. Casey Found.,
*Juvenile Detention Facility Assessment*, (2016) https://cclp.org/wp-
content/uploads/2016/06/JDAI-Detention-Facility-Assessment-Standards.pdf .......................... 12

Charles Alan Wright, et al.,
11A Federal Practice & Procedure § 2948.3 (2d ed. 1995) ........................... 23

https://lailluminator.com/2023/07/08/youth-angola/ ................................... 2, 4

Janet Currie & Erdal Tekin,

*Does Child Abuse Cause Crime?*, 12171 JEL No. Il, K4, National Bureau of
Economic Research (Apr. 2006), https://www.nber.org/papers/w12171 ................................... 36

Mr. Schiraldi now serves as Secretary of the Maryland Department of Juvenile Services.
https://msa.maryland.gov/msa/mdmanual/19djj/html/msa18520.html ........................................... 4

Off. of Juv. Just.,
*OJJ Completes First Phase of Adjudicated Youth Transfers*, Oct. 19, 2022, at
https://ojj.la.gov/ojj-completes-first-phase-of-adjudicated-youth-transfers/ (OJJ
announcing that on October 19, 2022, it moved eight youth to Angola.) ...................................... 2

Tom Dart,
*Texas Prisons Violate International Human Rights Standards, Report Says*, The Guardian,
(Apr. 23, 2014, 1:10 PM), https://www.theguardian.com/world/2014/apr/23/
teas-prisons-international-human-rights-standard-violations ........................................................ 19

U.N. G.A. Res. 45/113,
*United Nations Rules for the Protection of Juveniles Deprived of their Liberty*,
(adopted Dec. 14, 1990), https://www.ohchr.org/en/instruments-mechanisms/instruments
/united-nations-rules-protection-juveniles-deprived-their-liberty ................................................. 12

**Rules**
Federal Rule of Civil Procedure 25(a)(2) ............................................................................................. 2

Federal Rule of Evidence 1006 .............................................................................................................. 19

**Regulations**
La. Juv. Det. Standards, title 67, §7517(E),
Dep't of Children & Family Servs., (eff. June 1, 2022) *at*
https://www.dcfs.louisiana.gov/assets/docs/searchable/Licensing/Residential/2022/
20220101_Juvenile_Detention_Regulations.pdf. ......................................................................... 32

## INTRODUCTION

On September 23, 2022, in denying Plaintiff Alex A.'s motion for a preliminary injunction to prohibit the Edwards administration and the Office of Juvenile Justice ("OJJ") from moving youth in delinquency placements to the Louisiana State Penitentiary ("LSP") at Angola, the Court found "that no youth will be transferred to [LSP] until the facility is ready, properly staffed, and can fully provide educational, medical, mental health, recreational, and food services."[1] In addition, the Court noted that the OJJ facility at Angola—deemed (by Defendants) a "Therapeutic Treatment Unit" or "TTU"—would have "all services required by law" and would not "be punitive but . . . be therapeutic and rehabilitative."[2] In its findings of fact, the Court noted through pages of findings the full range of services OJJ <u>promised</u> to provide—medical and mental health care, education and special education, and food, recreation, and contact visits with family.[3] Such services are indisputably necessary when the State removes youth from their home and community because, as the Court noted, "the goal of juvenile justice is rehabilitation, not punishment."[4] The Court relied on Defendants' representations to deny the injunction and to reluctantly allow the use of the former death row to house children.[5]

Although top OJJ officials testified under oath and this Court found that the TTU at Angola's former death row would be a "temporary placement" for a small number of children until OJJ's scheduled completion of a new TTU at its Swanson-Monroe facility in April of 2023,[6] it has now been more than eight months – and well past April 2023 – since OJJ placed its first cohort of children in Angola.[7] Since late October 2022, OJJ has incarcerated 70-80 youth, some as young as 15, at

---

[1] *Alex A. by and through Smith v. Edwards*, 2022 WL 4445499 (M.D. La. September 23, 2022, Slip Op.) (hereafter "Doc. 79"), p.19.

[2] *Id.*, p. 23.

[3] *Id.*, pp. 23-29.

[4] *Id.*, p. 29.

[5] *See, id.*, p. 2 (Court called the "prospect of putting a teenager to bed at night in a locked cell behind razor wire surrounded by swamps at Angola" "disturbing" and "untenable.").

[6] *Id.*, p. 17.

[7] *See, e.g.*, Off. of Juv. Just., *OJJ Completes First Phase of Adjudicated Youth Transfers*, Oct. 19, 2022, at https://ojj.la.gov/ojj-completes-first-phase-of-adjudicated-youth-transfers/ (OJJ

Angola.[8] The vast majority of these boys are Black[9] and some have been transferred to Angola more than once.[10]

As shown below and much to the detriment of youth forced to endure this placement, Defendants broke nearly every one of their promises to this Court. As Plaintiffs predicted, OJJ has not fulfilled its rosy vision of a helpful and temporary "treatment" site with all legally-required services and supports. Defendants' promises to the Court that they would provide a safe environment, family visitation, and rehabilitative, educational, and treatment services required by law were empty. Plaintiffs demonstrate in this motion OJJ's routine use of solitary confinement, excessive heat and inadequate access to potable water on the cellblocks, almost no teaching staff and no instruction, a lack of family contact visits, and inadequate counseling, treatment and recreation. In short, there is no question that placement in OJJ's TTU at Angola is punishment in violation of the Fourteenth and Eighth Amendments, as well as violation of the children's statutory rights.

With these promises broken, Plaintiffs Alex A. and Curtis C., on their own behalf and on behalf of the class they seek to represent, now seek preliminary relief to end this harmful and failed experiment.[11] This Court should grant Plaintiffs' preliminary injunction request and immediately move to protect youth in OJJ's custody from harm. The use of an adult maximum-security facility to detain these youth violates their constitutional and statutory rights and the rights of the putative class

---

announcing that on October 19, 2022, it moved eight youth to Angola.).

  [8] *See*, Ex. 10 (Demographics of youth transferred to Angola, OJJ's June 23, 2023 response to public records request) (showing a total of 49 youth transferred to Angola); at a public hearing of Louisiana's Juvenile Justice Reform Act Implementation Commission (JJRAIC), OJJ Deputy Secretary Nelson stated his estimate of 70-80 children who have so far been housed at Angola. *See*, Ex. 9 (FFLIC statement documenting OJJ admission that they've had 7-80 kids at Angola). *See* https://lailluminator.com/2023/07/08/youth-angola/.

  [9] *See*, Ex. 10.

  [10] Doc. 146-4, p. 18, ¶ 57 ("Daniel D. was first sent to the Angola site in September or October 2022. Daniel D. was transferred out of Angola to OJJ's Swanson facility in January 2023 and then transferred back to Angola in March 2023.").

  [11] Pursuant to Federal Rule of Civil Procedure 25(a)(2), Plaintiffs' counsel notified the court of the death of putative named plaintiff Brian B. *See* Doc. 162.

– all youth in OJJ's system at risk of being transferred to Angola.

## FACTUAL BACKGROUND

Defendants' incarceration of children at the OJJ Angola facility, in the prison's former death row cells, has subjected them to conditions of confinement so seriously deficient as to constitute punishment—rather than rehabilitation or treatment—in violation of their constitutional rights. Additionally, the use of the OJJ Angola facility has violated the rights of all youth with disabilities who have been sent there, under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

As detailed in the following sections, Defendants broke their promises to the Court:

- The Governor's announced plan was to house a small number of youth from the Bridge City Center for Youth, for short stays, at the OJJ Angola facility. Defendants broke that promise, as some 70-80 youth have been cycled through Angola since October 2022 – some more than once.

- Defendants promised children would not spend more than 8 hours per day, for sleeping at night, in the windowless, concrete block, barred single cells. Defendants broke that promise, as children report the routine use of solitary confinement, for days at a time, for disciplinary and other purposes. This is only one of the adult prison features of the OJJ Angola site that make it unlawful as a children's facility.

- Defendants promised adequate teaching staff and services for both regular and special education. Defendants broke that promise, as there is one teacher for one housing area and no teachers at all for the other units, with youth receiving no instruction, no special education services, and only "computer learning" without assistance.

- Defendants promised both indoor and outdoor recreation. Defendants broke that promise, as there is almost no indoor activity, children are routinely confined to the cells for days on end, and – only recently – have been allowed outside near the basketball goal only in handcuffs and leg shackles, without even a ball.

- Defendants promised family visitation, by phone, video, and in person (and not separated by plexiglass or bars), with Deputy Secretary Sommers memorably reassuring this Court under oath that "mamas have got to hug their kids." Defendants broke that promise, with only phone calls irregularly available for family contact.

- Defendants promised a "treatment unit," with appropriate mental health and other rehabilitative services for youth in OJJ custody with the highest level of needs. Defendants broke that promise, with little to no counseling and insufficient staffing.

- Defendants promised safe and sanitary conditions. Defendants broke that promise, locking children in barred cells with only a metal bed and metal toilet/sink, unclean faucets and no drinkable water source, and allowing excessive heat in the housing areas to go unremediated during this hot summer in Louisiana.

The Court gave Defendants a chance to prove that they could lawfully provide rehabilitation for children in this horrific adult maximum-security setting and Defendants spectacularly failed. It is time to stop Defendants from continuing to inflict irreparable harm on children in their care at Angola, and redirect their efforts toward improving their other juvenile detention facilities.

### A.   Defendants are not using the Angola site sparingly, for a short time

Defendants' repeated assurances to the Court that they would us the OJJ Angola facility for "temporary" placements for a small number of youth were false.[12] Instead, a large number of children have suffered placement at the Angola site, and Defendants will continue to use it for youth in the delinquency system. Recently, Deputy Secretary Nelson admitted at a public juvenile justice reform hearing that OJJ had thus far transferred 70-80 children to Angola. Ex. 9. Rather than closing the Angola site by late April 2023 as promised, Doc. 79 at 16-17 (citing testimony of Defendant Nelson), Defendants recently acknowledged publicly that they would not stop using Angola before the end of calendar year 2023 at the earliest, and it might be later than that.[13]

### B.   Angola is an inappropriate site for any child because it is an adult maximum-security prison

As juvenile justice expert Vincent Schiraldi testified in September 2022, placing children anywhere on the Angola prison grounds violates national standards, is harmful, and ill-advised. Doc. 79 at 29-30.[14] Psychologist Dr. Monica Stevens testified that placing children in such a setting contradicts what many in her field would recommend from an "ethical," "clinical," or "humanitarian" perspective. Stevens, 9/2/22 Tr. at 117:14 – 118:8. She predicted that children placed at the Angola

---

[12] Doc. 79 at 17 & n.80 (citing Nelson testimony); Nelson, 9/7/22 Tr. at 167:9-10 (facility will "meet the needs on a short-term basis").

[13] *See* https://lailluminator.com/2023/07/08/youth-angola/.

[14] Mr. Schiraldi now serves as Secretary of the Maryland Department of Juvenile Services. https://msa.maryland.gov/msa/mdmanual/19djj/html/msa18520.html.

site would be at risk of neurological regression – adapting to the highly stressful adult prison environment in the wrong direction – and would have a lower likelihood of rehabilitation. *Id*. at 113:18-25, 139:1 - 141:1. All of this remains true. The lack of windows in the cells, the lack of privacy, lack of normalcy, inadequate recreation space, the metal prison beds and sinks and many other physical features send the clear message to Plaintiffs that they are in an adult prison, and that they are being punished. And the design of the prison cells in which youth at the OJJ Angola site are held creates a heightened risk of suicide, with the floor-to-ceiling bars providing multiple "cut-off" points around which youth could tie sheets or comparable items. Unlike their peers in juvenile facilities with individual rooms or dormitories, rather than barred cells, youth transferred to the OJJ site at Angola face a greater risk of suicide by the very architecture of the facility. Schiraldi, 9/7/22 Tr. at 261:1-14; *see also* Ex. 5 (Declaration of Craig W. Haney, "Haney Dec.") ¶¶ 66-69. Solitary confinement in such cells causes an increased risk of suicide as well. *See* Doc. 79 at 31.

Based on Defendants' detailed promises to the Court in September 2022, the Court found "that the TTU at BCCY-WF is a temporary solution and will provide all necessary programs and services to youth, and the TTU is not designed to be punitive but to be therapeutic and rehabilitative while maintaining discipline, safety, and security." Doc. 79 at 23. At the time, before OJJ began housing children at the site, the Court was aware of the physical adult prison environment, including high fences, razor wire, guard towers, and single barred cells, and the Court was very concerned.[15] The Court did not know, however, that the adult prison design of the Angola unit and its lack of services and adequate staffing would lead to OJJ routinely using the cells for discipline and solitary confinement, contrary to Defendants' promises that they would never do such a thing.

---

[15] Doc. 79 at 48 ("The Court does find, however, that Plaintiff has presented sufficient evidence of a serious risk of psychological harm to juveniles by placing them in facilities that were designed to house adult prisoners. . . . [T]he photographs of prison cells, barred sliding doors, open toilets in the cells, guard towers and razor wire surrounding the entire facility do, indeed, 'scream prison' as Schiraldi testified.")

C.      **Defendants routinely use solitary confinement at the OJJ Angola site**

Solitary confinement has been linked to increased rates of suicide, depression, and anxiety for both adults and children, and youth in particular are especially vulnerable to severe mental and physical harm as a result of solitary confinement. *See* Haney Dec. ¶¶ 21-35, 40-50. At the September 2022 hearing, both experts Schiraldi and Stevens warned against placement of children in Angola precisely because of the extremely negative effects solitary confinement has on young people. Doc. 79 at 48. This evidence was undisputed by Defendants, and the Court found it troubling. *Id.* (concluding that "the photographs of prison cells, barred sliding doors, open toilets in the cells, guard towers and razor wire surrounding the entire facility do, indeed, 'scream prison' as Schiraldi testified.")  Defendants emphatically promised this Court that the youth would not be subjected to solitary confinement; their cells would not be used for punitive or disciplinary purposes; and they would be provided with plenty of recreation activities. *Id.* ¶¶ 68, 136.[16]

Despite the State's sworn commitments, upon which the Court relied, the reality for the youth placed at Angola is now far different. Youth report routinely being locked in their cells daily for 15 consecutive hours, from 5 pm to 8 am. *See* Ex. 2 (June 2023 Supp. Dec. of Charles C.) ¶ 12; Ex. 1 (June 2023 Dec. of Daniel D.) ¶ 10. Frank F. reported that Angola was unlike other juvenile facilities, because he spent most of his time alone, and was sometimes left alone in his cell for multiple days. Ex. 4 (April 2023 Dec. of Frank F.) ¶¶ 9-10. As of July 11, youth report having been locked down in the cells since July 5, and only being allowed out of their cells for showers for eight minutes per day (while handcuffed and shackled), and for two hours outdoors on one day (also in mechanical restraints, making exercise impossible). Ex. 3 (July 2023 Dec. of Charles C.) ¶¶ 5-6.

Youth also report the use of solitary confinement for disciplinary purposes. Putative named

---

[16] Apparently referencing Louisiana's law limiting solitary confinement for children, Defendant Nelson asserted the state's intent to comply: "legally, no child can be confined in their room for more than 8 hours and then only after an assessment; the child must be checked on an hourly basis; once the child has calmed down, they are released back into the general population." Doc. 79 at ¶ 136.

plaintiff Daniel D. reported when he first arrived at Angola he was locked alone in a cell for three days and not let out except to shower. After that, he reported he was locked alone in the cell every day from 5 pm until 8 am the next morning. Ex. 1 ¶¶ 6, 9-10. He also witnessed other children be punished by being left alone in a cell for 48 hours at Angola. *Id.* ¶¶ 13; Ex. 2 ¶¶ 6,. Charles C. also notes the cell is incredibly small and he has no room to move, making isolation even more difficult to endure. Ex. 2 ¶ 7.

Craig Haney, Ph.D., J.D., is an expert on the psychological impact of solitary or isolated confinement generally, especially with regard to juveniles. He has visited the Angola death row facility in the context of past litigation, reviewed the photos of the OJJ Angola Unit entered into evidence, and reviewed the declarations of children currently and recently housed at Angola. *See generally* Ex. 5, Haney Dec. Research confirms that isolation "subjects people to significantly more stress and psychological pain than other forms of imprisonment." *Id*. ¶ 52. This is because "the experience of isolation is psychologically destabilizing, it undermines a person's sense of self or social identity and erodes his connection to a shared social reality, and many of the direct negative psychological effects of isolation are themselves very similar if not identical to certain symptoms of mental illness." *Id.* ¶ 53. As Dr. Haney explains, critical development differences between youth and adults heighten and exacerbate the risk of harm for children in solitary confinement:

> because of their scientifically well-established vulnerability . . ., adolescents are at especially formative stages in their lives and are in the process of ongoing social, psychological, and physiological development. In addition, the risk of serious psychological harm is further heightened for mentally ill youth. As children whose coping mechanisms are less well-developed, with limited ability to discern and control their emotional reactions, and whose personal identities are less stable and more influenced by surrounding circumstances—isolation is likely to be especially harmful and dangerous. [. . .]

> The widespread scientific consensus on the psychological and physical harms inflicted by solitary confinement is especially applicable to children whose developmental vulnerability makes them particularly sensitive to such treatment. The psychological stress and anguish of being kept in isolation increases the risk and seriousness of the harm, which is categorically greater in children, and can subject

7

them to potentially irreversible physical and mental harm.

Haney Dec. ¶¶ 18, 42 (citations omitted).[17]

More than half of U.S. states recognize the special vulnerability of youth to the risks of solitary confinement (either banning or severely limiting it use on children), and Louisiana passed restrictions on the use of solitary in *juvenile* facilities in 2022 after two youth in different facilities died by suicide in 2019 within 72 hours of one another. Haney Dec. ¶ 43.[18] Dr. Haney is especially concerned about the increased risk of suicide or self-harm among the youth incarcerated in Angola:

> [T]he U.S. Department of Justice data on deaths of children by suicide is unequivocal: **it found that half of the children who died by suicide in juvenile carceral facilities were in isolation at their time of death, more than 60% of young people who died by suicide in detention had a history of being held in isolation, and 40% of suicides in juvenile facilities occurred within the first 72 hours of the youth's placement in solitary.** The DOJ report noted that, "When placed in a cold and empty room by themselves, suicidal youth have little to focus on – except all of their reasons for being depressed and the various ways that they can attempt to kill themselves."

*Id.* ¶ 49. (Emphasis added). Moreover, studies have found that among juveniles incarcerated in *adult* facilities, the risk and rate of suicide is even higher: "a 2018 report by the UCLA School of Law found that youth under the age of 18 are *36 times* more likely to commit suicide if they are housed in an adult jail than if they are held in a juvenile detention facility." *Id.* ¶ 19.

Even "an initial, brief period in which someone is placed in solitary confinement carries heightened risk." *Id.* ¶ 36; *see also id.* at 39 (commenting on the reports of several youth that OJJ has a practice of locking children in cells for 72 after intake, except for showers). Dr. Haney declared, "**I**

---

[17] Dr. Haney's observation of current conditions mirrors the concerns Dr. Stevens voiced at the September hearing. Stevens, 9/6/22 Tr. at 177:23-25; 176:1-13 (in an environment that treats youth as criminals and strips them of their identity, they will conform to that vision of themselves; the planned OJJ facility at Angola, in the former death row, was especially problematic from a psychological perspective, conveying messages of punishment and hopelessness rather than rehabilitation and opportunities for the future).

[18] Act No. 496, available at https://legis.la.gov/legis/ViewDocument.aspx?d=1289566 (limiting involuntary isolation of a youth alone in a cell or room to regularly scheduled sleeping hours, and only as a "temporary response to behavior that poses a serious and immediate threat of physical harm to the juvenile or others.").

**cannot stress strongly enough my opinion that OJJ is playing with fire by incarcerating children continuously in solitary confinement conditions for the first 72 hours of their arrival to the facility**." *Id.* ¶ 39 (emphasis added).

Many professional organizations have urged outright prohibitions on the use of isolation on incarcerated people, especially children and people with mental illness, including but not limited to: the American Academy of Child & Adolescent Psychology, the American Psychiatric Association, the American Psychological Association, the National Alliance on Mental Illness, the National Commission on Correctional Health Care (NCCHC), the Society of Correctional Physicians, the United Nations General Assembly, and World Medical Association. *Id*. ¶¶ 56-65. Dr. Haney has visited the former Death Row unit at Angola multiple times, and reviewed photos taken of the OJJ Angola site that were introduced into in evidence at the September 2022 hearing. *See id.* ¶¶ 12, 67-69*;* Plfs' Exhibit 20 at 000299-303; Haney Decl. at ¶ 67-69.

 

The cells are windowless and the walls are made of concrete blocks. Dr. Haney notes that:

[T]his facility previously functioned as a high-security housing unit for adults who had been condemned to death in Louisiana. It is harsh, barren, and inhospitable. Architecturally, the cell design and unit configuration emphasize heightened security and institutional control, rather than providing adequate spaces to accommodate and encourage rehabilitation and treatment. The razor wire, locking mechanisms, and security gates and screens reflect the facility's original purpose as Death Row. It is hardly a place to house children at all, let alone to subject them to long periods of

what amounts to solitary confinement.

*Id.* ¶ 69. Given the serious risks that exist, Dr. Haney states unequivocally that "Defendants should not be locking youth alone in their cells for 72 hours at intake, or for hours or days on end for disciplinary reasons (including group punishment) or for staff convenience (or due to staff shortages or holidays); nor should it occur in a locked cell under conditions where children are deprived of basic human needs." *Id.* ¶ 20.

### D. Defendants do not provide required education or special education services

As minors, Alex A., Charles C. and all putative class members have a right to an education under Louisiana state law, which is not forfeited upon entering state custody. They are also children with disabilities entitled to receive education accommodations and other services, including under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

At the preliminary injunction hearing, OJJ made repeated assurances about the amount and quality of education services that would be available to children at Angola.[19] The reality has fallen far short of these promises. School at Angola is, at worst, non-existent, and, at best, woefully unequipped to meet the educational needs of children, especially children with disabilities, as required under Section 504 and the ADA.

In at least one case, a child currently held at Angola reports that, on his cell block, there are no teachers available at all. Ex. 2 ¶ 10. Children report days of solitary confinement with no access to any facilities at Angola beyond a shower, much less access to the classrooms OJJ claims to provide. *See id.* ¶ 6; Ex. 1 ¶¶ 9, 13; Ex. 4 ¶ 10. If allowed out of their cells during school hours, children are told to sit in front of a computer all day, rather than receiving live instruction. Ex. 2 ¶ 10.

---

[19] *See, e.g.*, Doc. 79 at 27; Nelson, 9/7/22 Tr. 168:24-169:4 (assuring presence of principal, special education teachers, tutors, paraprofessionals at Angola); Deville, 9/8/22 Tr. at 140-144, 160 (all IEP services will be available, education will be offered "where all the youth will be going to their classes, a 360-minute daily schedule, which is required by law . . . . They'll have their regular education teacher."); *See also* Stevens 9/6/22 Tr. at 161:10-15, 169:21-25 (testimony by Dr. Stevens expressing skepticism regarding OJJ's plan to implement educational, mental health, and counseling services at Angola, given staffing shortages in the mental health and education sectors).

Children in the putative disability subclass do not receive educational services and accommodations required by Individualized Education Plans ("IEPs") or Rehab Act 504 Plans, as Defendants promised the Court they would receive. Ex. 2 ¶ 11; Ex. 4 ¶ 12; Nelson, 9/7/22, *cf.* Tr. 151:8-23 (Defendant Nelson testifying that 504 Plans and IEPs will be implemented at Angola). For example, Plaintiff Charles C., who has ADHD, bipolar disorder, schizophrenia, and PTSD, reports that he has not received any of the accommodations in his IEP at Angola, which include one-on-one support and extra time. Ex. 2 ¶¶ 10-11; *see also* Ex. 4 ¶ 6. Other youth report similar denials of other required educational accommodations, such as read out loud supports. *See, e.g.*, Ex. 4 ¶ 12.

Children diagnosed with emotional and behavioral disabilities who are incarcerated at Angola further report that therapeutic and counseling services provided at other facilities are unavailable at Angola. To the extent that such services could ever counteract the traumatic stress caused by detention of children in a former death row facility, the absence of these services further impedes children's ability to make progress toward gaining a high school diploma and work toward their rehabilitative goals. Ex. 2 ¶ 15; Ex. 4 ¶ 13.

To deliver much-needed educational and related services to youth in an effective, trauma-informed, and youth-focused manner, there must be adequate and well-trained staff available to provide regular therapies. Defendants have failed to provide such staff. Contrary to Defendants' promises that they had a staffing plan and the hiring of teachers and other personnel to fulfill that plan was underway, the staff have not materialized.[20] Currently, it appears there is only one teacher in one of the units, who does not provide instruction, and no teacher at all in the other unit. Instead, the staff at the Angola site sit the children down in front of computer screens for the entire "school day" and tell them to work on their own via the Edgenuity program. Ex. 2 ¶¶ 10-11, Ex. 1 ¶ 17.

---

[20] Nelson, 9/7/22 Tr. at 174-77; Sommers, 9/8/22 Tr. at 86:19-23 ("We will not move one youth, not one child" into the facility "until our staffing is up, until our educational needs are met, until our mental health needs are met . . . ."); Doc. 79 at 26; Deville, 9/8/22 Tr. at 131:24-132:25 (all services including speech and occupational therapy and school psychologists will be available at the Angola site, there will be no interruption in special education services)

As education expert Joseph Gagnon states, "[t]here appears to be no adequate or consistent staffing of teachers" at the Angola facility, resulting in a denial of special education services and disability-related accommodations. Ex. 8, Declaration of Joseph Gagnon ("Gagnon Dec.") ¶¶ 23, 30, 38. For the large number of youth with disabilities served by OJJ, including Plaintiffs, live instruction from qualified teachers, rather than computer-based programming, is necessary to access the general education curriculum. *Id*. ¶¶ 34-36; *see also id*. ¶¶ 40-41 (describing need for instruction for students with Individualized Education Plans in particular). So too are positive behavioral supports and interventions, which are also denied to youth at Angola. *Id*. ¶ 48. The resulting denial of access to education services has lifelong consequences, including "unemployment, poverty, mental health conditions, problems with physical health (e.g., diabetes, heart disease), drug abuse, and future criminal behavior." *Id*. ¶ 44. It also has more immediate impacts for the children in OJJ facility. In Dr. Gagnon's opinion, "the unavailability of supports [also] leads to more serious behavior and behavioral escalation that can result in isolation of students with disabilities . . . ." Periods of solitary confinement then further deny children access to education and compound barriers to incarcerated children progressing in school and achieving their rehabilitative goals. *Id*. ¶¶ 49-50.

### E.  Defendants fail to provide adequate recreation and exercise

Juvenile justice experts agree that indoor and outdoor recreation is crucial to youth in juvenile facilities. According to the United Nations Rules for the Protection of Juveniles Deprived of their Liberty, "[e]very juvenile should have the right to a suitable amount of time for daily free exercise, in the open air whenever weather permits, during which time appropriate recreational and physical training should normally be provided. Adequate space, installations and equipment should be provided for these activities."[21] The Annie E. Casey Foundation similarly encourages facilities to "offer[] youth a range of choices for recreational activities in dayrooms or common areas."[22]

---

[21] U.N. G.A. Res. 45/113, *United Nations Rules for the Protection of Juveniles Deprived of their Liberty*, (adopted Dec. 14, 1990), https://www.ohchr.org/en/instruments-mechanisms/instruments/united-nations-rules-protection-juveniles-deprived-their-liberty.

[22] Annie E. Casey Found., *Juvenile Detention Facility Assessment*, (2016)

In offering his expert opinion to the Court in September, Vincent Schiraldi testified that it was in the interest of both OJJ and the youth for the adolescents "to get plenty of large muscle exercise" and generally have ample opportunity for recreational activities. Schiraldi, 9/7/22 Tr. at 265:10-266:11. Defendants promised such opportunities. In his testimony, Secretary Nelson spoke of both an outdoor recreation yard and an indoor area that could be used for "calisthenics" or allow the youths to play a game with one another. Nelson, 9/7/22 Tr. at 166:23-167:8. The reality at the Angola unit has proven quite different.

Instead of exercise and games that allow socializing and community, the youth at Angola, as recounted above, remain in their solitary cells or on their units for long stretches of time, sometimes not leaving for days at a time. Outdoor recreation, when available, is limited to one basketball goal on a concrete pad in a fenced area in view of a guard tower. Doc. 79 at ¶ 120. Outdoor recreation is unavailable when it rains and is arguably inappropriate in even normal summer temperatures in Louisiana, to say nothing of the recent heatwave experienced across the state. *See* Section I, *infra*. The indoor recreation space designated for recreation is inadequate. Doc. 79 at ¶ 119.

Because OJJ confines youth to the cells from 5 pm until 8 am daily, nine hours of out-of-cell time is the most generous allotment of programming the youth at Angola receive. In the first 72 hours after transfer, youth are routinely locked in their cells for 23 hours a day. Ex. 2 ¶ 6; Ex. 1 ¶ 9. At one point during his incarceration at Angola, Frank F. was not allowed to leave his cell for two days except to shower, and he routinely did not have access to outside recreation on the weekends. Ex. 4 ¶¶ 10, 17. The entire group of boys was locked down for at least four days straight in late June, and again July 5-11, and then only let outside for two hours in handcuffs and shackles, as described above. Ex. 3 ¶ 5, Ex. 2 ¶ 6. Whatever Defendants' plans regarding recreational opportunities at Angola, their promises before the Court have not been honored.

---

https://cclp.org/wp-content/uploads/2016/06/JDAI-Detention-Facility-Assessment-Standards.pdf; *See* Nelson, 9/7/22 Tr. 166:23-167:8.

**F.    Defendants severely limit youth contact with families**

Like recreation, access to family members is an important component of a youth's rehabilitative program. Mr. Schiraldi testified that family contact is "hugely important," as it allows bonding between the child and family members, and "keeps [youths] from getting depressed and keeps them from being endangered to commit suicide." Schiraldi, 9/7/22 Tr. at 268:18-22. Alex A. told the court that, while at other facilities, daily calls with his mother and biweekly Zoom visits with her and his siblings "motivate[] me to come home, do the right thing." Alex A., 9/6/22 Tr. at 53:19.

Defendants acknowledged the importance of visitation; in fact, then-Secretary Sommers was effusive about the family visits OJJ would provide at Angola. He testified, "a mama needs to hug her son. No ifs, ands or buts, that's just the way it goes. Mamas need to hug their boys. . . . [] a mama needs that touch, that boy needs that touch. And so we will have that type of visitation at West Feliciana, no doubt." Sommers, 9/8/22 Tr. at 82:20-25. In addition, Defendants promised video visits. Sommers testified, "Oh, yes. We'll have virtual visitation. We're also trying to work on seeing if we can't pick up the parents and bring them. We're trying to work on that as we go along." *Id.* at 83:4-6. And Angela Bridgewater, OJJ's Statewide LAMOD Coordinator, testified that children would have daily Zoom visitation with parents or guardians. Bridgewater, 9/8/2022 Tr. at 193:6-198:8.

Again, the reality has fallen far short of Defendants' promises. Multiple youth attested to speaking to family members on a daily or near-daily basis at other OJJ facilities. Ex. 2 ¶ 15; Ex. 1 ¶ 14; Ex. 4 ¶ 15. Yet at the Angola site, Charles C. reported he was unable to call home, and Daniel D. reported that when he was at Angola in June, he was allowed to call home just once in a period of 10 days. Ex. 2 ¶ 15; Ex. 1 ¶ 14. Frank F., who in another OJJ facility had been able to call home when he wanted and declared calls with his mother and siblings to be his "favorite thing," reported that at Angola he was limited to two video visits per week. Ex. 4 ¶ 15. Neither Charles C. nor Daniel D. had family visits while at Angola, due to the distance from their homes. Ex. 2 ¶ 15, Ex. 1 ¶ 19. The OJJ-supplied transportation for families has apparently not materialized.

14

### G.  Defendants do not provide required mental health and other rehabilitative services

Dr. Monica Stevens was skeptical in September, and rightly so, about the state's ability to provide mental health and counseling services to children at the OJJ Angola site and was extremely concerned about the children's psychological safety. Stevens, 9/6/22, Tr. at 141:15-17. Her concerns were rooted in the effects of the environmental change for youth who were already facing many challenges. A transfer to a stressful environment, such as a former death row or adult facility, would "redirect energy away from the prefrontal cortex to the survival parts of the brain" and this neurological regression could impact the "likelihood of rehabilitation." *Id.* at 139:1-141:1. Additionally, a transfer to Angola would "exacerbate mental and emotional instability of the youth." *Id.* at 164:14-15. Due to the sped-up timeline for the OJJ site, Dr. Stevens questioned whether there would be "enough mental health professionals to provide adequate service" given her knowledge of the lack of available qualified mental health professionals. *Id.* at 161:10-162:5. Similarly, Mr. Schiraldi testified that "an understaffed facility, period, is not good for rehabilitating the kids" and that "inadequate staffing and time for training puts entire rehabilitation mission at risk." Schiraldi, 9/7/22 Tr. at 293:25-294:25.

Defendants promised no child would be moved into the OJJ Angola site before "rehabilitation services [were put] in place" and assured the Court that youth would receive "the same mental health and counseling services as youth in any other OJJ facility." Doc. 79 at 24; Sommers, 9/8/22 Tr. 88:18-89:1; Dandridge Test., 9/7/22 Tr. at 30:2-22. Not only did OJJ leadership promise that youth would receive "the same degree of services at Angola as they [would] at other youth facilities," but that Angola would allow them to be "in a separate facility where they can focus on those behavior traits and give them *additional* treatment." Nelson Test., 9/7/22 Tr. at 96:3-5; (emphasis added). Defendant Nelson testified he had "proper rooms to do social services" at the Angola site and acknowledged that a reduction in mental health or medical services would be "against the law." Nelson, 9/7/22 Tr. at 181:4. To address staffing concerns, Mr. Sommers vowed "not one youth, not one child will be

15

moved into this type of facility until everything has been accomplished, until our staffing is up…until our mental health needs are met…anything and everything." Sommers, 9/8/22 Tr. at 86:19-24.

In spite of these assurances under oath to the Court, nine months after the first transfer of youth to Angola, evidence confirms Dr. Stevens' fears, showing that Defendants failed to provide mental health and rehabilitative services to youth. Daniel D. previously received substance use counseling at other OJJ facilities, but after his March 2023 transfer to Angola he did not receive treatment. Doc. 146-4 at 18. This is the type of counseling he found to be helpful, yet he no longer had access to it. *Id*. Three months later, in June 2023, Daniel D. was still not receiving treatment for his substance use disorder. Ex. 1 ¶ 16. Proposed Plaintiff Frank F. also declared he did not receive group therapy during his time at Angola. Ex. 4 ¶ 13. While he was at a different OJJ facility, Frank F. received group therapy one hour every day which he found to be helpful. *Id*. Contrary to Defendants' promise that services would be the same at every facility, and indeed would be enhanced at Angola, this group therapy was discontinued for Frank F. while at Angola. *Id*. at ¶ 23. As recently as July 11, 2023, youth confirm a lack of adequate counseling services. Plaintiff Charles C. describes counseling as "not any good" and "rare that [he] get[s] to see anyone, and mostly they just let [him] call home" during counseling time. Ex. 3 ¶ 9. Defendants' failed promises of providing the same degree of services at Angola as any other OJJ facility – and more – has impeded the rehabilitation of the youth sent there.

**H.    Defendants have subjected children to prolonged exposure to excessive heat and lack of potable water**

As detailed above, youth spend entire days and many hours locked in cells that are not air conditioned, and their very architecture puts youth at substantial risk of serious harm.[23] As shown in the photographs in evidence at the September hearing, the cells are windowless, and have no

---

[23] For pre-adjudication juvenile detention centers, the Louisiana Administrative Code mandates air conditioning. *See* La. Admin. Code tit. 48, § 6945(T) (2023) ("An adequate system of heating, ventilation, and air conditioning shall be provided. . . with consideration for the safety and security of children and staff.")

ventilation other than a small vent close to the ceiling of the unit, as shown below:



Plfs' Ex. 20, at Bates Nos. 000302-03.

The cell doors are open bars, and face a corridor with windows made of glass blocks, with an inset window that theoretically can open, as seen in the following photos:



17

 

*Id.* at Bates Nos. 000278, 000300-01, 000307.

**Excessive Heat**

As seen in these photos, the cells and the unit have concrete floors and cinderblock walls. Dr. Susi Vassallo, M.D., is an expert on thermoregulation and heat exposure, and has reviewed the photos of the OJJ Angola Unit. *See* Declaration of Dr. Susi Vassallo, filed hereto (Ex. 6).[24] She notes that the body's temperature may rise as a result of exposure to high external heat, including high temperature, humidity, and radiant heat—and radiant heat sources "include not only the sun, but also the walls of buildings, cement or asphalt grounds, or lights." *Id.* ¶ 18. She notes:

> The physical structure and architecture of prisons and the requirements prison life can make incarcerated people more susceptible to and vulnerable to heat. Prisons are normally built out of heat-retaining materials such as concrete or cement that increase internal prison temperatures. Prison buildings and cells often have few windows (if any) that can open to potentially create a cross-breeze or to circulate air. As a result, it is my experience that the un air-conditioned temperatures inside prisons often

---

[24] Dr. Vassallo has appeared before this Court as one of three experts for incarcerated adult men at Angola in *Lewis v. Cain*, Case No. 3:15-cv-00318-SDD-RLB (M.D. La.). She also has served as an expert in litigation related to the lack of air conditioning in Angola's new death row facility, *Ball v. LeBlanc*, Case No. 3:13-00368-BAJ-EWD (M.D. La.). Vassallo Dec. ¶ 3. The Fifth Circuit has recognized and noted her expertise in multiple cases. *See Yates v. Collier*, 868 F.3d 354, 363-64 (5th Cir. 2017) ("Dr. Vassallo is a licensed physician and a recognized expert in the field of thermoregulation and hyperthermia, with over twenty-five years treating heat stroke and heat-related disorders. Dr. Vassallo has previously served as an expert witness in lawsuits challenging prison conditions, and this court has (at least) twice upheld district court findings that relied heavily on Dr. Vassallo's testimony.") (citations omitted).

18

exceed the ambient outdoor temperature. For example, a 2014 report by the University of Texas School of Law found that the summer heat index inside Texas Department of Criminal Justice (TDCJ) facilities could exceed 149 degrees Fahrenheit.[25]

*Id*. ¶ 71.

The heat index is calculated by measuring air temperature and humidity together using a formula, and it is a "better indication of how the body 'feels' heat than air temperature alone." *Id.* ¶ 25. It is important to incorporate the relative humidity into any calculation because evaporation is less effective as humidity rises. Thus, it is more difficult for the water from sweat to evaporate from the surface of the skin into the air, the body cannot engage in evaporative cooling as efficiently, and as a result, the body cannot release as much heat so body temperature continues to rise, possibly leading to hyperthermia. *Id*. ¶ 24.

Dr. Vassallo explains that "[h]eat-related disorders occur when the body's temperature control system is overloaded, and the body is unable to adequately dissipate heat. The risk for heat stroke and heat-related disorders increases sharply when the heat index exceeds 88 degrees Fahrenheit. Heat related disorders include heat syncope (fainting), heat cramps, heat exhaustion, and heat stroke." *Id.* ¶ 27; *see also id*. ¶¶ 28-39 (describing heat related disorders and heat stroke's mortality rate); *id.* ¶¶ 40-41 (describing the psychological impact of persistent exposure to extreme heat, including higher suicide rates on extremely hot days).

Pursuant to Federal Rule of Evidence 1006, Plaintiffs submit a chart summarizing daily temperature, humidity, and heat index for Angola, Louisiana, from May 1, 2023 through July 13, 2023, using publicly-available historic weather data. *See* Ex. 7 (Warshal Dec.) ¶¶ 2-7, ex. 1. For all but five days since May 1, the heat index was at or exceeded 88° F:

| Date | Max Temp (°F) | Humidity (%) | Heat Index (°F) | Date | Max Temp (°F) | Humidity (%) | Heat Index (°F) |
|---|---|---|---|---|---|---|---|
| 5/1/2023 | 78.2 | 61.1 | 79 | 6/7/2023 | 90.5 | 72.8 | 109 |

---

[25] Tom Dart, *Texas Prisons Violate International Human Rights Standards, Report Says*, The Guardian, (Apr. 23, 2014, 1:10 PM), https://www.theguardian.com/world/2014/apr/23/teas-prisons-international-human-rights-standard-violations.

| Date | Max Temp (°F) | Humidity (%) | Heat Index (°F) | Date | Max Temp (°F) | Humidity (%) | Heat Index (°F) |
|---|---|---|---|---|---|---|---|
| 5/2/2023 | 79.5 | 60.5 | 81 | 6/8/2023 | 92.4 | 70.5 | 114 |
| 5/3/2023 | 82.1 | 58.5 | 84 | 6/9/2023 | 92.2 | 68.5 | 112 |
| 5/4/2023 | 86.7 | 57.7 | 92 | 6/10/2023 | 93.3 | 72.1 | 118 |
| 5/5/2023 | 84.9 | 81.5 | 97 | 6/11/2023 | 91.7 | 71 | 112 |
| 5/6/2023 | 74.5 | 93.4 | 76 | 6/12/2023 | 92.6 | 73.9 | 118 |
| 5/7/2023 | 84.6 | 83.5 | 97 | 6/13/2023 | 94.6 | 72 | 123 |
| 5/8/2023 | 82.7 | 87 | 93 | 6/14/2023 | 94.6 | 71.1 | 122 |
| 5/9/2023 | 80.7 | 90.4 | 88 | 6/15/2023 | 93.9 | 76.3 | 125 |
| 5/10/2023 | 81.1 | 86.5 | 88 | 6/16/2023 | 96.8 | 69.2 | 129 |
| 5/11/2023 | 87.2 | 81.3 | 104 | 6/17/2023 | 96.1 | 75 | 133 |
| 5/12/2023 | 89 | 81.3 | 111 | 6/18/2023 | 96 | 74.5 | 132 |
| 5/13/2023 | 88.7 | 74.7 | 105 | 6/19/2023 | 96.9 | 72.5 | 133 |
| 5/14/2023 | 89.3 | 79.6 | 110 | 6/20/2023 | 96.1 | 77.6 | 136 |
| 5/15/2023 | 88.8 | 83.6 | 112 | 6/21/2023 | 92.4 | 74.2 | 117 |
| 5/16/2023 | 86.5 | 77.9 | 100 | 6/22/2023 | 91.6 | 69.9 | 111 |
| 5/17/2023 | 83.2 | 78 | 91 | 6/23/2023 | 91.8 | 70.5 | 112 |
| 5/18/2023 | 86.7 | 72.3 | 98 | 6/24/2023 | 91.7 | 76.2 | 116 |
| 5/19/2023 | 91.5 | 69.1 | 110 | 6/25/2023 | 94.8 | 77 | 129 |
| 5/20/2023 | 91.7 | 74 | 115 | 6/26/2023 | 90.2 | 81.6 | 115 |
| 5/21/2023 | 81.3 | 73.1 | 86 | 6/27/2023 | 96.1 | 72.3 | 129 |
| 5/22/2023 | 86.5 | 67.6 | 95 | 6/28/2023 | 97 | 70.4 | 131 |
| 5/23/2023 | 89.2 | 64.5 | 100 | 6/29/2023 | 97.9 | 69.7 | 134 |
| 5/24/2023 | 84.8 | 73.3 | 93 | 6/30/2023 | 98.7 | 65.6 | 132 |
| 5/25/2023 | 87.5 | 68.7 | 98 | 7/1/2023 | 98.6 | 66.7 | 133 |
| 5/26/2023 | 87.7 | 60.3 | 95 | 7/2/2023 | 96 | 65 | 121 |
| 5/27/2023 | 87.7 | 66.2 | 97 | 7/3/2023 | 95.7 | 65.4 | 120 |
| 5/28/2023 | 88.7 | 65.7 | 100 | 7/4/2023 | 93.5 | 70.2 | 117 |
| 5/29/2023 | 89.6 | 65 | 102 | 7/5/2023 | 94.7 | 73.5 | 125 |
| 5/30/2023 | 90.6 | 65.9 | 105 | 7/6/2023 | 93.3 | 75.6 | 122 |
| 5/31/2023 | 90.7 | 64.3 | 104 | 7/7/2023 | 95.6 | 71.1 | 126 |
| 6/1/2023 | 91.2 | 67 | 107 | 7/8/2023 | 92.5 | 70.8 | 115 |
| 6/2/2023 | 92.4 | 63.9 | 109 | 7/9/2023 | 92 | 76.5 | 118 |
| 6/3/2023 | 93.3 | 64.1 | 111 | 7/10/2023 | 92.9 | 74 | 119 |
| 6/4/2023 | 90.8 | 77.1 | 114 | 7/11/2023 | 97.1 | 70.7 | 132 |

| Date | Max Temp (°F) | Humidity (%) | Heat Index (°F) | Date | Max Temp (°F) | Humidity (%) | Heat Index (°F) |
|------|------|------|------|------|------|------|------|
| 6/5/2023 | 84.8 | 80.7 | 97 | 7/12/2023 | 96.2 | 68.6 | 126 |
| 6/6/2023 | 87.7 | 75.3 | 102 | 7/13/2023 | 96 | 72.5 | 129 |

Of note, these are the outdoor temperatures and heat indexes in the greater Angola area; but temperatures inside the prison are often hotter due to its architecture. Ex. 6 ¶ 71. The youth at Angola confirm that the only location where they experience air conditioning is in the so-called classroom, (*see* Ex. 3 ¶ 8), but as detailed above youth often are held in their cells with no access to classroom facilities for days at a time.

As of July 11, the youth had been on lockdown in their cells since July 5, and had only been allowed out of their cells for showers for eight minutes per day, and for two hours outside on July 10. Ex. 3 ¶¶ 5-6. As noted in the chart, the heat index for each of those days was well into the triple digits. There is only one fan on each corridor that often breaks or does not work when the power goes out, and it is difficult for the youth to sleep. *Id.* ¶ 8; Ex. 2 ¶ 16. As Dr. Vassallo explains,

> Incarcerated people locked in their cells or a dorm setting without air conditioning are trapped and unable to escape the heat. To be in held in poorly ventilated hot cells causes a feeling of suffocation, which in turn causes panic. This compounds the fact that self-harm and suicide increase during hot weather. Mental health conditions are proven to worsen in hot conditions. And mental health medications affect the body's ability to thermoregulate, which creates a spiraling effect of panicked desperation when locked in a claustrophobic cell, unable to obtain any relief.

Ex. 6 at ¶ 75.

She also explains that fans "may provide some degree of comfort. However, fans alone do not prevent —and in fact, elevate the risk of— heat stroke when heat and humidity become extreme. The medical science and consensus are clear on this point . . ." *Id*. ¶ 67 (quoting the Environmental Protection Agency and the American Medical Association). Dr. Vassallo states that "[t]here is a common myth that people somehow acclimatize to these excessive heat conditions after prolonged exposure. I want to disabuse anyone of the uninformed idea that somehow 'the kids are from here, they're used to the heat.'" *Id.* ¶ 87. Data reported in March 2023 by the Louisiana Department of

21

Health showed that statewide there were more than 3,150 youth ages 10-19 who were admitted to emergency departments for heat-related illness between 2010 and 2020, at a rate of 47.0 per 100,000 youth. *Id*. ¶ 88.

Certain people are at a much greater risk of heat related disorders, up to and including serious injury or death. This includes people with chronic illnesses or medical conditions such as heart disease, diabetes, obesity, sickle-cell anemia, and respiratory diseases like asthma or chronic obstructive pulmonary disease (COPD); people with psychiatric or mental health disorders; and/or people taking drugs or medications that impair thermoregulation. Ex. 6. ¶¶ 42-62, 78-79. However, all people, including young healthy people with no known medical problems, are at risk for heat-related disorders during persistent exposure to a heat index above 88°. *Id*. ¶¶ 64-66.[26]

**Lack of Potable or Available Water**

The primary source of water for the youth while locked in their cells is the combination toilet/sink fixture in their cells, which has water that tastes bad, has a strange color, and is undrinkable. Ex. 2 ¶ 7; Ex. 1 ¶ 11. Charles C. reports that he is often thirsty, and while staff are supposed to provide the boys with ice and water, they only receive it sometimes. Ex. 3 ¶ 8. It is obvious that hydration and adequate (and drinkable) water is critical to human survival. The need for hydration is even more important when the temperatures and heat index are high. Dr. Vassallo states:

> The act of sweating depletes the body of water and salt, so without adequate repletion, a person will become dehydrated. Dehydration can cause light-headedness or dizziness, a lack of energy, low blood pressure, weakness, and increased heart rate. Cardiac output is the amount of blood pumped for each squeeze of the heart. It is a product of the amount of blood that the heart can squeeze out to the body and the number of times each minute that the heart squeezes, the heart rate. A person who is dehydrated may be unable to increase cardiac output adequately to meet the demands of the heat stress. If fluids are not replaced, core temperature will rise, and

---

[26] Dr. Vassallo and the other medical experts in *Lewis v. Cain* recently described for this Court two patients who were suffering from heat stroke who were provided wholly inadequate emergency care because in both cases, the Angola health care staff interpreted the symptoms of heat stroke as drug overdose, and did not provide the medically required cooling treatment for heat exhaustion or stroke. One of these patients died. *Id*. at ¶¶ 91-93.

22

hyperthermia will result. [. . .]

> Heat cramps are painful muscle cramps that result from salt and water loss during heat exposure. Heat cramps occur due to dehydration and sodium depletion, most often as a result of exercising or working in a high-heat index environment. Heat cramps can . . . be very painful. The cramps can persist for hours, even after a person drinks water and takes rest.

Ex. 6 ¶¶ 22, 29. She also notes that African-American people with sickle cell anemia or sickle cell trait are at very high risk of death or injuries due to dehydration. *Id.* ¶ 78. Additionally, people who take medications that cause dehydration, interfere with the body's salt and water balance, or remove water from the body, have increased risk of heat-related injury or death. *Id.* ¶¶ 51-53, 62, 78-79.

## LEGAL ARGUMENT

A preliminary injunction is warranted if the movant demonstrates: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). Plaintiffs satisfy each of these requirements.

"[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Id.* (citation omitted). Instead, to "show a likelihood of success, the plaintiff must present a prima facie case"—"not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,* 710 F.3d 579, 582 (5th Cir. 2013). Indeed, the Supreme Court has cautioned against "improperly equat[ing] "likelihood of success" with "success" when considering requests for preliminary injunctions. *See Camenisch*, 451 U.S. at 394.[27]

---

[27] *See also* Charles Alan Wright, et al., 11A Federal Practice & Procedure § 2948.3 (2d ed. 1995); *see also Janvey,* 647 F.3d at 595-96 (noting that plaintiffs are "not required to prove [their] entitlement to summary judgment" to show likelihood of success on the merits).

## I.    Plaintiffs Have Established a Substantial Likelihood of Success on the Merits.

Plaintiffs present a *prima facie* case and therefore have a substantial likelihood of success on the merits. The evidence demonstrates that despite this Court giving Defendants a chance to prove that they could provide constitutionally adequate care to children in their custody by housing them in cells at the former Angola Death Row unit, Defendants in fact cannot, and have not done so. Defendants moved children to the OJJ Angola site without an executed plan to guarantee their health, safety and rights to education and rehabilitative service. Instead they essentially asked this Court to "just trust us" and presented one high-level official witness after another at the September 2022 hearing who merely made empty promises.

Defendants' failure to provide the 70-80 children who have already been sent to Angola with health, safety, and rehabilitative services, and the knowing continuation of actions that risk causing serious injury, is objectively and subjectively unreasonable and rises to the level of deliberate indifference, in violation of both the Eighth and Fourteenth Amendments.[28] For all of the more than 330 children in OJJ's secure care at other facilities whom Defendants have admitted are at risk of being transferred to the Angola site if they meet OJJ's criteria, the anticipatory stress and trauma of that threat hanging over them violates their Constitutional rights as well.

---

[28] The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. This provision is only applicable to people convicted of crimes, and is violated when correctional officials, acting with deliberate indifference, deprive incarcerated people of "the minimal civilized measure of life's necessities" that place them at "a substantial risk of serious harm." *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Under the Fourteenth Amendment, only the objective prong is applicable and plaintiffs who are pretrial detainees or juveniles adjudicated delinquent do not have to prove deliberate indifference by officials, or the subjective prong. *Kingsley v. Hendrickson*, 576 U.S. 389, 398-99 (2015). This Court concluded in September 2022 that the appropriate legal standard to evaluate the claims of youth adjudicated delinquent was not the Fourteenth Amendment standard, but the more stringent Eighth Amendment standard. Doc. 79 at __.

Accordingly, while many of the cases cited herein are to the Eighth Amendment legal standard for adults convicted of crimes, the facts and conditions described herein easily meet this more stringent standard and *a fortiori* violate the Fourteenth Amendment. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (holding that "[T]he due process rights of a [detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner.")

Defendants have also not satisfied their obligations to Plaintiffs with disabilities under the ADA and Section 504 of the Rehabilitation Act while those youth have been incarcerated at Angola, and thus the use of the OJJ Angola site to house those Plaintiffs is also objectively unreasonable.

**A. Plaintiffs Have Shown that Defendants are Deliberately Indifferent to a Substantial Risk of Serious Harm to Plaintiffs, in Violation of Their Constitutional Rights**

**1. The Legal Standard**

"Underlying the Eighth Amendment is the fundamental premise that [incarcerated people] are not to be treated as less than human beings." *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979). Thirty years later, the Supreme Court affirmed this principle:

> As a consequence of their actions, prisoners may be deprived of rights that are fundamental to liberty. Yet the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.

*Brown v. Plata*, 563 U.S. 493, 510 (2011) (citations and internal quotation omitted).[29]

When challenging conditions of confinement under the Eighth Amendment, a prisoner must satisfy a two-part test. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The first, "objective" prong requires a showing that a person "is incarcerated under conditions posing a substantial risk of serious harm." *Id.* The second, "subjective" prong requires a showing that "a prison official . . . ha[s] a sufficiently culpable state of mind" in order to be liable under the Eighth Amendment." Such a state

---

[29] The Supreme Court, when evaluating Eighth Amendment challenges brought by juveniles to their criminal sentences, has taken an approach that youth are different and have greater rights and protections than adult prisoners. *See, e.g., Roper v. Simmons*, 543 U.S. 551 (2005); *Graham v. Florida*, 560 U.S. 48 (2010); *Miller v. Alabama*, 567 U.S. 460 (2012); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011) ("'[O]ur history is replete with laws and judicial recognition' that children cannot be viewed simply as miniature adults.") (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115–16 (1982)). Accordingly, conditions that may be constitutionally acceptable for adults are found to be unduly harsh for children with criminal convictions; it follows this is true for children with civil adjudications. This Court acknowledged this body of law in its September 2022 order. *See* Doc. 79 at 48-49 (acknowledging *Roper* and *Montgomery v. Louisiana*, 577 U.S. 190 (2016)).

of mind "is one of deliberate indifference to inmate health or safety." *Id*.

Eighth Amendment protections are not limited to health care or safety. Prison officials' treatment of incarcerated people violates the Eighth Amendment, regardless of whether it causes physical injury, when it "offend[s] contemporary concepts of decency, human dignity, and precepts of civilization which we profess to possess." *Hope v. Pelzer*, 536 U.S. 730, 737 & n.6, 739 (2002) (holding that that prison officials violated the Eighth Amendment by handcuffing a prisoner to a hitching post, thereby knowingly subjecting him to a substantial risk of physical harm, unnecessary pain, prolonged thirst, taunting, and deprivation of bathroom breaks that created a risk of discomfort and humiliation; and finding that such treatment "violated the basic concept underlying the Eighth Amendment, which is nothing less than the dignity of man.") (citations and quotation marks omitted).

In assessing whether a risk of harm violates "contemporary standards of decency," courts rely on federal and state practices, as well as scientific studies. *See Hall v. Florida*, 572 U.S. 701, 709-10 (2014) (holding that it was "proper to consider the psychiatric and professional studies" to resolve an Eighth Amendment claim); *Graham v. Florida*, 560 U.S. 48, 62 (2010) (looking to federal and state practices to resolve Eighth Amendment claim); *Spain*, 600 F.2d at 200 ("[W]hen confronting the question whether penal confinement in all its dimensions is consistent with the constitutional rule, the court's judgment must be informed by current and enlightened scientific opinion as to insure good physical and mental health for prisoners."). Conditions of confinement can violate the Eighth Amendment "alone or in combination." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). If a prisoner challenges a combination of conditions, she must demonstrate that the conditions have "a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Wilson v. Seiter*, 501 U.S. 294 at 304.

Next, under the subjective prong of the *Farmer* inquiry, deliberate indifference "is the equivalent of recklessly disregarding" a "substantial risk of serious harm." *Farmer*, 511 U.S. at 836. Though the "Eighth Amendment requires consciousness of a risk," *id*. at 840, "an Eighth Amendment

claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official failed to act despite his knowledge of a substantial risk of serious harm," id. at 842, and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that it was obvious." *Id*. Circumstantial evidence, if strong enough, may be sufficient to establish deliberate indifference even without direct evidence of what prison officials knew or thought. *Id*. at 842-43. [30]

In an injunctive case, such as this one, prison officials' knowledge of the risk is not at issue, as the litigation itself puts them on notice. *See Hadix v. Johnson*, 367 F.3d 513, 526 (6th Cir. 2004) ("If [prison] conditions are found to be objectively unconstitutional, then that finding would also satisfy the subjective prong because the same information that would lead to the court's conclusion was available to the prison officials").[31] Thus, Defendants "[can] not plausibly persist in claiming

---

[30] In September 2022, the Court rested its holding that Plaintiffs failed to show a likelihood of success on the deliberate indifference prong on its conclusion that, despite satisfying the objective test, "there is no evidence that OJJ officials subjectively drew the inference that housing youth on the grounds of Angola in the designated facility poses a serious risk of psychological harm." Doc. 79 at 49. Ten months later, that conclusion can no longer be sustained.

The Court also stated that "none [of Defendants' witnesses] testified in a manner which was suggestive of a vengeful or retaliatory intent in creating this transfer plan." Doc. 79 at 50. But deliberate indifference does not require actual malice or an intent to harm. *Farmer*, 511 U.S. at 835 (deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result"). And in an official capacity suit for injunctive relief, which is "in all respects other than name, to be treated as a suit against the [government] entity," *Kentucky v. Graham*, 473 U.S. 159, 166 (1985), deliberate indifference can be found despite the good-faith efforts of individual officials. *Harris v. Angelina Cnty., Tex.,* 31 F.3d 331, 335-36 (5th Cir. 1994).

[31] Moreover, in an injunctive case, the plaintiffs do not seek to impose individual liability on the defendants, but rather sue defendants in their official capacity and seek a court order to remedy the problem. *See Hutto v. Finney*, 437 U.S. 678, 699 (1978) (holding that an injunctive suit is, for practical purposes, a suit against the state); *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985) (same). Therefore, the focus on deliberate indifference is "broader and more generalized" than in damage cases, with the emphasis on the "combined acts or omissions" of the prison officials. *See Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Courts have held that in injunctive cases, liability can be premised on "'repeated examples of negligent acts which disclose a pattern of conduct . . . ' or by showing 'systemic or gross deficiencies in staffing, facilities, equipment or procedures.'" *French v. Owens*, 777 F.2d 1250, 1254 (7th Cir. 1985) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980), cert denied 450 U.S. 1041 (1981)).

lack of awareness" of this risk. *Farmer*, 511 U.S. at 846 n.9. The only remaining question is whether Defendants, having knowledge of the risk of serious harm to Plaintiffs, have "responded reasonably to the risk." *Id.* at 844. They have not.

Even if Defendants have taken some steps to abate the risk, the Court may still find deliberate indifference if their response was not reasonable. "Efforts to correct systemic deficiencies that simply do not go far enough, when weighed against the risk of harm, also constitute deliberate indifference because such insufficient efforts are not reasonable measures to abate the identified substantial risk of serious harm." *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *39 (M.D. La. Mar. 31, 2021), *reconsideration denied,* No. CV 15-318-SDD-RLB, 2021 WL 5287856 (M.D. La. Oct. 8, 2021) (internal quotation marks, footnotes omitted). *See also Ball v. LeBlanc*, 792 F.3d 584, 595-96 (5th Cir. 2015) (affirming finding of deliberate indifference to the risk of heat injury, despite prison officials' provision of awnings, misting, fans, access to ice water, and daily showers); *Gates v. Cook*, 376 F.3d 323, 340-41 (5th Cir. 2004) (affirming findings of deliberate indifference, despite prison officials' remedial efforts); *Harris v. Angelina Cnty., Tex.*, 31 F.3d 331, 335-36 (5th Cir. 1994) (affirming finding of deliberate indifference to risks posed by crowding, although jail officials "buil[t] a dormitory[,] transferr[ed] inmates[, and] provid[ed] alternatives to incarceration—in order to relieve overcrowding").

## 2. Defendants are Deliberately Indifferent to the Substantial Risk of Harm to the Children Incarcerated in Angola's Former Death Row.

Deliberate indifference must be assessed as of the time the Court is considering whether to grant injunctive relief. *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (deliberate indifference "should be determined in light of the prison authorities' current attitudes and conduct"). Developments since the filing of the litigation – including developments in the litigation itself – may establish deliberate indifference, even if it did not exist at the outset of the case. *Farmer*, 511 U.S. at 846 n. 9 ("If, for example, the evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of

28

awareness"); *Angelina Cnty.*, 31 F.3d at 335 ("evidence brought to the attention of the County through this ongoing litigation itself" showed "that the County was well aware of the overcrowding at the jail and the resulting conditions").

Both the objective and subjective elements set out in *Farmer* are satisfied here.

*First,* Plaintiffs clearly meet the objective prong of the deliberate indifference analysis, demonstrating that the current conditions place them at substantial risk of serious harm. In September 2022, this Court found as a matter of law that "Plaintiff has presented sufficient evidence of a serious risk of psychological harm to juveniles by placing them in facilities that were designed to hold adult prisoners." Doc. 79 at 48. *See also id*. at 49 ("The Plaintiff presented objective evidence of a serious risk of psychological harm"). As detailed above at pages 3-24, Plaintiffs have again shown harms that deprive them of the "minimal civilized measure of life's necessities," *Farmer*, 511 U.S. at 834, which include "food, clothing, shelter, medical care and reasonable safety," *Helling*, 509 at 32, along with "social contact and environmental stimulation." *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 679 (M.D. La. 2007). Defendants' ill-planned transfer of children to Angola, before they had the staffing or the planning for ensuring the safety, health, rehabilitative services and education of the young people moved there, created grave and unnecessary risks and punitive, dangerous conditions of confinement for the transferred children. Plaintiffs' experts describe in detail how these harms are placing children at substantial risk of serious psychological and physical harm, including permanent injury and death. *See generally* Haney Dec., Vassallo Dec.

The legal basis for such a ruling is strong:

Regarding extreme heat: *see, Yates v. Collier*, 868 F.3d 354, 360-61 (5th Cir. 2017) ("We have repeatedly upheld district court findings that the heat levels within these prisons violate the Eighth Amendment, and we have done so in the context of a class action in at least one case."); *Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015) ("exposing an inmate to extreme cell temperatures can constitute cruel and unusual punishment.") (collecting and discussing Fifth Circuit

precedents); *Ball*, 792 F.3d at 593, 596 (reversing this Court's order directing Louisiana prison officials to install air conditioning in Angola's new death row facility but holding the Eighth Amendment was violated due to excessive heat indexes at the facility, where heat index during the monitoring period ranged from 81.5° to 107.8° F); As noted above, the heat index in Angola has exceed 88° F all but five days since May 1, 2023, oftentimes well into the triple digits, yet Defendants have not taken reasonable efforts to ameliorate the effects of the heat. *See Hinojosa*, 807 F.3d at 667 (holding "the open and obvious nature of dangerously hot conditions would also support an inference of deliberate indifference."); *Blackmon v. Garza*, 484 Fed.Appx. 866, 871-72, 874 (reversing grant of summary judgment for defendant prison officials, concluding that remedial steps of providing cool ice water three times a day and extra showers was insufficient, based in part on the fact that "[t]here was no air-conditioning," "the windows are sealed," the unit "did not have a water fountain," and "the inmates were not able to use personal fans," though there was a large industrial fan available).

Regarding potable drinking water: *see, Hinojosa*, 807 F.3d at 666 (allegations that people were provided "grossly inadequate amounts of water to cope with the heat" in un-air conditioned prison cells "suffice[d] to raise an Eighth Amendment claim of substantial risk of serious harm."; *see also Blackmon*, 484 Fed.Appx. at 871 (allegation that people "were forced to drink from filthy sinks in the dormitory because prison officials did not supply a sufficient amount of water" raised an Eighth Amendment claim). Other federal courts across the country have reached similar conclusions. *Hearns v. Terhune*, 413 F.3d 1036, 1043 (9th Cir. 2005) (lack of cold water where yard temperatures reached 100 degrees); *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (Eighth Amendment claim raised when plaintiff alleged prison officials provided "leaking and inadequate plumbing, … unfit water to drink … and characterizing the allegations as describing "barbarous conditions" that were "strikingly reminiscent of the Black Hole of Calcutta").

Regarding solitary confinement: "A growing chorus of courts have recognized the unique harms that are inflicted on juveniles when they are placed in solitary confinement." *J.H. v.*

30

*Williamson Cnty., Tenn.*, 951 F.3d 709, 718-20 (6th Cir. 2020); *H.C. ex rel. Hewett v. Jarrard*, 786 F.3d 1080, 1088 (11th Cir. 1986) (describing the emotional harm caused by isolation of a juvenile for seven days, "deprived of virtually every physical or emotional stimulus"); *Milonas v. Williams*, 691 F.2d 931, 942-43 (10th Cir. 1982) (affirming injunction against placing children in isolation for any reason other than to contain violent behavior); *Nelson v. Heyne*, 491 F.2d 352, 358, 360 (7th Cir. 1974) (affirming district court holding that extended periods of solitary confinement of youth at the Indiana Boys School was cruel and unusual punishment under the Eighth Amendment, and a violation of procedural due process under the Fourteenth Amendment); *Jensen v. Thornell*, 2023 WL 2838040, *27 (D. Ariz. Apr. 7, 2023) (imposing a categorical prohibition on the use of solitary for children incarcerated in adult prisons in Arizona); *V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554, 588-89 (N.D.N.Y. 2017) ("[D]efendants' continued use of solitary confinement on juveniles puts them at serious risk of short- and long-term psychological damage"); *Doe ex rel. Frazier v. Hommrich*, No. 3-16-0799, 2017 WL 1091864, at *12 (M.D. Tenn. Mar. 22, 2017) (concluding that "solitary confinement of juveniles in government custody for punitive or disciplinary reasons" likely violates the Eighth Amendment and issuing a preliminary injunction prohibiting defendants from "placing juveniles in solitary confinement or otherwise isolating them from meaningful contact with their peers as punishment or discipline").

Regarding children's right to recreation and family visits: the Supreme Court characterized exercise as one of the basic human needs that prison officials must provide for incarcerated adults under the Eighth Amendment. *Helling*, 509 U.S. at 31-32; *Wilson v. Seiter*, 501 U.S. at 304.[32] In pre-adjudication juvenile detention facilities, Louisiana's standards require, among other recreation

---

[32] The Fifth Circuit has not addressed the right in the context of children who are confined. This Court recently ruled against an *adult* inmate on an exercise claim. *Berry v. Smith*, No. CV 21-20-SDD-RLB, 2021 WL 2980371, at *4 (M.D. La. June 30, 2021), *report and recommendation adopted*, No. CV 21-20-SDD-RLB, 2021 WL 2964252 (M.D. La. July 14, 2021) (citing *Hernandez v. Velasquez*, 522 F.3d 556, 560-61 (5th Cir. 2008); *Haralson v. Campuzano*, 356 Fed. Appx. 692, 697 (5th Cir. 2009).

activities, "at least one hour of large muscle exercise daily."[33] Plaintiffs at Angola are being deprived of this essential human need, made worse by the fact that they are developing adolescents. Family visitation is required by the state's pre-adjudication detention standards.[34] The children that OJJ incarcerates at Angola are not able to maintain in person family contact.

**Second**, Plaintiffs clearly meet the subjective prong of the deliberate indifference analysis. Defendants have not "responded reasonably to the risk." *Farmer*, 511 U.S. at 844. Defendants' use of solitary confinement and their rampant, callous violation of Plaintiffs' rights to healthy living conditions do not keep Plaintiffs safe; instead they actually harm children severely. Continuing to deprive Plaintiffs of the programming and education that are the core of the rehabilitative services to which they are entitled is in no way a reasonable response to the risk of harm. Plaintiffs who have already been placed at the Angola facility have been harmed and Defendants have not responded reasonably by, for example, actually providing the program and education staffing and specialists they promised, allowing children out of cell time instead of using solitary confinement regularly, abating the excessive heat conditions, and arranging for regular family contact. The risk of harm to the children already incarcerated at Angola is obvious, and if Defendants are continued to act in this manner, they will harm putative class members who are placed at Angola in the future.

In sum, now that Defendants have kept children in conditions even worse than Plaintiffs had feared for nine months, the evidence shows that the risks of irreparable harm have come to pass, with full knowledge of the responsible officials. Because those officials continued to understand not only the risk of serious harm but the reality of it, yet continued to house more and more children at the Angola site and made the conditions and risks worse rather than better – an inherently unreasonable response – Plaintiffs have shown widespread violations of their Eighth Amendment rights.

---

[33] La. Juv. Det. Standards, title 67, §. 7517(E), Dep't of Children & Family Servs., (eff. June 1, 2022) *at* https://www.dcfs.louisiana.gov/assets/docs/searchable/Licensing/Residential/2022/20220101_Juvenile_Detention_Regulations.pdf.

[34] *See, id.,* § 7515(B)(3) (parent/guardian "shall be allowed to visit youth unless prohibited by the court . . . at set times at least twice a week").

Defendants' use of the Angola site is the opposite of the course of conduct that would actually achieve any rehabilitative purpose: providing adequate and well-trained staffing in its other youth facilities. Instead, Defendants have targeted the children whom OJJ has determined most in need of services and shipped them out to an adult prison environment, where they are isolated in overheated and unhealthy cells for much of the day and receive little to no recreation, education, counseling, treatment, or family contact.

**B. Plaintiffs With Disabilities Are Likely to Succeed in Their Claims Under the Americans with Disabilities Act and the Rehabilitation Act.**

To succeed on claims under Title II of the ADA and Section 504 of the Rehabilitation Act, a plaintiff must show that they have a qualifying disability; that they were denied the benefits of certain programs, services, or activities for which a public entity is responsible; that any discrimination is by reason of their disability; and that the public entity in question receives federal financial assistance. 42 U.S.C. § 12132; 29 U.S.C. § 794(a); *see also, Tellis v. LeBlanc*, No. CV 18-541, 2021 WL 4267513, at *8 (W.D. La. Sept. 20, 2021). A person with a disability, under the ADA and the Rehabilitation Act, is any individual who has a "physical or mental impairment that substantially limits one or more major life activities"[35] that is recorded or which an individual is regarded as having. 42 U.S.C.A. § 12102(1) (West) (incorporated by reference into the Rehabilitation Act under 29 U.S.C.A. § 705(20)(B) (West)).

Plaintiffs and the other putative class members who have disabilities are likely to succeed in their claims under the ADA and Rehabilitation Act. As a preliminary matter, Defendants OJJ and DPSC/DOC are public entities regulated by Section 504 and the ADA. See 42 42 U.S.C. § 12131(1); see also Tellis, 2021 WL 4267513, at *8. In addition, Plaintiffs Alex A. and Charles C., along with other putative members of the subclass, qualify as people with disabilities under the ADA and Section 504 of the Rehabilitation Act. They and other putative class members have learning disabilities and/or

---

[35] Major life activities include "learning, reading, concentrating, thinking, communicating, and working". 42 U.S.C.A. § 12102(2) (West).

mental health disabilities, including PTSD, that impact major life activities such as sleeping, concentrating, thinking and learning, *see* 42 U.S.C.A. §§ 12102(1)-(2), and are likely to show that – because of those disabilities – they are being deprived of the services and supports to which they are entitled. *Id.* § 12101.

"The ADA recognizes a 'methods of administration' claim that prohibits public entities from using "criteria or methods of administration . . . [that] have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." *Tellis*, 2021 WL 4267513, at *8 (internal citations omitted); *see also State of Connecticut Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 277 (D. Conn. 2010) (outlining elements of "methods of administration" claim under the ADA).

Here, Defendants fail to adequately assess and identify the mental health needs of Plaintiffs and the putative class, and on the basis of children's identified mental health disabilities, or behaviors that are symptomatic thereof, place children in the adult facility at Angola, where they are systemically denied access to services and accommodations. According to OJJ policy, youth who meet the definition of "Seriously Mentally Ill" may be placed at Angola due to their mental health diagnosis. Doc. 28 Ex. 1 to Bridgewater Decl. Other children are placed at Angola for alleged misbehavior under uniform policies, which contain no exceptions for behavior resulting from a disability. *Id.* at 7-8. These same policies also do not prevent the placement of youth at Angola whose alleged misbehavior results from OJJ's failure to properly implement accommodations, such as a behavior intervention plan. *Id.* Once these children with disabilities are placed at Angola, they are then denied mental health treatment, counseling, behavioral intervention, and educational supports necessary to address their disabilities, in violation of Section 504 and the

ADA. *See* Ex. 2 ¶ 11; Ex. 4 ¶ 12. In the absence of such basic services and accommodations,

Plaintiffs are likely to succeed on these claims.[36]

## II.  There is a Substantial Threat That Plaintiffs Will Suffer Irreparable Injury Without a Preliminary Injunction.

The Court has already found this prong of the preliminary injunction test satisfied:

> For the same reasons the Court found that there was a serious risk of psychological harm to Plaintiff (and similarly situated youth) due to his age and that he suffers from PTSD and other mental health issues, the Court finds that Plaintiff has presented evidence to support the likelihood that psychological harm is imminent upon his transfer to BCCY-WF. … The Court is persuaded that transferring emotionally vulnerable adolescents, many of whom have mental health issues and cognitive disfunction, to a prison camp on the grounds of Angola will likely have deleterious psychological ramifications.

Doc. 79 at 59-60.

The evidence that accompanies this Motion amply reinforces the Court's conclusion. Plaintiffs are at imminent risk of serious physical and mental injury from being held in an adult prison facility, with conditions aggravated by routine use of solitary confinement, excessive heat, and denial of exercise, education, potable water, and family contact. *See, generally*, Exs. 2-6, 8.  It is well-settled that government action that threatens plaintiffs' physical or mental health poses a risk of irreparable injury. *See M.R. v. Dreyfus*, 697 F.3d 706, 726-32 (9th Cir. 2012) (cuts to Medicaid benefits). It is equally well established that violation of Constitutional rights constitutes irreparable injury. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

---

[36] At this same location, for adults incarcerated at the Angola Prison, the Court held that prison officials had violated the Rehabilitation Act rights of a subclass of adult incarcerated individuals by "[f]ailing to identify and track disabilities and accommodation requests in a meaningful way", and "[f]ailing to comply with [the Rehabilitation Act] in providing disabled [prisoners] access to programs and services", among other egregious failures related to the physical, mental and general wellbeing of the incarcerated adults at LSP. *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *59 (M.D. La. Mar. 31, 2021), *reconsideration denied*, No. CV 15-318-SDD-RLB, 2021 WL 5287856 (M.D. La. Oct. 8, 2021). It appears that history is repeating itself to the detriment of children held by OJJ at their Angola site.

With regard to youth with disabilities, the harm caused by the systemic failure of OJJ to provide education and special education services is irreparable, where students at Angola are not only deprived of instructional hours but also the opportunity to develop socially and psychologically. *See, e.g. Zavala v. Contreras*, 581 F. Supp. 701, 702-04 (S.D. Tex. 1984) (failure to provide proper educational services to special needs minors constituted an irreparable harm warranting a preliminary injunction); *see also N.J. v. New York*, 872 F. Supp. 2d 204, 214 (E.D.N.Y. 2011) ("[I]nterruption of a child's schooling causing a hiatus not only in the student's education but also in other social and psychological developmental processes that take place during the child's schooling, raises a strong possibility of irreparable injury.").

### III.    The Balance of Equities and the Public Interest Clearly Favor Plaintiffs

"Elements three and four of the preliminary injunction test, the balance of the equities and the public interest, merge when the Government is the opposing party." *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 852 (M.D. La. 2022) (internal quotation marks and brackets omitted) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

"It is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citation omitted). As "confidence in the humane application of the governing laws of the State must be in the public's interest," *Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004), public interest considerations weigh strongly in favor of preventing Defendants from continuing to hold children at Angola where, as the Court has found, they face a risk of irreparable harm.

The public interest is not served when children are traumatized and damaged. Studies have shown that child abuse roughly doubles the probability that a person engages in criminal behavior.[37] Plaintiffs presented evidence that most youth come into the juvenile justice system already suffering from trauma. *See, e.g.,* Doc. 79 at 60 (citing testimony of Dr. Monica Stevens); Ex. 5 ¶ 42 (Dr. Haney:

---

[37] Janet Currie & Erdal Tekin, *Does Child Abuse Cause Crime?*, 12171 JEL No. Il, K4, National Bureau of Economic Research (Apr. 2006), https://www.nber.org/papers/w12171.

"Thus, the incarceration of these children is not only traumatic, but represents a potentially powerful and harmful form of 'retraumatization,' compounding the effects of trauma to which they have already been exposed."). Subjecting children to solitary confinement, excessive heat, and denial of access to exercise, education, mental health treatment, and to their families inflicts grave harm, with no corresponding benefit to the public interest.

Despite finding "likely irreparable psychological harm," Doc. 79 at 60, the Court denied Plaintiffs' prior preliminary injunction motion based on ostensible harm to Defendants and the public, were injunctive relief to be granted. *See* Doc. 79 at 63 ("Louisiana has vested OJJ with discretionary authority concerning secure care for the juveniles in its custody"); *id*. at 61 (injunction would "interfere with OJJ's 'system-wide approach' to respond to the changing needs of the youth in its care").

As a threshold matter, foundational to the Court's ruling, was its reliance on the representations and commitments Defendants made under oath. *See, e.g.,* Doc. 79 at 61 ("The evidence demonstrated that the TTU program will provide intensified, targeted rehabilitative services and therapies to assist the youth who are not responding to OJJ's standard programming"); *id*. at 62 ("the Court finds that OJJ has made the necessary provisions to provide the youth subject to transfer to BCCY-WF with constitutionally adequate care and rehabilitative services"). As amply demonstrated above, Defendants have not honored these commitments.

More fundamentally, the Court cannot deny relief for constitutional violations merely because granting it would affect OJJ's operations.  As the Supreme Court has explained, even in the case of adult prisons,

> Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals. Courts nevertheless must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners.  ***Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration***.

37

*Plata*, 563 U.S. at 511 (emphasis added; citations, quotation marks omitted).

 *Plata* also makes clear that unsupported speculation about public safety risks cannot defeat enforcement of constitutional rights. In that case, the Supreme Court affirmed an order requiring California to reduce crowding in its prisons to 137.5% of the prisons' design capacity—an order that would inevitably require the state to release some prisoners, and possibly as many as 37,000. *Id.* at 500-01. The Prison Litigation Reform Act (PLRA) explicitly requires that a court issuing such an order "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." *Id.* at 530. In affirming the trial court's release order, the Supreme Court explained:

> The PLRA's requirement that a court give "substantial weight" to public safety does not require the court to certify that its order has no possible adverse impact on the public. … Whenever a court issues an order requiring the State to adjust its incarceration and criminal justice policy, there is a risk that the order will have some adverse impact on public safety in some sectors. … Yet the PLRA contemplates that courts will retain authority to issue orders necessary to remedy constitutional violations, including authority to issue population limits when necessary.

*Id.* at 534.

 Unlike the release of potentially thousands of incarcerated persons required by the order affirmed in *Plata*, any public safety implications of the relief Plaintiffs seek here are modest indeed. Plaintiffs would remain in state custody, in locked juvenile facilities and subject to whatever lawful security precautions Defendants see fit to impose. Under these circumstances, injunctive relief to halt the ongoing risk of harm the Court has found is clearly in the public interest.[38]

---

[38] The Court should waive the security bond. Courts have discretion to waive the Rule 65(c) requirement for a movant for a preliminary injunction. "The Fifth Circuit has acknowledged that the amount of the security is within the discretion of the district court, who can elect to impose no security at all." *New Orleans Home for Incurables Inc. v. Greenstein*, 911 F. Supp 386, 412-13 (E.D. LA 2012) *citing City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority*, 636 F.2d 1084, 1094 (5th Cir. Unit B Feb. 13, 1981). District courts in this circuit routinely exercise this discretion to require no security in cases brought by indigent and/or incarcerated people. *See, e.g.*, *Schultz v. Alabama*, 330 F. Supp. 3d 1344, 1376 (N.D. Ala. 2018) (county prisoners); *Campos v. I.N.S.*, 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998) (indigent immigrants). Plaintiffs ask this Court to do the same here.

## **CONCLUSION**

The relief Plaintiffs seek now is warranted. Their predictions when they filed this case of an inappropriate, harmful, unhealthy, traumatic and service-starved environment have sadly proved true. Even if the Defendants had the best of intentions last summer to relieve the problem they had created by incarcerating too many youth and inadequately staffing its secure juvenile care facilities, those intentions are legally irrelevant. *See Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644 (5th Cir. 1996) ("[E]ven where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices.") The necessary and least intrusive means, now, of stopping the harm and returning Plaintiffs and the proposed Class to the status quo before Defendants took the unprecedented step of housing children at Angola, is to prevent the transfer of any additional youth who are or will be in OJJ's custody to the OJJ Angola site, and direct Defendants to return any youth already sent there to lawful OJJ youth facilities. For these reasons, Plaintiffs respectfully request that this Court grant their motion for a preliminary injunction.

Respectfully submitted, this 17th day of July, 2023.

/s/: *David J. Utter*
DAVID J. UTTER *
Louisiana Bar Number: 23236
WILLIAM R. CLAIBORNE**
Georgia Bar Number: 126363
THE CLAIBORNE FIRM, P.C.
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
david@claibornefirm.com
will@claibornefirm.com

/s/: *Hector Linares*
HECTOR LINARES
Louisiana Bar Number: 28857
SARA GODCHAUX
Louisiana Bar Number: 34561

/s/: *Christopher J. Murell*
CHRISTOPHER J. MURELL
Louisiana Bar Number: 32075
MURELL LAW FIRM
2831 St. Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 Telephone
(504) 233-6691 Facsimile
chris@murrell.law

/s/ *Nancy Rosenbloom*
NANCY ROSENBLOOM**
New York Bar Number: 2168425
ACLU NATIONAL PRISON PROJECT
125 Broad Street

39

STUART H. SMITH LAW CLINIC
LOYOLA UNIVERSITY NEW ORLEANS
COLLEGE OF LAW
7214 St. Charles Avenue, Box 902
New Orleans, Louisiana 70118
(504) 861-5560 Telephone
(504) 861-5440 Facsimile
halinare@loyno.edu
shgodcha@loyno.edu


/s/: *David Shanies*
DAVID SHANIES**
New York Bar Number: 4471140
SHANIES LAW OFFICE
110 West 40th Street, 10th Fl.
New York, New York 10018
Tel. (212) 951-1710
Fax (212) 951-1350
Cell (646) 515-2151
david@shanieslaw.com

New York, NY 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2652
nrosenbloom@aclu.org


/s/ *Tammie Gregg*
TAMMIE GREGG***
MN Bar Number: 026240
ACLU NATIONAL PRISON PROJECT
915 15th St. N.W., 7th Floor
Washington D.C. 20005
Telephone: (202) 393-4930
Facsimile: (202) 393-4931
tgregg@aclu.org

/s/ *Susan M. Meyers*
SUSAN M. MEYERS
Louisiana Bar Number: 29346
LAUREN WINKLER
Louisiana Bar Number: 39062
ASHLEY DALTON
Louisiana Bar Number: 40330
SOUTHERN POVERTY LAW CENTER
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
Telephone: 504-512-8649
susan.meyers@splcenter.org
lauren.winkler@splcenter.org
ashley.dalton@splcenter.org

* *Lead Counsel*
**Appearing *Pro Hac Vice*

***Appearing *Pro Hac Vice* and not admitted
in DC; practice limited to federal courts

**ATTORNEYS FOR PLAINTIFFS**


**CERTIFICATE OF
SERVICE**

40

I hereby certify that on the 17th day of July, 2023, a copy of the foregoing was served upon all counsel of record by electronic transmission.

*/s/ David J. Utter*
DAVID J. UTTER