# UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF OUISIANA

| | |
|---|---|
| ALEX A., by and through his guardian, Molly Smith; BRIAN B.[1]; and CHARLES C., by and through his guardian, Kenione Rogers, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>v.<br><br>GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS[2], in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections,<br><br>       Defendants. | Civil Action No. 3:22-CV-00573-SDD-RLB |

# EXHIBIT 5

---

[1] On July 14, 2023, pursuant to Rule 25(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs notified the Court of the death of Brian B. Doc. 162. Plaintiffs leave Brian B. as a Plaintiff until the clerk is ordered to change the caption.

[2] On November 18, 2022, Gov. Edwards announced the resignation of Dep. Sec. Sommers and the appointment of Otha "Curtis" Nelson as his replacement. https://gov.louisiana.gov/index.cfm/newsroom/detail/3892 Because Sommers was sued in his official capacity, Nelson is automatically substituted as a Defendant. Fed. R. Civ. P. 25(d). Plaintiff leaves Sommers as a Defendant until the clerk is ordered to change the caption.

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ALEX A., by and through his guardian, Molly Smith, *et al.*, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>v.<br><br>JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana, *et al.*,<br><br>       Defendants. | Civ. Act. No. 3:22-CV-00573-SDD-RLB<br><br><br>**DECLARATION OF CRAIG W. HANEY, PH.D., J.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

   A.    Role in This Case ..................................................................................... 1

   B.    Background, Expert Qualifications, and Experience .............................. 1

   C.    Materials Reviewed.................................................................................. 5

   D.    Summary of My Opinions ....................................................................... 6

II.     RESEARCH ON THE ADVERSE PSYCHOLOGICAL EFFECTS
        OF ISOLATION ................................................................................................ 9

   A.    The Impact of Isolation on Relatively Healthy Adults .......................... 9

   B.    The Potential Harmfulness and Dangerousness of Brief Stays in Isolation ........ 18

   C.    The Exacerbating Effects of Isolation on Juveniles............................... 20

   D.    The Exacerbating Effects of Isolation on Mental Illness....................... 26

   E.    Professional Organizations Recommend Outright Prohibitions
        on Isolating Juveniles or People With Mental Illness ........................... 28

III.    CONDITIONS AT THE OJJ ANGOLA UNIT MAGNIFY THE RISK OF
        SERIOUS HARM ............................................................................................. 32

IV.     CONCLUSION ................................................................................................. 36

I, Craig W. Haney, declare as follows:

## I.    INTRODUCTION

### A.  Role in This Case

1.      I have been retained by Plaintiffs' counsel in *Alex A., et al. v. Edwards, et al.*, to provide expert opinions about (a) the current state of scientific knowledge about the effects of solitary or isolated confinement on incarcerated persons; and (b) what is scientifically known about these effects on juveniles and persons with mental illness, in particular, including how negative consequences associated with solitary confinement are exacerbated for the children incarcerated at Angola's older Death Row building, now referred to as the "OJJ Angola Unit" or "Bridge City-West Feliciana."

2.      I have been retained at my standard hourly rate of $350 an hour. The matters set forth are my independent opinions, true and correct of my personal and professional knowledge. If called as a witness, I could and would testify competently as follows.

3.      The opinions contained in this declaration are based on my training, clinical experience, and familiarity with the extensive body of literature on the effects of solitary confinement on adults and children. In this declaration, I provide information on the psychological impact of solitary confinement generally, and especially on juveniles.

### B.  Background, Expert Qualifications, and Experience

4.      I am a Distinguished Professor of Psychology and a former U.C. Presidential Chair at the University of California, Santa Cruz. I have previously served at U.C. Santa Cruz as the Director of the Legal Studies Program, Chair of the Department of Psychology, Chair of the Department of Sociology, and the Director of the Graduate Program in Social Psychology. My area of academic specialization is what is generally termed "psychology and law," which is the application of psychological data and principles to legal issues. I teach graduate and undergraduate courses in social psychology, psychology and law, and research methods. I received a bachelor's degree in psychology from the University of Pennsylvania, an M.A. and Ph.D. in Psychology and a J.D. degree from Stanford

University, and I have been the recipient of a number of scholarship, fellowship, and other academic awards. My curriculum vitae and a list of the cases that I have testified in as an expert during the past four years are attached to this declaration as **Exhibits 1 and 2**.

5.      I have published numerous scholarly articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on the backgrounds and social histories of persons accused of violent crimes, the psychological effects of imprisonment, and the nature and consequences of solitary or "supermax"-type confinement. In addition to these scholarly articles and book chapters, I have published three sole-authored books: Death by Design: Capital Punishment as a Social Psychological System (Oxford Univ. Press, 2005), Reforming Punishment: Psychological Limits to the Pains of Imprisonment (Amer. Psych. Ass'n Books, 2006), and Criminality in Context: Psychological Foundations of Criminal Justice Reform (Amer. Psych. Ass'n Books, 2020). I was a member of a National Science Foundation committee that co-authored The Growth of Incarceration in the United States: Exploring the Causes and Consequences (Nat'l Acad. Press, 2014).

6.      In the course of my academic work in psychology and law, I have lectured and given invited addresses throughout the country on the role of social and institutional histories in explaining criminal violence, the psychological effects of living and working in institutional settings (typically maximum security prisons), and the psychological consequences of solitary confinement. I have given these lectures and addresses at various law schools, bar associations, university campuses, and numerous professional psychology organizations such as the American Psychological Association.

7.      I have served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations, including the Palo Alto Police Department, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, the U.S. Department of Justice, the U.S. Department of Health and Human Services, the U.S. Department of Homeland Security,

and the White House. In 2012, I testified as an expert witness before the U.S. Senate Judiciary Committee in the first-ever Senate hearing focused on the use and effects of solitary confinement. Also in 2012, I was appointed as a member of a National Academy of Sciences committee analyzing the causes and consequences of high rates of incarceration in the United States. In conjunction with the publication of the committee report on the growth of incarceration in the United States, in 2014 I collaborated with several other committee members to brief the White House Domestic Policy Council and various members of the U.S. House and Senate on its contents and policy recommendations.[1]  I also recently served as a member of an American Psychological Association Presidential Task Force that considered the implications of the vulnerability of juveniles and ongoing social and neurological development of adolescents and late adolescents (persons up to the age of 21) can and should be considered in the application of legal sanctions.[2]

8.    My academic interest in the psychological effects of various prison conditions is long-standing and dates back to 1971, when I was still a graduate student. I was one of the principal researchers in what has come to be known as the "Stanford Prison Experiment," in which my colleagues Philip Zimbardo, Curtis Banks, and I randomly assigned normal, psychologically healthy college students to the roles of either "prisoner" or "guard" within a simulated prison environment that we had created in the basement of the Psychology Department at Stanford University. The study has since come to be regarded as a classic study in the field, demonstrating the power of institutional settings to change and transform the persons who enter them.[3]

---

[1] Jeremy Travis & Bruce Western (Eds.), The Growth of Incarceration in the United States: Exploring the Causes and Consequences, Nat'l Academy Press (2014).

[2] See Amer. Psych. Ass'n, *APA Resolution on the Imposition of Death as a Penalty for Persons Aged 18 through 20, Also Known As the Late Adolescent Class*, (2022), at https://www.apa.org/about/policy/resolution-death-penalty.pdf.

[3] See Craig Haney, Curtis Banks & Philip Zimbardo, *Interpersonal Dynamics in a Simulated Prison*, 1 Int'l J. of Criminology & Penology 69 (1973); Craig Haney & Philip

9.     Since then I have been studying the psychological effects of living and working in real (as opposed to simulated) institutional environments, including juvenile facilities, mainline adult prison and jail settings, and specialized correctional housing units (such as solitary and "supermax"-type confinement). In the course of that work, I have toured and inspected numerous jails and prisons and related carceral facilities (in Alabama, Arkansas, Arizona, California, Colorado, Florida, Georgia, Hawaii, Idaho, Illinois, Louisiana, Maine, Massachusetts, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, and Washington), many federal prisons (including the Administrative Maximum or "ADX" facility in Florence, Colorado and federal death row in Terre Haute, Indiana), as well as prisons in Canada, Cuba, England, Ireland, Hungary, Mexico, the Netherlands, and Norway. I also have conducted numerous interviews with correctional officials, guards, and incarcerated people to assess the impact of penal confinement, and statistically analyzed aggregate data from numerous correctional documents and official records to examine the effects of specific conditions of confinement on the quality of prison life and the ability of incarcerated people to adjust to them.[4]

---

Zimbardo, *The Socialization into Criminality: On Becoming a Prisoner and a Guard*, in <u>Law, Justice, and the Individual in Society: Psychological and Legal Issues</u>. (J. Tapp and F. Levine, eds., 1977); and Craig Haney & Philip Zimbardo, *Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse*, Personality & Soc. Psych. Bulletin, 35, 807-814 (2009).

[4] For example, *see* Craig Haney, *Psychology and Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law*, Psychology, Public Policy, & Law, 3, 499-588 (1997); Craig Haney, *The Consequences of Prison Life: Notes on the New Psychology of Prison Effects*, in D. Canter & R. Zukauskiene (Eds.), <u>Psychology and Law: Bridging the Gap</u> (pp. 143-165). Burlington, VT: Ashgate Publishing (2008); Craig Haney, *On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence*, Univ. of Missouri-Kansas City L. Rev., 77, 911-946 (2009); Craig Haney, *Demonizing the "Enemy": The Role of Science in Declaring the "War on Prisoners,"* Conn. Pub. Interest L. Rev., 9, 139-196 (2010); Craig Haney, *The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement*, Amer. Crim. L. Rev., 48, 121-141 (2011) [Reprinted in: S. Ferguson (Ed.), <u>Readings in Race, Ethnicity, Gender and Class</u>.

10.     I have been qualified and have testified as an expert in various federal courts, including United States District Courts in Alabama, Arizona, Arkansas, California, Georgia, Louisiana, New Mexico, North Carolina, Pennsylvania, Texas, and Washington, and in numerous state courts, including courts in Arizona, California, Colorado, Florida, Montana, New Jersey, New Mexico, Ohio, Oregon, Tennessee, Utah, and Wyoming. My research, writing, and testimony have been cited by state courts, including the California Supreme Court, and by federal district courts, U.S. Courts of Appeals, and the U.S. Supreme Court.[5]

### C. Materials Reviewed

11.     For purposes of this declaration, I have reviewed the following:

a.  The complaint and other case filings in this case;

b.  The declarations of children incarcerated at Angola;

c.  Photographs of the Angola unit incarcerating children taken by Plaintiffs' expert Vincent Schiraldi in August 2022 and entered into evidence at the hearings held in September 2022; and

d.  Mr. Schiraldi's expert report.[6]

12.     I also rely upon my personal knowledge from visiting and touring Angola several times, and serving as an expert in a capital appeal that involved a Louisiana prisoner; and as an expert in *Hamilton v. Vannoy*, Case No. 3:17-cv-00194-SDD-RLB (M.D. La.) (solitary confinement practices in the Louisiana State Penitentiary (LSP)-Angola death row unit) and *Wilkerson et al. v. Stalder*, Civ. Act. 00-304-JJB (M.D. La.) (conditions of confinement in solitary confinement units at Angola for the so-called "Angola Three").

---

Sage Publications (2012)]; and Craig Haney, *Prison Effects in the Age of Mass Imprisonment*, The Prison Journal, 92, 1-24 (2012).

[5] *See, e.g., Brown v. Plata*, 563 U.S. 493 (2011).

[6] Mr. Schiraldi now serves as Secretary of the Maryland Department of Juvenile Services.  https://msa.maryland.gov/msa/mdmanual/19djj/html/msa18520.html.

13.    As discovery is stayed in this case and a class has not been certified, I have not been able to request or review the following information, which would be informative:

    a.    Transcripts of witnesses designated by Defendants under Rule 30(b)(6) of the Federal Rules of Civil Procedure as the persons most knowledgeable about the time spent by youth alone in their cells at OJJ Angola Unit;

    b.    Any policies, post orders, protocols, or directives for health care or custody staff on limitations on the amount of time spent by youth alone in their cells;

    c.    Movement and activity logs for the OJJ Angola unit;

    d.    Medical records, including mental health records, for all youth held at the OJJ Angola Unit;

    e.    A complete tour of the OJJ Angola Unit, including visiting and taking photographs of the cells in which youth are confined and live, all medical facilities, indoor and outdoor areas, and as well as an opportunity to speak freely and confidentially with youth and staff.

14.    Despite the inability to obtain this additional useful data and information, all of my opinions and conclusions here are rendered to a reasonable degree of certainty. I reserve the right to supplement this declaration when and if the stay of discovery is lifted, and Plaintiffs' counsel are able to obtain additional information from Defendants, and/or I am able to visit the OJJ Angola Unit.

**D. Summary of My Opinions**

15.    Based on the information in the documents I have reviewed, a number of youth at OJJ Angola Unit are being subjected to living conditions that are similar or identical to solitary confinement (i.e., they are locked in their cells for extended periods of time, deprived of access to meaningful social contact and purposeful activity).

16.    The youth incarcerated at OJJ Angola Unit who are being subjected to these conditions are at substantial risk of serious psychological harm.

6

17.     As detailed in Part II, the science is clear that for both adults and children, being incarcerated in solitary or isolated confinement can produce a number of negative psychological effects and places incarcerated people at significant risk of serious psychological harm.[7] Empirical studies form the underlying basis for a widespread consensus that has emerged among scientific, mental health, human rights, legal, and even correctional organizations about the harmful effects of solitary confinement. The empirical findings continue to be robust—that is, they come from studies that were conducted by researchers and clinicians from diverse backgrounds and perspectives, they were completed and have been published over a period of many decades, and they are empirically very consistent with one another. With remarkably few outlier exceptions, virtually every one of these studies has documented the pain and suffering that isolated incarcerated persons endure and the risk of psychological harm that they confront while kept in isolated confinement.[8]

18.     For youth, this risk of harm is even greater because of their scientifically well-established vulnerability; unlike adults, adolescents are at especially formative stages

---

[7] I use the terms "prisoners," "incarcerated people," or "incarcerated persons" interchangeably to refer to people who are incarcerated or detained in carceral facilities. The scientific and professional literature typically uses these terms in the same way. The terms include youth incarcerated in juvenile or adult correctional settings. Although much of the research and authorities cited refers to adults, as I explain further, the findings apply equally to juveniles. In fact, because they are at especially formative stages in their lives, they are at an even greater risk of harm from solitary confinement.

[8] In contrast to the numerous studies that make up this widespread scientific consensus about the harmfulness of solitary confinement, there are a few outlier studies that purport to find few if any negative effects. For a detailed discussion of the serious methodological flaws that plague these studies, *see* Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, Crime and Justice, 47, 365-416 (2018). For example, one such study, the so-called "Colorado Study," suffers from fatal methodological flaws that led well-known prison researchers to characterize its results as "flabbergasting" and conclude that "[d]espite the volume of the data, no systematic interpretation of the findings is possible." David Lovell, & Hans Toch, *Some observations about the Colorado segregation study*. Corr. Mental Health Report, May/June 2021, at 3.

in their lives and are in the process of ongoing social, psychological, and physiological development. In addition, the risk of serious psychological harm is further heightened for mentally ill youth. As children whose coping mechanisms are less well-developed, with limited ability to discern and control their emotional reactions, and whose personal identities are less stable and more influenced by surrounding circumstances—isolation is likely to be especially harmful and dangerous.

19.    Research from the U.S. Department of Justice's Office of Juvenile Justice and Delinquency Prevention (OJJDP) also shows that the isolation of youth in a locked room or cell is a strong risk factor for suicide. This research found that half of youth who committed suicide in *juvenile* facilities across the country were in isolation at the time of their death and more than 60% percent of young people who committed suicide in detention had a history of being held in isolation. Of the children in secure *juvenile* detention centers, *40% of suicides occurred within the first 72 hours*.[9] The suicide statistics are even more grim for youth who are held in adult jails or prisons. A 2018 report by the UCLA School of Law found that youth under the age of 18 are *36 times* more likely to commit suicide if they are housed in an adult jail, than if they are held in a juvenile detention facility.[10]

20.    It is my opinion that the practices of OJJ regarding conditions of confinement for children in the Angola Unit, as described in the declarations that I read, clearly constitute the kind of harsh and depriving conditions of isolated confinement that are detrimental to all persons subjected to them. As such, *all incarcerated youth who are subjected to these isolated conditions are at significant risk of serious psychological harm under current practice and conditions*. The significant risk of harm that isolation

---

[9] Lindsay Hayes, *Juvenile Suicide in Confinement, A National Survey*, U.S. Dep't of Just., Off. of Juv. Just. Delinquency & Prevention, 2009, at vii, at https://www.ncjrs.gov/pdffiles1/ojjdp/213691.pdf.

[10] Neelum Arya, *Getting to Zero: A 50-State Study of Strategies to Remove Youth from Adult Jails*, UCLA School of Law, 2018, at 23, at https://drive.google.com/file/d/1LLSF8uBlrcqDaFW3ZKo_k3xpk_DTmItV/view.

represents for incarcerated persons in general, its heightened risk of harm for juveniles, and the even greater risk it poses for juveniles who are mentally ill can only be addressed by implementing policies that eliminate the practice for youth altogether. Defendants should not be locking youth alone in their cells for 72 hours at intake, or for hours or days on end for disciplinary reasons (including group punishment) or for staff convenience (or due to staff shortages or holidays); nor should confinement occur in a locked cell under conditions where children are deprived of basic human needs. In the exceedingly rare instances where longer periods of separation beyond minutes or a few hours at most are absolutely necessary for a juvenile, in response to emergency situations, they should be limited to the shortest amount of additional time possible and even then, always under the intensive supervision and care of a licensed physician or psychologist.

## II. RESEARCH ON THE ADVERSE PSYCHOLOGICAL EFFECTS OF ISOLATION

### A. The Impact of Isolation on Relatively Healthy Adults

21.    The phrases "solitary confinement" and "isolated confinement" are terms of art in correctional practice and scholarship that encompass any number of different labels that denote isolating housing arrangements and procedures. For perhaps obvious reasons, total and absolute solitary confinement—literally complete isolation from any form of human contact—does not exist in prison and never has. Instead, the term is generally used to refer to conditions of extreme (but not total) isolation from others.

22.    Much of what we know about the negative psychological effects of prison isolation is situated in a much larger scientific literature about the harmfulness of social isolation, loneliness, and social exclusion in free society in general. There is a wealth of scientific knowledge about the adverse consequences of these negative experiences as they occur in contexts and settings outside of prison, which find that meaningful social contact is a fundamental human need whose deprivation has a range of potentially very serious psychological and physical effects. Many of us personally experienced the adverse effects

of isolation during the COVID-19 pandemic, especially in the early months of the pandemic when there was no vaccine or effective treatment for the virus.

23.     Psychology and other behavioral sciences have recognized for decades that the need for social contact is fundamental to establishing and maintaining emotional health and well-being. Because the human brain is literally "wired to connect" to other people, meaningful social contact is crucial to normal human development; as one researcher wrote, "Our brains evolved to experience threats to our social connections in much the same way they experience physical pain. The neural link between social and physical pain also ensures that staying socially connected will be a lifelong need, like food and warmth."[11] Impairing or depriving people (especially children) of the ability to connect to others undermines psychological wellbeing and produces a range of interrelated maladies in children and adults. The experience of social isolation also increases physical morbidity and mortality—it makes people more susceptible to illness and death.[12]

24.     In society at large, social isolation is a significant risk factor for a wide range of mental health problems. Specifically, social isolation increases the prevalence of depression and anxiety among adolescents and adults, and is related to psychosis, paranoia, and suicidal behavior.[13] Among people who already have been diagnosed or identified as

---

[11] Matthew Lieberman, <u>Social: Why Our Brains Are Wired to Connect</u>. New York: Random House (2013), at pp. 4-5.

[12] *See, e.g.*, Linda Chernus, *Separation / Abandonment / Isolation Trauma: What We Can Learn From Our Nonhuman Primate Relatives*, 8 J. Emotional Abuse, 469-92 (2008), p. 470 (discussing the harmful developmental consequences of early social deprivation in the form of maternal loss for humans and non-human primates).

[13] Depression and Anxiety: *see, e.g.*, Joshua Hyong-Jin Cho et al., *Associations of Objective Versus Subjective Social Isolation with Sleep Disturbance, Depression, and Fatigue in Community-Dwelling Older Adults*, Aging & Mental Health, 23, 1130-1138 (2019); Nathaniel Dell et al., *Loneliness and Depressive Symptoms in Middle Aged and Older Adults Experiencing Serious Mental Illness*, Psychiatric Rehabilitation, 42, 113-120 (2019); Lixia Ge et al., *Social Isolation, Loneliness and Their Relationships with Depressive Symptoms: A Population-based Study*, PLOS ONE, 12(8), e0182145(2017); Psychosis and Paranoia: *See, e.g.*, Anson Chau, *Loneliness and The Psychosis Continuum: A Meta-analysis on Positive Psychotic Experiences and a Meta-Analysis on Negative*

suffering from psychiatric disorders in free society, isolation is implicated in the persistence of delusional or psychotic beliefs, a lack of insight into one's psychiatric symptoms, and a higher rate of hospitalization and re-hospitalization.[14] People experiencing mental health crises also report severe loneliness which may, in turn, exacerbate their mental illness, creating a downward spiral toward decompensation.[15]

25.    In addition, there are a number of well-documented harmful physical and medical outcomes associated with social isolation and loneliness in humans, including adverse effects on neurological and endocrinological processes. As one group of

---

*Psychotic Experiences*, Int'l Review of Psychiatry, 31, 471-490 (2019); Dorothy DeNiro, *Perceived Alienation in Individuals with Residual-type Schizophrenia*, Issues in Mental Health Nursing, 16, 185-200 (1995) Sarah Butter, *Social Isolation and Psychosis-Like Experiences: A UK General Population Analysis*, Psychosis, 9, 291-300 (2017); Suicidal Behavior: *see*, *e.g.*, Raffaella Calati et al., *Suicidal Thoughts and Behaviors and Social Isolation: A Narrative Review of the Literature*, Affective Disorders, 245, 653-667 (2019); Institute of Medicine, Reducing Suicide: National Imperative (S.K. Goldsmith et al. eds., 2002); John L. Oliffe et al., *Injury, Interiority, and Isolation in Men's Suicidality*, Amer. J. of Men's Health, 11, 888-899 (2017).

[14] *See*, *e.g.*, P. Garety et al., *A Cognitive Model of the Positive Symptoms of Psychosis*, Psychological Medicine, 31, 189-195 (2001), at p. 190–91 (writing about the way that social marginalization contributes to beliefs about the self as "vulnerable to threat, or about others as dangerous" and the way that "social isolation contributes to the acceptance of . . . psychotic appraisal by reducing access to alternative more normalizing explanations"); R. White et al., *The Social Context of Insight in Schizophrenia, Social Psychiatry and Psychiatric Epidemiolog*y, 35, 500-507 (2000); Tennyson Mgutshini, Risk Factors for Psychiatric Re-Hospitalization: An Exploration*, International Journal of Mental Health Nursing, 19, 257-257 (2010); Graham Thornicroft, Social Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisatio*n, British Journal of Psychiatry, 158, 475-484 (1991).

[15] *See*, *e.g.*, Jingyi Wang et al., Epidemiology of Loneliness In a Cohort of UK Mental Health Community Crisis Service Users, Social Psychiatry and Psychiatric Epidemiology, 55, 811-822 (2019).

Although very closely related, the experiences of "loneliness" and "social isolation" are not identical. Loneliness is the negative <u>subjective</u> feeling of being isolated or disconnected from others, whereas social isolation is the <u>objective</u> condition of that disconnection. *See, e.g.*, Nancy Newall & Verena Menec, *Loneliness and Social Isolation of Older Adults: Why It Is Important to Examine These Social Aspects Together*, J. of Social & Personal Relationships, 36, 925-939 (2019)

researchers summarized, "[t]hese findings indicate that loneliness may compromise the structural and functional integrity of multiple brain regions."[16]

26.     Indeed, the well-documented negative physical and psychological effects of social isolation and loneliness in the free world have been acknowledged as creating a worldwide public health crisis. In 2020, U.S. Surgeon General Vivek Murthy described the negative effects of social isolation in a book titled <u>Together: The Healing Power of Human Connection in a Sometimes Lonely World</u>; a National Academy of Sciences Committee concluded that the negative consequences of social isolation "may be comparable to or greater than other well-established risk factors such as smoking, obesity, and physical inactivity," and another group of prominent researchers wrote in the *Journal of the American Medical Association* that loneliness is a "lethal behavioral toxin" that accounted for "more annual deaths than cancer or strokes."[17]

27.     The research on the harmful effects of social isolation, loneliness, and social exclusion in society at large is directly applicable to prison and other carceral settings. These conditions predictably impair the cognitive and mental health functioning of incarcerated people subjected to them.[18] In prison, the toxic experience of isolation is intensified by the fact that it is involuntarily, forcefully, and completely imposed, and

---

[16] Laetitia Mwilambwe-Tshilobo et al., *Loneliness and Meaning in Life Are Reflected in the Basic Network Architecture of the Brain*, Social Cognitive and Affective Neuroscience, 14, 423-433 (2019), at p. 424 (2019). *See also* Jacob Stein et al., *Perceived Social Support, Loneliness, and Later Life Telomere Length Following Wartime Captivity*, Health Psych., 37, 1067-1076 (2018).

[17] Nat'l Acad. of Science, Engineering, & Medicine, <u>Social Isolation and Loneliness in Older Adults</u>. Washington, DC: Nat'l Acads. Press (2020), pp. 2-12; Dilip V. Jeste, Ellen E. Lee, and Stephanie Cacioppo, *Battling the Modern Behavioral Epidemic of Loneliness: Suggestions for Research and Interventions*, 77(6) JAMA Psychiatry, 553 (2020).

[18] *See, e.g.*, Kristin Cloyes et al., *Assessment of Psychosocial Impairment in a Supermaximum Security Unit Sample*, Crim. Just. & Behavior, 33, 760-781 (2006): Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, Crime & Delinquency, 49, 124-156 (2003); and Peter Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, in Michael Tonry (Ed.), <u>Crime and Justice</u>, Vol. 34. Chicago: Univ. of Chicago Press (2006), at pp. 441-528.

occurs with a host of other severe deprivations (such as minimal or no access to positive environmental stimulation and material possessions). For some, these impairments are documented as permanent and even life-threatening. Indeed, many of the negative effects of solitary confinement are analogous to the acute reactions suffered by trauma victims, and the psychiatric consequences are often so severe that they resemble the symptoms manifested by victims of what are called "deprivation and constraint torture" techniques.[19]

28.    More than five decades of a substantial body of published studies conducted by researchers with different professional expertise on subjects from psychiatry to sociology and architecture, and in locations across multiple countries, show the overall distinctive patterns of harmful psychological effects on people placed in isolation in carceral settings.[20] The experience of solitary confinement has been shown not only to be painful and unpleasant but also capable of doing real harm and inflicting real damage. The

---

[19] Solitary confinement is among the most frequently used psychological torture techniques. In <u>Detention & Torture in South Africa: Psychological, Legal & Historical Studies</u>, Cape Town: David Philip (1987), psychologist Don Foster listed solitary confinement among the most common "psychological procedures" used to torture South African detainees under the apartheid regime (p. 69), and concluded that "[g]iven the full context of dependency, helplessness and social isolation common to conditions of South African security law detention, there can be little doubt that solitary confinement under these circumstances should in itself be regarded as a form of torture" (p. 136). *See also*: Matthew Lippman, *The Development and Drafting of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, 27 Boston Coll. Int'l & Comp. L. Rev., 27, 275 (1994); Tim Shallice, *Solitary Confinement—A Torture Revived?* New Scientist, Nov. 28, 1974; F.E. Somnier & I.K. Genefke, *Psychotherapy for Victims of Torture*, British J. of Psychiatry, 149, 323-329 (1986); and Shaun R. Whittaker, *Counseling Torture Victims*, The Counseling Psychologist, 16, 272-278 (1988).

[20] *See, e.g.*, Arrigo, B., & Bullock, J., *The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and What Should Change*, Int'l J. of Offender Therapy & Comparative Criminology, 52, 622-640 (2008); Craig Haney, et al., *Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement*, NYU R. of Law & Social Change 23, 477-570 (1997); Peter Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, in Michael Tonry (Ed.), <u>Crime and Justice</u>, Vol. 34. Chicago: Univ. of Chicago Press (2006) at pp. 441-528.

demonstrated damage was often severe, sometimes irreversible and, in the case of suicide, even fatal. Indeed, as researchers and mental health experts have learned over many decades, for some prisoners, the attempt to cope with isolated confinement set in motion a set of cognitive, emotional, and behavioral changes that could persist beyond the time that the incarcerated persons were housed in isolation and could lead to long-term disability and dysfunction. For example, a group of Stanford researchers found that behavioral patterns and psychological reactions developed in the course of adapting to solitary confinement were persistent and problematic when formerly long-term isolated incarcerated persons attempted to transition back to mainline prison housing.[21] Psychiatrist Terry Kupers, who has written extensively about the mental health risks of solitary confinement, has termed the lingering negative effects of the experience "SHU post-release syndrome."[22] In fact, recent research suggests that the harmful effects of solitary confinement persist even after a person has been released from prison. For example, solitary confinement survivors suffer post-prison adjustment problems at higher rates than the already high rates experienced by formerly incarcerated persons in general, including being more likely to manifest symptoms of PTSD.[23]

29.    Almost five decades ago, Hans Toch's large-scale psychological study of incarcerated men "in crisis" in New York State correctional facilities made important

---

[21] *See* Human Rights in Trauma Mental Health Lab, Stanford Univ., <u>Mental Health Consequences Following Release from Long-Term Solitary Confinement in California</u> (2017) at <u>https://perma.cc/5WGK-UBBN</u>.

[22] *See* Terry Kupers, <u>Solitary: The Inside Story of Supermax Isolation and What We Can Do to Abolish It</u>. Oakland, CA: Univ. of Cal. Press (2017), especially pp. 151-167.

[23] *See e.g.*, Brian Hagan et al., *History of Solitary Confinement Is Associated with Post-Traumatic Stress Disorder Symptoms among Individuals Recently Released from Prison*, J. of Urban Health, 95, 141-148 (2018); and Arthur Ryan & Jordan DeVylder, *Previously Incarcerated Individuals with Psychotic Symptoms Are More Likely to Report a History of Solitary Confinement*, Psychiatry Research, 290, 113064 (2020). <u>https://doi.org/10.1016/j.psychres.2020.113064</u>.

observations about the effects of isolation.[24] After conducting numerous in-depth interviews of the men, Toch concluded that "isolation panic" was a serious problem. The symptoms he reported included rage, panic, loss of control and breakdowns, psychological regression, and a build-up of physiological and psychic tension that led to incidents of self-harm.[25] He noted that while isolation panic could occur under other conditions of confinement it was "most sharply prevalent in segregation." Moreover, it marked an important dichotomy for incarcerated people: the "distinction between imprisonment, which is tolerable, and isolation, which is not."[26]

30.    Studies done in the 1980s and 1990s identified other adverse psychological symptoms produced by these conditions, including: appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations. Direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These include increases in the following potentially damaging symptoms and problematic behaviors: anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, and rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behavior.

31.    Additional research established a relationship between housing type and various kinds of incident reports in prison. It showed that self-harm and suicide are much more prevalent in isolated, punitive housing units like administrative segregation and security housing, where people are subjected to solitary-like conditions. Researchers have attributed higher suicide rates in solitary confinement-type units to the heightened levels of "environmental stress" generated by "isolation, punitive sanctions, [and] severely

---

[24] Hans Toch, <u>Men in Crisis: Human Breakdowns in Prisons</u>, Chicago: Aldine Pub. Co. (1975).
        [25] *Id.* at 54.
        [26] *Id*.

restricted living conditions" that exist there.[27] They reported that "the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide."[28] In addition, signs of deteriorating mental and physical health (beyond self-injury), other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence were all found to be more prevalent in these units.[29]

32.    In 2018, I published the results of a study that used a structured interview and systematic assessment format to compare the prevalence of symptoms of psychological stress, trauma, and isolation-related psychopathology in a randomly selected sample of extremely long-term SHU incarcerated persons (who had spent ten years or more in continuous solitary confinement) with a randomly selected sample of general population (GP) incarcerated persons who had spent ten years or more of continuous imprisonment.[30] The isolated incarcerated persons reported nearly twice the mean number of symptoms of both stress-related trauma (e.g., troubled sleep, heart palpitations, feelings of an impending breakdown) and isolation-related pathology (e.g., ruminations, irrational anger, depression, social withdrawal) overall compared to the incarcerated persons who were currently housed in general population and who had been in prison for similar amounts of time. The intensity

---

[27] Raymond Patterson & Kerry Hughes, *Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004*, Psychiatric Services, 59, 676-682 (2008), at p. 678.

[28] *Id.*

[29] *See, e.g.*, Howard Bidna, *Effects of Increased Security on Prison Violence*, J. of Crim. Just., 3, 33-46 (1975); K. Anthony Edwards, *Some Characteristics of Prisoners Transferred from Prison to a State Mental Hospital*, Behavioral Sciences & the Law, 6, 131-137 (1988); Peter Kratcoski, *The Implications of Research Explaining Prison Violence and Disruption*, Federal Probation, 52, 27-32 (1988); Frank Porporino, *Managing Violent Individuals in Correctional Settings*, J. of Interpersonal Violence, 1, 213-237 (1986); and Pamela Steinke, *Using Situational Factors to Predict Types of Prison Violence*, 17 J. of Offender Rehabilitation, 17, 119-132 (1991).

[30] Craig Haney, *Restricting the Use of Solitary Confinement*, Annual Rev. of Criminology, 1, 285-310 (2018).

16

with which the reported symptoms was reported also differed very significantly—on average they were experienced well over twice as intensely by the isolated group. In addition, incarcerated persons in long-term solitary confinement were not only significantly more "lonely" than the long-term general population incarcerated persons but also reported extremely high levels of loneliness rarely found anywhere else in the literature.[31]

33.    Other researchers also documented high levels of psychological distress in persons housed in solitary confinement. For example, in a 2020 publication, Keramet Reiter and her colleagues found clinically significant symptoms in sizable numbers of persons housed under isolated conditions, prevalence rates for serious mental illness and self-harming behavior in solitary confinement that were approximately twice as high as among general population incarcerated persons, "[s]ymptoms such as anxiety and depression [that] were especially prevalent in [the isolated] population, along with symptoms ostensibly specific to solitary confinement, such as sensory hypersensitivity and a perceived loss of identity…" as well as respondents who "pointed to psychiatric distress—in profoundly existential terms…"[32]

34.    Relatedly, there is evidence that the stressfulness and long-term damage that is inflicted by solitary confinement can adversely affect someone's life expectancy. A 2019 study published in the Journal of the American Medical Association, analyzing the experiences of more than 200,0000 persons who were released from a state prison system between 2000 and 2015, confirmed this. The researchers found that those who spent *any* time in solitary-type confinement (such as administrative or disciplinary segregation)

---

[31] *Id*.; *see also* Craig Haney, *Solitary Confinement, Loneliness, and Psychological Harm*, in J. Lobel & P. Scharff Smith (Eds.), Solitary Confinement: Effects, Practices, and Pathways to Reform (pp. 129-152). New York: Oxford University Press 2020).

[32] Keramet Reiter, et al., *Psychological Distress in Solitary Confinement: Symptoms, Severity, and Prevalence in the United States, 2017-2018*, Amer. J. of Public Health, 110, 556-562 (2020), p. 560.

"were 24% more likely to die in the first year after release."[33] Incarcerated people who spent time in solitary-type confinement also were more likely to commit suicide (78% more likely than other prisoners) and to be victims of homicide (54% more likely) after being released from prison, and they were "127% more likely to die of an opioid overdose in the first 2 weeks after release."[34]

35.    Taken as a whole, these data and the other studies that I have summarized confirm what I have observed in my own work: time spent in isolation is not only painful but harmful. It can and routinely does have extremely damaging psychological and physical effects—and in the worst case scenarios, death—for persons exposed to it.

**B. The Potential Harmfulness and Dangerousness of Brief Stays in Isolation**

36.    There also is evidence that even an initial, brief period in which someone is placed in solitary confinement carries heightened risk. This was first identified in psychologist Hans Toch's large-scale study of adult prisoners "in crisis" in New York State correctional facilities described above. After numerous in-depth interviews, he identified a phenomenon that he termed "isolation panic," an extreme psychological reaction that some prisoners have, including in the early stages when first placed alone in a solitary confinement cell.[35]

37.    More recent data also suggest that the initial period just after someone has been placed in solitary confinement can be an especially high-risk time. For example, a study done in the California Department of Corrections and Rehabilitation (CDCR) underscored the dangerous nature of solitary confinement and the heightened risks that occur in the first 72 hours of such confinement. An analysis of suicides that occurred in

---

[33] Lauren Brinkley-Rubinstein, et al., *Association of Restrictive Housing During Incarceration with Mortality After Release*, J. of Amer. Med. Ass'n, Oct. 4, 2019, at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350.
[34] *Id.*
[35] Toch, *supra* n. 24 at 54.

CDCR in 2015 corroborated the well-known fact that a disproportionate number of them occurred in segregated housing. Specifically, although only 6.5% of prisoners were housed in segregation, 37.5% of suicides occurred there.[36] As I noted above, research done in other prison systems have corroborated that persons placed in solitary confinement are at much greater risk of suicide as well as self-harm as compared to those in the general population.[37]

38.    In addition, however, the same analysis of California data found that: "In 2015, nearly half of the suicides that occurred in segregated housing occurred soon after placement. Three of the nine suicides occurred in intake cells, indicating stays of less than 72 hours."[38] Moreover, this finding was not limited to a single year: Over the seven-year period from 2009 to 2015, California prison analysts found that "suicides tended to occur shortly after [segregation] placement, particularly in the first 72 hours after placement."[39]

39.    Based on the declarations of youth who have been incarcerated at the OJJ Angola Unit, it appears that there is a policy or practice of incarcerating children in their cells in isolation for the first 72 hours after intake, where they are only allowed out for a few minutes a day for a shower. I detail further in the next section how the science shows that juveniles are more greatly affected by solitary than even adult prisoners are, and in part this is rooted in their developing brains and their perceptions of time. I cannot stress strongly enough my opinion that OJJ is playing with fire by incarcerating children

---

[36] *Annual Report on Suicides in the California Department of Corrections and Rehabilitation, January 1, 2015-December 31, 2015*, at p. 29, at https://cchcs.ca.gov/wp-content/uploads/sites/60/SR/2015-Annual-Suicide-Report.pdf. More recent data from 2020 found that only 4.3% of CDCR prisoners were housed in segregation, but 35% of all suicide decedents for the year were housed there. *See* 2020 *Report on Suicide Prevention and Response within the California Department of Corrections and Rehabilitation*, pp. 32-33, at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/CDCR-2020-SB-960.pdf.

[37] For example, *see* Kaba, *et al.*, *Solitary Confinement and Risk of Self-Harm among Jail Inmates*, Amer. J. of Public Health, 104(3), 442-447 (2014).

[38] *Annual Report on Suicides in the California Department of Corrections and Rehabilitation, January 1, 2015-December 31, 2015*, at p. 30 (emphasis added).

[39] *Id.* (emphasis added).

continuously in solitary confinement conditions for the first 72 hours after arrival to the facility.

### C. The Exacerbating Effects of Isolation on Juveniles

40.    With respect to children, psychologists and psychiatrists (as well as anyone who has raised children) have long known that adolescence is a period of significant cognitive, psychological, and neurobiological development, as well as fragility and malleability. Children are especially vulnerable to and potentially damaged by stressful and traumatic experiences during this key developmental period. This basic understanding is shared by legal decision-makers as well as social and behavioral scientists. Indeed, the developmental vulnerability of children is the very premise of having a separate juvenile justice system,[40] has recently been reaffirmed by the National Academy of Sciences,[41] and led the United States Supreme Court to repeatedly impose special limits on the nature of the punishments to which juveniles may be subjected.[42]

41.    In fact, a widespread movement to reform the juvenile justice system has been underway for the last several decades. Termed "developmental reform," it is premised on the scientifically well-established fact that there are significant differences between juveniles and adults and the recognition that these differences mean that the juvenile justice system must operate fundamentally differently than its adult counterpart. Among other

---

[40] For example, *see In re Gault*, 387 U.S. 1 (1967), as well as numerous scholarly analyses of the premises of the juvenile justice system, such as David Arredondo, *Child Development, Children's Mental Health and the Juvenile Justice System: Principles for Effective Decision-Making*, Stan. L. & Pol'y Rev., 14(1), 13-28 (2003); Alida Merlo & Peter Benekos, Juvenile Justice: Delinquency, Processing, and the Law, 9th Ed., New York: Pearson (2018); Barry Feld, The Evolution of the Juvenile Court: Race, Politics and the Criminalizing of Juvenile Justice, New York: NYU Press (2017); and Elizabeth Scott & Laurence Steinberg, Rethinking Juvenile Justice, Cambridge: Harvard Univ. Press (2010).

[41] Nat'l Research Council, Reforming Juvenile Justice: A Developmental Approach. Washington, D.C.: Nat'l Acads. Press (2013).

[42] *See, e.g., Roper v. Simmons*, 543 U.S. 551 (2005); *Graham v. Florida*, 560 U.S. 48 (2010); and *Miller v. Alabama*, 567 U.S. 460 (2012).

things, juvenile justice policies and practices within the justice system need to "promote adolescents' positive growth."[43] Developmental science now plays a much more critical role in the way that the juvenile justice system functions, and perhaps nowhere is that more important than with respect to the need to drastically limit or eliminate the practice of subjecting children to solitary confinement.[44]

42.    The widespread scientific consensus on the psychological and physical harms inflicted by solitary confinement is especially applicable to children whose developmental vulnerability makes them particularly sensitive to such treatment. The psychological stress and anguish of being kept in isolation increases the risk and seriousness of the harm, which is categorically greater in children, and can subject them to potentially irreversible physical and mental harm. In 2020, I published a book that was largely devoted to reviewing the scientific literature establishing the life-altering effects of these childhood and adolescent traumas, what are sometimes termed "adverse childhood experiences." The vast majority of incarcerated youth—whether in adult or juvenile facilities—have already experienced numerous adverse childhood experiences. Thus, the incarceration of these children is not only traumatic, but represents a potentially powerful and harmful form of "retraumatization," compounding the effects of trauma to which they

---

[43] Cavanagh, C., Paruk, J., & Grisso, T., *The developmental reform in juvenile justice: Its progress and vulnerability*, Psychology, Public Policy, and Law, 28(2), 151–166, (2022), at https://doi.org/10.1037/law0000326

[44] *See, e.g.*, Cauffman, E., et al., *How developmental science influences juvenile justice reform*, U.C. Irvine L. Rev., 8(1), 21–40 (2018); Fountain, E., Mikytuck, A., & Woolard, J. *Treating emerging adults differently: How developmental science informs perceptions of justice policy*. Translational Issues in Psychological Science, 7(1), 65–79 (2021). https://doi.org/10.1037/tps0000248; Luna, B., & Wright, C., *Adolescent brain development: Implications for the juvenile criminal justice system*, in K. Heilbrun, et al. (Eds.), APA Handbook of Psychology and Juvenile Justice (pp. 91–116), Amer. Psych. Ass'n (2016), at https://doi.org/10.1037/14643-005; and Vidal, *et al*, *Multi-system-involved youth: A developmental framework and implications for research, policy, and practice*, Adolescent Research Rev., 4(1), 15–29 (2019), at https://doi.org/10.1007/s40894-018- 0088-1.

have already been exposed. As I wrote, retraumatization consists of "*repeated* trauma-related experiences and events of the sort that can adversely affect their entire life course."[45] Adding a third level of traumatization, in the form of solitary confinement, thus represents a dangerous practice that can have truly profound and irreversible consequences.

43.    More than half of the states in the country have laws that prohibit or greatly restrict the use of isolation on youth.[46] For example, current California law significantly limits the use of solitary or solitary-like confinement for juveniles to durations of no longer than ***four hours***.[47] In fact, Louisiana itself passed restrictions on the use of solitary in *juvenile* facilities in 2022 after two children died by suicide in 2019 within 72 hours of each other.[48] The law, which Governor Edwards signed on June 16, 2022, and was effective on Aug. 1, 2022, only permits the involuntary placement of a youth alone in a cell or room

---

[45] Craig Haney, Criminality in Context: The Psychological Foundations of Criminal Justice Reform, Washington, D.C.: APA Books (2020), p. 153. Developmental psychologists and others understand that the age at which trauma is experienced affects its potential to incur life-long effects. This is true even with respect to trauma that is experienced later in life. For example, one group of researchers who studied the lasting effects of wartime captivity found that although "a substantial portion" of their sample "reported experiencing problematic levels of anxiety and depression" much later in life, their ***age at the time of captivity*** (which the authors characterized as a "resilience promoting" factor), predicted whether and to what degree former POWs experienced depression, anxiety, depression, and PTSD symptoms many years later. That is, those who were older at the time of the trauma experienced fewer lasting mental health symptoms. *See* Park, et al., *Does Wartime Captivity Affect Late-life Mental Health? A Study of Vietnam-era Repatriated Prisoners of War*, Research on Human Dev't, 9, 191–209 (2012).

[46] Nat'l Conf. of State Legislatures, *Summary: States that Limit or Prohibit Juvenile Shackling and Solitary Confinement*, July 8, 2022, at https://www.ncsl.org/civil-and-criminal-justice/states-that-limit-or-prohibit-juvenile-shackling-and-solitary-confinement.

[47] Calif. Welf. & Inst. Code § 208.3. *See also* Sue Burrell and Ji Seon Song, *Ending "Solitary Confinement" of Youth in California*, Children's Legal Rights J., 39, 42, 45 (2019).

[48] Beth Schwartzapfel, *Louisiana Limits Solitary Confinement for Youth*, The Marshall Project, June 22, 2022, at https://www.themarshallproject.org/2022/06/22/louisiana-limits-solitary-confinement-for-youth.

during regularly scheduled sleeping hours, and only as a "temporary response to behavior that poses a serious and immediate threat of physical harm to the juvenile or others."[49]

44.     The restriction on the use of isolation for children is mirrored by the number of jurisdictions across the U.S. that are moving toward severely restricting or ending the use of long-term solitary confinement for *all* people—both adults and juveniles—based on the scientific consensus about the harmfulness of isolation that I summarized above. A joint project of Yale Law School's Liman Center and the Correctional Leaders Association (CLA, formerly known as the Association of State Correctional Administrators), a national professional organization of correctional administrators, correctly characterized the impact of this consensus several years ago:

> [D]ozens of initiatives are underway to reduce the degree and duration of isolation or to ban [solitary confinement] outright, and to develop alternatives to protect the safety and well-being of the people living and working in prisons. The harms of such confinement for prisoners, staff, and the communities to which prisoners return upon release are more than well-documented. In some jurisdictions, isolated confinement has been limited or abolished for especially vulnerable groups (the mentally ill, juveniles, and pregnant women), and across the country, correctional directors are working on system-wide reforms for all prisoners.[50]

45.     In 2021, New York State enacted legislation prohibiting prison and jails statewide from holding persons in solitary confinement for more than 15 consecutive days, and disallowing solitary confinement completely for persons under 22 or over 54 years of age, those who are pregnant, persons with disabilities, and persons with serious mental illness. In 2019, New Jersey passed a law prohibiting use of solitary confinement in prisons and jails statewide for more than 20 consecutive days, or more than 30 days during a 60-day period, and prohibited use of solitary confinement for persons with serious mental

---

[49] H.B. No. 746, at https://legis.la.gov/legis/ViewDocument.aspx?d=1289566.
[50] Yale Law School & Ass'n of State Correctional Administrators, Time In-Cell: ASCA-Liman 2014 National Survey of Administrative Segregation in Prison (Aug. 2015), p. 7.

illness. Also in 2019, the Washington State Department of Corrections joined a number of states that have entered into a partnership with the Vera Institute of Justice to reduce the population of incarcerated persons held in isolation/solitary confinement, significantly improve the conditions of confinement to which they are subjected, and impose time limits on lengths of stay in these units.[51]

46.    More recently, after finding conditions in isolation units in the Arizona state prison system unconstitutional, including in units where children are held, a federal court issued a remedial order imposing a presumptive limit of no more than 60 days in isolation, and a categorical ban on the use of solitary for juveniles and people with serious mental illness.[52]

47.    The heightened risk of harms that solitary confinement represents for juveniles also has been recognized by agencies of the federal government. For example, former Director of the National Institute of Justice Nancy Rodriguez noted that the federal Office of Juvenile Justice and Delinquency Prevention (OJJDP) has dedicated funding to assist states to "reduce and end the use of solitary confinement in juvenile justice facilities." She also acknowledged that when President Obama banned juvenile solitary confinement in the federal system, his announcement "was meant to motivate state and local jurisdictions to take similar actions."[53]

48.    Most knowledgeable experts who have considered the issue, including Dr. Rodriguez and the OJJDP, understand that, in large part because of their still-developing brains, juveniles are not only "more susceptible to environmental pressures in decision making," but also likely "to experience greater suffering from isolation compared to their

---

[51] News reports that detail these solitary confinement reforms can be found at: https://www.nytimes.com/2021/04/01/nyregion/solitary-confinement-restricted.html; https://www.doc.wa.gov/news/2020/10282020.html; https://www.aclu-nj.org/en/press-releases/gov-murphy-signs-isolated-confinement-restriction-act-law.

[52] *See Jensen v. Thornell*, 2023 WL 2838040, *27 (D. Ariz. Apr. 7, 2023).

[53] Nancy Rodriguez, *The Role of Science in Reducing Racial and Ethnic Disparities in the Juvenile Justice System*, DuBois Review, 15(1), 195-204, (2018) at p. 200

adult counterparts," and "possess fewer psychological coping mechanisms to combat the stress and anxiety of segregation."[54]

49.    In addition to being painful, harmful, and dangerous, solitary confinement is potentially fatal, especially for juveniles. As noted above in Paragraph 19, the U.S. Department of Justice data on deaths of children by suicide is unequivocal: it found that half of the children who died by suicide in *juvenile* carceral facilities were in isolation at their time of death, more than 60% of young people who died by suicide in juvenile facilities had a history of being held in isolation, and 40% of suicides in juvenile facilities occurred within the first 72 hours of the youth's placement in solitary. The DOJ report noted that, "When placed in a cold and empty room by themselves, suicidal youth have little to focus on – except all of their reasons for being depressed and the various ways that they can attempt to kill themselves."[55] Relatedly, research has found that the two strongest predictors of self-harm among jail detainees were placement in solitary confinement and being less than 19 years of age.[56] Many of the lower-lethality acts of self-harm were committed by younger detainees who were desperate to avoid their placement in solitary confinement. Thus, children, as an already highly vulnerable population, are at even greater risk of harm when faced with, or placed in, the especially stressful environment of solitary confinement.

50.    The scientific justifications for the special limits that must be placed on the way the juvenile justice system functions and the need to promote approaches to the treatment of juveniles that are developmentally appropriate and trauma informed are now obvious. They help to explain why every professional scientific, mental health, and medical

---

[54] Valentine, C., Restivo, E., & Wright, K. (2019). *Prolonged Isolation As a Predictor of Mental Health for Waived Juveniles*, J. of Offender Rehab., 58(4), 352-369, (2019) at p. 354. These researchers also found an association between amount of time spent solitary confinement and number of mental health diagnoses among juveniles who had been waived into the adult justice system.

[55] Hayes, *supra* note 9 at 42.

[56] Kaba, *et al.*, *supra* note 37.

organization that has opined on the matter has urged banning the use of solitary confinement for juveniles. (See Part II.E, below).

### D.  The Exacerbating Effects of Isolation on Mental Illness

51.    It is also now a widely accepted fact that incarcerated people who suffer from serious mental illnesses have a more difficult time tolerating the painful experience of isolation or solitary confinement. This empirical fact is also rooted in sound theory. It results in part from the greater vulnerability of people with mental illness in general to stressful, traumatic conditions, and in part because some of the extraordinary conditions of isolation adversely impact the particular symptoms from which seriously mentally ill people suffer (such as depression) or directly aggravate aspects of their pre-existing psychiatric conditions. There are several reasons why this is so.

52.    First, isolation subjects people to significantly more stress and psychological pain than other forms of imprisonment. People with mental illness are generally more sensitive and reactive to psychological stressors and emotional pain. In many ways, the harshness and severe levels of deprivation that are imposed on them in isolation are the antithesis of the kind of benign and socially supportive atmosphere that mental health clinicians seek to create within genuinely therapeutic environments. Not surprisingly, mentally ill people are more likely to deteriorate and decompensate when they are subjected to the harshness and stress of isolation.

53.    Second, the experience of isolation is psychologically destabilizing. It undermines a person's sense of self or social identity and erodes his connection to a shared social reality. Isolated incarcerated persons have few if any opportunities to receive feedback about their feelings and beliefs, which become increasingly untethered from any normal social context. In extreme cases, a related pattern emerges: isolated confinement becomes so painful, so bizarre, and so impossible to make sense of that some people create their own reality—they live in a world of fantasy instead of the intolerable one that surrounds them.

54.    Third, many of the direct negative psychological effects of isolation are themselves very similar if not identical to certain symptoms of mental illness. Even though the direct effects of isolation, experienced in reaction to adverse conditions of confinement, are generally less chronic than those that are produced by a diagnosable mental illness, they can add to and compound a mentally ill incarcerated person's outward manifestation of symptoms as well as the internal experience of their disorder. For example, many studies have documented the degree to which isolated confinement contributes to feelings of lethargy, hopelessness, and depression. For already clinically depressed incarcerated persons, these acute situational effects are likely to exacerbate their pre-existing chronic condition and lead to worsening of their depressed state. Similarly, the mood swings that some incarcerated persons report experiencing in isolation would be expected to amplify the pre-existing emotional instability that incarcerated persons diagnosed with bi-polar disorder suffer. Incarcerated persons who suffer from disorders of impulse control would likely find their pre-existing condition made worse by the frustration, irritability, and anger that many isolated incarcerated persons report experiencing. And incarcerated persons prone to psychotic breaks may suffer more in isolated confinement due to conditions that deny them the stabilizing influence of social feedback that grounds their sense of reality in a stable and meaningful social world.

55.    It is also important to note in this regard that the placement of people with serious mental illness in isolated confinement is not only harmful to them, but also jeopardizes the well-being of other incarcerated people as well as correctional staff. Incarcerated persons with mental illness whose psychiatric conditions are likely to worsen in confinement may become assaultive to staff and to other incarcerated persons. They frequently engage in loud, disruptive, and otherwise noxious behavior to which other incarcerated people and staff are exposed, and from which they cannot escape. This behavior can have a "ripple effect" throughout an entire unit, increasing the levels of tension and irritability of prisoners and staff, interfere with already troubled sleep patterns

among others, and further destabilize the atmosphere inside the housing unit. In addition, the acting out and non-compliant behavior of mentally ill incarcerated persons in isolation often precipitates forceful interventions by staff (e.g., the use of chemical agents) or group punishments that adversely affect the well-being of everyone in the unit.

### E. Professional Organizations Recommend Outright Prohibitions on Isolating Juveniles or People With Mental Illness

56.    The empirical literature on the harmful effects of solitary confinement has led to a consensus among professional scientific, mental health, human rights, and even correctional organizations that its use should be drastically limited overall and prohibited entirely in the case of certain vulnerable groups (such as juveniles and the mentally ill).

57.    The World Medical Association's position statement on this issue is representative of those taken by other similar organizations. The WMA opined specifically about the special vulnerability of juveniles to the harmful effects of solitary confinement, writing that it should be prohibited "for children and young people." When juveniles must be separated "in order to ensure their safety or the safety of others," the WMA said, that separation "should be carried out in a non-solitary confinement setting with adequate resources to meet their needs, including ensuring regular human contact and purposeful activity."[57]

58.    The recognition of the scientific consensus on harmful effects of solitary confinement, especially for juveniles, has led mental health organizations to issue guidelines that prohibit its use for youth. For example, the American Academy of Child & Adolescent Psychiatry issued a Policy Statement that it "opposes the use of solitary

---

[57] WMA Statement on Solitary Confinement. Adopted by the 65th WMA General Assembly, Durban, South Africa, October 2014, and revised by the 70th WMA General Assembly, Tbilisi, Georgia, October, 2019. https://www.wma.net/policies-post/wma-statement- on-solitary-confinement/.

confinement in correctional facilities for juveniles."[58] The American Psychiatric Association similarly has issued an official policy position statement that the use of isolation for juveniles should be avoided "due to the potential for harm" and the risk of depression, anxiety, and self-harm, and "should never be used for punitive purposes."[59] In fact, some mental health professionals have characterized the solitary confinement of youth as a form of "child abuse," and suggest that, correspondingly, it should be subject to the same reporting requirements as other forms of abuse.[60]

59.     Calls to drastically limit or end the practice in the U.S. are consistent with an international consensus about the counter-therapeutic nature of solitary confinement, including they ways in which imposing it on incarcerated juveniles often leads to the "progressive degeneration of [their] behavior" and a host of "negative physical and psychological impacts to the children involved."[61] In December 2015 the U.N. General Assembly adopted the *United Nations Standard Minimum Rules for the Treatment of Prisoners* ("the Nelson Mandela Rules") that, among other things, flatly prohibit the use of solitary for juveniles.[62]

---

[58]     AACAP, *Solitary Confinement of Juvenile Offenders*, April 2012, at https://www.aacap.org/AACAP/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx.

[59]     Amer. Psychiatric Assoc., *Position Statement on Solitary Confinement (Restricted Housing) of Juveniles*, May 2018, at https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Solitary-Confinement-Restricted-Housing-of-Juveniles.pdf.

[60]     *See* Andrew Clark, *Juvenile Solitary Confinement as a Form of Child Abuse*, J. of the Amer. Acad. of Psychiatry & Law, 43, 350-357 (2017).

[61]     *See* Elizabeth Grant, Rohan Lulham, & Bronwyn Naylor, *The Use of Segregation for Children in Australian Youth Detention Systems: An Argument for Prohibition*, Advancing Corrections, 3, 117- 136 (2017). *See also* Claire Banks, *From Isolation to Independence: A Comparison Study of Juvenile Solitary Confinement Practices in the United States and Germany*, Penn State J. of Law & Int'l Affairs, 8, 757-799 (2020).

[62]     U.N. Gen'l Assembly, 70th Sess., Agenda item 106, *United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules)*, adopted Dec. 17, 2015; distributed Jan. 8, 2016, at https://documents-dds-

60.     Similar to the consensus with regard to youth, widespread recognition of the heightened vulnerability of mentally ill incarcerated persons to the adverse psychological effects of isolated confinement has led numerous corrections officials, professional mental health groups, and human rights organizations to prohibit their placement in such units or, if it is absolutely necessary (and only as a last resort) to confine them there, to very strictly limit the duration of such confinement and to provide incarcerated persons with significant amounts of out-of-cell time and augmented access to care.

61.     In 2012, the American Psychiatric Association issued a Position Statement on Segregation of Prisoners with Mental Illness stating:

> Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic activities (i.e., mental health/psychiatric treatment) in appropriate programming space an adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for the individuals.[63]

62.     The APA's position on this issue reflected what was already an accepted fact at the time, namely that mentally ill incarcerated persons were especially vulnerable to isolation—and stress-related regression, deterioration, and decompensation that worsened their psychiatric conditions and intensified their mental health-related symptoms and maladies (including depression, psychosis, and self-harm).

63.     In 2017, the American Psychological Association acknowledged that solitary confinement was associated with heightened risk of self-mutilation and suicidality, a range of adverse psychological symptoms such as anxiety, depression, sleep disturbance, paranoia and aggression as well as the exacerbation of pre-existing mental illness and

---

ny.un.org/doc/UNDOC/GEN/N15/443/41/PDF/N1544341.pdf?OpenElement. The Rules also prohibit the use of solitary on people with mental illness.
    [63]Amer. Psychiatric Assoc., *Segregation of Prisoners with Mental Illness* (2012), *at* http://www.psychiatry.org/advocacy--newsroom/position-statements.

trauma-related symptoms.[64] The American Public Health Association issued a statement in which it detailed the public-health harms posed by solitary confinement, urged correctional authorities to "eliminate solitary confinement for security purposes unless no other less restrictive option is available to manage a current, serious, and ongoing threat to the safety of others," and recommended that "[p]unitive segregation should be eliminated."[65] The position statement of the Society of Correctional Physicians similarly acknowledged "that prolonged segregation of incarcerated people with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment."[66]

64.    Other organizations have also recommended drastically limiting the use of solitary confinement and banning it outright for use with incarcerated persons who are mentally ill, including the National Commission on Correctional Healthcare ("NCCHC"). NCCHC's guidelines on this issue are especially notable because it is an organization of professionals who work in prison medical and mental health care. Its Position Statement includes a provision that juveniles, mentally ill people, and pregnant women should be "excluded from solitary confinement of *any* duration" (emphasis added), and that health care staff should advocate to correctional officials that juveniles and mentally ill people be barred entirely from such isolation.[67] Similarly, the National Alliance on Mental Illness

---

[64] Amer. Psychological Assoc., *Solitary Confinement of Juvenile Offenders*, (2017), at https://www.apa.org/about/gr/issues/cyf/solitary.pdf

[65] Amer. Public Health Assoc., *Solitary Confinement as a Public Health Issue*, Policy No. 201310. (2013), at http://www.apha.org/advocacy/policy/policysearch/default.htm?id=1462

[66] Soc. of Correctional Physicians, *Restricted Housing of Mentally Ill Inmates* (2013), at http://societyofcorrectionalphysicians.org/resources/position-statements/restricted-housing-of-mentally-ill-inmates

[67] Nat'l Comm. on Corr. Healthcare, *Position Statement: Solitary Confinement (Isolation)*, J. of Corr. Health Care, 22(3), 357-263 (2016).

issued a statement "oppos[ing] the use of solitary confinement and equivalent forms of extended administrative segregation for persons with mental illnesses."[68]

65.    Courts that have been presented with evidence on this issue have reached the same conclusions about the vulnerability of the mentally ill to isolation. For example, almost 30 years ago, one such court addressed the effects of solitary confinement. The judge noted that those incarcerated persons for whom the psychological risks of isolated confinement were "particularly"—and unacceptably—high, included anyone suffering from "overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of the conditions in [solitary confinement]."[69] That court found that the group of incarcerated persons who must be excluded from isolation should include

> [T]he already mentally ill, as well as persons with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression. For these inmates, placing them in [isolated confinement] is the mental equivalent of putting an asthmatic in a place with little air to breathe. The risk is high enough, and the consequences serious enough, that we have no hesitancy in finding that the risk is plainly "unreasonable."[70]

## III.    CONDITIONS AT THE OJJ ANGOLA UNIT MAGNIFY THE RISK OF SERIOUS HARM

66.    The physical structure and architecture of the OJJ Angola Unit magnify the risk of harm to youth held for prolonged periods of time in the cells. As noted in Paragraph 12, I have in the past toured and inspected the old Death Row facility now operating as the OJJ Angola Unit, and I reviewed the photos taken in September 2022 by Mr. Schiraldi of the facility, and entered into evidence with the court at the hearing on Plaintiffs' prior motion for a preliminary injunction.

---

[68] Nat'l Alliance on Mental Illness. *Public Policy Platform of the National Alliance on Mental Illness, 12th Ed.*, Sect. 9.8, at https://www.nami.org/About-NAMI/Policy-Platform.

[69] *Madrid v. Gomez*, 889 F.Supp. 1146, 1265 (N.D. Cal. 1995).

[70] *Id.*

67.    These cells are spartan:





*See* Plfs' Ex. 20 at 299-303:

68.    As shown above, the cells are windowless and the walls are concrete blocks. The youth report that they have no form of entertainment while in their cells except for televisions placed in the hallway outside their cells. They report (and photos show) that these cells have no air conditioning.

69.     Indeed, this facility previously functioned as a high-security housing unit for adults who had been condemned to death in Louisiana. It is harsh, barren, and inhospitable. Architecturally, the cell design and unit configuration emphasize heightened security and institutional control, rather than providing adequate spaces to accommodate and encourage rehabilitation and treatment. The razor wire, locking mechanisms, and security gates and screens reflect the facility's original purpose as Death Row. It is hardly a place to house children at all, let alone to subject them to long periods of what amounts to solitary confinement.














Plf's Ex. 20, Nos. 212-13, 279-80, 301, 318, 320-21, 382, 397.

## IV.    CONCLUSION

70.    Based on the allegations in the documents I reviewed, and the research summarized above, it is my opinion that the youth at the OJJ Angola Unit are subjected to inappropriate and dangerous living conditions. The practice of locking children in their cells for long periods of time during which they are deprived of meaningful social contact and purposeful activity is not only painful, but places them at significant risk of serious harm. Given the developmental vulnerability of the children in question, the potential of the resulting harm and damage to become irreversible and, in the case of suicidal behavior, even fatal, is greatly heightened.

71.    OJJ Angola or any other maximum custody adult prison is no place for children. The youth housed there should be removed immediately and placed in a juvenile facility properly equipped to provide the treatment, programs, and services that they need.

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 16, 2023, in Santa Cruz, California.

Craig W. Haney, Ph.D., J.D.

37

# EXHIBIT 1

CURRICULUM VITAE


Craig William Haney
Distinguished Professor of Psychology
UC Presidential Chair, 2015-2018
University of California, Santa Cruz 95064


home address:    ███████████████ .
                 ███████████████████
phone:           (831) 459-2153
fax:             (831) 425-3664
email:           psylaw@ucsc.edu


EMPLOYMENT HISTORY

| | |
|---|---|
| 2015-2018 | University of California Presidential Chair |
| 2014-present | Distinguished Professor of Psychology, University of California, Santa Cruz |
| 1985-2014 | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |


EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |
| 1978 | Stanford University, Ph.D. (Psychology) |

1972              Stanford University, M.A. (Psychology)

1970              University of Pennsylvania, B.A.


HONORS AWARDS GRANTS

2022              Appointed to the American Psychological Association *Amicus Curiae* Expert Panel ("ACEP").

                 Nominated for the Social Science Research Council's Albert O. Hirschman Prize for Excellence in Social and Behavioral Science.

                 Psychology Department "Most Inspiring Instructor"

                 Appointed to American Psychological Association Presidential Task Force on Raising the Age at Which Persons Are Eligible for Capital Punishment

2021              Finalist, Association of American Publishers, Professional and Scholarly Excellence (PROSE) Award for Excellence in Social Science (for Criminality in Context: Psychological Foundations of Criminal Justice Reform).

2020              Finalist, Stockholm Prize in Criminology (for "outstanding achievements in criminological research or for the application of research results by practitioners for the reduction of crime and the advancement of human rights").

2018              Emerald Literati Award for "Outstanding Paper" (for "Reducing the Use and Impact of Solitary Confinement in Corrections").

2016              Vera Institute of Justice "Reimagining Prisons" Initiative Advisory Council.

                 Psychology Department "Most Inspiring Instructor"

2015              University of California Presidential Chair (2015-2018 Term)

                 Martin F. Chemers Award for Outstanding Research in Social Science

                 Excellence in Teaching Award (Academic Senate Committee on Teaching).

                 President's Research Catalyst Award for "UC Consortium on Criminal Justice Healthcare" (with Brie Williams and Scott Allen).

Vera Institute of Justice "Safe Alternatives to Segregation" (SAS) Initiative Advisory Council.

Who's Who in Psychology (Top 20 Psychology Professors in California) [http://careersinpsychology.org/psychology-degrees-schools-employment-ca/#ca-psych-prof]

| 2014 | Distinguished Faculty Research Lecturer, University of California, Santa Cruz. |
|------|---|
| 2013 | Distinguished Plenary Speaker, American Psychological Association Annual Convention. |
| 2012 | Appointed to National Academy of Sciences Committee to Study the Causes and Consequences of High Rates of Incarceration in the United States. |
| | Invited Expert Witness, United States Senate, Judiciary Committee. |
| 2011 | Edward G. Donnelly Memorial Speaker, University of West Virginia Law School. |
| 2009 | Nominated as American Psychological Foundation William Bevan Distinguished Lecturer. |
| | Psi Chi "Best Lecturer" Award (by vote of UCSC undergraduate psychology majors). |
| 2006 | Herbert Jacobs Prize for Most Outstanding Book published on law and society in 2005 (from the Law & Society Association, for Death by Design). |
| | Nominated for National Book Award (by American Psychological Association Books, for Reforming Punishment: Psychological Limits to the Pains of Imprisonment). |
| | "Dream course" instructor in psychology and law, University of Oklahoma. |
| 2005 | Annual Distinguished Faculty Alumni Lecturer, University of California, Santa Cruz. |
| | Invited Expert Witness, United States House of Representatives, Subcommittee on Immigration, Border Security, and Claims, Committee on the Judiciary |

Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association (co-recipient).

Scholar-in-Residence, Center for Social Justice, Boalt Hall School of Law (University of California, Berkeley).

2004     "Golden Apple Award" for Distinguished Teaching, awarded by the Social Sciences Division, University of California, Santa Cruz.

National Science Foundation Grant to Study Capital Jury Decision-making

2002     Santa Cruz Alumni Association Distinguished Teaching Award, University of California, Santa Cruz.

United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project.

American Association for the Advancement of Science/American Academy of Forensic Science Project: "Scientific Evidence Summit" Planning Committee.

Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

2000     Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy.

Excellence in Teaching Award (Academic Senate Committee on Teaching).

Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists.

1999     American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future")

National Science Foundation Grant to Study Capital Jury Decision-making (renewal and extension).

1997     National Science Foundation Grant to Study Capital Jury Decision-making.

1996     Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

1995     Gordon Allport Intergroup Relations Prize (Honorable Mention)

4

|  | Excellence in Teaching Convocation, Social Sciences Division |
|---|---|
| 1994 | Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice. |
| 1992 | Psychology Undergraduate Student Association Teaching Award |
|  | SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities |
| 1991 | Alumni Association Teaching Award ("Favorite Professor") |
| 1990 | Prison Law Office Award for Contributions to Prison Litigation |
| 1989 | UC Mexus Award for Comparative Research on Mexican Prisons |
| 1976 | Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School |
| 1975-76 | Law and Psychology Fellow, Stanford Law School |
| 1974-76 | Russell Sage Foundation Residency in Law and Social Science |
| 1974 | Gordon Allport Intergroup Relations Prize, Honorable Mention |
| 1969-71 | University Fellow, Stanford University |
| 1969-74 | Society of Sigma Xi |
| 1969 | B.A. Degree Magna cum laude with Honors in Psychology |
|  | Phi Beta Kappa |
| 1967-1969 | University Scholar, University of Pennsylvania |


UNIVERSITY SERVICE AND ADMINISTRATION

| 2010-2016 | Director, Legal Studies Program |
|---|---|
| 2010-2014 | Director, Graduate Program in Social Psychology |
| 2009 | Chair, Legal Studies Review Committee |

| 2004-2006 | Chair, Committee on Academic Personnel |
| 1998-2002 | Chair, Department of Psychology |
| 1994-1998 | Chair, Department of Sociology |
| 1992-1995 | Chair, Legal Studies Program |
| 1995 (Fall) | Committee on Academic Personnel |
| 1995-1996 | University Committee on Academic Personnel (UCAP) |
| 1990-1992 | Committee on Academic Personnel |
| 1991-1992 | Chair, Social Science Division Academic Personnel Committee |
| 1984-1986 | Chair, Committee on Privilege and Tenure |

## WRITINGS AND OTHER CREATIVE ACTIVITIES IN PROGRESS

Books:

Counting Casualties in the War on Prisoners: Toward a Just and Lasting Peace (working title, in preparation).

Articles:

"The Psychological Foundations of Capital Mitigation: Why Social Historical Factors Are Central to Assessing Culpability," in preparation.

## PUBLISHED WRITINGS AND CREATIVE ACTIVITIES

Books

| 2020 | Criminality in Context: The Psychological Foundations of Criminal Justice Reform. Washington, DC: American Psychological Association Books. |
| 2014 | The Growth of Incarceration in the United States: Exploring the Causes and Consequences (with Jeremy Travis, Bruce Western, et al.). [Report of the National Academy of Sciences Committee on the |

6

Causes and Consequences of High Rates of Incarceration in the United States.] Washington, DC: National Academy Press.

2006      Reforming Punishment: Psychological Limits to the Pains of Imprisonment, Washington, DC: American Psychological Association Books.

2005      Death by Design: Capital Punishment as a Social Psychological System. New York: Oxford University Press.


Monographs and Technical Reports

1989      Employment Testing and Employment Discrimination (with Hurtado). Technical Report for the National Commission on Testing and Public Policy. New York: Ford Foundation.

2005      Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal (Appendix C in Study of Asylum Seekers in Expedited Removal as Authorized by Section 605 of International Religious Freedom Act of 1998).


Articles in Professional Journals and Book Chapters

2023      "Choosing Between Life and Death: Capital Jury Penalty-Phase Decision-Making," in M. Miller, L. Yelderman, M. Huss, & J. Cantone (Eds.), Cambridge Handbook of the Psychology of Legal Decision-Making, in press.

"The Resource Team: A Case Study of Solitary Confinement Reform in Oregon" (with David Cloud, Dallas Augustine, Cyrus Ahalt, & Brie Williams), PLOS ONE, in press.

2022      "Roper and Race: The Nature and Effects of Death Penalty Exclusions for Juveniles and the 'Late Adolescent Class'" (with Frank R. Baumgartner & Karen A. Steele), Journal of Pediatric Neuropsychology, 8, 168-177.

"Sykes's Prison in Context: Change and Continuity in the Life Span of a Penitentiary," in B. Crewe, A. Goldsmith, & M. Halsey (Eds.), Power and Pain in the Modern Prison: The Society of Captives Revisited (pp. 11-35). New York: Oxford University Press.

"The Continuing Unfairness of Death Qualification: Changing Death Penalty Attitudes and Capital Jury Selection" (with Eileen Zurbriggen & Joanna Weill), <u>Psychology, Public Policy, and Law</u>, <u>28(1)</u>, 1-31.

"The Impact of Isolation on Brain Health" (with Vibol Heng and Richard Smeyne), in M. Zigmond, L. Rowland, & J. Coyle (Eds.), <u>The Neurobiology of Brain Disorders: Biological Basis of Neurological and Psychiatric Disorders</u>. Second Edition. Elsevier, in press.

2021    "'We Just Need to Open the Door': A Case Study of North Dakota Department of Corrections' Quest to End Solitary Confinement" (with David Cloud, Dallas Augustine, Cyrus Ahalt, Lisa Peterson, Colby Braun, & Brie Williams), <u>Heath & Justice</u>, 9(28). https://doi.org/10.1186/s40352-021-00155-5

"The Death Qualification Process Continues to Render Capital Juries Less Representative and More Unfair. <u>Amicus Journal</u>, <u>42</u>, 20-25.

"Framing Criminal Justice and Crime in the News, 2015-2017" (with Camille Conrey), <u>Journal of Crime and Justice</u>, 44(3), 297-315.

2020    "Solitary Confinement, Loneliness, and Psychological Harm," in Jules Lobel and Peter Scharff Smith (Eds.), <u>Solitary Confinement: Effects, Practices, and Pathways to Reform</u> (129-152). New York: Oxford University Press.

"Continuing to Acknowledge the Power of Dehumanizing Environments: Responding to Haslam, et al. (2019) and Le Texier (2019)" (with Philip Zimbardo), <u>American Psychologist</u>, <u>75(3)</u>, 400-402.

"The Science of Solitary: Expanding the Harmfulness Narrative," <u>Northwestern Law Review</u>, <u>115(1)</u>, 211-256.

"Consensus Statement from the Santa Cruz Summit on Solitary Confinement and Health" (with Brie Williams and Cyrus Ahalt), <u>Northwestern University Law Review</u>, <u>115(1)</u>, 335-360.

"Solitary Confinement is Not Solitude: The Worst Case Scenario of Being 'Along' in Prison," in Robert Coplan, Julie Bowker, & Larry Nelson (Eds.), <u>Handbook of Solitude: Psychological Perspectives on</u>

8

Isolation, Social Withdrawal, and Being Alone (pp. 390-403). Second Edition. New York: Wiley-Blackwell.

2019     "Afterword," in Robert Johnson, Condemned to Die: Life Under Sentence of Death (pp. 137-141). Second Edition. New York: Routledge.

"Changing Correctional Culture: Exploring the Role of U.S.-Norway Exchange in Placing Health and Well-Being at the Center of U.S. Prison Reform" (with Cyrus Ahalt, Brie Williams, and Kim Ekhaugen), American Journal of Public Health, 110(S1), S27-S29.

2018     "Restricting the Use of Solitary Confinement," Annual Review of Criminology, 1, 285-310.

"Death Qualification in Black and White: Racialized Decision-Making and Death-Qualified Juries" (with Mona Lynch), Law & Policy, 40(2), 148-171.

"Balancing the Rights to Protection and Participation: A Call for Expanded Access to Ethically Conducted Correctional Research. Journal of General Internal Medicine, 33(22). DOI: 10.1007/s11606-018-4318-9.

"The Plight of Long-Term Mentally-Ill Prisoners" (with Camille Conrey and Roxy Davis), in Kelly Frailing and Risdon Slate (Eds.), The Criminalization of Mental Illness (pp. 163-180). Durham, NC: Carolina Academic Press.

"The Psychological Effects of Solitary Confinement: A Systematic Critique," Crime and Justice, 47, 365-416.

"The Media's Impact on the Right to a Fair Trial: A Content Analysis of Pretrial Publicity in Capital Cases (with Shirin Bakhshay), Psychology, Public Policy, and Law, 24, 326-346.

2017     "Mechanisms of Moral Disengagement and Prisoner Abuse" (with Joanna Weill). Analyses of Social Issues and Public Policy, 17, 286-318.

"'Madness' and Penal Confinement: Observations on Mental Illness and Prison Pain," Punishment and Society, 19, 310-326.

9

"Contexts of Ill-Treatment: The Relationship of Captivity and Prison Confinement to Cruel, Inhuman, or Degrading Treatment and Torture" (with Shirin Bakhshay), in Metin Başoğlu (Ed.), Torture and Its Definition in International Law: An Interdisciplinary Approach (pp. 139-178). New York: Oxford.

Special Issue: "Translating Research into Policy to Advance Correctional Health" (guest editor with B. Williams, C. Ahalt, S. Allen, & J. Rich), Part II, International Journal of Prisoner Health, 13, 137-227.

"Reducing the Use and Impact of Solitary Confinement in Corrections" (with Cyrus Ahalt, Sarah Rios, Matthew Fox, David Farabee, and Brie Williams), International Journal of Prisoner Health, 13, 41-48.

2016        "Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful" (with Joanna Weill, Shirin Bakhshay, and Tiffany Winslow), The Prison Journal, 96, 126-152.

"On Structural Evil: Disengaging From Our Moral Selves," Review of the book Moral Disengagement: How People Do Harm and Live With Themselves, by A. Bandura], PsycCRITIQUES, 61(8).

2015        "When Did Prisons Become Acceptable Mental Healthcare Facilities?," Report of the Stanford Law School Three Strikes Project (with Michael Romano et al.) [available at: http://law.stanford.edu/wp-content/uploads/sites/default/files/child-page/632655/doc/slspublic/Report_v12.pdf ].

"Emotion, Authority, and Death: (Raced) Negotiations in Capital Jury Negotiations" (with Mona Lynch), Law & Social Inquiry, 40, 377-405.

"Prison Overcrowding," in B. Cutler & P. Zapf (Eds.), APA Handbook of Forensic Psychology (pp. 415-436). Washington, DC: APA Books.

"The Death Penalty" (with Joanna Weill & Mona Lynch), in B. Cutler & P. Zapf (Eds.), APA Handbook of Forensic Psychology (pp. 451-510). Washington, DC: APA Books.

"'Prisonization' and Latinas in Alternative High Schools" (with Aida Hurtado & Ruby Hernandez), in J. Hall (Ed.), Routledge Studies in

10

Education and Neoliberalism: Female Students and Cultures of Violence in the City (pp. 113-134). Florence, KY: Routledge.

2014      "How Healthcare Reform Can Transform the Health of Criminal Justice-Involved Individuals" (with Josiah Rich, et al.), Health Affairs, 33:3 (March), 1-6.

2013      "Foreword," for H. Toch, Organizational Change Through Individual Empowerment: Applying Social Psychology in Prisons and Policing. Washington, DC: APA Books.

"Foreword," for J. Ashford & M. Kupferberg, Death Penalty Mitigation: A Handbook for Mitigation Specialists, Investigators, Social Scientists, and Lawyers. New York: Oxford University Press.

2012      "Politicizing Crime and Punishment: Redefining 'Justice' to Fight the 'War on Prisoners,'" West Virginia Law Review, 114, 373-414.

"Prison Effects in the Age of Mass Incarceration," Prison Journal, 92, 1-24.

"The Psychological Effects of Imprisonment," in J. Petersilia & K. Reitz (Eds.), Oxford Handbook of Sentencing and Corrections (pp. 584-605). New York: Oxford University Press.

2011      "The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement," American Criminal Law Review, 48, 121-141. [Reprinted in: S. Ferguson (Ed.), Readings in Race, Gender, Sexuality, and Social Class. Sage Publications (2012).]

"Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide'" (with Mona Lynch), Law and Society Review, 45, 69-102.

"Getting to the Point: Attempting to Improve Juror Comprehension of Capital Penalty Phase Instructions" (with Amy Smith), Law and Human Behavior, 35, 339-350.

"Where the Boys Are: Macro and Micro Considerations for the Study of Young Latino Men's Educational Achievement" (with A. Hurtado & J. Hurtado), in P. Noguera & A. Hurtado (Eds.),

Understanding the Disenfranchisement of Latino Males: Contemporary Perspectives on Cultural and Structural Factors (pp. 101-121). New York: Routledge Press.

"Looking Across the Empathic Divide: Racialized Decision-Making on the Capital Jury" (with Mona Lynch), Michigan State Law Review, 2011, 573-608.

2010    "Demonizing the 'Enemy': The Role of Science in Declaring the 'War on Prisoners,'" Connecticut Public Interest Law Review, 9, 139-196.

"Hiding From the Death Penalty," Huffington Post, July 26, 2010 [www.huffingtonpost.com/craig-haney/hiding-from-the-death-pen-pen_b_659940.html]; reprinted in Sentencing and Justice Reform Advocate, 2, 3 (February, 2011).

2009    "Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination" (with Mona Lynch), Law and Human Behavior, 33, 481-496.

"The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful," Prison Service Journal UK (Solitary Confinement Special Issue), Issue 181, 12-20. [Reprinted: California Prison Focus, #36, 1, 14-15 (2011).]

"The Stanford Prison Experiment," in John Levine & Michael Hogg (Eds.), Encyclopedia of Group Processes and Intergroup Relations. Thousand Oaks, CA: Sage Publications.

"Media Criminology and the Death Penalty," DePaul Law Review, 58, 689-740. (Reprinted: Capital Litigation Update, 2010.)

"On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence," University of Missouri-Kansas City Law Review, 77, 911-946.

"Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse," (with P. Zimbardo), Personality and Social Psychology Bulletin, 35, 807-814.

2008    "Counting Casualties in the War on Prisoners," University of San Francisco Law Review, 43, 87-138.

"Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation," Hofstra Law Review, 36, 835-882.

"A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons," Criminal Justice and Behavior, 35, 956-984.

"The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing.

"The Stanford Prison Experiment," in J. Bennett & Y. Jewkes (Eds.), Dictionary of Prisons (pp. 278-280). Devon, UK: Willan Publishers.

"Capital Mitigation," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 60-63). Volume I. Thousand Oaks, CA: Sage Publications.

Death Qualification of Juries," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 190-192). Volume I. Thousand Oaks, CA: Sage Publications.

"Stanford Prison Experiment," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 756-757) (with P. Zimbardo). Volume II. Thousand Oaks, CA: Sage Publications.

"Supermax Prisons," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 787-790). Volume II. Thousand Oaks, CA: Sage Publications.

2006    "The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions," Washington University Journal of Law & Policy, 22, 265-293. [Reprinted in: N. Berlatsky, Opposing Viewpoints: America's Prisons. Florence, KY: Cengage Learning, 2010.]

"Exonerations and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Capital Cases," Golden Gate Law Review, 37, 131-173.

"Preface," D. Jones (Ed.), Humane Prisons. San Francisco, CA: Radcliffe Medical Press.

2005    "The Contextual Revolution in Psychology and the Question of

13

Prison Effects," in Alison Liebling and Shadd Maruna (Eds.), The Effects of Imprisonment (pp. 66-93). Devon, UK: Willan Publishing.

"Achieving Educational Equity: Beyond Individual Measures of Merit," (with A. Hurtado), Harvard Journal of Hispanic Policy, 17, 87-92.

"Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal," in M. Hetfield (Ed.), Report on Asylum Seekers in Expedited Removal. Volume II: Expert Reports. Washington, DC: United States Commission on International Religious Freedom.

2004    "Special Issue on the Death Penalty in the United States" (co-edited with R. Weiner), Psychology, Public Policy, and Law, 10, 374-621.

"Death Is Different: An Editorial Introduction" (with R. Wiener), Psychology, Public Policy, and Law, 10, 374-378.

"The Death Penalty in the United States: A Crisis of Conscience" (with R. Wiener), Psychology, Public Policy, and Law, 10, 618-621.

"Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide," DePaul Law Review, 53, 1557-1590.

"Capital Constructions: Newspaper Reporting in Death Penalty Cases" (with S. Greene), Analyses of Social Issues and Public Policy (ASAP), 4, 1-22.

"Abu Ghraib and the American Prison System," The Commonwealth, 98 (#16), 40-42.

"Disciplinary Segregation," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (240-244). Volume 1. Thousand Oaks, CA: Sage Publications.

"Super-Maximum Secure Prisons," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (pp. 938-944). Volume 2. Thousand Oaks, CA: Sage Publications.

2003    "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," Crime & Delinquency (special issue on mental health and the criminal justice system), 49, 124-156. [Reprinted in:

Roesch, R., & Gagnon, N. (Eds.), <u>Psychology and Law: Criminal and Civil Perspectives</u>. Hampshire, UK: Ashgate (2007).]

"The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment," in Travis, J., & Waul, M. (Eds.), <u>Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities</u> (pp. 33-66). Washington, DC: Urban Institute Press.

"Comments on "Dying Twice": Death Row Confinement in the Age of the Supermax," <u>Capital University Law Review</u>.

2002    "Making Law Modern: Toward a Contextual Model of Justice, <u>Psychology, Public  Policy, and Law</u>, <u>7</u>, 3-63.

"Psychological Jurisprudence: Taking Psychology and Law into the Twenty-First Century," (with John Darley, Sol Fulero, and Tom Tyler), in J. Ogloff (Ed.), <u>Taking Psychology and Law into the Twenty-First Century</u> (pp. 35-59). New York: Kluwer Academic/ Plenum Publishing.

"Science, Law, and Psychological Injury: The <u>Daubert</u> Standards and Beyond," (with Amy Smith), in Schultz, I., Brady, D., and Carella, S., <u>The Handbook of Psychological Injury</u> (pp. 184-201). Chicago, IL: American Bar Association. [CD-ROM format]

2001    "Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times" (with D. Specter). In J. Ashford, B. Sales, & W. Reid (Eds.), <u>Treating Adult and Juvenile Offenders with Special Needs</u> (pp. 51-79). Washington, D.C.: American Psychological Association.

"Afterword," in J. Evans (Ed.), <u>Undoing Time</u> (pp. 245-256). Boston, MA: Northeastern University Press.

2000    "Discrimination and Instructional Comprehension: Guided Discretion, Racial Bias, and the Death Penalty" (with M. Lynch), <u>Law and Human Behavior</u>, <u>24</u>, 337-358.

"Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," (with S. Greene and A. Hurtado), <u>Prison Journal</u>, <u>80</u>, 3-23.

1999    "Reflections on the Stanford Prison Experiment: Genesis,

15

Transformations, Consequences ('The SPE and the Analysis of Institutions')," In Thomas Blass (Ed.), <u>Obedience to Authority: Current Perspectives on the Milgram Paradigm</u> (pp. 221-237). Hillsdale, NJ: Erlbaum.

"Ideology and Crime Control," <u>American Psychologist</u>, <u>54</u>, 786-788.

1998       "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," (with P. Zimbardo), <u>American Psychologist</u>, <u>53</u>, 709-727. [Reprinted in special issue of Norweigian journal as: USAs fengselspolitikk i fortid og fremtid, <u>Vardoger</u>, 25, 171-183 (2000); in H. Tischler (Ed.), <u>Debating Points: Crime and Punishment</u>. Englewood Cliffs, NJ: Prentice-Hall (2001); <u>Annual Editions</u>: <u>Criminal Justice</u>. Guilford, CT: Dushkin/McGraw-Hill, in press; Herman, Peter (Ed.), <u>The American Prison System</u> (pp. 17-43) (Reference Shelf Series). New York: H.W. Wilson (2001); and in Edward Latessa & Alexander Holsinger (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u>. Fourth Edition. Oxford University Press (2010).]

"Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," <u>Hastings Women's Law Journal</u>, <u>9</u>, 27-78.

"Becoming the Mainstream: "Merit," Changing Demographics, and Higher Education in California" (with A. Hurtado and E. Garcia), <u>La Raza Law Journal</u>, <u>10</u>, 645-690.

1997       "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," (with M. Lynch), <u>New York University Review of Law and Social Change</u>, <u>23</u>, 477-570.

"Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 499-588.

"Commonsense Justice and the Death Penalty: Problematizing the 'Will of the People,'" <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 303-337.

"Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," <u>Stanford Law Review</u>, <u>49</u>, 1447-1486.

"Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice." In James Acker, Robert Bohm,

and Charles Lanier, <u>America's Experiment with Capital Punishment</u>: <u>Reflections on the Past, Present, and Future of the Ultimate Penal Sanction</u>. Durham, NC: Carolina Academic Press, 343-377.

"Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Arguments" (with M. Lynch), <u>Law and Human Behavior</u>, <u>21</u>, 575-595.

"Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" <u>Studies in Law, Politics, and Society</u>, <u>16</u>, 3-69.

1995    "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," <u>Santa Clara Law Review</u>, <u>35</u>, 547-609. [Reprinted in part in David Papke (Ed.), <u>Law and Popular Culture</u>, Lexis/Nexis Publications, 2011)].

"Taking Capital Jurors Seriously," <u>Indiana Law Journal</u>, <u>70</u>, 1223-1232.

"Death Penalty Opinion: Myth and Misconception," <u>California Criminal Defense Practice Reporter</u>, <u>1995(1)</u>, 1-7.

1994    "The Jurisprudence of Race and Meritocracy: Standardized Testing and 'Race-Neutral' Racism in the Workplace," (with A. Hurtado), <u>Law and Human Behavior</u>, <u>18</u>, 223-248.

"Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions" (with M. Lynch), <u>Law and Human Behavior</u>, <u>18</u>, 411-434.

"Felony Voir Dire: An Exploratory Study of Its Content and Effect," (with C. Johnson), <u>Law and Human Behavior</u>, <u>18</u>, 487-506.

"Broken Promise: The Supreme Court's Response to Social Science Research on Capital Punishment" (with D. Logan), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 75-101.

"Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death" (with L. Sontag and S. Costanzo), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 149-176. [Reprinted in Koosed, M. (Ed.), <u>Capital Punishment</u>. New York: Garland Publishing (1995).]

17

"Modern' Death Qualification: New Data on Its Biasing Effects," (with A. Hurtado and L. Vega), <u>Law and Human Behavior</u>, <u>18</u>, 619-633.

"Processing the Mad, Badly," <u>Contemporary Psychology</u>, <u>39</u>, 898-899.

"Language is Power," <u>Contemporary Psychology</u>, <u>39</u>, 1039-1040.

1993    "Infamous Punishment: The Psychological Effects of Isolation," <u>National Prison Project Journal</u>, <u>8</u>, 3-21. [Reprinted in Marquart, James & Sorensen, Jonathan (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u> (pp. 428-437). Los Angeles: Roxbury Publishing (1997); Alarid, Leanne & Cromwell, Paul (Eds.), <u>Correctional Perspectives: Views from Academics, Practitioners, and Prisoners</u> (pp. 161-170). Los Angeles: Roxbury Publishing (2001).]

"Psychology and Legal Change: The Impact of a Decade," <u>Law and Human Behavior</u>, <u>17</u>, 371-398. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), <u>Psychology and Law: Criminal and Civil Perspectives</u>. Hampshire, UK: Ashgate (2007).]

1992    "Death Penalty Attitudes: The Beliefs of Death-Qualified Californians," (with A. Hurtado and L. Vega). <u>Forum</u>, <u>19</u>, 43-47.

"The Influence of Race on Sentencing: A Meta-Analytic Review of Experimental Studies." (with L. Sweeney). Special issue on Discrimination and the Law. <u>Behavioral Science and Law</u>, <u>10</u>, 179-195.

1991    "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," <u>Law and Human Behavior</u>, <u>15</u>, 183-204.

1988    "In Defense of the Jury," <u>Contemporary Psychology</u>, <u>33</u>, 653-655.

1986    "Civil Rights and Institutional Law: The Role of Social Psychology in Judicial Implementation," (with T. Pettigrew), <u>Journal of Community Psychology</u>, <u>14</u>, 267-277.

1984        "Editor's Introduction.  Special Issue on Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 1-6.

"On the Selection of Capital Juries:  The Biasing Effects of Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 121-132.

"Examining Death Qualification:  Further Analysis of the Process Effect," <u>Law and Human Behavior</u>, <u>8</u>, 133-151.

"Evolving Standards and the Capital Jury," <u>Law and Human Behavior</u>, <u>8</u>, 153-158.

"Postscript," <u>Law and Human Behavior</u>, <u>8</u>, 159.

"Social Factfinding and Legal Decisions:  Judicial Reform and the Use of Social Science."  In Muller, D., Blackman, D., and Chapman, A. (Eds.), <u>Perspectives in Psychology and Law</u>.  New York:  John Wiley, pp. 43-54.

1983        "The Future of Crime and Personality Research:  A Social Psychologist's View," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavioral Behavior</u>.  Lexington, Mass.:  Lexington Books, pp. 471-473.

"The Good, the Bad, and the Lawful:  An Essay on Psychological Injustice," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavior</u>.  Lexington, Mass.: Lexington Books, pp. 107-117.

"Ordering the Courtroom, Psychologically," <u>Jurimetrics</u>, <u>23</u>, 321-324.

1982        "Psychological Theory and Criminal Justice Policy:  Law and Psychology in the 'Formative Era,'" <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Presser, S. and Zainaldin, J. (Eds.), <u>Law and American History: Cases and Materials</u>. Minneapolis, MN: West Publishing, 1989; and in C. Kubrin, T. Stucky & A. Tynes (Eds.) <u>Introduction to Criminal Justice: A Sociological Perspective</u>. Palo Alto, CA: Stanford University Press (2012).]

"Data and Decisions: Social Science and Judicial Reform," in P. DuBois (Ed.), <u>The Analysis of Judicial Reform</u>.  Lexington, Mass.: D.C. Heath, pp. 43-59.

"Employment Tests and Employment Discrimination:  A Dissenting Psychological Opinion," <u>Industrial Relations Law Journal</u>, <u>5</u>, pp. 1-86.

"To Polygraph or Not:  The Effects of Preemployment Polygraphing on Work-Related Attitudes," (with L. White and M. Lopez), <u>Polygraph</u>, <u>11</u>, 185-199.

1981    "Death Qualification as a Biasing Legal Process," <u>The Death Penalty Reporter</u>, <u>1</u> (<u>10</u>), pp. 1-5. [Reprinted in <u>Augustus: A Journal of Progressive</u> <u>Human Sciences</u>, <u>9(3)</u>, 9-13 (1986).]

1980    "Juries and the Death Penalty:  Readdressing the <u>Witherspoon</u> Question," <u>Crime and Delinquency</u>, October, pp. 512-527.

"Psychology and Legal Change: On the Limits of a Factual Jurisprudence," <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Loh, Wallace (Ed.), <u>Social Research and the Judicial Process.</u> New York: Russell Sage, 1983.]

"The Creation of Legal Dependency:  Law School in a Nutshell" (with M. Lowy), in R. Warner (Ed.), <u>The People's Law Review</u>. Reading, Mass.: Addison-Wesley, pp. 36-41.

"Television Criminology:  Network Illusions of Criminal Justice Realities" (with J. Manzolati), in E. Aronson (Ed.), <u>Readings on the Social Animal</u>. San Francisco, W.H. Freeman, pp. 125-136.

1979    "A Psychologist Looks at the Criminal Justice System," in A. Calvin (Ed.), <u>Challenges and Alternatives to the Criminal Justice System.</u> Ann Arbor: Monograph Press, pp. 77-85.

"Social Psychology and the Criminal Law," in P. Middlebrook (Ed.), <u>Social Psychology and Modern Life</u>. New York: Random House, pp. 671-711.

"Bargain Justice in an Unjust World:  Good Deals in the Criminal Courts" (with M. Lowy), <u>Law and Society Review</u>, <u>13</u>, pp. 633-650. [Reprinted in Kadish, Sanford and Paulsen, Robert (Eds.), <u>Criminal Law and Its Processes</u>. Boston: Little, Brown, 1983.]

1977    "Prison Behavior" (with P. Zimbardo), in B. Wolman (Ed.), The Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology, Vol. IX, pp. 70-74.

"The Socialization into Criminality:  On Becoming a Prisoner and a Guard" (with P. Zimbardo), in J. Tapp and F. Levine (Eds.), Law, Justice, and the Individual in Society: Psychological and Legal Issues (pp. 198-223).  New York: Holt, Rinehart, and Winston.

1976    "The Play's the Thing:  Methodological Notes on Social Simulations," in P. Golden (Ed.), The Research Experience, pp. 177-190. Itasca, IL: Peacock.

1975    "The Blackboard Penitentiary:  It's Tough to Tell a High School from a Prison" (with P. Zimbardo).  Psychology Today, 26ff.

"Implementing Research Results in Criminal Justice Settings," Proceedings, Third Annual Conference on Corrections in the U.S. Military, Center for Advanced Study in the Behavioral Sciences, June 6-7.

"The Psychology of Imprisonment:  Privation, Power, and Pathology"  (with P. Zimbardo, C. Banks, and D. Jaffe), in D. Rosenhan and P. London (Eds.), Theory and Research in Abnormal Psychology.  New York:  Holt Rinehart, and Winston.  [Reprinted in:  Rubin, Z. (Ed.), Doing Unto Others:  Joining, Molding, Conforming, Helping, Loving.  Englewood Cliffs:  Prentice-Hall, 1974.  Brigham, John, and Wrightsman, Lawrence (Eds.) Contemporary Issues in Social Psychology.  Third Edition. Monterey:  Brooks/Cole, 1977. Calhoun, James  Readings, Cases, and Study Guide for Psychology of Adjustment and Human Relationships. New York: Random House, 1978; translated as: La Psicologia del encarcelamiento: privacion, poder y patologia, Revisita de Psicologia Social, 1, 95-105 (1986).]

1973    "Social Roles, Role-Playing, and Education" (with P. Zimbardo), The Behavioral and Social Science Teacher, Fall, 1(1), pp. 24-45. [Reprinted in:  Zimbardo, P., and Maslach, C. (Eds.) Psychology For Our Times. Glenview, Ill.:  Scott, Foresman, 1977.  Hollander, E. and Hunt, R. (Eds.) Current Perspectives in Social Psychology. Third Edition. New York: Oxford University Press, 1978.]

"The Mind is a Formidable Jailer:  A Pirandellian Prison" (with P. Zimbardo, C. Banks, and D. Jaffe), The New York Times Magazine,

April 8, Section 6, 38-60.  [Reprinted in Krupat, E. (Ed.), Psychology Is Social:  Readings and Conversations in Social Psychology. Glenview, Ill.: Scott, Foresman, 1982.]

"Interpersonal Dynamics in a Simulated Prison" (with C. Banks and P. Zimbardo), International Journal of Criminology and Penology, 1, pp. 69-97.  [Reprinted in:  Steffensmeier, Darrell, and Terry, Robert (Eds.) Examining Deviance Experimentally. New York: Alfred Publishing, 1975; Golden, P. (Ed.) The Research Experience. Itasca, Ill.: Peacock, 1976; Leger, Robert (Ed.) The Sociology of Corrections. New York:  John Wiley, 1977; A kiserleti tarsadalom-lelektan foarma. Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, Norman, and Savitz, L. Justice and Corrections. New York: John Wiley, 1978; Research Methods in Education and Social Sciences. The Open University, 1979; Goldstein, J. (Ed.), Modern Sociology. British Columbia:  Open Learning Institute, 1980; Ross, Robert R. (Ed.), Prison Guard/ Correctional Officer: The Use and Abuse of Human Resources of Prison. Toronto:  Butterworth's 1981; Monahan, John, and Walker, Laurens (Eds.), Social Science in Law: Cases, Materials, and Problems. Foundation Press, 1985: Siuta, Jerzy (Ed.), The Context of Human Behavior. Jagiellonian University Press, 2001; Ferguson, Susan (Ed.), Mapping the Social Landscape: Readings in Sociology. St. Enumclaw, WA: Mayfield Publishing, 2001 & 2010; Pethes, Nicolas (Ed.), Menschenversuche (Experiments with Humans). Frankfurt, Germany: Suhrkamp Verlag, 2006.]

"A Study of Prisoners and Guards" (with C. Banks and P. Zimbardo).  Naval Research Reviews, 1-17.  [Reprinted in Aronson, E. (Ed.) Readings About the Social Animal. San Francisco: W.H. Freeman, 1980; Gross, R. (Ed.) Key Studies in Psychology. Third Edition. London: Hodder & Stoughton, 1999; Collier, C. (Ed.), Basic Themes in Law and Jurisprudence. Anderson Publishing, 2000.]


MEMBERSHIP/ACTIVITIES IN PROFESSIONAL ASSOCIATIONS

American Psychological Association

American Psychology and Law Society

Law and Society Association

National Council on Crime and Delinquency

INVITED ADDRESSES AND PAPERS PRESENTED AT PROFESSIONAL ACADEMIC
MEETINGS AND RELATED SETTINGS (SELECTED)

2022    "Promulgating Myth, Ensuring Ignorance: How the Media Derails
Criminal Justice Reform," Media and Society Lecture Series,
University of California, Santa Cruz, CA, March.

"Context is Everything: From the Stanford Prison Experiment to
Supermax Prisons and Back," Joint UCSF Amend/Norwegian
Prison Service Training Program, Oslo, Norway, May.

"The Social Psychology of Solitary Confinement," Stanford
University, Stanford, CA, May.

"Dismantling Dehumanization," Advancing Real Change
Conference, Baltimore, MD, June.

"The Pains of Imprisonment," United Justice Summit Coalition,
New York, New York, July.

"The Social and Developmental Causes of Crime," Keynote Address
in the Rethinking the Social Environment in Criminal Law Theory
and Doctrine: Interdisciplinary Perspectives Academic Workshop,
Max Planck Institute for the Study of Crime, Security, and Law,
Freiburg, Germany, September.

2021    "Imagining Freedom: Psychological Constriction and Constraint in
Confinement," in conversation with Professors Reginal Dwayne
Betts and Gina Dent, Santa Cruz, CA, January.

"Prisoners of Isolation: The Dangers of Social Deprivation, in
Prisons and Pandemics," University Forum, University of
California, Santa Cruz, CA, February.

"The Stanford Prison Experiment: Trauma Realized," New Jersey
Reentry Conference Annual Meeting, Trenton, NJ, April.

"Criminality in Context," National Seminar on the Development
and Presentation of Mitigating Evidence in Capital Cases, May.

2020    "A History to Avoid Repeating: Changing the Narrative in Criminal
Justice Reform," Governor's Committee on the Reform of the
California Penal Code, Sacramento, CA, January.

"The Science of Solitary: Expanding the Harmfulness Narrative," International Symposium on Solitary Confinement, Thomas Jefferson University, Philadelphia, PA, November.

"Putting Criminality in Context," Advancing Real Change Symposium, Baltimore, MD, December.

2019   "The Recent History of Corrections in Norway and the United States," Plenary Address, Justice Reinvestment Summit, Salem, OR, February.

"The Dimensions of Suffering in Solitary Confinement," Plenary Address, Washington College of Law at American University, Washington, DC, March.

"Implementing Norwegian Correctional Principles to Change Prison Culture in Oregon Prisons," Invited Address, Oregon Department of Corrections Leadership Team, Salem, OR, June.

"Humanizing American Jails and Prisons," Center for Court Innovation, International Summit, New York, NY, June.

"Changing the Narrative in Criminal Justice Reform," Invited Address, Norwegian Correctional Academy, Oslo, Norway, September.

Plenary Address, "Perspectives on Solitary Confinement," Northwestern University Law Review Symposium, Chicago, IL, November.

2018   "The Art and Science of Capital Mitigation," Federal Death Penalty Training Conference, Atlanta, Georgia, June.

"From Eastern State Penitentiary to Supermax Prisons," Safe Alternatives to Segregation Conference, Vera Institute of Justice, Philadelphia, PA, June.

Plenary Address, "Advancing Prisoners' Rights Through Law and Psychology," Denver Law Prisoners' Advocates Conference, University of Denver Sturm College of Law, Denver, CO, October.

"In Praise of Positivism in the Age of 'Fake News' and 'Alternative Facts,'" Research Frontiers Conference, Santa Cruz, CA, October.

2017   "Neuroscience in Policy: Solitary Confinement in California," Law & Neuroscience Conference, San Francisco, CA, February.

"In My Solitude: The Detrimental Effects of Solitary Confinement on the Brain," Exploratorium-Fisher Bay Observation Gallery, San Francisco, CA, February.

"Brief History of Correctional Reform in the United States," Community Corrections Partnership/Smart on Crime Community Forum, Santa Cruz Civic Auditorium, May.

"Reducing and Eliminating the Use of Solitary Confinement in Irish Prisons," Joint Conference with the Irish Prison Service, Department of Justice, and Irish Penal Reform Trust, Dublin, Ireland, June.

"The Emerging Consensus on When, for How Long, and On Whom Solitary Confinement Should Ever Be Imposed," Leadership, Culture and Managing Prisons: Knowledge Exchange between the USA and Europe (LEADERS), Trinity College, Dublin, Ireland, June.

"Sykes and Solitary: The Transformation of the Penal Subject in the Devolution from a 'Society of Captives' to Supermax Prisons," Power and Authority in Modern Prisons: Essays in Memory of Gresham Sykes Workshop, Centre for Prison Research, Cambridge University, Cambridge, England, September.

"Context Is Everything: The Social Psychology of Imprisonment," Joint USA/Scandinavian Correctional Exchange Program, Oslo, Norway, September.

2016    "The Culture of Punishment," American Justice Summit, New York, January.

"Mental Illness and Prison Confinement," Conference on Race, Class, Gender and Ethnicity (CRCGE), University of North Carolina Law School, Chapel Hill, NC, February.

"Reforming the Treatment of California's Mentally Ill Prisoners: Coleman and Beyond," Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, April.

"Bending Toward Justice? The Urgency (and Possibility) of Criminal Justice Reform," UC Santa Cruz Alumni Association "Original Thinkers" Series, San Jose, CA (March), and Museum of Tolerance, Los Angeles (April).

"Isolation and Mental Health," International and Inter-Disciplinary Perspectives on Prolonged Solitary Confinement, University of Pittsburgh Law School, Pittsburgh, PA, April.

"Mechanisms of Moral Disengagement in the Treatment of Prisoners" (with Joanna Weill), Conference of the Society for the Study of Social Issues, Minneapolis, June.

2015    "Reforming the Criminal Justice System," Bipartisan Summit on Criminal Justice Reform, American Civil Liberties Union/Koch Industries co-sponsored, Washington, DC, March.

"PrisonWorld: How Mass Incarceration Transformed U.S. Prisons, Impacted Prisoners, and Changed American Society," Distinguished Faculty Research Lecture, UC Santa Cruz, March.

"Think Different, About Crime and Punishment," Invited Lecture, UC Santa Cruz 50th Anniversary Alumni Reunion, April.

"The Intellectual Legacy of the Civil Rights Movement: Two Fifty-Year Anniversaries," College 10 Commencement Address, June.

"Race and Capital Mitigation," Perspectives on Racial and Ethnic Bias for Capital and Non-Capital Lawyers, New York, September.

"The Dimensions of Suffering in Solitary Confinement," Vera Institute of Justice, "Safe Alternatives to Solitary Confinement-A Human Dignity Approach" Conference, Washington, DC, September.

"Mental Health and Administrative Segregation," Topical Working Group on the Use of Administrative Segregation in the U.S., National Institute of Justice/Department of Justice, Washington, DC, October.

"The Psychological Effects of Segregated Confinement," Ninth Circuit Court of Appeals "Corrections Summit," Sacramento, CA, November.

"How Can the University of California Address Mass Incarceration in California and Beyond?," Keynote Address, Inaugural Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, November.

2014      "Solitary Confinement: Legal, Clinical, and Neurobiological
          Perspectives," American Association for the Advancement of
          Science (AAAS), Chicago, IL February.

          "Overcrowding, Isolation, and Mental Health Care, Prisoners'
          Access to Justice: Exploring Legal, Medical, and Educational
          Rights," University of California, School of Law, Irvine, CA,
          February.

          "The Continuing Significance of Death Qualification" (with Joanna
          Weill), Annual Conference of the American Psychology-Law Society,
          New Orleans, March.

          "Using Psychology at Multiple Levels to Transform Adverse
          Conditions of Confinement," Society for the Study of Social Issues
          Conference, Portland, OR, June.

          "Humane and Effective Alternatives to Isolated Confinement,"
          American Civil Liberties Union National Prison Project Convening
          on Solitary Confinement, Washington, DC, September.

          "Community of Assessment of Public Safety," Community
          Assessment Project of Santa Cruz County, Year 20, Cabrillo College,
          November.

          "Overview of National Academy of Sciences Report on Causes and
          Consequences of High Rates of Incarceration," Chief Justice Earl
          Warren Institute on Law & Social Policy, Boalt Hall Law School,
          Berkeley, CA, November.

          "Presidential Panel, Overview of National Academy of Sciences
          Report on Causes and Consequences of High Rates of
          Incarceration," American Society for Criminology, San Francisco,
          November.

          "Presidential Panel, National Academy of Sciences Report on
          Consequences of High Rates of Incarceration on Individuals,"
          American Society for Criminology, San Francisco, November.

          "Findings of National Academy of Sciences Committee on the
          Causes and Consequences of High Rates of Incarceration,"
          Association of Public Policy Analysis and Management Convention
          (APPAM), Albuquerque, NM, November.

          "Politics and the Penal State: Mass Incarceration and American
          Society," New York University Abu Dhabi International Scholars
          Program, Abu Dhabi, United Arab Emirates, December.

2013    "Isolation and Mental Health," <u>Michigan Journal of Race and Law</u> Symposium, University of Michigan School of Law, Ann Arbor, MI, February.

"Social Histories of Capital Defendants" (with Joanna Weill), Annual Conference of Psychology-Law Society, Portland, OR, March.

"Risk Factors and Trauma in the Lives of Capital Defendants" (with Joanna Weill), American Psychological Association Annual Convention, Honolulu, HI, August.

"Bending Toward Justice: Psychological Science and Criminal Justice Reform," Invited Plenary Address, American Psychological Association Annual Convention, Honolulu, HI, August.

"Severe Conditions of Confinement and International Torture Standards," Istanbul Center for Behavior Research and Therapy, Istanbul, Turkey, December.

2012    "The Psychological Consequences of Long-term Solitary Confinement," Joint Yale/Columbia Law School Conference on Incarceration and Isolation, New York, April.

"The Creation of the Penal State in America," Managing Social Vulnerability: The Welfare and Penal System in Comparative Perspective, Central European University, Budapest, Hungary, July.

2011    "Tensions Between Psychology and the Criminal Justice System: On the Persistence of Injustice," opening presentation, "A Critical Eye on Criminal Justice" lecture series, Golden Gate University Law School, San Francisco, CA, January.

"The Decline in Death Penalty Verdicts and Executions: The Death of Capital Punishment?" Presentation at "A Legacy of Justice" week, at the University of California, Davis King Hall Law School, Davis, CA, January.

"Invited Keynote Address: The Nature and Consequences of Prison Overcrowding—Urgency and Implications," West Virginia School of Law, Morgantown, West Virginia, March.

"Symposium: The Stanford Prison Experiment—Enduring Lessons 40 Years Later," American Psychological Association Annual Convention, Washington, DC, August.

"The Dangerous Overuse of Solitary Confinement: Pervasive Human Rights Violations in Prisons, Jails, and Other Places of Detention" Panel, United Nations, New York, New York, October.

"Criminal Justice Reform: Issues and Recommendation," United States Congress, Washington, DC, November.

2010    "The Hardening of Prison Conditions," Opening Address, "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Desensitization to Inhumane Treatment: The Pitfalls of Prison Work," panel presentation at "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Mental Ill Health in Immigration Detention," Department of Homeland Security/DOJ Office for Civil Rights and Civil Liberties, Washington, DC, September.

2009    "Counting Casualties in the War on Prisoners," Keynote Address, at "The Road to Prison Reform: Treating the Causes and Conditions of Our Overburdened System," University of Connecticut Law School, Hartford, CN, February.

"Defining the Problem in California's Prison Crisis: Overcrowding and Its Consequences," California Correctional Crisis Conference," Hastings Law School, San Francisco, CA, March.

2008    "Prisonization and Contemporary Conditions of Confinement," Keynote Address, Women Defenders Association, Boalt Law School, University of California, November.

"Media Criminology and the Empathic Divide: The Continuing Significance of Race in Capital Trials," Invited Address, Media, Race, and the Death Penalty Conference, DePaul University School of Law, Chicago, IL, March.

"The State of the Prisons in California," Invited Opening Address,

29

Confronting the Crisis: Current State Initiatives and Lasting Solutions for California's Prison Conditions Conference, University of San Francisco School of Law, San Francisco, CA, March.

"Mass Incarceration and Its Effects on American Society," Invited Opening Address, Behind the Walls Prison Law Symposium, University of California Davis School of Law, Davis, CA, March.

2007    "The Psychology of Imprisonment: How Prison Conditions Affect Prisoners and Correctional Officers," United States Department of Justice, National Institute of Corrections Management Training for "Correctional Excellence" Course, Denver, CO, May.

"Statement on Psychologists, Detention, and Torture," Invited Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"Prisoners of Isolation," Invited Address, University of Indiana Law School, Indianapolis, IN, October.

"Mitigation in Three Strikes Cases," Stanford Law School, Palo Alto, CA, September.

"The Psychology of Imprisonment," Occidental College, Los Angeles, CA, November.

2006    "Mitigation and Social Histories in Death Penalty Cases," Ninth Circuit Federal Capital Case Committee, Seattle, WA, May.

"The Crisis in the Prisons: Using Psychology to Understand and Improve Prison Conditions," Invited Keynote Address, Psi Chi (Undergraduate Psychology Honor Society) Research Conference, San Francisco, CA, May.

"Exoneration and 'Wrongful Condemnation': Why Juries Sentence to Death When Life is the Proper Verdict," Faces of Innocence Conference, UCLA Law School, April.

"The Continuing Effects of Imprisonment: Implications for Families and Communities," Research and Practice Symposium on Incarceration and Marriage, United States Department of Health and Human Services, Washington, DC, April.

"Ordinary People, Extraordinary Acts," National Guantanamo Teach In, Seton Hall School of Law, Newark, NJ, October.

30

"The Next Generation of Death Penalty Research," Invited Address, State University of New York, School of Criminal Justice, Albany, NY, October.

2005    "The 'Design' of the System of Death Sentencing: Systemic Forms of 'Moral Disengagement in the Administration of Capital Punishment, Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Humane Treatment for Asylum Seekers in U.S. Detention Centers," United States House of Representatives, Washington, DC, March.

"Prisonworld: What Overincarceration Has Done to Prisoners and the Rest of Us," Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Prison Conditions and Their Psychological Effects on Prisoners," European Association for Psychology and Law, Vilnius, Lithuania, July.

2004    "Recognizing the Adverse Psychological Effects of Incarceration, With Special Attention to Solitary-Type Confinement and Other Forms of 'Ill-Treatment' in Detention," International Committee of the Red Cross, Training Program for Detention Monitors, Geneva, Switzerland, November.

"Prison Conditions in Post-"War on Crime" Era: Coming to Terms with the Continuing Pains of Imprisonment," Boalt Law School Conference, After the War on Crime: Race, Democracy, and a New Reconstruction, Berkeley, CA, October.

"Cruel and Unusual? The United States Prison System at the Start of the 21st Century," Invited speaker, Siebel Scholars Convocation, University of Illinois, Urbana, IL, October.

"The Social Historical Roots of Violence: Introducing Life Narratives into Capital Sentencing Procedures," Invited Symposium, XXVIII International Congress of Psychology, Beijing, China, August.

"Death by Design: Capital Punishment as a Social Psychological System," Division 41 (Psychology and Law) Invited Address,

American Psychological Association Annual Convention, Honolulu, HI, July.

"The Psychology of Imprisonment and the Lessons of Abu Ghraib," Commonwealth Club Public Interest Lecture Series, San Francisco, May.

"Restructuring Prisons and Restructuring Prison Reform," Yale Law School Conference on the Current Status of Prison Litigation in the United States, New Haven, CN, May.

"The Effects of Prison Conditions on Prisoners and Guards: Using Psychological Theory and Data to Understand Prison Behavior," United States Department of Justice, National Institute of Corrections Management Training Course, Denver, CO, May.

"The Contextual Revolution in Psychology and the Question of Prison Effects: What We Know about How Prison Affects Prisoners and Guards," Cambridge University, Cambridge, England, April.

"Death Penalty Attitudes, Death Qualification, and Juror Instructional Comprehension," American Psychology-Law Society, Annual Conference, Scottsdale, AZ, March.

2003    "Crossing the Empathic Divide: Race Factors in Death Penalty Decisionmaking," DePaul Law School Symposium on Race and the Death Penalty in the United States, Chicago, October.

"Supermax Prisons and the Prison Reform Paradigm," PACE Law School Conference on Prison Reform Revisited: The Unfinished Agenda, New York, October.

"Mental Health Issues in Supermax Confinement," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Roundtable on Capital Punishment in the United States: The Key Psychological Issues," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Psychology and Legal Change: Taking Stock," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Economic Justice and Criminal Justice: Social Welfare and Social Control," Society for the Study of Social Issues Conference, January.

"Race, Gender, and Class Issues in the Criminal Justice System," Center for Justice, Tolerance & Community and Barrios Unidos Conference, March.

2002    "The Psychological Effects of Imprisonment: Prisonization and Beyond." Joint Urban Institute and United States Department of Health and Human Services Conference on "From Prison to Home." Washington, DC, January.

"On the Nature of Mitigation: Current Research on Capital Jury Decisionmaking." American Psychology and Law Society, Mid-Winter Meetings, Austin, Texas, March.

"Prison Conditions and Death Row Confinement." New York Bar Association, New York City, June.

2001    "Supermax and Solitary Confinement: The State of the Research and the State of the Prisons." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"Mental Health in Supermax: On Psychological Distress and Institutional Care." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"On the Nature of Mitigation: Research Results and Trial Process and Outcomes." Boalt Hall School of Law, University of California, Berkeley, August.

"Toward an Integrated Theory of Mitigation." American Psychological Association Annual Convention, San Francisco, CA, August.

Discussant: "Constructing Class Identities—The Impact of Educational Experiences." American Psychological Association Annual Convention, San Francisco, CA, August.

"The Rise of Carceral Consciousness." American Psychological Association Annual Convention, San Francisco, CA, August.

33

2000       "On the Nature of Mitigation: Countering Generic Myths in Death Penalty Decisionmaking," City University of New York Second International Advances in Qualitative Psychology Conference, March.

              "Why Has U.S. Prison Policy Gone From Bad to Worse? Insights From the Stanford Prison Study and Beyond," Claremont Conference on Women, Prisons, and Criminal Injustice, March.

              "The Use of Social Histories in Capital Litigation," Yale Law School, April.

              "Debunking Myths About Capital Violence," Georgetown Law School, April.

              "Research on Capital Jury Decisionmaking: New Data on Juror Comprehension and the Nature of Mitigation," Society for Study of Social Issues Convention, Minneapolis, June.

              "Crime and Punishment: Where Do We Go From Here?" Division 41 Invited Symposium, "Beyond the Boundaries: Where Should Psychology and Law Be Taking Us?" American Psychological Association Annual Convention, Washington, DC, August.

1999       "Psychology and the State of U.S. Prisons at the Millennium," American Psychological Association Annual Convention, Boston, MA, August.

              "Spreading Prison Pain: On the Worldwide Movement Towards Incarcerative Social Control," Joint American Psychology-Law Society/European Association of Psychology and Law Conference, Dublin, Ireland, July.

1998       "Prison Conditions and Prisoner Mental Health," Beyond the Prison Industrial Complex Conference, University of California, Berkeley, September.

              "The State of US Prisons: A Conversation," International Congress of Applied Psychology, San Francisco, CA, August.

              "Deathwork: Capital Punishment as a Social Psychological System," Invited SPPSI Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"The Use and Misuse of Psychology in Justice Studies: Psychology and Legal Change: What Happened to Justice?," (panelist), American Psychological Association Annual Convention, San Francisco, CA, August.

"Twenty Five Years of American Corrections: Past and Future," American Psychology and Law Society, Redondo Beach, CA, March.

1997  "Deconstructing the Death Penalty," School of Justice Studies, Arizona State University, Tempe, AZ, October.

"Mitigation and the Study of Lives," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, Chicago, August.

1996  "The Stanford Prison Experiment and 25 Years of American Prison Policy," American Psychological Association Annual Convention, Toronto, August.

1995  "Looking Closely at the Death Penalty: Public Stereotypes and Capital Punishment," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Race and the Flaws of the Meritocratic Vision," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Taking Capital Jurors Seriously," Invited Address, National Conference on Juries and the Death Penalty, Indiana Law School, Bloomington, February.

1994  "Mitigation and the Social Genetics of Violence: Childhood Treatment and Adult Criminality," Invited Address, Conference on the Capital Punishment, Santa Clara Law School, October, Santa Clara.

1992  "Social Science and the Death Penalty," Chair and Discussant, American Psychological Association Annual Convention, San Francisco, CA, August.

1991    "Capital Jury Decisionmaking," Invited panelist, American Psychological Association Annual Convention, Atlanta, GA, August.

1990    "Racial Discrimination in Death Penalty Cases," Invited presentation, NAACP Legal Defense Fund Conference on Capital Litigation, August, Airlie, VA.

1989    "Psychology and Legal Change: The Impact of a Decade," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, New Orleans, LA., August.

        "Judicial Remedies to Pretrial Prejudice," Law & Society Association Annual Meeting, Madison, WI, June.

        "The Social Psychology of Police Interrogation Techniques" (with R. Liebowitz), Law & Society Association Annual Meeting, Madison, WI, June.

1987    "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," APA Annual Convention, New York, N.Y. August.

        "The Nature and Function of Prison in the United States and Mexico: A Preliminary Comparison," InterAmerican Congress of Psychology, Havana, Cuba, July.

1986    Chair, Division 41 Invited Address and "Commentary on the Execution Ritual," APA Annual Convention, Washington, D.C., August.

        "Capital Punishment," Invited Address, National Association of Criminal Defense Lawyers Annual Convention, Monterey, CA, August.

1985    "The Role of Law in Graduate Social Science Programs" and "Current Directions in Death Qualification Research," American Society of Criminology, San Diego, CA, November.

        "The State of the Prisons:  What's Happened to 'Justice' in the '70s and '80s?" Invited Address to Division 41 (Psychology and Law); APA Annual Convention, Los Angeles, CA, August.

1983    "The Role of Social Science in Death Penalty Litigation." Invited Address in National College of Criminal Defense Death Penalty Conference, Indianapolis, IN, September.

1982    "Psychology in the Court:  Social Science Data and Legal Decision-Making." Invited Plenary Address, International Conference on Psychology and Law, University College, Swansea, Wales, July.

1982    "Paradigms in Conflict: Contrasting Methods and Styles of Psychology and Law." Invited Address, Social Science Research Council, Conference on Psychology and Law, Wolfson College, Oxford University, March.

1982    "Law and Psychology: Conflicts in Professional Roles." Invited paper, Western Psychological Association Annual Meeting, April.

1980    "Using Psychology in Test Case Litigation," panelist, American Psychological Association Annual Convention, Montreal, Canada, September.

"On the Selection of Capital Juries: The Biasing Effects of Death Qualification." Paper presented at the Interdisciplinary Conference on Capital Punishment. Georgia State University, Atlanta, GA, April.

"Diminished Capacity and Imprisonment: The Legal and Psychological Issues," Proceedings of the American Trial Lawyers Association, Mid-Winter Meeting, January.

1975    "Social Change and the Ideology of Individualism in Psychology and Law." Paper presented at the Western Psychological Association Annual Meeting, April.

SERVICE TO STAFF OR EDITORIAL BOARDS OF FOUNDATIONS, SCHOLARLY JOURNALS OR PRESSES

2018-present:    Editorial Consultant, PLoS ONE.

2016-present    Editorial Consultant, <u>Translational Issues in Psychological Science</u>.

2016-present    Editorial Consultant, <u>International Journal of Law and Psychiatry</u>.

2016-present    Editorial Consultant, <u>Justice Quarterly.</u>

2015-present    Editorial Consultant, <u>Criminal Justice Review</u>.

2015-present    Editorial Consultant, <u>American Journal of Criminal Justice.</u>

2015-present    Editorial Consultant, <u>American Journal of Psychology.</u>

2015-present    Editorial Consultant, <u>Criminal Justice Policy Review.</u>

2014-2018    Editorial Board Member, <u>Law and Social Inquiry</u>.

2013-present    Editorial Consultant, <u>Criminal Justice and Behavior</u>.

2012-present:    Editorial Consultant, <u>American Sociological Review.</u>

2012-present:    Editorial Consultant, <u>Criminology</u>.

2011-present    Editorial Consultant, <u>Social Psychological and Personality Science</u>.

2008-present    Editorial Consultant, <u>New England Journal of Medicine</u>.

2007-present    Editorial Board Member, <u>Correctional Mental Health Reporter</u>.

2007-present    Editorial Consultant, <u>Journal of Offender Rehabilitation</u>.

2004-2016    Editorial Board Member, American Psychology and Law Society Book Series, Oxford University Press.

2000-2003    Reviewer, Society for the Study of Social Issues Grants-in-Aid Program.

2000-present:    Editorial Consultant, <u>Punishment and Society</u>.

2000-2015    Editorial Board Member, <u>ASAP</u> (on-line journal of the Society for the Study of Social Issues)

1997-2004    Editorial Board Member, <u>Psychology, Public Policy, and Law</u>

1997-present    Editorial Consultant, <u>Psychology, Public Policy, and Law</u>

38

| 1991 | Editorial Consultant, Brooks/Cole Publishing |
| 1989-present | Editorial Consultant, <u>Journal of Personality and Social Psychology</u> |
| 1988-present | Editorial Consultant, <u>American Psychologist</u> |
| 1985 | Editorial Consultant, <u>American Bar Foundation Research Journal</u> |
| 1985-2006 | <u>Law and Human Behavior</u>, Editorial Board Member |
| 1985 | Editorial Consultant, Columbia University Press |
| 1985-present | Editorial Consultant, <u>Law and Social Inquiry</u> |
| 1980-present | Reviewer, National Science Foundation |
| 1997 | Reviewer, National Institutes of Mental Health |
| 1980-present | Editorial Consultant, <u>Law and Society Review</u> |
| 1979-present | Editorial Consultant, <u>Law and Human Behavior</u> |
| 1997-present | Editorial Consultant, <u>Legal and Criminological Psychology</u> |

<u>GOVERNMENTAL, LEGAL AND CRIMINAL JUSTICE CONSULTING</u>

Training Consultant, Palo Alto Police Department, 1973-1974.

Evaluation Consultant, San Mateo County Sheriff's Department, 1974.

Design and Training Consultant to Napa County Board of Supervisors, County Sheriff's Department (county jail), 1974.

Training Consultation, California Department of Corrections, 1974.

Consultant to California Legislature Select Committee in Criminal Justice, 1974, 1980-1981 (effects of prison conditions, evaluation of proposed prison legislation).

Reviewer, National Science Foundation (Law and Social Science, Research Applied to National Needs Programs), 1978-present.

Consultant, Santa Clara County Board of Supervisors, 1980 (effects of jail overcrowding, evaluation of county criminal justice policy).

Consultant to Packard Foundation, 1981 (evaluation of inmate counseling and guard training programs at San Quentin and Soledad prisons).

Member, San Francisco Foundation Criminal Justice Task Force, 1980-1982 (corrections expert).

Consultant to NAACP Legal Defense Fund, 1982- present (expert witness, case evaluation, attorney training).

Faculty, National Judicial College, 1980-1983.

Consultant to Public Advocates, Inc., 1983-1986 (public interest litigation).

Consultant to California Child, Youth, Family Coalition, 1981-82 (evaluation of proposed juvenile justice legislation).

Consultant to California Senate Office of Research, 1982 (evaluation of causes and consequences of overcrowding in California Youth Authority facilities).

Consultant, New Mexico State Public Defender, 1980-1983 (investigation of causes of February, 1980 prison riot).

Consultant, California State Supreme Court, 1983 (evaluation of county jail conditions).

Member, California State Bar Committee on Standards in Prisons and Jails, 1983.

Consultant, California Legislature Joint Committee on Prison Construction and Operations, 1985.

Consultant, United States Bureau of Prisons and United States Department of the Interior (Prison History, Conditions of Confinement Exhibition, Alcatraz Island), 1989-1991.

Consultant to United States Department of Justice, 1980-1990 (evaluation of institutional conditions).

Consultant to California Judicial Council (judicial training programs), 2000.

Consultant to American Bar Association/American Association for Advancement

of Science Task Force on Forensic Standards for Scientific Evidence, 2000.

Invited Participant, White House Forum on the Uses of Science and Technology to Improve Crime and Prison Policy, 2000.

Member, Joint Legislative/California Department of Corrections Task Force on Violence, 2001.

Consultant, United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project, 2002.

Detention Consultant, United States Commission on International Religious Freedom (USCIRF). Evaluation of Immigration and Naturalization Service Detention Facilities, July, 2004-2005.

Consultant, International Committee of the Red Cross, Geneva, Switzerland, Consultant on international conditions of confinement.

Member, Institutional Research External Review Panel, California Department of Corrections, November, 2004-2008.

Consultant, United States Department of Health & Human Services on programs designed to enhance post-prison success and community reintegration, 2006.

Consultant/Witness, U.S. House of Representatives, Judiciary Committee, Evaluation of legislative and budgetary proposals concerning the detention of undocumented persons, February-March, 2005.

Invited Expert Witness to National Commission on Safety and Abuse in America's Prisons (Nicholas Katzenbach, Chair); Newark, New Jersey, July 19-20, 2005.

Testimony to the United States Senate, Judiciary Subcommittee on the Constitution, Civil Rights, and Property Rights (Senators Brownback and Feingold, co-chairs), Hearing on "An Examination of the Death Penalty in the United States," February 7, 2006.

National Council of Crime and Delinquency "Sentencing and Correctional Policy Task Force," member providing written policy recommendations to the California legislature concerning overcrowding crisis in the California Department of Corrections and Rehabilitation.

Trainer/Instructor, Federal Bureau of Prisons and United States Department of Justice, "Correctional Excellence" Program, providing instruction concerning conditions of confinement and psychological stresses of living and working in correctional environments to mid-level management corrections professionals, May, 2004-2008.

Invited Expert Witness, California Commission on the Fair Administration of Justice, Public Hearing, Santa Clara University, March 28, 2008.

Invited Participant, Department of Homeland Security, Mental Health Effects of Detention and Isolation, 2010.

Invited Witness, Before the California Assembly Committee on Public Safety, August 23, 2011.

Consultant, "Reforming the Criminal Justice System in the United States" Joint Working Group with Senator James Webb and Congressional Staffs, 2011 Developing National Criminal Justice Commission Legislation.

Invited Participant, United Nations, Forum with United Nations Special Rapporteur on Torture Concerning the Overuse of Solitary Confinement, New York, October, 2011.

Invited Witness, Before United States Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, June 19, 2012.

Member, National Academy of Sciences Committee to Study the Causes and Consequences of the High Rate of Incarceration in the United States, 2012-2014.

Member, National Academy of Sciences Briefing Group, briefed media and public officials at Pew Research Center, Congressional staff, and White House staff concerning policy implications of The Growth of Incarceration in the United States: Exploring the Causes and Consequences (2014), April 30-May 1.

Consultant to United States Department of Justice and White House Domestic Policy Council on formulation of federal policy concerning use of segregation confinement, 2015.

PRISON AND JAIL CONDITIONS EVALUATIONS

Hoptowit v. Ray [United States District Court, Eastern District of Washington, 1980; 682 F.2d 1237 (9th Cir. 1982)].  Evaluation of psychological effects of conditions of confinement at Washington State Penitentiary at Walla Walla for United States Department of Justice.

Wilson v. Brown (Marin County Superior Court; September, 1982, Justice Burke).  Evaluation of effects of overcrowding on San Quentin mainline inmates.

Thompson v. Enomoto (United States District Court, Northern District of California, Judge Stanley Weigel, 1982 and continuing).  Evaluation of conditions of confinement on Condemned Row, San Quentin Prison.

Toussaint v. McCarthy [United States District Court, Northern District of California, Judge Stanley Weigel, 553 F. Supp. 1365 (1983); 722 F. 2d 1490 (9th Cir. 1984) 711 F. Supp. 536 (1989)].  Evaluation of psychological effects of conditions of confinement in lockup units at DVI, Folsom, San Quentin, and Soledad.

In re Priest (Proceeding by special appointment of the California Supreme Court, Judge Spurgeon Avakian, 1983).  Evaluation of conditions of confinement in Lake County Jail.

Ruiz v. Estelle [United States District Court, Southern District of Texas, Judge William Justice, 503 F. Supp. 1265 (1980)].  Evaluation of effects of overcrowding in the Texas prison system, 1983-1985.

In re Atascadero State Hospital (Civil Rights of Institutionalized Persons Act of 1980 action). Evaluation of conditions of confinement and nature of patient care at ASH for United States Department of Justice, 1983-1984.

In re Rock (Monterey County Superior Court 1984).  Appointed to evaluate conditions of confinement in Soledad State Prison in Soledad, California.

In re Mackey (Sacramento County Superior Court, 1985).  Appointed to evaluate conditions of confinement at Folsom State Prison mainline housing units.

Bruscino v. Carlson (United States District Court, Southern District of Illinois 1984 1985).  Evaluation of conditions of confinement at the United States Penitentiary at Marion, Illinois [654 F. Supp. 609 (1987); 854 F.2d 162 (7th Cir. 1988)].

Dohner v. McCarthy [United States District Court, Central District of California, 1984-1985; 636 F. Supp. 408 (1985)].  Evaluation of conditions of confinement at California Men's Colony, San Luis Obispo.

Invited Testimony before Joint Legislative Committee on Prison Construction and Operations hearings on the causes and consequences of violence at Folsom Prison, June, 1985.

Stewart v. Gates [United States District Court, 1987]. Evaluation of conditions of confinement in psychiatric and medical units in Orange County Main Jail, Santa Ana, California.

43

Duran v. Anaya (United States District Court, 1987-1988).  Evaluation of conditions of confinement in the Penitentiary of New Mexico, Santa Fe, New Mexico [Duran v. Anaya, No. 77-721 (D. N.M. July 17, 1980); Duran v. King, No. 77-721 (D. N.M. March 15, 1984)].

Gates v. Deukmejian (United States District Court, Eastern District of California, 1989).  Evaluation of conditions of confinement at California Medical Facility, Vacaville, California.

Kozeak v. McCarthy (San Bernardino Superior Court, 1990).  Evaluation of conditions of confinement at California Institution for Women, Frontera, California.

Coleman v. Gomez (United States District Court, Eastern District of California, 1992-3; Magistrate Moulds, Chief Judge Lawrence Karlton, 912 F. Supp. 1282 (1995). Evaluation of study of quality of mental health care in California prison system, special mental health needs at Pelican Bay State Prison.

Madrid v. Gomez (United States District Court, Northern District of California, 1993, District Judge Thelton Henderson, 889 F. Supp. 1146 (N.D. Cal. 1995). Evaluation of conditions of confinement and psychological consequences of isolation in Security Housing Unit at Pelican Bay State Prison, Crescent City, California.

Clark v. Wilson, (United States District Court, Northern District of California, 1998, District Judge Fern Smith, No. C-96-1486 FMS), evaluation of screening procedures to identify and treatment of developmentally disabled prisoners in California Department of Corrections.

Turay v. Seling [United States District Court, Western District of Washington (1998)]. Evaluation of Conditions of Confinement-Related Issues in Special Commitment Center at McNeil Island Correctional Center.

In re: The Commitment of Durden, Jackson, Leach, & Wilson. [Circuit Court, Palm Beach County, Florida (1999).] Evaluation of Conditions of Confinement in Martin Treatment Facility.

Ruiz v. Johnson [United States District Court, Southern District of Texas, District Judge William Wayne Justice, 37 F. Supp. 2d 855 (SD Texas 1999)]. Evaluation of current conditions of confinement, especially in security housing or "high security" units.

Osterback v. Moore (United States District Court, Southern District of Florida (97-2806-CIV-MORENO) (2001) [see, Osterback v. Moore, 531 U.S. 1172 (2001)]. Evaluation of Close Management Units and Conditions in the Florida Department of Corrections.

Valdivia v. Davis (United States District Court, Eastern District of California, 2002). Evaluation of due process protections afforded mentally ill and developmentally disabled parolees in parole revocation process.

Ayers v. Perry (United States District Court, New Mexico, 2003). Evaluation of conditions of confinement and mental health services in New Mexico Department of Corrections "special controls facilities."

Disability Law Center v. Massachusetts Department of Corrections (Federal District Court, Massachusetts, 2007). Evaluation of conditions of confinement and treatment of mentally ill prisoners in disciplinary lockup and segregation units.

Plata/Coleman v. Schwarzenegger (Ninth Circuit Court of Appeals, Three-Judge Panel, 2008). Evaluation of conditions of confinement, effects of overcrowding on provision of medical and mental health care in California Department of Corrections and Rehabilitation. [See Brown v. Plata, 563 U.S. 493 (2011).]

Ashker v. Brown (United States District Court, Northern District of California, 2013-2015). Evaluation of the effect of long-term isolated confinement in Pelican Bay State Prison Security Housing Unit.

Parsons v. Ryan (United States District Court, District of Arizona, 2012-14). Evaluation of conditions of segregated confinement for mentally ill and non-mentally ill prisoners in statewide correctional facilities. [See Parsons v. Ryan, 754 F.3d 657 (9th Cir. 2014)].

Coleman v. Brown (United States District Court, District of California, 2013-2014). Evaluation of treatment of mentally ill prisoners housed in administrative segregation in California prisons. [See Coleman v. Brown, 28 F.Supp.3d 1068 (2014).]

Braggs v. Dunn (United States District Court, Middle District of Alabama, 2015-2017). Evaluation of mental health care delivery system, overcrowded conditions of confinement, and use of segregation in statewide prison system. [See Braggs v. Dunn, 257 F. Supp. 3d 1171 (M.D. Ala. 2017).]

# EXHIBIT 2

<u>Testimony of Professor Craig Haney</u>

In the last four years, I have testified at trial and/or in deposition in the following cases:

In 2019, *Francis v. Her Majesty the Queen in Right of Ontario* (Canada), deposition testimony; *Sabata v. Nebraska Department of Correctional Services* (federal), deposition testimony; and *Henry Davis et al. v. John Baldwin et al*. (federal), deposition testimony;

In 2020, *U.S. v. Alejandro Toledo* (federal), hearing testimony; *Raymond Tarlton, et al. v. Kenneth Sealey, et al.* (federal), deposition; testimony; *Novoa v. GEO* (federal), deposition testimony; and *In re Lisle* (federal), hearing testimony;

In 2021, *Raymond Tarlton, et al. v. Kenneth Sealey, et al*. (federal), trial testimony; *Tellis v. LeBlanc* (federal), deposition testimony; *Harvard v. Inch* (federal), deposition testimony; *Jensen v. Shinn* (formerly known as *Parsons v. Ryan*) (federal), hearing testimony;

In 2022, *Tellis v. LeBlanc* (federal, trial testimony); *G.H. et al. v. Florida Department of Juvenile Justice* (federal), deposition testimony; and *Thorpe v. Virginia Department of Corrections* (federal), deposition testimony; and,

In 2023, *Tellis v. LeBlanc* (federal), trial testimony, and *Arizona v. Maugaotega* (state), trial testimony.