# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ALEX A., by and through his guardian, Molly Smith, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana, *et al.*, <br><br> Defendants. | **STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA** |

## STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

The United States respectfully submits this Statement of Interest to address the rights of youth in the juvenile justice system. The Plaintiffs in this matter are youth who have been adjudicated delinquent in Louisiana's juvenile justice system and are in the custody of the Office of Juvenile Justice (OJJ) for the purpose of receiving treatment and rehabilitation. The Plaintiffs allege, among other things, that Defendants have confined these youth on the former death row cell block of the Louisiana State Penitentiary, commonly known as "Angola," deprived them of education and mental health services, exposed them to dangerous living conditions, and subjected them to harmful periods of isolation. These conditions, Plaintiffs claim, violate the Eighth Amendment. Doc. 166, Mem. in Supp. Pls.' 2d Mot. Prel. Inj. ("Pls.' Mem.") at 11. The United States submits this Statement of Interest to draw the Court's attention to relevant case law and research regarding the serious and lasting harms that youth may experience when subjected to the alleged conditions of confinement, particularly isolation.

I.       **Interest of the United States**

The United States files this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States" in any case pending in federal court.[1] The United States is charged with enforcing the constitutional rights of youth in institutions pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. §1997 (CRIPA), as well as the Violent Crime Control and Law Enforcement Act, 34 U.S.C. §12601 (Section 12601) (giving Attorney General authority to seek declaratory and injunctive relief for violations of the Constitution or federal law by entities responsible for "the incarceration of juveniles"). The United States has a long history of enforcing children's constitutional rights under CRIPA and Section 12601, including the rights of youth in the juvenile justice system to protection from harmful conditions of confinement. The United States files this Statement of Interest to assist the Court in its analysis of Plaintiffs' Second Motion for Preliminary Injunction and Memorandum in Support thereof. *See* Doc. 163, Pls.' 2d Mot. Prelim. Inj.; Doc. 166, Pls.' Mem.

The Civil Rights Division has previously exercised the United States' authority under CRIPA and Section 12601 to address issues related to conditions of confinement for youth in the juvenile and criminal justice systems, most recently in the South Carolina Department of Juvenile Justice Broad River Road Complex and the Manson Youth Institution in Cheshire, Connecticut.[2]

---

[1] The full text of 28 U.S.C. § 517 is as follows: "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

[2] Settlement Agreement between the United States and the South Carolina Dep't of Juvenile Justice, *United States v. South Carolina Dep't of Juvenile Justice*, No. 3:22-cv-01221 (D.S.C. Apr. 14, 2022), ECF No. 4-1 at 8–11, https://www.justice.gov/media/1299196/dl?inline [https://perma.cc/V62L-6Y67]

## II. Background

Plaintiffs brought this action individually and on behalf of all others similarly situated against state officials to address the transfer to Angola of youth who have been adjudicated delinquent. Doc. 96, First Am. Comp. at 1. Angola has a long history of abuse and brutality.[3] Doc. 79, Ruling on Pls.' Mot. for TRO ("Ruling") at 2. The youth in Angola are confined on a cell block that formerly held death row inmates. *Id.* They are surrounded by razor wire, guard towers, and swampland. *Id.* at 48.

On August 19, 2022, Plaintiffs filed a complaint seeking a declaratory judgment that Defendants are violating Plaintiffs' constitutional and federal statutory rights by transferring them to "a notoriously dangerous maximum security adult prison" without a plan to provide required services and sufficient safety. Doc. 1, Comp. at 14. Plaintiffs also sought a temporary

---

(addressing use of solitary confinement and excessive force on youth at the Broad River Road Complex); U.S. Dep't of Justice Special Lit. Section, *Letter from Assistant Attorney General Kristen Clarke to Governor Ned Lamont* (Dec. 21, 2021), https://www.justice.gov/d9/press-releases/attachments/2021/12/21/manson_findings_report_508_compliant_0.pdf [https://perma.cc/6DTC-4KPB] (finding constitutional and federal statutory violations in the use of isolation, mental health care and special education services for youth at the Manson Youth Institution). *See also, e.g.*, Settlement Agreement Between the United States and Hinds County, Mississippi Regarding the Hinds County Jail, *United States. v. Hinds Cnty.*, No. 16-489 (S.D. Miss. July 19, 2016), ECF No. 8-1 at 37–38, https://www.justice.gov/crt/file/883861/download [https://perma.cc/5MXW-RJNQ] (addressing use of solitary confinement, suicide prevention, and other conditions of confinement for youth in the Hinds County Jail); Settlement Agreement between the United States and Leflore County, Mississippi, *United States v. Leflore Cnty.*, No. 15-00059 (N.D. Miss. May 13, 2015), ECF No. 3-1 at 10–12, https://www.justice.gov/sites/default/files/crt/legacy/2015/05/14/leflore_agreement_5-13-15.pdf [https://perma.cc/2T6U-HZL5] (addressing use of solitary confinement, mental health care, and other conditions of confinement for youth at the Leflore County Juvenile Detention Center); Agreed Order, *United States v. Ohio*, No. 04-1206 (S.D. Ohio May 21, 2014), ECF No. 148 at 2, https://www.justice.gov/sites/default/files/crt/legacy/2014/06/30/ohiojuv_order_5-21-14.pdf [https://perma.cc/KK4Q-HJJH] (addressing use of solitary confinement on youth in Scioto and Marion Juvenile Correctional Facilities).

[3] *See generally* JOANNE RYAN & STEPHANIE L. PERRAULT, ANGOLA: PLANTATION TO PENITENTIARY (2007), https://www.crt.state.la.us/Assets/OCD/archaeology/discoverarchaeology/virtual-books/PDFs/Angola_Pop.pdf; *History of the State Penitentiary*, LOUISIANA STATE PENITENTIARY MUSEUM FOUNDATION (2019), https://www.angolamuseum.org/history-of-angola [https://perma.cc/S3HC-J49H].

3

restraining order, preliminary injunction, and permanent injunction requiring Defendants to cease plans to transfer adjudicated youth to Angola, and to immediately release or transfer back to one of OJJ's pre-existing facilities any youth who had already been moved. *Id.*

On September 23, 2022, the Court denied Plaintiffs' Motion. The Court was "persuaded that transferring emotionally vulnerable adolescents…to a prison camp on the grounds of Angola" would "likely have deleterious psychological ramifications," but ultimately relied on assurances by Defendants regarding plans for ensuring safety and services for the youth. Doc. 79, Ruling at 60. Defendants testified the Angola placement was a temporary measure to house between 24 and 30 youth at a time and would facilitate rehabilitation, not punishment. *Id.* at 18, 23. Defendants also testified there would be no risk of loss or reduction to programs and services, no excessive or abusive solitary confinement, and no risk of youth being housed in unfit facilities. *Id.* at 18–19. The Court found Defendants' evidence established that "no youth will be transferred until the facility is ready, properly staffed, and can fully provide educational, medical, mental health, recreational, and food services." *Id.* at 19.

Since late October 2022, OJJ has incarcerated a total of between 70 and 80 youth, some as young as 15, in Angola. Doc. 166, Pls.' Mem. at 9–10. Most of these youth are Black. *Id.* Additionally, the youth in Angola are "likely already suffering from a history of trauma." Doc. 79, Ruling at 48.

On July 18, 2023, Plaintiffs filed a second motion for preliminary injunction. Doc. 163, Pls.' 2d Mot. Prelim. Inj. Plaintiffs allege that, notwithstanding their assurances to the Court, Defendants have not given youth at Angola temporary therapeutic placements. *Id.* at 2. Rather, Plaintiffs allege, Defendants have regularly confined these young people in prolonged isolation,

failed to provide them the educational and other services promised, and subjected them to excessive heat and other dangerous living conditions. *Id.*

### III.   Discussion

The United States respectfully submits this Statement of Interest to draw the Court's attention to the serious and irreparable harms that youth may experience when subjected to the alleged conditions of confinement. Case law and research show that isolation is particularly harmful to youth.[4]

#### A. Youth are Particularly Vulnerable to Harmful Conditions of Confinement.

Plaintiffs allege that the youth at Angola, including youth with mental health and other disabilities, do not have adequate access to mental health and educational services. Doc. 166, Pls.' Mem. at 10–16. On one cell block, Plaintiffs allege, there are no teachers available to provide youth instruction. *Id.* at 10–12. Plaintiffs also allege that youth at Angola do not have adequate access to recreation and exercise. *Id.* at 12–13. Instead, youth allegedly spend most of their time locked in their cells. *Id.* at 21. Youth at Angola also allegedly cannot have regular contact with their families, *id.* at 14, suffer from excessive heat and a lack of adequate ventilation in their cells, and lack adequate access to safe drinking water. *Id.* at 17–22.

Youth are particularly vulnerable to harmful conditions of confinement such as those alleged because their brains are still developing and they lack adequate coping mechanisms.[5] Exposure to stressful conditions such as those alleged can result in long-term negative changes in

---

[4] Because the United States has not independently investigated the factual allegations of the second motion for preliminary injunction, the United States takes no position on its merits.
[5] *See See* NAT'L ACADS. OF SCIS., ENG'G & MED., THE PROMISE OF ADOLESCENCE: REALIZING OPPORTUNITY FOR ALL YOUTH 58 (Richard J. Bonnie & Emily P. Backes eds., 2019), https://nap.nationalacademies.org/catalog/25388/the-promise-of-adolescence-realizing-opportunity-for-all-youth [https://perma.cc/ACQ3-DKNH].

youths' bodies and brains.[6] For youth exposed to high levels of stress, the resulting maladaptation "disrupts brain circuitry and other organ and metabolic systems … during sensitive developmental periods, which may result in damage to the regulation of these systems."[7] The risk of harm is particularly acute for the youth at Angola, whom this Court has found are "likely already suffering from a history of trauma." Doc. 79, Ruling at 48.[8]

In assessing cruel and unusual punishment under the Eighth Amendment, the Supreme Court has recognized the developmental vulnerability of children and adolescents, distinguishing children from adults in the criminal justice context.[9] *See Miller v. Alabama*, 567 U.S. 460 (2012) (mandatory life imprisonment without parole for children is unconstitutional); *Graham v. Florida*, 560 U.S. 48 (2010), *as modified* (July 6, 2010) (mandatory life imprisonment without parole for children who did not commit homicide is unconstitutional); *Roper v. Simmons*, 543 U.S. 551 (2005) (imposing the death penalty on children is unconstitutional). The Court has recognized that youth "have a lack of maturity and an underdeveloped sense of responsibility," that they are "more vulnerable…to negative influences and outside pressures," and that their characters are not as "well formed" as those of adults. *Miller*, 567 U.S. at 471 (quoting *Roper*,

---

[6] *Id.* at 88–89.

[7] *Id.* at 89.

[8] RICHARD G. DUDLEY, JR., NEW PERSPECTIVES IN POLICING: CHILDHOOD TRAUMA AND ITS EFFECTS: IMPLICATIONS FOR POLICE 5 (July 2015), https://www.ojp.gov/pdffiles1/nij/248686.pdf [https://perma.cc/65W4-EJAB] (discussing how repeated exposure to trauma causes changes in a youth's brain that impair the ability to effectively cope with stressors).

[9] As previously noted, the youth in this case have not been convicted of crimes, but rather, adjudicated delinquent in Louisiana's juvenile justice system for the purpose of receiving treatment and rehabilitation. LA CHILD. CODE ANN. art. 801 ("The purpose of [Louisiana's juvenile justice system] is to … ensure that [a youth in the juvenile justice system] shall receive, preferably in his own home, the care, guidance, and control that will be conducive to his welfare and the best interests of the state and that in those instances when he is removed from the control of his parents, the court shall secure for him care as nearly as possible equivalent to that which the parents should have given him."). *See also Application of Gault*, 387 U.S. 1, 15 (1967) (the juvenile justice system was established to treat and rehabilitate children).

543 U.S. at 569); *see also Graham,* 560 U.S. at 68. Thus, "youth is more than a chronological fact…. It is a moment and condition of life when a person may be most susceptible to influence and to psychological damage." *Miller*, 567 U.S. at 476 (internal quotations and citations omitted). In these decisions, the Court relied in part on "developments in psychology and brain science [that] continue to show fundamental differences between juvenile and adult minds." *Graham*, 560 U.S. at 68.

This Court previously found that the confinement of youth in Angola, even with promises of safety and services, places them at "serious risk of psychological harm." Doc. 79, Ruling at 48.[10] If deprived of promised mental health and educational services and if subjected to isolation and other dangerous living conditions, youth in Angola are likely to suffer serious and irreparable harm to their physical and mental health. *See Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (stating elements for issuance of a preliminary injunction, including "a substantial threat of irreparable injury if the injunction is not issued").

**B. Isolation is particularly harmful to youth.**

Plaintiffs allege that solitary confinement is not the exception for youth at Angola, but closer to the rule. Plaintiffs allege that "youth are routinely locked in their cells for 23 hours a day" in their first 72 hours at Angola. Doc. 166, Pls. Mem. at 13. This initial period of confinement is a critical period of adjustment. Indeed, a Department of Justice nationwide study found that more than 40% of juvenile suicides in detention centers occurred within the first 72 hours of confinement.[11] Plaintiffs also allege that the youth at Angola were on lock-down in their

---

[10] Given the alleged conditions at Angola, confining adjudicated youth there instead of in appropriate community and juvenile justice settings also contradicts the purpose of Louisiana's juvenile justice system. *See* LA CHILD. CODE ANN. art. 801, *supra* note 10.

[11] LINDSAY M. HAYES, DEP'T OF JUSTICE OFFICE OF JUVENILE JUSTICE AND DELINQUENCY PREVENTION, JUVENILE SUICIDE IN CONFINEMENT: A NATIONAL SURVEY vii (2009), https://www.ncjrs.gov/pdffiles1/ojjdp/213691.pdf [https://perma.cc/YE22-HDK2].

cells for four consecutive days in late June and from at least July 5 to July 11, and that solitary confinement is used to punish youth held at the prison. *Id*. at 6–7, 13. These allegations stand in contrast to Defendants' previous testimony, which led to the Court's finding that youth would be "confined to their cells while sleeping at night," but "there was no evidence that OJJ has any intent to unlawfully subject youth to solitary confinement at [Angola]." Doc. 79, Ruling at 47.[12]

It is now widely recognized within the medical, psychiatric, and correctional communities that isolation inflicts particular and serious harms on children because of their developmental immaturity, brain development, and lack of effective coping mechanisms.[13] As noted above, youths' brains are still developing,[14] "making their time spent in solitary confinement even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting."[15] Over 10 years ago, the United States Attorney General's National Task Force on Children Exposed to Violence similarly concluded that "[n]owhere is the

---

[12] These allegations, if true, also amount to a violation of Louisiana law, which prohibits solitary confinement of any juvenile in the custody of OJJ "outside of regular sleeping hours," for any period longer than eight hours, and "for any reason other than a temporary response to behavior that poses a serious and immediate threat of physical harm to the juvenile or others." LA Rev. Stat. § 15:905 (2022).

[13] Although research shows that isolation has a particularly damaging impact on children and adolescents, the harms of isolation are not limited to them. *See, e.g.*, *Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring) ("The human toll wrought by extended terms of isolation long has been understood[.]"); *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3rd Cir. 2017) (noting "a growing consensus— with roots going back a century—that conditions like those to which [the plaintiff] repeatedly was subjected can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity"); Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J.L. & POL'Y 325, 330–31 ("[E]ven a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium.").

[14] The prefrontal cortex of the brain – the area associated with response inhibition, emotional regulation, planning, and organization – continues to develop well into a person's 20s. *See* U.S. DEPT. OF JUSTICE, REPORT AND RECOMMENDATIONS CONCERNING THE USE OF RESTRICTIVE HOUSING 59 (Mar. 2016), https://www.justice.gov/restrictivehousing [https://perma.cc/6ZL3-2WVV]; *see also* B.J. Casey et al., *Structural and Functional Brain Development and its Relation to Cognitive Development*, 54 BIOLOGICAL PSYCHO. 241, 243 (2000); Jay N. Giedd, et al., *Brain Development During Childhood and Adolescence: A Longitudinal MRI Study*, 2 NATURE NEUROSCIENCE 861 (1999).

[15] Position Statement, Solitary Confinement (Isolation) (Apr. 2016), https://www.ncchc.org/position-statements/solitary-confinement-isolation-2016 [https://perma.cc/Y8SN-BR8A].

damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement," including increased vulnerability to suicide.[16] The American Psychiatric Association notes that youth are at "particular risk of potential psychiatric consequences" from isolation, "including depression, anxiety, and self-harm."[17]

For these reasons, the American Academy of Child & Adolescent Psychiatry, American Public Health Association, and the National Commission on Correctional Health Care have all called for a ban on solitary confinement for youth.[18] The American Correctional Association, too, recognizes that "isolating a youth for extended periods can have serious psychological and developmental consequences."[19]

---

[16] ROBERT L. LISTENBEE, JR., REPORT OF THE ATTORNEY GENERAL'S NATIONAL TASK FORCE ON CHILDREN EXPOSED TO VIOLENCE 178 (Dec. 12, 2012). A Department of Justice nationwide study found that half of the suicides occurring in juvenile detention facilities occurred when the juvenile was held in solitary confinement, and more than 60 percent of young people who committed suicide while in confinement had a history of being held in isolation. *See* LINDSAY M. HAYES, *supra* note 12.

[17] Position Statement, Am. Psychiatric Ass'n, Position Statement on Solitary Confinement (Restricted Housing) of Juveniles (July 2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Solitary-Confinement-Restricted-Housing-of-Juveniles.pdf [https://perma.cc/876Q-METK].

[18] *See* Policy Statement, Am. Acad. of Child & Adolescent Psychiatry, *Solitary Confinement of Juvenile Offenders* (Apr. 2012), http://www.aacap.org/aacap/policy_statements/2012/solitary_confinement_of_juvenile_offenders.aspx [https://perma.cc/2SZN-BEET]; Am. Pub. Health Ass'n, *Solitary Confinement as a Public Health Issue* (Nov. 5, 2013), https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/14/13/30/solitary-confinement-as-a-public-health-issue [https://perma.cc/UE4E-VCU4]; Nat'l Comm'n on Correctional Health Care, *Restrictive Housing in Juvenile Settings* (2021), https://www.ncchc.org/position-statements/restrictive-housing-in-juvenile-settings-2021 [https://perma.cc/YJ83-YC4M]; Position Statement, Solitary Confinement (Isolation) (Apr. 2016), https://www.ncchc.org/position-statements/solitary-confinement-isolation-2016/ [https://perma.cc/JFS8-Y3TV]; *c.f.* Policy Statement, Am. Med. Ass'n, Solitary Confinement of Juveniles in Legal Custody (Nov. 2014), https://policysearch.ama-assn.org/policyfinder/detail/juvenile%20solitary?uri=%2FAMADoc%2FHOD.xml-0-5016.xml [https://perma.cc/G4W2-8BQ5] (opposing solitary confinement of juveniles for disciplinary purposes).

[19] Am. Correctional Ass'n, *Letter from President Mary L. Livers and Executive Director James A. Gondles, Jr. to Staff Attorney at the Center for Children's Law and Policy Jennifer Lutz* (Mar. 24, 2016), http://www.stopsolitaryforkids.org/wp-content/uploads/2016/04/ACA-Support-Letter.pdf [https://perma.cc/CF7Z-PVZJ].

Courts that recently have considered the constitutionality of isolating youth in both juvenile justice facilities and adult correctional settings have found that isolation, even for brief periods, causes serious harm and violates the Constitution.[20] *See V.W. v. Conway*, 236 F.Supp.3d 554, 583 (N.D.N.Y. 2017) (enjoining disciplinary isolation of children in an adult facility and relying on the "broad consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults"); *A.T. v. Harder*, 298 F.Supp.3d 391, 416 (N.D.N.Y. 2018) (granting preliminary injunction to a plaintiff class of children in an adult facility, finding "defendants' continued use of solitary confinement on juveniles puts them at serious risk of short- and long-term psychological damage," in violation of the Eighth Amendment); *Doe v. Hommrich*, 2017 WL 1091864, at *2 (M.D. Tenn. 2017) (holding that "solitary confinement of juveniles in government custody for punitive or disciplinary reasons, especially for extended periods of time and especially for youth who may suffer from mental illness, violates the Eighth Amendment's prohibitions against the inhuman treatment of detainees").

---

[20] For the purposes of this Statement of Interest, we rely on the Eighth Amendment standard because the Court has ruled that it applies. Doc. 79, Ruling at 44 (citing *Morales v. Turman*, 562 F.2d 993, 998 n.1 (5th Cir. 1977) and *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419-20 & n.4 (5th Cir. 2017)). However, we note that the United States has previously taken the position that the Fourteenth Amendment applies to conditions of confinement for youth in the juvenile justice system because of its rehabilitative, rather than punitive, nature, and because youth adjudicated delinquent have not been convicted of a crime. *See, e.g.*, U.S. Dep't. of Justice Special Lit. Section, *Letter from Assistant Attorney General Eric S. Dreiband to Governor Henry McMaster* (Feb. 5, 2020), at 5, https://www.justice.gov/crt/page/file/1244381/download [https://perma.cc/SY7C-8B5L]; U.S Dep't. of Justice Special Lit Section, *Letter from Assistant Attorney General Thomas E. Perez to Governor Mitch Daniels* (Jan. 29, 2010), at 4 n.4, https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/Indianapolis_findlet_01-29-10.pdf [https://perma.cc/3AXK-XFZB]; U.S. Dep't. of Justice Special Lit. Section, *Letter from Acting Assistant Attorney General Loretta King to Governor David A. Paterson* (Aug. 14, 2009), at 4, https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/NY_juvenile_facilities_findlet_08-14-2009.pdf [https://perma.cc/ZJ7U-EE8Y]; U.S. Dep't. of Justice Special Lit. Section, *Letter from Assistant Attorney General Wan J. Kim to Governor Ted Strickland* (May 9, 2007), at 3, https://www.justice.gov/sites/default/files/crt/legacy/2011/04/14/scioto_findlet_5-9-07.pdf [https://perma.cc/7HNF-X5ZM].

The federal government has echoed this consensus. In 2018, Congress passed the First Step Act, which prohibits the isolation of youth in federal facilities "for discipline, punishment, retaliation, or any reason other than as a temporary response to a covered juvenile's behavior [which] poses a serious and immediate risk of physical harm to any individual, including the covered juvenile." 18 U.S.C. § 5043(b)(1).[21] Numerous other organizations, such as the Annie E. Casey Foundation's Juvenile Detention Alternatives Initiative, Council of Juvenile Correctional Administrators, National Partnership for Juvenile Services, and PbS Learning Institute have issued professional standards similarly limiting the use of isolation in juvenile justice facilities to a brief de-escalation period (i.e., a short period to allow a child to regain emotional and physical self-control in response to an imminent risk of serious physical harm to another person).[22]

As previously noted, the Court has already held that "transferring emotionally vulnerable adolescents, many of whom have mental health issues and cognitive disfunction, to a prison

---

[21] Under the Act, no child in federal custody may be kept in isolation for longer than three hours under any circumstances. 18 U.S.C. § 5043(b)(2)(B). The Act requires that facility staff members attempt to use less restrictive techniques prior to resorting to isolation, including talking with the child in an effort to de-escalate the situation, and allowing a qualified mental health professional to talk to the child. 18 U.S.C. § 5043(b)(2)(A)(i). If staff nonetheless decide to place a child in isolation after attempting to use less restrictive measures, they must explain to the child the reasons for doing so and that he or she will be released as soon as he or she regains self-control. 18 U.S.C. § 5043(b)(2)(A)(ii), (B)(i). If a child continues to pose a "serious and immediate risk of physical harm" beyond the maximum period of permissible time in isolation, the facility must transfer the child "to another juvenile facility or internal location where services can be provided to the covered juvenile without relying on room confinement," or "if a qualified mental health professional believes the level of crisis service needed is not currently available, a staff member of the juvenile facility shall initiate a referral to a location that can meet the needs of the covered juvenile." 18 U.S.C. § 5043(b)(2)(C).

[22] *See* Juv. Det. Alts. Initiative, *Juvenile Detention Facility Assessment Standards Instrument: 2014 Update* (Dec. 2014), http://www.cclp.org/wp-content/uploads/2016/06/JDAI-Detention-Facility-Assessment-Standards.pdf [https://perma.cc/C7KS-TU2Y]; Council of Juv. Corr. Adm'rs, *Council of Juvenile Correctional Administrators Toolkit: Reducing the Use of Isolation* (Mar. 2015), https://nicic.gov/resources/nic-library/all-library-items/council-juvenile-correctional-administrators-toolkit [https://perma.cc/T36H-EQ7L]; Position Statement, Nat'l P'ship for Juv. Servs., Use of Isolation (Oct. 20, 2014), https://irp.cdn-website.com/45a58767/files/uploaded/2014%20-%20Use%20of%20Isolation.pdf [https://perma.cc/5LE4-ZM4Y]; PBS LEARNING INST., REDUCING ISOLATION AND ROOM CONFINEMENT 2 (2012), https://pbstandards.org/media/1153/pbs_reducingisolation_201209.pdf [https://perma.cc/TJ8U-CT8Q].

11

camp on the grounds of Angola will likely have deleterious psychological ramifications." Doc. 79, Ruling at 59–60. If Plaintiffs' allegations regarding the use of solitary confinement for youth at Angola are true, there would be a substantial risk of serious harm.

## IV.    Conclusion

For the foregoing reasons, the United States files this Statement of Interest regarding Plaintiffs' motion for preliminary injunction.

Respectfully submitted,

Counsel for the United States:

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief
Special Litigation Section

LAURA COWALL
Deputy Chief
Special Litigation Section
JACQUELINE CUNCANNAN
JEAN ZACHARIASIEWICZ
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Phone: 202-532-3928
E-mail: jacqueline.cuncannan@usdoj.gov


RONALD C. GATHE, JR.
UNITED STATES ATTORNEY

/s/ Davis Rhorer Jr.
DAVIS RHORER, JR., LBN 37519
Assistant United States Attorney

777 Florida Street, Suite 208<br>
Baton Rouge, Louisiana 70801<br>
Telephone: (225) 389-0443<br>
Fax: (225) 389-0685<br>
E-mail: davis.rhorer@usdoj.gov

Dated: July 28, 2023

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing STATEMENT OF INTEREST OF THE UNITED STATES was served by operation of the Court's Case Management/Electronic Case Files (CM/ECF) system on July 28, 2023, on all counsel or parties of record.

                                                By:    s/ Davis Rhorer Jr._____
                                                        Office of the U.S. Attorney

Dated: July 28, 2023