UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ALEX A., by and through his guardian, Molly Smith; BRIAN B.[1]; and CHARLES C., by and through his guardian Kenoine Rogers, individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>v.<br><br>GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS,[2] in his official capacity as Deputy Secretary of the Office of Juvenile Justice; JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections,<br><br>              Defendants. | Civil Action No. 3:22-573-SDD-RLB |

# EXHIBIT E

---

[1] On July 14, 2023, pursuant to Rule 25(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs notified the Court of the death of Brian B. *Doc. 162.* Plaintiffs leave Brian B. as a Plaintiff until the clerk is ordered to change the caption.

[2] On November 18, 2022, Gov. Edwards announced the resignation of Dep. Sec. Sommers and the appointment of Otha "Curtis" Nelson as his replacement. *See* https://gov.louisiana.gov/index.cfm/newsroom/detail/3892. Because Sommers was sued in his official capacity, Nelson is automatically substituted as a Defendant. Fed. R. Civ. P. 25(d). Plaintiff leaves Sommers as a Defendant until the clerk is ordered to change the caption.

UNITED STATES DISTRICT COURT

THE MIDDLE DISTRICT OF LOUISIANA

ALEX A., by and through his       CIVIL ACTION NO. 3:22-cv-00573
guardian, Molly Smith; BRIAN B.;           SDD-RLB
and CHARLES C., by and through
his guardian, Kenione Rogers,
individually and on behalf of all
others similarly situated;

      Plaintiffs

V

GOVERNOR JOHN BEL EDWARDS, in his
Official capacity as Governor of
Louisiana; WILLIAM SOMMERS, in his
Capacity as Deputy Secretary of the
Office of Juvenile Justice,
JAMES M. LEBLANC, in his official
capacity as Secretary of the
Louisiana Department of
Corrections,

      Defendants

      DEPOSITION OF DAJA McKINLEY, given in the above-entitled cause, pursuant to the following stipulation, before Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, at the Louisiana State Penitentiary, 17544 Tunica Trace, Angola, Louisiana, 70712, commencing at 1:45 o'clock p.m., on Thursday, the 3rd day of August, 2023.

```
 1   APPEARANCES:
 2
     For the Plaintiff:
 3
     MURELL LAW FIRM
 4   Attorney at Law
     BY:  CHRISTOPHER J. MURELL, ESQ.
 5   2831 St. Claude Avenue
     New Orleans, Louisiana   70117
 6
     and
 7
     BARKSDALE LAW
 8   Attorney at Law
     BY: RUSSELL BARKSDALE, ESQ.
 9   636 Baronne Street
     New Orleans, Louisiana   70113
10
11   For the Defendants:
12
     MESSRS. BUTLER SNOW, LLP
13   Attorneys at Law
     BY:  ALLENA W. McCAIN, ESQ.
14   City Plaza
     445 North Boulevard, Suite 300
15   Baton Rouge, Louisiana   70802
16
     ALSO PRESENT:   LINDA LONDON
17
18   PARTICIPANTS VIA ZOOM AT VARIOUS TIMES:
19   Hector Linares
     Lem Montgomery
20   Anna Morris
     Carly H. Chinn
21   Ashley Dalton
     Sara Godchaux
22
23
     Reported By:   Raynel E. Schule
24                  Certified Shorthand Reporter
                    State of Louisiana
25
```

```
1   Q.   Okay, and that -- is there anything else?
2   A.   Nothing out of the ordinary.
3   Q.   In terms of the -- when I say -- you-all
4        use the word cell restriction, right?
5   A.   Huh-huh.
6   Q.   I just want to make sure we're on the same
7        page about what cell restriction means.
8        Cell restriction is each of the kids have
9        their own cell, correct?
10  A.   Correct.
11  Q.   They're all separated from each other?
12  A.   Correct.
13  Q.   Cell restriction is when they can't come
14       out -- they can't -- when they're on cell
15       restriction, they can't voluntarily come
16       out of their cell?  They can't just come
17       out of their cell as they please?
18  A.   Well, none of them can go out as they
19       please.  Like, they're are on a schedule.
20  Q.   Right.  So when they're on cell
21       restriction, they can't leave their cell
22       other than the times that you tell them to
23       leave the cells?
24  A.   Correct.
25  Q.   And that is restricted, meaning that they
```

|    |    |    |
|----|----|----|
| 1  |    | don't get to participate in all the other |
| 2  |    | activities that everybody else does? |
| 3  | A. | Correct. |
| 4  | Q. | When they are on cell restriction, do |
| 5  |    | you-all have -- are you familiar with |
| 6  |    | certain policies or protocols about -- |
| 7  |    | well, let's -- let me back up for a second. |
| 8  |    | Are you involved in decisions about who is |
| 9  |    | put on cell restriction? |
| 10 | A. | Yes. |
| 11 | Q. | Okay.  Tell me about that.  So say an |
| 12 |    | incident happens, any incident, but let's |
| 13 |    | say -- I mean, like, cell restriction can |
| 14 |    | range from throwing feces at a guard to |
| 15 |    | actually assaulting a staff member.  Is |
| 16 |    | that right? |
| 17 | A. | Correct. |
| 18 | Q. | So when an incident happens, how is it |
| 19 |    | determined if the child is put on cell |
| 20 |    | restriction and for how long? |
| 21 | A. | There's a paper that we go by for the |
| 22 |    | violation.  Of course if they throwing |
| 23 |    | stuff out of the cell, then they'll be on |
| 24 |    | cell restriction. |
| 25 | Q. | Okay.  So if they -- for throwing stuff out |

1       of the cell, they go on cell restriction?
2  A.   For throwing stuff out of the cell, it --
3       it -- it varies.  Like, if they throwing
4       feces, it will be 24 hours.
5  Q.   Okay.
6  A.   Then they'll come out for their hour or if
7       they have callout or have the nurse -- see
8       the nurse, doctor visit, they'll still come
9       out, but you know.
10 Q.   Okay.  So is that -- the sheet that you're
11      -- the sheet that you're referencing, so
12      there's a written policy about cell
13      restrictions, how much time people should
14      get?
15 A.   It's -- it's -- it's a sheet --
16 Q.   Okay.
17 A.   -- that the youth sign.
18 Q.   The youth signs it?
19 A.   Right.
20 Q.   Okay.  So where -- who wrote this sheet?
21 A.   I'm not sure who wrote it.
22 Q.   Is it something that you-all are provided
23      when you start working here?  Like, tell me
24      what does it say about -- tell me what it
25      says about cell restriction.

1   A.   It lists all of the violations on, like,
2        throwing stuff out of the cell, assaulting
3        staff, sexual misconduct.
4   Q.   So sexual misconduct would include
5        masturbation?
6   A.   Correct.
7   Q.   Okay.  Go on.  Go on.  Throwing stuff out
8        of the cell, assault, sexual misconduct.
9   A.   It's -- it's a -- it's a variety.  I can't
10       really name all of them off the top of my
11       head.
12  Q.   But there's a sheet that's provided to the
13       kids that you-all have that outlines all
14       the things for which they can get a cell
15       restriction?
16  A.   Correct.
17  Q.   Does it -- does the sheet say how long they
18       are put on cell restriction for each
19       violation?
20  A.   Correct.
21  Q.   To your recollection what are the different
22       times for the different levels of offense?
23  A.   Say it again.
24  Q.   To the best of your recollection, what are
25       the times that -- does it say, like,

1 there's a 24-hour minimum or is that, like,
2 for throwing feces, you get 24 hours; for
3 beating up a guard, you get 72 hours?
4 A. Correct.
5 Q. So what -- what are the times -- what are
6 the offenses and what are the times that
7 are on that sheet?
8 A. All I know is for assaulting staff, 72
9 hours.
10 Q. Okay.
11 A. I can't really, like, come up -- like, I
12 have to look at the sheet to know, like,
13 the exact hours.
14 Q. Okay. So say an incident happens, be it
15 throwing something out of the cell or as
16 serious as assaulting a staff member, who
17 gets together to determine if cell
18 restriction is appropriate?
19 A. The Operational Supervisors and, of course,
20 before, you know, we make that move, then
21 we talk to the head, which is the Deputy
22 Director, the Director.
23 Q. Of OJJ or this --
24 A. Of -- of this -- this facility.
25 Q. So who is that you talk to? Director

1     London?
2 A.   Yeah, Director London.
3 Q.   And who's the Deputy Director you talk to?
4 A.   Charmaine Jones.
5 Q.   So if something happens in the middle of
6     the night, like, say, like, at 1:00 a.m.
7     somebody throws excrement out of their
8     cell, when do folks meet about what the
9     appropriate punishment?
10 A.   When do they meet?
11 Q.   Huh-huh.
12 A.   You saying like --
13 Q.   Say -- say an incident happens at, like,
14     1:00 or 2:00 in the morning instead of --
15 A.   Huh-huh.
16 Q.   -- like in the classroom --
17 A.   Huh-huh.
18 Q.   -- how -- when -- how is it determined
19     something that happens in the middle of the
20     night whether cell restriction is
21     appropriate?
22 A.   They'll get an UOR, and then it will be
23     discussed between the supervisors in the
24     morning, and then we have a morning powwow
25     with the Director, the Deputy Director of

```
 1         what occurred, and we will determine from
 2         there.
 3    Q.   Got you.  So it's the Director, the Deputy
 4         Director, the JJS 4s --
 5    A.   5s --
 6    Q.   5s.
 7    A.   6s, and Lieutenant Colonel.
 8    Q.   And that's Lieutenant Colonel Gordon?
 9    A.   Huh-huh.
10    Q.   What is -- so in determining cell
11         restriction, is there anybody -- you're
12         familiar with Wellpath?
13    A.   Huh-huh.
14    Q.   They have nurses here?
15    A.   Huh-huh.
16    Q.   And they also provide mental health here?
17    A.   Huh-huh.
18    Q.   You have to say yes.
19    A.   Yes.
20    Q.   For the court reporter.  This isn't for me.
21         I -- I understand what you're saying what
22         you're saying.  It just has to be down on
23         the court reporter.
24    A.   Okay.
25    Q.   But if I -- I'm not trying to be fussy in
```

1   saying that.
2   A.  Okay.
3   Q.  It's just --
4   A.  It's fine.
5   Q.  You know, I don't -- I don't want to have
6       somebody sit in my lap either.  So --
7   A.  I --
8   Q.  -- so --
9            MS. McCAIN:
10               That's going to be really
11           interesting on the transcript.
12  BY MR. MURELL:
13  Q.  -- with -- is somebody -- so there's
14      Lieutenant Colonel Gordon, the Director,
15      the Deputy Director, the JJS 4, 5, and 6.
16      Is there anybody from Wellpath there in
17      determining if a kid goes on cell
18      restriction?
19  A.  No.
20  Q.  Is there anybody from Wellpath there  --
21      neither the medical or mental health part?
22  A.  No.
23  Q.  Once a cell restriction is decided on,
24      like, say it says 24 hours or 72 hours, is
25      there -- do you-all ever revisit that?

```
 1          Like after a day, do you check in and say
 2          --
 3    A.    Yes.
 4    Q.    So tell me about that.  How is that done?
 5    A.    When they're put on cell restriction, it
 6          depends on the amount of hours.  If they're
 7          not, you know, doing anything out of the
 8          ordinary, like, still doing the same --
 9          showing the same behavior, doing anything
10          else being, you know, they'll be lenient,
11          and they'll let them out, like, a little
12          early.
13    Q.    When you say, "a little early," what do you
14          mean?
15    A.     Like, they'll have -- like, if they're not
16          doing nothing today, being the Director or
17          somebody they'll come around when they
18          making their rounds, they'll talk to them,
19          and they be, like, okay, we'll see about
20          letting you out tomorrow, you know, just
21          finish the day out.  So it's kind of like a
22          finish the day out, and if you haven't did
23          anything else, then you can come on out.
24    Q.    Is anybody from Wellpath consulted about
25          those decisions to let them out early?
```

```
 1   A.   No.
 2   Q.   This morning powwow that you said, what
 3        else goes on at the morning powwow than
 4        discussions about cell restrictions?
 5   A.   In the morning powwow we discuss, of
 6        course, cell restriction.  We discourse --
 7        I mean, discuss the movement, how we're
 8        going to move with them.
 9   Q.   When you say that, what do you mean?
10   A.   Like, we have a lot of aggressive kids, so
11        we have these morning powwows to see and we
12        get intel and, like, if this kid talking
13        about fighting this kid, then we coming
14        together to try not to make that to cause
15        any confusion amongst a group of kids.
16   Q.   Okay.  So you-all discuss cell
17        restrictions, discuss the movement.
18   A.   Huh-huh.
19   Q.   Is there anything else you-all discuss each
20        morning?
21   A.   Basically the plan for the day, like, make
22        sure we have a productive day.
23   Q.   What -- what's the longest you can recall a
24        kid being on cell restriction in a row?
25   A.   72 hours.
```

1  Q.  Was he on B, Believe?
2  A.  Yes, huh-huh.
3  Q.  Do you remember him, an incident with him
4      in a turtle suit?
5  A.  Yes.
6  Q.  Tell me what you remember about that.
7  A.  I remember making a round on the tier, and
8      the day before he had punched the wall and
9      broke his hand, so he had a -- he had a
10     brace on his arm.
11 Q.  He punched a wall in the cell or --
12 A.  In the cell.
13 Q.  Okay.
14 A.  He punched the wall in the cell.  He had a
15     brace on his arm.  When I made it to his
16     cell, he was saying he wanted to kill
17     hisself, and he was taking the wire part
18     out of his arm brace --
19 Q.  Huh-huh.
20 A.  -- but at this time, he wasn't doing it,
21     and I called for assistance.  They came,
22     and he had started, like, trying to cut
23     hisself, so we went in and we removed
24     everything from him so that he couldn't
25     harm hisself.

| | | |
|---|---|---|
| 1 | Q. | When he punched the wall -- so this is the |
| 2 | | day before he punched the wall, was he on |
| 3 | | cell restriction when he punched the wall? |
| 4 | | Was he already on cell restriction when he |
| 5 | | punched the wall? |
| 6 | A. | I can't remember. |
| 7 | Q. | When he was trying to cut himself with the |
| 8 | | metal from the brace, was he on cell |
| 9 | | restriction? |
| 10 | A. | No, I don't think so. |
| 11 | Q. | What time of day was that that it happened? |
| 12 | A. | I -- I couldn't -- I can't recall. |
| 13 | Q. | So he said he was going to try to do that. |
| 14 | | You called for help.  Do you remember who |
| 15 | | responded, who else responded? |
| 16 | A. | Mental health, medical, and the Supervisor. |
| 17 | Q. | Do you remember who -- the mental health do |
| 18 | | you remember -- who -- who are the mental |
| 19 | | health people?  Do you know their names? |
| 20 | A. | It was Dr. Berry. |
| 21 | Q. | Dr. Berry? |
| 22 | A. | Yeah, Dr. Berry. |
| 23 | Q. | And for the medical, do you remember who it |
| 24 | | was? |
| 25 | A. | No, I can't remember.  I just know Dr. |

|   |    |                                                            |
|---|----|------------------------------------------------------------|
| 1 |    | Berry.                                                     |
| 2 | Q. | For the Supervisors, do you remember who                   |
| 3 |    | else was on duty that day?                                 |
| 4 | A. | No, I don't remember who was on duty that                  |
| 5 |    | day.                                                       |
| 6 | Q. | Okay.  Do you remember anybody else besides                |
| 7 |    | Dr. Berry that responded with you?                         |
| 8 | A. | OSS Edwards, Frank Edwards.                                |
| 9 | Q. | Frank Edwards.  So he was taken out of his                 |
| 10|    | cell --                                                    |
| 11| A. | Huh-huh.                                                   |
| 12| Q. | -- and what happened to him when he was                    |
| 13|    | taken out of his cell?                                     |
| 14| A. | He was moved to -- he was moved to the                     |
| 15|    | observation cell, which is Cell 1.                         |
| 16| Q. | Is that on B Tier?                                         |
| 17| A. | Correct.                                                   |
| 18| Q. | Okay, and where was he in -- when did he                   |
| 19|    | get put in the turtle jacket, the turtle                   |
| 20|    | suit?                                                      |
| 21| A. | When -- when he talked to mental health his                |
| 22|    | -- he was still, "I'm going kill myself.                   |
| 23|    | I'm going to kill myself."  She tried to                   |
| 24|    | talk to him.  He was still set in his mind                 |
| 25|    | he was going to kill hisself.  So it was                   |

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
| 1  |    | Dr. Berry's decision, okay, if he want to                    |
| 2  |    | try to kill hisself, he can't have nothing                   |
| 3  |    | in his cell to try to and kill hisself.                      |
| 4  | Q. | How long was he in the observation cell?                     |
| 5  | A. | He was in the observation cell for -- it                     |
| 6  |    | was -- I think maybe it was longer than                      |
| 7  |    | three days.                                                  |
| 8  | Q. | Okay.                                                        |
| 9  | A. | But he wasn't just in the cell.                              |
| 10 | Q. | Where else was he?                                           |
| 11 | A. | What you mean, like, where?                                  |
| 12 | Q. | You said he wasn't just in the cell.  Where                  |
| 13 |    | else would he be?                                            |
| 14 | A. | So, like, I'm saying, like, not just                         |
| 15 |    | staying inside the cell.  Like, he --                        |
| 16 |    | that's where his living area was until he                    |
| 17 |    | was off of the close watch.                                  |
| 18 | Q. | So when he was on observation, did he stay                   |
| 19 |    | in the observation cell for that time?                       |
| 20 | A. | Yeah, he stayed in the observation cell for                  |
| 21 |    | that time.                                                   |
| 22 | Q. | And that was longer than three days?                         |
| 23 | A. | Yeah.                                                        |
| 24 | Q. | Were you-all on your morning meetings                        |
| 25 |    | talking about him?                                           |

1   A.   Huh-huh.
2   Q.   What do you remember of those
3        conversations?
4   A.   I don't remember the conversation, but I
5        know it was to, you know, like, keep an eye
6        on him, like, keep checking on him, make
7        sure that he's okay.
8   Q.   Did Director London know or did you discuss
9        with her about him trying to kill himself?
10  A.   Yeah, she knew.  She was aware.
11  Q.   Was Lieutenant Colonel Gordon aware?
12  A.   He was aware.
13  Q.   Who else was in the meetings where you were
14       talking about Logan Terry trying to kill
15       himself?
16  A.   Say it again.
17  Q.   Who else was in the meeting when you were
18       talking about Logan Terry, and what
19       happened with him?
20  A.   Just basically supervisor -- like,
21       basically Supervisors, like, our morning --
22       morning meetings, which is with the
23       Directors and Supervisors.
24  Q.   Are you aware -- so there's a time Logan
25       Terry -- was there a time that Rendarian

1            C E R T I F I C A T E
2            THIS CERTIFICATION IS VALID ONLY FOR A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
3    SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS PAGE.
4
              I, RAYNEL E. SCHULE, Certified Court
5    Reporter, #77005, in good standing, in and for the State of Louisiana, as the officer before
6    whom this testimony was taken, do hereby certify that DAJA McKINLEY, after having been duly sworn
7    by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the
8    foregoing 62 pages; that this testimony was reported by me in stenotype reporting method,
9    was prepared and transcribed by me or under my personal direction and supervision, and is a
10   true and correct transcript to the best of my ability and understanding; that the transcript
11   has been prepared in compliance with transcript format guidelines required by statute or by
12   rules of the Board, that I have acted in compliance with the prohibition on contractual
13   relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and
14   advisory opinions of the Board; that I am not of counsel, not related to counsel or to the
15   parties herein, nor am I otherwise interested in the outcome of this matter.
16
17
18   8-5-2023                    _____
     Date                        Raynel E. Schule, CSR
19                               Certified Shorthand Reporter
                                 State of Louisiana
20
21
22
23
24
25