```
1
                    UNITED STATES DISTRICT COURT
2
                    MIDDLE DISTRICT OF LOUISIANA
3


4

5 ALEX A., by and through his        )   CIVIL ACTION:
  guardian, Molly Smith; BRIAN       )   3:22-cv-573-
6 B.; and CHARLES C., by and         )   SDD-RLB
  through his guardian Kenione       )
7 Rogers, individually and on        )
  behalf of all others               )
8       Plaintiff,                    )
                                      )
9 vs.                                 )
                                      )
10 GOVERNOR JOHN BEL EDWARDS, in      )
   his official capacity as          )
11 Governor of Louisiana; WILLIAM    )
   SOMMERS, in his official          )
12 capacity as Deputy Secretary      )
   of the Office of Juvenile         )
13 Justice, JAMES M. LEBLANC, in     )
   his official capacity as          )
14 Secretary of the Louisiana        )
   Department of Public Safety &     )
15 Corrections,                      )
        Defendant.                   )
16 _____

17            DEPOSITION OF PATRICK MCCARTHY, PH.D.

18 taken on Wednesday, August 9, 2023, at or about

19 10:32 a.m. CST via Zoom videoconference.

20

21

22 STENOGRAPHER:   KIMBERLY D. EDWARDS, CSR
                   Certified Court Reporter, No. 20017
23

24

25
```

DEFENDANT'S
EXHIBIT
tabbies
B

Page 2

```
 1  APPEARANCES:
 2  FOR PLAINTIFF:
          SOUTHERN POVERTY LAW CENTER
 3        201 St. Charles Avenue
          Suite 2000
 4        New Orleans, Louisiana 70170
          (504) 512-8649
 5        Susan.meyers@splcenter.org
          BY: SUSAN A. MEYERS, ESQUIRE
 6
     FOR PLAINTIFF:
 7        AMERICAN CIVIL LIBERTIES UNION
          Post Office Box 56157
 8        New Orleans, Louisiana 70156
          (504) 522-0628
 9        Mmatt@laaclu.org
          BY: MEGHAN MATT, ESQUIRE
10
     FOR PLAINTIFF:
11        ACLU NATIONAL PRISON PROJECT
          39 Drumm Street
12        San Francisco, California 94111
          (202) 393-4930
13        Ckendrick@aclu.org
          BY: CORENE KENDRICK, ESQUIRE
14        BY: MARISOL DOMINGUEZ-RUIZ, ESQUIRE
15  FOR PLAINTIFF:
          CLAIBORNE FIRM, P.C.
16        410 East Bay Street
          Savannah, Georgia 31401
17        (912) 236-9559
          David@claibornefirm.com
18        BY: DAVID J. UTTER, ESQUIRE
19
     FOR DEFENDANT:
20        BUTLER SNOW, LLP
          445 North Boulevard
21        Suite 300
          Baton Rouge, LA 70802
22        (225) 325-8748
          Connell.archey@butlersnow.com
23        BY: CONNELL ARCHEY, ESQUIRE
          BY: LEM E. MONTGOMERY III, ESQUIRE
24        BY: ALLENA MCCAIN, ESQUIRE
          BY: CARLY CHINN, ESQUIRE
25
```

Page 3

```
 1  WITNESS                                    PAGE

     PATRICK MCCARTHY, PH.D.
 2
 3              I N D E X
 4  EXAMINATION BY MR. ARCHEY              5
 5  EXAMINATION BY MR. UTTER              91
 6  FURTHER EXAMINATION BY MR. ARCHEY     93
 7  FURTHER EXAMINATION BY MR. UTTER      95
 8  FURTHER EXAMINATION BY MR. ARCHEY     96
 9  REPORTER'S CERTIFICATE              100
10
11
                E X H I B I T S
12
              -0-
13
          * * * * * * *
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              S T I P U L A T I O N
 2              It is stipulated and agreed by and
 3  between counsel for the parties hereto that the
 4  deposition of the witness, PATRICK MCCARTHY, PH.D.,
 5  is hereby being taken under the Federal Rules of
 6  Civil Procedure, for all purposes, in accordance
 7  with law;
 8              That the formalities of reading and
 9  signing are specifically waived;
10              That the formalities of sealing,
11  certification, and filing are specifically saved;
12              That all objections, save those as to
13  the form of the question and the responsiveness of
14  the answer, are hereby reserved until such time as
15  this deposition, or any part thereof, may be used
16  or sought to be used in evidence.
17
18              KIMBERLY DELATTE EDWARDS, Certified
19  Court Reporter in and for the State of Louisiana,
20  officiated in administering the oath to the
21  witness.
22
23
24
25
```

Page 5

1  THEREUPON:
2          PATRICK MCCARTHY, PH.D.,
3  being called as a witness herein, was examined and
4  testified as follows:
5      BY COURT REPORTER:
6          Do you swear the testimony you are
7      about to give will be the truth, the whole
8      truth, and nothing but the truth so help you
9      God?
10     BY THE WITNESS:
11         I do.
12     BY MR. ARCHEY:
13         All right.  For the record, it's 10:32,
14     is what I have on my cell phone.  I'll go
15     with that as my official time.
16             EXAMINATION
17 BY MR. ARCHEY:
18     Q.  Good morning, Dr. McCarthy.  I'm
19 Connell Archey.  I represent the defendants.  We
20 did some chit-catting about dogs before we got on.
21 I'm here to take your deposition.  I want to jump
22 right into it.  I'm going to skip a bunch of
23 formalities.  We've got a clock, so we're going to
24 get right into things.  Okay.
25         Have you given a deposition before?

Page 6

1    A.    I have not.
2    Q.    All right. Well, I'll do it quickly.
3 You need to answer out loud. You need to
4 understand my question. If you don't understand my
5 question, ask me and I'll explain or ask a better
6 question. We're on Zoom, so that makes it even
7 more important that you let me finish talking
8 before you answer, and I need to let you finish
9 answering before I talk. Okay?
10    A.    Yes.
11    Q.    All right. Thank you.
12          Doctor, when was the last time you were
13 involved in actually running a juvenile system?
14    A.    1992. I think it would have been June
15 of 1992.
16    Q.    Since 1992, have you worked in a
17 juvenile system in any other capacity?
18    A.    No.
19    Q.    I asked about your previous or other
20 expert experience, and I've been referred to the
21 New Hampshire sex abuse litigation.
22          Are you an expert in that matter?
23    A.    Yes.
24    Q.    What is the nature of your expertise in
25 that matter, or why were you retained?

Page 7

1    A.    Conditions of confinement as well as
2 overall system responsibility for ensuring those
3 systems -- those conditions were met.
4    Q.    Have you issued a report in that case?
5    A.    No.
6    Q.    Have you been deposed in that case?
7    A.    Not yet.
8    Q.    Okay. Is that case pending in federal
9 or state court?
10    A.    State court.
11    Q.    Okay. All right. You're currently
12 associated with the Columbia Justice Lab; is that
13 correct?
14    A.    Correct.
15    Q.    Okay. And previously, you were with
16 Annie E. Casey Foundation, right?
17    A.    That's correct.
18    Q.    Have you done any research into secured
19 care facilities for youth?
20    A.    Yes. As part of a publication that I
21 think was supplied to you done with Harvard and the
22 National Institute of Justice about the future of
23 youth justice.
24    Q.    Okay. What was the -- I'm sorry. Go
25 ahead.

Page 8

1    A.    Sorry. There are a number of
2 additional experiences and research that I've been
3 involved with over the course of my 25 years of
4 Casey Foundation, but I'd be happy to take them one
5 at a time if you'd prefer.
6    Q.    So what was the research that you have
7 been involved in as to secured care facilities for
8 youth?
9    A.    Investigating outcomes associated with
10 placement in secured care, histories of abuse in
11 secured care, histories of lack of meeting minimal
12 standards, conditions of confinement. And, again,
13 this is just speaking about the publication
14 proffered and the National Institute of Justice.
15 There's other research I've been involved with that
16 wasn't part of that report. So I'm not sure if you
17 want me to also cover that.
18    Q.    What do you mean by research? Have you
19 done any kind of quantitative studies where you've
20 gone into any system and looked at their outcomes
21 and that type of thing? Or are you talking about
22 more of a literature-based type review? What are
23 you talking about?
24    A.    A literature-based type review.
25    Q.    Okay.

Page 9

1    A.    Again, just to be clear, are we still
2 talking about this one publication, or are we
3 talking about more broad?
4    Q.    I was not limiting it to that one
5 publication. You kept going to it, and that's
6 good. I understand why. I wasn't limiting it to
7 that one publication.
8    A.    Oh, good. Actually, I think it would
9 be helpful to talk about my other experience that
10 is actually more extensive than that publication,
11 the research associated with that publication.
12          So as I said, I was with the foundation
13 for 25 years, and as part of that responsibility,
14 the work in -- the foundations work in juvenile
15 justice was under me as a vice-president at the
16 foundation before I became president. And during
17 that time, in addition to overseeing the
18 initiative -- juvenile detention alternative
19 initiative, which is now in 300 jurisdictions
20 around the country and 39 states, we also brought
21 in a variety of experts around conditions of
22 confinement to help us work with those
23 jurisdictions in improving conditions in the JDAI
24 sites, Juvenile Detention Alternative Initiative
25 sites.

Page 10

1       And in that process, some of them were
2  attorneys who had been involved in the
3  investigation and lawsuits regarding conditions of
4  confinement.  Others were various experts in
5  operations, correctional leaders from across the
6  country.  We published a whole series of
7  publications around conditions of confinement,
8  including one that is essentially an assessment
9  instrument that's used to determine where detention
10  facilities could improve their conditions.
11       Some of that was drawn from case law.
12  Again, to be clear, I'm not an attorney and I'm not
13  implying that I am.  But some of the minimum
14  standards were drawn from case law.  And that in
15  addition, those particular publications, or a
16  couple of them, also tried to promote best
17  practice.  So it was kind of here's the minimum
18  practice, if you will, minimally accepted
19  standards, and here are examples of best practice
20  that will yield better results.
21       In addition to that, I believe two
22  publications separated by about five years, based
23  on documented instances of abuse, inappropriate use
24  of solitary confinement, excessive force,
25  et cetera, will use those publications to track how

Page 11

1  many states in the country had their facilities
2  identified as resulting in abusive conditions or
3  conditions that did not meet minimum standards.
4       In addition -- and, again, the website
5  for the foundation's replete with literally dozens
6  and dozens of publications focused on juvenile
7  corrections system reform, public policy, all
8  related to juvenile corrections that, again, over
9  the course of my 25 years there I was overseeing
10  that work.  Essentially, all those documents I
11  either contributed to or edited or was part of the
12  team that researched them.
13       So I hope that's responsive to your
14  question.
15       Q.  Let me see if can encapsulate that, and
16  if you disagree with me, just tell me that, and
17  we're going to move on.  Okay?  I have a clock.
18       But I think what I'm hearing you say is
19  there's a lot of literature.  There's a lot of
20  these papers that have been put out by attorneys
21  and others.  I'm asking you if you've done any
22  research that would be scientific in nature where
23  you develop a hypotheses, you go into a facility
24  and you test the hypotheses, and then you adjust
25  your hypotheses and come up with your conclusions.

Page 12

1  Have you done anything like that?
2       A.   No, sir.
3       BY MR. UTTER:
4            Object.  I was unclear on the question.
5            But you can go ahead and answer,
6       Mr. McCarthy.
7       BY THE WITNESS:
8            No, I haven't conducted that kind of
9       empirical research, no.
10  BY MR. ARCHEY:
11       Q.   All right.  So your result of all this,
12  I believe, is you've got this -- I'll call it a
13  mantra, but you don't have to agree with my word.
14  What you say is produce the pipeline, reform the
15  culture, and then reinvest?  That's what you've
16  been promoting, is that fair?
17       A.   That's the public policy position that
18  I've taken.  Actually, you missed one of them, but
19  that's okay.  For the purposes of this, there's
20  actually four, the four Rs.
21       Q.   I didn't say the fourth -- what's the
22  fourth R?
23       A.   Refinancing, reinvesting the dollars
24  into savings and things that work better for kids.
25       Q.   Okay.

Page 13

1       A.   That's the public policy position.
2       Q.   And that's what you spend a lot of your
3  time at the Annie E. Casey Foundation and elsewhere
4  promoting that position, fair?
5       A.   I would not agree with a lot of my
6  time.  You know, as vice-president and as president
7  and even now that I've retired from the foundation,
8  it was a portion of my time.  But I had a lot of
9  other things going on.
10            One of the things I think I just want
11  to put in here is that a lot of my expertise is
12  overall child well-being.  And if it's helpful, the
13  areas I was responsible for included health,
14  reproductive health, mental health, education,
15  income security, child development, et cetera --
16  this is when I vice-president -- as well as connect
17  services and consultation.  So my expertise is
18  beyond, if you will, specific to juvenile justice.
19       Q.   Let's move on.  I want to know what
20  documents you reviewed in this case prior to right
21  now.
22       A.   Yeah, so I reviewed everything that I
23  was able to get my hands on.  So I reviewed the
24  declarations of the plaintiffs, the young people.
25  I reviewed the depositions that have been forwarded

Page 14

1 so far of the defendants' witnesses, which were
2 quite a few. Let's see. I reviewed the expert
3 reports from both the original hearing back in
4 September as well as the reports of Dr. Gagnon,
5 Dr. Vassallo, and Dr. Haney.
6        I reviewed the transcript of the court
7 hearing, and I reviewed the Court's decision. Let
8 me see if I'm leaving anything out. There have
9 been -- not a let yet, but there were a few
10 documents that related to policies and procedures
11 at the facility. Again, not a lot of that. And
12 there was a couple of unusual incident report
13 samples that I looked at. I'd have to go back and
14 check, but I believe I can do that. But I believe
15 those are the primary documents that I've reviewed
16 so far.
17    Q.    Do you have those in a folder or
18 something where you could forward those to us like
19 this afternoon after your deposition?
20    A.    I have them electronically, not in a
21 folder. And, actually, the plaintiff's counsel has
22 sent me these, so I'm assuming that that's a good
23 question you can make to them.
24    Q.    I meant electronic folder.
25        So you have them electronically in a

Page 15

1 place where you could forward everything to me this
2 afternoon if counsel agrees, is that fair?
3    A.    I'd have to go back and -- they've been
4 coming in an e-mail, but, again, I'd defer to David
5 as to what the best way is to do that.
6 BY MR. UTTER:
7        I'll just state for the record,
8 Connell, that they are all in your
9 possession, everything that he's reviewed.
10 BY MR. ARCHEY:
11        It's wonderful, but I want to know what
12 he's reviewed, and the only way to know that
13 is for him to send me what he's been provided
14 so far. I will request that and I'll send an
15 e-mail afterwards.
16 BY MR. UTTER:
17        Yeah, I'll send you everything we send
18 to him.
19 BY MR. ARCHEY:
20        That'd be great.
21 BY MR. ARCHEY:
22    Q.    Doctor, what are your opinions in this
23 case?
24    A.    I will give you my preliminary opinions
25 because I'm still expecting some additional

Page 16

1 documents. But in sum, as I've reviewed the expert
2 reports, I've looked at a variety of the -- hold on
3 one second because I want to make sure I'm being
4 accurate here.
5        I reviewed the expert reports, as I
6 said. My opinions relate to the potential risks of
7 harm to children and youth starting from physical
8 environment, the use of solitary confinement, the
9 rehabilitative programming that is offered, mental
10 health services, educational services and supports,
11 recreational facilities and programs, and contact
12 with families. And in each instance, I've tried to
13 determine, based on the information currently
14 available to me, whether or not in each of those
15 areas there is risk of harm to young people.
16    Q.    Do this for me, please. I'm just
17 trying to make sure I have my list.
18        Risk of harm from, and then you listed
19 a whole number of things.
20    A.    Sure. I'll go through them. Solitary
21 confinement, rehabilitative programming, mental
22 health services, educational services and supports,
23 recreational facilities and programming, and
24 contact with families.
25    Q.    Thank you.

Page 17

1        All right. I know this is an overview.
2 Does this capture your opinions, or is there more?
3    A.    That's what I have so far, and I'm
4 happy to share my opinion about each of those, my
5 preliminary opinion based on what I've reviewed.
6    Q.    We're going to get there. We're going
7 to run through them.
8        First off -- and let me ask you to keep
9 them fairly succinct. I can't get our treatise on
10 each of these. Some of these answers could call
11 for long answers. I understand that.
12    A.    Yeah.
13    Q.    I want to talk about the models of
14 justice. Louisiana is using what's called a LaMOD,
15 which is patterned after the Missouri model. Is
16 that what you understand?
17    A.    Yes. Not only that, but we helped
18 bring it to -- "we" being on the Casey Foundation,
19 helped bring it to Louisiana.
20    Q.    Okay. Now, Louisiana having a model
21 that's modeled after Missouri, that's a good thing,
22 right?
23    A.    If it's implemented properly and
24 sustained over time, yes.
25    Q.    And Louisiana -- I'm sorry. Go ahead.

PATRICK MCCARTHY, PH.D. on 08/09/2023

18..21

Page 18

1    A.   Well, I was about to say that any
2 model, you can have a lot of description of it.
3 Louisiana did fairly well in the early years with
4 the adaptation of the Missouri model.  It is my
5 opinion that at a certain point between funding
6 cuts, staff turnover, leadership turnover, changes
7 in the administration, that some of the core
8 elements of the Missouri model may not have been
9 sustained over time.  Now, that's an opinion based
10 on results.
11          Having said that, yes, the Missouri
12 model is certainly a strong model, and if Louisiana
13 could do it right, I think you'd get good results.
14    Q.   Right.  And Louisiana was one of the
15 first systems in the country to follow the Missouri
16 model, correct?
17    A.   That's correct.
18    Q.   And the Missouri model which Louisiana
19 in its LaMOD model is following is based on
20 rehabilitation, correct?
21    A.   Correct.
22    Q.   And that's what you think ought to be
23 done, right?
24    A.   Correct.
25    Q.   Okay.  One of the primary obligations

Page 19

1 of a system when you have youth in their care is
2 the safety of the youth, is that fair?
3    A.   Correct.
4    Q.   Even after the application of good
5 rehabilitation services, there can still be youth
6 who are difficult and aggressive and violent,
7 correct?
8    A.   Correct.
9    Q.   There are some youth who are at high
10 risk of committing violent crimes, and you know
11 this, even after applying the best practices that
12 you advocate for, correct?
13    A.   Yes, but I have more to say about that,
14 if I'm able to.
15    Q.   Well, I need to kind of move.  I don't
16 mean to cut you off, but I only have two hours, and
17 you have lots of words, so...
18    A.   Then I'd have to say that is partially
19 correct.
20    Q.   Okay.  Well, go ahead, tell me what you
21 think.
22    A.   I'll be brief.  An overall model such
23 as the Missouri model will work with lots and lots
24 of kids.  What research has shown over time in the
25 20 years since LaMOD was put in place is that for

Page 20

1 certain individual youth, you need to have more
2 intensive and more focused and more individualized,
3 if you will, interventions that have been shown to
4 work in other places that go beyond the Missouri
5 model.
6    Q.   Okay.  I think we're on the same page.
7          In those smaller or those intensive
8 places where they're getting services, they're
9 designed to be smaller, secured care facilities,
10 right?
11    A.   Say that again.
12    Q.   Yeah, that was convoluted.
13          You want those facilities that provide
14 the more intensive rehabilitation services to be
15 smaller, smaller numbers, right?
16    A.   Sir, I didn't mean to say that you
17 needed to move those children to a different
18 facility.  I'm saying within the model, for
19 example, the Missouri model, whatever the model is
20 you're choosing, within that model within the
21 facility where they sit, you may need more
22 intensive services.
23          Now having -- certainly at times, you
24 want to move some youth to a different facility for
25 whatever reason, but I didn't want to imply that it

Page 21

1 was just necessary to move a young person out of
2 the Missouri model or the Louisiana model in order
3 to provide those more intensive services.
4    Q.   In some cases, it is necessary to
5 remove youth from their family or their
6 neighborhood for a period of time, correct?
7    A.   Yes.
8    Q.   A secured care facility needs to be
9 concerned about the safety of the youth, correct?
10    A.   Yes.
11    Q.   The safety of the other youth that are
12 in that facility adjacent to the -- what may be a
13 violent or aggressive youth, correct?
14    A.   Yes.
15    Q.   The safety of the staff that are
16 working with the youth, correct?
17    A.   Yes.
18    Q.   And the safety of the public who -- so
19 we don't have the youth escape and cause harm,
20 correct?
21    A.   Yes.
22    Q.   What do you know about why Louisiana
23 determined that it needed to open Bridge City --
24 and I want to refer to it as West Feliciana.  That
25 is better.  West Feliciana, which is the facility

Page 22

1 that we're talking about today. You understand
2 when I say West Feliciana what we're talking about?
3    A.   Yes. You mean the facility that's on
4 the grounds of the Louisiana state prison at
5 Angola?
6    Q.   Yes. And we're referring to it as
7 West Feliciana.
8         So what is your understanding as to why
9 the State determined that it needed to open
10 West Feliciana?
11    A.   Based on the transcript from
12 Mr. Nelson's testimony in court at the September
13 hearing, my understanding is there had been a
14 series of very serious violent episodes as well as
15 an escape that ultimately resulted in someone being
16 shot.
17         So a combination of destruction of
18 property, youth-on-youth assault, youth-on-staff
19 assault, and as I recall, the one escape -- I do
20 recall one escape. I don't recall if there were
21 more than one escapes.
22    Q.   Okay. And the property destruction, is
23 it your understanding that the youth basically
24 destroyed several facilities and made them
25 inhabitable?

Page 23

1    A.   Yes.
2    Q.   Okay. Are you aware of any other
3 short-term solution that Louisiana had available to
4 it to institute this TTU program while
5 Swanson Monroe is being constructed and repaired?
6    A.   Yes.
7    Q.   What?
8    A.   I need to begin with saying these kinds
9 of behaviors are generally symptomatic of a
10 breakdown of the entire approach to young people.
11 We needed to believe that these young people are
12 somehow inherently different from young people who
13 come from the Bronx, from Anacostia from Houston,
14 rather large urban areas where there's certainly a
15 lot of history of violence and crime where you
16 don't have these kinds of behaviors, or you need to
17 ask the question what's going on in those
18 facilities that have led to this kind of behavior.
19         And my understanding from the testimony
20 is that some of these behaviors go back a couple
21 years. It wasn't just in 2022.
22    Q.   Let me interrupt you, please. Let me
23 interrupt you, please. My question is what
24 facility.
25         What other facility did Louisiana have

Page 24

1 that would be an option for housing these youth
2 that are currently at West Feliciana? What other
3 options were there, to your knowledge?
4    A.   If Louisiana decided that the only
5 approach is to find a different facility, then I
6 don't know of any other facilities in Louisiana
7 because I don't know every facility in Louisiana.
8 The decision was it had to be a facility change.
9 If that's your question and that's your premise,
10 then I don't know --
11    Q.   My premise is we have youth --
12    A.   Let me just finish my statement, if I
13 could. Sorry.
14         If your premise is that it required a
15 facility, then I don't know any other facility in
16 Louisiana because I don't know all of the
17 facilities in Louisiana.
18         Sorry. Go ahead.
19    Q.   And that's what the judge found in a
20 ruling was there was a need for another facility
21 and there were no others available. Is that what
22 you understood?
23    A.   My understanding of the judge's
24 decision was much broader than what you just
25 summarized.

Page 25

1    Q.   But it included that, right?
2    A.   I believe -- I would characterize it as
3 the judge felt there was not another alternative.
4 Then we can quibble about there are other
5 approaches because obviously in other
6 jurisdictions, they don't move kids to these kinds
7 of facilities. There were other options.
8    Q.   But Louisiana had no other alternative,
9 as the judge confirmed, correct?
10    A.   Louisiana apparently -- and, again, I
11 can't speak to the other facilities in Louisiana,
12 but Louisiana may not have had another facility.
13 It doesn't mean that was the only alternative or
14 that today it's the only alternative. I would
15 disagree with that.
16    Q.   What other facility could Louisiana use
17 to house these youth that have been identified for
18 West Feliciana?
19    A.   I don't think I'm being clear. If the
20 decision is the only approach to dealing with the
21 problems is a facility change, then I don't know of
22 any other facility because I don't know the other
23 facilities. My point is the premises -- the best
24 way to deal with the kinds of behaviors that have
25 been going on apparently for several years was to

Page 26

1 move the youth to a different facility. I don't
2 think that's the only approach that other
3 correctional leaders would take.
4    **Q. Sometimes it is necessary to restrict**
5 **the movement of a youth, correct?**
6    A. Correct.
7    **Q. And when a youth is being violent,**
8 **attacking another youth, what options are available**
9 **to the staff at that time?**
10    A. There are a number of options. First,
11 of course, and most important, is to get the youth
12 who is doing the assaulting to a safe place where
13 he can't assault anyone in that moment and, of
14 course, to attend to the youth who has been
15 assaulted.
16    Then the next step is to work with the
17 young person who has done the assaulting, you know,
18 assaulted the other youth, and work with that young
19 person to determine why it occurred, what can we
20 learn from it. It's actually a rehabilitation
21 opportunity moment.
22    Then following that -- because over
23 time it may take, you know, an hour or so, even
24 longer than that, the young person once calmed down
25 and resorts to a peaceful place, you can begin

Page 27

1 working on accountability for the actions that that
2 young person took, including accountability to the
3 person that was hurt.
4    Very importantly, I think if a youth
5 has committed that kind of harm, you want to
6 surround that young person with enough staff not
7 only to see he doesn't harm but also to work the
8 issue that has led to it.
9    **Q. Right. And the first thing is to get**
10 **the youth where he cannot hurt someone else. Staff**
11 **may have to place their hands on that youth to**
12 **control that youth, correct?**
13    A. That's correct. In a case of a serious
14 ongoing assault, staff may have to place their
15 hands on the young person to get them to a safe
16 place.
17    **Q. All right. Are you aware of any**
18 **evidence that the youth at West Feliciana had been**
19 **in contact with adult inmates any time since**
20 **they've been there?**
21    A. No.
22    **Q. Okay. Who is running the**
23 **West Feliciana facility, to your knowledge?**
24    A. I've looked at the depositions, and
25 it's an interesting -- appears to be an interesting

Page 28

1 chain of command. I believe it's Ms. London who is
2 the director, and she has, as I recall, two levels
3 underneath her. I believe an assistant and deputy.
4 I'd have to look at my notes to get that exactly
5 right. And then there are supervisors and, of
6 course, the JJS staff.
7    **Q. All of those are OJJ personnel that are**
8 **running the West Feliciana facility, correct?**
9    A. I see your point of your question.
10 Yes.
11    **Q. Okay. That's okay.**
12    **As to the Director London, do you know**
13 **what her qualifications are?**
14    A. I reviewed them when she gave her
15 deposition. I don't recall if she testified. It's
16 been a while since I read the transcript, but, yes,
17 I understand that she has good qualifications as a
18 director.
19    **Q. Okay. Are you familiar with the TTU**
20 **program being used at West Feliciana?**
21    A. I'm familiar with it based on the
22 depositions of the JJS staff, the social worker,
23 and the -- Dr. Danger, I guess, is over all the
24 clinical programs. I have not seen a written
25 description of the program, but I have examined

Page 29

1 depositions to determine the schedule, so the --
2 what the average day looks like.
3    So until I see something in writing, I
4 have had to infer what the actual rehabilitative
5 programming actually is. I am aware that there was
6 a plan to implement trust-based relational
7 intervention, and I am clear that that's not what's
8 going on.
9    **Q. So --**
10    A. If you have another description, I'd
11 like to see it.
12    **Q. I'm sorry. Go ahead.**
13    A. No, I was just going to say if there's
14 a description, I'd like to see it.
15    **Q. Okay. It's out there. No one's**
16 **provided that to you?**
17    A. Not yet.
18    **Q. Okay. Have you ever operated in a**
19 **director over, supervised, a TTU program?**
20    A. No.
21    **Q. Have you ever designed a TTU program?**
22    A. No.
23    **Q. Are you familiar with Dr. Underwood who**
24 **did design the TTU program that's being used at**
25 **West Feliciana?**

Page 30

1    A.  I understand he is your expert witness,
2  and I've reviewed his background just through the
3  web, but I don't know him personally.
4      Q.  Are you familiar that Dr. Underwood has
5  implemented TTU programs in approximately eight
6  other states?
7    A.  No.
8      Q.  Have you seen the TTU PowerPoint
9  training that is provided to the JJS staff and
10 others?
11   A.  No.
12     Q.  The TTU program, is it your
13 understanding that it's designed to be intensive
14 rehabilitation and treatment?
15 BY MR. UTTER:
16      Before you answer that, Mr. McCarthy,
17 Connell, can you identify the document you're
18 talking about identifying the TTU program?
19 BY MR. ARCHEY:
20      David, I don't have that at my ready.
21 I think it's documents 1 and 2.  The
22 PowerPoint, I know, is Document 18.
23 BY MR. UTTER:
24      I just wanted you to identify the
25 documents you're referring to.  Obviously,

Page 31

1  you're referring to a policy.  You're
2  referring to a TTU program.  Just please
3  identify them for the record.
4  BY MR. ARCHEY:
5      No, I don't need to do that.  Plus,
6  it's the policies that we introduced before,
7  plus the ones we identified in the record at
8  this time.
9  BY MR. UTTER:
10      You're asking a question about a
11 specific policy.  I'm asking you to identify
12 it as you're asking the question.  That seems
13 fair.
14 BY MR. ARCHEY:
15      It doesn't matter.  He hasn't seen any
16 of them, David.
17 BY MR. ARCHEY:
18     Q.  All right.  Is the TTU program designed
19 to provide intensive rehabilitation and treatment
20 for the youth?
21   A.  Is it designed that way, or is it
22 implemented that way?
23     Q.  Designed is my word first.
24   A.  I see.  As I understand it, based on
25 the testimony of Mr. Nelson, that was the intent in

Page 32

1  moving the young people to West Feliciana.
2      Q.  Okay.  What are the components of the
3  TTU program?  Do you know?
4      A.  As I understand from testimony and
5  deposition, all that has been said by the people
6  who presumably are implementing it is that it's a
7  three-phase program with orientation and then
8  treatment and then transition.  And the folks who I
9  assume are responsible for implementing, the JJS
10 clinical folks, the social workers, et cetera, when
11 asked to describe the program, that's how they
12 described it.
13      Again, not having seen the PowerPoint
14 that you referenced or the description of the
15 program, that's all I know about -- all I know
16 about the TTU is what I know about the schedule.
17 What actually is happening in that building, and
18 what the folks who were asked about the program
19 said.  That was always the approach to presumably
20 implementing the program.
21     Q.  What services are Ms. Bryant providing
22 as part of the TTU program?  Do you know?
23      A.  She is described as the social worker,
24 and she said her duties were to keep in touch with
25 the families and to -- again, I have to go back and

Page 33

1  look at the specifics in her deposition, but it
2  sounded like relatively generic social work.  My
3  own background is in social work, and I taught in
4  social work schools.  It sounded like a relatively
5  straightforward and typical social worker at a
6  facility.
7      Again, that's based on her testimony in
8  her deposition.  I don't have a -- any other
9  information about what her role would be other than
10 what she says her role is.
11     Q.  Well, you call it generic or
12 straightforward social services.  That's a
13 component of this rehabilitation program for these
14 youth, correct?
15 BY MR. UTTER:
16      Objection, Connell.  We want to see the
17 documents that you're talking about, so I'm
18 just going to object.
19      And, Mr. McCarthy, you can go ahead and
20 answer the question.
21 BY THE WITNESS:
22      Yes.
23      Any competent, if you will,
24 correctional facility will have someone doing
25 the kinds of things described by Ms. Bryant,

Page 34

1  whether it's a facility that's offering high
2  quality -- or any quality of rehabilitation
3  services, or simply if they need somebody who
4  will arrange to talk to the families when the
5  families want to talk.
6  BY MR. ARCHEY:
7    Q.  And Ms. Bryant is visiting with the
8  youth on a daily basis, according to her testimony;
9  is that right?
10   A.  According to her testimony or from my
11 testimony?
12   Q.  According to her testimony.
13   A.  She talks about seeing them regularly,
14 and the JJS staff talk about occasionally she'll
15 call folks out.  I don't know if she talks to every
16 young person every day.  My sense from the response
17 to the question of how often family contact
18 happens, which is once or twice a week, is that
19 it's not daily for every youth.
20   Q.  All right.  What do you know about
21 multidisciplinary means that occur to discuss the
22 youth in the program?
23   A.  Only what's been described by the
24 people who are involved with those meetings from
25 depositions.  I think I just read one earlier today

Page 35

1  or yesterday from a JJS 6 who I found a little bit
2  hard to follow, frankly, but who apparently talked
3  about, within the facility, the people who are
4  on -- the daily -- I think it was a daily basis to
5  kind of go over how are the kids doing, which young
6  people should we really be paying attention to
7  because they're kind of getting riled up, let's
8  talk about how we're going to move the young people
9  -- you know, person A has a beef with person B,
10 let's make sure we don't put them together, that
11 type of thing.
12       Again, I have no description other than
13 what's in the depositions.
14   Q.  Now, the description by the JJS 6 of a
15 daily discussion as to the youth, that's a good
16 thing among those JJSs to have good handoff and
17 good intel on how they're doing, right?
18   A.  Yeah, it's very standard practice in
19 every facility.  It certainly would be troubling if
20 you didn't have some kind of handoff conversation.
21   Q.  Okay.  Are you aware of
22 multidisciplinary meetings involving professionals
23 that take place to discuss the youth?
24   A.  I'm aware that before they are placed,
25 they are supposed to -- placed at West Feliciana

Page 36

1  from one of the other facilities, there's supposed
2  to be multidisciplinary staffing to determine
3  whether or not that's a good idea or not.  That's
4  what I know about outside the facility itself.
5    Q.  Okay.  Have you seen any of these, I
6  guess, records documenting the multidisciplinary
7  meetings as to why youth are being sent there to
8  West Feliciana?
9    A.  I have not.
10   Q.  Do you know anything about
11 multidisciplinary meetings that may take place
12 while the youth is at West Feliciana?
13   A.  I believe there are a couple of
14 depositions that reference some conference calls.
15 I believe Mr. Nelson has said that he expected that
16 they would happen; although, he was not usually
17 involved in them.  He described the process, but,
18 again, he was not attending them.
19       So, again, with these kind of
20 situations, I'm not sure if it's the expected
21 policy that happens or an expected policy that
22 doesn't happen.
23   Q.  Have you not seen any information that
24 there are multidisciplinary meetings every Thursday
25 afternoon to discuss every youth at West Feliciana?

Page 37

1    A.  I have not.
2    Q.  Do you know who participates in these
3  multidisciplinary meetings every Thursday
4  afternoon?
5    A.  Without reference to specifically
6  Thursday afternoon, I believe from the depositions,
7  I understand who is generally involved in those
8  multidisciplinary conversations when they're held,
9  but I don't know if there's a different or a very
10 specific group that's Thursday afternoon because,
11 like I said, I was not aware of the Thursday
12 afternoon meeting.
13   Q.  Meeting to discuss every youth and
14 their status and their progress by all the
15 professionals involved on a weekly basis would be a
16 very good and important part of this program,
17 wouldn't it?
18   A.  It would be an expected part of a
19 program that is focused on young people with
20 complex problems.  If it were not occurring, it'd
21 be deeply troubling.  It would be deeply troubling
22 if it was not occurring, given the characteristics
23 that we...
24   Q.  You've come up with some preliminary
25 opinions, and were you even aware this was

Page 38

1 happening?

2    A.    I'm sorry, say that again.

3    Q.    In developing your preliminary

4 opinions, were you aware that there are

5 multidisciplinary meetings by professionals taking

6 place every Thursday afternoon?

7    A.    I believe I said I was not aware of

8 that.

9    Q.    Are you aware that Dr. Underwood

10 participates in those meetings every Thursday

11 afternoon?

12    A.    Since I did not know about the Thursday

13 meetings, I think it is reasonable to say that I

14 was not aware that Dr. Underwood was participating

15 in those meetings. I don't know that Dr. Underwood

16 has been working with the young people directly so

17 has to have an understanding of their needs, et

18 cetera. But I guess that's a different...

19    BY MR. UTTER:

20        Quick question, Connell. We cannot

21    recall seeing the minutes of these meetings.

22    Do they actually -- we assume that if they're

23    having a meeting, there are notes taken, and

24    minutes?

25    BY MR. ARCHEY:

Page 39

1        My understanding, it ends up in the

2    youth's file, so they've been produced to

3    you.

4    BY MR. UTTER:

5        We'll look. Thank you.

6 BY MR. ARCHEY:

7    Q.    All right. Do you know how many youth

8 are in the TTU program at West Feliciana at any one

9 time?

10    A.    I believe right now, there are 15. I

11 think Mr. Nelson testified or in his deposition

12 stated he's trying to keep it at 15. It might be

13 16 at one point. I believe there are two units

14 with roughly half on one and half on the other. I

15 gather that the third unit might be sometimes used

16 for young people who are just about to transition

17 out.

18    Q.    Do you know the length of the program?

19    A.    I know the design is four to six weeks.

20 I know that some young people might stay for eight

21 weeks. I know that some young people cycle back

22 through if there's another incident while they are

23 in a different facility. I understand there's some

24 lack of clarity about what's the longest period of

25 time that any young person has stayed there. The

Page 40

1 number that sticks in my head is 12 weeks, but I'm

2 not sure that that's accurate.

3    Q.    Have you done anything to ascertain

4 whether the TTU program at West Feliciana is

5 helping, whether it's getting good results with the

6 youth that are going through the program?

7    A.    I have not.

8    Q.    Do you know either way?

9    A.    I'm not sure -- I'm not sure I

10 understand the question.

11    Q.    Okay. That's fair.

12    A.    I don't want to launch into a big thing

13 about how you measure outcomes. I'm happy to do

14 that because after all, as a Columbia citizen, I'm

15 a research scholar. But having said that, I'm sure

16 that's not how you want to spend your time.

17    Q.    Okay. Let me talk about social

18 services. Do you know what social services are

19 provided to the youth at West Feliciana?

20    A.    I'm sorry, do I know what social

21 services are provided?

22    Q.    Yes, sir, that's the question.

23    A.    All that I know is what Ms. Bryant's

24 deposition said. If you want me to repeat all of

25 that, I'm happy to do so, but I don't have a

Page 41

1 written description of those social services.

2    Q.    Have you reviewed any of the files for

3 the youth that either are or have been at

4 West Feliciana?

5    A.    No.

6    Q.    Do you have any opinions as to

7 Ms. Bryant's competency as a social services

8 provider?

9    A.    I don't have enough information to form

10 an opinion about that.

11    Q.    Do you know where Ms. Bryant was before

12 West Feliciana opened?

13    A.    I believe from her deposition that she

14 covered that, but I don't recall. That was one of

15 the first depositions I read. I don't recall the

16 details. So I don't recall. But at one point, I

17 did read the deposition, read the qualifications

18 based on the deposition.

19    Q.    So is it your opinion that social

20 services at West Feliciana are somehow deficient?

21    A.    No, I don't have an opinion about the

22 social services at West Feliciana other than the

23 question of family contact, which I would not lay

24 at the door of social services.

25    Q.    Okay. All right. Let's talk about

Page 42

1 family contact, then. Do you know, has West
2 Feliciana ever denied visitation to any family that
3 have requested visitation?
4     A.   I don't know. I do know based on --
5     BY THE WITNESS:
6         I'm sorry, David, were you going to say
7 something?
8     BY MR. UTTER:
9         Hold on.
10        I just want to object. You have
11 questions that sort of go to, you know,
12 Mr. McCarthy's almost like a fact witness.
13 He's an expert. He's, you know, taking
14 information from all different places. He's
15 going to give his opinion about whether the
16 conditions there hurt kids. I just want to
17 make the objection.
18        Go ahead and answer, Mr. McCarthy.
19    BY MR. ARCHEY:
20        I appreciate no speaking objections,
21 David. And I don't think there's anything
22 inappropriate about that question at all.
23    BY THE WITNESS:
24        Could you repeat the question, sir.
25    BY MR. ARCHEY:

Page 43

1     I will.
2 BY MR. ARCHEY:
3     Q.   Are you aware of any instances where
4 West Feliciana or OJJ have denied parents or family
5 the right to visit anyone at West Feliciana?
6     A.   Thank you. I appreciate that.
7     No.
8     Q.   Okay. Are you aware of steps that
9 West Feliciana takes to try to facilitate family
10 visitation for the youth there?
11    A.   I am aware that the plan was to offer
12 transportation in order to give families contact,
13 and I'm aware that there has been very little
14 family contact based on depositions.
15    Q.   Are you aware that West Feliciana sends
16 a letter to the family when the youth is
17 transferred to West Feliciana advising them of the
18 visitation, how to get there, and if they need
19 transportation, they will assist? Are you aware of
20 that?
21    A.   I would assume that that would be the
22 case. I wasn't aware of it, but I would assume
23 that you would, of course, do that.
24    Q.   Okay. Are you aware that there is a
25 family liaison counselor that works with the

Page 44

1 families to assist in visitation and contact with
2 the youth at West Feliciana?
3     A.   Again, I would assume that would occur,
4 but I was not aware specifically that it was
5 occurring. I'd be troubled if it were not
6 occurring.
7     Q.   Okay. And you certainly saw where
8 Ms. Bryant facilitates phone calls and Zoom calls
9 between the youth and their family, correct?
10    A.   Yes.
11    Q.   So are you -- what are the criticisms
12 as to contact with families that are attributable
13 to OJJ or West Feliciana?
14    A.   Yes. So, again, it goes to the ability
15 of a correctional institution, a juvenile
16 correctional institution, to be truly
17 rehabilitative. In having the young people this
18 far away from their families, it greatly inhibits
19 the opportunity for family to have contact,
20 in-person contact, with their child.
21        If you look at the research on the most
22 effective interventions are young people with the
23 kinds of problems we're talking about, those that
24 are evidence-based have the most solid evidence
25 behind them, multisystemic therapy, functional

Page 45

1 family therapy, et cetera, each of them rely on
2 family contact.
3        So the concern is not that someone is
4 saying, no, you can't see your child or that phone
5 calls are not being arranged, but rather, the
6 distance that families would have to travel -- even
7 if they were willing to accept transportation, that
8 the distance they would have to travel represents a
9 barrier to true family engagement with their young
10 people. In places that are more successful, if you
11 will, family engagement is central to how the
12 program works.
13    Q.   Do you know where Bridge City was
14 located prior to the opening of West Feliciana?
15    A.   You mean the original Bridge City? I
16 believe it was in Jefferson Parish, if I'm not
17 mistaken.
18    Q.   Correct. Down in the New Orleans area,
19 likely closer to many of the youths' family, is
20 that fair?
21    A.   Yeah.
22    Q.   And Bridge City had to move to
23 West Feliciana because of the destruction of that
24 facility with riots and other conduct by the youth,
25 correct?

Page 46

1    A.   I'm not sure how the question follows,
2 sir.  So you say they had to be moved there because
3 of what happened, and I think I said earlier, there
4 were other alternatives that could have been
5 pursued.
6        So I understand that's your premise and
7 I understand the point of your question, but I
8 can't agree with that premise because I don't agree
9 with it.
10   Q.   All right.  Fair enough.
11        That's why West Feliciana was opened,
12 though, because of the destruction of Bridge City
13 down in Jefferson Parish?
14 BY MR. UTTER:
15        Objection, asked and answered.
16 BY MR. ARCHEY:
17        No, that's a different question.
18        Go ahead, Doctor.
19 BY THE WITNESS:
20        I'm sorry, ask the question again.  I
21 thought it was the same question.
22 BY MR. ARCHEY:
23        All right.  I'm going to move on.  I
24 don't want to argue with you, and counsel.
25 BY MR. ARCHEY:

Page 47

1    Q.   And West Feliciana, it is a temporary
2 solution, correct?
3    A.   That's my understanding.  I understand
4 it was supposed to be until April 2023, I believe.
5 Now they're talking about maybe October or maybe
6 November, if everything else goes right, this
7 deposition.
8    Q.   Right.  And OJJ has contact with the
9 family and has even offered to facilitate
10 transportation for the family, correct?
11   A.   I actually don't know the second part
12 of that, sir.  I know that was part of the plan.  I
13 have not seen any evidence one way or the other
14 whether families have actually been offered
15 transportation and whether they've said no, what
16 the transportation was, et cetera.
17        So I do know that was the plan, but,
18 again, having being in this business for a while,
19 it's the case that plans often are not implemented
20 as you would hope they would be.
21   Q.   You haven't seen the letter that goes
22 out to the family that offers the transportation,
23 have you?
24   A.   I haven't seen the letter.  Again, I
25 would expect that letter to say exactly what it

Page 48

1 says.  But your question to me, I thought, was
2 whether it was actually being done, so I don't know
3 if beyond sending a letter, something like that's
4 actually -- I just don't have any evidence one way
5 or the other.
6    Q.   So your criticism -- I'm sorry.  Go
7 ahead.
8    A.   No, I was just going to say could be
9 being done.  Maybe not.  I just haven't seen any
10 evidence one way or the other.
11   Q.   Okay.  So your criticism as to contact
12 with families goes to the location and the distance
13 from where many of the youth might be, their
14 families might be, and where West Feliciana is
15 located, is that it?
16   A.   It goes to lack of family contact.  The
17 distance -- the lack of family contact is a
18 deficiency in the rehabilitative program that's
19 being offered based on the effectiveness and the
20 importance of close family contact.
21   Q.   And what else did you expect OJJ or
22 West Feliciana did do if the family is not
23 interested in contact?
24   A.   Sorry, if the family's not interested
25 in contact -- you know, I should mention that I'm

Page 49

1 actually a trained family therapist.  That was my
2 first job.  Again, that's actually a huge
3 opportunity to engage that family.  The family that
4 says it's not interested -- in my experience as a
5 family therapist working with families with very
6 disturbed young people, including behaviorally
7 disturbed, a family in that situation who says
8 they're not interested in contact, that's the
9 opportunity to really start to dig deeper.  Who
10 else in that family's involved, what's going on.
11        That's not the opportunity to, okay,
12 well, never mind.
13   Q.   All right.  I'm going to move on.
14        Medical, do you know what medical
15 services are provided at West Feliciana?
16   A.   I understand they're provided by a
17 group called Wellpath.  I am hoping to learn more
18 about exactly what is offered on site when I am on
19 tour on Friday, I believe, it is, to see what's
20 actually there.  I have not yet received any
21 detailed information about the services that are
22 actually offered, so I haven't formed an opinion
23 about the medical piece at all.  I just don't have
24 enough information.
25   Q.   Are you aware that there is a

Page 50

1 registered nurse located at West Feliciana full
2 time 24/7?
3    A.   Yes.
4    Q.   Are you aware there's an LPN located at
5 the facility during the daytime whose primary
6 duties are medication administration?
7    A.   Yes.
8    Q.   Are you aware that there is a physician
9 available or sees the youth one day a week?
10    A.   I am aware of that. I wasn't clear
11 whether that was in person or via Zoom.
12    Q.   Okay. Are you an expert in medical
13 services?
14    A.   No.
15    Q.   And when you run a facility, you rely
16 upon the medical personnel to tell you what is
17 necessary; is that correct?
18    A.   Correct.
19    Q.   As you sit here today, do you have any
20 criticism of the medical services being provided to
21 the youth at West Feliciana?
22    A.   Again, I haven't received enough
23 information to form an opinion one way or the
24 other, but at this point, I don't have an opinion.
25    Q.   Okay. Let's talk about the mental

Page 51

1 health services at West Feliciana. Are you an
2 expert in mental health services?
3    A.   Yes.
4    Q.   All right. What mental health services
5 are provided at West Feliciana?
6    A.   Again, I'm waiting for additional
7 information. My understanding is that there is an
8 LCSW. That is a licensed clinical social worker
9 from Wellpath. What I'm not exactly clear on is is
10 he there -- I believe it's a he. Is he there every
11 day on site? Is he available to come in as needed?
12 I understand there is a second -- a nurse who would
13 me the requirements of what's generally referred to
14 as a qualified mental health professional who is
15 on site. I believe the nurse is on site providing
16 mental health services.
17         If I read it correctly -- and, again, I
18 believe this was a deposition, so it might have
19 been inaccurate. I believe there's a psychiatrist
20 available through telemedicine. So not in person
21 but through telemedicine. And my understanding is
22 that's essentially the mental health services that
23 are being provided.
24         What I don't know because I have not
25 been able to determine it from depositions, even

Page 52

1 though I believe it's been asked, is the extent to
2 which those mental health professionals are engaged
3 as fully as they should be when a young person is
4 in solitary confinement.
5         I'm also not clear -- again, based on
6 depositions, when a young person is pulled out for
7 what they call a call-out for, quote, counseling,
8 whether that's with the LCSW, with the nurse, with
9 Ms. Bryant, with somebody else who calls himself
10 counselor. I don't know enough about all of that
11 to form an opinion on mental health. I have a
12 whole lot of questions about it, but I haven't been
13 provided enough information to form an opinion
14 about the quality of it.
15    Q.   Have you been provided with the mental
16 health files for any of the youth at
17 West Feliciana?
18    A.   No.
19    Q.   As far as the mental health coverage
20 that is available for that facility, do you find
21 that coverage to be sufficient?
22    A.   I'd have to know more about the young
23 people, but it probably should be. If you have 15
24 young people and you have a licensed clinical
25 social worker and a psychiatric nurse and a

Page 53

1 psychiatrist on call, I would -- just if it's true
2 and it's telemedicine, I'd have concern about the
3 lack of ability to read nonverbals, but I gather
4 the psychiatrist is basically managing meds and,
5 you know, in today's world, sometimes that happens.
6         So I don't have any concerns on level
7 staffing. I'd like to know a lot more about the
8 access of the young people to mental health
9 services based on the schedule as described by
10 several of the juvenile justice specialists.
11    Q.   All right. Are you aware of any
12 suicide adjustors that have taken place at West
13 Feliciana?
14    A.   From the deposition, I am aware of at
15 least one case of a young man who said he was going
16 to attempt suicide and climbed upon a chair or
17 something like that. I understand mental health
18 services were called in that instance.
19         And I believe there was -- I don't
20 think that was a suicide. There's one other
21 instance that was discussed where mental health was
22 called in as part of the solution. The period
23 covered, I gather, from beginning of June until
24 now, those are the two instances that I have read
25 about in depositions.

Page 54

1    Q.   What's the second incident?  Because I
2 don't know what you're referring to.
3    A.   And I could have it wrong.  I have to
4 go back and double-check the details, but I just
5 remember when it was being described, again, it
6 was, frankly, a little bit of a confusing
7 deposition with the juvenile justice specialist,
8 but I do remember him saying, and so we called
9 mental health services.
10         So I'd have to go back and look.
11    Q.   Have you reviewed any information on
12 West Feliciana's suicide prevention policy?
13    A.   No.
14    Q.   Do you have any criticisms of
15 West Feliciana's suicide prevention policy?
16    A.   Well, sir, since I haven't read it, I
17 can safely say I don't have any criticism of it.
18    Q.   All right.  One of the areas that you
19 listed off were your preliminary opinions or things
20 you want to talk about, you said rehabilitation
21 programming.  What are you referring to there?
22    A.   So I've reviewed the schedule as
23 reported, again, by multiple frontline staff, and
24 as I reviewed that schedule, I was looking for the
25 kind of programming that one would expect

Page 55

1 especially in a facility that was housing young
2 people with complex needs.
3         Now, again, I understand that there was
4 intention to use trauma-based relational
5 interventions, and either that plan changed or it's
6 not at all being implemented because in the
7 depositions, the director -- the clinical director
8 and alliance staff had never heard of the term.  So
9 I'm going to assume that's not a rehabilitative
10 model that's being used.
11         A rehabilitative model is basically
12 something that looks at the entire experience of a
13 young person while they're in the facility every
14 part of the day and figures out how do you use
15 those opportunities throughout the day to
16 accomplish rehabilitation.
17         As I looked at the schedule, which I'm
18 happy to walk through if you'd like me to, the only
19 part of the day that appears to be any type of
20 effort in rehabilitation, again, according to
21 multiple folks, is 30 to 60 minutes where a young
22 person might be called out for what somebody
23 described as, quote, counseling.
24         Other than that, I can detect no
25 indicators that there was a rehabilitative model in

Page 56

1 place other than a rather straightforward
2 perspective, which I actually think is empathetical
3 to rehabilitation, and that is one that says if a
4 young person violates the code of conduct, he will
5 be moved into solitary confinement.
6         So it's essentially a -- we're going to
7 teach them that there's consequences for their
8 action, and the consequences will be punitive.
9 That's the only -- in all the depositions evidence
10 that I saw anything that approaches some model,
11 some idea, some theory of rehabilitation.
12    Q.   But you did say references to 30 to
13 60 minutes of counseling with youth per day, right?
14    A.   No.  What I said was there are some
15 reference that some youth on some days may be
16 called out for 30 to 60 minutes of counseling.
17 What I don't know is that every day every youth and
18 what does that have to do with -- I mean, how does
19 that work translated to line staff so that the
20 professional -- presumably a professional that was
21 counseling with them can say, okay, Johnny, here's
22 these triggers, let's work together so that we
23 avoid those kinds of triggers.  So we can teach him
24 to manage his anger, manage his responses, make
25 better choices, et cetera.  I don't see any

Page 57

1 evidence of that in the depositions at all.
2    Q.   How about these discussions going on at
3 these weekly staffing meetings that you're not
4 aware of?
5    A.   That could well be.  I guess the
6 question would be, then, the juvenile justice
7 specialist should be representing those ideas in
8 how they describe their work.  I guess there's like
9 five or six depositions.  Not one of them gave any
10 indication that they were following any model other
11 than kid steps out of line, move them into
12 confinement.
13    BY MR. UTTER:
14         I just want to follow up.
15         Are you referring to -- you called it a
16    weekly meeting.  Is that the same thing as
17    the multidisciplinary staffing?
18    BY MR. ARCHEY:
19         I'm not answering questions to you,
20    David.  Let's move on.
21    BY MR. UTTER:
22         Connell, I want clarity on what you're
23    asking.  What was the question about?
24    BY MR. ARCHEY:
25         He and I communicated.

Page 58

1  BY MR. UTTER:
2      Well, we're to object that -- I
3  don't think he was answering the question you
4  asked, but go ahead.
5  BY MR. ARCHEY:
6      That is what I'm referring to. I don't
7  have to give you my explanation, but that is
8  what I was referring to, those weekly
9  meetings.
10 BY MR. ARCHEY:
11     Q.   Are you aware of Dr. Underwood meeting
12 with the youth in person?
13     A.   That was the question that I had. I
14 was not aware, and my question is how often does he
15 do that, is that a regular thing? I have no idea.
16     Q.   Okay. Are you aware if Dr. Underwood,
17 Ms. Bryant, and others entered into contracts with
18 the youth, you know, sat down and figured out what
19 the trigger is and say, all right, here's what you
20 need to do for the next two weeks, and we'll move
21 you on to the next phase?
22     A.   I believe that deposition of Mr. Nelson
23 referenced contracts. That was the first reference
24 that I saw. I didn't see about reference in any of
25 the depositions from line staff of any knowledge of

Page 59

1  or follow-through on any contracts.
2      Q.   Okay. Let's talk about the line staff
3  for a minute. JJS, they're on the front lines of
4  dealing with these youth at this facility and
5  elsewhere too; is that right?
6      A.   Absolutely.
7      Q.   Okay. Have you seen the training that
8  the JJS are provided before they undertake their
9  duties?
10     A.   I saw the description of the training.
11 The three weeks' worth of training, is that what
12 you're talking about?
13     Q.   Yes, sir.
14     A.   Yeah, I saw the description of the
15 training. I have not seen -- when I say saw, I saw
16 the depositions where people who went through the
17 training described it. I have not seen the actual
18 curriculum and would be very interested in seeing
19 that.
20     Q.   Have you seen the TTU training that was
21 provided to these JJS officers?
22     A.   Same answer. I've not seen it. Would
23 love to see it.
24     Q.   Okay. The job of a JJ officer is
25 really two-fold. One is to interact with the youth

Page 60

1  and facilitate the programming and the services
2  that are being provided to the youth. That's on
3  one hand; is that right? Do you agree with that?
4      A.   I'm sorry, sir, are you describing
5  what's in their job description? Or are you asking
6  in general in facilities is this the work of the
7  line staff?
8      Q.   Well, I don't know. If you think it's
9  different, then let me know. But, yes, I'm talking
10 about at West Feliciana, the job of a JJS -- and
11 I'm going to suggest to you it has two parts. One
12 part that we'll talk about first is to interact
13 with the youth, establish rapport, and be able to
14 facilitate their social services and programming
15 and training that the youth is needing while
16 they're there. Is that accurate?
17     A.   Yes, that sounds like an accurate
18 description of a typical front line equivalent to a
19 JJS, absolutely.
20     Q.   Okay. So, you know, it's important
21 that JJS have got good relationships with the youth
22 as they work with them; is that right?
23     A.   Yes.
24     Q.   When the youth are on recreation, you
25 would like to see the JJS in there with them

Page 61

1  playing basketball or playing cards or things like
2  that with the youth? That would all be good,
3  right?
4      A.   Absolutely.
5      Q.   Okay. Did you see any indication of
6  that?
7      A.   I saw --
8      Q.   I'm sorry, that's a bad question.
9      Did you see any indication that the JJS
10 staff at West Feliciana are interacting with the
11 youth by engaging in recreation?
12     A.   One of the depositions of one of the
13 JJS staff specifically talked about attempting to
14 build rapport and mentioned basketball courts,
15 et cetera. The other JJS folks focused on what I
16 would assume you would call the second part of the
17 job, which was security and patrol.
18     Q.   All right. There is the second part,
19 which is the security part as well, right?
20     A.   Yes.
21     Q.   Okay. Have you been told when the
22 judge came by and visited she saw JJS sitting
23 around the card playing cards with youth in the
24 recreation room. Are you aware of that?
25     A.   No I was not told that, sir.

Page 62

1    Q.   Okay.  Is that the kind of interaction
2  you would hope to see with JJS staff, right?
3    A.   Yes.
4    Q.   Okay.  If a youth is having a difficult
5  day, you would hope that the JJS staff would sit
6  down with them and talk to them and say, hey,
7  what's going on today can we figure out what the
8  problem is?  That would be helpful, right?
9    A.   Yes.  I would want to see that as the
10 normal, expected, and consistent approach when a
11 young person seems to be ratcheting up or --
12 agitated.  That's the word I'm looking for.  For a
13 young person to be agitated.
14    Q.   Sure.  Did you see in the first trial
15 on -- Alex A. is the youth's name that testified,
16 at least the assigned name in the litigation, was
17 asked who he trusted.  He mentioned one of the
18 JJSs, JJS Mr. Pollard.  Are you aware of that?
19    A.   I'm sorry, JJS?
20    Q.   Mr. Pollard?
21    A.   Yes, I was aware of that.
22    Q.   Do you know where Mr. Pollard is today?
23    A.   I'm going to assume he's at
24 West Feliciana.
25    Q.   Do you know that?

Page 63

1    A.   I do not know that.
2    Q.   Palmer?
3    A.   I'm sorry.  You said Pollard.
4    Q.   I did.  Let me correct myself.  Let me
5  correct myself.  My associate caught me.  It's
6  Mr. Palmer, not Pollard.  P-a-l-m-e-r.
7         So with all that, please respond again.
8    A.   Yes, no, I am aware that he's at
9  West Feliciana.  I just read his deposition
10 actually this morning, I think.
11    Q.   Okay.  So that's one of the ones that
12 Alex A. said he trusted when he was at the
13 Jefferson facility.  Are you aware of that?
14    A.   I am aware of that.  In fact, he was
15 the one who did talk about trying to build rapport.
16 Of all the ones that I -- all the depositions I
17 read, he was the one who talked specifically about
18 it.
19    Q.   What are your criticisms of our JJS
20 staff?  I'm trying to understand.
21    A.   I'm not sure that I said I had
22 criticisms of the JJS staff.
23    Q.   Okay.  Do you have criticisms of the
24 JJS staff?  Let me ask that.
25    A.   No, I don't have criticisms of the JJS

Page 64

1  staff, per se.  I have concerns about the
2  rehabilitative -- the use -- let me rephrase that.
3         I have concerns about whether the JJS
4  staff are considered and actually functioning as
5  part of the rehabilitative program, based on,
6  again, the schedule as related from multiple JJS
7  staff.  When you look at the schedule, there just
8  is concern that I have about whether JJS staff, in
9  fact, are able to provide rehabilitative programing
10 consistent with kinds of multidisciplinary staff
11 and recommendations and individual counseling that
12 you mentioned earlier.
13    Q.   Why do you say you have concerns as to
14 whether the JJS staff are able to provide the kind
15 of services you think ought to be happening?
16    A.   By April, I mean, did they really have
17 the opportunity to do so, not whether they have the
18 capacity to do so.
19    Q.   All right.  Let's get to that on the
20 schedule because I think that's part of where I'm
21 hearing you sort of driving at.
22         The youth attends educational services
23 during the day, correct?
24 BY MR. UTTER:
25         Objection.

Page 65

1 BY THE WITNESS:
2         I'm sorry?
3 BY MR. ARCHEY:
4    Q.   The youth attend education and have
5  school during the day, correct?
6    A.   Yeah, no, I thought that David had said
7  something.
8    Q.   He did.
9    A.   I believe, as I understand it, that at
10 least at this point, it's a more complicated than
11 it should be question about whether they attend
12 educational services.  If you'd like us to go
13 through that, we can.  You're probably already
14 aware of the current educational situation at
15 West Feliciana.
16    Q.   Well, let's begin this.  And there is
17 school scheduled for the youth daily, correct?
18    A.   Yes.
19    Q.   Okay.  Currently, the youth are broke
20 down into two groups, one which is in the
21 classroom, and the other that is getting education
22 on the tier, correct?
23    A.   Correct.
24    Q.   All right.
25    A.   Excuse me, sir.  On the tier, you mean

Page 66

1 in their cells, correct?
2    Q.    I do.
3    A.    Okay. Thank you.
4    Q.    Go ahead.
5    A.    No, no, I just wanted to clarify. I
6 didn't want to imply that on the tier -- I didn't
7 want to answer in a way that said on the tier
8 implied some kind of educational space on the tier.
9 They're basically in their cells with workbooks.
10    Q.    They are, that's correct. With the
11 teacher available on the tier, correct?
12    A.    Well, as I understand -- again, based
13 on the depositions, as I understand, over the last
14 couple of months, there have been many, many times
15 when there has not been a teacher on the tier and
16 in many cases, not a teacher in the classroom.
17           So -- in fact, the JJS folks have said
18 at times that they try to step in and at least show
19 them how to use -- in the classroom how to use the
20 computer or try to answer a question. But -- so I
21 can't say yes to the question of there's a teacher
22 there. Yes, because my understanding from
23 depositions is that that's just not the case.
24    Q.    All right. Let's break that down.
25           The school year started on August 1 of

Page 67

1 just this last week, right?
2    A.    I don't know the school year. I'm
3 talking about over the last two months.
4    Q.    I'm asking about this coming school
5 year. Are you aware the school year started on
6 August 1?
7    A.    If you want to confine it to the last
8 few days, certainly. As I understand it, two new
9 teachers as of August 2nd.
10    Q.    All I was asking is are you aware the
11 school year started August 1, yes or no?
12    A.    Yes.
13    Q.    Okay. And there are two full-time
14 teachers assigned to West Feliciana beginning this
15 school year, correct?
16    A.    I believe two new teachers were hired.
17 I read the deposition of Dr. -- I can't remember
18 his last name, but one of the new teachers hired.
19 So I'm quite familiar with a new teacher being
20 hired.
21    Q.    In addition, there are two teachers
22 from the special school district who provide
23 special education services for half days Monday
24 through Thursday, correct?
25    A.    That may be the plan. From deposition,

Page 68

1 I have concerns, shall I say. I doubt that that's
2 actually happening, based on depositions, unless
3 you're saying since August 1st. But over the last
4 couple of months, my understanding is that has
5 been -- has not been happening.
6    Q.    I'm talking about from August 1. For
7 the new school year, there will be special ed
8 teachers in the classrooms Monday through Thursday
9 for half days, correct?
10    A.    I understand that that's the plan. So
11 all I can say is since it didn't -- it was the plan
12 before and it didn't happen and it's the plan now,
13 all I can say is if you say that's the plan, I have
14 no evidence that it's not the plan. I also don't
15 have any evidence it's happening, because it wasn't
16 happening before.
17    Q.    Let's talk about before. You
18 understand that there was a break in school before
19 August 1 where there was just no school because
20 there was a break? You understand that?
21    A.    I understand there was a two-week
22 break, yes.
23    Q.    You understand before that, they were
24 short a teacher. Do you know why they were short a
25 teacher?

Page 69

1    A.    My understanding is they were short
2 more than one teacher, but I don't know the reason
3 for the shortage.
4    Q.    Do you know the teacher was attacked by
5 a youth and that's why the teacher no longer worked
6 there?
7    A.    I did not know that.
8    Q.    Are you providing opinions as to
9 education services? Because Mr. Gagnon testified
10 for a couple of hours this morning and prepared a
11 huge report. Are you providing opinions as to
12 education services?
13    A.    No, sir, only relying on the opinions
14 of Dr. Gagnon.
15    Q.    Do you have any opinions on whether the
16 Edgenuity program is an appropriate program for
17 education?
18    A.    I'm probably going to have the same
19 answer to a series of questions, sir, but my answer
20 is that I'm relying on the expertise of Dr. Gagnon
21 who has much more expertise in education than I do.
22    Q.    Do you know how many computers there
23 are available to the youth for education?
24    A.    My understanding is that when they're
25 in the classroom, they have access to a Chromebook,

Page 70

1 and when they're in their cells they do not. They
2 have workbooks. But beyond that, I don't know the
3 number of computers. I understand there are
4 sufficient computers for the number of students who
5 are in the classroom at a given time, based on
6 depositions.
7     Q. Do you know anything about what's
8 called study buddies that the youth use as part of
9 their classroom or education services?
10    A. I do not.
11    Q. Are you going to offer any opinions as
12 to special education services?
13    A. I'm going to rely on the opinion of
14 Dr. Gagnon.
15    Q. Recreation, that was one of the areas
16 that you listed. What are your opinions as to
17 recreation?
18    A. I don't do the tour until tomorrow.
19 Based on depositions and testimony at court, my
20 understanding is there is an outside recreation
21 area that at least at the time of one of the
22 depositions, about a third of it had concrete so
23 one could actually play basketball. It had a hoop.
24 There may have been one or two other hoops, but not
25 concrete so you couldn't really dribble. You could

Page 71

1 shoot, I guess. And that the JJS said that they
2 will occasionally throw a football around and
3 they've had some games like sack races, that type
4 of thing.
5        I understand there's what's called an
6 indoor recreation area that's essentially used for
7 movies, video games, in other words, for passive
8 recreation rather than active recreation. I have
9 not seen either the outside or the inside
10 recreation area. I have not seen a recreation
11 schedule that lists specific activities, so I -- I
12 will say that from the standpoint of a more typical
13 facility, that's pretty sparse recreational space.
14 But I haven't seen it, so I'll wait till I see it
15 before I form an opinion.
16    BY MR. UTTER:
17        Let's clarify for the record, Connell,
18    that the tour is scheduled for Friday, not
19    tomorrow.
20    BY THE WITNESS:
21        Oh, I'm sorry. Yes, Friday.
22    BY MR. ARCHEY:
23        I understand, David. Thank you.
24    BY MR. ARCHEY:
25    Q. All right. Do you have any opinions as

Page 72

1 to the climate at West Feliciana? I'm not talking
2 about heat.
3     A. No, again, I'll rely on the expert
4 report from -- the testimony from Dr. Vassallo. I
5 am not expert on heat regulation as she is.
6     Q. Do you have any opinions on the quality
7 or sufficiency of the food services at
8 West Feliciana?
9     A. No. Again, when I go on the tour, I
10 think I can get a better sense. Hopefully we can
11 hear from young people, but I have not seen any
12 specific evidence about that other than that I
13 understand the food is prepared off site and
14 transported in hot boxes.
15        I do -- I find myself a bit troubled by
16 the fact that young people have lunch in the dining
17 hall, but otherwise, it sounds like from
18 depositions that they eat breakfast in their cells.
19 They eat dinner in their cells. You know, meal
20 time can be, I know, a time for trouble. It can
21 also be the time for working on things. But,
22 again, that's not a nutrition issue. That's just a
23 programming issue, I guess.
24    Q. As far as food and food quality, are
25 you a dietitian?

Page 73

1     A. I have no opinion and no expertise on
2 nutrition, per se.
3     Q. All right. The quality of the water,
4 do you have any opinions on the quality of the
5 water?
6     A. I'm not an expert on water. I have
7 seen allegations, at least, complaints that the
8 water is brown and musty, et cetera, but I don't
9 intend to test the water. I'm not an expert on
10 water.
11    Q. Have you seen the documents showing
12 that the water is tested and the water meets the
13 standards?
14    A. Again, no intention to form an opinion
15 about it. I've not seen that document. I'll be
16 happy to look at it. I'm not qualified to make a
17 judgment.
18    Q. All right. You've alluded to it.
19 Let's take it on. I want to talk about the cell
20 restriction at West Feliciana.
21        What's your understanding of the
22 typical time length of a cell restriction for
23 youth?
24    A. I have seen a document that is provided
25 to youth that lists a series of violations and the

Page 74

1 spread of time that they would remain confined to
2 their cells, restricted to their cells. I see that
3 there are escalating lengths of time. Minor
4 infractions, if you will, 24 hours, and then a
5 whole series that are 24 to 72 hours. So I'm
6 familiar with that.
7        I'm familiar that at least at one
8 point, a young person who first entered the program
9 had 72 hours of what was called orientation in
10 which they would be restricted to their cell. A
11 little bit of confusion because I believe
12 Mr. Nelson still referred to 72 hours. One of the
13 depositions said it's now 48. Another one said
14 it's 48 to 72. So -- but I'm familiar with that's
15 one of the things that they do.
16        And I'm familiar, again, from the
17 schedule that depending on the day, a tier will
18 spend in excess of 22 hours in a 24-hour period in
19 their cells, presumably not permitted to come out
20 except for showers, what they call call-outs for
21 speculation, family contact, et cetera.
22        As I recall, that's what I'm familiar
23 with from the evidence that I've seen. There was,
24 again, the same JJS Mr. Palmer talked about using
25 cell restriction for a shorter period of time to

Page 75

1 deescalate. None of the other JJSs talked about
2 that. In fact, there was an interesting comment
3 where the deposition of a JJS was asked, well,
4 let's say a young person gets 72 hours in the cell.
5 Are they ever let out sooner than that. The
6 response was, well, if they're really behaving,
7 we'll tell them, look, you know, you're doing well,
8 just serve out the rest of the day, and then we'll
9 let you out.
10        In other words, instead of being used
11 as a way to calm someone down and then they return
12 to the population, once they've calmed down, it
13 clearly is a term, if you will, a sentence, because
14 these are clearly young people who have certainly
15 calmed down enough for someone to say you're
16 behaving well, but you're still going to serve out
17 maybe not the whole three days. Maybe we'll just
18 let you get by with a day and a half, then we'll
19 let you out, which I thought was an interesting
20 perspective.
21    Q.   All right. Your very long-winded right
22 now. Okay? That was a long, long answer to what
23 was a pretty short question.
24        The cell restriction policy that you've
25 seen said there can be cell restriction for 24 to

Page 76

1 72 hours, correct?
2    A.   Correct.
3    Q.   And then when there's orientation
4 during the initial -- when they arrive, there can
5 be cell restriction 48 to possibly 72 hours, right?
6    A.   Correct.
7    Q.   All right. And in addition, the JJS,
8 they do have the ability to pull youth off of cell
9 restriction sooner than what's been assigned,
10 correct?
11    A.   Correct.
12    Q.   All right. Now, when a youth is on
13 cell restriction, I want to talk about the
14 interaction that the youth has with others.
15        Have you seen any observation logs that
16 are maintained for youth while they're on cell
17 restriction?
18    A.   No.
19    Q.   Are you aware that there are
20 observation logs while a youth is on cell
21 restriction?
22    A.   Yes.
23    Q.   Okay. And are you aware that the JJSs
24 are actively engaging with the youth while they're
25 on cell restriction?

Page 77

1    A.   I don't have evidence of that.
2    Q.   You haven't seen any observation logs,
3 right?
4    A.   I believe I already answered that.
5    Q.   Okay. Are you aware that Ms. Bryant
6 will engage with the youth while they're on cell
7 restriction?
8    A.   I don't have evidence of that.
9    Q.   Are you aware that the youth will get
10 call-outs while they're on cell restriction?
11    A.   Yes.
12    Q.   Are you aware the youth have done
13 things like made trips to court and gone to the
14 hospital, things like that while they're on cell
15 restriction?
16    A.   Yes.
17    Q.   Okay. Are you aware the youth get
18 their education while they're on cell restriction?
19    A.   Oh, I'm very aware of that.
20    Q.   Okay. When you have a youth that has
21 been violent and has attacked other youth and that
22 youth says, I will continue to do this, you can't
23 stop me, would that be an appropriate time to put
24 that youth on cell restriction?
25    A.   That'd be an appropriate time to engage

Page 78

1  very heavily with that young person and work with
2  that young person until he can come off cell
3  restriction. It would not be the time to say
4  because you said that, your going to be in there
5  for 72 yours.
6       Q.  All right.  Have you seen evidence of
7  the youth attacking the staff?
8       A.  Yes.
9       Q.  Have you seen evidence of youth
10 attacking each other?
11      A.  Yes.
12      Q.  What's your understanding of why youth
13 are even sent to West Feliciana in the first place?
14      A.  I believe I covered that when you asked
15 the question whether I understood why they were
16 sent to West Feliciana when we first started.
17 Happy to give the answer again, but I don't want to
18 be, quote, long-winded.
19      Q.  That's fair, but I guess I need you to
20 do that again because I don't know that I heard it
21 all or have it in my memory, so please re-answer
22 that for me.  Thank you.
23      A.  Happy to do that.  I would just ask
24 that you not interrupt or comment on the length of
25 my response.

Page 79

1            So you asked that earlier, and I said
2  that there was testimony from Mr. Nelson during the
3  hearing in September in which he detailed at
4  considerable length page after page of testimony
5  regarding destruction of property, violence against
6  other youth, violence against staff, and at least
7  one escape that resulted in an individual being
8  shot.
9            Again, it was much, much longer than
10 that.  I'm trying to be brief.  That's the reason
11 my understanding is why initially people -- young
12 people were sent to West Feliciana.
13            However, I need to amend and add to
14 that response.  I believe there was -- is a list of
15 reasons that was developed that made people
16 eligible, and the first three are the three that
17 Mr. Nelson has emphasized which is escape attempt,
18 violence, and destruction of property.  Among the
19 others are disrupting the program, failing to
20 follow directions from staff, masturbation, and one
21 or two others that seem to be quite a few levels
22 below, assault on staff or assault on youth.
23            I'm done.
24      Q.  In all deference to my question and
25 going back and forth right then, see, that -- we

Page 80

1  really did miss each other.  Because you were
2  talking about the reason the youth were sent there
3  when it was opened.  My question is more on the
4  latter part of what you were just discussing, why
5  any particular youth will be sent there now.
6            The youth are still coming in and out
7  regularly, right?
8       A.  That's my understanding.
9       Q.  Okay.  Youth are progressing through
10 the program and then returning back to their
11 facility and proceeding on with what they need, but
12 the youth that are coming in now, your
13 understanding is what you were telling me about,
14 there's a list of items on that that included
15 attacking staff, violence, and then goes to other
16 matters that you don't like, right?
17            BY MR. UTTER:
18            Objection.
19            Go ahead and answer.
20            BY THE WITNESS:
21            Yes.  That's what I said, yes.
22 BY MR. ARCHEY:
23      Q.  All right.  Do you know if -- or do you
24 have any information on whether the TTU program at
25 West Feliciana has benefitted the other secured

Page 81

1  care facilities in Louisiana?
2       A.  No.
3       Q.  Okay.
4            BY MR. ARCHEY:
5            All right.  David, I'd like to take a
6  break, just five minutes.  Let me see what
7  else I want to cover, and then we'll be in
8  the home stretch here.  I may be getting
9  close to wrapping up.
10           BY MR. UTTER:
11           Thank you, Connell.  There was one part
12 of the record I just wanted to clear up.  I
13 think Mr. McCarthy gave an answer but
14 misunderstood the question.
15           Whenever you want to do that, just let
16 me know.
17           BY MR. ARCHEY:
18           Well, I guess if you want to do it now.
19 I don't know that I'm going to agree with
20 you, but certainly if it's reasonable and he
21 thinks that that's what happened, okay.
22           BY MR. UTTER:
23           Yeah, it was just a question about
24 whether they receive education when they're
25 on cell restriction.  I didn't know whether

Page 82

1    Mr. McCarthy heard that clearly.
2    BY THE WITNESS:
3        Yes, I thought the question was when
4    they receive education, are they in their
5    cells, and I said I was very aware of that.
6    BY MR. UTTER:
7        Thank you.
8    BY MR. ARCHEY:
9        All right. Let's take a break.
10   (At this time, 12:04 p.m., a recess was taken.
11   Back on the record, 12:10 p.m.)
12   BY MR. ARCHEY:
13       **Q.   Dr. McCarthy, do you have any**
14   **opinions -- let me restate that.**
15       **How are your opinions impacted by the**
16   **physical facilities at West Feliciana?**
17       A.   I haven't seen them yet, so they're not
18   impacted at all, yet. I'm going to tour it Friday.
19       **Q.   Have you seen photographs of the**
20   **facility?**
21       A.   Yes, I've seen photographs. I've read
22   descriptions. I, again, read the testimony of
23   Mr. Schiraldi who toured the facility and others
24   who toured the facility.
25       **Q.   And after all that, has any of that**

Page 83

1    **impacted your opinions in this case thus far?**
2        A.   Well, as I said, I'd prefer to do the
3    tour first. There certainly are things that I want
4    to pay some attention to.
5        **Q.   And what is the purpose of the site**
6    **visit on Friday?**
7        A.   So I can form an opinion about the
8    overall physical environment. As I recall, the
9    judge echoing Mr. Schiraldi's testimony talking
10   about the place, quote, screaming prison. I'd like
11   to see that for myself because that's part of what
12   young people obviously experience.
13       **Q.   Well, what is it you need to see in**
14   **person you couldn't do through photographs that are**
15   **available even now?**
16       A.   I don't know that I would rely just on
17   photographs for something as important as the
18   environment that we're confining youth in. The
19   photographs do not give the full view. I also want
20   to see the recreation area. I want to see the
21   indoor recreation, outdoor recreation, where school
22   happens, et cetera, so I can form a full opinion.
23       **Q.   Okay. What's your understanding as to**
24   **the number of classrooms at the facility?**
25       A.   I understand it had three classrooms

Page 84

1    initially. Two were destroyed. Currently -- I'm
2    assuming the other two are being fixed, but unless
3    they've been fixed in the last couple days, my
4    understanding is there's one classroom right now.
5        **Q.   Going back to the very beginning, which**
6    **part of what you promote and advocate for is a**
7    **system where you rehabilitate youth, correct?**
8        A.   Correct.
9        **Q.   And when you have a small number of**
10   **youth that are problems, you pull them out and put**
11   **them in an intensive program to try to address**
12   **their needs and you can get them going back in the**
13   **right direction toward rehabilitation; is that**
14   **fair?**
15       A.   That's not how I would describe it.
16       **Q.   Well, that is some of the words you've**
17   **used in some of your materials. I could start**
18   **reading if I need to, but...**
19       A.   I'm sorry. I thought you were asking
20   about the specifics around West Feliciana. You're
21   asking a different question. What I would say is
22   there are certainly circumstances in which young
23   people need to be confined in either a staff
24   secured or a hardware secured facility. When that
25   has to happen, it ought to be small, homelike, and

Page 85

1    normal. To be clear, that's a public policy
2    recommendation. It's not relevant -- I don't think
3    it's relevant to this particular place.
4        **Q.   Okay. But the part that is relevant is**
5    **that when you have certain youth that are very**
6    **problematic, very violent and very aggressive, they**
7    **may need to be pulled out into an intensive program**
8    **where they are secured, correct?**
9        A.   Pulled out from the community, not
10   pulled out of another facility. That's what I
11   think we're not communicating.
12       **Q.   All right. Fair enough. Thank you for**
13   **clearing me up. But even in that, there are times**
14   **when you need them in a -- you called it staff**
15   **secured facility, correct?**
16       A.   Staff secured or hardware secured.
17   Staff secured is when you don't have hardware
18   security, you rely on 24/7 eyes on.
19       **Q.   Okay.**
20       A.   For young people who represent, at
21   least for a period of time, even a greater level of
22   hazard, you need building security as well as staff
23   security.
24       **Q.   Right. Okay. So the building security**
25   **is that you're able to, for lack of a better word,**

PATRICK MCCARTHY, PH.D. on 08/09/2023

86..89

Page 86

1 keep them locked and secured in the building,
2 correct?
3    A.    Correct.
4    Q.    And is it your understanding that the
5 buildings and facilities that Louisiana had
6 available to Louisiana prior to opening
7 West Feliciana were unable to provide the building
8 security?
9    A.    I'm not sure I follow the question.
10 You mean the existing juvenile facilities that the
11 youth had been in?
12    Q.    Yes, sir, prior to West Feliciana.
13 Yes, sir.
14    A.    Yes, I understand that the destruction
15 that was going on and the assaults, et cetera, were
16 such that the State concluded that their only
17 option was to move them to another facility. I
18 don't agree that that was the only option that was
19 possible, especially since this had apparently been
20 going on for several years, indicating breakdown in
21 the system itself. Because you don't see this kind
22 of thing in lots of other systems. Not every
23 system. Lots of other systems don't have this
24 level of acting out going on.
25    Q.    Be that as it may, once it's going on,

Page 87

1 were there any building secured facilities
2 available to Louisiana prior to the opening of
3 West Feliciana?
4 BY MR. UTTER:
5        Objection.
6 BY THE WITNESS:
7        You asked that question before, and
8 what I said then, I will say again. I don't
9 know all the facilities in Louisiana, so I
10 can't really answer the question.
11        I'm sorry, were you going to say
12 something? I'm sorry, go ahead.
13 BY MR. ARCHEY:
14        Okay. I'm sorry. Sometimes the Zoom's
15 a little complicated.
16 BY MR. ARCHEY:
17    Q.    Are you aware of the use of a point
18 system with the youth where they can accumulate
19 points to be able to acquire items out of a
20 canteen, snacks, for instance?
21    A.    I was aware at one time, there was a
22 point system where they're able to get snacks,
23 et cetera. Then I understand that was suspended
24 for a period of time. I haven't seen that it's
25 been put back in place, but perhaps it has. I just

Page 88

1 haven't seen that. I know it was stopped for a few
2 weeks.
3    Q.    Okay. Is that a good thing, the use of
4 a point system like that?
5    A.    Yes.
6    Q.    Okay.
7    A.    .If it's done properly, yes.
8    Q.    Okay. Why have you not reviewed more
9 documents yet? They've been produced for -- since
10 July 31. Why have you not reviewed documents?
11    A.    I'm not sure if you're asking me or
12 David.
13    Q.    I'm asking you.
14    A.    I reviewed everything that's been sent
15 to me, and as of this week, I know there was a big
16 pile of documents, I guess, and they were going to
17 sort of sort through them and send them -- send the
18 ones that were most relevant to me. I haven't
19 received them yet.
20    Q.    Okay. Well, the big documents were
21 produced on July 31. I'm just trying to figure out
22 why you haven't had them and -- well, let me ask
23 you this. Better question.
24        Do you plan to prepare an expert report
25 in this matter?

Page 89

1    A.    I do.
2    Q.    When?
3    A.    I'm working on it right now. As more
4 information comes, I'm adding to it. So I'm doing
5 everything I can to get it done as soon as I can.
6    Q.    Are you aware of youth that have
7 succeeded while in the TTU program?
8    A.    No. I don't know the definition of
9 succeeded, and I haven't seen data on what that
10 means, so I don't have any evidence one way or the
11 other.
12    Q.    Have seen youth that has completed his
13 HiSET while at the TTU?
14    A.    I heard about one youth who wanted to
15 stay so he could complete his HiSET, yes.
16    Q.    And you've heard about that youth, and
17 I believe there are others that wanted to stay at
18 the West Feliciana facility. Do you know why they
19 wanted to stay at the West Feliciana facility?
20    A.    I've only heard about one youth, so I
21 can't speculate. That one youth apparently said he
22 wanted to stay because he was close finishing the
23 HiSET.
24    Q.    Were you aware the youth felt more
25 comfortable because at night, he was in his cell

PATRICK MCCARTHY, PH.D. on 08/09/2023

90..93

Page 90

1 and didn't have to worry about other youth in a
2 dormitory type setting or other youth coming
3 through the ceiling that might be violent?
4     BY MR. UTTER:
5         Objection.  Objection.
6         Go ahead and answer.
7     BY THE WITNESS:
8         I don't have evidence of that.
9 BY MR. ARCHEY:
10    **Q.   Are you aware that the youth wanted to**
11 **stay at West Feliciana because he got more**
12 **individualized education and could finish his**
13 **HiSET?**
14    BY MR. UTTER:
15        Same objection.
16        Go ahead.
17    BY THE WITNESS:
18        I don't have evidence of that.  I have
19 nothing from this young person in front of
20 me.  So any question about this young person,
21 I'd have to either hear from him himself or
22 see some documentation of that.  I haven't
23 seen it.
24 BY MR. ARCHEY:
25    **Q.   Have you heard other youth indicate**

Page 91

1 **that they felt safer at West Feliciana because of**
2 **the cell at night and they could sleep?**
3     A.   I have no evidence of that.
4     BY MR. UTTER:
5         Same objection.
6     BY MR. ARCHEY:
7         Dr. McCarthy, I look forward to seeing
8     you on Friday.  Thank you.
9     BY THE WITNESS:
10        I look forward to seeing you as well.
11    Take care, Everybody.
12    BY MR. UTTER:
13        Hold on.  Dr. McCarthy, I have just one
14    quick follow-up.
15            EXAMINATION
16 BY MR. UTTER:
17    **Q.   The question about are you aware**
18 **whether young people are receiving education while**
19 **they're in solitary or cell restriction, you**
20 **answered in the affirmative.  Can you explain that**
21 **a little bit?**
22    A.   Yes.  I think there's a bit of
23 confusion.  But the specific -- my specific
24 understanding is that when in their cells,
25 sometimes because of cell restrictions, sometimes

Page 92

1 because the classroom is not available, what they
2 receive is workbooks.  Again, there's been some
3 back and forth about the extent to which there are
4 teachers available on the tiers when young people
5 are in their cells, whether on cell restriction or
6 just the schedule because there's only one
7 classroom.
8         So to the extent that education is
9 occurring, my understanding is that it's through
10 workbooks.  There's no Chromebook.  There's no --
11 at least my understanding from depositions, there
12 is rarely -- or at least historically, there's
13 rarely been a teacher there to help the young
14 person with the education.
15    **Q.   Wouldn't it be helpful for you to**
16 **interview youth during your tour?**
17    A.   It would be critical for me to
18 understand what their experience is, and I think
19 that's an important part of this conversation.
20    **Q.   And what about interviewing staff,**
21 **would that be helpful?**
22    A.   It would be extraordinarily helpful.  I
23 think line staff are often left out of these
24 conversations.  Line staff are the ones who really
25 see what's happening, and they have a huge

Page 93

1 investment.  They're doing the best they can.  So I
2 have a huge respect for line staff.  Would love to
3 talk to line staff if I can.
4     BY MR. UTTER:
5         Thank you.  That's all I got.
6     BY MR. ARCHEY:
7         One quick follow-up.
8            FURTHER EXAMINATION
9 BY MR. ARCHEY:
10    **Q.   Doctor, have I covered all your**
11 **opinions through my questions today?**
12    A.   No.
13    **Q.   Excuse me?**
14    A.   No.
15    **Q.   Oh, what other opinions do you have**
16 **that I've not addressed?**
17    A.   I believe when I made the list, I
18 referenced the schedule in the rehabilitation
19 program multiple times, and you didn't really ask
20 me about that.
21        Let me just check to make sure I'm not
22 misspeaking here.
23    **Q.   Well, I thought I did, but go ahead**
24 **tell me what is you're saying, because that was**
25 **purpose of my question.**

Page 94

1 A. Sure. So in assessing the program of
2 rehabilitation, I relied heavily on depositions
3 that disrupt the schedule that young people go
4 through on their daily basis. I'm sure you don't
5 want me to walk you through step by step. I'm
6 happy to do that, but that would take some time.
7       But as I heard the schedule described,
8 there seemed to be very little opportunity for
9 rehabilitation programing of any type. That was a
10 matter of some concern on my part. So maybe that's
11 a detail under rehabilitation. Perhaps that's not
12 what you meant by your follow-up. But that's the
13 one thing that we didn't talk about in any detail
14 about.
15      Q. Are you talking about taking time from
16 education and diverting it over to programming?
17      A. No, sir.
18      Q. Okay. So when is this supposed to
19 occur if the youth are in education for their day?
20      A. Well, there are a couple parts of that.
21 One is done correctly, the educational experience
22 is also part of rehabilitation. But secondly,
23 recreation is also done well as part of
24 rehabilitation. If you have a young person in
25 their cell not able to come out except for a

Page 95

1 call-out of some kind from 12:30 in the afternoon
2 until 11 a.m. the next day, I sincerely question
3 how much rehabilitation programming in any sense of
4 the term is going on.
5      Q. Okay. So is that opinion primarily
6 being addressed to cell restriction?
7      A. Not -- I'm going to say yes. Yes to
8 that, the cell restriction is key to their
9 rehabilitation. But I think I've answered your
10 question.
11      Yes, you've covered, I believe, in your
12 questions the areas that I'm attempting to form an
13 opinion about.
14      Q. Just to be clear, so now with that
15 additional clarification, thank you, I have
16 addressed all the opinions that you intend to offer
17 in this matter next week in trial; is that fair?
18      A. As far as I know, yes.
19      Q. Okay.
20 BY MR. UTTER:
21      Just one follow-up on that.
22      FURTHER EXAMINATION
23 BY MR. UTTER:
24      Q. Dr. McCarthy, if your -- will your
25 final report include opinions based on the

Page 96

1 information that you find out during your tour on
2 Friday?
3      A. Yes.
4      Q. And will it include your final opinions
5 based on information that you get from the
6 documents that we will provide and, of course,
7 provide to counsel?
8      A. Yes.
9      BY MR. UTTER:
10      Thank you.
11      FURTHER EXAMINATION
12 BY MR. ARCHEY:
13      Q. Doctor, I'm going to --
14 BY MR. ARCHEY:
15      Or David, maybe, I'm objecting if his
16 opinions are going to be shaded or changed or
17 develop new opinions based on documents that
18 you have available to you. Because this is
19 not fair. We're here for his deposition. I
20 need to get his opinions. I think he's
21 answered the questions. I think that's
22 right.
23      I get the site tour. I don't have a
24 problem with that. I think we'll be able to
25 work through that.

Page 97

1      But if you just said based upon
2 documents that we're going to send him,
3 that's where I lodge my objection for the
4 record that, no.
5 BY MR. UTTER:
6      I understand, Connell. You gave us a
7 bunch last night or yesterday. You know, we
8 can talk about, you know, reopening the
9 deposition, if you like, once he issues his
10 final report. Let's meet and confer on that.
11 But, you know, there's -- I understand your
12 objection.
13 BY MR. ARCHEY:
14      Well --
15 BY MR. ARCHEY:
16      Q. Doctor, I have one more question. Are
17 you aware of any other documents from outside
18 sources that did not come through us in litigation?
19      A. Let me ask what you mean from "us"?
20      Q. Yeah, from the defendants through the
21 litigation. And what I mean by this is -- is it
22 Dr. Or Mr. Gagnon? I'm not even sure.
23      A. Doctor.
24      Q. Dr. Gagnon provided us with 400 pages
25 of documents last night that we'd never seen that

Page 98

1 were outside of us and that somehow plaintiffs had
2 and failed to produce in this litigation.
3        Do you have anything like that?
4    A.   I haven't seen anything like that, no.
5    Q.   Okay.
6    BY MR. ARCHEY:
7        That's truly my last question unless
8    David keeps going.
9    BY MR. UTTER:
10       Now, Connell, just one thing sort of --
11   one thing for the record. Those documents
12   are in the control of JJ. Those are kids in
13   your custody, and those are education records
14   that you and your clients have access to
15   24/7. So, you know, this notion that these
16   are new documents that your client doesn't
17   have is just not true.
18   BY MR. ARCHEY:
19       So under that theory, you don't have to
20   come up with anything. Even though we sent
21   requests for production to you and you
22   produced not the first piece of paper,
23   nothing, until 12 hours before one of your
24   primary experts you attach all these records,
25   yeah, we've got millions of pages of pieces

Page 99

1    of paper. David, that is in bad faith and
2    that is not good.
3    BY MR. UTTER:
4        I'm not -- Connell, my only point is
5    that they're your documents. You didn't turn
6    them over to us, but they're your documents.
7    BY MR. ARCHEY:
8        No, some of them are not our documents.
9    Some of them go from facilities even prior to
10   OJJ.
11   BY MR. UTTER:
12       And, again, they're in a system that is
13   accessible by your people 24/7.
14   BY MR. ARCHEY:
15       That is as bad faith of a response as
16   I've ever heard. We will take this up.
17   That's good.
18   BY MR. UTTER:
19       Have a good one.
20   BY MR. ARCHEY:
21       Thank you, Doctor. I appreciate it.
22   BY THE WITNESS:
23       Thank you. See you soon. Bye, now.
24   (AT THIS TIME, 12:29 P.M., TESTIMONY WAS CONCLUDED
25   AND THE RECORD WAS CLOSED.)

Page 100

1           REPORTER'S CERTIFICATE
2           This certification is valid only for a
   transcript accompanied by my original signature and
3  original seal on this page.
4           I, KIMBERLY DELATTE EDWARDS, Certified
   Court Reporter in and for the State of Louisiana,
5  Certificate No. 20017, as the officer before whom
   this testimony was taken, do hereby certify that,
6  PATRICK MCCARTHY, PH.D. to whom the oath was
   administered, after having been duly sworn by me on
7  August 9, 2023, upon authority of R.S. 37:2554, did
   testify as hereinbefore set forth in the foregoing
8  99 pages;
           that this testimony was reported by me
9  in the stenotype reporting method, was prepared and
   transcribed by me or under my personal direction
10 and supervision, and is a true and correct
   transcript to the best of my ability and
11 understanding;
           that the transcript has been prepared
12 in compliance with transcript format guidelines
   required by statute or by rules of the board and
13 that I am informed about the complete arrangement,
   financial or otherwise, with the person or entity
14 making arrangements for deposition services;
           that I have acted in compliance with
15 the prohibition on contractual relationships, as
   defined by Louisiana Code of Civil Procedure
16 Article 1434 and in rules and advisory opinions of
   the board;
17         that I have no actual knowledge of any
   prohibited employment or contractual relationship,
18 direct or indirect, between a court reporting firm
   and any party litigant in this matter nor is there
19 any such relationship between myself and a party
   litigant in this matter.
20         I am not related to counsel or to the
   parties herein, nor am I otherwise interested in
21 the outcome of this matter.
22
           DATED this 11th day of AUGUST, 2023.
23                    Kimberly D. Edwards
24
              Kimberly Delatte Edwards, CSR
25              Certificate No. 20017