**Review of Conditions of Confinement**
**Bridge City Center for Youth at West Feliciana**
**Patrick McCarthy, Ph.D.**

Introduction

The purpose of this report is to provide opinions on whether the State of Louisiana and its Office of Juvenile Justice (OJJ) are providing minimally acceptable conditions of confinement at the Bridge City Center for Youth at West Feliciana (BCCY-WF), which is located on the grounds of the adult Louisiana State Prison in Angola in a building designed as death row. This report will consider environmental safety, security procedures and practices, rehabilitative treatment, social services, mental health care, education, recreation and access to family contact.

This report will also respond to concerns and issues raised in the course of the September 2022 hearing on Plaintiff's motion for a preliminary injunction as well as in the Court's decision in that matter. These include:

- The Court's request to be clear about distinctions among "best practices", "common practices" and "minimally acceptable" practices.

- Whether Plaintiffs' concerns raised prior to the transfer of youth were adequately addressed once the transfer of youth began; more specifically, in each section, the report will review the Court's findings about the stated plans of the State which were part of the basis for denying the Plaintiff's motion for a preliminary injunction. The report will offer opinions on the extent to which those stated plans were implemented. This portion of the report is relevant to the Court's assessment of the reliability and feasibility of implementing any recent or planned attempts at corrective actions that the State may offer going forward.

- The report will include a summary of the risks of serious and irreparable harm stemming from the conditions at BCCY-WF.

- The report will address issues to be considered by the Court relevant to balancing the interests of the transferred youth, the interests of the other youth in the care and custody of OJJ, the interests of OJJ officials to design and implement rehabilitation programs without undue Court involvement in operational issues and the interest of the public to be safe from juvenile crime.

Methods
I reviewed the following materials in preparing this report:

Documents listed in Exhibit A to this report
Transcript of Sept. 2022 Preliminary Injunction hearing
Tour of OJJ Angola facility on August 11, 2023



DEFENDANT'S
EXHIBIT
tabbies®
c

In addition, I reviewed literature on minimally acceptable standards of care, including conditions of confinement that risk serious and irreparable harm to incarcerated children as well as the required, common and best practices to avoid those risks. That review included court decisions and consent agreements that refer to minimally acceptable standards of care and custody. The purpose of that review was not to draw any legal conclusion, as I am not an attorney and making a legal argument is beyond the scope of this report. Rather, the purpose of reviewing those decisions and consent decrees was to contribute to an overall perspective on "minimally acceptable" vs. "best practice" standards, as requested by the Court.

**Summary of Conditions of Confinement for Youth Held at BCCY-WF**

Physical Environment

Vincent Schiraldi, expert witness for the Plaintiffs for the September 2022 hearing, toured the BCCY-WF facility in early September and provided a summary of the existing deficiencies of the facility. At the hearing, his findings were challenged based on OJJ's plans to address those deficiencies before youth would be moved.

Based on his tour, Mr. Schiraldi identified deficiencies in the spaces which were to be dedicated to cell tiers, education, recreation, medical care and programming. His findings are summarized below:

> The section of Angola where the State intends to incarcerate youth in OJJ custody—Louisiana's former death row—was designed with purely adults in mind and is reflective of a highly adult correctional model that will not work successfully with juveniles. The following description is based in large part on my personal observations at Angola on September 1, 2022.

> The unit has rows of barred cells that are centrally controlled, no indoor recreational areas, inadequate outdoor recreational facilities for growing young bodies, jerry-rigged classrooms, no medical facilities, an overall correctional environment, and is, of course, situated inside one of the nation's largest and most notorious adult maximum-security prisons. It will not rehabilitate young people and is likely to cement in their budding self-images the destructive identities of "inmate" and "prisoner," exactly the opposite of the juvenile justice system's goals. (pp 14-15)

The transcript from the September 2022 hearing as well as the findings in the Court's decision contested many of Mr. Schiraldi's observations and findings, based largely on OJJ's plans to address those deficiencies prior to transferring youth to BCCY-WF.

Based on my tour of BCCY-WF on August 11, 2023, I agree with Mr. Schiraldi's expert opinion that the physical facility of BCCY-WF was and remains grossly inappropriate and inadequate for the treatment and rehabilitation of youth in the care and custody of the State. My observations include:

- As stated by Mr. Schiraldi and repeated as a Court finding, the physical building "screams prison". As the building was originally constructed as Death Row on the grounds of the Louisiana State Prison at Angola, this is hardly surprising but the immediate and long-term harmful impact of locking youth into that building should not be discounted: Both Mr.

2

Schiraldi and the Court concluded that confinement in the BCCY-WF facility would likely be psychologically harmful and traumatizing.

- In addition to longer-term effects, this physical environment will routinely trigger aggressive behaviors and extreme anxiety and/or depression, activating a stress response of flight or (more likely) fight among youth while they are at BCCY-WF.

- Young males who have suffered deep trauma and toxic stress are very likely to respond to triggering events with increased mental health symptoms that are often interpreted as defiance and noncompliance as well as with aggressive and assaultive behavior. This triggers a staff response of escalating physical restraint and punishment in an attempt to maintain control, further exacerbating the fight/flight response in a young person without the developmental capacity to fully control or even modulate his reaction. In short, the building itself contributes to triggering the very behavior that the program is ostensibly trying to help the young person learn to control.

- I concur with Mr. Schiraldi's expert opinion that the design of the tiers and the design of the cells on the tiers increase the risk of self-harm and suicide. In the earlier hearing, OJJ countered that staff are more able to keep eyes on any youth identified as a suicide risk; they also stated that staff would walk along the entire cell block every 15 minutes to check on all youth. When safety is a matter of life and death, relying on the diligence of fallible humans rather than designs that reduce if not eliminate the danger is a risky choice. Sadly, the history of self-harm and suicide among incarcerated youth and adults shows the dire consequences of taking that risk.

- During my tour of the tiers, I saw that the cells each face a blank, relatively narrow corridor. There is no room for staff to have desks or to provide enough space to observe more than a very limited number of cells at any one time. This requires staff to walk back and forth along the entire tier, much like someone strolling by animal cages in a zoo. This is one of the most dehumanizing arrangement of cells that I ever seen in a facility that houses adolescents.

- Because it was designed as Death Row, the BCCY-WF building has very limited space for the kinds of activities that are routinely provided to youth. As a direct result, youth are confined in their cells for long periods of time, not due to their behavior or needs, but rather because the building doesn't offer alternatives. They eat breakfast and dinner in their cells; they are in their cells during half of the hours assigned to education (often with only workbooks and no instruction from a qualified teacher); they spend hours of "free time" in their cells. As of last week, youth who are not on cell restriction would nevertheless routinely spend more than 22 hours in their cells in a 24-hour period, except for showering and if they were called out for 30 to 60 minutes of counseling and/or a call with family.

- Mr. Schiraldi's report cited inadequacies in the spaces to be used as classrooms. At this writing, there is now only one functional classroom, which means the two tiers rotate to have a half-day in the classroom with the other half-day of education consisting of

3

workbooks in their cells.

I asked to see the two classrooms that were "destroyed" by youth. My observations and the photos I took indicate relatively little damage: cameras and the associated wiring were pulled out and some ceiling tiles were damaged. I note this not to diminish the seriousness of the behavior, but rather to question why the two classrooms haven't been repaired after at least a month and possibly two months. A competent handyman with no special skills could repair the ceilings in both classrooms within no more than a couple of hours and an electrician could reinstall the cameras within roughly the same timeframe.

The youth are required to receive education in their cells for at least half of the total time devoted to education, reportedly because the classrooms as unusable. This is simply not true. I can only speculate that confining the students to their cells greatly reduces the workload and stress of frontline staff, and so there is little inclination to fix the two classrooms. In any event, the failure to repair this relatively minor damage results in placing youth in solitary confinement, an environment completely unsuitable for education.

- Mr. Schiraldi identified the lack of adequate outdoor recreation space; the State responded with plans to create a half-court for basketball. I was shown the outdoor recreation space during my tour. It is divided into three sections, separated by fencing, and it now does include one half-court basketball court. The other two areas have basketball hoops, but no court; youth could shoot baskets but not play a game.

- Based on depositions and a tour, the indoor recreation space is woefully limited. As there is only one space, only one tier at a time can use it. The programming for the space is basically TV and videogames, with occasional card or other table games.

- Both Mr. Schiraldi's report and my own tour of the building find that the dining area is adequate; however, as noted above, it is only used for lunch. All other meals are provided to youth while they are locked in their cells.

Environmental Safety:
Dr. Vassallo provided a report and a supplemental report that comprehensively cover issues involving the risks and considerations regarding excessive heat. I refer the Court to those reports.

Air conditioning equipment may of course fail to operate properly on occasion. Given the extreme risks described by Dr. Vassallo, however, minimally acceptable standards require emergency measures to immediately restore proper operation of the air conditioning equipment and/or to provide alternative means of ensuring the safety of the young people in the care and custody of the state. Failure to take immediate action exposes young people to serious and potentially irreparable harm, including serious illness and death.

Security Procedures and Practices:

4

Dr. Haney provided the Court with a comprehensive summary of the research on the risks associated with the use of solitary confinement for children and youth. The summary of his findings and opinion includes:

It is my opinion that the practices of OJJ regarding conditions of confinement for children in the Angola Unit, as described in the declarations that I read, clearly constitute the kind of harsh and depriving conditions of isolated confinement that are detrimental to all persons subjected to them. As such, all incarcerated youth who are subjected to these isolated conditions are at significant risk of serious psychological harm under current practice and conditions. The significant risk of harm that isolation represents for incarcerated persons in general, its heightened risk of harm for juveniles, and the even greater risk it poses for juveniles who are mentally ill can only be addressed by implementing policies that eliminate the practice for youth altogether. Defendants should not be locking youth alone in their cells for 72 hours at intake, or for hours or days on end for disciplinary reasons (including group punishment) or for staff convenience (or due to staff shortages or holidays); nor should confinement occur in a locked cell under conditions where children are deprived of basic human needs. In the exceedingly rare instances where longer periods of separation beyond minutes or a few hours at most are absolutely necessary for a juvenile, in response to emergency situations, they should be limited to the shortest amount of additional time possible and even then, always under the intensive supervision and care of a licensed physician or psychologist.

In his conclusion, Dr. Haney specifically warned that solitary confinement is likely to result in serious and irreparable harm and even death:

Based on the allegations in the documents I reviewed, and the research summarized above, it is my opinion that the youth at the OJJ Angola Unit are subjected to inappropriate and dangerous living conditions. The practice of locking children in their cells for long periods of time during which they are deprived of meaningful social contact and purposeful activity is not only painful, but places them at significant risk of serious harm. Given the developmental vulnerability of the children in question, the potential of the resulting harm and damage to become irreversible and, in the case of suicidal behavior, even fatal, is greatly heightened.

Dr. Haney's report is comprehensive and extensive. I would only add that his findings, recommendations and conclusions are widely accepted by youth correctional leaders. Numerous presentations at professional conferences, published reports, standards from national organizations, and press coverage of investigations, lawsuits and court decisions have all served to give notice to correctional administrators that the inappropriate use of solitary confinement violates minimally acceptable standards of care and exposes youth to risks of serious and irreparable harm, including long term psychological consequences, social and behavioral dysfunction and injury including death by suicide.

5

In addition to the inappropriate use of solitary confinement through cell restriction as punishment for violations of the rules, BCCY-WF uses solitary confinement as part of the planned "orientation" phase: youth are routinely held in solitary confinement for 48 to 72 hours. According to depositions from multiple line staff, the daily schedule also includes periods of planned cell restriction that last more than 22 hours straight. To be clear, these planned periods of solitary confinement are not to help a youth "calm down" or even to punish a youth for an infraction. These extended periods of cell restriction are built into the schedule for everyone on the tier.

Beyond simply asserting and demonstrating the power and control of the BCCY-WF staff over the newly arrived youth, it is difficult to imagine the purpose of placing a youth in immediate solitary confinement as soon as he arrives. Depositions from staff and the OJJ consultant who designed the program for BCCY-WF describe this as a way to get to understand the young person before he is introduced into the population. Yet OJJ has emphasized the importance and thoroughness of the full multi-disciplinary team staffing that precedes placement, including a full review of behaviors, needs and possible treatment plans. Observing a youth on cell restriction for 48 to 72 hours is very unlikely to yield useful additional information. Rather, it is very likely to exacerbate anger and a sense of injustice as well as the trauma response discussed above just as the youth is expected to adapt to the program.

I believe it is important to consider this experience from the perspective of a young person transferred to BCCY-WF. We know staff at the sending facility recommend transfer based on an allegation of a serious offense or a series of serious violations. Quite reasonably, the youth will see his transfer as punishment, which he is likely to believe is unjust. He will be frightened, angry and anxious. He arrives and following processing he is placed in a cell designed for an adult, roughly 6x8 feet. He stays there for two or even three days before he is even allowed to have contact with other youth, basically staring out across a narrow corridor at a brick wall with a window that opens to a barren courtyard. He will hear other youth who are locked in the same type of cell yelling and possibly threatening staff or other youth. This is not a necessary or an acceptable way to introduce an adolescent into a treatment program, unless one wants to signal the power to punish and control the young person.

Is "cell restriction" solitary confinement?  In a FAQ (frequently asked questions) post on the OJJ website, officials state that solitary confinement is not used at BCCY-WF. The posted question is "Are youth at BCCY-WF put in solitary confinement?". The response follows:

> No. Youth temporarily assigned to the BCCY-WF transitional treatment unit are never placed in solitary confinement. Even when youth are assigned to their rooms following acts of physical violence towards their peers or staff, they are provided consistent staff and peer interaction. It is part of our targeted therapeutic service. All youth receive 24/7 staff, medical, social services, and mental health interaction while participating in BCCYWF's four to eight-week program. State law prohibits the use of solitary confinement. OJJ's policies (Behavioral Intervention Policy B.2.21) are consistent with state law.

6

Yet the OJJ Behavioral Intervention Policy referenced in OJJ's website response includes the following definition of solitary confinement, which is drawn word-for-word from the Louisiana statute:

> Solitary Confinement – The **involuntary placement of a juvenile alone in a cell, room, or other area**, except during regularly scheduled sleeping hours. It includes but is not limited to any behavioral intervention, seclusion, isolation, room isolation, segregation, administrative segregation, **or room confinement**, in response to rule violations, staffing shortages, or **for any other reason that is not an emergency response to behavior** that poses a serious and immediate threat of physical harm to the juvenile or others (emphasis added).

Again, the above definition has the same wording as Louisiana law defining solitary confinement. That law goes on to state the following:

> A juvenile **shall not be placed in solitary confinement for the purposes of discipline, punishment,** administrative convenience, retaliation, protective custody, suicide intervention, general behavior management that is not a response to a serious and immediate threat of physical harm to the juvenile or others, rule violations, in response to staffing shortages, **or for any other reason that is not an emergency response to behavior that poses a serious and immediate threat of physical harm to the juvenile or others** (emphasis added)**.**

The law also limits the amount of time youth can be held in solitary confinement to 8 hours and requires a number of services and supports as necessary to ensure the youth is safe and returned to the population and full programming as soon as possible.

Despite the clear prohibitions in policy and law against using solitary confinement for discipline, punishment, rule violations and general behavior management, BCCY-WF staff and youth are provided with a list of infractions that will result in punishment via varying lengths of cell restriction, which is defined by both Louisiana law and OJJ policy as a form of solitary confinement. Multiple depositions confirm that line staff, supervisors and managers routinely use solitary confinement as discipline, punishment, administrative convenience and general behavior management.

Louisiana law and OJJ policy also require rather specific services and supports for youth held in solitary confinement, with considerable emphasis on assessment and oversight by Qualified Mental Health Professionals (QMHP). In a deposition, the Regional Mental Health Director for Wellpath—the organization responsible for providing mental health services to youth in BCCY-WF—was asked a series of questions about the mental health assessments and services provided to youth placed in solitary confinement. As a very brief summary, he responded that none of the following services (required by policy and law) are provided by Wellpath, which is the sole source of Qualified Mental Health Professional services available at BCCY-WF:

7

- The mental health providers at Wellpath are not told when a youth in placed on cell restriction. The Regional Director said he had "never witnessed" cell restriction, although it is literally a daily occurrence.

- Wellpath is not provided a list of youth on cell restriction and so don't even know that youth have been placed in cell restriction, much less why or for how long or whether the experience is contributing to a mental health issue.

- A Qualified Mental Health Professional is not consulted before a youth is placed on cell restriction, nor is a QMHP consulted on how long the youth should be held in their cells.

- The required 8-hour checks are not performed by a QMHP.

- There is no QMHP assessment of whether a young person should be placed in cell restriction because they are an immediate threat to harm themselves or someone else and there is no assessment of whether he can be released from cell restriction because he no longer poses such a threat.

- According to the law and OJJ policy, a youth held longer than 8 hours should be transported to a mental health facility for evaluation; this is never done.

- Unless a youth makes an explicit request to see a mental health professional or is seen as at risk of self-harm or suicide, the QMHP at Wellpath is almost never called to assess the youth.

In a deposition of Dr. Underwood, the consultant who designed the TTU program and continues to provide advice on implementation, he acknowledged and even endorsed the use of cell restriction during the first 48 to 72 hours of admission to BCCY-WF. He also claimed the use of cell restriction is "not really solitary confinement" and even if it were, it would be consistent with the policy's (and the law's) requirement that it should only be used in response to an emergency. Contrary to the intended definition of emergency used in OJJ's policies (which reflect the specific wording of the law), Dr. Underwood stated that the transfer of a youth BCCY-WF was in itself an emergency, justifying solitary confinement of 48 to 72 hours. This is demonstrably and drastically different from the wording in OJJ policy drawn from the language of the law, including requirements that a QMHP be part of the decision to place a youth in solitary, that he be released from solitary as soon as he is no longer an imminent threat to harm himself or someone else, that he be seen at least hourly by a QMHP to determine if he can be released and that if he is held for longer than eight hours he should be transported to a mental health facility.

Dr. Underwood also said the 48-to-72-hour cell restriction was a necessary element in assessing the youth and orienting him to the TTU program. This is completely at odds with the requirements of the law, OJJ's own policies and accepted practice. This period of solitary

8

confinement provides no additional information about the youth, other than how he reacts to solitary confinement. Any relevant information about his patterns of behavior, adjustment to incarceration and relationships with other youth who may be in BCCY-WF is or should be part of the multi-disciplinary staffing that OJJ says is provided on every youth who is considered for transfer.

The Court is of course much more qualified than I am to determine if OJJ is violating the law. Beyond the rather critical question of whether the law is being followed, however, the policies and practices of solitary confinement at BCCY-WF clearly do not meet minimally acceptable standards of care and custody and result in strong risks of grave immediate and long term severe and irreparable harm to youth, harms which have been spelled out in great detail in Dr. Haney's report and harms which any competent youth correctional administrator should be very aware of.

### Rehabilitation Programming

As noted at the September hearing and as referenced in the Court's decision at that time, there is no one model of rehabilitation within institutional secure custody facilities. This is an evolving field, and we continue to experiment and learn. The Court has been clear that a "best practice" or even "evidence-based" requirement is not the standard.

Therefore, consistent with the rest of this report, my focus will be on whether BCCY-WF provides a "minimally acceptable" program of rehabilitation. This assessment rests on two rather straightforward questions:

> Does the facility provide any rehabilitation services?

> And does the approach to rehabilitation that is actually happening at the facility expose young people to risk of harm?

In other words, the test is not based on what adults say about the model they'd like to see happen—Trust-Based Relational Intervention or Cognitive Behavioral Therapy or Dialectical Behavior Therapy or Normative Culture or Positive Youth Development or the TTU model or any other model--but rather what adults are actually providing to youth.

To understand the intended philosophy of rehabilitation at BCCY-WF, I reviewed the Program Summary for BCCY-WF; a PowerPoint presentation about the model prepared by Dr. Lee Underwood; and a Youth Handbook developed for a different TTU. These materials were provided to Plaintiffs' counsel by OJJ.

The material I reviewed describes an approach resting on well-researched and validated principles of rehabilitation, drawing heavily from Cognitive Behavioral Therapy. Similar principles underly effective interventions with youth and young adults who have committed very serious acts of violence and other serious crimes, such as the community-based Roca model and some versions of the Credible Messenger model. The material makes some reference to TRBI (presumably Trust-Based Relational Therapy, as described by OJJ officials at the September

9

hearing), although it is unclear from the materials if the BCCY-WF program model was designed to be an adaptation of TRBI.

Unfortunately for the youth incarcerated at BCCY-WF, I see almost no evidence that any of the principles or practices described in the material are actually in place at BCCY-WF. Instead, many of the practices in place, as described by the frontline staff responsible for care, custody and program implementation and even by Dr. Underwood himself in his deposition violate the very core principles described in the model. Other core services and approaches are simply not being provided, according to the staff who would be expected to provide them.

For example, the theoretical framework for the model includes the following language; I have commented on the BCCY-WF implementation of these principles after each.

> Practically speaking, the unit's operational philosophy adheres to the following principles:
>
> - Structured activities should occur throughout the day rather than restrictive living; **(The daily schedule for BCCY-WF includes up to 22 hours of continuous cell restriction from mid-day to the next morning; there are virtually no structured activities offered at all)**
>
> - Implementation of the incentive program for weekend rewards should be implemented; **(There was apparently an incentive program providing points to obtain snacks etc; no interviewee referenced weekend rewards)**
>
> - Rigorous program schedule should be adhered to decrease boredom; **(Again, youth spend hours and hours in their cells; recreation time is usually completely unstructured; I could find little evidence of any schedule for rehabilitative programming.)**
>
> - Appropriate staffing should be maintained at all times to implement the program's objectives; **(BCCY-WF does not appear to have staff available on an ongoing basis with the skills to implement this program; as described by frontline staff and teachers, they have received little or no training in the program model; although Trust-Based Relational Intervention—TRBI—is listed as an important element of the program model, no one in the building from the director to the deputy director to the counselor to the Juvenile Justice Specialists have ever even heard of the term, according to their depositions)**
>
> - Arts and crafts activities should be provided to improve leisure activities (plaster, puzzles, etc); **(Puzzles and board games may be available, but no arts or crafts)**
>
> - An area will be provided within range of the social service staff and used as a tool to allow the youth to separate themselves in times when they are unable to manage emotions. Youth will have options to engage in self-soothing activities so that conversation can follow about the stressors and ways to prevent them in

*cool down room* (handwritten annotation)

10

the future. This is in line with TBRI practices. **(Youth who are "unable to manage emotions" are placed in cell restriction for 24 to 72 hours)**

• Whenever possible, TTU staff should be dedicated to the program and receive specialized training appropriate to TTU operations. **(Based on depositions, no frontline staff at any level have received training in TBRI or the TTU model as described)**

Under Environmental Structure, the TTU Program Summary states:

Because of the potential violence posed by this population, the TTU is considered a "self-contained" unit. However, the purpose of the program is behavioral change; therefore, youth are involved in planned activities that consider normalizing and developmental perspectives. Except for occasions when a youth on the unit is exhibiting behaviors which are dangerous, threatening or disruptive to the milieu, youth should be restricted to their rooms solely during night-time hours. **(As part of the regular schedule—not as discipline or a planned behavioral intervention -- youth are restricted to their rooms for breakfast, portions of their school day, and the rest of the day after school and recreation, including for dinner time and into the evening hours.)**

The Program Summary also describes specific practices and approaches, such as a Behavioral Analysis Worksheet, a "life story" autobiography and milieu therapy. A list of behavioral techniques is supplied as well. Depositions with frontline staff show no evidence of any training $E_{c}$ \8 in any of these approaches and no evidence that they are ever used at BCCY-WF.

The Program Summary includes a rather compelling albeit brief summary of the importance of family interventions, yet this section provides no guidance about or description of a family engagement program or approach.

In contrast to the TTU program model described in the materials I reviewed, depositions from the line staff who implement the daily schedule indicate an almost complete lack of any scheduled rehabilitation programming other than (possibly) 30-60 minutes of weekly undefined "counseling", time with the social worker and possibly some mental health care for youth with a diagnosis indicating serious mental illness. The TTU program description calls for weekly sessions with the social worker and youth with a diagnosis of "severely mentally ill" (SMI) see a mental health professional twice per month through Wellpath, I'm not aware of any evidence showing that the individual sessions are integrated into an overall individualized behavior management and rehabilitation plan for each youth. The depositions from the line staff who would be critical to carrying out that plan demonstrate little to no familiarity with the individual needs of the youth or with effective strategies for engaging with them.

In her testimony at the September hearing, Ms. Bridgewater stated plans were in place to implement the Trust-Based Relational Intervention (TRBI) as an added and more intensive intervention that would be available to the youth at BCCY-WF. The Court decision referenced these plans as a finding that provided support for allowing the transfer of youth to BCCY-WF. As noted above, none of the BCCY-WF managers or staff even recognized the term.

11

The depositions suggest that the only consistent approach to rehabilitation at BCCY-WF is based on punitive consequences—cell restriction of 24 to 72 hours—for behavioral or other violations. As described in OJJ's own Program Summary for BCCY-WF, this approach is antithetical to true rehabilitation programming, especially in lieu of any other effort to provide effective services. As detailed in Dr. Haney's report, cell restriction is more likely to lead to increased aggression and mental turmoil rather than less. Rather than learning to deal with conflict or frustration and learning how to manage anger, enforced cell restriction teaches youth that force and power are the keys to control rather than learning positive coping skills.

There appears to be no evidence of even rudimentary training of line staff in delivering a rehabilitative program or environment and no evidence of training for line staff in how to engage youth with significant histories of trauma and toxic stress or how to effectively de-escalate conflict and early signs of violence. In fact, JJS depositions imply that most of them believe de-escalation simply means moving youth to their cells and locking them down.

Testimony and depositions indicate policy and practices that encourage the widespread belief that youth held at BCCY-WF can never receive group counseling, but rather should only receive individual counseling. As described in the BCCY-WF Program Summary, youth learn to deal with conflict and harm through opportunities to work through their issues with other youth in a safe space. I can find no discussion or evidence of attempts to resolve issues between youth. I understand the reluctance to provide open group discussion is due to concerns about violence between youth. Yet there is apparently no attempt to encourage conflict resolution and personal accountability through dialogue between youth, even if that requires limiting the dialogue to pairs and even if a face to face conversation requires a cell door or other protection in place. In short, the facility misses every opportunity to help youth learn from and be accountable for incidents of harmful behaviors.

A review of the current schedule confirms the lack of focused rehabilitation. From the depositions provided by line staff, the two tiers alternate schedules daily, i.e., the B tier schedule for Day One becomes the C tier schedule on Day 2 and vice versa. For example:

- Wake-up 7:00
- Breakfast in cell
- Classroom 7:50
- Lunch 10:30
- Rec 11-12:15
- Workbook in cell from 12:30 to 3:00
- Dinner in cell
- Cell from 12:30 to 10:30 the next day except for shower

Based on depositions from the staff who manage the schedule and are responsible for moving youth through the day, a narrative version of the above schedule follows:

Each youth wakes up at 7:00 for hygiene and has breakfast in his cell. They are then escorted to classroom at 7:50 where they work on Edgeunity via Chromebook and/or workbooks with some guidance by either teacher or staff on how to use Edgenuity. Until very recently, teacher instruction included very little content other than the Edgeunity

curriculum and workbooks. After about 2.5 hours of workbook and/or Chromebook work, youth go to lunch at 10:30 followed by 75 minutes of outside Rec. They are then returned to the tier around 12:30 for in-cell workbook assignments until about 3:00. After workbook time, they remain in their cells until dinner time and then they eat dinner in their cells. They are let out for a shower or for sessions with social work or mental health staff, to call home or for medical visits. But from 12:30 PM to 11:00 AM the next day—more than 22 hours—each youth is confined to his cell for most of the time.

Juvenile justice systems have made great strides over the last 25 years in implementing more effective rehabilitative treatment approaches. These include significant changes in the culture and practices within residential programs, including secure institutions. As an example, at one time Louisiana adopted the principles and practices of the "Missouri Model" and had some initial success in improving several of the State's facilities. Other systems have relied on similar reforms, such as "positive youth development", "positive youth justice", "normative culture" and the kind of CBT-based models described in the BCCY-WF Program Summary. Over time, these types of changes in facility culture and milieu have moved from "best practices" of a few and now approach "common practice" for many jurisdictions.

Given the ongoing evolution of the field of practice, no one or group of these milieu-based interventions are seen as required or minimally acceptable treatment. Nevertheless, the failure to take any discernible steps to address culture and practices throughout the facility interferes with and can defeat other efforts at rehabilitation. Punitive and/or control-oriented culture and practices lead inexorably to heightened tension, stress and acting out, including increased risk of violence between youth and between youth and staff. Facilities that fail to prevent and respond effectively to violence in the facility do not meet acceptable standards for protecting young people in their care and custody and also defeat attempts to provide effective treatment to address those problems. Sadly, OJJ's attempts to prevent and respond to violence through harsh punishment and control have the exact opposite effect: more rather than less anger, frustration, anxiety, stress and violence.

These kind of overly simplistic control and punish approaches to adolescent behavior problems have been tried repeatedly over the years. They seem to make sense: teach an adolescent that there are consequences for bad behavior and he will learn to stop behaving badly. But this is an adult frame that ignores the developing nature of the adolescent brain generally and the developing adolescent who has endured toxic stress and trauma for years. The adult may see a consequence as reasonable, necessary and fair. The adolescent often sees just another example of adults hurting him, giving up on him, treating him unfairly and abusing power.

This is why programs such as Scared Straight, which enjoyed popularity as a common sense response to behavior problems, have been shown again and again to worsen rather than improve outcomes: Youth randomly assigned to Scared Straight were more likely to recidivate, more likely to hurt someone and less likely to complete education than youth in the control group who did not experience Scared Straight. Similarly, boot camps for juvenile offenders were seen for quite a while as a creative and effective way to use the techniques of military boot

camps to put young people back on the right track. Again, research that randomly assigned youth to boot camps found they had much worse outcomes than the control group of youth randomly assigned to other interventions.

Institutions must also provide individualized rehabilitative treatment that responds to the individual needs of each young person. Again, the field has seen much progress in developing, implementing and evaluating individual, group and family-based interventions that demonstrate effectiveness with young people who have broken the law and committed harm, including serious harm, as summarized on several websites such as Blueprints for Healthy Youth Development.

In addition to these facility-based interventions, decades of research have demonstrated that family-based treatments are among the most effective interventions for young people who have a history of serious delinquency, including violence, sexual offenses and substance abuse. The three most common and well-researched interventions for these young people—Multi-Systemic Therapy, Functional Family Therapy and Treatment Foster Care Oregon—all have intensive family engagement at the core. Thus, placing youth so far away from their families that regular, sustained in-person contact is essentially impossible for most families not only prevents connection to loved ones but also eliminates opportunities to provide an effective treatment.

Practitioners and researchers continue to explore an increasing number of very promising interventions that have not yet accumulated sufficient evidence of effectiveness to be considered proven or evidence-based. Although secure custody institutions are not required to provide any one of these models that may be considered either evidence-based or promising, minimally acceptable standards require institutions to provide counseling and supports that address the social, emotional and behavioral problems of each individual young person who has been incarcerated and deprived of freedom for the purpose of rehabilitation.

Witnesses for the Defendants and court filings on their behalf emphasized the centrality of rehabilitation as a critical element of the TTU model. Young people were to receive intensive, individualized interventions to address their behavioral problems, so they could be reintegrated into the general population as soon as possible. Trust-Based Relational Intervention (TBRI) was specifically described as a short-term, evidenced-based intervention that would be central to the 4-6 weeks of treatment at the BCCY-WF unit; this intervention was to treat the problems contributing to violent and other harmful behavior and prepare them to return to the general population. Again, in their depositions, the director, deputy director, nursing supervisor and supervisor of social services stated they had never heard of this program.

Nevertheless, it may be useful to consider the theory and rationale behind the Trust-Based Relational Intervention (TRBI) that OJJ promised to implement at the September hearing. While this is only one model, it illustrates exactly how far from even minimally adequate the program at BCCY-WF has become.

TRBI rests on the theory that children who have experienced "adverse childhood experiences" (ACEs) including neglect, abuse, trauma and loss will find it difficult to form attachments with

14

other people as they develop, which in turn will contribute to a lack of empathy and connection with others. TRBI requires three fundamental components to build trust and relationship: (1) meeting physical needs for support and nurturance and providing a sense of safety ("empower"); (2) healing relationships ("connect"); and (3) helping the young person learn self-management and coping skills ("correct"). No objective observer who tours BCCY-WF would conclude that youth are supported, nurtured or safe. No objective observer would believe they have any opportunity to form relationships that are healing. And no objective observer would conclude that BCCY-WF provides even a minimal level of help to learn self-management and other coping skills.

If the OJJ leadership believed in September that TRBI and the TTU program model would be the core program for BCCY-WF, there is absolutely no evidence that they have attempted to implement even the most basic principles of that approach, much less a systematic implementation of TRBI, the TTU model or any other model of rehabilitation. From all appearances, OJJ's actual treatment of the young people at BCCF-WF reflects a belief that the threat of being sent to Angola and the use of solitary confinement as punishment for any infractions are effective forms of treatment. This type of punitive approach does not meet minimal standards of rehabilitative treatment and contributes to a risk of serious and irreparable harm.

In sum, the loss of liberty inherent in secure custody institutions carries increased responsibility to provide not only effective but also safe rehabilitative treatment for incarcerated youth, who are denied their freedom to ensure they receive such treatment. Failure to provide safe, effective treatment violates minimally acceptable standards of practice and can contribute to heightened risk of serious and irreparable harm to incarcerated children.

The Court recognized the risk of psychological harm due to the stress associated with incarceration at Angola on the former death row cell block. This risk is compounded by the failure to provide even minimal professional counseling and other rehabilitation services, the extraordinarily high reliance on prolonged solitary confinement in the daily schedule, the extraordinarily high reliance on prolonged (24-72 hours) solitary confinement as punishment and general behavioral management, the lack of adequate and appropriate education and the lack of structured recreational or any other programming.

The combination of incarceration in a grossly inappropriate building and the grossly substandard treatment and programming actually provided is highly likely to result in one of the most troubling harms: The young people committed to the care and custody of OJJ are very likely to conclude that they are irredeemably criminal and worthless. It is hard to imagine that they will find a path to successful adulthood or that the public will be safer upon their release back to their communities.

Social Services

The BCCY-WF program is supposed to have both a social services supervisor and a case manager. As of the time of her deposition, the social services supervisor stated that she was performing both roles as the program has not been able to hire a case manager.

It is important to note that the social worker in the BCCY-WF model is responsible for providing almost all of the counseling to the youth in the program as well as their families. The Program Summary calls for the social worker to provide weekly counseling sessions to each youth as well as leading groups and responding to behavioral issues.

The social services supervisor described herself in her deposition as "not a trained social worker", and said she has a bachelor's degree in business administration. In describing her role, she said if a youth engages in fighting or other negative behavior she tries to "find out if there is anything I can do to assist them with that not happening again, so try to deter the behavior". While this is certainly an important goal, I saw no evidence that she has had any training in the model described in the Program Summary, or in any basic counseling skills or approaches that would prepare her to help youth achieve that goal.

In response to questions, she acknowledged that she has no training in recognizing depression among adolescents and has no knowledge about the impact of solitary confinement on adolescents. When asked to describe a youth, she provided a very superficial assessment, saying "(Name deleted) does not want to take responsibility for his own actions. He blames everyone else for his actions. That's pretty much the totality of it". The youth had just turned 15. Her description could be an accurate summary of the attitudes (at least at times) for at least half of the entire population of male 14 and 15 year old children in the country.

She said she speaks with the families monthly to respond to any concerns; other than this basic case management approach, there was no description of attempts to provide actual family counseling as described in the Program Summary. She was unaware that families should be offered transportation to BCCY-WF so they could visit their children.

While the case management component of social services may be adequately provided, minimally adequate counseling services for youth with the kinds of complex and difficult problems seen among youth at BCCY-WF requires at the very least a trained counselor with knowledge and skills in working with young people. This is all the more critical if the success of the model depends so heavily on the skills of the primary counselor, as appears to be the case in the model described in the BCCY-WF Program Summary.

To be clear, it appears that the mental health services provided by Wellpath do not include ongoing counseling and therapy or family therapy unless a youth has been designated as "seriously mentally ill" (SMI). According to the deposition of the Regional Director for Mental Health at Wellpath, a youth designated as SMI would get two individual sessions a month. And for emergency intervention in the event a youth was a risk for harming someone else, the Regional Director said that Wellpath would be involved if the youth was "hearing voices";

16

otherwise, it would be a problem for "security" staff. He said the key question determining Wellpath's role is whether the behavior of concern was symptomatic of a mental illness or "willful behavior". If the latter, the OJJ social worker would be responsible for counseling, not Wellpath.

Education:

Children and youth incarcerated by the State do not forfeit their right to a "free and appropriate education". Minimally acceptable standards of confinement require facilities to provide a curriculum that fulfills the graduation requirements of the State and that ensures children and youth do not lose educational progress at this critical developmental period. Minimally acceptable standards also require institutions to meet all the requirements of relevant laws and regulations governing special education services.

As Plaintiff's expert Dr. Joseph Brojomohun-Gagnon states in the introduction to his report:

> Incarcerated youth commonly have complicated and traumatic histories, as well as significant education, special education, and mental health needs. Recognition of these needs is necessary to ensure that students are provided adequate general education supports, in addition to disability-related accommodations and special education services for students identified with a disability under the Individuals with Disabilities Education Act (IDEA), Title II of the Americans with Disabilities Act (ADA), and/or Section 504 of the Rehabilitation Act of 1973 (i.e., "Section 504").

In his conclusion Dr. Brojomohun-Gagnon stated:

> Throughout this declaration, I have reviewed the serious deficiencies in the provision of education and special education at the OJJ Angola Unit. I detailed specific violations and harm related to several issues including a lack of, (a) access to an adequate number of qualified general and special education teachers, (b) access to the general education curriculum, (c) continuous specialized instruction, (d) appropriate academic and behavioral monitoring, (e) identification of students with disabilities, (f) a continuum of special education services, (g) positive behavioral interventions and supports and individualized behavioral interventions and supports, (h) socialization with peers, (i) related services, and (j) familial contact. I also detailed the serious harm and education deprivation associated with placing youth in isolation. It is likely that these serious failures of the education system at the facility negatively impact the plaintiffs and other students' education, ability to work toward and earn a high school diploma, and eventually to reintegrate into schools, the workforce, and community upon their exit from the facility.

A recently hired teacher provided a deeply disturbing first-hand account of just how deficient the BCCY-WF educational program is. This witness is a former superintendent as well as a former Statewide Assistant Superintendent for Special Education and a former Statewide

17

Director of Programs for children with emotional and social disabilities. He is not only familiar with the minimally acceptable standards, but he has also had responsibility in other settings for implementing them. Among his observations and concerns were a lack of access to educational records of the youth, no information on the IEP or 504 accommodation needs of the students, a lack of qualified special education instructors and aides to provide an appropriate staff/student ratio and failure to integrate computer-based learning and direct instruction.

Based on expert testimony and deposition testimony, BCCY-WF does not meet minimally acceptable standards for educational services. Failing to provide these educational services and supports contributes to a risk of serious and irreparable harm to the young people incarcerated at BCCY-WF: they are missing opportunities to learn and achieve at a critical developmental time in their young lives, and the institution is reinforcing a message that they are worthless and hopeless at a time when they are forming and consolidating their self-image.

### Recreation:
Mr. Schiraldi's report described the existing outdoor recreation space prior to the opening of BCCY-WF. At the time, it consisted of a basketball hoop with partial concrete paving. This same space now has a concrete half-court for basketball; two other basketball goals are in the outdoor recreation area, although there is no concrete paving and so they are not useable for games. Depositions from some OJJ staff state that youth have occasionally used the space to toss a football and there have been some reported instances of organized games such as sack races. There is no other organized outdoor recreational activity.

A room within the building has been designated as an indoor recreation space. Recreation in this space is limited to videogames, board games and watching TV. There is no adequate indoor space for large muscle exercise when the outdoor space cannot be used due to weather conditions including rain or excessive heat and humidity. Youth are essentially left on their own to create a recreational program with little to no guidance from staff other than security supervision.

Mr. Schiraldi's report contrasted the recreational facilities at BCCY-WF with the Bridge City Jefferson Parish facility, based on descriptions from Glenn Holt, the former director there:

> Bridge City has an outdoor, covered, full court basketball court that also has several half court rims. There is an indoor gymnasium with a high school regulation-sized, full court basketball court, bleacher seating to allow family and staff to be spectators, and an electronic scoreboard. There is an outdoor field that is both marked off for flag football and that has a backstop for softball. There is a "boys club" that has comfortable furniture, café style dining tables, a large screen for watching movies and sporting events, a pool table, a popcorn machine and a snow cone maker. Mr. Holt indicated that they had both intramural softball and flag football that the youth participated in, as well as a drumline, and that on occasion, they would bring youth together from several facilities (e.g., the Jetson Center for Youth (now closed) and Swanson Center for Youth) for intra-facility flag football tournaments.

18

Mr. Schiraldi's expert report summarized the importance of recreational programming for incarcerated children and youth.

> All of this enhanced programmatic and recreational space was used as a reward and incentive for positive youth behavior in a process called "positive youth development," so that staff can build on youth's strengths rather than primarily threatening and punishing them for bad behavior. This is part of the Missouri Model. Louisiana's Missouri Model approach was dubbed by OJJ leadership "LaMod," short for the Louisiana Model.

Minimally acceptable standards require facilities to minimize unstructured idle time and to provide a structured recreational program, including indoor and outdoor recreation, with set and specific guidelines for such activity. Facilities should have sufficient recreational equipment to provide each youth with an opportunity for large muscle exercise. It is common practice to employ a recreation director or similar position to plan and oversee implementation of a recreation plan, although many smaller programs incorporate these responsibilities into the job descriptions of Juvenile Justice Specialists or similar personnel.

Failure to meet minimally acceptable standards for recreational programming contributes to the overall risk of failing to meet the physical, social and developmental needs of adolescents. In addition to the importance of exercise and recreational activity for physical development, recreational activities provide opportunities for socialization and teamwork. Positive recreational experiences can enhance self-esteem and can create a bridge between youth and frontline staff that enables the development of the kinds of relationships that are central to the rehabilitative process. Moreover, a full recreational program is critical for relieving the boredom and stress that can contribute to negative and aggressive behavior.

Family Contact and Counseling:

Engaged families who have frequent and reliable contact with their children can be a foundational element of successful rehabilitation. Many of the interventions with the strongest evidence of success with young people with behavior problems have family engagement at their core, including Multi-Systemic Therapy, Functional Family Therapy and Multidimensional Treatment Foster Care.

Witnesses for the Defendants embraced the importance of family contact in their testimony, and the State emphasized their plans for ensuring that the children and youth incarcerated at BCCY-WF at Angola would have ample access to their families, including contact visits. As the former Deputy Secretary put it in testimony, "A mama has to hug her boy." OJJ officials stated that they would provide transportation for families to ensure they had this kind of contact.

The actual experience of youth and their families at BCCY-WF does not fit the rhetoric offered by OJJ. The primary contact with families is the social services supervisor, who currently also functions as the case manager due to a long-term vacancy. In her deposition, she stated she was

19

unfamiliar with the option of offering transportation to families. This may explain why there have been so few in-person family visits—less than five, according to multiple staff depositions.

This same social services supervisor is responsible for providing family counseling. As noted above, she holds a bachelor's degree in business administration and has neither training nor qualifying experience as a family counselor. Her own description of her role with families is to respond to any "concerns" they may raise. She made no mention of any attempts to engage the families around the care and treatment of their children, and how the families might play a positive role in the rehabilitation and/or reintegration process, nor did she describe any attempts to engage families around conflicts or challenges with their children. Her description of her role is consistent with a basic case manager role: communicating and facilitating basic procedures and processes. This is of course an important role. But the kind of family therapy or counseling necessary to intervene effectively with youth who have complex needs and who engage in very harmful behaviors requires the skills of a trained professional, skills that go far beyond case management.

## Conclusions

The physical environment, inappropriate use of solitary confinement, lack of rehabilitative programming, limited social services and mental health services, deficient educational services and supports, lack of adequate recreational facilities and programming, and failure to provide contact with families each put youth at risk of harm.

Clearly, the sheer number of risks increases the odds that youth will be harmed: while through personal resilience and plain luck an individual youth may avoid harm from one or two sources of risk, he will confront risks from other sources.

Yet even beyond the combined risks from multiple deficiencies, the cumulative effects of all these risks goes beyond the sum of the individual risks. These types of harms reinforce each other and combine in ways that exacerbate the harms from each. As one example: Overreliance on solitary confinement increases the risk that a young person will be unable to benefit from an educational program, increases the risk that he will be more rather than less likely to engage in disruptive and/or violent behavior, increases the risk that staff will be unable to engage him in the kind of trusting relationship necessary to rehabilitation and renders the lack of in-person family contact and support all the more painful and harmful.

The State may argue that youth who have been through the BCCY-WF TTU program have been successfully returned to the general population in OJJ facilities and are now complying with the programs there. I have not seen evidence concerning how youth transferred back to OJJ placements are faring. Even if one accepts that youth transferred to BCCY-WF are more compliant when transferred back to the general population, however, the risks of harm to youth cannot be ignored.

In the 1950's, prefrontal lobotomies were an accepted surgical procedure for people with severe mental illness and/or developmental disabilities who were prone to violent behavior. Although this barbaric procedure was effective in reducing or eliminating violent behavior and made patients more compliant with institutional programs, we now recognize the severe side effects and sheer inhumanity of the procedure.

In my own experience working in psychiatric hospitals in the 1970's, it was not uncommon for children, youth and adults to receive massive doses of psychotropics so they could be more easily managed in overcrowded, understaffed institutions. We now know that the side effects of this approach had tragic lifelong physical, developmental, cognitive and social consequences.

No one would expect the State to be permitted to force a young person to take an experimental drug or undergo a surgical procedure to make him more compliant with the programs in their juvenile correctional institutions without consideration of potential side effects. The TTU program as implemented at BCCY-WF puts youth at risk of a host of negative side effects, as detailed in this report and in the reports of experts in psychology, solitary confinement, education and environmental safety.

Punitive responses to adolescent behavioral problems have been overwhelmingly rejected by the best available research evidence. Even if punitive approaches were considered effective, however, the risk of side effects is simply too high to consider these punitive approaches safe. If the TTU program as implemented at BCCY-WF were subjected to the kind of scrutiny and review associated with a drug or surgical procedure trial, it would never be approved as a safe intervention for adolescents. The risk of serious and irreparable side effects is simply too high.

In summary, the BCCY-WF facility and program do not meet minimally acceptable standards of care, custody and rehabilitation, and the conditions and lack of services put youth at risk of serious and irreparable harm.

#### What are the alternatives?
The Court's findings and decision in the September 2022 hearing included consideration of the balance of interests among the youth held at BCCY-WF at Angola who may be at risk of harm; the youth in other OJJ facilities who according to OJJ have been assaulted by the youth now held at BCCY-WF at Angola; the OJJ administrators who have the authority and responsibility to manage OJJ without undue judicial oversight; and the public at large who could be endangered should violent youth escape from one of the existing OJJ facilities with less security than BCCY-WF at Angola.

In considering the balance of these various interests, the Court concluded that the "unacceptable" risk of harm to youth held at BCCY-WF at Angola was preferable to the "intolerable" risks to others if the transferred youth were to be returned to the existing OJJ facilities. In reaching this decision, the Court appears to have accepted two key arguments put forth by the Defendants: First, that the young people held at BCCY-WF at Angola are inherently violent and destructive and can't be managed within the existing programs at other OJJ facilities.

21

Second, that the OJJ system has no alternatives that would enable them to more effectively respond to the behaviors and needs of these young people.

A brief analogy may be useful in reframing this apparent dilemma. A family home is surrounded by several small ponds that are stocked with fish. One morning, they discover three dead fish floating in one of the ponds. They wonder why these fish died but decide there was just something wrong with the fish. Concerned that they might contaminate the other fish, they pull them out and throw them away. The next day they discover 20 or more fish floating belly up in the pond and they realize there must be something wrong with the water in that pond. The day after that they see fish floating belly up in several of their ponds and realize there must be something wrong with the ground water feeding into all the ponds.

OJJ originally described the problem as "10 to 15 youth" who were acting out so violently and destructively that OJJ was unable to manage their behavior and unable to provide an effective program for the rest of the youth in their care. These were analogous to the first group of fish discovered floating belly up in the pond: pull them out of the pond and get rid of them and the pond and the rest of the fish will be fine.

However, the behaviors they were describing had been going on for several years. Since youth age out of the OJJ system at 18, it seems unlikely that these were the same 10-15 youth. Moreover, since OJJ began transferring youth to BCCY-WF at Angola, almost 100 youth have been transferred. There appear to be a whole lot more than 10-15 troubled fish in the OJJ ponds, over a much longer period of time.

With apologies for this somewhat awkward analogy, the central point is that the problem has been too narrowly framed and too narrowly focused on just the young people whose behavior has been so dangerous and destructive. Given the high risk of serious and irreparable harm for the young people transferred to BCCY-WF at Angola, far beyond the risks considered in the Court's decision in the September 2022 hearing, continuing to rely on BCCY-WF at Angola as a solution, even a temporary solution, is clearly intolerable.

Finding a solution that addresses all the legitimate interests identified by the Court in the September decision is by no means an easy or straightforward challenge. But surely OJJ has the responsibility to develop and implement a strategy that deals with all aspects of the problem, rather than continuing to place youth at such serious risk of harm.

I have not had the opportunity to assess the overall OJJ system and services. But I do have more than 30 years of experience working with state and county public systems to improve results and outcomes for children and youth. As the senior vice president and then the president and CEO of the country's leading organization focused on reforming those systems, I had the opportunity and privilege to work closely with the leading national experts on every facet of public system reform, including juvenile justice system detention centers, secure custody institutions, probation, and intensive community-based alternatives to youth detention centers and youth prisons. As a member of the steering committee of Youth Correctional Leaders for

Justice, I work closely with over 70 current and former commissioners and directors of state and county juvenile justice systems who have demonstrated success in reforming their systems in ways that get better results and outcomes.

Based on that experience, I can offer some basic hypotheses about the multiple issues that may be contributing to OJJ's inability to respond to these challenging youth more effectively. The issues that are likely relevant include:

1. The identified youth are indeed extraordinarily challenging and would be challenging for any system. As noted in Defendants' testimonies at the September hearing and in depositions for this hearing, these young people have often experienced multiple "adverse childhood experiences" (ACEs) which have been shown to be associated with psychological, social, cognitive and behavioral problems. They have witnessed violence and they have experienced violence. They have been exposed to chronic toxic stress. Many likely have symptoms of Post Traumatic Stress Disorder (PTSD). Most have some level of mental illness, and many have severe mental illness. While all adolescents are still in the process of developing the kinds of "executive functioning" that we associate with adulthood—judgment, impulse control, frustration tolerance, empathy and so on—these young people have extreme gaps in their development.

   And so finding effective interventions for these young people is certainly no easy challenge. But that's the job.

   Every system in the country has some young people who are very difficult to engage and serve, and who act out their many troubles in ways that cause destruction and serious harm to others. Systems serving youth with tough problems from New York City, Washington DC, Baltimore, Detroit, Chicago, Houston, St. Louis and more have had to find a way to respond to these youth that is supportive and rehabilitative rather than purely punitive. But it requires an honest and thorough assessment of not only the individual youth but also the entire environment and network of relationships surrounding that youth.

   Three interrelated factors are the most common drivers of systemic failures in secure custody facilities: staffing problems, overcrowding and poor programming.

2. Since the onset of the pandemic, many systems around the country are struggling with hiring and retaining qualified staff at every level. Secure custody facilities have been among the hardest hit. In desperation, systems too often turn to problematic solutions.

   The remaining staff are asked to work longer hours, with double and even triple shifts. Exhausted and stressed, they lose their ability to maintain positive relationships with the youth who are most difficult to manage and increasingly rely on punitive responses, which contributes to yet more negative behavior. Turnover and sick time increases, putting even more stress on the staff who show up for work, which leads to even more

23

turnover. Systems try to fill the positions by hiring under-qualified applicants to fill in, and because the training department staff have been pressed into filling in at the frontline, these under-qualified applicants receive at best perfunctory training.

3. The impact of the pandemic on schools and community resources—rec centers, sports and other activities, family support centers—has led to a predictable rise in adolescent behavior problems, with some cities seeing a spike in arrests for armed robberies, carjacking and gun-related offenses, including shootings, homicides and gun possession. While the hard data show that crime among young people is still much, much lower than historical trends, the public is concerned, and many are demanding a return to tougher responses. In many (although far from all) jurisdictions, commitments to secure custody have been increasing, reversing a 25-year trend. In many places, this has resulted in over-crowding, which combined with staffing shortages results in a volatile mix within secure custody institutions.

4. Lack of qualified staff and overcrowding make it extraordinarily difficult to provide the kind of programming necessary to help young people get back on track, thrive and be ready to return safely to their families and communities. A spate of serious violence and destruction such as reported over the last three years in OJJ facilities is almost always associated with a break-down in programming. The more challenging and struggling youth are the youth who need the most comprehensive and individualized programming, and so they are the youth most likely to act out anger, fear, frustration, boredom, anxiety and stress when programming breaks down.

As one example of the level of programming successful facilities provide, the Washington DC Division of Youth Rehabilitation Services offers the following interventions in their secure care facility:

Core Programs:
- Power Source
- Thinking for a Change
- Trauma and Grief Component Therapy for Adolescents (TGCTA)
- Victim Impact
- Ready Restorative Justice (RJ) Curriculum
- Washington Aggression Interruption Training (WAIT)
- Houses of Healing

Supplemental Programs:
- Substance Abuse
- Pathways
- Animal Assisted Therapy
- Horticulture
- Independent Life Skills
- Real Talk Lecture/Red Table Talk Program
- Wellness Calendar Activities

24

- Rise and Reflection Circles
- Restorative Justice Community Building

Supportive Programs
- Therapy for Adolescents
- TGCTA (modules 2 and 3)
- Creative Writing
- Therapeutic Writing Module
- Customer Service
- Dramatic Arts
- Digital Arts
- Music Production
- Yoga and Meditation
- Barbering Training

5. The systems which have had the greatest success in not only implementing but sustaining transformative change have continued to invest in staffing, training, coaching, accountability, innovation, community partnerships and programming. Examples include Washington DC, New York, Detroit, Missouri, Illinois, Washington State, Oregon and others. None are perfect, all continue to have some problems, but they are all on a steady trajectory toward sustained improvement and success.

Other systems may have some initial success, but the combination of leadership change, budget cuts and shifting philosophies gut the programs and practices that achieved the success. The system may keep the name and trumpet the principles associated with the successful approach, much as the exterior design and the ad copy may try to convince you that the car you once loved hasn't changed a bit with the new model. But if you take it for a drive or look under the hood you discover it's a far inferior version.

Again, I have not assessed the Louisiana system. But an OpEd written by a former deputy secretary of OJJ in August 2022 includes a compelling summary of the kinds of systemic problems facing the State:

> State Sen. Katrina Jackson was right when she said in a recent committee hearing that, "the state had failed to fund the Missouri model." Even though the model was not adequately funded, it was evident the model was right for youth. While there were many challenges, mainly due to the same lack of staffing evident today, the research in juvenile justice science supports a therapeutic model over placing youth in isolation. The truth is, the therapeutic model was never given a real chance to succeed.
>
> One might ask what happened to the reform effort that the state had embraced? At one time our judges, district attorneys and public defenders worked together with the Office of Juvenile Justice to build an evidenced-based system for our youth. If the years of Gov. Bobby Jindal's administration forced

lean budgets and created a crisis, then what has been done in the last seven years to rectify this? Was this not the perfect time to move forward in developing the therapeutic model? Was there a strategic plan to continue the reform efforts? While focus was rightly placed on reforming our archaic laws regarding long-term adult sentences, it seems that there was little or no focus making advancements in juvenile justice.

Staffing issues have always been the enemy of an effective treatment model in secure care. Does a plan exist to address a long-term staffing solution? If so, what is it? Where are the so-called voices of the "juvenile justice advocates?" Why has blaming the kids and locking kids up become the main answer to violence and escapes within secure care?

I hope the Court will encourage OJJ leadership to look beyond the behaviors of the young people in their care in searching for answers. I know there are organizations that stand ready to partner with OJJ to complete an expedited assessment and to recommend immediate steps to address systemic problems that may be contributing to the kinds of acting out OJJ is experiencing.

The transferred youth are being exposed to the risk of serious and irreparable harm. In accepting responsibility for the care and custody of young people, OJJ and the State of Louisiana have an obligation to find alternative solutions that will protect all the youth in their care as well as the public. This is not easy, but again, that's the job. Given the magnitude of the challenge, there's no shame nor blame in looking for additional help. But continuing to pursue the failed strategy of using BCCY-WF to punish young people who are not complying with OJJ's model will not only harm young people who are transferred; over time, this strategy will also undermine OJJ's entire approach to rehabilitation.

Dated: August 14, 2023

_____/s/_____
Patrick McCarthy

26

| Bates # | Document Title | Description/Notes |
|---|---|---|
| | B.2.21-Behavioral-Intervention-BI-and-Extended-BI-08-01-22 | 2022.08.01 YSP - Behavioral Intervention (BI) and Extended BI |
| | ANDREAJONES | 2023.08.01 Andrea Jones Depo Transcript |
| | 23.07.28 Doc 183 SOI of the USA | 2023.07.28 Doc. 183 -- Statement of Interest of the USA |
| | Final Gagnon Dec and Exhibits | 2023.07.17 Gagnon Dec and Exhibits |
| | SBRYANT | 2023.08.01 Sandra Bryant Depo Transcript |
| | Final V. Schiraldi Expert Report | 2022.09.02 Schiraldi Expert Report |
| | 09072022_22CV573_SDD | 2022.09.07 Preliminary Injunction Hearing Transcript |
| | 09082022_22CV573_SDD | 2022.09.08 Preliminary Injunction Hearing Transcript |
| | 166 Memo of Law in Support | 2023.07.18 Doc 166 - Memo ISO Motion for PI |
| | 166-1 exhibit list | 2023.07.18 Doc 166-1 Exhibit List |
| | Doc 164-4- Exhibit 1 | 2023.07.17 Doc 164-4 Exhibit 1 |
| | Doc 164-5- Exhibit 2 | 2023.07.17 Doc 164-5 Exhibit 2 |
| | Doc 164-6- Exhibit 3 | 2023.07.17 Doc 164-6 Exhibit 3 |
| | Doc 164-7- Exhibit 4 | 2023.07.17 Doc 164-7 Exhibit 4 |
| | Doc 164-8- Exhibit 5 | 2023.07.17 Doc 164-8 Exhibit 5 |
| | Doc 164-9- Exhibit 6 | 2023.07.17 Doc 164-9 Exhbit 6 |
| | Doc 164-11- Exhibit 8 | 2023.07.17 Doc 164-11 Exhibit 8 |
| | Doc 164-14- Exhibit 11 | 2023.07.17 Doc 164-14 Exhibit 11 |
| | LONDON, LINDA (condensed) | 2023.08.01 Linda London Depo Transcript (condensed) |
| | LONDON, LINDA | 2023.08.01 Linda London Depo Transcript |
| | jones, charmaine (condensed) | 2023.08.01 Charmaine Jones Depo Transcript (condensed) |
| | jones, charmaine | 2023.08.01 Charmaine Jones Depo Transcript |
| | NELSON, CURTIS (condensed) | 2023.08.07 Curtis Nelson Depo Transcript (condensed) |
| | NELSON, CURTIS | 2023.08.07 Curtis Nelson Depo Transcript |
| OJJ-006990-006992 | Office of Juvenile Justice | 2023.08.07 C. Nelson Depo Ex. 1 -- OJJ Minor Tickets and Cell Restrictions |
| | 2023.08.08 Email from D. Utter | 2023.08.08 Email from D. Utter re: how kids get to Angola |
| | Doc 79 - PI Ruling | 2022.09.23 Doc 79 - Preliminary Injuction Ruling |
| | Deville_full | 2023.08.03 Shenell Deville Depo Transcript |
| | Deville_cond_N | 2023.08.03 Shenell Deville Depo Transcript (condensed) |
| | Deville Errata Sheet | 2023.08.03 Shenell Deville Depo Transcript Errata Sheet |
| | EDWARDS, FRANK | 2023.08.03 Frank Edwards Depo Transcript |
| | EDWARDS, FRANK (condensed) | 2023.08.03 Frank Edwards Depo Transcript (condensed) |
| | JACKSON, LADONNA (condensed) | 2023.08.03 LaDonna Jackson Depo Transcript (condensed) |
| | JACKSON, LADONNA | 2023.08.03 LaDonna Jackson Depo Transcript |
| OJJ-001161-001179 | 0002_B.2.8 (i) Transitional Treatment Unit (TTU) Youth Handbook August 2022 | 2022.08.00 B.2.8 (i) TTU Youth Handbook |
| OJJ-001140-001160 | 0001_B.2.8 (h) Transitional Treatment Unit (TTU) Youth Handbook August 2022 | 2022.08.00 B.2.8 (h) TTU Youth Handbook |
| OJJ-001234-001280 | 0018_TTU Presentation July 2023 | 2023.07.00 OJJ TTU Overview: Managing Youth Aggression - Underwood Presentation |

| | | 2023.06-2023.08 Dr. Lee Sick In Person Visit Log, BCCY-WF (and specific 6.14.23 List for In |
|---|---|---|
| OJJ-007461-007465 | 0344_Dr.Lee's Sick Call | Person Visits w Dr. Lee at 7pm) |
| | 23.07.31 Defendants Responses to Plfs RFPD | 2023.07.31 Defs' Responses to Pls' Pre-PI Hearing RFPs |
| | TAYLOR, TAMIKA (CONDENSED) | 2023.08.07 Tamika Taylor Depo Transcript (condensed) |
| | TAYLOR, TAMIKA | 2023.08.07 Tamika Taylor Depo Transcript |
| | PALMER, RONALD (condensed) | 2023.08.03 Ronald Palmer Depo Transcript (condensed) |
| | PALMER, RONALD | 2023.08.03 Ronald Palmer Depo Transcript |
| | SYLVESTER, HENRY | 2023.08.04 Henry Sylvester Depo Transcript |
| | SYLVESTER, HENRY (condensed) | 2023.08.04 Henry Sylvester Depo Transcript (condensed) |
| | McKINLEY, DAJA (condensed) | 2023.08.03 Daja McKinley Depo Transcript (condensed) |
| | McKINLEY, DAJA | 2023.08.03 Daja McKinley Depo Transcript |
| | Moreau, Todd (condensed) | 2023.08.04 Todd Moreau Depo Transcript (condensed) |
| | Moreau, Todd | 2023.08.04 Todd Moreau Depo Transcript |
| | GORDON, TRAVION (condensed) | 2023.08.03 Travion Gordon Depo Transcript (condensed) |
| | GORDON, TRAVION | 2023.08.03 Travion Gordon Depo Transcript |
| | Cooper, Patrick (condensed) | 2023.08.03 Patrick Cooper Depo Transcript (condensed) |
| | Cooper, Patrick | 2023.08.03 Patrick Cooper Depo Transcript |
| | Exhibit 9 | 2023.08.03 P. Cooper Depo Ex. 9 - Notice to Take Deposition of P. Cooper |
| OJJ-005879-005895 | Exhibit 10 | 2023.08.03 P. Cooper Depo Ex. 10 - C. Tassin IEP Docs |
| | COX, BRANDY (condensed) | 2023.08.03 Brandy Cox Depo Transcript (condensed) |
| | COX, BRANDY | 2023.08.03 Brandy Cox Depo Transcript |
| | J. Gagnon Amended Report | 2023.08.08 J. Gagnon Amended Report |
| | UNDERWOOD, PSY. D., LEE (condensed) | 2023.08.10 Lee A. Underwood Depo Transcript (condensed) |
| | UNDERWOOD, PSY. D., LEE | 2023.08.10 Lee A. Underwood Depo Transcript |
| | Cormier, Raschid (CONDENSED) | 2023.08.07 Raschid Cormier Depo Transcript (condensed) |
| | Cormier, Raschid | 2023.08.07 Raschid Cormier Depo Transcript |
| OJJ-001321-001372 | 0020_Photos from July 20 2023 | 2023.07.20 Photos |
| OJJ006990-OJJ007030 | OJJ - Document Production 08.04.2023 | 2023.08.04 OJJ Document Production |
| OJJ7007031-OJJ007466 | OJJ Document Production 08.08.2023 | 2023.08.08 OJJ Document Production |
| OJJ006856-OJJ006989 | OJJ - Document Production 08.02.2023 | 2023.08.02 OJJ Document Production |
| OJJ-000417-000422 | P 32 - 427_BCCY-WF MOU (000479-000484) | 2022.08.29 MOU Between La. DPSC-YS-OJJ and La. DCCS |
| | P 71 - OJJ-000259-OJJ-000263-Memo of Understanding (001387- | |
| OJJ-000259-000263 | 001391) | Undated MOU Between La. DCCS and La. DPSC-YS-OJJ |
| | P 39- 34_B.2.21 Behavioral Intervention (BI) and Extended BI 08- | |
| 000512-000523 | 01-22 (000512-000523) | 2022.08.01 Youth Services Policy - Behavioral Intervention (BI) and Extended BI (B.2.21) |
| | Doc 51 - Plaintiffs' Proposed Findings of Fact and Conclusions of | |
| | Law | 2022.09.02 Doc. 51 - Pls' Proposed Findings of Fact and Conclusions of Law |
| | Charles C. Digicourt records | Charles C. Digicourt Records f |
| OJJ-006989 | 0286_SSD_RiversideWF Schedule | 2023-2024 Riverside Alternative HS - West Feliciana |