UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ALEX A., et al., <br><br> Plaintiffs, <br><br> v. <br><br> JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana, *et al.*, <br><br> Defendants. | Civ. Act. No. 3:22-CV-00573-SDD-RLB <br><br> **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SPOLIATION SANCTIONS REGARDING ABSENCE OF BODY-WORN CAMERA FOOTAGE** |

The Court should, pursuant to Fed. R. Civ. P. 37(e) and this Court's inherent powers to regulate the litigation process[1], sanction Defendants to cure the prejudice Plaintiffs face due to missing body-worn camera (BWC) footage containing the audio and video of Defendants' employees spraying putative class members with chemical spray at the OJJ Angola facility. This BWC footage would have provided the only unbiased and full account of what transpired and should have been recorded and preserved under Office of Juvenile Justice ("OJJ") policy and Plaintiffs' timely discovery and preservation requests.

## RELEVANT BACKGROUND

Plaintiffs seek sanctions because OJJ's body-worn cameras of two JJS officers were not set to record on the date of an incident that is at issue in the current Preliminary Injunction hearing. Specifically, Plaintiffs seek sanctions to cure the prejudice they face because they are missing the video footage that would show what transpired in the incident, in which Defendants' employees sprayed a child locked in a cell with mace and failed to provide medical assistance to, or even move, that child or those locked in nearby cells for nearly six minutes.

---

[1] *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991) (holding allegations of spoliation are addressed through federal courts' inherent powers); *Union Pump Co. v. Centrifugal Tech., Inc.*, 404 Fed. Appx. 899, 905 (5th Cir. 2010) (per curiam) (same) (*citing Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 449 (4th Cir. 2004)).

On July 26, 2023, Plaintiffs sent a preservation demand to Defendants, pursuant to Fed. R. Civ. P. 34, to preserve any and all videos that depicted the inside of the OJJ Angola facility (or as defendants refer to it, the Bridge City Center for Youth – West Feliciana) in which children in OJJ's custody are held. *See* Exh. 1 (July 26, 2023 letter to Defendants). This demand did not specifically mention body-worn camera, as the Plaintiffs were not aware that OJJ prison guards—known as Juvenile Justice Specialists (hereafter "JJS") —wore body cameras. However, the demand did not need to specify BWC. The language in this preservation demand plainly encompassed any video in possession of the Defendants or their employees that depicted the events occurring where children are present inside the OJJ Angola facility. *Id*. On July 24, 2023, Plaintiffs had also served discovery requests on Defendants that encompassed these videos and other electronically-stored information ("ESI"). *See, e.g.,* Doc. 197-1, Ex. 1 (Plaintiffs' Pre-Preliminary Injunction Hearing Requests for Production of Documents to the Defendants).

Meanwhile, Plaintiffs first deposed a JJS on August 3, 2023. At that time, Plaintiffs' counsel became aware that all JJS's wear body-worn cameras as a matter of OJJ policy. That same day, Plaintiffs also became aware of an alarming use of force against a child locked in his cell on August 2, the day before the deposition. Deposition testimony revealed that on August 2, 2023, a child was inside a locked cell at the OJJ Angola facility, and that JJS Frank Edwards fired a mace canister at the youth confined in the cell. This use of a chemical agent against a child in a locked cell allegedly occurred after the youth threw an unknown liquid from a cup through the cell bars. Exh. 2, August 3, 2023 Deposition of Frank Edwards excerpt at 12-13. The same day, Plaintiffs' counsel sent Defendants' counsel a specific request for all BWC footage of this incident. Exh. 3, Email from David Utter.

On August 4, 2023, Defendants provided Plaintiffs' counsel with a use of force report authored by JJS Daja McKinley about the macing, in which she reported that she was present next to JJS Edwards when he sprayed the youth with mace through the bars of the cell. But Counsel for Defendants provided no video. Plaintiffs continued to seek this specific video from Defendants. On August 8, 2023, the Magistrate Judge denied Plaintiffs' Motion to Compel Discovery, which included electronic discovery, and *sua sponte* ordered that Plaintiffs could file no further motions about non-expert discovery, encompassing specific outstanding requests that Defendants unilaterally ignored. Doc. 201. *Cf.* Local Rule 26(d)(1) (allowing discovery motions "within seven days after the discovery deadline and pertaining to conduct occurring during the final seven days of discovery"). Plaintiffs made a final request in writing for Defendants to turn over a list of previously specified discovery items voluntarily, including the BWC footage from JJS Edwards and JJS Daja McKinley of the macing of the child. Exh. 4, Plaintiffs' August 12, 2023 Letter to Defendants. Defendants' attorneys refused to produce any further materials unless compelled by this Court. As a result, on August 13, 2023, Plaintiffs filed their consolidated motion for reconsideration—treated by this Court as an appeal—of certain portions of the Magistrate Judge's discovery orders. Doc. 213. This Court held a status conference with the parties on August 14 and ordered Defendants to disclose the requested BWC footage of JJS Edwards and JJS McKinley by the close of business on August 15, 2023. Doc. 216.

Defendants produced "tier video," which contains video from the far corners of the tier where the incident occurred, but contains no audio. The only BWC video that Defendants produced was that of a responding officer who was outside the tier at the time of the incident, and whose camera did not capture the incident. Defendants did not produce BWC from JJS McKinley or JJS Edwards, and Defendants' counsel claimed this incident was not recorded on *either* guard, contrary

3

to policy. Though Plaintiffs' counsel was willing to wait additional time for the video to be produced, Defendants' counsel then stated on the record that BWC footage did not exist.

When JJS McKinley was called to testify, this Court viewed two tier videos and the BWC of a different responding guard. In all the videos, JJS McKinley and JJS Edwards are clearly shown with body-worn cameras attached to their uniform shirts as JJS Edwards maced the youth locked inside his cell and in the moments immediately after. Plaintiffs' Exhibits in evidence ("PX") 440a-c; PX 441a-c. JJS McKinley testified that it was OJJ policy for JJS's to have their body-worn cameras on at all times except while in the breakroom or in the restroom. She further testified that it was OJJ policy to have their BWC turned on at all times while interacting with the youth in their care. When questioned about why her body-worn camera was turned off at the time of the incident, JJS McKinley testified that she may have "accidentally" forgotten to turn her BWC back on after using the bathroom, and that she has forgotten to turn her camera on after using the toilet in the past. This testimony of JJS McKinley contrasts with her deposition testimony. On August 3—the day after JJS McKinley was shown on tier video less than one foot from JJS Edwards as he fired mace at the youth—she testified under oath that she could not recall any date when she witnessed any JJS spray mace at a youth locked in his cell. Exh. 5 at 49. She likewise testified that she could not recall the cause of the macing, despite Plaintiffs later learning that she wrote an incident report about the incident less than twenty-four hours before her deposition. *Id.* at 50.

On the third day of the preliminary injunction hearing, August 17, the Court viewed two segments of the "tier" video (recorded with the camera outside the cell that faces down the hallway of cells rather than facing into any cell) showing the tier from 3:39 pm to 3:56 pm on August 2, 2023, The videos depict JJS Edwards putting his arm all the way through the cell bars and spraying the chemical agent known as "mace" at a child locked in a cell, and reveal that it took close to

4

fourteen minutes to begin clearing the children off the tier. PX 440a-c; PX 441a-c. Plaintiffs' counsel played the video and asked JJS McKinley, who was on the tier and repeatedly shown in the video, a number of questions at different stopping points. The video shows JJS McKinley physically forcing a youth into cell 9 and locking the door. Moments later, the video shows JJS Edwards (identified by JJS McKinley) reaching his arm though the bars at approximately 3:42 pm and spraying a substance into the cell, within extremely close proximity to the youth. JJS McKinley testified that the substance was mace. The spraying is also documented in OJJ's Chemical Agent logs. PX 89. JJS McKinley testified that the mace was sprayed after the child threw a cup of unknown liquid at her (standing outside the cell) from inside the cell. There were four JJS officers visible on the tier at the time of the incident, including JJS's McKinley and Edwards, who are shown in the video running off while coughing and gagging. PX 440a-c; PX 441a-c. Visible on the tier video, other children were locked in cells on the same tier, including a child in the open-barred cell next to the youth who was maced.

    The video shows that the child in cell 9 who was maced was forced to wait in his cell for nearly six minutes until he was finally, violently, removed from the tier by JJS Edwards—who was wearing a gas mask and who is seen having removed some of his (presumably mace-soaked) clothing—at 3:48 pm. PX 440a-c; PX 441a-c. After the child who was sprayed was finally taken off the tier, the video depicts JJS officers re-entering the tier, along with OJJ facility Director London and Deputy Director Jones. The tier video depicts all staff members wearing face coverings that clearly resemble gas masks, while JJS McKinley handed out what appear to be paper surgical masks to children still locked in their cells. PX 440a-c, 441a-c. In testimony before this Court, JJS McKinley testified that the children were not given the more protective masks like those the JJS's and staff were given. The video shows the child in cell 8—who was directly next

5

to the child who had been maced—remained in his cell, throwing himself intermittently against cell bars, for at least fourteen minutes. The video footage provided ends at 3:56 p.m., at which point the child in cell 8 was still locked in his cell. *Id.*

The only BWC footage produced by the Defendants was that of a responding guard who was on-duty outside of the tier at the time of the incident. This BWC video is the only video provided by Defendants that has audio, but it does not capture video or audio of the tier during the time when JJS Edwards maced the child in cell 9. That footage, however, *does* reveal the extreme, acute reaction all of the guards and staff had to the mace as they came running off the tier, coughing and gasping for air, leaving the children locked in cells behind. Though the video is blocked at times as the wearer apparently attempts to cover their mouth, screams and coughs can be heard from the children locked in cells after the mace was deployed. This BWC video with audio is close to twenty minutes in length, and all throughout the video after the incident, staff can be heard coughing and reacting to the mace. Additionally, all staff can be seen wearing gas masks all throughout the facility and in the hallways well past the tier area. PX 410a-e.

The Court heard Defendants' version of events, but missing at the hearing was the most reliable and objective evidence: the BWC footage from each JJS present and involved. This footage is not accidentally missing. It is missing because Defendants and their employees did not preserve it. As Defendant Nelson (a lawyer and officer of the court) testified on August 7, neither he nor his OJJ counsel Ms. Woods implemented a litigation hold at any time after this action was filed on August 19, 2022, for any time of electronically-stored information whether it be e-mail messages, tier video, or BWC video. Defendant Nelson also testified that Defendants did not do so after this PI Motion was filed on July 17, 2023, nor after receiving discovery requests on July 24, 2023, and that he and OJJ issued no directive to preserve any video. After being told to

6

investigate whether Defendants preserved any video from the incident, their counsel stated that Defendants' employees Edwards and McKinley did not set their BWC to record, contravening clear department policy that body cameras be "activated at the beginning of an employee's shift" and "recording when in the presence of children."[2] Because JJS's BWCs are always recording and buffering video until they are deactivated, the Defendants' employees' actions show clearly that they failed to take reasonable steps to preserve it.

## LAW AND ARGUMENT

### I. Relevant Law

The framework by which courts analyze spoliation of electronically stored information during the pendency of litigation is set out in Rule 37(e) of the Federal Rules of Civil Procedure. *Lou v. Lopinto*, CV 21-80, 2022 WL 16685539, *4 (E.D. La. Nov. 2, 2022) ("Rule 37 provides a basis for spoliation sanctions when the alleged destruction of evidence arises during the discovery period of active litigation and there is a failure to … preserve electronically stored information."). This rule sets out three requirements to find spoliation: (1) the information "should have been preserved in the anticipation or conduct of litigation," (2) it "is lost because a party failed to take reasonable steps to preserve it," and (3) "it cannot be restored or replaced through additional discovery. Fed. R. Civ. P. 37(e). Once a court finds spoliation, it then considers whether a remedy is appropriate. "[U]pon finding prejudice to another party from the loss of the information," the Court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Rule 37(e) also permits harsher sanctions of dismissal or an adverse inference on a

---

[2] Exh. 6, Louisiana's Office of Juvenile Justice Youth Services Policy No. C.20.3, BODY CAMERAS (Oct. 18, 2022). No explanation other than JJS McKinley's testimony was provided by defense counsel as to why the cameras were not activated.

finding of "intent to deprive another party of the information's use in litigation." Fed. R. Civ. P. 37(e)(2).

Plaintiffs do not currently seek those harsher sanctions in this motion.

**II.     Argument**

Rule 37(e) codified the common-law duty to preserve,[3] which is triggered when a party "has notice that the evidence is relevant to . . . or should have known that the evidence may be relevant" to pending or future litigation.[4] Additionally, the Advisory Committee notes to Rule 37(e) state:

> Although [Rule 37(e)] focuses on the common-law obligation to preserve in the anticipation or conduct of litigation, courts may sometimes consider whether there was an independent requirement that the lost information be preserved. Such requirements arise from many sources—statutes, administrative regulations, an order in another case, *or a party's own information-retention protocols*.[5]

Application of this Rule and its sanctions to an officer's failure to turn on her BWC at a required time is a relatively new area of law and there few opinions discussing the discovery ramifications of a decision to not set a BWC to record. *See United States v. Garcia*, No. 1:19-cr-410- FB-1, 2021 U.S. Dist. LEXIS 150129, at *19 (E.D.N.Y. Aug. 10, 2021) ("Because of the relatively recent advent of police body cameras, there is a dearth of caselaw assessing the evidentiary consequences of a police officer's failure to comply with body camera mandates where the Fourth Amendment is implicated.").

---

[3] *See* Advisory Committee Notes to Rule 37(e), 2015 Amendment.

[4] *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015).

[5] Advisory Committee Notes to Rule 37(e) – 1, December 2015 (emphasis added).

8

Defendants' failure to preserve BWC evidence meets the three requirements of Rule 37(e) for a finding of spoliation. This failure to preserve evidence prejudices Plaintiffs, and thus entitles them to sanctions to correct that prejudice.

### 1. The BWC Footage of the Use of Force Incident, Which Was the Subject of a Live Discovery Request, Should Have Been Preserved.

Defendants were on notice that BWC footage of use of force incidents is relevant to this case as soon as the complaint was filed.[6] Fear of physical harm at the hands of adults, and current and possible future psychological harm, were front at center from the outset. The BWC footage of the use of force incident "should have been preserved in the anticipation or conduct of litigation." Fed. R. Civ. P. 37(e).

Additionally, Louisiana's Office of Juvenile Justice ("OJJ") has a written policy on body cameras, which functions as an independent requirement to preserve BWC footage in anticipation of litigation. The policy obligates a JJS to activate their body worn camera upon it being issued at the beginning of the shift, unless they are in the restroom, not supervising children, or instructed to deactivate the camera by an investigator from OJJ or supervisor.[7] This policy also obligates a JJS to activate the body worn camera when a youth allegedly becomes aggressive, even when the event would not otherwise be recorded.[8] This policy reflects the department's anticipation of future

---

[6] Doc. 1 at ¶¶ 13, 15, 21-22; Doc. 4-4 at ¶ 23 (Alex A. Declaration, stating that DOC guards at a different OJJ secure facility where he was held behave differently than OJJ security guards, stating that DOC guards "mace us for nothing"); Doc. 79 at p. 3  (The Court found "there is a high-risk that the placement of adolescents in a facility designed to house adult inmates will be psychologically harmful and traumatizing"); *Id.* at p. 60 (The Court was "persuaded that transferring emotionally vulnerable adolescents, many of whom have mental health issues and cognitive disfunction, to a prison camp on the grounds of Angola will likely have deleterious psychological ramifications").

[7] *See* Exh. A, §VIII. B.

[8] *Id.*

9

litigation and its understanding that BWC footage will be relevant to that litigation. The policy's duty to preserve BWC footage thus buttresses the common law duty to preserve.

   2. **Defendants Failed to Take Reasonable Steps to Preserve BWC Footage Because They Failed to Issue a Litigation Hold, Their Employees Violated Department Policy, and Their Employees Neglected to Activate Their BWC.**

Spoliation sanctions apply "if the information was lost because the party failed to take reasonable steps to preserve it." Fed. R. Civ. P. 37(e). A party that "never implemented a formal litigation hold" and "failed to take sufficient informal steps to preserve evidence" fails this element of the Rule 37(e) test. *Marsulex Env't Techs. v. Selip S.P.A.*, No. 1:15-CV-00269, 2019 WL 2184873, at *10 (M.D. Pa. May 21, 2019).

Defendants' failure to take reasonable preservation steps is proved by the testimony of Secretary Nelson at the hearing on this motion. He testified that neither he nor Ms. Woods, the OJJ counsel, implemented a litigation hold or instructed anyone to preserve e-mails, surveillance video, or BWC footage. Testimony of Curtis Nelson, Transcript not yet available. In addition, when one considers the timing of the excessive use of force in relation to Plaintiffs' request for emergency relief, OJJ did not reiterate the need to their line staff to abide by their own BWC policy that cameras are to be activated during critical moments. This did not happen even after the discovery requests concerning this Preliminary Injunction Motion were served. As a result of the Defendants' failure to formalize a litigation hold, their employees used slipshod preservation efforts that fell woefully short.

At least four BWCs, visible in the tier video footage, were positioned to capture audio of the use of force incident and video of the child who was maced. Defendants' failure to maintain BWC footage through the implementation of a litigation hold and instructions to relevant

10

supervisors and staff, and the JJS guards' failures to have their BWC on during this interaction with youth, satisfies this prong of the Rule 37(e) analysis.

Defendants failed to take reasonable steps to preserve relevant BWC footage when their employees, JJS McKinley and JJS Edwards disregarded Department policies on body worn cameras.[9] In addition to codifying the common law duty to preserve evidence, spoliation rules contemplate a duty to preserve stemming from "an independent requirement that the lost information be preserved," such as requirements created by "statutes, administrative regulations, an order in another case, or a party's own information-retention protocols." Advisory Committee Notes to Rule 37(e), 2015 Amendment.

Here, Defendants' BWC policy functions as an independent requirement to preserve BWC footage that reinforces the common law duty to preserve in anticipation of litigation. Exh. 6, OJJ Youth Services Policy No. C.2.30 § VIII. The policy explains that a BWC "must be activated upon being issued at the beginning of the shift."[10] It enumerates specific events when BWCs must be deactivated, such as when a JJS uses the restroom, *id.* at § VIII.B., but it explains that BWCs "must

---

[9] As this Court has held, the failures by JJS McKinley and JJS Edwards—employees of the Defendants—may be imputed to the Defendants themselves, who were sued in their official capacities. "[T]he duty to preserve evidence extends to th[e] employees [of the named parties] likely to have relevant information." *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 339 (M.D. La. 2006). Thus, McKinley's and Edwards's failures to preserve evidence warrants sanctions against the Defendants—McKinley's and Edwards's employers sued in their official capacity. Court orders specifically in civil-rights cases against the government further bolster this conclusion. Courts considering sanctions under Rule 37(e) recognize the reality that "[s]tate correctional departments and municipalities ultimately bear responsibility for preserving evidence and litigating cases filed by prisoners," even when immunity rules may force those incarcerated litigants to bring the suits against individual employees. *Johns v. Gwinn*, 503 F. Supp. 3d 452, 463 (W.D. Va. 2020). Thus, these government entities' "failure to preserve evidence may be imputed to individual officer defendants in order to avoid unfair prejudice to inmate litigants." *Id*. (imputing to an employee named as a defendant the failure by unnamed department employees to preserve body camera footage); *see also Woods v. Scissons*, No. 17-cv-08038, 2019 WL 3816727, at *4 (D. Ariz. Aug. 14, 2019) (imputing to an officer named as a defendant the failure by unnamed employees of the police department to preserve dash cam footage).

[10] Exh. 6, § VIII.A. ("A body-worn camera must be activated upon being issued at the beginning of the shift, including when transporting a youth off campus, unless an event listed in VIII.B requires the body-worn camera to be deactivated. The body-worn camera must be reactivated immediately upon the conclusion of any event listed in VIII.B").

11

be reactivated immediately upon the conclusion" of these events.[11] Defendants' employees who use BWCs receive training on these policies, and "may be subject to disciplinary action if the employee fails to … activate a body-worn camera when required"[12] or ... "follow the proper procedures for activation and deactivation."[13] When JJS McKinley and JJS Edwards did not set their BWCs to record, they violated department policies.

At least one other court has found that when a carceral facility's policies would result in the preservation of body worn camera footage, "deviating from [those] practices" is evidence of a failure to take reasonable steps to preserve evidence. *Jenkins v. Woody*, No. 3:15CV355, 2017 WL 362475, at *16 (E.D. Va. Jan. 21, 2017). The failure to follow department policy is particularly remarkable because JJS McKinley admitted during the preliminary injunction hearing that her BWC was off, and that she had quite likely used the bathroom and forgotten to reactivate it. She testified that forgetting to turn it back on is something she has done before. JJS Edwards admitted in his deposition that it is department policy to record interactions with youth while on duty and interacting with children. Exh. 2 at 15:24-25, 16:1-19.

The Defendants' representations about their employees' choice to set their BWCs not to record video of the use of force incident do not make clear exactly the technical mechanism through which these employees set their devices not to record; regardless of the specific mechanism, this represents a failure to take reasonable measures to preserve the footage under this prong of the Rule 37(e) analysis.

---

[11] *Id.*

[12] *Id.* at § X.B.1.

[13] *Id.* at § VIII.D.

OJJ uses the Axon Body 3 BWC.[14] The Axon Body 3—like most BWCs—has one mode that records footage (the "event" mode) and two modes that do not record footage (the "pre-event buffer" mode and "off" mode).[15] The "pre-event buffer" mode means the camera is in constant standby in which the "camera will be capturing video but does not record to permanent memory."[16] In this mode, the BWC stores footage only temporarily, and it automatically deletes the footage shortly after it is captured unless the user places the BWC into "event" mode, in which case it will permanently record the footage in its buffer as well as footage going forward.[17]

By placing their BWCs into either "pre-event buffer" or "off" mode, JJS McKinley and JJS Edwards failed to take reasonable steps to preserve footage. Courts considering similar technologies find that a failure to permanently store data represents a failure to take reasonable steps to preserve it. For example, a court considered whether a party that was subject to a discovery request was obligated to collect information held in a computer's RAM. That court noted that RAM—much like the BWCs' buffer memory—contains information "for later use by the computer (e.g., to be used in tasks performed by software or written to a hard drive, flash drive, DVD, or other more permanent medium) or disposal (e.g., to be erased when the computer is turned off or when the data is overwritten with new information as part of the regular computing process)." *Columbia Pictures, Inc. v. Bunnell*, 245 F.R.D. 443, 446 (C.D. Cal. 2007). That court,

---

[14] PX 410a-e. These exhibits depict the only body camera footage received by the Plaintiffs. The camera model is noted in the top right corner of the video.

[15] Axon, *Axon Body 3 User Manual*, September 2021, at 16, https://my.axon.com/s/contentdocument/069f3000006Ko4cAAC?language=en_US ("The Axon Body 3 camera has two operating modes: ready (buffering), turning on the camera and starting pre-event buffering; and recording (event), event recording").

[16] *Id.*

[17] *Id.*

too, found that, so long as "obtaining the data [from RAM is] possible," it was "subject to discovery under the appropriate circumstances." *Id.* at 447. Another court addressed the choice of several employees of a party, while under a preservation obligation, to use a messaging application configured so that "messages would disappear from users' devices shortly after they were read by the recipient" such "that messages exchanged via [the application] were not preserved." *Fed. Trade Comm'n v. Noland*, No. CV-20-00047-PHX-DWL, 2021 WL 3857413, at *2, 7 (D. Ariz. Aug. 30, 2021). The court found these employees' "choice to turn on [the application]'s auto-delete feature" to constitute spoliation. *Id.* at *7.

Here, like in the aforementioned cases, "obtaining the data [from the BWC] is possible" by simply placing it into event mode. *Columbia Pictures*, 245 F.R.D. at 447. Thus, JJS McKinley's and JJS Edwards's choice to put their BWCs into a mode where they do not record a persistent copy of footage is a "fail[ure] to take reasonable steps to preserve" this BWC footage. Fed. R. Civ. P. 37(e).

3. **When JJS Guards Fail to Activate Their BWCs, the Video Footage is Not Recoverable Through Other Means of Discovery.**

The lost evidence must be irreplaceable for spoliation sanctions to apply. Fed. R. Civ. P. 37(e). This condition is also met here. Lost BWC footage "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e)(3).

The video footage provided by Defendants to the Plaintiffs is missing key information. It either lacks audio or does not show the inside of the cell in which the child subjected to the use of force was held, and does not show the child.[18] The video that was produced shows that there were four JJS's present on the tier when JJS Edwards maced a child in his cell. There could have been

---

[18] PX 410a-e; PX 440a-c; PX 441a-c.

14

BWC footage from four unique perspectives, reflecting their positioning and viewpoint. For example, footage from the JJS furthest away from the situation may offer critical context that the recording from the JJS closest lacks. JJS Edwards's BWC footage would have been the closest to the child. Nonetheless, when a JJS fails to activate his or her BWC, the camera records over itself and the footage is lost forever.[19]

Testimony is a poor substitute for video because "[m]emories fade and [witnesses] may be biased in their recollections." *Phan v. Costco Wholesale Corp.*, No. 19-CV-05713-YGR, 2020 WL 5074349, at *3 (N.D. Cal. Aug. 24, 2020). This is particularly true when parties testify on use of force because they have a "natural bias in favor of" their colleagues that "may color [their] interpretation and descriptions of the events [they] witnessed." *Johns*, 503 F. Supp. 3d at 472.

### 4. Plaintiffs Suffered Prejudice as a Result of the Loss of this BWC Footage that Can Be Cured Only Through Appropriate Sanctions.

Defendants' failure to preserve and/or loss of BWC footage of the use of force incident satisfies the three elements of Rule 37(e). The Court should therefore proceed to Rule 37(e)(1) and may "order measures no greater than necessary to cure the prejudice" to Plaintiffs.

Plaintiffs suffered prejudice because they lack audio of the use of force incident, and lack video fully showing JJS McKinley, JJS Edwards, or the child subjected to the use of force. This "[v]ideo [d]ata would have been the only unbiased and dispassionate depiction of events that occurred" during the use of force incident, so the resulting "prejudice is immense." *Jenkins*, 2017 WL 362475, at *18.

Other courts considering sanctions under Rule 37(e)(1) for a loss of BWC footage have issued several forms of sanctions. One court presiding over a jury trial precluded certain evidence

---

[19] Doc. 197-10, Exh. 8, p. 2 (Defendants' counsel writing to Plaintiffs counsel, stating "As you are likely aware, video is being overwritten in the normal course of operations as we speak").

15

and argument relevant to the events that the video would have depicted, informed the jury that the evidence was not preserved, allowed the parties to present evidence and argument about the missing footage, and awarded attorneys' fees. *Jenkins*, 2017 WL 362475 at *18. Another court issuing a decision after a bench trial ordered sanctions in the form of a finding that the spoliation "persuade[d] the Court that [two officers'] testimony about what they observed on the video is less credible than if they had, for example, taken steps to preserve the video but it was later destroyed through no fault of their own." *Johns*, 503 F. Supp. 3d at 474. Here, similar sanctions are necessary here to cure the prejudice Plaintiffs face.

## CONCLUSION

This Court should, pursuant to Fed. R. Civ. P. 37(e) and it's inherent powers to regulate the litigation process, sanction Defendants to cure the prejudice Plaintiffs face due to missing body-worn camera (BWC) footage containing the audio and video of Defendants' employees spraying putative class members with chemical spray at the OJJ Angola facility. Therefore, Plaintiffs request that:

1. The Court find that JJS McKinley's and JJS Edwards's choices not to record BWC footage of the incident diminishes their credibility, and

2. The Court preclude evidence and argument by the Defendants that the actions of the child in the cell—for which video footage is missing due to Defendants' spoliation—posed a serious and immediate risk of physical harm to him or to others.

Respectfully submitted, this 28th day of August, 2023.

/S/: *David J. Utter*  
David J. Utter *  
Louisiana Bar Number: 23236  
William R. Claiborne**  
Georgia Bar Number: 126363  
The Claiborne Firm, P.C.  

/S/: *Christopher J. Murell*  
Christopher J. Murell  
Louisiana Bar Number: 32075  
Murell Law Firm  
2831 St. Claude Avenue  
New Orleans, Louisiana 70117  

16

410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
David@Clairbornefirm.Com
Will@Claibornefirm.Com


/S/: *Hector Linares*
Hector Linares
Louisiana Bar Number: 28857
Sara Godchaux
Louisiana Bar Number: 34561
Stuart H. Smith Law Clinic
Loyola University New Orleans College Of Law
7214 St. Charles Avenue, Box 902
New Orleans, Louisiana 70118
(504) 861-5560 Telephone
(504) 861-5440 Facsimile
Halinare@Loyno.Edu
Shgodcha@Loyno.Edu


/S/: *David Shanies*
David Shanies**
New York Bar Number: 4471140
Shanies Law Office
110 West 40th Street, 10th Fl.
New York, New York 10018
Tel. (212) 951-1710
Fax (212) 951-1350
Cell (646) 515-2151
David@Shanieslaw.Com

(504) 717-1297 Telephone
(504) 233-6691 Facsimile
Chris@Murell.Law


*/S/: Nancy Rosenbloom*
Nancy Rosenbloom**
New York Bar Number: 2168425
Aclu National Prison Project
125 Broad Street
New York, Ny 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2652
Nrosenbloom@Aclu.Org

*/S/: Tammie Gregg*
Tammie Gregg***
Mn Bar Number: 026240
Aclu National Prison Project
915 15th St. N.W., 7th Floor
Washington D.C. 20005
Telephone: (202) 393-4930
Facsimile: (202) 393-4931
Tgregg@Aclu.Org

/S/:  Marisol J. Dominguez-Ruiz
Marisol J. Dominguez-Ruiz**
ACLU National Prison Project
39 Drumm Street
San Francisco, Ca 94111
Telephone: (202) 393-4930
Facsimile: (202) 393-4931
Mdominguez-Ruiz@Aclu.Org

*/S/ Meghan Matt*
MEGHAN MATT
La. Bar No. 39975
ACLU Foundation of Louisiana
1340 Poydras St., Suite 2160
New Orleans, LA 70112
Telephone: (504) 522-0628
Facsimile: (504) 613-6511
mmatt@laaclu.org

17

/S/ Susan M. Meyers
Susan M. Meyers
Louisiana Bar Number: 29346
Lauren Winkler
Louisiana Bar Number: 39062
Ashley Dalton
Louisiana Bar Number: 40330
Southern Poverty Law Center
201 St. Charles Avenue, Suite 2000
New Orleans, La 70170
Telephone: 504-512-8649
Susan.Meyers@Splcenter.Org
Lauren.Winkler@Splcenter.Org
Ashley.Dalton@Splcenter.Org

\* *Lead Counsel*
\*\*Appearing *Pro Hac Vice*
\*\*\*Appearing *Pro Hac Vice* And Not Admitted In Dc; Practice Limited To Federal Courts

**Attorneys For Plaintiffs**

## Certificate Of Service

I hereby certify that on this 28th day of August, 2023, a copy of the foregoing was served upon all Counsel of record by electronic submission.

/s/ *David J. Utter*
David J. Utter