### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF LOUISIANA

ALEX A., by and through his guardian,
MOLLY SMITH, individually and on behalf
of all others similarly situated

VERSUS

GOVERNOR JOHN BEL EDWARDS,
in his official capacity as Governor of Louisiana;
 WILLIAM SOMMERS, in his official
capacity as Deputy Secretary of the
Office of Juvenile Justice,
JAMES M. LEBLANC, in his official capacity
 as Secretary of the Louisiana Department
of Public Safety & Corrections

CIVIL ACTION

22-573-SDD-RLB

### RULING

This matter is before the Court on the *Motion for Class Certification*,[1] filed by Alex

A. ("Alex A."), by and through his guardian, Molly Smith, and Charles C ("Charles C."), by

and through his guardian Kenione Rogers (or collectively "Named Plaintiffs" or

"Plaintiffs"). Defendants, Governor Jon Bel Edwards, in his official capacity as Governor

of Louisiana, William Sommers ("Sommers"), in his official capacity as Deputy Secretary

of the Office of Juvenile Justice ("OJJ"),[2] and James M. Leblanc, in his official capacity

as Secretary of the Louisiana Department of Public Safety & Corrections

("DOC")(collectively "Defendants"), filed an *Opposition*[3] to this motion, to which Plaintiffs

---

[1] Rec. Doc. No. 99.
[2] Since the resignation of Sommers in November 2022, Otha "Curtis" Nelson is now substituted in place of Sommers as a Defendant in this matter.
[3] Rec. Doc. No. 101.

filed a *Reply*.[4]  For the following reasons, the Court finds that class certification is proper in this case.

The Court further finds that an evidentiary hearing is unnecessary to determine whether class certification is proper.  The Fifth Circuit holds that "[a] district court has wide discretion in deciding whether to certify a class."[5] Deciding whether a class should be certified "generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"[6] "Nevertheless, an evidentiary hearing on the class certification issue is not required."[7] As the Fifth Circuit explained, "'[s]ometimes the issues are plain enough from the pleadings …' to render an evidentiary hearing unnecessary."[8] For the reasons set forth below, the Court finds that the pertinent issues have been sufficiently briefed and supported by the record such that an evidentiary hearing is unnecessary.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This case was filed following an announcement by Louisiana Governor John Bel Edwards in the summer of 2022 that the Office of Juvenile Justice ("OJJ") had plans to temporary transfer a small number of youth in OJJ custody to the facility formerly used as "death row" on the grounds of the Louisiana State Penitentiary in Angola.  This decision was in response to "a small handful of youth" who "wreaked havoc, endangering themselves, other youth, OJJ staff, and members of the general public" by "ongoing and

---

[4] Rec. Doc. 112.

[5] *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir.1999).

[6] *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n. 12, 98 S.Ct. 2454, 2458 n. 12, 57 L.Ed.2d 351 (1978) (quoting *Mercantile Nat'l. Bank at Dallas v. Langdeau*, 371 U.S. 555, 558, 83 S.Ct. 520, 522, 9 L.Ed.2d 523 (1963)).

[7] *Kemp v. Metabolife Intern., Inc.*, 2002 WL 113894, *3 (E.D. La. Jan. 25, 2002)(citing *Bradford v. Sears, Roebuck & Co.*, 673 F.2d 792, 795 (5th Cir.1982).

[8] *Id.* (quoting Castano v. American Tobacco Co., 84 F.3d 734, 744 n. 17 (quoting *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982))).

repeated acts of violent and disruptive behavior" and repeatedly escaping and attempting to escape OJJ secure care facilities all over the state.[9]   Plaintiff Alex A. moved for a temporary restraining order,[10] which the Court denied,[11] but the Court set the matter for a preliminary injunction hearing, which was held from September 6 through September 8, 2022.[12]

The September 2022 hearing evidence established that the facility on the grounds of Angola, known as Bridge City Center for Youth at West Feliciana ("BCCY-WF"), would operate as OJJ's Transitional Treatment Unit ("TTU"), a secure care facility with the structural components to offer a more restrictive environment compared to other secure care facilities across in the state.[13] OJJ policy defines the TTU as "[a] maximum custody unit for youth described as violent and very aggressive with a documented history of engaging in behavior which creates or incites aggressive responses from others and creates an unsafe therapeutic environment for staff and youth."[14]   The TTU policy also sets forth "specific criteria for assignments to the TTU" to "prevent arbitrary assignment."[15] High-risk youth ages ten through eighteen are eligible for placement in the TTU.[16]

The TTU policy provides "admission criteria" to determine a youth's eligibility for TTU transfer,[17] including whether the youth has, *inter alia*: 1) "exhibited a pattern of battery on other youth which has not been substantially reduced by prior intervention efforts," 2) "[h]as committed a single battery/predatory act of such serious consequence

---

[9] Rec. Doc. 79, p. 2.
[10] Rec. Doc. 3.
[11] Rec. Doc. 15.
[12] Rec. Docs. 67, 68, & 69.
[13] Rec. Doc. 79, p. 12.
[14] September 2022 Hearing, DX 3, p. 5.
[15] *Id.* at p. 6.
[16] Rec. Doc. 79, p. 22.
[17] September 2022 Hearing, DX 3, pp. 6-7.

that the potential of reoccurrence must be actively prevented," 3) "[h]as been in possession of a significant weapon," 4) "[h]as marijuana or other illegal substances in possession or has a substantial amount with motivation to distribute."[18] All "incidents" referenced in the criteria "must be documented" by various policy reports.[19] The policy also establishes the procedure for referring youth for admission to the TTU, which includes an evaluation by a "multidisciplinary team" consisting of facility staff, the youth's social services counselor, group leader, and educational representative.[20]  Additionally, the TTU policy states that "up to four youth classified as Seriously Mentally Ill may be transferred to the program after a consensus recommendation from an [multidisciplinary team] staffing."[21]  According to the TTU referral form and the eligibility and referral criteria described in Defendants' TTU policy document, some youth may be deemedd eligible for transfer to the TTU at Angola based solely upon  misbehavior, without a team evaluation of their particular needs.[22]

After consideration of the testimony and evidence submitted at the preliminary injunction hearing, the Court denied Alex A.'s motion for a preliminary injunction.[23]  The Court *did*, however, find that Alex A. had exhausted administrative remedies under the PLRA or, alternatively, that OJJ's emergency administrative remedy procedure operates as a "dead end."[24]  The case proceeded to discovery.

---

[18] *Id.*
[19] *Id.* at p. 8.
[20] *Id.* at p. 9.
[21] *Id.* at p, 8,
[22] September 2022 hearing DX 59; PX 18 at p. 37 (describing the process for an emergency transfer).
[23] Rec. Doc. 79.
[24] *Id.* at p. 7.

On October 19, 2022, OJJ moved the first eight youth to BCCY-WF.[25] On October 25, 2022, Plaintiffs filed an Amended Complaint adding Brian B. and Charles C. as Named Plaintiffs and proposed class representatives.[26]  Brian B. is now deceased;[27] thus, Alex A. and Charles C. are the only "Named Plaintiffs" and proposed class representatives. Shortly after amending their Complaint, Plaintiffs filed a Motion for Class Certification and appointment of class counsel,[28] which is opposed by Defendants.

In July 2023, nearly a year after BCCY-WF has been operating as OJJ's TTU, Plaintiffs filed a second Motion for Preliminary Injunction,[29] arguing that OJJ has failed to deliver on the promises made to this Court at the prior hearing to provide constitutionally adequate care and services as required by federal and state law.  Specifically, Plaintiffs claim they are subjected to long periods of solitary confinement, referred to by OJJ as "cell restriction"; they are not receiving mental health, educational, rehabilitative, or recreational services; and their disabilities are not being accommodated.

Spanning over three weeks in August 2023, the Court scheduled a 7-day evidentiary hearing on this motion. There is evidence before the Court suggesting that youth are being threatened with transfer to BCCY-WF in a punitive manner and that "cell restriction" is likewise being administered as punishment..  There is also evidence before the Court that youth are being placed in cell restriction for several consecutive days, eating meals in their cells, and receiving purported educational services in their cells. Hearing evidence also suggests that youth housed at BCCY-WF are not receiving the

---

[25] Rec. Doc. 96, p. 6.
[26] Rec. Doc. 96.
[27] Rec. Doc. 162.
[28] Rec. Doc. 99.
[29] Rec. Doc. 166.

required level of services that were promised to be delivered by OJJ and that are required by law.

## II.    NAMED PLAINTIFFS AND PROPOSED CLASS, SUBCLASS

Alex A. is a 17-year-old male[30] in the secure care custody of OJJ at BCCY.[31] He suffers from disabilities and has a 504 Plan pursuant to the Rehabilitation Act and an Individualized Education Plan ("IEP") pursuant to the Individuals with Disabilities Education Act ("IDEA").[32]  After the announcement of Governor Edwards' plan to transfer high risk youth to BCCY-WF, Alex A. attested that he and other youth at BCCY were told that their transfer was imminent.[33]  Since this purported threat, Alex A. claims he has suffered mental and physical harm accompanied by sleeplessness, extreme anxiety, and pulling out his hair.[34]  Alex A. is afraid he will be subject to unsafe conditions and violence at BCCY-WF.[35] Alex A.'s mother, Molly Smith, through whom he brings this lawsuit, attested that she is concerned her son will be locked in a barred single cell and be deprived of necessary educational, medical, and rehabilitative services at BCCY-WF.[36]

Charles C. is a 17-year-old male who was in the secure care custody of OJJ at the Acadiana Center for Youth at St. Martinville prior to his transfer to BCCY-WF on June 1, 2023.[37]  Charles C. attests that since he has been housed at BCCY-WF, was locked in his cell for three days in a row, and has witnessed other youth locked in their cells for several days at a time.[38]  He further complains that he is not receiving educational

---

[30] This is Alex A.'s age at the time of the filing of the Amended Complaint.
[31] Rec. Doc. 9-2 at ¶¶ 3-4.
[32] *Id.* at ¶ 7.
[33] *Id.* at ¶¶ 13, 19.
[34] *Id.* at ¶¶ 20-21.
[35] *Id.* at ¶¶ 20-23.
[36] Rec. Doc. 9-6 at ¶ 8.
[37] Rec. Doc. 166-3 at ¶¶ 4-5.
[38] *Id.* at ¶ 6.

rehabilitative, or recreational services, and his disabilities are not being accommodated.[39]
Charles C. also attests that prior to his transfer to BCCY-WF, staff at St. Martinville
threatened him with transfer if he "was bad."[40]

## III.   CLASS CERTIFICATION UNDER RULE 23

Class action is the exception to the usual rule that litigation is conducted by and
on behalf of individual named parties only.[41]  The requirements for class certification are
governed by Rule 23 of Federal Rules of Civil Procedure.  To obtain class certification,
parties must satisfy Rule 23(a)'s four prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the
> claims or defenses of that class; and
> (4) the representative parties will fairly and adequately protect the interests
> of the class.

Assuming the proposed class satisfies the requirements of Rule 23(a), Plaintiffs
must also establish the requirements of Rule 23(b)(1), (2), or (3).[42]  Plaintiffs seek class
certification under Rule 23(b)(2), which permits certification if "the party opposing the
class has acted or refused to act on grounds that apply generally to the class, so that final
injunctive relief is appropriate respecting the class as a whole."[43]  Plaintiffs, as the party
seeking class certification, bear the burden of demonstrating that the requirements of
Rule 23 have been met.[44]  "Rule 23 does not set forth a mere pleading standard."[45]

---

[39] *Id.* at ¶¶ 10-12, 15.
[40] *Id.* at ¶ 14.
[41] *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016) (internal citation omitted).
[42] *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012) (citing *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007)).
[43] Fed. R. Civ. P. 23(b)(2).
[44] *Ibe*, 836 F.3d at 528 (citing *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F. 3d 732, 737-38 (5th Cir. 2003)).
[45] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541, 2551 (2011).

It is well-established that "[a] district court must conduct a rigorous analysis of the [R]ule 23 prerequisites before certifying a class."[46]  Generally, "a district court has broad discretion when deciding a motion for class certification."[47]  Before concluding that a class has satisfied the requirements of Rule 23(a), an analysis will "[f]requently … entail some overlap with the merits of the plaintiff's underlying claim."[48]  The Fifth Circuit has traditionally construed this directive to require a district court to "look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."[49]

However, Rule 23 does not require Plaintiffs to show that questions common to the class "will be answered, on the merits, in favor of the class."[50]  "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[51]

The proposed class and subclass in this case consist of:

> [A]ll youth who are now or will be in the custody of OJJ who have been, might be, or will be transferred to the OJJ site (the "Transitional Treatment Unit" or "TTU") at Angola or another adult prison (the "Principal Class"), including a subclass of all current and future youth with disabilities within the meaning of the ADA and Section 504 of the Rehabilitation Act in the custody of OJJ who have been, might be, or will be transferred to the OJJ site at Angola or another adult prison (the "Disabilities Subclass").[52]

---

[46] *Perry*, 675 F.3d at 837 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)).
[47] *Dockery v. Fischer*, No. 13-cv-326, 2015 WL 5737608 at *7 (S.D. Miss. Sept. 29, 2015) (citing *Allison v. Citgo Petroluem Corp.*, 151 F.3d 402, 408 (5th Cir.1998)).
[48] *Wal-Mart*, 564 U.S. at 351.
[49] *Perry*, 675 F.3d at 837 (quoting *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 548 (5th Cir. 2007)(internal quotations omitted)).
[50] *Cole v. Livingston*, No. 4:14-CV-1698, 2016 WL 3258345 (S.D. Tex. June 14, 2016) (quoting *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 459, 133 S. Ct. 1184, 1191 (2013)).
[51] *Amgen*, 568 U.S. at 466, 133 S. Ct. at 1194-95.
[52] Rec. Doc. 99-1, pp. 6-7.

<u>Class Certification of the Principal Class and the Disabilities Subclass</u>

*Numerosity*

Under Rule 23(a)(1), certification is only appropriate where "the class is so numerous that joinder of all members is impracticable." The numerosity requirement "requires examination of the specific facts of each case and imposes no absolute limitations."[53] However, the Fifth Circuit has repeatedly noted that "the number of members in a proposed class is not determinative of whether joinder is impracticable."[54] In addition, courts must consider "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim."[55] Relevance of the numerosity requirement to class certification may in appropriate cases be less significant where class-wide discrimination has been alleged. In addition, the fluid nature of a plaintiff class, as in prison-litigation context, counsels in favor of certification of all present and future members.[56] This principle is particularly applicable to jail and detention situations where the "population is constantly in flux."[57] Although there is no strict threshold, classes containing more than 40 members are generally large enough to warrant certification.[58]

---

[53] *Dockery*, 2015 WL 5737608 at *8 (quoting *General Tel. Co. of the NW., Inc. v. EEOC,* 446 U.S. 318, 329, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980)).
[54] *Ibe*, 836 F.3d at 528 (quoting *In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013)).
[55] *Dockery*, 2015 WL 5737608 at *8 (quoting *Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1038 (5th Cir. 1981)).
[56] *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000)
[57] *Jones v. Gusman*, 296 F.R.D. 416, 465 (E.D. La. 2013); *see also Cole v. Livingston*, No. 4:14-CV-1698, 2016 WL 3258345, at *6 (S.D. Tex. June 14, 2016), *aff'd sub nom. Yates v. Collier*, 868 F.3d 354 (5th Cir. 2017) (noting that there is "a constant flux of inmates into and out of the Pack Unit, so joinder of all the proposed class members would be impracticable if not impossible") (internal quotation marks omitted).
[58] *Braggs v. Dunn*, 318 F.R.D. 653, 661 (M.D. Ala. 2017).

In the present case, Defendants agree that there are approximately 356 youth in OJJ's secure care custody.[59] Further, national statistics show that "70 percent of youth who enter the justice system have a mental health, sensory or learning disability, and anywhere between 28 percent and 43 percent of detained or incarcerated youth have special education needs."[60]

At full capacity, BCCY-WF can house between twenty-four and thirty youth who are determined eligible for TTU placement.[61] Despite prior testimony that only about 25 youth, or "about five percent of the youth," would be eligible for transfer to the TTU,[62] current OJJ records indicate that between 70 and 80 youth have been cycled through BCCY-WF since it opened.[63]

Plaintiffs' proposed Principal Class and Disability Subclass consist of fluid, transient populations that include youth who might be or are transferred to BCCY-WF. Additionally, the TTU population is transitional by nature. Under similar circumstances, other courts have found numerosity satisfied where "the class is fluid, when 'the juveniles may by law be incarcerated for varying lengths of time, the [detention] population is constantly in flux, and the proposed class includes future members whose identities are unknown.'"[64]  Further, "parties seeking class certification need not establish at the outset

---

[59] *See* September 2022 Hearing, DX 3.
[60] Coalition for Juvenile Justice, *Youth with Undiagnosed or Mistreated Disabilities*, https://www.juvjustice.org/our-work/safety-opportunity-and-success-project/national-standards/section-i-principles-responding-2 (last accessed Oct. 28, 2022).
[61] Rec. Doc. 79, p. 18.
[62] *See id.* at p. 13.
[63] Rec. Doc. 166-11.
[64] *G.H. v. Tamayo*, 339 F.R.D. 584, 588 (N.D. Fla. 2021)(quoting *Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2013WL 1821077, at *22 (M.D. Fla. Mar. 27, 2013)).  *See also Wilburn v. Nelson*, 329 F.R.D. 190, 195 ("plaintiffs' class and subclass include all future juvenile pre-trial detainees at the Justice Center, the sort of revolving population that makes joinder of individual members a difficult proposition.")(citing *V.W. by and through Williams v. Conway*, 236 F.Supp.3d 554, 574 (N.D.N.Y. 2017); *see also A.T. by and through Tillman v. Harder*, 298 F.Supp.3d 391, 407 (N.D.N.Y. 2018) ("[P]laintiffs' proposed class includes all future

that they will ultimately prevail on the merits. It is enough that the Plaintiffs have a substantial claim that" OJJ's "custom, if not its ostensible policy" violates their constitutional and statutory rights.[65]    Accordingly, the proposed class and subclass are sufficiently numerous to make joinder impracticable.

Therefore, the Court finds that the numerosity requirement is satisfied for both the Principal Class and the Disabilities Subclass.

*Commonality & Typicality*[66]

The Supreme Court, in *Wal-Mart Stores, Inc. v. Dukes*, further defined the contours of the "rigorous analysis" required by Rule 23.[67]    Under *Wal-Mart*, "[w]hat matters to class certification…is not the raising of common 'questions'—even in droves—but, rather the capacity of a class wide proceeding to generate common *answers* apt to drive the resolution of the litigation.    Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."[68]

The *Wal-Mart* decision has heightened the standards for establishing commonality under Rule 23(a)(2), demanding more than the presentation of questions that are common to the class "because any competently crafted class complaint literally raises common questions."[69] Furthermore, members of a proposed class do not establish that "their claims can productively be litigated at once," merely by alleging a violation of the

---

juveniles who will be detained at the Broome County Jail, precisely the sort of revolving population that often makes joinder of individual members impracticable.")).

[65] *Id.* at 588-89.

[66] The Court addresses these requirements together because, as the Supreme Court observed, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-mart*, 564 U.S. at 349 n.5 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157-58, n.13 (1982)).

[67] *Perry*, 675 F.3d at 837 (citing *Wal-Mart*, 131 S.Ct. at 2551-52).

[68] 131 S.Ct. at 2551 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L.REV. 97, 132 (2009)) (emphasis original).

[69] 131 S.Ct. at 2551 (quoting Nagareda, 84 N.Y.U. L.REV. at 131-32).

same legal provision by the same defendant.[70]   Thus, as evident in *Perry*, the commonality test requires more than establishing that there is "at least one issue whose resolution *will affect all or a significant number* of the putative class members."[71]

In order to satisfy commonality under *Wal-Mart*, the claims of every class member must "depend upon a common contention … that is capable of class wide resolution," meaning that the contention is "of such a nature … that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke."[72] Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury."[73]   Yet, the Fifth Circuit has clarified that "this contention need not relate specifically to the damages component of the class members' claims.  Even an instance of injurious conduct, which would usually relate more directly to the defendant's liability than to the claimant's damages, may constitute 'the same injury.'"[74]

As to typicality, "Rule 23(a) requires that the named representatives' claims be typical of those of the class."[75] Prior to *Wal-Mart*, the typicality test was "not demanding."[76] The extent to which *Wal-Mart* changed the threshold for typicality in unclear.  The Court noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."[77] As the Fifth Circuit has described it, "typicality is commonality addressed from the perspective of the named plaintiffs.  Commonality requires showing that, in fact, all

---

[70] *Id.*
[71] 675 F.3d at 840 (quoting *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir.1993)) (original emphasis) (internal quotation marks and citation omitted).
[72] 131 S.Ct. at 2551.
[73] *Id.* (quoting *Falcon*, 457 U.S. at 161, 102 S.Ct. 2364).
[74] *Cole v. Livingston*, No. 14-698, 2016 WL3258345 (S.D. Tex. June 14, 2016).
[75] *Lanbecker v. Electronic Data Systems Corp.*, 476 F.3d 299, 314 (5th Cir. 2007).
[76] *Cole,* 2016 WL 3258345 at *8, (quoting *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999)).
[77] 131 S.Ct. at 2551 n.5.

members of the proposed class share a common claim….Typicality requires showing that, in fact, the proposed representatives have that claim."[78]  The claims of all class members need not be identical.[79]  However, typicality demands that claims "arise from a similar course of conduct and share the same legal theory."[80]

The Court finds that commonality and typicality are satisfied here because all class and subclass members are subject to the same referral procedures for transfer to BCCY-WF and may or have experience[d] the same alleged harm of continuous cell restrictions and a lack of educational, rehabilitative, recreational, mental health services. Further, the disability subclass challenges OJJ's failure to have a system in place to accommodate disabled children placed at BCCY-WF. Ultimately, whether OJJ's policies pertaining to BCCY-WF are constitutional is a question with an answer that will be common to all class and subclass members.

To determine whether Plaintiffs present "common questions of law and fact, a court must trace the class claims and conclude that the common questions, and answers, will resolve them without the need for additional extensive individualized inquiry."[81]  Plaintiffs submit the following common questions regarding the class and subclass:

(a) Whether Defendants have sufficient policies and practices in place to ensure the physical and psychological safety of youth transferred to the Angola site; (b) Whether Defendants have sufficient policies and practices in place to ensure adequate educational and rehabilitative services to youth transferred to the Angola site; (c) Whether Defendants' policies, including their TTU policy requirements and education policy requirements, are implemented in practice at the Angola site; (d) Whether Defendants will provide adequate medical and mental health treatment and services to youth transferred to the Angola site; (e) Whether Defendants will provide adequate staffing for all relevant services at the Angola site; (f) Whether

---

[78] *M.D. v. Perry*, 297 F.R.D. 7, 29 (S.D. Tex. 2013).
[79] *Cole,* 2016 WL3258345 at *8 (citing *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001)).
[80] *Id.*
[81] *Dockery*, 2015 WL 5737608 at *11.

Defendants will hire sufficient education staff, including special education teachers and specialists, to meet the needs of youth with disabilities who are transferred to the Angola site; (g)  Whether Defendants will provide adequate access to family members of youth transferred to the OJJ Angola site to the geographically remote Angola campus, and adequate contact visitation spaces for family members of youth transferred there; (h) Whether the conditions at the Angola site constitute punishment in violation of the Fourteenth Amendment due process rights of youth transferred there; (i) Whether the conditions at the Angola site are likely to cause serious physical and/or psychological harm to youth transferred there, in violation of their right to safety under the Fourteenth Amendment; (j) Whether youth with disabilities who are transferred to the Angola site will face discrimination, in violation of their rights under the Rehabilitation Act and the ADA; (k) Whether Defendants are objectively aware of the risk of harm to youth who may be moved to the Angola site; and (l) Whether Defendants are subjectively aware of the risk of harm to youth who may be moved to the Angola site.[82]

The answers to the foregoing questions are not unique to each individual class member; rather, the answers to these questions will apply to all class and subclass members. Further, the existence of factual variations within a proposed class does not necessarily destroy commonality.[83] The commonality requirement is satisfied as long as the class's common questions are "dispositive of their claim and the claim arises out of a single course of conduct and on a single theory of liability."[84]  For example, "[c]ourts regularly certify classes of inmates who are disabled, even if they do not have the same disability."[85]

The Court finds that the allegations and evidence submitted in this case clearly satisfy commonality and typicality as the challenged policies and practices pose several common questions of fact and law as set forth above.  Evidence demonstrates that the policies implemented (or not implemented) at BCCY-WF apply across the board to all

---

[82] Rec. Doc. 99-1, pp. 23-24.
[83] *Dockery*, 2015 WL 5737608 at *11.
[84] *Id.* (internal citations omitted).
[85] *Cole*, 2016 WL3258345 at *6 (citing *Hernandez v. County of Monterey*, 305 F.R.D. 132, 149 (N.D. Cal. 2015)).

class and subclass members.  (For example, it is undisputed that every youth transferred from a state secure care facility to BCCY-WF will spend their first 24-72 hours in cell restriction.) Thus, the alleged exposure of the entire class and subclass to the identified policies is capable of class-wide resolution under Rule 23, and there are common resolutions that would answer these common questions across the board.

### Adequacy of Representation

Next, Plaintiffs must demonstrate that they fairly and adequately protect the interests of the class.[86] "The 'adequacy' requirement looks at both the class representatives and their counsel."[87] In determining this requirement, the Court must consider the (1) zeal and competence of representatives' counsel; and (2) willingness and ability of representatives to take an active role in controlling litigation and protecting the interests of absentees.[88] This initial determination of a representative's adequacy "should be based on two criteria: first, the representative must have common interests with the unnamed members of the class; and second, it must appear that the representative will vigorously prosecute the interests of the class through qualified counsel."[89]  To satisfy the adequacy requirement, "there must be no significant conflict of interest between the named plaintiffs and the absent class members."[90]

Defendants primarily argue that the Named Plaintiffs are not adequate class representatives because they have failed to exhaust administrative remedies.  However, the Court already determined that Alex A. exhausted his administrative remedies.  In

---

[86] Fed.R.Civ.P. 23(a)(4).
[87] *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468 (5th Cir.1986).
[88] *Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir.2001).
[89] *J.D. v. Nagin*, 255 F.R.D. 406, 415 (E.D. La. 2009)(citing *Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir.1973).
[90] *Id.*

*Gates v. Cook*, the Fifth Circuit held that exhaustion of remedies by one named representative plaintiff is sufficient to satisfy the requirement for the class.[91]  To the extent Defendants argue Charles C.'s claims have not been exhausted, since he was not at BCCY-WF at the time he filed his ARP and Amended Complaint, the Court finds that there is evidence in the record that may support the allegation that Charles C.'s fears about BCCY-WF materialized.  Like Alex A., Charles C. alleges he is "worried, scared, and anxious about being sent to Angola, and has had trouble sleeping because of this," and he "is concerned about being locked in a cell most of the time if he is moved there."[92]  All Named Plaintiffs allege that BCCY-WF is not equipped to provide for their educational, rehabilitative, mental health, and recreational needs.[93]

After Charles C. was transferred to BCCY-WF, Plaintiffs filed a Motion for Preliminary Injunction wherein Charles C. claims, *inter alia*, that he is routinely subject to solitary confinement, receives almost no teaching  or instruction, and that  counseling, mental health treatment and recreation are inadequate.[94]   These are the same issues Named Plaintiffs have complained of and feared since the inception of this litigation; thus, the Court finds them within the scope of the pleadings.  As the Fifth Circuit explained in

---

[91] 376 F.3d 323, 330 (5th Cir. 2004)(citing *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 498–99 (5th Cir.1968) (exhaustion of remedies requirement satisfied for class action if named plaintiff representing class exhausted remedies); 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1776 (2d ed. 1986) ("[W]hen prospective relief is the primary remedy being sought, a representative who has exhausted his administrative remedies may bring a class suit on behalf of those who have not done so.").

[92] Rec. Doc. 96 at ¶ 54.

[93] *Id.* at ¶¶ 72-73.

[94] Rec. Doc. 166, p. 10.  In Plaintiffs' recent Motion for Preliminary Injunction, Plaintiffs raise claims that have not been exhausted and do not constitute "grievances about the same issue," *i.e.*, potable drinking water and heat on the tiers.  However, the exhaustion of these "new" claims is irrelevant for purposes of determining class certification and will be addressed at the appropriate time.

*Jones v. Jones*, in some circumstances, "prisoners need not continue to file grievances about the same issue."[95]

Alternatively, the Court finds that OJJ's grievance process, even as amended in December 2022,[96] provides no available remedy with respect to certain grieved issues. Both Alex A. and Charles C. filed ARPs noting their fears of being transferred to BCCY-WF where they believed they would be locked in cells for long periods of time. The current record before the Court establishes that it is OJJ's official policy to utilize cell restriction at the TTU, and every youth transferred to BCCY-WF will face cell restriction for the first 24 to 72 hours, with no exceptions. Given this official policy that applies to all youth transferred to BCCY-WF, the Court finds there is no available remedy via OJJ's grievance process for such a complaint.

This issue is similar to that addressed by the Court in *Howard v. Ashcroft*, where a claimant brought suit against the United States based on the Federal Bureau of Prisons' ("BOP") wholesale policy change regarding the placement of a certain class of convicts directly into community corrections centers.[97]    The BOP officially changed its interpretation of its discretion to place certain inmates into community correction centers and informed convicts housed in community correction centers that they would be

---

[95] 385 F.3d 503, 521 (5th Cir. 2004)(citing *Sulton v. Wright*, 265 F.Supp.2d 292, 295–99 (S.D.N.Y.2003) (holding that two grievances filed during the course of a several-year period of repeated delays in treating an inmate's injured knee sufficed to exhaust the entire course of conduct, despite the prison system's rule that grievances must be filed within fourteen days of an occurrence); *Aiello v. Litscher*, 104 F.Supp.2d 1068, 1074 (W.D.Wis.2000) (holding that when inmates have filed a grievance regarding a prison policy, they need not file grievances regarding subsequent incidents in which the policy is applied); *cf. Lewis v. Washington*, 197 F.R.D. 611, 614 (N.D.Ill.2000) (holding that inmates complaining about various aspects of the conditions in their housing unit need only grieve their placement in that unit, not each of the various alleged unconstitutional conditions present in the unit; "[o]therwise the defendants could obstruct legal remedies to unconstitutional actions by subdividing the grievances....")).

[96] *See* Rec. Doc. 230, p. 4, n. 3.

[97] 248 F.Supp.2d 518, 520 (M.D. La. 2003).

transferred to federal corrections facilities.[98]  The claimant sued, and the United States

moved to dismiss, arguing that the claimant failed to exhaust administrative remedies as

required by the PLRA.[99]  The Court found that the claimant

> need not continue tilting at the administrative windmills in her particular
> case. While the Government is correct that the exhaustion doctrine normally
> bars direct resort to the courts, that is not true where pursuing administrative
> remedies would be futile, "because it is clear that the claim will be rejected."
> Where an agency has adopted a new rule or policy and announced that it
> will follow that policy, especially where that policy has its origin above the
> Bureau's General Counsel Office, it is pointless to require a complainant to
> follow the administrative procedure.[100]

The Court acknowledged that the plain language of the PLRA "destroy[s] the futility

exception in some cases," but it also found that "where a petitioner not only is unable to

prevail by going through the proper procedures as a matter of plain agency policy, but by

doing so would be completely deprived of any hope of relief, the exhaustion requirement

under the PLRA does not bar relief in the courts."[101]  For the same reasons, the Court

finds, alternatively, that OJJ's grievance policy provides no relief for mandatory cell

restriction complaints.

Turning back to the adequacy requirement, the Court finds no conflict of interest

between the Named Plaintiffs and putative class members, and the record demonstrates

that the class representatives have common interests with the unnamed members.  All

claims implicate OJJ's policies and practices at BCCY-WF, which apply to all potential

class and subclass members. Further, Plaintiffs seek the same remedies in the form of

---

[98] *Id.*
[99] *Id.*
[100] *Id.* at 533 (citations omitted).
[101] *Id.* at 534 (citation omitted).

declaratory and injunctive relief which, if granted, will apply to the class as a whole. Accordingly, the adequacy requirement is satisfied.

There is likewise no reason that Plaintiffs' counsel should not be appointed class counsel pursuant to Rule 23(g), which, for the purpose of appointing class counsel, requires the Court to consider: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class."[102] Class counsel has a duty to "fairly and adequately represent the interests of the class."[103]  The record before the Court demonstrates that Plaintiffs' counsel easily meet these four requirements; further, Defendants concede they do not challenge the adequacy of counsel for purposes of Rule 23(g).[104]

### Certification Under Rule 23(b)(2)

Finally, the Court must determine whether the proposed class meets the requirements of Rule 23(b)(2), as Plaintiffs assert.  This requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."   "Rule 23(b)(2) certification is available if three requirements are satisfied: (1) class members must have been harmed in essentially the same way; (2) injunctive relief must predominate over monetary damage claims; and (3) the injunctive relief sought must be specific."[105] Further, "Rule 23(b)(2) applies only when

---

[102] Fed. R. Civ. P. 23(g)(1)(A).
[103] Fed. R. Civ. P. 23(g)(4).
[104] Rec. Doc. 101, p. 9, fn 3.
[105] *Yates v. Collier*, 868 F.3d 354, 366 (5th Cir. 2017) (quotation marks omitted).

a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant."[106]

This requirement is easily met based on the findings above.  This case is suitable for certification under 23(b)(2) because Plaintiffs allege that Defendants' policies and practices generally applicable to class and subclass members operate to violate their rights under federal and state law; thus, the issuance of injunctive and/or declaratory relief, if warranted, is appropriate in this case.  The Plaintiffs have been allegedly harmed in purportedly the same manner, *i.e.* the threat of transfer to BCCY-WF as a form of punishment where transferees' constitutional and statutory rights will be violated, or for those transferred, the actual alleged violation of those rights.  Without question, injunctive relief predominates over money damage claims.  Finally, the injunctive relief requested is very specific.  Plaintiffs request that the Court:

> B. Enter a declaratory judgment that Defendants are violating Named Plaintiffs' and class members' constitutional rights (and, for proposed disability subclass members, federal statutory rights) by transferring them to the OJJ site at Angola where they will not receive lawful conditions of confinement, counseling, education, other rehabilitative services, and sufficient safety from adults incarcerated at LSP; [and]
> C. Issue a preliminary injunction and permanent injunction, requiring Defendants to cease plans to transfer Plaintiffs and class members to the OJJ site at Angola, and to immediately release to the community or transfer Plaintiffs and any class members who have already been moved to the OJJ site at Angola back to one of OJJ's pre-existing secure care or other facilities[.][107]

---

[106] *Wal-mart v.Dukes*, 564 U.S. at 360.
[107] Rec. Doc. 96, p. 39.

Essentially, the relief requested is specific and quite simple:  forbid OJJ from transferring youth to BCCY-WF. Accordingly, the Court finds that all requirements of Rule 23 are satisfied in this case, and Plaintiffs' Motion for Class Certification shall be GRANTED.

## IV.    CONCLUSION[108]

For the reasons set forth above, Plaintiffs' *Motion for Class Certification*[109] is GRANTED.  The Named Plaintiffs are hereby appointed class representatives for the Principal Class and the Disabilities Subclass, as defined.  The Court further designates Plaintiffs' counsel as Class Counsel under Rule 23(g).

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 31st day of August, 2023.

*Shelly D. Dick*
_____
**SHELLY D. DICK
CHIEF DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA**

---

[108] The Court notes that the findings herein regarding exhaustion under the PLRA are final and are the "law of the case"; however, the Court makes no definitive findings on the merits.
[109] Rec. Doc. 99.