**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| ALEX A., by and through his guardian, MOLLY SMITH, BRIAN B.; and CHARLES C., by and through his guardian, KENIONE ROGERS, individually and on behalf of all other similarly situated, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. A. No. 3:22-CV-00573-SDD-RLB |
| GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS, in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections, | ) ) ) ) ) ) ) ) ) | **DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL** |
| Defendants. | ) | |

Defendants[1] move the Court to stay its Order granting Plaintiffs' Motion for Preliminary Injunction (Ex. A (Dkt. 163)), pending the resolution of Defendants' appeal of that Order to the United States Court of Appeals for the Fifth Circuit.

## I.      A STAY IS NECESSARY

The Court has ordered a Preliminary Injunction requiring Defendants to remove all youth from OJJ's Bridge City Center for Youth at West Feliciana ("BCCY-WF"). These youth have a documented history of escape (from facilities other than BCCY-WF) and of extreme violence against other youth, OJJ staff, and the public. This injunction will almost certainly result in serious bodily injury to any number of youth, OJJ staff, or even private citizens. Further, the

---

[1] "Defendants" refers collectively to the named defendants. Otha "Curtis" Nelson, Jr. is the Deputy Secretary of the Louisiana Office of Juvenile Justice ("OJJ").

injunction violates the Prison Litigation Reform Act ("PLRA") and tramples on the rights of the State of Louisiana to administer juvenile justice. The injunction should be stayed pending appeal.

As this Court recognized in its Ruling denying Plaintiffs' <u>First</u> Motion for Preliminary Injunction in September 2022, certain high-risk youth within OJJ's custody engage in violent behavior within OJJ's secure care facilities, resulting in broken bones, fractured skulls, and other serious injuries to staff and other youth. These same high-risk youth have escaped OJJ facilities, committing violent crimes against the public, including assaults, carjackings, and shootings. As this Court found, these youth require more restrictive and secure housing to prevent them from inflicting serious injury to other youth, OJJ staff, and the public. BCCY-WF provides the required safeguards to prevent such injuries.

The Court's findings from 2022 remain true. At the Court's repeated request, OJJ agreed to pause transfers to BCCY-WF during the hearing on Plaintiffs' <u>Second</u> Motion for Preliminary Injunction. After youth in other OJJ facilities learned of that agreement, acts of violence, aggression, and escapes increased in number and severity, resulting in injuries to youth and staff and injuries to law enforcement who apprehended the escapees. If the Preliminary Injunction takes effect, there will be a substantial risk—indeed, a near certainty—of serious bodily injury to the youth, OJJ staff, and (in the event of escapes) the public.

In addition to these risks, Defendants have a substantial likelihood of succeeding on the appeal of the Preliminary Injunction because (1) no plaintiff exhausted their administrative remedies, (2) the Preliminary Injunction ordering the transfer of all youth from BCCY-WF is not the least intrusive means necessary to correct the alleged harm, (3) the Preliminary Injunction violates the prisoner release provisions of the PLRA, and (4) Plaintiffs have failed to prove Defendants acted with deliberate indifference as required under Section 1983.

## II.    INTRODUCTION AND BACKGROUND

In July 2022, Governor Edwards announced plans to open a temporary secure care facility for the housing of youth in OJJ custody, while OJJ completed construction of a new facility. The temporary facility, BCCY-WF, serves as OJJ's transitional treatment unit ("TTU")—a unit that provides individual attention and therapy to youth in OJJ's secure care system who are not appropriately responding to the standard rehabilitation program and whose behavior presents an imminent risk of violence, destruction, or escape. Ex. 2 (Dkt. 79) at 22.

### A.    OJJ Was Required to Place Certain Youth at BCCY-WF's TTU Because Those Youth Committed Acts of Violence Against Other Youth, Staff, and the Public.

As of September 2022, OJJ maintained five secure care facilities: Acadiana Center for Youth at Bunkie ("ACY"), Acadiana Center for Youth at St. Martinville ("ACY-SM"), Bridge City Center for Youth ("BCCY"), Swanson Center for Youth at Monroe ("SCY" or "Swanson-Monroe"), and Swanson Center for Youth at Columbia ("SCY-C"). *Id.* at 12. "OJJ secure care facilities include housing dormitories, common areas, gymnasiums, outdoor recreational areas, schools, medical and counseling facilities, and dining areas. Most youth in OJJ secure care facilities reside in dormitories which accommodate twelve to fifteen Youth. The youth can move freely in their dormitories." *Id.* at 13.

In the summer of 2022, there was "a significant increase in the frequency and severity of serious incidents at OJJ secure care facilities, including destruction of property, attempted and successful escapes, acts of violence against staff and other youth, and injury to … the public. A small population of the youth, approximately 25, … engaged in violent and destructive behavior which …caused significant disruption in OJJ's ability to deliver educational and rehabilitation services to the other youth in its custody." *Id.* "Some youth … repeatedly escaped and … engaged in violent criminal behavior before being returned to OJJ. Youth who … escaped …

[were] accused of motor vehicle theft, carjacking, burglary, armed robbery, attempted murder, reckless operation of stolen vehicles, and illegal possession of handguns. A small percentage of the OJJ population … caused substantial property destruction across OJJ campuses, with some dorms … destroyed to the point of being uninhabitable. These youth … also bec[a]me increasingly aggressive and … engaged in serious acts of violence against other youth and OJJ staff, resulting in 'severely broken bones, crushed skulls, broken fingers, eye sockets' resulting, in some instances, in 'lifelong injuries to some [OJJ] staff members.' Other youth [were] victimized by the high-risk youth when they tr[ied] to go to sleep at night, and they … reported … that they [we]re afraid to go to sleep at night for fear of being attacked by these high-risk youth. The high-risk youth … created weapons like shanks, and they … used pipes from the walls and ceilings (of facilities they … destroyed) as weapons. They … destroyed security cameras so their behavior [could not] be observed by OJJ security. Rival groups … emerged who [fought] each other, particularly during recreational time." *Id.* at 13-14.

"[T]he Cypress Unit at [SCY] housed high-risk youth in need of a high level of security; the Cypress Unit provided single rooms and locking doors. [But, i]n May 2021, the Cypress Unit was 'completely destroyed' by the high-risk youth housed there. … Having no secure location to house these youth, OJJ transferred them to the Ware facility in Alabama, but the youth destroyed that facility as well. … [V]ery soon after the youth were transferred to the Ware facility, Alabama officials demanded their removal." *Id.* at 15.

"[O]n June 13, 2022, at least five youth were involved in a physical altercation … at SCY…. At least four staff members were battered by the youth, and one staff member was transported to the hospital for treatment of injuries." *Id.* at 16. "On June 16, 2022, around 20 youth escaped their dormitory at BCCY, took over part of the facility, and caused a riot. The riot

resulted in injuries requiring medical attention to at least two youth. At least one staff member was hospitalized due to injuries. Ultimately, five youth escaped [BCCY]." *Id.* "On July 17, 2022, six [additional] youth escaped [BCCY]. Five of the youth stole a truck …, repeatedly rammed it into a Jefferson Parish Sheriff's Deputy's vehicle, and led officers on a short pursuit before finally crashing the stolen truck. Most of the escaped youth were apprehended, but one youth managed to get away. The escaped youth then carjacked [another vehicle] and shot the driver, who was critically injured…." *Id.* at 16.

The Court held these incidents demonstrated that "OJJ lack[ed] high security accommodations for the high-risk youth" and ruled there was "overwhelming[]" evidence of "an immediate need for a more secure facility." *Id.* at 16-17. Hence, OJJ's plan to open BCCY-WF.

**B.**  **The District Court Denied Plaintiffs' First Motion for Preliminary Injunction.**

Plaintiffs filed their First Motion for Preliminary Injunction in August 2022, seeking to prevent BCCY-WF from opening. *See* Ex. 3 (Dkt. 3). Following an evidentiary hearing, the Court denied Plaintiffs' First Motion, concluding that OJJ was required to establish the TTU at BCCY-WF as a necessary response to the violent, uncontrolled behavior of a handful of youth:

> A few of the adolescents adjudicated as 'delinquent' and placed in the secure care of the OJJ present formidable security and safety risks. OJJ is charged with a rehabilitative, not punitive, mission. But a small handful of youth have wreaked havoc, endangering themselves, other youth, OJJ staff, and members of the general public. Ongoing and repeated acts of violent and disruptive behavior by a few has reduced OJJ to becoming security enforcers….

Ex. 2 (Dkt. 79) at 2. Thus, OJJ opened BCCY-WF in response to the "serious events at OJJ secure care facilities" outlined above. *Id.* at 3. BCCY-WF opened in October 2022 and has continually housed between 3 and 15 youths.

**C.**    **OJJ Must Maintain BCCY-WF's TTU to House Youth Who Continue to Commit Acts of Violence and Present an Ongoing Risk of Serious Injury to Other Youth, Staff, and the Public.**

On July 17, 2023, Plaintiffs filed a Second Motion for Preliminary Injunction. *See* Ex. 1 (Dkt. 163). An evidentiary hearing was conducted between August 15 and 30, 2023. During the course of the hearing, the District Court twice requested that OJJ voluntarily agree not to transfer any additional youth to BCCY-WF before the Court ruled on the Motion (the "Status Quo Agreement"). In an effort to comply with the Court's preference, OJJ initially agreed but, soon after, was forced to withdraw its consent due to a spike in violence by the youth housed in secure care facilities. *See* Ex. 4. The increase in frequency and severity of aggressive and violent behaviors appeared to stem from the youths' awareness that transfer to BCCY-WF was not an available option. *See id.*[2] In fact, the dangerous outbursts of youth housed in OJJ secure care facilities reached levels rivaling the serious incidents that necessitated opening BCCY-WF's TTU in the first place.

On August 26, 2023, two youth housed in ACY's "Cajuns" dormitory (Youth 3 and Youth 10)[3] engaged in extreme acts of violence against a staff member, Juvenile Justice Specialist ("JJS") Darel Augustine. *See* Ex. 5. The youth verbally threatened JJS Augustine, surrounded him, and slapped and punched the back of his head. *Id.* When JJS Augustine fell to the ground, Youth 3 choked JJS Augustine while Youth 10 kicked him in the face. *Id.*

On August 27, 2023, four youth escaped from ACY. *See* Ex. 6. Youth 3 and Youth 10 (the same as above) armed themselves with a pipe, violently attacked JJS Darelle Cooks, and stole his keys. *Id.* Several youth in another dormitory attacked the facility's Assistant Director by

---

[2] The youth acknowledged the policy change and even taunted staff with it. For example, on August 26, 2023, during the Status Quo Agreement,  Plaintiff Charles C. threw multiple items at a JJS and stated, "They have no where to put me, so you can call who you want." *See* Ex. 10.
[3] Youth have been identified in this case by alias to protect the minor youths' identities.

pushing her to the ground, punching and kicking her in the stomach repeatedly, and taking her

keys and cell phone. *Id.* The youth proceeded to unlock several dormitories. *Id.* Youth from at

least three of the dormitories engaged in riot-like behavior. *Id.* Youth from two dormitories

teamed up to attack another youth. *Id.* At least two ACY staff members were injured, and the

Assistant Director was transported to a local hospital due to bleeding from the injuries she

suffered. *Id.*

   While staff attempted to secure the dormitories, four youth escaped, including Youth 3

and Youth 10. *Id.* Youth 3 and Youth 10 were detained shortly after the escape and charged with

Battery of a Correctional Facility Employee, Aggravated Escape, Criminal Conspiracy, and

Theft. *Id.* After being detained, Youth 3 and Youth 10 told ACY staff that they have plans and

methods to escape from other OJJ secure care facilities *except* BCCY-WF. *Id.* The other two

youth who escaped remained at large until August 28, 2023—one was charged with Simple

Escape and Criminal Conspiracy; the other was charged with Aggravated Escape, Second

Degree Battery, Theft, and Criminal Conspiracy for his actions during the escape from ACY and

charged with Battery of a Police Officer, Simple Criminal Damage to Property, and Resisting an

Officer for his actions during the apprehension. *Id.*

    Due to the Status Quo Agreement, OJJ could not transfer these youth to BCCY-WF. *Id.*

Instead, OJJ transferred all four youth to ACY-SM. *Id.* One week after their transfer, on

September 3, 2023, Youth 3 and Youth 10 were involved in another major riot. *See id.*; Ex. 7.

Youth housed together in the dormitories of ACY-SM broke out of their rooms and armed

themselves, forcing OJJ staff to evacuate the facility. *Id.* Youth 3 and Youth 10 broke metal

dividers from the shower area and used them to smash through the wall and enter the dormitory

hallway. *Id.* Youth 10 armed himself with an approximately seven-foot-long metal pipe. *Id.*

Youth 3 and Youth 10 threatened to beat and kill OJJ staff if they came into the hallway. *Id.*
Youth in other dormitories began to destroy property, arm themselves, and engage in riot-like
behavior. *Id.* The St. Martin Parish Sheriff's Office ("SMPSO") received a panicked 911 call
from OJJ staff requesting assistance. *See id.*; Ex. 8. SMPSO deputies arrived at the facility,
breached the dormitories' door, took youth into custody, and re-established order. *See* Ex. 7.

These incidents foreshadow and confirm the substantial risk of serious injury presented
by the Preliminary Injunction. Again, a stay is necessary.

### III.    ARGUMENT AND AUTHORITIES

#### A.    Standard of Review on Motion to Stay Injunction Pending Appeal.

"A party must ordinarily move first in the district court for … a stay of the … order of a
district court pending appeal…." Fed. R. App. P. 8(a). On the motion to stay, courts are to
consider four factors:  (1) whether the movant has made a showing of likelihood of success on
the merits; (2) whether the movant has made a showing of irreparable injury if the stay is not
granted; (3) whether granting a stay would substantially harm other parties; and (4) whether
granting a stay would serve the public interest.  *United States v. Baylor Univ. Med. Ctr.*, 711
F.2d 38, 39 (5th Cir. 1983). Here, each of the factors favors staying the Preliminary Injunction.

#### B.    Serious Injury Is Likely to Occur Unless the Preliminary Injunction Is Stayed.

##### 1.    The Preliminary Injunction Poses a Substantial Risk of Physical Injury.

As the District Court already found, OJJ is charged with housing the youth assigned to
secure care and is charged with the safety and security of all youth in its care. The TTU is a
necessary tool to safely house youth—not just the youth in the TTU but all youth. As
demonstrated above, the lack of a TTU at BCCY-WF presents a substantial risk of serious bodily
harm to all youth in OJJ's custody, to OJJ staff, and to the public. The Preliminary Injunction
must be stayed to avoid the substantial risk of violence.

2.    **The Preliminary Injunction's Intrusion in State Affairs Injures Defendants.**

As recognized by the Fifth Circuit, courts are not in "a position to monitor day-by-day changes that affect rehabilitation programs." *Morales v. Turman*, 562 F.2d 993, 996 (5th Cir. 1977). Intervention on this issue is "a significant federal intrusion into a state's affairs," where "[s]tate governments have wide discretion." *Id.* at 996. The State has assigned juvenile detention policy to the OJJ. The injunction would prevent the State from effectuating the legislature's choice and thus, "imposes irreparable injury." Ex. 2 (Dkt. 79) at 60-61 (citing *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020)).

C.    **The Public Interest Is Served by Staying the Preliminary Injunction.**

In denying Plaintiffs' First Motion for Preliminary Injunction, the Court correctly found:

- "Louisiana has vested OJJ with discretionary authority concerning secure care facilities for juveniles in custody." Ex. 2 (Dkt. 79) at 62.

- "The Constitution affords juveniles in secure custody no constitutionally protected interests that outweigh the Defendants' or the public's interests in the administration of juvenile justice." *Id.*

- "The public has an interest in seeing adolescents adjudicated delinquent rehabilitated." *Id.*

- "So too, the public has an interest in maintaining public safety." *Id.*

Those findings still apply today. The Preliminary Injunction requires all youth at BCCY-WF to be transferred to other secure care facilities, but those youth have already demonstrated that they cannot safely or successfully be rehabilitated at those facilities. If the injunction is not stayed, no youth in OJJ custody will be able to properly receive education and rehabilitative services, due to the violent and disruptive behavior of the high-risk youth transferred from BCCY-WF. The public has a vested interest in the future of all youth in OJJ custody and in their effective rehabilitation. The public interest is best served by staying the Preliminary Injunction.

**D.**    **Defendants Have a Substantial Likelihood of Succeeding on the Merits.**

Defendants are substantially likely to prevail on the merits of the appeal because (1) Plaintiffs failed to exhaust their administrative remedies under the PLRA; (2) the Preliminary Injunction is not narrowly tailored, as required by the PLRA; (3) the Preliminary Injunction does not comply with the PLRA's requirements for prisoner transfers; and (4) Plaintiffs have failed to prove Defendants acted with deliberate indifference as required under Section 1983.

**1.**    **Plaintiffs failed to exhaust their administrative remedies under the PLRA.**

**a.**    **Plaintiffs' claims are subject to the PLRA's exhaustion requirement.**

Plaintiffs' lawsuit is brought pursuant to 42 U.S.C. § 1983, the Rehabilitation Act, 29 U.S.C. § 794, and the Americans with Disabilities Act, 42 U.S.C. § 12101. *See* Ex. 11 (Dkt. 96) at 35-37. The PLRA provides that "no action shall be brought under [S]ection 1983 …, <u>or any other Federal law</u>, by a prisoner confined in any … correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (emphasis added).[4] Accordingly, Plaintiffs' claims are subject to the PLRA and its various requirements. *See Ferrington v. Louisiana Dep't of Corr.*, 315 F.3d 529, 532 (5th Cir. 2002).

One requirement of the PLRA is administrative remedy exhaustion. *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004).[5] The PLRA mandates "proper" exhaustion, requiring the plaintiff to comply with an agency's deadlines and other critical procedural rules. *Woodford v. Ngo*, 548 U.S.81, 90 (2006). The Fifth Circuit "has taken a 'strict' approach to [PLRA's] exhaustion requirement, under which prisoners must not just substantially comply with the prison's grievance procedures, but instead must 'exhaust available remedies properly.'" *Wilson v. Epps*,

---

[4] "Prisoner" is broadly defined and includes "any person … detained in any facility who is … adjudicated delinquent for, violations of criminal law…." 42 U.S.C. § 1997e(h).

[5] Once a defendant puts on evidence that plaintiff failed to exhaust, the burden shifts to plaintiff to prove exhaustion. *Brantner v. Freestone County Sheriffs Ofc.*, 776 Fed. App'x 829, 832 (5th Cir. 2019).

776 F.3d 296, 299-300 (5th Cir. 2015) (quoting *Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010)). Plaintiffs must exhaust remedies <u>before</u> filing suit. *Wilson*, 776 F.3d at 299.

A plaintiff must also exhaust administrative remedies prior to filing a motion for preliminary injunction. *See Jimerson v. Rheams*, No. 21-119, 2021 WL 2005492, at *1 (M.D. La. April 15, 2021) (quoting *Muhammed v. Wiles*, 841 Fed. App'x 681, 685-86 (5th Cir. 2021)). Where a prisoner files a lawsuit, then raises new and distinct claims in a motion for preliminary injunction within that lawsuit, the PLRA bars the new claims if they have not also been exhausted. *See, e.g.*, *Tolliver v. Collins*, 2010 WL 2640061, at *2 (S.D. Ohio April 29, 2010).

### b.    OJJ maintains an administrative remedy procedure.

OJJ maintains an Administrative Remedy Procedure ("ARP")[6] to process internal grievances, such as those referenced in Plaintiffs' complaint and injunction motions.[7] *See* Ex. 12.

*Standard ARP Grievance Procedure*:  Under the ARP policy, a youth must fully exhaust a two-step grievance process before seeking judicial review. *See id.* at 9. A youth initiates Step 1 by filing an ARP form. *Id.* at 6–7. The facility director must respond within 30 days. *Id.* at 7. If the youth is dissatisfied with the response, he has 15 days to exercise Step 2, seeking review from the Deputy Secretary of Youth Services. *Id.* at 8. The Deputy Secretary must respond within 21 days of the Step 2 request. *Id.* at 9. Only then may the youth seek judicial review. *Id.*

*Emergency ARP Grievance Procedure*:  If the youth's grievance states that the youth believes he is at immediate risk of harm and that any delay in responding to the grievance would subject him to substantial risk of immediate personal injury or cause other serious or irreparable harm, the ARP is immediately forwarded to the Facility Director, Statewide Youth Facilities

---

[6] OJJ updated its ARP procedure in December 2022. However, the procedure discussed here applied when Plaintiffs Alex A. and Charles C. initially filed suit.

[7] *See* Ex. 11 (Dkt. 96) ¶ 34 (referencing Alex A.'s administrative grievance) and ¶ 55 (referencing Charles C.'s administrative grievance).

Director, and the Deputy Secretary of Youth Services. *Id.* at 9–10. OJJ will provide an initial

response within 48 hours. *Id.* If reviewers determine that the grievance is indeed emergent, OJJ

has up to five calendar days to provide a final decision as to the relief requested in the ARP. *Id*.

      c.      **Charles C. failed to exhaust his administrative remedies.**

Plaintiff Charles C. is a youth in OJJ custody; Charles C is not currently housed at

BCCY-WF. While Charles C. did at one time reside at BCCY-WF, Plaintiffs do not allege and

presented no evidence that Charles C. will be transferred to BCCY-WF in the future.

On October 25, 2022, <u>before Charles C. was ever housed at BCCY-WF and before the</u>

<u>alleged conditions that form the basis of the Second Motion for Preliminary Injunction existed,</u>

Plaintiffs' counsel filed an "emergency" administrative grievance on behalf of Charles C. *See*

Ex. 13. That same day, Charles C. joined this lawsuit by filing his Amended Complaint. *See* Ex.

11 (Dkt. 96). Regardless of whether Charles C.'s grievance was deemed an Emergency ARP or a

Standard ARP, Charles C. did not exhaust before filing suit.

Charles C.'s grievance, which was nearly identical to Alex A.'s grievance, also failed to

exhaust the claims alleged in the Second Motion for Preliminary Injunction for the same reasons

discussed below regarding Alex A.'s ARP.

      d.      **Alex A. failed to exhaust his administrative remedies before filing the**
                  **Second Motion for Preliminary Injunction.**

Alex A. is a youth in OJJ custody. He is not and never has been housed at BCCY-WF.

Plaintiffs do not allege Alex A. will ever be transferred to BCCY-WF.

On August 16, 2022, <u>before BCCY-WF was even open,</u> Plaintiffs' counsel filed an

emergency grievance on behalf of Alex A. *See* Ex. 14. That grievance complained about OJJ's

purported "decision to imminently move" Alex A. to BCCY-WF because the facility was to be

located at "Angola, an adult maximum security prison." *Id.* The grievance alleged:

1.  Alex A. feared the possibility of being transferred to an adult prison, *id.* ¶ 1;

2.  Alex A., as a minor adjudicated as delinquent, cannot be subjected to "punishment in an adult prison," *id.* ¶ 2;

3.  Alex A. believes he would not receive adequate education at BCCY-WF because "[a]s a maximum security adult prison, Angola does not have a school capable of providing [adequate] education services," *id.* ¶ 3;

4.  Alex A. will not receive access to therapy and counseling because "Angola does not have these types of programs," *id.* ¶ 4;

5.  Alex A. will be subjected to adult prisoners because creating "sight and sound separation [of youth from adult prisoners] will be impossible," *id.* ¶ 5;

6.  Alex A. will be subjected to solitary confinement as a means to create a sight and sound barrier between him and adult prisoners, *id.* ¶ 6;

7.  Alex A. will be subjected to deficient medical care at BCCY-WF because of alleged ongoing deficiencies at LSP to provide medical care to adult prisoners, *id.* ¶ 7; and

8.  At BCCY-WF, Alex A. either would be exposed to adult inmates or would be placed in solitary confinement to avoid exposure to adult inmates, *id.* ¶ 8.

OJJ responded to Alex A.'s grievance, denying the request for emergency consideration because Alex A. was not housed at BCCY-WF and was not subject to any of the alleged conditions. *See* Ex. 15.[8] The Court ruled OJJ's denial of emergency treatment of Alex A.'s ARP constituted a decision upon which Alex A. could rely in filing the Complaint.

Although the Court found Alex A. exhausted his remedies as to the claims in the Complaint and First Motion for Preliminary Injunction, Alex A.'s grievance did not properly exhaust the claims of the Second Motion for Preliminary Injunction, for several reasons.

First, none of the current conditions allegedly occurring at BCCY-WF could have existed when Alex A. filed his grievance because BCCY-WF did not open until two months <u>after</u> Alex

---

[8] Following denial of his emergency grievance, OJJ processed Alex A.'s grievance as a standard ARP. At the time the original Complaint was filed, the deadline for OJJ to respond to the standard ARP had not yet passed. Ex. 16 (Dkt. 1). Therefore, Alex A. failed to exhaust his administrative remedies prior to filing the initial Complaint and the initial Motion for Preliminary Injunction.

A. filed his grievance.

Second, Alex A. has never been exposed to any conditions at BCCY-WF because he does not reside and never has resided at BCCY-WF.

Third, Alex A.'s grievance (and Charles C.'s grievance) concerned complaints that are materially different from the claims in the Second Motion for Preliminary Injunction. Specifically, the complaints asserted in Alex A.'s grievance were fear of exposure to adult offenders and potential denial of services because BCCY-WF was to be located at an adult correctional facility; in contrast, the claims raised in the Second Motion for Preliminary Injunction are alleged use of cell restriction as a form of punishment and inadequate education and rehabilitation services. *Compare* Ex. 14, *with* Exs. 1 (Dkt. 163) & 17 (Dkt. 166).

The PLRA requires grievances to be "sufficiently specific to give officials a fair opportunity to address the problem that will later form the basis of the lawsuit." *Petzold v. Rostollan*, 946 F.3d 242, 254-55 (5th Cir. 2019).[9] The Fifth Circuit has rejected the argument that a grievance about one particular incident exhausts claims that arise from future incidents of the same general type. *Yankton v. Epps*, 652 Fed. App'x 242, 245-46 (5th Cir. 2016).

Again, Alex A.'s grieved claims concerned his projected fears of being housed with adult prisoners and his suspicion that he would be denied services because those services would not be available at an adult facility. But the current allegations are that:

- OJJ is excessively using cell restriction to punish youth at BCCY-WF (not as a means of creating sight and sound separation between youth and adult prisoners); and

- The youth education and rehabilitation services provided at BCCY-WF are constitutionally deficient (not that services are being withheld because BCCY-WF

---

[9] Practically speaking, the potential responses by OJJ to a youth's grievance of fears of future events at an unopened facility would be wholly different than the potential responses by OJJ to a youth's grievance of events that are actually occurring within a facility where that youth is currently housed. *See, e.g., Johnson v. Johnson*, 385 F.3d 503, 518, n.9 (5th Cir. 2004).

sits on the grounds of an adult penitentiary that does not offer youth services).

The claims in the Second Motion for Preliminary Injunction were never grieved by Alex A. (or

Charles C.). OJJ was never put on notice of the specific issues and never afforded an opportunity

to resolve them through the administrative process, which is the very purpose of the PLRA.

       e.       **The putative class action is irrelevant to the exhaustion analysis.**

When the class representative has properly exhausted his administrative remedies <u>before</u>

filing suit, the class representative may vicariously exhaust the administrative remedies for the

entire class after the class is certified. *See Valentine v. Collier*, No. 4:20-CV-1115, 2020 WL

3491999, at *3 (S.D. Tex. June 27, 2020). But vicarious liability does nothing to assist Alex A.

or Charles C., who are the only named plaintiffs and proposed class representatives. Alex A. and

Charles C. must exhaust the administrative process; it is the absent class members who may

benefit from vicarious exhaustion. The fact that Alex A. and Charles C. filed their Amended

Complaint as a class action does not change the above exhaustion deficiencies.

       2.       **The Preliminary Injunction is not narrowly tailored and is not the least intrusive means to correct the alleged harm, as required by the PLRA.**

The PLRA provides that "preliminary injunctive relief must be narrowly drawn, extend

no further than necessary to correct the violation of the federal right, and be the least intrusive

means necessary to correct the harm." 18 U.S.C. § 3626(a)(2). Federal courts are to "eschew

toward minimum intrusion into the affairs of state prison administration." *Gumns*, 2020 WL

2510248, at *3. The Preliminary Injunction must not simply reference the PLRA's least intrusive

means requirement but should make specific findings to demonstrate it meets that requirement.

*See*, *e.g.*, *Victory v. Berks County*, 789 Fed. App'x 328, 334 (3d Cir. 2019).[10]

This Preliminary Injunction is not narrowly tailored. Shutting down BCCY-WF is the

---

[10] *But see Gates v. Cook*, 376 F.3d 323, n. 8 (5th Cir. 2004).

most intrusive means to correct the alleged harm, not the least intrusive as the PLRA requires. The Court already ruled that the BCCY-WF facility, itself, does not constitute a constitutional violation. *See* Ex. 2 (Dkt. 79) at 62. Accordingly, closure of BCCY-WF is not necessary to comply with the Constitution. To the extent the Court found education and rehabilitation services or the use of cell restriction at BCCY-WF violates the rights of the youth, the injunction must be narrowly tailored to address those alleged violations. And the Preliminary Injunction made no specific findings regarding the least intrusive means requirement.

### 3. The Preliminary Injunction constitutes a "prisoner release order" that does not comply with PLRA requirements.

A "prisoner release order" is "any order, <u>including</u> a temporary restraining order or <u>preliminary injunctive relief</u>, that has the purpose or effect of reducing or limiting the prison population, or that <u>directs the release from or nonadmission of prisoners to a prison</u>." 18 U.S.C. § 3626(g)(4) (emphasis added).[11] The Court's Preliminary Injunction, which directs that all youth be transferred from BCCY-WF and that no youth be admitted to BCCY-WF in the future, is a prisoner release order. *See Ruiz v. Estelle*, 161 F.3d 814, 825-27 (5th Cir. 1998) (order limiting population of a given prison "plainly" meets PLRA definition of "prisoner release order"), *abrogated on other grounds as recognized in Camp v. McGill*, 789 Fed. Appx. 449, 450 n.6 (5th Cir. 2020). Before a prisoner release order can issue, the PLRA requires that: (1) the Court must have previously entered an order for less intrusive relief that failed to remedy the deprivation of the subject Federal right; and (2) the defendants must have been given a reasonable amount of time to comply with the prior order. *See* 18 U.S.C. § 3626(a)(3)(A)(i)-(ii). Moreover, a prisoner release order can only be issued by a three-judge panel, who must find by clear and convincing evidence that crowding is the primary cause of the violation of a Federal

---

[11] "Prison" includes any State that detains juveniles adjudicated delinquent. 18 U.S.C. § 3626(g)(5).

right and that no other relief will remedy the violation. *Id.* at § 3626(a)(3)(B), (E).  None of these requirements are satisfied here. Thus, the injunction should be stayed pending appellate review.

### 4.    Plaintiffs cannot establish deliberate indifference.

Liability under § 1983 requires that prison officials act with deliberate indifference to a substantial risk of serious harm. *See Gumns v. Edwards*, No. 20-231-SDD-RLB, 2020 WL 2510248 (M.D. La. May 15, 2020) (analyzing § 1983 claims under Eighth and Fourteenth Amendments).[12] Deliberate indifference is "an extremely high standard to meet." *Valentine*, 956 F.3d at 801 (citation omitted). Proof of negligence, or even gross negligence, is not enough. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996). Deliberate indifference requires deprivation of "basic human needs." *Valentine*, 956 F.3d at 801. A two-part test applies to determine whether a defendant has acted with deliberate indifference under § 1983. *Id.* First, the plaintiff must establish an "objectively intolerable risk of harm." *Id.* Second, the plaintiff must establish the defendant acted with subjective indifference to that risk; that is, the defendant: "(1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively dr[e]w the inference that the risk existed; and (3) disregarded the risk." *Id.* (citations and quotations omitted).

Plaintiffs presented no evidence to show that they have a likelihood of proving either the objective or subjective parts of the deliberate indifference standard. Plaintiffs generally claim youth at BCCY-WF are subjected to four risks of harm: (1) being housed in a building originally constructed for adult incarceration; (2) lack of constitutionally adequate education; (3) lack of rehabilitative services; and (4) improper use of cell restrictions. Plaintiffs cannot demonstrate an

---

[12] *See also generally Jones v. Tex. Dep't of Crim. Justice*, 880 F.3d 756 (5th Cir. 2018) (discussing deliberate indifference in Eighth Amendment claim); *Estate of Pollard v. Hood County, Tex.*, 579 Fed. App'x 260 (5th Cir. 2014) (discussing deliberate indifference in Fourteenth Amendment claim).

objectively intolerable risk of any of the harms asserted in their Second Motion for Preliminary

Injunction. Nor can they establish a subjective decision on OJJ's part to disregard the risk of

those harms. Plaintiffs fall far short of "clearly carrying" their burden.

### a.    Use of a former adult incarceration facility does not constitute deliberate indifference.

The fact that BCCY-WF is located in a physical building that was previously used to

incarcerate adult inmates does not violate the Constitution. At the hearing on Plaintiffs' First

Motion for Preliminary Injunction, Plaintiffs' expert Dr. Stevens testified that she personally did

not like the decision to move youth to BCCY-WF, but she offered no diagnosis or prognosis for

Alex A.[13] and no testimony that Plaintiff will suffer any particular symptom causally related to

being housed on campus at "Angola." She spent a total of 30 minutes with Alex A., all via

Zoom. She had no knowledge of his medical or psychiatric history, his family history, and his

experiences while in OJJ's custody or before he entered OJJ's custody. Dr. Stevens admitted that

she claims no expertise in corrections and has never been to Angola or even seen photographs of

it. She ultimately characterized her own testimony as "speculation."

At the same hearing, Plaintiffs' other expert, Mr. Schiraldi, admitted that moving youth to

BCCY-WF violates no laws and violates no accepted industry standard for juvenile detention. He

merely characterized the transfer of youth to BCCY-WF as "unique" or "unusual" and inconsistent

with the "Missouri model" (a model he prefers but admits is not the prevailing standard in the

United States). Mr. Schiraldi had no literature—medical or otherwise—to support his position that

youth should not be housed in a facility that formerly housed adults, and he admits no such

literature exists. While he is not a doctor or health care professional and claims no such expertise,

---

[13] At the time of Plaintiffs' First Motion, Alex A. was the lone plaintiff. No testimony has ever been provided regarding Charles C.

he took the liberty of offering a short list of articles on the risks of placing youth offenders within "adult prisons." However, he conceded that the articles he cited are irrelevant here because they pertain to situations where youth and adults are actually housed together (unlike BCCY-WF where the youth facility is completely separated from the adult facilities). Overall, Mr. Schiraldi's testimony can be summarized as a lecture in what he considers to be best practices based on his personal preferences,[14] not accepted industry standards or minimum constitutional standards.

Furthermore, to the extent Plaintiffs put on any evidence that merely being housed at "Angola" presents a risk of mental stress, Alex. A's testimony confirmed he experienced no harm on that basis. Rather, Alex A. testified unequivocally that his only concern about BCCY-WF was the risk of being assaulted by adult inmates. It is undisputed that no youth housed at BCCY-WF has ever had sight or sound exposure to (let alone physical contact with) an adult inmate.

As for the subjective component, as the Court recognized, OJJ actively considered and investigated other options for housing these high-risk youth and ultimately concluded that the BCCY-WF facility was the only available facility that met the needs of the agency from both a security and rehabilitative services standpoint. Ex. 2 (Dkt. 79) at 53-54.

        **b.**    <u>**Education services at BCCY-WF meet constitutional requirements.**</u>

The education provided to the youth at BCCY-WF complies with constitutional and Louisiana Department of Education standards. Plaintiffs' complaints amount to arguments that the education provided at BCCY-WF fails to meet best practices. Specifically, Plaintiffs complain: (1) some students' education plans were not sent to BCCY-WF before the youth were transferred there; (2) there are less than two teachers currently assigned full-time to BCCY-WF; and (3) some education was temporarily administered in housing tiers, not classrooms.

---

[14] The majority of Mr. Schiraldi's testimony involved recalling his own work at youth facilities in Missouri and Rikers Island, which are not relevant to this case.

The undisputed evidence is that from October 2022 to April 2023, BCCY-WF had full-time teachers assigned to BCCY-WF. Classes were between seven and fifteen students, with a teacher/student ratio of less than 1:8. Education was offered through live instruction, Edgenuity (an online distance learning program approved by the Louisiana Department of Education for all public schools), and written workbooks. No contrary evidence was presented.

The undisputed evidence is that, during summer session (May 22 – July 13), OJJ provided six hours of education per weekday to BCCY-WF youth, offering "catch up" services to youth who needed additional academic coursework as well as vocational options. For this period, OJJ provided one full-time teacher for up to 15 youth. OJJ lost its second teacher after she was assaulted by the youth and resigned, but OJJ filled the second teacher position by alternating teachers, principals, and administrators from other OJJ facilities. Edgenuity and written workbooks were offered to the youth every day throughout the summer session.

Plaintiffs presented evidence that during the first three days of the 2023-24 school year, some students' education plans were missing. But the evidence was undisputed that after those few days, the education plans were obtained, and education was and has been in place and actively offered to the youth at BCCY-WF for the new school year.

As for education being provided on housing tiers, the undisputed evidence is that this relocation was caused by the youth. When BCCY-WF opened, it featured three well-equipped classrooms. The youth subsequently destroyed two of those classrooms (including the video surveillance equipment) to the point where the classrooms could not be monitored and were thus unsafe and unusable. After this youth-caused destruction, OJJ rotated groups of youth between the one available classroom and the housing tiers for education. The undisputed evidence is that OJJ has now repaired and reopened one of the classrooms and is in the process of repairing the

remaining destroyed classroom. And, Plaintiffs presented no evidence that providing education on the tiers resulted in a level of education below the constitutional minimum.

Against this record, Plaintiffs cannot establish the objective or subjective parts of the deliberate indifference standard.

c.    <u>**Rehabilitative services meet constitutional requirements.**</u>

Witness testimony established that rehabilitative services available to youth at BCCY-WF are constitutionally sufficient. Director Linda London and Dr. Lee Underwood, the clinical psychologist and juvenile justice expert who developed the TTU program curriculum for BCCY-WF, testified that a multi-disciplinary team develops an initial plan for each youth transferred into the facility. The multi-disciplinary team meets each Thursday to discuss the needs and progress of each youth within the program. Sandra Bryant, Social Services Supervisor, testified she meets daily with each youth in the program. Dr. Underwood visits the facility every month and participates telephonically in the weekly Thursday review meetings.

JJS staff members Patterson, McKinley, and Gordon testified about the art of trust-based relationship building when new youth are introduced into the TTU. These JJS witnesses testified about how they form and build relationships with the youth and then leverage those relationships to get the youth to invest in the rehabilitative programming. Dr. Underwood testified extensively about the introspective nature of the behavioral intervention program curriculum and how it is designed to help youth reflect on prior habits of negative decision making and to use learning strategies (e.g., role playing, reflective essays) to practice improving behavioral traits for future circumstances. Dr. Underwood and Ms. Bryant testified about the three phases of the treatment program and the accompanying curriculum. The written curriculum workbooks were introduced into evidence as exhibits, both in blank copy and with examples of workbooks and worksheets completed by youth in the program. Although the Court strictly prohibited the introduction of

any evidence supporting the efficacy of the TTU program, Dr. Underwood and Deputy Secretary Nelson testified that most youth who complete the TTU program do not return, strongly suggesting the program goals are being met in most cases.

The trial evidence was also clear as to OJJ's provision of medical and mental health treatment services within the TTU.  Rashied Cormier, the Regional Mental Health Director for Wellpath,[15] testified about the mental health services provided at BCCY-WF. More importantly, Plaintiffs did not point to even a single anecdotal instance where any youth at BCCY-WF was allegedly denied proper medical or mental health treatment.

Though the Court found Ms. Bryant to be "tasked beyond her capabilities" and characterized her testimony defending her work as "anemic," Plaintiffs could not present a single complaint, instance, or case study suggesting Ms. Bryant has been an ineffective counselor or that any youth has been harmed for failure of proper counseling. In fact, the very suggestion by Plaintiff's counsel during cross-examination that Ms. Bryant is ineffective in her duties elicited perhaps the most emotionally charged testimony of the trial wherein Ms. Bryant vehemently defended her work and, in the process, made clear that both she and the OJJ are anything but deliberately indifferent to the youth within their care.

### d.     Use of cell restriction complies with constitutional requirements.

As this Court has already recognized, "An effective discipline system is necessary in a juvenile correctional institution to aid staff in controlling violence and other inappropriate behavior, to maintain safety and security, and to serve as a training tool for the overall purpose of correcting the juveniles' behavior." Ex. 2 (Dkt. 79) at 54 (citation omitted). Likewise, the Court recognized, "The level of restraint to be used for each juvenile should be based upon some

---

[15] OJJ contracts with third party Wellpath to provide medical and mental health services at BCCY-WF.

rational professional judgment as to legitimate safety and security needs." *Id.* at 56 (citation

omitted). Regarding striking the balance between a punitive-only program and a rehabilitative

program, this Court recognized, "The management of a detention facility and the preservation of

safety and security at the facility present a compelling 'alternative purpose' for regulatory

measures, including temporary suspension of a privilege or the imposition of administrative

confinement, however denominated, without implicating the Due Process Clause…." *Id.* at 58

(citation omitted).

There is no per se prohibition on the use of cell restriction, mechanical restraints, or

restrictions of privileges. Rather, the level of restriction and the amount of privileges to allow is

an essential part of the management of a juvenile facility. Juvenile facilities are entitled to

enforce disciplinary rules and to impose restrictions necessary to achieve security. While

Plaintiffs have put on proof regarding the use of cell restriction and other forms of discipline,

they presented no evidence that any youth has ever been placed on cell restriction or subjected to

restraint for any other reason except serious and immediate threats of harm—property

destruction, youth-on-staff assault, youth-on-youth assault, and escape attempts. Restriction

under any of these circumstances constitutes a legitimate "alternative purpose."

While Plaintiffs focused heavily on demonstrating that youth were placed on cell

restriction at BCCY-WF, Plaintiffs worked actively to avoid admitting evidence showing why

youth were placed on cell restriction (such as hundreds of pages of incident reports detailing

security and safety risks caused by non-compliant youth). The Court likewise refused to accept

evidence on the reasons for these restrictions. Moreover, it went undisputed that cell restriction

was rarely used at BCCY-WF from its opening in October 2022 until Summer 2023, when a

specific group of highly problematic youth, including Charles C., were transferred to BCCY-WF.

It also went undisputed that the use of cell restriction significantly declined in August after the highly problematic youth were transferred to other facilities.

To the extent Plaintiffs attempt to rely on Louisiana Revised Statute 15:905—the state statute regarding restrictions on solitary confinement for youth—their reliance is misplaced. First, Plaintiffs have <u>not</u> pled a claim for any alleged violation of La. R.S. 15:905. As a general matter, courts are to disregard claims that are not expressly pled. *Allstate Ins. Co. v. Plambeck*, No. 08-CV-0388-M-BD, 2012 WL 2130982, at *4 (N.D. Tex. Jan. 4, 2012).

Second, as a matter of law, mere violation of a state statute (without more) is not a Constitutional violation under Section 1983. *Woodard v. Andrus*, 419 F.3d 348 (5th Cir. 2005). To violate the Constitution, a defendant's violation of state law must "shock the conscience." *Whitley v. Hanna*, 726 F.3d 631, n.2 (5th Cir. 2012) (citing cases).[16]

Third, the evidence reveals that OJJ did not violate the state statute. "Cell restriction" is not "solitary confinement" as defined by La. R.S. 15:905. "Solitary confinement" is:

> [T]he involuntary placement of a juvenile <u>alone</u> in a cell, room, or other area, except during regularly scheduled sleeping hours. It includes but is not limited to any behavioral intervention, seclusion, isolation, room isolation, segregation, administrative segregation, or room confinement in response to rule violations, staffing shortages, or for any other reason that is not an emergency response to behavior that poses a serious and immediate threat of physical harm to the juvenile or others.

La. R.S. 15:905 (emphasis added). By definition, cell restriction is not solitary confinement because youth are never alone; instead, the undisputed evidence is that while on cell restriction, OJJ staff has "constant" engagement with each youth. In fact, if a youth is on cell restriction and his tier transitions to an off-tier activity, OJJ relocates the youth on cell restriction to a full tier so

---

[16] Relatedly, federal courts are prohibited from issuing an injunction against state officials solely to require adherence to state law, pursuant to *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104-11 (1984).

that the youth will not be alone. Additionally, the evidence showed that a youth on cell restriction receives meals, education, medical treatment, mental health services, family visits/calls, recreation, television, and books, and a youth on cell restriction can and does interact with other youth on the housing tier, including talking, passing notes, and watching television together.

Fourth, even if cell restriction constitutes solitary confinement, the statutory exception for "serious and immediate threat of physical harm to the juvenile or others" would apply. Plaintiffs presented no evidence indicating any arbitrary use of cell restriction, and the Court refused to accept evidence regarding the bases for the imposition of cell restriction. Without providing the Court with the underlying bases for assigning youth to cell restriction, the Court was left only to guess whether cell restriction at BCCY-WF was "excessive."

E.    **A Stay Poses No Risk of Injury to Plaintiffs.**

Plaintiffs failed to present evidence of an intolerable risk of harm or injury for purposes of the merits of their Section 1983 claim. For purposes of establishing entitlement to injunctive relief, Plaintiffs also have failed to put on evidence of any <u>irreparable</u> injury. The Fifth Circuit has explained the heavy burden to establish <u>irreparable</u> harm or injury where adequate relief is available under the plaintiff's asserted cause of action. *See Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012).

Here, Plaintiffs presented no evidence that they are at any risk of any harm, let alone irreparable harm. Moreover, Plaintiffs adduced no evidence that any youth actually housed at BCCY-WF has suffered a harm or is at risk of irreparable harm.

## IV.    <u>CONCLUSION</u>

For these reasons, the Court should stay the Preliminary Injunction pending appeal.

Dated: September 11, 2023

Respectfully submitted,

BY:    /s/ Lemuel E. Montgomery III
       Connell Archey (#20086)
       Randal J. Robert (#21840)
       Allena McCain (#38830)
       Madaline King Rabalais (#38301)
       BUTLER SNOW LLP
       445 North Boulevard, Suite 300 (70802)
       P.O. Box 2997
       Baton Rouge LA  70821-2997
       Telephone:    (225) 325-8700
       Facsimile:     (225) 325-8800
       Connell.Archey@butlersnow.com
       Randy.Robert@butlersnow.com
       Allena.McCain@butlersnow.com
       Madaline.Rabalais@butlersnow.com

       Lemuel E. Montgomery III (pro hac vice)
       Kyle V. Miller (pro hac vice)
       Anna Morris (pro hac vice)
       Carly Chinn (pro hac vice)
       BUTLER SNOW LLP
       1020 Highland Colony Parkway, Suite 1400
       Ridgeland, MS 39157
       Telephone: (601) 948-5711
       Facsimile: (601) 985-4500
       Lem.Montgomery@butlersnow.com
       Kyle.Miller@butlersnow.com
       Anna.Morris@butlersnow.com
       Carly.Chinn@butlersnow.com

       Counsel for Defendants
       GOVERNOR JOHN BEL EDWARDS, in
       his official capacity as Governor of
       Louisiana; WILLIAM SOMMERS, in his
       official capacity as Deputy Secretary of the
       Office of Juvenile Justice; and JAMES M.
       LEBLANC, in his official capacity as
       Secretary of the Louisiana Department of
       Public Safety & Corrections

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing has this day been filed electronically with the Clerk of Court using the CM/ECF system, which will deliver notice of this filing to all counsel of record.

Baton Rouge, Louisiana this 11th day of September, 2023.

<i>/s/ Lemuel E. Montgomery III</i>

82379158.v1