**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**


ALEX A., by and through his guardian,
MOLLY SMITH, individually and on behalf
of all others similarly situated                           CIVIL ACTION

VERSUS                                                     22-573-SDD-RLB

GOVERNOR JOHN BEL EDWARDS,
in his official capacity as Governor of Louisiana;
 WILLIAM SOMMERS, in his official
capacity as Deputy Secretary of the
Office of Juvenile Justice,
JAMES M. LEBLANC, in his official capacity
 as Secretary of the Louisiana Department
of Public Safety & Corrections


<u>**RULING**</u>

  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure the Court makes the following Findings of Fact and Conclusions of law.

**I. FINDINGS OF FACT**

  This is a case of promises made and promises broken. Last summer, the Office of Juvenile Justice told this Court that, due to a shortage of adequate secure care facilities, it needed to use the former death row at Angola[1] to temporarily house a small population of severely troubled and behaviorally challenged youth. It promised that renovated or new secure housing for these adolescents would be available in April of this year.

  The Office of Juvenile Justice promised this Court that they would not violate the constitutional rights of the young people housed at Angola if the Court would permit them

---

[1] The Court's use of the terms "Angola" or the "Angola site or facility" refer to the Bridge City Center for Youth at West Feliciana ("BCCY-WF"), as it is called by Defendants.

to temporarily house a few youth for a short period of time. It argued that this drastic move was needed to protect the public and other youth under its care. It was offered as a short-term solution to a temporary space problem.

As of last week, almost a year later, 70 to 80 adolescent boys have been incarcerated at the Angola facility.

After hearing seven days of testimony and considering thousands of pages of exhibits, the Court finds that the conditions of confinement of the youth incarcerated at Angola constitute cruel and unusual punishment, and the punitive atmosphere and systemic programming failures violate the Fourteenth Amendment.

The Transitional Treatment Unit at Angola does not provide youth with a reasonable opportunity for rehabilitation, which is the professed goal of the Transitional Treatment Unit at Angola. The youth at Angola are being victimized, traumatized, and seriously and irreparably harmed.

The Office of Juvenile Justice implored the Court to allow these seriously troubled young people to be housed at Angola for a short time promising that they would receive robust rehabilitative treatment.  Regrettably, the Court bought what the Office of Juvenile Justice was selling, which was:

- use of the cell blocks at Angola would be temporary,

- Angola would serve only a "very small population,"

- the youth would be in their cells ONLY during sleeping hours,

- it would offer rehabilitation not punishment,

- it would be properly and adequately staffed,

- it would provide the Free Appropriate Public Education guaranteed to all children,

- it would provide special education where necessary and appropriate,

- it would provide necessary and appropriate mental health treatment, and

- it would provide appropriate social services.

Based on those sworn promises, the Court denied the Plaintiff's request that the Office of Juvenile Justice be prohibited from moving juveniles to the Angola site. Why did the Office of Juvenile Justice make those promises - because such conditions and programming are required by law.

Virtually every promise made was broken, causing severe and irreparable harm to the wards that the Office of Juvenile Justice is obliged to help.

<u>Promise #1</u>

The use of the Angola site would be short term. A new facility was going to come online in April 2023.[2]

Angola has now been used for almost a year, and the building that was supposed to be ready in April MIGHT be ready in December; the delay is blamed on bad weather and change orders.

<u>Promise # 2</u>

Angola would be used for only a very small population; only "about five percent of the youth," would be eligible for transfer to Angola.[3]

Of the approximately 375 adolescents in the Office of Juvenile Justice secure care, 70-80 have been transferred to Angola.

---

[2] Rec. Doc. 79, p. 50.
[3] *Id.* at p. 13.

Promise #3

The following are the words of the Deputy Secretary of the Office of Juvenile

Justice:

"THIS IS NOT OUR CHILDREN BEING PLACED IN A CELL FOR 24
HOURS A DAY."[4] "THE ONLY TIME OUR YOUTH WILL BE IN THEIR
ROOMS IS AT NIGHTTIME, WHEN IT'S TIME TO GO TO SLEEP."[5]
"YOU DO EVERYTHING OUTSIDE OF THOSE INDIVIDUAL CELLS, AND
THEN AT NIGHTTIME, WHEN IT'S TIME TO GO DOWN TO GO TO
SLEEP, YOU GO BACK TO YOUR ROOM."[6]

Those were the promises made by Otha "Curtis" Nelson, then-Assistant Secretary

of the Office of Juvenile Justice, last September. He testified that legally, no child can be

confined in their room for more than 8 hours and then only after an assessment.[7] The

cells would be used only for sleeping.

In truth, right from the start, youth are locked in their cell for 48 to 72 hours for

"orientation." The youth eat two of three meals per day locked in their cells. Youth are

locked in their cells excessively and for days at a time as punishment. For example, Youth

# 3 was confined to his cell 19 out of 30 days in June, 14 of which were consecutive days,

and then he was confined another 9 out of 24 days in July. Youth # 5 was confined to his

cell for 4 consecutive days after expressing suicidal thoughts and then locked in his cell

for another 6 days in the 2 weeks that followed. All youth on one of the tiers were locked

in their cells for a week, and another youth was locked in his cell for 9 consecutive days.

At least 4 youth were locked in their cells for 5 straight days.

---

[4] Rec. Doc. 152, Nelson Testimony at 161:6-7.
[5] *Id.* at 161:1-3.
[6] *Id.* at 161:7-11.
[7] *Id.* at 180:9-12.

All of these are examples occurred in the two months of June and July, which is the only time period covered by the discovery which generated the evidence before the Court.

Promise #4 Rehabilitation, not Retribution

The Office of Juvenile Justice promised that, notwithstanding the fact that the facility "screams prison," the treatment at Angola would be rehabilitative and therapeutic. The then-Assistant Secretary promised:

> "IT IS NOT PUNITIVE."[8]
>
> . . .
>
> "WE DON'T PUNISH AND EVERYTHING WE DO IS TREATMENT BASED."[9]
>
> . . .
>
> THIS IS NOT PUNISHMENT, IT'S REHABILITATION.[10]
>
> . . .
>
> "MY JSS'S WOULD NOT HAVE . . . CHEMICALS (i.e, mace) ON THEM."[11]
>
> . . .
>
> "THEY ARE NOT GOING TO BE DEPRIVED. WE ARE GOING TO GIVE THEM MORE, BECAUSE THAT'S WHY THEY ARE IN THETRANSITIONAL TREATMENT UNIT."[12]

But the recent evidence showed extensive and excessive cell restriction, indiscriminate use of hand cuffs and mace, and punitively denying youth family contact.

---

[8] *Id.* at 139:18.
[9] *Id.* at 140:20-21.
[10] *Id.* at 181:8.
[11] *Id.* at 80:6.
[12] *Id.* at 95:8-10.

Every guard[13] that testified said that cell restrictions are used as punishment. Physical restraints are used indiscriminately when youth are out of their cells.

In its site visit earlier this summer, the Court observed that the few youth who were not in their cells were handcuffed. One young man was handcuffed while in the dining room alone with two guards.  Two young men were handcuffed while playing cards with two guards, and another young man was handcuffed while writing in a journal under the supervision of a guard.

Director London admitted that Youth are handcuffed during recreation if their behavior is aggressive. There is no documentation of use of physical restraints despite the fact that all use of force is required to be documented by agency Policy.

Guards with a JJS4 designation can use restraints and cell restrictions at their discretion.  The guards also use mace or chemical agent.  Plaintiff's Exhibit 440 is disturbing video footage of a young man being maced while locked in his cell. From the testimony and video, the story is as follows.

At lunchtime in the dining room, a young man complained about his food and demanded a sandwich. When he was refused a sandwich, he became irate. One of the guards displayed a can of mace to the youth before removing him from the dining room and returning him to his cell. On the video, guards can be seen speaking with the young man through the cell bars. The young man threw liquid, reported to be toilet water, on one of the guards, at which point the guard reached his arm inside the cell through the bars and sprayed the young man with mace. Video shows the guards running off the tier but returning several minutes later wearing gas masks. There were at least two other youth

---

[13] The Court's use of the term "guards" refer to the Juvenile Justice Specialists employed by The Office of Juvenile Justice.

locked in adjacent cells. The youth who was maced and the youth who are in neighboring cells were left in their cells for six to seven minutes.

Nelson, now the Deputy Secretary of the agency, called the mace incident unacceptable, yet there is no evidence of any corrective training or reprimand of the guard. JJS McKinley testified that she has seen mace used two to three times. The records show that mace was used five times in July alone.[14]

Family contact is also withheld as punishment. Dr. Lee Underwood, the designer of the treatment program at Angola, testified that family engagement is a critical component of the treatment program.[15]

In September 2022, then-Deputy Secretary William A. Sommers passionately told the Court that:

> MAMAS NEED TO HUG THEIR BOYS. WHETHER THEY ARE DRIVING THEM CRAZY OR NOT, WHETHER THEY'RE IN OUR FACILITIES OR NOT, THAT'S -- A MAMA NEEDS THAT TOUCH, THAT BOY NEEDS THAT TOUCH. AND SO WE WILL HAVE THAT TYPE OF VISITATION AT WEST FELICIANA, NO DOUBT.[16]

However, instead of facilitating family engagement, Angola punitively withholds it.

Plaintiff's Exhibit 399 is the case file of Youth #5. It documents that his mother was very involved. She called and video conferenced with her son at every opportunity, but for three consecutive weeks, she was told that she would not be permitted to speak with her son because of his behavioral infractions.

Further, the testimony revealed a culture of correction and punishment rather than rehabilitation. Juvenile Justice witnesses frequently used terms like: "call out," "shake

---

[14] PX 89.
[15] Underwood Testimony on 9/18/23.
[16] Rec. Doc. 153, Sommers Testimony at 82:21-25.

down," and "lockdown."  The Court finds that the Transitional Treatment Unit at Angola is decidedly punitive and not rehabilitative.

Promise #5 Staffing & Services

Angola will be adequately staffed, and "SERVICES WILL BE RAMPED UP."[17]

The education plan calls for three teachers, but there has been one or none most of the time.  The Court acknowledges that one teacher resigned this past summer after an assault by some youth; however, this does not relieve the Office of Juvenile Justice's legal obligation to provide an appropriate education to the youth in its custody.

The treatment plan calls for weekly individual counseling with a social worker. There is no licensed social worker or professional counselor, and the case manager was on site less than 50% of the time in June and July.

The treatment plan calls for two on-site mental health professionals. There are none on site. Mental health is delivered by telemedicine, which, considering the extensive use of cell restriction, is virtually unavailable.

Promise #6 Education and Special Education

The promise was that Angola would have qualified teachers and provide instruction at a ratio of eight students to one teacher, and students would receive 360 minutes per day of instruction as required by state law, "lockdown notwithstanding."

In fact, there has rarely been an adequate number of teachers. For example, from May 22 to July 13, there was one teacher at Angola when two were required. And the logs reveal that educators were at Angola a total of eight partial days in two months; many times they were onsite for mere minutes. There is no teacher instruction provided to youth

---

[17] Rec. Doc. 152, Nelson Testimony at 165:19.

who are locked in their cells. Instead, the youth are given workbooks which the agency calls "distance learning."

Pertaining to Special Education, he Office of Juvenile Justice promised that if a student at Angola has an Individualized Education Plan, or IEP, that requires a psychologist, speech therapist, occupational therapist, or any other special service deemed necessary by the IEP, such service/provider will be provided to the student. There was no evidence of the provision of any special services.

The Court credits Dr. Joseph Gagnon's expert testimony that there is a Systemic Lack of Educational Supports at Angola, specifically:

- Inadequate Teacher time at facility;

- Insufficient number of teachers;

- Unqualified teachers;

- Overuse of Edgenuity, a computer based asynchronistic platform, which is also unavailable when a student is locked in their cell; and

- Insufficient number of special education teachers and lack of fidelity to Individual Education Plans.[18]

While on the topic of education, another circumstance warrants discussion. For several months, the youth incarcerated at Angola went to school in a classroom only three out of the six instructional hours per day. Half the population that was not on cell restriction went to class in the morning and the other half went to class in the afternoon. Why? Because, according to the agency, the youth "destroyed" two of the three classrooms. The Court now displays Defense Exhibits 472 and 473. What is shown are some

---

[18] Gagnon Testimony 8/16/23.

damaged ceiling tiles and dislodged cameras. This is hardly the kind of damage that is an excuse for taking one classroom out of service for five months and another classroom for over two months.  Moreover, Deputy Secretary Nelson testified that he anticipates that there will be property damage from youth in secure care. By his words, he's replaced literally hundreds of television sets, and this type of acting out is just part of serving emotionally disturbed, traumatized youngsters.

The Court finds that the agency's abysmally slow response to making the basic repairs needed, as shown by those photos, shows that the Office of Juvenile Justice is deliberately indifferent to the educational rights and needs of the youth in their care at Angola and quick to lock youth in cells for their administrative convenience.

<u>Promise # 7 Mental Health</u>

The Office of Juvenile Justice promised that mental health counselors would be onsite at Angola eight hours a day, Monday through Friday. Counselors would be on-call on weekends and nights. A psychiatrist would be available by telemedicine.[19]

Currently, eleven of the youth confined to Angola were diagnosed with a "serious mental illness." Yet, mental health is being delivered by telemedicine.  Mental health professionals are not consulted before or during cell restriction. Mental health professionals make no evaluation of the continuation of cell restriction. Mental health professionals do not round or check on the youth who are locked in their cells to determine whether they are a threat to themselves or others.  Mental health professionals are not consulted by staff to see if cell restriction would compromise any particular youth's mental health treatment.

---

[19] Rec. Doc. 594, ¶ 75 (citing 9/6/22 Testimony of Dandridge).

Promise # 8 Social Services

The treatment plan calls for weekly individual counseling and for "Skills training on interpersonal effectiveness, emotional regulation, and distress tolerance [to] occur in group counseling."[20]

There is no licensed social worker or professional counselor at Angola, and there is no evidence of any group counseling. The case manager who, according to the logs was on site less than 50% of the time,[21] is not qualified by education or training to counsel the youth. The Court found the case manager's testimony about her therapeutic interactions with the youth anemic. She recounted her counseling as asking the youth "what's going on" or asking if they "have any issues?" The case manager is tasked well beyond her education and training.

The Office of Juvenile Justice also told the Court that they would be adding Trust Based Relational Intervention therapies. There was no evidence that this was done.

## II.    CONCLUSIONS OF LAW

The applicable law is set forth in the Court's prior ruling denying Plaintiff's First Motion for Preliminary Injunction and remains applicable to the pending motion.  The Court therefore adopts by reference the legal standards and jurisprudence set forth in its September 2022 Ruling[22] and adopts by reference its Ruling finding that Plaintiffs have exhausted their administrative remedies as required by the PLRA.[23]

Injunctive relief is an extraordinary remedy, to be granted only if Plaintiffs clearly demonstrate (1) a substantial likelihood of success on the merits, (2) a substantial threat

---

[20] *See* DX 3, 101, & 118.
[21] PX 93.
[22] *See* Rec. Doc. 79.
[23] Rec. Doc. 243.

that Plaintiffs will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to the Defendants, and (4) that granting the preliminary injunction will not disserve the public interest.[24]  While the first two factors are most critical,[25] the movant is required to "clearly carry the burden as to all four elements;" failure to do so requires a denial of the motion.[26]

### A. Substantial Likelihood of Success on the Merits

#### 1. Section 1983 Eighth and Fourteenth Amendment Constitutional Violations

Plaintiffs assert claims pursuant to 42 U.S.C. § 1983 for unlawful conditions of confinement and deprivation of due process.  Courts around the country have found increased protections for juveniles and persons with diminished capacities from inhumane treatment under the Eighth and Fourteenth Amendments.[27]

##### a. Conditions of Confinement

The Court previously followed the Fifth Circuit's holding in *Morales v. Turman* that: "The [E]ighth [A]mendment applies to juvenile detention centers as well as to adult prisons."[28]  Accordingly, the deliberate indifference standard applies to Plaintiffs' conditions of confinement claims.  Under this standard, a plaintiff must satisfy both the

---

[24] *Gumns v. Edwards*, No. 20-231-SDD-RLB, 2020 WL 2510248, at *3 (M.D. La. May 15, 2020)(Dick, C.J.)(citing *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012) (quotation and citation omitted); *Justin Industries v. Choctaw Securities, L.P.*, 920 F.2d 262 (5th Cir.1990).

[25] *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016).

[26] *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).

[27] *See, e.g., Montgomery v. Louisiana*, 136 S.Ct. 718, 732 (2016) (mandatory life without parole for juveniles violates Eighth Amendment); *Ruiz v. Johnson*, 154 F.Supp.2d 975 (S.D. Tex. 2001) (administrative segregation units for diminished capacity prisoners violate Eighth Amendment standards); *Turner v. Palmer*, 84 F.Supp.3d 880, 883 (S.D. Iowa 2015) and cases cited therein (isolation cells for juveniles unconstitutional).

[28] 562 F.2d 993, 998 n. 1 (5th Cir. 1977). One reported district court decision within this circuit also followed *Morales*. *Vega v. Parsley*, 700 F. Supp. 879, 883 (W.D. Tex. 1988) ("The Fifth Circuit has held that the Eighth Amendment applies to juvenile detention centers." (citing *Morales, supra*)).

subjective and objective requirements of the Eighth Amendment inquiry.[29] To satisfy the objective requirement, the plaintiff must show an "objectively intolerable risk of harm." To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk."

Both *Valentine* and *Farmer* hold that deliberate indifference requires "a subjective 'state of mind more blameworthy than negligence,' akin to criminal recklessness." However, systemic deficiencies in a custodial setting can provide the basis for a finding of deliberate indifference at an institutional level.[30] The cumulative effect of different deficiencies can demonstrate the subjective component of deliberate indifference, as the Supreme Court acknowledged in *Wilson v. Seiter*.[31]

i.      Objective Component

The first, "objective" prong requires a showing that a person "is incarcerated under conditions posing a substantial risk of serious harm."[32]   Conditions of confinement can violate the Eighth Amendment "alone or in combination."[33] If a prisoner challenges a combination of conditions, he must demonstrate that the conditions have "a mutually enforcing effect that produces the deprivation of a single, identifiable human need."[34]

---

[29] *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020)(quoting *Farmer v. Brennan*, 511 U.S. 825, 846, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).
[30] *See Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004)("Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need . . . .").
[31] 501 U.S. 294, 300 (1991) (rejecting a distinction between "one-time" or "short-term" conditions of confinement and "continuing" or "systemic" conditions).
[32] *Farmer*, 511 U.S. at 834.
[33] *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).
[34] *Wilson v. Seiter*, 501 U.S. 294 at 304.

In September 2022, this Court found as a matter of law that "Plaintiff has presented sufficient evidence of a serious risk of psychological harm to juveniles by placing them in facilities that were designed to hold adult prisoners."[35] The plaintiffs proved that placing adolescents in a facility designed to house adult prisoners creates a serious risk of psychological harm. The Court was convinced after hearing the testimony of mental health experts at the first hearing "that transferring emotionally vulnerable adolescents, many of whom have mental health issues and cognitive disfunction, to a prison camp on the grounds of Angola will likely have deleterious psychological ramifications."[36] The Court found that "placing any child in a maximum-security facility designed for adults is unreasonably psychologically harmful to children."[37]  The objective standard is met.

### ii.    Subjective Component

The "subjective" prong requires a showing that "a prison official . . . ha[s] a sufficiently culpable state of mind" in order to be liable under the Eighth Amendment … such a state of mind "is one of deliberate indifference to inmate health or safety."[38] Though the "Eighth Amendment requires consciousness of a risk,"[39] "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official failed to act despite his knowledge of a substantial risk of serious harm,"[40] and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that it was obvious."[41]

---

[35] Rec. Doc. 79, p. 48-49 ("The Plaintiff presented objective evidence of a serious risk of psychological harm").
[36] Rec. Doc. 79, p. 60.
[37] *Id.* at p. 37.
[38] *Id.*
[39] *Farmer*, 511 U.S. at 840.
[40] *Id.* at 42.
[41] *Id.*

Circumstantial evidence, if strong enough, may be sufficient to establish deliberate indifference even without direct evidence of what prison officials knew or thought.[42]

Further, "[e]fforts to correct systemic deficiencies that simply do not go far enough, when weighed against the risk of harm, also constitute deliberate indifference because such insufficient efforts are not reasonable measures to abate the identified substantial risk of serious harm."[43]

The evidence established that the treatment at Angola is knowingly punitive and harmful. The Parties in this matter agree that the goal of juvenile justice is rehabilitation, not punishment. There is no dispute that when a youth is acting out, one of the last resort options is physical restraint. There is no dispute that solitary confinement has a very negative affect on the developing brain of adolescents; it exacerbates already existing mental health problems, it can exacerbate or cause the onset of mental illness and depression, and it causes an increased risk of suicide. The Court finds that cell restrictions as used at Angola are *de facto* solitary confinement in both use and affect. Furthermore, the Court finds that the cell restrictions as used on the youth at Angola meet the statutory definition of solitary confinement in La. R. S. 15:905, which states: "the involuntary placement of a juvenile alone in a cell, room, or other area, except during regular sleeping hours." The state law which proscribes solitary confinement of juveniles and the Deputy

---

[42] *Id*. at 842-43.

[43] *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *39 (M.D. La. Mar. 31, 2021), *reconsideration denied*, No. CV 15-318-SDD-RLB, 2021 WL 5287856 (M.D. La. Oct. 8, 2021) (internal quotation marks, footnotes omitted). *See also Ball v. LeBlanc*, 792 F.3d 584, 595-96 (5th Cir. 2015) (affirming finding of deliberate indifference to the risk of heat injury, despite prison officials' provision of awnings, misting, fans, access to ice water, and daily showers); *Gates v. Cook*, 376 F.3d 323, 340-41 (5th Cir. 2004) (affirming findings of deliberate indifference, despite prison officials' remedial efforts); *Harris v. Angelina Cnty., Tex*., 31 F.3d 331, 335-36 (5th Cir. 1994) (affirming finding of deliberate indifference to risks posed by crowding, although jail officials "buil[t] a dormitory[,] transferr[ed] inmates[, and] provid[ed] alternatives to incarceration—in order to relieve overcrowding").

Secretary's testimony at the September 2022 hearing demonstrate the subjective component of knowing deliberate indifference. The Court concludes that The Office of Juvenile Justice was aware of and indifferent to the serious harm caused by excessively confining adolescents in their cells.

### b. Denial of Due Process – Punishment

It is the public policy of the state of Louisiana that commitment of a juvenile to the care of the Office of Juvenile Justice "is not punitive nor is it in any way to be construed as a penal sentence, but as a step in the total treatment process toward rehabilitation of the juvenile[.]"[44]  According to the Louisiana Supreme Court, "the unique nature of the juvenile system is manifested in its noncriminal, or civil, nature, its focus on rehabilitation and individual treatment rather than retribution, and the state's role as *parens patriae* in managing the welfare of the juvenile in state custody."[45]

Like a pretrial detainee, a juvenile can demonstrate that he was subjected to unconstitutional punishment in either of two ways: (1) by showing "an expressed intent to punish on the part of the detention facility officials," or (2) by showing that a restriction or condition is not rationally related to a legitimate government objective or is excessive in relation to that purpose.[46]

The Court finds that excessively confining adolescents in their cells, the untrained and undocumented use of handcuffs, the use of mace in the manner depicted in Exhibit 440, and the systematic denial of family interactions for punitive reasons violate the Fourteenth Amendment.

---

[44] La. Rev. Stat. Ann. § 15:906(B).
[45] *In re C.B.*, 708 So.2d 391, 396-7 (La. 3/11/98).
[46] *Id.* at 538–39, 99 S.Ct. 1861; *see also Kingsley*, 576 U.S. at 398.

2.  <u>Violations of the ADA and RA</u>

To succeed on claims under Title II of the ADA and Section 504 of the Rehabilitation Act, Plaintiffs must show that: 1) they have a qualifying disability; 2) that they were denied the benefits of certain programs, services, or activities for which a public entity is responsible; 3) that any discrimination is by reason of their disability; and 4) that the public entity in question receives federal financial assistance.[47]

A person with a disability, under the ADA and the Rehabilitation Act, is any individual who has a "physical or mental impairment that substantially limits one or more major life activities" that is recorded or which an individual is regarded as having.[48]  Major life activities include "learning, reading, concentrating, thinking, communicating, and working."[49]

Defendants The Office of Juvenile Justice and DPSC/DOC are public entities regulated by Section 504 and the ADA.[50]  Named Plaintiffs and the Disabilities Subclass qualify as persons with disabilities under the ADA and Section 504 of the RA, as they have learning disabilities and/or mental health disabilities, including PTSD, that impact major life activities such as sleeping, concentrating, thinking, and learning.[51]

"The ADA recognizes a 'methods of administration' claim that prohibits public entities from using "criteria or methods of administration . . . [that] have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of

---

[47] 42 U.S.C. § 12132; 29 U.S.C. § 794(a); *see also, Tellis v. LeBlanc*, No. CV 18-541, 2021 WL 4267513, at *8 (W.D. La. Sept. 20, 2021).
[48] 42 U.S.C.A. § 12102(1) (West) (incorporated by reference into the Rehabilitation Act under 29 U.S.C.A. § 705(20)(B) (West)).
[49] 42 U.S.C.A. § 12102(2) (West).
[50] 42 U.S.C. § 12131(1).
[51] *See* 42 U.S.C.A. §§ 12102(1)-(2).

disability."[52] Based on the record evidence in this case, the Court finds that Plaintiffs are substantially likely to succeed in showing that, because of their disabilities, they are being denied necessary services to which they are entitled as a matter of law.

### B.  Substantial Threat of Irreparable Injury

"'Irreparable harm requires a showing that: (1) the harm to Plaintiff[] is imminent (2) the injury would be irreparable and (3) that Plaintiff[] ha[s] no other adequate legal remedy.'"[53]  The Court previously held that Plaintiffs satisfied this prong, and the current record further supports this finding in the following ways:  1) the psychological harm of being in adult prison cell has already been heavily detailed by the Court; 2) there is new evidence of the excessive and/or unwarranted use cell restriction/macing which further demonstrates psychological harm; and 3) the lack of education, mental health, and rehabilitative services furthers the harm to children and sets them back even further.

### C.  Balance of Harms/Public Interest Factors

The final two elements of the preliminary injunction standard—the balance of the harms and whether an injunction will disserve the public interest—may be considered together. "These factors merge when the Government is the opposing party."[54] Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."[55] "In exercising their sound

---

[52] *Tellis*, 2021 WL 4267513, at *8 (internal citations omitted).
[53] *J.H. by and through N.H. v. Edwards*, 2020 WL 3448087 at *44 (quoting *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 608 (N.D. Tex. 2006) (citing *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975))).
[54] *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).
[55] *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."[56]

As the Court held previously, and the fact remains true, the Office of Juvenile Justice has a strong interest in maintaining safety and security within its secure care facilities. "But invoking safety and security does not provide corrections officials with *carte blanche* to deprive incarcerated youth of the guarantees promised by the [Constitution]."[57] Furthermore, "[p]rotection of children from violations of constitutional rights is clearly in the public interest."[58] Indeed, the Fifth Circuit holds that an injunction does not disserve the public interest when it prevents constitutional deprivations.[59] Stated another way, injunctions preventing the violation of constitutional rights are "always in the public interest."[60]

In the Court's September 2022 Ruling denying the Plaintiffs' Motion for Injunction, the Court found that the untenable – "locking children in cells at night at Angola" – must yield to the intolerable – "the threat of harm these youngsters present to themselves and others."[61]    However, the Court's balancing of harms and consideration of the public interest factors was premised on the Office of Juvenile Justice's promises that it would not violate the constitutional or statutory rights of any youth placed at the Angola facility. The record of promises made and promises broken demonstrates that these youth's

---

[56] *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (citation omitted).
[57] *V.W. v. Conway*, 236 F.Supp.3d 554, 589 (N.D. N.Y. 2017).
[58] *Doe v. Hommrich*, 2017 WL 1091864, *3 (M.D. Tenn. Mar. 22, 2017).
[59] *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014).
[60] *See Ingebretsen on behalf of Ingebretsen v. Jackson Public Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *see also, e.g., G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994); *Charles H. Wesley Educ. Fdn., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005). *Deerfield Med. Ctr.*, 661 F.2d at 338-39.
[61] Rec. Doc. 79, p. 2

constitutional rights are being violated. The treatment unit at Angola is both untenable and constitutionally intolerable.  There is no "public interest" served by violating a person's constitutional rights. The Office of Juvenile Justice's broken promises tipped scales in the balance of harms consideration.

### D.    Bond

A federal court may waive the bond requirement pursuant to Federal Rule of Civil Procedure 65(c).[62] The Court finds that waiving the bond is appropriate in this case; the plaintiffs are indigent,[63] and the Plaintiffs have brought this suit to enforce constitutional rights.[64] Accordingly, no bond is imposed.

## III.    CONCLUSION

For the oral reasons given, the Plaintiffs' Second Motion for Preliminary Injunction is GRANTED.[65]

Defendants are hereby enjoined from housing youth in the Office of Juvenile Justice custody at BCCY-WF referred to herein as Angola.

Defendants are ordered to move the youth from the Angola facility, the BCCY-WF, no later than Friday September 15th, 2023.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 8th day of September, 2023.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[62] *See also*, *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.,* 636 F.2d 1084, 1094 (5th Cir. Unit B 1981); *Corrigan Dispatch Co. v. Casa Guzman, S.A.,* 569 F.2d 300, 303 (5th Cir.1978).
[63] *See Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977).
[64] *See City of Atlanta*, 636 F.2d at 1094.
[65] Rec. Doc. 163.