UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ALEX A., by and through his guardian,** Molly Smith; **BRIAN B.**; and **CHARLES C., by and through his guardian,** Kenione Rogers, individually and on behalf of all others similarly situated | **CIVIL ACTION** <br><br> **NO. 22-573-SDD-RLB** |
| **VERSUS** | |
| **GOVERNOR JOHN BEL EDWARDS,** in his official capacity as Governor of Louisiana; **WILLIAM SOMMERS,** in his official capacity as Deputy Secretary of the Office of Juvenile Justice, **JAMES M. LEBLANC,** in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections | |

## ORDER

Before the Court is Plaintiffs' Motion to Enforce this Court's Order Permitting Access to OJJ Youth in the Jackson Parish Jail ("Motion to Enforce"). (R. Doc. 229). The motion is opposed. (R. Doc. 303). Plaintiffs filed a reply. (R. Doc. 306).

**I.    Background**

On August 19, 2022, the plaintiff Alex A. commenced this putative class action on behalf of certain individuals under the secure care of the Office of Juvenile Justice ("OJJ") to obtain injunctive relief preventing their transfer from the Bridge City Center for Youth ("BCCY") to a location at the Louisiana State Penitentiary at Angola known as the Bridge City Center for Youth at West Feliciana ("BCCY-WF"). (R. Docs. 1, 96).

On September 23, 2022, the district judge denied Alex A.'s Motion for Preliminary Injunction, allowing the transfer of the youths to BCCY-WF based on certain promises regarding the temporary nature of the facilities and the conditions of confinement. (R. Doc. 79).

The operative pleading in this action is the First Amended Class Action Complaint filed by Alex A., Brian B.,[1] and Charles C. (collectively, "Plaintiffs") on behalf of themselves and others similarly situated against Governor John Bel Edwards, Deputy Secretary of the OJJ Williams Sommers,[2] and the Secretary of the Louisiana Department of Public Safety & Corrections ("DOC") James M. LeBlanc (collectively, "Defendants"). (R. Doc. 96). Plaintiffs seek declaratory and injunctive relief under 42 U.S.C. § 1983 for violation of the Fourteenth Amendment (Count I), declaratory and injunctive relief for violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Count II), and declaratory and injunctive relief for violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Count III). (R. Doc. 96 at 35-39).

Among other things, Plaintiffs filed a Motion for Class Certification (R. Doc. 99) and second Motion for Preliminary Injunction (R. Doc. 163).

On August 31, 2023, the district judge granted Plaintiffs' Motion for Class Certification, appointing the Plaintiffs as class representatives for the following class:

> [A]ll youth who are now or will be in the custody of OJJ who have been, might be, or will be transferred to the OJJ site (the "Transitional Treatment Unit" or "TTU") at Angola or another adult prison (the "Principal Class"), including a subclass of all current and future youth with disabilities within the meaning of the ADA and Section 504 of the Rehabilitation Act in the custody of OJJ who have been, might be, or will be transferred to the OJJ site at Angola or another adult prison (the "Disabilities Subclass").

(R. Doc. 243 at 8).[3] The district judge also designated Plaintiffs' counsel as Class Counsel under Rule 23(g) of the Federal Rules of Civil Procedure. (R. Doc. 243 at 21).

---

[1] Brian B. is now deceased. (R. Doc. 162). Accordingly, Alex A. and Charles C. are the only remaining named "Plaintiffs" in this action.
[2] Deputy Secretary Otha "Curtis" Nelson, Jr. has been substituted in place of Deputy Sommers by operation of law. *See* Fed. R. Civ. P. 25(d).
[3] The district judge's ruling does not specifically define this class, which was proposed by Plaintiffs. Given that the district judge granted Plaintiffs' Motion for Class Certification, this proposed class definition is the governing class definition.

2

On September 8, 2023, finding that the OJJ broke virtually every promise it had made, the district judge granted Plaintiffs' Second Motion for Preliminary Injunction, enjoined Defendants from housing youth in OJJ custody at BCCY-WF, and ordered Defendants to move the youth from BCCY-WF no later than September 15, 2023. (R. Doc. 257; *see* R. Doc. 267). Defendants appealed the foregoing rulings to the Fifth Circuit. (R. Doc. 259).

On September 15, 2023, Defendants moved the youth housed at BCCY-WF to the Jackson Parish Jail (the facility name used by Plaintiffs) or the Jackson Parish Juvenile Facility (the facility name used by Defendants) in Jonesboro, Louisiana (the "Jackson Facility"). (R. Doc. 229-1 at 1-3; R. Doc. 303 at 2; R. Doc. 303-1 at 1).[4]

On October 16, 2023, the district judge held a hearing, in part, on Plaintiffs' Class Motion for Access to Counsel (R. Doc. 262). In granting this motion, the district judge stated, in relevant part, the following:

> The Office of Juvenile Justice is ordered to promptly facilitate opportunity for class members to have a face-to-face meeting with class counsel;
>
> Consent to meet with class counsel shall be obtained from the class member prior to meeting with class counsel in the following manner. Prior to a meeting with class counsel, the class member shall be informed by one representative of OJJ, in the presence of class counsel, that there is a class action, that the youth is a member of the Class, that the members of the Class are represented by class counsel, that the class member is entitled to meet privately with class counsel but is not obliged to meet with class counsel.
>
> Counsel shall confer to determine which youth are subject to possible transfer to the TTU. All youth presently in a TTU facility are class members and class counsel shall have access to them.
>
> Any further issues related to this process shall be presented to the Magistrate Judge for resolution.

---

[4] As discussed below, there remains a dispute regarding whether the Jackson Facility is an "adult prison" for the purposes of the class definition.

3

(R. Doc. 293 at 2).

On October 24-25, 2023, Plaintiffs' counsel met with 22 youth at the Jackson Facility. (*See* R. Doc. 299-1 at 3; R. Doc. 303 at 3). It appears that there is no dispute that these 22 youth were previously housed at BCCY-WF and were transferred to the Jackson Facility.

On November 1, 2023, Plaintiffs' counsel requested to meet with the 22 youth, as well as "any other new class members detained at the facility since the last visit to class members" by Plaintiffs' counsel, on November 3. (*See* R. Doc. 299-4 at 5). Defendants denied the request, stating the following:

> First, OJJ cannot entertain requests to meet with large numbers of youth on such short notice. While the attorney visit policy requires that attorneys make their requests at least 24 hours in advance of the requested legal visit, this is a minimum requirement. When you seek to meet with numerous youth, more time is required so that OJJ can make plans to logistically accommodate such a request.
>
> Second, the attorney visits policy limits the number of youth with whom attorneys can meet at any one time (10) and the total number that attorneys can visit on a single day (20). Additionally, these maximum limits are subject to the availability of space and security constraints, and the facility directors are granted discretion to provide additional limits if the need exists. Your request exceeds these limitations. At the Jackson Parish facility, OJJ can accommodate visits with a maximum of five (5) youth at any one time and with a maximum of ten (10) youth in any given day.
>
> Third, as you are aware, there is a dispute between the parties regarding the scope of the c]ass. OJJ disagrees with plaintiffs' position that any youth other than those who were previously housed at BCCY-WF is a member of the class. As discussed, the Jackson Parish facility is a collocated juvenile and adult facility. Accordingly, the youth who were never housed at BCCY-WF and who have subsequently been transferred to the Jackson Parish facility are not members of the class.
>
> Finally, the attorney visits requests being submitted by you and your colleagues are unreasonable and are significantly interfering with OJJ's ability to administer its system. While youth are entitled to have access to their attorneys, the access rights are not unfettered and OJJ's obligation is to allow for reasonable access. In order to continue allowing access to the youth who are members of the class, we propose the following:
>
> 1. Class counsel will be allowed in-person or Zoom meetings with the class members every other Friday;

      2.      Class counsel shall submit to OJJ a list of the youth with whom class counsel seeks to meet at least seven (7) days in advance of the proposed meeting;

      3.      Class counsel will be permitted to meet with a maximum of five class members at one time;

      4.      Class counsel will be permitted to meet with a maximum of ten class members on any one day;

      5.      Facility directors shall have the discretion to limit the maximum number of class members with whom class counsel may meet at any one time or any one day due to space availability or security concerns.

    If this agreeable, please provide us with a list of the ten youth with whom you would like to meet on Friday, 11/10/2023.

(R. Doc. 299-4 at 4). Plaintiffs' counsel disagreed with the proposed restrictions, stating that they are "an unreasonable and unconstitutional denial of our clients' access to courts." (R. Doc. 299-4 at 2-3). Plaintiffs' counsel noted that on the previous week Plaintiffs' counsel visited with the 22 members of the class at the Jackson facility over the course of two days, including one day in which he visited with 12 youth at once. (R. Doc. 299-4 at 2).

    On November 13, 2023, Plaintiffs filed the instant Motion to Enforce, which seeks an order granting Plaintiffs' counsel access to youth in OJJ custody and housed at the Jackson Facility. (R. Doc. 299).

    On November 14, 2023, the undersigned held a status conference with the parties. (R. Doc. 302). The undersigned ordered the parties to file briefs addressing, among other things, the scope of the certified class, whether a scheduling order should be entered while the preliminary injunction ruling is on appeal, and whether and to what extent discovery (and access to counsel) should be allowed with respect to the Jackson Facility.

    On November 27, 2023, the district judge referred the instant Motion to Enforce to the undersigned for resolution. That same day, the parties filed the briefs ordered by the undesigned. (*See* R. Docs. 307, 308).

5

On December 19, 2023, the Fifth Circuit dismissed the appeal as moot because the 90-day preliminary injunctive period under the Prison Litigation Reform Act ("PLRA") automatically expired on December 7, 2023 (or at the latest December 13, 2023), and vacated the district judge's ruling issuing the preliminary injunction. *See Smith v. Edwards*, No. 23-30634, 2023 WL 8747492 (5th Cir. Dec. 19, 2023). The Fifth Circuit did not address the scope of the certified class.

## II.     Law and Analysis

The district judge has already decided that Plaintiffs' counsel is allowed visitation access to class members. (R. Doc. 293). The sole issues regarding visitation access now before the Court are (A) to what extent are OJJ restrictions on access consistent with the district judge's ruling allowing class members access to counsel, and (B) whether individual youths moved directly to the Jackson Facility fall within the scope of the class as defined by the district judge's ruling.

### A.     OJJ's Proposed Restrictions to Access to Counsel

There is no dispute that "prisoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977). This right is not, however, absolute. *Lynott v. Henderson*, 610 F.2d 340, 342 (5th Cir. 1980). "Even so, limitations of visitation may be imposed only if they are necessary to meet legitimate penological objectives, such as rehabilitation and the maintenance of security and order." *Id*. "Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled in part on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401 (1989).

There is no dispute that Youth Services Policy No. C.1.4 (the "Policy") governs attorney visitation. (*See* R. Doc. 299-5). Among other things, the Policy requires meetings to be

6

scheduled "a minimum of 24 hours in advance" and that the meetings "take place Monday through Friday, excluding holidays, between the hours of 8 a.m. and 4 p.m." (R. Doc. 299-5 at 6). The Policy further provides the following limitation on visits with respect to the number of youth: "Generally, no more than 10 youth may be seen at any one time, and no more than 20 on any one (1) day subject to available space and security constraints. Further limitations may be imposed by the Facility Director if valid reasons exist." (R. Doc. 299-5 at 7). At oral argument, the district judge specifically noted that the "Court expects OJJ to abide by its Policy." (R. Doc. 298 at 28).

There also appears to be no dispute that the default rules provided in the Policy are reasonable. Defendants now argue, however, that the "minimum" requirements of the Policy are subject to change at the discretion of the OFF, and the proposed modifications of the default requirements are "necessary to meet legitimate penological objectives, including rehabilitation and the maintenance of security and order." (R. Doc. 303 at 5). Defendants submit the Declaration of Deputy Secretary Nelson in support of this position. (*See* R. Doc. 303-1).

The Court finds the reasons for necessary deviations from the default requirements in the Policy that are offered in the Declaration to be unconvincing. Paragraphs 6-10 of the Declaration speak in conclusory and generalized terms regarding the need for the additional restrictions:

> 6.  At the Jackson Facility, OJJ is unable to accommodate requests to meet with large numbers of youth on short notice. Legal visits with large numbers of youth pose logistical burdens on the staff of OJJ and the Jackson Facility, as security and administrative personnel must be allocated to facilitate the visits.
>
> 7.  Additionally, meetings on short notice are extremely disruptive to the youth's daily routines and impeded OJJ's ability to provide rehabilitative services to the youth in its custody.
>
> 8.  To facilitate meetings with class counsel at the Jackson Facility, OJJ proposed that these meetings occur every other Friday, OJJ requested that class counsel submit to OJJ a list of the youth with whom they seek to meet at least seven days in advance. These limitations, as permitted by the Policy, will allow

7

> the staff to plan for the meetings and minimize disruptions to the youth's schedules.
>
> 9.  At the Jackson Facility, OJJ is unable to accommodate meetings with large numbers of youth at one time due to space and security constraints. Any time OJJ moves a youth in custody to a new area of the facility, and particularly when the youth will be in a group setting, OJJ must undertake security measures to ensure the safety of the youth, the staff, and the general public. These security measures are even more critical when the youth are classified as high-risk.
>
> 10. To facilitate meetings with class counsel at the Jackson Facility, OJJ limited visitation to no more than 5 youth at one time and no more than 10 youth in one day. These limitations, as permitted by the Policy, will assist the staff in preserving internal order and maintaining safety.

(R. Doc. 303-1 at 1-2). The Declaration provides no specific evidence in support of a finding that the default requirements in the Policy require any modification.

Having considered the record, the Court concludes that the proposed blanket modifications to the default requirements in the Policy are unreasonable. The proposed limitations would effectively limit counsel to visit, at most, **10 class members every other Friday**. Defendants do not adequately explain the need for any of the proposed modifications, including: (1) the significant increase in the default notification period (from 24 hours to 168 hours); (2) the elimination of 9 out of every 10 non-holiday weekdays as available options for visitation in any given two-week period; and (3) the significant reduction of the number of youths available for visitation at any given meeting (down from 10 to 5) or day (down from 20 to 10). Importantly, Defendants make no effort to identify any specific disruptions with respect to space or security concerns caused by the visits on October 24-25, 2023.

Again, the district judge has already concluded that Plaintiffs' counsel shall have access to class members. In the instant ruling, the undersigned merely concludes that the OJJ's proposed additional limitations (in deviation of the default requirements in the Policy that the district judge

8

expected OJJ to follow) are unreasonable given the lack of any evidence in support of a finding that the deviations advance any specific penological objectives.

Accordingly, the Court will require OJJ to provide access to counsel in accordance with the default requirements in the Policy. As required by the Policy, approved counsel must schedule visits "through the Facility Director's office a minimum of 24 hours in advance" and the visits "shall take place Monday through Friday, excluding holidays, between the hours of 8 a.m. and 4 p.m." (R. Doc. 299-5 at 6). The Court notes that 24 hours is the minimum notice requirement. In light of the significant number of visits anticipated and likely preparation involved, it is reasonable to expect plaintiff's counsel to be able to provide a greater notice period for most visits. Approved counsel may not visit more than 10 youth at one time, and no more than 20 on any one day, <u>unless the Facility Director identifies a specific space or security constraint with the particular day at issue</u>. (R. Doc. 299-5 at 7) (emphasis added).

If any space or security constraint is identified with respect to a specific day on which visitation is sought, then the Facility Director must provide to Plaintiffs' counsel a written statement identifying the specific space or security constraint involved with that visit. The parties shall confer regarding any specific concerns in an attempt to reach an accommodation. After denial of a visitation request, Plaintiffs may file a renewed Motion to Enforce. Defendants shall have **7 days** to respond to any such subsequent Motion to Enforce. If a ruling is obtained in Plaintiffs' favor, the Court will issue appropriate sanctions, up to and including a finding of contempt of court.

    **B.**    **The Scope of the Class Encompasses all Youth in OJJ Custody**

The second issue before the Court is whether individual youths moved directly to the Jackson Facility fall within the scope of the class as defined by the district judge's ruling. Defendants argue that OJJ can deny access to such youth on the basis that "the class certified by

9

the Court consists only of those youths who were previously housed at BCCY-WF." (R. Doc. 303 at 7). In contrast, Plaintiffs argue that the defined class includes "all youth in secure care" given the potential, however remote, that they may be transferred to a TTU (whether at BCCY-WF or elsewhere) based solely on "misbehavior." (R. Doc. 307 at 2-3).

    As stated above, the proposed class definition adopted by the district judge is as follows:

> [A]ll youth who are now or will be in the custody of OJJ who have been, might be, or will be transferred to the OJJ site (the "Transitional Treatment Unit" or "TTU") at Angola or another adult prison (the "Principal Class"), including a subclass of all current and future youth with disabilities within the meaning of the ADA and Section 504 of the Rehabilitation Act in the custody of OJJ who have been, might be, or will be transferred to the OJJ site at Angola or another adult prison (the "Disabilities Subclass").

(R. Doc. 243 at 8). The highlighted language precludes any finding, as suggested by Defendants, that the class "consists only of those youths who were previously housed at BCCY-WF." (R. Doc. 303 at 7) (emphasis added). The language of the class definition specifically includes youth who "have been, might be, or will be" transferred to BCCY-WF (the TTU at Angola) or "have been, might be, or will be transferred" to "another adult prison."

    Having reviewed the district judge's ruling on class certification, the undersigned concludes that the class definition is to be read broadly to include all youth in the custody of OJJ who have been, or may potentially be, transferred to BCCY-WF (a renewed possibility now that the district judge's preliminary injunction ruling has been vacated) or a TTU at another adult prison. In addition to the express language of the class definition, the district judge's rationale in adopting the class definition supports this conclusion. In addressing numerosity, the district judge specifically noted that the parties agreed "there are approximately 356 youth in OJJ's secure care custody," and that the "proposed Principal Class and Disability Subclass consist of fluid, transient populations that include youth who might be or are transferred to BCCY-WF." (R. Doc. 243 at 10-11; *see also* R. Doc. 99-1 at 7). Similarly, in addressing commonality and

typicality, the district judge stated that "all class and subclass members are subject to the same referral procedures for transfer to BCCY-WF and may or have experience[d] the same alleged harm of continuous cell restrictions and a lack of educational, rehabilitative, recreation, [and] mental health services." (R. Doc. 243 at 13).

Finally, at oral argument, the district judge stated that "the class certification is any juvenile who is or may be or is subject to transfer to an adult facility." (R. Doc. 298 at 6). Furthermore, noting that the class definition is "rather broad," the district judge further suggested that "whether Jackson Parish Jail is or is not an adult facility, the class extends to any youth that is subject to being transferred to an adult facility." (R. Doc. 298 at 7). In short, the district judge did not limit the class to youth previously housed at BBCY-WF.

For the foregoing reasons, consistent with the terms of this Order and the Policy, Plaintiffs' counsel shall have access to all youth in OJJ custody, whether located, regardless of whether the youth were transferred from BCCY-WF or directly to the Jackson Facility. Regardless of whether the Jackson Facility is a "TTU" or an "adult facility," the youth transferred to Jackson Facility remain subject to potential transfer to BCCY-WF or another adult facility.

### C. Issuance of Scheduling Order

Given the Fifth Circuit's ruling on appeal, the issue of whether the Court should defer entry of a scheduling order is moot. The parties shall submit a joint status report with proposed deadlines in this action within **14 days** of the date of this Order.

After the issuance of a scheduling order, the parties may proceed with discovery regarding the conditions of confinement at BCCY-WF and all other claims and defenses raised in this litigation.

11

The Court will limit, however, any discovery regarding the Jackson Facility until (and unless) the district judge determines whether it is an "adult prison" for the purposes of the class definition. After the issuance of a scheduling order, the parties may conduct limited discovery with respect to whether the Jackson Facility is an "adult prison" and whether it is operating as a TTU. While Plaintiffs' counsel may have access to all juveniles housed at the Jackson Facility for the purposes of litigating the instant class action, the Court will not allow any discovery on the conditions of confinement at the Jackson Facility at this time.[5]

### III. Conclusion

For the foregoing reasons,

**IT IS ORDERED** that Plaintiffs' Motion to Enforce (R. Doc. 229) is **GRANTED.** Plaintiffs' counsel shall have access to all youth in OJJ custody, wherever located, in accordance with the default terms of the Policy. The parties shall bear their own costs.

**IT IS FURTHER ORDERED** that the parties shall submit a Joint Status Report, with proposed deadlines up to and including the dispositive and Daubert motion filing deadlines, within **14 days** of the date of this Order. The Court will set a scheduling conference if necessary. Should the parties agree on the proposed deadlines, the Court will set the remaining pretrial and trial deadlines.

Signed in Baton Rouge, Louisiana, on February 7, 2024.

_____
RICHARD L. BOURGEOIS, JR.
UNITED STATES MAGISTRATE JUDGE

---

[5] The district judge has already suggested that the conditions of confinement at the Jackson Facility would be the subject of a "separate lawsuit." (*See* R. Doc. 298 at 8).