UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ALEX A., by and through his guardian, Molly Smith; BRIAN B.[1]; and CHARLES C., by and through his guardian, Kenione Rogers, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>GOVERNOR JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; WILLIAM SOMMERS[2], in his official capacity as Deputy Secretary of the Office of Juvenile Justice, JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections,<br><br>        Defendants. | Civil Action No. 3:22-CV-00573-SDD-RLB |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' RULE 12(b)(1) MOTION TO DISMISS**

---

[1] Pursuant to Rule 25(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs notified the Court of the death of Brian B. Doc. 162. Brian B. is noted as a Plaintiff until the clerk is ordered to change the caption.

[2] On November 18, 2022, Gov. Edwards announced the resignation of Dep. Sec. Sommers and the appointment of Otha "Curtis" Nelson as his replacement. Because Sommers was sued in his official capacity, Nelson was automatically substituted as a Defendant. Fed. R. Civ. P. 25(d). Gov. Jeff Landry is now the official capacity Defendant instead of Edwards, and as of February 2024, Gov. Landry has appointed Kenneth Loftin as Deputy Secretary, who has replaced Nelson. Doc. 316-2. Landry and Loftin are automatically substituted as Defendants. *Id.* Edwards and Sommers are noted as Defendants until the clerk's office changes the caption.

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................. 1

STATEMENT OF FACTS ............................................................................................................. 2

   This Case Concerns the Risk of Harm to Youth Confined at Angola *or Another Adult Prison Facility* ................................................................................................................ 2

   Defendants' History of Broken Promises Underscores the Ongoing Risk that Youth Will Be Confined in Adult Facilities ................................................................................. 4

   Defendants' Arguments on Appeal Against Mootness Undercut Their Current Motion ......... 5

   Defendants' Efforts to Retain Adult Facilities as Options for Confining OJJ Youth............... 6

   Defendants' Current, Unlawful Use of the Jackson Parish Jail for OJJ Youth ........................ 7

LEGAL STANDARD FOR MOTIONS TO DISMISS UNDER RULE 12(b)(1) ......................... 8

ARGUMENT ................................................................................................................................ 10

   I.  Defendants Do Not Meet the Legal Standard to Prove Mootness Because of the Continued Substantial Risk of Serious Harm to Class Members If Incarcerated at Angola or Other Adult Facilities ................................................................................... 10

      A.  Defendants' Assurances That They Have "Voluntarily Ceased" Incarcerating Youth at Angola Do Not Render This Case Moot. ......................... 12

      B.  This Case is Not Moot Because of the Real Risk that Defendants Will Confine Youth at Angola Again. ...................................................................... 15

      C.  This Case is Not Moot, Because Defendants Currently Confine Youth at the Adult Jackson Parish Jail and Might Use Other Adult Facilities. ................ 16

CONCLUSION ............................................................................................................................. 17

CERTIFICATE OF SERVICE ................................................................................................... 188

Plaintiffs oppose Defendants' Motion to Dismiss[3] this entire case based on alleged mootness.

## INTRODUCTION

Defendants have not met the formidable burden of showing that the case is moot. Contrary to Defendants' assertions, this case is not moot based on their conclusory promises to the Court that they *currently* have "no plans" to use Angola or another adult prison to house children adjudicated delinquent. These promises to the Court are contradicted by their repeated public statements that they may see a need to use Angola again, and the fact that as of March 11, 2024, there are 36 class member youth incarcerated with adults at the Jackson Parish Jail in shocking and abysmal conditions. Declaration of David J. Utter, filed herewith, Attachment 1. For this reason alone, the case is not moot. The case is also not mooted by the Court's granting a preliminary injunction in September 2023 that provided *temporary* relief for 90 days under the plain language of the Prison Litigation Reform Act, nor because the Fifth Circuit found Defendants' appeal of that preliminary injunction itself to be moot.

Defendants mischaracterize the Plaintiffs' claims as well as the Court's definition of the certified class to arrive at their flawed argument that, because they are not *at this very moment* confining children in the former death row cells at Angola prison, the entire case is moot and should be dismissed under Rule 12(b)(1). Defendants rely upon irrelevant case law that is inapplicable to class action injunctive litigation. Indeed, this case continues to present a live and justiciable controversy affecting the rights of members of the certified class: Plaintiff children class members continue to be at substantial risk of serious harm if transferred by Defendants to

---

[3] Doc. 322. In this brief, "Doc." citations refer to District Court ECF filings and "Dkt." citations refer to filings in the Fifth Circuit Court of Appeals.

Angola or another adult prison facility.

From the inception of this litigation, Defendants have repeated the falsehood that the case is only about temporarily closing the OJJ unit at Angola. But Plaintiffs' case is about the risk of harm to children with juvenile delinquency adjudications from being confined in an adult prison or jail by Louisiana authorities. *See, e.g.*, Doc. 96 at 10, 32, 39 ("Plaintiffs seek classwide relief enjoining Defendants from transferring youth to the OJJ site at Angola or on the grounds of any other adult prison" and "Plaintiffs seek to represent . . . all current and future persons held in OJJ's secure or other custody who have been or might be transferred to the OJJ site at Angola or another adult prison"); Doc. 243 at 8, 21 (Class Certification Order).

The Court should deny Defendants' motion so the parties may engage in discovery for trial and/or attempt to settle this case with a court-enforceable stipulation to not use adult prisons to house children in the state's delinquency system.

## STATEMENT OF FACTS

**This Case Concerns the Risk of Harm to Youth Confined at Angola *or Another Adult Prison Facility***

Before the State confined youth at Angola, Defendants argued that present confinement at Angola was necessary for a constitutional violation, but the Court was clear that *risk* of harm is the operative standard under which Fourteenth (and Eighth) Amendment claims are judged in this context. Doc. 79 at 44, citing *Farmer v. Brennan*, 511 U.S. 825, 846 (1994). Even after the Court granted the second motion for preliminary injunction in September 2023 ordering Defendants both to transfer children out of Angola *and* to cease future use of that site – Defendants have continuously mischaracterized the case as concerning only the current confinement of youth there. *Compare, e.g.,* Doc. 303 at 7 ("OJJ's position [is] that the class as

2

certified by the Court consists only of those youth who were previously housed at BCCY-WF"), *with* Doc. 314 at 10-12 (Court's Order, at 11, citing Doc. 298 at 6: "at oral argument, the district judge stated that 'the class certification is any juvenile who is or may be or is subject to transfer to an adult facility.'"). Asserting time and again that Plaintiffs' claims are only about the current use of Angola does not make it so. It is clear that the litigation encompasses the risk to class members of being confined at Angola in the future, or at "another adult prison." Doc. 96 at 10, 32; Doc. 243 at 8.

The definitions of the certified Plaintiff class and subclass underscore this point. The definitions clearly encompass the risk to all youth in OJJ custody of being confined at Angola *or another adult prison*. The principal class consists of:

> [A]ll youth who are now or will be in the custody of OJJ who have been, might be, or will be transferred to the OJJ site (the "Transitional Treatment Unit" or "TTU") at Angola *or another adult prison* (the "Principal Class").

Doc. 243 at 8, 21 (emphasis added). The disabilities subclass – part of the class as a whole by definition – consists of:

> youth with disabilities . . . in the custody of OJJ who have been, might be, or will be transferred to the OJJ site at Angola *or another adult prison*.

*Id.* Defendants' contention that "youth at a TTU at any 'adult prison'" is the relevant group, Doc. 316-1 at 2, is belied by the wording of the certified class and subclass, which makes clear that the class includes youth at risk of transfer to, or who have been transferred to any adult

3

prison – not merely so-called TTUs[4] – located at adult prisons.[5]

**Defendants' History of Broken Promises Underscores the Ongoing Risk that Youth Will Be Confined in Adult Facilities**

Since the inception of this case, Defendants have proven one thing: promises made by them are promises broken. During the summer of 2022, Defendants promised that the use of the former death row at Angola was temporary until "renovated or new secure housing for these adolescents would be available in April of [2023]." Doc. 267 at 1. In July 2023, then-Deputy Secretary of the Office of Juvenile Justice ("OJJ") Otha "Curtis" Nelson, Jr., was "happy to report" that youth would be "transitioning" out of BCCY-WF in "late-October, maybe mid-November." Testimony before Louisiana's Juvenile Justice Reform Act Implementation Committee, *available at* https://www.youtube.com/watch?v=mfoTa2b1mv-g (https://perma.cc/T84F-58YB) at 29:49 - 30:07 (July 7, 2023). To date, the much-awaited facility is still not fully operational and is "scheduled to open soon, pending final inspections and outfitting with furniture." Doc. 322-1 at 2. Notably, more than 20 months after state officials first promised that a new juvenile facility was on the cusp of opening, Defendants have yet to provide an exact timeline as to when the new facility will be operating fully.

---

[4] The parenthetical wording "the TTU" to describe only "the OJJ site at Angola" in the main Class definition might be misunderstood as limiting the class to only youth at risk of being sent to *a TTU at* any adult prison, *see, e.g.,* Doc. 314, but the wording placement of that parenthetical description of Angola, along with the certified subclass definition, contradict such an interpretation. The subclass definition makes clear that the parenthetical above merely describes the Angola juvenile site, which Defendants labeled a "treatment unit," and logically should not be read to apply to all facilities.

[5] Defendants argue that the prayer for relief section of the Amended Complaint does not explicitly enumerate injunctive relief on other adult prisons, but the intent is clearly articulated in that document in the proposed class definition and allegations paragraphs, and is encompassed by "such other and further relief as this Court deems just, proper, and equitable" in the prayer for relief. Doc. 96 at 10, 32, 39. At most, any confusion in the Amended Complaint is a drafting error.

4

Defendants also promised in the summer of 2022 to "not violate the constitutional rights of the young people" while housed at Angola. Doc. 267 at 1. Among other things, Defendants promised – but did not deliver – that: 1) "Angola would be only for a very small population," 2) children would not be "placed in a cell for 24 hours a day," 3) "treatment at Angola would be rehabilitative and therapeutic," 4) "Angola [would] be adequately staffed," 5) "Angola would have qualified teachers and provide instruction…as required by state law," 6) "mental health counselors would be onsite," and 7) OJJ would "provide appropriate social services." Doc. 267 at 3-5, 8, and 10. Throughout the seven-day preliminary injunction hearing in August 2023, Defendants continued to testify despite overwhelming evidence to the contrary that they were treating the children confined at Angola in a lawful, constitutional manner, but the Court found a likelihood of success on the merits of Plaintiffs' deliberate indifference and disability law claims. *Id.* at 19-20. Given Defendants' extraordinarily harmful history of failing to live up to their promises, the Court should not rely upon any promises now as the basis for granting their motion to dismiss.

**Defendants' Arguments on Appeal Against Mootness Undercut Their Current Motion**

Defendants' arguments on appeal that the Preliminary Injunction was not moot undercuts their current position that the entire case is moot based on their having no "current" plans to re-open Angola. Defendants insisted – after having transferred all youth out of Angola – that in issuing the preliminary relief, "the district court . . . altogether ignored *the strong public interest in maintaining BCCY-WF* for purposes of safety and security." Fifth Circ. App. No. 23-30634, Dkt. 128 at 61 (emphasis added). Defendants also asserted that "[t]he public surely has a strong interest to maintain a facility that can safely and securely detain this [high-risk] population to ensure their treatment and rehabilitation," contending that "BCCY-WF [Angola]

5

is the only OJJ facility that has proven over time that it can successfully do so." *Id.* at 63-64. Defendants further argued that "closure of BCCY-WF is not necessary to comply with the Constitution." *Id.* at 66. Most directly, as recently as December 1, 2023, Defendants "fervently contend[ed]" that "controversy will remain" because "injunctions against the Defendants are also capable (and likely) of repetition." Dkt. 167 at 9, 23 (Defendants' reply brief on appeal). Defendants' assertions on appeal suggest the very real possibility that Angola or another adult prison or jail will be used once again to confine youth with delinquency adjudications.

**Defendants' Efforts to Retain Adult Facilities as Options for Confining OJJ Youth**

Defendants' non-committal promises in their brief in support of this motion to dismiss continue this line of argument. *See, e.g.,* Doc. 322-1 at 5 ("OJJ *currently* has no plans to reopen BCCY-WF for housing youth in OJJ custody"; "For the *foreseeable future*, DOC intends to house only adult inmates at the Reception Center.") (emphasis added). Little weight can be given to the State's claim that the "completion of construction and renovations at SCY-Monroe obviates the need for housing youth at BCCY-WF," *Id.* at 5, since Defendants' position is that Angola is the only site proven to meet OJJ's needs. *See* s*upra*. Defendants are litigating mightily to retain the option to confine youth in OJJ custody at Angola and other adult facilities, and go out of their way to leave room for the possibility that circumstances may change in the future, which they anticipate will require the use of Angola or another adult facility.

Recent legislative action is likely to increase the length of stay for youth detained in OJJ custody. There is evident intention to make the system less rehabilitative and more punitive, and it would not be inconsistent for Defendants to change course and re-open Angola or continue confining children in other adult prisons or jails. In one of his first official acts, Governor Jeff Landry convened an extraordinary session in the state legislature to "begin[] to fulfill the

6

campaign promises [he] made" on criminal and juvenile justice. Speaking about the juvenile justice system, he opened the session with this sweeping statement: "These juveniles are not innocent children any longer; they are hardened criminals. They violently attack our citizens, our law enforcement officers, and even our juvenile correction officers without hesitation." Office of the Governor, "Governor Landry Opens Special Session to Address Crime in Louisiana," (Feb. 19, 2024), available at https://gov.louisiana.gov/index.cfm/newsroom/detail/4425 [https://perma.cc/D4DK-F99B]. This Court has heard similar justifications for the incarceration of youth with delinquency adjudications at Angola. It would not be surprising if Defendants use similar justifications to excuse confining youth in unconstitutional conditions at other adult facilities. Sadly, this has already begun to occur in Jackson Parish.

**Defendants' Current, Unlawful Use of the Jackson Parish Jail for OJJ Youth**

Defendants' commitment to a more punitive approach is consistent with their continuing use of the adult Jackson Parish Jail to confine youth in OJJ custody, where youth are treated as adults and housed with adults. Declaration of Heather Barrow, filed herewith, at ¶¶ 4-14 (summarizing class member youths' experiences at Jackson); Utter Decl. at Attachment 2 (ARP grievances filed by numerous class member Plaintiffs held at the Jackson jail). Like the constitutional violations at Angola, discovery will show that Jackson is an adult jail, where OJJ youth are subjected to the wanton use of excessive force including chemical spray and use of "shock gloves," denial of mental health services, no rehabilitation services, extended confinement periods that require youth to be locked all day in cells with others, denial of family visitation, requirements that youth pay for clothes, food, and phone calls home, and denial of free and appropriate education services. Additionally, the Jackson Parish Jail has been staffed

7

almost completely by Sheriff's Office personnel rather than OJJ staff. Especially with the recent legislative changes, and given the Governor's public statements and actions, there is a significant risk that Defendants will confine youth at adult facilities, including but not limited to the Jackson Parish Jail, in the future. As a result, this litigation is far from moot.

## LEGAL STANDARD FOR MOTIONS TO DISMISS UNDER RULE 12(b)(1)

As a threshold matter, Defendants mischaracterize the standard for a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). Motions filed under Rule 12(b)(1) allow a party to challenge the subject matter jurisdiction of the Court. *See generally* Wright & Miller, Fed. Prac. & Proc. § 1350. But Plaintiffs are not required in response to a 12(b)(1) motion, as Defendants contend, to "show that they have sustained or are immediately in danger of sustaining a direct injury." Doc. 332-1 at 6. Nor do Plaintiffs need to prove all factual claims in opposing a motion to dismiss; in this posture, Plaintiffs' factual allegations must be "accepted as true." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Assuming the veracity of the well-pleaded factual allegations, the Court must then determine "whether they plausibly give rise to an entitlement for relief." *Id.* at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citation omitted). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

In considering a Rule 12(b)(1) motion, the Court may find a plausible set of facts to support subject matter jurisdiction and to reject the motion, by considering any of the following: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Barrera-Montenegro v. United States,* 74 F.3d 657, 679 (5th Cir. 1996) (citation

8

and quotations omitted). In deciding a Rule 12(b)(1) motion, the Court may rely on allegations outside the complaint without converting a motion to dismiss into a motion for summary judgment. *Causey v. Sewell Cadillac-Chevrolet, Inc.,* 394 F.3d 285, 288 (5th Cir. 2004) (citing *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498-99 (5th Cir. 2000)); *see Williams v. Wynne*, 533 F.3d 360, 364-65 n.2 (5th Cir. 2008) (noting that the Rule 12(b)(1) and Rule 12(b)(6) standards of review are similar, Rule 12(b)(1) permits a court to consider a broader range of materials); *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.,* 336 F.3d 375, 379 (5th Cir. 2003) (holding that in a 12(b)(1) motion, courts may consider matters of public record or subject to judicial notice without converting into a summary judgment motion).

When the issues of jurisdiction and the facts of a plaintiff's claim are intertwined, however, a court should not dismiss under Rule 12(b)(1) unless a narrow exception applies. *See Clark v. Tarrant County, Tex.,* 798 F.2d 736, 741-42 (5th Cir. 1986) (citing *Bell v. Hood,* 327 U.S. 678, 682-83 (1946)). These exceptions arise when a claim "clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or . . . is wholly insubstantial and frivolous." *Bell,* 327 U.S. at 682-83, *accord Clark,* 798 F.2d at 742. Otherwise, the Court may assume jurisdiction in order to make a ruling on the merits at some future time. *Roberts v. Corrothers*, 812 F.3d 1173, 1177 (9th Cir. 1987) (citing *Augustine v. United States,* 704 F.2d 1074, 1077 (9th Cir. 1983)). For example, in *Eubanks v. McCotter*, the Fifth Circuit reversed a district court's dismissal under 12(b)(1) of a case brought by incarcerated people against the Texas prison system because it was not immaterial or frivolous. 802 F.3d 790, 793 (5th Cir. 1986). The Fifth Circuit held:

> The appellants claim that officials of the Department of Corrections have deprived them of rights secured by the Constitution under color of state law in violation of § 1983. They invoked general "federal question" jurisdiction pursuant to 28 U.S.C.

9

> § 1331. This is a classic example of a case in which the federal cause of action and federal jurisdiction are interdependent. Thus, the only question is whether the appellants' claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction" or if "such a claim is wholly insubstantial and frivolous." This case does not fall within either of those exceptions.

*Id.* Plaintiffs' claims in this case clearly are not immaterial, wholly insubstantial, or frivolous.

The class member youth have a "living dispute":

> So long as the court is willing to construct a class whose members have a living dispute, mootness disappears. Only the limits of class-action procedure remain, and the limits can be readily adjusted.

§ 3533.9.1 Wright & Miller, Class Actions, 13C Fed. Prac. & Proc. Juris. § 3533.9.1 (3d ed.)

Due to the numerous outstanding and disputed factual issues, this Court should deny Defendants' 12(b)(1) motion so that the parties can continue with discovery and trial.

## ARGUMENT

**I.    Defendants Do Not Meet the Legal Standard to Prove Mootness Because of the Continued Substantial Risk of Serious Harm to Class Members If Incarcerated at Angola or Other Adult Facilities**

A case is moot "when there are no longer adverse parties with sufficient legal interests to maintain the litigation or when the parties lack a legally cognizable interest in the outcome of the litigation." *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 915 (5th Cir. 2008) (cleaned up).[6] The

---

[6] Notably, Defendants improperly conflate the doctrines of standing and mootness in their brief. These are two different doctrines, as Plaintiffs have briefed before. Doc. 322-1 at 6. Indeed, in *Lyons*, which Defendants cite repeatedly to argue mootness, the Supreme Court discussed at length that Mr. Lyons' claims of violations of his constitutional rights were not moot, but that the holding had to do with his *standing* to seek future injunctive relief. *See generally City of Los Angeles v. Lyons*, 461 U.S. 95, 108-11 (1983). The Supreme Court has further detailed the conceptual distinction between mootness and the other Article III justiciability doctrines such as standing or ripeness. In *Laidlaw*, the Court emphasized that there is a "distinction between mootness and standing" and that mootness is *not* "simply standing set in a time frame," despite previously referring to it as such, because "if mootness were simply 'standing set in a time frame,' the exception to mootness that arises when the defendant's allegedly unlawful activity is 'capable of repetition, yet evading review,' could not exist." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*

availability of even a "partial remedy" or a "possible remedy" is "sufficient to prevent this case from being moot." *Church of Scientology of Calif. v. United States*, 506 U.S. 9, 13 (1992). And in the context of class action suits, such as this one, once a court certifies a class, a case will not be mooted even if the class representative's claim becomes moot, because the mootness doctrine is "flexible." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980); *see also Sandoz*, 553 F.3d at 920 (in a Rule 23 class action, any possible mootness of the claims of the named plaintiff does not moot the entire case nor a putative class's claims). Other than to misstate the class definition, Defendants fail in their brief supporting this motion to address the mootness standards in the context of class action litigation. *See* Doc. 322-1 at 6.[7]

Defendants' citation to Fifth Circuit and district cases related to transfer out of a prison are inapposite for two key reasons. First, as detailed above, this case is not simply about the conditions specific to Angola. Second, all of the cases Defendants cite – *Herman v. Holiday*, 238 F.3d 660

---

*(TOC), Inc.*, 528 U.S. 167, 190 (2000) (quoting *Arizonans for Official English v. Ariz.*, 520 U.S. 43, 68 n.22 (1997)).

[7] Defendants' citations to *Lyons* and *Spencer* are inapposite as they deal with individual plaintiffs, and not a certified class action. *See Lyons*, 461 U.S. 95 (individual civil rights plaintiff seeking damages and injunctive relief after being beaten by police); *Spencer v. Kemna*, 523 U.S. 1 (1998) (habeas corpus petition brought under 28 U.S.C. § 2254). Defendants' citation to a footnote in *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974) is similarly inapposite and irrelevant. While Steffel involved a putative class action, the case centered on whether *Younger* abstention precluded the district court's issuance of injunctive or declaratory judgment upon the constitutionality of a state criminal statute while a criminal proceeding was pending. 415 U.S. at 454. There is no abstention issue here.

Defendants also point to Plaintiffs' citation of *Harris v. City of Houston*, 151 F.3d 186, 189 (5th Cir. 1998) in Plaintiffs' Fifth Circuit Answering Brief (Dkt. 156-1 at 30) as somehow supporting Defendants' position that the entire case is moot. *See* Doc. 322-1 at 6 n.3. Yet Plaintiffs' position before the Fifth Circuit—which was adopted by that Court, *see Smith v. Edwards*, 88 F.4th 1119, 1124-25 (5th Cir. 2023)— was only that Defendants' appeal *of the September 2023 preliminary injunction* (Doc. 267) was moot given the 90-day automatic expiration imposed by the Prison Litigation Reform Act.

(5th Cir. 2001), *Cooper v. Sheriff, Lubbock Cnty., Tex.*, 929 F.2d 1078 (5th Cir. 1991), *Beck v. Lynaugh*, 842 F.2d 759 (5th Cir. 1988), and *Pitre v. David Wade Corr. Ctr.*, 2008 WL 466160 (W.D. La. Feb. 14, 2008), involved individual *pro se* prisoners and did not involve even a putative class, let alone a certified class. Defendants continue to stubbornly refuse to acknowledge that the instant case is a certified class action, and not a run-of-the-mill case. *See, e.g. Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir. 1985) ("*Absent class certification*, an inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been transferred") (emphasis added) (citation omitted); *see also Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51-52 (1991) (named plaintiffs' release from jail did not render class claims moot).

### A. Defendants' Assurances That They Have "Voluntarily Ceased" Incarcerating Youth at Angola Do Not Render This Case Moot.

Of great significance and relevance here, when a Court is considering a defendant's protestations of reform and compliance in a motion to dismiss because of mootness, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw,* 528 U.S. at 190.[8] Even if all of the issues raised in Plaintiffs' Amended Complaint had been permanently addressed by Defendants—which they have not been, *see infra* pages 15- 17— there is a well-recognized exception to the mootness doctrine holding that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to

---

[8] Defendants ignore *Laidlaw* and fail to set out their alleged proof of meeting the "formidable burden" in their opening brief. Any attempt to do so at the last minute in their reply is waived. *See Dixon v. Toyota Motor Credit Corp.*, 794 F.3d 507, 508 (5th Cir. 2015) ("Arguments raised for the first time in a reply brief are waived.")

12

determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 632 ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot.") The voluntary cessation analysis "traces to the principle that a party should not be able to evade judicial review, or to defeat judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001). "Such [] maneuvers designed to insulate a decision from review … must be viewed with a critical eye," and accordingly, the exception seeks to prevent "a resumption of the challenged conduct as soon as the case is dismissed." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (citing *Waukesha*, 531 U.S. at 283-84). Because of this concern, the burden rests with the defendant to demonstrate "that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Franciscan All., Inc. v. Becerra,* 47 F.4th 368, 376 (5th Cir. 2022) (citations omitted).

A defendant fails to meet the heavy burden to establish that its allegedly wrongful behavior will not recur when the defendant "retains the authority and capacity to repeat an alleged harm." *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014). Courts are particularly unwilling to find that a defendant has shown complete and voluntary cessation when the defendant expressly states that notwithstanding its current or temporary abandonment of a challenged policy or practice, it could return to the policy or practice in the future due to "a desire to return to the old ways." *Citizen Cetner v. Gessler*, 770 F.3d 900, 908 (10th Cir. 2014) (cleaned up); *Town of Nags Head v. Toloczko*, 728 F.3d 391, 394 n.3 (4th Cir. 2013) (same). In the context of litigation about incarcerated peoples' conditions of confinement, courts have refused to find a challenge to an abandoned policy or practice moot when the prison refuses to "promise[] not to resume the prior

13

practice," *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 532 (11th Cir. 2013), or to otherwise "unambiguously terminate[]" the challenged practice, *Doe v. Wooten*, 747 F.3d 1317, 1324 (11th Cir. 2014); *see Porter v. Clarke*, 852 F.3d 358, 365-66 (4th Cir. 2017) (finding that state prison system defendants "refused to keep[] the revised policies in place" and "refuse[ed] to guarantee that it will not revert to the challenged policies" and therefore the litigation was not moot).

By contrast, a defendant can meet the formidable burden of *Laidlaw* when, for example, it enters into an "unconditional and irrevocable" agreement that prohibits it from returning to the challenged conduct. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 93 (2013); *see also Porter*, 852 F.3d at 365 (pointing to prison agency's "refus[al] to agree to a consent decree keeping revised policies in place" to reject mootness argument). Here, Defendants have repeatedly refused offers to enter into such a settlement agreement, and accordingly they have not met the high burden of showing that their current voluntary cessation of the practice of incarcerating children in adult facilities— including but not limited to Angola—is not likely to recur. Therefore, this case is not moot.

Meanwhile, Defendants' assurances ring hollow. Defendants assert that they have no "current" plans to use the facility in the future, pointing to the anticipated completion of construction of a new OJJ facility. Doc. 322-1 at 7. They then, in a conclusory fashion, allege that the instant case is moot. *Id*. Such indefinite assurances are insufficient under controlling Supreme Court doctrine. And based on Defendants' documented statements and actions, it is more than likely that Defendants will indeed incarcerate class member children at Angola or other adult facilities in the future. Indeed, as explained in the Barrow Declaration and Attachment 2 to the Utter Declaration, Defendants are already doing so because the Jackson Parish Jail is an adult facility. The case is not made moot simply because no class member is being confined at Angola at this particular moment.

14

### B. This Case is Not Moot Because of the Real Risk that Defendants Will Confine Youth at Angola Again.

Defendant OJJ transferred all youth out of Angola pursuant to the Court's September 8, 2023 Order. *See* Doc. 278 at 3 ("[o]n September 15, 2023, OJJ transferred all youth from BCCY-WF to a juvenile justice facility at Jackson Parish."); Dkt. 37 (Sept. 15, 2023, Defendants' notice to Fifth Circuit). Defendants have also stated that OJJ has no "current" plans to resume the use of the Angola site, but have not made a binding commitment not to resume use of that site to confine youth. *See, e.g.,* Doc. 316-1 at 8, 9. Defendants' terminology of "for the foreseeable future" and "no current plans" evidences a commitment that is vague as to time period and is indefinite at best. Doc. 316-1 at 10.

Based on Defendants' well-documented track record of unmaterialized "plans," Doc. 267, and their broken promises to operate Angola in a manner consistent with the Constitution and federal disability law there is no reason now to take their vague invocation of "current plans" as a valid commitment not to resume use of the Angola site to incarcerate youth. It is certainly not an enforceable commitment.

Defendants' actions speak far louder than their words. While it may be that, today, Defendants have no "current" plans to use these facilities in the "foreseeable future" to confine children, they have continued to litigate this case – including an appeal after they moved children out of Angola – based on their desire to have the option of the facility in reserve for possible future use. Dkt. 167 at 10-17; *Id*. at 16 n. 12 ("Plaintiffs' [*sic.*] claim 'defendants . . . assert they will not use [Angola] in the future.' . . . . Defendants have never made that assertion. . . . OJJ has repeatedly urged the Court not to shutdown [*sic.*] BCCY-WF."). The Court and the Plaintiff class cannot rely on these vague time periods and intentions.

15

### C. This Case is Not Moot, Because Defendants Currently Confine Youth at the Adult Jackson Parish Jail and Might Use Other Adult Facilities.

Plaintiffs will prove following discovery that the Jackson Parish Jail, where Defendants have confined youth in OJJ custody since at least September 15, 2023 and continue to do so, is an "adult prison." Doc. 314 at 2-3, 10-12 (Court's Order on enforcement and discovery). Plaintiffs' case seeks to bar Defendants from confining class members at Angola or another adult prison, and the evidence available thus far suggests that this issue is far from moot. Defendants' use, for months now, of the Jackson Jail to incarcerate youth in OJJ custody is the primary example and a cautionary tale. *See* Barrow Decl. and Utter Decl. Attachment 2 (youth report, among other things, extended periods of isolation locked in cells, staffing by Sheriff's Office guards rather than trained OJJ staff, rampant use of mace and shock gloves on youth for disciplinary and other reasons, limited schooling, no special education/services, family visits not allowed, guards shouting racist epithets at them); Utter Decl., Attachment 3 ("Offender Orientation Handbook" given to youth in OJJ custody at the Jackson Jail, setting out adult facility characteristics including no family visitation, recreation of only "up to an hour per day", payment required for medical and mental health care requests, no packages allowed, referring to youth as "offenders"). The fact that Defendants are now confining some children at the Cypress unit at Swanson Center for Youth and plan to open the much-delayed new OJJ building/facility at Swanson[9] does not preclude Defendants' confining youth in the Jackson Jail

---

[9] The delays are well-known to this Court. Since announcing that the State would confine youth at Angola 20 months ago. Defendants have pushed back the promised opening date of a new youth facility to create more space from April 2023 to March of 2024, and it is not yet fully open. *Compare* Doc. 316-1 at 8 *with* Doc. 26-8 (Nelson Decl. in support of Defendants' August 26, 2022 opposition to TRO motion); Doc. 26-2 at 9-10 (Defendants' brief in opposition to TRO motion). *See also* Doc. 79 at 3, 17, 23; Doc. 267 at 1-3; Doc. 316-1 at 9.

16

or other adult prisons or jails. Defendant Governor Landry's public statements and the Legislature's recent actions aimed at making the State's juvenile justice system less rehabilitative and more punitive make this risk all the more real.

## CONCLUSION

The case is not moot. For the reasons set forth above, the Court should deny Defendants' request for dismissal, allowing Plaintiffs to proceed with their case in chief seeking declaratory and permanent injunctive relief.

Respectfully submitted, this 15th day of March, 2024.

/s/: *David J. Utter*
DAVID J. UTTER *
Louisiana Bar Number: 23236
WILLIAM R. CLAIBORNE**
Georgia Bar Number: 126363
THE CLAIBORNE FIRM, P.C.
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
david@claibornefirm.com
will@claibornefirm.com

/s/: Hector Linares
HECTOR LINARES
Louisiana Bar Number: 28857
SARA GODCHAUX
Louisiana Bar Number: 34561
STUART H. SMITH LAW CLINIC
LOYOLA UNIVERSITY NEW ORLEANS
COLLEGE OF LAW
7214 St. Charles Avenue, Box 902
New Orleans, Louisiana 70118
(504) 861-5560 Telephone
(504) 861-5440 Facsimile
halinare@loyno.edu
shgodcha@loyno.edu

/s/: David Shanies

/s/: *Christopher J. Murell*
CHRISTOPHER J. MURELL
Louisiana Bar Number: 32075
MEGHAN MATT
Louisiana Bar Number: 39975
MURELL LAW FIRM
2831 St. Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 Telephone
(504) 233-6691 Facsimile
chris@murell.law
meghan@murell.law

*/s/: Nancy Rosenbloom*
NANCY ROSENBLOOM**
New York Bar Number: 2168425
ACLU NATIONAL PRISON PROJECT
125 Broad Street
New York, NY 10004
Telephone: (202) 393-4930
Facsimile: (212) 549-2652
nrosenbloom@aclu.org
*/s/: Corene Kendrick*
CORENE KENDRICK**
California Bar No. 226642
MARISOL DOMINGUEZ-RUIZ**
California Bar No. 345416
ACLU NATIONAL PRISON PROJECT
425 California Street, Ste. 700

DAVID SHANIES**  
New York Bar Number: 4471140  
SHANIES LAW OFFICE  
110 West 40th Street, 10th Fl.  
New York, New York 10018  
Tel. (212) 951-1710  
Fax (212) 951-1350  
Cell (646) 515-2151  
david@shanieslaw.com

San Francisco, CA 94104  
Tel: (202) 393-4930  
Fax: (202) 393-4931  
ckendrick@aclu.org  
mdominguez-ruiz@aclu.org

*/s/*: *Susan M. Meyers*  
SUSAN M. MEYERS  
Louisiana Bar Number: 29346  
LAUREN WINKLER  
Louisiana Bar Number: 39062  
ASHLEY DALTON  
Louisiana Bar Number: 40330  
SOUTHERN POVERTY LAW CENTER  
201 St. Charles Avenue, Suite 2000  
New Orleans, LA 70170  
Telephone: 504-512-8649  
susan.meyers@splcenter.org  
lauren.winkler@splcenter.org  
ashley.dalton@splcenter.org

\* *Lead Counsel*  
\*\*Appearing *Pro Hac Vice*

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of March, 2024, a copy of the foregoing was served upon all counsel of record by electronic transmission.

/s/ *David J. Utter*  
DAVID J. UTTER