## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA


ALEX A., by and through his guardian,
MOLLY SMITH, individually and on behalf
of all others similarly situated                         CIVIL ACTION

VERSUS                                                   22-573-SDD-RLB

GOVERNOR JOHN BEL EDWARDS,
in his official capacity as Governor of Louisiana;
 WILLIAM SOMMERS, in his official
capacity as Deputy Secretary of the
Office of Juvenile Justice,
JAMES M. LEBLANC, in his official capacity
 as Secretary of the Louisiana Department
of Public Safety & Corrections


### RULING

   This matter is before the Court on the Rule 12(b)(1) Motion to Dismiss,[1] filed by

Defendants Jeff Landry, in his official capacity as Governor of Louisiana; Kenneth "Kenny"

Loftin ("Loftin"), in his official capacity as Deputy Secretary of the Office of Juvenile Justice

("OJJ"); and James M. LeBlanc, in his official capacity as Secretary of the Louisiana

Department of Public Safety & Corrections ("DOC") (collectively "Defendants").[2]  Plaintiffs

Alex A. and Charles C. ("Plaintiffs"), on behalf of themselves and the certified Plaintiff

Class, filed an Opposition[3] to Defendants' motion, to which Defendants filed a Reply.[4]

---

[1] Rec. Doc. No. 322.
[2] Since the filing of this lawsuit, the State of Louisiana elected a new governor, Jeff Landry. Because former Gov. Edwards was initially sued in his official capacity, Gov. Landry is automatically substituted as a defendant pursuant to Fed. R. Civ. P. 25(d). Additionally, since Kenneth "Kenny" Loftin had been appointed as the Deputy Secretary of OJJ, he is now automatically substituted as a Defendant pursuant to Fed. R. Civ. P. 25(d).
[3] Rec. Doc. 329.
[4] Rec. Doc. 333.

I.    PRELIMINARY OVERVIEW

When filed, the sole claim in this lawsuit was a challenge to the constitutionality of housing high-risk juvenile offenders on the grounds of an adult prison, namely the Louisiana State Penitentiary at Angola ("LSP" or "Angola").  On Plaintiffs' first request for injunctive relief, the issues before the Court were: 1) whether the use of the Reception Center (the former death row) on the grounds of the LSP was lawful, and 2) if it was lawful, could OJJ provide all constitutionally and statutorily mandated programming and rehabilitative services the youth require.  In particular, a primary issue was whether the former death row structure itself was psychologically harmful to juvenile offenders.  After the first evidentiary hearing, the Court was persuaded by the evidence and testimony presented that the juvenile detention facility at LSP's former death row, named by OJJ as BCCY-WF, would operate as a juvenile facility collocated on the grounds of an adult prison with guarantees that the youth would be shielded from contact with adult inmates.  The Court was also satisfied that OJJ had the plans and structure in place to provide the necessary constitutionally and statutorily mandated programming and rehabilitative services.  On those findings, the Court denied injunctive relief.

As time passed and youth were housed at BCCY-WF, and for a number of reasons, it became clear that OJJ was failing to meet its programming obligations at this facility; it was also failing to uphold the guarantees OJJ made to this Court regarding the number of youth that would be transferred to BCCY-WF and the length of time that the operation of BCCY-WF would be necessary.  Plaintiffs renewed their request for injunctive relief and prayed that the Court to immediately transfer Plaintiff Charles C. and all putative class members then housed at BCCY-WF and to immediately cease transferring any children

in OJJ custody to BCCY-WF.[5]  After a second evidentiary hearing, the Court granted the requested relief and ordered the youth removed from BCCY-WF.

Despite OJJ's removal of youth from BCCY-WF, Plaintiffs persist in arguing that: 1) youth are subject to the risk of transfer back to BCCY-WF or another adult prison; 2) youth are currently unlawfully held at an adult prison in Jackson Parish, Louisiana; and 3) youth are suffering various unlawful conditions of confinement in Jackson Parish. Some of these claims are far afield from where they started.  Plaintiffs appear to expect that they can continuously transform and expand their pleadings well beyond what this case is about - housing juvenile offenders in adult prison facilities, namely Angola.

To the extent juvenile offenders have conditions of confinement claims at a juvenile facility, there is no evidence that those claims have been exhausted, and they are not the subject of this lawsuit.  However, in Plaintiffs' Amended Complaint, they "seek classwide relief enjoining Defendants from transferring youth to the OJJ site at Angola **or on the grounds of any other adult prison**."[6]  The Court utilized this language in crafting the class definition. Thus, Court will consider whether any youth in OJJ custody are being unlawfully housed in an adult prison, subjected to exposure to adult inmates, and/or lacking OJJ juvenile justice specialists at the facility, which would render the juveniles' placement unlawful by statute.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

In July 2022, then-Governor Edwards announced plans to open a temporary secure care facility for the housing of youth in OJJ custody while OJJ completed

---

[5] Rec. Doc. 163-1, pp. 1-2. Plaintiffs alternatively sought injunctive relief regarding several items pertaining to conditions of confinement at BCCY-WF. *Id.* at pp. 2-3.
[6] Rec. Doc. 96, ¶ 26.

construction of a new facility for its transitional treatment unit ("TTU"). The designated facility, identified by OJJ as BCCY-WF, was to be located on the grounds of the Louisiana State Penitentiary at Angola ("LSP" or "Angola").

In response to this public announcement, Plaintiffs filed this lawsuit in August 2022 to enjoin OJJ from operating the TTU on the LSP campus and transferring any juveniles in OJJ custody to that site.[7] Plaintiffs maintained that it was unconstitutional to house them on the grounds of an adult prison and, further, that OJJ could not provide for their statutorily mandated educational and rehabilitative needs.[8]

In September 2022, the Court held an evidentiary hearing on Plaintiffs' first Motion for a Preliminary Injunction and ultimately denied the motion finding that, based on the sworn testimony of witnesses and other evidence presented at the hearing, BCCY-WF at Angola would operate as a juvenile facility preventing any contact with adult inmates at Angola; the rehabilitative and educational needs of the juveniles would be met; and the structural facility would provide a secure environment that would protect the juveniles, OJJ staff, and the public.[9]  BCCY-WF opened in October 2022.  Because the Court's ruling was not a final ruling on the merits, discovery began, and the parties continued to litigate the matter.

Plaintiffs filed a First Amended Class Action Complaint and moved for class certification.[10]  In July 2023, Plaintiffs filed a second Motion for Preliminary Injunction.[11] In August 2023, the Court granted class certification[12] and conducted an evidentiary

---

[7] Rec. Doc. 1.
[8] Rec. Doc. 96.
[9] Rec. Doc. 79.
[10] Rec. Docs. 96, 99.
[11] Rec. Doc. 163.
[12] Rec. Doc. 243.

hearing on Plaintiffs' second injunction motion. The Court granted Plaintiffs' motion and enjoined the use of BCCY-WF as a secure care facility and TTU for juveniles in OJJ custody; the Court further ordered Defendants to remove all juveniles housed at BCCY-WF and enjoined the transfer of any OJJ youth back to BCCY-WF.[13]    Defendants appealed the Court's order to the Fifth Circuit.

On September 13, 2023, the Fifth Circuit stayed this Court's Preliminary Injunction.[14] This notwithstanding, OJJ transferred all juveniles from BCCY-WF to the juvenile unit of the newly-opened Jackson Parish facility.[15] On October 5, 2023, the Fifth Circuit dissolved the stay.[16] On December 19, 2023, the Fifth Circuit dismissed the appeal.[17] The Fifth Circuit never addressed the  merits of the Court's rulings.  The parties have since been engaged in various discovery battles, and Defendants move for dismissal based on mootness.

## III.    ARGUMENTS

Defendants contend OJJ has closed BCCY-WF at Angola,[18] and it has no plans to reopen the facility to hold juveniles.[19] The facility on Angola's campus that housed juveniles currently houses adult women inmates, and it will not house juveniles in the future.[20] Renovations to the Cypress Unit at SCY-Monroe are complete, and the unit is already housing youth in OJJ custody. Further, at the time of this motion, construction of the new facility at SCY-Monroe was essentially complete and was scheduled to be

---

[13] Rec. Doc. 267.
[14] Rec. Doc. 268.
[15] Rec. Doc. 278, p. 3.
[16] Rec. Doc. 291, p. 2.
[17] Rec. Doc. 312.
[18] Rec. Doc. 322-1, p. 7.
[19] Rec. Doc. 322-1, p. 8.
[20] Rec. Doc. 322-1, p. 8.

opened soon.  Defendants also maintain that the use of Jackson Parish Jail for juveniles is permissible because it is a "collocated facility" designed to separately house youth and adults in the same building or complex.[21]  Defendants assert that OJJ is not operating a TTU at SCY-Monroe or the Jackson Parish juvenile facility; it will only establish a TTU at SCY-Monroe, once completed.  For all these reasons, Defendants argue this case is now moot.

Plaintiffs counter that the case is not moot because there is a continued substantial risk of harm of class members being incarcerated at Angola or other adult facilities.[22] Plaintiffs contend Defendants have not shown that their allegedly wrongful conduct will not recur after the case is dismissed,[23] and Plaintiffs maintain there remains a risk that Defendants will transfer youth to an adult facility in the future.[24] Finally, Plaintiffs claim that the issue of youth being confined in adult facilities is not moot because youth are currently being confined in Jackson Parish Jail, which Plaintiffs contend is an adult facility.[25] Plaintiffs substantiate this allegation through reports from youth being held at this facility.[26]

In reply, Defendants state that Plaintiffs have misrepresented the youth population in Jackson Parish in arguing that "there are 36 class member youth incarcerated with adults at the Jackson Parish Jail."[27] Courtney E. Myers ("Myers"), Assistant Secretary for OJJ, attested that, of the 33 individuals at Jackson Parish with active juvenile dispositions, only 10 individuals are currently housed in the juvenile unit at Jackson Parish based on

---

[21] *Id.* at p. 11; Rec. Doc. 322-2, pp. 7-8.
[22] Rec. Doc. 329, p. 10.
[23] *Id.* at p. 13.
[24] *Id.* at p. 17.
[25] *Id.* at p. 18.
[26] *Id.*; Rec. Doc. 329-1, pp. 1-3; Rec. Doc. 329-2, pp. 6-54.
[27] Rec. Doc. 329, p. 1.

their juvenile dispositions.[28]  These 10 youth will be transferred to Monroe once it is open and operational.[29]    Because these youth are in a collocated juvenile facility, their confinement at the Jackson Parish jail does not violate the law.

The remaining individuals are adults who were originally in OJJ custody based on their juvenile dispositions but, after turning 18, are now adult, pre-trial detainees awaiting trial on charges for crimes allegedly committed after they became adults.[30]    Accordingly, these individuals are not currently in OJJ custody, and they will not be returned to OJJ custody unless their "adult charges" are resolved before their juvenile dispositions have expired.[31]

Finally, to the extent Plaintiffs complain about specific conditions of confinement at Jackson Parish, Defendants maintain these are unexhausted claims irrelevant to the claims asserted in this lawsuit, as this Court has previously recognized.[32]

## IV.    LAW & ANALYSIS

### A.    Rule 12(b)(1) Dismissal

When considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, a court may evaluate: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts and the court's resolution of disputed facts.[33] The party

---

[28] Rec. Doc. 333-1, ¶¶ 8-9.
[29] *Id.* at ¶ 10.
[30] *Id.* at ¶ 11.
[31] *Id.* at ¶¶ 12-13.
[32] Rec. Doc. 298, p. 8.
[33] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *In re FEMA Trailer Formaldehyde Products Liability Litigation*, 668 F. 3d 281, 287 (5th Cir. 2012).

asserting jurisdiction bears the burden of proof on a 12(b)(1) motion to dismiss.[34] Thus, the plaintiff "constantly bears the burden of proof that jurisdiction does in fact exist."[35]

A claim is "properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate" the claim.[36] "Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'"[37] "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."[38] "All of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to ... the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government."[39] Thus, mootness presents a question of subject matter jurisdiction which may be resolved through a Rule 12(b)(1) motion.[40]

### B.    Mootness

If "the parties lack a legally cognizable interest in the outcome,"[41] the case is moot. Accordingly, "any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot."[42]

---

[34] *Choice Inc. of Texas v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012) (citing *Life Partners Inc. v. United States*, 650 F.3d 1026, 1029 (5th Cir. 2011)); *Ramming*, 281 F.3d at 161.

[35] *Breaux v. Haynes*, No. No. 15-769-JJB-RLB, 2017 WL 5158699, *2 (M.D. La. Aug. 3, 2017)(citing *Ramming*, 281 F.3d at 161 (citing *Menchaca v. Chrysler Credit Corp*., 613 F.2d 507, 511 (5th Cir. 1980))).

[36] *In re FEMA*, 668 F.3d at 286 (quoting *Home Builders Ass'n, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

[37] *Allen v. Wright*, 468 U.S. 737, 750 (1984).

[38] *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997).

[39] *Id*. at 750 (quotation omitted).

[40] *North Carolina v. Rice*, 404 U.S. 244, 246 (1971).

[41] *Already, LLC v. Nike, Inc*., 568 U.S. 85, 91 (2013) (citation and quotation marks omitted)

[42] *DeOtte v. Nevada*, 20 F.4th 1055, 1064 (5th Cir. 2021) (quoting *Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006)).

There is an exception to mootness, however, that occurs when a defendant voluntary ceases the challenged practice. "'[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'"[43] "In general, a defendant's voluntary conduct moots a case only if 'it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'"[44] But, government entities bear a "'a lighter burden'. . . in proving that the challenged conduct will not recur once the suit is dismissed as moot."[45] The Court presumes that "state actors, as public representatives, act in good faith."[46] Consequently, unless there is evidence to the contrary, the Court assumes "'that formally announced changes to official government policy are not mere litigation posturing.'"[47] Moreover, the government's ability to "reimplement the statute or regulation at issue is insufficient to prove the voluntary-cessation exception."[48]

## C.    Analysis

The Court notes at the outset that it is not the role of this Court to generally oversee the day-to-day operations of the OJJ.  Federal Courts eschew toward "minimum intrusion into the affairs of state prison administration; state prison officials enjoy wide discretion in the operation of state penal institutions."[49]  In a case challenging a state prison transfer policy, the Supreme Court warned against federal courts making decisions regarding "the

---

[43] *Freedom From Religion Found., Inc. v. Abbott*, 58 F.4th 824, 833 (5th Cir. 2023) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 189 (2000)).
[44] *Id* (quoting *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), aff'd sub nom. *Sossamon v. Texas*, 563 U.S. 277 (2011)).
[45] *Id* (quoting *Stauffer v. Gearhart*, 741 F.3d 574, 582 (5th Cir. 2014)).
[46] *Id* (internal citations omitted).
[47] *Id* (quoting *Sossamon*, 560 F.3d at 325).
[48] *Id* (internal citations omitted).
[49] *Williams v. Edwards*, 547 F.2d 1206, 1211-1212 (5th Cir. 1977)(citing *Procunier v. Martinez*, 416 U.S. 396, 404-05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)).

day-to-day functioning of state prisons and involv[ing] the judiciary in issues and discretionary decisions that are not the business of federal judges,"[50] noting that "[t]he federal courts do not sit to supervise state prisons, the administration of which is an acute interest to the States."[51] The same deference is owed to state juvenile justice agencies.[52] Even though adjudicated delinquents are not incarcerated per se, the Fifth Circuit has held that "the deference given to correctional officials in the adult context applies to correctional officials in the juvenile context as well."[53]

With those principles in mind, in the Court's view, the only issue that remains before the Court is whether any OJJ youth are being housed in an adult prison or in a juvenile facility where they are exposed to adult inmates and/or lack juvenile justice programming at the facility as required by law. If OJJ youth are being detained at a juvenile facility in Jackson Parish that is collocated with an adult prison, this does not necessarily violate the law. Federal law contemplates the existence of "collocated facilities" and requires that individuals who work with both juveniles and adult inmates be trained and certified to work with juveniles.[54] This distinction derives from the different objectives of an adult penal incarceration and a rehabilitation-focused juvenile detention.

In connection with their motion, Defendants have provided sworn Declarations by Courtney E. Myers, Assistant Secretary for the Louisiana Office of Juvenile Justice,[55] and James LeBlanc, the current Secretary for the Louisiana Department of Public Safety and

---

[50] *Mecham v. Fano*, 427 U.S. 215, 228-229 (1976).
[51] *Id.* at 229 (citing *Preiser v. Rodriguez*, 411 U.S. 475, 491-492, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973); *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Johnson v. Avery*, 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969)).
[52] *Mabry*, 849 F.3d at 238.
[54] 34 U.S.C. § 11133(12)(B).
[54] 34 U.S.C. § 11133(12)(B).
[55] Rec. Doc. 333-1.

Corrections.[56]  Secretary LeBlanc attests that the Reception Center at Angola, previously BCCY-WF, will house only adult inmates for the foreseeable future.[57]  The Court is satisfied that BCCY-WF is closed, and the Court's injunction not to house juveniles at BCCY-WF remains in effect.

Assistant Secretary Myers attests that "[t]he Jackson Parish Jail is a correctional complex with a section that houses adults and a separate section that houses youth.  The Jackson Parish Jail is a collocated facility."[58]  Myers also explains the breakdown of OJJ youth in Jackson Parish, noting that "[o]f [the] thirty-three (33) individuals at Jackson Parish, twenty-three (23) individuals are currently housed at the Jackson Parish Jail. These are adult-aged individuals who (1) were in OJJ's physical custody on a juvenile disposition, (2) but after turning 18 years old, engaged in behavior that resulted in arrests as adults, and (3) are now adult, pre-trial detainees awaiting trial on an adult charge."[59]

Plaintiff presented the sworn Declaration of Heather Barrow, an Investigator for the Southern Poverty Law Center, who attests that, "[s]ome of the youth, ages 18 or older who remain in OJJ custody up to age 21, have been housed with adults in Dorm A and Dorm B."[60]  She further attests that, "[o]ther youths under 18 who are not housed in the adult dorms or in cells with adults reported they are around adults almost every day. When they are moved, they encounter adults in the hallway or in the cafeteria.  Adults pass their cells on a regular basis, and they can see and/or hear them as they pass by."[61]

---

[56] Rec. Doc. 322-4.
[57] *Id.* at ¶ 5.
[58] Rec. Doc. 333-1, ¶ 6.
[59] *Id.* at ¶ 11.
[60] Rec. Doc. 329-1, ¶ 12.
[61] *Id.* at ¶ 14.

Although the Court is to apply a "lighter burden" to government officials upon considering mootness, the Court has previously found in this matter that Defendants have made promises and representations to the Court that were not trustworthy. The Court agrees with Defendants that this case is not about conditions of confinement at any facility other than BCCY-WF. However, considering the Plaintiffs' Amended Complaint, which broadened the requested relief to "any adult prison," whether OJJ youth are transferred to an adult facility is an issue that remains before the Court.

The Court's comments at the October 16, 2023 hearing in this matter clarify this distinction:

> **THE COURT**:  … IF THEY ARE TALKING ABOUT CONDITIONS GENERALLY AT JUVENILE FACILITIES, THAT'S A DIFFERENT LAWSUIT THAN WE HAVE HERE.[62]
>
> …
>
> **THE COURT**:  … THE ONLY RELEVANCE THAT JACKSON PARISH HAS TO DO WITH THIS CLASS ACTION IS IF THERE ARE CLASS MEMBERS THERE WHO ARE IN AN ADULT FACILITY ARE SUBJECT TO BEING TRANSFERRED -- FRANKLY, YOU GET TO THE CLASS EVEN -- EVEN IF THEY ARE JUST SUBJECT TO BEING TRANSFERRED TO AN ADULT FACILITY, WHICH IS RATHER BROAD, FRANKLY.
>
> SO WHETHER JACKSON PARISH JAIL IS OR IS NOT AN ADULT FACILITY, THE CLASS EXTENDS TO ANY YOUTH THAT IS SUBJECT TO BEING TRANSFERRED TO AN ADULT FACILITY. AND I THINK WHAT MR. UTTER IS TRYING TO PUT IN AS EVIDENCE, THAT THE JACKSON PARISH JAIL IS AN ADULT FACILITY.[63]
>
> …
>
> **THE COURT**:  I AM NOT GOING TO CONSIDER THE AFFIDAVITS FOR PURPOSES OF THE CONDITIONS OF CONFINEMENT. I AM GOING TO CONSIDER THE AFFIDAVITS FOR ONE REASON AND ONE REASON ONLY. I SAW ADULTS LOCKED UP IN JAIL EVERY DAY, THAT'S P-2. THAT'S THE SIGHT AND SOUND OF ADULT PRISONERS. AND THEN P-1, THERE ARE NO JUVENILE JUSTICE SPECIALISTS FROM OJJ AT THE FACILITY. SO AS EVIDENCE -- NOT NECESSARILY DIRECT

---

[62] Rec. Doc. 298, p. 6, lines 10-12.
[63] *Id.* at p. 7, lines 5-15.

EVIDENCE, BUT EVIDENCE FROM CLASS MEMBERS THAT THEY ARE INCARCERATED EITHER WITHIN THE SIGHT AND SOUND OF ADULT PRISONERS OR THEY ARE IN AN ADULT FACILITY. I MEAN, YOU SAID IT'S AN ADULT FACILITY WITH JUVENILE JUSTICE ALSO, WHICH IS WHAT YOU ESTABLISHED AT WEST FELICIANA, AND THE WHOLE QUESTION ABOUT SIGHT AND SOUND OF PRISONERS AND -- OR ADULT PRISONERS AND ALL THAT. SO WHAT WE HAVE IS TWO MEMBERS OF THE CLASS THAT WERE AT JACKSON.[64]

…

**THE COURT**: -- THE COURT IS NOT CONSIDERING THE CONDITIONS OF CONFINEMENT BECAUSE THE CONDITIONS OF CONFINEMENT ARE NOT THE ISSUE IN THIS CASE.[65]

Should all OJJ youth be removed from Jackson Parish and housed in OJJ secure care facilities, this lawsuit will be moot.  But under the circumstances, Plaintiffs have the right to seek discovery to determine whether OJJ youth are improperly being held in an adult facility and/or whether OJJ youth held in the collocated juvenile facility are nevertheless being exposed to adult inmates or lacking monitoring by OJJ juvenile justice specialists. Accordingly, the Court will allow limited, narrowly tailored discovery on these specific issues.  Any other issues of confinement are, as this Court advised the parties previously, a "separate lawsuit."[66]

## V.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss[67] based on mootness is DENIED without prejudice to Defendants' right to re-urge this motion once all OJJ youth

---

[64] *Id*. at p. 19, lines 9-22.
[65] *Id*. at p. 20, lines 18-20.
[66] Rec. Doc. 298, p. 8, line 24.
[67] Rec. Doc. No. 322.

are in OJJ secure care facilities or at the close of discovery.  All discovery matters remain

referred to the Magistrate Judge in accordance with this Ruling.

Baton Rouge, Louisiana, this  4th  day of September, 2024.


_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**