UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ALEX A., by and through his guardian, Molly Smith; BRIAN B.[1]; and CHARLES C., by and through his guardian Kenione Rogers, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>GOVERNOR JOHN BEL EDWARDS,[2] in his official capacity as Governor of Louisiana; WILLIAM SOMMERS,[3] in his official capacity as Deputy Secretary of the Office of Juvenile Justice; JAMES M. LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections,<br><br>        Defendants. | Civil Action No. 3:22-573 (SDD) (RLB)<br><br>**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF RENEWED MOTION TO COMPEL DISCOVERY** |

## INTRODUCTION

Defendants once again misinterpret this Court's orders concerning Plaintiffs' right to limited discovery about the Jackson Parish Jail ("the Jail").[4] And to date, Defendants have

---

[1] On July 14, 2023, pursuant to Rule 25(a)(2) of the Federal Rules of Civil Procedure, Plaintiffs notified the Court of the death of Brian B. Doc. 162. Plaintiffs leave Brian B. as a Plaintiff until the clerk is ordered to change the caption.

[2] Since the filing of this lawsuit, the State of Louisiana elected a new governor, Jeff Landry. Because former Gov. Edwards was initially sued in his official capacity, Gov. Landry is automatically substituted as a defendant. Fed. R. Civ. P. 25(d).

[3] On November 18, 2022, then-Gov. Edwards announced the resignation of Dep. Sec. Sommers and the appointment of Otha "Curtis" Nelson as his replacement. Because Mr. Sommers was sued in his official capacity, Mr. Nelson was automatically substituted as a Defendant. On Feb. 2, 2024, Gov. Landry announced the appointment of Kenneth Loftin as Deputy Secretary of OJJ. *See* https://gov.louisiana.gov/index.cfm/newsroom/detail/4402. Therefore, Mr. Loftin is now automatically substituted as a Defendant. Fed. R. Civ. P. 25(d).

[4] *See, e.g.,* Doc. 360 at 2 (omitting the key portion of the Court's ruling naming "juvenile justice programming," Doc. 353 at 10, and instead claiming incorrectly that "Plaintiffs seek information about every aspect of confinement at the juvenile unit of the Jackson Parish Jail"); *cf.* Doc. 358-1 at 10-14 (Plaintiffs seek to compel discovery about precisely the issues named by the Court.).

1

produced zero documents concerning the Jackson Jail with the exception of OJJ's Memorandum of Understanding with the Jackson Parish Sheriff.[5] As Plaintiffs pointed out in their main brief, the clear language of the Court's Orders states that Plaintiffs are entitled to discovery about whether the Jail is an adult facility because that point is disputed.[6] Further, Plaintiffs are entitled to discovery about whether, for OJJ youth confined at the Jail, there is sight and sound separation from adult detainees, monitoring by OJJ juvenile justice specialists, and "juvenile justice programming."[7]

Defendants seem to assert that the Jail, which confines adults, is not an adult jail when it also confines youth in OJJ custody, thus making it outside the scope of this lawsuit. However, this is not Defendants' unilateral decision to make. This very dispute is the reason the Court has allowed discovery regarding whether the Jail is functionally an adult prison for the class members in this case – youth in OJJ custody.[8] Defendants quote the Juvenile Justice and Delinquency Prevention Act's (JJDPA) definition of "jail or lockup for adults" ("the term 'jail or lockup for adults' means a secure facility that is used by a State, unit of local government, or law enforcement authority to detain or confine adult inmates . . . ." 34 U.S.C. § 11103(22)) but invent a limitation that is not in the law, by claiming the "only question" related to adult facilities is whether "*the juvenile unit of the Jackson Parish Jail serve as a 'secure facility . . . to detain or confine adult inmates.'*"[9] The addition of "juvenile unit" is Defendants' own—it is not in the statute.

---

[5] This is true despite Defendants' statements to Plaintiffs and the Court that they will provide "the documents in their possession, custody, or control that fall within those three limited subject areas." Doc. 358-2, 360 at 2.

[6] Doc. 314 at 11-12.

[7] Doc. 353 at 10, 13.

[8] Doc. 314 at 12.
[9] Doc. 360 at 10 (emphasis added).

2

The Jail confines both adults facing criminal charges and youth in OJJ custody, and the only way to determine whether it is an "adult facility" as relates to the OJJ youth in its custody is to look at the features of the Jail that would distinguish an adult facility from a youth facility.[10] These features are relevant to both questions the Court has allowed: inquiry into (1) whether Jackson is an "adult Jail" for OJJ youth confined there, and (2) whether, if the Court finds OJJ youth are confined in a co-located unit at the Jail, there is (a) sight and sound separation from adults, (b) monitoring by OJJ trained staff, and (c) "juvenile justice programming".[11] Especially in light of the recent publication of a State inspection report finding the Jail deficient in those very respects, the discovery Plaintiffs seek is needed and appropriate.[12]

Defendants do not object to Plaintiffs' request for an order compelling Defendants to preserve documents, including video data, regarding the Jail that may be relevant to this litigation; though they do complain again, and again inaccurately, that Plaintiffs do not identify to which requests such preservation corresponds.[13] Plaintiffs request the Court order that preservation immediately and for the duration of this litigation.

---

[10] Defendants also contend that Plaintiffs are currently seeking discovery into all conditions at the Jail, Doc. 360 at 2, but Plaintiffs have been clear that they limit this motion to issues the Court has allowed, namely sight and sound separation from adults, monitoring by trained OJJ staff, and whether youth in OJJ's custody at the Jail "lack juvenile justice programming at the facility as required by law." Doc. 353 at 10, 13; Doc. 358-1 at 10-14.

[11] The Court ruled that discovery is appropriate regarding whether youth in OJJ's custody at the Jail "are being housed in an adult prison or in a juvenile facility where they are exposed to adult inmates and/or lack juvenile justice programming at the facility as required by law." Doc. 353 at 10.

[12] *See,* Louisiana Department of Children and Families, Licensing Deficiencies Letter and Deficiencies Report Re. Jackson Parish Jail (based on April 5, 2024 State re-inspection), The Lens (Oct. 1, 2024), https://www.documentcloud.org/documents/25177030-jpso-dcfs-licensing-documents#document/p31/a2591374. Plaintiffs discuss the findings below.

[13] Doc. 360 at 7. Plaintiffs do specify the requests, as described in Doc. 337-1 at 6-7, 12 and Doc. 337-3, Ex. 2 (email exchange re meet and confer process).

**LEGAL ARGUMENT**

In their opposition brief, Defendants cite no case law except to argue that OJJ does not have "possession, custody or control" over many relevant documents, and they do not address the cases cited by Plaintiffs.

I. **Plaintiffs' Motion Complies with Local Rule 37.**

Plaintiffs complied with Local Rule 37 by tracking each disputed request covered by this motion to a specific Request for Production propounded on Defendants. Each numbered request for production was reproduced and attached to Plaintiff's Motion to Compel; Plaintiffs cite to those filed requests in this renewed motion.[14] The motion to compel therefore should not be denied for failure to comply with the rule. This Court has found that, regarding Rule 37, Plaintiffs may either "'quote verbatim' the discovery requests at issue" or "provide the Court with a copy of the discovery requests as an attachment to the Motion to Compel." *Murray v. LeBlanc*, No. CV 21-592-JWD-RLB, 2023 WL 3480877, at *2, 6 (M.D. La. May 16, 2023) (motion to compel denied in light of stay of discovery and where moving party did not comply with the Local Rule). Here, Plaintiffs attached the discovery requests to their Motion to Compel by attaching Defendants' responses and objections which reproduce verbatim each of Plaintiffs' 28 numbered requests. Notably, Defendants do not cite to any caselaw to support their Local Rule 37 argument.

II. **Discovery Related to Sight and Sound Separation, Juvenile Staffing, and the Programming and Punitive Characteristics of Jackson Parish Jail Is Relevant and Permissible Under the Court's Directives**.

Defendants misread the Magistrate Judge's Order allowing limited discovery into the features of the Jail – specifically for the purpose of the District Court's determination about whether it is indeed an adult facility—so as to preclude all discovery into the characteristics of the

---

[14] Doc. 337-2 at 5-28.

4

Jail.[15]  But it would make no sense for the language of that Order to mean both that (1) Plaintiffs may obtain discovery about whether the Jail is an adult facility when it confines youth and adults, and (2) that Plaintiffs may not obtain discovery about the features of the Jail that make it an adult facility and therefore legally inappropriate for confining youth adjudicated delinquent. The Court clarified that this discovery covers whether the Jail is an adult facility and, if a juvenile facility co-located with an adult Jail, whether it meets legal requirements for a co-located facility.[16]

It is undisputed that the Jail currently incarcerates adults and is staffed by Jackson Parish Sheriff's Office (JPSO) guards. It is therefore an adult jail under the JJDPA definition, despite Defendants' disingenuous attempt to limit that definition, as described above.[17] Certain characteristics of the Jail, set forth below, also make clear that youth in OJJ custody at the Jail experience an adult jail environment.  The Court has allowed discovery into sight and sound separation, monitoring of OJJ youth by OJJ trained staff, and "juvenile programming."[18]

**A. State DCFS April 2024 Inspection of Jail and Deficiency Findings**

A State inspection of the Jail and a subsequent Deficiency Report found deficiencies in each of these areas. In the weeks since Plaintiffs filed their renewed Motion to Compel on September 18, 2024, media outlets published documents directly relevant to youth being confined at the Jackson Parish Jail and to the question before this Court: a Deficiency Report following an inspection of the Jail and a letter to Jackson Parish Sheriff Andy Brown summarizing the failure to comply with legal requirements when confining children and requiring correction of the

---

[15] *See, e.g.,* Doc. 360 at 2.

[16] Doc. 353.

[17] 34 U.S.C. § 11103(22).

[18] Doc. 353 at 10, 13.

deficiencies.[19] These documents indicate that the Louisiana Department of Children and Family Services (DCFS) found in an April 2024 inspection that the Jail failed to meet required key compliance items for detaining juveniles.[20] DCFS found numerous deficiencies related to the question of whether this adult Jail is operating a juvenile unit that meets legal requirements. Those findings and deficiencies include: (i) a lack of sight and sound separation from adult detainees ("Requirements—If the facility is located in the same building or on the grounds of any type of adult jail lockup, or corrections facility, it shall be a separate, self-contained unit. All applicable federal and state laws pertaining to the separation of youth from adult inmates will apply. Deficiency—the juvenile section of the facility is not self-contained from the adult section");[21] (ii) insufficient staffing (citing the requirement that "[t]here shall be a minimum of 1 to 8 ratio of direct care staff to youth during the hours that youth are awake" and finding that the Jail failed to meet this requirement where a "specialist observed 17 residents in dorm C during awake time with only 1 staff member present.");[22] (iii) failure to provide juvenile programming including education (citing the requirement that the "provider shall ensure that youth are available for the minimum minutes in a school day required by law" and finding that "residents do not meet collectively as a group for school or in small groups … therefore, the residents are "not getting all required minutes

---

[19] *See,* Nick Chrastil, *Licensing a troubled juvenile jail*, The Lens (Oct. 1, 2024), https://thelensnola.org/2024/10/01/licensing-a-troubled-juvenile-jail/.

[20] 04/22/2024 Letter (with Statement of Deficiencies) from La. Dep't of Child. & Fam. Servs. to Sheriff Andy Brown, Director of Jackson Parish Jail (embedded in Chrastil, *Licensing a troubled juvenile jail*, supra; document available at https://www.documentcloud.org/documents/25177030-jpso-dcfs-licensing-documents#document/p27/a2591617). Plaintiffs acknowledge that DCFS does not license OJJ secure care facilities; however, their findings with regard to conditions for pre-trial detainees have direct bearing on the question of whether the Jail operates as an adult facility for the youth held there, regardless of disposition status.

[21] *Id.* at 19 (Sec. 7507.A.9).

[22] *Id.* at 6 (Sec. 7511.G.1-4 & G.6-10).

6

in a school day");[23] and (iv) finding that staff reported youth at the Jackson Jail can be kept in solitary confinement for up to 10 days, in violation of state law prohibiting isolation for longer than 72 hours.[24] The State's own licensing deficiency findings make it all the more important that the Court compel the State in this case to turn over documents relevant to whether OJJ is unlawfully confining youth in their custody at an adult facility or at a co-located facility that fails to ensure separation from adults, monitoring by trained juvenile justice specialists, and juvenile justice programming.

### B. Lack of Sight and Sound Separation

Evidence shows that the Jail lacks sight and sound separation between cells and dorms in which youth in OJJ custody are confined and those in which adults and youth in DOC custody are confined. For example, OJJ youth at the Jail reported that "[o]ther youths under 18 who are not housed in the adult dorms or in cells with adults reported they are around adults almost every day. When they are moved, they encounter adults in the hallway or in the cafeteria. Adults pass their cells on a regular basis, and they can see and/or hear them as they pass by."[25] The State itself found that "[t]he juvenile section of the facility is not self-contained from the adult section as, but with a staggered schedule per staff, they both use the following spaces: booking/holding, multi-purpose room for eating and meeting with counselor, nurse's office, and the rec yard section that has the basketball goal."[26] The DCFS deficiency report appears to cover all youth at the Jail,

---

[23] *Id.* at 12-13, *see also id.* at 33 (Sec. 7517.A).

[24] *Id.* at 11 (Sec. 7515.E.4.).

[25] Doc. 329-1 at 3.

[26] Apr. 22, 2024 Letter (with Statement of Deficiencies) from La. Dep't of Child. & Fam. Servs. to Sheriff Andy Brown, Director of Jackson Parish Jail at 19 (embedded in Chrastil, *Licensing a troubled juvenile jail*, supra; document available at https://www.documentcloud.org/documents/25177030-jpso-dcfs-licensing-documents#document/p27/a2591617).

7

including both youth remanded to the custody of OJJ (class members in this case) and youth detained pre-adjudication. There is no indication in the DCFS report, however, that class member youth in OJJ custody are held in areas where they do not see or hear adults incarcerated at the Jail.

### C. Lack of Monitoring by Juvenile Justice Specialists

Defendants entirely refuse to provide complete staffing information regarding the Jail. They have agreed to provide—but have not yet turned over—documents regarding any OJJ staff who are at the Jail. But even this information would not give the complete picture of who is overseeing OJJ youth at the Jail. Without the information concerning JPSO guards who oversee and monitor OJJ youth, the Court cannot know whether OJJ youth at the Jail are monitored by OJJ juvenile justice specialists, Jail guards specially trained by OJJ, or instead by adult Jail guards untrained to work with youth. And although Defendants continue to contend that they cannot require the Sheriff's Office to share this information with Defendants, their MOU with Sheriff Brown says exactly the opposite. The MOU gives OJJ and its designees "the right to access an OJJ youth's records *or other information related to youth housed under the agreement.*"[27] In their opposition brief to this motion, Defendants leave out the second part of the sentence, arguing in the face of clear language to the contrary, that youth records are the only documents they may require JPSO to turn over to OJJ.[28]

### D. Lack of Juvenile Justice Programming

The third area of inquiry this Court has designated is information about "juvenile programming" at the Jail.[29] Defendants misleadingly characterize the limited number of

---

[27] Doc. 337-4 at 3 (Memorandum of Understanding between OJJ and the Jackson Parish Sheriff's Office contracting to hold OJJ youth in custody at the Jail) (emphasis added).

[28] Doc. 360 at 12.

[29] Doc. 353 at 10.

programming areas on which Plaintiffs seek to compel production as "conditions" of confinement. But programming specific to and required for youth in OJJ custody includes education, counseling, and family visitation, among other things. Moreover, if members of the Plaintiff class are being held in cell confinement for long stretches of time and are disciplined with chemical spray, shock gloves or tasers, they are clearly not in required programming. Plaintiffs seek production regarding the absence of rehabilitative features and programs and the presence of punitive uses of force and isolation because they fall within the question of whether "juvenile programming" is adequately provided at the Jail. These features are also directly relevant to the baseline question of whether the Jail is an "adult prison" environment for OJJ youth. And the DCFS Inspection Division Deficiency Report bears out the concern. Last year, this Court reviewed similar evidence related to Angola before reaching the conclusion that it was unconstitutional in large part because of "the punitive atmosphere and systemic programming failures."[30]

Plaintiffs do not seek wide-ranging discovery about all conditions faced by the youth in OJJ custody held at the Jail, as Defendants contend. Instead, they heed the Court's instructions by confining the disputed discovery requests to information about the types of programming that must be offered by Defendants in order to create the legally-required rehabilitative environment for juveniles.[31] For example, documents responsive to Plaintiffs' requests for discovery related to "Youths' educational needs," "Youths' actual or potential receipt of social services," "Youths' access to family visitation," and "any form of self-harm by Youth" will allow the Court to determine whether the level of rehabilitative services received by youth at the Jail makes it a

---

[30] Doc. 267 at 2, *see id*. at 3 ("…such conditions and programming are required by law.").

[31] *Supra* note 22.

youth facility as opposed to an adult facility.[32]  When youth entitled to mental health, educational, and/or social services do not receive those services during their confinement at the Jail, this illustrates the punitive atmosphere of an adult facility rather than the rehabilitative atmosphere that a youth facility must have under the law.  Thus, discovery into these features is entirely relevant and proportional.  Plaintiffs' discovery requests do not exceed the Court's limitations and are in fact aligned with the Court's analysis of class certification and whether youth in OJJ custody are held in an adult facility like Angola.

### III. Discovery regarding Youth in OJJ Custody Held with Adults at the Jail is Relevant.

Defendants also object to any discovery into the fact that Defendants are confining children who remain in OJJ custody, but who have now been accused (but not convicted) of crimes as adults, in the cells and dorms of the Jail designated for adults, often in dormitories and group cells with much older men.[33] These youth are class members in this litigation, who are currently under a juvenile delinquency adjudication by a juvenile court judge and detained pursuant to a disposition to OJJ custody.  OJJ has not shown that their legal obligations to provide programming and services end when OJJ's custody is shared with another entity.  Additionally, Defendants incorrectly state that "it is unclear exactly what documents Plaintiffs seek in this Motion," although Plaintiffs' Request for Production dated March 26, 2024, quite specifically lists exactly what documents Plaintiffs seek.[34]

---

[32] Doc. 337-2 at 7.

[33] Doc. 360 at 13-14; Doc. 337-1 at 5.
[34] Doc. 360 at 13-14; *see, e.g.,* Doc. 337-2 at 8 (Request number 4 states "Any and all entrance and exit logs from the Angola Youth Facility, the Jackson Parish Jail, or any other Adult Prison Facility, sufficient to show the dates and times educational staff, counseling staff, Jackson Parish Sheriff's staff, DOC staff, and Youths' parents exited and entered each facility since September 15, 2022.").

**IV. Requests for Documents from Defendants' Agent are Relevant and Within the Scope of Discovery**

The Jackson Parish Sheriff is indisputably OJJ's agent, and so "documents in [the Jackson Parish Sheriff's] possession. . . are deemed to be in [Defendants'] possession because [they] retain[] control over the documents."[35] Notably, in their response, Defendants do not deny the obligation to produce their agent's documents, instead falling back on a false allegation that those documents are outside what OJJ's Memorandum of Understanding with the Sheriff provides.[36] Defendants do not dispute Plaintiffs' argument that the Memorandum of Understanding between the JPSO and OJJ to confine youth in OJJ custody gives OJJ and its designees "the right to access an OJJ youth's records *or other information related to youth* housed under the agreement."[37] And Defendants understand that Plaintiffs' requests are for their agent's documents related to separation from adults and staffing, along with solitary confinement, use of force and denial of family visitation for class members.[38] As explained above, those features of the Jail are covered by the Court's discovery limitation ruling and are highly relevant to the question of whether the Jail is an adult facility unlawfully holding youth in OJJ custody. Defendants' only argument is to ignore the words "other information related to youth" and focus solely on "youth[] records."[39] This is

---

[35] *Ntakirutimana v. CHS/Cmty. Health Sys., Inc.,* No. CV L-09-114, 2011 WL 13135608, at *1 (S.D. Tex. June 28, 2011) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litigation*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006) (quotation marks omitted)).

[36] Doc. 360 at 12.

[37] Doc. 337-4 at 3 (emphasis added).

[38] Doc. 360 at 9.

[39] Defendants write: "Plaintiffs are attempting to compel the production of floor plans, videotapes, JPSO staff schedules, JPSO staff training documents, JPSO entry/exit logs, and JPSO programming documents. None of that constitutes 'OJJ youth records.'" *Id.* at 12. They do not explain why these items do not constitute "other information related to youth."

11

unconvincing. Plaintiffs' have met their burden of proof in putting forward the MOU, which clearly covers "information related to youth" in addition to their OJJ records.

## CONCLUSION

For the reasons stated above and in Plaintiffs' Renewed Motion to Compel Discovery, Plaintiffs request that the Court require Defendants to produce all relevant discovery described above.

Respectfully Submitted, this 10th day of October, 2024.

*/S/: David J. Utter*
David J. Utter *
Louisiana Bar Number: 23236
William R. Claiborne **
Georgia Bar Number: 126363
The Claiborne Firm, P.C.
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
David@Clairbornefirm.com
Will@Claibornefirm.com

*/S/: Hector Linares*
Hector Linares
Louisiana Bar Number: 28857
Sara Godchaux
Louisiana Bar Number: 34561
Stuart H. Smith Law Clinic
Loyola University New Orleans College of Law
7214 St. Charles Avenue, Box 902
New Orleans, Louisiana 70118
(504) 861-5560 Telephone
(504) 861-5440 Facsimile
Halinare@Loyno.edu
Shgodcha@Loyno.edu

*/S/: David Shanies*
David Shanies **
New York Bar Number: 4471140
Shanies Law Office

*/S/: Christopher J. Murell*
Christopher J. Murell
Louisiana Bar Number: 32075
Meghan Matt
La. Bar No. 39975
Murell Law Firm
2831 St. Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 Telephone
(504) 233-6691 Facsimile
Chris@murell.law
meghan@murell.law

*/S/: Nancy Rosenbloom*
Nancy Rosenbloom **
New York Bar Number: 2168425
ACLU National Prison Project
125 Broad Street
New York, Ny 10004
Telephone: (212) 549-2500
Facsimile: (212) 549-2652
nrosenbloom@aclu.org

*/S/: Corene T. Kendrick*
Corene T. Kendrick**
Ca Bar No. 226642
ACLU National Prison Project
425 California St., Ste. 700
San Francisco, CA 94104
Telephone: (202) 393-4930
Facsimile: (202) 393-4931
Ckendrick@Aclu.org

12

110 West 40th Street, 10th Fl.
New York, New York 10018
Tel. (212) 951-1710
Fax (212) 951-1350
Cell (646) 515-2151
David@Shanieslaw.com

*/S/: Marisol J. Dominguez-Ruiz*
Marisol J. Dominguez-Ruiz**
ACLU National Prison Project
425 California St., Ste. 700
San Francisco, CA 94104
Telephone: (202) 393-4930
Facsimile: (202) 393-4931
Mdominguez-Ruiz@Aclu.org

*/S/ Susan M. Meyers*
Susan M. Meyers
Louisiana Bar Number: 29346
Lauren Winkler
Louisiana Bar Number: 39062
Ashley Dalton
Louisiana Bar Number: 40330
Southern Poverty Law Center
201 St. Charles Avenue, Suite 2000
New Orleans, La 70170
Telephone: 504-512-8649
susan.meyers@splcenter.org
lauren.winkler@splcenter.org
ashley.dalton@splcenter.org

\* *Lead Counsel*

\*\* Appearing *Pro Hac Vice*

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of October, 2024, a copy of the foregoing pleading was served upon all counsel of record by electronic transmission via the Court's CM/ECF system.

/s/ David J. Utter
DAVID J. UTTER