UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

**ALEX A., by and through his guardian,**　　　　　　　　　　**CIVIL ACTION**
**Molly Smith; BRIAN B.; and**
**CHARLES C., by and through his guardian,**　　　　　　　　**NO. 22-573-SDD-RLB**
**Kenione Rogers, individually and on behalf**
**of all others similarly situated**

**VERSUS**

**GOVERNOR JOHN BEL EDWARDS,**
**in his official capacity as Governor of Louisiana;**
**WILLIAM SOMMERS, in his official**
**capacity as Deputy Secretary of the**
**Office of Juvenile Justice,**
**JAMES M. LEBLANC, in his official capacity**
**as Secretary of the Louisiana Department**
**of Public Safety & Corrections**

## ORDER

Before the Court is Plaintiffs' Renewed Motion to Compel. (R. Doc. 358). The motion is opposed. (R. Doc. 360). Plaintiffs filed a Reply Memorandum. (R. Doc. 365). Defendants filed a Sur-reply Memorandum. (R. Doc. 368).

**I.　　Background**

This is a class action lawsuit pertaining to the transfer of certain juveniles in the custody of the Office of Juvenile Justice ("OJJ") to a facility located at the Louisiana State Penitentiary in Angola, Louisiana. The operative pleading in this action is the First Amended Class Action Complaint filed by Alex A., Brian B.,[1] and Charles C. (collectively, "Plaintiffs"), on behalf of themselves and others similarly situated, against Governor John Bel Edwards,[2] Deputy Secretary

---

[1] Brian B. is now deceased. (R. Doc. 162). Accordingly, Alex A. and Charles C. are the only remaining named "Plaintiffs" in this action.

[2] The current Governor of Louisiana, Jeff Landry, is substituted as defendant by operation of law. *See* Fed. R. Civ. P. 25(d).

of the OJJ Williams Sommers,[3] and the Secretary of the Louisiana Department of Public Safety & Corrections ("DOC") James M. LeBlanc (collectively, "Defendants"). (R. Doc. 96). Plaintiffs seek declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 for violation of the Fourteenth Amendment (Count I), declaratory and injunctive relief for violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Count II), and declaratory and injunctive relief for violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Count III). (R. Doc. 96 at 35-39).

On August 31, 2023, the district judge granted Plaintiffs' Motion for Class Certification, appointing the Plaintiffs as class representatives for the following class:

> [A]ll youth who are now or will be in the custody of OJJ who have been, might be, or will be transferred to the OJJ site (the "Transitional Treatment Unit" or "TTU") at Angola or another adult prison (the "Principal Class"), including a subclass of all current and future youth with disabilities within the meaning of the ADA and Section 504 of the Rehabilitation Act in the custody of OJJ who have been, might be, or will be transferred to the OJJ site at Angola or another adult prison (the "Disabilities Subclass").

(R. Doc. 243 at 8).[4] The district judge also designated Plaintiffs' counsel as Class Counsel under Rule 23(g) of the Federal Rules of Civil Procedure. (R. Doc. 243 at 21).

On September 8, 2023, the Court granted Plaintiffs' second motion for preliminary injunction, enjoining Defendants from "housing youth in Office of Juvenile Justice custody at BCCY-WF," ordering removal of the OJJ youth from BCCY-WF within one week. (R. Doc. 267 at 20). There is no dispute that Defendants then moved the OJJ youth from BCCY-WF to the

---

[3] The current Deputy Secretary of the OJJ, Kenneth Loftin, is substituted as defendant by operation of law. *See* Fed. R. Civ. P. 25(d).
[4] The district judge's ruling does not specifically define this class, which was proposed by Plaintiffs. Given that the district judge granted Plaintiffs' Motion for Class Certification, this proposed class definition is the governing class definition.

Jackson Parish Jail in Jonesboro, Louisiana, which is operated by the Jackson Parish Sheriff's Office ("JPSO"). (R. Doc. 271-6).[5]

On March 26, 2024, Plaintiffs served Defendants with their Third Requests for Production, in response to which the Defendants objected to the production of produce certain information regarding the Jackson Parish Jail. (*See* R. Doc. 337-2). After the parties met-and-conferred, Plaintiffs filed a Motion to Compel on June 14, 2024, seeking the production and preservation of documents responsive to Request for Productions Nos. 1-8, 10-12, 14-23, and 25-26. (R. Doc. 337).

Defendants subsequently filed a Motion to Dismiss, arguing that the action is moot, and no longer presents a case or controversy under Article III, because the youth under the secure care of the OJJ no longer face the possibility of being transferred to BCCY-WF. (R. Doc. 322). Defendants further asserted that the Jackson Parish Jail is not an "adult prison" for the purposes of the Class because it is a "collocated facility" under the Juvenile Justice Delinquency and Prevention Act ("JJDPA"), meaning that it is "a correctional facility that separately houses youth and adults in the same building or complex." (R. Doc. 322-1 at 11). *See* 34 U.S.C. § 11103(28) ("The term 'collocated facilities' means facilities that are located in the same building, or are part of a related complex of buildings located on the same grounds.").

On August 8, 2024, Defendants confirmed in a Status Report that while "there are no juveniles being housed at the Jackson Parish facility who were in OJJ's custody and then transferred by OJJ to the Jackson Parish facility for housing," the Jackson Parish Jail continues to house "(1) newly adjudicated juveniles who are pending placement at an OJJ secure care facility;

---

[5] Defendants refer to the specific location in which the youth are held as the "Jackson Parish juvenile facility." (*See* R. Doc. 271-6; R. Doc. 360 at 4-5, 8-9). Plaintiffs do not distinguish between the area in which the OJJ Youth are held and the remainder of the Jackson Parish Jail.

3

and (2) adult pre-trial detainees who are awaiting criminal trial but also have an active juvenile adjudication." (R. Doc. 344 at 2-3).

On September 4, 2024, the district judge denied Defendants' Motion to Dismiss, without prejudice to Defendants' right to refile once all OJJ youth are in OJJ secure care facilities or after the close of discovery. (R. Doc. 353). In so ruling, the district judge specifically stated the following:

> In the Court's view, the only issue that remains before the Court is whether any OJJ youth are being housed in an adult prison or in a juvenile facility where they are exposed to adult inmates and/or lack juvenile justice programming at the facility as required by law. If OJJ youth are being detained at a juvenile facility in Jackson Parish that is collocated with an adult prison, this does not necessarily violate the law. Federal law contemplates the existence of "collocated facilities" and requires that individuals who work with both juveniles and adult inmates be trained and certified to work with juveniles. This distinction derives from the different objectives of an adult penal incarceration and a rehabilitation-focused juvenile detention.

(R. Doc. 353 at 5). The district judge specifically allowed "limited, narrowly tailored discovery" to proceed on "whether OJJ youth are improperly being held in an adult facility and/or whether OJJ youth held in the collocated juvenile facility are nevertheless being exposed to adult inmates or lacking monitoring by OJJ juvenile justice specialists." (R. Doc. 353 at 13). Accordingly, the district judge's ruling does not pertain to discovery regarding adult pre-trial detainees who are awaiting criminal trial but also have an active juvenile adjudication.[6] The ruling only pertains to discovery pertaining to newly adjudicated juveniles who are pending placement at an OJJ secure care facility, *i.e.* "OJJ youth."[7]

---

[6] In their Status Report, Defendants represented that "[t]here are currently fourteen (14) individuals housed in the Jackson Parish Jail who (a) are adults, (b) have been arrested on adult charges, (c) are being held as pretrial detainees, and (d) have active juvenile adjudications." (R. Doc. 344 at 4).

[7] In their Status Report, Defendants represented that "there are eight (8) juveniles being housed in the juvenile unit of the Jackson Parish Jail who (a) have been adjudicated as delinquent and (b) are awaiting placement at an appropriate OJJ secure care facility." (R. Do. 344 at 3).

4

Based on the foregoing, the undersigned denied the pending discovery motions, without prejudice to refile, after the parties met-and-conferred with respect to whether, and to what extent, the disputed discovery falls within the limited scope of discovery allowed by the district judge's ruling or the relief sought is otherwise moot in light of the district judge's ruling.

On September 18, 2024, Plaintiffs filed the instant Renewed Motion to Compel. (R. Doc. 358). Plaintiffs represent that while Defendants have agreed to produce certain documents regarding the Jackson Parish Jail, as of the filing of the instant motion, "Defendants have only produced the Memorandum of Understanding between OJJ and JPSO [and] rosters listing names (but not locations or other information) of OJJ youth held at the [Jackson Parish] Jail." (R. Doc. 358-1 at 6). Plaintiffs now seek an order compelling Defendants to produce certain documents and electronically stored information ("ESI"), preserve certain documents and ESI, and permit an expert site inspection of the Jackson Parish Jail. (*See* R. Doc. 358-1 at 19).[8]

## II.    Law and Analysis

### A.    General Legal Standards for Discovery

"Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P.

---

[8] In their reply memorandum, Plaintiffs raise new arguments regarding a report by the Louisiana Department of Children & Family Services ("DCFS") and reporting from media outlets. (R. Doc. 365). The Court does not find these arguments relevant to the issue of whether Plaintiffs are entitled to the limited discovery allowed by the district judge's ruling.

5

26(b)(1). The court must limit the frequency or extent of discovery if it determines that: "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).

"The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Rule 26(c)'s "good cause" requirement indicates that the party seeking a protective order has the burden "to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) (quoting *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978)).

  **B. Analysis**

    **1. Non-Compliance with Local Rule 37**

As an initial matter, Defendants argue that Plaintiffs' Renewed Motion to Compel should be denied for failure to comply with Local Rule 37. (R. Doc. 360 at 7-8). Local Rule 37 provides that discovery motions "must quote verbatim each interrogatory, request for production, or request for admission to which the motion is addressed, followed immediately by the verbatim response or objection which provided thereto." LR 37.

In their Renewed Motion to Compel, Plaintiffs did not quote verbatim the discovery requests and responses at issue as required by Local Rule 37. Furthermore, contrary to their assertion otherwise, Plaintiffs <u>did not</u> attach a copy of the underlying discovery requests and

responses at issue as an exhibit to their instant Renewed Motion to Compel. (*See* R. Doc. 365 at 4). At any rate, the instant Renewed Motion to Compel does not present the situation (such as where the opposing party fails to completely respond to discovery requests) where providing a complete copy of the discovery requests and responses at issue may be appropriate in lieu of strict compliance with Local Rule 37. *See Murray v. LeBlanc*, No. 21-592, 2023 WL 3480877, at *2 (M.D. La. May 16, 2023).

Here, Plaintiffs generally seek documents to determine whether the areas in which the youth are confined within the Jackson Parish Jail constitute an adult prison or whether the youth are being exposed to adult detainees by sight or sound. (R. Doc. 358-1 at 10-12). Plaintiffs also seek the production of documents demonstrating whether and to what extent (1) the youth are receiving monitoring by OJJ juvenile justice specialists, (2) the youth are receiving juvenile justice programming as required by law; and (3) the use of force by JSPSO employees and/or any OJJ staff. (R. Doc. 358-1 at 13-16). The Court's review of the record indicates that Plaintiffs are seeking this information pursuant to Requests for Production Nos. 1, 3, 6, 11 14, 16-21, 25-26. One of the problems raised by Plaintiffs' Renewed Motion to Compel is that several of these documents overlap. The instant Renewed Motion to Compel often does not specify which of the document requests and responses correlates to Plaintiffs' arguments.

Plaintiffs' lack of compliance with Local Rule 37 has delayed the Court's resolution of the instant motion. That said, Plaintiffs' original Motion to Compel raised issues with respect to Requests for Production Nos. 1-8, 10-12, 14-23, 25-26, which encompasses the requests for production at issue here. (*See* R. Doc. 337-1 at 4 n.17). Furthermore, Plaintiffs' original Motion to Compel attached a copy of Defendants' Objections and Responses, which restated the underlying requests for production. (R. Doc. 337-2).

Given the record, the Court will proceed with the merits of the instant motion. Plaintiffs' counsel are directed to comply with Local Rule 37 with respect to any future discovery motion (including renewed motions to compel) filed in this district.

## 2. Areas of Confinement and Exposure to Adult Inmates

Plaintiffs seek documents pursuant to Request for Production No. 1, which seeks, in relevant part, documents related to the "actual or potential placement of any member of the Plaintiff class" at the Jackson Parish Jail since September 1, 2022. (R. Doc. 337-2 at 5). Defendants objected to the request, in relevant part, "to the extent it seeks documents concerning youth assigned to or conditions of confinement at the juvenile facility at Jackson Parish." (R. Doc. 337-2 at 5-6).

In addition, Plaintiffs seek documents pursuant to Request for Production No. 14, which seeks the following:

> Any and all documents concerning features of the cells and other areas at the Jackson Parish Jail in which Youth in OJJ custody have been and are being confined. These shall include but not be limited to: (a) floor plans or other diagrams of cells and dorms in which Youth have been held; (b) staffing schedules, titles of staff, and staff and supervisory shifts for all Jackson Parish Sheriff's office staff who are assigned to work in what is designated the OJJ or juvenile area of the Jackson Parish Jail and for all OJJ personnel who are assigned to work there; (c) documents indicating the distance and any sight and sound barriers between the OJJ or juvenile area of the Jackson Parish Jail and areas of that Jail in which adults (aged 18 and over) are detained; (d) photographs of the areas at the Jackson Parish Jail in which Youth have been or are confined, and any areas through which those Youth walk or are transported; and (e) records sufficient to show the number of youth held in each cell or other area, disaggregated by cell, race, and age, as of September 15, 2023 and the date of this response.

(R. Doc. 337-2 at 17). Subject to various objections, including relevance, proportionality, and lack of possession, Defendants represented that they "will conduct a reasonably diligent review

8

of their records and will produce the relevant and responsive documents in their possession, if any, that are responsive to sub-parts (a), (c), (d), and the relevant portion of (e) of this Request." (R. Doc. 337-2 at 18).

Plaintiffs represent that "Defendants have produced only periodic rosters containing the names of youth in OJJ's custody" at the Jackson Parish Jail, but those rosters do not provide sufficient information "to show the number of youth held in each cell or other area, disaggregated by cell, race, and age," and do not otherwise identify in which cells, dorms or units the youth are held, which of the areas also hold adult detainees, or whether they are co-located, across the hallway from adult units, or separate." (R. Doc. 358-1 at 11). Plaintiffs further represent that "Defendants have now agreed to provide limited information about identities and training and/or certification to work with youth—presumably limited to OJJ employees because of Defendants' sweeping objection regarding information in JPSO's possession—but do not agree to produce information about how many hours per day if any, OJJ staff are in the Jail, what their job responsibilities are, and whether JPSO personnel are instead assigned to the tasks of monitoring OJJ youth." (R. Doc. 358-1 at 11). Finally, Plaintiffs represent that "Defendants have not produced any such floor plans or diagrams, or any information indicating distance of youth from adults nor of sight and sound barriers," claiming those documents are in JPSO's possession. (R. Doc. 358-1 at 12).

Consistent with the district judge's ruling, the Court generally finds the documents in Request for Production Nos. 1 and 14 to fall within the scope of limited discovery allowed by the district judge. In particular, floor plans and staffing assignments are relevant to whether and to what extent the OJJ youth are being inappropriately held in a section of the Jackson Parish Jail that is designated for adults, are being improperly exposed to adult inmates, or otherwise lack

9

monitoring by OJJ juvenile justice specialists. Accordingly, Defendants must supplement their responses to Request for Production No. 1 and Request for Production No. 14 and provide all responsive documents within their possession, custody, or control.

Defendants represent that they "have produced the relevant, responsive documents that are within their possession, custody, or control," specifically asserting that they do not have "control" over JPSO documents. (R. Doc. 360 at 11-12). To the extent Defendants have withheld documents and ESI in their actual possession or custody responsive to Request for Production Nos. 1 and 14, they must produce these documents and ESI. The Court will address the issue of "control" over JPSO documents for the purposes of Rule 34 below.

### 3. Monitoring by OJJ Juvenile Specialists and/or JPSO Staff

With respect to documents and information regarding monitoring by OJJ juvenile specialists, Plaintiffs seek documents "indicating staffing levels, hours, and assignments of all personnel who come into contact with class members at the Jail, in order to ascertain whether and how often OJJ youth in each area of the Jail are overseen by OJJ juvenile justice specialists, or JPSO guards without training to work with juveniles." (R. Doc. 58-1 at 13). Plaintiffs state that this information is sought pursuant to Request for Production No. 16-18.[9] Plaintiffs note that

---

[9] Request for Production No. 16 ("Organizational charts for all offices, units, or subdivisions of the Jackson Parish Jail facility used by OJJ, including lists of all OJJ and Jackson Sheriff's Office positions within such offices, units, or subdivisions and the person and qualifications or that person occupying each position. This information shall be provided as of September 15, 2023 and as of the date of response to this Request."); Request for Production No. 17 ("Documents sufficient to show the duties, responsibilities, and qualifications associated with each job classification related to (a) the management or oversight of security at the Jackson Parish Jail and (b) the provision of education services at the Jackson Parish Jail, including but not limited to special education services, for Youth in OJJ custody."); and Request for Production No. 18 ("All documents and communications relating to, and/or describing, actual OJJ staffing and staffing levels at the Jackson Parish Jail as of September 15, 2023 and as of the date of response to this Request, including, but not limited to: a) the current number of staff, by role, including whether each staff line is full time or part time and whether each staff line is located on-site; b) the budget to hire staff, by role; c) the number of staff required for staffing to be considered complete, by role; and, d) the number of positions unfilled, by role. Staff roles include, but are not limited to, the following positions: i) Juvenile Justice Specialists (JJSs); ii) education staff, including teachers, special education teachers, specialists, classroom assistants; iii) social workers; iv) directorial and managerial staff, including the facility deputy director and facility assistant director. Include any

Defendants have agreed to provide "the identities and training of the staff at Jackson Parish who worked with the juveniles being housed there" and documents that "demonstrate the training and/or certification of these individuals to work with juveniles." (R. Doc. 358-1 at 13; *see* R. Doc. 358-2).

To be clear, the district judge specifically allowed "limited, narrowly tailored discovery" to proceed on "whether OJJ youth are improperly being held in an adult facility and/or whether OJJ youth held in the collocated juvenile facility are nevertheless being exposed to adult inmates or **lacking monitoring by OJJ juvenile justice specialists**." (R. Doc. 353 at 13) (emphasis added). Accordingly, documents related to whether and to what extent OJJ juvenile specialists and/or JPSO staff are monitoring youths confined to the Jackson Parish Jail generally falls within the scope of discovery allowed by the district judge.

It appears that the only remaining dispute raised in the instant motion with respect to monitoring by OJJ juvenile specialists is whether the Court should order Defendants to produce documents regarding JPSO staff, including documents sought pursuant to Request for Production No. 14(b). Again, the Court will discuss the issue of whether Defendants have "control" of JPSO documents for the purposes of Rule 34 below.[10]

### 4. Juvenile Justice Programming

Plaintiffs also seek documents regarding juvenile justice programming, "including education and special education services, recreation, counseling and rehabilitative services, medical and mental health services, and family visitation." (R. Doc. 358-1 at 13). This

---

and all operation reports or other documents discussing current vacancies as of the date of the response."). (*See* R. Doc. 337-2 at 19-21).

[10] It appears that Plaintiffs are satisfied that Defendants have produced (or will produce) all responsive documents with respect to the monitoring of juveniles by OJJ juvenile justice specialists. The Motion does not seek any other specific documents in response to Requests for Productions Nos 16-18 other than documents regarding JPSO staff, which Defendants argue are not in their possession, custody, or control.

information is sought pursuant to Request for Production Nos. 19-21 and 25-26.[11] Defendants originally objected to these document requests on various grounds, including "to the extent" the requests seek "documents concerning conditions of confinement at the juvenile facility at Jackson Parish and on the grounds that this Request is not limited to whether the Jackson Parish juvenile unit is an 'adult prison' or whether it is operating as a TTU." (*See* R. Doc. 337-2 at 21-23, 25-27).

Defendants argue that documents related to juvenile justice programing do not fall under the three topics for limited discovery identified by the district judge (*i.e.*, whether the location in which the OJJ youth are held an adult prison, whether there is sight and sound separation between the OJJ youth and adult detainees, and whether OJJ youth are being monitored by OJJ juvenile specialists. (R. Doc. 360 at 8) (citing R. Doc. 353 at 13). But in denying Defendants' motion to dismiss, the district judge specifically concluded that "[t]he only issue that remains

---

[11] *See* Request for Production No.19 ("Any and all documents and communications reflecting lesson plans, curriculum, and educational instruction in core subjects, technology, electives, vocational courses, literacy, and social emotional learning provided at the Jackson Parish Jail. This information shall be provided as of the date of this response."); Request for Production No. 20 ("Any agreements with the Louisiana Special School District (SSD) and/or any other state agencies to provide teachers, resources, and services at the Jackson Parish Jail to children with disabilities in the certified Plaintiff subclass and any other current and future youths with special educational needs, including but not limited to, all current and future youths with disabilities within the meaning of the ADA and Section 504 of the Rehabilitation Act."); Request for Production No. 21 ("All documents and communications describing the range of mental health, medical care, healthcare, emergency, disability-related services and other services offered by providers with whom OJJ has contracted or will contract to provide care to youths at the Jackson Parish Jail as of the date of response to this request."); Request for Production No. 25 ("Any and all documents showing family and guardian visitation allowed to and experienced by youth held at the Jackson Parish Jail since September 15, 2023, including phone calls, video/Zoom calls, and in-person visits, including documents showing the dates on which each type of visitation has been or will be provided; what categories of people are permitted to visit; how often, on what days, at what times, and the duration of each type of visit; how youth or families/guardians may request visits; the criteria upon which visits are allowed or denied; the staff members involved in facilitating family and guardian visits, and records of such facilitation; the number of family and guardian visits that occurred each month; the number of family and guardian visits that were denied each month and the reasons for denial; and the numbers of non-legal phone calls, video/Zoom calls, and in-person visits for each Youth held at the Jackson Parish Jail."); and Request for Production No. 26 ("Any and all documents and communications showing policies, practices and measures taken since October 17, 2022 to provide both indoor and outdoor recreation to youth held at the Jackson Parish Jail, including construction, building, ordering of equipment and supplies, dates of completion or provision of equipment and supplies, staffing, hours, variation in hours related to youth behavior including but not limited to disciplinary or behavior intervention measures, and the recreation facilities, supplies and hours available to youth held at the Jackson Parish Jail as of the date of response to this request."). (*See* R. Doc. 337-2 at 21-23, 25-27).

before the Court is whether any OJJ youth are being housed in an adult prison or in a juvenile facility where they are exposed to adult inmates and/or **lack juvenile justice programming** at the facility as required by law." (R. Doc. 353 at 10) (emphasis added). The JJPDA requires the State to "provide for the coordination and maximum utilization of evidence-based and promising juvenile delinquency programs, programs operated by public and private agencies and organizations, and other related programs (such as education, special education, recreation, health, and welfare programs) in the State." 34 U.S.C. § 11133(a)(8).

Accordingly, the Court overrules Defendants' objections that documents related to the presence or absence of juvenile justice programming fall outside of the scope of discovery. The district judge specifically stated that juvenile justice programming at the Jackson Parish Jail is a remaining issue in this lawsuit. Furthermore, such information is relevant for determining whether the youth at issue are being held in an "adult prison" for the purposes of the class definition. The Court rejects Defendants' argument that the Jackson Parish Jail cannot be categorized as an "adult prison" because it houses OJJ youth. The very failure to separate youth from adults in a correctional facility, as well as the failure to provide required juvenile justice programming, would support a finding that the facility is, in fact, operating (for all practical purposes) as an "adult prison" that is improperly housing OJJ youth.[12]

---

[12] To be clear, the term "adult prison" is not defined by either the class definition or federal law. The JJDPA provides, however, that "the term "jail or lockup for adults" means a secure facility that is used by a State, unit of local government, or law enforcement authority to detain or confine adult inmates." 34 U.S.C. § 11103(22). The JJPDA also provides that a juvenile may be held in a "secure detention facility" or "secure correctional facility." 34 U.S.C. § 11103(12)-(13). A juvenile may only be detained or confined in a "jail or lockup for adults" under limited circumstances. *See* 34 U.S.C. § 11133(a)(11), (13). Generally, juveniles shall "not be detained or confined in any institution in which they have sight or sound contact with adult inmates" and there must be "a policy that requires individuals who work with both such juveniles and such adult inmates, including in collocated facilities, have been trained and certified to work with juveniles." *See* 34 U.S.C. § 11133(a)(12).

13

### 5. Use of Force

Finally, Plaintiffs seek documents "concerning uses of force by JPSO employees and/or any OJJ staff who are on site at the Jail." (R. Doc 358-1 at 14-21). This information is sought pursuant to Request for Production Nos. 3, 6, and 11.[13] Among other things, Defendants objected to these document requests for lack of relevance. (*See* R. Doc. 337-2 at 7-8, 10-11, 14-15).

Plaintiffs appear to argue that because improper "use of force" is inconsistent with "juvenile justice programming," the use of force is discoverable in this action. Plaintiffs argue that because discovery with respect to juvenile justice programming is relevant to the rehabilitative goal of a juvenile facility, whereas the use of force (such as the improper use of mace, handcuffs, tasers and shock gloves) indicate the existence of a punitive, adult facility. (R. Doc. 358-1 at 15).

General discovery regarding unlawful conditions of confinement, such as improper use of force at the Jackson Parish Jail, falls outside of the scope of discovery. (*See* R. Doc. 353 at 12) ("The Court agrees with Defendants that this case is not about conditions of confinement at any facility other than BCCY-WF."). That said, and as discussed above, the Court will allow Plaintiff to proceed with limited discovery regarding the presence or absence of monitoring by OJJ

---

[13] *See* Request for Production No. 3 ("All Documents, including Your Communications, regarding the conditions in the Angola Youth Facility or any other Adult Prison Facility, including the Jackson Parish Jail, in which You have held or confined, or plan to hold or confine any Youth in custody since September 1, 2022, including but not limited to : (a) Youths' physical and/or mental health, (b) Youths' safety, (c) Youths' educational needs, (d) Youths' actual or potential receipt of social services, (e) Youths' recreation needs, (f) any and all uses of force against any Youth, (g) any form of self-harm by any Youth, (h) adequate staffing or the lack thereof (including, but not limited to, security staff, medical staff, mental health staff, social services staff, teaching staff, and agreements between Defendants and the Jackson Sheriff's office or any other custodial entity in Louisiana to hold Youth in OJJ's custody), and (i) Youths' access to family visitation, by telephone, video, and in person."); Request for Production No. 6 ("All video data not previously produced in this litigation, recorded by any camera . . . at the Angola Youth Facility, the Jackson Parish Jail, or any other Adult Prison Facility, in which You have held or will hold any Youth in custody concerning any Use of Force against any Plaintiff or any other Youth in Your custody, since October 15, 2022."); and Request for Production No. 11 ("All use of force and incident reports created as the result of any force used on any youth at the Jackson Parish Jail in OJJ custody or dual custody of OJJ and any other jurisdiction."). (*See* R. Doc. 337-2 at 7, 10, 14).

juvenile specialists and juvenile justice programming, which are relevant "issues of confinement" on which the district judge allowed discovery to proceed. (R. Doc. 353 at 13). In sum, Defendants' objections to Request for Production Nos. 3, 6, and 11 based on relevancy are sustained to the extent these document requests specifically seek information regarding the improper use of force. Defendants must otherwise produce responsive documents relevant to monitoring by OJJ juvenile specialists and juvenile justice programming as discussed above.

### 6. JPSO Documents

Defendants represent that they have "produced the relevant, responsive documents that are within their possession, custody or control." (R. Doc. 360 at 12). To the extent Defendants have withheld documents in their possession, custody, or control inconsistent with the terms of this Order, they must produce those documents to Plaintiffs within 14 days of the date of this Order, or as otherwise agreed upon by the parties.

The Court recognizes, however, that there remains a dispute between the parties as to whether Defendants have "control" over JPSO documents. Defendants represent that JPSO documents (such as "floor plans, videotapes, JPSO staff schedules, JPSO staff training documents, JPSO entry/exit logs, and JPSO programming documents") are not "OJJ youth records" and, therefore, not in Defendants' "possession, custody, or control" for the purposes of Rule 34. (R. Doc. 360 at 11-12). Defendants maintain that while they have agreed to ask JPSO to voluntarily produce responsive documents, Defendants do not have possession, custody, or control over the JPSO documents. (R. Doc. 360 at 12).

Rule 34 requires that a responding party produce responsive documents that are within their "possession, custody or control." Fed. R. Civ. P. 34(a)(1). Documents are deemed to be within the "possession, custody or control" of a responding party if that party either has "actual

15

possession, custody or control" of the documents or if that party "has the legal right to obtain the documents on demand or has the practical ability to obtain the documents from a non-party to the action." *Estate of Monroe v. Bottle Rock Power Corp.,* No. 03-2682, 2004 WL 737463, at * 10 (E.D. La. Apr. 2, 2004). "Rule 34 is broadly construed and documents within a party's control are subject to discovery, even if owned by a nonparty." *Id.* (citing *Commerce and Industry Ins. Co. v. Grinnell Corp.,* Nos. 97–0775, 97–0803, 98–2200, 2001 WL 96337, at *3 (E.D. La. Feb. 1, 2001)). The burden, however, is on the party seeking discovery to make a showing that the other party has control over the documents sought. *Id.* Typically, what must be shown to establish control over documents in the possession of a non-party is that there is "a relationship, either because of some affiliation, employment or statute, such that a party is able to command release of certain documents by the non-party person or entity in actual possession." *Id.; see also Shell Global Solutions (US) Inc. v. RMS Engineering, Inc.,* No. 09-3778, 2011 WL 3418396 (S.D. Tex. Aug. 3, 2011) ("Among the factors used by courts to determine whether one corporation may be deemed under control of another corporation are: (a) commonality of ownership, (b) exchange or intermingling of directors, officers or employees of the two corporations, (c) exchange of documents between the corporations in the ordinary course of business, (d) any benefit or involvement of the nonparty corporation in the transaction, and (e) involvement of the non-party corporation in the litigation.").

Plaintiffs argue that the JPSO documents at issue are in Defendants' control in light of the Memorandum of Understanding ("MOU") entered between Defendants and the JPSO. (R. Doc. 358-1 at 16; *see* R. Doc. 337-4). The MOU states that the arrangement to house OJJ youths at the Jackson Parish Jail between OJJ and the JPSO "does not limit OJJ or any authorized representative of OJJ the right to access an OJJ youth's records *or other information related to*

16

*youth housed under the agreement.*" (R. Doc. 337-4 at 3) (emphasis added). Plaintiffs argue that, in addition to JPSO being an agent of the OJJ, the phrase "or other information related to youth housed" signifies that Defendants have a legal right and practical ability to produce all documents "related to youth housed" at the Jackson Parish Jail. (R. Doc. 358-1 at 17).

The Court need not determine whether JPSO is an "agent" of the OJJ for the purposes of concluding that the OJJ has "control" of JPSO documents to the extent they pertain to the OJJ's care and custody of OJJ youth housed at the Jackson Parish Jail. The MOU specifically provides that OJJ the right "to access an OJJ youth's records or other information related to youth housed under the agreement." (R. Doc. 337-4 at 3). Given the language of the MOU, the OJJ has the right to obtain JPSO documents to the extent they pertain to the housing of OJJ youth at the Jackson Parish Jail. Accordingly, to the extent the Court has held above that these documents fall within the limited scope of discovery allowed by the district judge, Defendants must present this Order to the JPSO, obtain the responsive documents, and produce those documents to Plaintiffs.

### 7.     Preservation of Documents

It appears that Plaintiffs are seeking an order, pursuant to Rule 37, generally compelling Defendants to preserve certain documents and ESI, including video footage. (*See* R. Doc. 358-1).

A party must preserve materials that it reasonably knows or can foresee would be material to a legal or potential legal action. *Consolidated Aluminum Corp. v. Alcoa, Inc.,* 244 F.R.D. 335, 339 (M.D. La. 2006). The duty to preserve material evidence arises not only during litigation, but also during the period before litigation when a party knew or should have known that litigation was imminent. It does not depend on a court order. *See Condrey v. SunTrust Bank of Ga.,* 431 F.3d 191, 203 (5th Cir.2003). If a party intentionally destroys evidence, the court has the discretion to impose sanctions. Severe sanctions may include "granting default judgment,

striking pleadings, or giving adverse inference instructions." *Equal Employment Opportunity Comm'n v. Resources for Human Development (RHD)*, 843 F.Supp.2d 670, 672 (E.D. La.2012).

Rule 37 specifically provides for the issuance of appropriate sanctions for a party's failure to preserve electronically stored information. *See* Fed. R. Civ. P. 37(e). *See Owens v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, 695 F. Supp. 3d 750, 754 (M.D. La. 2023) ("The rule governing spoliation of ESI provides a clear directive for deciding whether and which sanctions can be imposed on a party that fails to preserve ESI."). Rule 37 does not, however, create a new duty to preserve documents or ESI. *See* Fed. R. Civ. P. 37(e), Advisory Committee Note to the 2015 Amendment ("The new rule applies only if the lost information should have been preserved in the anticipation or conduct of litigation and the party failed to take reasonable steps to preserve it. Many court decisions hold that potential litigants have a duty to preserve relevant information when litigation is reasonably foreseeable. Rule 37(e) is based on this common-law duty; it does not attempt to create a new duty to preserve. The rule does not apply when information is lost before a duty to preserve arises."). The Court will not otherwise "compel" Defendants to prospectively preserve documents or ESI.

Based on the foregoing, the Court will not issue an order compelling Defendants to "preserve" documents or ESI pursuant to Rule 37. The Court also finds no basis to issue any sanctions pursuant to Rule 37(e) based on the instant motion. The parties are reminded, however, that they are under a continuing duty to supplement disclosures and responses. *See* Fed. R. Civ. P. 26(e). Furthermore, Defendants must "preserve" documents and ESI in the sense that they must collect and produce documents and ESI as required by this Order.

### 8.     **Expert Site Inspection**

Plaintiffs assert that they "maintain that they continue to require the noticed inspection by their expert Dr. Patrick McCarthy so that he may inspect the physical characteristics of the Jail and the staffing for youth in OJJ custody . . . because Defendants have not produced floor plans, staffing assignments or any other relevant documents" regarding "sight and sound separation" or whether the OJJ youth are being monitored by OJJ staff or JPSO guards. (R. Doc. 358-1 at 2).

The issue of Plaintiffs' proposed expert site inspection arose in the context of Defendants' Motion for Protective Order (*see* R. Doc. 345), not Plaintiffs' initial Motion to Compel. In response to the Motion for Protective Order, Plaintiffs conceded that their pending request for entry and inspection is expired and moot. (*See* R. Doc. 350 at 1). Plaintiffs also represent, in support of the current Renewed Motion to Compel, that "[t]his inspection will not be necessary if sufficient documentation is produced" on issues relevant to the limited discovery allowed by the district judge. (R. Doc. 358-1 at 2).

This Order requires Defendants to produce certain documents regarding the physical characteristics of the Jackson Parish Jail, including the cells in which the OJJ youth are being held, the cells in which adult inmates are being held, the locations accessible to both OJJ youth and adult inmates, and the staffing at the Jackson Parish Jail. Accordingly, the Court will not compel an expert site inspection at this time. Furthermore, any site inspection of the Jackson Parish Jail will require access to both areas in which the OJJ youth are held and areas in which only adults are held. To the extent Plaintiffs again seek to conduct an expert site inspection after receipt and review of the documents ordered to be produced by this Order, Plaintiffs must attempt to reach an agreement with both Defendants and the JPSO and, to the extent necessary, seek entry into the Jackson Parish Jail through a subsequent court order.

**III.    Conclusion**

Based on the foregoing,

**IT IS ORDERED** that Plaintiffs' Renewed Motion to Compel (R. Doc. 358) is **GRANTED IN PART and DENIED IN PART.** Defendants must produce to Plaintiffs documents and ESI, consistent with the terms of this Order, within 14 days of the date of this Order, or as otherwise agreed upon by the parties. The parties shall bear their own costs.

Signed in Baton Rouge, Louisiana, on January 21, 2025.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**